**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER ON MARCH 15, 2018, AT 2:00 P.M. (CT) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"): [2]

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and "Final Order," respectively), (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (collectively as described in sub-clauses (i) and (ii), the "Employee Obligations") and (b) granting related relief.

**I. Interim Order.**

2. To minimize disruption to the Debtors' business, the Debtors request the authority to make the following payments related to the Employee Obligations that come due during the period between the Petition Date (as defined herein) and entry of the Final Order (the "Interim Period") in an aggregate amount of approximately $38.9 million and to continue to honor the programs associated with such Employee Obligations in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures; *provided*, *however*, that no individual holder of a priority claim under section 507(a)(4) of the Bankruptcy Code will receive in the aggregate a payment in excess of $12,850 on account of such claim.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Brian Coleman, Senior Vice President and Treasurer of iHeartMedia, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

3. To enable the Debtors to carry out the relief requested, the Debtors request that the Court (a) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic fund transfer requests made by the Debtors related to the Employee Obligations, whether such checks were presented or electronic fund transfer requests were submitted before or after the date hereof and (b) modify the automatic stay to the extent necessary to permit the relief requested in this Motion with respect to the Debtors' Workers' Compensation Programs (as defined herein).

## II. The Final Order.

4. In addition, at the final hearing, the Debtors will seek entry of the Final Order authorizing the Debtors to continue to honor the Employee Programs associated with the following Employee Obligations in the ordinary course of business and in a manner consistent with the Debtors' prepetition policies and to honor, pay, satisfy, or remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs all prepetition amounts outstanding on account of the following Employee Obligations in an aggregate amount of approximately $63.3 million (which amount includes all amounts requested in the Interim Order), including amounts owed to individual holders of claims with respect to such Employee Obligations in excess of $12,850:

| Relief Sought | Interim Amount | Final Amount |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages | $6.25 million | $6.25 million |
| Unpaid Commissions | $4.9 million | $4.9 million |
| Unpaid Temporary Staff Compensation | $5.4 million | $6.8 million |
| Unpaid Withholding Obligations | $2.8 million | $2.8 million |
| **Employee Benefit Programs** | | |
| Health Insurance Benefits | $12.1 million | $15.0 million |
| Life and AD&D Insurance | $N/A | $N/A |
| Disability Benefits | $N/A | $N/A |
| Workers' Compensation Programs | $N/A | $N/A |
| 401(k) Matching Contribution | $890,000 | $890,000 |

| Relief Sought | Interim Amount | Final Amount |
|---|---|---|
| Employee Assistance Program | $N/A | $N/A |
| **Non-Insider Specialized Employee Incentive Plans** | | |
| Programming Bonuses | $N/A | $470,000 |
| Sales Bonuses | $N/A | $14.4 million |
| Other Bonuses | $N/A | $310,000 |
| **Deferred Compensation Plan** | | |
| Deferred Compensation Plan | $N/A | $13,000 |
| **Other Obligations** | | |
| Reimbursable Expenses | $6.5 million | $6.5 million |
| Non-Insider Severance Programs | $N/A | $4.9 million |
| Miscellaneous Employee Benefits | $N/A | $N/A |
| **Unions** | | |
| Union Dues | $N/A | $N/A |
| Union Severance | $N/A | $100,000 |
| **TOTAL** | $38.9 million | $63.3 million |

5. In addition, the Debtors seek authority, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue the same Employee Programs permitted in the Interim Order.

**Jurisdiction and Venue**

6. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges (District Court General Order 2012-6)*, dated May 24, 2012 (the "Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), 541, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy

Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

9. iHeartMedia, Inc. ("iHeart") and its direct and indirect Debtor and non-Debtor subsidiaries are a diversified media and entertainment business headquartered in San Antonio, Texas, with approximately 17,000 employees operating in the Americas, Europe, and Asia. These entities operate three primary business segments: (i) iHeartMedia (the "iHM Segment"), (ii) Americas Outdoor Advertising, and (iii) International Outdoor Advertising (Americas Outdoor Advertising and International Outdoor Advertising together, the "Outdoor Segments"). The Debtors in these cases operate the iHM Segment, which provides media and entertainment services via broadcast and digital delivery and also includes other businesses, including a national syndication business, a live-events business, and a media representation business (collectively, "iHM"). Non-Debtor affiliates (including, among others, Clear Channel Outdoor Holdings, Inc., Clear Channel Outdoor, Inc., and Clear Channel International BV) operate the Outdoor Segments, which provide outdoor advertising services in North America and internationally using various digital and traditional display types.

10. For the year ended December 31, 2017, the Debtors recognized approximately $1.01 billion of OIBDAN and $3.58 billion of revenue. As of the Petition Date (as defined herein), the funded debt obligations of iHeart and its direct and indirect Debtor and non-Debtor subsidiaries totaled over $20 billion, while the Debtors' funded obligations totaled approximately $16 billion.

11. On March 14, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce[3]

12. As of the Petition Date, the Debtors employ more than 12,400 employees (collectively, the "Employees"), including approximately 600 independent contractors, temporary workers, and staffing agencies (collectively, the "Temporary Staff"). Approximately 9,400 of the Debtors' Employees work full-time, and approximately 3,000 of the Debtors' Employees work part-time. Approximately 700 Employees (collectively, the "Represented Employees") are members of various labor unions (collectively, the "Unions") and are covered by 35 collective bargaining agreements (inclusive of the Interim Transitional Agreement (as defined herein)) (the "CBAs")[4] between the Debtors and the Unions. Represented Employees are typically composed of the Debtors' on-air and commercial-production talent, although some off-air positions are also

---

3 Concurrently herewith, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Claims and Obligations of On-Air Talent, Station Affiliates, and Copyright Owners and (II) Granting Related Relief* (the "Talent Motion"), pursuant to which the Debtors are seeking authority to pay prepetition claims and obligations on account of On-Air Talent (as that term is defined in the Talent Motion) that are not Employees of the Debtors, but rather are independent contractors and individuals who are employed by third-party companies that contract with the Debtors to provide the services of certain talent. By this Motion, the Debtors seek authority to pay prepetition Employee Obligations solely on account of the Debtors' Employee on-air talent.

