**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
04/12/2018

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IHEARTMEDIA, INC., *et al.*,[1] | ) | Case No. 18-31274 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 17, 101, 317** |

**FINAL ORDER (I) AUTHORIZING POSTPETITION USE
OF CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363,
AND 507, BANKRUPTCY RULES 2002, 4001, AND 9014, AND LOCAL
BANKRUPTCY RULES 4001-1(b) AND 4002-1**

Upon the motion dated March 15, 2018 [Docket No. 17] (the "Motion")[2] of the above-captioned debtors, as debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 4001-1(b) and 4002-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex Case Rules") promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "Court") for entry of a first interim order [Docket No. 101] (the "First Interim Order"), a second interim order [Docket No. 317] (the "Second Interim Order" and

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or further herein, as applicable.

together with the First Interim Order, the "Interim Orders"), and a final order (this "Final Order",

and, together with the Interim Orders, the "Orders"), seeking, among other things:

(a)     authorization for the Debtors to use the cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, that constitutes Prepetition Collateral (as defined below) ("Cash Collateral") of: (i) TPG Specialty Lending, Inc., as administrative agent (the "ABL Agent"), for the benefit of itself and the lenders and letter of credit issuers party to the ABL Credit Agreement (as defined below) (collectively, the "ABL Lenders", and together with the ABL Agent, the "ABL Secured Parties"); (ii) Citibank N.A., as administrative agent (the "Bank Facility Agent") for the lenders (the "Bank Facility Lenders" and, together with the Bank Facility Agent, the "Bank Facility Secured Parties") party to the Term Loan Credit Facility (as defined below), and (iii) Deutsche Bank Trust Company Americas as collateral agent (the "Notes Collateral Agent" for the benefit of the trustees (the "Notes Trustees") and, together with the ABL Agent and the Bank Facility Agent, the "Prepetition Administrative Parties") and the noteholders (the "Noteholders" and, together with the Notes Trustees and the Notes Collateral Agent, the "Notes Secured Parties" and, together with the ABL Secured Parties and the Bank Facility Secured Parties, collectively, the "Prepetition Secured Parties") party to the indentures for the PGNs (as defined below), on a final basis and subject to the terms of this Final Order during the period following the date of commencement of these Chapter 11 Cases (as defined below);

(b)     the granting of adequate protection to (i) the ABL Agent, for itself and for the benefit of the ABL Secured Parties, (ii) the Bank Facility Agent, for itself and for the benefit of the Bank Facility Lenders, and (iii) the Notes Collateral Agent and the Notes Trustees, for themselves and for the benefit of the Notes Secured Parties, pursuant to sections 361, 362 and 363(e) of the Bankruptcy Code, for any diminution in the value of their interests in the Prepetition Collateral resulting from the Debtors' use of the Cash Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(c)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Prepetition Administrative Parties and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Final Order;

(d)     except to the extent of the Carve Out (as defined below), a waiver of (i) the Debtors' ability to surcharge against the Prepetition Collateral or the Adequate Protection Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law; and (ii) the applicability of the "equities of the case" exception under section 552(b) of the Bankruptcy Code; and

(e)     the waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Final Order;

2

and due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearings (as defined below) having been served by the Debtors on (i) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (ii) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iii) the agent for the Debtors' receivables based credit facility and counsel thereto; (iv) the agent for the Debtors' term loan credit facility and counsel thereto; (v) the indenture trustees for the Debtors' priority guarantee notes, 14.0% senior notes due 2021, 6.875% senior notes due 2018, and 7.25% senior notes due 2027; (vi) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility and priority guarantee noteholders; (vii) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility; (viii) counsel to the indenture trustee for the 6.875% senior notes due 2018 and 7.25% senior notes due 2027; (ix) counsel to an ad hoc group of holders of 14.0% senior notes due 2021; (x) the Office of the United States Attorney for the Southern District of Texas; (xi) the state attorneys general for states in which the Debtors conduct business; (xii) the Internal Revenue Service; (xiii) the Securities and Exchange Commission; and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion, and an initial interim hearing having been held by this Court on March 15, 2018 (the "First Interim Hearing") at which time the Debtors presented and introduced into evidence, among other things, the *Declaration of Justin Schmaltz In Support of the Debtors' Emergency Motion for Interim and Final Orders Authorizing (I) Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014, and Bankruptcy Local Rules 4001-1(b) and 4002-1, and (III) Scheduling A Final Hearing Pursuant to Bankruptcy Rule 4001(B)*, (the

"Declaration"); and a second interim hearing having been held by this Court on March 27, 2018 (the "Second Interim Hearing," and together with the First Interim Hearing, the "Interim Hearings"); and the Court having conducted a hearing for final relief on the Motion (the "Final Hearing"); and the Court having entered the First Interim Order on March 15, 2018 and the Second Interim Order on March 27, 2018, approving certain of the relief requested in the Motion on an interim basis; and the Court having reviewed the Declaration, the Motion, the other evidence adduced by the parties, the representations of counsel, and the entire record made at the Interim Hearings and Final Hearing; and it appearing to the Court that granting the relief sought in the Motion, on the terms and conditions contained herein, is necessary and essential to enable the Debtors to preserve the value of their businesses and assets, and facilitate the reorganization of the Debtors' businesses, and that such relief is fair and reasonable and in the best interests of the Debtors' estates, their creditors, and all parties in interest, and is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 1334.  The Motion and proceedings in connection therewith constitute a core proceeding as defined in 28 U.S.C. §§ 157(b)(2).  Venue for the Chapter 11 Cases and the proceedings on the Motion is permissible in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought in the Motion and

---

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

granted in this Final Order are Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, 6004 and 9014, Bankruptcy Local Rules 4001-1(b) and 4002-1,

and the Complex Case Rules.

B.      On March 14, 2018 (the "Petition Date"), iHeartMedia, Inc. ("iHeart") and each

of the other Debtors filed a voluntary petition for relief with this Court under chapter 11 of the

Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly

administered under Case No. 18-31274 (MI).

C.      The Debtors are continuing in possession of their properties and are operating

and managing their businesses as debtors in possession pursuant to Sections 1107 and 1108 of

the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.   On

March 21, 2018, the U.S. Trustee appointed an official committee of unsecured creditors (the

"Committee") in the Chapter 11 Cases [Docket No. 244].

D.      Without prejudice to the rights of any other party in interest (but subject to the

limitations thereon contained in paragraphs 23 and 24 below) the Debtors admit, stipulate, and

agree that:

>       1.      The ABL Agent, the ABL Lenders, iHeartCommunications, Inc.
> ("iHeartCommunications"), as Parent Borrower, the Several Subsidiary Borrowers
> thereto,[4] and iHeartMedia Capital I, LLC, as holdings ("Holdings") (among others) are
> parties to that certain Credit Agreement dated as of November 30, 2017 (as amended,
> restated, amended and restated, supplemented or otherwise modified prior to the
> commencement of these Chapter 11 Cases, the "ABL Credit Agreement").  Pursuant to
> that certain ABL Receivables Pledge and Security Agreement dated as of November 30,
> 2017 among the Grantors identified therein and the ABL Agent (the "First Lien Pledge
> Agreement", and together with all other documentation executed, delivered or created in
> connection with the First Lien Pledge Agreement, each as amended, restated, amended
> and restated, supplemented or otherwise modified prior to the commencement of these
> Chapter 11 Cases, the "First Lien Collateral Agreements"), each of the Debtors granted a

---

[4]     The current subsidiary borrowers under the ABL Credit Agreement are:  AMFM Broadcasting, Inc.; AMFM
Texas Broadcasting, LP; Capstar Radio Operating Company; Christal Radio Sales, Inc.; Citicasters Co.;
iHeartMedia + Entertainment, Inc.; Katz Communications, Inc.; Katz Millennium Sales & Marketing, Inc.; and
Premiere Networks, Inc.

valid, binding, perfected and enforceable first-priority lien on and security interest in the Article 9 Collateral (as defined in Section 3.01 of the First Lien Pledge Agreement as of the date hereof) (the "Prepetition First Priority Liens") existing on the Petition Date (the "Prepetition Collateral") to the ABL Secured Parties.  Pursuant to the ABL Credit Agreement and the First Lien Collateral Agreements (collectively, the "ABL Loan Documents"), the Debtors are jointly and severally indebted and liable to the ABL Secured Parties for all Obligations (as defined in the ABL Credit Agreement) arising under the ABL Loan Documents and (i) such Obligations are legal, valid, binding and enforceable against the Debtors and (ii) constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code (the "ABL Indebtedness").  The Debtors are in default under the ABL Loan Documents. As of the Petition Date, there were no security interests or liens on the Prepetition Collateral other than as permitted by the ABL Loan Documents.

2.      The Bank Facility Agent, the Bank Facility Lenders, iHeartCommunications, and Holdings, are parties to that certain Credit Agreement dated as of May 13, 2008, as Amended and Restated as of February 23, 2011, and as amended by Amendment No. 1 dated as of October 25, 2012, Amendment No. 2 dated as of May 31, 2013 and Amendment No. 3 dated as of December 18, 2013 (as further amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "Term Loan Credit Facility") and the Obligations (as defined in the Term Loan Credit Facility) described therein and payable thereunder (the "Bank Facility Indebtedness").  The Term Loan Credit Facility is guaranteed by Holdings and each existing and future material wholly-owned domestic restricted subsidiary of the Parent Borrower, subject to certain exceptions and secured by various security and pledge agreements.[5]  Among other things, pursuant to that certain Receivables Collateral Security Agreement, dated as of February 23, 2011 (together with similar security documents entered into by any loan party and the Bank Facility Agent in respect of the Prepetition Collateral owned by such loan party and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "Bank Facility Collateral Agreements"), the Debtors have granted second-priority liens and security interests (the "Bank Facility Second Priority Liens") in and against the Prepetition Collateral (including, without limitation, the Cash Collateral), subject in each case to the Intercreditor Agreement (as defined herein), to the Bank Facility Agent for the benefit of the Bank Facility Secured Parties (the Term Loan Credit Facility, the Bank

---

[5]   The current subsidiary guarantors of the Term Loan Credit Facility, the ABL Credit Agreement, and the PNG Credit Facility (as defined below) are:  AMFM Broadcasting, Inc.; AMFM Broadcasting Licenses, LLC; AMFM Operating Inc.; AMFM Radio Licenses, LLC; AMFM Texas Licenses, LLC; AMFM Texas, LLC; AMFM Texas Broadcasting LP; Capstar Radio Operating Company; Capstar TX LLC; CC Broadcast Holdings, Inc.; CC Finco Holdings, LLC; CC Licenses, LLC; Christal Radio Sales, Inc.; Cine Guarantors II, Inc.; Citicasters Co.; Citicasters Licenses, Inc.; Clear Channel Broadcasting Licenses, Inc.; Clear Channel Holdings, Inc.; Clear Channel Investments, Inc.; Clear Channel Metro, LLC; Clear Channel Mexico Holdings, Inc.; Clear Channel Real Estate, LLC; Critical Mass Media, Inc.; iHeartMedia + Entertainment, Inc.; iHeartMedia Management Services, Inc.; iHM Identity, Inc.; Katz Communications, Inc.; Katz Media Group, Inc.; Katz Millennium Sales & Marketing, Inc.; Katz Net Radio Sales, Inc.; M Street Corporation; Premiere Networks, Inc.; Terrestrial RF Licensing, Inc.; TTWN Networks, LLC; and TTWN Media Networks, LLC.

Facility Collateral Agreements, and any collateral and ancillary documents executed in connection therewith, collectively, the "Bank Facility Loan Documents").  Pursuant to the Bank Facility Loan Documents, the Debtors are jointly and severally indebted and liable to the Bank Facility Secured Parties for all Obligations (as defined in the Term Loan Credit Facility) arising under the Bank Facility Loan Documents and (i) such Obligations are legal, valid, binding and enforceable against the Debtors and (ii) constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code; provided, that nothing in the Orders shall be deemed to be an admission on the part of the Debtors that the Collateral Flip (as defined in the First Day Declaration)[6] occurred and the Debtors' and the Prepetition Secured Parties' rights related to the Collateral Flip are expressly reserved.

3.      The Notes Collateral Agent, Wilmington Trust FSB as trustee or successor trustee, as the case may be, iHeartCommunications, Holdings, and each of the other guarantors party thereto are parties to that certain (i) Indenture, dated as of October 25, 2012, providing for the issuance of an unlimited aggregate principal amount of 9.0% Priority Guarantee Notes Due 2019, as supplemented by that First Supplemental Indenture dated as of November 28, 2016 (as further amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "9.0% PGN Due 2019 Facility"), (ii) Indenture, dated as of February 23, 2011, providing for the issuance of an unlimited aggregate principal amount of 9.0% Priority Guarantee Notes Due 2021, as supplemented by that First Supplemental Indenture dated as of June 14, 2011 and that Second Supplemental Indenture dated as of November 28, 2016 (as further amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "9.0% PGN Due 2021 Facility"), and (iii) Indenture, dated as of September 10, 2014, providing for the issuance of an unlimited aggregate principal amount of 9.0% Priority Guarantee Notes Due 2022, as supplemented by that First Supplemental Indenture dated as of September 29, 2014 and that Second Supplemental Indenture dated as of November 28, 2016 (as further amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "9.0% PGN Due 2022 Facility"). The Notes Collateral Agent, UMB Bank, National Association as successor trustee, iHeartCommunications and Holdings and each of the other guarantors party thereto are parties to that certain Indenture, dated as of February 28, 2013, providing for the issuance of an unlimited aggregate principal amount of 11.25% Priority Guarantee Notes Due 2019, as supplemented by that First Supplemental Indenture dated as of November 28, 2016 and that Second Supplemental Indenture dated as of February 7, 2017 (as further amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "11.25% PGN Due 2019 Facility"). The Notes Collateral Agent, U.S. Bank National Association as trustee, iHeartCommunications and Holdings and each of the other guarantors party thereto are parties to that certain Indenture, dated as of February 26, 2015, providing for the issuance of an unlimited aggregate principal amount of 10.625% Priority Guarantee Notes Due 2023, as supplemented by that First Supplemental Indenture dated as of November 28,

---

[6]     The *Declaration of Brian Coleman, Senior Vice President and Treasurer of iHeartMedia, Inc., in Support of the Chapter 11 Petitions and First Day Motions*, (the "First Day Declaration").

2016 (as further amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "10.625% PGN Due 2023 Facility"; together with the 9.0% PGN Due 2021 Facility, 9.0% PGN Due 2019 Facility, 11.25% PGN Due 2019 Facility, 9.0% PGN Due 2022 Facility and 10.625% PGN Due 2023 Facility, the "PGN Facility"). The PGN Facility is guaranteed by iHeartCommunications and each of its existing and future material wholly-owned domestic restricted subsidiaries, subject to certain exceptions, and secured by various security and pledge agreements.   Among other things, pursuant to that certain (i) Receivables Collateral Security Agreement, dated as of February 23, 2011 (together similar security documents entered into by any grantor and the Notes Collateral Agent in respect of the Prepetition Collateral owned by such grantor and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "9.0% PGN Due 2021 Collateral Agreements"), (ii) Receivables Collateral Security Agreement, dated as of October 25, 2012 (together with any similar security documents entered into by any grantor and the Notes Collateral Agent in respect of the Prepetition Collateral owned by such grantor and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "9.0% PGN Due 2019 Collateral Agreements"), (iii) Receivables Collateral Security Agreement, dated as of February 28, 2013 (together with any similar security documents entered into by any grantor and the Notes Collateral Agent in respect of the Prepetition Collateral owned by such grantor and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "11.25% PGN Due 2019 Collateral Agreements"), (iv) Receivables Collateral Security Agreement, dated as of September 10, 2014 (together with any similar security documents entered into by any grantor and the Notes Collateral Agent in respect of the Prepetition Collateral owned by such grantor and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "9.0% PGN Due 2022 Collateral Agreements"), and (v) Receivables Collateral Security Agreement, dated as of February 26, 2015 (together with any similar security documents entered into by any grantor and the Notes Collateral Agent in respect of the Prepetition Collateral owned by such grantor and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "10.625% PGN Due 2023 Collateral Agreements"; together with the 9.0% PGN Due 2021 Collateral Agreements, 9.0% PGN Due 2019 Collateral Agreements, 11.25% PGN Due 2019 Collateral Agreements, 9.0% PGN Due 2022 Collateral Agreements and 10.625% PGN Due 2023 Collateral Agreements, the "PGN Collateral Documents"),   the Debtors have granted second-priority liens and security interests (the "PGN Facility Second Priority Liens" and together with the Bank Facility Second Priority Liens, the "Prepetition Second Priority Liens") in and against the Prepetition Collateral (including, without limitation, the Cash Collateral), subject in each case to the Intercreditor Agreement (as defined herein), to the Notes Collateral Agent for the benefit of the Notes Secured Parties (the PGN Facility, the PGN Collateral

Agreements, and any collateral and ancillary documents executed in connection therewith, collectively, the "PGN Notes Documents"; and together with the ABL Loan Documents and the Bank Facility Loan Documents, the "Prepetition Credit Documents"), and the Obligations (as defined in the PGN Credit Facility) described therein and payable thereunder (the "PGN Indebtedness"; together with the Bank Facility Indebtedness, the "Second Lien Indebtedness"; and the Second Lien Indebtedness together with the ABL Indebtedness, the "Prepetition Indebtedness"). Pursuant to the PGN Notes Documents, the Debtors are jointly and severally indebted and liable to the PGN Secured Parties for all Obligations (as defined in the PGN Credit Facility) arising under the PGN Notes Documents and (i) such Obligations are legal, valid, binding and enforceable against the Debtors and (ii) constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code; provided, that nothing in the Orders shall be deemed to be an admission on the part of the Debtors that the Collateral Flip occurred and the Debtors' and the Prepetition Secured Parties' rights related to the Collateral Flip are expressly reserved.

4.      Pursuant to that certain amended and restated ABL Intercreditor Agreement, dated as of July 30, 2008, as Amended and Restated as of February 23, 2011 (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time and with all supplements, joinders, and exhibits thereto, the "Intercreditor Agreement"), by and among ABL Agent (as successor to Citibank, N.A.), Bank Facility Agent, Notes Collateral Agent and the other parties thereto, with respect to the Prepetition Collateral, the Prepetition First Priority Liens have priority over and are senior in all respects to the Prepetition Second Priority Liens.  The Intercreditor Agreement is a subordination agreement as referenced by section 510(a) of the Bankruptcy Code.

5.      As of the Petition Date, in accordance with the terms of the ABL Loan Documents, the Debtors were each jointly and severally indebted and liable to the ABL Secured Parties for all of the ABL Indebtedness, comprised of (among other things) the Loans (as defined in the ABL Credit Agreement) made by the ABL Lenders in the aggregate principal amount of not less than $371,000,000 under the ABL Credit Agreement and not less than $66,697,782.67 in face amount of undrawn Letters of Credit (as defined in the ABL Credit Agreement) issued by the L/C Issuers (as defined in the ABL Credit Agreement), together with all accrued and unpaid interest, fees, expenses (including, without limitation, the reasonable and documented fees and expenses of the ABL Secured Parties' attorneys, consultants, accountants, experts and financial advisors required to be reimbursed by the Debtors pursuant to the ABL Credit Agreement, and including $60,000 for the reasonable and documented fees and expenses of counsel to the representative of the Revolving Credit Lenders (as defined in the ABL Credit Agreement), costs, other charges or amounts paid, incurred or accrued prior to the Petition Date (including the Prepayment Premium, as defined in the ABL Credit Agreement as of the date hereof), and other obligations incurred in connection therewith, in each case in accordance with the terms of the ABL Loan Documents, plus all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code. Each of the ABL Loan Documents is valid, binding, and enforceable in accordance with its terms.  The ABL Indebtedness is secured by valid, binding, properly perfected,

enforceable, non-avoidable, first-priority liens and security interests in and against the Prepetition Collateral (including, without limitation, Cash Collateral). There exists no basis upon which the Debtors can properly challenge or avoid the validity, enforceability, priority or perfection of the ABL Indebtedness or the Prepetition First Priority Liens, and the Debtors shall not assert any claim, challenge or counterclaim in respect of the ABL Indebtedness, the Prepetition First Priority Liens or the amounts paid to the ABL Secured Parties.  No portion of the ABL Indebtedness, the Prepetition First Priority Liens, or any amounts paid to the ABL Secured Parties or applied to the obligations owing under the ABL Loan Documents prior to the Petition Date is subject to avoidance, subordination (whether equitable, contractual or otherwise), recharacterization, recovery, attack, offset, counterclaim, cross-claims, disallowance, impairment, recoupment, defense, challenge, objection, reduction, disgorgement, or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  As of the Petition Date, the value of the Prepetition Collateral securing the ABL Indebtedness exceeded the amount of the ABL Indebtedness, and accordingly the ABL Indebtedness constitutes allowed secured claims within the meaning of Section 506 of the Bankruptcy Code, together with accrued and unpaid and hereafter accruing interest, reasonable and documented fees (including, without limitation, attorneys' and other professionals' reasonable fees and related expenses), costs, charges and contingent indemnification obligations arising under or related to the ABL Loan Documents.

6.     All cash proceeds of the Prepetition Collateral and the Adequate Protection Collateral, including all such cash proceeds of such Prepetition Collateral or Adequate Protection Collateral held at any time and from time to time in any of the Debtors' banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts), are and will be Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

7.     As of the Petition Date, in accordance with the terms of the Bank Facility Loan Documents, the Debtors were each jointly and severally indebted and liable to the Bank Facility Secured Parties for all of the Bank Facility Indebtedness.  Each of the Bank Facility Loan Documents is valid, binding, and enforceable in accordance with its terms. The Bank Facility Indebtedness is secured by valid, binding, properly perfected, enforceable, non-avoidable, second-priority liens and security interests in and against the Prepetition Collateral (including, without limitation, Cash Collateral). There exists no basis upon which the Debtors can properly challenge or avoid the validity, enforceability, priority or perfection of the Bank Facility Indebtedness or the Bank Facility Second Priority Liens, and the Debtors shall not assert any claim, challenge or counterclaim in respect of the Bank Facility Indebtedness, the Bank Facility Second Priority Liens or the amounts paid to the Bank Facility Secured Parties.  No portion of the Bank Facility Indebtedness, the Bank Facility Second Priority Liens, or any amounts paid to the Bank Facility Secured Parties or applied to the obligations owing under the Bank Facility Loan Documents prior to the Petition Date is subject to avoidance, subordination (whether equitable, contractual or otherwise), recharacterization, recovery, attack, offset, counterclaim, cross-claims, disallowance, impairment, recoupment, defense, challenge, objection, reduction, disgorgement, or claim (as defined in section 101(5) of the

Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that nothing in the Orders shall be deemed to be an admission on the part of the Debtors that the Collateral Flip occurred and the Debtors' and the Prepetition Secured Parties' rights related to the Collateral Flip are expressly reserved.

8.     As of the Petition Date, in accordance with the terms of the PGN Notes Documents, the Debtors were each jointly and severally indebted and liable to the Notes Secured Parties for all of the PGN Indebtedness.  Each of the PGN Notes Documents is valid, binding, and enforceable in accordance with its terms.  The PGN Indebtedness is secured by valid, binding, properly perfected, enforceable, non-avoidable, second-priority liens and security interests in and against the Prepetition Collateral (including, without limitation, Cash Collateral). There exists no basis upon which the Debtors can properly challenge or avoid the validity, enforceability, priority or perfection of the PGN Indebtedness or the PGN Facility Second Priority Liens, and the Debtors shall not assert any claim, challenge or counterclaim in respect of the PGN Indebtedness, the PGN Facility Second Priority Liens or the amounts paid to the PGN Secured Parties.  No portion of the PGN Indebtedness, the PGN Facility Second Priority Liens, or any amounts paid to the PGN Secured Parties or applied to the obligations owing under the PGN Notes Documents prior to the Petition Date is subject to avoidance, subordination (whether equitable, contractual or otherwise), recharacterization, recovery, attack, offset, counterclaim, cross-claims, disallowance, impairment, recoupment, defense, challenge, objection, reduction, disgorgement, or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that nothing in the Orders shall be deemed to be an admission on the part of the Debtors that the Collateral Flip occurred and the Debtors' and the Prepetition Secured Parties' rights related to the Collateral Flip are expressly reserved.

E.     Subject to paragraphs 17, 18, and 22 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns hereby to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the ABL Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, objections, challenges, counterclaims, setoff rights, rights to subordinate, recoupment, causes of action, indebtedness and obligations,

rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof arising out of, relating to or in connection with the Debtors or any of the ABL Loan Documents, or the transactions contemplated under such ABL Loan Documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens or the claims of the ABL Secured Parties.   The Debtors' acknowledgements, stipulations and releases are binding on the Debtors and their respective representatives, successors and assigns and, subject to any action timely commenced by the Committee or other party in interest before the end of the Challenge Period (as defined below), on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in the Chapter 11 Cases, whether such trustee or representative is appointed in chapter 11 or chapter 7.

F.     Good cause has been shown for the entry of this Final Order.  The Debtors have an ongoing need to use the Cash Collateral to, among other things, fund the orderly continuation of their businesses, maintain the confidence of their customers and vendors, pay their operating expenses, and preserve their going-concern value, consistent with the Budget (as defined below). The terms for the Debtors' use of Cash Collateral pursuant to this Final Order are fair and

12

reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration. The terms for the Debtors' use of Cash Collateral pursuant to this Final Order have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Prepetition Secured Parties and, pursuant to Bankruptcy Code sections 105, 361 and 363, the Prepetition Secured Parties are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Final Order, and each is entitled to the protection provided under Bankruptcy Code section 363(m).

G.      The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (d). Absent granting the relief sought by this Final Order, the Debtors' estates could be irreparably harmed. The use of Cash Collateral in accordance with this Final Order is therefore in the best interest of the Debtors' estates, their creditors and other parties in interest.

H.      The Debtors desire to use the cash, rents, income, offspring, products, proceeds and profits that constitute Cash Collateral under section 363(a) of the Bankruptcy Code of the (i) ABL Agent and other ABL Secured Parties, (ii) Bank Facility Agent and other Bank Facility Secured Parties, and (iii) the PGN Secured Parties.

I.      The ABL Agent, on behalf of the ABL Secured Parties has consented to the Debtors' use of the Cash Collateral subject to the terms and conditions set forth herein and for the duration of this Final Order. Such consent is binding upon the Bank Facility Secured Parties and the Notes Secured Parties (collectively, the "Second Lien Secured Parties") pursuant to and to the extent set forth in the Intercreditor Agreement.

J.      The adequate protection provided to the Prepetition Secured Parties, as set forth more fully in paragraphs 7, 8, 9, and 10 of this Final Order, for any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date from the use, sale, or lease of the Prepetition Collateral and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code. The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Prepetition Secured Parties from any diminution of their interests in the value of the Prepetition Collateral and (ii) obtain the foregoing consents and agreements.

K.      The Debtors stipulate, and the Court finds, that in permitting the Debtors to use Cash Collateral or in taking any other actions permitted by this Final Order, none of the Prepetition Secured Parties or the Prepetition Administrative Parties shall (i) have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner" or "operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, is used in the Internal Revenue Code, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors, their creditors or their estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

L.      Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. The "equities of the case" exception under

14

section 552(b) of the Bankruptcy Code shall not apply to them with respect to proceeds, product, offspring or profits with respect to any of the Prepetition Collateral.

M.     Notice of the requested relief sought at the Final Hearing was provided by the Debtors to:  (i) the U.S. Trustee; (ii) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iii) the agent for the Debtors' receivables based credit facility and counsel thereto; (iv) the agent for the Debtors' term loan credit facility and counsel thereto; (v) the indenture trustees for the Debtors' priority guarantee notes, 14.0% senior notes due 2021, 6.875% senior notes due 2018, and 7.25% senior notes due 2027; (vi) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility and priority guarantee noteholders; (vii) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility; (viii) counsel to an ad hoc group of holders of 6.875% senior notes due 2018 and 7.25% senior notes due 2027; (ix) counsel to an ad hoc group of holders of 14.0% senior notes due 2021; (x) the Office of the United States Attorney for the Southern District of Texas; (xi) the state attorneys general for states in which the Debtors conduct business; (xii) the Internal Revenue Service; (xiii) the Securities and Exchange Commission; (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (xv) counsel to the Committee.

N.     Sufficient and adequate notice of the Motion and the hearing thereon was provided pursuant to Bankruptcy Rules 2002, 4001(b) and (d), and 9006, as required by sections 361 and 363 of the Bankruptcy Code and Local Bankruptcy Rule 4002-1.  No further notice of, or hearing on, the relief sought in the Motion is necessary or required.

O.     The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001.  The Court concludes that entry of this Final Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow the Debtors

to preserve and maintain the value of their assets and businesses and enhance the Debtors' prospects for a successful reorganization.

P.      On March 15, 2018, following the Interim Hearing, the Court entered the First Interim Order, which, among other things, granted the relief sought in the Motion on an interim basis, pending entry of this Final Order.  Subsequently, on March 27, 2018, the Court held the Second Interim Hearing and entered the Second Interim Order, which, among other things, granted the relief sought in the Motion on an interim basis, pending entry of this Final Order.  To the extent not addressed in this Final Order, the Prepetition Secured Parties shall be entitled to all of their rights, priorities, protections, and benefits under the Interim Orders.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before the Court at the Final Hearing, and good and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ADJUDGED AND ORDERED:**

1.      <u>Motion and Disposition</u>.  The Motion is granted, subject to the terms and conditions set forth in this Final Order.  The Debtors shall not use any Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or resolved at the Final Hearing, and (except as set forth herein) all reservations of rights included therein, are hereby denied and overruled.

2.      <u>Use of Cash Collateral</u>.  Subject to the terms and conditions of this Final Order, including the Carve Out, the Debtors are hereby authorized to use Cash Collateral during the period beginning on the Petition Date and ending on the Termination Date (as defined below)

pursuant to the following terms.  Each budget provided by the Debtors to the ABL Agent will be a 13-week budget (such period, a "Budget Period").

      (a)    The Initial Budget.  During the Budget Period commencing on the Petition Date, the Debtors are authorized to use Cash Collateral for disbursements of the type set forth in the budget attached as **Exhibit A** to the First Interim Order (which budget was approved by the ABL Agent on an unconsolidated basis and as such budgets may be modified from time to time by the Debtors, on no less than five (5) business days' advance notice to the Committee (which notice period may be waived in writing by the Committee) and with the prior written consent of the ABL Agent, not to be unreasonably withheld, the "Initial Budget"), subject in each case to any Non-Conforming Use permitted herein (as such term is defined below).

      (b)    Subsequent Budgets.  For each subsequent Budget Period, at the end of each Testing Period (as defined below) the Debtors shall provide the ABL Agent with a proposed budget (each, a "Proposed Budget").  Upon written approval of such budget by the ABL Agent, not to be unreasonably withheld, the Debtors shall be authorized to use Cash Collateral for disbursements of the type set forth in such budget (which budget will be approved by the ABL Agent on an unconsolidated basis and as such budgets may be modified from time to time by the Debtors with no less than five (5) business days' advance notice to the Committee (which notice period may be waived in writing by the Committee) and the prior written consent of the ABL Agent, not to be unreasonably withheld, and together with the Initial Budget, the "Budget"), subject in each case to any Non-Conforming Use permitted herein.

    3.    Liquidity Compliance.  The Debtors shall at all times maintain Consolidated Liquidity (as defined below) of not less than: (x) $30,000,000 until the end of the fourth full week after the date of entry of the First Interim Order, (y) $40,000,000 commencing on the first day of the fifth full week after the date of entry of the First Interim Order until the end of the eighth full week after the date of entry of the First Interim Order, and (z) $50,000,000 at any time thereafter. "Consolidated Liquidity" means, on any date, the sum of (i) unrestricted cash and Cash Equivalents (as defined in the ABL Credit Agreement as of the date hereof) of the Debtors and (ii) Excess Availability (as defined below).  "Excess Availability" means, as of any date of determination thereof, an amount which in any case, shall not be less than zero, and which shall be calculated as (a) the Borrowing Base as determined from time to time in accordance with the ABL Credit Agreement as of the date hereof (after giving effect to the

Reserve Block) *minus* (b) the outstanding principal amount of ABL Indebtedness outstanding on such date (excluding any Prepayment Premium), *minus* (c) for purposes of calculating Excess Availability after the months of February and March, the Post-Carve Out Trigger Notice Cap described in clause (iv) of the definition of Carve Out, *minus* (d) the amount, if any, then on deposit in the Success Fee Reserve (as defined below), or then required to be deposited into the Success Fee Reserve.

   4. <u>Non-Conforming Use of Cash Collateral</u>.  On no less than five (5) business days' advance notice to the Committee (which notice period may be waived in writing by the Committee), the ABL Agent may, in its sole discretion, agree in writing to the use of the Cash Collateral in a manner or amount which does not conform to the manner or amount, as applicable, set forth in the Budget (each such approved non-conforming use of Cash Collateral, a "<u>Non-Conforming Use</u>"), with such consent not to be unreasonably withheld.  If no objection is interposed by the Committee during the five (5) business day notice period above and such written consent is given by the ABL Agent, the Debtors shall be authorized pursuant to this Final Order to use Cash Collateral for any such Non-Conforming Use without further Court approval, and the Prepetition Secured Parties shall be entitled to all of the protections specified in this Final Order for any such Non-Conforming Use.  If an objection is interposed by the Committee during the five (5) business day notice period above, the Committee consents to having such objection heard telephonically and on shortened notice.   The Debtors shall provide substantially contemporaneous notice of any Non-Conforming Use to (a) counsel for the Committee, (b) counsel to the Bank Facility Agent, (c) counsel to the Notes Collateral Agent, (d) counsel to each of the Notes Trustees, (e) Jones Day, (f) counsel to the Ad Hoc Term Lenders (as defined below), and (g) the U.S. Trustee.

5.      <u>Entitlement to Adequate Protection</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Cash Collateral, solely to the extent of the aggregate postpetition diminution in value of such Prepetition Secured Party's interest in the Prepetition Collateral (including the Cash Collateral) (the "<u>Adequate Protection Obligations</u>"), including, without limitation, any diminution in value resulting from (a) the sale, lease or use by the Debtors of Cash Collateral, (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (c) the subordination of the Prepetition Secured Parties' interests in the Prepetition Collateral to the Carve Out ("<u>Collateral Diminution</u>").  Cash payments from the proceeds of Prepetition Collateral made to the Prepetition Administrative Parties for the benefit of themselves or the other Prepetition Secured Parties on account of Adequate Protection Obligations under paragraphs 7, 8, and 9 shall not be deemed to result in Collateral Diminution. For the avoidance of doubt, and notwithstanding anything contained in this Final Order, any Adequate Protection Obligations shall only be assertable, on a joint and several basis, against those Debtors that had a legal interest in the Prepetition Collateral and solely on account of Collateral Diminution.

6.      <u>Carve Out</u>.

(a)      As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or

otherwise, (x) all unpaid fees and expenses (excluding any success or similar fees; the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") and (y) unpaid expenses of members of the Committee (including fees and expenses of no more than one law firm to each Committee member, not to exceed $200,000 per Committee member in the aggregate) solely to the extent incurred in connection with such Committee member's service on the Committee) ("Committee Member Expenses") at any time before or on the first business day following delivery by the ABL Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons and Committee Member Expenses in an aggregate amount not to exceed $20,000,000 incurred after the first business day following delivery by the ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the ABL Agent to the Debtors, their lead restructuring counsel, counsel to the Bank Facility Agent, counsel to each of the Notes Trustees, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of a Termination Event under this Final Order, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)  Carve Out Reserves.

(i)  On the day on which a Carve Out Trigger Notice is given by the ABL Agent to the Debtors, their lead restructuring counsel, counsel to the Bank Facility

Agent, the U.S. Trustee and counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees and Committee Member Expenses.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees and Committee Member Expenses (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the ABL Agent for the benefit of the ABL Lenders, unless the ABL Indebtedness has been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Bank Facility Agent for the benefit of the Second Lien Secured Parties.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the ABL Agent for the benefit of the ABL Lenders, unless the ABL Indebtedness has been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Bank Facility Agent for the benefit of the Second Lien Secured Parties.  Notwithstanding anything to the contrary in the ABL Loan Documents, or the Interim Orders or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 6(b), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 6(b), prior to making any payments to the ABL Agent or any of the Debtors' creditors, as applicable. Notwithstanding anything to the contrary in the ABL Loan Documents or the Interim Orders or this Final Order, following delivery of a Carve Out Trigger Notice, the ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the ABL Agent for application in accordance with the ABL Loan Documents and the Intercreditor Agreement, unless the ABL Indebtedness has been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Bank

Facility Agent for the benefit of the Second Lien Secured Parties. Further, notwithstanding anything to the contrary in the Interim Orders or this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the ABL Loan Documents) or increase or reduce the ABL Indebtedness, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees or Committee Member Expenses due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Orders or this Final Order or in any Prepetition Credit Document, the Carve Out shall be senior to all liens and claims.

(ii)     Upon the entry of any order authorizing and approving any transaction that would result in an obligation of the Debtors to pay any success or similar fee that would benefit from the Carve-Out, the Debtors shall deposit unrestricted cash on hand to fund a reserve (the "<u>Success Fee Reserve</u>") in an amount equal to such success or similar fee. The Debtors shall hold such amount in a segregated account in trust to pay such success or similar fee as and when due; *provided*, that a Success Fee Reserve shall not be created if the order approving any applicable transaction includes a requirement that a reserve be created from the proceeds of such transaction to provide for the payment of success or similar fees for Professional Persons. For the avoidance of doubt, any amounts deposited into the Success Fee Reserve shall not reduce the amounts that may be required to be funded into or paid by the Carve Out Reserves. All amounts deposited in the Success Fee Reserve shall be used solely to pay such success or similar fees, <u>provided,</u> that to the extent the amounts on deposit in the Success Fee Reserve exceed the success or similar fees to be paid therefrom, the balance shall be paid to the ABL Agent for the benefit of the ABL Lenders, unless the ABL Indebtedness has been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Bank Facility Agent for the benefit of the Second Lien Secured Parties.

(c)     <u>Payment of Allowed Professional Fees and Committee Member Expenses Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees and Committee Member Expenses shall not reduce the Carve Out.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees or Committee Member Expenses</u>. None of the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or Committee

member incurred in connection with the Chapter 11 Cases or any Successor Cases (as defined herein) under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or any Committee member or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees and Committee Member Expenses shall permanently reduce the Carve Out on a dollar-for-dollar basis.

7.     Adequate Protection for the ABL Agent and ABL Secured Parties.  As adequate protection, the ABL Agent and the other ABL Secured Parties are hereby granted the following claims, liens, rights, and benefits, solely to the extent of any Collateral Diminution:

(a)     ABL Section 507(b) Claim.  Subject and subordinate only to the Carve Out, the Adequate Protection Obligations due to the ABL Agent and the other ABL Secured Parties (the "ABL Adequate Protection Obligations") shall constitute allowed joint and several superpriority administrative claims against those Debtors that hold a legal interest in the Prepetition Collateral as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against such Debtors, now existing or hereafter arising in the Chapter 11 Cases, including all claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (solely to the extent permitted in this Final Order), 507(a), 507(b), 726, 1113 or 1114, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings, including, without limitation, any chapter 7 proceeding, under the Bankruptcy Code (the "ABL 507(b) Claim"), which administrative claims shall have recourse to and be payable from all prepetition and postpetition property of such Debtors other than any Avoidance Actions and licenses granted by the Federal Communications Commission ("FCC Licenses"); provided, that such administrative claims shall have recourse to and be payable from proceeds and property recovered in respect of any Avoidance Actions and proceeds of FCC Licenses.[7]

---

[7]     "Avoidance Actions" shall mean the estates' claims and causes of action arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code or any other state or federal law.

(b)  ABL Adequate Protection Liens.  Subject and subordinate only to the Carve Out, and effective as of the Petition Date, solely to the extent of the ABL Adequate Protection Obligations, and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the ABL Agent of any Adequate Protection Collateral (as defined below), the ABL Agent for the benefit of the ABL Secured Parties is hereby granted valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority liens and/or replacement liens on, and security interest in, all of the Article 9 Collateral (as defined in Section 3.01 of the First Lien Pledge Agreement) now owned and hereafter arising or acquired by each of the Debtors that hold a legal interest in the Prepetition Collateral, and all accounts into which the proceeds of any Article 9 Collateral may be deposited, but in any case, excluding any "Excluded Assets" (as such term is defined in the First Lien Pledge Agreement) (the "Adequate Protection Collateral," and the liens and security interests therein, the "ABL Adequate Protection Liens").  Subject and subordinate only to the Carve Out, the ABL Adequate Protection Liens shall not be (i) subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

8.  Additional ABL Adequate Protection.  As additional adequate protection:

(a)  Payments:  The Debtors are authorized to pay to the ABL Agent for the ratable benefit of the ABL Secured Parties, adequate protection payments on the earlier of (i) any applicable Interest Payment Date (as defined in the ABL Credit Agreement), or (ii) the closing of any refinancing of the ABL Indebtedness, in each case, in an amount equal to all accrued and unpaid postpetition interest on account of ABL Indebtedness (accruing at the non-default interest rate), fees and costs due and payable under the ABL Credit Agreement (including, without limitation, interest on loans, breakage costs and fees that become due and payable to the ABL Secured Parties), such payments to be calculated based on the Eurocurrency Rate plus the Applicable Rate for Eurocurrency Rate Loans as specified in the ABL Credit Agreement as of the date hereof (and accruing at the non-default interest rate), with interest periods of 1 month or 3 months selected for Eurocurrency Rate Loans.  The aforementioned payments shall constitute adequate protection payments in accordance with Section 361 of the Bankruptcy Code and shall not constitute or be deemed to constitute an acknowledgement by the ABL Secured Parties as to the rate of interest applicable to the ABL Indebtedness from and after the Petition Date.  The ABL Secured Parties reserve any and all rights with respect to the rate of interest applicable to the ABL Indebtedness from and after the Petition Date, including with respect to the payment of default interest and the payment of interest at any other rates (including the Base Rate plus the Applicable Rate applicable to Base Rate Loans (each as specified in the ABL Credit Agreement)) in accordance with the applicable governing documents.

(b)  Fees and Expenses:  The Debtors are authorized to pay, on the terms set forth in this paragraph, the reasonable and documented fees, expenses and

24

disbursements, including, but not limited to, contractual agency fees and the reasonable fees, disbursements, and other charges of counsel (limited to those of one counsel to the ABL Agent and ABL Secured Parties (and one local counsel in each applicable jurisdiction and, in the event of any actual conflict of interest, one additional counsel to the affected parties)) and financial consultants arising prior to, on or subsequent to the Petition Date of the ABL Agent on behalf of the ABL Secured Parties under the ABL Credit Agreement (including, without limitation, the fees and expenses of Schulte Roth & Zabel LLP and Jones Walker LLP and including $60,000 for the payment of the fees and expenses of counsel to the representative of the Revolving Credit Lenders (as defined in the ABL Credit Agreement)).  Within two (2) business days of the later to occur of delivery of an invoice or the entry of the First Interim Order, the Debtors shall pay in cash all invoiced reasonable and documented out-of-pocket fees, expenses, and disbursements set forth in this paragraph that have accrued as of the Petition Date.  The payment of the fees, expenses and disbursements set forth in this paragraph accruing on and after the Petition Date shall be made within ten (10) business days after the receipt by the Debtors, the Committee, and the U.S. Trustee (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications.  The invoices for such Invoiced Fees shall include the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable professional; provided, however, that the Debtors, the Committee, and the U.S. Trustee may preserve their right to dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees, and (ii) the Debtors, the Committee, or the U.S. Trustee file with the Court a motion or other pleading, on at least ten (10) days' prior written notice to the ABL Agent of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees.  The ABL Agent and the ABL Lenders shall not be required to comply with the U.S. Trustee fee guidelines.

(c)      Reporting:  The Debtors shall comply with the minimum Consolidated Liquidity covenant, the Budget reporting requirements and all reporting requirements set forth in the ABL Credit Agreement (including timely provision of Borrowing Base Certificates and certain financial statements as required under Sections 6.01 and 6.02 thereof, and giving effect to any grace periods set forth therein, and in any case, without giving effect to any events of default that have occurred on or prior to the Petition Date and/or as a result of the commencement Chapter 11 Cases), all of which reports shall be provided to the Prepetition Administrative Parties, Jones Day and PJT Partners (collectively, the "Specified Second Lien Secured Party Professionals"), the advisors to the Ad Hoc Term Lenders, Arnold & Porter Kaye Scholer LLP and Ducera Partners LLC (the "Ad Hoc Term Lender Professionals"), and the advisors to the Committee; provided, that with regard to the requirements under Section 6.01(a) thereof, the requirement to deliver annual audited financials for the fiscal year ended December 31, 2017 may instead be satisfied by delivering unaudited financial statements certified by a financial officer of iHeartCommunications as fairly presenting in all material respects, the financial condition of iHeartCommunications and its subsidiaries in accordance with GAAP, subject only to changes resulting from normal year-end adjustments and the absences of

footnotes, within one-hundred and twenty (120) days after the end of such fiscal year, and delivery of the annual audited financials at the time iHeartCommunications' Form 10-K is publicly filed (which filing shall satisfy such requirement), which audit may be qualified by the auditors that have prepared such financial statements and/or include an emphasis of matter paragraph, and provided, further that the Debtors shall not be required to comply with Section 6.01(c) thereof.   In addition, and subject to appropriate confidentiality provisions, the Debtors shall provide the following additional reporting to the Prepetition Administrative Parties, the Specified Second Lien Secured Party Professionals, the Ad Hoc Term Lender Professionals, and the Committee:

(i)    (A) On or before the fifth (5th) business day following the conclusion of the previous Testing Period (as defined below), (1) an updated rolling 13-week cash flow forecast of the Debtors substantially in the form of the Initial Budget, which Proposed Budget, upon written approval by the ABL Agent, such approval not to be unreasonably withheld or delayed, shall become the Budget effective as of the first day of that Testing Period, and (2) a cash report detailing daily cash balances for each deposit account of the Debtors for each day during the Testing Period, and (B) on or before each third business day of each other calendar week, (1) a report of total receipts, total disbursements and a reconciliation of actual disbursements with those set forth in the Budget for the prior two weeks and (2) a statement setting forth in reasonable detail the cash balance for each deposit account of the Debtors as of the previous Friday. "Testing Period" means, initially the period from the Petition Date to but excluding the date that is four weeks following the Petition Date and, thereafter, each subsequent four week period beginning on the date immediately following the end of the prior Testing Period (such date, the "Subsequent Start Date") to but excluding the date that is four weeks following the Subsequent Start Date;

(ii)   If the Debtors' Consolidated Liquidity falls below $50,000,000 at any time, then the Debtors shall (x) promptly provide notice of such event to the Prepetition Administrative Parties and (y) thereafter provide to the Prepetition Administrative Parties each day a cash report detailing the cash balances for each deposit account of the Debtors at the end of each day until Consolidated Liquidity is above $50,000,000;

(iii)  Promptly provide copies of all written reports provided by the Debtors to the Committee, the U.S. Trustee, the Second Lien Secured Parties, or any other party in interest in the Chapter 11 Cases; and

(iv)   Such other reports and information as the ABL Agent may reasonably request; provided, that all reports provided to the ABL

26

Agent shall be provided to the other Prepetition Administrative Parties.

(d)      In addition to, and without limiting, whatever rights to access the ABL Agent and ABL Secured Parties have under the ABL Credit Agreement (including the rights set forth in Section 6.10 of the ABL Credit Agreement (including, without limitation, to conduct appraisals and field exams at the expense of the Debtors in accordance with the ABL Credit Agreement), upon reasonable prior written notice, at reasonable times during normal business hours, and otherwise not to be unreasonably withheld, the Debtors shall permit representatives, advisors, agents, and employees of the ABL Agent (1) to have access to and inspect the Debtors' properties, (2) to examine the Debtors' books and records, and (3) discuss the Debtors' affairs, finances, and condition with the Debtors' officers, management, financial advisors and counsel; provided, that, this covenant shall not require the Debtors, and their respective officers, to disclose any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege or where such disclosure would not be permitted by any applicable requirements of law.

(e)      The Debtors shall at all times remain in compliance with the Borrowing Base as contemplated by Sections 2.01 and 2.05(b)(ii) and (iii) of the ABL Credit Agreement, provided, that in lieu of making any mandatory prepayment otherwise required pursuant to Section 2.05(b)(ii) or (iii) of the ABL Credit Agreement, the Debtors shall, within 2 Business Days of the date of any such noncompliance, fund a segregated cash reserve account, subject to the ABL Adequate Protection Liens, in an amount equal to the difference between the principal amount of ABL Indebtedness outstanding on such date (excluding any Prepayment Premium (as defined in the ABL Credit Agreement)) and the Borrowing Base as determined from time to time in accordance with the ABL Credit Agreement; provided further that, at all times during the Chapter 11 Cases there shall be a reserve to the Borrowing Base in an amount equal to (x) $35 million, for the Borrowing Base calculated for the months of February and March of 2018 and (y) $50 million for each subsequent month (the "Reserve Block"), which Reserve Block (x) may be modified from time to time in accordance with the ABL Credit Agreement and (y) shall be in addition to any other reserves permitted to be instituted against the Borrowing Base in accordance with the ABL Credit Agreement.  For the avoidance of doubt, if it is subsequently determined that the Debtors are thereafter in compliance with the Borrowing Base as determined from time to time in accordance with the ABL Credit Agreement without giving effect to the segregated cash reserve account (or that a lesser amount than the amount then on deposit is required to be in compliance) the Debtors shall be entitled to withdraw from such account the excess amount.

9.      Adequate Protection for the Second Lien Secured Parties.   As adequate protection, the Second Lien Secured Parties are hereby granted the following claims, liens, rights, and benefits (the "Second Lien Adequate Protection Obligations"), solely to the extent of any Collateral Diminution; provided that the Second Lien Adequate Protection Obligations shall

be determined by and not exceed the aggregate of (i) Collateral Diminution and (ii) the diminution in the value of the Second Lien Secured Parties' interest in any other property of the Debtors (the "<u>Second Lien Prepetition Collateral</u>") from and after the Petition Date from the use, sale, or lease of such Second Lien Prepetition Collateral and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

(a)     <u>Second Lien Adequate Protection Claims</u>.     Subject to the reservation of rights regarding the Collateral Flip, and subject to and subordinate only to the Carve Out and the ABL Adequate Protection Obligations, the Second Lien Secured Parties are hereby granted allowed joint and several superpriority administrative claims against those Debtors that hold a legal interest in the Prepetition Collateral and the Second Lien Prepetition Collateral as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against such Debtors, now existing or hereafter arising in the Chapter 11 Cases, including all claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (solely to the extent permitted in this Final Order), 507(a), 507(b), 726, 1113 or 1114, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings, including, without limitation, any chapter 7 proceeding, under the Bankruptcy Code (the "<u>Second Lien 507(b) Claims</u>", and together with the ABL 507(b) Claims, the "<u>507(b) Claims</u>"), which administrative claims shall have recourse to and be payable from all prepetition and postpetition property of such Debtors other than any Avoidance Actions and FCC Licenses; <u>provided</u>, that such administrative claims shall have recourse to and be payable from proceeds and property recovered in respect of any Avoidance Actions and proceeds of FCC Licenses.

(b)     <u>Fees and Expenses</u>:  As additional adequate protection, the Debtors are authorized to pay, on the terms set forth in this paragraph, the reasonable and documented fees, expenses and disbursements, including, but not limited to, trustee fees, contractual agency fees and the reasonable fees, disbursements, and other charges of counsel and financial consultants arising prior to, on or subsequent to the Petition Date of:  (A) Cahill Gordon & Reindel LLP, and one local counsel, as counsel to the Bank Facility Agent, (B) the Ad Hoc Term Lender Professionals (Arnold & Porter Kaye Scholer LLP and Ducera Partners LLC), and one local counsel, (C) the Specified Second Lien Secured Party Professionals, and one local counsel, as advisors for certain Second Lien Secured Parties, and (D) primary counsel and one local counsel to each of Wilmington Trust, UMB Bank, and U.S. Bank; <u>provided</u>, <u>however</u>, that (i) the foregoing payments in item (D) shall be subject to a payment limit of $50,000 per month for each of Wilmington Trust, UMB Bank, and U.S. Bank (provided that any unused amounts in any month shall be applied to accrued excess fees and expenses and then be carried over into future periods), and (ii) any monthly payment under item (D) shall not, under any circumstances, constitute a limit on the aggregate amount of fees, costs, and expenses

28

payable to Wilmington Trust, UMB Bank, and U.S. Bank as a Notes Trustee under the applicable Prepetition Credit Documents; and, in the event of any actual conflict of interest for counsel in (B) and (C) above, one additional counsel to the affected parties. Within two (2) business days of the later to occur of delivery of an invoice or the entry of the First Interim Order, the Debtors shall pay in cash all invoiced reasonable and documented out-of-pocket fees, expenses, and disbursements set forth in this paragraph that have accrued as of the Petition Date. The payment of the fees, expenses and disbursements set forth in this paragraph accruing on and after the Petition Date shall be made within the Review Period of Invoiced Fees (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications. The invoices for such Invoiced Fees shall include the total aggregate number of hours billed (for the charges of counsel) and a summary description of services provided and the expenses incurred by the applicable professional; provided, however, that the Debtors, the Committee, and the U.S. Trustee may preserve their right to dispute the payment of any portion of the Disputed Invoiced Fees if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees, and (ii) the Debtors, the Committee, or the U.S. Trustee file with the Court a motion or other pleading, on at least ten (10) days' prior written notice to the parties listed under (A) through (D) of this subparagraph, as applicable, of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees. The advisors subject to this paragraph shall not be required to comply with the U.S. Trustee fee guidelines.

10. _Second Lien Adequate Protection Liens._ Effective as of the Petition Date, subject to the reservation of rights regarding the Collateral Flip, and subject to and subordinate only to the Carve Out, the ABL Adequate Protection Liens, and the Prepetition First Priority Liens, solely to the extent of the Collateral Diminution, and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Second Lien Secured Parties of any Adequate Protection Collateral, the Second Lien Secured Parties are hereby granted valid, binding, continuing, enforceable, fully-perfected, non-avoidable second priority liens and/or replacement liens on, and security interest in, all of the Adequate Protection Collateral (the "Second Lien Adequate Protection Liens", and together with the ABL Adequate Protection Liens, the "Adequate Protection Liens"). Subject to the reservation of rights regarding the Collateral Flip, and subject

to and subordinate only, to the Carve Out and the ABL Adequate Protection Liens, the Second Lien Adequate Protection Liens shall not be (i) subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

11.     Intercreditor Agreement.   For the avoidance of doubt and notwithstanding any other provision of this Final Order, the priorities and rights of the ABL Adequate Protection Obligations, the ABL Adequate Protection Liens, the Second Lien Adequate Protection Obligations and the Second Lien Adequate Protection Liens shall be governed by the terms of the Intercreditor Agreement; provided that to the extent any subsequent debtor in possession financing refinances the ABL Indebtedness, the Debtors may incur obligations and grant liens in connection with such subsequent debtor in possession financing that are senior to the Second Lien Adequate Protection Obligations, senior to the Second Lien Adequate Protection Liens and the Bank Facility Second Priority Liens, and otherwise in accordance with the terms of the Intercreditor Agreement.

12.     Termination.   The Debtors' right to use the Cash Collateral pursuant to this Final Order shall terminate (the date of any such termination, the "Termination Date") without further notice or court proceeding on the earliest to occur of (i) the one year anniversary of the Petition Date, (ii) the effective date of a plan of reorganization; and (iii) five (5) business days (any such five business-day period of time, the "Default Notice Period") following the delivery of a written notice (any such notice, a "Default Notice") by the ABL Agent to the Debtors, the U.S. Trustee, the Bank Facility Agent, the Specified Second Lien Secured Party Professionals, the Ad Hoc Term Lender Professionals, the Notes Collateral Agent, the Notes Trustees, and the Committee

of the occurrence of any of the events set forth in any of clauses (a) through (o) below unless such occurrence is cured by the Debtors prior to the expiration of such Default Notice Period; provided, that, during the Default Notice Period, the Debtors shall be entitled to continue to use the Cash Collateral in accordance with the terms of this Final Order (the events set forth in clauses (a) through (o) below are collectively referred to herein as the "Termination Events"):

(a)        Failure of the Debtors to make any payment under this Final Order to the ABL Agent or ABL Secured Parties when due;

(b)        Failure of the Debtors to (i) observe or perform any of the material terms or material provisions contained herein; or (ii) comply with any other covenant or agreement specified in this Final Order (other than those described in clause (b)(i) above), including, without limitation, the terms, provisions and covenants set forth in paragraphs 8-10 of this Final Order, in each case, in any material respect;

(c)        The Debtors shall grant, create, incur or suffer to exist any postpetition liens or security interests other than:  (i) those granted pursuant to this Final Order and the *Stipulation and Order Granting Adequate Protection* filed by the Debtors on the Petition Date [Docket No. 15] (the "AP Stipulation"); (ii) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business for amounts outstanding as of the Petition Date, even if recorded after the Petition Date; (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation; (iv) deposits to secure the payment of any postpetition statutory obligations, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and (v) any other liens or security interests that the Debtors are permitted to incur under the ABL Loan Documents except with respect to Indebtedness for borrowed money;

(d)        The Debtors' failure to comply with their obligations set forth in paragraph 3 of this Final Order;

(e)        An order shall be entered reversing, adversely amending, adversely supplementing, staying, vacating or otherwise adversely modifying any material provision of this Final Order without the written consent of the ABL Agent;

(f)        There shall be a breach by any Debtor of any material provisions of this Final Order, or this Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment;

(g)        The Debtors shall create, incur or suffer any other claim which is *pari passu* with or senior to the ABL Adequate Protection Claims, other than those provided in the AP Stipulation;

(h)     The Court shall have entered an order dismissing any of the Chapter 11 Cases, unless the ABL Agent has consented to such order in writing;

(i)     The filing by the Debtors of a chapter 11 plan that does not provide for the indefeasible payment in full in cash of all amounts due and owing under the ABL Credit Agreement (unless a chapter 11 plan is filed that provides for alternate treatment with the written consent of the ABL Agent) on the effective date of such chapter 11 plan;

(j)     The Court shall have entered an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, unless the ABL Agent has consented to such order in writing;

(k)     The Court shall have entered an order authorizing the appointment or election of a trustee or examiner with expanded powers or any other representative with expanded powers relating to the operation of the businesses in the Chapter 11 Cases, unless consented to in writing by the ABL Agent;

(l)     The Court shall have entered an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the ABL Agent or any of the ABL Secured Parties or, subject to the terms of the Intercreditor Agreement, the Second Lien Notes Trustee, Bank Facility Secured Party or any of the Bank Facility Secured Parties or the Notes Collateral Agent or any Noteholder, with respect to any material Prepetition Collateral or Cash Collateral without the written consent of the ABL Agent, which consent may be withheld by each in its sole discretion;

(m)     A filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the ABL Indebtedness or asserting any other cause of action against and/or with respect to the ABL Indebtedness, the Prepetition Collateral, or the ABL Agent, any of the ABL Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party);

(n)     The Debtors shall use Cash Collateral in any manner inconsistent with the terms of this Final Order, including, without limitation, paragraphs 2 and 4 hereof; or

(o)     The Court shall have entered an order avoiding, disallowing, subordinating or recharacterizing any claim, lien, or interest held by any Prepetition Secured Party arising under the ABL Credit Agreement, unless (i) the Debtors have sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance or (ii) the ABL Agent has consented to such order in writing.

13.     <u>Remedies upon the Termination Date</u>.  During the Default Notice Period, the

Debtors shall be entitled to use Cash Collateral pursuant to the terms of this Final Order and in

accordance with the Budget and the minimum Consolidated Liquidity covenant.   Upon the

expiration of the Default Notice Period and the occurrence of the Termination Date, and subject in all respects to the Debtors' reservation of rights included in paragraph 19, (a) the Debtors shall immediately cease using Cash Collateral, (b) the Adequate Protection Obligations, if any, shall become due and payable, and (c) the ABL Agent and each ABL Secured Party may exercise the rights and remedies available under the ABL Loan Documents, the Intercreditor Agreement, this Final Order, or applicable law, as applicable (subject only to the Carve Out), including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or Adequate Protection Collateral in order to collect and satisfy the Adequate Protection Obligations, and ABL Indebtedness, in accordance with this Final Order and the Intercreditor Agreement. The automatic stay under section 362 of the Bankruptcy Code is hereby deemed modified and vacated to the extent necessary to permit such actions; provided, that during the Default Notice Period, unless the Court orders otherwise, the automatic stay under section 362 of the Bankruptcy Code (to the extent applicable) shall remain in effect. Any delay or failure of the ABL Agent or ABL Secured Parties to exercise rights under the ABL Loan Documents or this Final Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable document. In any hearing regarding any exercise of rights or remedies, the only issues that may be raised by any of the Debtors or the Committee in opposition thereto shall be (a) whether, in fact, the Termination Date shall have occurred, and (b) what is the magnitude of the Collateral Diminution, and each of the Debtors hereby waives any right to seek relief, including, without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the ABL Agent and ABL Secured Parties set forth in this Final Order; provided, that at any such hearing, the

burden will be on the party seeking to exercise its rights or remedies to demonstrate good cause for allowing the exercise of such rights and remedies.  Without limiting the Debtors' rights under, and subject in all respects to, paragraph 19, subject and subordinate only to the Carve Out and as otherwise set forth herein, the ABL Agent shall be entitled to apply the payments or proceeds of the Prepetition Collateral and the Adequate Protection Collateral in accordance with the provisions of the ABL Loan Documents and the Intercreditor Agreement, as applicable. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the ABL Agent and the ABL Secured Parties under this Final Order shall survive the Termination Date.  Notwithstanding anything to the contrary in this Final Order, following termination of consensual use of Cash Collateral, (including following the occurrence and continuation of a Termination Event), nothing shall limit the Debtors' right to seek continued use of Cash Collateral on a nonconsensual basis.  In any hearing related to such nonconsensual use of Cash Collateral, the Debtors, the Prepetition Administrative Parties and the Prepetition Secured Parties may raise, assert, prosecute, or otherwise advance any and all rights and arguments that could be asserted at such hearing. During and after the Default Notice Period, upon three (3) business days' prior written notice to counsel to any landlord of leased real property, the ABL Agent may, enter any leased premises of the Debtors to inspect such premises and to remove or photocopy any books and records at the leased premises without unreasonable interference from landlords; provided, that the ABL Agent shall have no rights to use or occupy the leased premises.  For the avoidance of doubt, (a) all of the Debtors' obligations under any lease and any right to seek to enforce such obligations by a landlord against the Debtors shall not be affected, limited, or otherwise modified by the access

rights granted to the ABL Agent pursuant to this paragraph, and (b) any affected landlord shall retain all remedies available under section 365 of the Bankruptcy Code.

14.     <u>Limitation on Charging Expenses Against Collateral</u>.  All rights to surcharge any Prepetition Collateral or Adequate Protection Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Chapter 11 Cases.   Neither the Prepetition Administrative Parties nor the Prepetition Secured Parties' consent to the Budget nor anything else herein shall be deemed or construed as agreement by the Prepetition Administrative Parties or the Prepetition Secured Parties to be surcharged under section 506(c) or any other provision of the Bankruptcy Code or equitable doctrine.

15.     <u>Payments Free and Clear</u>.  Subject to paragraphs 17, 22, and 23 of this Final Order, any and all payments or proceeds remitted to any Prepetition Administrative Party on behalf of the applicable Prepetition Secured Parties pursuant to the provisions of the Orders or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code, and solely in the case of payments made or proceeds remitted after the delivery of a Carve Out Trigger Notice, subject to the Carve Out in all respects.

16.     <u>Bankruptcy Code Section 552(b)</u>.  The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to

the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

17.     <u>All Parties' Reservation of Rights</u>.   Notwithstanding anything to the contrary in this Final Order, and subject to the Intercreditor Agreement, all parties reserve their respective rights and related remedies to argue that, to the extent that any cash payment or accrual of interest, fees and/or expenses is not allowed under section 506(b) of the Bankruptcy Code or on any other basis (including, without limitation, on account of the Debtors' use of Prepetition Collateral and/or that there has been no Collateral Diminution), such payments should be recharacterized and applied as payments of principal owed under the applicable Prepetition Credit Documents or disgorged, <u>provided</u>, that the applicable Prepetition Administrative Parties and Prepetition Secured Parties reserve their rights to assert defenses to any such arguments and to otherwise oppose any remedy sought with respect to such adequate protection payments.

18.     <u>Reservation of Rights of the Prepetition Administrative Parties and Prepetition Secured Parties</u>.   Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant hereto is without prejudice to the rights of the Prepetition Secured Parties to seek (subject to the terms of the Intercreditor Agreement) modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection with respect to Collateral Diminution from and after the Petition Date, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.   Any additional adequate protection granted to the Prepetition Secured Parties shall be subject to the Intercreditor Agreement.   Nothing herein shall be deemed to waive, modify, or otherwise impair the respective rights of the Prepetition Administrative Parties or the Prepetition Secured Parties under the Prepetition Credit Documents, and the Intercreditor

36

Agreement, or under equity or law, and the Prepetition Administrative Parties and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the Prepetition Credit Documents, respectively, and/or equity or law in connection with all Defaults and Events of Default (as defined in the Prepetition Credit Documents, respectively, and whether arising prior to or after the Petition Date).

19.    <u>Debtors' Reservation of Rights</u>.  Notwithstanding anything to the contrary in this Final Order, following receipt of a Default Notice, and at any time before or after the occurrence of the Termination Date, including without limitation as a result of a Termination Event pursuant to paragraph 12 of this Final Order, the Debtors may seek authority to use the Cash Collateral without the consent of the Prepetition Administrative Parties or Prepetition Secured Parties, and the Prepetition Administrative Parties and Prepetition Secured Parties reserve all rights to contest such request.

20.    <u>Modification of Automatic Stay</u>.  The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Final Order and the transactions contemplated hereby.  The stay of section 362 of the Bankruptcy Code is hereby modified to permit the Debtors and each of the Prepetition Administrative Parties and Prepetition Secured Parties to accomplish the transactions contemplated by this Final Order.

21.    <u>Perfection of Adequate Protection Liens</u>.

(a)    The Prepetition Secured Parties are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not any Prepetition Secured Party, in its sole discretion, chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or

subordination as of the date of entry of the First Interim Order.  If a Prepetition Secured Party determines to file or execute any financing statements, agreements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such execution and/or filings as reasonably requested by such Prepetition Secured Party and the automatic stay shall be modified to allow such filings.

(b)      A certified copy of this Final Order may, in the discretion of any Prepetition Administrative Party, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording; provided, that, notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of the First Interim Order.

(c)      For the avoidance of doubt and notwithstanding what is set forth in paragraph 21(a), without the necessity of the filing of financing statements, security agreements, federal or state notices, pledge agreements, recordings, mortgages or other documents or taking possession or control of any Prepetition Collateral, this Final Order shall be sufficient evidence of the Prepetition Secured Parties' perfected security interests and liens granted in the Adequate Protection Collateral pursuant to this Final Order. Furthermore, notwithstanding the foregoing, the Debtors are authorized and directed to execute such documents including, without limitation, mortgages, pledges and Uniform Commercial Code financing statements and to use Cash Collateral to pay such costs and expenses as may be reasonably requested by the Prepetition Secured Parties to provide further evidence of the perfection of the Prepetition Secured Parties' security interests and liens in the Adequate Protection Collateral as provided for herein.  All such documents shall be deemed to have been recorded and filed as of the Petition Date.

22.      Preservation of Rights Granted Under this Final Order.

(a)      Except as expressly provided in this Final Order, and subject to the Intercreditor Agreement, no claim or lien having a priority senior to or *pari passu* with those granted by this Final Order to the ABL Agent and ABL Secured Parties shall be granted or allowed, and the ABL Adequate Protection Liens shall not be subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)      Notwithstanding any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time (x) the 507(b) Claims, the other administrative claims granted pursuant to this Final Order and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Adequate Protection Obligations shall have been paid and satisfied in full in cash (and such 507(b) Claims, the other administrative claims granted pursuant to this Final Order and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)      If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Prepetition Secured Parties, of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral or any Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by the Prepetition Secured Parties of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Final Order, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted herein and to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Cash Collateral and all Adequate Protection Obligations.

(d)      Subject to paragraphs 17 and 23 of this Final Order, the adequate protection payments made pursuant to the Orders shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Chapter 11 Cases or any subsequent chapter 7 cases (other than a defense that the payment has actually been made).

(e)      Except as expressly provided in this Final Order, the Adequate Protection Obligations, the 507(b) Claims and the Adequate Protection Liens and all other rights and remedies of the Prepetition Secured Parties granted by the provisions of this Final Order shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, or by any other act or omission.  The terms and provisions of this Final Order shall continue in the Chapter 11 Cases, in any Successor Cases if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, the 507(b) Claims, the other administrative claims granted pursuant to this Final Order, and all other rights and remedies of the Prepetition Secured Parties granted by the provisions of this Final Order shall continue in full force and effect until all Adequate Protection Obligations are indefeasibly paid in full in cash.

23.    <u>Effect of Stipulations</u>.  As a result of the Debtors' review of the Prepetition Credit Documents and the facts relating thereto, the Debtors have admitted, stipulated, and agreed to the various stipulations and admissions contained in the Orders, including, without limitation, the stipulations and admissions included in paragraph D of this Final Order, which stipulations and admissions shall be binding upon the Debtors and any successors thereto in all circumstances (although such stipulations are not findings of the Court); <u>provided</u>, that nothing in the Orders

shall be deemed to be an admission on the part of the Debtors that the Collateral Flip occurred and the Debtors' and the Prepetition Secured Parties' rights related to the Collateral Flip are expressly reserved.   The stipulations and admissions contained in the Orders, including without limitation, in paragraph D of this Final Order, shall also be binding upon all other parties in interest, including the Committee or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), for all purposes unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) has properly filed a claim objection or a motion seeking standing to file an adversary proceeding (provided, that such motion includes any applicable adversary complaint), as required under the Bankruptcy Rules (subject in either case to the limitations contained herein, including, without limitation, in paragraph 24) by no later than the date that is seventy-five (75) days from the date of entry of the First Interim Order (or, in the case of the Committee and Wilmington Savings Fund Society, FSB, (i) sixty (60) days from the date of the appointment of the Committee with respect to the ABL Agent and ABL Secured Parties and (ii) one-hundred (100) days from the date of the appointment of the Committee with respect to the other Prepetition Secured Parties (as applicable, the "Challenge Period"))[8] (x) challenging the amount, validity, enforceability, priority or extent of the amount of the Prepetition Indebtedness or the liens on the Prepetition Collateral securing the Prepetition Indebtedness, or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests or defenses against the ABL Agent and ABL Secured Parties with respect to the ABL Credit Agreement, First Lien Pledge Agreement, Prepetition First Priority Liens, the Prepetition Collateral, or the ABL Indebtedness (collectively, the "Claims and Defenses"), and (b) the Court rules in favor of the plaintiff sustaining any such

---

[8]     The Debtor and the parties who are protected by the Challenge Period must reasonably and promptly provide requested documents in discovery, including the pre-challenge investigation.

challenge or claim in connection with any such claim objection or duly filed adversary proceeding; provided, that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished effective as of the Petition Date.  If no such claim objection or motion seeking standing to file an adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of the Court:  (1) the Debtors' stipulations, admissions and releases contained in this Final Order shall be binding on all parties in interest, including the Committee and any Trustee; (2) the Prepetition Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case; (3) subject to the reservation of rights regarding the Collateral Flip, the Prepetition Administrative Parties' liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, and of the priority specified in paragraph D, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (4) the Prepetition Indebtedness, the Prepetition Administrative Parties' liens on the Prepetition Collateral, and the Prepetition Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors) shall not be subject to any other or further challenge by the Committee or any other party in interest, and any such Committee or party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period) subject to any order of a court with proper jurisdiction finding that the Collateral Flip has occurred; provided, that if the Chapter 11 Cases are converted to chapter 7 or a Trustee is appointed prior to the expiration of the Challenge Period, any such estate

representative or Trustee shall receive the full benefit of any remaining Challenge Period, subject to the limitations described herein.  If any such claim objection or motion seeking standing to file an adversary proceeding (provided, that such motion includes any applicable adversary complaint) is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Final Order, including without limitation, in paragraph D of this Final Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Committee and any other person, including any Trustee, except as to any such findings and admissions that were expressly challenged in such claim objection or motion seeking standing to file an adversary proceeding (and applicable adversary complaint). Nothing in this Final Order vests or confers on any person, including a Committee or any Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.   In the event that there is a timely successful challenge brought pursuant to this paragraph, the Court shall retain jurisdiction to fashion an appropriate remedy.  The stipulations and admissions contained in this Final Order, including without limitation, in paragraph D of this Final Order, shall be binding upon the Debtors, their estates, all parties in interest in the Chapter 11 Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Chapter 11 Cases or any subsequently converted bankruptcy case(s) of any Debtors and shall inure to the benefit of the Prepetition Secured Parties and the Debtors and their respective successors and assigns (collectively, the "Successor Cases").

24.    Limitation on Use of Cash Collateral.  The Debtors shall use the proceeds of the Prepetition Collateral solely as provided in this Final Order.  No Cash Collateral may be used to: (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Prepetition Indebtedness, or the liens or claims granted under this Final

42

Order or the Prepetition Credit Documents; (b) assert any Claims and Defenses against the Prepetition Administrative Parties or any of the other Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys or advisors; (c) seek to modify any of the rights granted to the Prepetition Administrative Parties and the other Prepetition Secured Parties hereunder, or (d) pay any amount on account of any claims arising prior to the Petition Date unless in accordance with the Budget and such payments are approved by an order of the Court, provided, that, notwithstanding anything to the contrary herein, no more than $250,000 of the Prepetition Collateral in the aggregate may be used by the Committee to investigate the validity, enforceability or priority of the Prepetition Indebtedness or the liens on the Prepetition Collateral or investigate any Claims and Defenses or other causes action against the Prepetition Administrative Parties or any of the other Prepetition Secured Parties; provided, for the avoidance of doubt, that any fees and/or expenses in excess of $250,000 incurred in connection with the foregoing and allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331 and/or 503(b) shall be permitted to be paid in accordance with applicable orders of this Court including any interim compensation orders, provided that the administrative expenses in respect thereof shall be subordinate in all respects to the Carve Out and the Adequate Protection Obligations.

25.     Legacy Noteholder Rights.  If the Legacy Noteholders (whose rights will include any rights of the Legacy Indenture Trustee) or the holders of the 2021 Notes are determined to have had an unavoidable interest in the Prepetition Collateral as of the Petition Date, then the adequate protections granted in the Orders shall be adjusted to (i) protect the rights of the Legacy Noteholders and the holders of the 2021 Notes to the same extent and priority as existed on the Petition Date (which is stipulated to be junior to the rights of the ABL Secured Parties, including

the rights that existed as of the Petition Date and the rights granted in the Orders); and (ii) adjust adequate protection awarded to the Bank Facility Secured Parties and Notes Secured Parties, but only to the extent that the rights of the Legacy Noteholders or holders of the 2021 Notes were impaired by the rights given in the Orders to the holders of the Bank Facility Secured Parties and Notes Secured Parties.  The rights of the holders of the 2021 Notes will be determined in light of any applicable and binding subordination agreements.

26.     <u>Binding Effect; Successors and Assigns</u>.   The provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including without limitation, the Prepetition Administrative Parties and the Prepetition Secured Parties, the Committee, and the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estate of any Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Prepetition Administrative Parties, the Prepetition Secured Parties and the Debtors and their respective successors and assigns, <u>provided</u>, that except to the extent expressly set forth in this Final Order, the Prepetition Administrative Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral or extend any financing to any Trustee or similar responsible person appointed for the estate of any Debtor.  For all adequate protection and stay relief purposes throughout the Debtors' Chapter 11 Cases, the Prepetition Administrative Parties and Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date.

27.    <u>Limitation of Liability</u>.  In permitting the use of the Prepetition Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order, the Prepetition Administrative Parties and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).   Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Administrative Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

28.    <u>Intercreditor Agreement</u>.  Nothing in this Final Order shall amend or otherwise modify the terms and enforceability of the Intercreditor Agreement.  The rights of the Prepetition Administrative Parties and Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement.

29.    <u>No Marshalling</u>.  Neither the ABL Agent nor the ABL Secured Parties shall be subject to the equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the Prepetition Collateral (including Cash Collateral); <u>provided</u>, that the doctrine of "marshalling" shall never apply to adequate protection granted under this Final Order.

30.    <u>Headings</u>.  The headings in this Final Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Final Order.

31.  <u>Effectiveness</u>.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of execution of effectiveness of this Final Order.  To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

32.  <u>Proofs of Claim</u>.   Neither the Prepetition Administrative Parties nor any Prepetition Secured Party will be required to file proofs of claim in the Chapter 11 Cases or Successor Cases, and the Debtors' stipulations in paragraph 1(a)(a)(i)D herein shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s) on account of the Prepetition Indebtedness.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or Successor Cases shall not apply to the Prepetition Administrative Parties or the other Prepetition Secured Parties with respect to the Obligations under each Prepetition Credit Document.  Notwithstanding the foregoing, each Prepetition Administrative Party (on behalf of itself and the applicable Prepetition Secured Parties it represents) is hereby authorized and entitled at the direction of the Required Lenders (as defined in the Term Loan Credit Facility) (or, in the case of any other Prepetition Credit Document, as provided under such Prepetition Credit Document), but not required, to file (and amend and/or supplement, as it sees fit) in the Debtors' lead Chapter 11 Case—*In re iHeartMedia, Inc.*, *et al.*, (Case No. 18-31274 (MI)), a single master proof of claim in the Chapter 11 Cases for any claims arising under the applicable Prepetition Credit Document and hereunder (each a "<u>Master Proof of Claim</u>").  Upon the filing of the Master Proof of Claim (if any), which shall be deemed asserted against each of the applicable Debtors that are borrowers, obligors, or guarantors of the Prepetition Indebtedness, the applicable Prepetition Secured Parties and each of their respective successors and assigns,

shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims (which names may be redacted in the publicly filed version of the Master Proof of Claim) against each of the applicable Debtors that are borrowers, obligors, or guarantors of the Prepetition Indebtedness of any type or nature whatsoever with respect to the applicable Prepetition Credit Document, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in the Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases. Each Master Proof of Claim, if filed, shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph and the Master Proof of Claim are intended solely for the purpose of administrative convenience.  Each Master Proof of Claim, if filed, shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Administrative Party.

33.     Taxing Authorities.  Notwithstanding any other provisions included in the Interim Orders or this Final Order, or any agreements approved hereby, any statutory liens ("Tax Liens") of Angelina County, Bexar County, Cameron County, Cleveland ISD, Cypress-Fairbanks ISD, Dallas County, City of El Paso, Fort Bend County, Frio Hospital District, Harris County, Hays County, Hidalgo County, Irving ISD, Jefferson County, Lewisville ISD, City of McAllen, McLennan County, Nueces County, Pearsall ISD , Rockwall CAD, San Marcos CISD, San

Patricio County, Smith County, Tarrant County, Tom Green CAD, and Victoria County (the "Taxing Authorities") shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Taxing Authorities are fully preserved.

34.     Controlling Effect of Final Order.  To the extent any provision of this Final Order conflicts or is inconsistent with any provision of the Motion, the provisions of this Final Order shall control to the extent of such conflict.

35.     Order Immediately Effective.   Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

36.     Debtor Authorization to Effectuate Relief.  The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

37.     Exclusive Jurisdiction.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

IT IS SO ORDERED.

Signed: April 12, 2018

Marvin Isgur
United States Bankruptcy Judge