IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| IHEARTMEDIA, INC., *et al.*,[1] | § § | Case No. 18-31274 (MI) |
| Debtors. | § § § § | (Jointly Administered) |
| | § | **Re: Docket Nos. 519, 632** |

**REPLY OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF IHEARTMEDIA, INC.,** ***ET AL.*** **TO THE
OBJECTION OF THE TERM LOAN/PGN GROUP TO THE APPLICATION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF
AN ORDER AUTHORIZING THE COMMITTEE TO RETAIN AND EMPLOY
JEFFERIES LLC AS INVESTMENT BANKER PURSUANT TO 11 U.S.C. §§ 328(A)
AND 1103(A)**, ***NUNC PRO TUNC*** **TO MARCH 30, 2018**

The Official Committee of Unsecured Creditors (the "Committee") of iHeartMedia, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") submits this reply (the "Reply") to the *Objection of the Term Loan/PGN Group to the Application of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Retain and Employ Jefferies LLC as Investment Banker Pursuant to 11 U.S.C. §§ 328(a) and 1103(a), Nunc Pro Tunc to March 30, 2018* [Docket No. 632] (the "Objection").[2] In support of this Reply, the Committee respectfully represents as follows:

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2] On April 19, 2018, the Committee filed the *Application of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Retain and Employ Jefferies LLC as Investment Banker Pursuant to 11 U.S.C. §§ 328(a) and 1103(a), Nunc Pro Tunc to March 30, 2018* [Docket No. 519] (the "Jefferies Application"). Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to such terms in the Jefferies Application or the Objection, as applicable.

**PRELIMINARY STATEMENT**

1.  By the Objection, the Term Loan/PGN Group[3] opposes the Committee's retention of Jefferies as its investment banker asserting that (i) Jefferies's services are not necessary and (ii) the Committee has not established that Jefferies's proposed fees are reasonable. Both of these contentions are misguided and inaccurate. The Objection should be seen for what it is—a baseless attempt by the Term Loan/PGN Group to inhibit the Committee's ability to carry out its fiduciary duties in a blatant effort to further its own agenda.[4]

2.  As a threshold matter, the Committee is the *single* entity established by the Bankruptcy Code with a fiduciary duty to protect the interests of *all* of the Debtors' unsecured creditors and is permitted to fulfill its mandate according to its business judgment.

3.  In an attempt to characterize Jefferies as being "unnecessary," the Term Loan/PGN Group trumpets the existence of the RSA and perceived inevitable confirmation of the Plan as the reason why the Committee does not require Jefferies's services. However, the RSA itself contemplates the ability of the Debtors to pursue alternative transactions and related financings. Moreover, there are serious questions about the viability of both the RSA and the Plan as currently drafted. Indeed, Committee counsel has advised Debtors' counsel that the RSA

---

[3] On May 29, 2018, conflicts counsel for the Term Loan/PGN Group filed the *Amended Verified Statement of Loewinsohn Flegle Deary Simon LLP Pursuant to Bankruptcy Rule 2019* [Docket No. 843] (the "2019 Statement"), which disclosed that the members of the Term Loan/PGN Group held, as of April 6, 2018, in the aggregate, $2,432,363,740.84 of outstanding principal amount of Term Loans and $3,269,203,000.00 of outstanding principal amount of PGNs. Such amounts represent approximately 38.6% of outstanding Term Loans, 48.4% of outstanding PGNs, and approximately 42.5% of the Debtors' Term Loans and PGNs in the aggregate. There is no disclosure in the 2019 Statement explaining why the Term Loan/PGN Group's holdings information is not as of the date Loewinsohn Flegle Deary Simon LLP was employed or why such information is not more current.

[4] For example, counsel for the Term Loan/PGN Group advised Committee counsel that if the Committee adjourned the hearing on the Jefferies Application and successfully objected to the Debtors' proposed retention of Moelis, as investment banker, and reduced Moelis's fees to an amount acceptable to the Term Loan/PGN Group, the Term Loan/PGN Group would consider not objecting to Jefferies's retention. The Committee immediately dismissed the Term Loan/PGN Group's unsavory suggestion.

may be void as an unenforceable post-petition agreement and that there are serious issues about the confirmability of the Plan, in its current form.[5]

4.    Yet, even if the Plan on file is modified in a manner consistent with the Bankruptcy Code, the Debtors are pursuing numerous initiatives in connection therewith which the Committee requires the services of an investment banker to evaluate thoroughly. These initiatives include, among others, the following: (a) seeking approval of debtor in possession financing; (b) seeking third party financing of up to $5.75 billion in lieu of providing certain creditors with "take back debt" under the Plan; and (c) seeking third party equity investments in the reorganized Debtors. There can be no serious debate that the Committee requires the services of an investment banker to assist the Committee in evaluating each of the foregoing transactions, the Debtors' business plan and valuation issues flowing therefrom. Similarly, the Committee is analyzing potential claims in respect of the Term Loans and PGNs and will require Jefferies's services in connection with, among other things, the foregoing analysis and any potential actions to avoid, as constructively fraudulent, claims and liens with respect to certain Term Loans and/or PGNs. Thus, the notion that Jefferies is not required to perform any services to earn its fees is unwarranted and false.

5.    Additionally, the Committee engaged in a reasoned selection process in deciding to retain both a financial advisor (FTI Consulting, Inc. ("FTI")) and an investment banker and has clearly delineated the separate and distinct services that such professionals will have in these

---

[5] The Plan's most glaring flaw is the absence of proposed treatment for unsecured creditors while providing a recovery to the Debtors' existing sponsors who also hold Term Loans or PGNs. Among other fundamental problems with the Plan are (i) the proposed disparate treatment of similarly situated creditors, (ii) the absence of treatment of intercompany claims, (iii) allowance of claims that are avoidable as constructively fraudulent, if not actually fraudulent and (iv) unjustifiably broad releases for insiders for which they have provided no consideration. Surprisingly, the terms of the Plan were "agreed to" by the Debtors' board of directors prior to any substantive investigation into potential claims against the Debtors' insiders and also before the Debtors had prepared the 5-year business plan upon which the Plan is premised.

cases. As described in the Horwitz Declaration (annexed as Exhibit D to the Jefferies Application), the Committee's decision to retain both a financial advisor and an investment banker was not taken lightly. The Committee is mindful of the significant costs borne by the Debtors' estates with respect to professional fees and chose to retain Jefferies only after it determined that Jefferies's services were necessary for the Committee to acquit its fiduciary duties to unsecured creditors. Indeed, the distinction between Jefferies's and FTI's services is clear; and there has not been, and will not be, unnecessary overlap in the scope of services to be performed.

6. Finally, the Committee submits that Jefferies's proposed fees are market and appropriate for large, complex chapter 11 cases such as these. Importantly, the Jefferies Application and Jefferies's proposed fee structure has not drawn an objection from the Debtors, the U.S. Trustee or any other stakeholder.

7. For the foregoing reasons and those set forth below, the Committee respectfully requests that the Court overrule the Objection and approve the Jefferies Application.

## REPLY

**A.  The Committee Has Exercised Its Business Judgment in Retaining Jefferies as its Advisor**

8. The law is well-settled that an official committee has fiduciary obligations to safeguard and advance the interests of all unsecured creditors and, in doing so, must take actions in furtherance of those actions. *See Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 2003 WL 22327118, at *4 (S.D.N.Y. Oct. 10, 2003) (affirming lower court's decision not to appoint separate committee for certain debtors reasoning in part that an official committee has a fiduciary obligation to its entire constituency); *see also In re Bohack Corp.*, 607 F.2d 258, 262 n. 4 (2d Cir. 1979); *In re Venturelink Holdings, Inc.*, 299

4

B.R. 420, 423 (Bankr. N.D. Tex. 2003) (noting that members of official committees owe a fiduciary duty to all unsecured creditors); *In re Enron Corp. Securities Derivative, & "ERISA" Litigation*, 2003 WL 22319078, at *3 (S.D. Tex. May 29, 2003) (unlike examiners, "the Creditors' Committee owes a fiduciary duty to the creditors"). Here, the Committee has determined that in order to acquit its duties it requires the aid of an investment banker. While the Term Loan/PGN Group contends in a conclusory fashion that the Committee does not require the services to be provided by Jefferies, the chapter 11 process does not allow the Term Loan/PGN Group or its members to supplant its business judgment for the Committee's, nor does it permit such creditors to dictate what type of professionals the Committee should retain in order for the Committee to satisfy its fiduciary duties. Instead, such decisions are for the Committee to decide (subject to this Court's approval).[6] The Horwitz Declaration describes in detail the Committee's need to retain an investment banker, the selection of Jefferies and its careful consideration of the associated costs and benefits.

**B.    The Services to be Performed by Jefferies are Necessary for the Committee to Acquit its Fiduciary Duties**

9.    The Objection presents confirmation of the Plan premised on the RSA as a foregone conclusion and from that starting point that the Committee's role in these chapter 11 cases should be curtailed. The Objection further posits that because the Debtors' creditors and the Debtors' equity sponsors that entered into the RSA already are represented by advisors, the Committee does not require the services of an investment banker. The Term Loan/PGN Group does not rely on case law in support of its propositions, nor could it, because its protestations are

---

[6] *See Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron),* 2003 WL 223455, at *4 (S.D.N.Y. 2003) (providing that a committee's decision to employ a professional under 1103 should be given deference); *see also* 11 U.S.C. § 1103(a) ("with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee").

5

antithetical to the Bankruptcy Code's clear mandate with respect to the appointment of a creditors' committee and the delineation of its duties. *See Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 2003 WL 22327118, at *4. In performing its duties, a creditors' committee "must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors." *See In re Bohack Corp.,* 607 F.2d at 262 n. 4.

10. Unmentioned in the Objection is that the RSA affords the Debtors significant flexibility to pursue alternative transactions. As the Court is aware, the Debtors received a restructuring proposal from Liberty Media Corporation and Sirius XM Holdings Inc. prior to the Petition Date and the Debtors continue to take actions, such as seeking to retain both Moelis and LionTree Advisors LLC, to pursue such alternative transactions.[7] In point of fact, the Debtors, in support of the foregoing retentions, recently stated that the RSA specifically contemplates conducting a marketing process for an alternative transaction with the objective of potentially unlocking value incremental to the value in the standalone scenario.[8] The Objection glaringly ignores that the Committee will be required to assess the Debtors' alternative transaction process and value any potential alternative transactions.

11. Moreover, the Term Loan/PGN Group's position with respect to the RSA also is untenable because the Debtors entered into the RSA on March 16, 2018—*after* filing these chapter 11 cases—without qualification that it was subject to the approval of this Court under

---

[7] On May 9, 2018, during its quarterly earnings call, Greg Maffei, the President and CEO of Liberty Media Corporation, reaffirmed Liberty's interest in the Debtors and stated that he expected the Debtors would re-engage with Liberty at some point. *See* Liberty Media Corporation, "Q1 2018 Liberty Media Corp Earnings Conference Call," available at http://ir.libertymedia.com/events-and-presentations/events.

[8] *See Joint Reply of the Debtors, Moelis & Company LLC, and LionTree Advisors LLC in Support of the Debtors' Applications Authorizing and Approving the Employment and Retention of Moelis & Company LLC as Investment Banker and LionTree Advisors LLC as Special Financial Advisor Nunc Pro Tunc to the Petition Date* [Docket No. 783].

6

Bankruptcy Code section 363.[9]  As a result, entry into the RSA appears to be an unauthorized postpetition transaction and may be void or voidable as a matter of law.  These facts, combined with, among other things, (a) the undetermined treatment of general unsecured creditors, (b) the absence of a business plan as foundation for the RSA or Plan, (c) the lack of a published valuation for the Debtors (individually or in the aggregate), (d) the Debtors' intention to seek billions of dollars in debt and equity financing, and (e) the Committee's ongoing analysis of potential claims and causes of action with respect to the Term Loans and/or PGNs, support the Committee's decision to retain an independent investment banker.[10]

12.     Indeed, as set forth in the Horwitz Declaration, the Committee determined that an independent investment banker was required to assess and, if necessary, provide expert testimony, as needed, with respect to the foregoing issues as well as (a) the current state of the "restructuring market," (b) the relevant valuations, recoveries, evaluation and negotiation of the proposed or alternative plans of reorganization, and (c) other potential alternatives for the Debtors.  Jefferies also will assist the Committee in connection with negotiations with other stakeholders (including the Debtors and the Term Loan/PGN Group) and their respective advisors regarding the terms of a *confirmable* chapter 11 plan, assuming such parties are

---

[9] *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (applying Bankruptcy Code section 363(b) when considering and authorizing the debtors' entry into a postpetition plan support agreement); *see also Medical Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne)*, 183 B.R. 65, 69 (Bankr. S.D.N.Y. 1995) ("Although section 363 is meant to facilitate a debtor's reorganization by allowing it to make decisions in the ordinary course of business, an extraordinary transaction undertaken by the debtor or trustee without notice and a hearing is unenforceable.") (citing *In re The Leslie Fay Cos., Inc.*, 168 B.R. 294 (Bankr. S.D.N.Y. 1994).

[10] The Term Loan/PGN Group places significant weight on the fact that "holders of Term Loans and PGNs are already well represented with counsel and financial advisors."  *See* Objection ¶ 5.  This is irrelevant.  In contrast to ad hoc groups and their advisors, a creditors' committee stands as a fiduciary to the class of creditors it represents, and professionals retained by a creditors' committee owe fiduciary duties to the committee.  *See, e.g.*, *Woods v. Nat'l City Bank*, 312 U.S. 262, 269 (1941); *In re Caldor, Inc.*, 193 B.R. 165, 169-70 (Bankr. S.D.N.Y. 1996); 11 U.S.C. § 1103(b) (professionals "employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case.").

prepared to engage in good faith negotiations, which has not been evident to date. In light of the foregoing, among other reasons, the Term Loan/PGN Group's suggestion that the Committee can rely on the financial advisors retained by various ad hoc groups in connection with these chapter 11 cases rings hollow.[11] As a fiduciary to all unsecured creditors, the Committee's retention of an investment banker to consider the interests of *all* unsecured creditors is necessary and cannot be supplanted with the advice of financial advisors tasked with looking out for individual creditor constituencies' pecuniary and self-serving interests.

13. In sum, the Committee has fiduciary obligations to all unsecured creditors and Jefferies's services are necessary for the Committee to fulfill those duties.

**C.     Jefferies and FTI are Performing Separate and Distinct Duties**

14. Despite the Term Loan/PGN Group's statements to the contrary, the Committee has stated why it requires the services of both Jefferies and FTI clearly and succinctly. In particular, the Committee focused on ensuring the investment banking services to be provided by Jefferies will provide material and tangible benefits to the Committee in fulfilling its fiduciary duties to all unsecured creditors without duplication of FTI's or any other professional's efforts.[12]

15. As set forth in detail in the Jefferies Application and discussed in the Horwitz Declaration, Jefferies, as investment banker, is responsible for assisting and advising the Committee on any potential or proposed restructuring or other transaction, including the

---

[11] The Term Loan/PGN Group points to the financial advisor, GLC Advisors, retained by an ad hoc group of holders of 14% Senior Notes due 2021 (the "2021 Group") in arguing that the Committee's retention of an investment banker is unnecessary. *See* Objection ¶ 5. As reflected in the *First Amended Verified Statement of Gibson, Dunn & Crutcher LLP and Porter Hedges LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 372], the members of the 2021 Group hold significant positions in the Term Loans (approximately $140 million) and PGNs (approximately $340 million) and have interests that conflict, at least in part, with unsecured creditors, and do not act as fiduciaries to the Debtors' unsecured creditors.

[12] *See* Jefferies Application ¶ 10; Horwitz Declaration ¶¶ 13-16.

implementation and negotiation thereof. Jefferies has and will continue to provide independent analysis of the proposals and alternatives available to the Debtors as they restructure their businesses and related support including valuation analysis and expert testimony, as needed. As noted in the Horwitz Declaration, "Jefferies is tasked with advising the Committee on the strategic elements of the Debtors' reorganization (including relevant valuations, viability, recoveries and evaluation of proposed or alternative plans of reorganization), as well as financing alternatives for the Debtors." Horwitz Declaration ¶ 15.

16. In contrast, FTI's primary responsibility is to review and analyze the financial aspects of the Debtors' complex day-to-day businesses and the administration of these chapter 11 cases. This role is complementary, but in no way duplicative, of Jefferies's role. As befits its specific expertise and industry reputation, FTI's focus has been on, among other things, reviewing and analyzing financial disclosures and information, employee benefit programs, assumption or rejection of executory contracts, tax issues, intercompany activities and claims, liquidity and cash flow, and operating results.

17. The Objection overlooks the Committee's thoughtful process in retaining both Jefferies and FTI, and instead questions why FTI is not serving as both financial advisor and investment banker. The Objection suggests that FTI already has begun providing services within Jefferies's scope of work (*e.g.*, participating in meetings and evaluating the Debtors' business).[13] This superficial and disingenuous statement ignores the different roles for which the Committee retained Jefferies and FTI and the substantive work each has performed to date and will perform in the future for the benefit of unsecured creditors in an attempt to show unreasonable duplication where none exists.

---

[13] *See* Objection ¶ 6.

### D. The Transaction Fee is Reasonable, Appropriate and Market

18. The Objection states that the Term Loan/PGN Group "has concerns about the reasonableness of the Transaction Fee" because "[t]he Transaction Fee does not appear to be tied at all to any success Jefferies achieves or in any way to recoveries of the Committee's constituency." Objection ¶ 7.[14] *First*, as discussed above, the Committee's constituency comprises *all* of the Debtors' unsecured creditors, including the members of the Term Loan/PGN Group whose claims are largely unsecured, thus the vast majority of the Debtors' capital structure constitutes the "Committee's constituency." *Second*, the circumstances upon which Jefferies earns the Transaction Fee and the amount thereof were negotiated heavily between the Committee and Jefferies.

19. The Committee selected Jefferies as its investment banker after interviewing all of the investment banking firms that were invited to present their qualifications to the Committee. Thereafter, over a period of approximately one week, the Committee negotiated Jefferies's fee structure. The Jefferies fee structure comprises two components: (x) a monthly fee of $175,000 and (y) a bi-furcated Transaction Fee. With respect to the Transaction Fee, 50% (or $2.875 million) will be payable only if the Committee supports a chapter 11 plan that is consummated or if the Committee files, but ultimately resolves, an objection to a chapter plan that is consummated. The other 50% of the Transaction Fee would be payable upon a consummation of a chapter 11 plan in these cases, regardless of the Committee's support, in order to compensate Jefferies appropriately for the services they would need to provide regardless of whether the

---

[14] The Term Loan/PGN Group's feigned concern regarding the extent of fees being incurred in these cases is belied by the engagement terms of its professionals who presumably will be seek to be compensated in these cases by the Debtors' estates. Indeed, upon information and belief, the Term Loan/PGN Group will seek fees for PJT in excess of $20 million and the group has entered into an engagement agreement with Jones Day pursuant to which the Term Loan/PGN Group apparently has agreed to compel the Debtors to provide Jones Day with a yet to be determined success fee.

10

Committee supported a chapter 11 plan in these cases (*i.e.*, performing the services outlined herein and in the Jefferies Application). This dual pronged fee structure strikes the appropriate balance of ensuring that the Committee receives material benefits from Jefferies's services, while being fair, reasonable, and market-based.

20. Indeed, at the time the Committee selected Jefferies as its investment banker, the Debtors and Term Loan/PGN Group had yet to propose treatment for general unsecured creditors under the RSA and at least one major unsecured funded debt constituency indicated that it was not supportive of the transactions contemplated thereby. As such, the Committee recognized that there was a need to incentivize its investment banker to facilitate a chapter 11 plan that the Committee could support.

21. Further, because the RSA contemplated not just a simple debt for equity swap but, rather, the potential for a complex alternative plan process and myriad potential financing transactions for which the Committee would require Jefferies's services, the Committee determined that tying the Transaction Fee only to consummation of a chapter 11 plan supported by the Committee would not be fair or reasonable to Jefferies or market-based. Accordingly, after significant negotiation, the Committee and Jefferies agreed that the second half of the Transaction Fee would not be tied to a Committee supported plan, but would compensate Jefferies appropriately for the services they would need to provide regardless of whether the Committee supported a chapter 11 plan in these cases. Thus, the Transaction Fee has been structured in a manner that appropriately incentivizes Jefferies to assist the Committee in achieving successful results for the Committee and its unsecured creditor constituency.

22. The Term Loan/PGN Group's assertion that Jefferies' proposed Transaction Fee is unreasonable is not based on any review of market fees. Indeed, a review of eight comparable

cases (summarized in the chart attached hereto as Exhibit A (the "Fee Structures Chart")) demonstrates that the Transaction Fee clearly is reasonable. The Fee Structures Chart includes chapter 11 cases filed on or after January 1, 2014, where the subject debtors had aggregate funded debt obligations of approximately $5.125 billion or more and reflects, among other things, the fees for each investment banker to the respective creditors' committee in the comparable cases. Notably, in each of the cases included on the Fee Structures Chart, the respective creditors' committee retained both an investment banker and a financial advisor. The total fees incurred by the investment bankers for creditors' committees in those comparable cases range from $4.575 million to $16 million.[15] Jefferies's projected fees of $7.85 million fall squarely within this range. Similarly, when expressed as a percentage of the Debtors' total funded debt, Jefferies's total projected fees are 0.05%, which is less than the 0.10% median in comparable cases, and the Transaction Fee standing alone is 0.04%, which is less than the 0.07% median in comparable cases.[16] In addition, the proposed crediting of 50% of monthly fees after 12 months is consistent with the crediting in comparable cases. In light of the foregoing, the Committee respectfully submits that Jefferies's proposed fee structure, including the Transaction Fee, is reasonable and should be approved pursuant to Bankruptcy Code section 328.

---

[15] The Fee Structures Chart assumes a twelve-month case duration.

[16] As reflected in the Fee Structures Chart, the median is equal to the mean in the comparable cases.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court overrule the Objection, grant the relief requested in the Jefferies Application and grant the Committee such other and further relief as is just, proper and equitable.

Dated: May 29, 2018

Respectfully Submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

/s/ *Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr. (State Bar No. 00793386; S.D. Tex. No. 30464)
Lacy M. Lawrence (State Bar No. 24055913; S.D. Tex No. 995675)
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email:  mbrimmage@akingump.com
          llawrence@akingump.com

-and-

Ira S. Dizengoff (admitted *pro hac vice*)
Philip C. Dublin (admitted *pro hac vice*)
Naomi Moss (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:  idizengoff@akingump.com
          pdublin@akingump.com
          nmoss@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of iHeartMedia, Inc., et al.*

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and by U.S. Mail to the U.S. Trustee.

*/s/ Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr.

**<u>Exhibit A</u>**

**Fee Structures of Committee Investment Bankers**

*($ Thousands)*

| Company | Note | Petition Date | Investment Banker | Pre-Petition Funded Debt | % Monthly Crediting | Monthly Retainers | Transaction Fee Amount | Transaction Fee % of Debt | 12-Month Banker Fee Amount | 12-Month Banker Fee % of Debt |
|---|---|---|---|---|---|---|---|---|---|---|
| Toys "R" Us | (1) | 09/18/17 | Moelis | $ 5,265,000 | 50% after 6 months, Caped at $1M | $ 200 | $ 6,000 | 0.11% | $ 7,800 | 0.15% |
| Seadrill | | 09/12/17 | Perella | 8,021,000 | 50% after 6 months | 175 | 5,000 | 0.06% | 6,575 | 0.08% |
| Avaya | | 01/19/17 | Jefferies | 6,023,000 | 25% after 9 months, 50% after 12 months | 175 | 4,250 | 0.07% | 6,219 | 0.10% |
| SunEdison | (2) | 04/21/16 | Lazard | 8,736,000 | 50% after 6 months | 250 | 9,500 | 0.11% | 11,750 | 0.13% |
| Peabody Energy | (3) | 04/13/16 | Jefferies | 8,800,000 | 50% after 12 months | 200 | 8,000 | 0.09% | 10,400 | 0.12% |
| Arch Coal | | 01/11/16 | Jefferies | 5,125,000 | 50% after 6 months | 175 | 3,000 | 0.06% | 4,575 | 0.09% |
| Caesars Entertainment Operating Co. | (4) | 01/15/15 | Jefferies | 18,372,700 | 50% after 12 months | 225 | 6,500 | 0.04% | 10,200 | 0.06% |
| Energy Future Holdings - TCEH Committee | (5,6) | 04/29/14 | Lazard | 32,138,000 | NA | 250 | 13,000 | 0.04% | 16,000 | 0.05% |
| Energy Future Holdings - EFH Committee | (7) | 04/29/14 | Guggenheim | 9,638,000 | 50% after $1,500 in monthlies paid (~6 months) | 250 | 8,000 | 0.08% | 10,250 | 0.11% |
| | | | Maximum | $ 32,138,000 | | $ 250 | $ 13,000 | 0.11% | $ 16,000 | 0.15% |
| | | | Mean | 11,346,522 | | 211 | 7,028 | 0.07% | 9,308 | 0.10% |
| | | | Median | 8,736,000 | | 200 | 6,500 | 0.07% | 10,200 | 0.10% |
| | | | Minimum | 5,125,000 | | 175 | 3,000 | 0.04% | 4,575 | 0.05% |
| iHeart (Proposed) | (8) | 03/15/18 | Jefferies | $ 16,190,000 | 50% after 12 months | $ 175 | $ 5,750 | 0.04% | $ 7,850 | 0.05% |

Source: Bankruptcy court filings / terms summarized - for detail refer to relevant engagement letters and retention orders

(1) The Transaction fee of $6M is only payable in the event of a confirmed chapter 11 plan, otherwise the fee is reduced to $3M.
(2) Transaction fee includes $2 million contingent on Committee support.
(3) Transaction fee includes $3 million contingent on Committee support.
(4) In a supplemental application [Docket No. 6227], Jefferies was granted a New Capital fee equal to $1M.
(5) Transaction fee includes $3 million contingent on Committee support.
(6) Commencing with February 2015, 50% of any additional monthly retainer payments shall be credited against any Contingent fee earned. By agreement with the Fee Committee, Lazard agreed to discontinue its monthly retainer effective November 1, 2015.
(7) Pursuant to agreement reached with the Fee Committee, Guggenheim Securities voluntarily reduced its monthly retainer beginning on January 1, 2017 through the Effective Date to $125,000 and agreed to reduce the Transaction fee by $1,000,000 to $8,000,000. There was no crediting on the monthly retainers Guggenheim received after December 31, 2016.
(8) Transaction fee includes $2.875 million contingent on Committee support.