## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## DEBTORS' SUPPLEMENTAL[2] MOTION FOR
## ENTRY OF AN ORDER AUTHORIZING
## AND APPROVING THE DEBTORS' 2018 INCENTIVE PLANS

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**A HEARING WILL BE HELD ON THIS MATTER ON JUNE 7, 2018, AT 3:30 PM (CT) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[3]

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]    The original version of this Motion, filed on May 8, 2018 at Docket No. 606, had sealed Exhibit E attached thereto.  Contemporaneously herewith, the Debtors have withdrawn their *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Performance Metrics for the 2018 Incentive Plans* [Docket No. 605] and accordingly are refiling this supplemental Motion with an unsealed **Exhibit E** attached hereto.  No other changes to the original Motion have been made.

[3]    A description of the Debtors' businesses, the reasons for commencing the chapter 11 cases, and the relief sought from the Court to allow for a smooth transition into chapter 11 are set forth in the *Declaration of Brian Coleman,*

**Preliminary Statement**

1.      The original version of this Motion, filed on May 8, 2018 at Docket No. 606, had sealed Exhibit E attached thereto.  Contemporaneously herewith, the Debtors have withdrawn their *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Performance Metrics for the 2018 Incentive Plans* [Docket No. 605] and accordingly are refiling this supplemental Motion with an unsealed **Exhibit E** attached hereto.  No other changes to the original Motion have been made.

2.      The weight of the Debtors' success has historically been borne on the shoulders of their most important asset—a skilled and productive workforce.  The Debtors have historically incentivized their employees to deliver operational success through various compensation programs that provide market-based financial incentives based on performance, including a long-standing annual incentive plan.   A number of macroeconomic and industry-specific challenges, together with the financial crisis that began in 2008, significantly reduced advertising and marketing by iHM's advertising customers, leading to declining revenues across iHM's businesses.   Concurrently, new competitors entered the media entertainment space (including streaming media and social networks), leading certain of iHM's advertising customers to redeploy their advertising spending away from broadcast radio to the rapidly growing digital advertising industry.[4]  While the Debtors' long-term prospects look strong, the 2018 calendar year is a time of transition, and the demands placed upon the Debtors' senior executive team (collectively, the "Senior Executives") and certain of the Debtors' non-insider workforce (collectively,

---

*Senior Vice President and Treasurer of iHeartMedia, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Coleman Declaration"), filed on March 15, 2018 [Docket No. 25], incorporated herein by reference.

[4]      For more information on the Debtors' business and the events leading to these chapter 11 cases, see the Coleman Declaration.

the "Non-Insider Employees") leading up to and during these chapter 11 cases have been, and will no doubt continue to be, significant. The Senior Executives are responsible for guiding and implementing the Debtors' overall business strategy for a set of diverse media, advertising, and radio operations across the country in a highly challenging industry environment.

3.     The Senior Executives' experience, focus, and dedication to operating such a complex business efficiently and effectively in a rapidly changing industry environment will continue to be critical to the overall success of the Debtors' restructuring and maximizing recoveries for all stakeholders. For those same reasons, the Non-Insider Employees, too, have become more essential than ever. Accordingly, incentivizing these critical employees with market-based compensation programs that are consistent with historical compensation opportunities is necessary to the Debtors' continued operational success.

4.     This Motion therefore seeks approval of the Debtors' employee incentive plans for 2018: (a) the 2018 Incentive Plan for Insiders (the "IPI"), which will include the Debtors' 11 Senior Executives; and (b) the 2018 Incentive Plan for Non-Insiders (the "IPN," and together with the IPI, the "Incentive Plans"), which will include approximately 714 Non-Insider Employees. Like other companies in the Debtors' industry and companies of similar size, the Debtors have historically offered a program that pays bonuses based on the Debtors' performance. The Incentive Plans for 2018 described in this Motion are generally consistent with the Debtors' historical incentive-compensation practices (with certain adjustments as discussed herein); consistent with the Debtors' historical compensation levels and similar to those compensation opportunities available at similar companies in the Debtors' industry; compliant with the Bankruptcy Code; and designed to continue driving the Debtors' operational excellence for the benefit of all stakeholders. The Incentive Plans, which are more fully described below, can be summarized as follows:

| Program | Number of Participants | Potential Remainder of 2018 Cost[5] | Payment Timing |
|---|---|---|---|
| 2018 Incentive Plan for Insiders | 11 | $16.6 million | Quarterly |
| 2018 Incentive Plan for Non-Insiders | 714 | $55.5 million | Quarterly |

5.    The Debtors have historically offered annual incentive compensation to the Senior Executives and Non-Insider Employees based on the Debtors' achievement of selected performance and other goals over the course of the fiscal year.  At "target" performance levels, the total cost of the Debtors' incentive plans for the Senior Executives and Non-Insider Employees in 2017 would have been $21.85 million, which is approximately the same as the "target" level awards under the IPI, which are $22.1 million (comprised of the $16.6 million under the IPI for the remainder of 2018 and the $5.5 million previously paid in February 2018 relating to the first quarter of 2018).  Given the Debtors' current financial condition and near-term restructuring goals, the Debtors seek approval of the Incentive Plans, which:  (a) continue the Company's incentive structure, with appropriate modifications, which encourages and rewards exceptional performance and focuses key employees on valu-maximization for all stakeholders; and (b) offer total potential award amounts consistent with past years, but provide that payments be made on a quarterly, rather than on an annual, basis.

6.    Importantly, the Incentive Plans also comply with the requirements and mandates of the Bankruptcy Code.  Payments under the IPI are made only if participants achieve selected and objective performance goals.  The Debtors consulted with outside advisors, including their independent compensation consultant Willis Towers Watson Delaware, Inc. ("Willis Towers Watson"), financial advisor Alvarez & Marsal North America, LLC ("A&M"), and external legal

---

[5]    These figures assume each participant receives their "target" award.

counsel Kirkland & Ellis LLP, to develop Incentive Plans that are market-based, consistent with competitive practices, and compliant with the Bankruptcy Code.  The Debtors' incentive awards are based on performance goals that align employee interests with the Debtors' financial and other business objectives, and the potential amounts of the incentive awards were guided by a competitive benchmarking analysis performed by Willis Towers Watson.  Additionally, without any requirement to do so under the Bankruptcy Code, the Debtors determined that implementing performance targets that apply to 50% of the potential payments under the IPN would further drive outperformance and align all key employees to the same or similar goals.  The performance goals themselves are based on the financial metrics set forth in the Debtors' 2018 forecast (the "Forecast"), developed by the Debtors with assistance from A&M.  The Forecast was ultimately approved by the Board of Directors of iHeartMedia, Inc. (the "Board of Directors"), and the applicable metrics and other terms for the 2018 Incentive Plans were approved by the Compensation Committee of the Board of Directors of iHeartMedia, Inc. (the "Compensation Committee").

7.     The Compensation Committee is comprised of five experienced directors that have no personal stake in the Incentive Plans.  In formulating the Incentive Plans for 2018, the Compensation Committee undertook a deliberative process, convening frequently with the Debtors' various advisors, to understand how to best incentivize the workforce in light of a likely in-court restructuring during 2018 (these meetings started in late 2017 and continued up through the approval of the plans by the Compensation Committee in late April 2018).  In the end, the Compensation Committee approved incentive plans for the 2018 year that:  (a) would cost the

Debtors for Q2, Q3, and Q4 of 2018 approximately $72.1 million[6] at target performance levels; (b) provide total compensation opportunities to Senior Executives that, at target performance levels, are approximately 3% above the 50th percentile of the market, on average;[7] and (c) establish performance goals that will challenge the Senior Executives and Non-Insider Employees and ultimately drive the most critical of the Debtors' employees to maximize stakeholder value.

8.      In short, the Debtors' Incentive Plans are reasonable and well within the Debtors' business judgment.  Consistent with past practices, the Debtors are focused on implementing an incentive plan for 2018 that motivates their employees to outperform during this challenging transition period.

9.      Importantly, with respect to the Debtors' 11 Senior Executives, market-based bonuses will be awarded if—and only if—the Debtors meet profitability targets, designed to be both stretch goals and within management's control, which will generate substantial value for the Debtors' constituencies, particularly their creditors.  To that end, the Debtors tailored the Incentive Plans around OIBDAN[8]—a generally accepted, industry-wide metric that is designed to more

---

[6]    The total allocation from iHM to CCOH on account of the Incentive Plans is projected to be $3.2 million for 2018.

[7]    In its benchmarking analysis, Willis Towers Watson compared annualized total direct compensation for participants in the IPI to those in comparable positions at peer companies and similarly sized organizations operating in the media industry.  *See* Georgeson Decl. ¶¶ 20-24.

[8]    OIBDAN (the "Performance Metric") is an important economic measure of the Debtors' ongoing efforts to capture value in the current economic environment.  OIBDAN, like EBITDA, is a proxy for analyzing the cash a firm can generate from operations regardless of capital structure and taxes and is therefore useful as a tool in designing restructurings, mergers and acquisitions, and recapitalizations, and for valuing firms on a total enterprise value basis.  OIBDAN differs from EBITDA because its starting point is operating income, not earnings, and therefore does not include non-operating income, which tends not to recur year after year. OIBDAN includes only income gained from regular operations, ignoring items such as impairments, gains or losses on disposals of assets or financing activities, interest, FX changes or tax treatments.

accurately measure actual value creation than EBITDA, and the metric historically used by the Debtors' in their previous incentive plans.[9]

10.     Moreover, without the market-based plans discussed in this Motion, the Debtors face a significant risk of losing critical employees to competitors that offer attractive compensation programs.

11.     Recognizing the importance of the relief requested herein, the Debtors have previewed the Incentive Plans with parties in interest in advance of filing this Motion.  In particular, the Debtors have met and shared information with the Official Committee of Unsecured Creditors (the "Committee") and advisors to the ad hoc group of holders of the Debtors' term loans and priority guaranty notes.  The Debtors have also previewed the filing of this Motion with the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee").  Moreover, the Debtors will continue to discuss the relief requested in this Motion with the U.S. Trustee, the Committee, and the Debtors' economic stakeholders prior to the hearing on this Motion.

12.     For these reasons and the reasons stated herein, and based on the evidence that will be presented at the hearing on this Motion, the Debtors respectfully submit that the Incentive Plans plainly satisfy the legal standards set forth in the Bankruptcy Code and the applicable case law and respectfully request the Court authorize the Debtors to implement the Incentive Plans.

**Relief Requested**

13.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), authorizing and approving the Incentive Plans.  In support of this motion,

---

[9]   Historically, the Debtors have used a non-GAAP, "internal" OIBDAN as the performance metric for their incentive plans which excludes the impact of FX and does not include certain expenses such as restructuring expenses.  The Incentive Plans also contemplate using "internal" OIBDAN, consistent with historical practice.

7

the Debtors submit the *Declaration of Zach Georgeson, Director of Executive Compensation at Willis Towers Watson, in Support of the Debtors' Motion for Entry of an Order Approving the Debtors' 2018 Incentive Plans* (the "Georgeson Declaration"), attached hereto as **Exhibit B**.

## Jurisdiction and Venue

14.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges (District Court General Order 2012-6)*, dated May 24, 2012 (the "Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

15.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16.     The bases for the relief requested herein are sections 105(a), 363(b), 363(c), 503(c), 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rule 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

17.     iHeartMedia, Inc. ("iHeart") and its direct and indirect Debtor and non-Debtor subsidiaries are a diversified media and entertainment business headquartered in San Antonio, Texas, with approximately 17,000 employees operating in the Americas, Europe, and Asia.  These entities operate three primary business segments: (i) iHeartMedia (the "iHM Segment"), (ii) Americas Outdoor Advertising, and (iii) International Outdoor Advertising (Americas Outdoor

Advertising and International Outdoor Advertising together, the "Outdoor Segments"). The Debtors in these cases operate the iHM Segment, which provides media and entertainment services via broadcast and digital delivery and also includes other businesses, including a national syndication business, a live-events business, and a media representation business (collectively, "iHM"). Non-Debtor affiliates (including, among others, Clear Channel Outdoor Holdings, Inc.) operate the Outdoor Segments, which provide outdoor advertising services in North America and internationally using various digital and traditional display types.

18.    For the year ended December 31, 2017, the Debtors' iHM Segment recognized approximately $1.01 billion of OIBDAN and $3.58 billion of revenue. As of the Petition Date, the funded debt obligations of iHeart and its direct and indirect Debtor and non-Debtor subsidiaries totaled over $20 billion, while the Debtors' funded obligations totaled approximately $16 billion.

19.    On March 14, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 76]. On March 21, 2018, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 244].

## The Incentive Plans

**I.     The Incentive Plans.**

   **A.     Summary of Key Features.**

20.    As approved by the Compensation Committee, the Incentive Plans have the following key features:[10]

| Key Terms of Incentive Plans | | |
|---|---|---|
| **Element** | **IPI** | **IPN** |
| **Participation** | • Chairman & CEO<br>• President, COO & CFO<br>• Executive Vice President, General Counsel, & Secretary<br>• President, National Sales and Marketing Partnerships<br>• President, Markets Group<br>• CFO & Senior Vice President of Corporate Finance, iHM<br>• President, iHeartRadio and iHeartMedia Networks<br>• Senior Vice President, Treasurer<br>• Chief Information Officer<br>• Executive Vice President and Deputy General Counsel<br>• Senior Vice President, Chief Accounting Officer, & Assistant Secretary | • The IPN will include approximately 714 Non-Insider Employees |
| **Form of Payment** | • Quarterly cash payments | • Quarterly cash payments |

---

[10]   This summary of the Incentive Plans is for illustrative purposes only and is qualified in its entirety by the terms of the IPI and the IPN, copies of which are annexed hereto as **Exhibit C** and **Exhibit D**, respectively.

| Key Terms of Incentive Plans | | |
|---|---|---|
| **Element** | **IPI** | **IPN** |
| **Award Opportunities** | • IPI program opportunities would be provided in lieu of annual incentive opportunities<br><br>• IPI awards would be calibrated to provide nine months of incentive opportunities (*i.e.*, three quarters, from April 2018 to December 2018, with 33% of the opportunity payable at the end of each respective quarter) | • IPN program opportunities would be provided in lieu of ongoing incentive opportunities<br><br>• IPN awards would be calibrated to provide 12 months of incentive opportunities (*i.e.*, 25% of the opportunity payable at the end of June 2018 based on January 2018 through March 2018, 25% payable at the end of June 2018 based on April 2018 through June 2018, 25% payable at the end of September 2018 based on July 2018 through September 2018, and 25% payable at the end of December 2018 based on October 2018 through December 2018). |
| **Performance Metrics** | • Based 100% on OIBDAN:<br> • Awards for eight Senior Executives will be based on Consolidated OIBDAN (as defined below)<br> • Awards for the remaining three Senior executives will be based on Segment OIBDAN (as defined below) | • 50% based on Segment OIBDAN (OIBDAN targets for particular groups would be specific by business segment) with payments subject to management discretion if performance targets not achieved<br><br>• 50% based on management discretion and will be evaluated quarterly based on participant performance (with managers being able to reallocate bonus amounts not awarded to other employees in the non-insider group) |

| Key Terms of Incentive Plans | | |
|---|---|---|
| **Element** | **IPI** | **IPN** |
| **Performance Ranges and Payout Potential** | • 100% of award is based on target OIBDAN goals, threshold and maximum payouts corresponding to achievement of 80% and 120% of target OIBDAN goals ($0 of payments if less than 80% of target OIBDAN is achieved)<br><br>• If 80% of the performance metric is achieved (the "threshold" level), then the IPI participant will receive a corresponding installment IPI payment of 50% of the target award. If 120% of the performance metric is achieved (the "maximum" level), then the IPI participant will receive a corresponding installment IPI payment of 150% of the target award. Linear interpolation of the IPI Payment will be applied for achievement of the performance metric between the threshold level and maximum level | • 50% of award is based on target OIBDAN goals, threshold and maximum payouts corresponding to 80% and 120% of target, respectively<br><br>• If 80% of the performance metric is achieved (the "threshold" level), then the IPN participant will receive a corresponding installment IPN payment of 50% of the target award. If 120% of the performance metric is achieved (the "maximum" level), then the IPN participant will receive a corresponding installment IPN payment of 150% of the target award. Linear interpolation of the IPN Payment will be applied for achievement of the performance metric between the threshold level and maximum level<br><br>• However, management has discretion to award payments even if performance targets are not met (unlike IPI) |
| **Cost (assuming achievement of target performance levels)** | • Approximately $16.6 million | • Approximately $55.5 million |

| Key Terms of Incentive Plans | | |
|---|---|---|
| **Element** | **IPI** | **IPN** |
| **Performance Measurement and "Catch-up" Mechanism** | • Performance would be measured at the end of each measurement period, and Q3 and/or Q4 quarterly payouts would be trued up relative to cumulative performance <br><br> • *i.e.*, at the end of the year, participants will receive the greater of (i) the sum of actual payments or (ii) the IPI outcome once measured on a cumulative basis | • Same as IPI |
| **Program Treatment Upon Emergence from Chapter 11** | • If the effective date of a chapter 11 plan of reorganization occurs before December 31, 2018, participants will receive a prorated portion of their bonus award as appropriate under the program | • Same as IPI |

21.     Additionally, the Incentive Plans contemplate tailoring the use of OIBDAN to each Incentive Plan participant's (collectively, the "Incentive Plan Participants") role.  Specifically, eight of the IPI participants will have their performance measured based on the OIBDAN of all segments of iHM—that is, the iHM Segment and the Outdoor Segment ("Consolidated OIBDAN")—because their roles are important drivers of the performance of both of those segments.  However, three of the IPI participants, and all of the IPN participants, will have their performance measured solely on the OIBDAN of the iHM Segment ("Segment OIBDAN") because their roles do not necessarily cover all segments.

**B.      Timing of Payments and Estimated Costs.**

22.      Awards under the Incentive Plans are paid, if earned, based on the Debtors'

performance during the year.

23.      Under the IPI, performance is measured at the conclusion of the second quarter

(starting April 1, 2018 and ending June 30, 2018 ("Q2")); the end of the third quarter (starting July

1, 2018 and ending September 30, 2018 ("Q3")); and the end of the fourth quarter (starting October

1, 2018 and ending December 31, 2018 ("Q4," and each, a "Period")).

24.      Under the IPN, payments related to the performance component of the IPN for the

first quarter (January 1, 2018 and ending March 31, 2018) will be made at "target" award levels

and payments related to the performance component of the IPN for Q2, Q3, and Q4 will be based

on actual performance for Q2, Q3, and Q4.

25.      The award opportunities for each Period correspond to threshold, target, and stretch

performance goals established for each of the Performance Metrics, and are set at 80%, 100%, and

120% of the target goal, respectively.   A "catch-up" mechanism, as described further below,

encourages both the Senior Executives and Non-Insider Employees to continue to strive for

excellence even if performance falls short in an earlier Period.

26.      If the "target" Performance Metric is achieved, the estimated total cost of the

Incentive Plans for Q2, Q3, and Q4 of 2018 will be approximately $72.1 million.[11]  Importantly,

the figure for total 2018 compensation for insiders and the industry benchmarking analysis include

one year of the two year retention bonuses paid in February of 2017 and annualized over a two-year

---

[11]      The total allocation from iHM to CCOH on account of the Incentive Plans is projected to be $3.2 million for 2018.

claw-back period, further establishing the continuity between prepetition practice and the IPI and the IPI's consistency with industry practice.

### C.   The Performance Goals and Catch-Up Mechanism.

27.   The actual goals for the IPI Performance Metric for Q2, Q3, and Q4 are summarized in the table attached hereto as **Exhibit E**.[12]   The performance goal levels for each of the Performance Metrics were determined based on the Debtors' 2018 Forecast.

28.   If the threshold performance for one Period is not achieved, no amounts will be earned under the IPI; however, to continue incentivizing the Senior Executives, performance will also be measured cumulatively (*i.e.*, from April 1, 2018) through the end of each of Q3 and Q4. Accordingly, if performance falls below threshold or target levels in a given Period, but in the aggregate meets cumulative target or maximum levels due to outperformance in a subsequent Period, participants will receive a "catch-up" payment at the end of Q3 (but not to exceed cumulative target payments) and at the end of Q4, as applicable.   At the end of the year, participants would have received the greater of (a) the sum of actual payments or (b) the IPI outcome once measured on a cumulative basis.   Awards that have been paid would not be subject to a "clawback" to the extent any cumulative targets were not achieved.

### D.   No Guarantee That Performance Metrics Will Be Satisfied.

29.   Importantly, there is no guarantee that the Debtors will meet any of the Performance Metrics in this business environment.   The Compensation Committee therefore designed the Incentive Plans using these targets to ensure that these are "stretch" goals that incentivize and reward excellent performance.

---

[12]   Contemporaneously with the filing of this Motion, the Debtors filed a motion to seal Exhibit E containing the Performance Metrics, which contain commercially sensitive information.

30.     There are, in fact, a number of risks that could cause results to differ materially from the OIBDAN targets.  Among other things, these risks include increased operational costs and decreased advertising revenues associated with parties concerned about doing business with a chapter 11 debtor.

31.     Moreover, broader economic conditions may also result in the Debtors' inability to meet the OIBDAN targets.  Nonetheless, it is the Debtors' (and the Compensation Committee's) belief that these OIBDAN targets represent the critical value drivers that are most directly within the control of the participants of the Incentive Plans, and expect that through strong performance (and only through strong performance) some or all of these targets could be hit.

**E.     Award Opportunities Under the IPI.**

32.     The Senior Executives and their total annual award opportunities can be summarized as follows:

| Incentive Plan for Insiders | | | |
|---|---|---|---|
| Senior Executive | Threshold Award Opportunity (50% of Target Award) | Target Award Opportunity | Maximum Award Opportunity (150% of Target Award) |
| Chairman & Chief Executive Officer | $3,487,500 | $6,975,000 | $10,462,500 |
| President, Chief Operating Officer & Chief Financial Officer | $1,987,500 | $3,975,000 | $5,962,500 |
| Executive Vice President, General Counsel, & Secretary | $337,500 | $675,000 | $1,012,500 |
| Other Senior Executives (8)[13] | $2,483,440 | $4,966,875 | $7,450,315 |
| **Total Award Opportunity** | **$8,295,940** | **$16,591,875** | **$24,887,815** |

33.     The 11 Senior Executives have been intimately involved in managing the Debtors' business and restructuring efforts.   In recent months, the Senior Executives have not only continued to perform their preexisting job functions, but have also taken on more responsibilities as a result of the chapter 11 process.   The Senior Executives' responsibilities now include developing and implementing the Debtors' reorganization strategy, participating in Court hearings and meetings with stakeholders and other parties, reviewing court filings and required reports, and responding to creditor inquiries and requests from the U.S. Trustee—all in addition to their other daily responsibilities and duties.

---

[13]     The names, titles, and award amounts have been or will be provided to the U.S. Trustee, counsel to the Committee, and the RSA parties.

34.     In its review of the IPI, Willis Towers Watson compared the award opportunities under the IPI against other executive compensation programs, specifically with respect to the types of metrics, payout ranges, and the individual award opportunities, as well as conducted a benchmarking analysis of the compensation levels for the Senior Executives.   The analysis provided by Willis Towers Watson confirmed that the IPI is consistent with market practice and provide a reasonable award opportunity to Senior Executives given the facts and circumstances of the Debtors' restructuring efforts.[14]   Willis Towers Watson also concluded that total direct compensation for the Senior Executives under the IPI will be 3% above the 50th percentile of media industry market data, on average, at target performance levels, and that level is reasonable in light of competitive market practices for similar companies.[15]

F.     **The IPN Award Opportunities.**

35.     The IPN provides award opportunities to the Non-Insider Employees (approximately 714 employees) whose knowledge and experience are essential to both preserving operational stability and maximizing estate value.   These employees include highly trained personnel with considerable knowledge of the Debtors' operations that would be significantly difficult to replace without a negative effect on the Debtors' business.

36.     Under the IPN, 50% of the award opportunity is based on quarterly and annual Segment OIBDAN performance targets and 50% of the award opportunity is based on management discretion.[16]   While the Debtors considered implementing a plan for these 714 employees that resulted in payments based solely on employees staying with the company (*i.e.*, a

---

[14]     *See* Georgeson Decl. ¶ 19.

[15]     *See* Georgeson Decl. ¶ 19.

[16]     Provides ability to grant 0% to 100% for individual plan participants, with managers being able to re-allocate bonus amounts not awarded to other employees in the group (subject to a maximum payment to any one individual of 150% of their target award).

traditional retention program, which is often used in chapter 11 cases), the Debtors instead have put in a program that utilizes the same performance metrics that apply to the Senior Executives, thereby aligning everyone's interests.

37.     While Willis Towers Watson compared target award opportunities under the IPN with similarly paid employees in the media industry and found the award levels to be within the range of observed market practice.[17]

38.     The Debtors believe the IPN is integral to the operation of the Debtors' business. The IPN aligns employees' interests with those of the Debtors, and therefore the Debtors' stakeholders, generally by linking payments under the plan to overall profitability of the Debtors' operations based on the OIBDAN targets and individual performance contributions as determined by management.

## Basis for Relief

39.     The Debtors respectfully request that the Court grant this Motion for two primary reasons.  *First*, the Incentive Plans are an ordinary-course continuation of the Debtors' prepetition compensation practices that constitute a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors' estates.  *See*, *e.g.*, *In re Dana Corp.*, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006).  *Second*, the Incentive Plans comply with the requirements of sections 503(b) and (c) of the Bankruptcy Code.  The Incentive Plans' performance metrics for the Senior Executives are "stretch" goals that are primarily incentivizing and tied to financial performance objectives that are directly aligned with the ultimate interests of all stakeholders.  For that reason, payments under the Incentive Plans are fully justified by the facts and circumstances of the Debtors' chapter 11 cases.

---

[17]    Georgeson Decl. ¶ 30.

I.     **The Incentive Plans Constitute Ordinary Course Transactions Authorized by Section 363(c) of the Bankruptcy Code.**

40.    The Incentive Plans are generally consistent with the Debtors' previous incentive compensation programs, cover hundreds of employees, and are similar to programs within the industry generally.  Accordingly, the Debtors believe that the payments under the Incentive Plans in these chapter 11 cases are ordinary course transactions.  In the interests of certainty and transparency, however, the Debtors are requesting Court approval of the Incentive Plans.

41.    The Bankruptcy Code grants the Debtors flexibility to engage in ordinary course transactions without unneeded oversight by creditors or the Court, while also providing creditors an opportunity to challenge non-ordinary transactions.  *See In re Dana Corp.*, 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006).  Pursuant to section 363(c)(1) of the Bankruptcy Code:

> [The Debtor] may enter into transactions ... in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

42.    Courts have developed a two-prong test to determine "ordinariness" under section 363(c) of the Bankruptcy Code.  *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (discussing the analysis of transactions on a horizontal and vertical basis); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007) (same).  The vertical test focuses on whether the transaction is ordinary for the particular debtor, based on the debtor's past practices and viewed from the perspective of a hypothetical prepetition creditor.  *See In re Lavigne*, 114 F.3d 379, 385 (2d Cir. 1997).  The horizontal test, in contrast, focuses on an "industry-wide perspective" in which the debtor's business is compared to other like businesses.  *Id.*   ("whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business.").

43.     The Incentive Plans satisfy the vertical and horizontal prongs of the "ordinariness" requirements of the Bankruptcy Code.  The Incentive Plans represent the continuation of the Debtors' historical compensation practices and are substantially similar to incentive plans existing at similar companies.  The Incentive Plans' hallmarks—the use of performance metrics, the participants in the programs, and the total levels of compensation—have remained consistent on a year-to-year basis.  The Debtors' usage of performance metrics as benchmarks for awards in employee incentive plans for several years, and in similar form, supports that the Incentive Plans are in the ordinary course of business.  *See Nellson*, 368 B.R. at 803 (finding that compensation plans were in the ordinary course where "[c]onsistent with the Debtors' pre-petition practices . . . [incentive compensation] must be viewed as a whole.  It consists of two parts:  the establishment of 'aspirational goals' in the early part of the year; and a review at the end of the year to consider whether those goals have been met").  The implementation of the Incentive Plans, notwithstanding certain changes for the 2018 year that were the result of the Compensation Committee annual review process, therefore reflects a continuation of prepetition practices that takes into account the Debtors' financial performance and particular business objectives.  *See Dana Corp.*, 358 B.R. at 571 (finding that because a debtor's postpetition incentive plan was a "refinement" of historical practices, the proposed program was within the ordinary course); *In re Glob. Home Prods.*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed compensation programs were "not 'new' compensation programs but, instead, [were] nearly identical to plans previously used, and approved by a compensation committee and board of directors")

44.     The *Dana* case is illustrative.  In *Dana*, the court found that certain prepetition modifications to the Debtor's ordinary course bonus plan, which reduced the number of participating employees from roughly 2,000 to 1,368 and replaced prepetition performance

measures with EBITDA targets better suited to a company operating under chapter 11, was still ordinary course under section 363(c) of the Bankruptcy Code.  *See Dana*, 358 B.R. at 581; *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007) (analyzing debtor's alteration of short term compensation plan and finding that it remained ordinary course under section 363(c)); *In re Glob. Home Prods., LLC*, 369 B.R. 778 (Bankr. D. Del. 2007) (same).  Here, the Incentive Plans use OIBDAN, a metric commonly used by the Debtors to measure their financial performance, in calculating payouts to Senior Executives and Non-Insider Employees. While the Debtors changed the payments under the Incentive Plan to quarterly payments (instead of annual payments),[18] the Compensation Committee determined that this modification better aligned the Incentive Plans with the Debtors' current situation for a number of reasons, including that more frequent payments would build confidence in the Debtors long-term prospects, eliminate the discounting that employees would do if the payment were promised to come at the end of the restructuring, and keep employees focused for future quarters even if a particular quarter missed the targets for unexpected reasons or reasons outside of the employee's control.

## II.   The Incentive Plans Are Exercises of the Debtors' Sound Business Judgment.

45.   Even if the Incentive Plans are not ordinary course transactions, the Debtors respectfully submit that the Incentive Plans constitute a sound exercise of the Debtors' business judgment and constitute valid non-ordinary course transactions that this Court should approve.

46.   Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of

---

[18]   Two of the Senior Executives (the Chairman and Chief Executive Officer as well as the President, Chief Operating Officer and Chief Financial Officer), however, were in a quarterly payment program during 2017.

the Bankruptcy Code, the Fifth Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines*), 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

47.     The business judgment rule shields a debtor's management's decisions from judicial second guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the Court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain debtor decisions—such as the Debtors' adoption of the Incentive Plans—from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.")  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

48.     Courts consider some or all of the following factors when determining if a compensation proposal and the process for developing it were an exercise of the Debtors' sound business judgment:

    a.    Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e.... in the case of a performance incentive, is the plan calculated to achieve the desired performance?

    b.    Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential? Is the plan or proposal consistent with industry standards?

    c.    Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

    d.    What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which employees need to be incentivized; what is available; what is generally applicable in a particular industry? Did the Debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana*, 358 B.R. at 576-77 (collecting cases).

49.     Here, there is no question that an articulable business purpose exists to implement the Incentive Plans—to properly incentivize the Senior Executives and Non-Insider Employees— and that implementation of the Incentive Plans is a sound exercise of the Debtors' business judgment. ***First***, each of the plans awards compensation based on the employees' satisfaction of specific performance targets for the Company overall and/or relevant to the employees' areas of expertise and responsibility. For example, payments under the IPI are based on the Company's overall success and profitability, that is, the achievement of the Board-approved OIBDAN targets. Further, the Senior Executives are in positions that are most integral to the Debtors' restructuring process, including right-sizing the Debtors' capital structure as well as improving operational and financial performance. As a result, the Senior Executives' incentive compensation is designed to drive the Debtors' desired financial performance. Likewise, the Non-Insider Employees are

integral to the day-to-day operation of the Debtors' business. Therefore it is essential that the Non-Insider Employees receive competitive pay and are properly incentivized to achieve the Debtors' financial, operational, and restructuring objectives.

50.     *Second*, the cost of the Incentive Plans is reasonable for the size and earnings potential of the Debtors. The total cost of the Debtors' Incentive Plans is included in the Debtors' current operating budget and, based on Willis Towers Watson's review, target and maximum costs fall within the range of observed market practice. Additionally, it is clear that the Debtors' restructuring initiatives have placed additional demands on the Senior Executives and Non-Insider Employees, making the provision of appropriate, market-based compensation and incentives essential to the success of the Debtors' restructuring efforts.

51.     *Third*, the Incentive Plans have a broad scope, reaching over 700 of the Debtors' most senior employees, and eligibility under the programs is based on objective, non-discriminatory criteria. Employees participate in the Incentive Plans based on their job titles, areas of responsibility, and functions within the Company. Similarly, key Senior Executives participate in the IPI based on their titles and executive functions, which, in turn, are selected based on standards and expectations common to companies of the Debtors' size and within the industry.

52.     *Finally*, the Debtors followed best corporate practices when adopting the Incentive Plans. The performance targets for the Incentive Plans are determined in connection with the Debtors' annual budgeting process, which concluded in April 2018. The Debtors worked collaboratively with A&M to develop the 2018 Forecast, which was approved by the Board. The IPI for Senior Executives was subject to significant diligence and approved by the Compensation Committee, an independent committee of the Board, based on the advice of a third-party consultant, Willis Towers Watson. The Compensation Committee discussed the approach for

incentive compensation for 2018 over a number of different meetings that took place between late 2017 and April 2018.

53.     Incentive plans, like those described herein, are common in large, complex chapter 11 cases such as these, and courts routinely have recognized that such programs can be an efficient means of maximizing value for a debtor's estate and, accordingly, have approved them.  *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex. Nov. 4, 2016) (approving incentive plan based on financial and operational metrics); *In re Heartland Automotive Holdings, Inc.*, No. 08-40047 (DML) (Bankr. N.D. Tex. Jun. 20, 2008) (approving debtors' incentive plan based on EBITDA metrics); *In re Kitty Hawk, Inc.*, No. 07-44536 (RFN) (Bankr. N.D. Tex. Dec. 5, 2007) (approving debtors' incentive plan employing metrics related to collection of accounts receivable); *In re Vanderra Res., LLC*, No. 12-45137 (DML) (Bankr. N.D. Tex. Nov. 30, 2012) (same); *In re Scotia Development, LLC*, No. 07-20027 (RSS) (Bankr. S.D. Tex. Aug. 24, 2007) (approving management incentive plan with performance targets).[19]  Accordingly, the Debtors submit that implementing the Incentive Plans are a valid exercise of the Debtors' business judgment and should be approved as implementing the Incentive Plans is in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

III.     **The Incentive Compensation Programs Are Permissible under Section 503(c) of the Bankruptcy Code.**

54.     The Senior Executives are "insiders" within the meaning of section 101(31) of the Bankruptcy Code, and therefore the Incentive Plans implicate, and also satisfy the requirements of, section 503(c) of the Bankruptcy Code, which restricts compensation transfers or payments made by the Debtors to the extent that such payments are outside the ordinary course of business.

---

[19]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

*See* 11 U.S.C. § 503(c).  This section focuses primarily on payments to "insiders."  *See, e.g.*, *Dana*, 358 B.R. at 575.  Specifically, sections 503(c)(1) and (c)(2) of the Bankruptcy Code prohibit the allowance and payment of sums to "insiders" for (a) the purposes of inducing such persons to remain with the business, absent satisfying certain stringent standards, and (b) severance, absent satisfying equally stringent standards.  *Id.*  Section 503(c)(3) of the Bankruptcy Code permits a non-ordinary course incentive plan if it is "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3).

### A.      Sections 503(c)(1) and (c)(2) Do Not Apply to the Incentive Compensation Plans or Payments Thereunder.

55.      On their face, sections 503(c)(1) and (c)(2) of the Bankruptcy Code only apply to insiders, and accordingly, only apply to the IPI, which covers the Debtors' 11 "insiders."

56.      In addition, to the extent recipients under the IPI are "insiders," section 503(c)(1) of the Bankruptcy Code applies only to compensation plans that are primarily retentive in nature. Here, the primary purpose of each of the Incentive Plans is to *incentivize* the recipients, *i.e.*, the plans are a "'pay for value' plan that offers incentives based on performance rather than a 'pay to stay' plan."  *In re Res. Cap., LLC*, 478 B.R. 154, 170–71 (Bankr. S.D.N.Y. 2012) ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)."); *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  The milestones and targets triggering the incentives must force the participants to stretch and cannot be compared to "lay-ups" for the ease by which the participants could achieve the targets.  *See Dana Corp.*, 358 B.R. at 583; *Hawker Beechcraft*, 479 B.R. at 313, n.7.

57.      The primary effect of the Incentive Plans is to incentivize the Senior Executives and Non-Insider Employees in a manner that will benefit the Debtors' business as a whole and, as

a result, all stakeholders.  Toward that end, the 2018 Board-Approved OIBDAN targets are aggressive financial targets, which the Company may not achieve.  Accordingly, the IPI is anything but a "pay to stay" plan and those performance goals are certainly not "lay-ups."  The Debtors crafted the benchmarks for each performance metric based on their 2018 Forecast.  Historically the Debtors' forecasts—like the 2018 Forecast—have challenged senior management to meet ambitious goals that often were not met.  Similarly, the 2018 Forecast will be particularly challenging in the Debtors' industry, which is a complicated industry that is in the middle of a significant transition and subject to intense competition from all types of new challengers.

58.     Moreover, an incentive-based bonus plan "may contain some retentive effect" without being deemed to be wholly "retentive rather than incentivizing in nature."  *In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mich. 2013) (citing *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bank. S.D.N.Y. 2012)); *see also In re Glob. Home Prods., LLC*, 369 B.R. at 785 ("The entire analysis changes if a bonus plan is not primarily motivated to retain personnel or is not in the nature of severance.").

59.     Similarly, section 503(c)(2) of the Bankruptcy Code that limits severance payments to insiders does not apply on its face as none of the Incentive Plans constitute "severance" within the meaning of the statute.  *See Dana*, 358 B.R. at 576 (defining severance as compensation for termination of employment).

## IV.     The Incentive Compensation Programs Are Justified By the Facts and Circumstances of These Chapter 11 Cases.

60.     Section 503(c)(3) of the Bankruptcy Code prohibits, in relevant part, certain transfers made to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case.  *See* 11 U.S.C. § 503(c)(3).  Certain courts have held that section 503(c)(3)'s "facts and circumstances" test "creates a standard no different than the business

judgment standard under section 363(b) of the Bankruptcy Code." *In re Borders Grp. Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011); *Glob. Home Prods.*, 369 B.R. at 783 (noting that a review under section 503(c)(3) of the Bankruptcy Code, as opposed to section 503(c)(1), "utilizes the more liberal business judgment review under § 363").  Other courts, including the United States Bankruptcy Court for the Northern District of Texas, have determined that section 503(c)(3) requires the court "to make its own determination that the transaction will serve the interests of creditors and the debtor's estate." *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009).  A court should make this determination based on whether the proposed compensation program is justified based on the facts of a particular case.  *Id.*

61.    To the extent that section 503 of the Bankruptcy Code applies to the Incentive Plans, the Debtors believe that the Incentive Plans satisfy section 503(c)(3) of the Bankruptcy Code because they are appropriately tailored to meet the Debtors' need (a) to incentivize employees to strive for strong operational performance during the pendency of these chapter 11 cases and (b) for driving the IPI Participants to stretch for value-driving operational and financial objectives designed to maximize value for the benefit of all creditors and the Debtors' estates.

### A.    The Incentive Plans Are a Necessary Component of the Debtors' Historical Employee Compensation and Benefits Program.

62.    As discussed above, implementation of the Incentive Plans is a sound exercise of the Debtors' business judgment, and the Debtors submit it is also justified by the facts and circumstances of these chapter 11 cases.  More specifically, the Incentive Plans have been historically a significant driver of the Debtors' employees' compensation packages.  Denying the Debtors' the ability to implement programs substantially similar to historical programs would jeopardize the Debtors' relationship with their current employees, possibly increasing employee attrition.  This would put the Debtors' operations at risk to the detriment of all stakeholders.

Accordingly, the Debtors respectfully submit that the Court should authorize the Debtors to implement the Incentive Plans as justified by the facts and circumstances of these chapter 11 cases and as a sound exercise of business judgment.

**B.      The Incentive Plans Meet the Requirements of Section 503(c)(3) of the Bankruptcy Code.**

63.      The Incentive Plans are also appropriate and justified under the facts and circumstances of these chapter 11 cases.  The Incentive Plan Participants—subject to reaching the stretch targets in the Incentive Plans—are incentivized to meet the Performance Metrics to increase their overall compensation.[20]  And indeed, the Debtors have offered incentive-based compensation programs to their Senior Executives and Non-Insider Employees for years, with award amounts determined largely by company performance measures. Further, the general structure of the Incentive Plans aligns with industry and market standards.[21]   In determining whether a compensation plan satisfies the justified-by-the-facts standard under section 503(c)(3) of the Bankruptcy Code, courts consider several factors, including:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan.  *See Glob. Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77.  As set forth below, each of these factors favors approval of the Incentive Plans in this case:

---

[20]    *See* Georgeson Decl. ¶¶ 20–21

[21]    *See* Georgeson Decl. ¶ 19; *Blitz U.S.A. Inc.*, 475 B.R. at 215.

a. <u>The Incentive Plans are Calculated to Achieve the Desired Performance</u>. The Incentive Plans are designed to achieve value-driving financial objectives in order to maximize value for stakeholders in a challenging time for the Debtors' business.[22]   The Incentive Plans contemplate the Debtors meeting certain OIBDAN targets.   The payments under the Incentive Plans are tailored to motivate the Senior Executives to successfully drive the initiatives necessary to attain these goals.[23]   Indeed, these metrics were specifically chosen as both critical to achieving the desired performance here (maximization of value for all stakeholders) and also within the direct control of the Incentive Plan participants.

b. <u>The Cost of the Incentive Plans Is Reasonable</u>.   The estimated total cost of the Incentive Plans at target payout levels is approximately $72.1 million in the aggregate.[24]   These costs are reasonable in the context of the Debtors' assets, liabilities, and earning potential.[25]   The total target cost in the aggregate amounts to 0.26% of the Debtors' estimated revenue for the IPI,[26] and 0.88% for the IPN.[27]   Further, under the Incentive Plans, the Debtors' aggregate target total direct compensation for the IPI Participants, reflecting the sum of base salaries and target annualized award opportunities, would be positioned 3% percent above the median of the media industry.[28] And if the Debtors fail to meet the performance goals set forth in the IPI, the Incentive Plan participants are not entitled to receive the related awards.

c. <u>The Scope of the Incentive Plans Is Fair and Reasonable</u>.   The scope of the Incentive Plans is fair, reasonable, and does not discriminate unfairly among Incentive Plan participants.[29]   The Incentive Plan Participants were carefully selected as those that could drive the company performance and represent all of the "insiders" of the Debtors as well as certain critical Non-Insider Employees.

d. <u>The Incentive Plans Are Consistent with Market Practices</u>.   The Debtors' compensation advisors at Willis Towers Watson, including Mr. Georgeson, worked with the Compensation Committee, the Debtors' management, and other advisors to ensure that the Incentive Plans are similar in structure, number, and scope to those of other companies in the media industry and

---

[22]   *See* Georgeson Decl. ¶¶ 20–24.

[23]   *See* Georgeson Decl. ¶¶ 20–24.

[24]   The total allocation from iHM to CCOH on account of the Incentive Plans is projected to be $3.2 million for 2018.

[25]   *See* Georgeson Decl. ¶ 24.

[26]   *See* Georgeson Decl. ¶¶ 23–24.

[27]   *See* Georgeson Decl. ¶¶ 28–29.

[28]   *See* Georgeson Decl. ¶¶ 18–19.

[29]   *See* Georgeson Decl. ¶ 30.

companies operating in chapter 11.[30]  In conducting their analysis, Mr. Georgeson and his team reviewed 12 executive incentive plans implemented by other companies in the media industry, 11 executive incentive plans authorized and approved in chapter 11 cases, and eight non-executive compensation plans implemented by other companies that were authorized and approved in chapter 11 cases.[31]  Based on this plan, Mr. Georgeson concluded that the design, structure, and award opportunities available under the Incentive Plans are reasonable and consistent with industry and postpetition benchmarks.[32]

e.  <u>The Debtors Performed Due Diligence in Developing the Incentive Plans</u>. As discussed above, the Debtors actively sought the advice of their advisors at Willis Towers Watson in assessing the Incentive Plans, as well as the advice of their legal advisors at Kirkland & Ellis and financial advisors at A&M.  The Compensation Committee reviewed and evaluated the Incentive Plans and their metrics based on the input of the Debtors' management and independent advisors.  As a result of these efforts, the Debtors concluded that: (i) it was critical to implement the Incentive Plans to ensure the competitiveness of the Debtors' compensation practices; (ii) the Incentive Plans are reasonable and consistent with market practice and industry standards; and (iii) the Incentive Plans are appropriately tailored to incentivize financial outperformance by the Debtors' leadership team, thus positioning the Debtors for long-term success.

f.  <u>The Debtors Received Independent Counsel in Developing the Incentive Plans</u>.  Willis Towers Watson, A&M, and Kirkland & Ellis advised the Compensation Committee and management team regarding the development and implementation of the Incentive Plans.  The Compensation Committee evaluated all aspects of the Incentive Plans before ultimately approving them in April 2018.  On these facts, the Debtors submit that they have received sufficient counsel regarding the Incentive Plans.  *See Borders Grp.*, 453 B.R. at 477 (noting that a debtor receives sufficient counsel when it receives counsel from its retained compensation consultants, counsel, and other advisors).

64.  For these reasons, the Debtors respectfully submit that implementation of the Incentive Plans is a proper exercise of the Debtors' business judgment and a proper use of the Debtors' resources, is justified by the facts and circumstances of these chapter 11 cases and

---

[30]  *See* Georgeson Decl. ¶¶ 14–18.

[31]  *See* Georgeson Decl. ¶¶ 14, 27.

[32]  *See* Georgeson Decl. ¶ 30.

therefore satisfies the requirements of section 503(c)(3) of the Bankruptcy Code.  The Debtors believe that the implementation of the Incentive Plans will motivate the Senior Executives and Non-Insider Employees to the ultimate benefit of all parties in interest.  Accordingly, the Debtors respectfully request that the Court enter the Order approving and authorizing the implementation of the Incentive Plans.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

65.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

66.     Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties in interest, including:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the agent for the Debtors' receivables based credit facility; (d) the agent for the Debtors' term loan credit facility; (e) the indenture trustees for the Debtors' priority guarantee notes, 14.0% senior notes due 2021, 6.875% senior notes due 2018, and 7.25% senior notes due 2027; (f) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility and priority guarantee noteholders; (g) counsel to an ad hoc group of lenders under the Debtors' term loan credit facility; (h) counsel to an ad hoc group of holders of 6.875% senior notes due 2018 and 7.25% senior notes due 2027; (i) counsel to an ad hoc group of holders of 14.0% senior notes due 2021; (j) the Office of the United States Attorney for the Southern District of Texas; (k) the state attorneys general for states

in which the Debtors conduct business; (l) the Internal Revenue Service; (m) the Securities and Exchange Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

67.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 6, 2018

/s/ *Matthew D. Cavenaugh*

| | |
|---|---|
| Patricia B. Tomasco (TX Bar No. 01797600) | James H.M. Sprayregen, P.C. |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | Anup Sathy, P.C. (admitted *pro hac vice*) |
| Jennifer F. Wertz (TX Bar No. 24072822) | William A. Guerrieri (admitted *pro hac vice*) |
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| 1401 McKinney Street, Suite 1900 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Houston, Texas 77010 | 300 North LaSalle Street |
| Telephone:      (713) 752-4200 | Chicago, Illinois 60654 |
| Facsimile:      (713) 752-4221 | Telephone:      (312) 862-2000 |
| Email:      ptomasco@jw.com | Facsimile:      (312) 862-2200 |
|                  mcavenaugh@jw.com | Email:      james.sprayregen@kirkland.com |
|                  jwertz@jw.com |                  anup.sathy@kirkland.com |
| |                  brian.wolfe@kirkland.com |
| *Co-Counsel to the Debtors* |                  will.guerrieri@kirkland.com |
| *and Debtors in Possession* | |
| | -and- |
| | Christopher J. Marcus, P.C. (admitted *pro hac vice*) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:      (212) 446-4800 |
| | Facsimile:      (212) 446-4900 |
| | Email:      christopher.marcus@kirkland.com |
| | |
| | *Co-Counsel to the Debtors* |
| | *and Debtors in Possession* |

**<u>Certificate of Service</u>**

     I certify that on the June 6, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh
