UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
HENRY G. HOBBS, JR.
ACTING UNITED STATES TRUSTEE
REGION 7, SOUTHERN and WESTERN DISTRICTS OF TEXAS
HECTOR DURAN
TRIAL ATTORNEY
515 Rusk, Suite 3516
Houston, Texas   77002
Telephone:  (713) 718-4650 x 241
Fax:  (713) 718-4670

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. |
| | § | |
| iHEARTMEDIA, INC., *et al.,* | § | 18-31274 (MI) |
| | § | (Chapter 11) |
| | § | Jointly Administered |
| | § | |
| | § | Hearing Date: |
| DEBTORS[1] | § | June 19, 2018, at 3:45 p.m. |

**OBJECTION OF THE ACTING UNITED STATES TRUSTEE
TO DEBTORS' MOTION FOR ENTRY OF AN ORDER
<u>APPROVING DEBTORS' 2018 INCENTIVE PLANS</u>**

TO THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE:

      COMES NOW Henry G. Hobbs, Jr., the Acting United States Trustee for Region 7, by and through the undersigned counsel, who respectfully objects under 11 U.S.C. § 503(c) to the Debtors' Motion and Supplemental Motion for Entry of an Order Authorizing and Approving the Debtors' 2018 Incentive Plans (the "Motion" and the "Supplemental Motion") [Dkt. No. 606 and 898], and represents as follows:

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

**I.     Preliminary Statement**

1. The Debtors seek Court approval of the 2018 Incentive Plan for Insiders ("IPI"). More specifically, the Debtors seek an order approving bonuses under the IPI to eleven (11) insiders who are members of the Debtors' senior management team. The Court should deny approval of the IPI because it violates the strict limitations imposed by section 503(c) of the Bankruptcy Code. Despite the Debtors' attempts to disguise the IPI as an "incentive" plan, the bonuses are primarily retentive in nature and thus subject to section 503(c)(1). And even if subject to the standards in section 503(c)(3), the Debtors have not shown that the IPI is justified by the facts and circumstances of these cases. The Court should not approve the Motion under either framework.

**II. Jurisdiction, Venue & Constitutional Authority to Enter a Final Order**

2. The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district under 28 U.S.C. § 1408.

3. The Court has constitutional authority to enter a final order in this matter. If it is determined that the bankruptcy judge does not have the constitutional authority to enter a final order or judgment in this matter, the Acting United States Trustee consents to the entry of a final order or judgment by this Court in this matter.

4. Henry G. Hobbs, Jr. is the duly appointed Acting United States Trustee for Region 7, Southern and Western Districts of Texas, under 28 U.S.C. § 581(a)(7).

5. Pursuant to 11 U.S.C. § 307, the Acting United States Trustee has standing to appear and be heard on any issue in a case or proceeding under the Bankruptcy Code.

6. Pursuant to 28 U.S.C. § 586(a)(3), the Acting United States Trustee is statutorily obligated to monitor the administration of cases commenced under the Bankruptcy Code, 11 U.S.C. § 101 *et seq*. Specifically, the Acting United States Trustee is charged with a number of supervisory responsibilities in reorganization bankruptcy cases under chapter 11 of the Bankruptcy Code, including monitoring the progress of such cases and taking such actions as the Acting United States Trustee deems to be appropriate to prevent undue delay in such progress. 28 U.S.C. § 586(a)(3)(G).

### III. Factual Background

#### A. General Background

7. On March 14, 2018 ("Petition Date"), the Debtors filed petitions seeking relief under chapter 11 of the Bankruptcy Code. Since the orders for relief under chapter 11 were entered, the Debtors have operated as debtors in possession under 11 U.S.C. §§ 1107(a) and 1108. No trustee or examiner has been appointed in these chapter 11 cases.

8. On March 15, 2018, the Court entered the Order directing joint administration of these bankruptcy cases. *See* Dkt. No. 76.

9. On March 21, 2018, the Acting United States Trustee appointed the Committee of Unsecured Creditors. *See* Dkt. No. 244.

10. On April 28, 2018, the Debtors filed the Disclosure Statement and the Plan. *See* Dkt. Nos. 552 and 551.

#### B. The Motion and Supplemental Motion

11. On May 8, 2018, the Debtors filed the Motion pursuant to sections 105(a), 363(b), 363(c), 503(c), 507, 1107, and 1108 of the Bankruptcy Code. Subsequently, on June 6, 2018, the

Debtors filed the Supplemental Motion. *See* Dkt. No. 898. The Supplemental Motion discloses Exhibit E, which contains the performance metrics.

12.   In the year prior to bankruptcy, the Debtors paid the insiders aggregate bonuses of: (a) $5,530,575.00 for Q1 of 2018 under the IPI; (b) $8,824,683.27 under the Annual Incentive Plan; (c) $7,980,000.00 under the Supplemental Incentive Plan; and (d) $10,000,000.00 under the 2017 KEIP. *See* Statement of Financial Affairs, Dkt. No. 661, pp. 1254-1258.

13.   The IPI obligates the Debtors to pay bonuses to the insiders of about $16.6 million for the remainder of 2018, provided that the Debtors achieve "target" performance levels. Supplemental Motion, ¶ 4, n. 5; ¶ 32. It further obligates the Debtors to pay larger bonuses, up to about $24.9 million, at "maximum" performance levels. *Id.* The following chart sets forth the proposed bonuses:

| Incentive Plan for Insiders | | | |
|---|---|---|---|
| **Senior Executive** | **Threshold Award Opportunity (50% of Target Award)** | **Target Award Opportunity** | **Maximum Award Opportunity (150% of Target Award)** |
| Chairman & Chief Executive Officer | $3,487,500 | $6,975,000 | $10,462,500 |
| President, Chief Operating Officer & Chief Financial Officer | $1,987,500 | $3,975,000 | $5,962,500 |
| Executive Vice President, General Counsel, & Secretary | $337,500 | $675,000 | $1,012,500 |
| Other Senior Executives (8)[13] | $2,483,440 | $4,966,875 | $7,450,315 |
| **Total Award Opportunity** | **$8,295,940** | **$16,591,875** | **$24,887,815** |

4

14. The Debtors' senior executives eligible to participate under the IPI are the:

- Chairman and CEO
- President, COO & CFO
- Executive Vice President, General Counsel, & Secretary
- President, National Sales and Marketing Partnerships
- President, Markets Group
- CFO & Senior Vice President of Corporate Finance, iHM
- President, iHeartRadio and iHeartMedia Networks
- Senior Vice President, Treasurer
- Chief Information Officer
- Executive Vice President and Deputy General Counsel
- Senior Vice President, CAO, & Assistant Secretary

Supplemental Motion, ¶ 20. The senior executives are conceded to be "insiders" as defined in the Bankruptcy Code. *Id.* at ¶ 54.

15. The IPI pays bonuses based upon the following performance metrics: (a) eight (8) of the insiders will have their performance measured based upon Consolidated OIBDAN, which consists of OIBDAN for all segments of iHM; and (b) three (3) of the insiders will have their performance measured solely on Segment OIBDAN, which is OIBDAN of the iHM Segment. Supplemental Motion, ¶ 21. For Consolidated OIBDAN, the actual performance goals, designated as "threshold," "target," and "maximum" levels, appear in the following chart:

| Period | Consolidated OIBDAN Performance Goals (in millions) | | |
|---|---|---|---|
| | June 30, 2018 | September 30, 2018 | December 31, 2018 |
| **Quarterly Threshold Performance Goal** | $350 | $322 | $430 |
| **Quarterly Target Performance Goal** | $437 | $402 | $537 |
| **Quarterly Maximum Performance Goal** | $524 | $482 | $644 |
| **Cumulative Threshold Performance Goal** | N/A | $671 | $1,101 |
| **Cumulative Target Performance Goal** | N/A | $839 | $1,376 |
| **Cumulative Maximum Performance Goal** | N/A | $1,007 | $1,651 |

5

Supplemental Motion, Exhibit E.  For Segment OIBDAN, the actual performance goals are:

| Period | Segment OIBDAN Performance Goals (in millions) | | |
| --- | --- | --- | --- |
| | June 30, 2018 | September 30, 2018 | December 31, 2018 |
| Quarterly Threshold Performance Goal | $225 | $221 | $276 |
| Quarterly Target Performance Goal | $281 | $276 | $345 |
| Quarterly Maximum Performance Goal | $337 | $331 | $414 |
| Cumulative Threshold Performance Goal | N/A | $446 | $722 |
| Cumulative Target Performance Goal | N/A | $557 | $902 |
| Cumulative Maximum Performance Goal | N/A | $668 | $1,082 |

*Id.*

16.     On information and belief, the Debtors and the Committee reached agreement regarding certain modifications to the IPI, including:  (a) a definition of Consolidated OIBDAN and Segment OIBDAN; (b) bonuses for "threshold" and "maximum" performance goals will require the Debtors to achieve 85% and 115%, respectively, of the Consolidated OIBDAN and Segment OIBDAN; (c) the Debtors may not modify the Consolidated OIBDAN or Segment OIBDAN targets nor the bonus opportunity levels unless the Committee provides prior written consent or the Court approves such action; (d) at the end of each applicable quarter, the Debtors shall provide three (3) business days' advance notice to the Committee and the Acting United States Trustee of the calculations for Consolidated OIBDAN and Segment OIBDAN, and any adjustments; (e) capping bonuses for Q2 and Q3 of 2018 at 100% of "target" performance goals, with a catch-up payment in Q4 of 2018; and (f) bonuses for Q4 of 2018 may be paid only after completion of the annual financial statement audit, unless the audit is delayed beyond February 28, 2019, and the reason for the delay does not impact the calculations of Consolidated OIBDAN

or Segment OIBDAN.

### IV. Statutory Authority

17. Section 503(c) of the Bankruptcy Code prohibits:

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid—

(1) a transfer made to, or an obligation incurred for the benefit of, an *insider* of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that—

(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either –

(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
…

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

### V. Grounds for Objection

**A.  The IPI Violates § 503(c)(1) of the Code**

18. Section 503(c) was added to the Bankruptcy Code in 2005 to respond to "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp, and

WorldCom Inc. and Polaroid Corporation, who lined their own pockets but left thousands of employees and retirees out in the cold." (Floor Statement, quoted in *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("Dana II"). *See also In re Hawker Beechcraft, Inc.,* 479 B.R. 308, 312-13 (Bankr. S.D.N.Y. 2012) (quotations omitted) ("Congress enacted § 503(c) as part of the 2005 BAPCPA amendments of the Bankruptcy Code to 'eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process'"); *In re Residential Capital, LLC*, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012). The abuses at which the provision is aimed regularly manifest themselves in the guise of retention plans. *See* 3 COLLIER ON BANKRUPTCY ¶ 503.17[1] at 503-105 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) (section 503(c)'s "purpose was to limit the scope of . . . programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor").

19.     Through section 503(c), Congress prohibits debtors from paying bonuses to executives and insiders "simply for staying with the Company through the bankruptcy process." *In re Global Home Prods., LLC.,* 369 B.R. 778, 783-84 (Bankr. D. Del. 2007). Rather, under section 503(c)(1), a debtor may only provide a bonus designed to cause an insider to remain in the debtor's employ if:

(1)     the bonus payment is essential to the retention of the employee because the employee has a "bona fide job offer from another business at the same or greater rate of compensation;"

(2)     the services provided by the employee are essential to the survival of the business; and

3)      the amount of the payment is within the parameters set by the statute.

*See* 11 U.S.C. § 503(c)(1). In light of Section 503(c), a retention plan payable to insiders can no longer be "justified solely on the debtor's business judgment." *In re Velo Holdings, Inc.*, 472 B.R.

201, 209 (Bankr. S.D.N.Y. 2012); *In re Borders Grp. Inc.,* 453 B.R. 459, 470-471 (Bankr. S.D.N.Y. 2011). If a proposed transfer falls within §503(c)(1), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist. *See In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("Dana I"). Rather, a transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of § 503(c)(1) to be subject to this subdivision's exception. *See e.g. In re Residential Capital, LLC*, 478 B.R. at 169 ("[I]f a debtor proposes to (i) make a transfer or incur an obligation; (ii) to or for the benefit of an insider of a debtor; (iii) for the purpose of retaining that insider, it must meet the strict requirements of section 503(c)(1)."); *Dana II*, 358 B.R. at 575 (summarizing the requirements under Section 503(c)(1) of the Bankruptcy Code).

20. After the addition of section 503(c) to the Code in 2005, debtors began to craft performance-based insider incentive plans with some retentive elements to avoid the stringent requirements imposed by section 503(c)(1) on insider retention bonuses. In determining whether section 503(c)(1) applies to such plans, courts have framed the issue as whether the plans are "pay to stay" retention plans or "pay for value" compensation plans offering incentives based on performance. *See In re Global Home Prods, LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007).

21. The proponent of a purported "incentive" plan bears the burden of proving that the proposed plan is not a pay-to-stay retention plan governed by section 503(c)(1). *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) (sustaining U.S. Trustee objection to insider bonuses proposed by affiliated debtors). A debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism; the circumstances under which the proposal is made and the structure of the compensation package control. *Id*. (*citing In re Velo Holdings, Inc*., 472 B.R. 201, 209-210 (Bankr. S.D.N.Y. 2012)). A plan that does not require

additional work or effort beyond that contemplated prepetition is not an incentive plan, but is retentive and cannot be approved under the more lenient standards for incentive plans. *In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013) (citations omitted).

22. The Debtors have not met their burden here for at least two reasons. <u>First</u>, the Debtors have not shown a nexus between the particular work duties of the insiders and the achievement of the performance goals. <u>Second</u>, the Debtors have not demonstrated that the performance goals represent challenging, incentive-based benchmarks. Taken together, the proposed bonuses amount to a disguised retention plan subject to section 503(c)(1). And because the Debtors did not (and cannot) show that the insider bonus payments satisfy section 503(c)(1), the Court should deny the Motion.

> **1. Because the OIBDAN Performance Goals are Based on External Factors, the Proposed Bonuses are Impermissible Retention Bonuses**

23. The Debtors have not demonstrated a nexus between the particular job of any of the insiders and the achievement of the performance goals. Absent that nexus, the insiders who receive bonuses based upon the performance goals that they do not affect, and cannot affect, are receiving impermissible retention bonuses. Further, the Debtors allege that achieving the OIBDAN performance goals are subject to significant risks, including "increased operational costs and decreased advertising revenues associated with parties concerned about doing business with a chapter 11 debtor." Supplemental Motion, ¶ 30.

> **2. The Debtors Have Not Demonstrated That the IPI Contains Genuine Incentives Conditioned Upon the Achievement of Challenging Metrics**

24. As discussed above, the insiders will receive bonuses based upon the Debtors' ability to achieve the OIBDAN performance goals. Despite statements that the performance goals are challenging, the Debtors have not provided sufficient context or evidence to support these

claims.

### a. Consolidated OIBDAN

25. The performance goals for Consolidated OIBDAN for 2018 are forecasted to be $1.339 billion at the "threshold" level, $1.613 billion at the "target" level, and $1.887 billion at the "maximum" level. Supplemental Motion, Exhibit E. According to documents produced, actual Consolidated OIBDAN for 2015, 2016, and 2017 was $1.898 billion, $1.890 billion, and $1.654 billion, respectively. The amounts for 2015 and 2016 exceed the 2018 "maximum" performance goal, and the amount for 2017 falls between the 2018 "target" and "maximum" performance goals. Although the Supplemental Motion made passing references to "increased operational costs" and "decreased advertising revenues," no meaningful attempt was made to quantify the size of any expected revenue declines cost increases. *Id.* at ¶ 30. Consequently, the Debtors have not met their burden of demonstrating that the performance goals for Consolidated OIBDAN represent a meaningful challenge.

### b. Segment OIBDAN

26. The performance goals for Segment OIBDAN for 2018 are forecasted to be $891 million at the "threshold" level, $1.071 billion at the "target" level, and $1.251 billion at the "maximum" level. Supplemental Motion, Exhibit E. According to documents produced, actual Segment OIBDAN for 2015, 2016, and 2017 was $1.234 billion, $1.334 billion and $1.137 billion, respectively. The amount for 2016 exceeds the 2018 "maximum" performance goal, and the amounts for 2015 and 2017 fall between the 2018 "target" and "maximum" performance goals. Once again, the Debtors have not met their burden in demonstrating that the performance goals for Segment OIBDAN represent a meaningful challenge.

27. For all of these reasons, the IPI amounts to a pay-to-stay retention plan governed

by section 503(c)(1). The Debtors, however, have not shown that these individuals have bona fide offers from other businesses at the same or greater rate of compensation, that the services of these individuals are essential to the survival of the business, and that the payments fall within the strict monetary parameters of 11 U.S.C § 503(c)(1)(C). Therefore, the Court should deny the Motion and the Supplemental Motion..

**B.     Even if Section 503(c)(1) Does Not Apply, the IPI Nonetheless Violates Section 503(c)(3) of the Code**

28.     Even if the Court determines that section 503(c)(1) of the Bankruptcy Code does not apply in these cases, the Debtors would still have to meet the standards in section 503(c)(3). Section 503(c)(3) limits payments made to any of the Debtors' employees outside of the ordinary course of business unless such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The requirement that the payments must be "justified by the facts and circumstances of the case" constitutes a higher burden than the "business judgment" requirement of Section 363. *See GT Advanced Techs. Inc. v. Harrington*, No. 15-CV-069-LM, 2015 WL 4459502, at *7 (D.N.H. July 21, 2015) ("§ 503(c)(3) directs courts to give plans such as the EIP in this case more scrutiny than is required by the § 363(b)(1) business judgment test"); *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-237 (Bankr. N.D. Tex. 2009) (Section 503(c)(3) sets a higher standard of review and should not be equated to the business judgment rule as applied under Section 363; to do so would render 503(c)(3) redundant); *but see In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363").

29.     The Fifth Circuit has not adopted any factors for evaluating an incentive plan under section 503(c)(3). However, courts generally consider the following factors to determine

determining whether to approve a key employee incentive plan as an exercise of sound business judgment:

    (1)    whether there is a reasonable relationship between the plan proposed and the results to be obtained;

    (2)    whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities, and earning potential;

    (3)    whether the scope of the plan is fair and reasonable;

    (4)    whether the plan is consistent with industry standards;

    (5)    whether the debtor engaged in due diligence in investigating the need for a plan, in analyzing the need to incentivize key employees, and in investigating the types of plans generally applicable in the particular industry; and

    (6)    whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

*In re Dana Corp.*, 358 B.R. 567, 576-577 (Bankr. S.D.N.Y. 2007) ("*Dana II*"). The Debtors argue that each of the *Dana II* factors has been satisfied. However, it is difficult to understand how the KEIP is calculated to achieve the desired performance when the metrics do not represent a challenge. Furthermore, under *Dana II*, the benchmarks for the payment of the incentives must be "difficult targets to reach." *Dana II* at 583. At this juncture in the cases, and without sufficient context or evidence, it is impossible to assess whether the targets for the performance metrics are difficult to reach or are reasonably within reach.

    30.    In *Pilgrim's Pride*, the bankruptcy court interpreted section 503(c)(3) to require, in addition to the business judgment standard, that the proposed transfer or obligation be in the best interests of creditors and the debtor's estate. *Pilgrim's Pride,* 401 B.R. at 237.

    31.    The Debtors bear the burden of proof to show that they have met the statutory requirements of section 503(c)(3) of the Code. The Court should deny approval of the IPI because they have failed to do so.

## VI. Relief Requested

WHEREFORE, the Acting United States Trustee requests that the Court enter an order denying the Motion and the Supplemental Motion, and for any and all further relief as may be equitable and just.

Dated: June 14, 2017                    Respectfully Submitted,

                                            HENRY G. HOBBS, JR.
                                            ACTING UNITED STATES TRUSTEE
                                            REGION 7, SOUTHERN and WESTERN
                                            DISTRICTS OF TEXAS

                                    By:    /s/ Hector Duran
                                                 Hector Duran
                                                 Trial Attorney
                                                 Texas Bar No. 00783996
                                                 515 Rusk, Suite 3516
                                                 Houston, TX 77002
                                                 Telephone: (713) 718-4650 x 241
                                                 Fax: (713) 718-4670

## CERTIFICATE OF CONFERENCE

I hereby certify that on June 13, 2018, I conferred with Will Guerrieri and Richard Howell of Kirkland & Ellis LLP, Debtors' counsel, as required by BLR 9013-1(g), but the parties were unable to resolve the matter and it requires court determination.

                                          /s/ Hector Duran
                                          Hector Duran, Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means on all PACER participants on this 14th day of June, 2018.

                                          /s/ Hector Duran
                                          Hector Duran, Trial Attorney