4 On or around November 9, 2017, the Debtors reached an interim agreement (the "Interim Transitional Agreement") with SAG-AFTRA for union employees (the "WBZ Employees") as part of the Debtors' acquisition of Newsradio 1030 WBZ in Boston, Massachusetts. As part of the Interim Transitional Agreement, the Debtors have agreed to honor certain terms of employment contained in the previous collective bargaining agreement covering the WBZ Employees until a new collective bargaining agreement can be negotiated. For the avoidance of doubt, the relief sought in this Motion applies to the WBZ Employees.

covered by the CBAs. The Debtors request authority to continue to honor all obligations to Represented Employees under the terms of the existing CBAs to which the Debtors are party.[5]

13. The Employees perform a variety of functions critical to the operation of the Debtors' commercial radio stations, broadcasting, and the production of syndicated radio and media content that the Debtors distribute to their network affiliates. These functions include radio and other media broadcast production and engineering, sales, programming, promotions, customer service, market research, accounting, finance, human resources, and general management. The Employees' skills, knowledge, and understanding of the Debtors' operations, customer relations, and infrastructure are essential to the effective operation of the Debtors' business.

14. The Debtors also supplement their workforce from time to time by relying on the Temporary Staff to complete discrete projects and fulfill certain duties on a short and long-term basis. The Temporary Staff are a critical and cost-effective supplement to the efforts of the Debtors' Employees. Generally, the Debtors make payments to staffing agencies who then pay the Temporary Staff directly (collectively, the "Temporary Staff Compensation"). The staffing agencies' ability to pay the Temporary Staff hinges upon timely receipt of the Temporary Staff Compensation from the Debtors.

15. The vast majority of Employees and Temporary Staff rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Employees and Temporary Staff will be exposed to significant financial hardships if the Debtors are not permitted to continue paying wages and salaries, provide employee benefits, and maintain certain programs benefiting Employees in the ordinary course of business. Consequently, the

[5] By requesting authority to honor obligations relating to any CBAs (inclusive of the Interim Transitional Agreement) in this Motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the CBAs, and the Debtors reserve all of their rights with regard to any CBAs.

Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

**Employee Compensation and Benefits**

16. The Debtors seek to minimize the personal financial burden Employees and Temporary Staff would suffer if prepetition Employee and Temporary Staff-related obligations are not paid or remitted when due or as expected. As such, by this Motion, the Debtors seek authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, salaries, temporary staff fees, withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), reimbursable expenses, deferred compensation plan, certain non-insider incentive programs, health insurance benefits, health savings accounts, health reimbursement accounts, life and AD&D insurance, short and long-term disability benefits, the workers' compensation program, retirement savings plans, benefit administration services, time-off benefits (including vacation time, sick days, holidays and parental leave), non-insider severance programs, COBRA benefits, and other benefits the Debtors historically have provided to Employees and/or Temporary Staff (collectively, the "Employee Compensation and Benefits") on an interim and final basis, as detailed herein and summarized in the chart above.

17. In addition, the Debtors seek authority to continue honoring Employee Compensation and Benefits provided to Employees on a postpetition basis in the ordinary course of business and to pay all necessary costs incident to these arrangements.

## III. Compensation and Withholding Obligations.

### A. Wages.

18. In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to Employees (collectively, the "Wages") on a: (a) semi-monthly basis for salaried and exempt Employees on the 15th and last calendar day of each month; (b) bi-weekly basis and six days in arrears for hourly and non-exempt Employees; and (c) weekly basis and six days in arrears for hourly Employees working in Rhode Island. In addition, certain on-air Employees also earn compensation from, among other sources, appearance fees, profit shares, endorsements, and other talent-related fees (collectively, the "Talent Fees") in connection with their employment.

19. Because the majority of Employees are paid in arrears, certain Employees are owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees or (b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

20. As of the Petition Date, the Debtors estimate that they owe Employees approximately $6.0 million in accrued and unpaid Wages and approximately $250,000 in accrued and unpaid Talent Fees (excluding Withholding Obligations, Reimbursable Expenses, Time-Off Benefits, and any payments provided under the Non-Insider Severance Programs, Non-Insider Specialized Employee Incentive Plans, and Deferred Compensation Plan) (as defined herein) (Wages and Talent Fees together, the "Unpaid Wages"), all of which will become due and owing

within the first 21 days of these chapter 11 cases. Accordingly, by this Motion, the Debtors seek authority to pay any accrued Unpaid Wages and continue to pay the Wages and Talent Fees on a postpetition basis in the ordinary course of business and consistent with past practices. The Debtors do not believe they have a need to pay any Employee in excess of the $12,850 priority cap set forth in section 507(a)(4) of the Bankruptcy Code and out of an abundance of caution seek to pay any amounts above the cap under the Final Order only.

**1. Commissions.**

21. Approximately 2,400 Employees in the sales department earn commissions (the "Commissions"), sometimes in addition to base Wages, for selling advertising space in the markets where the Debtors operate. The commission-based pay structure motivates the Debtors' sales Employees to meet defined sales targets, and the Commissions constitute part of their ordinary-course compensation on which they depend.

22. Most Commissions are paid one month in arrears and on the last day of each calendar month. Accordingly, certain Employees may be owed accrued but unpaid Commissions as of the Petition Date (the "Unpaid Commissions"). As of the Petition Date, the Debtors estimate that approximately $4.9 million is due and owing on account of Unpaid Commissions, all of which will come due during the Interim Period.

23. By this Motion, the Debtors seek authority to pay all Unpaid Commissions when due and payable to their Employees, as well as the authority, but not direction, to continue the Commissions-based pay structure in the ordinary course of business on a postpetition basis. The Debtors do not believe that any of their Employees will have outstanding Unpaid Commissions that, together with the applicable Employee's Unpaid Wages, exceed the priority cap set forth in section 507(a)(4) of the Bankruptcy Code.

**B. Unpaid Temporary Staff Compensation.**

24. As stated above, the Debtors utilize the services of approximately 600 Temporary Staff. The Debtors generally hire Temporary Staff through staffing agencies (the "Staffing Agencies") and pay Temporary Staff Compensation for services provided by the Temporary Staff through the Staffing Agencies based upon periodic invoices submitted to the Debtors. On average, the Debtors pay approximately $2.8 million in Temporary Staff Compensation each month. The Temporary Staff are not eligible to receive the Employee Health and Welfare Benefits (as defined herein) or any other benefits provided by the Debtors and further described in this Motion.

25. As of the Petition Date, the Debtors estimate that they owe approximately $6.8 million in accrued and unpaid Temporary Staff Compensation (the "Unpaid Temporary Staff Compensation"), approximately $5.4 million of which will become due and owing within the first 21 days of these chapter 11 cases. Accordingly, by this Motion, the Debtors seek authority to pay any accrued Unpaid Temporary Staff Compensation and to continue to pay the Staffing Agencies on a postpetition basis in the ordinary course of business and consistent with past practices. The Debtors do not believe they owe any Temporary Staff amounts in excess of $12,850. Further, the Debtors seek authority to continue to pay the Temporary Staff Compensation on a postpetition basis in the ordinary course of business and consistent with past practices.

**C. Withholding Obligations.**

26. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre and post-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below), such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, charitable contributions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various

third-party recipients. In the 12 months before the Petition Date, average monthly Deductions were approximately $7.6 million. The Debtors estimate that as of the Petition Date, they hold approximately $650,000 in such Deductions.

27. The Debtors also are required by law to withhold from the Employees' compensation amounts related to, among other things, federal, state, and local income taxes, and Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The majority of Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed, or on a monthly or quarterly basis in accordance with applicable state and local taxing authority requirements. In the 12 months before the Petition Date, average monthly Payroll Taxes were approximately $34.3 million.

28. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $2.8 million, approximately all of which will come due during the Interim Period. By this Motion, the Debtors seek authority, but not direction, to pay or deduct in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of the Debtors' business on a postpetition basis.

**IV. Employee Benefit Programs.**

29. The Debtors offer health and welfare benefits to eligible Employees for medical, dental, and vision care coverage and certain other welfare benefits, including Health Insurance

Benefits, Basic Life and AD&D Insurance, Disability Benefits, the Workers' Compensation Programs, the 401(k) Plan, the Employee Assistance Program, and Time Off Benefits (each as defined herein and collectively, the "Health and Welfare Programs"). By this Motion, the Debtors seek authority, but not direction, to pay any unpaid amounts on account of the Health and Welfare Programs, including any prepetition amounts related thereto, and to continue the Health and Welfare Programs in the ordinary course of the Debtors' business on a postpetition basis.

**A. Health Insurance Benefits.**

30. The Debtors offer Employees the opportunity to participate in a variety of health benefit plans, including the Medical Plans, the Dental Plans, the Vision Plan, and the Flexible Spending Accounts (each as defined herein and collectively, the "Health Insurance Benefits"). The Debtors self-insure for all their Health Insurance Benefits. The Health Insurance Benefits are customary for similarly-sized companies, and the participants and their dependents have come to rely on the Health Insurance Benefits, without which participants would be forced to either forego health benefit coverage completely or obtain potentially expensive out-of-pocket insurance coverage that would adversely affect Employee morale. As such, the Debtors seek authority to pay or remit all prepetition amounts due on account of the Health Insurance Benefits and continue offering the Health Insurance Benefits and pay amounts owed thereunder on a postpetition basis in the ordinary course of business and consistent with past practices.

31. The Debtors estimate that they remit an aggregate amount of approximately $10.5 million each month on account of the Health Insurance Benefits. As of the Petition Date, the Debtors estimate that they owe approximately $15.0 million on account of the Health Insurance Benefits, $12.1 million of which will become due and owing within the first 21 days of these chapter 11 cases. Accordingly, the Debtors seek authority to pay any prepetition amounts owed

on account of the Health Insurance Benefits and to continue honoring their obligations on a postpetition basis in the ordinary course of business and consistent with past practices. The following is a detailed description of each of the Health Insurance Benefits provided by the Debtors.

**1. Medical Plans.**

32. The Debtors offer their current and former Employees the opportunity to participate in various medical plans (collectively, the "Medical Plans"), which are self-insured plans administered by Mertain Health, Inc., a subsidiary of Aetna (which leverages the "Open Choice II" provider network), Hawaii Medical Service Association (for certain Employees in Hawaii) and a prescription drug plan administered by OptumRx. The costs of the Medical Plans differ based on the tier level of coverage Employees elect to receive and whether the Employee has dependents covered. Because the Medical Plans are self-insured, the costs of the Medical Plans are borne by the Employees.[6] The Debtors' monthly cost to provide the Medical Plans on behalf of their Employees is approximately $2.0 million, all of which is covered by premiums paid by Employees. This number also includes administrative fees of approximately $725,000 per month. The Debtors also maintain a Stop-Loss Insurance Policy, administered by Tokio Marine America, in relation to the provision of the Medical Plans. The Policy's limit is $850,000 per claim with an aggregate deductible of $200,000.

33. The Debtors also spend approximately $6.5 million per month on average on account of medical claims asserted under the Medical Plans. The Debtors make payments on account of medical claims asserted under the Medical Plans on a monthly basis. On average, the insurer submits claims approximately 8 weeks after incurring such expense, so the Debtors are

6 The Medical Plan administered by the Hawaii Medical Service Association is fully insured.

unable to ascertain the prepetition amounts due and outstanding on account of the Medical Plans. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $10.8 million for unreimbursed prepetition medical claims, approximately $5.6 million of which will come due during the Interim Period, and approximately $550,000 for administrative and other costs on account of the Medical Plans, approximately all of which will come due during the Interim Period. By this Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the Medical Plans, including any prepetition amounts related thereto.

**a. HSAs.**

34. Employees who participate in the Medical Plans may contribute a portion of their compensation into a health savings account (the "HSA"), administered by Connect Your Care, which may be used to help pay health-related expenses on a tax-free basis. Participating Employees can make pre-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to the maximum amounts permitted by the Internal Revenue Code. The Debtors help fund the Employees' HSAs by offering an annual contribution based on the applicable Employee's enrollment in the HSA-based Medical Plan and the tier level of coverage. Currently, approximately 7,700 Employees utilize the HSA. On average, the Debtors pay less than $20,000 each month in administrative fees on account of the HSAs. The Debtors do not believe they owe any amounts outstanding on account of the HSAs. Out of an abundance of caution, however, by this Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the HSAs, including any prepetition amounts related thereto.

**b. COBRA.**

35. The Debtors' Health Insurance Benefits also provide former Employees with certain health benefits following their departure from the Debtors. More specifically, pursuant to

the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees of the Debtors (the "COBRA Employees") may continue insurance coverage under the Medical Plans, Dental Plans, and Vision Plan (the "COBRA Benefits"). COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to eighteen months, and in some instances up to 36 months, following termination of employment.

36. COBRA Employees are responsible for paying all costs associated with the COBRA Benefits except with respect to those former Employees who are eligible for three months of COBRA medical benefits on account of their participation in a voluntary transition plan. Similarly, COBRA Employees who elect to receive benefits under the Vision Plan pay all costs associated with those benefits. The Debtors provide for COBRA benefits as part of their usual expenditure on account of the Health Insurance Benefits and accordingly do not believe they owe any prepetition amounts on account of COBRA Benefits. As such, the Debtors seek authority (a) to pay any prepetition amounts outstanding on account of the COBRA Benefits solely out of an abundance of caution, (b) to continue to offer the COBRA Benefits, including to those Employees who may be terminated after the Petition Date, and honor all obligations related thereto on a postpetition basis in the ordinary course of business and consistent with past practices, and (c) to continue to pay fees related to the COBRA Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**2. Dental Plans.**

37. The Debtors provide their Employees with the opportunity to participate in two fully insured dental plans (the "Dental Plans") administered by Delta Dental. Generally, the Dental Plans provide benefits for preventative services, basic care, and restorative services for covered Employees and their respective dependents. The total cost of the Dental Plans is approximately

$510,000 per month, all of which is paid for by Employees through payroll deductions. As of the Petition Date, the Debtors estimate that they owe approximately $450,000 in premiums on account of the Dental Plans, approximately all of which will come due during the Interim Period. By this Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the Dental Plans, including any prepetition amounts related thereto.

**3. Vision Plan.**

38. The Debtors provide a separate vision plan (the "Vision Plan") to their Employees issued and administered by Aetna, Inc. The Vision Plan provides benefits for annual eye exams, eyeglasses, and contact lenses for covered Employees and their respective dependents. The total cost of the Vision Plan is approximately $102,000 per month, the overwhelming majority of which is paid for by the Employees through payroll deductions, with the Debtors subsidizing a small portion of the cost, approximately $10,000 per month. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Vision Plan, including administrative fees. Out of an abundance of caution, however, by this Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the Vision Plan, including any prepetition amounts related thereto.

**4. Flexible Spending Accounts.**

39. The Debtors offer their Employees additional options for saving pre-tax dollars to help pay for health care and dependent care expenses, regardless of whether the Employee is enrolled the Medical Plan. Employees who enroll in the Flexible Spending Account (the "FSA"), administered by Connect Your Care are provided with a tax-free savings account to help pay for certain medical deductible, prescription drug, dental, and vision expenses. The annual limit for contributions to the FSA is $2,650. Contributions to the FSA are withheld from the applicable

Employee's paycheck. Approximately 500 Employees are enrolled in FSAs. On average, the Debtors pay less than $20,000 per month in administration costs on account of the FSAs. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the FSAs, including administrative fees. Out of an abundance of caution, however, by this Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the FSAs, including any prepetition amounts related thereto.

**B. Insurance, Disability, and Workers' Compensation Programs.**

**1. Life and AD&D Insurance.**

40. The Debtors provide basic life insurance ("Basic Life Insurance") and basic accidental death and dismemberment insurance ("Basic AD&D Insurance," and, together with Basic Life Insurance, the "Basic Life and AD&D Insurance") to all Employees pursuant to group policies issued and administered by Unum. Eligible Employees and their dependents also have the option to purchase additional levels of coverage.[7] In the event of a death, many Employees' long-term planning consists solely of the Basic Life and AD&D Insurance.

41. Basic Life and AD&D Insurance is provided at no cost to Employees and provides a benefit equal to one times an Employee's adjusted base benefit rate, up to $1 million of Basic Life Insurance and $1.5 million of Basic AD&D Insurance. The Debtors pay approximately $393,000 per month in premiums and administrative costs with respect to the Basic Life and AD&D Insurance.

42. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Basic Life and AD&D Insurance. Out of an abundance of caution, however, by this

---

7 Employees may elect to enroll in supplemental and dependent life and AD&D insurance, up to a maximum of $2 million of additional life insurance and $2 million of additional AD&D insurance, at an additional cost to the respective Employee.

Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the Basic Life and AD&D Insurance, including any prepetition amounts related thereto. The Debtors believe that continuing the Basic Life and AD&D Insurance is essential to maintaining morale, adhering to Employees' expectations, and protecting their families from the impact of a death or serious injury. Accordingly, the Debtors seek authority to pay any prepetition amounts owed on account of the Basic Life and AD&D Insurance and to continue honoring their obligations on a postpetition basis in the ordinary course of business and consistent with past practices.

**2. Disability Benefits.**

43. The Debtors provide Employees with both short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits," and together with the Short-Term Disability Benefits, the "Disability Benefits") pursuant to group policies issued and administered by Unum.[8] The Long-Term Disability Benefits are fully insured.

44. Under the Short-Term Disability Benefits program, Employees receive 60 percent of their adjusted base benefit rate, up to $2,500 per week, for a period of up to 84 days. Following the period of Short-Term Disability Benefits, Employees are eligible to receive Long-Term Disability Benefits. In general, under the Long-Term Disability Benefits program, Employees receive 60 percent of their adjusted base benefit rate, up to $25,000 per month, for a period of up to the Employee's standard retirement age.

45. The premiums for the Disability Benefits are paid entirely by approximately 10,450 Employees through payroll deductions. Each month, approximately $262,000 is withheld from Employee paychecks on account of the Disability Benefits. As of the Petition Date, the Debtors

[8] Disability Benefits in Hawaii and New York are offered through The Hartford.

do not believe they owe any amounts on account of the Disability Benefits. Employees have come to rely on the Disability Benefits as their sole form of wage-loss relief should they be unable to work in the future. As such, the Debtors seek authority to honor any accrued but unpaid prepetition amounts on account of the Disability Benefits and to continue to provide the Disability Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**3. Workers' Compensation Programs.**

46. In the ordinary course of business, the Debtors maintain multiple workers' compensation policies, including certain legacy policies[9] that have only run-off claims, for their Employees at the statutorily required level for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Programs"). The Debtors maintain coverage for the Workers' Compensation Programs through XL America, Inc. ("XL America"). The Debtors pay approximately $1.0 million in premiums and fees to XL America annually—pursuant to premium financing arrangements—for maintaining the Workers' Compensation Programs.[10] As of the Petition Date, the Debtors estimate that they have approximately $600,000 in remaining installment payments in premiums and administrative fees on account of the Workers' Compensation Programs.

---

[9] The carriers for these policies are Lumbermen's Mutual Casualty Company, Reliance Insurance Companies, Travelers, and CNA Insurance Companies.

[10] Concurrently herewith, the Debtors have filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Supplement, and Enter into New Insurance Policies and (II) Granting Related Relief* (the "Insurance Motion"). The Debtors finance the premiums payable under certain of their Insurance Policies (as defined in the Insurance Motion), including those premiums and administrative fees payable on account of the Workers' Compensation Programs, pursuant to several premium financing arrangements. As of the Petition Date, the Debtors do not believe they currently owe any premiums or administrative fees on account of the Workers' Compensation Programs. For the avoidance of doubt, any relief with respect to premiums and administrative fees payable on account of the Workers' Compensation Programs will be sought pursuant to the Insurance Motion, and any relief with respect to the Workers' Compensation Obligations will be sought pursuant to this Motion.

47. In 2017, the Debtors paid approximately $3.9 million in claims related to the Workers' Compensation Programs (the "Workers' Compensation Obligations"). As of the Petition Date, the Debtors estimate that approximately 40 claims are outstanding, totaling approximately $1.5 million. The Debtors must continue the claim assessment, determination, adjudication, and payment process in connection with the Workers' Compensation Obligations without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable laws and requirements.[11] Accordingly, the Debtors seek authority to continue to maintain the Workers' Compensation Programs in the ordinary course of business, including by modifying the automatic stay, solely to facilitate the administration of the Workers' Compensation Programs.

**C. The 401(k) Plans.**

48. The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan") administered by Fidelity Investments ("Fidelity") that generally provides for automatic pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck (the "401(k) Deductions"). Each month, approximately $3.6 million is deducted from Employees' paychecks in the aggregate on account of Employees' 401(k) Deductions. The Debtors pay administrative fees of approximately $103,000 on account of the 401(k) Plan each year. The Debtors generally hold the 401(k) Deductions in trust and, as a result, the Debtors generally do not consider these as assets of their estates.

[11] The Workers' Compensation Programs may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue making all payments related to Workers' Compensation Obligations postpetition, including making any changes to current policy and practices that become necessary.

49. The Debtors also provide certain matching contributions for certain of their Employees (the "401(k) Matching Contributions"). More specifically, the Debtors match 50 percent of the contributions of the participating Employees, up to five percent of the participating Employee's yearly base pay, including any cash payments in addition to base salary (the "401(k) Matching Contributions"). Employees are vested in the 401(k) Matching Contributions based on their years of service with the Debtors and are fully vested after five years of service. The Debtors pay on average approximately $1.4 million in 401(k) Matching Contributions each month and remit both the 401(k) Deductions and 401(k) Matching Contributions to Fidelity on a monthly basis. As of the Petition Date, the Debtors estimate that they owe approximately $890,000 in prepetition 401(k) Matching Contributions.

50. Many Employees' retirement savings consist solely of their 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Matching Contributions. Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Matching Contributions is essential to maintaining Employee morale. Accordingly, the Debtors seek the authority to (a) pay any accrued but unpaid amounts owed on account of the 401(k) Plan, including prepetition 401(k) administrative fees and 401(k) Matching Contributions, and remit any unpaid prepetition 401(k) Deductions and (b) continue the 401(k) Plan and 401(k) Matching Contributions on a postpetition basis in the ordinary course of business and consistent with past practices.

**D. Employee Assistance Program.**

51. The Debtors provide their Employees with a confidential counseling and referral service (the "Employee Assistance Program") that pairs Employees with clinicians, financial professionals, and attorneys. The Employee Assistance Program is administered by E4Health and funded entirely by the Debtors. On average, the Debtors pay approximately $26,000 each month on account of the Employee Assistance Program. As of the Petition Date, the Debtors do not

believe that they owe any amounts on account of the Employee Assistance Program. Out of an abundance of caution, however, by this Motion, the Debtors seek authority to pay any amounts due and outstanding on account of the Employee Assistance Program, including any prepetition amounts related thereto.

**E. Time Off Benefits.**

52. The Debtors offer several paid and unpaid time-off benefits for all Employees, including Vacation Time, Sick Leave, Holidays, and Other Paid Leave (each as defined below, and collectively, the "Time-Off Benefits").

53. In the ordinary course of business, the Debtors provide Employees with vacation time ("Vacation Time") as a paid Time-Off Benefit. Unless otherwise negotiated, Eligible employees receive between 10 and 30 working days of Vacation Time per year depending on such Employee's seniority, role, and length of employment. Vacation Time is pro-rated based on the amount of time remaining in the year for new hires. Any unused Vacation Time is forfeited.[12] Generally, unless required under the applicable CBA or state law, Employees who are terminated or resign with unused Vacation Time are not entitled to cash payments based on unused Vacation Time.

54. In the ordinary course of business, Employees are eligible for sick leave ("Sick Leave"). The amount of Sick Leave provided to Employees depends upon such Employee's years of service and as required by local or state law. Employees receive between 10 and 20 days of Sick Leave per year and may accumulate up to 45 days of unused Sick Leave. Generally, unless required under the applicable CBA or state or local law, Employees may not cash out their unused

[12] California and Nebraska Employees and certain Represented Employees are allowed to carry over any unused Vacation Time.

Sick Leave upon termination/resignation. A maximum of 40 hours of Sick Leave may also be carried over into the next calendar year. Part-Time Employees and Temporary Staff in Massachusetts may accrue Sick Leave at a rate of one hour for every 30 hours worked, up to a maximum of 40 hours in a calendar year.

55. In addition, the Debtors offer their Employees ten fixed paid holidays and, for full-time Employees, one floating/personal holiday throughout the year (collectively, the "Holidays"). Generally, eligible Employees are not required to work on a designated Holiday but are paid at their regular base rate of pay.

56. The Debtors also provide eligible Employees extended time to attend to certain family or personal needs such as bereavement leave, jury duty, military duty, or community service (the "Other Paid Leave"). In general, there is no entitlement to any additional unpaid leave, although the Debtors may make certain exceptions on an emergency basis.

57. The Debtors believe that the continuation of the Time-Off Benefits in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. The Debtors do not believe they presently owe any prepetition amounts on account of the Time-Off Benefits. Out of an abundance of caution, however, the Debtors seek authority to continue to offer the Time-Off Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**V. Non-Insider Specialized Employee Incentive Plans.**

58. The Debtors maintain certain employee incentive programs to motivate, reward, and retain certain of their non-insider Employees (each as defined herein and collectively, the

"Non-Insider Specialized Employee Incentive Programs").[13] Bonuses payable to Employees under the Non-Insider Specialized Employee Incentive Programs fall into three broad categories: (a) programming bonuses payable to Employee-based on-air talent and other programming and digital managers for achieving certain ratings metrics (the "Programming Bonuses"); (b) bonuses payable to certain sales staff and account executives for achieving certain sales targets (the "Sales Bonuses"); and (c) bonuses payable to non-Insider Employees that do not constitute Programming Bonuses or Sales Bonuses (the "Other Bonuses"). Awards under the Non-Insider Specialized Employee Incentive Programs are distributed entirely at the discretion of the Debtors' management and are calculated and paid in cash, up to the maximum incentive payment for each Employee, based on the specific performance metrics and timeline as set forth in the applicable program.

59. The Debtors believe the Non-Insider Specialized Employee Incentive Programs are integral to the Debtors' business operations and align the Employees' interests with those of the Debtors generally by linking payments under the Non-Insider Specialized Employee Incentive Programs to performance and overall efficiency of the Debtors' operations. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Non-Insider Specialized Employee Incentive Programs is approximately $15.2 million. By this Motion, the Debtors seek authority to pay amounts accrued but unpaid on account of the Non-Insider Specialized Employee Incentive Programs solely pursuant to the Final Order and to continue, supplement, or modify the Non-Insider Specialized Employee Incentive Programs in the ordinary course of business on a postpetition basis.

---

[13] The relief sought under this Motion with respect to the Non-Insider Specialized Employee Incentive Programs does not include the payment of any obligation to an "insider" as that term is defined in section 101(31) of the Bankruptcy Code (the "Insiders"). The Debtors will seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

**A. Programming Bonuses.**

60. Certain of the Debtors' Employee on-air talent, producers, and programming and digital managers are eligible to receive Programming Bonuses for achieving certain revenue and ratings metrics, including, but not limited to, penetration and growth in a particular market or region, and overall listenership within certain key demographic audiences within a particular demographic area. Each eligible Employee may earn Programming Bonuses on a sliding scale based on market or region specific metrics for, among other things, revenue and audience share. Each metric is weighted differently based on the particular Employee's job function. Eligible Employees may earn a payout for achieving 90 percent of a particular revenue or audience share target, with an increased payout for each percentage in excess of 90 percent, up to a maximum of 200 percent of target. Employees also earn a payout for achieving certain market, region, or area targets. Programming Bonuses are paid on a quarterly basis.

61. As of the Petition Date, the Debtors estimate that they owe approximately $470,000 on account of Programming Bonuses. By this Motion, the Debtors seek authority to pay amounts accrued but unpaid on account of the Programming Bonuses solely pursuant to the Final Order.

**B. Sales Bonuses.**

62. Certain of the Debtors' non-insider account executives and salaried sales Employees (some of whom do not receive Commissions) are eligible to receive Sales Bonuses for achieving certain sales targets throughout the year that are paid to the eligible Employees based either on dollars billed or performance goals that are based upon the particular accounts managed. Certain Employees are also allocated Sales Bonuses based on region, company, and additional performance metrics. The Debtors used a report generated by accounting firm Miller Kaplan Arase LLP to compare such performance against the Debtors' peers.

63. In addition, certain non-insider Employees who are eligible to receive Sales Bonuses contribute a percentage of their base salary, based on a particular Employee's job function, into a bonus pool (the "Bonus Pool"), which is established at the beginning of the year. Each quarter, region, area, and market presidents have the ability to allocate a certain percentage of the Bonus Pool to each eligible Employee and keep a discretionary percentage for sales assistants and other needs. The region, area, and market presidents have the ability to alter this allocation of percentages each quarter.

64. Last, certain non-insider sales Employees are allocated bonuses on a 70/30 split basis. For example, if the Debtors assign a $100,000 sales level to a particular Employee, then $70,000 (i.e., 70 percent) is paid to the Employee as a guaranteed salary, while the remaining $30,000 (i.e., 30 percent) may be earned by the Employee as a Sales Bonus throughout the year based on the achievement of certain sales and performance goals.

65. As of the Petition Date, the Debtors estimate that they owe approximately $14.4 million on account of Sales Bonuses. By this Motion, the Debtors seek authority to pay amounts accrued but unpaid on account of the Sales Bonuses solely pursuant to the Final Order.

### C. Other Bonuses.

66. The Debtors also provide certain of their non-insider Employees the opportunity to earn Other Bonuses pursuant to a number of separate, often individualized programs. These Other Bonuses are typically offered to a limited number of Employees for achieving certain results and metrics specific to that particular Employee's job function. As of the Petition Date, the Debtors estimate that they owe approximately $310,000 in the aggregate on account of Other Bonuses.

## VI. Deferred Compensation Plan.

67. The Debtors maintain a non-qualified deferred compensation plan (the "Deferred Compensation Plan") for the benefit of certain current and former employees. Approximately 199

individuals participate in the Deferred Compensation Plan, 193 of whom are current Employees. As of the Petition Date, all deferrals to the Deferred Compensation Plan have been suspended.

68. The Debtors maintain a bank account at Fidelity (the "Fidelity Account") in connection with the Deferred Compensation Plan, the balance of which, as of March 2, 2018, is approximately $12.0 million. During the remainder of 2018, only one payment is scheduled to be made in June of 2018 to a non-insider for approximately $13,000 (the "2018 Payment"). For the avoidance of doubt, no additional funds will be deposited in the Fidelity Account during the pendency of these chapter 11 cases. By this Motion, the Debtors seek only to honor the 2018 Payment solely pursuant to the Final Order.

## VII. Other Obligations.

### A. Reimbursable Expenses.

69. The Debtors pay for or directly reimburse Employees for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, flights, per diems, car rentals, parking, fuel costs, and other qualifying expenses (collectively, the "Reimbursable Expenses").

70. For the overwhelming majority of Reimbursable Expenses, Employees are expected to use purchase cards (the "Purchase Cards") and fuel cards (the "Fuel Cards" and together with the Purchase Cards, the "Purchase Card Program"), issued by Comdata Network, Inc. ("Comdata"), for the purchase of authorized goods and services. The Purchase Cards and Fuel Cards are to be used for all Reimbursable Expenses. Out-of-pocket Reimbursable Expenses are limited to only those instances where a Purchase Card or Fuel Card cannot be used. Currently, the Debtors have issued approximately 2,400 Purchase Cards and approximately 2,150 Fuel Cards. On average, the Debtors pay approximately $4.6 million per month in Reimbursable Expenses.

71. In addition, certain Employees in the Debtors' accounts payable department use virtual cards (the "V Cards"), also issued by Comdata, for making certain vendor payments. When an authorized Employee initiates such a vendor payment, the Debtors' accounts payable system issues a one-time-use account number for the transaction. Amounts attributable to the V Cards paid by the Debtors are included in the amounts paid to Comdata under the Purchase Card Program.

72. As of the Petition Date, the Debtors estimate that they owe approximately $6.5 million in outstanding prepetition Reimbursable Expenses, all of which will become due and owing within the first 21 days of these chapter 11 cases.

73. Although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur. Accordingly, Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Reimbursable Expenses are incurred with the understanding that they will be reimbursed. Without continued reimbursement of the Reimbursable Expenses, Employees relying on these benefits would be saddled with additional costs, causing personal financial hardship. Accordingly, to avoid harming Employees who incurred Reimbursable Expenses, the Debtors seek authority to (a) satisfy any accrued but unpaid prepetition Reimbursable Expenses, (b) continue to pay the Reimbursable Expenses on a postpetition basis in the ordinary course of business and consistent with past practices, and (c) continue the Purchase Card Program and V Cards on a postpetition basis in the ordinary course of business and consistent with past practices.

**B. Non-Insider Severance Programs.**

74. In the ordinary course of business, the Debtors provide severance benefits to non-insider Employees[14] in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns, under three separate arrangements:[15] (a) as mandated by separate employment agreements; (b) amounts paid pursuant to the Debtors' severance plan (the "Severance Plan"); and (c) amounts paid pursuant to severance arrangements at the time of separation that are neither under the Severance Plan nor pursuant to a separate employment agreement (collectively, the "Non-Insider Severance Programs"). Under the Non-Insider Severance Programs, eligible Employees receive, upon termination and determined by the Employee's seniority and length of service, a severance amount payable over time.

75. The Debtors believe that the Non-Insider Severance Programs have been critical to maintaining Employee morale and loyalty. Current Employees have come to depend on the Non-Insider Severance Programs upon their separation from the Debtors, and increased uncertainty around the Non-Insider Severance Programs will have an adverse impact on Employee morale, cause current Employees to seek outside employment, or cause potential employees to avoid joining the Debtors. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation and to be positioned for

[14] The Debtors believe that none of the Employees proposed to be paid on account of the Non-Insider Severance Programs are Insiders of the Debtors for purposes of section 503(c) of the Bankruptcy Code because none of the Employees: (a) participate in the management of the Debtors; (b) have decision-making authority with respect to policies of the Debtors; (c) report directly to the Debtors' board of directors; (d) were appointed by the Debtors' board of directors; (e) qualify as an Insider under Rule 16a-1(f) of the Securities Exchange Act; (f) undertake budget control over the Debtors' business operations; (g) are compensated in the form of equity of the Debtors; and (h) are relatives of any Insider of the Debtors. To the extent the Debtors propose to make a severance payment to, or implement a severance program for, any Insiders, the Debtors will seek separate approval from the Court with respect to such payments or programs.

[15] The Debtors also provide Union Severance (as defined below) to certain Represented Employees pursuant to the applicable CBAs.

long-term success. Moreover, as a condition to receiving benefits under the Non-Insider Severance Programs, the Debtors typically require that each eligible Employee execute a release agreement releasing any claims held against the Debtors.

76. As of the Petition Date, the Debtors estimate that approximately $4.9 million in unpaid obligations is outstanding on account of the Non-Insider Severance Programs. By this Motion, the Debtors seek authority to continue the Non-Insider Severance Programs in the ordinary course of business on a postpetition basis and consistent with past practices and to pay any prepetition amounts thereunder pursuant to the Final Order only. For the avoidance of doubt, the Debtors are only seeking authority to continue and pay prepetition amounts on account of the Non-Insider Severance Programs and will exercise their discretion as to which Employees receive benefits under such Programs.

**C. Miscellaneous Employee Benefits.**

77. In the ordinary course of business, the Debtors also offer Employees certain additional benefits, including, but not limited to, critical illness insurance, voluntary accident insurance, and whole life insurance, administered by Unum, identity theft protection administered by LifeLock, and a commuter spending account administered by Connect Your Care (collectively, the "Miscellaneous Employee Benefits"). The costs of the Miscellaneous Employee Benefits are borne entirely by the Employees, and therefore, the Debtors do not believe that they currently owe any outstanding amounts on account of Miscellaneous Employee Benefits. By this Motion, however, the Debtors request authorization to continue to offer the Miscellaneous Employee Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**VIII. Unions.**

78. As described above, the Debtors employ approximately 700 Represented Employees who are party to 35 CBAs with the various Unions. Under the CBAs, the Debtors are required to withhold via payroll deduction union member dues and typically remit such dues on a monthly basis to the Unions (collectively, the "Union Dues"). On average, the Debtors remit less than $20,000 each month on account of Union Dues. The Debtors generally hold the Union Dues in trust and as a result, the Debtors generally do not consider these to be assets of their estates. As such, the Debtors do not believe they need authority to remit such payments to the Unions. Out of an abundance of caution, however, the Debtors seek authority to continue to remit the Union Dues to the Unions and honor and process the Union Dues on a postpetition basis in the ordinary course of business and consistent with past practices.

79. In addition, pursuant to the applicable CBA, the Debtors are contractually obligated to provide certain severance obligations to the Represented Employees (the "Union Severance"). As of the Petition Date, the Debtors estimate that approximately $100,000 is outstanding on account of Union Severance, none of which is expected to come due during the Interim Period. Out of an abundance of caution, however, the Debtors seek authority to continue Union Severance in the ordinary course of business on a postpetition basis and consistent with past practices, and to pay any amounts that may come due during the Interim Period, including any prepetition amounts related thereto. For the avoidance of doubt, the Debtors are seeking authority to continue Union Severance pursuant to the Interim Order.

## Basis for Relief

**I. Sufficient Cause Exists to Authorize the Debtors to Honor Employee Compensation and Benefit Obligations.**

**A. Certain of the Employee Compensation and Benefits Are Entitled to Priority Treatment.**

80. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As these are priority claims, the Debtors are required to pay these claims in full in order to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than the statutory prescribed limit on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B. Payment of the Employee Compensation and Benefits Is Required by Law.**

81. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' Wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' Wages on another party's behalf. *See*

11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' Wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors do not believe they need authority to remit these payments. Nevertheless, out of an abundance of caution, the Debtors request authority to transmit the Withholding Obligations to the proper parties in the ordinary course of business and consistent with prepetition practices.

82. Similarly, state laws and laws of other jurisdictions require the Debtors to maintain the Workers' Compensation Programs. If the Debtors fail to maintain the Workers' Compensation Programs, state laws and laws of other jurisdictions may prohibit the Debtors from operating in those states or jurisdictions. Payment of all obligations related to the Workers' Compensation Programs is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II. Payment of the Employee Compensation and Benefits Is Warranted under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

83. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A.*

*Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

84. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

85. Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); *see also Armstrong*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). Specifically, the business judgment standard

requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.

86. In addition, this Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a) of the Bankruptcy Code, courts may permit preplan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re NVR L.P.*, 147 B.R. 126, 127-28 (Bankr. E.D. Va. 1992).

87. The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated in *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors mid-century, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations), and has long been recognized as precedent within the Second Circuit. *See Ionosphere Clubs*, 98 B.R. at 175-76. Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Id.*; *see also In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of

reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank* (*In re Adams Apple, Inc.*), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 2 Collier On Bankruptcy, 105.02[4][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2015) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

88. This flexible approach is particularly critical where prepetition creditors, here Employees and related third parties, provide vital goods or services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations. For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *Id*. (citation omitted). The court explained that "a *per se* rule proscribing the payment of

pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

89. The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003. Paying prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and likely diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.

90. In addition, the majority of Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto. Moreover, failure to satisfy such obligations will undermine Employee morale and loyalty at a time when Employee support is critical to the Debtors' business. Furthermore, if this Court does not authorize the Debtors to honor their various obligations under

the benefits programs described herein, Employees will not receive health coverage and thus may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

91. The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) (Bankr. S.D. Tex. Dec. 14, 2017); *In re Seadrill Ltd.*, No. 17-60079 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2017); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. June 15, 2017) (approved on a final basis at first day hearing); *In re Ameriforge Grp. Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 2, 2017) (approved on a final basis at first day hearing); *In re Goodman Networks Inc.*, No 17-31575 (MI) (Bank. S.D. Tex. Mar. 13, 2017).[16] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**III. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims.**

92. Section 362(a)(1) of the Bankruptcy Code operates to stay:

---

[16] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

93. The Debtors seek authorization to, under section 362(d) of the Bankruptcy Code, permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being of Employees and Employee morale and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all parties in interest.

**IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.**

94. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, access to unencumbered cash, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested hereunder. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

95. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

96. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

97. Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type

specified or defined in the Motion, the Interim Order, or the Final Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## Notice

98. Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties in interest, including: (a) the Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent for the Debtors' receivables based credit facility; (d) the agent for the Debtors' term loan credit facility; (e) the indenture trustees for the Debtors' priority guarantee notes, 14.0% senior notes due 2021, 6.875% senior notes due 2018, and 7.25% senior notes due 2027; (f) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility and priority guarantee noteholders; (g) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility; (h) counsel to an ad hoc group of holders of 6.875% senior notes due 2018 and 7.25% senior notes due 2027; (i) counsel to an ad hoc group of holders of 14.0% senior notes due 2021; (j) the Office of the United States Attorney for the Southern District of Texas; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Internal Revenue Service; (m) the Securities and Exchange Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter each of the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
March 15, 2018

/s/ *Patricia B. Tomasco*
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: ptomasco@jw.com
mcavenaugh@jw.com
jwertz@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Anup Sathy, P.C. (*pro hac vice* pending)
Brian D. Wolfe (*pro hac vice* pending)
William A. Guerrieri (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
anup.sathy@kirkland.com
brian.wolfe@kirkland.com
will.guerrieri@kirkland.com

-and-

Christopher J. Marcus, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: christopher.marcus@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on March 15, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco