**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re: Docket Nos. [2143, 2144, 2148, 2149]** |

**JOINT FURTHER REPLY IN SUPPORT OF
JOINT EMERGENCY MOTION AND EMERGENCY MOTION**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") and Clear Channel Outdoor Holdings, Inc. ("CCOH") respectfully submit this reply (this "Further Reply") to the objections filed by Norfolk County Retirement System ("Norfolk," and its objection, the "Norfolk Objection") [Docket No. 2149] to the *Joint Emergency Motion for Entry of an Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Preliminarily Approving the Settlement, (III) Approving the Retention of Prime Clerk LLC as Notice Administrator, (IV) Approving the Form and Manner of Notice, (V) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement as Part of Confirmation of the Plan, and (VI) Granting Related Relief* (the "Joint Motion") [Docket No. 2143] and the *Emergency Motion for Entry of an Order (I) Directing the Application of Bankruptcy Rule 7023 and 7023.1, (II) Certifying a Class, Designating a Class Representative, and Appointing Class Counsel for Purposes of Settlement, and (III) Granting Related Relief* (the "GAMCO Motion")

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[Docket No. 2144].[2]  In further support of approval of the Joint Motion and the GAMCO Motion, CCOH and the Debtors respectfully state as follows.

## Preliminary Statement

1.     Norfolk's objection seeks to derail a settlement providing enormous benefits to the Debtors and all of their stakeholders, including in particular the Debtors' subsidiary Clear Channel Outdoor Holdings, Inc., on whose behalf Norfolk purports to act.  The Settlement Agreement is integral to the Debtors' Plan of Reorganization and is part of a global resolution of numerous issues relating to the relationship between the Debtors and CCOH, including the Separation of CCOH from the Debtors, the termination of the Intercompany Agreements between iHC and CCOH, and the treatment in the bankruptcy of the Intercompany Note between iHC and CCOH.  Settling all outstanding claims relating to the Intercompany Agreements and Intercompany Note – including the GAMCO class action lawsuit in Delaware, GAMCO's threatened derivative claims in this bankruptcy proceeding, and Norfolk's derivative lawsuit in Delaware – is a critical component of the total peace the parties seek through the settlement.

2.     The Settlement Agreement is an excellent deal for all constituencies:  It provides significant benefits to CCOH and its shareholders (including GAMCO and Norfolk) by (among many other things) the Debtors' agreeing to the Separation of CCOH, ending the Intercompany Agreements that have been the source of *four* lawsuits in the past six years, funding CCOH with a below-market line of credit, transferring valuable intellectual property (including the name "Clear Channel") to CCOH, and allowing CCOH's Intercompany Note balance without any offset.  The Settlement Agreement also provides significant benefits to the Debtors and their creditors by

---

[2]     Capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement or the Joint Motion.

completing the Debtors' plan of reorganization, obtaining the support of CCOH and GAMCO for the Plan and eliminating costly and protracted litigation, and enhancing the value of one of the Debtors' most valuable assets (its equity interests in CCOH), which will be distributed to its creditors.

3.      The Settlement Agreement was reached only after a thorough process with multiple parties negotiating in good faith to achieve the best possible result.[3]  The negotiations included the Debtors, CCOH, several groups of creditors, and GAMCO.   The interests of CCOH and its minority shareholders were represented by an independent committee of the Board that was fully independent from the Debtors and their shareholders.   The interests of CCOH and its minority shareholders were also represented by GAMCO, which is one of the largest single CCOH minority shareholders and has been heavily involved in these issues, including having filed two of the four lawsuits relating to the Intercompany Agreements.   Both the CCOH Special Committee and GAMCO vigorously negotiated for the best possible deal for CCOH and its shareholders in this complex transaction, and obtained numerous important and valuable concessions that enhanced the value of the deal for CCOH and all of its shareholders.  All parties to the Settlement Agreement agree that it is in the best interests of all concerned.

4.      Norfolk stands alone in contesting the Settlement Agreement.  Norfolk is a small shareholder that has brought a derivative claim in Delaware that should be dismissed for the reasons previously argued to the Delaware Court of Chancery.  Here, Norfolk seeks to be a spoiler to disrupt the beneficial Settlement and hold it hostage to the narrow interests of Norfolk and its counsel.  Norfolk's substantive complaints about the Settlement suggest that it does not understand

---

[3]      As of this filing, the parties are still finalizing some of the terms of the Settlement Agreement.  None of the open terms relates to the releases at issue here.

(or does not want to understand) the significant benefits CCOH and its shareholders will receive as a result of this deal.[4]

5.      Norfolk's assertion that the parties to the Settlement Agreement do not have the authority to release Norfolk's claim is meritless.  Under black-letter Delaware law, the parties to the Settlement Agreement are entitled to settle GAMCO's class and derivative claims and release all claims arising out of the same operative facts, including Norfolk's derivative claim.  *See In re Philadelphia Stock Exch., Inc.*, 945 A.2d 1123 (Del. 2008).  In fact, it is common in complex multi-forum litigation for one case to settle and thereby release other related claims.  Indeed, the Delaware Supreme Court has held that a class action settlement can release related derivative claims where both claims arise out of the same operative facts.  *See id.* at 7.  That is the only way to achieve total peace in a comprehensive settlement such as the one here.

6.      There is no doubt that GAMCO's claims and Norfolk's claims arise out of the same operative facts – they both relate to the Intercompany Note, and they both specifically challenge the November 29, 2017 extension of that Note.  As a result, under Delaware law, the Settlement Agreement that the Debtors, CCOH, and others reached with GAMCO can and does release the derivative claims that Norfolk is litigating as well.

7.      Norfolk's objection ignores this well-settled law and instead argues that it somehow has the exclusive right to release the derivative claims it has purported to bring on behalf of CCOH

---

[4]    Norfolk's true strategy was laid bare last night when it filed an "emergency" motion in Delaware seeking to wrest control of the GAMCO class action from GAMCO – even though GAMCO is a bigger shareholder and has played a far bigger role in the past litigation and in the negotiations in the bankruptcy.  This Court is the proper forum for approving the Settlement Agreement and addressing who should be the class representative because this Court is the only place where the entire deal can be approved.  The Settlement is a critical component of the Debtors' Plan and only this Court can confirm the Plan and provide the relief sought therein.  Moreover, the parties have already begun the process of briefing the fairness of the settlement and the appointment of a class representative.  Insofar as Norfolk believes the settlement is unfair, or wants to seek to be class representative, this Court is fully capable of resolving those questions.  If this Court approves the settlement, then the defendants in the GAMCO and Norfolk actions will ask the Delaware Court of Chancery to dismiss those cases based on the releases.

in Delaware.  Norfolk cites no law for this remarkable proposition.  To the contrary, numerous cases make clear that the settlement of one lawsuit can release related claims, including derivative claims, in another lawsuit.  Nor does Norfolk "own" this derivative claim as it suggests.  Delaware law is clear that a derivative claim is "owned" by the corporation (here, CCOH), at all stages of the litigation.  Norfolk relies primarily on *Zapata v. Maldonado*, 430 A.2d 779 (Del. 1981), for its position.  But *Zapata* is not on point.  It addresses the conditions for an independent committee of an otherwise conflicted board to *unilaterally* decide to settle or dismiss a derivative claim brought on its behalf.  It does *not* address the situation here – where there are multiple lawsuits and defendants settle with one of the shareholder-plaintiffs and a special committee of the board and agree to release direct and derivative claims arising out of the same operative facts.

8.      In short, the releases in the Settlement Agreement are fully permitted by Delaware law and Norfolk's *Zapata*-based objection is off point.  This Court should preliminarily approve the settlement and the notices and conduct a final fairness hearing where all of the other issues Norfolk raises can be addressed in due course.

## Background

9.      The Settlement Agreement was negotiated at arms' length by an independent committee of the Board of iHeart (representing iHeart and its shareholders), an independent special committee of the Board of CCOH (representing CCOH and its shareholders), and GAMCO (representing a class of CCOH's minority shareholders).  The result of those negotiations is a settlement and release of claims that is good for iHeart, good for iHeart's creditors, good for CCOH, good for CCOH's minority shareholders.  The releases in the Settlement Agreement are fully permitted by Delaware law.

### I.     The Intercompany Agreements Between iHeart and CCOH

10.     CCOH is a Delaware corporation that is among the largest providers of outdoor advertising in the United States.  Prior to 2005, CCOH was owned 100% by Debtor iHeart Communications, Inc. ("iHC" or "iHeart").  At that time, CCOH and iHeart entered into a series of intercompany agreements under which iHeart provided essentially all of CCOH's management and administrative functions (the "Intercompany Agreements").  The Delaware courts have found that the Intercompany Agreements are "highly favorable to iHC" and give iHC "significant control over nearly every aspect of CCOH's operations."  *GAMCO Asset Mgmt. Inc. v. iHeartMedia Inc*., 2016 WL 6892802, at *1, *3 (Del. Ch. Nov. 23, 2016) ("*GAMCO I*"), *aff'd* 172 A.3d 884 (Del. 2017) (table).

11.     As relevant here, iHC and CCOH entered into a Corporate Services Agreement, which included a Cash Management Arrangement, under which iHeart managed all of CCOH's cash and provided liquidity for CCOH's operations.  *See* Corporate Services Agreement (attached hereto as Exhibit A) at 4-5; Prospectus (attached hereto as Exhibit B) at 61.  As part of the Cash Management Arrangement, every day, any excess cash from CCOH's domestic operations is "swept" to iHeart to be used for its general corporate purposes.  *Id*. at 62.  Separate from the Cash Management Arrangement are two cash management notes that "evidence" the "net cash position" between iHC and CCOH.  *Id*.  One note "evidences" advances made by iHC to CCOH and the other "evidences" funds transferred by CCOH to iHC (the "Intercompany Note").  The Intercompany Note is a demand note – meaning that repayment of any outstanding balance can be demanded by CCOH at any time.  Although the balance is payable on demand, the Intercompany Agreements restrict CCOH's ability to use cash, and unused cash received from a repayment demand is swept back to iHC daily under the Cash Management Arrangement.  *GAMCO I*, 2016 WL 6892802, at *4, *12.

12.     The Intercompany Note originally had a maturity date of August 10, 2010.  That date has been extended by more than one amendment.  On November 29, 2017, iHC and the Independent Note Committee of the Board of CCOH amended the Intercompany Note to extend its maturity from December 15, 2017 to May 15, 2019, and agreed to adjust the interest rate payable on the Note.  *See* Revolving Promissory Note (attached hereto as Exhibit C); *see also* Clear Channel Outdoor Holdings, Inc., Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q) (May 22, 2018), at 31.

13.     On November 11, 2005, CCOH conducted an initial public offering ("IPO") for about 10% of its stock.  All of the Intercompany Agreements were fully disclosed to potential shareholders prior to CCOH's IPO.  Because the Intercompany Agreements were entered into at a time when CCOH was a wholly owned subsidiary of iHC, those Agreements are not subject to challenge as unfair to CCOH or its minority shareholders.  *See GAMCO I*, 2016 WL 6892802, at *1, *12 n.48.

## II.     Serial Litigation About the Intercompany Agreements

14.     After the 2005 IPO, the balance on the Intercompany Note increased over time.  After iHeart's 2008 leveraged buy-out, minority shareholders of CCOH expressed concern that iHeart's financial condition was deteriorating, and the Intercompany Note balance was increasing (ultimately reaching more than $1 billion).  Minority shareholders of CCOH filed a series of lawsuits attacking the Intercompany Agreements and seeking protection from the increasing balance of the Intercompany Note.

### A.     *CCOH I*

15.     In 2012, two minority shareholders of CCOH brought nearly identical derivative lawsuits in the Delaware Court of Chancery challenging the Intercompany Agreements.  *See In re Clear Channel Outdoor Holdings, Inc. Derivative Litig.*, C.A. No. 7315-CS (Del. Ch.) ("*CCOH I*")

(complaint attached hereto as Exhibit D). The minority shareholders sued the members of CCOH's Board, iHM, iHC, and the Debtors' financial sponsors. They alleged that the Intercompany Note balance had increased over time and that CCOH "face[d] a severe risk that the [Intercompany Note would] never be paid back because [iHC] has been drowning under a massive debt load since its 2008 leveraged buyout." *CCOH I* Compl. ¶ 1. Accordingly, the plaintiffs claimed that defendants' fiduciary duties obligated them to (among other things) extricate CCOH from the Intercompany Agreements and "demand immediate repayment" of the Intercompany Note in order to protect CCOH from potentially losing the balance owed if iHC were to declare bankruptcy. *Id.* ¶¶ 7, 63.

16.     In response to those lawsuits, the CCOH Board created a Special Litigation Committee ("SLC") composed of two independent directors. The SLC brokered a forward-looking settlement ("2013 Settlement") that addressed the concerns raised in *CCOH I* that the Debtors' financial condition would continue to deteriorate, the balance on the Intercompany Note would continue to grow, the Debtors might not have enough liquidity to pay CCOH back, and the balance might be lost if the Debtors went bankrupt. *See CCOH I* SLC Factual Findings (attached hereto as Exhibit E) at 12-13.

17.     The settlement established the Intercompany Note Committee, composed of the independent board members of CCOH, to monitor the Intercompany Note. *See CCOH I* Settlement (attached hereto as Exhibit F) at 19. The settlement empowered the Intercompany Note Committee to demand payment of the Intercompany Note whenever one of two protective financial triggers was satisfied and to use the proceeds to issue a dividend to all shareholders of CCOH. *See* Intercompany Note Committee Charter (attached hereto as Exhibit G) at 1.

18.     The triggers were designed to "ensure[] independent action in the two circumstances in which the full [CCOH] Board's decision not to make a demand is potentially at

the greatest risk of being influenced by the needs of [iHC] or the Sponsors: when the balance of

the Intercompany Note is so large that a decision not to exercise the demand feature may not be

based solely on consideration of [CCOH's] best interests; and when [iHC's] own financial position

is precarious or is projected to become so." *CCOH I* SLC Settlement Br. (attached hereto as

Exhibit H) at 23-26.

19.     No CCOH shareholder objected to the settlement, and, after conducting a fairness

hearing, the then-Chancellor of Delaware approved it as fair and reasonable. *See CCOH I* Final

Judgment (attached hereto as Exhibit I). The Court noted that the Intercompany Agreements were

"formidable," they were fully disclosed to investors, and they could not now be broken. *CCOH I*

Settlement Fairness Hr'g Tr. at 36-37 (attached hereto as Exhibit J). It further recognized that

demanding repayment of the Intercompany Note would have no "utility" because the repaid cash

would be re-swept to iHC under the Cash Management Arrangement. *Id*. at 37; *see id*. at 20.

Moreover, demanding repayment could have "spillover effects" that would outweigh any benefits

of such a demand. *Id*. at 33. "[G]iven those realities," the Court concluded that the corporate-

governance reforms would provide "substantial benefits on an ongoing basis." *Id*. at 37-38.

**B.     *GAMCO I***

20.     On May 10, 2016, GAMCO filed a derivative lawsuit in the Delaware Court of

Chancery regarding the Intercompany Agreements. *See GAMCO Asset Management Inc. v.

iHeartMedia, Inc.*, C.A. No. 12312-VCS ("*GAMCO I*") (complaint attached hereto as Exhibit K);

*GAMCO I*, 2016 WL 6892802, at *1 & n.1. GAMCO sued the CCOH Board, iHM, iHC, and the

Sponsors. GAMCO alleged that iHC's bankruptcy was "inevitable," *GAMCO I* Compl. ¶ 84,

because iHC had an "unsustainable capital structure" and was "mired . . . in debt" that it had "little,

if any, prospect of repaying or refinancing," *Id*. ¶¶ 1, 3, 7. GAMCO claimed that defendants'

fiduciary duties obligated them "to reduce [CCOH's] exposure to iHC" by "demand[ing] payment on the outstanding balance on the [Intercompany] Note." *Id.* ¶ 9; *see id.* ¶¶ 132, 137; *GAMCO I*, 2016 WL 6892802, at *7.

21.     The Delaware Court of Chancery granted the defendants' motion to dismiss those claims on three grounds. *First*, the suit was barred by the 2013 Settlement, which released any claims that were asserted or could have been asserted in *CCOH I*. *See GAMCO I*, 2016 WL 6892802, at *8-11. *Second*, the suit was barred by the *res judicata* effect of *CCOH I*. *See id.* at *13-14. *Third*, "[g]iven the corner into which the Intercompany Agreements have painted the CCOH Board, there is no reasonably conceivable basis upon which GAMCO can establish that the Board has breached its fiduciary duty by adhering to the carefully-negotiated governance and monitoring provisions agreed to in the 2013 Settlement." *Id.* at *12.

22.     GAMCO appealed. The Delaware Supreme Court affirmed "largely on the basis of [the Court of Chancery's] thorough decision," without reaching the *res judicata* or release issues. *GAMCO Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2017 WL 4607413, at *1 (Del. Oct. 12, 2017) (judgment noted at 172 A.3d 884 (table)).

C.     **Norfolk Action**

23.     On December 29, 2017, just a few weeks after the Delaware Supreme Court affirmed the dismissal of *GAMCO I*, the Norfolk County Retirement System ("Norfolk") brought yet another derivative action in the Delaware Court of Chancery relating to the Cash Management Arrangement and the Intercompany Note. *See Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (the "Norfolk Action") (complaint attached hereto as Exhibit L). Norfolk sued the board of directors of CCOH, iHM, iHC, and the Sponsor Entities. The central premise of this lawsuit was the same as the prior lawsuits (and GAMCO's subsequent lawsuit):

that iHC is in financial distress and CCOH must modify the Intercompany Agreements to protect itself. Norfolk specifically challenged the November 29, 2017 decision of the Intercompany Note Committee to extend the maturity date of the Intercompany Note. Norfolk claimed that this extension violated defendants' fiduciary duties. *See* Norfolk Compl. ¶¶ 1-6, 42-60, 68-88.

24.     The defendants filed a motion to dismiss, arguing that the decisions of the Court of Chancery and Supreme Court in *GAMCO I* foreclosed the Norfolk Action. *GAMCO I* held that the CCOH Board did not breach its fiduciary duties by acting within the framework established by the forward-looking settlement and the company's binding contractual obligations that strictly limited its ability to use repaid funds. That holding is equally applicable to Norfolk's claim that the CCOH Board breached its fiduciary duties by deciding to "continue lending greater than $1 billion to iHeart." Norfolk Compl. ¶ 1. The motion to dismiss was argued on September 20, 2018, and is currently pending before the Delaware Court of Chancery.[5]

**D.     *GAMCO II* (GAMCO Action)**

25.     On August 27, 2018, after the Debtors filed for bankruptcy protection, GAMCO filed a verified class action complaint in the Delaware Court of Chancery on its own behalf and on behalf of a class of the CCOH minority shareholders (which would of course include Norfolk). *See GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) ("*GAMCO II*" or the "GAMCO Action") (complaint attached hereto as Exhibit M). GAMCO named as defendants the CCOH Board members as well as the Sponsors. It did not name iHC and iHM, presumably because of the automatic stay then in effect.

---

[5]   Contrary to Norfolk's suggestion, at no time did defendants concede that it was futile for Norfolk to demand that the CCOH Board pursue these claims. Instead, defendants filed a motion to dismiss on the merits because the claims were so obviously deficient given the ruling in *GAMCO I*.

26.     *GAMCO II* attacked the very same transaction as the Norfolk Action.  GAMCO alleged that the defendants breached their fiduciary duties by agreeing, on November 29, 2017, to extend the maturity date of the Intercompany Note.  *GAMCO II* Compl. ¶¶ 176-180, 205.  GAMCO claimed that defendants should instead have forced maturity of the Note and issued a dividend to all shareholders.  The *GAMCO II* Complaint also claimed that the defendants breached their fiduciary duties by failing to otherwise demand repayment of the Intercompany Note and issue a dividend, apart from the maturity date.  *See id*. ¶¶ 181-183.  It also claimed that the members of the Independent Note Committee set up by the 2013 Settlement also breached their fiduciary duties by failing to demand repayment of the Intercompany Note and issue a dividend upon the occurrence in the Fall of 2017 of one of the triggers set forth in that settlement.  *See id*. ¶¶ 164-175.  The *GAMCO II* Complaint primarily sought declaratory relief – an order declaring that the Defendants breached fiduciaries duties owed to the Class or aided and abetted the breaches – as well as damages allegedly suffered by the Class.  *See id*. at 77.

## III.     The Debtors' Bankruptcy Filings

27.     On March 14, 2018, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  On March 16, 2018, the Debtors, an ad hoc group of holders of term loan credit facility claims and PGN claims, an ad hoc group of holders of term loan credit facility claims, an ad hoc group of holders of 2021 notes claims, and certain holders of the Debtors' equity interests entered into a Restructuring Support Agreement (the "<u>RSA</u>") setting forth the material terms of the transactions embodied in the Plan (as defined herein).  The RSA contemplated (among other things) that CCOH and the Debtors would negotiate a transaction to separate or spin-off CCOH from the Debtors (the "Separation") in order to unlock value for CCOH and iHeart's creditors.  *See* <u>Exhibit A</u> to <u>Exhibit B</u> attached to the *Disclosure Statement Relating to the Fourth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc.and Its*

*Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1484].  On October 18, 2018, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1632] (the "Plan") which also contemplated the CCOH Separation and contained release provisions that were broad enough to encompass both the pending Norfolk Action and the GAMCO Action.  *See* Plan, Art. VIII.C.  The terms of any Separation, however, still had to be negotiated and agreed among the parties, including CCOH.

28.     On September 5, 2018, GAMCO filed an objection to the release provisions contained in the Plan and reserving its rights with respect to confirmation of the Plan.  In discussions with Debtors' counsel, GAMCO also threatened to object to confirmation of the Plan based on the treatment of the balance of the Intercompany Note owed to CCOH.  Specifically, GAMCO has asserted that the relationship between iHC and CCOH created a constructive trust over the balance on the Intercompany Note such that it should not be treated as a general unsecured claim.

29.     Similarly, on November 28, 2018, Norfolk County Retirement System filed the *Limited Objection of Norfolk County Retirement System To The Approval Of Fifth Amended Joint Chapter 11 Plan Of Reorganization of iHeartMedia, Inc. and Its Debtors Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* ("Norfolk's Limited Objection") [Docket No. 2055] objecting to the original release provisions contained in the Plan, requesting the exclusion of the Norfolk Action from the release, and reserving its rights with respect to confirmation of the Plan.

## IV.     Negotiations Regarding the CCOH Separation

30.     As contemplated by the RSA and the Plan, the Debtors and CCOH began to negotiate the terms of the CCOH Separation as well as the future of the Intercompany Agreements and the treatment of the Intercompany Note in the Plan.  Those negotiations were conducted

primarily by the Debtors (and their counsel and advisors) and a Special Committee of the Board of CCOH (and their counsel and advisors).  The CCOH Board appointed a Special Committee of the Board consisting of independent directors – initially, Paul Keglevic, Doug Jacobs, and Dale Tremblay – who were non-management directors not affiliated with iHeart or its significant shareholders.[6]  *See* Resolution (attached hereto as Exhibit N) at 1.  They were charged with negotiating with iHeart and approving or disapproving any restructuring transaction or any transaction "regarding the existing cash management and other intercompany arrangements" and the "balance outstanding under the" Intercompany Note.  *Id*. at 1-2.  They were advised by independent counsel at Willkie Farr & Gallagher and independent financial advisors at Houlihan Lokey.

31.     The Debtors and the CCOH Special Committee exchanged due diligence information both before and after the Petition Date relevant to the Separation, the Intercompany Agreements, and the Intercompany Note.  On May 16, 2018, the Debtors and CCOH presented five-year business plans to their respective boards of directors, which were subsequently approved.  After the exchange of diligence, in June 2018, the settlement discussions between the CCOH Special Committee and the Debtors began in earnest.  These negotiations included numerous discussions between the Parties' respective advisors, circulation of numerous term sheets, and multiple meetings, including an in-person meeting on July 11, 2018.

32.     In the course of these discussions, the Debtors determined that it would be beneficial to include GAMCO in the negotiations regarding the CCOH Separation in order to resolve GAMCO's objections and threatened objections to the Plan, as well as the claims asserted

---

[6]     On February 15, 2018, Mr. Jacobs resigned from the CCOH Board and was replaced on the CCOH Board and on the Special Committee by Harvey L. Tepner.

in the *GAMCO II* Complaint, all of which related to the Intercompany Agreements and the Intercompany Note. Accordingly, beginning in September 2018, the Debtors and GAMCO engaged in extensive further negotiations regarding the terms of the Separation and the treatment of the Intercompany Note. The parties exchanged numerous term sheets and conducted several rounds of negotiations. During the negotiations, GAMCO sought additional value flowing to CCOH as part of the Settlement. For their part, the Debtors requested that GAMCO, on behalf of a class of all CCOH Shareholders, provide a broad release designed to create global peace regarding the continuing litigation in Delaware over the Intercompany Agreements and the Intercompany Note, as well as GAMCO's threatened challenges to Plan confirmation.

## V.     The Settlement Agreement

33.     Following these extensive negotiations, the Parties reached an agreement in principle regarding the material terms of the Separation and resolution of GAMCO's objections and threatened objections to the Plan and the claims asserted in the GAMCO Action and related claims. Such terms were memorialized in the Settlement Agreement which is an essential and integral component of the Separation and the Plan. Those terms provide significant value to CCOH and the CCOH minority shareholders, including:

   a. *The spin-off of CCOH from iHeart and the ultimate termination (after a transition period) of the Intercompany Agreements*. This spin-off will separate CCOH from iHeart and permit CCOH to control its own business destiny – a great value to all of CCOH's shareholders. These Intercompany Agreements, including the Intercompany Note, were the subject of all of the prior litigation and would all now be eliminated going forward.

   b. *Settlement of Intercompany Note balance*. iHeart agreed to allow CCOH's claim of $1.032 billion for the Intercompany Note without any setoff and pay in cash 14.4% of that claim. This is beneficial to CCOH and its minority shareholders because iHeart gave up potential defenses to this claim as well as potential offsets to its value.

   c. *The transfer of valuable intellectual property from iHeart to CCOH*. iHeart owns the name "Clear Channel." As part of the Settlement, iHeart agreed to transfer this

valuable mark (and other IP) to CCOH for no charge and as no offset to the Intercompany Note claim.

d. *Liquidity for CCOH.*  In order to ensure CCOH has adequate liquidity to fund its operations, iHeart has agreed to provide a $170 million unsecured line of credit to CCOH for three years at the prime rate of interest.  The favorable terms of this liquidity are of enormous benefit to CCOH for its business going forward.

e. *Waiver of post-petition balance owed to Debtors.*  The Debtors agreed to waive post-petition intellectual property license fees and the post-petition intercompany balance CCOH owes to iHeart as of December 31, 2018.  To the extent the Debtors owe a post-petition balance to CCOH as of December 31, 2018, iHeart will pay it.

34.     All of these terms are of immense value to CCOH and its shareholders because they remove CCOH from the control of the Debtors, provide sufficient liquidity for CCOH to pursue its own independent business plan and obtain other important benefits for CCOH (*e.g*., the transfer of certain intellectual property, the waiver of the set-off for the value of such intellectual property, and the waiver of any potential post-petition intercompany balance owed by CCOH to the Debtors).  The Settlement and Separation were also beneficial to the Debtors and their creditors because the Debtors have long desired to separate the businesses in a consensual, tax-efficient manner (given, among other things, the relative lack of synergies between the two businesses and the different investor bases), and the Settlement avoids the inherent uncertainty and substantial costs associated with a prolonged legal battle regarding the Plan and the Delaware litigation. Further, the consensual Separation is also contemplated by the Debtors' RSA and Plan, both of which have massive stakeholder support, and are critical to the Debtors' expeditious emergence from chapter 11.

35.     The Settlement Agreement also provided for a release of claims that was designed to obtain global peace for all parties, including the Debtors, CCOH, their respective Board members, their creditors, and all of their shareholders.  Signatories to the Settlement Agreement included the Debtors, CCOH, and the defendants in the two Delaware lawsuits. This total peace

was a critical component of the overall deal because of the series of lawsuits that had been repeatedly filed making essentially the same attack on the Intercompany Note. The release encompassed any claims of CCOH or GAMCO or the class of CCOH's shareholders, "individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the [GAMCO] Action or the intercompany agreements between CCOH and Debtors." The Settlement Agreement also provided that, "[f]or the avoidance of doubt, the Released Claims include, but are not limited to, all claims asserted or that could be asserted in the Norfolk Action."

36.     On December 7, 2018, the Debtors, CCOH, and GAMCO filed a Joint Motion to approve the Settlement Agreement in this Court, explaining why the settlement is in the best interests of all constituencies.

## VI.     Norfolk's Attempt To Play Spoiler

37.     On December 10, 2018, Norfolk filed a Preliminary Objection challenging the fairness of the Settlement. Norfolk's substantive attacks on the settlement evinced a fundamental misunderstanding of its terms and an underappreciation of the incredible value it provides to CCOH and its shareholders.

38.     In addition to its fairness objections, Norfolk argued that, under Delaware law, CCOH "cannot settle or release the claims asserted in the" Norfolk Action. *Id*. at 14. Norfolk asserted that the defendants in the Norfolk Action did not challenge demand futility and that, therefore, under *Zapata v. Maldonado*, 430 A.2d 779 (Del. 1981), the only way for CCOH to release the claims in the Norfolk Action, is for CCOH to appoint a Special Litigation Committee and comply with the various procedural requirements set forth in *Zapata*. This argument is wrong as a matter of Delaware law and fundamentally misconstrues the Settlement and the releases set

forth therein.  At the hearing on December 11, 2018, the Court permitted the Debtors and CCOH to file this brief responding to Norfolk's argument.

39.      Seeking to hedge its bets, Norfolk filed an "emergency" motion in the Delaware Court of Chancery on December 12, 2018, to consolidate the GAMCO Action and the Norfolk Action, to appoint Norfolk as the lead plaintiff, and to appoint Norfolk's counsel as lead counsel. *See* Norfolk Emergency Mot.  Importantly, Norfolk acknowledged in its motion that the claims asserted in the Norfolk Action arise from the same transaction as the claims asserted in the GAMCO Action – the November 2017 amendment extending the maturity of the Intercompany Note.  *See id.* at 5 ("GAMCO parroted Norfolk's challenges to the Third Amendment"); *id.* at 9 ("Both Actions challenge the Board's decisions concerning the maturity of the Revolving Note and entry into the Third Amendment.").

## Argument

### I.      The Settlement of GAMCO's Claims Properly Releases the Derivative Claim that Norfolk Asserts Based on the Same Transaction

40.      The GAMCO Action and Norfolk Action both arise from the same transaction and the same set of operative facts.  Specifically, both lawsuits challenge the November 2017 decision of the CCOH Board to extend the Intercompany Note.  Accordingly, under Delaware law, the settlement of GAMCO's claims – which GAMCO entered into on behalf of a class of CCOH shareholders including Norfolk – properly releases the derivative claim that Norfolk asserts based on the same operative facts.

41.      Under Delaware law, "a settlement can release claims that were not specifically asserted in the settled action . . . if those claims are based on the same identical factual predicate or the same set of operative facts as the underlying action."  *In re Philadelphia Stock Exch., Inc.*, 945 A.2d 1123, 1146 (Del. 2008) (internal quotation marks omitted); *see Nottingham Partners v.*

*Dana*, 564 A.2d 1089, 1105 (Del. 1989) ("In this case, the Settlement included a general release of all claims that were or could have been asserted against the defendants arising out of matters and transactions referred to in the Dana complaint or the Stipulation and Agreement of Compromise and Settlement.  The validity of executing a general release in conjunction with the termination of litigation has long been recognized by the Delaware courts.").  As the Delaware Supreme Court has repeatedly recognized, "[i]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not even been presentable in the class action." *Philadelphia Stock Exch.*, 945 A.2d at 1146.  In the class action context, settlements that release claims beyond those asserted in the settled class action – including derivative claims – are common.[7]

42.    Delaware courts have specifically approved settlements of shareholder *class* actions that release other shareholders' *derivative* actions where the class and derivative actions are based on the same alleged conduct.  *See*, *e.g.*, *Philadelphia Stock Exch.*, 945 A.2d at 1146.  In *Philadelphia Stock Exchange*, a shareholder brought a class action in the Delaware Court of Chancery alleging that directors of the corporation had breached their fiduciary duties through transactions that transferred most of the corporation's shares to strategic investors.  945 A.2d at 1131.  The Court of Chancery approved a settlement of the class action that included a release of all claims relating to the challenged transactions, and the Delaware Supreme Court affirmed.  *Id*. at 1132-33.  The Supreme Court upheld the settlement over an objection that the release would bar

---

[7]    *See*, *e.g.*, *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *9-13 (Del. Ch. Dec. 20, 2012); *Lomeli v. Sec. & Inv. Co. Bahrain*, 546 F. App'x 37, 39-40 (2d Cir. 2013); *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460-61 (2d Cir. 1982); *Breslow v. Prudential-Bache Props., Inc.*, 1993 WL 150052, at *2-3 (N.D. Ill. May 7, 1993).

several pending actions, including a shareholder's derivative action, *see id.* at 1147-48,[8] because those other actions "arose out of the same set of operative facts as the claims for relief that were actually asserted" in the class action. *Id.* at 1133. Norfolk's assertion (at 4) that "GAMCO cannot release *derivative* claims already asserted by Norfolk" cannot be squared with the Delaware Supreme Court's decision in *Philadelphia Stock Exchange*. *See also Steiner v. Sithe-Energies, L.P.*, 1988 WL36133, at *2 (Del. Ch. Apr. 18, 1988) (approving settlement releases in class action filed in Delaware that released derivative claims filed in California arising out of the same events).

43.     Similarly, Delaware courts have dismissed derivative actions on the ground that the derivative claims were released in a class action settlement. *See, e.g.*, *Tremont*, 2012 WL 6632681, at *1. In *Tremont*, the Court of Chancery dismissed a shareholder's derivative action based on a release in a settlement of class and derivative litigation in the Southern District of New York. *Id.* at *3, 9-13. The shareholder-plaintiff in the derivative action was not a party to the settlement of the federal litigation. *See id.* Nevertheless, the Court of Chancery held that the settlement barred the derivative claim because "[a] well-settled principle of Delaware law is that, 'in a stockholder's derivative suit a judgment entered . . . upon an approved settlement is [r]es judicata and bars subsequent suit on the same claim [on] behalf of the Corporation.'" *Id.* at *10 (quoting *Ezzes v. Ackerman*, 234 A.2d 444, 445 (Del. 1967)). Other courts have similarly approved releases of derivative claims in a class settlement or barred derivative claims because of an earlier class settlement.[9]

---

[8]     One of the other lawsuits listed, *Penn Mont Sec. v. Frucher*, 502 F. Supp. 2d 443 (E.D. Pa. 2007), included derivative claims. *See Philadelphia Stock Exchange*, 945 A.2d at 1147 n.51.

[9]     *See Lomeli*, 546 F. App'x at 39-40 (affirming approval of class settlement that released a derivative claim because the class action and derivative claim were based "share[d] a single factual predicate" and the class representative provided "adequate representation" to the derivative plaintiff); *Breslow*, 1993 WL 150052, at *4 (enjoining a derivative lawsuit in another court because it had been released in an earlier class settlement).

44.     Consistent with that precedent, the Settlement here validly releases the derivative claims that Norfolk asserts because the GAMCO Action and the Norfolk Action are "based on the same identical factual predicate or the same set of operative facts." *Philadelphia Stock Exch.*, 945 A.2d at 1146 (internal quotation marks omitted).  The GAMCO Action and the Norfolk Action both challenge the Intercompany Agreements between the Debtors and CCOH and in particular focus on the Intercompany Note.  *See supra* Part II.C-D, VI.   GAMCO and Norfolk both specifically challenge the CCOH Board's November 2017 decision to extend the maturity of the Intercompany Note.  *See id.*  GAMCO and Norfolk both assert claims for breach of fiduciary duty arising out of the failure of CCOH to protect itself from losing the balance on the Intercompany Note.  *See id.*[10]  Because the two Actions are based on the same facts, the settlement of GAMCO's claims validly releases the claims asserted in Norfolk's Action.

45.     GAMCO also raised derivative claims on behalf of CCOH in the bankruptcy proceeding which were also settled and released as part of the Settlement Agreement.  GAMCO threatened to bring derivative claims on behalf of CCOH inside the bankruptcy regarding the treatment of the Intercompany Note.  *See supra* Part III.  Specifically, GAMCO claimed that the Intercompany Note was subject to a constructive trust and so should not be treated as an unsecured debt.  *See id.*  This claim clearly is based on the same set of operative facts as the Norfolk Action – the alleged failure of CCOH to protect itself and the balance on the Intercompany Note from the Debtors' pending bankruptcy.   In other words, the GAMCO Action, GAMCO's threatened constructive trust claim, and the Norfolk Action all arise out of the same set of operative facts – the

---

[10]   GAMCO's claim was broader than Norfolk's in that it also challenged the failure to demand repayment under the Intercompany Note.  But the dispositive point for present purposes is that GAMCO's claim arises out of the same set operative facts (and, indeed, overlaps entirely with) Norfolk's claim.  *See Philadelphia Stock Exchange*, 945 A.2d at 1147-48 (holding that a class action based on two corporate transactions could validly release other actions based on only the first transaction because they "arose out of the same set of operative facts").

Intercompany Agreements, the balance on the Intercompany Note, the Debtors' financial struggles, and the extension of the Intercompany Note.[11]

46.     Indeed, the GAMCO Action and Norfolk Action are much more similar than other actions that have satisfied "the identical factual predicate or the same set of operative facts" test. In *Philadelphia Stock Exchange*, the settled class action challenged sales of company stock to strategic investors – what the parties called the "Strategic Investor Transactions." *Id*. at 1130.  The Strategic Investor Transactions occurred shortly after the company had converted from a mutual company to a shareholder-owned company – what the parties called the "Demutualization."  *Id*. The Delaware Supreme Court held that the class action, which challenged the Strategic Investor Transactions, shared an identical factual predicate or the same set of operative facts with other lawsuits challenging the Demutualization.  *Id*. at 1148.  The Supreme Court reasoned that even though the Demutualization was not the "wrongdoing for which specific relief was requested" in the class action, the Demutualization was "the 'but for' factual foundation of the conduct that does form the subject of the claims for relief," and so "the Demutualization claims arose out of the same set of operative facts as the claims for relief that were actually asserted."  *Id*.  While the class and derivative actions in *Philadelphia Stock Exchange* concerned related but separate transactions, the GAMCO Action and the Norfolk Action focus on precisely the same transactions – those involving the Intercompany Note and the extension of the maturity of the Note on November 29, 2017.

47.     It does not matter under Delaware law that the precise legal theories asserted in the GAMCO Action may differ from the legal theory asserted in the Norfolk Action.  What matters is that the cases are "based on the same identical factual predicate or the same set of operative facts,"

---

[11]     Illustrating the point, Norfolk has taken the position that GAMCO's claims *are* derivative claims.  *See* Norfolk Obj. at 17.  Either way, the Settlement with GAMCO releases Norfolk's claims.

*Philadelphia Stock Exchange*, 945 A.2d at 1146, so that the class defendants can obtain a "comprehensive settlement" of any claim based on the underlying events as the class action, *id*. (internal quotation marks omitted).  In *Philadelphia Stock Exchange*, a class action settlement of breach of fiduciary duty claims included a release of securities, RICO, and insider trading claims – all the subject of parallel litigation, including derivative litigation – because the various claims arose out of the same events.  *Id*. at 1147 n.51.  That is precisely what the parties have properly done here.

## II.    The Case On Which Norfolk's Objection Depends (*Zapata*) Does Not Involve A Class Settlement With One Shareholder That Releases Claims Asserted by Another Shareholder Based on the Same Transaction

48.    Norfolk's objection does not address the black-letter Delaware law that the settlement of the claims asserted by GAMCO can release the claim asserted by Norfolk because all the claims arise out of the same identical factual predicate or the same set of operative facts.  *See supra* Part I.  Instead, Norfolk cites *Zapata v. Maldonado*, 430 A.2d 779 (Del. 1981), to argue that, "to wrest control of litigation after a stockholder has demonstrated demand futility and dismiss or settle the litigation, a corporation must satisfy the test set forth by the Delaware Supreme Court in *Zapata v. Maldonado*."  Norfolk Obj. at 14.  *Zapata*, however, applies only when an independent committee of an otherwise conflicted Board decides to unilaterally take control of a pending shareholder derivative action that has survived a motion to dismiss.  It does not apply to a situation like this one involving a settlement of a separate action brought by a different shareholder that releases claims based on the same transaction that are pending in a different case.

49.    A closer examination of *Zapata* confirms that it provides no support for Norfolk's objection to the settlement here.  There, a shareholder brought derivative claims to recover from ten directors and officers for alleged breaches of fiduciary duty.  430 A.2d at 780.  The shareholder alleged that it was futile to make a demand on the board to bring the action because the board

comprised the ten defendants in the derivative action.  *Id*. at 780-81.  The board then created a committee of newly appointed independent directors and authorized it to decide unilaterally whether the litigation should continue.  *Id*.  The committee concluded that the claims should be dismissed.  *Id*.  But the Court of Chancery ruled that the committee could not secure dismissal because, among other reasons, after surviving a motion to dismiss, a shareholder "possesses an independent, individual right to continue a derivative suit for breaches of fiduciary duty over objection by the corporation."  *Id.* at 782.

50.     The Delaware Supreme Court reversed.  The Supreme Court first held that the Court of Chancery's ruling that a shareholder "possesses an independent, individual right to continue a derivative suit . . . is erroneous."  *Id.*  The Supreme Court explained that this follows from the fact that "[d]erivative suits enforce corporate rights and any recovery obtained goes to the corporation."  *Id.* at 784.

51.     That holding flows from the well-settled Delaware principle that a shareholder derivative claim, such as the claim Norfolk asserts, is always owned by *the corporation*, and never by the shareholder-plaintiff.  It is a fundamental principle of corporate law that "[a] derivative claim belongs to the corporation, not to the shareholder plaintiff who brings the action."  *In re MAXXAM, Inc./Federated Dev. Shareholders Litig.*, 698 A.2d 949, 956 (Del. Ch. 1996); *see also*, *e.g.*, *California State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 846 (Del.), *cert. denied*, 139 S. Ct. 177 (2018).  This is true at every stage of litigation – "through the entire process, the corporation alone is the real party in interest because the suit is always on its behalf."  *Alvarez*, 179 A.3d at 847; *see id.* at 846 ("[t]he corporation is always the sole owner of the claims").  Indeed, "because the corporation is always the real party in interest, the identity of the specific representative shareholder plaintiff is not a paramount concern."  *MAXXAM*, 698 A.2d at 956.

24

52.     Because "[t]he corporation is always the sole owner of the claims," *Alvarez*, 179 A.3d at 846, a shareholder's ability to litigate the claims is always subject to divestment – even after the pleadings stage.  For example, a shareholder loses standing to litigate derivative claims when the corporation on whose behalf the shareholder is suing merges into another corporation, even if the merger occurs after a trial on the derivative claim.  *See*, *e.g.*, *El Paso Pipeline GP Co, L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016).  "This rule flows from the fact that, following a merger, the derivative claim – originally belonging to the acquired corporation – is transferred to and becomes an asset of the acquiring corporation."  *Id.* (internal quotation marks omitted).  Likewise, a shareholder loses standing to litigate derivative claims when the corporation files for bankruptcy.  *See*, *e.g.*, *Police & Fire Ret. Sys. of City of Detroit v. Callen*, 44 A.3d 922 (Del. 2012) (table).  In *Callen*, the Delaware Supreme Court affirmed the dismissal of derivative claims over the objection of the shareholder who had brought the claims because the corporation filed for bankruptcy.  *Id.*  Moreover, the bankruptcy court had earlier approved a settlement of securities claims that included a release of the derivative claims.  *Id.*

53.     Norfolk ignores the settled principle that a corporation is always the sole owner of a derivative claim.  It also fails to address *Zapata*'s rejection of the argument that a shareholder "possesses an independent, individual right to continue a derivative suit."  430 A.2d at 782.

54.     The Supreme Court in *Zapata* also held that a specially constituted committee of independent directors "can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest."  *Id.* at 784.  This is the aspect of *Zapata* that Norfolk clings to, reciting in its objections the steps a court must take to decide whether such a committee has taken such a decision.  *See* Norfolk Obj. at 14-15.  But Norfolk fails to acknowledge that *Zapata* did not address whether a class settlement with one shareholder

plaintiff validly releases claims asserted in a separate case brought by another shareholder.  Other cases *have* addressed that issue, however.  As explained above, courts have consistently held that a settlement with one shareholder plaintiff properly releases derivative claims brought by another shareholder plaintiff, so long as both claims arise from the same set of facts.

55.     Nothing in *Zapata* calls into question that settled principle.  *Zapata* addressed the circumstances under which a board can unilaterally take over a derivative claim and dismiss it or settle it without the participation of *any* shareholder-plaintiff.  *Zapata* did not involve a settlement with one shareholder-plaintiff that includes a release precluding claims litigated by another shareholder-plaintiff.[12]

56.     Moreover, none of the concerns cited by the *Zapata* court is present here.  This does not involve the unilateral decision of a conflicted board to dismiss a properly pleaded derivative action.  Here, the interests of CCOH and its shareholders were represented in the settlement negotiations by both GAMCO – one of CCOH's largest shareholders, which has been litigating these issues for years – *and* an independent committee of CCOH directors.  Both GAMCO and the CCOH special committee helped negotiate the deal and agreed to the releases.  This robust and fulsome process – together with the approval process this Court will undertake under Rules 23 and 23.1 – provides significant protection of the interests of minority shareholders.[13]

---

[12]   Nor does *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726 (Del. 1988), support Norfolk's objection.  *Cf.* Norfolk Limited Obj.  Like *Zapata*, *Kaplan* did not involve a settlement with one shareholder-plaintiff that includes a release precluding claims litigated by another shareholder-plaintiff.  Instead, *Kaplan* held that, when a corporation's board responds to the filing of a derivative action by submitting an affidavit stating that it does not object to the action being brought on its behalf, the shareholder has standing to litigate the action without first making a demand on the corporation's board.  *See id.* at 731.  That holding has nothing to do with the issue here, which concerns whether the GAMCO settlement validly releases a derivative claim arising from the same facts that Norfolk has asserted.

[13]   *Zapata* is not on point for another reason:  Defendants in the Norfolk Action have not conceded demand futility and Norfolk has not survived a motion to dismiss for failure to state a claim.  Under such circumstances, *Zapata* does not apply at all.

* * *

57.     This Court should grant preliminary approval of the Settlement and then consider the fairness of the Settlement and objections to the scope of the releases in connection with final approval.  As part of that final approval process, the Court can (and should) also evaluate any arguments as to whether GAMCO and its counsel are adequate representatives of the class.  If the Court approves the settlement, then the defendants in the Norfolk Action will present the release as a defense in that Action, and the Court of Chancery will ultimately determine whether the release ends that Action.  *See*, *e.g.*, *Philadelphia Stock Exch.*, 945 A.2d at 1146; *Tremont*, 2012 WL 6632681, at *1.  Either way, the question whether the settlement is fair and adequate is for this Court to determine, not for Norfolk to determine.  As Judge Friendly explained, "the assent of the plaintiff (or plaintiffs) who brought a derivative stockholder's action is not essential to a settlement; a contrary view would put too much power in a wishful thinker or a spite monger to thwart a result that is in the best interests of the corporation and its stockholders."  *Saylor v. Lindsley*, 456 F.2d 896, 899-900 (2d Cir. 1972).[14]

---

[14]   *Accord Sved v.Chadwick*, 783 F.Supp. 2d 851, 859 (N.D. Tex. 2009) ("Settlements of shareholders' derivative suits 'are particularly favored' . . . [and] Fifth Circuit precedent directs the Court to consider not only the opinion of the derivative plaintiff, but also the preferences of the many other players involved.") (quoting *Maher v. Zapata Corp.*, 714 F. Supp. 2d 436, 455-56 (5th Cir. 1983); *Settlement or Compromise of Asserted Right of Corporation Pending a Derivative Action To Enforce It*, 150 A.L.R. 872 (1944) ("[T]he rule appears to be established that there may be a compromise and settlement of an asserted right of a corporation pending a derivative action to enforce it, despite opposition by, or want of consent of, the plaintiffs or other interested persons, provided proper opportunity to be heard is given to those opposing, and the terms of settlement are fair and reasonable.").

WHEREFORE, the Debtors and CCOH respectfully request that the Court:  (a) overrule the Norfolk Objection; (b) approve the relief sought in the Joint Motion and GAMCO Motion; and (c) grant such other and further relief as the Court may deem just and appropriate under the circumstances.

Houston, Texas
December 13, 2018

/s/ *Patricia B. Tomasco*
Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth C. Freeman (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          ptomasco@jw.com
                efreeman@jw.com
                mcavenaugh@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Brian D. Wolfe (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                anup.sathy@kirkland.com
                brian.wolfe@kirkland.com
                will.guerrieri@kirkland.com
                benjamin.rhode@kirkland.com

-and-

Christopher Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          christopher.marcus@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

_/s/ Jennifer J. Hardy_
Jennifer J. Hardy (Texas Bar No. 24096068)
**Willkie Farr & Gallagher LLP**
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799

   - and -

Matthew A. Feldman
Paul V. Shalhoub
Benjamin McCallen
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

_Counsel for CCOH Special Committee,_
_For and On Behalf of CCOH_

## **Certificate of Service**

I certify that on December 13, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Patricia B. Tomasco_
Patricia B. Tomasco

# Exhibit A

# CORPORATE SERVICES AGREEMENT

## DATED NOVEMBER 10, 2005

### BETWEEN

## CLEAR CHANNEL MANAGEMENT SERVICES, L.P.

### AND

## CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

## CORPORATE SERVICES AGREEMENT

This CORPORATE SERVICES AGREEMENT, dated to be effective as of November 10, 2005 (this "Agreement"), is made by and between Clear Channel Management Services, L.P., a Texas limited partnership ("Management Services"), and Clear Channel Outdoor Holdings, Inc., a Delaware corporation ("Outdoor"). Management Services is indirectly wholly-owned by Clear Channel Communications, Inc., a Texas corporation ("CCU"), and as of the date hereof, Outdoor is an indirect, wholly-owned subsidiary of CCU. Certain capitalized terms used in this Agreement are defined in Section 1.1 and the definitions of the other capitalized terms used in this Agreement are cross-referenced in Section 1.2.

W I T N E S S E T H :

WHEREAS, CCU and Outdoor have entered into a Master Agreement, dated as of November 10, 2005 (the "Master Agreement"), pursuant to which, among other things, CCU will separate its outdoor advertising and related businesses and operations from the other businesses and operations of CCU by contributing, assigning and transferring such businesses, operations and related assets and liabilities to Outdoor and its Subsidiaries, as set forth in the Master Agreement;

WHEREAS, after the separation of the outdoor advertising and related businesses and operations from CCU by contribution, transfer and assignment to the Outdoor Group, it is contemplated that an initial public offering will be made of the class A common stock of Outdoor, resulting in partial public ownership of Outdoor;

WHEREAS, after such separation and the initial public offering, both Outdoor and CCU desire for Management Services to provide certain administrative and support services and other assistance to the Outdoor Group in accordance with the terms and subject to the conditions set forth herein, and Management Services desires to provide, or cause to be provided by other members of the CCU Group, such services and assistance to the Outdoor Group;

WHEREAS, because of the parent-subsidiary relationships among CCU, Outdoor and Management Services, the terms and conditions set forth herein have not resulted from arms length negotiations between the parties, and accordingly, such terms may be in some respects less favorable to Outdoor than those it could obtain from unaffiliated third parties;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1    Certain Defined Terms.**

The following capitalized terms used in this Agreement will have the meanings set forth below:

"Information Systems" means computing, telecommunications or other digital operating or processing systems or environments, including, without limitation, computer programs, data, databases, computers, computer libraries, communications equipment, networks and systems. When referenced in connection with Services, Information Systems will mean the Information Systems accessed and/or used in connection with the Services.

"Intellectual Property" means all of the following, whether protected, created or arising under the laws of the United States or any other foreign jurisdiction:   (i) patents, patent applications (along with all patents issuing thereon), statutory invention registrations, divisions, continuations, continuations-in-part, substitute applications of the foregoing and any extensions, reissues, restorations and reexaminations thereof, and all rights therein provided by international treaties or conventions; (ii) copyrights, mask work rights, database rights and design rights, whether or not registered, published or unpublished, and registrations and applications for registration thereof, and all rights therein whether provided by international treaties or conventions or otherwise; (iii) trademarks, service marks, trade dress, logos and other identifiers of source, including all goodwill associated therewith and all common law rights, registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (iv) intellectual property rights arising from or in respect of domain names, domain name registrations and reservations and URLs; (v) trade secrets; (vi) intellectual property rights arising from or in respect of Technology; and (vii) all other applications and registrations related to any of the intellectual property rights set forth in the foregoing clauses (i) through (vi) above.

"Provider" means Management Services or another member of the CCU Group that is providing a Service pursuant to this Agreement.

"Recipient" means Outdoor or another member of the Outdoor Group to whom a Service pursuant to this Agreement is being provided.

"Representative" of a Person means any director, officer, employee, agent, consultant, accountant, auditor, financing source, attorney, investment banker or other representative of such Person.

"Service Termination Date" means the effective date of the termination of this Agreement pursuant to Section 9.1(a) or such earlier termination date as may be determined in accordance with Section 9.1(a) in respect of any specified Service.

"Software" means the object and source code versions of computer programs and any associated documentation therefor.

"Tax Matters Agreement" means the Tax Matters Agreement entered into pursuant to the Master Agreement and in substantially the form of Exhibit C to the Master Agreement.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, techniques, ideas, know-how, software, programs, models, routines, confidential and proprietary information, databases, tools, inventions, invention disclosures, creations, improvements, works of authorship, and all recordings, graphs, drawings, reports, analyses, other writings, and any other embodiment of the above, in any form, whether or not specifically listed herein.

"Trademark License" means the Amended and Restated Trademark License Agreement entered into pursuant to the Master Agreement and in substantially the form of Exhibit E to the Master Agreement.

"Trigger Date" means the first date on which members of the CCU Group cease to beneficially own more than fifty percent (50%) of the total voting power of Outdoor Common Stock.

"Undertakings" means the obligations of the respective CCU and Outdoor Groups set forth in Article III.

### Section 1.2    Other Terms.

For purposes of this Agreement, the following terms have the meanings set forth in the sections or agreements indicated.

| Term | Section |
|------|---------|
| Affiliate | Master Agreement |
| After-Tax Basis | Master Agreement |
| Agreement | Preamble |
| Breaching Party | Section 9.1(a) |
| CCU | Preamble |
| CCU Confidential Information | Master Agreement |
| CCU Executives | Section 2.2 |
| CCU Group | Master Agreement |
| CCU Indemnified Parties | Section 3.1(c) |
| CCU Services Manager | Section 2.3 |
| CCU Vendor Agreements | Section 3.1(a) |
| Closing | Master Agreement |
| Closing Date | Master Agreement |
| Consents | Section 5.2 |
| Conversion Costs | Section 5.3 |
| Force Majeure | Master Agreement |
| Group | Master Agreement |
| Laws | Master Agreement |
| Liabilities | Master Agreement |
| Management Services | Preamble |
| Master Agreement | Recitals |
| Non-Breaching Party | Section 9.1(a) |
| Other Costs | Section 5.1(a) |
| Outdoor | Preamble |
| Outdoor Business | Master Agreement |
| Outdoor Common Stock | Master Agreement |
| Outdoor Confidential Information | Master Agreement |
| Outdoor Group | Master Agreement |
| Outdoor Indemnified Parties | Section 3.1(d) |
| Outdoor Services Manager | Section 2.3 |
| Outdoor Vendor Agreements | Section 3.1(b) |
| Services | Section 2.1(a) |
| Service Charges | Section 5.1(a) |

| Term | Section |
|------|---------|
| Standard for Services | Section 6.1 |
| Substitute Service | Section 2.1(a) |
| Taxes | Master Agreement |

## ARTICLE II
## SERVICES AND TERMS

**Section 2.1    Services; Scope.**

(a)    During the period commencing on the Closing Date and continuing until the earlier of the termination of this Agreement or an individual Service pursuant to Section 9.1, subject to the terms and conditions set forth in this Agreement, Management Services will provide, or will cause to be provided to the Outdoor Group, finance, information technology, human resources, legal services, management oversight and other general services of an administrative and/or advisory nature with respect to the Outdoor Business, as set forth on Schedule A and Schedule C (the "Services"), and Outdoor will, and will cause the other members of the Outdoor Group to, utilize such Services in the conduct of their respective businesses. The "Services" also will include (1) any Services to be provided by the CCU Group to the Outdoor Group as agreed pursuant to Section 10.3(a), and (2) any Substitute Service; provided, however, that (i) the scope of each Service will be substantially the same as the scope of such service provided by the CCU Group to the Outdoor Group on the last day prior to the Closing in the ordinary course; (ii) the use of each Service by the Outdoor Group will include use by the Outdoor Group's contractors in substantially the same manner as used by the contractors of the Outdoor Group prior to the Closing; and (iii) nothing in this Agreement will require that any Service be provided other than for use in, or in connection with, the Outdoor Business. Nothing in the preceding sentence or elsewhere in this Agreement will be deemed to restrict or otherwise limit the volume or quantity of any Service; provided, that, certain volume or quantity changes with respect to a Service may require the parties to negotiate in good faith and use their commercially reasonable efforts to agree upon a price change with respect to such Service. If, for any reason, Management Services is unable to provide any Service pursuant to the terms of this Agreement, Management Services will provide to the Outdoor Group a substantially equivalent service (a "Substitute Service") at or below the cost for the substituted Service as set forth on Schedule A or Schedule C, as applicable, and otherwise in accordance with the terms of this Agreement, including the Standard for Services.

(b)    The Services will include, and the Service Charges reflect charges for, such maintenance, support, error correction, training, updates and enhancements normally and customarily provided by members of the CCU Group to other CCU Group members that receive such services. If Outdoor requests that Management Services provides a custom modification in connection with any Service, Outdoor will be responsible for the cost of such custom modification. The Services will include all functions, responsibilities, activities and tasks, and the materials, documentation, resources, rights and licenses to be used, granted or provided by the CCU Group that are not specifically described in this Agreement as a part of the Services, but are incidental to, and would normally be considered an inherent part of, or necessary subpart included within, the Services or are otherwise necessary for the CCU Group to provide, or the Outdoor Group to receive, the Services.

(c)      This Agreement will not assign any rights to Technology or Intellectual Property between the parties, other than as specifically set forth herein or in the Trademark License.  Any upgrades, updates or other modifications to Software or other electronic content made available or delivered to the Outdoor Group pursuant to this Agreement will be deemed to be Intellectual Property of the CCU Group and licensed to the Outdoor Group, notwithstanding that such upgrades, updates or other modifications (i) were not used, held for use or contemplated to be used by the Outdoor Group as of the Closing Date, (ii) were not controlled by any member of the CCU Group as of the Closing Date, or (iii) may constitute improvements made after the Closing Date.

(d)      Throughout the term of this Agreement, the Provider and the Recipient of any Service will cooperate with one another and use their good faith, commercially reasonable efforts to effect the efficient, timely and seamless provision and receipt of such Service.

(e)      Any Software delivered by a Provider hereunder will be delivered, at the election of the Provider, either (i) with the assistance of the Provider, through electronic transmission or downloaded by the Recipient from the applicable intranet, or (ii) by installation by the Provider on the relevant equipment, with retention by the Provider of all tangible media on which such Software resides.  The Provider and the Recipient acknowledge and agree that no tangible medium containing such Software (including any enhancements, upgrades or updates) will be transferred to the Recipient at any time for any reason under the terms of this Agreement, and that the Provider will, at all times, retain possession and control of any such tangible medium used or consumed by the Provider in the performance of this Agreement.  Each party will comply with all reasonable security measures implemented by the other party in connection with the delivery of Software.

**Section 2.2      Executive Services.**

Until the earlier of the Trigger Date or termination of this Agreement in accordance with Section 9.1, in conjunction with the provision of the Services, Management Services will make available to Outdoor, and Outdoor will utilize, the management oversight services of the executive officers of CCU referenced on Schedule A and from time to time as mutually agreed to by the parties, certain other officers of CCU (collectively, "CCU Executives"); provided, however, that Outdoor may terminate the provision of management oversight services by any particular executive officer of CCU at any time by providing notice of such termination to CCU, such termination to be effective on the later of the date specified in the notice, if any, or the date that is six months after delivery of such notice.  In rendering such services, until their resignation or the termination of Services as otherwise provided in this Section 2.2, the Chief Executive Officer of CCU shall serve as the Chief Executive Officer of Outdoor, and the Chief Financial Officer of CCU shall serve as the Chief Financial Officer of Outdoor.  The obligations of Management Services pursuant to this Section 2.2 will be subject to the reasonable demands imposed by, and the reasonable requirements of, the on-going operations of the CCU Group and the Outdoor Group, respectively.

### Section 2.3    Services Managers.

Management Services will designate a dedicated services account manager (the "CCU Services Manager") who will be directly responsible for coordinating and managing the delivery of the Services and will have authority to act on the CCU Group's behalf with respect to the Services. Outdoor will designate a dedicated services account manager (the "Outdoor Services Manager") who will be directly responsible for coordinating and managing the delivery of the Services and will have authority to act on the Outdoor Group's behalf with respect to the Services. The CCU Services Manager and the Outdoor Services Manager will work together to address the Outdoor Group's issues and the parties' relationship under this Agreement.

### Section 2.4    Performance and Receipt of Services.

Each of Management Services and Outdoor will, and will cause its respective Groups to, comply with the following provisions with respect to the Services:

(a)    Each Provider and Recipient will at all times comply with its own then in-force security guidelines and policies applicable to the performance, access and/or use of the Services and Information Systems.

(b)    Each Provider and Recipient will take commercially reasonable measures to ensure that no computer viruses or similar items are coded or introduced into the Services or Information Systems. If a computer virus is found to have been introduced into the Services or Information Systems, the parties hereto will use their commercially reasonable efforts to cooperate and to diligently work together to eliminate the effects of such computer virus.

(c)    Each Provider and Recipient will exercise reasonable care in providing and receiving the Services to (i) prevent access to the Services or Information Systems by unauthorized Persons, and (ii) not damage, disrupt or interrupt the Services or Information Systems.

### Section 2.5    WARRANTIES.

THIS IS A SERVICE AGREEMENT. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, THERE ARE NO EXPRESS WARRANTIES OR GUARANTIES, AND THERE ARE NO IMPLIED WARRANTIES OR GUARANTIES, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE AND FITNESS FOR A PARTICULAR PURPOSE.

### ARTICLE III
### OTHER ARRANGEMENTS

### Section 3.1    Vendor Agreements.

(a)    A member of the CCU Group is or may become a party to certain corporate purchasing contracts, master services agreements, vendor contracts, software and other Intellectual Property licenses or similar agreements unrelated to the Services (the "CCU Vendor Agreements") under which (or under open work orders thereunder) the Outdoor Group purchases

goods or services, licenses rights to use Intellectual Property and realizes certain other benefits and rights.  Management Services agrees that prior to the Trigger Date, the Outdoor Group will continue to retain the right to purchase goods or services and continue to realize such other benefits and rights under each CCU Vendor Agreement to the extent allowed by such CCU Vendor Agreement until the expiration or termination date of such rights or benefits pursuant to the terms of such CCU Vendor Agreement (including, without limitation, any voluntary termination of such CCU Vendor Agreement by the CCU Group).

(b)     A member of the Outdoor Group is or may become a party to certain corporate purchasing contracts, master services agreements, vendor contracts, software and other Intellectual Property licenses or similar agreements unrelated to the Outdoor Services (the "Outdoor Vendor Agreements") under which (or under open work orders thereunder) the CCU Group purchases goods or services, licenses rights to use Intellectual Property and realizes certain other benefits and rights.  Outdoor agrees that prior to the Trigger Date, the CCU Group will continue to retain the right to purchase goods or services and continue to realize such other benefits and rights under each Outdoor Vendor Agreement to the extent allowed by such Outdoor Vendor Agreement until the expiration or termination date of such rights or benefits pursuant to the terms of such Outdoor Vendor Agreement (including, without limitation, any voluntary termination of such Outdoor Vendor Agreements by the Outdoor Group).

(c)     The Outdoor Group will indemnify, defend and hold harmless on an After-Tax Basis the CCU Group and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "CCU Indemnified Parties"), from and against any and all Liabilities of the CCU Indemnified Parties relating to, arising out of or resulting from the Outdoor Group purchasing goods or services, licensing rights to use Intellectual Property or otherwise realizing benefits and rights under any CCU Vendor Agreements.

(d)     The CCU Group will indemnify, defend and hold harmless on an After-Tax Basis the Outdoor Group and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "Outdoor Indemnified Parties"), from and against any and all Liabilities of the Outdoor Indemnified Parties relating to, arising out of or resulting from the CCU Group purchasing goods or services, licensing rights to use Intellectual Property or otherwise realizing benefits and rights under any Outdoor Vendor Agreements.

## ARTICLE IV
## ADDITIONAL AGREEMENTS

### Section 4.1     Leases.

Management Services and Outdoor agree that each lease or sublease listed on Schedule B, pursuant to which any member of the Outdoor Group leases or subleases real property from any member of the CCU Group, will remain in full force and effect pursuant to its terms unless otherwise agreed to in writing by the parties.

**Section 4.2**    **Computer-Based Resources.**

(a)    Management Services and Outdoor agree that (i) prior to the Trigger Date, the Outdoor Group will continue to have access to the Information Systems of the CCU Group, and (ii) on and after the Trigger Date, the Outdoor Group will not have access to all or any part of the Information Systems of the CCU Group, except to the extent necessary for the Outdoor Group to receive the Services (subject to the Outdoor Group complying with all reasonable security measures implemented by the CCU Group as deemed necessary by the CCU Group to protect its Information Systems; provided, that, the Outdoor Group has had a commercially reasonable period of time in which to comply with such security measures).

(b)    Management Services and Outdoor agree that (i) prior to the Trigger Date, the CCU Group will continue to have access to the Information Systems of the Outdoor Group, and (ii) on and after the Trigger Date, the CCU Group will not have access to all or any part of the Information Systems of the Outdoor Group, except to the extent necessary for the CCU Group to perform the Services (subject to the CCU Group complying with all reasonable security measures implemented by the Outdoor Group as deemed necessary by the Outdoor Group to protect its Information Systems; provided, that, the CCU Group has had a commercially reasonable period of time in which to comply with such security measures).

**Section 4.3**    **Access.**

Outdoor will allow the CCU Group and its Representatives reasonable access to the facilities of the Outdoor Group necessary for the performance of the Services and to enable the CCU Group and to fulfill its obligations under this Agreement.

## ARTICLE V
## COSTS AND DISBURSEMENTS; PAYMENTS

**Section 5.1**    **Service Charges.**

(a)    Schedule A or Schedule C, as applicable, sets forth with respect to each Service a description of the charges for such Service or the basis for the determination thereof (the "Service Charges"). Further, in connection with performance of the Services and in connection with the Undertakings, the Provider will make payments for the benefit of and on behalf of the Recipient and will incur out-of-pocket costs and expenses (collectively, the "Other Costs"), which will be reimbursed to the Provider by the Recipient; provided, that, any Other Costs will only be payable by the Recipient if it receives from the Provider reasonably detailed data and other documentation sufficient to support the calculation of amounts due to the Provider as a result of such Other Costs.

(b)    (i)    Prior to the Trigger Date, Management Services and Outdoor will arrange for the payment of all Service Costs and Other Charges in a manner consistent with past practices for similar services provided by the CCU Group to the Outdoor Group prior to the date hereof. The Recipient will have the right to dispute any Service Charges and Other Costs by delivering written notice of such dispute, setting forth in reasonable detail the basis therefor, to the Provider within, and no later than, 60 days after notice of billing. As soon as practicable after receipt of any such notice, the Provider will provide the Recipient with reasonably detailed

data and documentation sufficient to support the calculation of any Service Charges and Other Costs that are the subject of the dispute.  If the Provider's furnishing of such information does not promptly resolve such dispute, the dispute will be resolved pursuant to <u>Section 8.2</u>.

(ii)    From and after the Trigger Date, the Provider will deliver an invoice to the Recipient on a monthly basis (or at such other frequency as is set forth on <u>Schedule A</u> or <u>Schedule C</u>, as applicable) in arrears for the Service Charges and any Other Costs.  The Recipient will pay the amount of such invoice to the Provider in U.S. dollars within 30 days of the date of such invoice, <u>provided</u>, <u>that</u>, to the extent consistent with past practice with respect to Services rendered outside the United States, payments may be made in local currency.  If the Recipient fails to pay such amount (excluding any amount contested in good faith) by such date, the Recipient will be obligated to pay to the Provider, in addition to the amount due, interest on such amount at the lesser of (i) the three month London Interbank Offered Rate (LIBOR) plus 100 basis points or (ii) the maximum rate of interest allowed by applicable law, from the date the payment was due through the date of payment.  As soon as practicable after receipt by the Provider of any reasonable written request by the Recipient, the Provider will provide the Recipient with reasonably detailed data and documentation sufficient to support the calculation of any amount due to the Provider under this Agreement for the purpose of verifying the accuracy of such calculation.  If, after reviewing such data and documentation, the Recipient disputes the Provider's calculation of any amount due to the Provider, then the dispute will be resolved pursuant to <u>Section 8.2</u>.

## Section 5.2    <u>Consents</u>.

Management Services and Outdoor acknowledge and agree that certain Software and other licenses, consents, approvals, notices, registrations, recordings, filings and other actions (collectively, "<u>Consents</u>") may be required by Management Services, Outdoor or members of their respective Groups in connection with the provision of the Services.  With respect to each Service, the Recipient will, after consultation with the Provider, either directly pay the out-of-pocket expenses incurred to obtain, perform or otherwise satisfy each such Consent or after any such Consent is obtained, performed or otherwise satisfied, reimburse the Provider for all actual, out-of-pocket costs incurred by the Provider and related to such Consent.  Prior to payment of, or reimbursement for, such out-of-pocket expenses, the Provider will provide the Recipient with an invoice accompanied by reasonably detailed data and documentation sufficient to evidence the out-of-pocket expenses for which the Provider is seeking payment or reimbursement.  Upon receipt of such invoice and data and documentation, the Recipient will either pay the amount of such invoice directly in accordance with its general payment terms with vendors or reimburse the Provider for its payment of the invoice within 30 days of the date of its receipt of such invoice.  If the Recipient disputes the invoiced amount, then the parties will work together to resolve such dispute.  If the parties are unable to resolve such dispute, the dispute will be resolved pursuant to <u>Section 8.2</u>.  Management Services and Outdoor acknowledge and agree that no prior approval of the Recipient will be required for the Provider to seek any reimbursement pursuant to this <u>Section 5.2</u>.

### Section 5.3    Conversion Costs.

Management Services and Outdoor acknowledge and agree that in connection with the implementation, provision, receipt and transition of the Services, there will be certain nonrecurring, out-of-pocket conversion costs incurred by Management Services, Outdoor and their respective Groups ("Conversion Costs").  With respect to each Service, the Recipient of the Service will either reimburse the Provider as incurred for all actual, out-of-pocket Conversion Costs incurred by the Provider and related to such Service or, after consultation with the Provider, pay such Conversion Costs directly on an as-incurred basis, in either case regardless of whether the Recipient replaces such Service with the same application, system, vendor or other means of effecting the Service.  Prior to payment of, or reimbursement for, such actual out-of-pocket Conversion Costs, the Provider will provide the Recipient with an invoice accompanied by reasonably detailed data and documentation sufficient to evidence the out-of-pocket expenses for which the Provider is seeking payment or reimbursement.  Upon receipt of such invoice and data and documentation, the Recipient will either pay the amount of such invoice directly in accordance with its general payment terms with vendors or reimburse the Provider for its payment of the invoice within 30 days of the date of its receipt of such invoice.  If the Recipient disputes the invoiced amount, then the dispute will be resolved pursuant to Section 8.2. Management Services and Outdoor acknowledge and agree that no prior approval will be required from the Recipient for the Provider to seek any reimbursement for Conversion Costs pursuant to this Section 5.3.

### ARTICLE VI
### STANDARD FOR SERVICE; COMPLIANCE WITH LAWS

### Section 6.1    Standard for Service.

Except as otherwise provided in this Agreement (including in Schedule A and Schedule C), Management Services agrees that the Provider will perform the Services such that the nature, quality, standard of care and the service levels at which such Services are performed are no less than the nature, quality, standard of care and service levels at which the substantially same services were provided to the members of the Outdoor Group by or on behalf of the Provider on the last day prior to the Closing Date in the ordinary course (the "Standard for Services").

### Section 6.2    Compliance with Laws.

Each of Management Services and Outdoor will be responsible for its, and its respective Group's, compliance with any and all Laws applicable to its performance under this Agreement; provided, however, that each of Management Services and Outdoor will, subject to reimbursement of out-of-pocket expenses by the requesting party, use commercially reasonable efforts to cooperate and provide the other party with all reasonably requested assistance (including, without limitation, the execution of documents and the provision of relevant information) to ensure compliance with all applicable Laws in connection with any regulatory action, requirement, inquiry or examination related to this Agreement or the Services.

## ARTICLE VII
## INDEMNIFICATION; LIMITATION ON LIABILITY

### Section 7.1    Limited Liability of a Provider.

Notwithstanding the provisions of Section 6.1, none of Management Services, any other members of the CCU Group, their respective Affiliates or any of their respective directors, officers or employees, or any of the heirs, executors, successors or assigns of any of the foregoing (each, a "Provider Indemnified Party"), will have any liability in contract, tort or otherwise, including for any such party's ordinary or contributory negligence, to the Recipient or its Affiliates or Representatives for or in connection with (i) any Services rendered or to be rendered by any Provider Indemnified Party pursuant to this Agreement, (ii) the transactions contemplated by this Agreement, or (iii) any Provider Indemnified Party's actions or inactions in connection with any such Services or transactions; provided, however, that such limitation on liability will not extend to or otherwise limit any Liabilities that have resulted directly from such Provider Indemnified Party's (a) gross negligence or willful misconduct, (b) improper use or disclosure of information of, or regarding, a customer or potential customer of a Recipient Indemnified Party or (c) violation of applicable Law.

### Section 7.2    Indemnification by Each Provider.

Management Services will, and will cause each Provider to indemnify, defend and hold harmless each relevant Recipient and each of its Subsidiaries and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (each, a "Recipient Indemnified Party"), from and against any and all Liabilities of the Recipient Indemnified Parties relating to, arising out of, or resulting from (a) the gross negligence or willful misconduct of a Provider Indemnified Party in connection with such Provider Indemnified Party's provision of the Services, (b) the improper use or improper disclosure of information of, or regarding, a customer or potential customer of a Recipient Indemnified Party in connection with the transactions contemplated by this Agreement or such Provider Indemnified Party's provision of the Services, or (c) any violation of applicable Law by a Provider Indemnified Party in connection with the transactions contemplated by this Agreement or such Provider Indemnified Party's provision of the Services; provided, that, the aggregate liability of the CCU Group as Providers pursuant to this Article VII will in no event exceed an amount equal to the aggregate payments made by the Recipients to the Providers for Services pursuant to this Agreement for the 12 month period preceding the date of such event giving rise to indemnification hereunder.

### Section 7.3    Indemnification by Each Recipient.

Outdoor will, and will cause each member of the Outdoor Group to, indemnify, defend and hold harmless each relevant Provider Indemnified Party from and against any and all Liabilities of the Provider Indemnified Parties relating to, arising out of, or resulting from the provision of the Services by any Provider or any of its Affiliates, except for (a) any Liabilities that result from a Provider Indemnified Party's gross negligence in connection with the provision of the Services, and (b) any Liabilities that result from a Provider Indemnified Party's material breach of this Agreement.

### Section 7.4    Indemnification Matters; Exclusivity.

The indemnification provisions set forth in Sections 5.6 through 5.8 of the Master Agreement are hereby incorporated into, and made a part of, this Article VII, Sections 3.1(c) and 3.1(d) and as otherwise applicable to this Agreement.  The provisions of this Article VII will constitute the sole and exclusive remedy for Liabilities arising under this Agreement, other than Liabilities arising under Sections 3.1(c) and 3.1(d).

### Section 7.5    Limitation on Liability.

**Notwithstanding any other provision contained in this Agreement, Management Services and Outdoor agree on their behalf, and on behalf of their respective Groups, that no member of the CCU Group on the one hand, and no member of the Outdoor Group, on the other hand, will be liable to any member of the other Group, whether based on contract, tort (including negligence), warranty or any other legal or equitable grounds, for any special, indirect, punitive, incidental or consequential losses, damages or expenses of the other Group, including, without limitation, loss of data, loss of profits, interest or revenue, or use or interruption of business, arising from any claim relating to breach of this Agreement or otherwise relating to any of the Services or Undertakings provided hereunder**.  For clarification purposes only, the parties hereto agree that the limitation on liability contained in this Section 7.5 will not apply to (a) damages awarded to a third party pursuant to a third party claim for which a Provider is required to indemnify, defend and hold harmless any Recipient Indemnified Party under Section 7.2; (b) damages awarded to a third party pursuant to a third party claim for which a Recipient is required to indemnify, defend and hold harmless any Provider Indemnified Party under Section 7.3; (c) damages awarded to a third party pursuant to a third party claim for which the Outdoor Group is required to indemnify, defend and hold harmless any CCU Indemnified Party under Section 3.1(c); and (d) damages awarded to a third party pursuant to a third party claim for which the CCU Group is required to indemnify, defend and hold harmless any Outdoor Indemnified Party under Section 3.1(d).

### Section 7.6    Liability for Payment Obligations.

Nothing in this Article VII will be deemed to eliminate or limit, in any respect, any member of the CCU Group's or any member of the Outdoor Group's express obligation in this Agreement to pay or reimburse, as applicable, for (a) Service Charges;  (b) Other Costs; (c) amounts payable or reimbursable with respect to any custom modification provided pursuant to Section 2.1(b); (d) any amounts payable or reimbursable pursuant to the terms of the leases referred to in Section 4.1; (e) any amounts payable or reimbursable pursuant in respect of the Consents pursuant to Section 5.2; (f) amounts payable or reimbursable in respect of Conversion Costs pursuant to Section 5.3; (g) amounts payable or reimbursable pursuant to Section 6.2 with respect to compliance with Laws; (h) amounts payable or reimbursable pursuant to Section 10.3(b) with respect to books and records; and (i) amounts payable or reimbursable pursuant to 0 with respect to Taxes.

# ARTICLE VIII
# DISPUTE RESOLUTION

### Section 8.1    Applicable Law.

This Agreement will be governed by, and construed and interpreted in accordance with, the laws of the State of Texas, without giving effect to any conflicts of law rule or principle that might require the application of the laws of another jurisdiction.

### Section 8.2    Dispute Resolution.

To the extent not resolved through discussions between the CCU Services Manager and the Outdoor Services Manager, any dispute, controversy or claim arising out of, or relating to, this Agreement will be resolved in accordance with Article VII of the Master Agreement, which dispute resolution provisions are hereby incorporated into, and made a part of, this Section 8.2.

# ARTICLE IX
# TERMINATION

### Section 9.1    Termination.

(a)    This Agreement may be terminated (1) after the Trigger Date by either Management Services or Outdoor upon no less than six months' prior written notice; provided, however, after the Trigger Date, Management Services will continue to provide, and Outdoor will utilize, and will cause the other members of the Outdoor Group to utilize, the Services identified on Schedule C for the applicable time periods after the Trigger Date set forth in Schedule C, and therefore (A) the effective date of such termination of this Agreement must be no earlier than the latest date provided on Schedule C for the provision of Services, (B) the effective date of termination of individual Services specified on Schedule C must be no earlier than the date provided on Schedule C for such individual Service, and (C) all other Services that are not specified on Schedule C will terminate upon the effective termination date provided in such written notice, or (2) at any time upon mutual agreement of Management Services and Outdoor.  Notwithstanding the foregoing, with respect to specific Services provided hereunder, (i) either party hereto (the "Non-Breaching Party") may terminate this Agreement with respect to any individual Service, in whole but not in part, at any time upon prior written notice by the Non-Breaching Party to the other party (the "Breaching Party") if the Breaching Party (including any member of its respective Group) has failed to perform any of its material obligations under this Agreement relating to such Service, and such failure will have continued without cure for a period of 60 days after receipt by the Breaching Party of a written notice of such failure from the Non-Breaching Party seeking to terminate such Service; provided, however, that no Service may be terminated pursuant to this clause (i) until the parties have completed the dispute resolution process set forth in Section 8.2 with respect to such Service; (ii) Management Services and Outdoor may from time to time mutually agree to terminate any individual Service, in whole but not in part, provided, that, any such agreement to terminate a Service will comply with Section 10.10 and include all terms and conditions applicable to termination of the Service to be terminated and (iii) as provided in Section 2.2, Outdoor may terminate the provision of management oversight services by any particular executive officer of CCU at any time by

providing notice of such termination to CCU, such termination to be effective on the later of the date specified in the notice, if any, or the date that is six months after delivery of such notice. Any such termination of an individual Service will not in any way affect the obligations of the party terminating such Service to continue to receive all other Services not so terminated and to continue to provide Services as required by this Agreement.

(b)     In addition to and not in limitation of the rights and obligations set forth in Section 2.1(d), upon the request of the Recipient of a Service, (i) the Provider of such Service will cooperate with the Recipient and use its good faith, commercially reasonable efforts to assist the transition of such Service to the Recipient (or Affiliate of the Recipient or such third-party vendor designated by the Recipient) by the Service Termination Date for such Service.

**Section 9.2     Effect of Termination.**

Upon termination or expiration of any Service or Undertaking pursuant to this Agreement, the relevant Provider will have no further obligation to provide the terminated Service or expired Undertaking, and the relevant Recipient will have no obligation to pay any future Service Charges or Other Costs relating to any such Service or Undertaking (other than for or in respect of Services or Undertakings provided in accordance with the terms of this Agreement and received by such Recipient prior to such termination). Upon termination of this Agreement in accordance with its terms, no Provider will have any further obligation to provide any Service or Undertaking, and no Recipient will have any obligation to pay any Service Charges or Other Costs relating to any Service or Undertaking or make any other payments under this Agreement (other than for or in respect of Services or Undertakings received by such Recipient prior to such termination).

**Section 9.3     Survival.**

Each of Section 4.1 (Leases), Section 4.2 (Computer-Based Resources), Article V (Costs and Disbursements), Article VII (Indemnification; Limitation on Liability), Article VIII (Dispute Resolution), Section 9.2 (Effect of Termination), this Section 9.3 (Survival), and Article X (General Provisions) will survive the expiration or other termination of this Agreement and remain in full force and effect.

**Section 9.4     Force Majeure.**

No party hereto (or any member of its Group or any other Person acting on its behalf) will have any liability or responsibility for failure to fulfill any obligation (other than a payment obligation) under this Agreement so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure. A party claiming the benefit of this provision will, as soon as reasonably practicable after the occurrence of any such event: (a) notify the other party of the nature and extent of any such Force Majeure condition and (b) use commercially reasonable efforts to remove any such causes and resume performance under this Agreement as soon as feasible.

## ARTICLE X
## GENERAL PROVISIONS

**Section 10.1    Independent Contractors.**

In providing Services hereunder, the Provider will act solely as independent contractor and nothing in this Agreement will constitute or be construed to be or create a partnership, joint venture, or principal/agent relationship between the Provider, on the one hand, and the Recipient, on the other.  All Persons employed by the Provider in the performance of its obligations under this Agreement will be the sole responsibility of the Provider.

**Section 10.2    Subcontractors.**

Any Provider may hire or engage one or more subcontractors to perform any or all of its Services; provided, that, Management Services will in all cases remain responsible for all its obligations under this Agreement, including, without limitation, with respect to the scope of the Services, the Standard for Services and the content of the Services provided to the Recipient. Under no circumstances will any Recipient be responsible for making any payments directly to any subcontractor engaged by a Provider.

**Section 10.3    Additional Services; Books and Records.**

(a)    If, during the term of this Agreement, a party hereto identifies a need for additional or other corporate services to be provided by or on behalf of Management Services, the parties hereto agree to negotiate in good faith to provide such requested services (provided that such services are of a type generally provided by the CCU Group at such time) and the applicable service fees, payment procedures, and other rights and obligations with respect thereto.  To the extent practicable, such additional or other services will be provided on terms substantially similar to those applicable to Services of similar types and otherwise on terms consistent with those contained in this Agreement.

(b)    All books, records and data maintained by a Provider for a Recipient with respect to the provision of a Service will be the exclusive property of such Recipient.  The Recipient, at its sole cost and expense, will have the right to inspect, and make copies of, any such books, records and data during regular business hours upon reasonable advance notice to the Provider. At the sole cost and expense of the Provider, upon termination of the provision of any Service, the relevant books, records and data relating to such terminated Service will be delivered by the Provider to the Recipient in a mutually agreed upon format to the address of Outdoor set forth in Section 10.5 or any other mutually agreed upon location; provided, however, that the Provider will be entitled to retain one copy of all such books, records and data relating to such terminated Service for archival purposes and for purposes of responding to any dispute that may arise with respect thereto.

**Section 10.4    Confidential Information.**

Outdoor agrees to, and will cause the other members of the Outdoor Group to, maintain and safeguard all the Information pursuant to Section 6.2 of the Master Agreement and Management Services agrees to, and will cause the other members of the CCU Group to,

maintain and safeguard all Outdoor Confidential Information pursuant to Section 6.2 of the Master Agreement, and each party hereto agrees that Section 6.2 of the Master Agreement is hereby incorporated by reference into, and made a part of, this Agreement.

**Section 10.5    Notices.**

All notices, requests, claims, demands and other communications under this Agreement will be in writing and will be given or made (and will be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as will be specified in a notice given in accordance with this Section 10.5):

If to Management Services:

> Clear Channel Management Services, L.P.
> 200 E. Basse Road
> San Antonio, Texas  78209
> Attn:  President of Clear Channel GP, LLC
> Fax:  (210) 822-2299

If to any other member of the CCU Group:

> Clear Channel Communications, Inc.
> 200 E. Basse Road
> San Antonio, Texas  78209
> Attn:  Chief Executive Officer
> Fax:  (210) 822-2299

If to any member of the Outdoor Group:

> Clear Channel Outdoor Holdings, Inc.
> 2850 E. Camelback Road
> Phoenix, Arizona  85016
> Attention:  President
> Fax:  (602) 957-8602

**Section 10.6    Taxes.**  Except as otherwise specifically provided for in the Tax Matters Agreement:

(a)    Each party will be responsible for any personal property Taxes on property it owns or leases, for franchise and privilege Taxes on its business, and for Taxes based on its net income or gross receipts.

(b)    Each Recipient may report and (as appropriate) pay any sales, use, excise, value-added, services, consumption, and other Taxes directly if the Recipient provides the applicable Provider with a direct pay or exemption certificate.

(c)     A Provider will promptly notify the applicable Recipient of, and coordinate with the Recipient the response to and settlement of, any claim for Taxes asserted by applicable taxing authorities for which the Recipient is alleged to be financially responsible hereunder.

(d)     Each Recipient will be entitled to receive and to retain any refund of Taxes paid to a Provider pursuant to this Agreement.  In the event a Provider receives a refund of any Taxes paid by a Recipient to the Provider, the Provider will promptly pay, or cause the payment of, such refund to the Recipient.

(e)     Each of the parties hereto agrees that if reasonably requested by the other party, it will cooperate with such other party to enable the accurate determination of such other party's Tax liability and assist such other party in minimizing its Tax liability to the extent legally permissible.  The Provider's invoices will separately state the amounts of any Taxes the Provider is proposing to collect from the Recipient.

**Section 10.7    Severability.**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**Section 10.8    Entire Agreement.**

Except as otherwise expressly provided in this Agreement, this Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes all prior agreements and undertakings, both written and oral, between or on behalf of the parties hereto with respect to the subject matter of this Agreement.  The Schedules and Recitals to this Agreement are hereby incorporated by reference into and made part of this Agreement for all purposes.

**Section 10.9    Assignment; No Third-Party Beneficiaries.**

This Agreement will not be assigned by any party hereto without the prior written consent of the other party hereto; provided, however, Management Services may assign this Agreement in connection with a merger, consolidation, reorganization, sale of all or substantially all of its assets or similar transaction within the CCU Group whether or not Management Services is the surviving entity.  Except as provided in Article III and Article VII with respect to indemnified parties, this Agreement is for the sole benefit of the parties to this Agreement, the members of their respective Group and their permitted successors and assigns and nothing in this Agreement, express or implied, is intended to or will confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.  Outdoor will cause each member of the Outdoor Group receiving Services hereunder as a Recipient to abide by the terms and conditions of this Agreement, and

Management Services will cause each member of the CCU Group providing Services hereunder as a Provider to abide by the terms and conditions of this Agreement.

**Section 10.10  Amendment.**

No provision of this Agreement may be amended or modified except by a written instrument signed by all the parties to such agreement. No waiver by any party of any provision hereof will be effective unless explicitly set forth in writing and executed by the party so waiving. The waiver by either party hereto of a breach of any provision of this Agreement will not operate or be construed as a waiver of any other subsequent breach.

**Section 10.11  Rules of Construction.**

(a)     Interpretation of this Agreement will be governed by the following rules of construction: (i) words in the singular will be held to include the plural and vice versa and words of one gender will be held to include the other gender as the context requires, (ii) references to the terms Article, Section, paragraph, and Schedule are references to the Articles, Sections, paragraphs, and Schedules to this Agreement unless otherwise specified, (iii) the word "including" and words of similar import will mean "including, without limitation," (iv) provisions will apply, when appropriate, to successive events and transactions, (v) the headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement, (vi) the recitals are and (vii) this Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

(b)     Unless specifically stated in the Master Agreement that a particular provision of the Master Agreement should be given effect in lieu of a conflicting provision in this Agreement, to the extent that any provision contained in this Agreement conflicts with, or cannot logically be read in accordance with, any provision of the Master Agreement, the provision contained in this Agreement will prevail.

(c)     Unless specifically stated in the Schedules to this Agreement, to the extent that any provision contained in this Agreement conflicts with, or cannot logically be read in accordance with, any provision of a Schedule to this Agreement the provision contained in such Schedule will prevail.

**Section 10.12  Counterparts.**

This Agreement may be executed in one or more counterparts, and by the different parties to each such agreement in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail will be as effective as delivery of a manually executed counterpart of any such Agreement.

**Section 10.13 <u>No Right to Set-Off.</u>**

Outdoor will, and will cause each other Recipient to, pay the full amount of costs and disbursements, including Other Costs, incurred under this Agreement, and will not set-off, counterclaim or otherwise withhold any other amount owed to a Provider on account of any obligation owed by a Provider to a Recipient.

[<i>SIGNATURE PAGE FOLLOWS</i>]

IN WITNESS WHEREOF, the parties have caused this Corporate Services Agreement to be executed to be effective on the date first written above by their respective duly authorized officers.

CLEAR CHANNEL MANAGEMENT SERVICES, L.P.

By:  Clear Channel GP, LLC, its general partner

By:  _____

Name:  Mark P. Mays

Title:  President


CLEAR CHANNEL OUTDOOR HOLDINGS, INC.


By:  _____

Name:  Paul J. Meyer

Title:  President and Chief Operating Officer

IN WITNESS WHEREOF, the parties have caused this Corporate Services Agreement to be executed to be effective on the date first written above by their respective duly authorized officers.

CLEAR CHANNEL MANAGEMENT SERVICES, L.P.

By:  Clear Channel GP, LLC, its general partner


By: _____
Name:  Mark P. Mays
Title:  President


CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

By: _____
Name:  Paul J. Meyer
Title:  President and Chief Operating Officer

SCHEDULES TO THE

CORPORATE SERVICES AGREEMENT

DATED NOVEMBER 10, 2005

BETWEEN

CLEAR CHANNEL MANAGEMENT SERVICES, LP

AND

CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

**Schedule A**

(Services)

See attached.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## Schedule A.  Description of Services – Clear Channel Outdoor

## I. Definitions

## II. Services

1. Finance
    1.1 Corporate Services……………………………………………………… 3
    1.2 Corporate Accounting and SEC Reporting……………………… 4
    1.3 Outdoor Accounting …………………………………………………… 5
    1.4 Payroll Tax Management……………………………………………… 6
    1.5 Corporate Tax …………………………………………………………… 7
    1.6 Payroll and H/R Service and support……………………………… 8
    1.7 Outdoor Accounts Receivable and Billing……………………… 9
    1.8 Accounts Payable……………………………………………………… 10
    1.9 Cash Management / Treasury……………………………………… 11
    1.10 Strategic Development……………………………………………… 12

2. Information Technology
    2.1 Transaction & Financial Information Services………………… 13
    2.2 Development…………………………………………………………… 14
    2.3 Field Services………………………………………………………… 15

3. Human Resources
    3.1 Human Resources…………………………………………………… 16

4. Legal
    4.1 Intellectual Property………………………………………………… 17
    4.2 Litigation………………………………………………………………… 18
    4.3 Employment…………………………………………………………… 19
    4.4 Corporate Governance……………………………………………… 20

5. Other
    5.1 Executive Management and Oversight………………………… 21
    5.2 Risk Management…………………………………………………… 22
    5.3 Internal Audit………………………………………………………… 23
    5.4 Investor Relations…………………………………………………… 24
    5.5 Government Affairs………………………………………………… 25
    5.6 Internal Communications………………………………………….. 26
    5.7 External Communications/Public Relations………………… 27
    5.8 Aviation………………………………………………………………… 28

## III. Service Levels

1. Standard Service Levels……………………………………………… 29

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## I. Definitions

***Additional Services Document (ASD)*** is a detailed document used to define the specific requirements and metrics that will be associated with IT/IS development projects initiated by Clear Channel Outdoor.  Generally, the document will include project goals, timing, deliverables, and estimated fees associated with the effort.

***Billing Period*** refers to the period of time for which transition services will be provided.

***Clear Channel*** refers to the combination of entities that includes: Clear Channel Broadcast, Clear Channel Outdoor, and Corporate.

***Clear Channel Outdoor*** refers to the future stand-alone entity that currently exists as the Clear Channel Outdoor division.

***Cost*** (as used in the allocation methodology definitions) refers to the total of all wages, benefits, bonuses, employee taxes, facility overhead, and depreciation.  Generally, cost will be allocated on a Full Time Equivalent (FTE) basis depending upon the primary workplace of the individual.

***Revenue Allocation*** refers to the ratio of Clear Channel Outdoor revenue divided by total Clear Channel revenue for the previous fiscal year.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## II. Services

### 1.1 Finance – Corporate Services

**Services Provided**

*Fixed Asset Accounting & Inventory Services*
1. Maintain fixed asset and intangible accounting policies and procedures.
2. Process all capital expenditure transactions.
3. Maintain the fixed asset and intangible asset sub-ledger system.
4. Record all general ledger journal entries related to fixed assets and intangibles.
5. Reconcile the sub-ledger to the general ledger.
6. Record depreciation and amortization expense.
7. Prepare roll-forward, capital spending and Depreciation and Amortization forecasting information.
8. Provide customer service to the branches and divisional corporate offices.
9. Prepare audit work-papers and answering audit questions.
10. Perform physical inventories of fixed assets.

*Corporate Accounting Services*
1. Provide General ledger accounting services for Corporate business units supporting Clear Channel Outdoor including; Legal, Human Resources, Accounting, Treasury, Risk Management, Internal Audit, Communications and Executive.
2. Provide Inter-company accounting, reconciliations and eliminations services that include: preparation and recording of payroll journal entries, inter-company interest, management fees, license fees, insurance allocations and tracking/analysis for risk management, employee benefit plan allocations and tracking/analysis for Human Resources, Clear Channel PAC accounting and various other cost allocation journal entries.
3. Provide cash accounting services for transfers, sweeps, wires, and cash transactions including payroll tax EFT payments.
4. Perform monthly bank reconciliations (lockbox, disbursement, and payroll).
5. Perform research and general ledger posting of lockbox transfers (intra and inter-company).
6. Support and maintain unclaimed property tracking, compliance and reporting.
7. Provide print services for Clear Channel Outdoor legal invoices from Serengeti for processing by accounts payable.
8. Provide services related to International holding company general ledger accounting and statutory report preparation.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

*Fixed Asset Accounting and Inventory Services*
Management has dedicated resources that perform Fixed Asset Accounting services to each specific entity. Therefore, Clear Channel Outdoor will be allocated costs (labor and overhead) related to these services based on the resources directly performing the services. Management is able to directly account for the resources performing Fixed Asset Inventory services (Business Unit 00510) to each specific entity. Therefore, Clear Channel Outdoor will be allocated costs based on the ratio of estimated level of effort dedicated to servicing Clear Channel Outdoor projects to the total level of effort spent servicing all Fixed Asset Inventory projects for the billing period.

*Corporate Accounting Services*
Management is able to directly account for the resources performing Corporate Accounting services to each specific division. Therefore, Clear Channel Outdoor will be allocated these costs directly based on the resources directly performing these services.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.2 Finance – Corporate Accounting and SEC Reporting

**Services Provided**

1. Consolidate and generate key financial statements including: balance sheet, income statement, statement of shareholder's equity, statement of cash flow on a quarterly and annual basis.  Included in the reports will be all related footnote disclosures.
2. Assist the external auditors through preparation of schedules, explanations and other assistance to complete the external audit of the financial results.
3. Assist the external and internal auditors through preparation of schedules, explanations and other assistance to complete the external audit of internal controls including preparation of necessary documentation and reporting results to the audit committee.
4. Prepare and review of internal and external forecasting models.
5. Prepare accounting entries related to all non-routine transactions.
6. Maintain appropriate controls over the stock option database and prepare necessary journal entries related to compensation costs.
7. Prepare and submit all necessary governmental statistical reports (non-SEC).
8. Provide technical GAAP assistance and documentation.
9. Prepare and file all SEC related documents, including Forms 4 and 5.
10. Provide other financial related services as requested by management.
11. Maintain appropriate controls over shareholders' equity and prepare necessary journal entries related to equity, which includes reconciliation of shares outstanding and calculation of basic and diluted EPS.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate all costs related to the Corporate Accounting (Business Unit 00501) services based on the pro rata share of actual business unit costs for the billing period.  The pro rata share will be based on the ratio of Clear Channel Outdoor revenue to the total Clear Channel revenue.  The revenue basis will be determined using the previous fiscal year's results.  External Auditing and other third-party service fees will be directly invoiced based on the entity incurring the charges.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.3 Finance – Outdoor Accounting

**Services Provided**

1. Perform reviews of payment vouchers and associated journal entries.
2. Process payment vouchers and journal entries for division-wide entries and corporate overhead business units.
3. Prepare foreign currency translation calculations and consolidation entries for international markets.
4. Review reconciliations prepared by the branch.
5. Coordinate all division-wide financial reporting including budget analysis and statistical analysis.
6. Maintain online budget forms.
7. Reconcile and report on corporate overhead accounts.
8. Provide general accounting assistance, research, and guidance.
9. Participate and provide guidance in the development of policy and procedures.
10. Provide ancillary support to approved special projects.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will directly invoice all costs for Outdoor Accounting services (Business Unit 00521).

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

1.4 Finance - Payroll Tax Management

**Services Provided**

1. Provide payroll tax compliance services including: weekly, monthly, quarterly, and annual filing and depositing for all federal, state and local income, unemployment, disability, and workers compensation taxes.
2. Provide W-2 Processing services including: monthly reconciliations of withholding wages and taxes, the annual preparation and distribution of employee W-2's, and filing of annual reports and magnetic media to the social security administration and other local agencies, as required.
3. Provide General ledger reconciliation services including reconciliation of liabilities maintained within the PeopleSoft general ledger system with liabilities accrued within the FLS reporting system.
4. Provide IRS and state audit representation services including correspondence with federal, state and local agencies and their representatives to facilitate the auditing of previously filed tax returns.
5. Provide PeopleSoft Employee maintenance / Upkeep including: daily audit of employee new hire setups, and tracking, researching and correcting payroll tax transaction errors at the request of employees and business unit managers.
6. Provide ancillary support to approved special projects including all other services that are not defined above.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate a percentage of the total Payroll Tax (Business Unit 00505) service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor domestic employee headcount to the total Clear Channel domestic employee headcount for the billing period.

**Clear Channel Communications, Inc.**
Schedule A -- Description of Services

## 1.5 Finance - Corporate Tax

**Services Provided**

1. Provide income tax compliance services including: both federal (including federal reporting of international entities) and state compliance, calculation of quarterly tax estimates, preparation of all required income and franchise returns, and preparation of annual reports.
2. Provide Quarterly GAAP reporting services including the calculation of current and deferred tax expense and the tracking of cumulative temporary differences as required under FAS 109.
3. Provide Fixed Asset maintenance services including the tracking of the tax basis of depreciable and amortizable assets maintained in the Best FAS system. Services also include calculation of amortization and depreciation on a quarterly basis and estimation of 10 year forecasts for financial reporting purposes.
4. Provide IRS and state audit representation services including correspondence with federal, state and local agencies and their representatives to facilitate the auditing of previously filed tax returns.
5. Provide miscellaneous compliance / consulting services including services provided to local markets concerning sales, property, and other general operating taxes.
6. Provide ancillary support for approved special projects including all other services that are not defined above including: advising on mergers and acquisitions and divestitures as well as implementing various tax planning initiatives.
7. Provide support for documentation requests.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

*Management (Planning and Consulting) services (00513)*
Management will allocate the total costs (i.e., vice president, senior directors, senior managers and planning and consulting fees excluding broadcast related fees, etc.) of the department to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor revenue to the total Clear Channel revenue. The revenue basis will be determined using the previous fiscal year's results.

*Compliance Services*
Management will allocate a percentage of the total Compliance and ancillary services (Business Unit 00503) costs (not including Clear Channel Entertainment entity or Management costs) to the Clear Channel Outdoor entity based on the ratio of Clear Channel Outdoor entity returns to the total number of returns processed by Clear Channel Communications for the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.6 Finance - Payroll and H/R Service and Support

**Services Provided**

*Payroll/HR Service & Support*
1. Manage job postings and track candidate status within job posting system.
2. Operate payroll systems to produce payroll and payroll reporting.
3. Enter employee personal and job data information for locations unable to process information online.
4. Enter timesheet data for locations unable to process timesheets online.
5. Report employee tax information, stock options, and benefits.
6. Process and distribute checks and direct deposit advice.
7. Provide manual checks, check voids and check reversals as required.
8. Create pay sheet adjustments such as non-cash income, tax override, and garnishments override.
9. Prepare Request for Funding for each payroll.
10. Produce electronic data feeds for ACH transactions, payroll tax reports, as well as benefit and retirement plan information.
11. Prepare preprocessing and post-processing reconciliation of payroll data.
12. Audit payroll exceptions and check distribution for completeness and accuracy.
13. Administer garnishments.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

*Payroll/HR Service and Operations*
Management will allocate a percentage of the total Payroll Processing service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor employee headcount to the total Clear Channel employee headcount for the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.7 Finance - Outdoor Accounts Receivable and Billing

**Services Provided**

1. Process and post all lock box payments to accounts receivable module.
2. Perform collection procedures on certain national agency accounts.
3. Manage new customer review and activation.
4. Manage customer information additions, modifications, and deletions.
5. Manage and prepare all consolidated billing projects.
6. Manage unapplied credits for branches on an as needed basis.
7. Perform collection procedures for branches on an as needed basis.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will directly invoice all costs related to the Outdoor Accounting services (Business Unit 00507).

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.8 Finance - Accounts Payable

**Services Provided**

1. Operate financial systems for supplier invoice payment processing.
2. Process full, split and partial invoice payments per customer request.
3. Administers electronic workflow systems to facilitate payment process.
4. Maintain vendor master file.
5. Provide inquiry support to vendors and business managers from 8:30 am to 5:30 pm CDT.
6. Review and verify invoice, invoice documentation, and invoice approvals for completeness and accuracy.
7. Manage cash disbursements to gain vendor discounts while timing disbursements based on needs of the business.
8. Manage regulatory and compliance matters related to accounts payable including 1099 filing, B-Notice resolution, 1042 filing, federal tax withholding, state tax filing, and penalty abatement.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate a percentage of the total Accounts Payable (Business Unit 00506) service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor checks processed to the total number of checks processed by Clear Channel for the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.9 Finance - Cash Management / Treasury

**Services Provided**

*Treasury*
1. Assist with the development and execution of a global capital structure strategy to provide capital for growth, maximize cash flow, and minimize financial risk.
2. Collaborate with financial institutions to ensure adequate liquidity and financing capacity.
3. Develop and manage global cash strategy to achieve maximum value and minimize risk.
4. Design and implement global risk management strategy to address financial exposures, including foreign exchange and interest rate.

*Cash Management*
1. Manage daily cash position and determine liquidity needs (funding/investing).
2. Administer borrowings and repayments under the liquidity facility.
3. Establish cash management systems and procedures that help minimize investment in non-earning cash resources while providing adequate liquidity.
4. Initiate all electronic funds transfers which shall include wires and ACHs.
5. Provide bank administration (includes opening, closing, maintenance and control) for all domestic bank accounts and for all international accounts established by a domestic subsidiary.
6. Administer on-line bank reporting systems which includes downloading data files and placing them on the intra-net site as well as providing access to on-line banking systems.
7. Process requests for cashier checks.

The foregoing cash management services shall be provided and utilized as set forth under "Cash and Cash Equivalents; cash management policies" beginning on page 61 of Clear Channel Outdoor's final prospectus dated November 10, 2005.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate the costs to provide Cash Management and Treasury services (Business Unit 00801) to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor revenue to the total Clear Channel revenue.  The revenue basis will be determined using the previous fiscal year's results.

Transfer agent, banking fees and other third party service fees will be allocated directly based on the entity incurring the cost and charge to interest expense.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 1.10 Finance - Strategic Development

**Services Provided**

1. Manage and coordinate the corporate approval process for the following types of transactions:
   a. Capital investment-related transactions, including, but not limited to municipal contracts with upfront payments, fixed rents, and/or revenue sharing agreements
   b. Revenue & Non-Revenue Generating Capex Guidance
   c. Acquisitions
   d. Divestitures
   e. Fixed asset or real estate disposals
   f. Joint ventures
   g. Asset swaps
   h. Lease Renewals
2. Assess Clear Channel Outdoor's optimal deployment of free cash flow regarding:
   a. Acquisitions / Investments
   b. Share repurchases
   c. Dividends
3. Provide consulting services regarding debt reductions

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management retains the capabilities to track the resource time incurred to support Clear Channel Outdoor Strategic Development (Business Unit 00611) activities. Therefore, Clear Channel Outdoor will be allocated a percentage of the total Strategic Development service costs based on the ratio of estimated level of effort servicing Clear Channel Outdoor activities to the total level of effort incurred by Clear Channel Strategic Development during the prior year billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 2.1 Information Technology – Transaction and Financial Information Services

### Services Provided

*Financial Systems Support*

1. Maintain all technical infrastructures for financial systems (general ledger, payroll, payables, accounts receivable, asset management, reporting, budgeting and forecasting).
2. Provide computer network access to users of financial systems.
3. Monitor financial system availability and performance with incident response 24x7x365.
4. Perform daily financial system data back-ups and archival for data restoration in case of loss.
5. Set-up of new users according to customer requirements.  Manage changes to user accounts including deactivation of terminated users.
6. Support financial system users with functional system questions from 8:30 am to 5:30 pm CDT.
7. Use system configuration settings to provide menu items, features, and fields within financial systems
8. Develop customized reports to provide data required for the customer's purpose.
9. Consult with financial system owners and users concerning business process management and maintain business process maps.
10. Facilitate classroom and online delivery of user information for new financial systems and system enhancements.
11. Develop training materials to supplement the financial system user learning experience.

### Service Levels

Refer to standard service level description defined on page 29.

### Allocation Methodology

*Financial/Transaction Systems Support*
Costs associated with the IT Financial Systems Support are contained within the IT allocation charge distributed across all business units.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 2.2 Information Technology – Development

**Services Provided**

1. Develop technology standards for business system interoperability.
2. Identify opportunities with business system owners for business process engineering through technology and user interface enhancements that increase productivity.
3. Facilitate collaborative requirement definition between business system owners, users, and developers.
4. Document functional specifications to match customer requirements with a technical solution.
5. Design and develop custom software code and databases for new business systems and business system modifications.
6. Provide application and data integration services for commercial software, as required.
7. Test new business systems and system changes for data conversion completeness, data accuracy, required application functionality, and hardware capacity and performance.
8. Provide full implementation services for newly acquired/developed business systems and system modifications.  This includes: project management and oversight, technical and functional resources to assist with project execution, testing, user training, and post go-live support.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Clear Channel Information Technology will invoice development services to Clear Channel Outdoor entity based on the time and materials incurred to complete the development request/project.  An hourly charge, to be agreed upon at the time of the engagement, will be determined based on the cost of IT resources assigned to the project.

A separate "Additional Services Document" (ASD) will be executed by the parties for each project requested by Clear Channel Outdoor.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 2.3 Information Technology – Field Services

**Field Services Provided**

1. Provide on-site hardware, software, and network access support.
2. Consult with local businesses concerning Information Technology (IT) capital equipment and maintenance of local IT capital budgets.
3. Support new location IT build-outs including, site survey, hardware procurement, installation, and testing.
4. Perform IT-related training for end users and local IT staff members.

**Help Desk Services Provided**

Provide Help Desk service for current Clear Channel Outdoor information technology users via telephone and electronic mail.  Services include:

1. Answer personal computer (PC) user questions concerning hardware and Windows desktop software operation.
2. Support Wide Area Network user connectivity.  Provide Virtual Private Network (VPN connectivity assistance for authorized users.
3. Assist users with Symantec Anti-Virus installation and updates.  Determine if personal computer has contracted a computer virus and assist user with removal.
4. Provide Electronic Mail user account assistance.
5. Support Blackberry device users with set-up and usage questions.
6. Manage Active Directory user accounts.
7. Provide application user access assistance for Clear Channel Outdoor enterprise applications.  Assist users with client software installation.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate a percentage of the total Field Services and Help Desk Support costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor domestic employee headcount to the total Clear Channel domestic employee headcount for the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 3.1 Human Resources – All Services

**Services Provided**

*Health and Welfare Benefits*
1. Plan design and administration for all health and welfare benefit plans (medical, dental, life, disability, etc).
2. Select and manage benefit providers.
3. Maintain plan compliance with applicable benefit laws.
4. Provide benefit support for employees through centralized Benefit Customer Service Center.

*Retirement Benefits*
1. Plan design and administration for all retirement benefit plans (401(k)'s, ESPP, NQ Deferred Comp, Defined benefit).
2. Select and manage benefit providers.
3. Prepare tax filings and coordinate with internal & external auditors.
4. Perform 401(k) plan discrimination tests.

*HR Data Quality*
1. Audit and verify new hires, rehires, terminations, and pay rate changes for correct documentation, authorizations, and accuracy.
2. Communicate employee information, documentation requirements, and respond to management inquiries.
3. Manage compensation plan and positions, approve new hires, pay increases, bonuses per plan/budget, and coordinate changes/data entry for such with Corporate Payroll
4. Maintain data change, audit documentation, I-9, and W-4 filing systems.
5. Prepare, analyze, and audit HR data and reports for management and various regulatory agencies.
6. Complete audits to ensure benefits compliance with FLSA requirements.
7. Complete Unemployment, EEO and other regulatory reporting requirements.

*Compensation*
1. Design and administer long term incentive plans.
2. Review employment and consulting agreements including stock options.
3. Coordinate FLSA compliance (exempt and non-exempt).
4. Design and review base pay and bonus plans.

*HR Services*
1. Complete resource recruitment and selection activities.
2. Manage and resolve employee relations issues – conduct investigations and approve terminations.
3. Management & employee development and succession planning.
4. Provide Performance management design and training services.
5. Manage unemployment vendors and provide support for hearing preparation requirements.
6. Provide Safety Committee administration (audits, policies and procedures).

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate a percentage of the total Human Resources (Business Unit 00400) service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor domestic employee headcount to the total Clear Channel domestic employee headcount for the billing period.  Third-party fees and expenses will be invoiced directly based on the entity incurring the charges.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 4.1 Legal – Intellectual Property

**Services Provided**

1. Provide support and assistance with Intellectual Property ("IP") issues (trademark, copyright, patent, domain name, and related matters).
2. Provide information on Clear Channel policies regarding IP, performing "knockout" trademark searches, maintaining a database of IP owned by Clear Channel Outdoor, and researching domain names and potential infringement claims.
3. Retain and manage outside counsel when necessary. This includes: negotiating fee arrangements and overseeing outside counsel budgets.
4. Collaborate with outside counsel regarding filing and maintenance of trademark registrations, copyright registrations, patents, domain name issues, infringement issues, and related legal advice.

**Service Levels**

Services by lawyers, other Office of General Counsel professionals, and support staff provided under the CORPORATE SERVICES AGREEMENT will be given with a priority and importance equal to the Services being delivered directly to their respective organizations. The Services shall be performed in a manner and at a quality level that is the same as the manner and quality level in and at which such Services are generally provided today.

**Allocation Methodology**

Management retains the capabilities to track level of effort to support Intellectual Property (Business Unit 00073) activities. Therefore, Clear Channel Outdoor will be allocated a percentage of the total IP service costs to Clear Channel Outdoor based on the ratio of estimated level of effort servicing Clear Channel Outdoor activities to the total level of effort incurred by Clear Channel Intellectual Property during the billing period. Professional and third-party fees will be allocated directly to the division utilizing the services contracted.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 4.2 Legal – Litigation

**Services Provided**

1. Provide support and management of all employment-related claims and litigation.
2. Assist with non-employment related litigation when requested.
3. Provide litigation services including: investigating claims, negotiating settlement agreements when appropriate, and managing the cases when lawsuits are filed
4. Retain and manage outside counsel when necessary, negotiate fee arrangements, oversee litigation budgets, coordinate discovery, and provide advice throughout the litigation process.

**Service Levels**

Services by lawyers, other Office of General Counsel professionals, and support staff provided under the CORPORATE SERVICES AGREEMENT will be given with a priority and importance equal to the Services being delivered directly to their respective organizations. The Services shall be performed in a manner and at a quality level that is the same as the manner and quality level in and at which such Services are generally provided today.

**Allocation Methodology**

Management will allocate a percentage of the total Legal Litigation service (Business Unit 00302) costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor division cases supported to the total number of Clear Channel cases supported by the Litigation team for the billing period. Professional and third-party fees will be allocated directly to the division utilizing the services contracted.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 4.3 Legal – Employment

**Services Provided**

1. Provide support and management of all employment matters (does not include other than day-to-day union negotiations supporting role only) including:
   a. Employment agreements, termination reviews, severance agreements, discrimination investigations, EEO statements, collective bargaining, disciplinary actions, immigration matters, work visas, employee training and human resource support.
2. Conduct internal audits in the areas of wage and hour compliance, glass ceiling analysis and employee policy compliance efforts.
3. Retain and manage outside counsel when necessary, negotiating fee arrangements, overseeing outside counsel budgets, and coordinating same with management.

**Service Levels**

Services by lawyers, other Office of General Counsel professionals, and support staff provided under the CORPORATE SERVICES AGREEMENT will be given with a priority and importance equal to the Services being delivered directly to their respective organizations. The Services shall be performed in a manner and at a quality level that is the same as the manner and quality level in and at which such Services are generally provided today.

**Allocation Methodology**

Management will allocate a percentage of the total Legal Employment (Business Unit 00303) service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor domestic employee headcount to the total Clear Channel domestic employee headcount for the billing period. Professional and third-party fees will be allocated directly to the division utilizing the services contracted.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 4.4 Legal – Corporate Governance

**Services Provided**

1. Provide guidance and advice concerning Corporate Governance, including related party transaction matters.
2. Assist with internal audit department investigations.
3. Provide guidance and advice on anti-trust and transaction matters.
4. Provide guidance and advice on issues relating to corporate law and securities law (including SEC filings).
5. Retain and manage outside counsel when necessary, negotiating fee arrangements, overseeing outside counsel budgets, and coordinating same with management.

**Service Levels**

Services by lawyers and other Office of General Counsel professionals and support staff provided under the CORPORATE SERVICES AGREEMENT will be given with a priority and importance equal to the Services being delivered directly to their respective organization. The Services shall be performed in a manner and at a quality level that is the same as the manner and quality level in and at which such Services are generally provided today.

**Allocation Methodology**

Management will allocate the costs to provide Legal Corporate Governance (Business Unit 00300) services to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor revenue to the total Clear Channel revenue. The revenue basis will be determined using the previous fiscal year's results.

Professional and third-party fees will be allocated directly to the division utilizing the services contracted.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.1 Other – Executive Management and Oversight

**Services Provided**

1. Executive management services (office of the CEO, President, COO, Chief Financial Officer, and Chief Accounting Officer) will be made available to provide oversight and consultation in such areas as: strategy development, corporate operations, financial planning, acquisition support and other ancillary services.

**Service Levels**

Refer to standard service level description defined on page 29

**Allocation Methodology**

Management will allocate the personnel and personnel related costs  to provide Executive Management (Business Unit 00600) services to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor OIBDAN to the total Clear Channel OIBDAN.  The OIBDAN basis will be   determined using the previous fiscal year's results.

Management will allocate the Director and Officers Insurance costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor OIBDAN to the total Clear Channel OIBDAN.  The OIBDAN basis will be determined using the previous fiscal year's results.

Professional fees, contributions and other non personnel related costs fees will be allocated directly to the division receiving the benefit.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.2 Other – Risk Management

**Services Provided**

1. Analyze risk exposures and determine appropriate risk mitigation/retention strategies.
2. Select and manage insurance broker(s) and place worldwide insurance coverage.
3. Manage claims process for insured matters.
4. Provide consulting services with the field for insurance, loss control, and risk management issues.
5. Provide consulting services with Legal for contracts containing indemnification and other insurance related provisions.
6. Collect exposure data and maintain risk management information system (RMIS) database.
7. Supervise the issuance of insurance certificates and review incoming certificates from contractors and vendors for accuracy.
8. Assist in processing motor vehicle reports for the field and provide consulting services regarding field scores/results/eligibility;
9. Manage surety bond program.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate a percentage of the Risk Management (Business Unit 00450) service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor revenue to the total Clear Channel revenue.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.3 Other – Internal Audit

**Services Provided**

1. Provide audit services designed to assess the compliance of policies and procedures from a market specific operational perspective.
2. Provide audit services to assess the effectiveness of policies and procedures from a divisional perspective.
3. Complete the required audit of internal controls including preparation of necessary documentation and reporting results to Corporate Accounting.
4. Provide assistance and guidance with internal fraud investigations through forensic auditing and specialized interview techniques.
5. Provide assessment of Information Systems regarding policy, security, contingency planning, and various other information systems issues.
6. Other financial/audit related services as requested.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management retains the capabilities to track the internal audit (Business Unit 00609) projects completed or in-progress. Therefore, Clear Channel Outdoor will be allocated costs based on the ratio of estimated level effort dedicated to servicing Clear Channel Outdoor projects to the total level of effort spent servicing all internal audit projects for the billing period. Professional and contract labor fees will be allocated directly to the division utilizing the services contracted.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.4 Other – Investor Relations

**Services Provided**

1. Support investor relations goals and objectives (including strategies, actions and associated budgets) as they support overall company goals and objectives, such as:
   a. Provide consistent communications and overall outlook to the financial community
   b. Educate investment community (including employees) regarding the opportunities and risks associated with owning shares of the Company
   c. Attract new investors or more analysts to cover the company

2. Develop a communications plan to include such items as:
   a. Disclosure policy – ensuring consistent communications (investor/financial matters) across the Company
   b. Definition of "material Information"/Regulation FD
   c. Disaster planning
   d. Provide any requested assistance regarding annual and quarterly report preparation
   e. Analyst contact/financial media contact

3. Educate the investment community about the Company
4. Respond to investor or potential investor inquiries in timely and consistent fashion
5. Coordinate quarterly earnings releases and conference calls
6. Coordinate investor presentations (example: media conferences) and meetings
7. Provide senior management/board with updates which include industry trends and financial reports of peer companies
8. Differentiate Clear Channel Outdoor from others in the media/broadcasting industry

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management retains the capabilities to track the resource time incurred to support Clear Channel Outdoor Investor Relations (Business Unit 00450) activities. Therefore, Clear Channel Outdoor will be allocated a percentage of the total Investor Relations service costs based on the ratio of estimated level of effort servicing Clear Channel Outdoor activities to the total level of effort incurred by Clear Channel Investor Relations during the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.5 Other – Government Affairs

**Services Provided**

1. Monitor legislation in the House and the Senate directly impacting Outdoor division.
2. Monitor potential vehicles for legislative initiatives harmful to the Outdoor division as it moves through the Committee process and onto the floors of the respective chambers focusing on Senate, Commerce, Science and Transportation Committee, Senate Environment and Public Works, Senate Appropriations Committee, House Appropriations Committee, House Transportation and Infrastructure.
3. Coordinate with Outdoor Advertising Association of America on federal issues.
4. Attend fundraising events on behalf of Outdoor division at OAAA coordinated events;
5. Attend fundraisers for Members on relevant committees for OAAA.
6. Monitor Outdoor industry trade periodicals and follow-up with congressional staff on inquiries about the Outdoor business division and the industry as a whole.
7. Coordinate Outdoor presentation at our annual congressional staff trip with Outdoor executives.
8. Provide legislative outlook at company luncheon for Outdoor division's yearly fly-in (coordinated with OAAA).
9. Educate members of Congress on Outdoor business division.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management retains the capabilities to track the resource time consumed to support Clear Channel Outdoor Government Affairs (Business Unit 00607) activities. Therefore, Clear Channel Outdoor will be allocated a percentage of the total Government Affairs service costs based on the ratio of estimated level of effort servicing Clear Channel Outdoor activities to the total level of effort consumed by Clear Channel Government Affairs during the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.6 Other – Internal Communications (CCRC)

**Services Provided**

1. Provide content management and intranet deployment services

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management will allocate a percentage of the total Internal Communications (Business Unit 00603) service costs to Clear Channel Outdoor based on the ratio of Clear Channel Outdoor employee headcount to the total Clear Channel employee headcount for the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## 5.7 Other – External Communications / Public Relations

**Services Provided**

1. Provide support for general corporate public relations communications, day-to-day media relations and branding through coordination with functions across the company to develop media statements.
2. Provide support for the development of strategic and tactical corporate announcements from concept formulation and message development to execution.
3. Manage corporate communications activities around corporate announcements and develop PR strategies and tactics that support and/or promote area(s) of corporate focus.
4. Develop goals and objectives, plans, timelines and goals in alignment with business objectives.
5. Service as a secondary company spokesperson with the media as required.
6. Development of press releases, messaging, Q&A documents.

**Service Levels**

Refer to standard service level description defined on page 29.

**Allocation Methodology**

Management retains the capabilities to track the External Communications / Public Relations (Business Unit 00602) projects completed or in-progress.  Therefore, Clear Channel Outdoor will be allocated costs based on the ratio of level of effort (estimated) dedicated to servicing Clear Channel Outdoor projects to the total level of effort (estimated) spent servicing all Clear Channel External Communications / Public Relations projects for the billing period.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

5.8 Other – Aviation

1. **Services Provided** Access to the aviation business unit resources including corporate aircraft on an as-available basis.

**Service Levels**

Not Applicable

**Allocation Methodology**

Management tracks the hours flown for the corporate aircraft fleet and can calculate the variable costs for airplane use on an hourly basis.  In addition, the fixed costs associated with running the aviation business unit will be allocated based on the number of Clear Channel Outdoor employees authorized to utilize the plane over the total number of Clear Channel Outdoor and Clear Channel employees authorized to use the plane. Clear Channel Outdoor will be invoiced for its allocable portion of the fixed costs, plus the variable expense associated with the actual number of hours flown.

**Clear Channel Communications, Inc.**
Schedule A – Description of Services

## III. Service Levels

### 1. Standard Service Level

Unless otherwise noted within a specific transition service description, the service level section within a service description will reference the following:

Clear Channel will provide this Service pursuant to the "Standard for Services" (as defined in Section 6.1 of the agreement to which this schedule is attached).  When dealing with third-party providers, Clear Channel will be the primary point of contact and will represent the Clear Channel Outdoor entity interests consistent with service levels of Clear Channel Group companies.

**Schedule B**

(Leased Facilities (CCU Group as Lessor))

| Leases | | |
|---|---|---|
| ***Property*** | ***Lessor*** | ***Lessee*** |
| 11700 Central Parkway, Bldg 1<br>Jacksonville, Florida | Clear Channel Television<br>78,379 sq ft | Clear Channel Outdoor<br>4,783 sq ft |
| 11700 Central Parkway, Bldg 2<br>Jacksonville, Florida | Clear Channel Television<br>26,640 sq ft | Clear Channel Outdoor<br>26,640 sq ft |
| 7601 Riviera Blvd.<br>Miramar, Florida | Clear Channel Broadcasting<br>63,000 sq ft | Clear Channel Outdoor<br>300 sq ft |
| **Subleases** | | |
| ***Property*** | ***Lessee / Sublessor*** | ***Sublessee*** |
| East Gateway Center<br>Phoenix, Arizona | Clear Channel Broadcasting<br>75,374 sq ft | Clear Channel Outdoor<br>7,803 sq ft |
| Highland Plaza One<br>St. Louis, Missouri | Clear Channel Broadcasting<br>50,041 sq ft | Clear Channel Airports<br>830 sq ft |
| BalaPoint Office Centre<br>Bala Cynwyd, Pennsylvania | Clear Channel Broadcasting<br>64,172 sq ft | Clear Channel Airports<br>304 sq ft |
| 1600 Utica Ave. South<br>Minneapolis, Minnesota | AMFM Operating, Inc.<br>57,609 sq ft | Clear Channel Airports<br>324 sq ft |
| 9660 Granite Ridge<br>San Diego, California | Jacor Communications<br>70,000 sq ft | Clear Channel Outdoor<br>1,170 sq ft |
| John Hancock Building<br>Chicago, Illinois | Premiere Radio Networks<br>15,496 sq ft | Clear Channel Airports<br>7,854 sq ft |
| Masco Office Park<br>Las Vegas, Nevada | Citicasters Co.<br>25,387 sq ft | Clear Channel Outdoor<br>10,133 sq ft |
| Smoketree Tower<br>Raleigh, North Carolina | Clear Channel Broadcasting<br>27,181 sq ft | Clear Channel Outdoor<br>3,031 sq ft |
| Rotunda Office Building<br>Baltimore, Maryland | Clear Channel Broadcasting<br>18,671 sq ft | Clear Channel Outdoor<br>100 sq ft |

**Schedule C**

(Mandatory Services Post Trigger Date)

See attached.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

Schedule C.  Description of Services – Clear Channel Outdoor

## I. Definitions

## II. Services

1. Information Technology

     1.1 Electronic Mail…………………………………………………………   3
     1.2 Network Management………………………………………………...   4
     1.3 Hosting Services …………………………………………………....   5
     1.4 Security……………………………………………………………   6
     1.5 Help Desk………………………………………………………….   7

## III. Service Levels

1. Standard Service Levels………………………………………………… 8

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## I. Definitions

*Additional Services Document (ASD)* is a detailed document used to define the specific requirements and metrics that will be associated with IT/IS development projects initiated by Clear Channel Outdoor. Generally, the document will include project goals, timing, deliverables, and estimated fees associated with the effort.

*Period in Which Services will be Provided* refers to the five year period for which services will be provided. Clear Channel Management will forecast annual costs/metrics based on the last quarter's performance/metrics prior to the transaction date.

*Clear Channel* refers to the combination of entities that includes: Clear Channel Broadcast, Clear Channel Outdoor, Clear Channel Outdoor and Corporate.

*Clear Channel Outdoor* refers to the future stand-alone entity that currently exists as the Clear Channel Outdoor division.

*Cost* (as used in the allocation methodology definitions) refers to the total of all wages, benefits, bonuses, employee taxes, facility OH and depreciation. Generally, cost will be allocated on an FTE basis depending upon the primary workplace of the individual.

*Revenue Allocation* refers to the ratio of Clear Channel Outdoor revenue divided by total Clear Channel revenue for the previous fiscal year.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## II. Services

### 1.1 Information Technology – Electronic Mail

#### Services Provided

1. Manage Microsoft Exchange Server to enable Microsoft Outlook client software to send and receive messages, files, calendars, contacts, and tasks.
2. Supply 200 MB for storage of messages, files, calendars, contacts, and tasks per mailbox (Additional storage available for additional costs).
3. Administer current public folders and distribution lists.
4. Provide Internet access to email messages, files, calendars, contacts, and tasks via Webmail application
5. Secure email using anti-virus and spam filters.
6. Perform daily email back-ups and complete application and data restoration in case of catastrophic systems failure.
7. Provide 24x7x365 phone and online technical assistance for email help and account management.
8. Monitor email system availability and performance with incident response 24x7x365.

#### Supplementary Services

1. Supply additional email storage space in 100 MB increments
2. Manage Blackberry device connectivity to the Exchange Server.
3. Provide automatic email archival when required for regulatory or legal compliance needs.

#### Service Levels

Refer to standard service level description defined on page 8.

#### Allocation Methodology

Clear Channel Information Technology is able to identify and separate all Information Technology costs that are necessary to provide Electronic Mail services for Clear Channel Outdoor's current domestic users.

Clear Channel Information Technologies will physically separate the Clear Channel Outdoor Electronic Mail hardware platform. Clear Channel Information Technologies will invoice Clear Channel Outdoor for the lease of Electronic Mail hardware.

Clear Channel Outdoor will provide licensed Microsoft Exchange 2003 software to Clear Channel Information Technologies.

Clear Channel Information Technologies will administer and manage Electronic Mail services for Clear Channel Outdoor. A per user charge to be agreed upon will be invoiced to Clear Channel Outdoor. The user charge will be determined based on the cost of time and materials incurred to produce Electronic Mail services for Clear Channel Outdoor.

Clear Channel Information Technologies will manage supplementary services in addition to the basic Electronic Mail service. A per user charge, in addition to the basic service per user charge, to be agreed upon will be invoiced to Clear Channel Outdoor. The user charge will be determined based on the cost of time and materials incurred to produce the supplementary Electronic Mail services for Clear Channel Outdoor.

Service levels beyond Clear Channel Outdoor's current domestic users are outside of scope for this agreement. A separate "Additional Service Agreement" (ASD) will be executed by the parties for augmented Electronic Mail services.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## 1.2 Information Technology – Network Management

**Services Provided**

1. Operate Wide Area Network (WAN) for access to internal computing resources (data center) and the Internet.
2. Manage telecommunications services from external telecommunications providers who deliver dedicated data circuits and virtual private network connections.
3. Monitor computer network ports, hardware, telecommunication circuits, bandwidth utilization, data routing with incident response - 24x7x365.
4. Provide domestic remote user access to the computer network through dial-up and VPN connections.

**Service Levels**

Refer to standard service level description defined on page 8.

**Allocation Methodology**

Clear Channel Information Technology is able to identify and separate all Information Technology costs that are necessary to provide Network Management services for Clear Channel Outdoor's current domestic business divisions.

All circuit costs to support a particular Clear Channel Outdoor entity location will be directly invoiced. In addition, Clear Channel Information Technologies will manage wide area network services for Clear Channel Outdoor. A per site charge to be agreed upon will be invoiced to Clear Channel Outdoor. The site charge will be determined based on the cost of time and materials incurred to provide Network connectivity services for Clear Channel Outdoor.

Service levels beyond Clear Channel Outdoor's current domestic business divisions are outside of scope for this agreement. A separate "Additional Service Agreement" (ASD) will be executed by the parties for augmented Network Management services.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## 1.3 Information Technology – Hosting Services

**Services Provided**

Provide managed hosting service for current Clear Channel Outdoor information technology systems and websites. Services include:

- Operate Clear Channel owned data center with computer network connectivity, uninterruptible power, HVAC, fire suppression, and physical security for computer system hosting.
- Install, configure, and maintain customer provided computer system hardware, operating system, and database including security hardening and anti-virus.
- Support data storage including existing RAID configurations, Network Attached Storage, and Storage Area Networks
- Provide 24x7x365 monitoring for network availability, system availability, application availability, data center environmental controls with incident response.
- Acquire, test and install vendor released patches upon customer request.
- Provide 24x7x365 phone and online technical assistance for incident reporting.
- Provide on-staff expertise to perform network, application, database and hardware troubleshooting support.

**Service Levels**

Refer to standard service level description defined on page 8.

**Allocation Methodology**

Clear Channel Information Technology is able to identify and separate all Information Technology costs that are necessary to provide Hosting services for Clear Channel Outdoor's current information technology systems and websites.

Clear Channel Information Technologies will provide Hosting services for Clear Channel Outdoor. A per rack unit charge to be agreed upon will be invoiced to Clear Channel Outdoor. The rack unit charge will be determined based on the cost of time and materials incurred to produce Hosting services for Clear Channel Outdoor.

Service levels beyond Clear Channel Outdoor's current Hosting for information technology systems and websites are outside of scope for this agreement. A separate "Additional Service Agreement" (ASD) will be executed by the parties for augmented Hosting services.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## 1.4 Information Technology – Security

**Services Provided**

*User Authentication – Active Directory Management*
- Administer Active Directory to authoritatively authenticate users to computer network, and email resources.

*Supplementary Services – Account Administration*
- Provide administration services including account additions/deletions/modifications and configuration of access privileges.

**Service Levels**

Refer to standard service level description defined on page 8.

**Allocation Methodology**

Clear Channel Information Technology is able to identify and separate all Information Technology costs that are necessary to provide Network Login services for Clear Channel Outdoor's current domestic users.

Clear Channel Information Technologies will physically separate the Clear Channel Outdoor Active Directory forest hardware platform. Clear Channel Information Technologies will invoice Clear Channel Outdoor for the lease of Active Directory hardware.

Clear Channel Outdoor will provide licensed Windows 2003 Active Directory service to Clear Channel Information Technologies.

Clear Channel Information Technologies will provide Active Directory Management services for Clear Channel Outdoor. A per user charge to be agreed upon will be invoiced to Clear Channel Outdoor. The user charge will be determined based on the cost of time and materials incurred to manage Active Directory services for Clear Channel Outdoor.

Clear Channel Information Technologies will provide Account Administration services in addition to the Active Directory Management service. A per user charge, in addition to the Active Directory Management service per user charge, to be agreed upon will be invoiced to Clear Channel Outdoor. The user charge will be determined based on the cost of time and materials incurred to administer user accounts for Clear Channel Outdoor.

Service levels beyond Clear Channel Outdoor's current domestic users are outside of scope for this agreement. A separate "Additional Service Agreement" (ASD) will be executed by the parties for augmented Security services.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## 1.5 Information Technology – Help Desk

**Services Provided**

Provide Help Desk service for current Clear Channel Outdoor information technology users via telephone and electronic mail.  Services include:

- Answer personal computer user questions concerning hardware and Windows desktop software operation.
- Support Wide Area Network user connectivity.  Provide Virtual Private Network (VPN) connectivity assistance for authorized users.
- Assist users with Symantec Anti-Virus installation and updates.  Determine if personal computer has contracted a computer virus and assist user with removal.
- Provide Electronic Mail user account assistance.
- Support Blackberry device users with set-up and usage questions.
- Manage Active Directory user accounts.
- Provide application user access assistance for Clear Channel Outdoor enterprise applications.  Assist users with client software installation.

**Service Levels**

Refer to standard service level description defined on page 8.

**Allocation Methodology**

Clear Channel Information Technology is able to identify and separate all Information Technology costs that are necessary to provide Help Desk services for Clear Channel Outdoor's current domestic users.

Clear Channel Information Technologies will provide Help Desk services for Clear Channel Outdoor.  A per ticket charge to be agreed upon will be invoiced to Clear Channel Outdoor.  The ticket charge will be determined based on the cost of time and materials incurred to produce Help Desk services for Clear Channel Outdoor.

Service levels beyond Clear Channel Outdoor's current domestic users are outside of scope for this agreement.  A separate "Additional Service Agreement" (ASD) will be executed by the parties for augmented Help Desk services.

**Clear Channel Communications, Inc.**
Schedule C – Description of Services

## III. Service Levels

### 1. Standard Service Level

Unless otherwise noted within a specific transition service description, the service level section within a service description will reference the following:

Clear Channel will provide this Service pursuant to the "Standard of Service" (as defined in Section 6.1 of the agreement to which this schedule is attached).   When dealing with third party providers, Clear Channel will be the primary point of contact and will represent the Clear Channel Outdoor entity interests consistent with service levels of Clear Channel Group companies.

# Exhibit B

**Table of Contents**

Filed Pursuant to Rule 424(b)(4)
Registration No. 333-127375



### 35,000,000 Shares

### Class A Common Stock

This is the initial public offering of shares of Class A common stock of Clear Channel Outdoor Holdings, Inc. All of the 35,000,000 shares are being sold by us. We intend to use all of the net proceeds from this offering to repay a portion of the outstanding intercompany indebtedness owed to our parent company, Clear Channel Communications, Inc. See "Use of Proceeds."

Prior to this offering, there has been no public market for the shares of our Class A common stock. The Class A common stock has been authorized for listing on the New York Stock Exchange under the symbol "CCO."

We are an indirect, wholly owned subsidiary of Clear Channel Communications and have two classes of common stock outstanding: Class A common stock and Class B common stock. After this offering, Clear Channel Communications will own all of our outstanding shares of Class B common stock, representing approximately 90% of the outstanding shares of our common stock and approximately 99% of the total voting power of our common stock. The rights of the Class A common stock and the Class B common stock are substantially similar, except with respect to voting, conversion and transferability. Our Class A common stock and Class B common stock vote as a single class on all matters on which stockholders are entitled to vote, except as otherwise provided in our amended and restated certificate of incorporation or as required by law. Each share of Class A common stock entitles its holder to one vote and each share of Class B common stock entitles its holder to 20 votes.

*See "Risk Factors" beginning on page 13 to read about factors you should consider before deciding to invest in shares of our Class A common stock.*

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | | Total | |
|---|---|---|---|---|
| Initial public offering price | $ | 18.000 | $ | 630,000,000 |
| Underwriting discount | $ | 0.747 | $ | 26,145,000 |
| Proceeds, before expenses, to us | $ | 17.253 | $ | 603,855,000 |

The underwriters have agreed to reimburse us for certain of our expenses in connection with this offering. See "Underwriting."

The underwriters expect to deliver the shares of Class A common stock against payment in New York, New York on November 16, 2005.

## Goldman, Sachs & Co.

## Deutsche Bank Securities

### JPMorgan

## Merrill Lynch & Co.

## UBS Investment Bank

**Banc of America Securities LLC**

### Bear, Stearns & Co. Inc.

### Credit Suisse First Boston

**A.G. Edwards**                **Allen & Company LLC**                **Barrington Research**

**Harris Nesbitt**                **SunTrust Robinson Humphrey**                **Wachovia Securities**

**M. R. Beal & Company**                **Ramirez & Co., Inc.**                **Siebert Capital Markets**

Prospectus dated November 10, 2005.

Table of Contents



See inside back cover for a map of our international markets.

The information contained in this prospectus contains references to certain trademarks and registered marks. The trademark Adshel™ is owned by us.

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights information contained elsewhere in this prospectus and provides an overview of the material aspects of this offering. This summary does not contain all of the information you should consider before deciding to invest in shares of our Class A common stock. You should read this entire prospectus carefully, especially the risks of investing in shares of our Class A common stock discussed under "Risk Factors" beginning on page 13. Except as otherwise noted, we present all financial and operating data on fiscal year and fiscal quarter bases. Our fiscal year ends on December 31 of each year.*

*Unless the context otherwise requires, references in this prospectus to "Clear Channel Communications" shall mean Clear Channel Communications, Inc. and its combined subsidiaries (other than us).*

*Prior to the completion of this offering, Clear Channel Communications will, and will cause its affiliates to, transfer to us certain assets related to our business not currently owned by us. We or our subsidiaries will assume and agree to perform, discharge and fulfill certain liabilities related to our business. In this prospectus, the description of our business includes these assets and liabilities as if such assets and liabilities were ours for all historical periods described herein. Our historical financial results as part of Clear Channel Communications may not reflect our financial results in the future as an independent publicly traded company or what our financial results would have been had we operated as an independent publicly traded company during the periods presented.*

### Our Business

Our principal business is to provide our clients with advertising opportunities through billboards, street furniture displays, transit displays and other out-of-home advertising displays, such as wallscapes, spectaculars and mall displays, that we own and operate in key markets worldwide. As of September 30, 2005, we owned or operated more than 870,000 advertising displays worldwide. For the year ended December 31, 2004, we generated revenues of approximately $2.4 billion, operating income of approximately $243.3 million and operating income before depreciation, amortization and non-cash compensation expense, or OIBDAN, of approximately $631.6 million. Our domestic reporting segment consists of our operations in the United States, Canada and Latin America, with approximately 95% of our 2004 revenues in this segment derived from the United States. Our international reporting segment consists of our operations in Europe, Australia, Asia and Africa, with approximately 52% of our 2004 revenues in this segment derived from France and the United Kingdom. Approximately 89% of our total 2004 operating income excluding corporate expenses was derived from our domestic segment and approximately 11% was derived from our international segment. Approximately 66% of our total 2004 OIBDAN excluding corporate expenses was derived from our domestic segment and approximately 34% was derived from our international segment. See "— Summary Historical and Pro Forma Combined Financial Data — Non-GAAP Financial Measure" for an explanation of OIBDAN and a reconciliation of OIBDAN to operating income (loss). Additionally, we own equity interests in various out-of-home advertising companies worldwide, which we account for under the equity method of accounting.

Billboard displays are bulletin and poster advertising panels of various sizes that generally are mounted on structures we own. We believe that many of our billboards are strategically located to offer maximum visual impact to audiences. Larger billboards generally are located along major highways and freeways to target vehicular traffic. Smaller billboards generally are located on city streets to target both vehicular and pedestrian traffic.

Street furniture displays, marketed under our global Adshel™ brand, are advertising surfaces on bus shelters, information kiosks, public toilets, freestanding units and other public structures. Generally, we own the street furniture structures and are responsible for their construction and maintenance. Contracts for the right to place our street furniture structures in the public domain and sell advertising space on them are awarded by municipal and transit authorities in competitive bidding processes. We believe that street furniture is growing in popularity with municipal and transit authorities, especially in international and larger U.S. markets.

1

**Table of Contents**

Transit displays are advertising surfaces on various types of vehicles or within transit systems, including on the interior and exterior sides of buses, trains, trams and taxis and within the common areas of rail stations and airports. Contracts for the right to place our displays on vehicles or within transit systems and sell advertising space on them are awarded by public transit authorities in competitive bidding processes or are negotiated with private transit operators.

We generate revenues worldwide from local, regional and national sales. Advertising rates generally are based on the "gross rating points," or total number of impressions delivered expressed as a percentage of a market population, of a display or group of displays. The number of "impressions" delivered by a display is measured by the number of people passing the site during a defined period of time and, in some international markets, is weighted to account for such factors as illumination, proximity to other displays and the speed and viewing angle of approaching traffic. While price and availability of displays are important competitive factors, we believe that providing quality customer service and establishing strong client relationships are also critical components of sales.

**Our Competitive Strengths**

We believe our key competitive strengths are as follows:

- We believe that our presence in key markets gives our clients the ability to reach a global audience through one advertising provider.

- We have long-standing relationships with a diversified group of local, regional and national advertising brands and agencies in the United States and worldwide. No single advertiser accounted for more than 2% of our 2004 domestic or international revenues.

- Our high levels of cash flow from operations provide us with strategic and financial flexibility and will position us to opportunistically pursue attractive acquisitions and investments.

- We believe that we are well-positioned to take advantage of significant technological advances and the corresponding improvements in advertisers' abilities to present engaging campaigns to their target audiences.

- Our senior management team has extensive experience in the outdoor advertising industry.

- We believe that our financial strength and flexibility, our existing presence in key markets worldwide and our experienced senior management team position us well to capitalize on emerging acquisition and investment opportunities in the global industry.

See "Business — Our Competitive Strengths."

**Our Strategy**

Our fundamental goal is to increase stockholder value by maximizing our cash flow from operations worldwide. Accomplishing this goal requires the successful implementation of the following strategies:

- We seek to capitalize on our global network and diversified product mix to maximize revenues, increase profits and launch new products and initiatives.

- We seek to enhance revenue opportunities by focusing on specific initiatives that highlight the value of outdoor advertising relative to other media.

- We continue to focus on achieving operating efficiencies throughout our global network.

- We have made significant commitments to provide innovative services to and enhance our accountability with our clients.

- We intend to strengthen our existing market presence and selectively enter into new markets through acquisitions and investments worldwide.

- We offer our clients alternative displays that incorporate new cost-effective technologies.

**Table of Contents**

- We maintain an entrepreneurial and customer-oriented culture that motivates local market managers to maximize our cash flow from operations.

See "Business — Our Strategy."

## Our Risks

We face a number of risks associated with our business and industry and must overcome a variety of challenges in implementing our operating strategy in order to be successful. For instance:

- Our past operating results have been negatively affected by, among other things, a global economic slowdown and a decline in our clients' advertising budgets, resulting in our incurring net losses in each of 2002, 2003 and 2004 and an accrued retained deficit.

- The outdoor advertising industry is highly competitive. Our properties compete for audiences and advertising revenues with other outdoor advertising companies, as well as with other media.

- We are subject to U.S. and foreign government regulation. Regulations regarding permitting, nonconformance and taxes and the size, spacing, density and lighting of displays may restrict our outdoor advertising operations.

- After this offering, our total indebtedness for borrowed money will be approximately $2.7 billion, approximately $2.5 billion of which will be intercompany indebtedness owed to Clear Channel Communications. If our cash flow and capital resources are insufficient to service our debt obligations, a default under any debt instrument could materially impair our financial condition and liquidity. In addition, our debt instruments may include restrictive covenants that limit our ability to refinance debt, sell assets or obtain additional equity capital.

- We have not previously operated as an independent publicly traded company and our historical and pro forma combined financial information is not necessarily representative of the results we may achieve and it is difficult to predict our future success.

- After this offering and for so long as Clear Channel Communications continues to own more than 50% of the total voting power of our common stock, it will have the ability to direct the election of our board of directors, exercise control over our business and affairs and significantly influence the outcome of matters submitted to a vote of our stockholders.

- We derive benefits from our association with Clear Channel Communications. If Clear Channel Communications were to experience financial difficulty or if we were to separate from Clear Channel Communications in the future, our business could be materially adversely affected. In addition, conflicts of interest may arise between Clear Channel Communications and us relating to our past and ongoing relationships.

For further discussion of these challenges and other risks that we face, see "Risk Factors."

## Our Relationship with Clear Channel Communications

We are an indirect, wholly owned subsidiary of Clear Channel Communications, Inc. After this offering, Clear Channel Communications will own all of our outstanding shares of Class B common stock, representing approximately 90% of the outstanding shares of our common stock and approximately 99% of the total voting power of our common stock. For as long as Clear Channel Communications is the owner of such number of shares representing more than 50% of the total voting power of our common stock, it will have the ability to direct the election of all of the members of our board of directors and to exercise a controlling influence over our business and affairs, including any determination with respect to mergers or other business combinations involving us, the acquisition or disposition of assets by us, the incurrence of indebtedness by us, the issuance of any additional common stock or other equity securities by us, the repurchase or redemption of common stock or preferred stock by us and the payment of dividends by us. Similarly, Clear Channel Communications will have the power to determine or significantly influence the

3

Table of Contents

outcome of matters submitted to a vote of our stockholders, including the power to prevent an acquisition or any other change in control of us, and to take other actions that might be favorable to Clear Channel Communications. See "Description of Capital Stock."

Clear Channel Communications has advised us that its current intent is to continue to hold all the shares of our Class B common stock it owns after this offering. However, Clear Channel Communications is not subject to any contractual obligation that would prohibit it from selling, spinning off, splitting off or otherwise disposing of any shares of our common stock, except that Clear Channel Communications has agreed not to sell, spin off, split off or otherwise dispose of any shares of our common stock for a period of 180 days after the date of this prospectus without the prior written consent of the underwriters, subject to certain limitations and limited exceptions. As a result, there can be no assurance concerning the period of time during which Clear Channel Communications will maintain its ownership of the shares of our Class B common stock owned by it after this offering. See "Underwriting."

Prior to the completion of this offering, we will enter into agreements with Clear Channel Communications that will govern the relationship between Clear Channel Communications and us after this offering and will provide for, among other things, the provision of services by Clear Channel Communications to us and the allocation of employee benefit, tax and other liabilities and obligations attributable to our operations. These agreements will include, among others, a master agreement, corporate services agreement, registration rights agreement, tax matters agreement and employee matters agreement. All of the agreements relating to our ongoing relationship with Clear Channel Communications will be made in the context of a parent-subsidiary relationship and the terms of these agreements may be more or less favorable to us than if they had been negotiated with unaffiliated third parties. See "Risk Factors — Risks Related to Our Relationship with Clear Channel Communications" and "Arrangements Between Clear Channel Communications and Us."

After this offering and the application of all of the net proceeds from this offering to repay a portion of the intercompany indebtedness owed to Clear Channel Communications, we will have outstanding indebtedness of approximately $2.7 billion, approximately $2.5 billion of which will be intercompany indebtedness owed to Clear Channel Communications. See "Use of Proceeds" and "Description of Indebtedness."

The master agreement between Clear Channel Communications and us and the note evidencing the $2.5 billion intercompany indebtedness each contain covenants that restrict our ability to take certain actions and engage in certain transactions. See "Risk Factors — Risks Related to Our Business." Certain of the restrictive covenants in these agreements may continue in force later than the time when Clear Channel Communications owns less than 50% of the total voting power of our common stock.

After this offering, certain individuals will be officers and directors of both Clear Channel Communications and us. In addition, because Clear Channel Communications will continue to own more than 50% of the total voting power of our common stock after this offering, we will be a "controlled company" under the New York Stock Exchange corporate governance standards. As a result of this status, we intend to utilize certain exemptions under the NYSE standards that free us from the obligation to comply with certain NYSE corporate governance requirements, which may include the requirements (i) that a majority of the board of directors consists of independent directors, (ii) that we have a nominating and governance committee, and that such committee be composed entirely of independent directors and governed by a written charter addressing the committee's purpose and responsibilities, (iii) that we have a compensation committee composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (iv) for an annual performance

**Table of Contents**

evaluation of the compensation committee. See "Risk Factors — Risks Related to Our Relationship with Clear Channel Communications" and "Arrangements Between Clear Channel Communications and Us."

For a description of certain provisions of our amended and restated certificate of incorporation concerning the allocation of business opportunities that may be suitable for both Clear Channel Communications and us, see "Description of Capital Stock."

**Our Corporate Structure**

Our principal executive offices are located at 200 East Basse Road, San Antonio, Texas 78209, and our telephone number is (210) 832-3700. We operate through Clear Channel Outdoor Holdings, Inc. and our combined subsidiaries. Our Internet website address is *www.clearchanneloutdoor.com.* Information contained on our website or that can be accessed through our website is not incorporated by reference in this prospectus. You should not consider information contained on our website or that can be accessed through our website to be part of this prospectus for any purpose.

5

Table of Contents

## THE OFFERING

| | |
|---|---|
| Class A common stock offered | 35,000,000 shares |
| Common stock to be outstanding after this offering: | |
| Class A | 35,000,000 shares |
| Class B | 315,000,000 shares |
| Total common stock outstanding | 350,000,000 shares |
| Common stock to be held by Clear Channel Communications after this offering: | |
| Class A | 0 shares |
| Class B | 315,000,000 shares |
| Percentage of the outstanding shares of our common stock to be held by Clear Channel Communications after this offering | 90.0% |
| Percentage of the total voting power of our common stock to be held by Clear Channel Communications after this offering | 99.4% |
| Voting, conversion and transferability features | Our Class A common stock and Class B common stock vote as a single class on all matters on which stockholders are entitled to vote, except as otherwise provided in our amended and restated certificate of incorporation or as required by law. While the rights of our Class A common stock and Class B common stock are substantially similar, the Class A common stock and Class B common stock differ in certain respects, including the following: |
| Class A | • entitles holder to one vote per share on all matters on which stockholders are entitled to vote; and |
| | • will be listed on the New York Stock Exchange. |
| Class B | • entitles holder to 20 votes per share on all matters on which stockholders are entitled to vote; |
| | • will not be listed on any stock exchange; |
| | • is convertible, at the option of the holder, at any time into shares of Class A common stock on a one-for-one basis, subject to certain limited exceptions; and |
| | • will convert into shares of Class A common stock on a one-for-one basis upon any transfer, subject to certain limited exceptions. |
| Use of proceeds | Our net proceeds from this offering, after deducting underwriting discounts and estimated offering expenses, will be approximately $600.3 million. |
| | We intend to use all of the net proceeds of this offering to repay approximately $600.3 million of the outstanding balances of the intercompany notes issued to Clear Channel Communications in the original principal amounts of approximately $1.4 billion and $73.0 million. See "Use of Proceeds." |
| Dividend policy | We do not anticipate paying any dividends on our common stock in the foreseeable future. If cash dividends were to be paid on |

**Table of Contents**

|  | our common stock, holders of Class A common stock and Class B common stock would share equally, on a per share basis, in any such cash dividend. |
| --- | --- |
| NYSE symbol for the Class A common stock | CCO |
| Risk factors | For a discussion of the risks related to our business, our relationship with Clear Channel Communications, our Class A common stock and this offering, see "Risk Factors" beginning on page 13. |

Unless otherwise indicated, the number of shares of Class A common stock to be outstanding after this offering excludes shares issuable upon the exercise of employee stock options to be issued by us in connection with the conversion of equity-based compensation awards of Clear Channel Communications granted to our employees as well as shares issuable upon the exercise of options or shares of restricted stock that may be granted under our Stock Incentive Plan after this offering. See "Management — Employee Benefit Plans."

See "Use of Proceeds."

Table of Contents

### SUMMARY HISTORICAL AND PRO FORMA COMBINED FINANCIAL DATA

The following table sets forth summary historical and pro forma combined financial data and other information of Clear Channel Outdoor Holdings, Inc.

We have prepared our combined financial statements as if Clear Channel Outdoor Holdings, Inc. had been in existence as a separate company throughout all relevant periods. The summary results of operations data, segment data and cash flow data for the years ended December 31, 2004, 2003 and 2002 and the summary combined balance sheet data as of December 31, 2004 and 2003 presented below were derived from our audited combined financial statements and the related notes thereto included elsewhere in this prospectus. The summary combined balance sheet data as of December 31, 2002 is derived from our audited financial statements. The summary results of operations data, segment data and cash flow data for the nine months ended September 30, 2005 and 2004 and the summary balance sheet data as of September 30, 2005 presented below were derived from our unaudited combined financial statements and the related notes thereto included elsewhere in this prospectus. The operating results for the nine months ended September 30, 2005 and 2004 include all adjustments (consisting only of normal recurring adjustments) that we believe are necessary for a fair statement of the results for such interim periods.

Results for the nine months ended September 30, 2005 are not necessarily indicative of the results expected for the fiscal year ending December 31, 2005 or any future period.

Our unaudited pro forma as adjusted results of operations data present our pro forma as adjusted results of operations for the year ended December 31, 2004:

• as if this offering had been completed on January 1, 2004, and assuming:

  – the outstanding balances of the approximately $1.4 billion and $73.0 million intercompany notes issued to Clear Channel Communications are reduced by approximately $362.2 million, representing the balance at September 30, 2005 in the "Due from Clear Channel Communications" intercompany account;

  – then, approximately $500.5 million of the remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes is contributed to our capital by Clear Channel Communications; and

  – then, approximately $600.3 million of the remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes is repaid with all of the net proceeds of this offering, such that the notes are repaid in full.

• after giving effect to our distribution of an intercompany note in the original principal amount of $2.5 billion as a dividend on our common stock, which note was ultimately distributed to Clear Channel Communications, as if issued to Clear Channel Communications on January 1, 2004.

Our pro forma as adjusted balance sheet and results of operations data as of September 30, 2005 and for the nine months ended September 30, 2005, present, using the same assumptions and application of estimated net proceeds described above:

• our as adjusted financial position as of September 30, 2005, as if this offering had been completed on September 30, 2005; and

• our as adjusted results of operations for the nine months ended September 30, 2005, as if this offering and the issuance of the $2.5 billion intercompany note had been completed on January 1, 2004.

The unaudited pro forma information set forth below is based upon available information and assumptions that we believe are reasonable. The historical financial and other data have been prepared on a combined basis from Clear Channel Communications' consolidated financial statements using the historical results of operations and bases of the assets and liabilities of Clear Channel Communications' outdoor advertising business and give effect to allocations of expenses from Clear Channel Communica-

**Table of Contents**

tions. Our historical financial data is not indicative of our future performance, nor does such data reflect what our financial position and results of operations would have been had we operated as an independent publicly traded company during the periods shown.

The unaudited pro forma statements of operations do not reflect the complete impact of one-time and ongoing incremental costs required for us to operate as a separate company. Clear Channel Communications allocated to us $16.6 million in 2004, $19.6 million in 2003 and $17.6 million in 2002 of expenses incurred by it for providing us accounting, treasury, tax, legal, public affairs, executive oversight, human resources and other services. Through September 30, 2005, Clear Channel Communications allocated to us $11.8 million of expenses. After this offering, we expect to continue to receive from Clear Channel Communications substantially all of these services, the cost of which will be allocated to us.

You should read the information contained in this table in conjunction with "Selected Historical Combined Financial Data," "Unaudited Pro Forma Combined Financial Data," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the historical audited and unaudited combined financial statements and the accompanying notes thereto of us and our combined subsidiaries included elsewhere in this prospectus.

The following table presents a non-GAAP financial measure, OIBDAN, which we use to evaluate segment and combined performance of our business. OIBDAN is not calculated or presented in accordance with U.S. generally accepted accounting principles, or GAAP. In Note 3 and in "— Non-GAAP Financial Measure" below, we explain OIBDAN and reconcile it to operating income (loss), its most directly comparable financial measure calculated and presented in accordance with GAAP.

9

**Table of Contents**

| (In thousands, except per share data) | Year Ended December 31, | | | Pro Forma as Adjusted December 31, 2004 | Nine Months Ended September 30, | | Pro Forma as Adjusted September 30, 2005 |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | | 2004 | 2005 | |
| | | | | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) |
| **Results of Operations Data:** | | | | | | | |
| Revenue | $ 1,859,641 | $2,174,597 | $2,447,040 | $  2,447,040 | $1,761,308 | $1,931,471 | $  1,931,471 |
| Operating expenses: | | | | | | | |
| Direct operating expenses (exclusive of depreciation and amortization) | 957,830 | 1,133,386 | 1,262,317 | 1,262,317 | 924,420 | 988,448 | 988,448 |
| Selling, general and administrative expenses (exclusive of depreciation and amortization) | 392,803 | 456,893 | 499,457 | 499,457 | 358,188 | 410,075 | 410,075 |
| Depreciation and amortization | 336,895 | 379,640 | 388,217 | 388,217 | 288,810 | 290,233 | 290,233 |
| Corporate expenses (exclusive of depreciation and amortization) | 52,218 | 54,233 | 53,770 | 53,770 | 39,451 | 39,397 | 39,397 |
| Operating income | 119,895 | 150,445 | 243,279 | 243,279 | 150,439 | 203,318 | 203,318 |
| Interest expense | 11,623 | 14,201 | 14,177 | 14,177 | 11,111 | 9,874 | 9,874 |
| Intercompany interest expense | 227,402 | 145,648 | 145,653 | 143,208 | 109,239 | 133,093 | 107,409 |
| Equity in earnings (loss) of nonconsolidated affiliates | 3,620 | (5,142) | (76) | (76) | 2,270 | 9,908 | 9,908 |
| Other income (expense) — net | 9,164 | (8,595) | (13,341) | (13,341) | (17,210) | (17,353) | (17,353) |
| Income (loss) before income taxes and cumulative effect of a change in accounting principle | (106,346) | (23,141) | 70,032 | 72,477 | 15,149 | 52,906 | 78,590 |
| Income tax benefit (expense): | | | | | | | |
| Current | 72,008 | 12,092 | (23,422) | (24,400) | 6,481 | (37,767) | (48,041) |
| Deferred | (21,370) | (23,944) | (39,132) | (39,132) | (17,730) | 6,023 | 6,023 |
| Income (loss) before cumulative effect of a change in accounting principle | (55,708) | (34,993) | 7,478 | $  8,945 | 3,900 | 21,162 | $  36,572 |
| Cumulative effect of a change in accounting principle, net of tax of $504,927 in 2002 and $113,173 in 2004(1) | (3,527,198) | — | (162,858) | | — | — | |
| Net income (loss) | $(3,582,906) | $ (34,993) | $ (155,380) | | $ 3,900 | $ 21,162 | |
| Basic and diluted income (loss) before cumulative effect of a change in accounting principle per common share(2) | $  (.18) | $  (.11) | $  .02 | $  .03 | $  .01 | $  .07 | $  .10 |
| **Segment Data:** | | | | | | | |
| Revenue: | | | | | | | |
| Domestic | $  911,493 | $1,006,376 | $1,092,089 | $  1,092,089 | $  800,744 | $  886,649 | $  886,649 |
| International | 948,148 | 1,168,221 | 1,354,951 | 1,354,951 | 960,564 | 1,044,822 | 1,044,822 |
| Total revenue | $ 1,859,641 | $2,174,597 | $2,447,040 | $  2,447,040 | $1,761,308 | $1,931,471 | $  1,931,471 |
| Operating income (loss): | | | | | | | |
| Domestic | $  174,381 | $  215,485 | $  263,772 | $  263,772 | $  184,808 | $  263,448 | $  263,448 |
| International | (2,268) | (10,807) | 33,277 | 33,277 | 5,082 | (20,733) | (20,733) |
| Corporate | (52,218) | (54,233) | (53,770) | (53,770) | (39,451) | (39,397) | (39,397) |
| Total operating income | $  119,895 | $  150,445 | $  243,279 | $  243,279 | $  150,439 | $  203,318 | $  203,318 |

**Table of Contents**

| (In thousands) | Year Ended December 31, | | | Pro Forma as Adjusted December 31, 2004 | Nine Months Ended September 30, | | Pro Forma as Adjusted September 30, 2005 |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | (Unaudited) | 2004 (Unaudited) | 2005 (Unaudited) | (Unaudited) |
| **Cash Flow Data:** | | | | | | | |
| Cash flow provided by (used in): | | | | | | | |
| Operating activities | $ 320,235 | $ 433,459 | $ 492,495 | | $ 329,893 | $ 336,637 | |
| Investing activities | $(430,844) | $(230,162) | $(310,658) | | $(227,386) | $(223,189) | |
| Financing activities | $ 173,193 | $(222,491) | $(182,006) | | $ (95,759) | $ (48,154) | |
| Capital expenditures | $ 290,187 | $ 205,145 | $ 176,140 | | $ 117,733 | $ 130,484 | |
| **Other Data:** | | | | | | | |
| OIBDAN(3) | | | | | | | |
| Domestic | $ 354,328 | $ 409,722 | $ 450,494 | $    450,494 | $ 326,359 | $ 390,867 | $    390,867 |
| International | 154,680 | 174,596 | 234,888 | 234,888 | 152,423 | 142,593 | 142,593 |
| Corporate | (52,218) | (54,233) | (53,770) | (53,770) | (39,451) | (39,397) | (39,397) |
| Total OIBDAN(3) | $ 456,790 | $ 530,085 | $ 631,612 | $    631,612 | $ 439,331 | $ 494,063 | $    494,063 |

| (In thousands) | As of December 31, | | | As of September 30, 2005 | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | Historical (Unaudited) | Pro Forma as Adjusted (Unaudited) |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $     45,741 | $     34,105 | $     37,948 | $     91,676 | $     91,676 |
| Current assets | 753,289 | 958,669 | 1,107,240 | 1,243,287 | 881,133 |
| Property, plant and equipment — net | 2,213,817 | 2,264,106 | 2,195,985 | 2,172,197 | 2,172,197 |
| Total assets | 4,926,205 | 5,232,820 | 5,240,933 | 5,295,522 | 4,933,368 |
| Current liabilities | 642,330 | 736,202 | 749,055 | 807,900 | 807,900 |
| Long-term debt, including current maturities | 1,713,493 | 1,670,017 | 1,639,380 | 4,212,136 | 2,749,136 |
| Total liabilities | 2,347,262 | 2,472,656 | 2,511,280 | 5,207,173 | 3,744,173 |
| Owner's equity | 2,578,943 | 2,760,164 | 2,729,653 | 88,349 | 1,189,195 |
| Total liabilities and owner's equity | 4,926,205 | 5,232,820 | 5,240,933 | 5,295,522 | 4,933,368 |

(1)  Cumulative effect of change in accounting principle for the year ended December 31, 2002, related to an impairment of goodwill recognized in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets." Cumulative effect of change in accounting principle for the year ended December 31, 2004, related to a non-cash charge recognized in accordance with the adoption of Topic D-108, *Use of Residual Method to Value Acquired Assets other than Goodwill*. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Estimates — Indefinite-lived Assets."

(2)  Basic and diluted income (loss) before cumulative effect of a change in accounting principle per share is calculated by dividing income (loss) before cumulative effect of a change in accounting principle by the weighted average of common shares outstanding. The historic basic and diluted is based on 315,000,000 shares outstanding and the pro forma basic and diluted is based on 350,000,000 shares outstanding.

(3)  We evaluate segment and combined performance based on several factors, one of the primary measures of which is operating income (loss) before depreciation, amortization and non-cash compensation expense, which we refer to as OIBDAN. See "— Non-GAAP Financial Measure" below, "Unaudited Pro Forma Combined Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations — Use of OIBDAN."

**Table of Contents**

**Non-GAAP Financial Measure**

In addition to operating income, we evaluate segment and combined performance based on other factors, one primary measure of which is operating income (loss) before depreciation, amortization and non-cash compensation expense, which we refer to as OIBDAN. We use OIBDAN as a measure of the operational strengths and performance of our business and not as a measure of liquidity. However, a limitation of the use of OIBDAN as a performance measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in our business. Accordingly, OIBDAN should be considered in addition to, and not as a substitute for, operating income (loss), net income (loss) and other measures of financial performance reported in accordance with U.S. GAAP. Furthermore, this measure may vary among other companies; thus, OIBDAN as presented below may not be comparable to similarly titled measures of other companies.

We believe OIBDAN is useful to investors and other external users of our financial statements in evaluating our operating performance because it is widely used in the outdoor advertising industry to measure a company's operating performance and it helps investors more meaningfully evaluate and compare the results of our operations from period to period and with those of other companies in the outdoor advertising industry (to the extent the same components of OIBDAN are used), in each case without regard to items such as non-cash depreciation and amortization and non-cash compensation expense, which can vary depending upon the accounting method used and the book value of assets.

Our management uses OIBDAN (i) as a measure for planning and forecasting operating and individual expectations and for evaluating actual results against such expectations, (ii) as a basis for incentive bonuses paid to our executive officers and our branch managers and (iii) in presentations to our board of directors to enable them to have the same consistent measurement basis of operating performance used by management.

The following table presents a reconciliation of OIBDAN to operating income, which is a GAAP measure of our operating results:

| (In thousands) | Year Ended December 31, | | | Pro Forma as Adjusted December 31, 2004 | Nine Months Ended September 30, | | Pro Forma as Adjusted September 30, 2005 |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | (Unaudited) | 2004 (Unaudited) | 2005 (Unaudited) | (Unaudited) |
| *Reconciliation of OIBDAN to operating income:* | | | | | | | |
| **Combined:** | | | | | | | |
| OIBDAN | $456,790 | $530,085 | $631,612 | $ 631,612 | $ 439,331 | $ 494,063 | $ 494,063 |
| Depreciation and amortization | 336,895 | 379,640 | 388,217 | 388,217 | 288,810 | 290,233 | 290,233 |
| Non-cash compensation | — | — | 116 | 116 | 82 | 512 | 512 |
| Operating income | $119,895 | $150,445 | $243,279 | $ 243,279 | $ 150,439 | $ 203,318 | $ 203,318 |
| **Domestic:** | | | | | | | |
| OIBDAN | $354,328 | $409,722 | $450,494 | $ 450,494 | $ 326,359 | $ 390,867 | $ 390,867 |
| Depreciation and amortization | 179,947 | 194,237 | 186,620 | 186,620 | 141,479 | 127,019 | 127,019 |
| Non-cash compensation | — | — | 102 | 102 | 72 | 400 | 400 |
| Operating income | $174,381 | $215,485 | $263,772 | $ 263,772 | $ 184,808 | $ 263,448 | $ 263,448 |
| **International:** | | | | | | | |
| OIBDAN | $154,680 | $174,596 | $234,888 | $ 234,888 | $ 152,423 | $ 142,593 | $ 142,593 |
| Depreciation and amortization | 156,948 | 185,403 | 201,597 | 201,597 | 147,331 | 163,214 | 163,214 |
| Non-cash compensation | — | — | 14 | 14 | 10 | 112 | 112 |
| Operating income (loss) | $ (2,268) | $(10,807) | $ 33,277 | $ 33,277 | $ 5,082 | $ (20,733) | $ (20,733) |

12

Table of Contents

# RISK FACTORS

*You should carefully consider the following risks before investing in our Class A common stock. These risks could materially adversely affect our business, results of operations or financial condition. In such an event, the trading price of our Class A common stock could decline and you could lose part or all of your investment.*

## Risks Related to Our Business

### *We have incurred net losses and may experience future net losses, which could adversely affect our stock price.*

In the past, our operating results have been adversely affected by, among other things, a global economic slowdown and a decline in our clients' advertising budgets. We incurred net losses in each of 2002, 2003 and 2004 of approximately $3.6 billion, $35.0 million and $155.4 million, respectively, and had an accumulated retained deficit of $4.2 billion at September 30, 2005. Due to market conditions in the advertising industry generally and slow economic times and other factors that cause advertisers to cut back their advertising budgets or change their advertising strategies, we may face reduced demand for our advertising products, underutilization of our advertising faces and other factors that could adversely affect our results of operations in the near term. We cannot predict whether we will achieve profitability in future periods.

### *Government regulation of outdoor advertising may restrict our outdoor advertising operations.*

Changes in laws and regulations affecting outdoor advertising at any level of government, including laws of the foreign jurisdictions in which we operate, could have a significant financial impact on us by requiring us to make significant expenditures or otherwise limiting or restricting some of our operations.

U.S. federal, state and local regulations have had an impact on the outdoor advertising industry. One of the seminal laws was The Highway Beautification Act of 1965 (HBA), which regulates outdoor advertising on the 306,000 miles of Federal-Aid Primary, Interstate and National Highway Systems roads. HBA regulates the locations of billboards, mandates a state compliance program, requires the development of state standards, promotes the expeditious removal of illegal signs, and requires just compensation for takings. Size, spacing and lighting are regulated by state and local municipalities.

From time to time, certain state and local governments and third parties have attempted to force the removal of displays not governed by the HBA under various state and local laws, including amortization. Amortization permits the display owner to operate its display which does not meet current code requirements for a specified period of time, after which it must remove or otherwise conform its display to the applicable regulations at its own cost without any compensation. Several municipalities within our existing markets have adopted amortization ordinances. Other regulations limit our ability to rebuild or replace nonconforming displays and require us to remove or modify displays that are not in strict compliance with applicable laws. In addition, from time to time third parties or local governments assert that we own or operate displays that either are not properly permitted or otherwise are not in strict compliance with applicable law. Such regulations and allegations have not had a material impact on our results of operations to date, but if we are increasingly unable to resolve such allegations or obtain acceptable arrangements in circumstances in which our displays are subject to removal, modification or amortization, or if there occurs an increase in such regulations or their enforcement, our results could suffer.

Legislation has from time to time been introduced in state and local jurisdictions attempting to impose taxes on revenues of outdoor advertising companies. Several jurisdictions have already imposed such taxes as a percentage of our gross receipts of outdoor advertising revenues in that jurisdiction. While these taxes have not had a material impact on our business and financial results to date, we expect states to continue to try to impose such taxes as a way of increasing revenues. The increased imposition of these

13

**Table of Contents**

taxes and our inability to pass on the cost of these taxes to our clients could negatively affect our operating income.

In addition, we are unable to predict what additional regulations may be imposed on outdoor advertising in the future. Legislation that would regulate the content of billboard advertisements and implement additional billboard restrictions has been introduced in Congress from time to time in the past. We recently were fined $30,000 by the City of Los Angeles for our inadvertent failure to properly disclose our role in providing billboards to a local political candidate.

International regulation of the outdoor advertising industry varies by region and country, but generally limits the size, placement, nature and density of out-of-home displays. Significant international regulations include the Law of December 29, 1979 in France, the Town and Country Planning (Control of Advertisements) Regulations 1992 in the United Kingdom, and *Règlement Régional Urbain de l'agglomération bruxelloise* in Belgium. These laws define issues such as the extent to which advertisements can be erected in rural areas, the hours during which illuminated signs may be lit and whether the consent of local authorities is required to place a sign in certain communities. Other regulations limit the subject matter and language of out-of-home displays. For instance, the United States and France, among other nations, ban outdoor advertisements for tobacco products. Our failure to comply with these or any future international regulations could have an adverse impact on the effectiveness of our displays or their attractiveness to clients as an advertising medium and may require us to make significant expenditures to ensure compliance. As a result, we may experience a significant impact on our operations, revenues, international client base and overall financial condition.

> ### *We face intense competition in the outdoor advertising industry that may adversely affect the advertising fees we can charge, and consequently lower our operating margins and profits.*

We operate in a highly competitive industry, and we may not be able to maintain or increase the fees we charge our customers, which may consequently lower our operating margins and profits. Our advertising properties compete for audiences and advertising revenues with other outdoor advertising companies, as well as with other media, such as radio, newsweekly magazines, newspapers, prime time television, direct mail, the Internet and telephone directories. It is possible that new competitors may emerge and rapidly acquire significant market share. Competitive factors in our industry could adversely affect our financial performance by, among other things, leading to decreases in overall revenues, numbers of advertising clients, advertising fees or profit margins. These factors include:

- our competitors offering reduced advertising rates, which we may be unable or unwilling to match;

- our competitors adopting technological changes and innovations that we are unable to adopt or are delayed in adopting and that offer more attractive advertising alternatives than those we currently offer;

- shifts in the general population or specific demographic groups to markets where we have fewer outdoor advertising displays;

- our competitors securing more effective advertising sites than those sites where our displays are located;

- our competitors' abilities to complete and integrate acquisitions better than our ability to complete and integrate acquisitions;

- our inability to secure street furniture contracts on favorable terms; and

- development, governmental actions and strategic trading or retirement of displays, which, excluding acquisitions, may result in a reduction of our existing displays and increased competition for attractive display locations.

14

**Table of Contents**

***Doing business in foreign countries creates certain risks not involved in doing business in the United States that may disrupt our international operations or cause us to realize lower returns from our international operations.***

Doing business in foreign countries involves certain risks that may not exist when doing business in the United States. The risks involved in foreign operations that could result in disruptions to our business or financial losses in our international operations against which we are not insured include:

- exposure to local economic conditions, foreign exchange restrictions and restrictions on the withdrawal of foreign investment and earnings, investment restrictions or requirements, expropriations of property and changes in foreign taxation structures, each of which could reduce our profit from international operations;

- potential adverse changes in the diplomatic relations of foreign countries with the United States and government policies against businesses owned by foreigners, each of which could affect our ability to continue operations in or enter into an otherwise profitable market;

- changes in foreign regulations, such as the decision in France to lift the ban on retail advertising on television by 2007;

- hostility from local populations, potential instability of foreign governments and risks of insurrections, each of which could disrupt our ability to conduct normal business operations; and

- risks of renegotiation or modification of existing agreements with governmental authorities and diminished ability to legally enforce our contractual rights in foreign countries, each of which could cause financial losses in otherwise profitable operations.

In addition, we may incur substantial tax liabilities if we repatriate any of the cash generated by our international operations back to the United States, due to our current inability to recognize any foreign tax credits that would be associated with such repatriation. We are not currently in a position to recognize any tax assets in the United States that are the result of payments of income or withholding taxes in foreign jurisdictions.

***Exchange rates may cause fluctuations in our results of operations that are not related to our operations.***

Because we own assets overseas and derive revenues from our international operations, we may incur currency translation losses or gains due to changes in the values of foreign currencies relative to the United States dollar. For the years ended December 31, 2004, 2003 and 2002, foreign exchange rate gains had a significant positive effect on our results of operations. However, for the nine months ended September 30, 2005 and 2004, exchange rate fluctuations negatively affected our results of operations. We cannot predict the effect of exchange rate fluctuations upon future operating results. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Market Risk Management — Foreign Currency Risk."

***Our results of operations vary from quarter to quarter, and our financial performance in certain financial quarters may not be indicative of or comparable to our financial performance in subsequent financial quarters.***

Typically, we experience our lowest financial performance in the first quarter of our calendar year as retailers scale back their advertising budgets following the year-end holiday season. Because our results vary widely from quarter to quarter, our financial results for one quarter cannot necessarily be compared to another quarter and may not be indicative of our financial performance in subsequent quarters. These variations in our financial results could have an effect on our stock price.

Table of Contents

***The success of our street furniture and transit products is dependent on our obtaining key municipal concessions, which we may not be able to obtain on favorable terms.***

Our street furniture and transit products businesses require us to obtain contracts with municipalities and other governmental entities. Many of these contracts require us to participate in competitive bidding processes, have terms typically ranging from three to 20 years and have revenue share or fixed payment components. Our inability to successfully negotiate or complete these contracts due to governmental demands and delay and the highly competitive bidding processes for these contracts could affect our ability to offer these products to our clients, or to offer them to our clients at rates that are competitive to other forms of advertising, without adversely affecting our net income.

***Future acquisitions of businesses or properties could have adverse consequences on our existing business or assets.***

We may acquire outdoor advertising assets and other assets or businesses that we believe will assist our clients in marketing their products and services. Our acquisition strategy involves numerous risks, including:

• possible failures of our acquisitions to be profitable or to generate anticipated cash flows, which could affect our overall profitability and cash flows;

• entry into markets and geographic areas where our competitors are operating but where we have limited or no experience;

• potential difficulties in integrating our operations and systems with those of acquired companies, causing delays in realizing the potential benefits of acquisitions;

• diversion of our management team's attention away from other business concerns; and

• loss of key employees of acquired companies or the inability to recruit additional senior management to supplement or replace senior management of acquired companies.

***Antitrust regulations may limit future acquisitions due to our current inventory of advertising properties in certain markets.***

Additional acquisitions by us may require antitrust review by U.S. antitrust agencies and may require review by foreign antitrust agencies under the antitrust laws of foreign jurisdictions. We can give no assurances that the Department of Justice, the Federal Trade Commission or foreign antitrust agencies will not investigate, possibly challenge or seek divestitures or other remedies as a condition to not challenging future acquisitions. If those agencies take any such action, we may not be able to complete, or realize the desired benefits of, the proposed acquisition.

***The lack of availability of potential acquisitions at reasonable prices could harm our growth strategy.***

We face stiff competition from other outdoor advertising companies for acquisition opportunities. If the prices sought by sellers of these companies were to rise, we may find fewer acceptable acquisition opportunities. In addition, the purchase price of possible acquisitions could require the incurrence of additional debt or equity financing on our part. Since the terms and availability of this financing depend to a large degree upon general economic conditions and third parties over which we have no control, we can give no assurance that we will obtain the needed financing or that we will obtain such financing on attractive terms. In addition, our ability to obtain financing depends on a number of other factors, many of which are also beyond our control, such as interest rates and national and local business conditions. If the cost of obtaining needed financing is too high or the terms of such financing are otherwise unacceptable in relation to the acquisition opportunity we are presented with, we may decide to forgo that opportunity. Additional indebtedness could increase our leverage and make us more vulnerable to economic downturns and may limit our ability to withstand competitive pressures. Additional equity financing could result in dilution to our stockholders.

16

Table of Contents

*After this offering, we will have substantial debt obligations that could restrict our operations and impair our financial condition.*

After this offering, the application of all of the net proceeds of this offering to repay a portion of the outstanding balances of the $1.4 billion and $73.0 million intercompany notes owed to Clear Channel Communications, the reduction of a portion of the outstanding balances of such notes through offset to the "Due from Clear Channel Communications" account and the contribution of the remaining portion of the outstanding balances of such notes to our capital, our total indebtedness for borrowed money will be approximately $2.7 billion, approximately $2.5 billion of which will be intercompany indebtedness owed to Clear Channel Communications. As of December 31, 2004, on a pro forma basis, approximately $146.3 million of such total indebtedness (excluding interest) is due in 2005, $4.6 million is due in 2006 and 2007, $24.8 million is due in 2008 and 2009 and $2.5 billion thereafter. See "Contractual and Other Obligations — Firm Commitments." We may also incur additional substantial indebtedness in the future.

Our substantial indebtedness could have adverse consequences, including:

• increasing our vulnerability to adverse economic, regulatory and industry conditions;

• limiting our ability to compete and our flexibility in planning for, or reacting to, changes in our business and the industry;

• limiting our ability to borrow additional funds; and

• requiring us to dedicate a substantial portion of our cash flow from operations to payments on our debt, thereby reducing funds available for working capital, capital expenditures, acquisitions and other purposes.

If our cash flow and capital resources are insufficient to service our debt obligations, we may be forced to sell assets, seek additional equity or debt capital or restructure our debt. However, these measures might be unsuccessful or inadequate in permitting us to meet scheduled debt service obligations. We may be unable to restructure or refinance our obligations and obtain additional equity financing or sell assets on satisfactory terms or at all. As a result, inability to meet our debt obligations could cause us to default on those obligations. A default under any debt instrument could, in turn, result in defaults under other debt instruments. Any such defaults could materially impair our financial condition and liquidity.

*To service our debt obligations and to fund potential capital expenditures, we will require a significant amount of cash to meet our needs, which depends on many factors beyond our control.*

Our ability to service our debt obligations and to fund potential capital expenditures for display construction or renovation will require a significant amount of cash, which depends on many factors beyond our control. Our ability to make payments on and to refinance our debt will also depend on our ability to generate cash in the future. This, to an extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We cannot assure you that our business will generate sufficient cash flow or that future borrowings will be available to us in an amount sufficient to enable us to pay our debt, including our intercompany notes, or to fund our other liquidity needs. If our future cash flow from operations and other capital resources are insufficient to pay our obligations as they mature or to fund our liquidity needs, we may be forced to reduce or delay our business activities and capital expenditures, sell assets, obtain additional equity capital or restructure or refinance all or a portion of our debt, including the intercompany notes, on or before maturity. We cannot assure you that we will be able to refinance any of our debt, including the intercompany notes, on a timely basis or on satisfactory terms, if at all. In addition, the terms of our existing debt, including the intercompany notes, and other future debt may limit our ability to pursue any of these alternatives.

Table of Contents

***The $2.5 billion intercompany note and agreements with Clear Channel Communications impose restrictions on our ability to finance operations and capital needs, make acquisitions or engage in other business activities and requires prepayment from substantially all proceeds from debt or equity raised by us.***

The $2.5 billion intercompany note and Master Agreement with Clear Channel Communications include restrictive covenants that, among other things, restrict our ability to:

• incur additional debt;

• pay dividends and make distributions;

• make certain acquisitions and investments;

• repurchase our stock;

• create liens;

• enter into transactions with affiliates;

• enter into sale-leaseback transactions;

• dispose of all or substantially all of our assets; and

• merge or consolidate.

The existence of these restrictions could limit our ability to grow and increase our revenues or respond to competitive changes.

In addition, the intercompany note requires us to prepay it in full upon a change of control (as defined in the note), and, upon our issuances of equity and incurrences of debt, subject to certain exceptions, to prepay the note in the amount of net proceeds received from such events. Our failure to comply with the terms and covenants in our indebtedness could lead to a default under the terms of those documents, which would entitle Clear Channel Communications or other holders to accelerate the indebtedness and declare all amounts owed due and payable. See "Arrangements Between Clear Channel Communications and Us — Master Agreement — Approval Rights of Clear Channel Communications on Certain of Our Activities" and "Description of Indebtedness."

***Additional restrictions on outdoor advertising of tobacco, alcohol and other products may further restrict the categories of clients that can advertise using our products.***

Out-of-court settlements between the major U.S. tobacco companies and all 50 states, the District of Columbia, the Commonwealth of Puerto Rico and four other U.S. territories include a ban on the outdoor advertising of tobacco products. Our domestic revenues from the outdoor advertising of tobacco products were approximately $1.2 million, $1.6 million and $3.1 million in 2002, 2003 and 2004, respectively. Other products and services may be targeted in the future, including alcohol products. Our domestic revenues from the outdoor advertising of alcohol products were approximately $68.5 million, $74.0 million and $71.0 million in 2002, 2003 and 2004. Legislation regulating tobacco and alcohol advertising has also been introduced in a number of European countries in which we conduct business and could have a similar impact. Any significant reduction in alcohol-related advertising due to content-related restrictions could cause a reduction in our direct revenues from such advertisements and an increase in the available space on the existing inventory of billboards in the outdoor advertising industry.

***A general deterioration in economic conditions may cause our clients to reduce their advertising budgets or to choose advertising plans other than outdoor advertising.***

The risks associated with our businesses become more acute in periods of a slowing economy or recession, which may be accompanied by a decrease in advertising and which could have an adverse effect on our revenues and profit margins or result in an impairment in the value of our assets. The impact of slowdowns on our business is difficult to predict, but they may result in reductions in purchases of

18

**Table of Contents**

advertising. In addition, to the extent our street furniture and transit businesses rely on long-term guaranteed contracts with government entities, we may suffer losses on those contracts in times of economic slowdowns.

***Our outdoor advertising properties and revenues may be adversely affected by the occurrence of extraordinary events.***

The occurrence of extraordinary events with respect to our properties or the economy generally, such as terrorist attacks, severe weather conditions such as hurricanes or similar events may substantially decrease the use of and demand for advertising or expose us to substantial liability, which may decrease our revenues or increase our expenses. The September 11, 2001 terrorist attacks, for example, caused a nationwide disruption of commercial activities. The occurrence of future terrorist attacks, military actions, contagious disease outbreaks or similar events cannot be predicted, and their occurrence can be expected to further negatively affect the economies of the United States and other foreign countries where we do business generally, specifically the market for advertising.

## Risks Related to Our Relationship with Clear Channel Communications

***We have no operating history as an independent company and our historical and pro forma combined financial information is not necessarily representative of the results we would have achieved as an independent publicly traded company and may not be a reliable indicator of our future results.***

The historical and pro forma combined financial information included in this prospectus does not reflect the financial condition, results of operations or cash flows we would have achieved as an independent publicly traded company during the periods presented or those results we will achieve in the future. This is primarily a result of the following factors:

- Our historical and pro forma combined financial results reflect allocations of corporate expenses from Clear Channel Communications. Those allocations may be different from the comparable expenses we would have incurred had we operated as an independent publicly traded company.

- Our working capital requirements and capital for our general corporate purposes, including acquisitions and capital expenditures, historically have been satisfied as part of the corporate-wide cash management policies of Clear Channel Communications. Subsequent to this offering, Clear Channel Communications will not be required to provide us with funds to finance our working capital or other cash requirements. Without the opportunity to obtain financing from Clear Channel Communications, we may in the future need to obtain additional financing from banks, or through public offerings or private placements of debt or equity securities, strategic relationships or other arrangements. We may have a credit rating that is lower than Clear Channel Communications' credit rating and may incur debt on terms and at interest rates that will not be as favorable as those generally enjoyed by Clear Channel Communications.

- Significant changes may occur in our cost structure, management, financing and business operations as a result of our operating as an independent public subsidiary of Clear Channel Communications. These changes could result in increased costs associated with reduced economies of scale, stand-alone costs for services currently provided by Clear Channel Communications, the need for additional personnel to perform services currently provided by Clear Channel Communications and the legal, accounting, compliance and other costs associated with being a public company with equity securities listed on a national stock exchange. We are obligated to continue to use the services of Clear Channel Communications under the Corporate Services Agreement until such time as Clear Channel Communications owns less than 50% of the total voting power of our common stock, or longer for certain information technology services, and, in the event our Corporate Services Agreement with Clear Channel Communications terminates, we may not be able to replace the services that Clear Channel Communications provides us until such time or in a timely manner or on comparable terms.

19

Table of Contents

- Pursuant to a cash management arrangement, substantially all of our cash generated from our domestic operations will be transferred daily by Clear Channel Communications into accounts where funds of ours and of Clear Channel Communications may be commingled. The amounts so held by Clear Channel Communications will be evidenced in a cash management note issued by Clear Channel Communications to us. We do not have a commitment from Clear Channel Communications to advance funds to us, and we will have no access to the cash transferred from our concentration account to the master account of Clear Channel Communications. If Clear Channel Communications were to become insolvent, we would be an unsecured creditor like other unsecured creditors of Clear Channel Communications and could experience a liquidity shortfall.

### Because Clear Channel Communications controls substantially all the voting power of our common stock, investors will not be able to affect the outcome of any stockholder vote.

After this offering, Clear Channel Communications will own all of our outstanding shares of Class B common stock, representing approximately 90% of the outstanding shares of our common stock. Each share of our Class B common stock entitles its holder to 20 votes and each share of our Class A common stock entitles its holder to one vote on all matters on which stockholders are entitled to vote. As a result, after this offering, Clear Channel Communications will control approximately 99% of the total voting power of our common stock.

For so long as Clear Channel Communications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock, it will have the ability to direct the election of all members of our board of directors and to exercise a controlling influence over our business and affairs, including any determinations with respect to mergers or other business combinations involving us, our acquisition or disposition of assets, our incurrence of indebtedness, our issuance of any additional common stock or other equity securities, our repurchase or redemption of common stock or preferred stock and our payment of dividends. Similarly, Clear Channel Communications will have the power to determine or significantly influence the outcome of matters submitted to a vote of our stockholders, including the power to prevent an acquisition or any other change in control of us. Because Clear Channel Communications' interests as our controlling stockholder may differ from your interests, actions taken by Clear Channel Communications with respect to us may not be favorable to you.

Prior to the completion of this offering, we also will enter into a master agreement, a corporate services agreement, a trademark license agreement and a number of other agreements with Clear Channel Communications setting forth various matters governing our relationship with Clear Channel Communications while it remains a significant stockholder in us. These agreements, along with the $2.5 billion intercompany note, will govern our relationship with Clear Channel Communications after this offering and will allow Clear Channel Communications to retain control over, among other things, the continued use of the trademark "Clear Channel," the provision of corporate services to us and our ability to make certain acquisitions or to merge or consolidate or to sell all or substantially all our assets. The rights of Clear Channel Communications under these agreements may allow Clear Channel Communications to delay or prevent an acquisition of us that our other stockholders may consider favorable. We will not be able to terminate these agreements or amend them in a manner we deem more favorable so long as Clear Channel Communications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock. See "Description of Capital Stock", "Description of Indebtedness" and "Arrangements Between Clear Channel Communications and Us."

### Conflicts of interest may arise between Clear Channel Communications and us that could be resolved in a manner unfavorable to us.

Questions relating to conflicts of interest may arise between Clear Channel Communications and us in a number of areas relating to our past and ongoing relationships. After this offering, three of our directors will continue to serve as directors of Clear Channel Communications and two of these will be our executive officers. For as long as Clear Channel Communications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock, it will have the ability to

**Table of Contents**

direct the election of all the members of our board of directors and to exercise a controlling influence over our business and affairs.

Areas in which conflicts of interest between Clear Channel Communications and us could arise include, but are not limited to, the following:

- *Cross officerships, directorships and stock ownership.* The ownership interests of our directors or executive officers in the common stock of Clear Channel Communications or service as a director or officer of both Clear Channel Communications and us could create, or appear to create, conflicts of interest when directors and executive officers are faced with decisions that could have different implications for the two companies. For example, these decisions could relate to (i) the nature, quality and cost of services rendered to us by Clear Channel Communications, (ii) disagreement over the desirability of a potential acquisition opportunity, (iii) employee retention or recruiting or (iv) our dividend policy.

- *Intercompany transactions.* From time to time, Clear Channel Communications or its affiliates may enter into transactions with us or our subsidiaries or other affiliates. Although the terms of any such transactions will be established based upon negotiations between employees of Clear Channel Communications and us and, when appropriate, subject to the approval of the independent directors on our board or a committee of disinterested directors, there can be no assurance that the terms of any such transactions will be as favorable to us or our subsidiaries or affiliates as may otherwise be obtained in arm's length negotiations.

- *Intercompany agreements.* We have entered into certain agreements with Clear Channel Communications pursuant to which it will provide us certain management, administrative, accounting, tax, legal and other services, for which we will reimburse Clear Channel Communications on a cost basis. In addition, we will enter into a number of intercompany agreements covering matters such as tax sharing and our responsibility for certain liabilities previously undertaken by Clear Channel Communications for certain of our businesses. Pursuant to the corporate services agreement between Clear Channel Communications and us, we are contractually obligated to utilize the services of the chief executive officer of Clear Channel Communications as our Chief Executive Officer and the chief financial officer of Clear Channel Communications as our Chief Financial Officer until Clear Channel Communications owns less than 50% of the voting power of our common stock, or we provide Clear Channel Communications with six months prior written notice of termination. The terms of these agreements were established while we were a wholly owned subsidiary of Clear Channel Communications and were not the result of arm's length negotiations. In addition, conflicts could arise in the interpretation or any extension or renegotiation of these existing agreements after this offering. See "Arrangements Between Clear Channel Communications and Us."

***If Clear Channel Communications engages in the same type of business we conduct or takes advantage of business opportunities that might be attractive to us, our ability to successfully operate and expand our business may be hampered.***

Our amended and restated certificate of incorporation provides that, subject to any contractual provision to the contrary, Clear Channel Communications will have no obligation to refrain from:

- engaging in the same or similar business activities or lines of business as us; or

- doing business with any of our clients, customers or vendors.

In addition, the corporate opportunity policy set forth in our amended and restated certificate of incorporation addresses potential conflicts of interest between our company, on the one hand, and Clear Channel Communications and its officers and directors who are officers or directors of our company, on the other hand. The policy provides that if Clear Channel Communications acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both Clear Channel Communications and us, we will have renounced our interest in the corporate opportunity. It also provides

Table of Contents

that if one of our directors or officers who is also a director or officer of Clear Channel Communications learns of a potential transaction or matter that may be a corporate opportunity for both Clear Channel Communications and us, we will have renounced our interest in the corporate opportunity, unless that opportunity is expressly offered to that person in writing solely in his or her capacity as our director or officer.

If one of our officers or directors, who also serves as a director or officer of Clear Channel Communications, learns of a potential transaction or matter that may be a corporate opportunity for both Clear Channel Communications and us, our amended and restated certificate of incorporation provides that the director or officer will have no duty to communicate or present that corporate opportunity to us and will not be liable to us or our stockholders for breach of fiduciary duty by reason of Clear Channel Communications' actions with respect to that corporate opportunity.

This policy could result in Clear Channel Communications having rights to corporate opportunities in which both we and Clear Channel Communications have an interest.

By becoming a stockholder in our company, you will be deemed to have notice of and have consented to these provisions of our amended and restated certificate of incorporation. The principles for resolving such potential conflicts of interest are described under "Description of Capital Stock — Provisions of Our Amended and Restated Certificate of Incorporation Relating to Related-Party Transactions and Corporate Opportunities."

***We are a "controlled company" within the meaning of the New York Stock Exchange rules and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements that may not provide as many protections as those afforded to stockholders of other companies.***

After this offering, Clear Channel Communications will continue to own more than 50% of the total voting power of our common stock and we will be a "controlled company" under the NYSE corporate governance standards. As a controlled company, we may elect to utilize certain exemptions under the NYSE standards that free us from the obligation to comply with certain NYSE corporate governance requirements, including the requirements (i) that a majority of the board of directors consists of independent directors, (ii) that we have a nominating and governance committee, and that such committee be composed entirely of independent directors and governed by a written charter addressing the committee's purpose and responsibilities, (iii) that we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (iv) for an annual performance evaluation of the compensation committee. After this offering, we intend to utilize certain of these exemptions and, as a result, we may not create or maintain a nominating and governance committee, and the nominating and governance committee, if created, and the compensation committee may not consist entirely of independent directors, and our board of directors may not consist of a majority of independent directors. Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

***We will only have the right to use the Clear Channel brand name, logo and corporate name for so long as Clear Channel Communications owns at least 50% of the total voting power of our common stock. If Clear Channel Communications' ownership falls below such 50% threshold and we fail to establish in a timely manner a new, independently recognized brand name with a strong reputation, our revenue and profitability could decline.***

Upon completion of this offering, our corporate name will be "Clear Channel Outdoor Holdings, Inc.," and we and our subsidiaries may use the Clear Channel brand name and logo in marketing our products and services. Pursuant to a trademark license agreement, Clear Channel Communications will grant us the right to use the "Clear Channel" mark and logo in connection with our products and services and the right to use "Clear Channel" in our corporate name and the corporate names of our subsidiaries until 12 months after the date on which Clear Channel Communications owns less than 50% of the total

22

**Table of Contents**

voting power of our common stock. In the event our right to use the Clear Channel brand name and logo and corporate name expires, we will be required to conduct our business under a new brand name, which may not be immediately recognized by our clients and suppliers or by potential employees we are trying to recruit. We will need to expend significant time, effort and resources to establish a new brand name in the marketplace. We cannot guarantee that this effort will ultimately be successful. If our effort to establish a new brand identity is unsuccessful, our business, financial condition and results of operations may suffer.

> ***Any future separation from Clear Channel Communications could adversely affect our business and profitability due to Clear Channel Communications' strong brand and reputation.***

As a subsidiary of Clear Channel Communications, our businesses have marketed many of their products and services using the "Clear Channel" brand name and logo, and we believe the association with Clear Channel Communications has provided many benefits, including:

- a world-class brand associated with trust, integrity and longevity;

- perception of high-quality products and services;

- preferred status among our clients and employees;

- strong capital base and financial strength; and

- established relationships with U.S. federal and state regulators and non-U.S. regulators.

Any future separation from Clear Channel Communications could adversely affect our ability to attract and retain highly qualified dedicated sales specialists for our products and services. We may be required to lower the prices of our products and services, increase our sales commissions and fees, change long-term advertising and marketing agreements and take other action to maintain our relationship with our clients, suppliers and dedicated sales specialists, all of which could have an adverse effect on our financial condition and results of operations. Any future separation from Clear Channel Communications also could cause some of our existing clients to choose to stop doing business with us, and could cause other potential clients to decide not to purchase our products and services because we are no longer part of Clear Channel Communications.

We cannot accurately predict the effect that a separation from Clear Channel Communications would have on our sales, clients or employees. The risks relating to a separation from Clear Channel Communications could materialize at various times, including:

- if and when Clear Channel Communications reduces its ownership in our common stock to a level below 50% of the total voting power; and

- if and when we are required to cease using the Clear Channel name and logo in our sales and marketing materials.

> ***We will not have control over our tax decisions and could be liable for income taxes owed by Clear Channel Communications.***

For so long as Clear Channel Communications continues to own at least 80% of the total voting power and value of our common stock, we and certain of our subsidiaries will be included in Clear Channel Communications' consolidated group for U.S. federal income tax purposes. In addition, we or one or more of our subsidiaries may be included in the combined, consolidated or unitary tax returns of Clear Channel Communications or one or more of its subsidiaries for foreign, state and local income tax purposes. Under the Tax Matters Agreement, we will pay to Clear Channel Communications the amount of federal, foreign, state and local income taxes which we would be required to pay to the relevant taxing authorities if we and our subsidiaries filed combined, consolidated or unitary tax returns and were not included in the consolidated, combined or unitary tax returns of Clear Channel Communications or its subsidiaries. In addition, by virtue of its controlling ownership and the Tax Matters Agreement, Clear Channel Communications will effectively control all of our tax decisions. The Tax Matters Agreement

Table of Contents

provides that Clear Channel Communications will have sole authority to respond to and conduct all tax proceedings (including tax audits) relating to us, to file all income tax returns on our behalf and to determine the amount of our liability to (or entitlement to payment from) Clear Channel Communications under the Tax Matters Agreement. This arrangement may result in conflicts of interest between Clear Channel Communications and us. For example, under the Tax Matters Agreement, Clear Channel Communications will be able to choose to contest, compromise or settle any adjustment or deficiency proposed by the relevant taxing authority in a manner that may be beneficial to Clear Channel Communications and detrimental to us.

Moreover, notwithstanding the Tax Matters Agreement, federal law provides that each member of a consolidated group is liable for the group's entire tax obligation. Thus, to the extent Clear Channel Communications or other members of the group fail to make any U.S. federal income tax payments required by law, we would be liable for the shortfall. Similar principles may apply for foreign, state and local income tax purposes where we file combined, consolidated or unitary returns with Clear Channel Communications or its subsidiaries for federal, foreign, state and local income tax purposes.

### *If Clear Channel Communications spins off our Class B common stock to its stockholders, we have agreed in the Tax Matters Agreement to indemnify Clear Channel Communications for its tax-related liabilities in certain circumstances.*

If Clear Channel Communications spins off our Class B common stock to its stockholders in a distribution that is intended to be tax-free under Section 355 of the Internal Revenue Code of 1986, as amended, which we refer to herein as the Code, we have agreed in the Tax Matters Agreement to indemnify Clear Channel Communications and its affiliates against any and all tax-related liabilities if such a spin-off fails to qualify as a tax-free distribution (including as a result of Section 355(e) of the Code) due to actions, events or transactions relating to our stock, assets or business, or a breach of the relevant representations or covenants made by us in the Tax Matters Agreement. If neither we nor Clear Channel Communications is responsible under the Tax Matters Agreement for any such spin-off not being tax-free under Section 355 of the Code, we and Clear Channel Communications have agreed that we will each be responsible for 50% of the tax-related liabilities arising from the failure of such a spin-off to so qualify. See "Arrangements Between Clear Channel Communications and Us — Tax Matters Agreement."

### *Future sales or distributions of our shares by Clear Channel Communications could depress the market price for shares of our Class A common stock.*

After this offering, Clear Channel Communications may sell all or part of the shares of our common stock that it owns or distribute those shares to its stockholders, including pursuant to demand registration rights described herein. Sales or distributions by Clear Channel Communications of substantial amounts of our common stock in the public market or to its stockholders could adversely affect prevailing market prices for our Class A common stock. Clear Channel Communications has advised us that it currently intends to continue to hold all of our common stock that it owns following this offering. However, Clear Channel Communications is not subject to any contractual obligation that would prohibit it from selling, spinning off, splitting off or otherwise disposing of any shares of our common stock, except that Clear Channel Communications has agreed not to sell, spin off, split off or otherwise dispose of any of our shares of common stock for a period of 180 days after the date of this prospectus without the prior written consent of the underwriters, subject to certain limitations and limited exceptions. Consequently, we cannot assure you that Clear Channel Communications will maintain its ownership of our common stock after the 180-day period following this offering.

### *The terms of our arrangements with Clear Channel Communications may be more favorable than we will be able to obtain from an unaffiliated third party, and we may be unable to replace the services Clear Channel Communications provides us in a timely manner or on comparable terms.*

We and Clear Channel Communications will enter into a Corporate Services Agreement and other agreements prior to the completion of this offering. Pursuant to the Corporate Services Agreement, Clear

**Table of Contents**

Channel Communications and its affiliates will agree to provide us with corporate services after this offering, including treasury, payroll and other financial services, executive officer services, human resources and employee benefit services, legal services, information systems and network services and procurement and sourcing support.

We are negotiating these arrangements with Clear Channel Communications in the context of a parent-subsidiary relationship. Although Clear Channel Communications will be contractually obligated to provide us with services during the term of the Corporate Services Agreement, we cannot assure you that these services will be sustained at the same level after the expiration of that agreement, or that we will be able to replace these services in a timely manner or on comparable terms. In addition, we cannot provide assurance that the amount we pay Clear Channel Communications for the services will be as favorable to us as that which may be available for comparable services provided by unrelated third parties. Other agreements with Clear Channel Communications will also govern our relationship with Clear Channel Communications after this offering and will provide for the allocation of employee benefit, tax and other liabilities and obligations attributable to our operations. The agreements also contain terms and provisions that may be more or less favorable than terms and provisions we might have obtained in arm's length negotiations with unaffiliated third parties. If Clear Channel Communications ceases to provide services to us pursuant to those agreements, our costs of procuring those services from third parties may increase. See "Arrangements Between Clear Channel Communications and Us — Relationship with Clear Channel Communications."

> ***Any deterioration in the financial condition of Clear Channel Communications could adversely affect our access to the credit markets and increase our borrowing costs.***

For so long as Clear Channel Communications maintains a significant interest in us, a deterioration in the financial condition of Clear Channel Communications could have the effect of increasing our borrowing costs or impairing our access to the capital markets because of our reliance on Clear Channel Communications for availability under its revolving credit facility. In addition, because the interest rate we pay on the $2.5 billion intercompany note is based on the weighted average cost of debt for Clear Channel Communications, any such deterioration would likely result in an increase in Clear Channel Communications' cost of debt and in our interest rate. To the extent we do not pass on our increased borrowing costs to our clients, our profitability, and potentially our ability to raise capital, could be materially affected. Also, until the first date Clear Channel Communications owns less than 50% of our voting stock, pursuant to the Master Agreement between us and Clear Channel Communications, as well as pursuant to the $2.5 billion intercompany note, Clear Channel Communications will have the ability to limit our ability to incur debt or issue equity securities, which could adversely affect our ability to meet our liquidity needs or to grow our business. See "Arrangements Between Clear Channel Communications and Us" and "Description of Indebtedness."

## Risks Related to Our Class A Common Stock and This Offering

> ***There is no existing market for our Class A common stock, and a trading market that will provide you with adequate liquidity may not develop, the price of our Class A common stock may fluctuate significantly, and you could lose all or part of your investment.***

Prior to this offering, there has been no public market for our Class A common stock. We cannot predict the extent to which investor interest will lead to the development of an active and liquid trading market in our Class A common stock on the NYSE or otherwise. If an active trading market does not develop, you may have difficulty selling any of our Class A common stock that you buy.

The initial public offering price per share for our Class A common stock will be determined by negotiations between us and the representatives of the underwriters and may not be indicative of the market price of our Class A common stock that will prevail in the trading market. The market price of our Class A common stock may decline below the initial public offering price. The market price of our

**Table of Contents**

Class A common stock may also be influenced by many factors, some of which are beyond our control, including:

• our quarterly or annual earnings, or those of other companies in our industry;

• our loss of a large client;

• announcements by us or our competitors of significant contracts or acquisitions;

• changes in accounting standards, policies, guidance, interpretations or principles;

• general economic conditions;

• the failure of securities analysts to cover our Class A common stock after this offering or changes in financial estimates by analysts;

• future sales by us or other stockholders of our Class A common stock; and

• other factors described in these "Risk Factors."

In recent years, the stock market has experienced extreme price and volume fluctuations. This volatility has had a significant impact on the market price of securities issued by many companies, including companies in our industry. The changes frequently appear to occur without regard to the operating performance of these companies. The price of our Class A common stock could fluctuate based upon factors that have little or nothing to do with our company, and these fluctuations could materially reduce our stock price.

In the past, some companies that have had volatile market prices for their securities have been subject to securities class action suits filed against them. If a suit were to be filed against us, regardless of the outcome, it could result in substantial legal costs and a diversion of our management's attention and resources. This could have a material adverse effect on our business, results of operations and financial condition.

> ***Our stock ownership by Clear Channel Communications, provisions in our agreements with Clear Channel Communications and our corporate governance documents and Delaware law may delay or prevent an acquisition of us that our other stockholders may consider favorable, which could decrease the value of your shares of Class A common stock.***

After this offering, for as long as Clear Channel Communications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock, it will have the ability to control decisions regarding an acquisition of us by a third party. As a controlled company, we are exempt from some of the corporate governance requirements of the NYSE, including the requirement that our board of directors be comprised of a majority of independent directors. In addition, our amended and restated certificate of incorporation, bylaws and Delaware law contain provisions that could make it more difficult for a third party to acquire us without the consent of our board of directors. These provisions include restrictions on the ability of our stockholders to remove directors, supermajority voting requirements for stockholders to amend our organizational documents, restrictions on a classified board of directors and limitations on action by our stockholders by written consent. Some of these provisions, such as the limitation on stockholder action by written consent, only become effective once Clear Channel Communications no longer controls us. In addition, our board of directors has the right to issue preferred stock without stockholder approval, which could be used to dilute the stock ownership of a potential hostile acquirer. Delaware law also imposes certain restrictions on mergers and other business combinations between any holder of 15% or more of our outstanding voting stock. These restrictions under Delaware law do not apply to Clear Channel Communications while it retains at least 15% or more of our Class B common stock. Although we believe these provisions protect our stockholders from coercive or otherwise unfair takeover tactics and thereby provide for an opportunity to receive a higher bid by requiring potential acquirers to negotiate with our board of directors, these provisions apply even if the offer may be considered beneficial by some stockholders. See "Description of Capital Stock."

Table of Contents

*If Clear Channel Communications spins off our high vote Class B common stock to its stockholders and such shares do not convert into Class A common stock upon a sale or other transfer subsequent to such distribution, the voting rights of our Class A common stock will continue to be disproportionately lower than the voting rights of our Class B common stock.*

In connection with any distribution of shares of our Class B common stock to Clear Channel Communications' common stockholders in a spin-off, Clear Channel Communications may elect in its sole discretion whether our Class B common stock so distributed will automatically convert into shares of Class A common stock upon a transfer or sale by the recipient subsequent to the spin-off or whether the Class B common stock will continue as high vote Class B common stock after the distribution. In the event the Class B common stock does not convert into Class A common stock upon a sale or transfer subsequent to a spin-off, the voting rights of Class B common stock will continue to be disproportionately lower than the voting rights of our Class B common stock. Therefore, the holders of our Class B common stock will continue to be able to direct the election of all the members of our board of directors and exercise a controlling influence over our business and affairs.

*We currently do not intend to pay dividends on our Class A common stock.*

We do not expect to pay dividends on our Class A common stock in the foreseeable future. We are a holding company with no independent operations and no significant assets other than the stock of our subsidiaries. We therefore are dependent upon the receipt of dividends or other distributions from our subsidiaries to pay dividends. Accordingly, if you purchase shares in this offering, the price of our Class A common stock must appreciate in order to realize a gain on your investment. This appreciation may not occur.

*You will suffer an immediate and substantial dilution in the net tangible book value of the Class A common stock you purchase.*

Purchasers of Class A common stock in this offering will experience immediate and substantial dilution of approximately $18.11 per share in net tangible book value of the Class A common stock.

*We will incur increased costs as a result of being a public company.*

The Sarbanes-Oxley Act of 2002, as well as new rules subsequently implemented by the Securities and Exchange Commission and New York Stock Exchange, have required changes in corporate governance practices of public companies. We expect these new rules and regulations to increase our legal and financial compliance costs and to make some activities more time-consuming and costly. For example, when we cease to take advantage of the "controlled company" exemption available in the NYSE rules, we will have to add a number of independent directors in order that our board consist of a majority of independent directors and create additional board committees. In addition, we will incur additional costs associated with our public company reporting requirements. We also expect these new rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, it may be more difficult for us to attract and retain qualified persons to serve on our board of directors or as executive officers. We are currently evaluating and monitoring developments with respect to these new rules, and we cannot predict or estimate the amount of additional costs we may incur or the timing of such costs.

*If, after this offering, we are unable to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act, or our internal controls over financial reporting are not effective, the reliability of our financial statements may be questioned and our stock price may suffer.*

Section 404 of the Sarbanes-Oxley Act requires any company subject to the reporting requirements of the U.S. securities laws to do a comprehensive evaluation of its and its combined subsidiaries' internal controls over financial reporting. To comply with this statute, we will be required to document and test our

27

**Table of Contents**

internal control procedures; our management will be required to assess and issue a report concerning our internal controls over financial reporting; and our independent auditors will be required to issue an opinion on management's assessment of those matters. Our compliance with Section 404 of the Sarbanes-Oxley Act will first be tested in connection with the filing of our annual report on Form 10-K for the fiscal year ending December 31, 2006. The rules governing the standards that must be met for management to assess our internal controls over financial reporting are new and complex and require significant documentation, testing and possible remediation to meet the detailed standards under the rules. During the course of its testing, our management may identify material weaknesses or significant deficiencies which may not be remedied in time to meet the deadline imposed by the Sarbanes-Oxley Act. If our management cannot favorably assess the effectiveness of our internal controls over financial reporting or our auditors identify material weaknesses in our internal controls, investor confidence in our financial results may weaken, and our stock price may suffer. In connection with Clear Channel Communications' internal controls testing as of December 31, 2004, a number of control deficiencies were identified, some of which relate to our business. If these control deficiencies exist at the time our compliance with Section 404 is tested, there can be no assurance that they will not be material weaknesses.

28

**Table of Contents**

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

All statements other than statements of historical facts included in this prospectus, including, without limitation, statements regarding our future financial position, business strategy, budgets, projected costs, savings and plans and objectives of management for future operations, are forward-looking statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "intend," "estimate," "anticipate," "believe" or "continue" or the negative thereof or variations thereon or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from our expectations ("cautionary statements") are disclosed under "Risk Factors" and elsewhere in this prospectus, including, without limitation, in conjunction with the forward-looking statements included in this prospectus. All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by the cautionary statements included in this prospectus.

All forward-looking statements attributable to us or persons acting on our behalf apply only as of the date of this prospectus and are expressly qualified in their entirety by the cautionary statements included in this prospectus. We undertake no obligation to publicly update or revise forward-looking statements to reflect events or circumstances after the date made or to reflect the occurrence of unanticipated events.

29

Table of Contents

## USE OF PROCEEDS

We estimate that our net proceeds from this offering, after deducting underwriting discounts and estimated offering expenses, will be approximately $600.3 million.

In 2003, two intercompany notes were issued to Clear Channel Communications in the aggregate original principal amount of approximately $1.5 billion. The first intercompany note in the original principal amount of approximately $1.4 billion, the entire principal balance of which remains outstanding, matures on December 31, 2017, may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 10%. The second intercompany note in the original principal amount of $73.0 million, the entire principal balance of which remains outstanding, matures on December 31, 2017, may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 9%. See "Arrangements Between Clear Channel Communications and Us."

We intend to use all of the net proceeds of this offering to repay approximately $600.3 million of the outstanding balances of the $1.4 billion and $73.0 million intercompany notes. Prior to such use of proceeds, the outstanding balances of the $1.4 billion and $73.0 million intercompany notes will be reduced by approximately $362.2 million, the balance at September 30, 2005 in the "Due from Clear Channel Communications" intercompany account, and approximately $500.5 million of the remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes will be contributed to our capital by Clear Channel Communications, such that the notes are repaid in full.

Our total indebtedness after this offering and after application of all of the net proceeds of this offering to repay a portion of the intercompany indebtedness owed to Clear Channel Communications will be approximately $2.7 billion, approximately $2.5 billion of which will be intercompany indebtedness owed to Clear Channel Communications. See "Description of Indebtedness."

**Table of Contents**

## DIVIDEND POLICY

We do not anticipate paying any dividends on the shares of our common stock in the foreseeable future. If cash dividends were to be paid on our common stock, holders of Class A common stock and Class B common stock would share equally, on a per share basis, in any such cash dividend.

31

**Table of Contents**

## CAPITALIZATION

The following table sets forth our capitalization as of September 30, 2005:

(i) on an actual basis; and

(ii) on an as adjusted post-offering basis, after giving effect to:

   (a) this offering;

   (b) the reduction of the outstanding balances of the approximately $1.4 billion and $73.0 million intercompany notes by approximately $362.2 million, representing the balance at September 30, 2005 in the "Due from Clear Channel Communications" intercompany account;

   (c) the contribution of approximately $500.5 million of the remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes to our capital by Clear Channel Communications; and

   (d) the repayment of approximately $600.3 million of the remaining outstanding balances of the $1.4 billion and $73.0 million notes with all of the net proceeds of this offering, such that the notes are repaid in full.

You should read the information in this table in conjunction with the historical audited and unaudited combined financial statements and the accompanying notes thereto of us and our combined subsidiaries included elsewhere in this prospectus and "Use of Proceeds," "Dividend Policy," "Selected Historical Combined Financial Data," "Unaudited Pro Forma Combined Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Table of Contents**

| (In thousands) | As of September 30, 2005 | | |
|---|---|---|---|
| | **Actual** (Unaudited) | | **As Adjusted Post-Offering** (Unaudited) |
| Cash and cash equivalents | $ | 91,676 | $ 91,676 |
| Due from Clear Channel Communications | $ | 362,154 | $ — |
| Debt: | | | |
| Credit facility | $ | 49,732 | $ 49,732 |
| Intercompany note in the original principal amount of approximately $1.4 billion | | 1,390,000 | — |
| Intercompany note in the original principal amount of $73.0 million | | 73,000 | — |
| Intercompany note in the original principal amount of $2.5 billion(1) | | 2,500,000 | 2,500,000 |
| Other borrowings | | 199,404 | 199,404 |
| Total debt | | 4,212,136 | 2,749,136 |
| Owner's equity: | | | |
| Actual and as adjusted post-offering: Class A common stock and Class B common stock, each par value $0.01 per share; 750,000,000 shares authorized and 35,000,000 shares issued of Class A common stock and 600,000,000 shares authorized and 315,000,000 shares issued of Class B common stock(2) | | — | 3,500 |
| Additional capital paid-in | | — | 5,277,010 |
| Owner's net investment(1) | | 4,179,664 | — |
| Retained deficit | | (4,229,060) | (4,229,060) |
| Accumulated other comprehensive income | | 137,745 | 137,745 |
| Total owner's equity | | 88,349 | 1,189,195 |
| Total capitalization | $ | 4,300,485 | $ 3,938,331 |

(1) On August 2, 2005, we paid a dividend of $2.5 billion on our common stock to Clear Channel Communications in the form of an intercompany note.

(2) In connection with this offering, our amended and restated certificate of incorporation provides that the shares of our common stock outstanding prior to this offering will be changed into and reclassified as 315,000,000 shares of Class B common stock to be outstanding after this offering. After this offering, Clear Channel Communications will own all of our outstanding shares of Class B common stock.

**Table of Contents**

## DILUTION

Dilution is the amount by which the initial public offering price paid by the purchasers of shares of Class A common stock in this offering will exceed the net tangible book value per share of Class A common stock after this offering. The net tangible book value per share presented below equals the amount of our total tangible assets (total assets less intangible assets), less total liabilities as of September 30, 2005. As of September 30, 2005, we had a net tangible book value of $(1,139,641), or $(3.62) per share. On a pro forma basis, after giving effect to:

- the sale by us of 35,000,000 shares of Class A common stock in this offering and the application of all of the net proceeds of this offering, after deducting underwriting discounts and estimated offering expenses, as described under "Use of Proceeds;" and

- the repayment or contribution of the remaining outstanding balances of the approximately $1.4 billion and $73.0 million intercompany notes;

our pro forma net tangible book value as of September 30, 2005 would have been $(38,795) or $(.11) per share, which represents an immediate increase in net tangible book value of $3.51 per share to Clear Channel Communications, our current stockholder, and an immediate dilution in net tangible book value of $18.11 per share to new stockholders purchasing shares of Class A common stock in this offering.

The following table illustrates this dilution on a per share basis:

| | | |
|---|---:|---:|
| Initial public offering price per share | | $ 18.00 |
| Net tangible book value per share as of September 30, 2005 | (3.62) | |
| Increase in net tangible book value per share attributable to new stockholders | 3.51 | |
| Pro forma net tangible book value per share after this offering | | (.11) |
| Dilution per share to new stockholders | | $ 18.11 |

The following table summarizes, on the same pro forma basis as of September 30, 2005, the total number of shares of Class A common stock purchased from us, the total consideration paid to us and the average price per share paid by Clear Channel Communications, our current stockholder, and by new stockholders purchasing shares of Class A common stock in this offering:

| (In millions, except percentages and per share data) | Shares Purchased | | Total Consideration | | Average Price per Share |
|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | |
| Current stockholder(1) | 315 | 90% | $ 590 | 48% | $ 1.87 |
| New stockholders | 35 | 10% | 630 | 52% | 18.00 |
| Total | 350 | 100% | $ 1,220 | 100% | $ 3.49 |

(1)   After giving effect to the reclassification, in connection with this offering, of 1,917.0709 shares of our common stock into 315,000,000 shares of Class B common stock.

The tables and calculations above exclude 42,000,000 shares of Class A common stock reserved for issuance under our 2005 Stock Incentive Plan.

34

**Table of Contents**

## UNAUDITED PRO FORMA COMBINED FINANCIAL DATA

The following table sets forth unaudited pro forma combined financial data and other information of Clear Channel Outdoor Holdings.

We have prepared our combined financial statements as if Clear Channel Outdoor Holdings had been in existence as a separate company throughout all relevant periods. The pro forma combined statement of operations data for the year ended December 31, 2004 presented below was derived from our audited combined financial statements and the accompanying notes thereto included elsewhere in this prospectus. The pro forma combined statement of operations data for the nine months ended September 30, 2005 and the pro forma combined balance sheet data as of September 30, 2005 presented below were derived from our unaudited combined financial statements and the accompanying notes thereto included elsewhere in this prospectus. The operating results for the nine months ended September 30, 2005 include all adjustments (consisting only of normal recurring adjustments) that we believe are necessary for a fair statement of the results for such interim period.

Results for the nine months ended September 30, 2005 are not necessarily indicative of the results expected for the fiscal year ended December 31, 2005 or any future period.

Our unaudited pro forma results of operations data present our pro forma as adjusted results of operations for the year ended December 31, 2004 and the nine months ended September 30, 2005:

• as if this offering had been completed on January 1, 2004, and assuming:

  – the outstanding balances of the approximately $1.4 billion and $73.0 million intercompany notes issued to Clear Channel Communications are reduced by approximately $362.2 million, representing the balance at September 30, 2005 in the "Due from Clear Channel Communications" intercompany account;

  – then, approximately $500.5 million of the remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes is contributed to our capital by Clear Channel Communications; and

  – then, approximately $600.3 million of the remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes is repaid with all of the net proceeds of this offering, such that the notes are repaid in full;

• after giving effect to our distribution of an intercompany note in the original principal amount of $2.5 billion as a dividend on our common stock, which note was ultimately distributed to Clear Channel Communications, as if issued to Clear Channel Communications on January 1, 2004.

Our as adjusted balance sheet and statement of operations data as of September 30, 2005 and for the nine months ended September 30, 2005, present, using the same assumptions and application of estimated net proceeds described above, our as adjusted results of operations for the nine months ended September 30, 2005, as if this offering and the issuance of the $2.5 billion intercompany note had been completed on January 1, 2004.

The unaudited pro forma information set forth below is based upon available information and assumptions that we believe are reasonable. The historical financial and other data have been prepared on a combined basis from Clear Channel Communications' consolidated financial statements using the historical results of operations and bases of the assets and liabilities of Clear Channel Communications' outdoor advertising business and give effect to allocations of expenses from Clear Channel Communications. Our historical financial data will not be indicative of our future performance, nor will such data reflect what our financial position and results of operations would have been had we operated as an independent publicly traded company during the periods shown. Also, the unaudited pro forma statement of operations does not reflect estimates of one-time and ongoing incremental costs required for us to operate as a separate company, which are described in Note 1 below to the unaudited pro forma statement of operations.

35

**Table of Contents**

You should read the information contained in this table in conjunction with "Selected Historical Combined Financial Data," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the historical audited and unaudited combined financial statements and the accompanying notes thereto of us and our combined subsidiaries included elsewhere in this prospectus.

### Unaudited Pro Forma Combined Statement of Operations

(In thousands, except per share data)

| | Year Ended December 31, 2004 | | | Nine Months Ended September 30, 2005 | | |
|---|---|---|---|---|---|---|
| | Historical | Adjustments | Pro Forma | Historical | Adjustments | Pro Forma |
| **Statement of Operations:**(1) | | | | | | |
| Revenue | $ 2,447,040 | $ — | $2,447,040 | $1,931,471 | $ — | $1,931,471 |
| Operating expenses: | | | | | | |
| Direct operating expenses (exclusive of depreciation and amortization) | 1,262,317 | — | 1,262,317 | 988,448 | — | 988,448 |
| Selling, general and administrative expenses (exclusive of depreciation and amortization) | 499,457 | — | 499,457 | 410,075 | — | 410,075 |
| Depreciation and amortization | 388,217 | — | 388,217 | 290,233 | — | 290,233 |
| Corporate expenses (exclusive of depreciation and amortization) | 53,770 | — | 53,770 | 39,397 | — | 39,397 |
| Operating income | 243,279 | | 243,279 | 203,318 | | 203,318 |
| Interest expense | 14,177 | — | 14,177 | 9,874 | — | 9,874 |
| Intercompany interest expense | 145,653 | (2,445)(3) | 143,208 | 133,093 | (25,684)(3) | 107,409 |
| Equity in earnings (loss) of nonconsolidated affiliates | (76) | — | (76) | 9,908 | — | 9,908 |
| Other income (expense) — net | (13,341) | — | (13,341) | (17,353) | — | (17,353) |
| Income before income taxes and cumulative effect of a change in accounting principle | 70,032 | 2,445 | 72,477 | 52,906 | 25,684 | 78,590 |
| Income tax benefit (expense): | | | | | | |
| Current | (23,422) | (978)(4) | (24,400) | (37,767) | (10,274)(4) | (48,041) |
| Deferred | (39,132) | — | (39,132) | 6,023 | — | 6,023 |
| Income before cumulative effect of a change in accounting principle | $ 7,478 | $ 1,467 | $ 8,945 | $ 21,162 | $ 15,410 | $ 36,572 |
| Basic and diluted income (loss) before cumulative effect of a change in accounting principle per common share(2) | $ .02 | | $ .03 | $ .07 | | $ .10 |

36

**Table of Contents**

### Notes to Unaudited Pro Forma Combined Statement of Operations

(1) The unaudited pro forma statement of operations does not reflect the complete impact of one-time and ongoing incremental costs required for us to operate as a separate company. Clear Channel Communications allocated to us $16.6 million in 2004, $19.6 million in 2003 and $17.6 million in 2002 of expenses incurred by it for providing us accounting, treasury, tax, legal, public affairs, executive oversight, human resources and other services. Through September 30, 2005, Clear Channel Communications allocated to us $11.8 million of expenses. After this offering, we expect to continue to receive from Clear Channel Communications substantially all of these services.

(2) Basic and diluted income (loss) before cumulative effect of a change in accounting principle per common share is calculated by dividing income (loss) before cumulative effect of a change in accounting principle by the weighted average of common shares outstanding. The historic basic and diluted is based on 315,000,000 shares outstanding and the pro forma basic and diluted is based on 350,000,000 shares outstanding.

(3) Includes estimated annual intercompany interest expense of $143.1 million related to $2.5 billion of intercompany indebtedness incurred on August 2, 2005, at an estimated weighted average interest rate of 5.725% for the year ended December 31, 2004 and 5.725% for the nine months ended September 30, 2005. The interest rate on this intercompany indebtedness is based upon the weighted average cost of funds of Clear Channel Communications, so that a change in the weighted average cost of funds for Clear Channel Communications could change the weighted average annual interest rate. A 25 basis point change to the weighted average cost of funds of Clear Channel Communications would change our annual interest expense by $6.3 million. Also includes the elimination of intercompany interest expense incurred pursuant to intercompany indebtedness between Clear Channel Communications and us of $145.6 million for the year ended December 31, 2004 and $109.2 million for the nine months ended September 30, 2005.

(4) Represents estimated tax (expense) benefit related to the estimated interest expense adjustment discussed in Note (3) above at our combined statutory rate of 40% for the year ended December 31, 2004 and 40% for the nine months ended September 30, 2005.

37

Table of Contents

**Unaudited Pro Forma Combined Balance Sheet**

| (In thousands) | As of September 30, 2005 | | |
| --- | --- | --- | --- |
| | Historical | Adjustments | Pro Forma |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 91,676 | $ — | $ 91,676 |
| Accounts receivable, net | 679,469 | — | 679,469 |
| Due from Clear Channel Communications | 362,154 | (362,154)(1) | — |
| Prepaid expenses | 69,060 | — | 69,060 |
| Other current assets | 40,928 | — | 40,928 |
| Total current assets | 1,243,287 | (362,154) | 881,133 |
| Property, plant & equipment, net | 2,172,197 | — | 2,172,197 |
| Intangible assets: | | | |
| Definite-lived intangibles, net | 255,028 | — | 255,028 |
| Indefinite-lived intangibles — permits | 212,507 | — | 212,507 |
| Goodwill | 760,455 | — | 760,455 |
| Other assets: | | | |
| Notes receivable | 5,821 | — | 5,821 |
| Investments in, and advances to, nonconsolidated affiliates | 99,447 | — | 99,447 |
| Deferred tax asset | 243,030 | — | 243,030 |
| Other assets | 302,915 | — | 302,915 |
| Other investments | 835 | — | 835 |
| Total assets | $ 5,295,522 | $ (362,154) | $ 4,933,368 |
| **Liabilities and Shareholders' Equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 209,948 | $ — | $ 209,948 |
| Accrued expenses | 325,477 | — | 325,477 |
| Accrued interest | 2,443 | — | 2,443 |
| Accrued income taxes | 19,520 | — | 19,520 |
| Deferred income | 98,135 | — | 98,135 |
| Current portion of long-term debt | 152,377 | — | 152,377 |
| Total current liabilities | 807,900 | | 807,900 |
| Long-term debt | 96,759 | — | 96,759 |
| Debt with Clear Channel Communications | 3,963,000 | (1,390,000)(2) | 2,500,000 |
| | | (73,000)(2) | |
| Other long-term liabilities | 175,965 | — | 175,965 |
| Minority interest | 163,549 | — | 163,549 |
| Owner's equity: | | | |
| Class A common stock | — | 350 (3) | 350 |
| Class B common stock | — | 3,150 (4) | 3,150 |
| Additional paid-in capital | — | 4,179,664 (5) | 5,277,010 |
| | | 500,538 (5) | |
| | | 596,808 (5) | |
| Owner's net investment | 4,179,664 | (4,179,664)(6) | — |
| Retained deficit | (4,229,060) | — | (4,229,060) |
| Accumulated other comprehensive income | 137,745 | — | 137,745 |
| Total owner's equity | 88,349 | 1,100,846 | 1,189,195 |
| Total liabilities and owner's equity | $ 5,295,522 | $ (362,154) | $ 4,933,368 |

Table of Contents

**Notes to Unaudited Pro Forma Combined Balance Sheet**

(1)  From September 30, 2005 through the date we complete this offering, we are recording intercompany transactions with Clear Channel Communications in "Due from Clear Channel Communications." The balance in the "Due from Clear Channel Communications" intercompany account of approximately $362.2 million on September 30, 2005 will be settled by reducing the outstanding balances of the approximately $1.4 billion and $73.0 million intercompany notes by such amount.

(2)  All of the net proceeds from this offering will be used to repay approximately $600.3 million of the outstanding balances of the $1.4 billion and $73.0 million intercompany notes. The remaining outstanding balances of the $1.4 billion and $73.0 million intercompany notes will otherwise be extinguished.

(3)  Represents the par value of 35,000,000 shares of Class A common stock issued in connection with this offering.

(4)  Prior to this offering, shares of our common stock held by Clear Channel Communications will be converted into approximately 315,000,000 shares of Class B common stock.

(5)  Represents (i) the reclassification of "Owner's net investment" into "Additional paid-in capital," (ii) the impact of the extinguishment of a portion of the outstanding balance of the approximately $1.4 billion and $73.0 million intercompany notes and (iii) the receipt by us of approximately $600.3 million in this offering net of the par value of our Class A common stock issued in connection therewith for the remaining outstanding balance of the approximately $1.4 billion and $73.0 million intercompany notes.

(6)  Represents a reclassification into "Additional paid-in capital."

Table of Contents

### SELECTED HISTORICAL COMBINED FINANCIAL DATA

The historical financial and other data have been prepared on a combined basis from Clear Channel Communications combined financial statements using the historical results of operations and bases of the assets and liabilities of Clear Channel Communications' outdoor advertising businesses and give effect to allocations of expenses from Clear Channel Communications. Our historical financial data will not be indicative of our future performance nor will such data reflect what our financial position and results of operations would have been had we operated as an independent publicly traded company during the periods shown.

We have prepared our combined financial statements as if Clear Channel Outdoor Holdings had been in existence as a separate company throughout all relevant periods. The results of operations data, segment data and cash flow data for the years ended December 2001 and 2000 and for the nine months ended September 30, 2005 and 2004 and the combined balance sheet data as of December 31, 2001 and 2000 and as of September 30, 2005 and 2004 presented below were derived from our unaudited combined financial statements and the accompanying notes thereto included elsewhere is this prospectus. The results of operations data, segment data and cash flow data for the years ended December 31, 2004, 2003 and 2002 and the balance sheet data as of December 31, 2004 and 2003 presented below were derived from our audited combined financial statements and the accompanying notes thereto included elsewhere is this prospectus. The combined balance sheet data as of December 31, 2002 is derived from our audited financial statements. The operating results for the nine months ended September 30, 2005 and 2004 include all adjustments (consisting only of normal recurring adjustments) that we believe are necessary for a fair statement of the results for such interim periods.

Results for the nine months ended September 30, 2005 are not necessarily indicative of the results expected for the fiscal year ending December 31, 2005 or any future period.

You should read the information contained in this table in conjunction with "Capitalization," "Unaudited Pro Forma Combined Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the historical audited and unaudited combined financial statements and the accompanying notes thereto of us and our combined subsidiaries included elsewhere in this prospectus.

The following table presents a non-GAAP financial measure, OIBDAN, which we use to evaluate segment and combined performance of our business. OIBDAN is not calculated or presented in accordance with U.S. generally accepted accounting principles, or GAAP. In Note 3 and "— Non-GAAP Financial Measure" below, we explain OIBDAN and reconcile it to operating income (loss), its most directly comparable financial measure calculated and presented in accordance with GAAP.

**Table of Contents**

|  |  |  |  |  |  | Nine Months Ended September 30, | |
|  | Year Ended December 31, | | | | | | |
|  | **2000** | **2001** | **2002** | **2003** | **2004** | **2004** | **2005** |
| (In thousands, except per share data) | (Unaudited) | (Unaudited) |  |  |  | (Unaudited) | (Unaudited) |
| **Results of Operations Data:** |  |  |  |  |  |  |  |
| Revenue | $ 1,729,438 | $ 1,748,030 | $ 1,859,641 | $ 2,174,597 | $ 2,447,040 | $ 1,761,308 | $ 1,931,471 |
| Operating expenses: |  |  |  |  |  |  |  |
| Direct operating expenses (exclusive of depreciation and amortization) | 761,312 | 861,854 | 957,830 | 1,133,386 | 1,262,317 | 924,420 | 988,448 |
| Selling, general and administrative expenses (exclusive of depreciation and amortization) | 323,871 | 355,370 | 392,803 | 456,893 | 499,457 | 358,188 | 410,075 |
| Depreciation and amortization | 437,349 | 559,498 | 336,895 | 379,640 | 388,217 | 288,810 | 290,233 |
| Corporate expenses (exclusive of depreciation and amortization) | 52,431 | 62,266 | 52,218 | 54,233 | 53,770 | 39,451 | 39,397 |
| Operating income (loss) | 154,475 | (90,958) | 119,895 | 150,445 | 243,279 | 150,439 | 203,318 |
| Interest expense | 23,037 | 13,331 | 11,623 | 14,201 | 14,177 | 11,111 | 9,874 |
| Intercompany interest expense | 178,253 | 220,798 | 227,402 | 145,648 | 145,653 | 109,239 | 133,093 |
| Equity in earnings (loss) of nonconsolidated affiliates | 5,888 | (4,422) | 3,620 | (5,142) | (76) | 2,270 | 9,908 |
| Other income (expense) — net | (4,593) | (13,966) | 9,164 | (8,595) | (13,341) | (17,210) | (17,353) |
| Income (loss) before income taxes and cumulative effect of a change in accounting principle | (45,520) | (343,475) | (106,346) | (23,141) | 70,032 | 15,149 | 52,906 |
| Income tax benefit (expense): |  |  |  |  |  |  |  |
| Current | (4,824) | 68,101 | 72,008 | 12,092 | (23,422) | 6,481 | (37,767) |
| Deferred | (37,640) | (5,199) | (21,370) | (23,944) | (39,132) | (17,730) | 6,023 |
| Income (loss) before cumulative effect of a change in accounting principle | (87,984) | (280,573) | (55,708) | (34,993) | 7,478 | 3,900 | 21,162 |
| Cumulative effect of a change in accounting principle, net of tax of $504,927 in 2002 and $113,173 in 2004(1) | — | — | (3,527,198) | — | (162,858) | — | — |
| Net income (loss) | $ (87,984) | $ (280,573) | $ (3,582,906) | $ (34,993) | $ (155,380) | $ 3,900 | $ 21,162 |
| Basic and diluted income (loss) before cumulative effect of a change in accounting principle per common share(2) | $ (.28) | $ (.89) | $ (.18) | $ (.11) | $ .02 | $ .01 | $ .07 |

41

Table of Contents

| (In thousands) | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** | **2004** | **2005** |
| | (Unaudited) | (Unaudited) | | | | (Unaudited) | (Unaudited) |
| **Segment Data:** | | | | | | | |
| Revenue: | | | | | | | |
| Domestic | $ 885,563 | $ 880,720 | $ 911,493 | $1,006,376 | $1,092,089 | $ 800,744 | $ 886,649 |
| International | 843,875 | 867,310 | 948,148 | 1,168,221 | 1,354,951 | 960,564 | 1,044,822 |
| Total revenue | $1,729,438 | $1,748,030 | $1,859,641 | $2,174,597 | $2,447,040 | $1,761,308 | $1,931,471 |
| Operating income (loss): | | | | | | | |
| Domestic | $ 168,872 | $ 30,767 | $ 174,381 | $ 215,485 | $ 263,772 | $ 184,808 | $ 263,448 |
| International | 38,034 | (59,459) | (2,268) | (10,807) | 33,277 | 5,082 | (20,733) |
| Corporate | (52,431) | (62,266) | (52,218) | (54,233) | (53,770) | (39,451) | (39,397) |
| Total operating income (loss) | $ 154,475 | $ (90,958) | $ 119,895 | $ 150,445 | $ 243,279 | $ 150,439 | $ 203,318 |
| **Cash Flow Data:** | | | | | | | |
| Cash flow provided by (used in): | | | | | | | |
| Operating activities | | | $ 320,235 | $ 433,459 | $ 492,495 | $ 329,893 | $ 336,637 |
| Investing activities | | | $ (430,844) | $ (230,162) | $ (310,658) | $ (227,386) | $ (223,189) |
| Financing activities | | | $ 173,193 | $ (222,491) | $ (182,006) | $ (95,759) | $ (48,154) |
| Capital expenditures | | | $ 290,187 | $ 205,145 | $ 176,140 | $ 117,733 | $ 130,484 |
| **Other Data:** | | | | | | | |
| OIBDAN(3) | | | | | | | |
| Domestic | $ 435,299 | $ 362,604 | $ 354,328 | $ 409,722 | $ 450,494 | $ 326,359 | $ 390,867 |
| International | 208,956 | 168,202 | 154,680 | 174,596 | 234,888 | 152,423 | 142,593 |
| Corporate | (52,431) | (62,266) | (52,218) | (54,233) | (53,770) | (39,451) | (39,397) |
| Total OIBDAN(3) | $ 591,824 | $ 468,540 | $ 456,790 | $ 530,085 | $ 631,612 | $ 439,331 | $ 494,063 |

| (In thousands) | For the Three Months Ended | | |
|---|---|---|---|
| | **March 31** | **June 30** | **September 30** |
| | (Unaudited) | (Unaudited) | (Unaudited) |
| **2005 Quarterly Results of Operations:** | | | |
| Revenue | $ 578,959 | $ 684,509 | $ 668,003 |
| Operating expenses: | | | |
| Direct operating expenses | 326,054 | 332,706 | 329,688 |
| Selling, general and administrative expenses | 129,597 | 127,316 | 153,162 |
| Depreciation and amortization | 98,266 | 96,562 | 95,405 |
| Corporate expenses | 12,975 | 13,423 | 12,999 |
| Operating income (loss) | 12,067 | 114,502 | 76,749 |
| Interest expense | 3,244 | 3,223 | 3,407 |
| Intercompany interest expense | 36,414 | 36,414 | 60,265 |
| Equity in earnings of nonconsolidated affiliates | 345 | 5,602 | 3,961 |
| Other income (expense) — net | (2,211) | (4,524) | (10,618) |
| Income (loss) before income taxes | (29,457) | 75,943 | 6,420 |
| Income tax (expense) benefit | 23,565 | (58,431) | 3,122 |
| Net income (loss) | $ (5,892) | $ 17,512 | $ 9,542 |

42

**Table of Contents**

| | | | As of December 31, | | | As of September 30, | |
|---|---|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** | **2004** | **2005** |
| (In thousands) | (Unaudited) | (Unaudited) | | | | (Unaudited) | (Unaudited) |
| **Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents | $ 19,183 | $ — | $ 45,741 | $ 34,105 | $ 37,948 | $ 39,140 | $ 91,676 |
| Current assets | 588,998 | 642,536 | 753,289 | 958,669 | 1,107,240 | 1,010,645 | 1,243,287 |
| Property, plant and equipment — net | 2,330,256 | 2,039,002 | 2,213,817 | 2,264,106 | 2,195,985 | 2,122,346 | 2,172,197 |
| Total assets | 7,705,526 | 7,807,624 | 4,926,205 | 5,232,820 | 5,240,933 | 5,200,407 | 5,295,522 |
| Current liabilities | 1,769,959 | 1,825,904 | 642,330 | 736,202 | 749,055 | 726,900 | 807,900 |
| Long-term debt, including current maturities | 1,490,135 | 1,526,427 | 1,713,493 | 1,670,017 | 1,639,380 | 1,660,164 | 4,212,136 |
| Total liabilities | 2,352,752 | 2,394,226 | 2,347,262 | 2,472,656 | 2,511,280 | 2,444,447 | 5,207,173(4) |
| Owner's equity | 5,352,774 | 5,413,398 | 2,578,943 | 2,760,164 | 2,729,653 | 2,755,960 | 88,349(4) |
| Total liabilities and owner's equity | $ 7,705,526 | $ 7,807,624 | $4,926,205 | $5,232,820 | $5,240,933 | $ 5,200,407 | $ 5,295,522 |

(1)  Cumulative effect of change in accounting principle for the year ended December 31, 2002, related to an impairment of goodwill recognized in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets." Cumulative effect of change in accounting principle for the year ended December 31, 2004, related to a non-cash charge recognized in accordance with the adoption of Topic D-108, *Use of Residual Method to Value Acquired Assets other than Goodwill.* See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Estimates — Indefinite-lived Assets."

(2)  Basic and diluted income (loss) before cumulative effect of a change in accounting principle per share is calculated by dividing income (loss) before cumulative effect of a change in accounting principle by the weighted average common shares outstanding. The basic and diluted is based on 315,000,000 shares outstanding.

(3)  We evaluate segment and combined performance based on several factors, one of the primary measures of which is operating income (loss) before depreciation, amortization and non-cash compensation expense, which we refer to as OIBDAN.

   See "— Non-GAAP Financial Measure" below, "Unaudited Pro Forma Combined Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations — Use of OIBDAN."

(4)  Reflects the distribution by us to our parent company of an intercompany note in the original principal amount of $2.5 billion issued to us by one of our wholly owned subsidiaries on August 2, 2005.

**Non-GAAP Financial Measure**

   In addition to operating income, we evaluate segment and combined performance based on other factors, one primary measure of which is operating income (loss) before depreciation, amortization and non-cash compensation expense, which we refer to as OIBDAN. We use OIBDAN as a measure of the operational strengths and performance of our business and not as a measure of liquidity. However, a limitation of the use of OIBDAN as a performance measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in our business. Accordingly, OIBDAN should be considered in addition to, and not as a substitute for, operating income (loss), net income (loss) and other measures of financial performance reported in accordance with U.S. GAAP. Furthermore, this measure may vary among other companies; thus, OIBDAN as presented below may not be comparable to similarly titled measures of other companies.

   We believe OIBDAN is useful to investors and other external users of our financial statements in evaluating our operating performance because it is widely used in the outdoor advertising industry to

Table of Contents

measure a company's operating performance and it helps investors more meaningfully evaluate and compare the results of our operations from period to period and with those of other companies in the outdoor advertising industry (to the extent the same components of OIBDAN are used), in each case without regard to items such as non-cash depreciation and amortization and non-cash compensation expense, which can vary depending upon the accounting method used and the book value of assets.

Our management uses OIBDAN (i) as a measure for planning and forecasting overall and individual expectations and for evaluating actual results against such expectations, (ii) as a basis for incentive bonuses paid to our executive officers and our branch managers and (iii) in presentations to our board of directors to enable them to have the same consistent measurement basis of operating performance used by management.

The following table presents a reconciliation of OIBDAN to operating income, which is a GAAP measure of our operating results:

| (In thousands) | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
| | 2000 (Unaudited) | 2001 (Unaudited) | 2002 | 2003 | 2004 | 2004 (Unaudited) | 2005 (Unaudited) |
|---|---|---|---|---|---|---|---|
| *Reconciliation of OIBDAN to operating income (loss):* | | | | | | | |
| **Combined:** | | | | | | | |
| OIBDAN | $ 591,824 | $ 468,540 | $ 456,790 | $ 530,085 | $ 631,612 | $ 439,331 | $ 494,063 |
| Depreciation and amortization | 437,349 | 559,498 | 336,895 | 379,640 | 388,217 | 288,810 | 290,233 |
| Non-cash compensation | — | — | — | — | 116 | 82 | 512 |
| Operating income (loss) | $ 154,475 | $ (90,958) | $ 119,895 | $ 150,445 | $ 243,279 | $ 150,439 | $ 203,318 |
| **Domestic:** | | | | | | | |
| OIBDAN | $ 435,299 | $ 362,604 | $ 354,328 | $ 409,722 | $ 450,494 | $ 326,359 | $ 390,867 |
| Depreciation and amortization | 266,428 | 331,837 | 179,947 | 194,237 | 186,620 | 141,479 | 127,019 |
| Non-cash compensation | — | — | — | — | 102 | 72 | 400 |
| Operating income | $ 168,871 | $ 30,767 | $ 174,381 | $ 215,485 | $ 263,772 | $ 184,808 | $ 263,448 |
| **International:** | | | | | | | |
| OIBDAN | $ 208,956 | $ 168,202 | $ 154,680 | $ 174,596 | $ 234,888 | $ 152,423 | $ 142,593 |
| Depreciation and amortization | 170,921 | 227,661 | 156,948 | 185,403 | 201,597 | 147,331 | 163,214 |
| Non-cash compensation | — | — | — | — | 14 | 10 | 112 |
| Operating income (loss) | $ 38,035 | $ (59,459) | $ (2,268) | $ (10,807) | $ 33,277 | $ 5,082 | $ (20,733) |

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### INTRODUCTION

Management's discussion and analysis, or MD&A, of our financial condition and results of operations is provided as a supplement to the audited annual financial statements and unaudited interim financial statements and accompanying notes thereto included elsewhere in this prospectus to help provide an understanding of our financial condition, changes in our financial condition and results of our operations. The information included in MD&A should be read in conjunction with the annual and interim financial statements. MD&A is organized as follows:

- *Overview.* This section provides a general description of our business, as well as other matters that we believe are important in understanding our results of operations and financial condition and in anticipating future trends.

- *Results of operations.* This section provides an analysis of our results of operations for the nine months ended September 30, 2005 and 2004 and the years ended December 31, 2004, 2003 and 2002. Our discussion is presented on both a combined and segment basis. Our reportable operating segments are domestic and international. Approximately 95% of our 2004 domestic revenues were derived from the United States, with the balance derived from Canada and Latin America. Approximately 52% of our 2004 international revenues were derived from France and the United Kingdom. Our French operations incurred a restructuring charge in the third quarter of 2005 and in 2003. One measure we use to manage our segments is operating income. Corporate expenses, interest expense, equity in earnings (loss) of nonconsolidated affiliates, other income (expense) — net, income taxes and cumulative effect of change in accounting principle are managed on a total company basis and are, therefore, included only in our discussion of combined results.

- *Financial condition and liquidity.* This section provides a discussion of our financial condition as of September 30, 2005 and December 31, 2004, as well as an analysis of our cash flows for the nine months ended September 30, 2005 and 2004 and the years ended December 31, 2004 and 2003. The discussion of our financial condition and liquidity includes summaries of (i) our primary sources of liquidity, (ii) our key debt covenants and (iii) our outstanding debt and commitments (both firm and contingent) that existed as of September 30, 2005.

- *Seasonality.* This section discusses seasonal performance of our domestic and international segments.

- *Market risk management.* This section discusses how we manage exposure to potential losses arising from adverse changes in foreign currency exchange rates and interest rates.

- *Critical accounting estimates.* This section discusses accounting policies considered to be important to our financial condition and results of operations and which require significant judgment and estimates on the part of management in their application. In addition, all of our significant accounting policies, including our critical accounting policies, are summarized in Note A to our combined financial statements included elsewhere in this prospectus.

### OVERVIEW

#### Description of Business

Our revenues are derived from selling advertising space on the more than 870,000 displays that we own or operate as of September 30, 2005 in key markets worldwide, consisting primarily of billboards, street furniture displays and transit displays. We own the majority of our advertising displays, which typically are located on sites that we either lease or own or for which we have acquired permanent easements. Our advertising contracts with clients typically outline the number of displays reserved, the

Table of Contents

duration of the advertising campaign and the unit price per display. The margins on our billboard contracts tend to be higher than those on contracts for our other displays.

Generally, our advertising rates are based on the "gross rating points," or total number of impressions delivered expressed as a percentage of a market population, of a display or group of displays. The number of "impressions" delivered by a display is measured by the number of people passing the site during a defined period of time and, in some international markets, is weighted to account for such factors as illumination, proximity to other displays and the speed and viewing angle of approaching traffic. To monitor our business, management typically reviews the average rates, average revenues per display, occupancy and inventory levels of each of our display types by market. In addition, because a significant portion of our advertising operations are conducted in foreign markets, principally France and the United Kingdom, management reviews the operating results from our foreign operations on a constant dollar basis. A constant dollar basis allows for comparison of operations independent of foreign exchange movements. Because revenue-sharing and minimum guaranteed payment arrangements are more prevalent in our international operations, the margins in our international operations typically are less than the margins in our domestic operations. Foreign currency transaction gains and losses, as well as gains and losses from translation of financial statements of subsidiaries and investees in highly inflationary countries, are included in operations.

The significant expenses associated with our operations include (i) direct production, maintenance and installation expenses, (ii) site lease expenses for land under our displays and (iii) revenue-sharing or minimum guaranteed amounts payable under our street furniture and transit display contracts. Our direct production, maintenance and installation expenses include costs for printing, transporting and changing the advertising copy on our displays, the related labor costs, the vinyl and paper costs and the costs for cleaning and maintaining our displays. Vinyl and paper costs vary according to the complexity of the advertising copy and the quantity of displays. Our site lease expenses include lease payments for use of the land under our displays, as well as any revenue-sharing arrangements we may have with the landlords. The terms of our domestic site leases generally range from one to 50 years. Internationally, the terms of our site leases generally range from three to ten years, but may vary across our networks.

We have long-standing relationships with a diversified group of local, regional and national advertising brands and agencies in the United States and worldwide.

### Relationship with Clear Channel Communications

Clear Channel Communications has advised us that its current intent is to continue to hold all of our Class B common stock owned by it after this offering and thereby retain its controlling interest in us. However, Clear Channel Communications is not subject to any contractual obligation that would prohibit it from selling, spinning off, splitting off or otherwise disposing of any shares of our common stock, except that Clear Channel Communications has agreed not to sell, spin off, split off or otherwise dispose of any shares of our common stock for a period of 180 days after the date of this prospectus without the prior written consent of the underwriters, subject to certain limitations and limited exceptions. See "Underwriting."

### Factors Affecting Results of Operations and Financial Condition

Our revenues are derived primarily from the sale of advertising space on displays that we own and operate in key markets worldwide, and our operating results are therefore affected by general economic conditions, as well as trends in the out-of-home advertising industry.

The outdoor advertising industry is significantly influenced by general local and national economic conditions, as well as the general advertising environment in individual markets. For instance, weak national advertising and a difficult competitive environment in France have led to a decline in our revenues of approximately $14.5 million for the nine months ended September 30, 2005, as compared to the same period for the prior year. In July 2005, we announced a plan to restructure our French operations to reduce approximately 6% of our French workforce and streamline our operations, which we anticipate will

**Table of Contents**

provide cost savings over the next three years. In connection with this restructuring effort, we recorded approximately $26.6 million as a component of selling, general and administrative expenses.

Government regulation and geopolitical events also impact the outdoor advertising industry. In certain markets, deregulation of the advertising industry may have a negative impact on our revenues. For example, recent changes in French regulation will allow advertisers to place retail advertisements on television by January 1, 2007. We anticipate that such changes will impact our national advertising revenues derived from France as a portion of French retail advertising dollars shift from outdoor media to television. National retail advertising in France is approximately 2% of our consolidated global revenues.

The outdoor advertising industry is also influenced by the commuting habits of the general population. Population growth and increasing drive and other commute times are key growth drivers for us. Outdoor advertising provides advertisers the ability to capture a growing mobile audience base that spends an increasing amount of time out-of-home. Technological advances also provide opportunities in the outdoor advertising industry. For example, digital display capabilities offer innovative advances in electronic displays. We recently converted seven billboards in the Cleveland area from standard to digital formats and have experienced increases in revenues from those displays. Technological advances are also expected to allow us to quickly and frequently change advertisements on displays, facilitating our transition from selling an advertiser display space to selling an advertiser time on multiple displays.

There are several additional factors that could materially impact our results of operations. See "Risk Factors" for a more comprehensive list of these factors.

## Basis of Presentation

Our combined financial statements have been derived from the financial statements and accounting records of Clear Channel Communications, principally from the statements and records representing Clear Channel Communications' Outdoor Segment, using the historical results of operations and historical bases of assets and liabilities of our business. The combined statements of operations include expense allocations for certain corporate functions historically provided to us by Clear Channel Communications. These allocations were made on a specifically identifiable basis or using relative percentages of headcount as compared to Clear Channel Communications' other businesses or other methods. We and Clear Channel Communications considered these allocations to be a reflection of the utilization of services provided. Our expenses as a separate, stand-alone company may be higher or lower than the amounts reflected in the combined statements of operations. Additionally, Clear Channel Communications primarily uses a centralized approach to cash management and the financing of its operations with all related acquisition activity between Clear Channel Communications and us reflected in our owner's equity as "Owner's net investment" while all other cash transactions are recorded as part of "Due from Clear Channel Communications" on our combined balance sheets.

We will incur increased costs as a result of becoming an independent publicly traded company, primarily from audit fees paid to our independent public accounting firm, Public Company Accounting Oversight Board fees, the hiring of additional staff to fulfill reporting requirements of a public company, NYSE listing fees and shareholder communications fees. Under the Corporate Services Agreement, we will bear the costs of certain services continued to be provided to us by Clear Channel Communications. We believe cash flow from operations will be sufficient to fund these additional corporate expenses.

Under the Corporate Services Agreement, Clear Channel Communications will allocate to us our share of costs for services provided on our behalf based on actual direct costs incurred by Clear Channel Communications or an estimate of Clear Channel Communications' expenses incurred on our behalf. For the years ended December 31, 2004, 2003 and 2002, we recorded approximately $16.6 million, $19.6 million and $17.6 million, respectively, and for the nine months ended September 30, 2005 and 2004, we recorded approximately $11.8 million and $11.8 million, respectively, as a component of corporate expenses for these services. As mentioned above, we will incur additional expenses associated with being an independent publicly traded company that were not incurred by Clear Channel Communications in the past. See "Arrangements Between Clear Channel Communications and Us."

**Table of Contents**

We do not believe that becoming an independent publicly traded company will have an adverse effect on our growth rates in the future because we will be comprised of substantially the same business as the outdoor segment of Clear Channel Communications, and Clear Channel Communications will retain a significant financial interest in us immediately after the offering. Our success will continue to be highly dependent on the overall health of the local and national economies in which we operate and the overall health of the advertising environment in each of our markets. We believe that being a publicly traded company will provide a stock-based currency that could potentially be used to raise capital and to more closely align our management and employee incentives with our business performance.

We believe the assumptions underlying the combined financial statements are reasonable. However, the combined financial statements may not necessarily reflect our results of operations, financial position and cash flows in the future or what our results of operations, financial position and cash flows would have been had we been a separate, stand-alone company during the periods presented.

48

Table of Contents

## RESULTS OF OPERATIONS

### Combined Results of Operations

The following table summarizes our historical results of operations:

| (In thousands) | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2004 | 2003 | 2002 |
| | (Unaudited) | (Unaudited) | | | |
| Revenues | $ 1,931,471 | $ 1,761,308 | $ 2,447,040 | $ 2,174,597 | $ 1,859,641 |
| Operating expenses: | | | | | |
| Direct operating expenses | 988,448 | 924,420 | 1,262,317 | 1,133,386 | 957,830 |
| Selling, general and administrative expenses | 410,075 | 358,188 | 499,457 | 456,893 | 392,803 |
| Depreciation and amortization | 290,233 | 288,810 | 388,217 | 379,640 | 336,895 |
| Corporate expenses | 39,397 | 39,451 | 53,770 | 54,233 | 52,218 |
| Operating income | 203,318 | 150,439 | 243,279 | 150,445 | 119,895 |
| Interest expense (including intercompany) | 142,967 | 120,350 | 159,830 | 159,849 | 239,025 |
| Equity in earnings (loss) of nonconsolidated affiliates | 9,908 | 2,270 | (76) | (5,142) | 3,620 |
| Other income (expense) — net | (17,353) | (17,210) | (13,341) | (8,595) | 9,164 |
| Income (loss) before income taxes and cumulative effect of a change in accounting principle | 52,906 | 15,149 | 70,032 | (23,141) | (106,346) |
| Income tax (expense) benefit: | | | | | |
| Current | (37,767) | 6,481 | (23,422) | 12,092 | 72,008 |
| Deferred | 6,023 | (17,730) | (39,132) | (23,944) | (21,370) |
| Income (loss) before cumulative effect of a change in accounting principle | 21,162 | 3,900 | 7,478 | (34,993) | (55,708) |
| Cumulative effect of a change in accounting principle, net of tax of $113,173 in 2004 and $504,927 in 2002 | — | — | (162,858) | — | (3,527,198) |
| Net income (loss) | $ 21,162 | $ 3,900 | $ (155,380) | $ (34,993) | $ (3,582,906) |

#### Revenues

Our revenues increased approximately $170.2 million, or 10%, during the nine months ended September 30, 2005 as compared to the same period of 2004. Included in these results is approximately $33.9 million from increases in foreign exchange as compared to the same period of 2004. Our domestic operations contributed approximately $85.9 million primarily from increased bulletin and poster revenues of approximately $41.4 million. In addition to foreign exchange increases, our international operations contributed approximately $50.4 million from approximately $22.9 million related to our consolidation of Clear Media Limited, when we increased our investment to a majority controlling interest during the third quarter of 2005 which we had previously accounted for as an equity method investment. Partially offsetting this international revenue growth was a decline in revenues of approximately $14.5 million from our media products in France as a result of a difficult economic and competitive environment.

Our revenues increased approximately $272.4 million, or 13%, during 2004 as compared to 2003. Included in the increase is approximately $128.6 million from foreign exchange increases. Our domestic

49

**Table of Contents**

operations contributed approximately $85.7 million to the increase, primarily from increased rates on our bulletin and poster inventory. In addition to foreign exchange increases, our international operations contributed $58.1 million to the increase, principally from street furniture sales as a result of an increase in average revenue per display.

Our revenues increased approximately $315.0 million, or 17%, during 2003 as compared to 2002. Included in the increase is approximately $169.9 million from foreign exchange increases. Our domestic operations contributed approximately $94.9 million to the increase, primarily from increased rates and occupancy on our bulletin inventory and our acquisition of The Ackerley Group in June 2002, which contributed approximately $35.4 million for the six months ended June 30, 2003. In addition to foreign exchange, our international operations contributed approximately $50.2 million to the increase, principally from street furniture sales as a result of an increase in the number of displays and average revenue per display.

### *Direct Operating Expenses*

Direct operating expenses increased approximately $64.0 million, or 7%, during the nine months ended September 30, 2005 as compared to the same period of 2004. Included in these expenses is approximately $20.0 million from increases in foreign exchange as compared to the same period of 2004. Our domestic operations contributed approximately $11.6 million to the increased expense of which approximately $5.6 million related to direct production expenses and approximately $6.0 million related to site lease expenses, both of which were associated with the increase in revenues. In addition to foreign exchange increases, our international operations increased approximately $32.4 million, comprised from an approximately $21.7 million increase in fixed rent and minimum annual guarantees and approximately $8.7 million from our consolidation of Clear Media, partially offset by a decline of approximately $1.6 million of various other expenses.

Direct operating expenses increased $128.9 million, or 11%, during 2004 as compared to 2003. Included in the increase is approximately $76.0 million from foreign exchange increases. Our domestic operations contributed approximately $33.6 million primarily from increased site lease expense. In addition to foreign exchange increases, our international operations contributed approximately $19.3 million, principally from higher site lease rent expense and approximately $6.2 million from the consolidation of a joint venture.

Direct operating expenses increased $175.6 million, or 18%, during 2003 as compared to 2002. Included in the increase is approximately $102.0 million from foreign exchange increases. Our domestic operations contributed approximately $36.1 million, primarily from our acquisition of The Ackerley Group, which contributed approximately $19.3 million in direct operating expenses during the six months ended June 30, 2003. In addition to foreign exchange increases, our international operations contributed approximately $37.5 million to the increase principally from higher site lease rent expense.

### *Selling, General and Administrative Expenses (SG&A)*

SG&A increased approximately $51.9 million, or 14%, during the nine months ended September 30, 2005 as compared to the same period of 2004. Included in these expenses is approximately $8.7 million from increases in foreign exchange as compared to the same period of 2004. Our domestic operations increased approximately $10.1 million principally from an approximately $2.9 million increase in commission expenses and an approximately $1.8 million increase in bad debt expense. In addition to foreign exchange increases, our international operations increased approximately $33.1 million, principally from approximately $26.6 million of costs related to the restructuring of our business in France and approximately $3.8 million from our consolidation of Clear Media.

SG&A increased approximately $42.6 million, or 9%, during 2004 as compared to 2003. Included in the increase is approximately $31.3 million from foreign exchange increases. Our domestic operations contributed approximately $11.4 million primarily from commission expenses associated with the increase in revenue. In addition to foreign exchange, our international operations SG&A declined approximately

50

**Table of Contents**

$0.1 million. The decline is primarily due to a restructuring charge of $13.8 million in France taken during 2003, partially offset by a restructuring charge of $4.1 million in Spain taken during 2004, $2.6 million associated with the consolidation of a joint venture, as well as increased commission expenses associated with the increase in revenue during 2004.

SG&A increased approximately $64.1 million, or 16%, during 2003 as compared to 2002. Included in the increase is approximately $43.2 million from foreign exchange increases. Our domestic operations contributed approximately $3.4 million primarily from increased commission expenses associated with the increase in revenue. In addition to foreign exchange, in 2003 our international operations contributed approximately $17.5 million principally from a restructuring charge in France of approximately $13.8 million taken during 2003.

Our branch managers have historically followed a corporate policy allowing Clear Channel Communications to use, without charge, domestic displays that they or their staff believe would otherwise be unsold. Our sales personnel receive partial revenue credit for that usage for compensation purposes. This partial revenue credit is not included in our reported revenues. Clear Channel Communications bears the cost of producing the advertising and we bear the costs of installing and removing this advertising. In 2004, we estimated that these discounted revenues would have been less than 3% of our domestic revenues. Under the Master Agreement, this policy will continue.

### *Depreciation and Amortization*

Depreciation and amortization increased approximately $8.6 million in 2004 as compared to 2003. The increase is primarily attributable to approximately $3.0 million related to damage from the hurricanes that struck Florida and the Gulf Coast during the third quarter of 2004 and approximately $18.8 million from fluctuations in foreign exchange rates that impacted our international segment, largely offset by accelerated depreciation on display takedowns and abandonments of approximately $17.1 million recognized during 2003 that did not reoccur during 2004.

Depreciation and amortization increased approximately $42.7 million in 2003 as compared to 2002. The increase is primarily attributable to approximately $25.0 million from foreign exchange increases, increased display takedowns in 2003 as compared to 2002 of approximately $12.2 million and our acquisition of The Ackerley Group in June 2002 which contributed approximately $2.4 million.

### *Corporate Expenses*

Clear Channel Communications provides management services to us, which include, among other things, (i) treasury, payroll and other financial related services, (ii) executive officer services, (iii) human resources and employee benefits services, (iv) legal, public affairs and related services, (v) information systems, network and related services, (vi) investment services, (vii) corporate services and (viii) procurement and sourcing support services. These services are allocated to us based on actual direct costs incurred or on Clear Channel Communications' estimate of expenses relative to a seasonally adjusted headcount. For the nine months ended September 30, 2005 and 2004 and for the years ended December 31, 2004, 2003, and 2002, we recorded approximately $11.8 million, $11.8 million, $16.6 million, $19.6 million, and $17.6 million, respectively, as a component of corporate expenses for these services.

### *Interest Expense (Including Intercompany)*

Interest expense increased $22.6 million for the nine months ended September 30, 2005 compared to the same period of 2004 primarily from a $2.5 billion intercompany note with Clear Channel Communications issued on August 2, 2005. The note accrues interest at a variable per annum rate based on the weighted average cost of debt for Clear Channel Communications, calculated on a monthly basis. The estimated weighted average interest rate for the period ended September 30, 2005 was 5.7%.

**Table of Contents**

Throughout 2002, we had in place a revolving demand promissory note with Clear Channel Communications. Effective December 31, 2002, Clear Channel Communications capitalized amounts included in the revolving demand promissory note into two fixed principal and interest rate notes. The first note is in the original principal amount of approximately $1.4 billion and accrues interest at a per annum rate of 10%. The second note is in the original principal amount of $73.0 million and accrues interest at a per annum rate of 9%. This capitalization effectively lowered our interest expense for the years ended December 31, 2004 and 2003 as compared to 2002 because the revolving demand promissory note had a higher average balance than the two fixed rate promissory notes.

### Other Income (Expense) — Net

The principal components of other income (expense) — net were:

| (In millions) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2004** | **2003** | **2002** |
| Royalty fee | $    (15.8) | $    (14.1) | $    — |
| Gain on sale of operating and fixed assets | 11.7 | 11.1 | 7.1 |
| Transitional asset retirement obligation | — | (7.0) | — |
| Minority interest | (7.6) | (3.9) | 1.8 |
| Other | (1.6) | 5.3 | .3 |
| Total other income (expense) — net | $    (13.3) | $    (8.6) | $  9.2 |

The royalty fee represents payments to Clear Channel Communications for our use of certain trademarks and licenses.

### Income Taxes

Our operations are included in a consolidated income tax return filed by Clear Channel Communications. However, for our financial statements, our provision for income taxes was computed on the basis that we file separate consolidated income tax returns with our subsidiaries.

Current tax expense for the nine months ended September 30, 2005 increased approximately $44.2 million as compared to the nine months ended September 30, 2004. This increase is primarily due to an approximately $37.8 million increase in Income before income taxes for the nine months ended September 30, 2005 as compared to the nine months ended September 30, 2004. In addition, current tax expense from foreign operations increased approximately $16.5 million during the current period as compared to the prior period primarily due to a change in local country tax law that resulted in the recognition of additional current tax expense and less deferred tax expense for the nine months ended September 30, 2005. During the nine months ended September 30, 2004, current tax expense was reduced by amounts associated with the disposition of certain assets.

Deferred tax benefit for the nine months ended September 30, 2005 was approximately $6.0 million as compared to a tax expense of $17.7 million for the nine months ended September 30, 2004. The deferred tax benefit for the nine months ended September 30, 2005 primarily relates to the reversal of foreign deferred tax liabilities that were set up at acquisition for certain contract valuations. During the nine months ended September 30, 2004, deferred tax expense was increased $7.4 million related to the disposition of certain assets.

Our effective tax rate for the year ended December 31, 2004 was 89%. The effective tax rate is a result of our mix of earnings and losses in foreign jurisdictions and certain deferred tax adjustments necessary to transition from being a wholly-owned subsidiary and certain other impacting events.

Current and deferred foreign tax expense of $16.6 million was recorded on certain international subsidiaries generating net positive taxable income. There were no current and deferred foreign tax benefits recorded on certain international subsidiaries generating taxable losses due to the uncertainty of the ability

Table of Contents

to utilize such losses within the applicable carryforward periods. The impact of the foregoing provides for foreign tax expense of $16.6 million on foreign pre-tax earnings of $14.8 million, which is an effective tax rate of 112.2% The foreign tax rate in combination with certain adjustments to our domestic effective tax rate related to (i) additional state deferred tax expense necessary to adjust state deferred tax assets to an amount expected to be recoverable in future years considering the pending Clear Channel Communications group structure changes, and (ii) additional current tax expense of approximately $6.3 million necessary to accrue for tax and interest on ongoing tax contingencies, contribute to our overall effective tax rate for the period.

During 2003, we recorded additional current tax expense due to certain tax contingencies of approximately $10.1 million. In addition, we did not record a tax benefit on certain tax losses from our foreign operations due to the uncertainty of the ability to utilize those tax losses in the future. As a result of the above items, our effective tax rate of negative 51% resulted in an income tax expense of approximately $11.9 million on an approximately $23.1 million loss before income taxes and cumulative effect of a change in accounting principle for the year ended December 31, 2003.

During 2002, we recorded a tax benefit from foreign operations of approximately $17.0 million on foreign income before income tax of approximately $7.6 million. The tax benefit was the result of the blending of income taxed in low tax rate jurisdictions and losses benefited in high tax rate jurisdictions.

### Cumulative Effect of a Change in Accounting Principle

The SEC staff issued Staff Announcement No. D-108, *Use of the Residual Method to Value Acquired Assets Other Than Goodwill*, at the September 2004 meeting of the Emerging Issues Task Force which we adopted in the fourth quarter of 2004. The Staff Announcement states that the residual method should no longer be used to value intangible assets other than goodwill. Rather, a direct method should be used to determine the fair value of all intangible assets other than goodwill required to be recognized under Statement of Financial Accounting Standards No. 141, *Business Combinations*. Our adoption of the Staff Announcement resulted in an aggregate carrying value of our domestic permits that was in excess of their fair value. The Staff Announcement requires us to report the excess value of approximately $162.9 million, net of tax, as a cumulative effect of a change in accounting principle.

The loss recorded as a cumulative effect of a change in accounting principle during 2002 relates to our adoption of Statement 142 on January 1, 2002. Statement 142 required that we test goodwill and permits for impairment using a fair value approach. As a result of the goodwill test, we recorded a non-cash, net of tax, impairment charge of approximately $3.5 billion. As required by Statement 142, a subsequent impairment test was performed at October 1, 2002, which resulted in no additional impairment charge. The non-cash impairment of our goodwill was generally caused by unfavorable economic conditions, which persisted throughout 2001. This weakness contributed to our clients' reducing the number of advertising dollars spent on our inventory. These conditions adversely impacted the cash flow projections used to determine the fair value of each reporting unit at January 1, 2002 which resulted in the non-cash impairment charge of a portion of our goodwill.

## Domestic Results of Operations

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2004 | 2003 | 2002 |
| (In thousands) | | | | | |
| Revenues | $ 886,649 | $ 800,744 | $ 1,092,089 | $ 1,006,376 | $ 911,493 |
| Direct operating expenses | 359,263 | 347,619 | 468,687 | 435,075 | 399,006 |
| Selling, general and administrative expenses | 136,919 | 126,838 | 173,010 | 161,579 | 158,159 |
| Depreciation and amortization | 127,019 | 141,479 | 186,620 | 194,237 | 179,947 |
| Operating income | $ 263,448 | $ 184,808 | $ 263,772 | $ 215,485 | $ 174,381 |

**Table of Contents**

For the nine months ended September 30, 2005, our revenues grew approximately $85.9 million, or 11%, over the same period of the prior year. The increase was primarily due to approximately $41.4 million attributable to increased rates on our bulletin and poster inventory during 2005. Growth occurred across our markets including New York, Miami, Houston, Seattle, Cleveland and Las Vegas. Revenues from our airport, street furniture and transit advertising displays contributed the majority of the remaining $44.5 million increase. Strong advertising client categories for the nine months ended September 30, 2005 included automotive, entertainment and amusements, business and consumer services, retail and telecommunications.

Direct operating expenses increased approximately $11.6 million, or 3%, during the nine months ended September 30, 2005 as compared to the same period in 2004. The increase is from approximately $5.6 million related to direct production expenses and approximately $6.0 million related to site lease expenses, both of which were associated with the increase in revenues. SG&A increased $10.1 million, or 8%, principally from an approximately $2.9 million increase in commission expenses and an approximately $1.8 million increase in bad debt expense.

Depreciation and amortization expense decreased approximately $14.5 million during the nine months ended September 30, 2005 as compared to the same period of 2004, due to fewer display takedowns during the current period, which resulted in less accelerated depreciation. During the nine months ended September 30, 2004, our management team made strategic decisions to remove certain advertising structures to enhance overall geographic area profits. As a result of these decisions, advertising structures were removed and their remaining book value was written off as additional depreciation expense.

During 2004, revenues increased approximately $85.7 million, or 9%, over 2003. Revenue growth occurred across our inventory, with bulletins and posters leading the way. Increased rates drove the growth in bulletin revenues, partially offset by a decrease in occupancy. We also grew rates on our poster inventory in 2004, with occupancy flat compared to 2003. Revenue growth occurred across the nation, fueled by growth in Los Angeles, New York, Miami, San Antonio, Seattle and Cleveland. The client categories leading revenue growth remained consistent throughout the year, the largest being entertainment. Business and consumer services was also a strong client category and was led by advertising spending from banking and telecommunications clients. Revenues from the automotive client category increased due to national, regional and local auto dealer advertisements.

Direct operating expenses increased approximately $33.6 million, or 8%, during 2004 as compared to 2003 primarily as a result of $21.8 million from site lease rent expense as a result of an increase in revenue-share payments associated with the increase in revenues. Our SG&A in 2004 increased approximately $11.4 million, or 7%, primarily from approximately $5.1 million related to commission and wage expenses relative to the growth in revenue.

During 2003, revenues increased approximately $94.9 million, or 10%, over 2002. Included in the increase is our acquisition of The Ackerley Group, acquired in June 2002, which contributed approximately $35.4 million in revenues during the six months ended June 30, 2003. In addition to the acquisition of The Ackerley Group, our bulletin inventory fueled the growth. Our bulletin inventory performed well year over year in the vast majority of our markets, with both rates and occupancy up. We saw strong growth in both large markets such as New York, San Francisco, Miami and Tampa and in smaller markets such as Albuquerque and Chattanooga. Top domestic advertising categories for us during 2003 were business and consumer services, media and entertainment and amusement.

Direct operating expenses increased $36.1 million, or 9%, during 2003 as compared to 2002 primarily as a result of The Ackerley Group, which contributed approximately $19.3 million. The remaining $16.8 million of the increase is attributable to direct production and site lease rent expenses relative to the growth in revenue. SG&A in 2003 increased $3.4 million, or 2%, primarily from $2.6 million related to bonus and commission expenses relative to the growth in revenue.

Depreciation and amortization increased approximately $14.3 million in 2003 as compared to 2002. The increase is primarily attributable to increased display takedowns in 2003 as compared to 2002 of

Table of Contents

approximately $12.2 million and our acquisition of The Ackerley Group in June 2002, which contributed approximately $2.4 million, offset by a decline in depreciation and amortization of $0.3 million.

## International Results of Operations

| (In thousands) | Nine Months Ended September 30, | | Year Ended December 31, | | |
| | 2005 | 2004 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Revenues | $ 1,044,822 | $ 960,564 | $ 1,354,951 | $ 1,168,221 | $ 948,148 |
| Direct operating expenses | 629,185 | 576,801 | 793,630 | 698,311 | 558,824 |
| Selling, general and administrative expenses | 273,156 | 231,350 | 326,447 | 295,314 | 234,644 |
| Depreciation and amortization | 163,214 | 147,331 | 201,597 | 185,403 | 156,948 |
| Operating income (loss) | $ (20,733) | $ 5,082 | $ 33,277 | $ (10,807) | $ (2,268) |

Revenues increased approximately $84.3 million, or 9%, during the nine months ended September 30, 2005 as compared to the same period in 2004. The growth includes approximately $33.9 million from foreign exchange increases. Also included in the nine months ended September 30, 2005 is approximately $22.9 million from our consolidation of Clear Media, which we acquired during the third quarter of 2005 and had previously accounted for as an equity method investment. Partially offsetting this increase is an approximately $14.5 million revenue decline from our media products in France. Our revenue growth was attributable to our street furniture and transit revenues.

Direct operating expenses grew $52.4 million, or 9%, during the nine months ended September 30, 2005 as compared to the same period of the prior year. Included in these results is approximately $20.0 million from increases in foreign exchange as compared to the same period of 2004. In addition to foreign exchange increases, our direct operating expenses grew approximately $32.4 million, principally from an approximately $21.7 million increase in fixed rent and minimum annual guarantees and approximately $8.7 million from our consolidation of Clear Media, partially offset by a decline of approximately $1.6 million of various other expenses. Our SG&A grew approximately $41.8 million, or 18%, during the nine months ended September 30, 2005 as compared to the same period of the prior year. Included in these results is approximately $8.7 million from increases in foreign exchange as compared to the same period of 2004. In addition to foreign exchange increases, SG&A grew approximately $33.1 million, principally from an approximately $26.6 million of costs related to the restructuring of our business in France and approximately $3.8 million from our consolidation of Clear Media.

Depreciation and amortization expense increased approximately $15.9 million during the first nine months of 2005 as compared to the same period of the prior year, due primarily to increases in foreign exchange.

During 2004, revenues increased approximately $186.7 million, or 16%, over 2003, including approximately $128.6 million from foreign exchange increases. Street furniture sales in the United Kingdom, Belgium, Australia, New Zealand and Denmark were the leading contributors to our revenue growth. We saw strong demand for our street furniture inventory, enabling us to realize an increase in the average revenues per display. Our billboard revenues increased slightly as a result of an increase in average revenues per display. Also contributing to the increase was approximately $10.4 million related to the consolidation of our outdoor advertising joint venture in Australia during the second quarter of 2003, which we had previously accounted for under the equity method of accounting. Tempering our 2004 results were a difficult competitive environment for billboard sales in the United Kingdom and challenging market conditions for all of our products in France.

Direct operating expenses increased $95.3 million, or 14%, during 2004 as compared to 2003. Included in the increase is approximately $76.0 million from foreign exchange increases. In addition to foreign exchange, direct operating expenses grew approximately $19.3 million during this period, principally from higher site lease rent expense and approximately $6.2 million from the consolidation of a joint venture in

55

Table of Contents

Australia, which was previously accounted for under the equity method. SG&A increased $31.1 million, or 11%, during 2004 as compared to 2003. Included in the increase is approximately $31.3 million from foreign exchange increases. After the effect of foreign exchange increases, SG&A declined approximately $0.2 million. The decline is primarily due to a restructuring charge of $13.8 million in France taken during 2003, partially offset by a restructuring charge of $4.1 million in Spain taken during 2004, $2.6 million associated with the consolidation of a joint venture, as well as increased commission expenses associated with the increase in revenue during 2004.

Depreciation and amortization increased approximately $16.2 million in 2004 as compared to 2003 primarily attributable to foreign exchange increases.

During 2003, revenues increased approximately $220.1 million, or 23%, over 2002, including approximately $169.9 million from foreign exchange increases. Revenue growth was spurred by our transit displays and street furniture inventory. This growth was due to an increase in displays and average revenues per display primarily from our street furniture products. Strong markets for our street furniture inventory were Australia, Norway and the United Kingdom. This revenue increase was slightly offset by a decline in our billboard revenues.

Direct operating expenses increased $139.5 million, or 25%, during 2003 as compared to 2002. Included in the increase is approximately $102.0 million from foreign exchange increases. In addition to foreign exchange, direct operating expenses increased approximately $37.5 million during this period principally from higher site lease rent expense associated with the increase in revenue. SG&A increased $60.7 million, or 26%, during 2003 as compared to 2002. Included in the increase is approximately $43.2 million from foreign exchange increases. In addition to foreign exchange, SG&A grew approximately $17.5 million during this period principally from a restructuring charge in France of approximately $13.8 million taken during 2003.

Depreciation and amortization increased approximately $28.5 million in 2003 as compared to 2002 primarily attributable to approximately $25.0 million from foreign exchange increases.

### *Reconciliation of Segment Operating Income (Loss)*

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| (In thousands) | 2005 | 2004 | 2004 | 2003 | 2002 |
| Domestic outdoor | $ 263,448 | $ 184,808 | $ 263,772 | $ 215,485 | $ 174,381 |
| International outdoor | (20,733) | 5,082 | 33,277 | (10,807) | (2,268) |
| Corporate | (39,397) | (39,451) | (53,770) | (54,233) | (52,218) |
| Combined operating income | $ 203,318 | $ 150,439 | $ 243,279 | $ 150,445 | $ 119,895 |

## USE OF OIBDAN

In addition to operating income, we evaluate segment and combined performance based on other factors, one primary measure of which is operating income (loss) before depreciation, amortization and non-cash compensation expense, which we refer to as OIBDAN. We use OIBDAN as a measure of the operational strengths and performance of our business and not as a measure of liquidity. However, a limitation of the use of OIBDAN as a performance measure is that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in our business. Accordingly, OIBDAN should be considered in addition to, and not as a substitute for, operating income (loss), net income (loss) and other measures of financial performance reported in accordance with U.S. GAAP. Furthermore, this measure may vary among other companies; thus, OIBDAN as presented below may not be comparable to similarly titled measures of other companies.

We believe OIBDAN is useful to investors and other external users of our financial statements in evaluating our operating performance because it is widely used in the outdoor advertising industry to

56

Table of Contents

measure a company's operating performance and it helps investors more meaningfully evaluate and compare the results of our operations from period to period and with those of other companies in the outdoor advertising industry (to the extent the same components of OIBDAN are used), in each case without regard to items such as non-cash depreciation and amortization and non-cash compensation expense, which can vary depending upon the accounting method used and the book value of assets.

Our management uses OIBDAN (i) as a measure for planning and forecasting overall and individual expectations and for evaluating actual results against such expectations, (ii) as a basis for incentive bonuses paid to our executive officers and our branch managers and (iii) in presentations to our board of directors to enable them to have the same consistent measurement basis of operating performance used by management.

The following table presents a reconciliation of OIBDAN to operating income, which is a GAAP measure of our operating results:

| | Nine Months Ended September 30, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| (In thousands) | 2005 | | 2004 | 2004 | 2003 | 2002 |
| | (Unaudited) | | (Unaudited) | | | |
| *Reconciliation of OIBDAN to operating income (loss):* | | | | | | |
| **Combined:** | | | | | | |
| OIBDAN | $ 494,063 | $ | 439,331 | $ 631,612 | $ 530,085 | $ 456,790 |
| Depreciation and amortization | 290,233 | | 288,810 | 388,217 | 379,640 | 336,895 |
| Non-cash compensation | 512 | | 82 | 116 | — | — |
| Operating income | $ 203,318 | $ | 150,439 | $ 243,279 | $ 150,445 | $ 119,895 |
| **Domestic:** | | | | | | |
| OIBDAN | $ 390,867 | $ | 326,359 | $ 450,494 | $ 409,722 | $ 354,328 |
| Depreciation and amortization | 127,019 | | 141,479 | 186,620 | 194,237 | 179,947 |
| Non-cash compensation | 400 | | 72 | 102 | — | — |
| Operating income | $ 263,448 | $ | 184,808 | $ 263,772 | $ 215,485 | $ 174,381 |
| **International:** | | | | | | |
| OIBDAN | $ 142,593 | $ | 152,423 | $ 234,888 | $ 174,596 | $ 154,680 |
| Depreciation and amortization | 163,214 | | 147,331 | 201,597 | 185,403 | 156,948 |
| Non-cash compensation | 112 | | 10 | 14 | — | — |
| Operating income (loss) | $ (20,733) | $ | 5,082 | $ 33,277 | $ (10,807) | $ (2,268) |

Our combined OIBDAN increased $54.7 million, or 12%, for the nine months ended September 30, 2005 as compared to the same period of 2004 primarily as a result of approximately $64.5 million from our domestic operations driven by increased revenues across our domestic inventory. Included in the increase is approximately $5.2 million from foreign exchange increases. In addition to the foreign exchange increase, our international segment's OIBDAN declined approximately $15.0 million primarily from approximately $26.6 million related to restructuring expenses in France during the third quarter of 2005, partially offset by an OIBDAN increase of $10.4 million from our consolidation of Clear Media.

Our combined OIBDAN increased $101.5 million, or 19%, for the year ended December 31, 2004 compared to the same period of 2003. Our domestic segment contributed $40.8 million and our international segment contributed $60.3 million, including approximately $21.3 million from foreign exchange increases, while our corporate expenses decreased during 2004 by $0.4 million. The domestic OIBDAN growth was attributable to increased bulletin and poster sales while international OIBDAN growth was led by increased street furniture sales. We experienced OIBDAN margin expansion during

57

Table of Contents

2004 compared to 2003 primarily related to a $13.8 million restructuring charge taken in France during the second quarter of 2003.

Our combined OIBDAN increased $73.3 million, or 16%, for the year ended December 31, 2003 compared to the same period of 2002. Our domestic segment contributed $55.4 million and our international segment contributed $19.9 million, while our corporate expenses increased during 2003 by $2.0 million. Our domestic OIBDAN growth was attributable to bulletin sales and our domestic OIBDAN margin increased partially as a result of The Ackerley Group. The Ackerley Group contributed $16.1 million in OIBDAN and had a higher OIBDAN margin than our overall domestic OIBDAN margin for the first six months of 2003. Our combined OIBDAN margin decreased during 2003 compared to 2002 primarily from a $13.8 million restructuring charge taken in France during the second quarter of 2003. Included in OIBDAN for the year ended December 31, 2003 is approximately $24.7 million from foreign exchange increases over the same period of 2002.

## FINANCIAL CONDITION AND LIQUIDITY

### Financial Condition as of September 30, 2005

As of September 30, 2005, we had approximately $4.2 billion of debt, approximately $91.7 million of cash and cash equivalents and approximately $88.3 million of owner's equity. On August 2, 2005 we distributed an intercompany note in the original principal amount of $2.5 billion as a dividend on our common stock, which note was ultimately distributed to Clear Channel Communications. We intend to use all of the net proceeds from this offering to repay a portion of the intercompany indebtedness owed to Clear Channel Communications.

### Financial Condition as of December 31, 2004

As of December 31, 2004, we had approximately $1.6 billion of debt, approximately $37.9 million of cash and equivalents and approximately $2.7 billion of owner's equity. This compares to approximately $1.7 billion of debt, approximately $34.1 million of cash and equivalents and approximately $2.8 billion of owner's equity as of December 31, 2003.

### Cash Flows

The following table summarizes our historical cash flows. The financial data for the years ended December 31, 2004 and 2003 have been derived from our audited financial statements included elsewhere in this prospectus. The financial data for the nine months ended September 30, 2005 and 2004 are unaudited and are derived from our interim financial statements included elsewhere in this prospectus.

| (In thousands) | Nine Months Ended September 30, | | Year Ended December 31, | |
| | 2005 | 2004 | 2004 | 2003 |
| --- | --- | --- | --- | --- |
| Cash provided by (used in): | | | | |
| Operating activities | $ 336,637 | $ 329,893 | $ 492,495 | $ 433,459 |
| Investing activities | $ (223,189) | $ (227,386) | $ (310,658) | $ (230,162) |
| Financing activities | $ (48,154) | $ (95,759) | $ (182,006) | $ (222,491) |

#### Operating Activities

*Nine Months Ended September 30, 2005 as Compared to Nine Months Ended September 30, 2004*

Cash provided by operations was approximately $336.6 million for the nine months ended September 30, 2005, compared to cash provided by operations of approximately $329.9 million for the nine months ended September 30, 2004. The approximately $6.7 million increase relates primarily to changes in working capital items.

Table of Contents

*Year Ended December 31, 2004 as Compared to Year Ended December 31, 2003*

Cash provided by operations was approximately $492.5 million for the year ended December 31, 2004, as compared to cash provided by operations of approximately $433.5 million for the year ended December 31, 2003. The change in cash provided by operations resulted primarily from an increase in income before cumulative effect of a change in accounting principle of approximately $42.5 million.

### Investing Activities

*Nine Months Ended September 30, 2005 as Compared to Nine Months Ended September 30, 2004*

Cash used in investing activities was approximately $223.2 million for the nine months ended September 30, 2005 as compared to approximately $227.4 million for the nine months ended September 30, 2004. The $4.2 million change relates primarily to the approximately $7.5 million used to purchase an additional interest in Clear Channel Independent, a nonconsolidated affiliate in South Africa, offset by $12.1 million in cash received on the sale of our investment in SBS Broadcasting, Inc., both occurring in 2004. We purchased approximately $12.8 million more of property plant and equipment in 2005.

*Year Ended December 31, 2004 as Compared to Year Ended December 31, 2003*

Cash used in investing activities was approximately $310.7 million for the year ended December 31, 2004, as compared to approximately $230.2 million for the year ended December 31, 2003. The increase in cash used in investing activities primarily related to an increase in acquisition activity during 2004. In 2004, we acquired Medallion Taxi Media for $31.6 million and acquired advertising display faces for $60.8 million.

### Financing Activities

*Nine Months Ended September 30, 2005 as Compared to Nine Months Ended September 30, 2004*

Cash used in financing activities was approximately $48.2 million for the nine months ended September 30, 2005, as compared to cash used in financing activities of approximately $95.8 million for the nine months ended September 30, 2004. Included in cash flow from financing activities is changes in the "Due from Clear Channel Communications" account which relates to cash transfers between our domestic operations and Clear Channel Communications. For the nine months ended September 30, 2005 we had a net transfer of cash to Clear Channel Communications of approximately $59.5 million compared to a net transfer of cash to Clear Channel Communications of approximately $86.0 million for the nine months ended September 30, 2004. The net amount transferred is significantly affected, among other things, by the change in our domestic operations operating income and cash flow for the relevant period. The "Due from Clear Channel Communications" account has grown during the relevant periods primarily as a result of increases in our operating income.

*Year Ended December 31, 2004 as Compared to Year Ended December 31, 2003*

Cash used in financing activities was approximately $182.0 million for the year ended December 31, 2004, as compared to approximately $222.5 million for the year ended December 31, 2003. The decline is partially the result of decreased financing needs from our credit facility. Additionally, for the year ended December 31, 2004 we had a net transfer of cash to Clear Channel Communications of approximately $148.2 million compared to a net transfer of cash to Clear Channel Communications of approximately $154.4 million for the year ended December 31, 2003.

Table of Contents

## Liquidity

### Sources of Capital

Our primary sources of liquidity and capital resources are cash flows generated from our operations, availability of up to $150.0 million under a revolving credit facility sublimit for use in our international operations through Clear Channel Communications, funding through a cash management note with Clear Channel Communications and available cash and cash equivalents.

Management believes that future funds generated from our operations and available borrowing capacity of up to $150.0 million under the sub-limit of the Clear Channel Communications revolving credit facility discussed below will be sufficient to fund our debt service requirements, working capital requirements, capital expenditure requirements and the remaining one-time costs associated with this offering for a period of at least 18 months. However, our ability to continue to fund these items and to reduce debt may be affected by general economic, financial, competitive, legislative and regulatory factors, as well as other industry-specific factors.

Our short and long term cash requirements consist of minimum annual guarantees for our street furniture contracts, operating leases and capital expenditures. Minimum annual guarantees and operating lease requirements are included in our direct operating expenses, which historically have been satisfied by cash flows from operations. For 2005, we are committed to $378.3 million and $177.6 million for minimum annual guarantees and operating leases, respectively. Our capital expenditures were $176.1 million, $205.1 million and $290.2 million for 2004, 2003 and 2002, respectively, and have historically been satisfied by cash flow from operations. Our long-term commitments for minimum annual guarantees, operating leases and capital expenditure requirements are included in "— Contractual and Other Obligations," below. Our cash flow from operations was $492.5 million, $433.5 million, and $320.2 million for 2004, 2003 and 2002, respectively. Certain of our international subsidiaries have the ability to borrow under a $150.0 million sub-limit of the Clear Channel Communications revolving credit facility discussed below under "— Bank Credit Facility," to the extent Clear Channel Communications has not already borrowed against this capacity. At September 30, 2005, approximately $100.3 million was available for future borrowings under this facility.

As of September 30, 2005 and December 31, 2004 and 2003, we had the following debt outstanding, cash and cash equivalents and amounts due from Clear Channel Communications:

| | September 30, 2005 | | December 31, 2004 | | 2003 |
|---|---|---|---|---|---|
| (In millions) | | | | | |
| Bank credit facility | $ 49.7 | $ | 23.9 | $ | 50.1 |
| Debt with Clear Channel Communications | 3,963.0 | | 1,463.0 | | 1,463.0 |
| Other long-term debt | 199.4 | | 152.4 | | 156.9 |
| Total debt | 4,212.1 | | 1,639.3 | | 1,670.0 |
| Less: cash and cash equivalents | 91.7 | | 37.9 | | 34.1 |
| Less: Due from Clear Channel Communications | 362.2 | | 302.6 | | 154.4 |
| | $ 3,758.2 | $ | 1,298.8 | $ | 1,418.5 |

*Bank Credit Facility.* In addition to cash flows from operations, a primary source of our liquidity is through borrowings under a $150.0 million sub-limit included in Clear Channel Communications' five-year, multicurrency $1.75 billion revolving credit facility. Certain of our international subsidiaries may borrow under the sub-limit to the extent Clear Channel Communications has not already borrowed against this capacity and is in compliance with its covenants under the credit facility. The interest rate on outstanding balances under the credit facility is based upon LIBOR or, for Euro denominated borrowings, EURIBOR plus, in each case, a margin. At September 30, 2005, the outstanding balance on the sub-limit was approximately $49.7 million, and approximately $100.3 million was available for future borrowings,

Table of Contents

with the entire balance to be paid on July 12, 2009. At September 30, 2005, interest rates on borrowings under this credit facility ranged from 3.1% to 6.0%.

*Debt with Clear Channel Communications.* In 2003, two intercompany notes were issued to Clear Channel Communications in the total original principal amount of approximately $1.5 billion. The first intercompany note in the original principal amount of approximately $1.4 billion matures on December 31, 2017, may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 10%. The second intercompany note in the original principal amount of $73.0 million matures on December 31, 2017, may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 9%. We intend to use all of the net proceeds of this offering, along with our balance in the "Due from Clear Channel Communications" account, to repay a portion of the outstanding balances of the $1.4 billion and $73.0 million intercompany notes. Any remaining balances will be otherwise capitalized by Clear Channel Communications.

On August 2, 2005, we distributed a third intercompany note issued by our wholly-owned subsidiary to us in the original principal amount of $2.5 billion as a dividend on our common stock, which note was subsequently distributed as a dividend in a series of transfers to Clear Channel Communications. This note matures on August 2, 2010, may be prepaid in whole at any time, or in part from time to time. The note accrues interest at a variable per annum rate equal to the weighted average cost of debt for Clear Channel Communications, calculated on a monthly basis. This note is mandatorily payable upon a change of control of us and, subject to certain exceptions, all proceeds from debt or equity raised by us must be used to prepay such note. At September 30, 2005, the interest rate on the $2.5 billion intercompany note was 5.7%. See "Use of Proceeds," "Arrangements Between Clear Channel Communications and Us" and "Description of Indebtedness."

Our working capital requirements and capital for our general corporate purposes, including acquisitions and capital expenditures, historically have been satisfied as part of the corporate-wide cash management policies of Clear Channel Communications. After this offering, our working capital requirements and capital for our general corporate purposes may be provided to us by Clear Channel Communications, in its sole discretion, pursuant to a cash management note issued by us to Clear Channel Communications. See " — Cash and cash equivalents; cash management policies," below. Without the opportunity to obtain financing from Clear Channel Communications, we may need to obtain additional financing from banks, or through public offerings or private placements of debt, strategic relationships or other arrangements at some future date. Management currently believes that we could raise the funds if needed given our credit profile. Additionally, we will have publicly traded stock that management believes could be used as a source to raise capital through public or private placements of our equity securities. Subject to certain exceptions, the first $2.5 billion of such debt or equity proceeds (plus an amount equal to accrued interest thereon) would be required to be used to prepay the $2.5 billion intercompany note, unless such requirement is waived by Clear Channel Communications.

*Other long-term debt.* Other long-term debt consists primarily of loans with international banks and other types of debt. At September 30, 2005, approximately $199.4 million was outstanding as other long-term debt.

*Cash and cash equivalents; cash management policies.* Pursuant to the Corporate Services Agreement to be entered into between Clear Channel Communications and us, Clear Channel Communications will be providing us with cash management services to assist us in managing our excess operating cash. These services include:

• managing our daily cash position and determining our liquidity needs;

• administering borrowings and repayments under the revolving credit facility available to our international operations;

• establishing cash management systems and procedures that help minimize investment in non-earning cash resources while providing adequate liquidity;

61

**Table of Contents**

- initiating all electronic funds transfers;

- providing bank administration for all domestic bank accounts and for all international accounts established by a domestic subsidiary;

- administering on-line bank reporting systems; and

- processing requests for cashier checks.

As part of the cash management services to be provided to us, on a daily basis, cash from our domestic operations will be transferred to a concentration account maintained by us. The cash will consist of money received by, available funds transferred by wire to, and the collection of good funds on checks and other orders remitted to, us. Pending receipt of good funds on checks and other orders remitted to us, such items will be maintained in lockboxes to be maintained by us.

In addition, on a daily basis, cash will be transferred from our concentration account to our disbursement account, from which our then due accounts payable and payroll obligations will be discharged. If, after cash is transferred to the disbursement account, there remains a balance in our concentration account, then that amount will be transferred to a master account maintained by Clear Channel Communications and either invested or subsequently disbursed by Clear Channel Communications for its general corporate purposes. If the cash in our concentration account is not sufficient to discharge our obligations for the corresponding day, then Clear Channel Communications may advance funds to us by transferring cash from its master account to our concentration account in an amount, which when added to the amount available in that concentration account, would discharge those daily obligations. We do not have a commitment from Clear Channel Communications to advance funds to us, and we will have no access to the cash transferred from our concentration account to the master account of Clear Channel Communications. Our claim in relation to cash transferred from our concentration account to Clear Channel Communications will be based on the net cash balances from time to time owed to us.

At the conclusion of each day, the net cash position between Clear Channel Communications and us will be determined by Clear Channel Communications. We will have a daily net positive cash position if cash has been transferred from our concentration account to the account maintained by Clear Channel Communications, and a daily net negative cash position will exist if Clear Channel Communications has had to advance funds to our concentration account. The records of Clear Channel Communications will reflect the net cash balance between Clear Channel Communications and us, which, if owed to us, will be noted in our financial statements as "Due from Clear Channel Communications" or, if owed by us, will be noted in our financial statements as "Due to Clear Channel Communications." The cash management note from us to Clear Channel Communications and the cash management note from Clear Channel Communications to us will evidence those respective obligations. Each of the notes will be a demand obligation. Interest on the cash management note owed by us will accrue on the daily net negative cash position at a per annum rate based on the average one-month LIBOR rate plus a percentage that corresponds to the percentage paid by Clear Channel Communications on LIBOR-based borrowings made by it under its corporate revolver facility. Interest on the cash management note owed by Clear Channel Communications will accrue on the daily net positive cash position at a per annum rate based on the average one-month generic treasury bill rate for the applicable period. The average one-month LIBOR rate and the average one-month generic treasury bill rate will correspond to the applicable respective rates from time to time published by Bloomberg financial services. If Clear Channel Communications were to become insolvent, we would be an unsecured creditor like other unsecured creditors of Clear Channel Communications and could experience a liquidity shortfall.

Unlike the management of cash from our domestic operations, the amount of cash that is transferred from our foreign operations to Clear Channel Communications will be determined on a basis mutually agreeable to us and Clear Channel Communications, and not on a pre-determined basis. In arriving at such mutual agreement, the reasonably foreseeable cash needs of our foreign operations will be evaluated before a cash amount is to be considered as an excess or surplus amount for transfer to Clear Channel

**Table of Contents**

Communications. When an amount of excess cash from our foreign operations is agreed upon, any proposed transfer of that excess cash will be further subject to a consideration of the effects of repatriating all or any portion of that amount. Excess cash from our foreign operations which is transferred to Clear Channel Communications will be subject to the record-keeping procedures and note arrangements utilized for cash transferred from our domestic operations to Clear Channel Communications.

For so long as Clear Channel Communications maintains a significant interest in us, a deterioration in the financial condition of Clear Channel Communications could increase our borrowing costs or impair our access to the capital markets because of our reliance on Clear Channel Communications for availability under its revolving credit facility. In addition, because the interest rate we pay on our $2.5 billion promissory note is based on the weighted average cost of debt for Clear Channel Communications, any such deterioration would likely result in an increase in Clear Channel Communications' cost of debt and in our interest rate. To the extent we cannot pass on our increased borrowing costs to our clients, our profitability, and potentially our ability to raise capital, could be materially affected. Also, so long as Clear Channel Communications maintains a significant interest in us, pursuant to the Master Agreement between Clear Channel Communications and us, Clear Channel Communications will have the ability to limit our ability to incur debt or issue equity securities, which could adversely affect our ability to meet our liquidity needs. In addition, the $2.5 billion intercompany note requires us to prepay it in full upon a change of control (as defined in the note), and, upon our issuances of equity and incurrence of debt, subject to certain exceptions, to prepay the note in the amount of net proceeds received from such events. See "Risk Factors — Risks Related to Our Business" and "Arrangements Between Clear Channel Communications and Us."

### Uses of Capital

Our primary uses of capital are funding our working capital liabilities, debt service, acquisitions and capital expenditures. Our working capital liabilities are funded through cash flows from operations. Cash paid for interest during the years ended December 31, 2004, 2003 and 2002 was approximately $175.4 million, $198.3 million and $268.0 million, respectively.

We have entered into certain agreements relating to acquisitions that provide for purchase price adjustments and other future contingent payments based on the financial performance of the acquired company. We will continue to accrue additional amounts related to such contingent payments if and when it is determinable that the applicable financial performance targets will be met. The aggregate of these contingent payments, if performance targets are met, would not significantly impact our financial position or results of operations. The following is a summary of our acquisition activity for the years ended December 31, 2004, 2003 and 2002:

*2004 Acquisitions.* In September 2004, we acquired Medallion Taxi Media, Inc. for approximately $31.6 million. In addition, during 2004 we acquired display faces for approximately $60.8 million in cash and acquired equity interests in international outdoor companies for approximately $2.5 million in cash. We also exchanged advertising assets, valued at approximately $23.7 million, for other advertising assets valued at approximately $32.3 million.

*2003 Acquisitions.* During 2003 we acquired display faces for approximately $28.3 million in cash. We also acquired investments in nonconsolidated affiliates for approximately $10.7 million in cash and acquired an additional 10% interest in a subsidiary for approximately $5.1 million in cash.

*2002 Acquisitions.* In June 2002 we acquired The Ackerley Group. The transaction was funded by approximately $26.3 million of our operating cash and a non-cash capital contribution from Clear Channel Communications of approximately $612.8 million. In addition, we acquired display faces for approximately $126.3 million in cash and acquired investments in nonconsolidated affiliates for approximately $2.1 million in cash.

Table of Contents

*Capital Expenditures.* Our capital expenditures have consisted of the following:

| (In millions) | Nine Months Ended September 30, | | Year Ended December 31, | | |
| | 2005 | 2004 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Non-revenue producing | $ 53.0 | $ 44.5 | $ 70.1 | $ 63.4 | $ 81.0 |
| Revenue producing | 77.5 | 73.2 | 106.0 | 141.7 | 209.2 |
| Total capital expenditures | $ 130.5 | $ 117.7 | $ 176.1 | $ 205.1 | $ 290.2 |

We define non-revenue producing capital expenditures as those expenditures that are required on a recurring basis. Revenue producing capital expenditures are discretionary capital investments for new revenue streams, similar to an acquisition. Our capital expenditures have been declining since 2002, primarily as a result of fewer revenue producing capital expenditures in our international segment. Due to successful bidding on street furniture contracts in prior years, we needed to supply the street furniture required under the contracts. We have not been as actively bidding on international street furniture contracts since 2002 and therefore have not had the capital needs associated with these contracts.

Part of our long-term strategy is to pursue the technology of electronic displays, including flat screens, LCDs and LEDs, as alternatives to traditional methods of displaying our clients' advertisements. We are currently performing limited tests of these technologies in certain markets. We believe that cash flow from operations will be sufficient to fund these expenditures because we expect enhanced margins through: (i) lower cost of production as the advertisements will be digital and controlled by a central computer network, (ii) decreased down time on displays because the advertisements will be digitally changed rather than manually posted paper or vinyl on the face of the display, and (iii) incremental revenue through more targeted and time specific advertisements allowing us to sell more advertisements on a single display.

## Covenant Compliance

The newly issued $2.5 billion intercompany note requires us to comply with various negative covenants, including restrictions on the following activities: incurring consolidated funded indebtedness (as defined in the note), excluding intercompany indebtedness, in a principal amount in excess of $400.0 million at any one time outstanding; creating liens; making investments; entering into sale and leaseback transactions (as defined in the note), which when aggregated with consolidated funded indebtedness secured by liens, will not exceed an amount equal to 10% of our total consolidated shareholder's equity (as defined in the note) as shown on our most recently reported annual audited consolidated financial statements; disposing of all or substantially all of our assets; entering into mergers and consolidations; declaring or making dividends or other distributions; repurchasing our equity; and entering into transactions with our affiliates. In addition, the note requires us to prepay it in full upon a change of control. The note defines a change of control to occur when Clear Channel Communications ceases to control (i) directly or indirectly, more than 50% of the aggregate voting equity interests of us, our operating subsidiary or our respective successors or assigns, or (ii) the ability to elect a majority of the board of directors of us, our operating subsidiary or our respective successors or assigns. Upon our issuances of equity and incurrences of debt, subject to certain exceptions, we are also required to prepay the note in the amount of the net proceeds received by us from such events. Generally, the following constitute events of default under the $2.5 billion intercompany note: any principal or accrued interest on the principal remains unpaid when due on the stated maturity date (as defined in the note) or upon the occurrence of a mandatory prepayment event (as defined in the note); any accrued interest or accrued expenses remain unpaid three days after the interest payment date (as defined in the note); any provision in the note or any related security document that represents a right or remedy ceases to be binding on our operating subsidiary or available to us; any representation or warranty made in the note or any related security document is untrue or inaccurate in any material respect; breaches of covenants or agreements or the occurrence of an event of default in the note or any related security document; defaults by us in the payment of indebtedness in excess of $25.0 million, a final judgment or order in excess of $25.0 million

Table of Contents

against us or forfeiture of property by us having a value in excess of $25.0 million; or the declaration by us or against us of bankruptcy or insolvency.

Certain of our international subsidiaries that are offshore borrowers may borrow up to $150.0 million for use in our international operations under a sub-limit of the approximately $1.8 billion revolving credit facility of Clear Channel Communications so long as Clear Channel Communications remains in compliance with its covenants under the facility and does not otherwise borrow against such capacity. The significant covenants contained in the credit facility relate to leverage and interest coverage (as defined in the credit facility). The leverage ratio covenant requires Clear Channel Communications to maintain a ratio of consolidated funded indebtedness to operating cash flow (as defined by the credit facility) of less than 5.25x. The interest coverage covenant requires Clear Channel Communications to maintain a minimum ratio of operating cash flow to interest expense (as defined by the credit facility) of 2.50x. Generally, the following constitute events of default under the $1.8 billion revolving credit facility: failure to pay borrowings and interest when they become due; failure to perform or observe covenants contained in the credit facility; failure to perform or observe any covenant contained in any other loan document; incorrect or misleading representations and warranties made in connection with the credit facility agreement; default on any other indebtedness greater than $200 million; the declaration by Clear Channel Communications or against Clear Channel Communications of bankruptcy or insolvency; failure to pay debts as they become due; a final judgment for the payment of money exceeding $250 million; invalidity of loan documents at any time after their execution and delivery; change of control; and failure to comply with the Communications Act or any rule or regulation promulgated by the Federal Communications Commission. A change of control occurs under the $1.8 billion credit facility generally when any person or group acquires more than 50% of the voting interest of Clear Channel Communications or when there has been a turnover of a majority of the board of directors of Clear Channel Communications during a 24 consecutive month period.

There are no significant covenants or events of default contained in the $1.4 billion and $73.0 million intercompany notes, the cash management note issued by Clear Channel Communications to us or the cash management note issued by us to Clear Channel Communications.

## Contractual and Other Obligations

### Firm Commitments

In addition to the scheduled maturities on our debt, we have future cash obligations under various types of contracts. We lease office space, certain equipment and the majority of the land occupied by our advertising structures under long-term operating leases. Some of our lease agreements contain renewal options and annual rental escalation clauses (generally tied to the consumer price index), as well as provisions for our payment of utilities and maintenance.

We have minimum franchise payments associated with noncancelable contracts that enable us to display advertising on such media as buses, taxis, trains, bus shelters and terminals. The majority of these contracts contain rent provisions that are calculated as the greater of a percentage of the relevant advertising revenues or a specified guaranteed minimum annual payment.

65

Table of Contents

The scheduled maturities of our credit facility, other long-term debt outstanding, future minimum rental commitments under noncancelable lease agreements, minimum payments under other noncancelable contracts, minimum annual guarantees and capital expenditures commitments as of December 31, 2004 are as follows:

| | | | | Payments Due by Period | | | | | |
| | Total | | 2005 | | 2006-2007 | | 2008-2009 | | 2010 and Thereafter |
|---|---|---|---|---|---|---|---|---|---|
| **(In thousands)** | | | | | | | | | |
| Revolving credit facility | $ | 23,938 | $ | — | $ | — | $ | 23,938 | — |
| Debt with Clear Channel Communications | | 1,463,000 | | — | | — | | — | $ 1,463,000 |
| Other long-term debt | | 152,442 | | 146,268 | | 4,569 | | 832 | 773 |
| Minimum annual guarantees | | 1,658,599 | | 378,313 | | 471,406 | | 282,702 | 526,178 |
| Noncancelable operating leases | | 1,254,014 | | 177,567 | | 290,827 | | 218,027 | 567,593 |
| Capital expenditure commitments | | 223,716 | | 119,687 | | 63,065 | | 25,222 | 15,742 |
| Noncancelable contracts | | 8,953 | | 4,215 | | 1,604 | | 883 | 2,251 |
| Total firm commitments and outstanding debt | $ | 4,784,662 | $ | 826,050 | $ | 831,471 | $ | 551,604 | $ 2,575,537 |

On a pro forma basis, after giving effect to the application of the proceeds of this offering and the distribution of the $2.5 billion intercompany note, as if such transactions had occurred at January 1, 2004, our contractual obligations would have consisted of the following:

| | | | | Payments Due by Period | | | | | |
| | Total | | 2005 | | 2006-2007 | | 2008-2009 | | 2010 and Thereafter |
|---|---|---|---|---|---|---|---|---|---|
| **(In thousands)** | | | | | | | | | |
| Revolving credit facility | $ | 23,938 | $ | — | $ | — | $ | 23,938 | — |
| Debt with Clear Channel Communications | | 2,500,000 | | — | | — | | — | $ 2,500,000 |
| Other long-term debt | | 152,442 | | 146,268 | | 4,569 | | 832 | 773 |
| Minimum annual guarantees | | 1,658,599 | | 378,313 | | 471,406 | | 282,702 | 526,178 |
| Noncancelable operating leases | | 1,254,014 | | 177,567 | | 290,827 | | 218,027 | 567,593 |
| Capital expenditure commitments | | 223,716 | | 119,687 | | 63,065 | | 25,222 | 15,742 |
| Noncancelable contracts | | 8,953 | | 4,215 | | 1,604 | | 883 | 2,251 |
| Total firm commitments and outstanding debt | $ | 5,821,662 | $ | 826,050 | $ | 831,471 | $ | 551,604 | $ 3,612,537 |

## SEASONALITY

Typically, both our domestic and international segments experience their lowest financial performance in the first quarter of the calendar year, with international typically experiencing a loss from operations in this period. Our domestic segment typically experiences consistent performance in the remainder of our calendar year. Our international segment typically experiences its strongest performance in the second and fourth quarters of our calendar year. We expect this trend to continue in the future. See "Risk Factors — We have incurred net losses and may experience future net losses which could adversely affect our stock price."

## MARKET RISK MANAGEMENT

We are exposed to market risks arising from changes in market rates and prices, including movements in foreign currency exchange rates and interest rates.

**Table of Contents**

**Foreign Currency Risk**

We have operations in countries throughout the world. The financial results of our international operations are measured in their local currencies, except in the hyperinflationary countries in which we operate. As a result, our financial results could be affected by factors such as changes in foreign currency exchange rates or weak economic conditions in the international markets in which we operate. We believe we mitigate a small portion of our exposure to international currency fluctuations with a natural hedge through borrowings in currencies other than the U.S. dollar. Our international operations reported a net loss of approximately $35.0 million for the nine months ended September 30, 2005. We estimate that a 10% change in the value of the U.S. dollar relative to foreign currencies would have changed our net income for the nine months ended September 30, 2005 by approximately $3.5 million.

This analysis does not consider the implication such currency fluctuations could have on the overall economic activity that could exist in such an environment in the United States or the foreign countries or on the results of operations of these foreign entities.

**Interest Rate Risk**

We had approximately $4.2 billion total debt outstanding as of September 30, 2005, of which $2.5 billion was variable rate debt.

Based on the amount of our floating-rate debt as of September 30, 2005, each 50 basis point increase or decrease in interest rates would increase or decrease our annual interest expense and cash outlay by approximately $12.5 million. This potential increase or decrease is based on the simplified assumption that the level of floating-rate debt remains constant with an immediate across-the-board increase or decrease as of September 30, 2005 with no subsequent change in rates for the remainder of the period.

## RECENT ACCOUNTING PRONOUNCEMENTS

In March 2005, the Financial Accounting Standards Board, or FASB, issued Interpretation No. 47, *Accounting for Conditional Asset Retirement Obligations*, or FIN 47. FIN 47 is an interpretation of FASB Statement 143, *Asset Retirement Obligations*, which was issued in June 2001. According to FIN 47, uncertainty about the timing or method of settlement because they are conditional on a future event that may or may not be within the control of the entity should be factored into the measurement of the asset retirement obligation when sufficient information exists. FIN 47 also clarifies when an entity would have sufficient information to reasonably estimate the fair value of an asset retirement obligation. FIN 47 is effective no later than the end of fiscal years ending after December 15, 2005. Retrospective application of interim financial information is permitted, but is not required. We adopted FIN 47 on January 1, 2005, which did not materially impact our financial position or results of operations.

In March 2005, the SEC issued Staff Accounting Bulletin No. 107 *Share-Based Payment*, or SAB 107. SAB 107 expresses the SEC staff's views regarding the interaction between Statement of Financial Accounting Standards No. 123(R) *Share-Based Payment*, or Statement 123(R), and certain SEC rules and regulations and provides the staff's views regarding the valuation of share-based payment arrangements for public companies. In particular, SAB 107 provides guidance related to share-based payment transactions with nonemployees, the transition from nonpublic to public entity status, valuation methods (including assumptions such as expected volatility and expected term), the accounting for certain redeemable financial instruments issued under share-based payment arrangements, the classification of compensation expense, non-GAAP financial measures, first time adoption of Statement 123(R) in an interim period, capitalization of compensation cost related to share-based payment arrangements, the accounting for income tax effects of share-based payment arrangements upon adoption of Statement 123(R) and the modification of employee share options prior to adoption of Statement 123(R). We are unable to quantify the impact of adopting SAB 107 and Statement 123(R) at this time because it will depend on levels of share-based payments granted in the future. Additionally, we are still evaluating the assumptions we will use upon adoption.

67

Table of Contents

In April 2005, the SEC issued a press release announcing that it would provide for phased-in implementation guidance for Statement 123(R). The SEC would require that registrants that are not small business issuers adopt Statement 123(R)'s fair value method of accounting for share-based payments to employees no later than the beginning of the first fiscal year beginning after June 15, 2005. We intend to adopt Statement 123(R) on January 1, 2006.

In June 2005, the Emerging Issues Task Force, or EITF, issued EITF 05-6, *Determining the Amortization Period of Leasehold Improvements*, or EITF 05-6. EITF 05-6 requires that assets recognized under capital leases generally be amortized in a manner consistent with the lessee's normal depreciation policy except that the amortization period is limited to the lease term (which includes renewal periods that are reasonably assured). EITF 05-6 also addresses the determination of the amortization period for leasehold improvements that are purchased subsequent to the inception of the lease. Leasehold improvements acquired in a business combination or purchased subsequent to the inception of the lease should be amortized over the lesser of the useful life of the asset or the lease term that includes reasonably assured lease renewals as determined on the date of the acquisition of the leasehold improvement. We adopted EITF 05-6 on July 1, 2005, which did not materially impact our financial position or results of operations.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of our financial statements in conformity with generally accepted accounting principles requires management to make estimates, judgments and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of expenses during the reporting period. On an ongoing basis, we evaluate our estimates that are based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. The result of these evaluations forms the basis for making judgments about the carrying values of assets and liabilities and the reported amount of expenses that are not readily apparent from other sources. Because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such difference could be material. Our significant accounting policies are discussed in Note A to our combined financial statements included elsewhere in this prospectus. Management believes that the following accounting estimates are the most critical to aid in fully understanding and evaluating our reported financial results, and they require management's most difficult, subjective or complex judgments, resulting from the need to make estimates about the effect of matters that are inherently uncertain. The following narrative describes these critical accounting estimates, the judgments and assumptions and the effect if actual results differ from these assumptions.

### Allowance for Doubtful Accounts

We evaluate the collectibility of our accounts receivable based on a combination of factors. In circumstances where we are aware of a specific client's inability to meet its financial obligations, we record a specific reserve to reduce the amounts recorded to what we believe will be collected. For all other clients, we recognize reserves for bad debt based on historical experience of bad debts as a percentage of revenues for each business unit, adjusted for relative improvements or deteriorations in the agings and changes in current economic conditions.

If our agings were to improve or deteriorate resulting in a 10% change in our allowance, it is estimated that our bad debt expense for the nine months ended September 30, 2005 would have changed by approximately $2.3 million and our net income for the same period would have changed by approximately $0.9 million.

### Long-lived Assets

Long-lived assets, such as property, plant and equipment are reviewed for impairment when events and circumstances indicate that depreciable and amortizable long-lived assets might be impaired and the

Table of Contents

undiscounted cash flows estimated to be generated by those assets are less than the carrying amount of those assets. When specific assets are determined to be unrecoverable, the cost basis of the asset is reduced to reflect the current fair market value.

We use various assumptions in determining the current fair market value of these assets, including future expected cash flows and discount rates, as well as future salvage values. Our impairment loss calculations require management to apply judgment in estimating future cash flows, including forecasting useful lives of the assets and selecting the discount rate that reflects the risk inherent in future cash flows.

If actual results are not consistent with our assumptions and judgments used in estimating future cash flows and asset fair values, we may be exposed to future impairment losses that could be material to our results of operations.

**Goodwill**

Goodwill represents the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations. We review goodwill for potential impairment annually using the income approach to determine the fair value of our reporting units. The fair value of our reporting units is used to apply value to the net assets of each reporting unit. To the extent that the carrying amount of net assets would exceed the fair value, an impairment charge may be required to be recorded.

The income approach we use for valuing goodwill involves estimating future cash flows expected to be generated from the related assets, discounted to their present value using a risk-adjusted discount rate. Terminal values are also estimated and discounted to their present value.

As a result of adopting Statement 142 on January 1, 2002, we recorded a non-cash, net of tax, goodwill impairment charge of approximately $3.5 billion. As required by Statement 142, a subsequent impairment test was performed at October 1, 2002, which resulted in no additional impairment charge. The non-cash impairment of our goodwill was generally caused by unfavorable economic conditions, which persisted throughout 2001. This weakness contributed to our clients' reducing the number of advertising dollars spent on our inventory. These conditions adversely impacted the cash flow projections used to determine the fair value of each reporting unit at January 1, 2002 which resulted in the non-cash impairment charge of a portion of our goodwill. We may incur impairment charges in future periods under Statement 142 to the extent we do not achieve our expected cash flow growth rates, and to the extent that market values decrease and long-term interest rates increase.

**Indefinite-lived Assets**

Indefinite-lived assets such as our billboard permits are reviewed annually for possible impairment using the direct method. Our key assumptions using the direct method are market revenue growth rates, market share, profit margin, duration and profile of the build-up period, estimated start-up capital costs and losses incurred during the build-up period, the risk-adjusted discount rate and terminal values. This data is populated using industry normalized information representing an average permit within a market.

The SEC staff issued Staff Announcement No. D-108, *Use of the Residual Method to Value Acquired Assets Other Than Goodwill*, at the September 2004 meeting of the Emerging Issues Task Force. D-108 states that the residual method should no longer be used to value intangible assets other than goodwill. Prior to the adoption of Staff Announcement No. D-108, we recorded our acquisition of permits at fair value using an industry accepted income approach and consequently applied the same approach for purposes of impairment testing. Our adoption of the direct method resulted in an aggregate fair value of our permits that was less than the carrying value determined under our prior method. As a result, we recorded a non-cash charge of $162.9 million, net of deferred taxes, as a cumulative effect of a change in accounting principle during the fourth quarter 2004.

If actual results are not consistent with our assumptions and estimates, we may be exposed to impairment charges in the future. If our assumption on market revenue growth rate decreased 10%, our non-cash charge, net of tax, would increase approximately $25.1 million. Similarly, if our assumption on

69

**Table of Contents**

market revenue growth rate increased 10%, our non-cash charge, net of tax, would decrease approximately $30.0 million.

**Asset Retirement Obligations**

Statement of Financial Accounting Standards No. 143, "*Accounting for Asset Retirement Obligations*," requires us to estimate our obligation upon the termination or nonrenewal of a lease, to dismantle and remove our billboard structures from the leased land and to reclaim the site to its original condition. We record the present value of obligations associated with the retirement of tangible long-lived assets in the period in which they are incurred. The liability is capitalized as part of the related long-lived asset's carrying amount. Over time, accretion of the liability is recognized as an operating expense and the capitalized cost is depreciated over the expected useful life of the related asset.

Due to the high rate of lease renewals over a long period of time, our calculation assumes that all related assets will be removed at some period over the next 50 years. An estimate of third-party cost information is used with respect to the dismantling of the structures and the reclamation of the site. The interest rate used to calculate the present value of such costs over the retirement period is based on an estimated risk-adjusted credit rate for the same period.

Table of Contents

# INDUSTRY OVERVIEW

*This section includes industry data, forecasts and information that we have prepared based, in part, upon industry data, forecasts and information obtained from industry publications and surveys and internal company information. Media Dynamics Inc., Nielsen Media Research, Inc., Outdoor Advertising Association of America (OAAA), Zenith Optimedia and other industry reports and articles were the primary sources for third-party industry data, forecasts and information. These third-party industry publications and surveys and forecasts generally state that they believe the information contained therein was obtained from sources they believe to be reliable, but that they can give no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Similarly, while we believe the industry forecasts and market research are reliable, we have not independently verified such forecasts and research.*

The global outdoor market has emerged as a leading advertising medium that serves as a core branding and marketing platform for companies, both domestically and internationally. Similar to other advertising media, the key competitive factors for outdoor advertising are pricing, location and availability of displays.

The principal advantages of outdoor advertising include the following:

• *Facilitates broad reach and high frequency.* The outdoor advertising industry is characterized by broad reach and high frequency, as compared to other forms of advertising media. We believe that national and regional brands are increasing their use of outdoor advertising to maximize the coverage and impact of their advertising campaigns. These advertisers benefit from the branding effect and broad exposure that results from the sustained, repetitive viewing provided by outdoor advertising.

• *Drives sustained mass advertising.* Unlike other advertising media, such as television, consumers cannot interrupt or selectively avoid advertisements displayed on outdoor structures.

• *Enables selective targeting.* Outdoor advertising enables advertisers, such as restaurants, entertainment facilities, hotels and other roadside operations, to target motorists or pedestrians in close proximity to their businesses.

• *Captures increasingly mobile audiences.* Population growth and increasing commute times are key growth drivers for outdoor advertising due to its ability to capture a growing mobile audience base that spends an increasing amount of time out-of-home.

• *Offers low cost platform.* Outdoor advertising is a relatively low cost medium, as compared to other forms of advertising media. As a result, outdoor advertising is often used as a complementary marketing platform for companies implementing a multifaceted media plan across various media, including print, broadcasting, the Internet and direct marketing. Also, outdoor advertising is used by local businesses that cannot afford costlier alternatives.

## Industry Metrics

According to OAAA, outdoor advertising grew 10.2% in the second quarter of 2005. Based on industry data compiled by us in conjunction with our efforts to highlight for our customers the value of outdoor advertising relative to other media, we believe that this rate was higher than overall U.S. advertising growth in the second quarter of 2005, outpacing television, radio and publishing. Also, according to a study conducted by two researchers from the Louisiana State University Manship School of Mass Communications, the recall rate for outdoor advertising is greater than that of magazines, network television and cable television. Recall is determined by the ability to name an advertiser without prompting.

According to OAAA, the top 10 industries using outdoor advertising, based on 2004 year-end outdoor expenditures, were: (1) local services and amusements, (2) media and advertising, (3) public

Table of Contents

transportation, hotels and resorts, (4) retail, (5) insurance and real estate, (6) financial, (7) automotive dealers and services, (8) restaurants, (9) automotive, auto access and equipment and (10) telecommunications. Also according to OAAA, the top 20 outdoor brands, based on 2004 year-end outdoor expenditures, were: (1) McDonald's, (2) Warner movies, (3) Miller beers, (4) Verizon long distance, (5) Anheuser-Busch beers, (6) General Motors, (7) Verizon Wireless, (8) Cracker Barrel, (9) Chevrolet, (10) Walt Disney movies, (11) Nissan, (12) Bank of America, (13) Diageo, (14) Toyota, (15) Geico, (16) Coca-Cola, (17) Coors Light, (18) Allstate, (19) Dodge and (20) Dreamworks movies.

## Pricing

Outdoor advertising is a low cost, high impact medium for advertisers. The average cost per thousand impressions, or CPM, of outdoor advertising is approximately one fourth that of newspapers and prime time television and one half that of radio and newsweekly magazines. The average reach of outdoor advertising is approximately twice that of radio and newsweekly magazines, four and a half times that of newspapers and five times that of prime time television. The following table lists the average CPM for advertising media (according to calculations from data in TV Dimensions 2005© Media Dynamics, Inc.) and the number of persons reached for every $1,000 invested in those media in the United States:

| Advertising Medium | Average CPM | Persons Reached per $1,000 Invested |
|---|---|---|
| Outdoor | $   5.53 | 180,832 |
| Radio | 9.91 | 100,908 |
| Newsweekly magazines | 11.76 | 85,034 |
| Newspapers | 24.92 | 40,128 |
| Prime time network television | 26.44 | 37,821 |

## Ratings and Measurement

Unlike for other forms of advertising media, including radio, television and print, no universally recognized methodology has emerged in the United States or internationally as the industry standard for audience ratings and measurement. A number of independent third parties are in the process of implementing new measurement systems designed to measure the demographics of people who pass U.S. billboards. Nielsen Outdoor has also piloted a new audience measurement methodology in Chicago that is currently being reviewed by the outdoor advertising industry. The Traffic Audit Bureau announced plans to develop its own ratings and measurement system from its traffic counts and demographic data supplied by third-party research companies. One of the goals of these efforts is to measure outdoor advertising using traditional advertising metrics used in other media, including print and broadcasting. Additionally, Arbitron has established an outdoor group to provide research services specialized for outdoor advertising.

These next-generation ratings services may improve measurements within the industry, which may lead to an increase in outdoor advertising's market share. The introduction of Postar, an outdoor advertising measurement service launched in the United Kingdom in the early 1990s, partly contributed to an increase in market share for outdoor advertising from 4.8% in 1996 to 6.4% in 2004, according to Zenith Optimedia. Other international markets in which we operate are at various stages of developing similar measurement technologies.

## Regulation

### Domestic

The outdoor advertising industry is subject to federal, state and local regulation. For instance, The Highway Beautification Act of 1965 (HBA) regulates outdoor advertising on the 306,000 miles of Federal-Aid Primary, Interstate and National Highway Systems roads within the United States. The HBA regulates the location of billboards, mandates a state compliance program, requires the development of

72

**Table of Contents**

state standards, promotes the expeditious removal of illegal signs and requires just compensation for takings. Size, spacing and lighting of billboards are regulated by state and local municipalities. Periodically, certain state and local governments attempt to force the removal of billboards not governed by the HBA under various amortization theories. When challenged under such a theory, an outdoor advertising company is permitted to "recoup" its investment for a certain period of time, after which the signs in question must be removed. Other important advertising regulations include the Intermodal Surface Transportation Efficiency Act of 1991, the Bonus Act/ Bonus Program, the 1995 Scenic Byways Amendment and various increases or implementations of property taxes, billboard taxes and permit fees. While these regulations set certain limits on the placement or erection of new outdoor advertising displays, they have benefited established companies such as us by creating high barriers to entry and have protected the outdoor advertising industry against an oversupply of inventory.

### *International*

International regulation of the outdoor advertising industry varies by region and country, but generally limits the size, placement, nature and density of out-of-home displays. The significant international regulations include the Law of December 29, 1979 in France, the Town and Country Planning (Control of Advertisements) Regulations 1992 in the United Kingdom and *Règlement Régional Urbain de l'agglomération bruxelloise* in Belgium. These laws define issues such as the extent to which advertisements can be erected in rural areas, the hours during which illuminated signs may be lit and whether the consent of local authorities is required to place a sign in certain communities. Other regulations may limit the subject matter and language of out-of-home displays. For instance, the United States and France, among other nations, ban outdoor advertisements for tobacco products.

## Competitive Landscape

The outdoor industry has recently undergone major consolidation, as multiple acquisitions occurred throughout the 1990s. The top 10 U.S. outdoor advertising companies, based on 2004 U.S. revenues, according to OAAA, were: Clear Channel Outdoor Holdings, Viacom Outdoor, Lamar, Regency Outdoor Advertising, Van Wagner, JCDecaux, Adams Outdoor Advertising, Magic Media, Fairway and Reagan National. We believe that our main competitors in the international outdoor advertising industry are JCDecaux, Viacom Outdoor and a number of regional companies.

## Digital

Digital advertising is a small but rapidly growing niche within the outdoor industry. These units, supported by advanced LED, LCD and plasma technologies, offer unique benefits to advertisers. Unlike traditional outdoor advertising, in which advertisers may buy a display for a week or longer, advertisers can buy digital time slots for as short as a specified number of seconds within each minute, with the ability to change their message dynamically and in real time. While digital displays are capable of supporting full motion video, currently most state and local ordinances (excluding specially zoned areas like Times Square in New York City) allow only static messages, or advertising copy without motion, to be presented and changed on the displays.

Table of Contents

# BUSINESS

## Our Company

Our principal business is to provide our clients with advertising opportunities through billboards, street furniture displays, transit displays and other out-of-home advertising displays that we own or operate in key markets worldwide. As of September 30, 2005, we owned or operated more than 870,000 advertising displays worldwide. For the year ended December 31, 2004, we generated revenues of approximately $2.4 billion, operating income of approximately $243.3 million and operating income before depreciation, amortization and non-cash compensation expense, or OIBDAN, of approximately $631.6 million. Our domestic reporting segment consists of our operations in the United States, Canada and Latin America, with approximately 95% of our 2004 revenues in this segment derived from the United States. Our international reporting segment consists of our operations in Europe, Australia, Asia and Africa, with approximately 52% of our 2004 revenues in this segment derived from France and the United Kingdom. Approximately 89% of our total 2004 operating income excluding corporate expenses was derived from our domestic segment and approximately 11% was derived from our international segment. Approximately 66% of our total 2004 OIBDAN excluding corporate expenses was derived from our domestic segment and approximately 34% was derived from our international segment. See "Prospectus Summary — Summary Historical and Pro Forma Combined Financial Data — Non-GAAP Financial Measure" for an explanation of OIBDAN and a reconciliation of OIBDAN to operating income (loss). Additionally, we own equity interests in various out-of-home advertising companies worldwide, which we account for under the equity method of accounting.

Billboard displays are bulletin and poster advertising panels of various sizes that generally are mounted on structures we own. These structures typically are located on sites that we either lease or own or for which we have acquired permanent easements. Site lease terms generally range from one to 50 years. We believe that many of our billboards are strategically located to offer maximum visual impact to audiences. Larger billboards generally are located along major highways and freeways to target vehicular traffic. Smaller billboards generally are located on city streets to target both vehicular and pedestrian traffic. Our client contracts for billboards generally have terms ranging from one week to one year.

Street furniture displays, marketed under our global Adshel™ brand, are advertising surfaces on bus shelters, information kiosks, public toilets, freestanding units and other public structures. Generally, we own the street furniture structures and are responsible for their construction and maintenance. Contracts for the right to place our street furniture structures in the public domain and sell advertising space on them are awarded by municipal and transit authorities in competitive bidding processes. Generally, these contracts have terms ranging from 10 to 20 years and involve revenue-sharing arrangements with the authorities, including payments by us of minimum guaranteed amounts. We believe that street furniture is growing in popularity with municipal and transit authorities, especially in international and larger U.S. markets. Our client contracts for street furniture displays typically have terms ranging from one week to one year.

Transit displays are advertising surfaces on various types of vehicles or within transit systems, including on the interior and exterior sides of buses, trains, trams and taxis and within the common areas of rail stations and airports. Contracts for the right to place our displays on vehicles or within transit systems and sell advertising space on them are awarded by public transit authorities in competitive bidding processes or are negotiated with private transit operators. These contracts typically have terms ranging from three to ten years. Our client contracts for transit displays generally have terms ranging from two weeks to one year.

We generate revenues worldwide from local, regional and national sales. Advertising rates generally are based on the "gross rating points," or total number of impressions delivered expressed as a percentage of a market population, of a display or group of displays. The number of "impressions" delivered by a display is measured by the number of people passing the site during a defined period of time and, in some international markets, is weighted to account for such factors as illumination, proximity to other displays

74

Table of Contents

and the speed and viewing angle of approaching traffic. For all of our billboards in the United States, we use independent, third-party auditing companies to verify the number of impressions delivered by a display. While price and availability of displays are important competitive factors, we believe that providing quality customer service and establishing strong client relationships are also critical components of sales. For example, one service we provide our smaller clients is access to our creative personnel who can assist the clients in designing advertising copy.

## Our History

In 1997, Clear Channel Communications, which was founded in 1974, acquired Eller Media Company. In 1998, Clear Channel Communications acquired Universal Outdoor, giving Clear Channel Communications an outdoor presence in 33 major U.S. markets with over 88,000 displays. Also in 1998, Clear Channel Communications acquired More Group plc, a European-based company operating in 25 countries. Other significant outdoor acquisitions over the last five years include The Ackerley Group, Spectacolor, Donrey Outdoor, Taxi Tops and France Rail Publicité.

In addition to this offering, Clear Channel Communications intends to spin off the entire operations of its entertainment division into an independent publicly traded company in which Clear Channel Communications will not hold any ownership interest. This new public company will consist of Clear Channel Communications' worldwide entertainment operations.

## Domestic Products

Our domestic segment consists of our operations in the United States, Canada and Latin America, with approximately 95% of our 2004 revenues in this segment derived from the United States. Our domestic display inventory consists primarily of billboards, street furniture displays and transit displays, with billboards contributing approximately 75% of our 2004 domestic revenues. The margins on our billboard contracts also tend to be higher than those on contracts for other displays.

The following table shows the approximate percentage of revenues derived from each category of our domestic advertising inventory:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2003 | 2002 |
| Billboards: |  |  |  |
|   Bulletins(1) | 56% | 56% | 56% |
|   Posters | 19% | 20% | 21% |
| Street furniture displays | 4% | 3% | 3% |
| Transit displays | 11% | 11% | 10% |
| Other displays(2) | 10% | 10% | 10% |
|   Total | 100% | 100% | 100% |

(1) For our internal reporting purposes, wallscape revenues are combined with bulletin revenues. For a description of wallscapes, see "— Other Domestic Inventory."

(2) Includes spectaculars and mall displays.

In the United States, our displays are located in all of the top 30 U.S. designated market area regions, or DMA® regions (DMA® is a registered trademark of Nielsen Media Research, Inc.), and in 46 of the top 50 DMA® regions, giving our clients the ability to reach a significant portion of the U.S. population. A DMA® region, a term developed by Nielsen Media Research, Inc., is used to designate a geographic area or media market. The significant expenses associated with our domestic operations include (i) direct production and installation expenses, (ii) site lease expenses for land under our displays and (iii) revenue-sharing or minimum guaranteed amounts payable under our street furniture and transit display contracts. Our direct production and installation expenses include costs for printing, transporting and changing the

75

**Table of Contents**

advertising copy displayed on our bulletins, and related labor and vinyl or paper costs. Vinyl and paper costs vary according to the complexity of the advertising copy and the quantity of displays. Our site lease expenses include lease payments for use of the land under our displays, as well as any revenue-sharing arrangements we may have with the landlords. The terms of our domestic site leases generally range from one to 50 years.

### Billboards

Our domestic billboard inventory primarily includes bulletins and posters.

#### Bulletins

Bulletins vary in size, with the most common size being 14 feet high by 48 feet wide. Almost all of the advertising copy displayed on bulletins is computer printed on vinyl and transported to the bulletin where it is secured to the display surface. Because of their greater size and impact, we typically receive our highest rates for bulletins. Bulletins generally are located along major expressways, primary commuting routes and main intersections that are highly visible and heavily trafficked. Our clients may contract for individual bulletins or a network of bulletins, meaning the clients' advertisements are rotated among bulletins to increase the reach of the campaign. "Reach" is the percent of a target audience exposed to an advertising message at least once during a specified period of time, typically during a period of four weeks. Our client contracts for bulletins generally have terms ranging from one month to one year, or longer.

#### Posters

Posters are available in two sizes, 30-sheet and eight-sheet displays. The 30-sheet posters are approximately 11 feet high by 23 feet wide, and the eight-sheet posters are approximately five feet high by 11 feet wide. Advertising copy for posters is printed using silk-screen or lithographic processes to transfer the designs onto paper that is then transported and secured to the poster surfaces. Posters generally are located in commercial areas on primary and secondary routes near point-of-purchase locations, facilitating advertising campaigns with greater demographic targeting than those displayed on bulletins. Our poster rates typically are less than our bulletin rates, and our client contracts for posters generally have terms ranging from four weeks to one year. Two types of posters are premiere panels and squares. Premiere displays are innovative hybrids between bulletins and posters that we developed to provide our clients with an alternative for their targeted marking campaigns. The premiere displays utilize one or more poster panels, but with vinyl advertising stretched over the panels similar to bulletins. Our intent is to combine the creative impact of bulletins with the additional reach and frequency of posters. "Frequency" is the average number of exposures an individual has to an advertising message during a specified period of time. Out-of-home frequency is typically measured over a four-week period.

### Street Furniture Displays

Our street furniture displays, marketed under our global Adshel™ brand, are advertising surfaces on bus shelters, information kiosks, public toilets, freestanding units and other public structures, and primarily are located in major metropolitan cities and along major commuting routes. Generally, we own the street furniture structures and are responsible for their construction and maintenance. Contracts for the right to place our street furniture in the public domain and sell advertising space on them are awarded by municipal and transit authorities in competitive bidding processes governed by local law. Generally, these contracts have terms ranging from 10 to 20 years. As compensation for the right to sell advertising space on our street furniture structures, we pay the municipality or transit authority a fee or revenue share that is either a fixed amount or a percentage of the revenues derived from the street furniture displays. Typically, these revenue sharing arrangements include payments by us of minimum guaranteed amounts. Client contracts for street furniture displays typically have terms ranging from four weeks to one year, or longer, and, similar to billboards, may be for network packages.

76

**Table of Contents**

### Transit Displays

Our transit displays are advertising surfaces on various types of vehicles or within transit systems, including on the interior and exterior sides of buses, trains, trams and taxis and within the common areas of rail stations and airports. Similar to street furniture, contracts for the right to place our displays on such vehicles or within such transit systems and sell advertising space on them generally are awarded by public transit authorities in competitive bidding processes or are negotiated with private transit operators. These contracts typically have terms of up to five years. Our client contracts for transit displays generally have terms ranging from four weeks to one year, or longer.

### Other Domestic Inventory

The balance of our domestic display inventory consists of spectaculars, mall displays and wallscapes. Spectaculars are customized display structures that often incorporate video, multidimensional lettering and figures, mechanical devices and moving parts and other embellishments to create special effects. The majority of our spectaculars are located in Dundas Square in Toronto, Times Square and Penn Plaza in New York City, Fashion Show in Las Vegas, Sunset Strip in Los Angeles and across from the Target Center in Minneapolis. Client contracts for spectaculars typically have terms of one year or longer. We also own displays located within the common areas of malls on which our clients run advertising campaigns for periods ranging from four weeks to one year. Contracts with mall operators grant us the exclusive right to place our displays within the common areas and sell advertising on those displays. Domestically, our contracts with mall operators generally have terms ranging from five to ten years. Client contracts for mall displays typically have terms ranging from six to eight weeks. A wallscape is a display that drapes over or is suspended from the sides of buildings or other structures. Generally, wallscapes are located in high-profile areas where other types of outdoor advertising displays are limited or unavailable. Clients typically contract for individual wallscapes for extended terms. Domestically, our inventory includes other small displays that are not counted as separate displays in this prospectus since their contribution to our revenues is not material.

## International Products

Our international segment consists of our advertising operations in Europe, Australia, Asia and Africa, with approximately 52% of our 2004 revenues in this segment derived from France and the United Kingdom. Our international display inventory consists primarily of billboards, street furniture displays and transit displays in approximately 50 countries worldwide, with billboards and street furniture displays collectively contributing approximately 77% of our 2004 international revenues.

The following table shows the approximate percentage of revenues derived from each category of our international advertising inventory:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2004** | **2003** | **2002** |
| Billboards | 46% | 47% | 50% |
| Street furniture displays | 31% | 33% | 30% |
| Transit displays(1) | 10% | 10% | 10% |
| Other displays(2) | 13% | 10% | 10% |
|     Total | 100% | 100% | 100% |

(1)   Includes small displays.

(2)   Includes spectaculars, mall displays and other small displays.

The majority of our international clients are advertisers targeting national audiences whose business is placed with us through advertising agencies and outdoor buying services. The significant expenses associated with our international operations include (i) revenue-sharing or minimum guaranteed amounts

Table of Contents

payable under our billboard, street furniture and transit display contracts, (ii) site lease expenses and (iii) cleaning and maintenance expenses related to our street furniture. These expenses consist of costs similar to those associated with our domestic operations. Internationally, the terms of our site leases typically range from three to ten years, but may vary across our networks. Because revenue-sharing and minimum guaranteed payment arrangements are more prevalent in our international operations, the margins in our international operations typically are less than the margins in our domestic operations.

### Billboards

The size of our international billboards is not standardized. The billboards vary in both format and size across our networks, with the majority of our international billboards being similar in size to our domestic posters (30-sheet and eight-sheet displays). Our international billboards are sold to clients as network packages with contract terms typically ranging from one to two weeks. Long-term client contracts are also available and typically have terms of up to one year. We lease the majority of our international billboard sites from private landowners.

### Street Furniture Displays

Our international street furniture displays are substantially similar to their domestic counterparts, and include bus shelters, freestanding units, public toilets, various types of kiosks and benches. Internationally, contracts with municipal and transit authorities for the right to place our street furniture in the public domain and sell advertising on them typically range from 10 to 15 years. The major difference between our international and domestic street furniture businesses is in the nature of the municipal contracts. In the international segment, these contracts typically require us to provide the municipality with a broader range of urban amenities such as public wastebaskets and lampposts, as well as space for the municipality to display maps or other public information. In exchange for providing such urban amenities and display space, we are authorized to sell advertising space on certain sections of the structures we erect in the public domain. Client contracts for street furniture displays typically have terms ranging from one to two weeks, but are available for up to one year, and may be for network packages.

### Transit Displays

Our international transit display contracts are substantially similar to their domestic counterparts, and typically require us to make only a minimal initial investment and few ongoing maintenance expenditures. Contracts with public transit authorities or private transit operators typically have terms ranging from three to seven years. Our client contracts for transit displays generally have terms ranging from two weeks to one year, or longer.

### Other International Inventory

The balance of our international display inventory consists primarily of spectaculars and mall displays. DEFI, our international neon subsidiary, is a leading global provider of spectaculars with approximately 300 spectacular displays in 30 countries worldwide. Client contracts for international spectaculars typically have terms ranging from five to ten years. Internationally, our contracts with mall operators generally have terms ranging from five to ten years and client contracts for mall displays generally have terms ranging from one to two weeks, but are available for up to six months. Our international inventory includes other small displays that are counted as separate displays in this prospectus since they form a substantial part of our network and international revenues.

## Marketing Resources

We have several online tools and resources to help us sell our inventory. Our online rate card is a web-based application that allows users to view all of our markets and products for rates and gross rating point allotments. We also have an online inventory search that is designed to provide users access to photos and maps of all our U.S. bulletins, wallscapes, premiere squares and spectaculars. Our internal web-

**Table of Contents**

based system, FastPitch™, delivers real-time rate and availability data for each of our U.S. markets, and our account executives use that data to create multi- or single-market advertising programs without having to contact individual markets for this data. FastPitch™ also contains maps, product sheets, market information, shipping information and product specifications. Inventory availability is updated daily directly from each market's scheduling system.

Additionally, our account executives use several research products to help sell our inventory. Our account executives assist advertisers in structuring advertising campaigns using computer databases and mapping software to analyze target audiences and consumer products and services. By examining demographic profiles, socioeconomic information and consumer buying power, our research allows us to create smart, effective purchases for our advertisers.

## Production

### Domestic

In a majority of our markets, our local production staff performs the full range of activities required to create and install advertising copy. Production work includes creating the advertising copy design and layout, coordinating its printing and installing the copy on displays. We provide creative services to smaller advertisers and to advertisers that are not represented by advertising agencies. National advertisers often use preprinted designs that require only installation. Our creative and production personnel typically develop new designs or adopt copy from other media for use on our inventory. Our creative staff also can assist in the development of marketing presentations, demonstrations and strategies to attract new clients.

### International

The majority of our international clients are advertisers targeting national audiences whose business generally is placed with us through advertising agencies. These agencies often provide our international clients creative services to design and produce both the advertising copy and the physical printed advertisement. Advertising copy, both paper and vinyl, is shipped to centralized warehouses operated by us. The copy is then sorted and delivered to sites where it is installed on our displays.

## Client Categories

In 2004, the top five client categories in our domestic segment, based on domestic revenues derived from these categories, were entertainment and amusements, business and consumer services, automotive, retail and insurance and real estate. In 2004, the top five client categories in our international segment, based on international revenues derived from those categories, were automotive, food and drink, media and entertainment, retail and telecommunications.

## Our Markets

Approximately 95% of our 2004 domestic revenues were derived from the United States and approximately 52% of our 2004 international revenues were derived from France and the United Kingdom. The following table sets forth certain information regarding displays that we own or operate in domestic and international markets worldwide. As of September 30, 2005, we owned or operated approximately 164,000 domestic displays and approximately 709,000 international displays. Our domestic markets are listed in order of their DMA® region ranking and our international markets are listed in descending order according to revenues contribution.

Table of Contents

### Our Domestic Displays

| DMA® Region Rank | Domestic Markets | Billboards | | Street Furniture Displays | Transit Displays | Other Displays(2) | Total Displays |
|---|---|---|---|---|---|---|---|
| | | Bulletins(1) | Posters | | | | |
| | *United States* | | | | | | |
| 1 | New York, NY | • | • | • | • | • | 18,214 |
| 2 | Los Angeles, CA | • | • | • | • | • | 11,789 |
| 3 | Chicago, IL | • | • | | •(3) | • | 11,673 |
| 4 | Philadelphia, PA | • | • | • | • | • | 6,525 |
| 5 | San Francisco-Oakland-San Jose, CA | • | • | • | • | • | 6,722 |
| 6 | Boston, MA (Manchester, NH) | • | • | • | • | • | 6,926 |
| 7 | Dallas-Ft. Worth, TX | • | • | | • | • | 6,956 |
| 8 | Washington, DC (Hagerstown, MD) | • | • | • | • | • | 3,708 |
| 9 | Atlanta, GA | • | • | | | • | 3,313 |
| 10 | Houston, TX | • | • | | •(3) | • | 4,742 |
| 11 | Detroit, MI | | | | • | • | 547 |
| 12 | Seattle-Tacoma, WA | • | • | | | • | 3,312 |
| 13 | Minneapolis-St. Paul, MN | • | • | | | • | 1,977 |
| 14 | Phoenix (Prescott), AZ | • | • | • | • | •(3) | 1,464 |
| 15 | Miami-Ft. Lauderdale, FL | • | • | • | • | •(3) | 3,701 |
| 16 | Tampa-St. Petersburg (Sarasota), FL | • | • | • | • | • | 1,963 |
| 17 | Cleveland-Akron (Canton), OH | • | • | | | • | 2,448 |
| 18 | Sacramento-Stockton-Modesto, CA | • | • | • | | • | 958 |
| 19 | Denver, CO | | | | • | • | 685 |
| 20 | Orlando-Daytona Beach-Melbourne, FL | • | • | | | • | 3,465 |
| 21 | St. Louis, MO | | | | • | • | 234 |
| 22 | Pittsburgh, PA | | | • | •(3) | • | 528 |
| 23 | San Diego, CA | • | • | | • | •(3) | 1,334 |
| 24 | Portland, OR | • | • | | | • | 1,294 |
| 25 | Baltimore, MD | • | • | | | •(3) | 2,025 |
| 26 | Indianapolis, IN | • | • | | • | | 1,981 |
| 27 | Hartford-New Haven, CT | | | | | • | 6 |
| 28 | Charlotte, NC | | | | | • | 12 |
| 29 | Raleigh-Durham (Fayetteville), NC | | | | | • | 10 |
| 30 | Nashville, TN | | | | | • | 21 |
| 31 | Salt Lake City, UT | | | | • | • | 124 |
| 32 | Kansas City, KS/ MO | | | | •(3) | | — |
| 33 | Milwaukee, WI | • | • | • | | | 1,700 |
| 34 | Cincinnati, OH | | | | | • | 8 |
| 35 | Columbus, OH | • | • | | | • | 1,401 |
| 37 | San Antonio, TX | • | • | | •(3) | •(3) | 3,016 |
| 39 | Norfolk-Portsmouth-Newport News, VA | | | | | • | 8 |
| 40 | West Palm Beach-Ft. Pierce, FL | • | • | | | | 372 |
| 42 | New Orleans, LA | | | | • | • | 2,775 |
| 43 | Memphis, TN | • | • | • | • | | 2,200 |
| 44 | Harrisburg-Lancaster-Lebanon-York, PA | | | | | • | 36 |
| 45 | Albuquerque-Santa Fe, NM | • | • | | | | 1,097 |
| 47 | Oklahoma City, OK | | | | | • | 12 |
| 48 | Buffalo, NY | | | | • | | 240 |
| 49 | Fresno-Visalia, CA | | | | | • | 10 |
| 50 | Las Vegas, NV | • | • | | • | •(3) | 11,295 |
| 52 | Louisville, KY | | | | | • | 16 |
| 53 | Jacksonville, FL | | | | | • | 866 |
| 54 | Wilkes Barre-Scranton, PA | | | | | • | 39 |
| 55 | Austin, TX | | | | •(3) | • | 16 |
| 56 | Hudson Valley, NY | • | • | | | | 376 |
| 57 | Richmond-Petersburg, VA | | | | | • | 12 |
| 62 | Knoxville, TN | | | | | • | 13 |
| 63 | Charleston-Huntington, WV | | | | | • | 9 |
| 67 | Wichita-Hutchinson, KS | • | • | | | | 673 |
| 72 | Tucson (Sierra Vista), AZ | • | • | | | | 1,550 |
| 73 | Des Moines-Ames, IA | • | • | | | •(3) | 672 |
| 87 | Chattanooga, TN | • | • | | | • | 1,562 |
| 89 | Northpark, MS | | | | | •(3) | 6 |
| 91 | Cedar Rapids-Waterloo-Iowa City-Dubuque, IA | | | | | • | 12 |
| 93 | El Paso, TX (Las Cruces, NM) | • | • | | | • | 1,305 |
| 94 | Colorado Springs-Pueblo, CO | | | | | • | 7 |
| 97 | Johnstown-Altoona, PA | | | | | • | 20 |
| 101 | Youngstown, OH | | | | | • | 8 |
| 104 | Monterey-Salinas, CA | | | | | • | 40 |
| 107 | Ft. Smith-Fayetteville-Springdale-Rogers, AR | • | • | | | • | 914 |
| 113 | Reno, NV | • | • | | | • | 574 |
| 114 | Tallahassee, FL-Thomasville, GA | | | | | • | 9 |

Case 18-31274   Document 2188   Filed in TXSB on 12/13/18   Page 179 of 689

80

Table of Contents

| DMA® Region Rank | Domestic Markets | Billboards | | Street Furniture Displays | Transit Displays | Other Displays(2) | Total Displays |
|---|---|---|---|---|---|---|---|
| | | Bulletins(1) | Posters | | | | |
| 115 | Augusta, GA | | | | | •(3) | — |
| 117 | Sioux Falls (Mitchell), SD | | | | | • | 19 |
| 142 | Sioux City, IA | | | | | • | 8 |
| 145 | Lubbock, TX | | | | | • | 16 |
| 148 | Palm Springs, CA | | | | | • | 12 |
| 150 | Salisbury, MD | • | • | | •(3) | • | 1,247 |
| 163 | Ocala-Gainesville, FL | • | • | | | • | 1,317 |
| 171 | Billings, MT | | | | | • | 8 |
| 176 | Rapid City, SD | | | | | • | 10 |
| 189 | Great Falls, MT | | | | | • | 14 |
| 190 | Grand Junction-Aspen-Montrose, CO | | | | • | • | 51 |
| n/a | Newport, RI | | | | | • | 25 |
| n/a | Wilmington, DE | | | | •(3) | •(3) | — |
| | *Domestic Non-U.S.* | | | | | | |
| n/a | Brazil | • | • | • | • | | 8,243 |
| n/a | Canada | • | • | • | • | • | 2,669 |
| n/a | Chile | • | • | | | | 1,272 |
| n/a | Mexico | | | • | • | • | 4,922 |
| n/a | Peru | • | • | • | • | • | 2,512 |
| | | | | | **Total Domestic Displays** | | 163,871 |

(1) Includes wallscapes.

(2) Includes spectaculars and mall displays.

(3) We have access to additional displays through arrangements with local advertising and other companies.

## Our International Displays

| International Markets | Billboards | Street Furniture Displays | Transit Displays(1) | Other Displays(2) | Total Displays |
|---|---|---|---|---|---|
| France | • | • | • | • | 170,500 |
| United Kingdom | • | • | • | • | 92,344 |
| Italy | • | • | • | • | 50,918 |
| Spain | • | • | • | • | 34,645 |
| China(3) | • | • | • | • | 52,746 |
| Sweden | • | • | • | • | 102,124 |
| Switzerland | • | | • | • | 16,892 |
| Belgium | • | • | • | • | 22,407 |
| Australia | | • | • | | 12,829 |
| Norway | | • | • | | 20,544 |
| Denmark | • | • | • | • | 28,836 |
| Ireland | • | • | | | 5,947 |
| Russia | • | | • | • | 4,703 |
| Greece | | | • | • | 1,193 |
| Finland | • | • | • | • | 44,584 |
| Poland | • | • | • | • | 12,596 |
| Singapore | | • | • | • | 10,626 |
| Holland | • | | • | • | 2,743 |
| Turkey | • | • | • | • | 5,628 |
| New Zealand | | • | • | | 2,979 |
| Baltic States | • | | • | | 12,857 |
| Portugal | | | | • | 18 |
| India | • | • | • | | 403 |
| Germany | | | | • | 80 |
| Hungary | | | | • | 25 |
| Czech Republic | | | | • | 5 |
| Austria | | | | • | 4 |
| Ukraine | | | | • | 2 |
| Dubai | | | | • | 1 |
| | | | **Total International Displays** | | 709,179 |

(1) Includes small displays.

(2) Includes spectaculars, mall displays and other small displays.

(3) In July 2005 Clear Media became a consolidated subsidiary when we increased our investment to a majority controlling interest.

Table of Contents

## Equity Investments

In addition to the more than 870,000 displays we owned and operated worldwide as of September 30, 2005, we have made equity investments in various out-of-home advertising companies that operate in the following markets:

| Market | Company | Equity Investment(1) | Billboards | Street Furniture Displays | Transit Displays | Other Displays(2) |
|--------|---------|------|------|------|------|------|
| **Outdoor Advertising Companies** | | | | | | |
| South Africa(3) | Clear Channel Independent | 50.0% | • | • | • | |
| Italy | Alessi | 35.0% | • | • | • | |
| Italy | AD Moving SpA | 17.5% | • | | • | |
| Hong Kong | Buspak | 50.0% | • | | • | |
| Thailand | Master & More | 32.5% | • | | | |
| Korea | Ad Sky Korea | 30.0% | | | • | |
| Belgium | MTB | 49.0% | | | • | |
| Belgium | Streep | 25.0% | | | • | |
| Denmark | City Reklame | 45.0% | | | | • |
| **Other Media Companies** | | | | | | |
| Norway | CAPA | 50.0% | | | | |
| Holland | Kamasutra | 49.0% | | | | |

(1)   As of September 30, 2005.

(2)   Includes spectaculars, mall displays and other small displays.

(3)   Clear Channel Independent is headquartered and has the majority of its operations in South Africa, but also operates in other African countries such as Angola, Botswana, Lesotho, Malawi, Mauritius, Mozambique, Namibia, Swaziland, Tanzania, Uganda and Zambia.

## Construction and Operation

### Domestic

We typically own the physical structures on which our clients' advertising copy is displayed. We build some of the structures at our billboard fabrication business in Illinois and erect them on sites we either lease or own or for which we have acquired permanent easements. The site lease terms generally range from one to 50 years. In addition to the site lease, we must obtain a permit to build the sign. Permits are typically issued in perpetuity by the state or local government and typically are transferable or renewable for a minimal, or no, fee. Bulletin and poster advertising copy is either printed with computer generated graphics on a single sheet of vinyl or placed on lithographed or silk-screened paper sheets supplied by the advertiser. These advertisements are then transported to the site and in the case of vinyl wrapped around the face, and in the case of paper pasted and applied like wallpaper. The operational process also includes conducting visual inspections of the inventory for display defects and taking the necessary corrective action within a reasonable period of time.

### International

The international manufacturing process largely consists of two elements: the manufacture and installation of advertising structures and the weekly preparation of advertising posters for distribution throughout our networks. Generally, we outsource the manufacturing of advertising structures to third parties and regularly seek competitive bids. We use a wide range of suppliers, located in each of our markets, none of whom represents more than 10% of our manufacturing budget in any one year. The

**Table of Contents**

design of street furniture structures (such as bus shelters, bicycle racks, kiosks and public toilets) is typically done in conjunction with a third-party design or architecture firm. These street furniture designs then form the basis of a competitive bidding process to select a manufacturer. Our street furniture sites are posted by our own employees or subcontractors who also clean and maintain the sites. The decision to use our own employees or subcontractors is made on a market-by-market basis taking into consideration the mix of products in the market and local labor costs.

## Our Competitive Strengths

We believe our key competitive strengths are as follows:

### Leading positions in key markets

We believe that our presence in key markets gives our clients the ability to reach a global audience through one advertising provider. As of September 30, 2005, we owned or operated more than 870,000 advertising displays worldwide. Our displays are located in all of the top 30 U.S. designated market area regions, or DMA® regions, and in 46 of the top 50 DMA® regions, giving our clients the ability to reach a significant portion of the U.S. population. In addition, as of September 30, 2005, we owned or operated displays in approximately 50 countries in North and South America, Europe, Australia, Asia and Africa, providing us with a global market presence.

### Diversified and global client base

We have long-standing relationships with a diversified group of local, regional and national advertising brands and agencies in the United States and worldwide. In 2004, the top five client categories in our domestic segment, based on domestic revenues derived from these categories, were entertainment and amusements, business and consumer services, automotive, retail, and insurance and real estate. In 2004, the top five client categories in our international segment, based on international revenues derived from those categories, were automotive, food and drink, media and entertainment, retail and telecommunications. No single advertiser accounted for more than 2% of our 2004 domestic or international revenues.

### Business model with significant financial flexibility

We have historically generated high levels of cash flow from operations due to consistent revenue growth with disciplined control of operating expenditures. Our cash flow from operations was approximately $492.5 million in 2004, $433.5 million in 2003 and $320.2 million in 2002. Operating cash flow through the first nine months of 2005 was $336.6 million and through the first nine months of 2004 was $329.9 million. Total revenue increased at a 9.1% compounded annual rate from 2000 to 2004. We believe that these high levels of cash flow from operations provide us with strategic and financial flexibility and, together with our ability to use our publicly traded common stock as acquisition currency, will position us to opportunistically pursue attractive acquisitions and investments.

### Positioned to capitalize on new technologies

We believe that we are well-positioned to take advantage of significant technological advances and the corresponding improvements in advertisers' abilities to present engaging campaigns to their target audiences. In particular, we believe that we are prepared to capitalize on the growing trend of digital outdoor displays. We have a dedicated team tasked with determining the most effective deployment of networked digital sign technologies to enhance the revenue-generating capacity of our assets in existing and new markets worldwide. In July 2005, we launched our first networked digital trial on select bulletins in Cleveland, Ohio and plan to launch similar pilots in other U.S. and international markets. Of the seven billboards that we converted from a standard to digital format in Cleveland, we have experienced significant increases in revenues from those displays. We are evaluating the additional capital improvement costs relative to the increased revenue and the regulatory issues surrounding possible future conversions.

**Table of Contents**

We anticipate that these trials will provide us with significant experience in shaping our long-term digital strategy.

### Experienced senior management team

Our senior management team is led by Mark P. Mays, Paul J. Meyer and Randall T. Mays, each of whom has extensive experience in the outdoor advertising industry. The experience of our senior management team extends internationally with regionally based teams that oversee our respective international markets.

### Positioned to capitalize on emerging international opportunities

We believe that our financial strength and flexibility, our existing presence in key markets worldwide and our experienced senior management team position us well to capitalize on emerging international opportunities. Accordingly, we have engaged in acquisitions and investment opportunities in the global out-of-home advertising industry. For instance, in July 2005, we made an additional equity investment in Clear Media Limited, one of the largest outdoor advertising companies in China, that gave us a majority ownership interest in the company.

## Our Strategy

Our fundamental goal is to increase stockholder value by maximizing our cash flow from operations worldwide. Accomplishing this goal requires the successful implementation of the following strategies:

### Capitalize on global network and diversified product mix

We seek to capitalize on our global network and diversified product mix to maximize revenues and increase profits. We can increase our operating margins by spreading our fixed investment costs over our broad asset base. In addition, by sharing best practices both domestically and internationally, we can quickly and effectively replicate our successes throughout the markets in which we operate. We believe that our diversified product mix and long-standing presence in many of our existing markets provide us with the platform necessary to launch new products and test new initiatives in a reliable and cost-effective manner.

### Highlight the value of outdoor advertising relative to other media

We seek to enhance revenue opportunities by focusing on specific initiatives that highlight the value of outdoor advertising relative to other media. We have made significant investments in research tools that enable our clients to better understand how our displays can successfully reach their target audiences and promote their advertising campaigns. Also, we are working closely with clients, advertising agencies and other diversified media companies to develop more sophisticated systems that will provide improved demographic measurements of outdoor advertising. We believe that these measurement systems will further enhance the attractiveness of outdoor advertising for both existing clients and new advertisers.

### Continue to focus on achieving operating efficiencies

We continue to focus on achieving operating efficiencies throughout our global network. For example, in most of our U.S. markets, we have been transitioning our compensation programs in our operations departments from hourly-wage scales to productivity-based programs. We have decreased operating costs and capital needs by introducing energy-saving lighting systems and innovative processes for changing advertising copy on our displays. Additionally, in certain heavy storm areas we continue to convert large format billboards to sectionless panels that face less wind resistance, reducing our weather-related losses in such areas.

Table of Contents

### Promote customer service

We believe that customer service is critical, and we have made significant commitments to provide innovative services to our clients. For example, we provide our U.S. clients with online access to information about our inventory, including pictures, locations and other pertinent display data that is helpful in their buying decisions. Additionally, in the United States we recently introduced a service guaranty in which we have committed to specific monitoring and reporting services to provide greater accountability and enhance customer satisfaction. We also introduced a proprietary online proof-of-performance system that is an additional tool our clients may use to measure our accountability. This system provides our clients with information about the dates on which their advertising copy is installed or removed from any display in their advertising program.

### Pursue attractive acquisitions and other investments worldwide

Through acquisitions and investments, we intend to strengthen our presence in existing markets and selectively enter into new markets where the returns and growth potential of such expansion are consistent with our fundamental goal of increasing stockholder value. In particular, in recent years we have steadily added to our presence in Europe, Asia and Latin America. All three regions continue to offer additional growth opportunities.

### Pursue new cost-effective technologies

Advances in electronic displays, including flat screens, LCDs and LEDs, as well as corresponding reductions in costs, allow us to provide these technologies as alternatives to traditional methods of displaying our clients' advertisements. These electronic displays may be linked through centralized computer systems to instantaneously and simultaneously change static advertisements on a large number of displays. We believe that these capabilities will allow us to transition from selling space on a display to a single advertiser to selling time on that display to multiple advertisers. We believe this transition will create new advertising opportunities for our existing clients and will attract new advertisers, such as certain retailers that desire to change advertisements frequently and on short notice. For example, these technologies will allow retailers to promote weekend sales with the flexibility during the sales to make multiple changes to the advertised products and prices.

### Maintain an entrepreneurial culture

We maintain an entrepreneurial and customer-oriented culture by empowering local market managers to operate their businesses as separate profit centers, subject to centralized oversight. A portion of our managers' compensation is dependent upon the financial success of their individual business units. This culture motivates local market managers to maximize our cash flow from operations by providing high-quality service to our clients and seeking innovative ways to deploy capital to further grow their businesses. Our managers also have full access to our extensive centralized resources, including sales training, research tools, shared best practices, global procurement and financial and legal support.

## Employees

As of September 30, 2005, we had approximately 2,700 domestic employees and approximately 4,900 international employees, of which approximately 100 were employed in corporate activities. As of September 30, 2005, 273 of our U.S. employees and 2,686 of our non-U.S. employees are subject to collective bargaining agreements in their respective countries. We believe that our relationship with our employees is good.

## Properties and Facilities

Our worldwide corporate headquarters are in San Antonio, Texas. The headquarters of our domestic advertising operations are in Phoenix, Arizona, and the headquarters of our international operations are in London, England. The types of properties required to support each of our advertising branches include offices, production facilities and structure sites. A branch and production facility is generally located in an industrial or warehouse district.

**Table of Contents**

We own or have acquired permanent easements for relatively few parcels of real property that serve as the sites for our outdoor displays. Our remaining outdoor display sites are leased. Our leases generally range from one to 50 years. There is no significant concentration of displays under any one lease or subject to negotiation with any one landlord. We believe that an important part of our management activity is to negotiate suitable lease renewals and extensions.

**Legal Proceedings**

From time to time, we are involved in legal proceedings arising in the ordinary course of business. Under our agreements with Clear Channel Communications, we have assumed and will indemnify Clear Channel Communications for liabilities related to our business. Other than as described below, we do not believe there is any litigation pending that would have, individually or in the aggregate, a material adverse effect on our financial position, results of operations or cash flow.

We are the defendant in a lawsuit filed October 20, 1998 by Jorge Luis Cabrera, Sr., and Martha Serrano, as personal representatives of the Estate of Jorge Luis Cabrera, Jr., in the 11th Judicial Circuit in and for Miami-Dade County, Florida. The plaintiff alleged that we negligently constructed, installed or maintained the electrical system in a bus shelter, which resulted in the death of Jorge Luis Cabrera, Jr. Martha Serrano settled her claims with us. On June 24, 2005, the jury rendered a verdict in favor of the plaintiff, and awarded the plaintiff $4.1 million in actual damages and $61.0 million in punitive damages. We have filed a motion to have the punitive damages award reduced. If our motion to reduce the punitive damages award is unsuccessful, we intend to vigorously seek to overturn or nullify the adverse verdict and damage award including, if necessary, pursuing appropriate appeals. We have insurance coverage for up to approximately $50 million in damages for this matter.

**Table of Contents**

# MANAGEMENT

### Executive Officers, Directors, and Significant Employees

Set forth below are the names and ages and current positions of our executive officers, current and proposed directors and significant employees. Immediately prior to this offering, we expect to appoint James M. Raines, Marsha McCombs Shields, Dale W. Tremblay and William D. Parker as additional directors to our board of directors. See "— Composition of the Board of Directors After This Offering" below.

| Name | Age | Position | Term as Director |
|---|---|---|---|
| L. Lowry Mays | 70 | Chairman of the Board and Director | Expires 2007 |
| William D. Parker | 43 | Director | Expires 2009 |
| James M. Raines | 65 | Director | Expires 2007 |
| Marsha McCombs Shields | 51 | Director | Expires 2008 |
| Dale W. Tremblay | 47 | Director | Expires 2009 |
| Mark P. Mays | 42 | Chief Executive Officer and Director | Expires 2009 |
| Randall T. Mays | | Executive Vice President, Chief | |
| | 40 | Financial Officer and Director | Expires 2008 |
| Paul J. Meyer | 62 | President and Chief Operating Officer | |
| Jonathan D. Bevan | | Chief Operating Officer — | |
| | 34 | International | |
| Augusto Claux | 58 | Regional President — Latin America | |
| Michael R. Deeds | | Executive Vice President — Domestic | |
| | 63 | Operations | |
| Bo Rickard Hedlund | | Chief Executive Officer — Northern | |
| | 40 | Europe | |
| Michael F. Hudes | 44 | Global Director — Digital Media | |
| Eugene P. Leehan | | Regional President — Western United | |
| | 43 | States | |
| Coline L. McConville | 41 | Chief Executive Officer — Europe | |
| Franklin G. Sisson, Jr. | | Global Director — Sales and | |
| | 53 | Marketing | |
| Timothy C. Stauning | | Regional President — Eastern United | |
| | 49 | States | |
| Kurt A. Tingey | | Executive Vice President — Domestic | |
| | 40 | Chief Financial Officer | |
| Laura C. Toncheff | | Executive Vice President — Domestic | |
| | 37 | Real Estate, Public Affairs and Legal | |

*L. Lowry Mays* has served as a member of our board of directors since April 1997 and has been our Chairman of the Board since October 2005. Mr. Mays is Chairman of the board of directors of Clear Channel Communications, and prior to October 2004 he was the company's Chief Executive Officer. Mr. Mays has been a member of Clear Channel Communications' board of directors since its inception and has served on the board of directors of CCE Spinco, Inc. since August 2005. Mr. Mays is the father of Mark P. Mays and Randall T. Mays, both of whom are members of our board of directors and executive officers of us.

*William D. Parker* has served as Chairman and Chief Executive Officer of America West Holdings Corporation and America West Airlines since September 2001. Since May 2000, Mr. Parker has served as President of America West Airlines. He assumed the position of Chief Operating Officer of America West

**Table of Contents**

Airlines in December 2000 in addition to his role as President of the company. From 1999 to 2000, Mr. Parker served as Executive Vice President, Corporate Group of America West Airlines.

*James M. Raines* has served as the President of James M. Raines & Co., an investment banking company, since 1988. Since 1998, Mr. Raines has served on the board of directors of Waddell & Reed Financial, Inc., a financial services corporation.

*Marsha McCombs Shields* has served as a director of Primera Insurance since March 1989. Since June 2002, Ms. McCombs has served as the President of the McCombs Foundation and as Dealer Principal for McCombs Automotive. She has served as Manager of McCombs Family Ltd. since January 2000. Ms. Shields is the daughter of one of the founders and board members of Clear Channel Communications.

*Dale W. Tremblay* has served as President and Chief Executive Officer of C.H. Guenther & Son, Inc., a food marketing and manufacturing company, since July 2001. Prior to that, from May 1998 to July 2001, Mr. Tremblay served as the Executive Vice President and Chief Operating Officer of C.H. Guenther & Son, Inc. Mr. Tremblay was a Financial Analyst for R.R. Donnelley & Sons from June 1980 to May 1982. He currently serves on the Advisory Board for the Michigan State University Financial Analysis Lab.

*Mark P. Mays* has served as our Chief Executive Officer since August 2005 and Director since April 1997. Mr. Mays has served as Chief Executive Officer and President of Clear Channel Communications since October 2004. Prior thereto, he served as the interim Chief Executive Officer and President and Chief Operating Officer of Clear Channel Communications from May 2004 to October 2004 and as the President and Chief Operating Officer of Clear Channel Communications for the remainder of the relevant five-year period. Mr. Mays has served on the board of directors of Clear Channel Communications since May 1998, and has served on the board of CCE Spinco, Inc. since August 2005. Mr. Mays is the son of L. Lowry Mays, Clear Channel Communications' Chairman and one of our board members, and is the brother of Randall T. Mays, our Executive Vice President and Chief Financial Officer and one of our board members.

*Randall T. Mays* has served as our Executive Vice President and Chief Financial Officer since August 2005 and Director since April 1997. Mr. Mays has served as Chairman of the board of directors of CCE Spinco, Inc. since August 2005. He also has served as the Executive Vice President, Chief Financial Officer and Secretary of Clear Channel Communications since 1996. He has served on the board of directors of Clear Channel Communications since April 1999. Mr. Mays is the son of L. Lowry Mays, Clear Channel Communications' Chairman and one of our board members, and is the brother of Mark P. Mays, our Chief Executive Officer and one of our board members.

*Paul J. Meyer* has served as our President and Chief Operating Officer since April 2005. Prior thereto, he served as President and Chief Executive Officer of our domestic segment from January 2002 to April 2005 and President/Chief Operating Officer of our domestic segment from March 1999 to December 2001. Mr. Meyer has also served as Vice President of Clear Channel Communications since March 1999.

*Jonathan D. Bevan* has served as our Chief Operating Officer — International since December 2004. Mr. Bevan served as Senior Vice President/ Operations of our international segment from September 2002 to December 2004 and, prior thereto, as Director of Finance for the remainder of the relevant five-year period.

*Augusto Claux* has served as our Regional President — Latin America since 1999.

*Michael R. Deeds* has served as our Executive Vice President — Domestic Operations since 1999 and has been employed with us for 38 years.

*Bo Rickard Hedlund* has served as the Chief Executive Officer — Northern Europe of our international segment since April 1, 2005. Prior thereto, Mr. Hedlund served as Executive Vice President — Nordic Region from October 2001 to March 2005 and Regional Director for all of our

88

**Table of Contents**

business units in Sweden, Norway, Denmark and Finland. From November 1997 to September 2001, Mr. Hedlund served as General Manager — Sweden. From 2003, Mr. Hedlund was responsible for our Baltics and Russia regions and was also responsible for our Dutch business unit and Clear Channel Hillenaar from 2004.

*Michael F. Hudes* has served as our Global Director — Digital Media (previously Executive Vice President/ Corporate Development) since August 2005. Prior thereto, he served as our Executive Vice President/ Corporate Development since March 2004. From April 2002 to February 2004, he also served as President, Chief Operating Officer and a Director of AdSpace Networks, Inc., a digital media network builder. Prior thereto, Mr. Hudes was President, Chief Operating Officer and a Director of Organic, Inc., an internet professional services company from November 1995 to September 2001.

*Eugene P. Leehan* has served as our Regional President — Western United States since January 2003. Prior thereto, Mr. Leehan has worked for us or our predecessor companies in various capacities since February 1986.

*Coline L. McConville* has served as Chief Executive Officer — Europe of our international segment since January 2003. Prior thereto, she served as Chief Operating Officer for our international segment for the remainder of the relevant five-year period.

*Franklin G. Sisson, Jr.* has served as our Global Director — Sales and Marketing since August 2005. Prior thereto, he served as Executive Vice President Sales and Marketing of the domestic segment since January 2001 and as President/ General Manager Orlando Division from August 1998 to December 2000.

*Timothy C. Stauning* has served as our Regional President — Eastern United States since August 2004. Prior thereto, Mr. Stauning served as President of our New York Branch since August 1998.

*Kurt A. Tingey* has served as our Executive Vice President and Domestic Chief Financial Officer since January 1, 2000. From March 1999 to January 2000, Mr. Tingey served as our Senior Vice President — Business Development.

*Laura C. Toncheff* has served as our Executive Vice President — Domestic Real Estate, Public Affairs and Legal since January 2003. Prior thereto, Ms. Toncheff served as the Executive Vice President and General Counsel for our domestic operations from January 2000, and prior thereto she served as Senior Vice President.

**Composition of the Board of Directors After This Offering**

Prior to the completion of this offering, we intend to restructure our board of directors. Our board of directors consists of three directors. We intend to appoint four additional directors, subject to the completion of this offering, each of whom has consented to so serve. We anticipate that James M. Raines, William D. Parker, Marsha McCombs Shields and Dale W. Tremblay will be independent as determined by our board of directors under the applicable securities law requirements and listing standards. Ms. Shields is the daughter of one of the founders and board members of Clear Channel Communications. For so long as Clear Channel Communications is the owner of such number of shares representing more than 50% of the total voting power of our common stock, it will have the ability to direct the election of all the members of our board of directors, the composition of our board committees and the size of the board. See "Description of Capital Stock."

Concurrent with the completion of the offering, our directors will be divided into three classes serving staggered three-year terms. At each annual meeting of our stockholders, directors will be elected to succeed the class of directors whose terms have expired. Class I directors' terms will expire at the 2007 annual meeting of our stockholders, Class II directors' terms will expire at the 2008 annual meeting of our stockholders and Class III directors' terms will expire at the 2009 annual meeting of our stockholders. L. Lowry Mays and James M. Raines initially will be our Class I directors, Randall T. Mays and Marsha McCombs Shields initially will be our Class II directors and Mark P. Mays, Dale W. Tremblay and William D. Parker initially will be our Class III directors. Our classified board of directors could have the

Table of Contents

effect of increasing the length of time necessary to change the composition of a majority of our board. Generally, at least two annual meetings of stockholders will be necessary for stockholders to effect a change in a majority of the members of the board of directors.

We intend to avail ourselves of certain of the "controlled company" exemptions of the New York Stock Exchange corporate governance standards which free us from the obligation to comply with certain NYSE corporate governance requirements that would otherwise require (i) that the majority of the board of directors consists of independent directors, (ii) that we have a nominating and governance committee and that it be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, (iii) that we have a compensation committee composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (iv) an annual performance evaluation of the compensation committee. See "Risk Factors — Risks Related to Our Relationship with Clear Channel Communications" and "Arrangements Between Clear Channel Communications and Us."

**Committees of the Board of Directors After This Offering**

The standing committees of our board of directors will be an audit committee and compensation committee, each of which is described below.

*Audit Committee*

The three independent (as determined by the board of directors based on the NYSE listing standards) audit committee members will be James M. Raines, who will serve as the chairman, Marsha McCombs Shields and Dale W. Tremblay. We anticipate that James M. Raines will be designated by our board of directors as the audit committee financial expert (as defined in the applicable regulations of the SEC). The audit committee will operate under a written charter adopted by the board of directors which reflects standards set forth in SEC regulations and NYSE rules. The composition and responsibilities of the audit committee and the attributes of its members, as reflected in the charter, are intended to be in accordance with applicable requirements for corporate audit committees. The charter will be reviewed, and amended if necessary, on an annual basis. The full text of the audit committee's charter can be found on our website at *www.clearchanneloutdoor.com* or may be obtained upon request from our Secretary.

As set forth in more detail in the charter, the audit committee's purpose is to assist the board of directors in its general oversight of Clear Channel Outdoor's financial reporting, internal control and audit functions. Clear Channel Communications' internal audit department will document, test and evaluate our internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulations. The responsibilities of the audit committee will include:

• recommending the hiring or termination of independent auditors and approving any non-audit work performed by such auditor;

• approving the overall scope of the audit;

• assisting our board of directors in monitoring the integrity of our financial statements, the independent accountant's qualifications and independence, the performance of the independent accountants and our internal audit function, and our compliance with legal and regulatory requirements;

• annually reviewing our independent auditors' report describing the auditing firms' internal quality control procedures, any material issues raised by the most recent internal quality control review, or peer review, of the auditing firm;

• discussing the annual audited financial and quarterly statements with our management and the independent auditor;

**Table of Contents**

- discussing earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- discussing policies with respect to risk assessment and risk management;

- meeting separately, periodically, with management, internal auditors and the independent auditor;

- reviewing with the independent auditor any audit problems or difficulties and management's response;

- setting clear hiring policies for employees or former employees of the independent auditors;

- annually reviewing the adequacy of the audit committee's written charter;

- reviewing with management any legal matters that may have a material impact on us; and

- reporting regularly to our full board of directors.

### *Compensation Committee*

The compensation committee members will be Mark P. Mays, who will serve as chairman, Dale W. Tremblay and William D. Parker. The compensation committee will operate under a written charter adopted by the board of directors. The committee will be primarily responsible for administering Clear Channel Outdoor's stock incentive plans, performance-based compensation plans and other incentive compensation plans. Also, the committee will determine compensation arrangements for all of our executive officers and will make recommendations to the board of directors concerning compensation policies for us and our subsidiaries.

### *Compensation Committee Interlocks and Insider Participation in Compensation Decisions*

Other than Mark P. Mays and Randall T. Mays, who each serve as an executive officer and member of the board of directors of Clear Channel Communications, none of our executive officers serves as a member of the compensation committee or as a member of the board of directors of any other company of which any member of our compensation committee or board of directors is an executive officer.

## Code of Business Conduct and Ethics

We adopted a Code of Business Conduct and Ethics applicable to all of our directors and employees, including our chief executive officer, chief financial officer and chief operating officer, which is a "code of ethics" as defined by applicable SEC rules. This code is publicly available on our website at *www.clearchanneloutdoor.com* or may be obtained upon request from our Secretary. If we make any amendments to this code, other than technical, administrative or other non-substantive amendments, or grant any waivers, including implicit waivers, from any provisions of this code that apply to our chief executive officer, chief financial officer or chief operating officer and relate to an element of the SEC's "code of ethics" definition, we will disclose the nature of the amendment or waiver, its effective date and to whom it applies on our website or in a report on Form 8-K filed with the SEC.

## Director Compensation

We do not currently pay any compensation to any of our directors. In conjunction with this offering, we will be adding independent directors to our board of directors and plan to pay our non-employee directors an annual cash retainer of $25,000, an additional $1,500 for each board meeting attended and an additional $1,000 for each committee meeting attended. We may also grant stock options or other stock-based awards to our non-employee directors, and non-employee directors may elect to receive their fees in the form of shares of our Class A common stock. We plan to pay the chairperson of the audit committee and the chairperson of the compensation committee an additional annual cash retainer of approximately $10,000 and $5,000, respectively.

Table of Contents

**Stock Ownership of Directors and Executive Officers**

All of the outstanding shares of our Class A common stock and Class B common stock are currently owned by Clear Channel Communications and its affiliates and thus none of our named executive officers (as defined below) or directors owns shares of our Class A common stock or Class B common stock.

The following table sets forth the Clear Channel Communications common stock and options to purchase shares of Clear Channel Communications' common stock held by our directors, the named executive officers and all of our directors and executive officers as a group, as of September 30, 2005. Except as otherwise noted, the individual director or named executive officer (including his or her family members) had sole voting and investment power with respect to the shares of Clear Channel Communications' common stock.

| Name | Amount and Nature of Beneficial Ownership |
|---|---|
| L. Lowry Mays | 31,242,193(1) |
| Mark P. Mays | 1,751,246(2) |
| Randall T. Mays | 1,366,101(3) |
| William D. Parker | — |
| James M. Raines | — |
| Marsha McCombs Shields | 4,755,353(4) |
| Dale W. Tremblay | — |
| Paul J. Meyer | 169,374(5) |
| Franklin G. Sisson, Jr. | 46,774(6) |
| All Directors and Executive Officers as a Group (11 persons) | 39,349,949(7) |

(1) Includes 2,750,000 shares subject to options held by Mr. L. Mays, 48,456 shares held by trusts of which Mr. L. Mays is the trustee, but not a beneficiary, 26,677,307 shares held by LLM Partners Ltd of which Mr. L. Mays shares control of the sole general partner, 1,577,120 shares held by the Mays Family Foundation and 102,874 shares held by the Clear Channel Foundation over which Mr. L. Mays has either sole or shared investment or voting authority.

(2) Includes 300,000 shares subject to options held by Mr. M. Mays, 156,252 shares held by trusts of which Mr. M. Mays is the trustee, but not a beneficiary, and 1,022,293 shares held by MPM Partners, Ltd. Mr. M. Mays controls the sole general partner of MPM Partners, Ltd.

(3) Includes 300,000 shares subject to options held by Mr. R. Mays, 168,228 shares held by trusts of which Mr. R. Mays is the trustee, but not a beneficiary, and 622,575 shares held by RTM Partners, Ltd. Mr. R. Mays controls the sole general partner of RTM Partners, Ltd.

(4) Includes 2,080,573 shares held by McCombs Family Ltd. and 2,674,780 shares held by a Foundation over each of which Ms. Shields has either sole or shared investment or voting authority.

(5) Includes 147,500 shares subject to options held by Mr. Meyer.

(6) Includes 46,200 shares subject to options held by Mr. Sisson.

(7) Includes 3,602,800 shares subject to options held by such persons, 327,936 shares held by trusts of which such persons are trustees, but not beneficiaries, 26,677,307 shares held by LLM Partners Ltd, 1,022,293 shares held by MPM Partners, Ltd., 2,080,573 shares held by McCombs Family, Ltd., 622,575 shares held by RTM Partners, Ltd, 4,354,774 shares held by Foundations over which such person has either sole or shared investment or voting authority.

Table of Contents

## Executive Compensation

The following table sets forth compensation information for our chief executive officer and our other four most highly compensated individuals, based on employment with Clear Channel Communications as determined by reference to total annual salary and bonus for the last completed fiscal year, who will become our executive officers. All of the information included in this table reflects compensation earned by the individuals for services with Clear Channel Communications. We refer to these individuals as our "named executive officers" in this prospectus.

### Summary Compensation Table

| | | | | | Long-Term Compensation | | | |
| | | Annual Compensation | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Annual Compensation ($)(1) | Restricted Stock Award(s) ($) | Options (#) | LTIP Payout ($) | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|---|
| Mark P. Mays(2) | 2004 | 688,469 | 1,700,000 | — | 1,113,250(3) | 150,000 | — | 5,125(4) |
| Randall T. Mays | 2004 | 688,293 | 1,700,000 | — | 1,113,250(3) | 150,000 | — | 5,125(4) |
| Paul J. Meyer | 2004 | 465,686 | 342,000 | — | — | 65,000 | — | 5,125(4) |
| Roger Parry*(5) | 2004 | 785,355 | 598,719 | — | — | 35,000 | — | 214,502(6) |
| Franklin G. Sisson, Jr. | 2004 | 249,068 | 99,250 | — | — | 15,000 | — | 4,048(4) |

\*  Mr. Parry resigned his position as Chief Executive Officer of Clear Channel International and remains a non-executive level employee with us.

(1)  Perquisites that are less than $50,000 in the aggregate for any named executive officer are not disclosed in the table in accordance with SEC rules.

(2)  Mr. Mays was appointed as the President and Chief Executive Officer of Clear Channel Communications on October 20, 2004. Prior thereto, Mark Mays served as the interim Chief Executive Officer and President and Chief Operating Officer of Clear Channel Communications from May 2004 to October 2004 and as the President and Chief Operating Officer of Clear Channel Communications prior to May 2004.

(3)  Grants of 25,000 shares of restricted stock were awarded on February 19, 2004. The restricted stock had a fair market value of $837,250 as of December 31, 2004. The restriction will lapse and the shares will vest on February 19, 2009. The holder will receive all cash dividends declared and paid during the vesting period.

(4)  Represents the amount of matching contributions paid by Clear Channel Communications under its 401(k) Plan.

(5)  Mr. Parry is a citizen of the United Kingdom. The compensation amounts reported in this table have been converted from British pounds to U.S. dollars using the average exchange rate from each applicable year.

(6)  Includes $62,902 in contracted payments to Mr. Parry in lieu of a company automobile, $9,334 in contracted payments to Mr. Parry in lieu of medical benefit and $142,266 in contributions paid by Clear Channel Communications to Mr. Parry's pension plan.

**Table of Contents**

## Stock Options

The following table sets forth certain information regarding stock options to acquire shares of Clear Channel Communications' common stock granted to our named executive officers in 2004.

### Stock Option Grant Table

| Name | Number of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/share) | Expiration Date | Grant Date Present Value ($)(1) |
|---|---|---|---|---|---|
| Mark P. Mays | 150,000 | 3.19% | 44.53 | 2/19/09 | 2,265,000 |
| Randall T. Mays | 150,000 | 3.19% | 44.53 | 2/19/09 | 2,265,000 |
| Paul J. Meyer | 65,000 | 1.38% | 44.53 | 2/19/09 | 981,500 |
| Roger Parry* | 35,000 | 0.75% | 44.53 | 2/29/09 | 528,500 |
| Franklin G. Sisson, Jr. | 15,000 | 0.32% | 44.53 | 2/19/09 | 226,500 |

\* Mr. Parry resigned his position as Chief Executive Officer of Clear Channel International and remains a non-executive level employee with us.

(1) Present value for this option was estimated at the date of grant using the Black-Scholes option pricing model with the following assumptions: risk-free interest rate of 2.21%, a dividend yield of .90%, a volatility factor of the expected market price of Clear Channel Communications' common stock of 50.0% and the expected life of three years. The present value of stock options granted is based on a theoretical option-pricing model. In actuality, because Clear Channel Communications' employee stock options are not traded on an exchange, optionees can receive no value nor derive any benefit from holding stock options under these plans without an increase in the market price of Clear Channel Communications stock. Such an increase in stock price would benefit all shareholders commensurately.

## Exercise of Stock Options

The following table discloses information regarding the exercise of stock options to acquire shares of Clear Channel Communications' common stock by our named executive officers in 2004 and the value of unexercised stock options held by the named executive officers.

### Aggregated Option Exercises and Fiscal Year-End Option Value Table

| Name | Shares Acquired on Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options at Fiscal Year End (#) Exercisable/Unexercisable | Value of Unexercised In-The-Money Options at Fiscal Year End ($) Exercisable/Unexercisable |
|---|---|---|---|---|
| Mark P. Mays | 30,000 | 772,200 | 266,500/800,000 | -0-/-0- |
| Randall T. Mays | 30,000 | 772,200 | 266,500/800,000 | -0-/-0- |
| Paul J. Meyer | — | — | 103,750/131,250 | -0-/-0- |
| Roger Parry* | — | — | 85,224/147,507 | -0-/-0- |
| Franklin G. Sisson, Jr. | — | — | 23,112/77,512 | 17,764/-0- |

\* Mr. Parry resigned his position as Chief Executive Officer of Clear Channel International and remains a non-executive level employee with us.

## Employee Benefit Plans

Our employees currently participate in various incentive, retirement savings, group welfare and other employee benefit plans sponsored by Clear Channel Communications. With certain exceptions, our

94

**Table of Contents**

employees will continue participating in the Clear Channel Communications plans after this offering, in accordance with the terms of the plans and past practice. We will be able to withdraw our participation in any Clear Channel Communications plan (subject to 90 days' notice). Similarly, Clear Channel Communications may terminate our participation in its plans (subject to 90 days' notice). Unless sooner terminated, it is likely that our participation in the Clear Channel Communications employee benefit plans will end if and at such time as Clear Channel Communications owns less than 80% of the total voting power of our common stock. See "Arrangements Between Clear Channel Communications and Us — Employee Matters Agreement." It is anticipated that our stock will be added to the listing of available investments under the Clear Channel Communications 401(k) plan, but there is no assurance that this will occur or continue.

Some of our employees hold stock options and/or shares of Clear Channel Communications restricted stock under the Clear Channel Communications, Inc. 2001 Stock Incentive Plan and certain predecessor stock incentive plans. Some or all of the Clear Channel Communications stock options held by our employees prior to the offering may be converted into options for shares of our Class A common stock. See "— Clear Channel Communications Stock Plan Awards" below. Absent a plan amendment, as long as we remain a subsidiary of Clear Channel Communications, certain of our employees will continue to be eligible for stock awards under the Clear Channel Communications stock incentive plans. Prior to the completion of this offering, we will have in place our own stock incentive and annual incentive compensation plans for our eligible employees. See "— Our New Stock Incentive Plan" and "— Annual Incentive Plan." We expect to make awards under our new stock incentive plan shortly after the completion of this offering. However, the number of shares covered by the initial awards and details relating to individual awards have not yet been determined.

We will reimburse Clear Channel Communications for the costs and expenses incurred by it and its other affiliates in connection with the continuing coverage of our employees in the Clear Channel Communications employee benefit plans and in connection with its or their services relating to payroll administration and the administration of our own stock incentive and other plans. See "Arrangements Between Clear Channel Communications and Us — Corporate Services Agreement" for information concerning our reimbursement obligations to Clear Channel Communications. We will continue to bear the cost of and retain responsibility for employment-related liabilities and obligations with respect to our employees, regardless of when incurred.

**Clear Channel Communications Stock Plan Awards**

Before this offering, some of our employees received Clear Channel Communications stock options and restricted stock under the Clear Channel Communications, Inc. Stock Incentive Plans.

It is anticipated that some or all of the outstanding Clear Channel Communications stock options held by our employees will be converted into adjusted options to purchase shares of our Class A common stock. The number of shares and the exercise price per share under each converted option will be adjusted such that the ratio of the per share exercise price to the per share value of our stock and the total intrinsic value of the option are the same after the conversion as they were prior to the conversion. Generally, the converted stock options will continue to be governed by their original vesting and other terms and conditions. We will be responsible for administering and honoring the converted Clear Channel Communications stock options held by our employees, and Clear Channel Communications will have no further liability with respect to those options.

The restricted shares of Clear Channel Communications stock held by our employees will continue to be subject to the forfeiture conditions and transfer restrictions and the other terms and conditions of the original award relating to those shares and of the Clear Channel Communications, Inc. 2001 Stock Incentive Plan. In the event of the completion of the previously-announced spin-off of the entertainment business of Clear Channel Communications, our employees who hold restricted shares of Clear Channel Communications stock under the Clear Channel Communications, Inc. 2001 Stock Incentive Plan will

**Table of Contents**

receive fully vested shares of the newly created company's stock in connection with the spin-off distribution, on the same basis as other stockholders of Clear Channel Communications generally.

## Annual Incentive Plan

For 2005, our executive officers and other key employees will generally be entitled to receive incentive compensation in accordance with the terms of the performance-based awards previously made to them under the Clear Channel Communications, Inc. 2005 Annual Incentive Plan. However, at least as to our named executive officers, we will be responsible for determining the amounts, if any, that are payable under those awards, subject to such adjustments as are deemed appropriate in light of the corporate restructuring by Clear Channel Communications, including the spin-off of the entertainment business of Clear Channel Communications and this offering.

For 2006, our executive officers and other designated key employees will participate in our own 2006 Annual Incentive Plan, which has been adopted by our board of directors and approved by Clear Channel Communications, in its capacity as our sole stockholder. In general, the plan provides for the payment of annual bonuses tied to the achievement of pre-established performance objectives fixed by the committee. We intend that bonuses under our plan will qualify for the performance-based-compensation exemption from the executive compensation deduction limitations of section 162(m) of the Code. Toward that end, in order to satisfy regulations issued under section 162(m), we expect to submit our plan for approval at the annual meeting of our stockholders occurring after the first anniversary of this offering.

Our annual incentive plan will be administered by the compensation committee of our board of directors. The committee will have the authority to select the executive officers and other key employees to whom awards will be made, to prescribe the performance objectives which must be satisfied pursuant to such awards, and to make the determinations necessary with respect to the administration and payment of such awards. The performance objectives that may be established for awards made under the plan may be based upon any one or more of the following business criteria: revenue growth, operating income before depreciation, amortization and non-cash compensation expense, or OIBDAN, OIBDAN growth, funds from operations, funds from operations per share and per share growth, operating income and operating income growth, net earnings, earnings per share and per share growth, return on equity, return on assets, share price performance on an absolute basis and relative to an index, improvements in attainment of expense levels, implementing or completion of critical projects, improvement in cash-flow (before or after tax). Performance objectives may be based upon the performance of such person or persons, as the committee may determine, including an individual or group of individuals, our company on a combined basis, one or more subsidiaries or other affiliates, and one or more divisions or business units. Performance objectives may be expressed in fixed or relative quantitative terms or in other ways, including, for example, targets relative to past performance, or targets compared to the performance of other companies, such as a published or special index or a group of companies selected by the committee for comparison. The committee may provide that the amount, if any, of a participant's annual bonus will be higher or lower, depending upon the extent to which the applicable performance objective is achieved.

Performance objectives applicable to a performance period must be established by the committee prior to, or reasonably soon after the beginning of a performance period, but no later than the 90 days from the beginning of the period or, if earlier, the date 25% of the period has elapsed.

Upon certification of the achievement of performance objectives by the committee which entitle a participant to the payment of a performance award, subject to deferral arrangements that may be permitted or required by the committee, the award shall be settled in cash or other property. The maximum performance bonus that may be earned by any participant in any calendar year is limited to $15.0 million.

The committee is authorized to reduce or eliminate the performance award of any participant, for any reason, including changes in the participant's position or duties, whether due to termination of employment (including death, disability, retirement, voluntary termination or termination with or without cause) or otherwise. To the extent necessary to preserve the intended economic effects of the plan or an award under

Table of Contents

the plan, the committee is authorized to adjust pre-established performance objectives and/or performance awards to take into account certain material events, such as a change in corporate capitalization, a corporate transaction, a partial or complete liquidation of our company or any subsidiary, or certain changes in accounting rules; provided that no such adjustment may cause a performance award to be non-deductible under Section 162(m) of the Code.

Our board of directors or the committee may, at any time, or from time to time, amend the plan. Any such amendment may be made without stockholder approval unless such approval is required to maintain the status of the plan under Section 162(m) of the Code. Our board of directors may terminate the plan at any time.

## Our New Stock Incentive Plan

Our board of directors adopted and our sole stockholder approved the Clear Channel Outdoor Holdings, Inc. 2005 Stock Incentive Plan. The purpose of the plan is to help us attract, motivate and retain qualified executives and other key personnel. In furtherance of this purpose, the plan authorizes us to grant various forms of incentive awards, including stock options, stock appreciation rights, restricted stock, deferred stock awards and performance-based cash and stock awards. See "— Forms of Award" below.

The plan and certain tax aspects of awards made under the plan are summarized below.

### Administration

The plan will be administered by the compensation committee of our board of directors; however, the full board of directors will have sole responsibility and authority for making and administering awards to any of our non-employee directors. Subject to the terms of the plan, the committee has broad authority to select the persons to whom awards will be made, fix the terms and conditions of each award, and construe, interpret and apply the provisions of the plan and of any award made under the plan. The committee may delegate any of its responsibilities and authority, subject to applicable law. Subject to certain limitations, we will indemnify the members of the committee against claims made and liabilities and expenses incurred in connection with their service under the plan.

### Securities Covered by the Plan

We can issue a total of 42,000,000 shares of our common stock under the plan. The following shares are not taken into account in applying these limitations: (i) shares covered by awards that expire or are forfeited, canceled or settled in cash, (ii) shares withheld by us for the payment of taxes associated with an award, (iii) shares withheld by us for the payment of the exercise price under an award and (iv) previously owned shares received by us in payment of the exercise price under an award.

### Individual Award Limitations

No participant may receive awards in any calendar year covering more than one million shares plus the amount of the participant's unused annual limit as of the close of the preceding calendar year. No participant may receive performance-based cash awards under the plan in any calendar year covering more than $5.0 million plus the amount of the participant's unused annual limit as of the close of the preceding calendar year.

### Eligibility

Awards may be made under the plan to any of our present or future directors, officers, employees, consultants or advisers. In connection with this offering and other related corporate restructurings, Clear Channel Communications stock options held by certain of our employees and other personnel will be converted into options or other awards for shares of our Class A common stock. The shares of our Class A common stock covered by such adjusted or converted Clear Channel Communications awards will not be

**Table of Contents**

taken into account in applying our plan's share limitations. See "— Clear Channel Communications Stock Plan Awards" below.

### Forms of Award

*Stock Options and Stock Appreciation Rights.* We may grant stock options that qualify as "incentive stock options" under Section 422 of the Code, or ISOs, as well as stock options that do not qualify as ISOs. ISOs may not be granted more than 10 years after the date the plan is adopted. We may also grant stock appreciation rights, or SARs. In general, an SAR gives the holder the right to receive the appreciation in value of the shares of company stock covered by the SAR from the date the SAR is granted to the date the SAR is exercised. The per share exercise price of a stock option and the per share base value of an SAR may not be less than the fair market value per share of common stock on the date the option or SAR is granted. The maximum term of a stock option is 10 years (different limitations apply to ISOs granted to 10% stockholders: the term may not be greater than five years and the exercise price may not be less than 110% of the value of our common stock on the date the option is granted). The committee may impose such exercise, forfeiture and other conditions and limitations as it deems appropriate with respect to stock options and SARs. The exercise price under a stock option may be paid in cash or in any other form or manner permitted by the committee, including, without limitation, payment of previously owned shares of stock, or payment pursuant to broker-assisted cashless exercise procedures. Methods of exercise and settlement and other terms of SARs will be determined by the committee.

*Restricted Stock and Deferred Stock Awards.* The plan authorizes the committee to make restricted stock awards, pursuant to which shares of common stock are issued to designated participants subject to transfer restrictions and vesting conditions. In general, if the recipient of a restricted stock award terminates employment before the end of the specified vesting period or if the recipient fails to meet performance or other specified vesting conditions, the restricted shares will be forfeited by the recipient and will revert to us. Subject to such conditions as the committee may impose, the recipient of a restricted stock award may be given the rights to vote and receive dividends on shares covered by the award pending the vesting or forfeiture of the shares.

Deferred stock awards generally consist of the right to receive shares of common stock in the future, subject to such conditions as the committee may impose, including, for example, continuing employment or service for a specified period of time or satisfaction of specified performance criteria. Deferred stock awards may be made in a number of different forms, including "stock units" and "restricted stock units." Prior to settlement, deferred stock awards do not carry voting, dividend or other rights associated with stock ownership; however, dividend equivalents may be payable if the committee so determines.

*Other Stock-Based Awards.* The plan gives the committee broad discretion to grant other types of equity-based awards, including, for example, dividend equivalent rights, phantom shares, and bonus shares, and to provide for settlement in cash and/or shares. The plan also allows non-employee directors to elect to receive their director fees in the form of Class A common stock, in lieu of cash.

*Performance-Based Awards.* The committee may also grant performance awards under the plan. In general, performance awards would provide for the payment of cash and/or shares of Class A common stock upon the achievement of performance objectives established by the committee for a fiscal year or other designated performance period. Performance objectives may be based upon any one or more of the following business criteria: (i) earnings per share, (ii) share price or total shareholder return, (iii) pretax profits, (iv) net earnings, (v) return on equity or assets, (vi) revenues, (vii) operating income before depreciation, amortization and non-cash compensation expense, or OIBDAN, (viii) market share or market penetration, or (ix) any combination of the foregoing. Performance objectives may be based upon the performance of such person or persons, as the committee may determine, including an individual or group of individuals, our company on a combined basis, one or more subsidiaries or other affiliates, and one or more divisions or business units. Performance objectives may be expressed in fixed or relative quantitative terms or in other ways, including, for example, targets relative to past performance, or targets

98

Table of Contents

compared to the performance of other companies, such as a published or special index or a group of companies selected by the committee for comparison.

### Adjustments of Awards

*Capital Changes.* In the event of material changes to our capital structure, including, for example, a recapitalization, stock split or spin-off, appropriate adjustments will be made to the maximum number of shares and the class of shares or other securities which may be issued under the plan, the maximum number and class of shares which may be covered by awards made to an individual in any calendar year, the number and class of shares or other securities subject to outstanding awards and, where applicable, the exercise price, base value or purchase price under outstanding awards.

*Merger and Other Transactions.* If we enter into a merger or other transaction involving the sale of our company, outstanding options and SARs will either become fully vested and exercisable, or assumed by and converted into options or SARs for shares of the acquiring company. Our board of directors may make similar adjustments to other outstanding awards under the plan and may direct a cashout of any or all outstanding awards based upon the value of the consideration paid for our shares in the merger or other transaction giving rise to the adjustment of plan awards. Additional or different types of adjustments may be permitted or required under the terms of individual plan awards, as the committee may determine.

*No Repricing of Stock Options.* Subject to the provisions of the plan regarding adjustments due to a change in capital structure, the committee will have no authority to reprice outstanding options, whether through amendment, cancellation or replacement grants, without approval of our stockholders.

### Amendment and Termination of the Plan; Term

Except as may otherwise be required by law or the requirements of any stock exchange or market upon which the common stock may then be listed, our board of directors, acting in its sole discretion and without further action on the part of our stockholders, may amend the plan at any time and from time to time and may terminate the plan at any time.

### United States Income Tax Considerations

The grant of a stock option or SAR under the plan is not a taxable event for federal income tax purposes. In general, ordinary income is realized upon the exercise of a stock option (other than an ISO) in an amount equal to the excess of the fair market value on the exercise date of the shares acquired pursuant to the exercise over the option exercise price paid for the shares. The amount of ordinary income realized upon the exercise of an SAR is equal to the excess of the fair market value of the shares covered by the exercise over the SAR base price. We are entitled to a deduction equal to the amount of ordinary income realized by a plan participant upon the exercise of an option or SAR. The tax basis of shares acquired upon the exercise of a stock option (other than an ISO) or SAR is equal to the value of the shares on the date of exercise. Upon a subsequent sale of the shares, capital gain or loss will be realized in an amount equal to the difference between the selling price and the basis of the shares.

No income is realized upon the exercise of an ISO other than for purposes of the alternative minimum tax. Income or loss is realized upon a disposition of shares acquired pursuant to the exercise of an ISO. If the disposition occurs more than one year after the ISO exercise date and more than two years after the ISO grant date, then gain or loss on the disposition, measured by the difference between the selling price and the option exercise price for the shares, will be long-term capital gain or loss. If the disposition occurs within one year of the exercise date or within two years of the grant date, then the gain realized on the disposition will be taxable as ordinary income to the extent such gain is not more than the difference between the value of the shares on the date of exercise and the exercise price, and the balance of the gain, if any, will be capital gain. We are not entitled to a deduction with respect to the exercise of an ISO; however, we are entitled to a deduction corresponding to the ordinary income realized by a participant upon a disposition of shares acquired pursuant to the exercise of an ISO before the satisfaction of the applicable one- and two-year holding period requirements described above.

Table of Contents

In general, a participant will realize ordinary income with respect to common stock received pursuant to restricted stock, deferred stock and other non-stock option and non-SAR forms of award at the time the shares become vested in accordance with the terms of the award in an amount equal to the fair market value of the shares at the time they become vested, and we are entitled to a corresponding deduction. A participant may make an "early income election" with respect to the receipt of restricted shares of common stock, in which case the participant will realize ordinary income on the date the restricted shares are received equal to the difference between the value of the shares on that date and the amount, if any, paid for the shares. In such event, any appreciation in the value of the shares after the date of the award will be taxable as capital gain upon a subsequent disposition of the shares. Our deduction is limited to the amount of ordinary income realized by the participant as a result of the early income election.

Compensation that qualifies as "performance-based" is exempt from the $1.0 million deductibility limitation imposed by Section 162(m) of the Code. It is contemplated that stock options and SARs granted under the plan with an exercise price or base price at least equal to 100% of fair market value of the underlying stock at the date of grant and certain other plan awards which are conditioned upon achievement of performance goals will be able to qualify for the "performance-based" compensation exemption, assuming the applicable requirements are satisfied. It is anticipated that the plan will be resubmitted for stockholder approval at or before the annual meeting of our stockholders next following the first anniversary of the initial public offering. Such approval would enable us to continue to qualify for an exception to the annual $1.0 million executive compensation deduction limitations of Section 162(m) of the Code with respect to certain awards made under the plan.

The above summary pertains solely to certain U.S. federal income tax consequences associated with awards made under the plan. The summary does not address all federal income tax consequences and it does not address state, local and non-U.S. tax considerations.

### Employment Agreements

Mark P. Mays and Randall T. Mays each have employment agreements with Clear Channel Communications. Paul J. Meyer has an employment agreement with us. Set forth below are summaries of these agreements.

On March 10, 2005, Clear Channel Communications entered into amended and restated employment agreements with Mark P. Mays and Randall T. Mays. These agreements amended and restated existing employment agreements dated October 1, 1999 between Clear Channel Communications and the executives. Each amended and restated agreement has a term of seven years with automatic daily extensions unless Clear Channel Communications or the executive elects not to extend the agreement. Each of these employment agreements provides for a minimum base salary, subject to review and annual increase by the compensation committee of Clear Channel Communications. In addition, each agreement provides for an annual bonus pursuant to Clear Channel Communications' Annual Incentive Plan or as the executive performance subcommittee of the compensation committee of Clear Channel Communications determines. The employment agreements with Mark Mays and Randall Mays provide for base minimum salaries of $350,000 and $325,000, respectively, and for minimum option grants to acquire 50,000 shares of Clear Channel Communications common stock; provided, however, that the annual option grant will not be smaller than the option grant in the preceding year unless waived by the executive. Each option will be exercisable at fair market value at the date of grant for a 10-year period even if the executive is not employed by Clear Channel Communications. The compensation committee of Clear Channel Communications or the executive performance subcommittee of the compensation committee of Clear Channel Communications will determine the schedule upon which the options will vest and become exercisable.

Each of these executive employment agreements provides for severance and change-in-control payments in the event that Clear Channel Communications terminates the executive's employment without "Cause" or if the executive terminates for "Good Reason." "Cause" is narrowly defined, and any determination of "Cause" is subject to a supermajority vote of Clear Channel Communications' independent directors. "Good Reason" includes defined change-in-control transactions involving Clear Channel Communications, Clear Channel Communications' election not to automatically extend the term

**Table of Contents**

of the employment agreement, a diminution in the executive's pay, duties or title or, (i) in the case of Mark Mays, at any time that the office of Chairman is held by someone other than himself, L. Lowry Mays or Randall Mays; or (ii) in the case of Randall Mays, at any time that either of the offices of Chairman or President and Chief Executive Officer is held by someone other than himself, L. Lowry Mays or Mark Mays. If either executive is terminated by Clear Channel Communications without "Cause" or the executive resigns for "Good Reason" then that executive will receive a lump-sum cash payment equal to the base salary and bonus that otherwise would have been paid for the remainder of the term of the agreement (using the highest bonus paid to the executive in the three years preceding the termination but not less than $1,000,000), continuation of benefits, immediate vesting on the date of termination of all stock options held by the executive on the date of termination, and either: (i) an option to acquire 1,000,000 shares of Clear Channel Communications' common stock at fair market value as of the date of termination that is fully vested and exercisable for a period of 10 years, or (ii) a grant of a number of shares of Clear Channel Communications' common stock equal to: (a) 1,000,000, divided by (b) the number computed by dividing: (x) the last reported sale price of Clear Channel Communications' common stock on the New York Stock Exchange at the close of the trading day immediately preceding the date of termination of executive's employment, by (y) the value of the stock option described in clause (i) above as determined by Clear Channel Communications in accordance with generally accepted accounting principles. Certain tax gross up payments would also be due on such amounts. In the event the executive's employment is terminated without "Cause" or for "Good Reason," the employment agreements also restrict the executive's business activities that compete with the business of Clear Channel Communications for a period of two years following such termination.

On August 5, 2005, we entered into an employment agreement with Paul J. Meyer. The initial term of the agreement ends on the third anniversary of the date of the agreement; the term automatically extends one day at a time beginning on the second anniversary of the date of the agreement. The contract calls for Mr. Meyer to be our President and Chief Operating Officer for a base salary of $600,000 in the first year of the agreement; $625,000 in the second year of the agreement; and $650,000 in the third year of the agreement, subject to additional annual raises thereafter in accordance with company policies. Mr. Meyer is also eligible to receive a performance bonus as decided at the sole discretion of our board of directors and the compensation committee.

Mr. Meyer may terminate his employment at any time after the second anniversary of the date of the agreement upon one year's written notice. We may terminate Mr. Meyer without "Cause" after the second anniversary of the date of the agreement upon one year's written notice. "Cause" is narrowly defined in the agreement. If Mr. Meyer is terminated without "Cause," he is entitled to receive a lump sum payment of accrued and unpaid base salary and prorated bonus, if any, and any payments to which he may be entitled under any applicable employee benefit plan. Mr. Meyer is prohibited by his employment agreement from activities that compete with us for one year after he leaves us and he is prohibited from soliciting our employees for employment for 12 months after termination regardless of the reason for termination of employment.

## Certain Relationships and Related Transactions

Each of Mark P. Mays, Randall T. Mays and L. Lowry Mays, our current directors, is an executive officer of Clear Channel Communications. We currently have issued three intercompany notes to Clear Channel Communications in the aggregate principal amount of approximately $4.0 billion, which represents in excess of five percent of our total consolidated assets at December 31, 2004 and September 30, 2005. In connection with this offering, approximately $1.5 billion of such indebtedness will be repaid or otherwise extinguished. Marsha McCombs Shields, one of our prospective directors, is the daughter of one of the founders and board members of Clear Channel Communications.

Table of Contents

## ARRANGEMENTS BETWEEN CLEAR CHANNEL COMMUNICATIONS AND US

*We have provided below a summary description of the Master Agreement between Clear Channel Communications and us and the other key agreements that relate to our separation from and post-separation relationship with Clear Channel Communications. This description, which summarizes the material terms of these agreements, is not complete. You should read the full text of these agreements, which have been included as exhibits to the registration statement of which this prospectus is a part.*

### Relationship with Clear Channel Communications

Immediately prior to this offering, Clear Channel Communications through its wholly owned subsidiary, Clear Channel Holdings, Inc., is our only stockholder. After this offering, Clear Channel Communications will own all of our outstanding shares of Class B common stock, representing approximately 90% of the outstanding shares of our common stock and approximately 99% of the total voting power of our common stock. For as long as Clear Channel Communications continues to own shares of common stock representing more than 50% of the total voting power of our common stock, Clear Channel Communications will be able to direct the election of all the members of our board of directors and exercise a controlling influence over our business and affairs, including any determinations with respect to mergers or other business combinations involving us, our acquisition or disposition of assets, our incurrence of indebtedness, the issuance of any additional common stock or other equity securities, the repurchase or redemption of common stock or preferred stock and the payment of dividends. Similarly, Clear Channel Communications will have the power to determine or significantly influence the outcome of matters submitted to a vote of our stockholders, will have the power to prevent a change in control of us and could take other actions that might be favorable to Clear Channel Communications. See "Description of Capital Stock."

Prior to the completion of this offering, we will enter into a Master Agreement and a number of other agreements with Clear Channel Communications setting forth various matters governing our separation from Clear Channel Communications and our relationship with Clear Channel Communications while it remains a significant stockholder in us. These agreements will govern our relationship with Clear Channel Communications after this offering and will provide for, among other things, the allocation of employee benefit, tax and other liabilities and obligations attributable to our operations.

Set forth below are descriptions of certain agreements, relationships and transactions we will have with Clear Channel Communications. The following descriptions and summaries of each of the agreements with Clear Channel Communications are qualified in their entirety by reference to the complete texts of the agreements, which are incorporated by reference into this prospectus and are attached as an exhibit to the registration statement in which this prospectus is included. We encourage you to read each of the agreements in its entirety for a more complete description of the terms and conditions of each agreement.

### Master Agreement

We will enter into a master agreement with Clear Channel Communications prior to the completion of this offering. In this prospectus, we refer to this agreement as the Master Agreement. The Master Agreement will set forth our agreements with Clear Channel Communications regarding the principal transactions required to effect the transfer of assets and the assumption of liabilities necessary to complete the separation of our company from Clear Channel Communications. It also will set forth other agreements governing our relationship after the separation.

#### The Transfers

To effect the separation, Clear Channel Communications will, and will cause its affiliates to, transfer to us the assets related to our businesses not currently owned by us, as described in this prospectus. We or our subsidiaries will assume and agree to perform, discharge and fulfill the liabilities related to our businesses for which Clear Channel Communications or its affiliates are presently obligated (which, in the case of tax liabilities, will be governed by the Tax Matters Agreement described below). If any governmental approval or other consent required to transfer any assets to us or for us to assume any liabilities is not obtained prior to the completion of this offering, we will agree with Clear Channel

102

**Table of Contents**

Communications that such transfer or assumption will be deferred until the necessary approvals or consents are obtained. Clear Channel Communications will continue to hold the assets and be responsible for the liabilities for our benefit and at our expense until the necessary approvals or consents are obtained.

Similarly, we will, and will cause our subsidiaries to, transfer to Clear Channel Communications the assets related to its business currently owned by us. Clear Channel Communications will assume from us and agree to perform, discharge and fulfill the liabilities related to its business for which we are presently obligated.

Except as expressly set forth in the Master Agreement or in any other transaction document, neither we nor Clear Channel Communications will make any representation or warranty as to:

• the assets, businesses or liabilities contributed, transferred or assumed as part of the separation;

• any consents or approvals required in connection with the transfers;

• the value, or freedom from any security interests, of, or any other matter concerning, any assets transferred;

• the absence of any defenses or right of set-off or freedom from counterclaim with respect to any claim or other assets of either us or Clear Channel Communications; or

• the legal sufficiency of any document or instrument delivered to convey title to any asset transferred.

Except as expressly set forth in any transaction document, all assets will be transferred on an "as is," "where is" basis, and we and our subsidiaries will agree to bear the economic and legal risks that any conveyance was insufficient to vest in us good title, free and clear of any security interest, and that any necessary consents or approvals are not obtained or that any requirements of laws or judgments are not complied with.

### Auditors and Audits; Annual Financial Statements and Accounting

We have agreed that, for so long as Clear Channel Communications is required to consolidate our results of operations and financial position or account for its investment in our company under the equity method of accounting, we will maintain a fiscal year end and accounting periods the same as Clear Channel Communications, conform our financial presentation with that of Clear Channel Communications and we will not change our independent auditors without Clear Channel Communications' prior written consent (which will not be unreasonably withheld), and we will use commercially reasonable efforts to enable our independent auditors to complete their audit of our financial statements in a timely manner so as to permit timely filing of Clear Channel Communications' financial statements. We have also agreed to provide to Clear Channel Communications all information required for Clear Channel Communications to meet its schedule for the filing and distribution of its financial statements and to make available to Clear Channel Communications and its independent auditors all documents necessary for the annual audit of our company as well as access to the responsible personnel so that Clear Channel Communications and its independent auditors may conduct their audits relating to our financial statements. We will provide Clear Channel Communications with financial reports, financial statements, budgets, projections, press releases and other financial data and information with respect to our business, properties and financial positions. We have also agreed to adhere to certain specified disclosure controls and procedures and Clear Channel Communications accounting policies and to notify and consult with Clear Channel Communications regarding any changes to our accounting principles and estimates used in the preparation of our financial statements, and any deficiencies in, or violations of law in connection with, our internal control over financial reporting and certain fraudulent conduct and other violations of law.

### Exchange of Other Information

The Master Agreement will also provide for other arrangements with respect to the mutual sharing of information between Clear Channel Communications and us in order to comply with reporting, filing, audit or tax requirements, for use in judicial proceedings, and in order to comply with our respective obligations

**Table of Contents**

after the separation. We will also agree to provide mutual access to historical records relating to the other's businesses that may be in our possession.

### *Releases and Indemnification*

Except for each party's obligations under the Master Agreement, the other transaction documents and certain other specified liabilities, we and Clear Channel Communications will release and discharge each other and each of our affiliates, and their directors, officers, agents and employees from all liabilities existing or arising between us on or before the separation, including in connection with the separation and this offering. The releases will not extend to obligations or liabilities under any agreements between Clear Channel Communications and us that remain in effect following the separation.

We will indemnify, hold harmless and defend Clear Channel Communications, each of its affiliates and each of their respective directors, officers and employees, on an after-tax basis, from and against all liabilities relating to, arising out of or resulting from:

- the failure by us or any of our affiliates or any other person or entity to pay, perform or otherwise promptly discharge any liabilities or contractual obligations associated with our businesses, whether arising before or after the separation;

- the operations, liabilities and contractual obligations of our business whether arising before or after the separation;

- any guarantee, indemnification obligation, surety bond or other credit support arrangement by Clear Channel Communications or any of its affiliates for our benefit;

- any breach by us or any of our affiliates of the Master Agreement, the other transaction documents or our amended and restated certificate of incorporation or bylaws;

- any untrue statement of, or omission to state, a material fact in Clear Channel Communications' public filings to the extent the statement or omission was as a result of information that we furnished to Clear Channel Communications or that Clear Channel Communications incorporated by reference from our public filings, if the statement or omission was made or occurred after the separation; and

- any untrue statement of, or omission to state, a material fact in any registration statement or prospectus related to this offering, except to the extent the statement was made or omitted in reliance upon information provided to us by Clear Channel Communications expressly for use in any such registration statement or prospectus or information relating to and provided by any underwriter expressly for use in any such registration statement or prospectus.

Clear Channel Communications will indemnify, hold harmless and defend us, each of our affiliates and each of our and their respective directors, officers and employees, on an after-tax basis, from and against all liabilities relating to, arising out of or resulting from:

- the failure of Clear Channel Communications or any of its affiliates or any other person or entity to pay, perform or otherwise promptly discharge any liabilities of Clear Channel Communications or its affiliates, other than liabilities associated with our businesses, whether arising before or after the separation;

- the liabilities of Clear Channel Communications and its affiliates' businesses, other than liabilities associated with our businesses;

- any breach by Clear Channel Communications or any of its affiliates of the Master Agreement or the other transaction documents;

- any untrue statement of, or omission to state, a material fact in our public filings to the extent the statement or omission was as a result of information that Clear Channel Communications furnished to us or that we incorporated by reference from Clear Channel Communications' public filings, if the statement or omission was made or occurred after the separation; and

**Table of Contents**

- any untrue statement of, or omission to state, a material fact contained in any registration statement or prospectus related to this offering, but only to the extent the statement or omission was made or omitted in reliance upon information provided by Clear Channel Communications expressly for use in any such registration statement or prospectus.

The Master Agreement will also specify procedures with respect to claims subject to indemnification and related matters and will provide for contribution in the event that indemnification is not available to an indemnified party.

*Expenses of the Separation and Our Initial Public Offering.* Clear Channel Communications will pay or reimburse us for all out-of-pocket fees, costs and expenses (including all legal, accounting and printing expenses) incurred prior to the completion of this offering in connection with our separation from Clear Channel Communications, except that we shall be responsible for fees and expenses attributable to this offering.

### Dispute Resolution Procedures

We will agree with Clear Channel Communications that neither party will commence any court action to resolve any dispute or claim arising out of or relating to the Master Agreement, subject to certain exceptions. Instead, any dispute that is not resolved in the normal course of business will be submitted to senior executives of each business entity involved in the dispute for resolution. If the dispute is not resolved by negotiation within 45 days after submission to the executives, either party may submit the dispute to mediation. If the dispute is not resolved by mediation within 30 days after the selection of a mediator, either party may submit the dispute to binding arbitration before a panel of three arbitrators. The arbitrators will determine the dispute in accordance with Texas law. Most of the other agreements between Clear Channel Communications and us have similar dispute resolution provisions.

### Other Provisions

The Master Agreement also will contain covenants between Clear Channel Communications and us with respect to other matters, including the following:

- our agreement (subject to certain limited exceptions) not to repurchase shares of our outstanding Class A common stock or any other securities convertible into or exercisable for our Class A common stock, without first obtaining the prior written consent or affirmative vote of Clear Channel Communications, for so long as Clear Channel Communications owns more than 50% of the total voting power of our common stock;

- confidentiality of our and Clear Channel Communications' information;

- our right to continue coverage under Clear Channel Communications' insurance policies for so long as Clear Channel Communications owns more than 50% of our outstanding common stock;

- restrictions on our ability to take any action or enter into any agreement that would cause Clear Channel Communications to violate any law, organizational document, agreement or judgment;

- restrictions on our ability to take any action that limits Clear Channel Communications' ability to freely sell, transfer, pledge or otherwise dispose of our stock;

- our obligation to comply with Clear Channel Communications' policies applicable to its subsidiaries for so long as Clear Channel Communications owns more than 50% of the total voting power of our outstanding common stock, except (i) to the extent such policies conflict with our amended and restated certificate of incorporation or bylaws or any of the agreements between Clear Channel Communications and us, or (ii) as otherwise agreed with Clear Channel Communications or superseded by any policies adopted by our board of directors; and

- restrictions on our ability to enter into any agreement that binds or purports to bind Clear Channel Communications.

**Table of Contents**

### *Approval Rights of Clear Channel Communications on Certain of our Activities*

Until the first date on which Clear Channel Communications owns less than 50% of the total voting power of our common stock, the prior affirmative vote or written consent of Clear Channel Communications is required for the following actions (subject in each case to certain agreed exceptions):

- a merger involving us or any of our subsidiaries (other than mergers involving our subsidiaries or to effect acquisitions permitted under our amended and restated certificate of incorporation);

- acquisitions by us or our subsidiaries of the stock or assets of another business for a price (including assumed debt) in excess of $5 million;

- dispositions by us or our subsidiaries of assets in a single transaction or a series of related transactions for a price (including assumed debt) in excess of $5 million;

- incurrence or guarantee of debt by us or our subsidiaries in excess of $400.0 million outstanding at any one time or that could reasonably be expected to result in a negative change in any of our credit ratings, excluding our debt with Clear Channel Communications described in this prospectus, intercompany debt (within our company and its subsidiaries), and debt determined to constitute operating leverage by a nationally recognized statistical rating organization;

- issuance by us or our subsidiaries of capital stock or other securities convertible into capital stock;

- enter into any agreement restricting our ability or the ability of any of our subsidiaries to pay dividends, borrow money, repay indebtedness, make loans or transfer assets, in any such case to our company or Clear Channel Communications;

- dissolution, liquidation or winding up of our company or any of our subsidiaries;

- adoption of a rights agreement; and

- alteration, amendment, termination or repeal of, or adoption of any provision inconsistent with, the provisions of our amended and restated certificate of incorporation or our bylaws relating to our authorized capital stock, the rights granted to the holders of the Class B common stock, amendments to our bylaws, stockholder action by written consent, stockholder proposals and meetings, limitation of liability of and indemnification of our officers and directors, the size or classes of our board of directors, corporate opportunities and conflicts of interest between our company and Clear Channel Communications, and Section 203 of the Delaware General Corporation Law.

## Corporate Services Agreement

We will enter into a corporate services agreement with Clear Channel Communications or one of its affiliates prior to the completion of this offering to provide us certain administrative and support services and other assistance in the United States consistent with the services provided to us before the offering. In this prospectus, we refer to this agreement as the Corporate Services Agreement. The services Clear Channel Communications will provide us, as qualified in the agreement, include, without limitation, the following:

- treasury, payroll and other financial related services;

- executive officer services;

- human resources and employee benefits;

- legal and related services;

- information systems, network and related services;

- investment services;

- corporate services; and

- procurement and sourcing support.

Table of Contents

The charges for the corporate services generally are intended to allow Clear Channel Communications to fully recover the allocated direct costs of providing the services, plus all out-of-pocket costs and expenses, generally without profit. The allocation of cost will be based on various measures depending on the service provided, which measures will include relative revenue, employee headcount or number of users of a service.

Under the Corporate Services Agreement, we and Clear Channel Communications will each have the right to purchase goods or services, use intellectual property licensed from third parties and realize other benefits and rights under the other party's agreements with third-party vendors to the extent allowed by such vendor agreements. The agreement also will provide for the lease or sublease of certain facilities used in the operation of our respective businesses and for access to each other's computing and telecommunications systems to the extent necessary to perform or receive the corporate services.

The Corporate Services Agreement will require Clear Channel Communications to continue to make available to us the range of services provided by Clear Channel Communications prior to this offering, as qualified by such agreement, and will require us to utilize such services in the conduct of our business until such time as Clear Channel Communications owns less than 50% of the total voting power of our common stock. The Corporate Services Agreement may be terminated by mutual agreement of Clear Channel Communications and us at any time, or upon no less than six months prior notice after such time as Clear Channel Communications owns less than 50% of the total voting power of our common stock. However, the Corporate Services Agreement will require Clear Channel Communications to provide, and us to continue to use, certain specified services, generally related to information technology, for a period of time specified in the agreement after the expiration of the six month notice period. Our participation in the Clear Channel Communications employee benefit plans may be terminated by us or by Clear Channel Communications on 90 days' notice and, unless otherwise agreed, will terminate if and when Clear Channel Communications owns less than 80% of the total combined voting power of our common stock. See "— Employee Matters Agreement" below. Under the terms of the Corporate Services Agreement, Clear Channel Communications will not be liable to us for or in connection with any services rendered pursuant to the agreement or for any actions or inactions taken by Clear Channel Communications in connection with the provision of services. However, Clear Channel Communications will be liable for, and will indemnify a receiving party for, liabilities resulting from its gross negligence, willful misconduct, improper use or disclosure of client information or violations of law, subject to a cap on Clear Channel Communications' liability of the amount received by Clear Channel Communications under the Corporate Services Agreement during the immediately preceding 12-month period. Additionally, we will indemnify Clear Channel Communications for any losses arising from the provision of services, except to the extent the liabilities are caused by Clear Channel Communications' gross negligence or material breach of the Corporate Services Agreement.

The Corporate Services Agreement provides that, with respect to executive services, after this offering Clear Channel Communications will make available to us, and we will be obligated to utilize, the services of the chief executive officer of Clear Channel Communications, currently Mark P. Mays, to serve as our Chief Executive Officer, and the chief financial officer of Clear Channel Communications, currently Randall T. Mays, to serve as our Chief Financial Officer. Our obligation to utilize the services of each of the chief executive officer and chief financial officer of Clear Channel Communications in these capacities will continue until Clear Channel Communications owns less than 50% of the voting power of our common stock or we provide Clear Channel Communications with six months prior written notice of termination. Clear Channel Communications will charge an allocable portion of the compensation and benefits costs of such persons based on the ratio of our OIBDAN to the total Clear Channel Communications OIBDAN using the previous year's fiscal results. The compensation and benefits costs allocated to us will include such executives' salary, bonus and other standard employee benefits, but will exclude equity based compensation. Because bonus is a major component of the allocable part of such executives' compensation and increase in OIBDAN is a major element in calculating such bonus, OIBDAN was used as the basis for making the allocation of overall compensation expense between Clear Channel Communications and us.

107

Table of Contents

Each of Mark and Randall Mays will be employed by Clear Channel Communications, and will spend a substantial part of his professional time and effort on behalf of Clear Channel Communications. In addition, both Mark and Randall Mays will serve as directors of the entertainment business of Clear Channel Communications, which is being spun off by Clear Channel Communications to its stockholders. We have not established any minimum time requirements for such officers. In addition, Mark and Randall Mays will continue to participate in Clear Channel Communications' stock incentive and other benefits plans and will continue to hold a substantial number of shares of and/or options to purchase shares of common stock of Clear Channel Communications. These substantial interests in Clear Channel Communications' equity present these officers with incentives different from those of our stockholders, and may create conflicts of interest described under "Risk Factors — Risks Related to Our Relationship with Clear Channel Communications."

### Registration Rights Agreement

We will enter into a registration rights agreement with Clear Channel Communications prior to the completion of this offering to provide Clear Channel Communications with registration rights relating to shares of our outstanding common stock held by Clear Channel Communications after this offering. In this prospectus, we refer to this agreement as the Registration Rights Agreement.

Clear Channel Communications may assign its rights under the Registration Rights Agreement to any person that acquires shares of our outstanding common stock subject to the agreement and agrees to be bound by the terms of the agreement. Subject to certain limitations, Clear Channel Communications and its permitted transferees may require us to register under the Securities Act of 1933, as amended, all or any portion of these shares, a so-called "demand request." We are not obligated to effect the following:

- a demand registration within 60 days after the effective date of a previous demand registration, other than a shelf registration pursuant to Rule 415 under the Securities Act;

- a demand registration within 180 days after the effective date of the registration statement of which this prospectus is a part;

- a demand registration, unless the demand request is for a number of shares of common stock with a market value that is equal to at least $150.0 million; and

- more than two demand registrations during the first 12 months after this offering or more than three demand registrations during any 12-month period thereafter.

We may defer the filing of a registration statement for a period of up to 90 days after a demand request has been made if (i) at the time of such request we are engaged in confidential business activities, which would be required to be disclosed in the registration statement, and our board of directors determines that such disclosure would be materially detrimental to us and our stockholders, or (ii) prior to receiving such request, our board of directors had determined to effect a registered underwritten public offering of our securities for our account and we have taken substantial steps to effect such offering. However, with respect to two demand requests only, if Clear Channel Communications or any of its affiliates makes a demand request during the two-year period after this offering, we will not have the right to defer such demand registration or to not file such registration statement during that period.

Additionally, Clear Channel Communications and its permitted transferees have so-called "piggyback" registration rights, which means that Clear Channel Communications and its permitted transferees may include their respective shares in any future registrations of our equity securities, whether or not that registration relates to a primary offering by us or a secondary offering by or on behalf of any of our stockholders. The demand registration rights and piggyback registrations are each subject to market cutback exceptions.

We will pay all costs and expenses in connection with any "demand" registration and any "piggyback" registration, except in each case underwriting discounts, commissions or fees attributable to the shares of common stock sold by Clear Channel Communications. The Registration Rights Agreement will set forth customary registration procedures, including an agreement by us to make our management available for road show presentations in connection with any underwritten offerings. We will also agree to indemnify

108

**Table of Contents**

Clear Channel Communications and its permitted transferees with respect to liabilities resulting from untrue statements or omissions in any registration statement used in any such registration, other than untrue statements or omissions resulting from information furnished to us for use in the registration statement by Clear Channel Communications or any permitted transferee.

The rights of Clear Channel Communications and its permitted transferees under the Registration Rights Agreement will remain in effect with respect to the shares of common stock covered by the agreement until those shares:

• have been sold pursuant to an effective registration statement under the Securities Act;

• have been sold to the public pursuant to Rule 144 under the Securities Act;

• have been transferred in a transaction where subsequent public distribution of the shares would not require registration under the Securities Act; or

• are no longer outstanding.

Additionally, the registration rights under the agreement will cease to apply to a holder other than Clear Channel Communications or its affiliates when such holder holds less than 3% of economic value of the then-outstanding shares of common stock covered by the agreement and such shares are eligible for sale pursuant to Rule 144(k) under the Securities Act.

**Tax Matters Agreement**

After this offering, we and certain of our eligible corporate subsidiaries will continue to be included in the affiliated group of corporations that files a consolidated return for U.S. federal income tax purposes of which Clear Channel Communications is the common parent corporation, and in certain cases, we or one or more of our subsidiaries may be included in a combined, consolidated or unitary group with Clear Channel Communications or one or more of its subsidiaries for certain state and local income tax purposes. Prior to the completion of this offering, we and Clear Channel Communications will enter into a tax matters agreement to allocate the responsibility of Clear Channel Communications and its subsidiaries, on the one hand, and we and our subsidiaries, on the other, for the payment of taxes resulting from filing tax returns on a combined, consolidated or unitary basis. In this prospectus, we refer to this agreement as the Tax Matters Agreement.

With respect to tax returns in which we or any of our subsidiaries are included in a combined, consolidated or unitary group with Clear Channel Communications or any of its subsidiaries for federal, state or local tax purposes, we will make payments to Clear Channel Communications pursuant to the Tax Matters Agreement equal to the amount of taxes that would be paid if we and each of our subsidiaries included in such group filed a separate tax return. We will also reimburse Clear Channel Communications for the amount of any taxes paid by it on our behalf with respect to tax returns that include only us or any of our subsidiaries for federal, state or local tax purposes, which tax returns, as described below, will be prepared and filed by Clear Channel Communications. With respect to certain tax items, such as foreign tax credits, alternative minimum tax credits, net operating losses and net capital losses, that are generated by us or our subsidiaries, but are used by Clear Channel Communications or its subsidiaries when a tax return is filed on a combined, consolidated or unitary basis for federal, state or local tax purposes, we will be reimbursed by Clear Channel Communications as such tax items are used.

Under the Tax Matters Agreement, Clear Channel Communications is appointed the sole and exclusive agent for us and our subsidiaries in any and all matters relating to federal, state and local income taxes, will have sole and exclusive responsibility for the preparation and filing of all tax returns (or amended returns) related to such taxes and will have the power, in its sole discretion, to contest or compromise any asserted tax adjustment or deficiency and to file, litigate or compromise any claim for refund on behalf of us or any of our subsidiaries with respect to such taxes. Additionally, Clear Channel Communications will determine the amount of our liability to (or entitlement to payment from) Clear Channel Communications under the Tax Matters Agreement. This arrangement may result in conflicts of interest between Clear Channel Communications and us. For example, under the Tax Matters Agreement, Clear Channel Communications will be able to choose to contest, compromise or settle any adjustment or

109

Table of Contents

deficiency proposed by the relevant taxing authority in a manner that may be beneficial to Clear Channel Communications and detrimental to us.

For U.S. federal income tax purposes, each member of an affiliated group of corporations that files a consolidated return is jointly and severally liable for the U.S. federal income tax liability of the entire group. Similar principles may apply with respect to members of a group that file a tax return on a combined, consolidated or unitary group basis for state and local tax purposes. Accordingly, although the Tax Matters Agreement will allocate tax liabilities between Clear Channel Communications and us during the period in which we or any of our subsidiaries are included in the consolidated group of Clear Channel Communications or any of its subsidiaries, we and our subsidiaries included in such consolidated group could be liable for the tax liability of the entire consolidated group in the event any such tax liability is incurred and not discharged by Clear Channel Communications. The Tax Matters Agreement provides, however, that Clear Channel Communications will indemnify us and our subsidiaries to the extent that, as a result of us or any of our subsidiaries being a member of a consolidated group, we or our subsidiaries becomes liable for the tax liability of the entire consolidated group (other than the portion of such liability for which we and our subsidiaries are liable under the Tax Matters Agreement).

Under Section 482 of the Code, the Internal Revenue Service has the authority in certain instances to redistribute, reapportion or reallocate gross income, deductions, credits or allowances between Clear Channel Communications and us. Other taxing authorities may have similar authority under comparable provisions of foreign, state and local law. The Tax Matters Agreement provides that we or Clear Channel Communications will indemnify the other to the extent that, as a result of the Internal Revenue Service exercising its authority (or any other taxing authority exercising a similar authority), the tax liability of one group is reduced while the tax liability of the other group is increased.

If Clear Channel Communications spins off our Class B common stock to its stockholders in a distribution that is intended to be tax-free under Section 355 of the Code, we have agreed in the Tax Matters Agreement to indemnify Clear Channel Communications and its affiliates against any and all tax-related liabilities if such a spin-off fails to qualify as a tax-free distribution (including as a result of Section 355(e) of the Code) due to actions, events or transactions relating to our stock, assets or business, or a breach of the relevant representations or covenants made by us in the Tax Matters Agreement. If neither we nor Clear Channel Communications is responsible under the Tax Matters Agreement for any such spin-off not being tax-free under Section 355 of the Code, we and Clear Channel Communications have agreed that we will each be responsible for 50% of the tax related liabilities arising from the failure of such a spin-off to so qualify.

**Employee Matters Agreement**

We have entered into an employee matters agreement with Clear Channel Communications covering certain compensation and employee benefit issues. In this prospectus, we refer to this agreement as the Employee Matters Agreement. In general, with certain exceptions, our employees will continue to participate in the Clear Channel Communications employee plans and arrangements along with the employees of other Clear Channel Communications subsidiaries, on terms and conditions consistent with past practice. We will also continue to have our payroll administered by Clear Channel Communications, also on terms and conditions consistent with past practice.

We and Clear Channel Communications reserve the right to withdraw from or terminate our participation, as the case may be, in any of the Clear Channel Communications employee plans and arrangements at any time and for any reason, subject to at least 90 days' notice. Unless sooner terminated, it is likely that our participation in Clear Channel Communications employee plans and arrangements will end if and at such time as we are no longer a subsidiary of Clear Channel Communications, which, for this purpose, means Clear Channel Communications owns less than 80% of the total combined voting power of all classes of our capital stock entitled to vote. We will, however, continue to bear the cost of and retain responsibility for all employment-related liabilities and obligations associated with our employees (and their covered dependents and beneficiaries), regardless of when incurred.

Table of Contents

We will have our own stock incentive and annual incentive plans in place for our employees. These plans are described in "Management — Employee Benefits Plans." Our employees who participate in the Clear Channel Communications Annual Incentive Compensation Plan will continue their participation for the balance of 2005, pursuant to the performance-based awards previously made to them. We will make the performance-related evaluations and determinations of 2005 bonus amounts earned by our executive officers under the Clear Channel Communications plan. For 2006, our executive officers and other designated key employees will be covered by our plan.

Some or all of the Clear Channel Communications stock options granted to our employees before this offering may be converted into options to purchase shares of our Class A common stock, subject generally to the same vesting and other terms and conditions applicable to the original Clear Channel Communications options. See "Management — Clear Channel Communications Stock Plan Awards."

**Trademarks**

Prior to the completion of this offering, we will amend and restate a trademark license agreement that entitles us to use (i) on a nonexclusive basis, the "Clear Channel" trademark and the Clear Channel Communications "outdoor" trademark logo with respect to day-to-day operations of our business; and (ii) certain other Clear Channel Communications marks in connection with our business. In this prospectus, we refer to this agreement as the Trademark License Agreement. Our use of the marks will be subject to Clear Channel Communications' approval. Clear Channel Communications may terminate our use of the marks in certain circumstances, including (i) a breach by us of a term or condition of the Master Agreement, the Corporate Services Agreement, the Tax Matters Agreement or the Employee Matters Agreement and (ii) at any time after Clear Channel Communications ceases to own at least 50% of the total voting power of our common stock. For our use of these trademarks and other marks, we pay Clear Channel Communications a royalty fee which is approximately 1.5% of gross receipts (or outdoor advertising revenues earned by users of the marks) less an annual management fee of $21,600. For the years ended December 31, 2004 and 2003, we recorded $15.8 million and $14.1 million of royalty fees, respectively.

**Clear Channel Communications Agreements with Third Parties**

Historically, we have received services provided by third parties pursuant to various agreements that Clear Channel Communications has entered into for the benefit of its affiliates. We pay the third parties directly for the services they provide to us or reimburse Clear Channel Communications for our share of the actual costs incurred under the agreements. After this offering, we intend to continue to procure certain of these third-party services, including services related to insurance, vehicle leases, information technology and software, through contracts entered into by Clear Channel Communications, to the extent we are permitted (and elect to) or required to do so.

**Products and Services Provided between Clear Channel Communications and Us**

We and Clear Channel Communications engage in transactions in the ordinary course of our respective businesses. These transactions include our providing billboard and other advertising space to Clear Channel Communications at rates we believe would be charged to a third party in an arm's length transaction.

Our branch managers have historically followed a corporate policy allowing Clear Channel Communications to use, without charge, domestic displays that they or their staff believe would otherwise be unsold. Our sales personnel receive partial revenue credit for that usage for compensation purposes. This partial revenue credit is not included in our reported revenues. Clear Channel Communications bears the cost of producing the advertising and we bear the costs of installing and removing this advertising. In 2004, we estimated that these discounted revenues would have been less than 3% of our domestic revenues. Under the Master Agreement, this policy will continue.

**Intercompany Notes**

We currently have issued three intercompany notes to Clear Channel Communications in the total original principal amount of approximately $4.0 billion. See "Use of Proceeds" and "Description of Indebtedness."

**Table of Contents**

## PRINCIPAL STOCKHOLDER

We are an indirect, wholly owned subsidiary of Clear Channel Communications. All of our common stock is held by Clear Channel Holdings, Inc., another wholly owned subsidiary of Clear Channel Communications. After this offering, Clear Channel Communications will own all of our outstanding shares of Class B common stock, representing approximately 90% of the outstanding shares of our common stock and approximately 99% of the total voting power of our common stock. Clear Channel Communications will not own any of our outstanding shares of Class A common stock. Each share of our Class B common stock is convertible while owned by Clear Channel Communications or any of its affiliates (excluding us and our subsidiaries) at the option of the holder thereof into one share of Class A common stock. Clear Channel Communications has advised us that its current intent is to continue to hold all of our Class B common stock owned by it after this offering and thereby retain its controlling interest in us. However, Clear Channel Communications is not subject to any contractual obligation that would prohibit it from selling, spinning off, splitting off or otherwise disposing of any shares of our common stock, except that Clear Channel Communications has agreed not to sell, spin off, split off or otherwise dispose of any shares of our common stock for a period of 180 days after the date of this prospectus without the prior written consent of the underwriters, subject to certain limitations and limited exceptions. See "Underwriting."

**Table of Contents**

## DESCRIPTION OF CAPITAL STOCK

Below we have provided a summary description of our capital stock. This description is not complete. You should read the full text of our amended and restated certificate of incorporation and bylaws, which will be included as exhibits to the registration statement of which this prospectus is a part, as well as the provisions of applicable Delaware law.

### General

After this offering, we will be authorized to issue 750,000,000 shares of our Class A common stock, $0.01 par value per share, 600,000,000 shares or our Class B common stock, $0.01 par value per share, and 150,000,000 shares of preferred stock, $0.01 par value per share.

### Common Stock

The rights of the Class A common stock and Class B common stock are substantially similar, except with respect to voting, conversion and transferability.

#### *Voting Rights*

Each share of Class A common stock entitles its holder to one vote and each share of Class B common stock entitles its holder to 20 votes. Our Class A common stock and Class B common stock vote as a single class on all matters on which stockholders are entitled to vote, except as otherwise provided in our amended and restated certificate of incorporation or as required by law. Generally, all matters to be voted on by stockholders must be approved by a majority of the votes entitled to be cast by the holders of Class A common stock and Class B common stock present in person or represented by proxy, voting as a single class, subject to any voting rights granted to holders of any preferred stock. Except as otherwise provided by law or in our amended and restated certificate of incorporation or in our bylaws, and subject to any voting rights granted to holders of any outstanding preferred stock and the powers of our board of directors to amend our bylaws, amendments to our amended and restated certificate of incorporation and bylaws must be approved by a majority of the votes entitled to be cast by the holders of our common stock, voting as a single class. Our Class A common stock and Class B common stock are not entitled to cumulate their votes in the election of directors.

#### *Dividends*

Holders of Class A common stock and Class B common stock will share equally, on a per share basis, in any cash dividend declared by our board of directors, subject to any preferential rights of any outstanding shares of preferred stock. Dividends payable in shares of common stock may be paid only as follows: (i) shares of Class A common stock may be paid only to holders of Class A common stock, and shares of Class B common stock may be paid only to holders of Class B common stock, and (ii) the number of shares so paid will be equal, on a per share basis, with respect to each outstanding share of Class A common stock and Class B common stock.

We may not reclassify, subdivide or combine shares of either class of common stock without at the same time proportionally reclassifying, subdividing or combining shares of the other class.

#### *Conversion*

While owned by Clear Channel Communications or any of its affiliates (excluding us), each share of our Class B common stock is convertible at the option of the holder thereof into one share of Class A common stock. In addition, any shares of Class B common stock transferred to a person other than Clear Channel Communications will convert into shares of Class A common stock on a one-for-one basis upon any such transfer, except for transfers to any of Clear Channel Communications' affiliates (excluding us) or its stockholders pursuant to a tax-free transaction under Section 355 of the Code, or any corresponding provision of any successor statute, which we refer to as a tax-free spin-off.

Table of Contents

### Conversion After a Tax-Free Spin-Off

Following any distribution of Class B common stock to Clear Channel Communications' common stockholders in a transaction (including any distribution in exchange for Clear Channel Communications shares or securities) intended to qualify as a tax-free spin-off, each share of our Class B common stock will be convertible at the option of the holder thereof into one share of Class A common stock. In addition, each share of our Class B common stock will convert into one share of our Class A common stock upon any transfer thereof subsequent to such tax-free spin-off.

Clear Channel Communications may determine, in its sole discretion, in accordance with our amended and restated certificate of incorporation that our Class B common stock will not be convertible into shares of our Class A common stock after a tax-free spin-off and, in such case, we would seek to list the Class B common stock on the NYSE. Such Class B common stock would be transferable after the tax-free spin-off, subject to applicable laws.

Although Clear Channel Communications has no current plans with respect to a tax-free spin-off of us, it will have the flexibility to effect a tax-free spin-off of us in the future.

### Other Rights

Unless approved by a majority of the votes entitled to be cast by the holders of each class of common stock, voting separately as a class, in the event of any reorganization or consolidation of our company with one or more corporations or a merger of our company with another corporation in which shares of common stock are converted into or exchangeable for shares of stock, other securities or property (including cash), all holders of common stock, regardless of class, will be entitled to receive the same kind and amount of shares of stock and other securities and property (including cash).

On liquidation, dissolution or winding up of our company, after payment in full of the amounts required to be paid to holders of preferred stock, if any, all holders of common stock, regardless of class, are entitled to receive the same amount per share with respect to any distribution of assets to holders of shares of common stock.

No shares of either class of common stock are subject to redemption or have preemptive rights to purchase additional shares of common stock or other securities of our company.

Upon completion of this offering, all the outstanding shares of Class A common stock and Class B common stock will be validly issued, fully paid and nonassessable.

## Preferred Stock

Our board of directors has the authority, without action by our stockholders, to designate and issue our preferred stock in one or more series and to designate the rights, preferences and privileges of each series, which may be greater than the rights of our common stock. It is not possible to state the actual effect of the issuance of any shares of our preferred stock upon the rights of holders of our common stock until our board of directors determines the specific rights of the holders of our preferred stock. However, the effects might include, among other things:

• restricting dividends on our common stock;

• diluting the voting power of our common stock;

• impairing the liquidation rights of our common stock; or

• delaying or preventing a change in control of our company without further action by our stockholders.

At the completion of this offering, no shares of our preferred stock will be outstanding and we have no present plans to issue any shares of our preferred stock.

**Table of Contents**

**Provisions of Our Amended and Restated Certificate of Incorporation Relating to Related-Party Transactions and Corporate Opportunities**

In order to address potential conflicts of interest between Clear Channel Communications and us, our amended and restated certificate of incorporation contains provisions regulating and defining the conduct of our affairs as they may involve Clear Channel Communications and its officers and directors, and our powers, rights, duties and liabilities and those of our officers, directors and stockholders in connection with our relationship with Clear Channel Communications. In general, these provisions recognize that we and Clear Channel Communications may engage in the same or similar business activities and lines of business, have an interest in the same areas of corporate opportunities and will continue to have contractual and business relations with each other, including officers and directors or both of Clear Channel Communications serving as our officers or directors or both.

Our amended and restated certificate of incorporation provides that, subject to any written agreement to the contrary, Clear Channel Communications will have no duty to refrain from engaging in the same or similar business activities or lines of business as us or doing business with any of our clients, customers or vendors or employing or otherwise engaging or soliciting any of our officers, directors or employees.

Our amended and restated certificate of incorporation provides that if Clear Channel Communications acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both Clear Channel Communications and us, we will have renounced our interest in such corporate opportunity. Clear Channel Communications will, to the fullest extent permitted by law, have satisfied its fiduciary duty with respect to such a corporate opportunity and will not be liable to us or our stockholders for breach of any fiduciary duty as our stockholder by reason of the fact that it acquires or seeks the corporate opportunity for itself, directs that corporate opportunity to another person or does not present that corporate opportunity to us.

If one of our directors or officers who is also a director or officer of Clear Channel Communications learns of a potential transaction or matter that may be a corporate opportunity for both Clear Channel Communications and us, our amended and restated certificate of incorporation provides that we will have renounced our interest in the corporate opportunity unless that opportunity is expressly offered to that person in writing solely in his or her capacity as our director or officer.

If one of our officers or directors, who also serves as a director or officer of Clear Channel Communications, learns of a potential transaction or matter that may be a corporate opportunity for both Clear Channel Communications and us, our amended and restated certificate of incorporation provides that the director or officer will have no duty to communicate or present that corporate opportunity to us and will not be liable to us or our stockholders for breach of fiduciary duty by reason of Clear Channel Communications' actions with respect to that corporate opportunity.

For purposes of our amended and restated certificate of incorporation, "corporate opportunities" include, but are not limited to, business opportunities that (i) we are financially able to undertake, (ii) are, from their nature, in our line of business, (iii) are of practical advantage to us and (iv) are ones in which we would have an interest or a reasonable expectancy.

The corporate opportunity provisions in the restated certificate will expire on the date that Clear Channel Communications ceases to own shares of our common stock representing at least 20% of the total voting power and no person who is a director or officer of us is also a director or officer of Clear Channel Communications.

By becoming a stockholder in our company, you will be deemed to have notice of and have consented to the provisions of our amended and restated certificate of incorporation related to corporate opportunities that are described above.

115

**Table of Contents**

**Anti-Takeover Effects of Our Amended and Restated Certificate of Incorporation and Bylaws and Delaware Law**

Some provisions of Delaware law and our amended and restated certificate of incorporation and bylaws could make the following more difficult, although they have little significance while we are controlled by Clear Channel Communications:

• acquisition of us by means of a tender offer or merger;

• acquisition of us by means of a proxy contest or otherwise; or

• removal of our incumbent officers and directors.

These provisions, summarized below, are expected to discourage coercive takeover practices and inadequate takeover bids. These provisions also are designed to encourage persons seeking to acquire control of us to first negotiate with our board of directors. We believe that the benefits of the potential ability to negotiate with the proponent of an unfriendly or unsolicited proposal to acquire or restructure our company outweigh the disadvantages of discouraging those proposals because negotiation of them could result in an improvement of their terms.

### *Election and Removal of Directors*

Our amended and restated certificate of incorporation provides that our board of directors is divided into three classes. The term of the first class of directors expires at our 2007 annual meeting of stockholders, the term of the second class of directors expires at our 2008 annual meeting of stockholders and the term of the third class of directors expires at our 2009 annual meeting of stockholders. At each of our annual meetings of stockholders, the successors of the class of directors whose term expires at that meeting of stockholders will be elected for a three-year term, one class being elected each year by our stockholders. This system of electing and removing directors may discourage a third party from making a tender offer or otherwise attempting to obtain control of us if Clear Channel Communications no longer controls us because it generally makes it more difficult for stockholders to replace a majority of our directors.

Directors may be removed, with or without cause, by the affirmative vote of shares representing a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors as long as Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) owns shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors. Once Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) cease to own shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors, our amended and restated certificate of incorporation requires that directors may only be removed for cause and only by the affirmative vote of not less than 80% of votes entitled to be cast by the outstanding capital stock in the election of our board of directors.

### *Size of Board and Vacancies*

Our amended and restated certificate of incorporation provides that the number of directors on our board of directors will be fixed exclusively by our board of directors. Newly created directorships resulting from any increase in our authorized number of directors will be filled solely by the vote of our remaining directors in office. Any vacancies in our board of directors resulting from death, resignation, retirement, disqualification, removal from office or other cause will be filled solely by the vote of our remaining directors in office; provided, however, that as long as Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) continue to beneficially own shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors and such vacancy was caused by the action of stockholders, then such vacancy may only be filled by the affirmative vote of shares representing at least a majority of the votes entitled to be cast by the outstanding common stock in the election of our board of directors.

Table of Contents

### Stockholder Action by Written Consent

Our amended and restated certificate of incorporation permits our stockholders to act by written consent without a meeting as long as Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) continue to beneficially own shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors. Once Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) cease to beneficially own at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors, our amended and restated certificate of incorporation eliminates the right of our stockholders to act by written consent.

### Amendment of Our Bylaws

Our amended and restated certificate of incorporation and bylaws provide that the provisions of our bylaws relating to the calling of meetings of stockholders, notice of meetings of stockholders, required quorum at meetings of stockholders, conduct of meetings of stockholders, stockholder action by written consent, advance notice of stockholder business or director nominations, the authorized number of directors, the classified board structure, the filling of director vacancies or the removal of directors and indemnification of officers and directors (and any provision relating to the amendment of any of these provisions) may only be amended by the vote of a majority of our entire board of directors or, as long as Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) owns shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors, by the vote of holders of a majority of the votes entitled to be cast by outstanding capital stock in the election of our board of directors. Once Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) cease to own shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors, our amended and restated certificate of incorporation and bylaws provide that these provisions may only be amended by the vote of a majority of our entire board of directors or by the vote of holders of at least 80% of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors.

### Amendment of Certain Provisions of Our Amended and Restated Certificate of Incorporation

The amendment of any of the above provisions in our amended and restated certificate of incorporation requires approval by holders of shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors, as long as Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) owns shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors. Once Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) cease to own shares representing at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors, our amended and restated certificate of incorporation and applicable provisions of Delaware law provide that these provisions may only be amended by the vote of a majority of our entire board of directors followed by the vote of holders of at least 80% of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors.

### Stockholder Meetings

Our amended and restated certificate of incorporation and bylaws provide that a special meeting of our stockholders may be called only by (i) Clear Channel Communications, so long as Clear Channel Communications and its subsidiaries (excluding our company and our subsidiaries) beneficially own at least a majority of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors or (ii) the Chairman of our board of directors or our board of directors.

117

Table of Contents

### Requirements for Advance Notification of Stockholder Nominations and Proposals

Our bylaws establish advance notice procedures with respect to stockholder proposals and nomination of candidates for election as directors other than nominations made by or at the direction of our board of directors or a committee of our board of directors.

In general, for nominations or other business to be properly brought before an annual meeting by a stockholder, the stockholder must give notice in writing to our secretary 90 to 120 days before the first anniversary of the preceding year's annual meeting, and the business must be a proper matter for stockholder action. The stockholder's notice must include for each proposed nominee and business, as applicable, (i) all required information under the Securities Exchange Act of 1934, as amended, (ii) the proposed nominee's written consent to serve as a director if elected, (iii) a brief description of the proposed business, (iv) the reasons for conducting the business at the meeting, (v) the stockholder's material interest in the business, (vi) the stockholder's name and address and (vii) the class and number of our shares which the stockholder owns.

In general, only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to our notice of meeting. At a special meeting of stockholders at which directors are to be elected pursuant to our notice of meeting, a stockholder who is a stockholder of record at the time of giving notice, who is entitled to vote at the meeting and who complies with the notice procedures, may nominate proposed nominees. In the event we call a special meeting of stockholders to elect one or more directors, a stockholder may nominate a person or persons if the stockholder's notice is delivered to our secretary 90 to 120 days before the such special meeting.

Only such persons who are nominated in accordance with the procedures set forth in our bylaws shall be eligible to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in our bylaws. The chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed in accordance with the procedures set forth in or bylaws and, if any proposed nomination or business is not in compliance with our bylaws, to declare that such defective proposal or nomination shall be disregarded.

Clear Channel Communications shall be entitled to nominate persons for election to the board of directors and propose business to be considered by stockholders at any meeting of stockholders without compliance with the foregoing advance notice requirements, so long as Clear Channel Communications owns at least 50% of the votes entitled to be cast by the outstanding capital stock in the election of our board of directors.

### Delaware Anti-Takeover Law

Our amended and restated certificate of incorporation provides that Section 203 of the Delaware General Corporation Law, an anti-takeover law, does not apply to us until Clear Channel Communications owns less than 15% of the total voting power of our common stock, at which date Section 203 shall apply prospectively.

In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years following the date the person became an interested stockholder, unless the business combination or the transaction in which the person became an interested stockholder is approved in a prescribed manner. Generally, a "business combination" includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. Generally, an "interested stockholder" is a person that, together with affiliates and associates, owns, or within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's voting stock. This may have an anti-takeover effect with respect to transactions not approved in advance by our board of directors, including discouraging attempts that might result in a premium over the market price for the shares of our common stock.

Table of Contents

*No Cumulative Voting*

Our amended and restated certificate of incorporation and bylaws do not provide for cumulative voting in the election of our board of directors.

**Pre-Offering Transactions with Clear Channel Communications**

Our amended and restated certificate of incorporation provides that neither any agreement nor any transaction entered into between us or any of our affiliated companies and Clear Channel Communications and any of its affiliated companies prior to this offering nor the subsequent performance of any such agreement will be considered void or voidable or unfair to us because Clear Channel Communications or any of its affiliated companies is a party or because directors or officers of Clear Channel Communications were on our board of directors when those agreements or transactions were approved. In addition, those agreements and transactions and their performance will not be contrary to any fiduciary duty of any directors or officers of our company or any affiliated company.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock is Bank of New York.

**New York Stock Exchange Listing**

The Class A common stock has been authorized for listing on the NYSE under the symbol "CCO."

Table of Contents

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to this offering, there has been no public market for our Class A common stock. The sale of a substantial amount of our common stock in the public market after this offering, or the perception that such sales may occur, could adversely affect the prevailing market price of our Class A common stock. Furthermore, because some of our shares will not be available for sale shortly after this offering due to the contractual and legal restrictions on resale described below, the sale of a substantial amount of common stock in the public market after these restrictions lapse could adversely affect the prevailing market price of our Class A common stock and our ability to raise equity capital in the future.

Upon the completion of this offering, we will have 350,000,000 shares of common stock outstanding, which includes the 35,000,000 shares of Class A common stock sold by us in this offering and 315,000,000 shares of Class B common stock outstanding.

Of those shares, all of the shares of our Class A common stock sold in this offering will be freely tradable without restriction or further registration under the Securities Act, unless the shares are purchased by "affiliates" as that term is defined in Rule 144 under the Securities Act. Any shares purchased by an affiliate may not be resold except in compliance with Rule 144 volume limitations, manner of sale and notice requirements, pursuant to another applicable exemption from registration or pursuant to an effective registration statement. The shares of our Class B common stock held by Clear Channel Communications are "restricted securities" as that term is defined in Rule 144 under the Securities Act. These restricted securities may be sold in the public market by Clear Channel Communications only if they are registered or if they qualify for an exemption from registration under Rule 144 or Rule 144(k) under the Securities Act. These rules are summarized below.

### Rule 144

In general, under Rule 144 as currently in effect, beginning 90 days after the date of this prospectus, a person or persons whose shares are aggregated, who have beneficially owned restricted shares for at least one year, including persons who may be deemed to be our "affiliates," would be entitled to sell within any three-month period a number of shares that does not exceed the greater of (i) 1% of the number of shares of common stock then outstanding, which will equal approximately 3,500,000 shares immediately after this offering, or (ii) the average weekly trading volume of our Class A common stock on the New York Stock Exchange during the four calendar weeks before a notice of the sale on SEC Form 144 is filed.

Sales under Rule 144 are also subject to certain manner of sale provisions and notice requirements and to the availability of certain public information about us.

### Rule 144(k)

Under Rule 144(k), a person who is not deemed to have been one of our "affiliates" at any time during the 90 days preceding a sale, and who has beneficially owned the shares proposed to be sold for at least two years, including the holding period of any prior owner other than an "affiliate," is entitled to sell these shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144.

### Stock Issued Under Employee Plans

We intend to file registration statements on Form S-8 under the Securities Act to register approximately 42,000,000 shares of Class A common stock issuable with respect to options and restricted stock units to be granted under our employee plans. Currently, there are no outstanding options to purchase shares of our Class A common stock or restricted stock units. These registration statements are expected to be filed following the effective date of the registration statement of which this prospectus is a part and will be effective upon filing. Shares issued upon the exercise of stock options or restricted stock units after the effective date of the Form S-8 registration statements will be eligible for resale in the public market without restriction, subject to Rule 144 limitations applicable to affiliates.

**Table of Contents**

**Lock-up Agreements**

Notwithstanding the foregoing, our company, our directors and officers and Clear Channel Communications have agreed with the underwriters not to dispose of or hedge any of our common stock or securities convertible into or exchangeable for shares of common stock owned by them during the period from the date of this prospectus continuing through the date 180 days after the date of this prospectus, except with the prior written consent of the underwriters, subject to certain limitations and limited exceptions. See "Underwriting."

**Registration Rights**

As described in "Arrangements Between Clear Channel Communications and Us — Registration Rights Agreement," we will enter into a registration rights agreement with Clear Channel Communications. We do not have any other contractual obligations to register our stock.

121

**Table of Contents**

## DESCRIPTION OF INDEBTEDNESS

On August 2, 2005, one of our wholly owned subsidiaries issued to us an intercompany note in the original principal amount of $2.5 billion, which we subsequently distributed to our parent, Clear Channel Holdings, Inc., as a dividend on our common stock and in turn Clear Channel Holdings, Inc. distributed the note to its and our ultimate parent, Clear Channel Communications, as a dividend on its common stock. This note matures on August 2, 2010, may be prepaid in whole at any time, or in part from time to time, and accrues interest at a variable per annum rate equal to the weighted average cost of debt for Clear Channel Communications, as determined by Clear Channel Communications from time to time. At September 30, 2005, the interest rate on the $2.5 billion intercompany note was 5.7%.

Upon a change of control of us, the entire outstanding principal amount of, and all accrued interest on, this note, and all accrued related costs and expenses are mandatorily payable.

Until all our obligations evidenced by and provided for in the $2.5 billion intercompany note are fully paid, we and our subsidiaries are subject to certain negative covenants contained in the note, including limitations on the following:

• becoming liable for consolidated funded indebtedness (as defined in the note), excluding certain intercompany indebtedness or guarantees of indebtedness incurred by Clear Channel Communications or certain of its subsidiaries, in a principal amount in excess of $400.0 million at any one time outstanding;

• creating liens;

• making investments;

• sale and leaseback transactions (as defined in the note), which when aggregated with consolidated funded indebtedness secured by liens, will not exceed an amount equal to 10% of our total consolidated shareholder's equity (as defined in the note) as shown on our most recently reported annual audited consolidated financial statements;

• disposing of all or substantially all of our assets;

• mergers and consolidations;

• declaring or paying dividends or other distributions;

• repurchasing our equity; and

• limitations on entering into transactions with our affiliates.

In addition, upon our issuances of equity and incurrences of debt, subject to certain exceptions, we are required to prepay the note in the amount of net proceeds received from such events. The note contains customary events that permit its maturity to be accelerated prior to its stated maturity date including our failure to comply with any of its negative covenants. See "Arrangements Between Clear Channel Communications and Us."

We believe that the size of the $2.5 billion intercompany note, combined with our additional existing third party indebtedness, sets a leverage level for us that is appropriate for a company with our asset mix and is generally in line with our peer companies. Furthermore, we believe that future cash flow from operations will be sufficient to fund the interest on our indebtedness obligations for a period of at least 18 months.

For additional information regarding our other indebtedness, see "Risk Factors — Risks Related to Our Business," "Management's Discussion and Analysis of Financial Condition and Results of Operations — Financial Condition and Liquidity — Liquidity," "Use of Proceeds" and Note F to the notes to our combined financial statements included elsewhere in this prospectus.

Table of Contents

## MATERIAL U.S. FEDERAL TAX CONSIDERATIONS FOR NON-U.S. HOLDERS
## OF COMMON STOCK

The following discussion summarizes the material U.S. federal income and estate tax consequences of the purchase, ownership and disposition of our Class A common stock by certain non-U.S. holders (as defined below). This discussion only applies to non-U.S. holders who purchase and hold our Class A common stock as a capital asset for U.S. federal income tax purposes (generally property held for investment). This discussion does not describe all of the tax consequences that may be relevant to a non-U.S. holder in light of its particular circumstances.

A "non-U.S. holder," for the purposes of this discussion, means a person (other than a partnership) that is not for U.S. federal income tax purposes any of the following:

• an individual citizen or resident of the United States (including certain former citizens and former long-term residents);

• a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

• an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

• a trust if it (a) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This discussion is based upon provisions of the Code and regulations, rulings and judicial decisions as of the date hereof. These authorities may be changed, perhaps retroactively, so as to result in U.S. federal income and estate tax consequences different from those summarized below. This discussion does not address all aspects of U.S. federal income and estate taxes and does not describe any foreign, state, local or other tax considerations that may be relevant to non-U.S. holders in light of their particular circumstances. In addition, this discussion does not describe the U.S. federal income and estate tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws (including if you are a United States expatriate, "controlled foreign corporation," "passive foreign investment company," corporation that accumulates earnings to avoid U.S. federal income tax, pass-through entity or an investor in a pass-through entity). We cannot assure you that a change in law will not alter significantly the tax considerations that we describe in this discussion.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds our Class A common stock, the U.S. federal income tax treatment of a partner of that partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our Class A common stock, you should consult your tax advisors.

**This discussion is provided for general information only and does not constitute legal advice to any prospective purchaser of our Class A common stock. Additionally, this discussion cannot be used by any holder for the purpose of avoiding tax penalties that may be imposed on such holder. If you are considering the purchase of our Class A common stock, you should consult your own tax advisors concerning the U.S. federal income and estate tax consequences of purchasing, owning and disposing of our Class A common stock in light of your particular circumstances and any consequences arising under the laws of applicable state, local or foreign taxing jurisdictions. You should also consult with your tax advisors concerning any possible enactment of legislation that would affect your investment in our Class A common stock in your particular circumstances.**

### Dividends

Dividends paid to a non-U.S. holder of our Class A common stock generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an

**Table of Contents**

applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by the non-U.S. holder within the United States (and, where a tax treaty applies, are attributable to a U.S. permanent establishment of the non-U.S. holder) are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. holder were a United States person as defined under the Code, unless an applicable income tax treaty provides otherwise. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. holder of our Class A common stock who wishes to claim the benefit of an applicable treaty rate and avoid backup withholding, as discussed below, for dividends will be required to either:

• complete Internal Revenue Service Form W-8BEN (or other applicable form) and certify under penalty of perjury that such holder is not a United States person as defined under the Code and is eligible for treaty benefits; or

• if our Class A common stock is held through certain foreign intermediaries, satisfy the relevant certification requirements of applicable United States Treasury regulations.

Special certification and other requirements apply to certain non-U.S. holders that are pass-through entities rather than corporations or individuals.

A non-U.S. holder of our Class A common stock eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the Internal Revenue Service.

**Gain on Disposition of Class A Common Stock**

Any gain realized by a non-U.S. holder on the disposition of our Class A common stock generally will not be subject to U.S. federal income or withholding tax unless:

• the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment of the non-U.S. holder);

• the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

• we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes.

An individual non-U.S. holder described in the first bullet point immediately above will be subject to tax on the net gain derived from the sale under regular graduated U.S. federal income tax rates. An individual non-U.S. holder described in the second bullet point immediately above will be subject to a flat 30% tax on the gain derived from the sale, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the United States. If a non-U.S. holder that is a foreign corporation falls under the first bullet point immediately above, it will be subject to tax on its net gain in the same manner as if it were a United States person as defined under the Code and, in addition, may be subject to the branch profits tax equal to 30% of its effectively connected earnings and profits or at such lower rate as may be specified by an applicable income tax treaty.

We believe we are not and do not anticipate becoming a "United States real property holding corporation" for U.S. federal income tax purposes.

Table of Contents

**Federal Estate Tax**

Class A common stock held by an individual non-U.S. holder at the time of death will be included in such non-U.S. holder's gross estate for U.S. federal estate tax purposes, unless an applicable estate tax treaty provides otherwise.

**Information Reporting and Backup Withholding**

We must report annually to the Internal Revenue Service and to each non-U.S. holder the amount of dividends paid to such non-U.S. holder and the tax withheld with respect to such dividends, regardless of whether withholding was required. Copies of the information returns reporting such dividends and withholding may also be made available to the tax authorities in the country in which the non-U.S. holder resides under the provisions of an applicable income tax treaty.

A non-U.S. holder will be subject to backup withholding for dividends paid to such non-U.S. holder unless such non-U.S. holder certifies under penalty of perjury that it is a non-U.S. holder (and the payor does not have actual knowledge or reason to know that such non-U.S. holder is a United States person as defined under the Code), and such non-U.S. holder otherwise establishes an exemption.

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale of our Class A common stock within the United States or conducted through certain United States-related financial intermediaries, unless the beneficial owner certifies under penalty of perjury that it is a non-U.S. holder (and the payor does not have actual knowledge or reason to know that the beneficial owner is a United States person as defined under the Code), and such owner otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a non-U.S. holder's U.S. federal income tax liability provided the required information is furnished to the Internal Revenue Service.

Table of Contents

## UNDERWRITING

We and the underwriters named below have entered into an underwriting agreement with respect to the shares being offered. Subject to certain conditions, each underwriter has severally agreed to purchase the number of shares indicated in the following table. Goldman, Sachs & Co. will act as global coordinator and senior book-running manager for the offering. Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and UBS Securities LLC will act as the joint book-running managers of the underwriters listed below:

| Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co. | 9,162,303 |
| Deutsche Bank Securities Inc. | 4,581,152 |
| J.P. Morgan Securities Inc. | 4,581,152 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 4,581,152 |
| UBS Securities LLC | 4,581,152 |
| Banc of America Securities LLC | 1,649,215 |
| Bear, Stearns & Co. Inc. | 1,649,215 |
| Credit Suisse First Boston LLC | 1,649,215 |
| A.G. Edwards & Sons, Inc. | 366,492 |
| Allen & Company LLC | 366,492 |
| Barrington Research Associates, Inc. | 366,492 |
| Harris Nesbitt Corp. | 366,492 |
| SunTrust Capital Markets, Inc. | 366,492 |
| Wachovia Capital Markets, LLC | 366,492 |
| M. R. Beal & Company, A Limited Partnership | 122,164 |
| Muriel Siebert & Co., Inc. | 122,164 |
| Samuel A. Ramirez & Company, Inc. | 122,164 |
| Total | 35,000,000 |

The underwriters are committed to take and pay for all of the shares being offered, if any are taken, other than the shares covered by the option described below unless and until this option is exercised.

The following tables show the per share and total underwriting discounts and commissions to be paid to the underwriters by us.

| Paid by the Company | Amount |
|---|---|
| Per Share | $ 0.747 |
| Total | $ 26,145,000 |

Any shares sold by the underwriters to securities dealers may be sold at a discount of up to $0.486 per share from the initial public offering price. Any such securities dealers may resell any shares purchased from the underwriters to certain other brokers or dealers at a discount of up to $0.100 per share from the initial public offering price. If all the shares are not sold at the initial public offering price, the representatives may change the offering price and the other selling terms.

We and Clear Channel Communications have agreed that neither we, nor our directors and executive officers, nor Clear Channel Holdings, Inc., will offer, sell, contract to sell or otherwise dispose of or hedge any shares of our Class A common stock, any shares of our Class B common stock, or any of our securities that are substantially similar to the Class A common stock, or Class B common stock, including but not limited to any securities that are convertible into or exchangeable or exercisable for any shares of our Class A common stock or our Class B common stock, for a period of 180 days after the date of this

**Table of Contents**

prospectus, without the prior written consent of Goldman, Sachs & Co., as global coordinator and senior book-running manager, subject to the following exceptions:

- the issuance by us of shares of our Class A common stock or our Class B common stock in connection with the transactions described in this prospectus;

- the grant by us of employee stock options or stock appreciation rights with respect to shares of our Class A common stock, or shares of Class A common stock pursuant to the terms of an employee benefit plan or other plan described in this prospectus or as otherwise described in this prospectus;

- the issuance by us of shares of our Class A common stock upon the conversion of shares of our Class B common stock (other than automatic conversions of shares of our Class B common stock into shares of our Class A common stock, pursuant to the terms of our amended and restated certificate of incorporation, resulting from a transfer of shares of our Class B common stock);

- the issuance by us of shares of our Class A common stock pursuant to the exercise of any employee stock options granted pursuant to the terms of a plan described in this prospectus or as otherwise described in this prospectus, or upon the conversion, exchange or exercise of convertible, exchangeable or exercisable securities outstanding as of the date of this prospectus;

- the issuance by us of shares of our Class A common stock in connection with the merger or joint venture with, or acquisition of, another company, or the acquisition of the assets or property of another company, and the related entry into a merger or acquisition agreement, so long as (i) the recipients of shares of our Class A common stock in such transaction agree to be bound by the lock-up restrictions described in this prospectus, or (ii) the aggregate number of shares of our Class A common stock issued in such transactions, taken together, does not exceed 10% of the aggregate number of shares of our Class A common stock issued in this offering;

- transfers by our directors and executive officers of shares of our Class A common stock (i) to a spouse, child or other dependent or member of immediate family or pursuant to a domestic relations order of a court of competent jurisdiction, provided that such recipient agrees to be bound by the lock-up restrictions described in this prospectus, (ii) to any trust, family partnership or similar entity for the direct or indirect benefit of the director or executive officer, provided that the trust, partnership or similar entity agrees to be bound by the lock-up restrictions described in this prospectus or (iii) in connection with the exchange or surrender of shares of our Class A common stock to us in satisfaction or payment of the exercise price of stock options or to satisfy any tax withholding obligations in respect of such option exercise; and

- transfers by Clear Channel Communications, Inc. or any other person of shares of our Class B common stock provided that such transfers do not result in the automatic conversion of shares of our Class B common stock into shares of our Class A common stock pursuant to the terms of our amended and restated certificate of incorporation.

In addition, if: (i) during the last 17 days of the 180-day restricted period, we issue an earnings release or announce material news or a material event or (ii) prior to the expiration of the 180-day restricted period, we announce that we will release earnings results during the 15-day period following the last day of the 180-day restricted period, the 180-day restricted period described above will be automatically extended until the expiration of the 18-day period beginning on the issuance of the earnings release or the announcement of the material news or material event, unless Goldman, Sachs & Co. waives, in writing, such extension.

We have been advised by the underwriters that they may at their discretion waive the lock-up agreements; however, they have no current intention of releasing any shares subject to a lock-up agreement. The release of any lock-up would be considered on a case-by-case basis. In considering any request to release shares covered by a lock-up agreement, the representatives would consider, among other factors, the particular circumstances surrounding the request, including but not limited to the number of shares requested to be released, market conditions, the possible impact on the market for our Class A

**Table of Contents**

common stock, the trading price of our Class A common stock, historical trading volumes of our Class A common stock, the reasons for the request and whether the person seeking the release is one of our officers or directors. No agreement has been made between the representatives and us or any of our stockholders pursuant to which the representatives will waive the lock-up restrictions.

Prior to this offering, there has been no public market for the shares of Class A common stock. The initial public offering price will be negotiated among us and the representatives. Among the factors to be considered in determining the initial public offering price of the shares of Class A common stock, in addition to prevailing market conditions, will be our historical performance, estimates of our business potential and earnings prospects, an assessment of our management and the consideration of the above factors in relation to market valuation of companies in related businesses.

The Class A common stock has been authorized for listing on the New York Stock Exchange under the symbol "CCO." In order to meet one of the requirements for listing on the NYSE, the underwriters have undertaken to sell lots of 100 or more shares of Class A common stock to a minimum of 2,000 beneficial holders.

At our request, the underwriters have reserved for sale, at the initial public offering price, up to 1,750,000 of the shares offered hereby to be sold to certain employees and friends. The number of shares of Class A common stock available for sale to the public will be reduced to the extent such persons purchase such reserved shares. Any reserved shares which are not orally confirmed for purchase within one day of the pricing of the offering will be offered by the underwriters to the general public on the same terms as the other shares offered hereby.

In connection with the offering, the underwriters may purchase and sell shares of common stock in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of shares than they are required to purchase in the offering. The underwriters must close out any short position by purchasing shares in the open market. A short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for or purchases of common stock made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares sold by or for the account of such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions may have the effect of preventing or retarding a decline in the market price of our stock, and together with the imposition of the penalty bid, may stabilize, maintain or otherwise affect the market price of the common stock. As a result, the price of the common stock may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued at any time. These transactions may be effected on the NYSE, the Nasdaq Stock Market, in the over-the-counter market or otherwise.

Each of the underwriters has represented and agreed that:

(a) it has not made or will not make an offer of shares to the public in the United Kingdom within the meaning of section 102B of the Financial Services and Markets Act 2000 (as amended) (FSMA) except to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by the company of a prospectus pursuant to the Prospectus Rules of the Financial Services Authority (FSA);

(b) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the

**Table of Contents**

meaning of section 21 of FSMA) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA would not, if the company were not an authorised person, apply to the company; and

(c) it has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the shares in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a Relevant Member State), each Underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the Relevant Implementation Date) it has not made and will not make an offer of Shares to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Shares which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Shares to the public in that Relevant Member State at any time:

(a) to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c) in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Shares to the public" in relation to any Shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Shares to be offered so as to enable an investor to decide to purchase or subscribe the Shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The shares may not be offered or sold by means of any document other than to persons whose ordinary business is to buy or sell shares or debentures, whether as principal or agent, or in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32) of Hong Kong, and no advertisement, invitation or document relating to the shares may be issued, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made thereunder.

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation or subscription or purchase, of the securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than under circumstances in which such offer, sale or invitation does not constitute an offer or sale, or invitation for subscription or purchase, of the securities to the public in Singapore.

The securities have not been and will not be registered under the Securities and Exchange Law of Japan (the Securities and Exchange Law) and each underwriter has agreed that it will not offer or sell

Table of Contents

any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

We estimate that our share of the total expenses of the offering, excluding underwriting discounts and commissions, will be approximately $5.5 million. The underwriters have agreed to reimburse us in an amount of $1,953,000.00 for certain of our expenses.

We have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act.

Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us or our affiliates, for which they have received or will receive customary fees and expenses. In July 2005, Goldman, Sachs & Co., the global coordinator and senior bookrunner, entered into an engagement letter with Clear Channel Communications to assist Clear Channel Communications as financial advisor in the exploration of certain strategic and financial alternatives. In addition, on October 25, 2005, Goldman, Sachs & Co. owned approximately 2.4% of Clear Channel Communications' capital stock. In July 2004, Clear Channel Communications and certain of our international subsidiaries entered into a credit agreement with Bank of America, N.A. and J.P. Morgan Chase Bank. Under this agreement, Bank of America, N.A., J.P. Morgan Chase Bank, Barclays Bank Plc, Citibank, N.A., Credit Suisse First Boston, Deutsche Bank Securities Inc., Deutsche Sumitomo Mitsui Banking Corp., UBS Loan Finance LLC, Wachovia Bank, National Association, Harris Nesbitt Financing, Inc., BNP Paribas, Societe Generale, UFJ Bank Limited, Union Bank of California, N.A. and US Bank National Association, some of which are affiliates of the underwriters, may extend loans to Clear Channel Communications in an aggregate amount of up to $1.75 billion.

Table of Contents

## LEGAL MATTERS

The validity of the issuance of the shares of Class A common stock to be sold in this offering will be passed upon for us by Fulbright & Jaworski L.L.P., San Antonio, Texas. Cravath, Swaine & Moore LLP, New York, New York will act as counsel to the underwriters.

## EXPERTS

The combined financial statements of Clear Channel Outdoor Holdings, Inc. as of December 31, 2004 and 2003 and for each of the three years in the period ended December 31, 2004 appearing in this prospectus and registration statement have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

With respect to the unaudited combined interim financial information of Clear Channel Outdoor Holdings, Inc. for the nine-month periods ended September 30, 2004 and 2005, included in this prospectus, Ernst & Young LLP reported that they have applied limited procedures in accordance with professional standards for a review of such information. However, their separate report dated October 20, 2005, except for the third paragraph of Note 1 and Note 7, as to which date is November 9, 2005, included herein, states that they did not audit and they do not express an opinion on that interim financial information. Accordingly, the degree of reliance on their report on such information should be restricted in light of the limited nature of the review procedures applied. Ernst & Young LLP is not subject to the liability provisions of Section 11 of the Securities Act of 1933 for their report on the unaudited interim financial information because that report is not a "report" or a "part" of the registration statement prepared or certified by Ernst & Young LLP within the meaning of Sections 7 and 11 of the Securities Act of 1933.

## AVAILABLE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the issuance of shares of our common stock being offered hereby. This prospectus, which forms a part of the registration statement, does not contain all of the information set forth in the registration statement. For further information with respect to us and the shares of our common stock, reference is made to the registration statement. Statements contained in this prospectus as to the contents of any contract or other document are not necessarily complete. We are not currently subject to the informational requirements of the Securities Exchange Act of 1934, or Exchange Act. As a result of the offering of the shares of our common stock, we will become subject to the informational requirements of the Exchange Act and, in accordance therewith, will file reports and other information with the SEC. The registration statement, such reports and other information can be inspected and copied at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington D.C. 20549. Copies of such materials, including copies of all or any portion of the registration statement, can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room. Such materials may also be accessed electronically by means of the SEC's home page on the Internet (http://www.sec.gov).

131

## INDEX TO FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm                                                      F-2
Audited Financial Statements:
  Combined Balance Sheets as of December 31, 2003 and 2004                                                   F-3
  Combined Statements of Operations for the three years ended December 31, 2004                              F-4
  Combined Statements of Changes in Owner's Equity for the three years ended December 31, 2004               F-5
  Combined Statements of Cash Flows for the three years ended December 31, 2004                              F-6
  Notes to Combined Financial Statements                                                                     F-7
Unaudited Interim Financial Statements:
  Report of Independent Registered Public Accounting Firm                                                    F-29
  Combined Balance Sheets at September 30, 2005 and December 31, 2004                                         F-30
  Combined Statements of Operations for the nine months ended September 30, 2005 and 2004                    F-31
  Combined Statements of Changes in Owner's Equity for the nine months ended September 30, 2005              F-32
  Combined Statements of Cash Flows for the nine months ended September 30, 2005 and 2004                    F-33
  Notes to Combined Financial Statements                                                                     F-34

Report of Independent Registered Public Accounting Firm on Financial Statement Schedule          F-42
Schedule II — Valuation and Qualifying Accounts                                                  F-43

F-1

**Table of Contents**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

BOARD OF DIRECTORS
CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

We have audited the accompanying combined balance sheets of Clear Channel Outdoor Holdings, Inc. and subsidiaries (the Company) as of December 31, 2004 and 2003, and the related combined statements of operations, changes in owner's equity, and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the combined financial position of Clear Channel Outdoor Holdings, Inc. and subsidiaries at December 31, 2004 and 2003, and the combined results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

As discussed in Note B to the combined financial statements, in 2004 the Company changed its method of accounting for indefinite lived intangibles and in 2002 the Company changed its method for accounting for goodwill.


/s/ Ernst & Young LLP


San Antonio, Texas
August 4, 2005, except for the first paragraph of Note A and the fourth paragraph of Note O, as to which date is November 9, 2005.

Table of Contents

## COMBINED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | **2004** | **2003** |
|  | (In thousands) | |
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 37,948 | $ 34,105 |
| Accounts receivable, less allowance of $19,487 in 2004 and $15,713 in 2003 | 661,244 | 630,758 |
| Due from Clear Channel Communications | 302,634 | 154,446 |
| Prepaid expenses | 59,601 | 58,133 |
| Other current assets | 45,813 | 81,227 |
| **Total Current Assets** | 1,107,240 | 958,669 |
| **PROPERTY, PLANT AND EQUIPMENT** | | |
| Land, buildings and improvements | 318,478 | 304,492 |
| Structures | 3,110,233 | 2,888,834 |
| Furniture and other equipment | 238,973 | 203,998 |
| Construction in progress | 54,021 | 68,481 |
|  | 3,721,705 | 3,465,805 |
| Less accumulated depreciation | 1,525,720 | 1,201,699 |
|  | 2,195,985 | 2,264,106 |
| **INTANGIBLE ASSETS** | | |
| Definite-lived intangibles, net | 334,284 | 384,567 |
| Indefinite-lived intangibles — permits | 211,690 | 424,640 |
| Goodwill | 787,006 | 700,797 |
| **OTHER ASSETS** | | |
| Notes receivable | 5,872 | 6,286 |
| Investments in, and advances to, nonconsolidated affiliates | 175,057 | 155,646 |
| Deferred tax asset | 231,056 | 155,193 |
| Other assets | 189,513 | 166,435 |
| Other investments | 3,230 | 16,481 |
| **Total Assets** | $ 5,240,933 | $ 5,232,820 |
| **LIABILITIES AND OWNER'S EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 243,542 | $ 274,951 |
| Accrued expenses | 264,567 | 226,497 |
| Accrued interest | 558 | 220 |
| Deferred income | 94,120 | 97,771 |
| Current portion of long-term debt | 146,268 | 136,763 |
| **Total Current Liabilities** | 749,055 | 736,202 |
| Long-term debt | 30,112 | 70,254 |
| Debt with Clear Channel Communications | 1,463,000 | 1,463,000 |
| Other long-term liabilities | 205,811 | 148,560 |
| Minority interest | 63,302 | 54,640 |
| Commitment and contingent liabilities (Note G) | | |
| **OWNER'S EQUITY** | | |
| Owner's net investment | 6,679,664 | 6,679,664 |
| Retained deficit | (4,250,222) | (4,094,842) |
| Accumulated other comprehensive income | 300,211 | 175,342 |
| **Total Owner's Equity** | 2,729,653 | 2,760,164 |
| **Total Liabilities and Owner's Equity** | $ 5,240,933 | $ 5,232,820 |

See Notes to Combined Financial Statements

F-3

Table of Contents

## COMBINED STATEMENTS OF OPERATIONS

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| | (In thousands) | | |
| Revenue | $ 2,447,040 | $ 2,174,597 | $ 1,859,641 |
| Operating expenses: | | | |
| Direct operating expenses (exclusive of depreciation and amortization) | 1,262,317 | 1,133,386 | 957,830 |
| Selling, general and administrative expenses (exclusive of depreciation and amortization) | 499,457 | 456,893 | 392,803 |
| Depreciation and amortization | 388,217 | 379,640 | 336,895 |
| Corporate expenses (exclusive of depreciation and amortization) | 53,770 | 54,233 | 52,218 |
| Operating income | 243,279 | 150,445 | 119,895 |
| Interest expense | 14,177 | 14,201 | 11,623 |
| Intercompany interest expense | 145,653 | 145,648 | 227,402 |
| Equity in earnings (loss) of nonconsolidated affiliates | (76) | (5,142) | 3,620 |
| Other income (expense) — net | (13,341) | (8,595) | 9,164 |
| Income (loss) before income taxes and cumulative effect of a change in accounting principle | 70,032 | (23,141) | (106,346) |
| Income tax (expense) benefit: | | | |
| Current | (23,422) | 12,092 | 72,008 |
| Deferred | (39,132) | (23,944) | (21,370) |
| Income (loss) before cumulative effect of change in accounting principle | 7,478 | (34,993) | (55,708) |
| Cumulative effect of change in accounting principle, net of tax of, $113,173 in 2004 and $504,927 in 2002 | (162,858) | — | (3,527,198) |
| Net loss | (155,380) | (34,993) | (3,582,906) |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign currency translation adjustments | 124,869 | 216,214 | 135,612 |
| Comprehensive income (loss) | $ (30,511) | $ 181,221 | $ (3,447,294) |

See Notes to Combined Financial Statements

F-4

**Table of Contents**

### COMBINED STATEMENTS OF CHANGES IN OWNER'S EQUITY

| | Owner's Net Investment | Retained Deficit | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|
| | | | (In thousands) | |
| Balances at December 31, 2001 | $ 6,066,825 | $ (476,943) | $ (176,484) | $ 5,413,398 |
| Net loss | — | (3,582,906) | — | (3,582,906) |
| Net transfers from Clear Channel Communications | 612,839 | — | — | 612,839 |
| Currency translation adjustment | — | — | 135,612 | 135,612 |
| Balances at December 31, 2002 | 6,679,664 | (4,059,849) | (40,872) | 2,578,943 |
| Net loss | — | (34,993) | — | (34,993) |
| Currency translation adjustment | — | — | 216,214 | 216,214 |
| Balances at December 31, 2003 | 6,679,664 | (4,094,842) | 175,342 | 2,760,164 |
| Net loss | — | (155,380) | — | (155,380) |
| Currency translation adjustment | — | — | 124,869 | 124,869 |
| Balances at December 31, 2004 | $ 6,679,664 | $ (4,250,222) | $ 300,211 | $ 2,729,653 |

See Notes to Combined Financial Statements

F-5

Table of Contents

**COMBINED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| | (In thousands) | | |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net loss | $ (155,380) | $ (34,993) | $ (3,582,906) |
| Reconciling items: | | | |
| Cumulative effect of a change in accounting principle, net of tax | 162,858 | — | 3,527,198 |
| Depreciation | 321,071 | 312,692 | 271,683 |
| Amortization of intangibles | 67,146 | 66,948 | 65,212 |
| Deferred taxes | 39,132 | 23,944 | 21,370 |
| (Gain) loss on sale of operating and fixed assets | (11,718) | (11,047) | (7,118) |
| (Gain) loss on sale of other investments | — | (81) | — |
| Equity in earnings (loss) of nonconsolidated affiliates | 76 | 5,142 | (3,620) |
| Increase (decrease) other, net | 5,024 | 2,888 | (16,603) |
| Changes in operating assets and liabilities, net of effects of acquisitions: | | | |
| Decrease (increase) in accounts receivable | (21,149) | (84,197) | (28,870) |
| Decrease (increase) in prepaid expenses | (1,468) | (5,478) | 4,598 |
| Decrease (increase) in other current assets | 4,262 | 2,589 | 11,377 |
| Increase (decrease) in accounts payable, accrued expenses and other liabilities | 51,535 | 99,583 | 57,821 |
| Increase (decrease) in accrued interest | 343 | (692) | 41 |
| Increase (decrease) in deferred income | (2,537) | 10,587 | 17,220 |
| Increase (decrease) in accrued income taxes | 33,300 | 45,574 | (17,168) |
| Net cash provided by operating activities | 492,495 | 433,459 | 320,235 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Decrease (increase) in notes receivable, net | 414 | (202) | 98 |
| Decrease (increase) in investments in, and advances to nonconsolidated affiliates — net | (6,986) | (619) | (6,068) |
| Purchase of other investments | (961) | — | — |
| Proceeds from sale of other investment | 12,076 | — | — |
| Purchases of property, plant and equipment | (176,140) | (205,145) | (290,187) |
| Proceeds from disposal of assets | 8,354 | 48,806 | 45,991 |
| Acquisition of operating assets | (94,878) | (44,137) | (154,685) |
| Decrease (increase) in other — net | (52,537) | (28,865) | (25,993) |
| Net cash used in investing activities | (310,658) | (230,162) | (430,844) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Draws on credit facilities | 71,389 | 122,032 | 192,418 |
| Payments on credit facilities | (104,945) | (190,077) | (175,646) |
| Proceeds from issuance of debt with Clear Channel Communications | — | — | 154,685 |
| Net transfers (to) from Clear Channel Communications | (148,188) | (154,446) | 1,736 |
| Payments on long-term debt | (262) | — | — |
| Net cash provided by (used in) financing activities | (182,006) | (222,491) | 173,193 |
| Effect of exchange rate changes on cash | 4,012 | 7,558 | (16,843) |
| Net increase (decrease) in cash and cash equivalents | 3,843 | (11,636) | 45,741 |
| Cash and cash equivalents at beginning of year | 34,105 | 45,741 | — |
| Cash and cash equivalents at end of year | $ 37,948 | $ 34,105 | $ 45,741 |
| SUPPLEMENTAL DISCLOSURE | | | |
| Cash paid during the year for interest | $ 175,395 | $ 198,296 | $ 267,972 |
| Cash paid during the year for taxes | $ 22,195 | $ 18,043 | $ 12,996 |

See Notes to Combined Financial Statements

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS

### NOTE A — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### *Basis of Presentation*

Clear Channel Outdoor Holdings, Inc. ("the Company") is currently a wholly-owned subsidiary of Clear Channel Communications Inc. ("Clear Channel Communications"), a diversified media company with operations in radio broadcasting, outdoor advertising, and live entertainment. On April 29, 2005, Clear Channel Communications announced a plan to separate its outdoor advertising business into a separate company. As part of the plan, Clear Channel Communications intends on completing an initial public offering ("IPO") of 10% of the Company's common stock. Effective November 9, 2005 Clear Channel Communications and its subsidiaries contributed and transfered to the Company all of the assets and liabilities of the outdoor advertising businesses not currently held by the Company prior to the completion of the IPO.

#### *Nature of Business*

The Company operates in the outdoor advertising industry by selling advertising on billboards, street furniture and other transit advertising displays. The Company has two principal business segments: domestic and international. The domestic segment includes operations in North and South America; and the international segment includes operations in Europe, Asia, Africa and Australia.

#### *Principles of Combination*

The combined financial statements include assets and liabilities of Clear Channel Communications not currently owned by the Company that will be transferred prior to or concurrent with the IPO transaction. The combined financial statements are comprised of businesses included in the consolidated financial statements and accounting records of Clear Channel Communications using the historical results of operations, and historical basis of assets and liabilities of the outdoor business. Significant intercompany accounts among the combined businesses have been eliminated in consolidation. Investments in nonconsolidated affiliates are accounted for using the equity method of accounting.

#### *Cash and Cash Equivalents*

Cash and cash equivalents include all highly liquid investments with an original maturity of three months or less.

#### *Allowance for Doubtful Accounts*

The Company evaluates the collectibility of its accounts receivable based on a combination of factors. In circumstances where it is aware of a specific customer's inability to meet its financial obligations, it records a specific reserve to reduce the amounts recorded to what it believes will be collected. For all other customers, it recognizes reserves for bad debt based on historical experience of bad debts as a percent of revenues for each business unit, adjusted for relative improvements or deteriorations in the agings and changes in current economic conditions.

#### *Prepaid Expenses*

Most of the Company's prepaid expenses relate to lease payments on advertising structures that are located on leased land. Domestic land rents are typically paid in advance for periods ranging from one to twelve months. International land rents are paid both in advance and in arrears, for periods ranging from one to twelve months. Most international street furniture advertising display faces are licensed through municipalities for up to 20 years. The street furniture licenses often include a percent of revenue to be paid along with a base rent payment. Prepaid land leases are recorded as an asset and expensed ratably over the related rental term and license and rent payments in arrears are recorded as an accrued liability.

F-7

**Table of Contents**

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

### Purchase Accounting

The Company accounts for its business acquisitions under the purchase method of accounting. The total cost of acquisitions is allocated to the underlying identifiable net assets, including any related indefinite-lived permit intangible assets, based on their respective estimated fair values. The excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash inflows and outflows, discount rates, asset lives and market multiples, among other items. In addition, reserves have been established on the Company's balance sheet related to acquired liabilities and qualifying restructuring costs and contingencies based on assumptions made at the time of acquisition. The Company evaluates these reserves on a regular basis to determine the adequacies of the amounts.

### Asset Retirement Obligation

On January 1, 2003, the Company adopted Statement of Financial Accounting Standards No. 143, *Accounting for Asset Retirement Obligations.* The Company's asset retirement obligation is reported in "Other long-term liabilities" and relates primarily to the Company's obligation upon the termination or non-renewal of a lease to dismantle and remove its advertising structures from the leased land and to reclaim the site to its original condition. The Company records the present value of obligations associated with the retirement of its advertising structures in the period in which the obligation is incurred. The liability is capitalized as part of the related advertising structures carrying amount. Over time, accretion of the liability is recognized as an operating expense and the capitalized cost is depreciated over the expected useful life of the related asset.

### Property, Plant and Equipment

Property, plant and equipment are stated at cost. Depreciation is computed using the straight-line method at rates that, in the opinion of management, are adequate to allocate the cost of such assets over their estimated useful lives, which are as follows:

Buildings and improvements — 10 to 39 years
Structures — 5 to 40 years
Furniture and other equipment — 3 to 20 years
Leasehold improvements — shorter of economic life or lease term assuming renewal periods, if appropriate

For assets associated with a lease or contract, the assets are depreciated at the shorter of the economic life or the lease or contract term, assuming renewal periods, if appropriate. Expenditures for maintenance and repairs are charged to operations as incurred, whereas expenditures for renewal and betterments are capitalized.

The Company tests for possible impairment of property, plant, and equipment whenever events or changes in circumstances, such as a reduction in operating cash flow or a dramatic change in the manner that the asset is intended to be used indicate that the carrying amount of the asset may not be recoverable. If indicators exist, the Company compares the estimated undiscounted future cash flows related to the asset to the carrying value of the asset. If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded in depreciation and amortization expense in the statement of operations for amounts necessary to reduce the carrying value of the asset to fair value. The impairment loss calculations require management to apply judgment in estimating future cash flows and the discount rates that reflects the risk inherent in future cash flows.

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

### Intangible Assets

The Company classifies intangible assets as definite-lived or indefinite-lived intangible assets, as well as goodwill. Definite-lived intangibles include primarily transit and street furniture contracts, which are amortized over the respective lives of the agreements, typically five to fifteen years. The Company periodically reviews the appropriateness of the amortization periods related to its definite-lived assets. These assets are stated at cost. Indefinite-lived intangibles include billboard permits. The excess cost over fair value of net assets acquired is classified as goodwill. The indefinite-lived intangibles and goodwill are not subject to amortization, but are tested for impairment at least annually.

The Company tests for possible impairment of definite-lived intangible assets whenever events or changes in circumstances, such as a reduction in operating cash flow or a dramatic change in the manner that the asset is intended to be used indicate that the carrying amount of the asset may not be recoverable. If indicators exist, the Company compares the estimated undiscounted future cash flows related to the asset to the carrying value of the asset. If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded in depreciation and amortization expense in the statement of operations for amounts necessary to reduce the carrying value of the asset to fair value.

The Company performed its 2004 annual impairment test for its permits using a direct valuation technique as prescribed by the Emerging Issues Task Force ("EITF") Topic D-108, *Use of the Residual Method to Value Acquired Assets Other Than Goodwill* ("D-108"), which the Company adopted in the fourth quarter of 2004. Certain assumptions are used under the Company's direct valuation technique, including market penetration leading to revenue potential, profit margin, duration and profile of the build-up period, estimated start-up cost and losses incurred during the build-up period, the risk adjusted discount rate and terminal values. The Company considered fair values derived by a third-party valuation firm to assist it in performing its impairment test. Impairment charges, other than the charge taken under the transitional rules of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* ("Statement 142") and D-108, are recorded in depreciation and amortization expense on the statement of operations.

At least annually, the Company performs its impairment test for each reporting unit's goodwill using a discounted cash flow model to determine if the carrying value of the reporting unit, including goodwill, is less than the fair value of the reporting unit. Certain assumptions are used in determining the fair value, including assumptions about cash flow rates, discount rates, and terminal values. If the fair value of the Company's reporting unit is less than the carrying value of the reporting unit, the Company reduces the carrying amount of goodwill. Impairment charges, other than the charge taken under the transitional rules of Statement 142 are recorded in amortization expense on the statement of operations.

### Nonconsolidated Affiliates

In general, investments in which the Company owns 20 percent to 50 percent of the common stock or otherwise exercises significant influence over the company are accounted for under the equity method. The Company does not recognize gains or losses upon the issuance of securities by any of its equity method investees. The Company reviews the value of equity method investments and records impairment charges in the statement of operations for any decline in value that is determined to be other-than-temporary.

### Financial Instruments

Due to their short maturity, the carrying amounts of accounts and notes receivable, accounts payable, accrued liabilities and short-term borrowings approximated their fair values at December 31, 2004 and 2003. Additionally, as none of the Company's debt is publicly traded, the carrying amounts of long-term debt approximated their fair value at December 31, 2004 and 2003.

**Table of Contents**

**NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)**

### Income Taxes

The Company accounts for income taxes using the liability method. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. Deferred tax assets are reduced by valuation allowances if the Company believes it is more likely than not that some portion or all of the asset will not be realized. As all earnings from the Company's foreign operations are permanently reinvested and not distributed, the Company's income tax provision does not include additional U.S. taxes on foreign operations. It is not practical to determine the amount of federal income taxes, if any, that might become due in the event that the earnings were distributed.

The operations of the Company are included in a consolidated federal income tax return filed by Clear Channel Communications, Inc. However, for financial reporting purposes, the Company's provision for income taxes has been computed on the basis that the Company files separate consolidated income tax returns with its subsidiaries.

### Revenue Recognition

The Company provides services under the terms of contracts covering periods up to three years, which are generally billed monthly. Revenue for advertising space rental is recognized ratably over the term of the contract. Advertising revenue is reported net of agency commissions. Agency commissions are calculated based on a stated percentage applied to gross billing revenue for the Company's operations. Clients remit the gross billing amount to the agency and the agency remits gross billings less their commission to the Company. Payments received in advance of being earned are recorded as deferred income.

The Company believes that the credit risk with respect to trade receivables is limited due to the large number and geographic diversification of its customers.

### Foreign Currency

Results of operations for foreign subsidiaries and foreign equity investees are translated into U.S. dollars using the average exchange rates during the year. The assets and liabilities of those subsidiaries and investees, other than those of operations in highly inflationary countries, are translated into U.S. dollars using the exchange rates at the balance sheet date. The related translation adjustments are recorded in a separate component of owner's equity, "Accumulated other comprehensive income." Foreign currency transaction gains and losses, as well as gains and losses from translation of financial statements of subsidiaries and investees in highly inflationary countries, are included in operations.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates, judgments, and assumptions that affect the amounts reported in the financial statements and accompanying notes including, but not limited to, legal, tax and insurance accruals. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results could differ from those estimates.

### New Accounting Pronouncements

The Securities and Exchange Commission ("SEC") staff issued D-108 at the September 2004 meeting of the EITF. D-108 states that the residual method should no longer be used to value intangible assets other than goodwill. Rather, a direct method should be used to determine the fair value of all intangible assets required to be recognized under Statement of Financial Accounting Standards No. 141,

**Table of Contents**

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

*Business Combinations.* Registrants who have applied the residual method to the valuation of intangible assets for purposes of impairment testing under Statement 142 shall perform an impairment test using a direct value method on all intangible assets that were previously valued using the residual method by no later than the beginning of their first fiscal year beginning after December 15, 2004. The Company adopted D-108 for its fiscal year ended December 31, 2004. As a result of adoption, the Company recorded a non-cash charge of $162.9 million, net of deferred taxes of $113.2 million, as a cumulative effect of a change in accounting principle during the fourth quarter of 2004. See Note B for more disclosure.

In December 2004, the Financial Accounting Standards Board ("FASB") issued Financial Accounting Standard No. 153, *Exchanges of Nonmonetary Assets, an amendment of APB Opinion No. 29* ("Statement 153"). Statement 153 eliminates the APB 29 exception for nonmonetary exchanges of similar productive assets and replaces it with an exception for exchanges of nonmonetary assets that do not have commercial substance. Statement 153 is effective for financial statements for fiscal years beginning after June 15, 2005. Earlier application is permitted for nonmonetary asset exchanges occurring in fiscal periods beginning after the date of issuance. The provisions of Statement 153 should be applied prospectively. The Company expects to adopt Statement 153 for its fiscal year beginning January 1, 2006 and management does not believe that adoption will materially impact the Company's financial position or results of operations.

In December 2004, the FASB issued Staff Position 109-2, *Accounting and Disclosure Guidance for the Foreign Repatriation Provision within the American Jobs Creation Act of 2004* ("FSP 109-2"). FSP 109-2 allows an enterprise additional time beyond the financial reporting period in which the Act was enacted to evaluate the effects of the Act on its plans for repatriation of unremitted earnings for purposes of applying Financial Accounting Standard No. 109, *Accounting for Income Taxes,* ("Statement 109"). FSP 109-2 clarifies that an enterprise is required to apply the provisions of Statement 109 in the period, or periods, it decides on its plan(s) for reinvestment or repatriation of its unremitted foreign earnings. FSP 109-2 requires disclosure if an enterprise is unable to reasonably estimate, at the time of issuance of its financial statements, the related range of income tax effects for the potential range of foreign earnings that it may repatriate and requires an enterprise to recognize income tax expense (benefit) if an enterprise decides to repatriate a portion of unremitted earnings under the repatriation provision while it is continuing to evaluate the effects of the repatriation provision for the remaining portion of the unremitted foreign earnings. FSP 109-2 is effective upon issuance. The Company currently has the ability and intent to reinvest any undistributed earnings of its foreign subsidiaries. Any impact from this legislation has not been reflected in the amounts shown since the Company is reinvested for the foreseeable future.

On December 16, 2004, the FASB issued Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment,* ("Statement 123(R)") which is a revision of Statement of Financial Accounting Standards No. 123, *Accounting for Stock-Based Compensation* ("Statement 123"). Statement 123(R) supersedes Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), and amends Statement No. 95, *Statement of Cash Flows.* Generally, the approach in Statement 123(R) is similar to the approach described in Statement 123. However, Statement 123(R) requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values. Pro forma disclosure is no longer an alternative. Statement 123(R) is effective for financial statements for the first interim or annual period beginning after June 15, 2005. Early adoption is permitted in periods in which financial statements have not yet been issued. In April 2005, the SEC issued a press release announcing that it would provide for phased-in implementation guidance for Statement 123(R). The SEC would require that registrants that are not small business issuers adopt Statement 123(R)'s fair value method of accounting for share-based payments to employees no later than the beginning of the first fiscal year beginning after June 15, 2005. The Company intends to adopt Statement 123(R) on January 1, 2006.

**Table of Contents**

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

As permitted by Statement 123, the Company currently accounts for share-based payments to employees using the APB 25 intrinsic value method and, as such, generally recognizes no compensation cost for employee stock options. Accordingly, the adoption of Statement 123(R)'s fair value method could have a significant impact on the Company's result of operations, although it will have no impact on its overall financial position. The Company is unable to quantify the impact of adoption of Statement 123(R) at this time because it will depend on levels of share-based payments granted in the future. However, had the Company adopted Statement 123(R) in prior periods, the impact of that standard would have approximated the impact of Statement 123 as described in the disclosure of pro forma net income and earnings per share below. Statement 123(R) also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow. This requirement will increase net financing cash flows in periods after adoption. The Company cannot estimate what those amounts will be in the future because they depend on, among other things, when employees exercise stock options.

#### *Stock Based Compensation*

The Company does not have any compensation plans under which it grants stock awards to employees. On behalf of the Company, Clear Channel Communications grants the Company's officers and other key employees stock options to purchase shares of Clear Channel Communications common stock. Clear Channel Communications accounts for its stock-based award plans in accordance with APB 25, and related interpretations, under which compensation expense is recorded to the extent that the current market price of the underlying stock exceeds the exercise price. Clear Channel Communications calculates the pro forma stock compensation expense as if the stock-based awards had been accounted for using the provisions of Statement 123. The stock compensation expense is then allocated to the Company based on the percentage of options outstanding to employees of the Company. The required pro forma disclosures, based on this allocated expense are as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (In thousands) | |
| Income (loss) before cumulative effect of a change in accounting principle: | | | |
| Reported | $ 7,478 | $ (34,993) | $ (55,708) |
| Pro forma stock compensation expense, net of tax | (6,474) | (3,701) | (4,447) |
| Pro Forma | $ 1,004 | $ (38,694) | $ (60,155) |

F-12

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

### NOTE B — INTANGIBLE ASSETS AND GOODWILL

#### *Definite-lived Intangibles*

The Company has definite-lived intangible assets which consist primarily of transit and street furniture contracts and other contractual rights, all of which are amortized over the respective lives of the agreements. Other definite-lived intangible assets are amortized over the period of time the assets are expected to contribute directly or indirectly to the Company's future cash flows. The following table presents the gross carrying amount and accumulated amortization for each major class of definite-lived intangible assets at December 31, 2004 and 2003:

| | 2004 | | | | 2003 | | | |
| | Gross Carrying Amount | | Accumulated Amortization | | Gross Carrying Amount | | Accumulated Amortization | |
| | | | (In thousands) | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transit, street furniture, and other contractual rights | $ | 688,373 | $ | 364,939 | $ | 655,775 | $ | 289,821 |
| Other | | 57,093 | | 46,243 | | 56,301 | | 37,688 |
| Total | $ | 745,466 | $ | 411,182 | $ | 712,076 | $ | 327,509 |

Total amortization expense from definite-lived intangible assets for the years ended December 31, 2004, 2003 and 2002 was $67.1 million, $66.9 million and $65.2 million, respectively. The following table presents the Company's estimate of amortization expense for each of the five succeeding fiscal years for definite-lived intangible assets that exist at December 31, 2004:

| | | (In thousands) |
|---|---|---|
| 2005 | $ | 83,251 |
| 2006 | | 73,072 |
| 2007 | | 47,875 |
| 2008 | | 20,049 |
| 2009 | | 17,502 |

As acquisitions and dispositions occur in the future and as purchase price allocations are finalized, amortization expense may vary.

#### *Indefinite-lived Intangibles*

On January 1, 2002, the Company adopted Statement 142, which addresses financial accounting and reporting for acquired goodwill and other intangible assets and supersedes APB Opinion No. 17, *Intangible Assets.* Statement 142 established new accounting for goodwill and other intangible assets recorded in business combinations. The Company performed the initial impairment test of its billboard permits at January 1, 2002 and subsequent impairment tests were performed at October 1, 2002, 2003 and 2004, all of which resulted in no impairment charge.

Upon the adoption of Statement 142 on January 1, 2002, the Company began to separately identify billboard permits as an indefinite-lived intangible asset. The Company's billboard permits are issued in perpetuity by state and local governments and are transferable or renewable at little or no cost. Permits typically include the location for which the permit allows the Company the right to operate an advertising structure. The Company's permits are located on either owned or leased land. In cases where the Company's permits are located on leased land, the leases are typically from 10 to 30 years and renew indefinitely, with rental payments generally escalating at an inflation based index. If the Company loses its lease, the Company will typically obtain permission to relocate the permit or bank it with the municipality for future use.

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

The Company does not amortize its billboard permits. The Company tests these indefinite-lived intangible assets for impairment at least annually. The carrying amount for billboard permits at December 31, 2004 and 2003 were $211.7 million and $424.6 million, respectively.

The SEC staff issued D-108 at the September 2004 meeting of the EITF. D-108 states that the residual method should no longer be used to value intangible assets other than goodwill. Rather, D-108 requires that a direct method be used to value intangible assets other than goodwill. Prior to adoption of D-108, the Company recorded its acquisition at fair value using an industry accepted income approach. The value calculated using the income approach was allocated to the indefinite-lived intangibles after deducting the value of tangible and intangible assets, as well as estimated costs of establishing a business at the market level. The Company used a similar approach in its annual impairment test prior to its adoption of D-108.

D-108 requires that an impairment test be performed upon adoption using a direct method for valuing intangible assets other than goodwill. Under the direct method, it is assumed that rather than acquiring indefinite-lived intangible assets as a part of a going concern business, the buyer hypothetically obtains indefinite-lived intangible assets and builds a new operation with similar attributes from scratch. Thus, the buyer incurs start-up costs during the build-up phase which are normally associated with going concern value. Initial capital costs are deducted from the discounted cash flows model, which results in value that is directly attributable to the indefinite-lived intangible assets.

Under the direct method, the Company continues to aggregate its indefinite-lived intangible assets at the market level for purposes of impairment testing as prescribed by EITF 02-07 *Unit of Accounting for Testing Impairment of Indefinite-Lived Intangible Assets.* The Company's key assumptions using the direct method are market revenue growth rates, market share, profit margin, duration and profile of the build-up period, estimated start-up capital costs and losses incurred during the build-up period, the risk-adjusted discount rate and terminal values. This data is populated using industry normalized information representing an average station within a market.

The Company's adoption of the direct method resulted in an aggregate fair value of its indefinite-lived intangible assets that were less than the carrying value determined under its prior method. As a result of the adoption of D-108, the Company recorded a non-cash charge of $162.9 million, net of deferred taxes of $113.2 million as a cumulative effect of a change in accounting principle during the fourth quarter of 2004.

**Table of Contents**

**NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)**

*Goodwill*

The Company tests goodwill for impairment using a two-step process. The first step, used to screen for potential impairment, compares the fair value of the reporting unit with its carrying amount, including goodwill. The second step, used to measure the amount of the impairment loss, compares the implied fair value of the reporting unit goodwill with the carrying amount of that goodwill. The following table presents the changes in the carrying amount of goodwill in each of the Company's reportable segments for the years ended December 31, 2004 and 2003:

| | Domestic | International | Total |
|---|---|---|---|
| | | (In thousands) | |
| Balance as of December 31, 2002 | $ 346,837 | $ 294,129 | $ 640,966 |
| Acquisitions | 2,371 | 13,611 | 15,982 |
| Dispositions | (894) | — | (894) |
| Foreign currency translation | — | 48,392 | 48,392 |
| Adjustments | (2,978) | (671) | (3,649) |
| Balance as of December 31, 2003 | 345,336 | 355,461 | 700,797 |
| Acquisitions | 53,719 | 3,066 | 56,785 |
| Foreign currency translation | — | 29,401 | 29,401 |
| Adjustments | (1,678) | 1,701 | 23 |
| Balance as of December 31, 2004 | $ 397,377 | $ 389,629 | $ 787,006 |

Upon adopting Statement 142, the Company completed the two-step impairment test during the first quarter of 2002. As a result of this test, the Company recognized impairment of approximately $3.5 billion, net of deferred taxes of $504.9 million related to tax deductible goodwill, as a component of the cumulative effect of a change in accounting principle during the first quarter of 2002.

## NOTE C — BUSINESS ACQUISITIONS

### *2004 Acquisitions:*

*Medallion Merger*

In September 2004, the Company acquired Medallion Taxi Media, Inc. ("Medallion") for $31.6 million. Medallion's operations include advertising displays placed on the top of taxi cabs. The Company began consolidating the results of operations in September 2004.

In addition to the above, during 2004 the Company acquired display faces for $60.8 million in cash and acquired equity interests in international outdoor companies for $2.5 million in cash. Also, the Company exchanged advertising assets, valued at $23.7 million for other advertising assets valued at $32.3 million. As a result of this exchange, the Company recorded a gain of $8.6 million in "Other income (expense) — net."

### *2003 Acquisitions:*

During 2003 the Company acquired domestic display faces for $28.3 million in cash. The Company also acquired investments in nonconsolidated affiliates for $10.7 million in cash and acquired an additional 10% interest in a subsidiary for $5.1 million in cash.

**Table of Contents**

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

### *2002 Acquisitions:*

#### *Ackerley Merger*

In June 2002 the Company acquired The Ackerley Group, Inc. ("Ackerley"). Ackerley operated approximately 6,000 outdoor displays in the Boston, Seattle and Portland, Oregon metropolitan markets, which are now operated by the Company. The transaction was funded by $26.3 million of the Company's operating cash and a non-cash capital contribution from Clear Channel Communications of $612.8 million. This transaction resulted in the recognition of approximately $358.8 million of goodwill, $42.8 million of which was tax deductible.

The results of operations for the year ended December 31, 2002 include the operations of Ackerley from June 2002. Unaudited pro forma combined results of operations, assuming the Ackerley acquisition had occurred on January 1, 2002 would have been as follows:

|  | | (In thousands) |
| --- | --- | --- |
| Revenue | $ | 1,887,051 |
| Income (loss) before cumulative effect of a change in accounting principle | $ | (38,871) |
| Net loss | $ | (3,566,069) |

The pro forma information above is presented in response to applicable accounting rules relating to business acquisitions and is not necessarily indicative of the actual results that would have been achieved had the merger occurred at the beginning of 2002, nor is it indicative of future results of operations.

#### *Other*

In addition to the acquisition discussed above, during 2002 the Company acquired domestic display faces for $126.3 million in cash and acquired investments in nonconsolidated affiliates for $2.1 million in cash.

#### *Acquisition Summary*

The following is a summary of the assets and liabilities acquired and the consideration given for all acquisitions made during 2004 and 2003:

|  | | 2004 | | 2003 |
| --- | --- | --- | --- | --- |
|  | | (In thousands) | | |
| Accounts receivable | $ | — | $ | 210 |
| Property, plant and equipment | | 15,061 | | 10,945 |
| Permits | | 36,956 | | 19,499 |
| Goodwill | | 45,762 | | 7,795 |
| Investments | | 2,512 | | 11,993 |
| | | 100,291 | | 50,442 |
| Other liabilities | | (3,058) | | (6,354) |
| Deferred tax | | (2,355) | | 49 |
| | | (5,413) | | (6,305) |
| Cash paid for acquisitions | $ | 94,878 | $ | 44,137 |

The Company has entered into certain agreements relating to acquisitions that provide for purchase price adjustments and other future contingent payments based on the financial performance of the acquired company. The Company will continue to accrue additional amounts related to such contingent payments if and when it is determinable that the applicable financial performance targets will be met. The

F-16

Table of Contents

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

aggregate of these contingent payments, if performance targets were met, would not significantly impact the Company's financial position or results of operations.

#### *Restructuring:*

As a result of the Company's acquisition of Ackerley in June 2002, the Company recorded a $9.4 million accrual related to the restructuring of Ackerley's operations. Of the $9.4 million, $5.3 million is related to severance and $4.1 million is related to lease terminations. The Ackerley corporate office closed in July 2002. At December 31, 2004, the accrual balance for this restructuring was $1.9 million. This restructuring has resulted in the actual termination of 19 employees. The Company recorded a liability in purchase accounting for Ackerley primarily related to severance for terminated employees and lease terminations as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  |  | (In thousands) |  |
| Severance and lease termination costs: |  |  |  |
| Accrual at January 1 | $ 2,661 | $ 8,940 | $ — |
| Estimated costs charged to restructuring accrual in purchase accounting | — | — | 9,375 |
| Adjustments to restructuring accrual | (377) | (5,265) | — |
| Payments charged against restructuring accrual | (357) | (1,014) | (435) |
| Remaining severance and lease termination accrual at December 31 | $ 1,927 | $ 2,661 | $ 8,940 |

The remaining restructuring accrual is comprised solely of lease termination, which will be paid over the next five years. During 2004, there were no payments charged to the restructuring reserve related to severance. The Company made adjustments to finalize the purchase price allocation for the Ackerley merger in 2003.

In addition to the restructuring described above, the Company restructured its operations in Spain during the fourth quarter of 2004. As a result, the Company has recorded a $4.1 million accrual in selling, general and administrative expenses. Of the $4.1 million, $2.2 million was related to severance and $1.9 million was related to consulting and other costs. As of December 31, 2004, this accrual balance remained $4.1 million. It is expected that this accrual will be paid over the next year. This restructuring will result in the termination of 44 employees.

During 2003, the Company restructured its operations in France resulting in a $13.8 million restructuring accrual being recorded in selling, general and administrative expenses. Of the $13.8 million, $12.5 million was related to severance and $1.3 million was related to lease terminations and consulting costs. As of December 31, 2004, this accrual balance was $.8 million. It is expected that this accrual will be paid during 2005. This restructuring resulted in the termination of 134 employees.

### NOTE D — INVESTMENTS

The Company's most significant investments in nonconsolidated affiliates are listed below:

#### *Clear Media*

At December 31, 2004, the Company owned 48.1% of the total number of shares of Hainan White Horse Advertising Media Investment Co. Ltd. ("Clear Media"), formerly known as White Horse, a Chinese company that operates street furniture displays throughout China. At December 31, 2004, the fair market value of the Company's shares of Clear Media was $231.3 million.

Table of Contents

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

#### Clear Channel Independent

The Company owns a 50% interest in Clear Channel Independent ("CCI"), formerly known as Corp Comm, a South African company involved in outdoor advertising.

#### Alessi

The Company owns a 35% interest in Alessi, an Italian company involved in outdoor advertising.

#### Summarized Financial Information

The following table summarizes the Company's investments in these nonconsolidated affiliates:

| | Clear Media | CCI | Alessi | All Others | Total |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| At December 31, 2003 | $ 77,257 | $ 29,557 | $ 22,977 | $ 25,855 | $ 155,646 |
| Acquisition (disposition) of investments | — | 1,456 | 520 | (298) | 1,678 |
| Transfers from cost investments and other reclasses | — | — | — | 852 | 852 |
| Additional investment, net | — | 7,508 | — | (522) | 6,986 |
| Equity in net earnings (loss) | (3,990) | 5,475 | 707 | (2,268) | (76) |
| Foreign currency translation adjustment | (33) | 7,372 | 1,894 | 738 | 9,971 |
| At December 31, 2004 | $ 73,234 | $ 51,368 | $ 26,098 | $ 24,357 | $ 175,057 |

The above investments are not consolidated, but are accounted for under the equity method of accounting, whereby the Company records its investments in these entities in the balance sheet as "Investments in, and advances to, nonconsolidated affiliates." The Company's interests in their operations are recorded in the statement of operations as "Equity in earnings (loss) of nonconsolidated affiliates." Accumulated undistributed earnings included in retained deficit for these investments were $5.5 million, $5.4 million and $.3 million for December 31, 2004, 2003 and 2002, respectively.

#### Other Investments

Cost and fair value of other investments at December 31, 2004 and 2003 was $3.2 million and $16.5 million, respectively. At December 31, 2004, these marketable securities were all classified as other cost investments. At December 31, 2003, $11.9 million of these marketable securities were classified as trading and the remaining $4.6 million was classified as other cost investments.

## NOTE E — ASSET RETIREMENT OBLIGATION

The Company has an asset retirement obligation of $49.2 million as of December 31, 2004, which is reported in "Other long-term liabilities." The liability relates to the Company's obligation to dismantle and remove its advertising displays from leased land and to reclaim the site to its original condition upon the termination or non-renewal of a lease. The liability is capitalized as part of the related long-lived assets' carrying value. Due to the high rate of lease renewals over a long period of time, the calculation assumes that all related assets will be removed at some period over the next 50 years. An estimate of third-party cost information is used with respect to the dismantling of the structures and the reclamation of the site. The interest rate used to calculate the present value of such costs over the retirement period is based on an estimated risk adjusted credit rate for the same period. During 2004, the Company increased its liability due to a change in estimate associated with the remediation costs used in the calculation. This change was recorded as an addition to the liability and related assets' carrying values.

Table of Contents

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

The following table presents the activity related to the Company's asset retirement obligation:

|  | (In thousands) |
|---|---|
| Balance at December 31, 2003 | $ 24,000 |
| Adjustment due to change in estimate of related costs | 26,850 |
| Accretion of liability | 1,800 |
| Liabilities settled | (3,434) |
| Balance at December 31, 2004 | $ 49,216 |

## NOTE F — LONG-TERM DEBT

Long-term debt at December 31, 2004 and 2003 consisted of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2003 |
|  | (In thousands) | |
| Debt with Clear Channel Communications | $ 1,463,000 | $ 1,463,000 |
| Bank credit facilities | 23,938 | 50,119 |
| Other long-term debt | 152,442 | 156,898 |
|  | 1,639,380 | 1,670,017 |
| Less: current portion | 146,268 | 136,763 |
| Total long-term debt | $ 1,493,112 | $ 1,533,254 |

### *Debt with Clear Channel Communications*

In 2002, the Company converted its $1.3 billion line of credit with Clear Channel Communications and issued two intercompany notes to Clear Channel Communications in the aggregate original principal amount of approximately $1.5 billion. The Company received $.2 million in excess proceeds that were used to acquire operating assets. The first intercompany note in the original principal amount of approximately $1.4 billion matures on December 31, 2017 and may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 10%. The second intercompany note in the original principal amount of approximately $73.0 million matures on December 31, 2017 and may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 9%. Prior to the issuance of the two intercompany notes, the Company recorded interest at a per annum rate of 6% on all net borrowings from Clear Channel Communications.

### *Bank Credit Facility*

An international subsidiary of the Company had a $150.0 million five-year revolving credit facility with a group of international banks. This facility allowed for borrowings in various foreign currencies, which were used to hedge net assets in those currencies and provide funds to the Company's international operations for certain working capital needs. At December 31, 2003, $50.1 million was outstanding. On July 30, 2004, the Company paid in full this $150.0 million five-year revolving credit facility. The $150.0 million five-year revolving credit facility was then terminated on August 6, 2004.

On July 13, 2004, Clear Channel Communications, entered into a five-year, multi-currency revolving credit facility in the amount of $1.75 billion. Certain of the Company's international subsidiaries are offshore borrowers under a $150.0 million sub-limit within this $1.75 billion credit facility. This sub-limit allows for borrowings in various foreign currencies, which are used to hedge net assets in those currencies and provide funds to the Company's international operations for certain working capital needs. Certain of the Company's international subsidiary borrowings under this sub-limit are guaranteed by Clear Channel

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

Communications. The interest rate is based upon, LIBOR, or, in the case of Euro, EURIBOR, plus a margin. At December 31, 2004, interest rates on this bank credit facility varied from 1.9% to 5.76%. At December 31, 2004, the outstanding balance on the $150.0 million sub-limit was $23.9 million and $126.1 million was available for future borrowings, with the entire balance to be repaid on July 12, 2009.

### *Debt Covenants*

Clear Channel Communications' significant covenants on its $1.75 billion five-year, multi-currency revolving credit facility relate to leverage and interest coverage contained and defined in the credit facility. The leverage ratio covenant requires Clear Channel Communications to maintain a ratio of consolidated funded indebtedness to operating cash flow (as defined by the credit facility) of less than 5.25x. The interest coverage covenant requires Clear Channel Communications to maintain a minimum ratio of operating cash flow (as defined by the credit facility) to interest expense of 2.50x. In the event that Clear Channel Communications does not meet these covenants, it is considered to be in default on the credit facility at which time the credit facility, including the $150.0 sub-limit utilized by certain of the Company's international subsidiaries, may become immediately due. At December 31 2004, Clear Channel Communications' leverage and interest coverage ratios were 3.1x and 6.4x, respectively. This credit facility contains a cross default provision that would be triggered if Clear Channel Communications were to default on any other indebtedness greater than $200.0 million. At December 31, 2004, Clear Channel Communications was in compliance with all debt covenants.

### *Other Debt*

Other debt includes various borrowings and capital leases utilized for general operating purposes. Included in the $152.4 million and $156.9 million balances at December 31, 2004 and 2003, is $146.3 million and $136.8 million, respectively, that mature in less than one year.

Future maturities of long-term debt at December 31, 2004 are as follows:

|  |  | (In thousands) |
|---|---|---|
| 2005 | $ | 146,268 |
| 2006 | | 3,728 |
| 2007 | | 841 |
| 2008 | | 660 |
| 2009 | | 24,110 |
| Thereafter | | 1,463,773 |
| Total | $ | 1,639,380 |

## NOTE G — COMMITMENTS AND CONTINGENCIES

The Company leases office space, equipment and the majority of the land occupied by its advertising structures under long-term operating leases. Some of the lease agreements contain renewal options and annual rental escalation clauses (generally tied to the consumer price index), as well as provisions for the payment of utilities and maintenance by the Company.

The Company has minimum franchise payments associated with non-cancelable contracts that enable it to display advertising on such media as buses, taxis, trains, bus shelters and terminals, as well as other type contacts. The majority of these contracts contain rent provisions that are calculated as the greater of a percentage of the relevant advertising revenue or a specified guaranteed minimum annual payment. In addition, the Company has commitments relating to required purchases of property, plant, and equipment under certain street furniture contracts.

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

As of December 31, 2004, the Company's future minimum rental commitments under non-cancelable operating lease agreements with terms in excess of one year, minimum payments under non-cancelable contracts in excess of one year, and capital expenditure commitments consist of the following:

|  | Non-Cancelable Operating Leases | Non-Cancelable Contracts | Capital Expenditures |
|---|---|---|---|
|  | (In thousands) | | |
| 2005 | $ 177,567 | $ 382,528 | $ 119,687 |
| 2006 | 157,150 | 281,051 | 44,186 |
| 2007 | 133,677 | 191,959 | 18,879 |
| 2008 | 117,503 | 149,640 | 18,876 |
| 2009 | 100,524 | 133,945 | 6,346 |
| Thereafter | 567,593 | 528,429 | 15,742 |
| Total | $ 1,254,014 | $ 1,667,552 | $ 223,716 |

Rent expense charged to operations for 2004, 2003 and 2002 was $822.8 million, $721.5 million and $610.4 million, respectively.

The Company is currently involved in certain legal proceedings and, as required, has accrued its estimate of the probable costs for the resolution of these claims. These estimates have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in the Company's assumptions or the effectiveness of its strategies related to these proceedings.

In various areas in which the Company operates, outdoor advertising is the object of restrictive and, in some cases, prohibitive zoning and other regulatory provisions, either enacted or proposed. The impact to the Company of loss of displays due to governmental action has been somewhat mitigated by federal and state laws mandating compensation for such loss and constitutional restraints.

Various acquisition agreements include deferred consideration payments including future contingent payments based on the financial performance of the acquired companies, generally over a one to five year period. Contingent payments involving the financial performance of the acquired companies are typically based on the acquired company meeting certain EBITDA targets as defined in the agreement. The contingent payment amounts are generally calculated based on predetermined multiples of the achieved EBITDA not to exceed a predetermined maximum payment. At December 31, 2004, the Company believes its maximum aggregate contingency, which is subject to the financial performance of the acquired companies, is approximately $36.5 million. In addition, certain acquisition agreements include deferred consideration payments based on performance requirements by the seller, generally over a one to five year period. Contingent payments based on performance requirements by the seller typically involve the completion of a development or obtaining appropriate permits that enable the Company to construct additional advertising displays. At December 31, 2004, the Company believes its maximum aggregate contingency, which is subject to performance requirements by the seller, is approximately $36.7 million. As the contingencies have not been met or resolved as of December 31, 2004, these amounts are not recorded. If future payments are made, amounts will be recorded as additional purchase price.

The Company has various investments in nonconsolidated affiliates that are subject to agreements that contain provisions that may result in future additional investments to be made by the Company. The put values are contingent upon financial performance of the investee and are typically based on the investee meeting certain EBITDA targets, as defined in the agreement. The contingent payment amounts are generally calculated based on predetermined multiples of the achieved EBITDA not to exceed a predetermined maximum amount.

**Table of Contents**

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

### NOTE H — RELATED PARTY TRANSACTIONS

The Company has an account that represents net amounts due to or from Clear Channel Communications, which is recorded as "Due from Clear Channel Communications" on the combined balance sheets. The account does not accrue interest and is generally payable on demand. Included in the account is the net activity resulting from day-to-day cash management services provided by Clear Channel Communications. As a part of these services, the Company maintains collection bank accounts that are swept daily by Clear Channel Communications. In return, Clear Channel Communications funds the Company's controlled disbursement accounts as checks or electronic payments are presented for payment. At December 31, 2004 and 2003, the balance in "Due from Clear Channel Communications" was $302.6 million and $154.4 million, respectively.

The Company has issued two intercompany notes to Clear Channel Communications in the aggregate original principal amount of approximately $1.5 billion. These notes are further disclosed in Note F.

Clear Channel Communications has provided funding for certain of the Company's acquisitions of outdoor advertising net assets. The amounts funded by Clear Channel Communications for these acquisitions are recorded in "Owner's net investment," a component of owner's equity.

The Company provides advertising space on its billboards for radio stations owned by Clear Channel Communications. For the years ended December 31, 2004, 2003 and 2002, the Company recorded $12.4 million, $17.5 million, and $12.5 million, respectively, in revenue for these advertisements.

Clear Channel Communications provides management services to the Company, which include, among other things: (i) treasury, payroll and other financial related services; (ii) human resources and employee benefits services; (iii) legal and related services; (iv) information systems, network and related services; (v) investment services; (vi) corporate services; and (vii) procurement and sourcing support services. These services are charged to the Company based on actual direct costs incurred or allocated by Clear Channel Communications based on a seasonally adjusted headcount calculation. For the years ended December 31, 2004, 2003 and 2002, the Company recorded $16.6 million, $19.6 million, and $17.6 million, respectively, as a component of corporate expenses for these services.

Clear Channel Communications owns the trademark and trade names used by the Company. Beginning January 1, 2003, Clear Channel Communications charges the Company a royalty fee based upon a percentage of annual revenue. Clear Channel Communications used a third party valuation firm to assist in the calculation of the royalty fee. For the years ended December 31, 2004 and 2003, the Company recorded $15.8 million and $14.1 million, respectively, of royalty fees in "Other income (expense) — net."

The operations of the Company are included in a consolidated federal income tax return filed by Clear Channel Communications. The Company's provision for income taxes has been computed on the basis that the Company files separate consolidated income tax returns with its subsidiaries. Tax payments are made to Clear Channel Communications on the basis of the Company's separate taxable income. Tax benefits recognized on employee stock options exercises are retained by Clear Channel Communications.

The Company computes its deferred income tax provision using the liability method in accordance with Statement 109, as if the Company was a separate taxpayer. Deferred tax assets and liabilities are determined based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. Deferred tax assets are reduced by valuation allowances if the Company believes it is more likely than not that some portion or all of the asset will not be realized. The Company's provision for income taxes is further disclosed in Note I.

The Company's employees participate in Clear Channel Communications employee benefit plans, including employee medical insurance and a 401(k) retirement benefit plan. These costs are recorded as a

**Table of Contents**

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

component of selling, general and administrative expenses and were approximately $8.2 million, $7.1 million, and $6.6 million for the years ended December 31, 2004, 2003 and 2002, respectively.

## NOTE I — INCOME TAXES

The operations of the Company are included in a consolidated federal income tax return filed by Clear Channel Communications, Inc. However, for financial reporting purposes, the Company's provision for income taxes has been computed on the basis that the Company files separate consolidated income tax returns with its subsidiaries.

Significant components of the provision for income tax expense (benefit) are as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  | (In thousands) | | |
| Current — federal | $ (10,291) | $ (27,813) | $ (85,352) |
| Current — foreign | 34,894 | 22,734 | 20,796 |
| Current — state | (1,181) | (7,013) | (7,452) |
| Total current | 23,422 | (12,092) | (72,008) |
| Deferred — federal | 40,048 | 44,098 | 50,476 |
| Deferred — foreign | (18,339) | (27,714) | (37,759) |
| Deferred — state | 17,423 | 7,560 | 8,653 |
| Total deferred | 39,132 | 23,944 | 21,370 |
| Income tax expense (benefit) | $ 62,554 | $ 11,852 | $ (50,638) |

The increases in current and deferred expense of $35.5 million and $15.2 million, respectively, for the year ended December 31, 2004 were due to an increase in "Income (loss) before income taxes and cumulative effect of a change in accounting principle" of $93.2 million and additional deferred tax expense of approximately $16.0 million being recorded in order to adjust the deferred tax asset balance to an amount determined to be realizable by the Company.

The decrease in current tax benefit recorded of $59.9 million for the year ended December 31, 2003 was due primarily to an increase in income before income taxes of approximately $83.2 million.

F-23

**Table of Contents**

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

Significant components of the Company's deferred tax liabilities and assets as of December 31, 2004 and 2003 are as follows:

|  | 2004 | 2003 |
|---|---|---|
|  | (In thousands) | |
| Deferred tax liabilities: | | |
| Foreign | $ 37,185 | $ 55,524 |
| Other | 1,816 | 2,605 |
| Total deferred tax liabilities | 39,001 | 58,129 |
| Deferred tax assets: | | |
| Intangibles and fixed assets | 266,053 | 209,214 |
| Accrued expenses | 1,163 | 1,273 |
| Equity in earnings | 2,138 | 776 |
| Net operating loss carryforwards | — | 753 |
| Bad debt reserves | 1,624 | 1,396 |
| Deferred income | 8,762 | 11,463 |
| Other | 95 | 47 |
| Total gross deferred tax assets | 279,835 | 224,922 |
| Net deferred tax assets | 240,834 | 166,793 |
| Less current portion | 9,778 | 11,600 |
| Long term deferred tax asset | $ 231,056 | $ 155,193 |

The deferred tax asset related to intangibles and fixed assets primarily relates to the difference in book and tax basis of acquired permits and tax deductible goodwill created from the Company's various stock acquisitions. As discussed in Note B, in 2004 the Company adopted D-108, which resulted in the Company recording a non-cash charge of approximately $162.9 million, net of deferred tax of $113.2 million, related to its permits. In accordance with Statement No. 142, the Company no longer amortizes permits. Thus, a deferred tax benefit for the difference between book and tax amortization for the Company's permits and tax-deductible goodwill is no longer recognized, as these assets are no longer amortized for book purposes. As the Company continues to amortize its tax basis in its permits and tax deductible goodwill, the deferred tax asset will decrease over time.

Deferred tax assets and liabilities are computed by applying the U.S. federal and state income tax rate in effect to the gross amounts of temporary differences.

Table of Contents

## NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

The reconciliation of income tax computed at the U.S. federal statutory tax rates to income tax expense (benefit) is:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  |  | (In thousands) |  |
| Income tax expense (benefit) at statutory rates | $ 24,511 | $ (8,100) | $ (37,221) |
| State income taxes, net of federal tax benefit | 16,242 | 547 | 1,201 |
| Foreign taxes | 11,379 | 5,974 | (19,620) |
| Nondeductible items | 607 | 560 | 476 |
| Additional deferred tax expense | 4,804 | — | — |
| Tax contingencies | 4,626 | 10,116 | 3,892 |
| Subpart F income | 441 | 2,542 | 871 |
| Other, net | (56) | 213 | (237) |
|  | $ 62,554 | $ 11,852 | $ (50,638) |

During 2004, the Company recorded tax expense of approximately $62.6 million on income (loss) before income taxes of $70.0 million. Foreign income (loss) before income taxes was approximately $14.8 million for 2004. The Company recorded additional deferred tax expense of approximately $16.0 million in 2004 in order to adjust the deferred tax asset balance to an amount determined to be realizable by the Company. In addition, the Company did not record a tax benefit on certain tax losses in its foreign operations due to the uncertainty of the ability to utilize those tax losses in the future.

During 2003, the Company recorded tax expense of approximately $11.9 million on income (loss) before income taxes of ($23.1) million. Foreign income (loss) before income taxes was approximately ($31.3) million. The Company recorded additional current tax expense due to certain tax contingencies of approximately $10.1 million in 2003. In addition, the Company did not record a tax benefit on certain tax losses in its foreign operations due to the uncertainty of the ability to utilize those tax losses in the future.

During 2002, the Company recorded tax benefit of approximately $50.6 million on income (loss) before income taxes of ($106.3) million. The Company recorded a tax benefit from foreign operations of approximately $17.0 million on foreign income (loss) before income taxes of approximately $7.6 million. The tax benefit was the result of the blending of income taxed in low tax rate jurisdictions and losses benefited in high tax rate jurisdictions.

All tax liabilities owed by the Company are paid by Clear Channel Communications through an operating account that represents net amounts due to or from Clear Channel Communications.

## NOTE J — OWNER'S EQUITY

### Stock Options

Clear Channel Communications has granted options to purchase Clear Channel Communications common stock to employees of the Company and its affiliates under various stock option plans at no less than the fair market value of the underlying stock on the date of grant. These options are granted for a term not exceeding ten years and are forfeited in the event the employee or director terminates his or her employment or relationship with the Company or one of its affiliates. All option plans contain anti-dilutive provisions that require the adjustment of the number of shares of the Company common stock represented by each option for any stock splits or dividends.

### Restricted Stock Awards

On behalf of the Company, Clear Channel Communications began granting restricted stock awards to the Company's employees in 2004. These Clear Channel Communications common shares bear a legend

F-25

**Table of Contents**

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

which restricts their transferability for a term of from three to five years and are forfeited in the event the employee terminates his or her employment or relationship with the Company prior to the lapse of the restriction. The restricted stock awards were granted out of the Clear Channel Communications' stock option plans. All option plans contain anti-dilutive provisions that require the adjustment of the number of shares of the Clear Channel Communications common stock represented by each option for any stock splits or dividends. Additionally, recipients of the restricted stock awards are entitled to all cash dividends as of the date the award was granted. The Company had 12,345 restricted stock awards outstanding at December 31, 2004 at a weighted average share price at the date of grant of $44.48.

### NOTE K — EMPLOYEE STOCK AND SAVINGS PLANS

The Company's employees are eligible to participate in various 401(K) savings and other plans provided by Clear Channel Communications for the purpose of providing retirement benefits for substantially all employees. Both the employees and the Company make contributions to the plan. The Company matches a portion of an employee's contribution. Beginning January 1, 2003, the Company match was increased from 35% to 50% of the employee's first 5% of pay contributed to the plan. Company matched contributions vest to the employees based upon their years of service to the Company. Contributions to these plans of $1.9 million, $1.6 million and $1.2 million were charged to expense for 2004, 2003 and 2002, respectively.

The Company's employees are also eligible to participate in a non-qualified employee stock purchase plan provided by Clear Channel Communications. Under the plan, shares of Clear Channel Communications' common stock may be purchased at 85% of the market value on the day of purchase. Employees may purchase shares having a value not exceeding 10% of their annual gross compensation or $25,000, whichever is lower. During 2004, 2003 and 2002, all Clear Channel Communications employees purchased 262,163, 266,978 and 319,817 shares at weighted average share prices of $32.05, $34.01 and $33.85, respectively. The Company's employees represent approximately 12% of the total participation in this plan.

Certain highly compensated executives of the Company are eligible to participate in a non-qualified deferred compensation plan provided by Clear Channel Communications, which allows deferrals up to 50% of their annual salary and up to 80% of their bonus before taxes. The Company does not match any deferral amounts and retains ownership of all assets until distributed. There is no liability recorded by the Company under this deferred compensation plan as the liability of this plan is Clear Channel Communications'.

### NOTE L — OTHER INFORMATION

|  | For the Year Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|  | | (In thousands) | |
| The following details the components of "Other income (expense) — net": | | | |
| Royalty fee to Clear Channel Communications | $ (15,809) | $ (14,063) | $ — |
| Gain on sale of operating and fixed assets | 11,718 | 11,047 | 7,118 |
| Asset retirement obligation | — | (7,000) | — |
| Minority interest | (7,602) | (3,906) | 1,778 |
| Other | (1,648) | 5,327 | 268 |
| Total other income (expense) — net | $ (13,341) | $ (8,595) | $ 9,164 |

Table of Contents

**NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)**

## NOTE M — SEGMENT DATA

The Company has two reportable operating segments — domestic and international. The domestic segment includes operations in North and South America, and the international segment includes operations in Europe, Asia, Africa and Australia.

|  | Domestic | International | Corporate | Combined |
|---|---|---|---|---|
|  |  | (In thousands) |  |  |
| **2004** |  |  |  |  |
| Revenue | $ 1,092,089 | $ 1,354,951 | $ — | $ 2,447,040 |
| Direct operating expenses | 468,687 | 793,630 | — | 1,262,317 |
| Selling, general and administrative expenses | 173,010 | 326,447 | — | 499,457 |
| Depreciation and amortization | 186,620 | 201,597 | — | 388,217 |
| Corporate expenses | — | — | 53,770 | 53,770 |
| Operating income (loss) | $ 263,772 | $ 33,277 | $ (53,770) | $ 243,279 |
| Identifiable assets | $ 3,378,761 | $ 1,862,172 | $ — | $ 5,240,933 |
| Capital expenditures | $ 60,506 | $ 115,634 | $ — | $ 176,140 |
| **2003** |  |  |  |  |
| Revenue | $ 1,006,376 | $ 1,168,221 | $ — | $ 2,174,597 |
| Direct operating expenses | 435,075 | 698,311 | — | 1,133,386 |
| Selling, general and administrative expenses | 161,579 | 295,314 | — | 456,893 |
| Depreciation and amortization | 194,237 | 185,403 | — | 379,640 |
| Corporate expenses | — | — | 54,233 | 54,233 |
| Operating income (loss) | $ 215,485 | $ (10,807) | $ (54,233) | $ 150,445 |
| Identifiable assets | $ 3,507,019 | $ 1,725,801 | $ — | $ 5,232,820 |
| Capital expenditures | $ 60,685 | $ 144,460 | $ — | $ 205,145 |
| **2002** |  |  |  |  |
| Revenue | $ 911,493 | $ 948,148 | $ — | $ 1,859,641 |
| Direct operating expenses | 399,006 | 558,824 | — | 957,830 |
| Selling, general and administrative expenses | 158,159 | 234,644 | — | 392,803 |
| Depreciation and amortization | 179,947 | 156,948 | — | 336,895 |
| Corporate expenses | — | — | 52,218 | 52,218 |
| Operating income (loss) | $ 174,381 | $ (2,268) | $ (52,218) | $ 119,895 |
| Identifiable assets | $ 3,494,697 | $ 1,431,508 | $ — | $ 4,926,205 |
| Capital expenditures | $ 83,563 | $ 206,624 | $ — | $ 290,187 |

Revenue of $57.5 million, $46.6 million and $42.7 million and identifiable assets of $35.7 million, $28.9 million and $14.9 million derived from the Company's foreign operations are included in the Domestic data above for the years ended December 31, 2004, 2003 and 2002, respectively.

Table of Contents

### NOTES TO COMBINED FINANCIAL STATEMENTS — (Continued)

**NOTE N —2004 QUARTERLY RESULTS OF OPERATIONS (Unaudited)**

| | For the Three Months Ended | | | |
| | March 31 | June 30 | September 30 | December 31 |
| | | | (In thousands) | |
|---|---|---|---|---|
| Revenue | $ 521,593 | $ 639,549 | $ 600,166 | $ 685,732 |
| Operating expenses: | | | | |
|   Direct operating expenses | 293,833 | 312,815 | 317,754 | 337,897 |
|   Selling, general and administrative expenses | 118,040 | 119,310 | 120,856 | 141,269 |
|   Depreciation and amortization | 99,750 | 92,806 | 96,254 | 99,407 |
|   Corporate expenses | 11,856 | 14,681 | 12,914 | 14,319 |
| Operating income (loss) | (1,886) | 99,937 | 52,388 | 92,840 |
| Interest expense | 3,675 | 3,600 | 3,836 | 3,066 |
| Intercompany interest expense | 36,413 | 36,413 | 36,413 | 36,414 |
| Equity in earnings of nonconsolidated affiliates | 319 | 4,468 | (2,517) | (2,346) |
| Other income (expense) — net | (6,435) | (5,203) | (5,572) | 3,869 |
| Income (loss) before income taxes and cumulative effect of a change in accounting principle | (48,090) | 59,189 | 4,050 | 54,883 |
| Income tax (expense) benefit | 35,706 | (43,946) | (3,009) | (51,305) |
| Income (loss) before cumulative effect of a change in accounting principle | (12,384) | 15,243 | 1,041 | 3,578 |
| Cumulative effect of a change in accounting principle, net of tax of $113,173 | — | — | — | (162,858) |
| Net income (loss) | $ (12,384) | $ 15,243 | $ 1,041 | $ (159,280) |

**NOTE O —SUBSEQUENT EVENTS**

In July, 2005, the Company increased its investment in Clear Media Limited, a Chinese outdoor advertising company, to over 50%. As a result, the Company will no longer account for this investment under the equity method, but rather will begin consolidating the results of Clear Media Limited beginning in the third quarter of 2005.

On July 27, 2005, the Company announced to the trade union representatives and to employees a draft plan to restructure its operations in France. In connection with the restructuring, the Company expects to record approximately $25.0 million in restructuring costs, including employee termination and other costs, as a component of selling, general and administrative expenses during the third quarter of 2005.

On August 2, 2005, a wholly-owned subsidiary of the Company entered into a $2.5 billion intercompany note payable to the Company which was subsequently distributed as a dividend to Clear Channel Communications. This note accrues interest at a variable per annum rate equal to the weighted average cost of debt for Clear Channel Communications, calculated on a monthly basis. The estimated weighted average interest rate for the period ended September 30, 2005 is 5.7%. This note will mature on August 2, 2010.

Effective November 9, 2005, Clear Channel Communications completed the contribution and transfer to the Company all of the assets and liabilities of its outdoor advertising business not currently held by the Company. The Company and Clear Channel Communications entered into the Master Separation Agreement detailing the provisions of the contribution and the separation of the Company from Clear Channel Communications.

Table of Contents

**Report of Independent Registered Public Accounting Firm**

The Board of Directors
Clear Channel Outdoor Holdings, Inc.

We have reviewed the accompanying combined balance sheet of Clear Channel Outdoor Holdings, Inc. and subsidiaries (the Company) as of September 30, 2005, and the related combined statements of operations for the nine-month periods ended September 30, 2005 and 2004, and the combined statements of cash flows for the nine-month periods ended September 30, 2005 and 2004. These financial statements are the responsibility of the Company's management.

We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the combined financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the combined balance sheet of Clear Channel Outdoor Holdings, Inc. and subsidiaries as of December 31, 2004, and the related combined statements of operations, owners' equity, and cash flows for the year then ended and in our report dated August 4, 2005, except for the first paragraph of Note A and the fourth paragraph of Note O, as to which date is November 9, 2005 we expressed an unqualified opinion on those combined financial statements and included an explanatory paragraph indicating in 2004 the Company changed its method of accounting for indefinite lived intangibles and in 2002 the Company changed its method for goodwill. In our opinion, the information set forth in the accompanying combined balance sheet as of December 31, 2004, is fairly stated, in all material respects, in relation to the combined balance sheet from which it has been derived.

/s/ Ernst & Young LLP

San Antonio, Texas
October 20, 2005, except for the third paragraph of Note 1 and Note 7,
as to which date is November 9, 2005

F-29

**Table of Contents**

## COMBINED BALANCE SHEETS

|  | September 30, 2005 | December 31, 2004 |
|---|---|---|
|  | (In thousands) (Unaudited) |  |
| **ASSETS** |  |  |
| **CURRENT ASSETS** |  |  |
| Cash and cash equivalents | $ 91,676 | $ 37,948 |
| Accounts receivable, less allowance of $22,930 at September 30, 2005 and $19,487 at December 31, 2004 | 679,469 | 661,244 |
| Due from Clear Channel Communications | 362,154 | 302,634 |
| Prepaid expenses | 69,060 | 59,601 |
| Other current assets | 40,928 | 45,813 |
| **Total Current Assets** | 1,243,287 | 1,107,240 |
| PROPERTY, PLANT AND EQUIPMENT |  |  |
| Land, buildings and improvements | 310,156 | 318,478 |
| Structures | 3,287,778 | 3,110,233 |
| Furniture and other equipment | 237,304 | 238,973 |
| Construction in progress | 54,977 | 54,021 |
|  | 3,890,215 | 3,721,705 |
| Less accumulated depreciation | 1,718,018 | 1,525,720 |
|  | 2,172,197 | 2,195,985 |
| INTANGIBLE ASSETS |  |  |
| Definite-lived intangibles, net | 255,028 | 334,284 |
| Indefinite-lived intangibles — permits | 212,507 | 211,690 |
| Goodwill | 760,455 | 787,006 |
| OTHER ASSETS |  |  |
| Notes receivable | 5,821 | 5,872 |
| Investments in, and advances to, nonconsolidated affiliates | 99,447 | 175,057 |
| Deferred tax asset | 243,030 | 231,056 |
| Other assets | 302,915 | 189,513 |
| Other investments | 835 | 3,230 |
| **Total Assets** | $ 5,295,522 | $ 5,240,933 |
| **LIABILITIES AND OWNER'S EQUITY** |  |  |
| CURRENT LIABILITIES |  |  |
| Accounts payable | $ 209,948 | $ 243,542 |
| Accrued expenses | 325,477 | 264,567 |
| Accrued interest | 2,443 | 558 |
| Accrued income tax | 19,520 | — |
| Deferred income | 98,135 | 94,120 |
| Current portion of long-term debt | 152,377 | 146,268 |
| **Total Current Liabilities** | 807,900 | 749,055 |
| Long-term debt | 96,759 | 30,112 |
| Debt with Clear Channel Communications | 3,963,000 | 1,463,000 |
| Other long-term liabilities | 175,965 | 205,811 |
| Minority interest | 163,549 | 63,302 |
| Commitment and contingent liabilities (Note 4) |  |  |
| OWNER'S EQUITY |  |  |
| Owners net investment | 4,179,664 | 6,679,664 |
| Retained deficit | (4,229,060) | (4,250,222) |
| Accumulated other comprehensive income | 137,745 | 300,211 |
| **Total Owner's Equity** | 88,349 | 2,729,653 |
| **Total Liabilities and Owner's Equity** | $ 5,295,522 | $ 5,240,933 |

See Notes to Combined Financial Statements

Case 18-31274   Document 2188   Filed in TXSB on 12/13/18   Page 261 of 689

Table of Contents

### UNAUDITED INTERIM COMBINED STATEMENTS OF OPERATIONS

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2005 | 2004 |
| | (In thousands) | |
| Revenue | $ 1,931,471 | $ 1,761,308 |
| Operating expenses: | | |
| Direct operating expenses (exclusive of depreciation and amortization) | 988,448 | 924,420 |
| Selling, general and administrative expenses (exclusive of depreciation and amortization) | 410,075 | 358,188 |
| Depreciation and amortization | 290,233 | 288,810 |
| Corporate expenses (exclusive of depreciation and amortization) | 39,397 | 39,451 |
| Operating income | 203,318 | 150,439 |
| Interest expense | 9,874 | 11,111 |
| Intercompany interest expense | 133,093 | 109,239 |
| Equity in earnings of nonconsolidated affiliates | 9,908 | 2,270 |
| Other income (expense) — net | (17,353) | (17,210) |
| Income before income taxes | 52,906 | 15,149 |
| Income tax (expense) benefit: | | |
| Current | (37,767) | 6,481 |
| Deferred | 6,023 | (17,730) |
| Net income | 21,162 | 3,900 |
| Other comprehensive loss, net of tax: | | |
| Foreign currency translation adjustments | (162,466) | (8,103) |
| Comprehensive loss | $ (141,304) | $ (4,203) |

See Notes to Combined Financial Statements

F-31

**Table of Contents**

### UNAUDITED COMBINED STATEMENTS OF CHANGES IN OWNER'S EQUITY

| | Owner's Net Investment | Retained Deficit | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| Balances at December 31, 2004 | $ 6,679,664 | $ (4,250,222) | $ 300,211 | $ 2,729,653 |
| Net income | — | 21,162 | — | 21,162 |
| Dividend payable to Clear Channel Communications | (2,500,000) | — | — | (2,500,000) |
| Currency translation adjustment | — | — | (162,466) | (162,466) |
| Balances at September 30, 2005 | $ 4,179,664 | $ (4,229,060) | $ 137,745 | $ 88,349 |

See Notes to Combined Financial Statements

F-32

Table of Contents

**UNAUDITED INTERIM COMBINED STATEMENTS OF CASH FLOWS**

| | Nine Months Ended September 30, | |
| | --- | --- |
| | 2005 | 2004 |
| | (In thousands) | |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income | $ 21,162 | $ 3,900 |
| Reconciling Items: | | |
| Depreciation and amortization | 290,233 | 288,810 |
| Deferred taxes | (6,023) | 17,730 |
| (Gain) loss on sale of operating and fixed assets | (2,762) | (1,530) |
| Equity in earnings of nonconsolidated affiliates | (9,908) | (2,270) |
| Increase (decrease) other, net | 8,870 | 4,007 |
| Changes in operating assets and liabilities, net of effects of acquisitions: | | |
| Decrease (increase) in accounts receivable | 275 | 22,303 |
| Decrease (increase) in prepaid expenses | (9,459) | (3,959) |
| Decrease (increase) in other current assets | 33,038 | (4,854) |
| Increase (decrease) in accounts payable, accrued expenses and other liabilities | (24,183) | (36,036) |
| Increase (decrease) in accrued interest | 1,860 | 797 |
| Increase (decrease) in deferred income | 2,547 | 13,334 |
| Increase (decrease) in accrued income taxes | 30,987 | 27,661 |
| Net cash provided by operating activities | 336,637 | 329,893 |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Decrease (increase) in notes receivable, net | 51 | 506 |
| Decrease (increase) in investments in, and advances to, nonconsolidated affiliates — net | 1,114 | (7,219) |
| Purchases of investments | — | (407) |
| Proceeds from sale of investments | — | 12,076 |
| Purchases of property, plant and equipment | (130,484) | (117,733) |
| Proceeds from disposal of assets | 9,593 | 5,672 |
| Acquisition of operating assets, net of cash acquired | (43,737) | (86,861) |
| Decrease (increase) in other — net | (59,726) | (33,420) |
| Net cash used in investing activities | (223,189) | (227,386) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Draws on credit facilities | 58,206 | 65,948 |
| Payments on credit facilities | (46,840) | (75,749) |
| Net transfers to Clear Channel Communications | (59,520) | (85,958) |
| Net cash used in financing activities | (48,154) | (95,759) |
| Effect of exchange rate changes on cash | (11,566) | (1,713) |
| Net increase in cash and cash equivalents | 53,728 | 5,035 |
| Cash and cash equivalents at beginning of period | 37,948 | 34,105 |
| Cash and cash equivalents at end of period | $ 91,676 | $ 39,140 |

See Notes to Combined Financial Statements

F-33

**Table of Contents**

NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS

**Note 1:    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

### _Preparation of Interim Financial Statements_

Clear Channel Outdoor Holdings, Inc. (the "Company") includes the entities principally comprising the outdoor segment of Clear Channel Communications, Inc. ("Clear Channel Communications"), a diversified media company with operations in radio broadcasting, outdoor advertising and live entertainment. The Company has two principal business segments: domestic and international. The domestic segment includes operations in North and South America; and the international segment includes operations in Europe, Asia, Africa and Australia.

The combined financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and, in the opinion of management, include all adjustments (consisting of normal recurring accruals and adjustments necessary for adoption of new accounting standards) necessary to present fairly the results of the interim periods shown. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles in the United States have been condensed or omitted pursuant to such SEC rules and regulations. Management believes that the disclosures made are adequate to make the information presented not misleading. Due to seasonality and other factors, the results for the interim periods are not necessarily indicative of results for the full year.

The combined financial statements include assets and liabilities of Clear Channel Communications that were transferred to the Company effective November 9, 2005. The combined financial statements are comprised of businesses included in the consolidated financial statements and accounting records of Clear Channel Communications, using the historical results of operations, and historical basis of assets and liabilities of the outdoor business. Investments in companies in which the Company owns 20 percent to 50 percent of the voting common stock or otherwise exercises significant influence over operating and financial policies of the company are accounted for under the equity method. Significant intercompany accounts among the combined businesses have been eliminated in consolidation.

### _Recent Developments_

In July 2005, the Company increased its investment in Clear Media Limited ("Clear Media"), a Chinese company that operates street furniture displays throughout China, to a controlling majority ownership interest. As a result, the Company began consolidating the results of Clear Media in the third quarter of 2005. The Company had been accounting for Clear Media as an equity investment prior to July 2005. Included in the consolidated balance sheet as of September 30, 2005, are total assets of $266.1 million and total liabilities of $164.4 million related to Clear Media.

**Table of Contents**

## NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)

### *Stock-Based Compensation*

The Company does not have any compensation plans under which it grants stock awards to employees. Clear Channel Communications grants stock options to the Company's officers and other key employees on behalf of the Company. Clear Channel Communications accounts for its stock-based award plans in accordance with APB 25, and related interpretations, under which compensation expense is recorded to the extent that the current market price of the underlying stock exceeds the exercise price. Clear Channel Communications calculates the pro forma stock compensation expense as if the stock-based awards had been accounted for using the provisions of Statement 123, *Accounting for Stock-Based Compensation.* The stock compensation expense is then allocated to the Company based on the percentage of options outstanding to employees of the Company. The required pro forma disclosures, based on this allocated expense are as follows:

|  | The Nine Months Ended September 30, | |
|  | 2005 | 2004 |
| --- | --- | --- |
|  | (In thousands) | |
| Income (loss): |  |  |
|    Reported | $  21,162 | $  3,900 |
|    Pro forma stock compensation expense, net of tax | (1,595) | (4,921) |
|    Pro Forma | $  19,567 | $  (1,021) |

### *Recent Accounting Pronouncements*

In March 2005, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 47, *Accounting for Conditional Asset Retirement Obligations* ("FIN 47"). FIN 47 is an interpretation of FASB Statement 143, *Asset Retirement Obligations,* which was issued in June 2001. According to FIN 47, uncertainty about the timing and (or) method of settlement because they are conditional on a future event that may or may not be within the control of the entity should be factored into the measurement of the asset retirement obligation when sufficient information exists. FIN 47 also clarifies when an entity would have sufficient information to reasonably estimate the fair value of an asset retirement obligation. FIN 47 is effective no later than the end of fiscal years ending after December 15, 2005. Retrospective application of interim financial information is permitted, but is not required. The Company adopted FIN 47 on January 1, 2005, which did not materially impact the Company's financial position or results of operations.

In March 2005, the SEC issued Staff Accounting Bulletin No. 107 *Share-Based Payment* ("SAB 107"). SAB 107 expresses the SEC staff's views regarding the interaction between Statement of Financial Accounting Standards No. 123(R) *Share-Based Payment* ("Statement 123(R)") and certain SEC rules and regulations and provides the staff's views regarding the valuation of share-based payment arrangements for public companies. In particular, SAB 107 provides guidance related to share-based payment transactions with nonemployees, the transition from nonpublic to public entity status, valuation methods (including assumptions such as expected volatility and expected term), the accounting for certain redeemable financial instruments issued under share-based payment arrangements, the classification of compensation expense, non-GAAP financial measures, first time adoption of Statement 123(R) in an interim period, capitalization of compensation cost related to share-based payment arrangements, the accounting for income tax effects of share-based payment arrangements upon adoption of Statement 123(R) and the modification of employee share options prior to adoption of Statement 123(R). The Company is unable to quantify the impact of adopting SAB 107 and Statement 123(R) at this time because it will depend on levels of share-based payments granted in the future. Additionally, the Company is still evaluating the assumptions it will use upon adoption.

In April 2005, the SEC issued a press release announcing that it would provide for phased-in implementation guidance for Statement 123(R). The SEC would require that registrants that are not

**Table of Contents**

### NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)

small business issuers adopt Statement 123(R)'s fair value method of accounting for share-based payments to employees no later than the beginning of the first fiscal year beginning after June 15, 2005. The Company intends to adopt Statement 123(R) on January 1, 2006.

In June 2005, the Emerging Issues Task Force ("EITF") issued EITF 05-6, *Determining the Amortization Period of Leasehold Improvements* ("EITF 05-6"). EITF 05-6 requires that assets recognized under capital leases generally be amortized in a manner consistent with the lessee's normal depreciation policy except that the amortization period is limited to the lease term (which includes renewal periods that are reasonably assured). EITF 05-6 also addresses the determination of the amortization period for leasehold improvements that are purchased subsequent to the inception of the lease. Leasehold improvements acquired in a business combination or purchased subsequent to the inception of the lease should be amortized over the lesser of the useful life of the asset or the lease term that includes reasonably assured lease renewals as determined on the date of the acquisition of the leasehold improvement. The Company adopted EITF 05-6 on July 1, 2005, which did not materially impact the Company's financial position or results of operations.

**Note 2:   INTANGIBLE ASSETS AND GOODWILL**

#### *Definite-lived Intangibles*

The Company has definite-lived intangible assets which consist primarily of transit and street furniture contracts and other contractual rights, all of which are amortized over the respective lives of the agreements. Other definite-lived intangible assets are amortized over the period of time the assets are expected to contribute directly or indirectly to the Company's future cash flows. The following table presents the gross carrying amount and accumulated amortization for each major class of definite-lived intangible assets at September 30, 2005 and December 31, 2004:

|  | September 30, 2005 | | December 31, 2004 | |
|  | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
|---|---|---|---|---|
|  | (In thousands) | | | |
| Transit, street furniture, and other contractual rights | $ 641,316 | $     396,720 | $ 688,373 | $     364,939 |
| Other | 56,652 | 46,220 | 57,093 | 46,243 |
| Total | $ 697,968 | $     442,940 | $ 745,466 | $     411,182 |

Total amortization expense from definite-lived intangible assets for the nine months ended September 30, 2005 and for the year ended December 31, 2004 was $64.2 million and $67.1 million, respectively. The following table presents the Company's estimate of amortization expense for each of the five succeeding fiscal years for definite-lived intangible assets:

|  | (In thousands) |
|---|---|
| 2006 | $     71,309 |
| 2007 | 40,458 |
| 2008 | 20,319 |
| 2009 | 16,759 |
| 2010 | 10,632 |

As acquisitions and dispositions occur in the future and as purchase price allocations are finalized, amortization expense may vary.

Table of Contents

**NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)**

### *Indefinite-lived Intangibles*

The Company's indefinite-lived intangible assets consist of billboard permits. Billboard permits are issued in perpetuity by state and local governments and are transferable or renewable at little or no cost. Permits typically include the location for which the permit allows the Company the right to operate an advertising structure. The Company's permits are located on either owned or leased land. In cases where the Company's permits are located on leased land, the leases are typically from 10 to 30 years and renew indefinitely, with rental payments generally escalating at an inflation based index. If the Company loses its lease, the Company will typically obtain permission to relocate the permit or bank it with the municipality for future use.

The Company does not amortize its billboard permits. The Company tests these indefinite-lived intangible assets for impairment at least annually using the direct method. Under the direct method, it is assumed that rather than acquiring indefinite-lived intangible assets as a part of a going concern business, the buyer hypothetically obtains indefinite-lived intangible assets and builds a new operation with similar attributes from scratch. Thus, the buyer incurs start-up costs during the build-up phase which are normally associated with going concern value. Initial capital costs are deducted from the discounted cash flows model which results in value that is directly attributable to the indefinite-lived intangible assets.

Under the direct method, the Company continues to aggregate its indefinite-lived intangible assets at the market level for purposes of impairment testing. The Company's key assumptions using the direct method are market revenue growth rates, market share, profit margin, duration and profile of the build-up period, estimated start-up capital costs and losses incurred during the build-up period, the risk-adjusted discount rate and terminal values. This data is populated using industry normalized information representing an average station within a market.

### *Goodwill*

The Company tests goodwill for impairment using a two-step process. The first step, used to screen for potential impairment, compares the fair value of the reporting unit with its carrying amount, including goodwill. The second step, used to measure the amount of the impairment loss, compares the implied fair aggregate of the reporting unit goodwill with the carrying amount of that goodwill. The following table presents the changes in the carrying amount of goodwill in each of the Company's reportable segments for the nine-month period ended September 30, 2005:

| | Domestic | International | Total |
|---|---|---|---|
| | | (In thousands) | |
| Balance as of December 31, 2004 | $ 397,377 | $ 389,629 | $ 787,006 |
| Acquisitions | 1,403 | 15,884 | 17,287 |
| Foreign currency | 462 | (42,512) | (42,050) |
| Adjustments | (1,612) | (176) | (1,788) |
| Balance as of September 30, 2005 | $ 397,630 | $ 362,825 | $ 760,455 |

F-37

**Table of Contents**

NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)

## Note 3:   RESTRUCTURING

The following represents the ongoing restructuring activities of the Company, including the 2002 Ackerley restructuring, the 2003 restructuring of the France operations, the 2004 restructuring of the Spain operations, and the additional restructuring of the France operations in 2005:

| | Nine Months Ended September 30, 2005 | | Year Ended December 31, 2004 | |
|---|---|---|---|---|
| | | (In thousands) | | |
| Accrual at January 1 | $ | 6,867 | $ | 7,469 |
| Estimated costs charged to restructuring accrual | | 26,576 | | 4,131 |
| Adjustments to restructuring accrual | | — | | (377) |
| Payments charged against restructuring accrual | | (5,460) | | (4,356) |
| Ending balance of accrual | $ | 27,983 | $ | 6,867 |

### *2002 Restructuring*

As a result of Clear Channel Communications' merger with Ackerley in June 2002, the Company recorded a $9.4 million accrual related to the restructuring of Ackerley's outdoor advertising operations. Of the $9.4 million, $5.3 million was related to severance and $4.1 million was related to lease terminations. The Ackerley corporate office closed in July 2002. This restructuring resulted in the termination of 19 employees. There were no payments charged to the restructuring reserve related to severance during the nine months ended September 30, 2005 or during the year ended December 31, 2004. At September 30, 2005, the accrual balance for this restructuring was $1.6 million. The remaining restructuring accrual is comprised solely of lease termination, which will be paid over the next five years.

### *2003 Restructuring*

The Company restructured its operations in France during 2003. As a result, the Company recorded a $13.8 million accrual in selling, general and administrative expenses; $12.5 million was related to severance and $1.3 million was related to lease terminations and consulting costs. As of September 30, 2005, the accrual balance relating to the France restructuring was $0.7 million, which is related to severance. It is expected that these accruals will be paid in the current year. This restructuring has resulted in the termination of 134 employees.

### *2004 Restructuring*

The Company restructured its operations in Spain during 2004. As a result, the Company recorded a $4.1 million accrual in selling, general and administrative expenses; $2.2 million was related to severance and $1.9 million was related to consulting and other costs. As of September 30, 2005, the accrual balance for this restructuring was $1.8 million, which consists of $0.4 million related to severance and $1.4 million related to lease termination and other costs. It is expected that these accruals will be paid in the current year. This restructuring has resulted in the termination of 44 employees.

### *2005 Restructuring*

In the third quarter of 2005, the Company restructured its operations in France. As a result, the Company recorded $26.6 million in restructuring costs as a component of selling, general and administrative expenses during the third quarter of 2005; $22.5 million was related to severance costs and $4.1 million was related to other costs. It has been announced that the restructuring will result in the termination of 101 employees. In addition, $2.7 million of related other costs were incurred during the quarter and applied against the reserve. As of September 30, 2005, the accrual balance was $23.9 million.

**Table of Contents**

**NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)**

**Note 4:   COMMITMENTS AND CONTINGENCIES**

Certain agreements relating to acquisitions provide for purchase price adjustments and other future contingent payments based on the financial performance of the acquired companies. The Company will continue to accrue additional amounts related to such contingent payments if and when it is determinable that the applicable financial performance targets will be met. The aggregate of these contingent payments, if performance targets are met, would not significantly impact the financial position or results of operations of the Company.

The Company is currently involved in certain other legal proceedings and, as required, has accrued an estimate of the probable costs for the resolution of these claims, inclusive of those discussed above. These estimates have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in the Company's assumptions or the effectiveness of its strategies related to these proceedings.

**Note 5:   RELATED PARTY TRANSACTIONS**

The Company has an account that represents net amounts due to or from Clear Channel Communications, which is recorded as "Due from Clear Channel Communications" on the combined balance sheets. The account did not accrue interest during the nine months ended September 30, 2005 and the year ended December 31, 2004 and is generally payable on demand. Included in the account is the net activity resulting from day-to-day cash management services provided by Clear Channel Communications. As a part of these services, the Company maintains collection bank accounts that are swept daily by Clear Channel Communications. In return, Clear Channel Communications funds the Company's controlled disbursement accounts as checks or electronic payments are presented for payment. At September 30, 2005 and December 31, 2004, the balance in "Due from Clear Channel Communications" was $362.2 million and $302.6 million, respectively.

The Company has issued two intercompany notes to Clear Channel Communications in the aggregate original principal amount of approximately $1.5 billion. The first intercompany note in the original principal amount of approximately $1.4 billion matures on December 31, 2017 and may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 10%. The second intercompany note in the original principal amount of approximately $73.0 million matures on December 31, 2017 and may be prepaid in whole at any time, or in part from time to time, and accrues interest at a per annum rate of 9%.

On August 2, 2005, a wholly-owned subsidiary of the Company entered into a $2.5 billion intercompany note payable to the Company which was subsequently distributed as a dividend to Clear Channel Communications. This note accrues interest at a variable per annum rate equal to the weighted average cost of debt for Clear Channel Communications, calculated on a monthly basis. The estimated weighted average interest rate for the period ended September 30, 2005 is 5.7%. This note will mature on August 2, 2010.

Clear Channel Communications has provided funding for certain of the Company's acquisitions of outdoor advertising net assets. The amounts funded by Clear Channel Communications for these acquisitions are recorded in "Owner's net investment," a component of owner's equity.

The Company provides advertising space on its billboards for radio stations owned by Clear Channel Communications. For the nine months ended September 30, 2005 and 2004 the Company recorded $7.0 million and $9.7 million, respectively, in revenue for these advertisements.

Clear Channel Communications provides management services to the Company, which include, among other things: (i) treasury, payroll and other financial related services; (ii) human resources and employee benefits services; (iii) legal and related services; (iv) information systems, network and related

Table of Contents

### NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)

services; (v) investment services; (vi) corporate services; and (vii) procurement and sourcing support services. These services are charged to the Company based on actual direct costs incurred or allocated by Clear Channel Communications based on a seasonally adjusted headcount calculation. For the nine months ended September 30, 2005 and 2004, the Company recorded $11.8 million and $11.8 million, respectively, as a component of corporate expenses for these services.

Clear Channel Communications owns the trademark and trade names used by the Company. Clear Channel Communications charges the Company a royalty fee based upon a percentage of annual revenue. Clear Channel Communications used a third party valuation firm to assist in the calculation of the royalty fee. For the nine months ended September 30, 2005 and 2004, the Company recorded $11.0 million and $12.2 million, respectively of royalty fees in "Other income (expense) — net."

The operations of the Company are included in a consolidated federal income tax return filed by Clear Channel Communications. The Company's provision for income taxes has been computed on the basis that the Company files separate consolidated income tax returns with its subsidiaries. Tax payments are made to Clear Channel Communications on the basis of the Company's separate taxable income. Tax benefits recognized on employee stock options exercises are retained by Clear Channel Communications.

The Company computes its deferred income tax provision using the liability method in accordance with Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes,* as if the Company was a separate taxpayer. Deferred tax assets and liabilities are determined based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. If the Company believes it is more likely than not that some portion or all of a deferred tax asset will not be realized, it will reduce the asset by a valuation allowance.

**Table of Contents**

### NOTES TO UNAUDITED INTERIM COMBINED FINANCIAL STATEMENTS — (Continued)

**Note 6:   SEGMENT DATA**

The Company has two reportable segments — domestic and international. The domestic segment includes operations in North and South America, and the international segment includes operations in Europe, Asia, Africa, and Australia.

| | Domestic | International | Corporate | Combined |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Nine months ended September 30, 2005** | | | | |
| Revenue | $ 886,649 | $ 1,044,822 | $ — | 1,931,471 |
| Direct operating expenses | 359,263 | 629,185 | — | 988,448 |
| Selling, general and administrative expenses | 136,919 | 273,156 | — | 410,075 |
| Depreciation and amortization | 127,019 | 163,214 | — | 290,233 |
| Corporate expenses | — | — | 39,397 | 39,397 |
| Operating income (loss) | $ 263,448 | $ (20,733) | $ (39,397) | 203,318 |
| Identifiable assets | $ 3,428,948 | $ 1,866,574 | $ — | $ 5,295,522 |
| Capital expenditures | $ 50,012 | $ 80,472 | $ — | $ 130,484 |
| **Nine months ended September 30, 2004** | | | | |
| Revenue | $ 800,744 | $ 960,564 | — | $ 1,761,308 |
| Direct operating expenses | 347,619 | 576,801 | — | 924,420 |
| Selling, general and administrative expenses | 126,838 | 231,350 | — | 358,188 |
| Depreciation and amortization | 141,479 | 147,331 | — | 288,810 |
| Corporate expenses | — | — | 39,451 | 39,451 |
| Operating income (loss) | $ 184,808 | $ 5,082 | $ (39,451) | 150,439 |
| Identifiable assets | $ 3,529,756 | $ 1,670,651 | $ — | $ 5,200,407 |
| Capital expenditures | $ 38,190 | $ 79,543 | $ — | $ 117,733 |

Revenue of $46.3 million and $39.2 million and identifiable assets of $50.0 million and $30.1 million derived from the Company's foreign operations are included in the Domestic data above for the nine months ended September 30, 2005 and 2004, respectively.

**Note 7:   SUBSEQUENT EVENTS**

Effective November 9, 2005, Clear Channel Communications completed the contribution and transfer to the Company all of the assets and liabilities of its outdoor advertising business not currently held by the Company. The Company and Clear Channel Communications entered into the Master Separation Agreement detailing the provisions of the contribution and the separation of the Company from Clear Channel Communications.

F-41

**Table of Contents**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON
### FINANCIAL STATEMENT SCHEDULE

We have audited the combined balance sheets of Clear Channel Outdoor Holdings, Inc. and subsidiaries as of December 31, 2004 and 2003, and the related combined statements of operations, changes in owner's equity, and cash flows for each of the three years in the period ended December 31, 2004, and have issued our report thereon dated August 4, 2005, except for the first paragraph of Note A and the fourth paragraph of Note O, as to which date is November 9, 2005 (included elsewhere in this Registration Statement). Our audits also included the financial statement Schedule II in this Registration Statement. This schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits.

In our opinion, the financial statement schedule referred to above, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ Ernst & Young LLP

San Antonio, Texas
August 4, 2005

F-42

Case 18-31274   Document 2188   Filed in TXSB on 12/13/18   Page 274 of 689

**Table of Contents**

**Schedule II — Valuation and Qualifying Accounts**
**Allowance for Doubtful Accounts**
**(In thousands)**

| Description | Balance at Beginning of period | Charges to Costs, Expenses and other | Write-off of Accounts Receivable | Other(1) | Balance at end of Period |
|---|---|---|---|---|---|
| Year ended December 31, 2002 | $ 13,751 | $ 17,588 | $ 13,296 | $ 776 | $ 18,819 |
| Year ended December 31, 2003 | $ 18,819 | $ 6,996 | $ 12,311 | $ 2,209 | $ 15,713 |
| Year ended December 31, 2004 | $ 15,713 | $ 8,731 | $ 6,112 | $ 1,155 | $ 19,487 |

(1)   Foreign currency adjustments.

F-43

Table of Contents



See inside front cover for a map of our domestic markets.

Case 18-31274   Document 2188   Filed in TXSB on 12/13/18   Page 276 of 689

**Table of Contents**

No dealer, salesperson, or other person is authorized to give any information or to represent anything not contained in the prospectus. You must not rely on any unauthorized information or representations. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date.

## TABLE OF CONTENTS

|                                                                                          | Page |
|------------------------------------------------------------------------------------------|------|
| Prospectus Summary                                                                       | 1    |
| Risk Factors                                                                             | 13   |
| Special Note Regarding Forward-Looking Statements                                        | 29   |
| Use of Proceeds                                                                          | 30   |
| Dividend Policy                                                                          | 31   |
| Capitalization                                                                           | 32   |
| Dilution                                                                                 | 34   |
| Unaudited Pro Forma Combined Financial Data                                              | 35   |
| Selected Historical Combined Financial Data                                              | 40   |
| Management's Discussion and Analysis of Financial Condition and Results of Operations    | 45   |
| Industry Overview                                                                        | 71   |
| Business                                                                                 | 74   |
| Management                                                                               | 87   |
| Arrangements Between Clear Channel Communications and Us                                  | 102  |
| Principal Stockholder                                                                    | 112  |
| Description of Capital Stock                                                             | 113  |
| Shares Eligible for Future Sale                                                          | 120  |
| Description of Indebtedness                                                              | 122  |
| Material U.S. Federal Tax Considerations for Non-U.S. Holders of Common Stock            | 123  |
| Underwriting                                                                             | 126  |
| Legal Matters                                                                            | 131  |
| Experts                                                                                  | 131  |
| Available Information                                                                    | 131  |
| Index to Financial Statements                                                            | F-1  |

Through and including December 5, 2005 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

35,000,000 Shares



Class A Common Stock

**PROSPECTUS**

# Goldman, Sachs & Co.

**Deutsche Bank Securities**
**JPMorgan**
**Merrill Lynch & Co.**

**UBS Investment Bank**

**Banc of America Securities LLC**
**Bear, Stearns & Co. Inc.**
**Credit Suisse First Boston**

**A.G. Edwards**
**Allen & Company LLC**
**Barrington Research**
**Harris Nesbitt**
**SunTrust Robinson Humphrey**
**Wachovia Securities**
**M. R. Beal & Company**
**Ramirez & Co., Inc.**
**Siebert Capital Markets**

# Exhibit C

Exhibit 10.8

## REVOLVING PROMISSORY NOTE

**$1,000,000,000**                    **San Antonio, Texas**                    **November 10, 2005**

**FOR VALUE RECEIVED AND ON DEMAND, OR IF NO DEMAND IS SOONER MADE, THEN ON AUGUST 10, 2010**, Clear Channel Communications, Inc., a Texas corporation ("***Maker***"), promises to pay to the order of Clear Channel Outdoor Holdings, Inc., a Delaware corporation (the "***Company***"; the Company and any subsequent holder of this Note being referred to herein as "***Payee***"), at its principal offices in Phoenix, Maricopa County, Arizona, or at such other place as Payee may hereafter designate in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of ONE BILLION AND NO/100 DOLLARS ($1,000,000,000) or if more or less than such amount, the aggregate unpaid principal amount of all funds transferred by the Payee to Maker, for the account of Maker, and evidenced hereby, together with interest on the unpaid balance of said principal amount from time to time remaining outstanding (as determined once each monthly period, or shorter period, if applicable, on the average daily outstanding amount thereof) from the date hereof until maturity, in like money, in immediately available funds, at a rate per annum equal to the lesser of the (i) the Contract Rate and (ii) the Maximum Rate, in each case, as determined by the Maker on the last day of each corresponding monthly period (or shorter, if applicable) for the applicable monthly period. Interest on this Note that is calculated at the Contract Rate shall be calculated at a rate per annum based upon the actual number of days elapsed over a year of 365 or 366 days, as applicable.

RECAPTURE. Notwithstanding the foregoing, if during any period the Contract Rate exceeds the Maximum Rate for the period of time in which the Contract Rate would otherwise be in effect, the rate of interest in effect on this Note shall be limited to the Maximum Rate during each such period, but at all times thereafter the rate of interest in effect on this Note shall be the Maximum Rate until the total amount of interest accrued on this Note equals the total amount of interest that would have accrued on this Note if the Contract Rate had at all times been in effect for such applicable period.

PAYMENTS. Until demand for payment of this Note has been made or this Note has otherwise matured pursuant to other provisions hereof (at which time the outstanding principal balance of this Note and all interest accrued and unpaid thereon shall be due and payable), accrued and unpaid interest on the outstanding and unpaid principal balance of this Note shall be due and payable on the 15th day following each preceding monthly period, and at the maturity of this Note, howsoever such maturity shall occur, with the first such scheduled payment of accrued interest on this Note being due and payable on December 15, 2005. The Payee is the maker, and the Maker is the payee, pursuant to the terms of that certain promissory note of even date herewith (the "***Tandem Note***"), which contains terms and provisions substantially similar to this Note. It is contemplated that on each scheduled due date and at maturity, however that shall occur, of this Note and the Tandem Note that the respective amounts owed on this Note and the Tandem Note, including accrued interest thereon, will be offset against each other, with the maker on the note that continues to have a balance due on its note, after giving effect to such offset, being then required to remit such difference to the then applicable payee.

PREPAYMENTS. Maker may prepay, in whole or part, the unpaid principal balance of this Note without premium or penalty; *provided* that, together with Maker's prepayment of such principal amount, Maker shall pay all interest accrued, previously due and unpaid on the amount of such principal prepayment (as determined in accordance with the terms of this Note).

PAYMENT ADMINISTRATION. All payments on this Note shall be received by Payee not later than 10:00 a.m. San Antonio, Texas time on the date on which such payments shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day). If the due date of any payment under this Note would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day, and interest shall be

*Cash Management Note: Maker – CCO*

payable for any principal so extended for the period of such extension. All payments and prepayments on this Note shall be applied first to previously due and unpaid accrued interest, and the balance, if any, to principal; but no such payment or prepayment shall defer or delay any payment then or thereafter due on this Note.

DEFINITIONS. Unless otherwise herein provided, capitalized terms used herein shall have the meanings assigned to them in the Credit Agreement; *provided, however*, that for purposes of this Note, the following terms shall have the respective meanings as follows:

"*Acceleration Event*" means any event so designated and described hereinafter in this Note, inclusive of cure periods and/or notice provisions, if any, expressly provided therefor.

"*Applicable Law*" means the law in effect, from time to time, applicable to the transaction evidenced by this Note that lawfully permits the receipt, contracting for, charging and collection of the highest permissible lawful, non-usurious rate of interest on this Note and the transactions evidenced hereby, and arising in connection herewith, including laws of the State of Texas and, to the extent controlling, the federal laws of the United States of America. To the extent that Applicable Law is determined by reference to Chapter 303 of the Texas Finance Code, as amended, the interest ceiling applicable hereto and in connection herewith shall be the "indicated" (weekly) rate ceiling from time to time in effect as referred to therein; *provided, however*, it is agreed that the terms hereof, including the rate, or index, formula or provision of law used to compute the rate in connection herewith, will be subject to the revisions as to current and future balances, from time to time, pursuant to Applicable Law. ***It is further agreed that in no event shall Chapter 346 of the Texas Finance Code, as amended, apply to this Note or the transactions evidenced thereby, and arising in connection therewith.***

"*Business Day*" means any day on which commercial banks are not required or authorized to close in San Antonio, Texas.

"*CCU*" means Clear Channel Communications, Inc., a Texas corporation, and its successors.

"*Contract Rate*" means the variable per annum rate of interest equal to the average one-month generic treasury bill rate for the applicable period, which generic treasury bill rate will be determined using the Bloomberg screen GBM<GOVT>GPO, or if such service and screen, or such rate information from such service or screen, is not available at any relevant time of determination, then "generic treasury bill rate" will be determined from such source or sources as CCU deems reasonable.

"*Credit Agreement*" means that certain Credit Agreement dated as of July 13, 2004, among CCU, certain subsidiaries of CCU as offshore borrowers, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto, as amended, supplemented, replaced, restated or otherwise modified from time to time and in effect, whether in whole or part or evidenced by one or more other agreements.

"*Maximum Rate*" means, on any day, the maximum lawful non-usurious rate of interest (if any) that, under Applicable Law, Payee is permitted or authorized to contract for, charge, collect, receive, reserve or take from or of Maker on the indebtedness evidenced by this Note from time to time in effect, including changes in such Maximum Rate attributable to changes under Applicable Law that permit a greater rate of interest to be contracted for, charged, collected, received, reserved or taken as of the effective dates of the respective changes; *provided, however*, to the extent that Applicable Law does not provide for such a maximum rate, then during such periods and for the purpose of the second complete paragraph of this Note, the term "Maximum Rate" shall mean a per annum rate equal to the Contract Rate <u>plus</u> 10%.

Terms otherwise defined herein, whether expressly, by reference or otherwise, and used herein are so used as so defined.

*Cash Management Note: Maker – CCO*

Page 2 of 6

**INTER-COMPANY ARRANGEMENTS.** This Note evidences funds from time to time transferred to the Maker, for the Maker's account, by Payee. It is contemplated that by reason of prepayments or adjustments hereon, there may be times when no indebtedness is owing hereunder; but notwithstanding such occurrences, this Note shall remain valid and shall be in full force and effect as to amounts from time to time owed by Maker to Payee under this Note subsequent to each such occurrence. The records of Maker shall be conclusive evidence, absent manifest error, of funds transferred by Payee to Maker that are evidenced hereby, the payments and other applications thereon and the outstanding unpaid amounts of principal thereof and accrued interest thereon.

**DEFAULTS AND RELATED REMEDIES.** Upon the occurrence of any of the following events or occurrences, each of which is hereby designated an "*Acceleration Event*," and in addition to all other rights and remedies of Payee, **INCLUDING, WITHOUT LIMITATION, THE RIGHT TO MAKE DEMAND ON THIS NOTE AT ANY TIME AND WITHOUT REGARD TO THE EXISTENCE OR NON-EXISTENCE OF ANY EVENT OR OCCURRENCE OTHER THAN THE MAKING OF SUCH DEMAND,** and not in diminution of any other rights and remedies of the Payee, the Payee shall have the respective rights with respect to the acceleration of the maturity of this Note prior to any other date or dates specified herein:

(A) Maker fails to pay, when due, any principal hereof or accrued interest hereon; or

(B) Maker fails to comply with any other material term, condition or covenant of this Note, which has not been cured within ten (10) days following the delivery of notice of such default by the Payee to the Maker; or

(C) Maker shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Maker seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property, and in the case of any such proceedings instituted against Maker (but not instituted by it), either such proceedings shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in such proceedings shall occur; or the Maker shall take any action to authorize any of the actions set forth above in this clause (C);

then, upon the occurrence of any of the events or occurrences specified in the foregoing clauses (A) or (B), the Payee at its option may declare the entire outstanding and unpaid principal balance of this Note and all interest accrued and unpaid thereon, and all other earned amounts payable under this Note, to be forthwith due and payable, whereupon such principal balance of this Note, all such interest and all such other amounts, shall become and be forthwith due and payable without presentment, demand, protest, or further notice of any kind **(including, without limitation, notice of default, notice of intent to accelerate maturity and notice of acceleration of maturity)**, all of which are hereby expressly waived by the Maker and, upon the occurrence on the event or occurrence specified in the foregoing clause (C), the entire outstanding and unpaid principal balance of this Note, all interest accrued and unpaid thereon, and all such other earned amounts payable under this Note, shall automatically become and be immediately due and payable, without presentment, demand, protest, or any notice of any kind **(including, without limitation, notice of default, notice of intent to accelerate maturity and notice of acceleration of maturity)**, all of which are hereby expressly waived by the Maker.

**ENFORCEMENT COSTS.** If this Note is collected by suit or through the bankruptcy court, or any judicial proceeding, or if this Note is not paid at maturity, howsoever such maturity may occur, and it is placed in the hands of an attorney for collection (whether or not suit or other legal proceedings are commenced by such attorney), then Maker agrees to pay, in addition to all other amounts owing hereunder, the collection costs and reasonable attorneys' fees of Payee.

**COMPLIANCE WITH APPLICABLE LAW.** It is the intent of Payee and Maker in the execution and performance of this Note to remain in strict compliance with Applicable Law from time to time in effect.

*Cash Management Note: Maker – CCO*

Page 3 of 6

In furtherance thereof, Payee and Maker stipulate and agree that none of the terms and provisions contained in this Note or any other documents now or hereafter securing or otherwise relating to this Note (collectively, the "***Subject Documents***") shall ever be construed to create a contract to pay for the use, forbearance or detention of money with interest at a rate or in an amount in excess of the Maximum Rate or maximum amount of interest permitted or allowed to be contracted for, charged, received, taken or reserved under Applicable Law. For purposes of this Note and each of the other Subject Documents, "interest" shall include the aggregate of all amounts that constitute or are deemed to constitute interest under Applicable Law that are contracted for, taken, charged, reserved, received or paid under this Note or any of the other Subject Documents. Maker shall never be required to pay unearned interest and shall never be required to pay interest at a rate or in an amount in excess of the Maximum Rate or maximum amount of interest that may be lawfully contracted for, charged, received, taken or reserved under Applicable Law, and the provisions of this paragraph shall control over all other provisions of this Note and each of the other Subject Documents, that may be in actual or apparent conflict herewith. If the maturity of this Note is accelerated for any reason, or if under any other contingency the interest effective rate or amount of interest that would otherwise be payable under this Note or any of the other Subject Documents would exceed the Maximum Rate or maximum amount of interest Payee is permitted or allowed by Applicable Law to charge, contract for, take, reserve or receive, or in the event Payee shall charge, contract for, take, reserve or receive monies that are deemed to constitute interest that would, in the absence of this provision, increase the effective interest rate or amount of interest payable under this Note or any of the other Subject Documents to a rate or amount in excess of that permitted or allowed to be charged, contracted for, taken, reserved or received under Applicable Law then in effect, then the principal amount of this Note or the amount of interest that would otherwise be payable under this Note, or both, shall be reduced to the amount allowed under Applicable Law as now or hereinafter construed by the courts having jurisdiction, and all such monies so charged, contracted for, taken, reserved or received that are deemed to constitute interest in excess of the Maximum Rate or maximum amount of interest permitted by Applicable Law shall immediately be returned to or credited to the account of Maker upon such determination. Payee and Maker further stipulate and agree that, without limitation of the foregoing, all calculations of the rate or amount of interest contracted for, charged, taken, reserved or received under this Note or any of the other Subject Documents that are made for the purpose of determining whether such rate or amount exceeds the Maximum Rate, shall be made to the extent not prohibited by Applicable Law, by amortizing, prorating, allocating and spreading during the period of the full stated term of this Note, all interest hereon at any time contracted for, charged, taken, reserved or received from Maker or otherwise by Payee.

     **REINSTATEMENT**. To the extent that the Maker makes a payment or payments to the Payee or the Payee enforces any lien, security interest, encumbrance, guaranty or claim, and such payment or payments or the proceeds of such enforcement, or any part thereof, are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or other person or entity under any law or equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all rights, remedies and liens therefor, shall be revived and shall continue in full force and effect as if such payment had not been made or such enforcement had not occurred.

     **CERTAIN WAIVERS, ETC**. Maker and all sureties, endorsers and guarantors of this Note severally waive grace, notice of non-payment, presentment, demand, presentment for payment, protest, notice of protest, notice of dishonor or default, **notice of intent to accelerate maturity, notice of acceleration of maturity** and all other such notices, filing of suit and diligence in collecting and bringing suit on this Note or enforcing any of the security herefor, and agree to any substitution, exchange or release of any such security, the release of any party primarily or secondarily liable hereon and further agree that it will not be necessary for Payee, in order to enforce payment of this Note, to first institute suit or exhaust its remedies against any security herefor, and consent to any one or more extensions, renewals, rearrangements, partial payments, or postponements of time of payment of this Note on any terms or any other indulgences with respect hereto, without notice thereof to any of them. The nonexercise or delay by Payee of any of its rights, remedies or powers hereunder or with respect hereto in any particular instance shall not constitute a waiver thereof in that or any subsequent instance. Neither a single or partial exercise of any such right, remedy or power by the Payee, nor any abandonment or discontinuance of steps to enforce such right, remedy or power, shall preclude any other or further exercise thereof or the exercise of any other right,

*Cash Management Note: Maker – CCO*

remedy or power. No course of dealing between the Payee and the Maker shall operate as a waiver of any right, remedy or power of the Payee.

MARGIN COMPLIANCE. Further, the Maker warrants and represents to the Payee that no amounts advanced or borrowed hereunder shall be used for the purchase or carrying, directly or indirectly, of any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System. Further, Maker covenants that it will not take or permit any action that would involve the Payee in a violation of any of the foregoing Regulations or a violation of the Securities Exchange Act of 1934, as amended, in each case as now or hereafter in effect.

GOVERNING LAW. This Note shall be governed by, and construed in accordance with, the internal laws of the State of Texas and, to the extent controlling, applicable federal laws of the United States of America; ***provided, however, in no event shall Chapter 346 of the Texas Finance Code, as amended and in effect, apply to this Note or any transaction provided herein or contemplated hereby***.

{SIGNATURE PAGE FOLLOWS}

*Cash Management Note: Maker – CCO*

Page 5 of 6

     IN WITNESS WHEREOF, Maker has executed and delivered this Note effective as of the date and year first written above.

CLEAR CHANNEL COMMUNICATIONS, INC.

By:  <u>/s/ Mark P. Mays                       </u>
Name: Mark P. Mays
Title: President and Chief Executive Officer

*Cash Management Note: Maker – CCO*

Page 6 of 6

# Exhibit D

EFiled:  Mar  7 2012 10:13PM EST
Transaction ID 42951925
Case No. 7315-

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| CITY OF PINELLAS PARK FIREFIGHTERS PENSION BOARD, derivatively on behalf of nominal defendant CLEAR CHANNEL OUTDOOR HOLDINGS, INC., | |
| Plaintiff, | |
| v. | C.A. No. _____ |
| MARGARET W. COVELL, BLAIR E. HENDRIX, DOUGLAS L. JACOBS, DANIEL G. JONES, MARK P. MAYS, RANDALL T. MAYS, ROBERT PITTMAN, THOMAS R. SHEPHERD, MARSHA M. SHIELDS, CHRISTOPHER M. TEMPLE, DALE W. TREMBLAY, SCOTT R. WELLS, JAMES C. CARLISLE, CLEAR CHANNEL COMMUNICATIONS, INC., BAIN CAPITAL PARTNERS, LLC AND THOMAS H. LEE PARTNERS, L.P. | |
| Defendants, | |
| and | |
| CLEAR CHANNEL OUTDOOR HOLDINGS, INC, a Delaware corporation | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, City of Pinellas Park Firefighters Pension Board ("Pinellas Park" or "Plaintiff"), for its derivative complaint on behalf of nominal defendant Clear Channel Outdoor Holdings, Inc. ("Outdoor" or the "Company"), makes the following allegations upon Plaintiff's personal knowledge with regard to itself and its own acts and upon information and belief as to all other

matters.   Based on the allegations in this Verified Shareholder Derivative Complaint (the "Complaint"), Plaintiff asserts derivative claims for breach of fiduciary duty against Margaret W. Covell, Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Thomas R. Shepherd, Marsha M. Shields, Christopher M. Temple, Dale W. Tremblay and Scott R. Wells (collectively, the "Individual Defendants" or "Director Defendants") on behalf of Outdoor.

## INTRODUCTION

1.      This derivative lawsuit arises from the decision by Outdoor's controlling shareholder, Clear Channel Communications, Inc. ("CCC"), to compel the Individual Defendants to approve a $1.0 billion unsecured loan (the "Loan") by Outdoor to CCC on terms so incredibly favorable to CCC that no rational third-party would have ever agreed to lend money on such terms.   Not only could Outdoor earn twice as much interest on the Loan if it charged CCC a commercially reasonable interest rate, but Outdoor faces a severe risk that the unsecured loan will never be paid back because CCC has been drowning under a massive debt load since its 2008 leveraged buyout ("LBO" or "Buyout").

2.      Outdoor is controlled by media conglomerate CCC.   CCC, through a subsidiary, owns 89% of Outdoor's outstanding common stock and holds approximately 99% of Outdoor's outstanding voting power through high vote shares.

3.      In 2008, Bain Capital Partners, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL") took CCC private in a $24 billion leveraged buyout.   The Buyout saddled CCC with more than $18 billion in debt.   This debilitating debt load has caused concern that CCC could default on its obligations and CCC is currently at risk of going into bankruptcy.   Doubts about CCC's financial health have made it extremely difficult for CCC to raise capital.   Currently, a

B234

company with CCC's credit risk profile would be required to pay 17.5% per year in interest on its unsecured borrowings.

4.      In the normal course, private equity buyers who over-levered a company the way sophisticated players did to CCC would face a stark choice; commit more of their own equity to stabilize the business or file for bankruptcy.  In this case, however, Bain and THL found a different solution:  forcing Outdoor and its public shareholders to become an involuntary source of capital.

5.      To provide much needed liquidity, CCC has abused its position as the controlling shareholder of Outdoor.  At CCC's directive, the Individual Defendants agreed to provide CCC with an unsecured $650 million loan at a 9.25% rate of interest, approximately half the rate at which any market participant is willing to lend to CCC.  Outdoors has publicly disclosed that it expects the size of the Loan to balloon to over $1 billion in the next few years.

6.      CCC is plagued by debt and could be forced into bankruptcy unless it is able to restructure its debt burden.  In the event of a CCC bankruptcy, the unsecured Loan would provide Outdoors with only general creditor status.  In most bankruptcies general creditors receive only pennies on the dollar.  Moreover, Outdoors concedes that the Company could experience a "liquidity shortfall" in the event CCC were to become insolvent.

7.      In late 2011, one of Outdoor's shareholders questioned the Board regarding the propriety of the Loan.  Instead of conducting a legitimate review of the Loan, the Board told the shareholder that the Company could not unilaterally modify or eliminate the contractual obligations under the Loan.  The Board's response is simply untrue.  The Loan is payable on demand and if the Board was concerned with the public shareholders' best interest, the Board would demand immediate repayment.

8.     Because the Loan has depleted the Company's cash reserves so significantly, Outdoor has recently been forced to borrow $2 billion to fund a $6.08 special dividend to its shareholders (the "Dividend") (89% of which obviously is upstreamed to CCC).   If the Individual Defendants had not allowed CCC to exploit the Company's cash reserves to the tune of nearly a billion dollars, Outdoor would not have to incur such substantial indebtedness (and concomitant interest expense) to pay the Dividend.

9.     This litigation seeks redress on behalf of Outdoor, so that its controlling shareholder, the private equity firms that own and control the controlling shareholder, and Outdoor's current and former directors who approved the Loan are held responsible for the severe damage they have inflicted on the Company.

## JURISDICTION

10.     This Court has jurisdiction over this action pursuant to 10 Del. C. § 341.

11.     As directors of a Delaware corporation, the Individual Defendants have consented to the jurisdiction of this Court pursuant to 10 Del. C. § 3114.

12.     This Court has jurisdiction over Outdoor pursuant to 10 Del. C. § 3111.

## THE PARTIES

13.     Plaintiff Pinellas Park is currently a shareholder of Outdoor and has been a shareholder of Outdoor at all times relevant to the claims asserted herein.

14.     Nominal Defendant Outdoor provides clients with advertising opportunities through billboards, street furniture displays, transit displays and other out-of-home advertising displays, such as wallscapes, spectaculars, neons and mall displays, which the Company owns or operates in global markets.   As of December 31, 2011, the Company owned or operated more than 750,000 advertising displays globally.   During the year ended December 31, 2011, the

B236

Company operated in two business segments: Americas outdoor advertising (Americas) and International outdoor advertising (International), which represented 44% and 56% of its revenue, respectively. Outdoor is incorporated under the laws of the State of Delaware, with its principal executive offices located at 200 East Basse Road, San Antonio, Texas.  The Company is publicly traded on the New York Stock Exchange under the ticker symbol "CCO."

15.     Defendant Margaret W. Covell ("Covell") served as a member of the Outdoor Board from August 2008 to January 2012.  Covell is a managing director in THL's Strategic Resource Group, which works in collaboration with senior management and THL investment professionals to drive value at portfolio companies.

16.     Defendant Blair E. Hendrix ("Hendrix") has served as a member of the Outdoor Board since August 2008.  Hendrix is a managing director of Bain and one of the leaders of the firm's operationally focused Portfolio Group.

17.     Defendant Douglas L. Jacobs ("Jacobs") has served as a member of the Outdoor Board since May 2010.

18.     Defendant Daniel G. Jones ("Jones") has served as a member of the Outdoor Board since August 2008.  Jones is a director at THL and is part of the firm's Strategic Resources Group, which works in collaboration with senior management and THL investment professionals to drive value at portfolio companies.

19.     Defendant Mark P. Mays ("M. Mays") has served as Chairman of the Outdoor Board since 2009, and was Chief Executive Officer of the Company from August 2005 through March 2011.  Mays has been a member of the Outdoor Board since 1997, and has served as one of CCC's directors since May 1998, and its Chairman since July 2008.  M. Mays is the brother of R. Mays and the son of L. Mays.

20.     Defendant Randall T. Mays ("R. Mays") was a member of the Outdoor Board from 1997 until May 2011.  R. Mays served as the Company's Chief Financial Officer from August 2005 until January 2010.  He was also appointed Executive Vice President and Chief Financial Officer of CCC in February 1997 and was appointed Secretary in April 2003.  R. Mays relinquished his duties as Secretary in May 2006 and Chief Financial Officer in January 2010. He was appointed President of CCC in February 2006 and relinquished his duties as President upon transitioning to the role of Vice Chairman in January 2010.  Upon the closing of the Buyout, R. Mays became a director and the President and Chief Financial Officer of CC Media. R. Mays is the brother of M. Mays.

21.     Defendant Robert Pittman ("Pittman") has served as the Executive Chairman of the Outdoor Board since October 2011.  Pittman also serves as the Chief Executive Officer of CC Media Holdings, Inc.  He serves on the board of directors of CC Media Holdings, Inc. and CCC.

22.     Defendant Thomas R. Shepherd ("Shepherd") has served as a member of the Outdoor Board since May 2011.  Shepherd is a former managing director of THL.

23.     Defendant Marsha M. Shields ("Shields") was a member of the Outdoor Board from November 2005 to May 2011.  Since June 2002, Shield has served as the President of the McCombs Foundation and as Deal Principal for McCombs Automotive.  She has served as Manager of McCombs Family Ltd. since January 2000.

24.     Defendant Christopher M. Temple ("Temple") has served as a member of the Outdoor Board since May 2011.

25.     Defendant Dale E. Tremblay ("Tremblay") has served as a member of the Board since November 2005.

B238

26.     Defendant Scott R. Wells ("Wells") has served as a member of the Outdoor Board since August 2008.  Wells has served as an Operating Partner at Bain since January 2011 and previously served as an Executive Vice President at Bain since 2007.   Wells also is one of the leaders of the Bain's operationally focused Portfolio Group.  Prior to joining Bain, Wells was a partner at Bain & Company, where he focused primarily on technology and consumer-oriented companies.

27.     Defendant James C. Carlisle ("Carlisle") has served as a member of the Outdoor Board since January 2012.  Carlisle is a director at THL.

28.     Defendant CCC is the #1 radio company in the U.S., with about 900 stations that reach more than 110 million people. The Company is owned by CC Media Holdings ("CC Media"), an investment group led Bain and THL.

29.     Defendant Bain is an alternative asset management and financial services company that specializes in private equity, venture capital, credit and public market investments. Bain invests across a broad range of industry sectors and geographic regions.  As of the beginning of 2012, Bain manages approximately $66 billion of investor capital across its various investment platforms.

30.     Defendant THL is a private equity firm specializing in leveraged buyouts, growth capital, special situations, industry consolidations and recapitalizations.  Since its inception in 1974, THL has raised approximately $22 billion equity capital.

31.     As directors of the Company, the defendants referred to in paragraphs 15 to 26 above are in a fiduciary relationship with the Company and the public stockholders of Outdoor, and owe the highest obligations of loyalty and care.

## SUBSTANTIVE ALLEGATIONS

**A.     CCC's Control Over Outdoor**

32.     Outdoor is the oldest advertising company in the United States.  The Company traces its roots back to the three companies that merged into the current incarnation:  Foster & Kleiser (1901-1986), Patrick Media Outdoor (1986-1995) and Eller Media Company (1959-1997).

33.     The Company changed its name to Clear Channel Outdoor Holdings, Inc. in August 2005.

34.     On November 11, 2005, Outdoor became a publicly traded company through an initial public offering (the "IPO") in which the Company sold 10%, or 35 million shares, of its Class A common stock.  Prior to the IPO, Outdoor was an indirect wholly-owned subsidiary of CCC.

35.     As of December 31, 2011, CCC owns all of the Company's outstanding shares of Class B common stock, and 1,553,971 shares of the publicly traded Class A common stock. Altogether, CCC owns approximately 89% of the outstanding shares of Outdoor common stock and approximately 99% of the Company's total voting power.  The Company's Class B common stock is entitled to twenty votes on matters submitted to a vote of Outdoor stockholders.

36.     With its absolute control, CCC has the ability to direct the election of all members of the Board and, as stated in the Company's public filings, CCC has the power to "exercise a controlling influence over our business and affairs, including any determinations with respect to mergers or other business combinations, our acquisition or disposition of assets, our incurrence of indebtedness, our issuance of any additional common stock or other equity securities, our

8

repurchase or redemption of common stock or any preferred stock, if applicable, and our payment of dividends."

## B.  CCC Exercises And Ensures Its Continued Control Over Outdoor Through Various Agreements That Enable CCC To Control Outdoor's Finances

37.     In connection with the IPO, Outdoor entered into various agreements designed to perpetuate CCC's actual control over the operations of Outdoor:

a.      The "Master Agreement" obligates Outdoor to use certain accounting procedures, to share information with CCC, and to indemnify CCC under certain circumstances, and requires CCC's approval before Outdoor can engage in certain activities;

b.      The "Corporate Services Agreement" requires Outdoor to pay CCC to perform various administrative services for the Company, including payroll, human resources, information services, and sourcing support.   Outdoor paid CCC $28.5 million and $38.1 million for such services in FY 2009 and FY 2010, respectively;

c.      The "Tax Matters Agreement" appoints CCC as "the sole and exclusive agent" to prepare all tax materials for the Company;

d.      The "Employee Matters Agreement" requires employees of Outdoor to participate in the employment plans of CCC;

e.      The "Trademark License Agreement" allows Outdoor to utilize certain trademarks owned by CCC; and

f.      A cash management program with CCC, pursuant to which CCC sweeps Outdoor's cash accounts on a daily basis into a master account owned by CCC, and CCC provides funds to Outdoor on days that Outdoor's disbursements exceeds its collections.

38.     As part of the cash management program, Outdoor would maintain an account that represented net amounts, up to $1.0 billion, due to or from CCC.  As originally structured,

CCC could borrow up to $1.0 billion from Outdoor and vice versa. This loan arrangement was evidenced by a promissory note (the "Promissory Note") that had an expiration date of August 10, 2010 and required the borrower to pay the lender interest at a rate equal to the average one-month generic Treasury bill rate. Any borrowings under the Promissory Note would be unsecured and the holder would be treated as a general unsecured creditor of the borrower in the event of bankruptcy. The Company's proxy statement filed on April 30, 2009, explained the following:

> The Company records net amounts due to or from Clear Channel Communications as "Due from/to Clear Channel Communications" on the consolidated balance sheets. The accounts represent the revolving promissory note issued by the Company to Clear Channel Communications and the revolving promissory note issued by Clear Channel Communications to the Company, in the face amount of $1.0 billion, or if more or less than such amount, the aggregate unpaid principal amount of all advances. The accounts accrue interest pursuant to the terms of the promissory notes and are generally payable on demand. Interest on the cash management note owed by the Company accrues on the daily net negative cash position based upon LIBOR plus a margin. Interest on the cash management note owed by Clear Channel Communications accrues interest on the daily net positive cash position based upon the average one-month generic treasury bill rate. Included in the accounts are the net activities resulting from day-to-day cash management services provided by Clear Channel Communications. As a part of these services, the Company maintains collection bank accounts swept daily into accounts of Clear Channel Communications. In return, Clear Channel Communications funds the Company's controlled disbursement accounts as checks or electronic payments are presented for payment. The Company's claim in relation to cash transferred from its concentration account is on an unsecured basis and is limited to the balance of the "Due from Clear Channel Communications" account. At December 31, 2008 (post-merger) and December 31, 2007 (pre-merger), the asset recorded in "Due from Clear Channel Communications" on the consolidated balance sheet was $431.6 million and $265.4 million, respectively. The net interest income for the pre-merger period from January 1, 2008 through July 30, 2008 was $2.6 million. The net interest income for the post-merger period from July 31, 2008 through December 31, 2008 was $0.9 million. The net interest income for the pre-merger years ended December 31, 2007 and 2006 was $3.7 million and $0.4 million, respectively. At December 31, 2008, the interest rate on the "Due from Clear Channel Communications" account was 0.02%, which represents the average one-month generic treasury bill rate as described above.

39.     During 2005 and 2006, CCC's financial performance was relatively strong and CCC had little need to borrow money from its majority-owned subsidiary.  As such, outstanding borrowings under the Promissory Note totaled only $0.1 million and $4.2 million as of the close of 2005 and 2006, respectively.

**C.     Bain and THL Take CCC Private**

40.     In November 2006, the CCC board of directors agreed to sell the company for $18.7 billion, or $37.60 per share, to a consortium of private equity firms including Bain and THL.  Citigroup, Deutsche Bank, Morgan Stanley, Credit Suisse, Wachovia and Royal Bank of Scotland agreed to provide financing, as well as a third of the equity for the deal.

41.     A significant number of CCC shareholders opposed the buyout at this price and forced Bain and THL to increase their offer price twice.  In September 2007, CCC shareholders approved the Buyout at a price of $39.20 per share.

42.     Before the Buyout could close, however, the credit markets seized up and the banks who had agreed to provide financing became skittish.   The banks refused to honor their debt commitments and a lengthy legal battle ensued between the private equity consortium and the lenders.

43.     Bain/THL and the lenders finally reached a settlement in May 2008.  Under the agreement, CCC shareholders would receive $36 per share, reducing the equity value of the deal to $17.9 billion.

44.     On July 30, 2008, CCC merged with a subsidiary of CC Media Holdings, Inc. CCC is now owned indirectly by CC Media.

**D.    CCC Teeters on the Edge of Bankruptcy, but the Outdoor Board Agrees to Extend the Promissory Note on Patently Unreasonable Terms**

45.    Not only did Bain and THL purchase CCC at the very top of the market, the private equity firms also utilized an extremely high degree of leverage to finance the transaction. The Buyout saddled CCC with more than $18 billion in debt.

46.    This crippling debt load combined with a slowdown in advertising spending caused concern in the market that CCC could default on its obligations.  For example, in May 2009, the New York Post reported that CCC had begun reaching out to its lenders about restructuring the company's massive debt load.  As part of those discussions, one topic that was debated was a pre-packaged bankruptcy.  Similarly, Bishop Cheen, an analyst at Wachovia at the time, noted that CCC was on track to become the biggest default among media companies and therefore the biggest bankruptcy workout ever in the industry.

47.    These legitimate concerns regarding a CCC bankruptcy made it very difficult for CCC to raise capital in the public or private arms-length markets.

48.    To provide liquidity after the Buyout closed, CCC tapped the Promissory Note with Outdoors.   Borrowings under the Promissory Note swelled from $4.2 million in December 2006 to $431.6 million in December 2008.  Despite CCC's precarious financial situation, the nearly half a billion Loan carried only an unconscionably low 0.02% interest rate.

49.    By the end of 2009, the maturity date on the Promissory Note was rapidly approaching and CCC had yet to restructure its massive debt load.  On December 11, 2009, Standard & Poor's downgraded CCC's debt from a "CC" to a abysmal "CCC-" rating.

50.    To ensure CCC's continued ability to exploit Outdoor for cash, CCC compelled Outdoor to amend-and-extend the terms of the Loan.  The Outdoor Board, composed almost

exclusively of Bain and THL executives and members of Mays family (the founding family of CCC which sold the company to Bain and THL for a fortune), was of course willing to agree.

51.     The amended promissory note ("Amended Promissory Note"), dated December 23, 2009, extended the term of the agreement from August 10, 2010 until December 15, 2017. The applicable interest rate was also increased from the one-month Treasury bill rate to a flat 9.25%.

52.     While the 9.25% interest rate represented an increase in the applicable interest rate, it was still substantially below then-current market rate.  According to data supplied by the Bank of America Merrill Lynch Global Index System, accessed via the Bloomberg Professional Terminal, the average yield on CCC or worse credit for the month of December 2009, was 12.75814%.  Put simply, no third-party would have provided a highly levered company like CCC with a $1.0 billion unsecured loan on terms remotely close to those that the Outdoor Board provided.

53.     Not only could Outdoor earn substantially more interest on the loan to CCC if it charged CCC a commercially reasonable interest rate, but Outdoor faces a severe risk that the loan will never be paid back.  In the event of a CCC bankruptcy, the unsecured loan would provide Outdoor with only general creditor status, resulting in a pennies on the dollar recovery.

54.     Further, because CCC takes all of Outdoor's cash on a daily basis, it prevents Outdoor from utilizing that cash to make alternative investments.  In essence, therefore, the "cash management program" not only compels Outdoor to serve as an unsecured creditor of CCC with no control over its own finances, but also makes CCC Outdoor's *only* cash investment rendering any sort of responsible diversification impossible.

E.   **Balance on Amended Promissory Note Continues to Balloon**

55.   Since the Outdoor Board agreed to amend the promissory note, CCC has aggressively drawn down the balance.

56.   As of December 31, 2011, CCC had borrowed $656.0 million from Outdoor under the Amended Promissory Note.

57.   During this period, CCC's financial prognosis worsened.  CCC's actively traded debt is rated at the lower end of the "junk"-bond universe.  Moreover, CCC has more than $12 billion in debt due in 2016 and default is a "real possibility" according to Melissa Link, an analyst at Fitch Ratings.

58.   In its public filings, Outdoor concedes that the Company could experience a "liquidity shortfall" in the event CCC was to become insolvent.  Nonetheless, Outdoor anticipates continuing to lend CCC more money under the Amended Promissory Note and expects the size of the Loan to increase to over $1.0 billion in the next few years.

F.   **Board's Troubling Response to Shareholder Concerns Regarding the Loan**

59.   On November 29, 2012, JHL Capital Group ("JHL"), a shareholder of Outdoor, wrote a letter to the Company questioning the legality of the Loan.

60.   In response to the letter from JHL, the Outdoor Board formed a purportedly independent committee (the "Committee") to review the issues raised by the letter.  As a threshold matter, no such committee is independent for the reasons detailed below in the section entitled "Demand on the Outdoor Board is Excused as Futile."

61.   During the week of February 27, 2012, the Committee sent a letter to JHL informing JHL that the Committee's review of the Loan had not revealed a way that Outdoor could unilaterally modify or eliminate the contractual commitment.  The Committee's response

14

is simply wrong and emphasizes that the Board's loyalty lies with CCC and not the Company's public shareholders.

62.     In no uncertain terms, Outdoors 2010 Form 10-K, filed on February 21, 2011, states that "the accounts … are generally payable on demand."  Similarly, the Promissory Note itself states that:

> "Upon the occurrence of any of the following events or occurrences, each of which is hereby designated an "Acceleration Event," ***and in addition to all other rights and remedies of Payee, including, without limitation, the right to make demand on this Note at any time and without regard to the existence or non-existence of any event or occurrence*** other than the making of such demand, …" (Emphasis added).

63.     In its letter to JHL, the Committee ignores the fact that Outdoor could demand repayment of the Loan by CCC at any time.  However, because demanding immediate repayment could be damaging to Bain and THL's multi-billion dollar investment in CCC, the Outdoor Board has not taken such action, even though doing so is necessary to protect the interests of the Company's public shareholders.

## G.     Depleted of Cash, Outdoors Incurs Must Incur $2 Billion in Indebtedness to Pay Special Dividend

64.     In an attempt to recoup a portion of its investment in CCC (and indirectly Outdoor), Bain and THL announced on February 29, 2012 that Outdoor will pay a $2.2 billion cash dividend (or approximately $6.08 per share).

65.     Outdoor is borrowing over $2 billion to fund the Dividend.  Outdoor will offer $275 million aggregate principal amount of 7.625% Series A Subordinated Notes due 2020 and Clear Channel Worldwide Holdings, Inc. ("Worldwide"), a wholly-owned subsidiary of Outdoor, will offer $1.925 billion aggregate principal amount of 7.625% Series B Senior Subordinated Notes due 2020 (collectively, the "Subordinated Notes").

66.     If the Outdoor Board had not allowed CCC to exploit the Company's cash reserves to the tune of nearly a billion dollars, Outdoor would not have to incur such substantial indebtedness (and concomitant interest expense).

<strong><u>DERIVATIVE ALLEGATIONS</u></strong>

67.     Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duties by the Individual Defendants.

68.     Plaintiff has owned Outdoor stock during the wrongful course of conduct by CCC, Bain, THL, and the Individual Defendants alleged herein, and continues to hold Outdoor stock.

69.     Plaintiff will adequately and fairly represent the interests of Outdoor and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in shareholder derivative litigation.

<strong><u>DEMAND ON THE OUTDOOR BOARD IS EXCUSED AS FUTILE</u></strong>

70.     Plaintiff has not made a demand on the Outdoor Board to bring suit asserting the claims set forth herein because pre-suit demand would be futile and is excused as a matter of law.

71.     *First*, the Amended Promissory Note is plainly an interested transaction and is on terms that are patently unfair to the Company.  Because the Amended Promissory Note is an interested transaction, the Defendants will bear the burden of proving the entire fairness of the transaction.  Because the allegations set forth above demonstrate that the Amended Promissory Note is not entirely fair to the Company, the Amended Promissory Note cannot be deemed a product of the valid exercise of business judgment and demand is excused as a matter of law.

16

72.     Further, because the Loan is unfair to Outdoor and its approval and continuance is inexplicable except on grounds of bad faith or a lack of independence, it cannot be deemed a product of the valid exercise of business judgment and demand is excused as a matter of law.

73.     The Amended Promissory Note provides a substantial benefit to CCC (*i.e.*, the ability to borrow nearly a billion dollars at half the interest rate disinterested third-party lenders would require).  However, the Loan provides no benefit to the Company and could have catastrophic effects on Outdoor in the event CCC declares for bankruptcy.  Moreover, CCC's borrowings under the Amended Promissory Note have depleted Outdoor's cash reserves and required the Company to borrow a substantial amount of money to fund the recently announced Dividend.

74.     *Second*, a majority of Outdoor directors suffer from conflicts of interest and divided loyalties which preclude them from exercising independent business judgment.  As of the date of the filing of this Complaint, the Outdoor Board consisted of the following directors: Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Robert Pittman, Thomas R. Shepherd, Christopher M. Temple, Dale W. Tremblay, Scott R. Wells and James Carlisle.  These directors suffer from the following incapacitating conflicts:

> (a)     **Hendrix** is a managing director at Bain and also serves on the board of directors of CCC.  Bain owns CCC, which is the direct beneficiary of the Loan.
>
> (b)     **Jacobs** was appointed to the Board in May 2010 by CCC and its owners, Bain and THL.  He serves at their behest and in accordance with their wishes.  Moreover, Jacobs has been self-employed since 2003 and his fees received for serving as an Outdoor director represent a material portion of

his yearly income.  Therefore, he is an interested party incapable of independent consideration of a pre-suit demand.

(c)  **Jones** is a director at THL.  Jones suffers the same incapacitating conflict as his THL colleague Covell.

(d)  **M. Mays** serves is the former CEO of the Company and serves on the Outdoor Board at the behest of Bain and THL.  M. Mays serves on the board of directors of CCC.  M. Mays and his family also received over a billion dollars from Bain and THL in the Buyout of CCC.  Therefore, it is unreasonable to expect M. Mays would take any action against the wishes of Bain and THL.

(e)  **Pittman**, the Executive Chairman of the Outdoor Board, is an investor in CCC and a member of the CCC board of directors.  He also serves in his executive capacity at Outdoor at the behest of CCC.  His interests are aligned with CCC, and he is therefore incapable of independent consideration of a pre-suit demand.

(f)  **Shepherd**, elected to the Outdoor Board in May 2011, is a former managing director of THL and serves on the Board at the behest of THL.  Shepherd is heavily invested in THL and his interests are aligned with THL when considering the operations of the Company, such as the Amended Promissory Note.

(g)  **Temple** was nominated and elected to the Outdoor Board by CCC in May 2011.  During 2010, Outdoor conducted business worth approximately $4.5 million with an entity at which Temple serves as a director.  By virtue

18

of his business relationship with the Company and service at the behest of CCC, Temple is not independent and is therefore incapable of considering a pre-suit demand.

(h)   **Wells** is an operating partner at Bain and therefore suffers the same debilitating conflicts as his colleague Hendrix.

(i)   **Carlisle** is a director at THL. THL owns CCC which is the direct beneficiary of the favorable terms contained in the Amended Promissory Note.

75.   Demand is also excused by the simple fact that certain members of the Outdoor Board (Covell, Hendrix, Jones, M. Mays, Tremblay, and Wells) would be required to sue themselves, potentially subjecting themselves to personal liability.  Here, where the Loan is so unreasonable on its face that approval cannot meet the test of business judgment, a substantial likelihood of director liability exists.  This high likelihood alone establishes demand futility.

76.   Additionally, the Individual Defendants refusal to legitimately investigate the Loan when prompted by JHL and the Committee's bad faith response to JHL regarding the Company's inability to terminate the Loan is indicative of the Individual Defendants' bad faith handling on this matter.

77.   The Outdoor Board is incapable or unwilling to take the actions required to seek the relief requested in this complaint.

## CAUSES OF ACTION

### COUNT I

**Breach of Fiduciary Duty
(Derivatively Against CCC, Bain and THL)**

78.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

79.     Defendants CCC, Bain and THL, as Outdoor's controlling shareholders, owe fiduciary duties to the Company and its shareholders.  As such, CCC Bain and THL owe Outdoors the highest duties of good faith, fair dealing, due care, and loyalty.

80.     Defendants CCC, Bain and THL breached their fiduciary duties by exploiting their position of control to require Outdoor to enter the Amended Promissory Note.

81.     As a result of the actions of CCC, Bain and THL, the Company has been and will be damaged.

82.     Plaintiff has no adequate remedy at law.

### COUNT II

**Breach of Fiduciary Duty
(Derivatively Against Individual Defendants)**

83.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84.     The Individual Defendants, as current or former directors of Outdoor, are fiduciaries of the Company and its shareholders.  As such, they owe the Company the highest duties of good faith, fair dealing, due care, and loyalty.

85.     The Individual Defendants have breached their duty of loyalty by approving the Amended Promissory Note which elevates the interests of CCC over the interests of Outdoor and the Company's public shareholders.

86.     As a result of the actions of the Individual Defendants described herein, the Company has been deprived tens of millions of dollars in interest payments and risks being forever deprived of being repaid the principal on the borrowings under the Amended Promissory Note.

87.     Plaintiff has no adequate remedy at law.

## COUNT III

**Waste of Corporate Assets**
**(Derivatively Against the Individual Defendants)**

88.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

89.     Because of the unreasonably low interest rate associated with CCC's unsecured borrowings under the Amended Promissory Note, this debt arrangement is tantamount to a disguised gift of corporate value from Outdoor to CCC.  Put simply, the Amended Promissory Note represents a waste of corporate assets by the Individual Defendants.

90.     As a result of these actions of the Individual Defendants, the Company has been and will be damaged.

91.     Plaintiff has no adequate remedy at law.

## COUNT IV

**Unjust Enrichment**
**(Derivatively Against CCC, Bain and THL)**

92.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

93.     Defendants CCC, Bain and THL were unjustly enriched as a result of the favorable terms of the Amended Promissory Note.

94.     As a result of the actions of CCC, Bain and THL, the Company has been and will be damaged.

95.     Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that making a demand upon the Outdoor Board to investigate and prosecute the claims alleged herein would be futile for the reasons alleged herein;

B.     Declaring that the Defendants breached their fiduciary duties to the Company;

C.     Rescinding the Amended Promissory Note, and terminating the cash management agreement;

D.     Ordering the immediate disgorgement of all profits, benefits and other compensation obtained by Defendants as a result of its breaches of fiduciary duties;

E.     Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as may be just and proper.

DATED:  March 7, 2012                         GRANT & EISENHOFER, P.A.

Of Counsel:                                   */s/  Jay W. Eisenhofer*
                                              Jay W. Eisenhofer (# 2864)
Mark Lebovitch                                Michael J. Barry (# 4368)
Jeremy Friedman                               123 Justison Street
BERNSTEIN LITOWITZ BERGER &                   Wilmington, DE 19801
  GROSSMANN LLP                               (302) 622-7000
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400                                *Proposed Co-Lead Counsel for Plaintiff*

*Proposed Co-Lead Counsel for Plaintiff*

Robert D. Klausner
Klausner, Kaufman, Jensen & Levinson
10059 Northwest 1st Court
Plantation, FL 33324
Phone: (954) 916-1202

*Additional Counsel for Plaintiff*

B254

# Exhibit E

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR | ) | CONSOLIDATED |
| HOLDINGS, INC. DERIVATIVE | ) | |
| LITIGATION | ) | C.A. No. 7315-CS |

## AFFIDAVIT OF CHRISTOPHER M. TEMPLE

Christopher M. Temple, being duly sworn, deposes and says:

1.     I am competent to make this Affidavit and have personal knowledge of the statements made herein.  I am the Chairman of the Special Litigation Committee ("SLC") of the Board of Directors (the "Board") of Nominal Defendant Clear Channel Outdoor Holdings, Inc. ("Outdoor") and submit this Affidavit in support of the Stipulation of Settlement being contemporaneously filed in this derivative action.

2.     As set forth in the Stipulation of Settlement, the SLC, with the assistance of Counsel for the SLC, has engaged in an intensive investigation and evaluation of the derivative claims asserted in this derivative action, as well as additional possible claims relating to the subject matter of this derivative action identified by the SLC.

3.     Attached as Exhibit A hereto is a true and correct copy of the summary of the SLC's relevant factual determinations based upon the SLC's investigation, evaluation, and analysis of matters raised by the claims and allegations asserted in the Verified Stockholder Derivative Complaint, which summary has been approved by the SLC.

_____
Christopher M. Temple

Dated: July 3, 2013  in Dallas, Texas

Sworn to before me on this 3rd day of July, 2013

_____
Notary Public



YVONNE OZUNA
Notary Public
State of Texas
Comm. Expires 4/7/2016

**Exhibit A**

In connection with the Stipulation of Settlement entered into by (1) the Special Litigation Committee of the Board of Directors of Clear Channel Outdoor Holdings, Inc. (the "SLC") (acting for and on behalf of nominal defendant Clear Channel Outdoor Holdings, Inc. ("Outdoor")); (2) plaintiffs NECA-IBEW Pension Trust Fund and City of Pinellas Park Firefighters Pension Board; and (3) defendants Clear Channel Communications, Inc. ("Clear Channel"), Bain Capital Partners, LLC ("Bain"), Thomas H. Lee Partners, L.P. ("THL"), Margaret W. Covell, Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Thomas R. Shepherd, Marsha M. Shields, Christopher M. Temple, Dale W. Tremblay, Scott R. Wells, and James C. Carlisle (collectively, the "Defendants"), the SLC provides the following summary of its relevant factual determinations based upon its investigation, evaluation, and analysis of matters raised by the claims and allegations asserted in the Verified Stockholder Derivative Complaint, as set forth in the Stipulation of Settlement.

### Outdoor's Initial Public Offering and the Intercompany Agreements

Before November 2005, Outdoor was a wholly-owned subsidiary of Clear Channel. On November 11, 2005, Outdoor made an initial public offering of 35 million Class A shares, representing ten percent of Outdoor's common stock. Clear Channel continued to indirectly hold approximately 90% of Outdoor's common stock after the IPO. Clear Channel's holdings also included all of Outdoor's outstanding Class B shares, which are entitled to twenty votes per share. Class A shares, by contrast, are entitled to a single vote per share. After the IPO, Clear Channel held 99% of the total voting power of Outdoor's common stock.

In advance of the initial public offering, Outdoor and Clear Channel entered into a number of intercompany agreements, some of which formalized pre-existing arrangements pursuant to which Clear Channel provided Outdoor with finance, cash management, and other general administrative services (collectively, the "Intercompany Agreements"). The Intercompany Agreements included, among others: (i) a Master Agreement, which provided for separation of the two companies pursuant to the IPO and delineated certain aspects of their relationship going forward; (ii) a Corporate Services Agreement, pursuant to which Clear Channel would provide various services to Outdoor, including a Cash Management Arrangement; and (iii) two tandem promissory notes, evidencing amounts either due from Clear Channel to Outdoor (the "Due-From Note") or due to Clear Channel from Outdoor (the "Due To Note") pursuant to the Cash Management Arrangement.

These agreements were favorable to Clear Channel in a number of ways.

- The Master Agreement prohibited Outdoor from incurring debt (other than debt to Clear Channel) in excess of $400 million. It also limited Outdoor's ability to use its own cash; Outdoor is prohibited from completing acquisitions and cash transfers (other than with its own subsidiaries) valued at more than $5 million without Clear Channel's approval. Under the Master Agreement, Outdoor also may not take any action that would cause Clear Channel to breach certain contracts with third parties, including Clear Channel's

credit agreements.   Outdoor agreed to indemnify Clear Channel for any liability arising from a breach by Outdoor of the Master Agreement.

- The Cash Management Arrangement included in the Corporate Services Agreement requires that any cash from Outdoor's domestic operations that is not used to meet Outdoor's payroll or accounts payable obligations is transferred—or "swept"—to a master account maintained by Clear Channel.  If Outdoor lacks cash sufficient to fund its operating obligations on any given day, Clear Channel may—but is not required to— advance the needed funds. As noted, the balances due pursuant to this arrangement are evidenced by the Due-From and Due-To Notes, as applicable.  The Cash Management Arrangement may not be terminated for so long as Clear Channel and its affiliates beneficially own more than 50% of the voting power of Outdoor common stock.

- The interest rate on the Due-From Note—representing the rate paid by Clear Channel on cash swept from Outdoor pursuant to the Cash Management Arrangement—was set at the average one-month generic treasury bill rate.  Under the Due-To Note, however, the rate paid by Outdoor on funds advanced by Clear Channel under the Cash Management Arrangement was set to a higher rate of average one-month LIBOR plus a margin equal to the basis points added to the LIBOR rate on LIBOR-based borrowings of Clear Channel under its corporate revolver facility.   The tandem Due-From and Due-To Notes are unsecured obligations.  As adopted in 2005, each was payable "on demand, or if no demand is sooner made, then on August 10, 2010."

Also in advance of the IPO, on August 2, 2005, Outdoor distributed a dividend to Clear Channel in the form of a $2.5 billion Senior Unsecured Term Promissory Note due August 2, 2010 (the "Term Note"), the debtor under which was a wholly-owned subsidiary of Outdoor, Clear Channel Outdoor, Inc.  Interest accrued on the balance of the Term Note at a variable per annum rate equal to the weighted-average cost of long-term debt of Clear Channel.  At the time of the dividend, this rate was 5.7%.  Like the Master Agreement, the Term Note prohibited Outdoor from incurring external debt exceeding $400 million without Clear Channel's consent, and required that all proceeds from the sale of debt or equity at Outdoor be applied to prepay the Note.

The key terms of these agreements were disclosed to prospective purchasers in the IPO.  Thus, purchasers of Outdoor's common stock were on notice of several key facts regarding Outdoor's finances.  First, all excess cash from domestic operations would be loaned to Clear Channel through the cash sweep.  Second, the interest rate paid by Clear Channel to Outdoor on this borrowed cash was less than the rate paid by Outdoor to Clear Channel under the term note.  Third, while cash swept to Clear Channel was repayable on demand, the uses that Outdoor could make of its cash without Clear Channel's consent were extremely limited.  Fourth, unless put to a permitted use, any cash repaid by Clear Channel as the result of a demand would be swept back to Clear Channel.  Fifth, because of the restrictions on Outdoor borrowing contained in the Master Agreement, balances due under the Due-From Note constituted one of Outdoor's principal sources of liquidity.  And sixth, the $2.5 billion owed by Outdoor under the Term Note would fall due in 2010, while at the same time the Master Agreement prohibited Outdoor, absent Clear Channel's consent, from borrowing in the capital markets the money necessary to repay that debt.

2

*Clear Channel's Leveraged Buyout*

On November 15, 2006, approximately one year after Outdoor's partial IPO, Clear Channel announced that it had agreed to a $26.7 billion buyout by Bain and THL (together, the "Sponsors").

In connection with the buyout, Clear Channel entered an Agreement and Plan of Merger ("Merger Agreement") with certain entities created for the purpose of facilitating the merger— BT Triple Crown Merger Co., Inc.; B Triple Crown Finco, LLC; and T Triple Crown Finco, LLC. In that agreement, the Finco entities promised to secure—and Clear Channel promised to facilitate—financing for the transaction. That financing proved difficult to obtain, however. Ultimately, the transaction did not close until twenty months later, during which time the credit markets and general economic environment deteriorated.

As a result of the substantial debt Clear Channel was to incur in connection with the LBO, coupled with the deterioration in the credit markets, the credit risk associated with Clear Channel's unsecured borrowings from Outdoor under the Cash Management Arrangement increased substantially. Between the announcement of the LBO and its closing, public shareholders of Outdoor therefore raised a number of concerns regarding its anticipated effects on Outdoor. Shareholders T. Rowe Price Associates, Inc. ("T. Rowe Price") and Arnold and S. Bleichroeder Advisers, LLC ("A&B") contacted Outdoor at least eight times between September 2007 and August 2008, making the following assertions, among others:

- the interest rate on the Due-From Note failed to reflect the risk associated with lending to Clear Channel;

- the disparity between the interest rate Outdoor paid on the Term Note and the interest rate Outdoor was paid on the Due-From Note would grow following the LBO, since the Term-Note interest rate was set according to the weighted average cost of Clear Channel debt;

- the balance on the Due-From Note was overly large; and

- the Due-From balance should be drawn down to partially prepay the Term Note.

In April 2008, Outdoor management (who also held positions at Clear Channel) prepared a memorandum that considered whether it would be advisable for Outdoor to draw down the Due-From Note to prepay a portion of the Term Note. As of the prior month's end, the Due-From balance stood at just under $150 million. Outdoor had approved $153 million in pending acquisitions, and had an additional $244 million in capital expenditures planned to occur prior to year end 2008. In addition, Outdoor had already borrowed $320 million of the $400 million in external borrowing permitted under the Master Agreement. Citing the pending liquidity needs and the limitations on external borrowing, Outdoor management recommended against drawing down the Due-From Note to prepay the Term Note. Instead, management recommended that Outdoor ask Clear Channel to increase the interest rate on the Due-From balance to more closely approximate what Outdoor would earn if it invested the funds itself in a manner consistent with Clear Channel's short-term investment policies.

3

Ultimately, on July 16, 2008, the independent directors of Outdoor sent a letter to Randall Mays, the CFO of Outdoor and President and CFO of Clear Channel, c/o Clear Channel.  The letter suggested that Outdoor propose to Clear Channel that the Cash Management Arrangement be amended to allow Outdoor to retain cash balances over $100 million.  The Clear Channel Board of Directors rejected this proposal on August 8.

On July 30, 2008—after Outdoor's independent directors wrote to Randall Mays, but before Clear Channel responded—the LBO closed.  Clear Channel emerged from the LBO as a wholly-owned subsidiary of  CC Media Holdings, Inc. ("CCMH").  CCMH (and, by extension, Clear Channel) is owned and managed by Bain and THL.  Collectively, Bain and THL (or their affiliates) own a majority of CCMH's voting shares, and Bain, THL, and CCMH are parties to a Management Services Agreement that obligates Bain and THL to provide financial, managerial, and operational advice.  The CCMH board consists of two public directors, and ten directors appointed by Bain and THL.  As required by a Stockholders Agreement dated July 29, 2008, the membership of the Boards of CCMH and Clear Channel is identical.

Following the LBO, the Outdoor board consisted of three independent directors (Raines, Shields, and Tremblay), two directors affiliated with Bain (Defendants Hendrix and Wells), two directors affiliated with THL (Defendants Covell and Jones), and three members of the Mays family, which co-founded Clear Channel (Lowry Mays and Defendants Mark and Randall Mays).

At the closing of the LBO, Clear Channel assumed approximately $20 billion of debt, over $16 billion of which was scheduled to come due in 2014 and 2016.  As contemplated by the Merger Agreement, BT Triple Crown Merger Co., Inc. and others entered a Credit Agreement dated as of May 13, 2008 with the lenders financing the LBO (the "Credit Agreement").  Clear Channel became a party to the Credit Agreement on July 20, 2008, shortly before the LBO closed.

First, the Credit Agreement prohibits certain changes to the Intercompany Agreements.  Section 7.12(c) of the Credit Agreement contains a negative covenant which bars changes to the Cash Management Arrangement, the Due-From and Due-To Notes, and the Term Note, to the extent such changes are materially adverse to the lenders.  The same section expressly permits changes to the interest rate applicable to each of those arrangements, and the extension of each of them, as long as such actions are approved by the Clear Channel Board.

In addition, Section 7.14 of the Credit Agreement contains a secured-leverage covenant, which limits the ratio of consolidated secured debt of Clear Channel (and certain subsidiaries) to Clear Channel's consolidated EBITDA.  From 2009 to 2012, the secured leverage ratio was not to exceed 9.5:1 in any quarter.  Beginning in the second quarter of 2013, the permitted  secured leverage ratio periodically decreases in 0.25-unit increments, until it reaches 8.75:1 in the fourth quarter of 2014.

A breach of Section 7.12(c) or Section 7.14 constitutes an event of default under the Credit Agreement.  An event of default permits the lenders to terminate their commitments, declare all unpaid principal amounts immediately due and payable, and require the posting of cash collateral to cover certain outstanding obligations.

*Financial Considerations at Outdoor and Clear Channel Following the LBO*

In the wake of the LBO, Clear Channel was heavily leveraged and projecting a declining EBITDA. Its debt was trading at a discount in the market, with senior notes available at a discount of between 18 and 88.5% in November 2008. In the second half of 2008 and first three months of 2009, each of the major credit ratings agencies downgraded Clear Channel's senior unsecured debt. In July 2008, Fitch downgraded Clear Channel's debt from BB- to CCC; after the LBO closed, Fitch withdrew its ratings on Clear Channel altogether. In February 2009, Standard & Poor's downgraded Clear Channel's debt from CCC$^+$ to CCC. On March 9, Moody's downgraded the debt from Caa1 to Ca, stating, "There is a high probability that the company will violate its secured 9.5x leverage covenant this year."

The independent directors of Outdoor—James Raines, Marsha Shields, and Dale Tremblay—were concerned about the effects of a possible Clear Channel bankruptcy on the unsecured Due-From balance and Outdoor's ability to operate. In October 2008, Tremblay emailed Mark and Randall Mays, the CEO and CFO of Outdoor, respectively, seeking discussion at an upcoming Board meeting regarding a number of topics, including: effects on Outdoor and the Due-From balance in the event of continuing weakness at Clear Channel; plans for the 2010 Term Note maturity; status of the Due-From balance and Outdoor's upcoming liquidity needs; and the possibility of using the Due-From balance to pay down the Term Note or finance a dividend if the balance continued to increase. As to the last of those issues, Mark Mays responded that the question was "whether or not [Outdoor] wishes to permanently repay part of its debt-capital structure that it potentially cannot replace. [Outdoor] cannot issue dividends without approval from Clear Channel." He recommended that Outdoor management open a dialogue with Clear Channel concerning the Term Note maturity, given Outdoor's inability to obtain more than $400 million in external financing absent Clear Channel's consent.

In the meantime, Clear Channel, Bain, and THL received a number of unsolicited restructuring proposals in late 2008 and early 2009, including from Lazard Frères & Co. LLC ("Lazard"). In November 2008, Clear Channel retained Goldman Sachs to assist it in formulating capital structure alternatives.

Goldman recommended that Clear Channel pursue an exchange transaction in which cash and new Outdoor debt would be exchanged for notes held by Clear Channel's lenders. Goldman estimated that each new Outdoor note could be exchanged for 1.5 to 3.6 existing Clear Channel notes of like face amount, depending on the identity of Clear Channel notes exchanged— allowing Clear Channel to take advantage of the discount at which its debt was trading. Goldman identified Outdoor as the best Clear Channel subsidiary at which to raise capital at the time: Clear Channel was over-levered, and Goldman had heard anecdotally in the market that Clear Channel investors had an appetite for Outdoor debt. The proceeds of the new Outdoor notes would be used to pay down Outdoor indebtedness under the Term Note.

*Initial Proposals Regarding the Cash Sweep and a Potential Intercompany Transaction*

On March 17, 2009, the independent directors of Outdoor—prompted by the growth of the Due-From balance to approximately $430 million and the recent credit-ratings downgrades of Clear Channel—wrote to the Outdoor board, care of Randall Mays in his capacity as CFO of

Outdoor, proposing that the Outdoor Board (i) seek to amend the Cash Management Arrangement so as to eliminate the cash sweep, and (ii) draw down the full Due-From balance and use the funds to partially prepay the Term Note.  Raines followed up with Randall Mays on April 1.  Mays told Raines that he expected Clear Channel to open a dialogue with the independent directors in the coming week, and would reach out to schedule a discussion.

On April 13, Goldman made a presentation to the independent directors of Outdoor regarding a potential exchange transaction.  Outdoor would issue $3 billion in new debt with an estimated weighted average yield of 13.5% (as compared to the 5.8% that Outdoor was then paying under the Term Note), which would be exchanged for existing Clear Channel notes held by Clear Channel lenders.  The transaction would allow Outdoor to refinance the Term Note and would improve Clear Channel's ratio of secured leverage to EBITDA.  Goldman noted that, given then-existing market conditions, it might not be possible for Outdoor to refinance the Term Note through a standalone debt offering.  Moreover, Goldman emphasized, Outdoor would benefit from carrying out a transaction that would prevent a covenant default or other financial distress at Clear Channel.

On April 24, the independent directors sent a letter to the Outdoor Board, care of Randall Mays, asking that at least $200 million of the Due-From balance be used to pay down the Term Note.

Also in late April, the independent directors asked Outdoor management to evaluate Outdoor's liquidity needs.  On April 27, management recommended that the company maintain $100 million to cover its working capital needs alone.  A few days later, management provided an analysis stating that the company's total liquidity needs were $289 million.

On April 30, Mays sent a letter responding to the independent directors' letters of March 17 and April 24.  Mays stated that he was responding to the independent directors' letters in his capacity as President and Chief Financial Officer of Clear Channel.  Mays also stated that, in light of the impending formation of a special committee to consider Clear Channel's April 13 proposal, and that proposal's "aim to address Outdoor's capital structure and relationship with [Clear Channel] on a comprehensive basis, it does not seem appropriate to me for the Outdoor Board to consider discrete elements of the relationship prematurely or on a piecemeal basis."

### Formation of the 2009 Outdoor Special Committee

In light of Goldman's presentation of a potential transaction between Outdoor and its controlling shareholder, Clear Channel, the Outdoor Board adopted resolutions on April 30, 2009 forming a special committee of independent directors (the "Special Committee") with the authority to retain independent advisors and to review, evaluate, and approve or reject all transactions proposed between the two companies.  The Board appointed Raines, Shields, and Tremblay to the Committee, and determined that none of them had any interest that would interfere with their ability to exercise independent judgment in evaluating the proposed transactions.  Raines was selected as Chair.

Dale Tremblay is the President and CEO of C.H. Guenther and Son, Inc., a food company with locations across the United States and Europe that serves both consumers and commercial

customers.  He has also served on the Board of Texas Capital Bank and the Advisory Counsel for the Federal Reserve Bank of Dallas.

James Raines is a long-time Texas banker.  He has served on the boards of Hispanic Broadcasting and Waddell & Reed Financial.

Marsha Shields occupies the second-highest-ranking executive position at McCombs Enterprises, which owns automobile dealerships, sports teams, convenience stores, and an insurance enterprise.  She is the daughter of Red McCombs, a co-founder of the Clear Channel enterprises, and President of the McCombs Foundation, with responsibilities over gifts, financial arrangements, and investments.

Each of Raines, Shields, and Tremblay had some connections to the Mays family, which had co-founded Clear Channel.  Raines has known Lowry Mays since the men worked at the same firm in the 1970s, and golfs with Mark and Randall Mays.  Shields sat on an advisory board at the MD Anderson Cancer Center, to which the Mays family also contributed money.  Tremblay had invested in real estate partnerships alongside the Mays family, belonged to three social clubs to which members of the Mays family also belonged, and played golf with Mark and Randall Mays about once a month.  None of Raines, Shields, or Tremblay, however, had any social connections with principals of Bain or THL or their representatives on the Clear Channel and Outdoor boards, nor did they have any financial interest in Clear Channel, Bain, or THL.

The SLC concluded that the members of the Special Committee were independent, and the vigor with which they negotiated against Clear Channel (as detailed below) reinforces that conclusion.

The independent directors had previously retained Vinson & Elkins as their legal advisor in 2006, following Clear Channel's announcement that it was considering strategic options, and they continued to retain Vinson & Elkins as legal advisor to the Special Committee.

The Special Committee also retained Lazard, which had served as financial advisor to the Special Committee of Clear Channel during the LBO transaction, as its financial advisor.  John Chachas, then a Managing Director, led the engagement.  Lazard's compensation, aside from a retainer, had three components.  The primary and largest component was a payment contingent on completing a recapitalization transaction, which was broadly defined to include "any refinancing, restructuring, redemption, exchange, modification, or retirement of" the Term Note.  Lazard could also earn an additional mandatory incentive fee based on realizing reductions in Outdoor's debt-service obligations, using the debt service obligations offered in Goldman's April 13 proposal as a baseline.  Finally, a discretionary success fee could be bestowed for achieving benefits for Outdoor in the recapitalization transaction other than a debt-service reduction and benefits flowing from a refinancing of the intercompany notes.  During Lazard's engagement by the Special Committee, Chachas participated in two separate, unrelated business pitches to THL.  The participants from THL included Charles Brizius, a THL managing director and Clear Channel Board member who had a role in shaping the refinancing proposals Clear Channel made to Outdoor over the course of 2009.  Lazard did not receive business as a result of either pitch.

*Subsequent Proposals and Negotiation During May and June 2009*

On May 7, 2009, the Outdoor Board met and discussed the potential refinancing. The Board reviewed management's liquidity-needs analysis, and the independent directors renewed their proposal that the Board draw down $200 million of the Due-From balance and use it to prepay a portion of the Term Note balance. The minutes of the meeting state that the Board determined to defer consideration of the proposal until after the Special Committee had completed its review of the comprehensive refinancing proposal from Clear Channel, as a comprehensive solution could offer benefits that other alternatives might not.

Negotiations regarding a potential refinancing went forward in earnest in May and June. Both sides stood to benefit from a negotiated transaction. Outdoor needed to address the upcoming Term Note maturity. Clear Channel needed to address the risk that it would breach its secured-leverage ratio, and a debt offering by Outdoor was an attractive—although not the only—potential method by which to do so.

Goldman Sachs was the principal negotiator for Clear Channel, with occasional participation from Randall Mays. John Chachas of Lazard was the principal negotiator for the Special Committee. The Special Committee met ten times over these two months, and considered four additional proposals, three of which originated with Clear Channel and one of which originated with a third party, Bank of America/Merrill Lynch ("BAML"):

- on May 15, BAML proposed a sale of $2.5 billion in Outdoor notes to third parties, the proceeds of which would be used to prepay the entire Term Note balance;

- on May 16-17, Clear Channel proposed a $2.8 billion offering of Outdoor notes, some of which would be placed with third parties and some of which would be placed with existing Clear Channel lenders, resulting in a refinancing of the entire Term Note;

- on May 28, Clear Channel proposed an offering of $1.5-$2.5 billion in Outdoor notes, which would be placed exclusively with Clear Channel's existing lenders, and which would result in the refinancing of some or all of the Term Note, with the maturity of any remaining Term Note balance extended; and

- on June 19, Clear Channel proposed a sale of $1.5 billion in Outdoor notes to third parties, the proceeds of which would be used to prepay a portion of the Term Note, with the remaining Term Note balance being extended.

As the proposals evolved, the Special Committee extracted a number of concessions from Clear Channel, including:

- the establishment of a liquidity reserve of at least $100 million, which would be funded by a drawdown of the Due-From balance and which would remain on Outdoor's balance sheet;

- an escrow arrangement to service the interest payments on any newly-issued debt, which would be funded by deposits preceding the cash sweep on any given day;

- an increase in the interest rate on the Due-From Note to roughly the yield of any new Outdoor notes issued; and

- a commitment that Outdoor's overall leverage would not increase.

Clear Channel refused to agree to any changes to the sweep under the Cash Management Arrangement. It also declined to allow Outdoor to contribute the Due-From Note to its subsidiary, Clear Channel Outdoor, Inc., the debtor under the Term Note held by Clear Channel, which the Special Committee understood would facilitate an offset of the two notes in the event of a Clear Channel bankruptcy. Clear Channel took the position that, in light of Section 7.12(c) of the Credit Agreement, it would not agree to such changes without the consent of its lenders. Clear Channel indicated that the effort required to extract such consent could jeopardize the success of the refinancing transaction as a whole.

No transaction was completed in the first half of 2009. Market conditions were such that Outdoor would have been required to pay a thirteen percent coupon (or more) on any newly-issued debt, and Clear Channel's lenders could not be persuaded to accept the amendments to the Credit Agreement necessary to facilitate an exchange of Clear Channel debt for new Outdoor notes.

During this period, Clear Channel's financial condition worsened. From the end of 2008 through the first half of 2009, Clear Channel's internal forecasting models projected steadily declining EBITDA, with the result that, under certain sets of assumptions, Clear Channel's secured-leverage ratio would come close to the limits permitted under its Credit Agreement. At these levels, a relatively modest shortfall in projected EBITDA could result in a covenant breach by the end of the year.

### *Further Proposals by the Independent Directors Regarding Due-From Drawdown and Term Note Payment*

On July 30, the members of the Special Committee sought and received information from joint Outdoor-Clear Channel management regarding the Due-From balance, Outdoor projections, and Clear Channel's current and forecasted secured-leverage covenant ratios. The Due-From balance had by then grown to $488 million by the end of June, a $57 million increase over the balance at the end of the first quarter. On September 3, the Independent Directors informed Mark and Randall Mays that at the Board meeting scheduled for September 10, they would recommend that the Outdoor Board demand repayment of $300 million of the Due-From balance and prepay a portion of the Term Note.

The Independent Directors made the recommendation at the September 10 meeting as planned. In response, Mark Mays told the Outdoor Board that the Clear Channel Board preferred to present a comprehensive proposal addressing the concerns regarding the Due-From Note and the Term Note. The Independent Directors agreed to postpone the vote on their recommendation in exchange for assurances from the Bain and THL representatives on the Outdoor Board that Clear Channel would present a comprehensive proposal at a Special Meeting of the Outdoor Board to be held on October 19.

### *Clear Channel's October 19, 2009 Proposal*

The proposal Clear Channel delivered at the October 19 meeting did not contemplate an immediate refinancing of any portion of the Term Note, or provide for any paydown of the Due-From Note.  Rather, the proposal's terms included a six-month extension of the Term Note, an increase in the Due-From interest rate to match that of the Term Note, and agreement by the Special Committee to pre-approve a $1 billion Outdoor debt offering to take place at an unspecified future date.  The Special Committee did not view the proposal as "comprehensive," but informed Clear Channel that it was willing to consider the aspects of the proposal other than pre-approval.  On November 6, Randall Mays relayed a proposal to the Special Committee with substantially the same terms as the October 19 proposal, but specifying timing and interest-rate constraints on the Outdoor debt offering for which the Special Committee's pre-approval was sought.

On November 13, the Special Committee responded by letter, stating that it would not agree to pre-approval.  "If Clear Channel and/or its Sponsors do not agree to extend the Term Note and to adjust the inter-company interest rate," the Special Committee wrote, "we will recommend to the Outdoor Board that the Term Note be reduced immediately with funds from the 'due from' balance of $528MM."

### *Late November and December 2009 Proposals and Negotiations*

In late November 2009, the Sponsors began receiving inquiries about the possibility of an Outdoor notes offering.

Clear Channel and the Sponsors made three refinancing proposals to the Special Committee in December.  Between December 2 and December 18, the Special Committee met six times, and the Outdoor Board met ten times, to discuss them.  At times, there were as many as three Board and Special-Committee meetings per day.  Blair Hendrix, a Managing Director at Bain who sat on both the Clear Channel and Outdoor boards, assumed the role of primary negotiator on behalf of Clear Channel and the Sponsors.  Chachas remained the primary negotiator on behalf of the Special Committee, though Hendrix sometimes spoke directly with Raines.  The parties negotiated with the expectation that, as a practical matter, the market for debt offerings would close for the year on Friday, December 18.

Clear Channel's first December proposal revived the idea of a "new money" bond offering by Outdoor.  Key features of this proposal were:

- $1 billion in unsecured notes would be issued by an Outdoor subsidiary, Clear Channel Worldwide Holding, the proceeds of which would be used to pay down part of the Term Note;

- the maturity dates on the Due-From Note and remaining balance on the Term Note would be extended to six months beyond the maturity of the newly-issued notes;

- Clear Channel would have the option, but not the obligation, to raise the interest rate on the Due-From Note to match the Term-Note rate;

- an unspecified amount of the Due-From Note would be drawn down to serve as a liquidity reserve for Outdoor; and

- at an unspecified future date, Outdoor would issue additional debt to refinance the remaining Term Note balance.

In negotiations with Clear Channel, the Special Committee successfully bargained to (i) eliminate Clear Channel's option to set the Due-From interest rate at the T-bill rate and instead require that the Due-From rate be increased to match the rate of the Term Note; (ii) establish a $100 million liquidity reserve for Outdoor, funded in part by a $50 million pay-down of the Due-From balance; and (iii) reset the interest rate on the Term Note to match the rate Outdoor would pay on its newly-issued notes. Clear Channel sought the Committee's preapproval for a future transaction that would refinance the remaining Term Note balance, and the Special Committee eventually agreed to preapprove the transaction within defined parameters. The Special Committee and the Outdoor Board approved the proposed transaction, as modified through the Special Committee's negotiations, on December 8, 2009.

On December 12, however, a group of Clear Channel's lenders objected to the transaction, arguing (among other things) that it violated the Credit Agreement by allowing Outdoor to acquire more than $400 in external debt without completely refinancing the Term Note. Clear Channel therefore formulated a revised proposal: Outdoor would issue $1 billion in cash notes, and $1.65 billion in floating-rate senior unsecured notes that would be exchanged for $1.5 billion in outstanding Clear Channel debt. The proposed transaction would refinance the Term Note in its entirety. Concerned about Outdoor becoming overleveraged, however, the Special Committee negotiated a cap of $2.5 billion on total indebtedness that Outdoor could incur, and the value of the new Outdoor notes to be exchanged for Clear Channel debt was therefore reduced to $1.5 billion. The Special Committee also sought a $1 billion cap on the Due-From balance, but this request was rebuffed. The Special Committee approved the second proposal, as revised, on December 16.

In the early-morning hours of December 17, it became clear that a debt exchange, which required the approval of Clear Channel's lenders, would not be possible. Clear Channel therefore came forward with a proposal for a $2.5 billion "new money" offering of notes of a wholly-owned Outdoor subsidiary, Clear Channel Worldwide Holdings, Inc. ("Worldwide"), (which would allow for prepayment of the entire Term Note balance), along with a $500 million paydown of the Due-From Note. The proposal also included a $100 million liquidity reserve at Outdoor and an increase in the Due-From interest rate to the weighted average coupon rate of the new Worldwide notes. The Special Committee and the Outdoor Board approved the transaction on December 17, and the offering closed on December 28. The proceeds of the partial paydown of the balance under the Due-From Note, together with proceeds of the notes offering, were used to repay the Term Note in full.

The rate on the new Worldwide notes was set at 9.25%. On December 23, Outdoor and Clear Channel executed an amendment to the Due-From Note that reset the rate thereunder to the same variable per annum rate of interest under the Due-To Note, and extended the maturity date of the Due-From Note to December 15, 2017.

Chachas left Lazard at the end of December 2009 to campaign for a United States Senate seat from Nevada.  In the several weeks before his departure, Chachas sent to Clear Channel representatives who were involved in the negotiations a number of emails that had an ingratiating tone and, in a few instances, appeared to criticize his client or its other advisors.  It was not entirely clear whether these comments were genuine or were intended as a negotiating tactic.  On at least one occasion, Chachas forwarded to Clear Channel representatives an email chain that included confidential discussions among the Special Committee and its legal and financial advisors.  In late 2009, Chachas sought contributions to his political campaign.  Among those from whom he solicited contributions after the final refinancing transaction had been approved were representatives of Clear Channel and the Sponsors.  Insofar as the SLC has been able to determine, no one employed by Clear Channel, Bain, or THL contributed to his campaign.  Upon learning of these facts during the course of the SLC's investigation, the members of the 2009 Special Committee were critical of the emails, but also expressed the strong view that this conduct did not affect the outcome of negotiations.  The Special Committee directed Chachas to seek—and he successfully obtained—substantial concessions from Clear Channel.  On occasion, after Chachas had advised the Committee that the terms of a particular proposal were fair, the Committee instructed Chachas to seek, and he in fact obtained, further concessions.

In November 2012, Outdoor refinanced the December 2009 Worldwide notes at a rate of 6.5%— thus reducing the rate received on the Due-From balance, but resulting in a substantial net savings to the company.

### Conclusions of the Special Litigation Committee

After an in-depth analysis of the facts developed in the investigation and the applicable legal standards, and consideration of the costs and risks of litigation, the Special Litigation Committee determined that the benefits conferred by the Stipulation of Settlement outweigh the potential gains of further litigation.  This determination is based on the following conclusions:

- Any assessment of the fairness of the December 2009 transaction between Outdoor and Clear Channel must take account of the pre-existing contractual constraints to which Outdoor was subject, as well as the entirety of the consideration received by Outdoor in the transaction.

- The December 2009 transaction provided substantial benefits to Outdoor, including an increase in the interest rate payable on the Due-From Note and the refinancing of the $2.5 billion Term Note that would have fallen due in August 2010.  Given the unique nature of the contractual relationships and the variety of consideration flowing in the transaction, there is no reliable basis by which to measure whether greater benefits could have been achieved in a transaction between unrelated parties under the same contractual constraints.

- The members of the 2009 Outdoor Special Committee were independent and negotiated vigorously.  The SLC considered whether the conduct of Chachas interfered with the committee's discharge of its duties.  The SLC found no evidence that it did, or that it resulted in Outdoor receiving less consideration in the December 2009 transaction than otherwise would have been the case.

- The SLC also considered whether the interested directors on Outdoor's board acted improperly in failing to acquiesce to the independent directors' periodic proposals to demand repayment of a portion of the Due-From balance.  There is evidence, however, that the interested directors believed that demanding repayment was not in Outdoor's best interests, particularly given the lack of other sources of liquidity for Outdoor.  And the SLC found no evidence that the failure to demand repayment resulted in Outdoor receiving less consideration in the December 2009 transaction than otherwise would have been the case.

- The Corporate Governance Measures, as defined in the Stipulation of Settlement, provide substantial benefits to Outdoor and its shareholders that could not be achieved through litigation.

# Exhibit F

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR | ) | CONSOLIDATED |
| HOLDINGS, INC. DERIVATIVE | ) | |
| LITIGATION | ) | C.A. No. 7315-CS |

## STIPULATION OF SETTLEMENT

This Stipulation of Settlement ("Stipulation") is made and entered into by: (1) the Special Litigation Committee of the Board of Directors of Clear Channel Outdoor Holdings, Inc. (the "SLC") (acting for and on behalf of nominal defendant Clear Channel Outdoor Holdings, Inc. ("Outdoor" or the "Company")); (2) plaintiffs NECA-IBEW Pension Trust Fund and City of Pinellas Park Firefighters Pension Board (each a "Plaintiff" and, together, the "Plaintiffs," as further defined below); and (3) defendants Clear Channel Communications, Inc. ("Clear Channel"), Bain Capital Partners, LLC ("Bain"), Thomas H. Lee Partners, L.P. ("THL"), Margaret W. Covell, Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Thomas R. Shepherd, Marsha M. Shields, Christopher M. Temple, Dale W. Tremblay, Scott R. Wells, and James C. Carlisle (each a "Defendant" and, together, the "Defendants," as further defined below; and, together with the SLC (acting for and on behalf of the Company) and the Plaintiffs, the "Parties").[1]  Subject to the approval of the Court and the terms and conditions expressly provided herein, this Stipulation is intended

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in Section I herein.

1

to fully, finally, and forever resolve, discharge, and settle the Derivative Action and any and all Released Plaintiff Claims against the Released Defendant Persons.

## RECITALS

**WHEREAS,** on March 7, 2012, Plaintiff City of Pinellas Park Firefighters Pension Board filed a complaint in the Court of Chancery of the State of Delaware (the "Court") asserting derivative claims on behalf of the Company against the Defendants with respect to a 2009 agreement to amend the Revolving Promissory Note, dated as of November 10, 2005, between Clear Channel, as maker, and Outdoor, as payee (as amended by the first amendment dated as of December 23, 2009, and as may be further amended, the "Note");

**WHEREAS,** on March 23, 2012, Plaintiff NECA-IBEW Pension Trust Fund brought a substantially identical derivative action;

**WHEREAS,** on July 16, 2012, the Court consolidated the two derivative actions into the Derivative Action;

**WHEREAS,** in the Verified Stockholder Derivative Complaint, the Plaintiffs allege, among other things:

- that Clear Channel is overleveraged with debt arising from its 2008 $24 billion leveraged buyout arranged by Bain and THL;

- that Clear Channel's increased leverage has, in turn, increased its risk of default, thereby making it difficult for Clear Channel to raise capital;

- that, in late 2009, to solve its liquidity issues, Clear Channel, as Outdoor's controlling stockholder, forced Outdoor to agree to support and approve a $1 billion unsecured loan in the form of the Note at an unreasonably low interest rate of 9.25%;

- that the Note is integrated into the combined cash management systems of Clear Channel and Outdoor pursuant to which Clear Channel sweeps Outdoor's cash accounts on a daily basis into a Clear Channel master account and Clear Channel provides funds to Outdoor on days that Outdoor's disbursements exceed its collections;

- that, as part of the cash management system, Outdoor records net amounts "due to" or "due from" Clear Channel on its consolidated balance sheets;

- that the Note permits Clear Channel to borrow up to $1 billion from Outdoor, and Clear Channel's borrowings under the Note are unsecured such that Outdoor would be treated as a general unsecured creditor in the event of a Clear Channel bankruptcy;

- that the Note was originally due to expire by its own terms on August 10, 2010, and provided for an interest rate equal to the average one-month generic treasury bill rate;

- that on December 23, 2009, Clear Channel and Outdoor agreed to extend the Note through December 15, 2017, and to increase the interest rate to an unreasonably low interest rate;

- that Outdoor anticipates that the balance on the Note will increase to over $1.0 billion in the next few years;

- that the Note is payable on demand and Outdoor could demand immediate repayment; and

- that Outdoor has unreasonably refused to demand repayment and has instead allowed outstanding indebtedness under the Note to grow to $650 million.

**WHEREAS,** on April 4, 2012, the Board of Directors of Clear Channel Outdoor Holdings, Inc. (the "Outdoor Board") established and empowered the SLC to "investigate all matters related to the Litigation, review and evaluate the findings of such investigation" and to "take all actions as the Special Litigation Committee deems appropriate and in the best interests of the Corporation with respect thereto, including,

without limitation, prosecution, control, and supervision of the Litigation by the Corporation including, if determined to be appropriate, its settlement";

**WHEREAS,** the Outdoor Board's resolutions further provide that the SLC's determinations "shall be final and binding upon the Corporation and shall not be subject to review or approval by the [Outdoor] Board" and that the SLC is authorized and empowered "to retain, at the Corporation's expense, any independent advisors that are acceptable to the Special Litigation Committee in its sole discretion, including legal counsel, as it deems necessary or desirable to assist and advise it in connection with the investigation, review, and evaluation of the Litigation";

**WHEREAS,** the SLC is composed of two independent members of the Outdoor Board, Christopher M. Temple and Douglas L. Jacobs, neither of whom was a member of the Outdoor Board at the time of the 2009 Note amendment and extension;

**WHEREAS,** pursuant to the Outdoor Board's resolutions and to assist in its charge, the SLC retained Covington & Burling LLP and Potter Anderson & Corroon LLP as its legal advisors (collectively, "Counsel for the SLC");

**WHEREAS,** on June 20, 2012, the SLC moved for a six-month stay (the "Stay") of the proceedings in the Derivative Action to facilitate the SLC's review, investigation, and determination with respect to the derivative claims asserted by the Plaintiffs in the Verified Stockholder Derivative Complaint;

**WHEREAS,** on July 10, 2012, the Plaintiffs moved for partial summary judgment, arguing that the Outdoor Board breached its fiduciary duties by refusing to

4

exercise its right to demand repayment and instead continuing to allow the loan to Clear Channel to grow to more than $700 million;

**WHEREAS,** on July 23, 2012, the Court granted the SLC's Stay motion;

**WHEREAS,** on January 24, 2013, the Court granted a 30-day extension of the Stay;

**WHEREAS,** the SLC, with the assistance of Counsel for the SLC, engaged in an intensive investigation and evaluation of the derivative claims asserted in the Derivative Action, as well as additional possible claims relating to the subject matter of the Derivative Action identified by the SLC, and that investigation included (i) the collection and review of pertinent hard-copy and electronic documents from (a) current and former employees, officers, and directors of each of Outdoor and Clear Channel, (b) employees of Bain and THL, (c) members of the Special Committee of the Outdoor Board that approved the 2009 transaction (the "2009 Special Committee"), and (d) the 2009 Special Committee's legal and financial advisors; (ii) the interviews, by Counsel for the SLC, of twenty-five witnesses (with SLC members attending and participating in six interviews of current or former members of the Outdoor Board); (iii) the retention of an economic expert, Dr. Kenneth Lehn, a former Chief Economist of the Securities and Exchange Commission and a Professor at the Katz Graduate School of Business at the University of Pittsburgh, to assist and advise the SLC in its analysis; and (iv) legal analysis of the derivative claims asserted in the Verified Stockholder Derivative Complaint, and of the additional possible claims relating to the subject matter of the Derivative Action identified by the SLC;

**WHEREAS,** the SLC's evaluation also took account of various prudential considerations, including the value of the Settlement terms in contrast to what might be achieved through further litigation and the costs (financial and otherwise) and risks of further litigation;

**WHEREAS,** the SLC's investigation is complete;

**WHEREAS,** pursuant to the authority granted to the SLC in its authorizing resolution, the SLC has made the determinations set forth in Exhibit A to the Affidavit of Christopher M. Temple, dated July 3, 2013, filed concurrently with this Stipulation;

**WHEREAS,** in December 2012, the SLC (acting for and on behalf of Outdoor, and with the full power and authority delegated to it by the Outdoor Board) initiated discussions with certain of the Defendants to explore the prospects of settlement;

**WHEREAS,** the SLC developed a framework setting forth components of a potential settlement;

**WHEREAS,** the SLC consulted with Counsel for the Plaintiffs regarding the status and findings of the SLC's investigation and the possibility of settlement;

**WHEREAS,** the SLC provided Counsel for the Plaintiffs with certain of the documents produced to the SLC in connection with its investigation and Counsel for the Plaintiffs reviewed such documents;

**WHEREAS,** the SLC continued to negotiate with certain of the Defendants regarding the terms of a potential settlement within the framework developed by the SLC;

**WHEREAS,** the SLC discussed with the Plaintiffs the levels within the SLC framework at which certain of the Defendants had proposed to settle;

**WHEREAS,** the Plaintiffs retained investment banking and advisory firm Cypress Associates LLC to review and provide input regarding the proposed settlement terms;

**WHEREAS,** the Plaintiffs stated they would not support a settlement at the levels proposed by the Defendants, and thereafter informed the SLC of the levels within the SLC framework at which they would support a settlement;

**WHEREAS,** the SLC continued to consult with the Plaintiffs and to negotiate with certain of the Defendants;

**WHEREAS,** the parties to the Derivative Action and the SLC subsequently entered into a binding Memorandum of Understanding dated March 28, 2013 (the "MOU"), reflecting their agreement in principle for the settlement of the Derivative Action between and among the SLC (acting for and on behalf of the Company), the Plaintiffs, and the Defendants;

**WHEREAS,** the Plaintiffs' involvement in the settlement negotiations was a factor in achieving the benefits received by Outdoor as a result of this Settlement;

**WHEREAS,** the Plaintiffs brought their derivative claims in good faith and continue to believe that their derivative claims have legal merit, and the entry by the Plaintiffs into this Stipulation is not an admission as to a lack of any merit of any derivative claims asserted or that could be asserted in the Derivative Action;

**WHEREAS,** on the basis of the information available to them, including publicly available information, their investigation, and certain non-public materials, the Plaintiffs took into consideration the strengths and weaknesses of the Plaintiffs' derivative claims and determined that the terms of the Settlement set forth herein are fair, reasonable, and adequate, and in the best interests of the Company and its stockholders, and the Plaintiffs believe that it is reasonable to seek approval of the Settlement by the Court based upon the terms outlined herein and the substantial benefits and protections to be provided to the Company thereby;

**WHEREAS,** entry into this Stipulation by the SLC (acting for and on behalf of the Company) is not an admission as to the lack of any merit of any of the derivative claims asserted or that could be asserted in the Derivative Action;

**WHEREAS,** each of the Defendants denies all allegations of wrongdoing or liability on his, her, or its respective part, and specifically maintains that he, she, or it has not committed any violation of law or breach of fiduciary duty or engaged in any wrongdoing whatsoever, but solely to avoid the costs, disruption and distraction of further litigation, and without admitting the validity of any allegations made in the Derivative Action, or any liability with respect thereto, has concluded that it is desirable that the derivative claims against him, her, or it be settled and dismissed on the terms reflected in this Stipulation;

**WHEREAS,** the SLC has taken into consideration the strengths and weaknesses of the Plaintiffs' derivative claims, as well as the strengths and weaknesses of certain other potential derivative claims relating to the subject matter of the Derivative

8

Action identified by the SLC in the course of its investigation, and the SLC has determined that a settlement of the Derivative Action on the terms reflected in this Stipulation is fair, reasonable, adequate, and in the best interests of the Company and its minority stockholders, and confers a substantial benefit upon the Company and its minority stockholders; and

> **WHEREAS,** Counsel for the Parties have engaged in extensive settlement negotiations, including arm's length discussions concerning the merits of the claims and defenses at issue in the Derivative Action and the remedial measures and relief that should be part of a settlement of the Derivative Action;

> **NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**

by and among the SLC (acting for and on behalf of the Company), the Plaintiffs, and the Defendants that, pursuant to the procedure set forth in Sections III & IV of this Stipulation, the Derivative Action and the claims released pursuant to Section III·G of this Stipulation shall be fully and finally compromised, settled and released, and the Derivative Action shall be dismissed on the merits, with prejudice, upon and subject to the terms and conditions of this Stipulation, as follows:

## I.   DEFINITIONS

> **A.**   As used in this Stipulation, the following terms have the meanings specified below.

> 1.   "Borrowing Availability" shall mean the aggregate amount of cash that can be borrowed by Clear Channel or any of its wholly-owned subsidiaries under any revolving credit facility, line of credit or similar agreement as of the applicable

measurement date; <u>provided</u> <u>that</u>, Borrowing Availability cannot exceed as of the applicable measurement date the amount of cash that Clear Channel would be permitted to borrow under any such facility or agreement pursuant to any other financing agreement to which Clear Channel is a party.

2.      "Claims" means any and all causes of action, claims, damages, and awards, whether equitable, legal, or administrative in nature, whether past or present, suspected or unsuspected, and whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, and includes without limitation known claims and Unknown Claims.

3.      "Clear Channel Liquidity" shall mean the aggregate of (a) cash and cash equivalents set forth on Clear Channel's balance sheet, excluding Unavailable Cash and Outdoor Minority Cash; and (b) Borrowing Availability.

4.      "Clear Channel Liquidity Ratio" shall mean (A) Clear Channel Liquidity divided by (B) the Outdoor Public Share.

5.       "Clear Channel Reference Notes" shall mean Clear Channel's 5.5% Senior Notes Due 2014, 4.9% Senior Notes Due 2015, 5.5% Senior Notes Due 2016, and 6.875% Senior Debentures Due 2018.

6.      "Company Stockholders" means all individuals or entities who hold of record, or beneficially own, directly or indirectly, common stock of the Company as of the close of business on the date the Court enters the Scheduling Order.

7.      "Corporate Governance Measures" means the corporate governance measures set forth in Sections III·A to III·E of this Stipulation.

8.     "Counsel for the Defendants" means (i) Seitz Ross Aronstam & Moritz LLP and Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. with respect to Margaret W. Covell, Blair E. Hendrix, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Scott R. Wells, James C. Carlisle, Bain, Clear Channel, and THL; (ii) Seitz Ross Aronstam & Moritz LLP and Paul Hastings LLP with respect to Robert Pittman; (iii) Ashby & Geddes with respect to Douglas L. Jacobs and Christopher M. Temple in their capacity as members of the Outdoor Board; and (iv) Bouchard Margules & Friedlander, P.A. with respect to Thomas R. Shepherd, Marsha M. Shields, and Dale W. Tremblay.

9.     "Counsel for the Plaintiffs" means (i) Bernstein Litowitz Berger & Grossmann LLP, Grant & Eisenhofer, P.A., and Klausner, Kaufman Jensen & Levinson with respect to Plaintiff City of Pinellas Park Firefighters Pension Board; and (ii)  Grant & Eisenhofer, P.A., and Saxena White, P.A. with respect to Plaintiff NECA-IBEW Pension Trust Fund.

10.     "Counsel for the Parties" means Counsel for the Defendants, Counsel for the Plaintiffs, and Counsel for the SLC.

11.     "Defendants" means Clear Channel, Bain, THL, Margaret W. Covell, Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Thomas R. Shepherd, Marsha M. Shields, Christopher M. Temple, Dale W. Tremblay, Scott R. Wells, and James C. Carlisle, as well as each of their respective successors and assigns.

12.     "Derivative Action" means the consolidated derivative action captioned *In re Clear Channel Outdoor Holdings, Inc. Derivative Litigation*, C.A. No. 7315-CS, in the Delaware Court of Chancery.

13.     "Exhibits" mean the exhibits to this Stipulation.

14.     "Final Court Approval" means the date on which the Judgment of the Court becomes Final.  For the purposes of this Stipulation, "Final" means: (i) if no appeal from the Judgment is taken, the date on which the time for taking such an appeal expires; or (ii) if any appeal is taken, the date on which all appeals, including petitions for rehearing or reargument, petitions for writ of review, and petitions for writ of *certiorari* or any other form of review, have been fully disposed of (whether through expiration of time to file, denial of any request for review, by affirmance on the merits, or otherwise) in a manner that does not result in any material alteration of the Judgment. Notwithstanding the foregoing, the Court's ruling or failure to rule on any application for attorneys' fees and/or expenses shall not preclude the Judgment from becoming Final.

15.     "Independent Directors" means any then-serving director who (i) satisfies the then-applicable Independence Tests set forth in the New York Stock Exchange Listed Company Manual, (ii) is not, and has not previously been, employed by (or a partner or member of, or held another analogous position at) Clear Channel, CC Media Holdings, Inc. ("CCMH"), Bain, or THL, or their respective affiliates, (iii) is not, and has not previously been, a director of Clear Channel or CCMH (it being understood that service as a director of any other company in which Bain, THL, or any funds managed by or affiliated with either of them has a direct or indirect investment shall not

12

disqualify a director from being deemed an "Independent Director" for purposes of this paragraph), and (iv) does not have a material financial interest, directly or indirectly, in Clear Channel, CCMH, Bain, or THL, *other than* an interest in funds managed by or affiliated with Bain or THL that do not have an economic interest in equity securities or debt obligations of Clear Channel or CCMH.  Any questions regarding whether a director not previously a member of the Committee meets the qualifications of this paragraph shall be determined by the already-serving members of the Committee (as defined in Section III·C below).

16.    "Judgment" means the Order and Final Judgment, substantially in the form attached as Exhibit F to this Stipulation, to be entered by the Court approving the Settlement and dismissing with prejudice the derivative claims asserted in the Verified Stockholder Derivative Complaint.

17.    "Notice" means the legal notice of the Settlement to be provided to Company Stockholders by first-class U.S. mail, substantially in the form attached hereto as Exhibit B.

18.    "Outdoor Minority Cash" shall mean the cash and cash equivalents on the balance sheet of Outdoor on the date of determination, multiplied by the percentage of shares of Outdoor common stock then held by persons other than Clear Channel and its affiliates.

19.    "Outdoor Public Share" shall mean the amount of cash that would be payable to holders of the Company's common stock, other than Clear Channel or any subsidiary of Clear Channel, assuming (x) a demand by the Company of the aggregate

13

amount outstanding under the Note and (y) a simultaneous dividend of the proceeds of such demand to the stockholders of the Company.

20.    "Plaintiffs" means the City of Pinellas Park Firefighters Pension Board and the NECA-IBEW Pension Trust Fund as well as each of their respective successors and assigns.

21.    "Released Defendant Claims" means any and all Claims that are based upon or arise out of the institution, prosecution or settlement  of the claims asserted by the Plaintiffs in the Derivative Action.   Notwithstanding the foregoing, Released Defendant Claims shall not mean and does not include any claims by the Parties to enforce the terms of this Stipulation.

22.    "Released Defendant Persons" means the Company, all current and former directors of the Company, and all Defendants and any of their respective employers, parent entities, controlling persons, principals, affiliates or subsidiaries and each of their respective past or present officers, directors, partners, stockholders, representatives, employees, attorneys, financial or investment advisors, consultants, accountants, investment bankers, commercial bankers, agents, heirs, executors, trustees, personal representatives, estates, administrators, predecessors, successors, assigns, insurers, and reinsurers.

23.    "Released Plaintiff Claims" means any and all Claims that (i) have been asserted in the Derivative Action, or (ii) that could have been asserted in the Derivative Action, or in any other court action or before any court, administrative body, tribunal, arbitration panel, or other adjudicatory body, from the beginning of time through

14

the date of this Stipulation, that are based upon, arise out of, or relate in any way, directly or indirectly, to: (a) the allegations made in, or the subject matter of, the Derivative Action; (b) the matters discussed in Exhibit A to the Affidavit of Christopher M. Temple, dated July 3, 2013, filed concurrently with this Stipulation; (c) the issuance by a subsidiary of the Company of the 9.25% Series A Senior Notes Due 2017 and 9.25% Series B Senior Notes Due 2017 and the use of proceeds thereof (including repayment of the $2.5 billion term loan payable by the Company to Clear Channel and the amendment and extension of the Note in connection therewith) including consummation of the issuance in lieu of any other potential transaction considered; (d) the adoption, approval, or amendment of, or the exercise or non-exercise of rights under, the Note; (e) any potential claims relating to the subject matter of the Derivative Action identified by the SLC in the course of its investigation; and/or (f) this Stipulation (including, without limitation, any and all Claims relating to the negotiation and execution of this Stipulation and any matter referred to herein) or the settlement of the Derivative Action. Notwithstanding the foregoing, Released Plaintiff Claims shall not mean and does not include any claims by the Parties to enforce the terms of this Stipulation.

24.    "Released Plaintiff Persons" means the Plaintiffs and Counsel for the Plaintiffs.

25.    "Scheduling Order" means the proposed Scheduling Order, substantially in the form attached hereto as Exhibit A, to be entered by the Court pursuant to Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware.

26.     "Settlement" means the settlement among the SLC (acting for and on behalf of the Company), the Plaintiffs and the Defendants on the terms and conditions set forth in this Stipulation.

27.     "Settlement Hearing" means a hearing required under Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware, to be held in connection with the Court's decision whether to approve this Stipulation as fair, reasonable, and adequate, and in the best interests of the Company and its stockholders.

28.     "Sponsors" means Bain and THL.

29.     "Summary Notice" means the summary legal notice of the Settlement, substantially in the form attached hereto as Exhibit C.  In the event of an inconsistency between the Notice and the Summary Notice, the Notice shall control.

30.      "Unavailable Cash" means the amount of cash on Clear Channel's consolidated balance sheet that is "restricted" as determined in accordance with U.S. Generally Accepted Accounting Principles or that is otherwise contractually restricted from being available for general use (e.g., cash pledged as collateral).

31.     "Unknown Claims" means any Released Plaintiff Claims that the Company, the SLC, any Plaintiff or any other Company Stockholder does not know or suspect to exist in his, her or its favor at the time of the release of the Released Defendant Persons, and any Released Defendant Claims that the Company, the SLC, or any of the Defendants does not know or suspect to exist in his, her or its favor at the time of the release of the Released Plaintiff Persons.

16

32. "Verified Stockholder Derivative Complaint" means the derivative complaint filed on March 7, 2012 in Civil Action No. 7315-CS (Del. Ch.) and designated as the operative complaint in the Derivative Action by the July 16, 2012 Stipulation and Order of Consolidation.

## II.   THE PARTIES' POSITIONS

A.   While the Plaintiffs believe that the derivative claims asserted in the Verified Stockholder Derivative Complaint have merit, they also recognize and acknowledge the following: (i) the expense and length of continued proceedings necessary to prosecute the Derivative Action; (ii) that they have no reason to contest the independence of the SLC, (iii) the extent of the SLC's investigation and its determination following such investigation that the derivative claims asserted in the Verified Stockholder Derivative Complaint should be resolved in the manner and upon the terms set forth in this Stipulation; (iv) the uncertainty and risk inherent in litigation, the problems of proof, and the potential existence of valid defenses to the derivative claims asserted in the Verified Stockholder Derivative Complaint; and (v) the substantial benefits provided by the proposed Settlement.

B.   The SLC (acting for and on behalf of the Company), in the exercise of its business judgment, has determined that it is in the best interests of the Company and its stockholders that the Derivative Action be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation, and that the terms and conditions are fair, reasonable, and adequate.  The SLC has reached this conclusion only after a comprehensive consideration of the pertinent factual and legal issues surrounding

the allegations made in the Verified Stockholder Derivative Complaint, as well as additional possible claims relating to the subject matter of the Derivative Action identified by the SLC, and only after an extensive investigation that spanned more than six months.  In addition, the SLC's determinations were informed by various prudential considerations, including the costs (financial and otherwise) of litigation, the uncertainty and risk inherent in any litigation, the potential disparity between the costs associated with continued litigation and a potential recovery sufficient to justify those costs, the availability of relief through this Settlement that would not be available through litigation, and the possibility that continued litigation would threaten harm to the Company's competitive position, prospects, and reputation and distract the Company's Board of Directors and senior management from managing the affairs and operations of the Company.

C.      While the Defendants believe that the derivative claims asserted in the Verified Stockholder Derivative Complaint lack merit, they also recognize and acknowledge the following: (i) the expense and length of continued proceedings necessary to defend the Derivative Action; and (ii) the uncertainty and risk inherent in litigation.

## III.   TERMS OF SETTLEMENT

### A.      Immediate Draw-Down of Note Balance by the Company

Not later than ten (10) calendar days after Final Court Approval, the Company will on the same day both (a) notify Clear Channel of its intent to make a demand for repayment of $200 million outstanding under the Note twenty (20) calendar days

18

thereafter (or if that day is not a business day, then the next business day thereafter), and (b) declare a dividend to be paid the same business day that such demand is made, conditioned on Clear Channel having satisfied such demand.  On the twentieth (20th) calendar day after providing such notice to Clear Channel (or if that day is not a business day, then the next business day thereafter), Outdoor will demand repayment of $200 million outstanding under the Note.  Clear Channel will satisfy the demand the same day it is made.

**B.     Amendment to Note Interest Rate**

Not later than ten (10) business days after Final Court Approval, the Company and Clear Channel will adopt a Note amendment in substantially the form attached hereto as Exhibit D.

**C.     Creation of a Committee of Independent Directors of the Outdoor Board to Monitor the Note**

Not later than ten (10) business days after Final Court Approval, the Company will establish a committee (the "Committee") of the Outdoor Board for the specific purpose of monitoring the Note, and the Outdoor Board shall adopt a Committee charter in substantially the form attached hereto as Exhibit E.  The members of the Committee shall at all times be all then-serving Independent Directors of the Company.

**D.     Reporting Obligations**

1.     Clear Channel agrees that, no later than the 16th calendar day of every month beginning with the month after the month in which the Judgment is entered by the Court, Clear Channel will deliver to the Outdoor Board (and then solely to the

19

Committee after the Committee has been established pursuant to the requirements of Section III·C) a report (the "Monthly Report") containing the following information compiled in good faith, in each case (x) calculated as of month's end for the three preceding months and (y) projected as of month's end for the current month and the three succeeding months (the "Projection Period") (for example, no later than April 16, 2013, Clear Channel would deliver a Monthly Report reflecting calculations as of January 31, 2013; February 28, 2013; and March 31, 2013; and projections as of April 30, 2013; May 31, 2013; June 30, 2013; and July 31, 2013):

      a.   Note balance;

      b.   Clear Channel Liquidity; and

      c.   Clear Channel Liquidity Ratio.

      2.     Clear Channel agrees that at the same time as delivery of Clear Channel's annual long-range forecast to the Clear Channel board of directors, but in all events no later than each July 1, Clear Channel will deliver to the Committee a report (the "Annual Report"), compiled in good faith, containing projections for each of the metrics identified in Sections III·D·1·(a)-(c) above and covering a period of three full calendar years.  Projections for the remainder of the then-current calendar year will be on a monthly basis.  Projections for the three succeeding calendar years will be on the same periodic basis as Clear Channel uses for its regular internal forecasting process.

      3.     Clear Channel agrees that it shall provide to the Outdoor Board (and the Committee if the Committee so desires) an annual presentation on Clear Channel's

capital structure status and outlook/financing plan, with quarterly updates if requested by the Outdoor Board or the Committee.

4.      Clear Channel covenants and agrees that if at any time after the delivery of the Monthly Report described in Section III·D·1 above, an event, circumstance or discovery were to occur (or is reasonably likely to occur) such that the previously-projected balances of the Note or Clear Channel Liquidity were to no longer be accurate in any material respect, then Clear Channel shall notify the Outdoor Board and the Committee as soon as reasonably practicable (provided that any event or circumstance which would result in the projected Clear Channel Liquidity Ratio being less than 2.0x or the projected Outdoor Public Share exceeding $114.0 million will require notification even if not material) (such notice to be deemed a new "Monthly Report").

5.      Clear Channel agrees to calculate the actual Clear Channel Liquidity Ratio on a monthly basis.  If on any date, Clear Channel has reason to know that the actual Clear Channel Liquidity Ratio has fallen below 2.0x (a "Liquidity Event"), then Clear Channel shall notify the Outdoor Board and the Committee as soon as reasonably practicable; provided, however, that for the avoidance of doubt, this provision is not intended to impose upon Clear Channel an affirmative obligation to ascertain the components of the Clear Channel Liquidity Ratio more frequently than on a monthly basis in connection with the delivery of the Monthly Reports.

**E.      The Provision of Legal Counsel and Financial Advisors to the Company's Independent Directors in Connection with Transactions Between Clear Channel and the Company.**

21

In connection with any proposed intercompany transaction between Clear Channel and the Company for which the approval of a majority of the Outdoor Board's Independent Directors is sought (including, without limitation, in connection with any transaction as to which approval by the Independent Directors is required by contract or otherwise), Clear Channel shall agree to pay the fees and any expenses related to any independent counsel and/or independent financial advisor whom the Independent Directors in their sole discretion shall choose to retain.

**F.    Implementation of Corporate Governance Measures**

1.    The Corporate Governance Measures shall continue in effect, and may not be repealed, changed, amended, modified, or otherwise altered, provided however that nothing shall preclude any Party from seeking to modify the Corporate Governance Measures described in Sections III·A-E of this Stipulation by motion under Rule 60(b)(6) of the Rules of the Court of Chancery of the State of Delaware for cause shown; except that the Corporate Governance Measures may be terminated upon: (i) a successful attempt to take the Company private through a transaction in which the only equity holders in the Company, upon completion of the transaction, are affiliates of the Company, or (ii) the successful completion of an all-shares acquisition by persons or entities unaffiliated with the Company, Clear Channel, or the Sponsors, whether for stock, cash, or other consideration.

2.    The Company, Clear Channel, and the Sponsors  each expressly agrees that: (i) failure to comply with this Section III·F shall subject the Company and its

stockholders to irreparable harm for which the Company and its stockholders could not be adequately compensated at law; and (ii) in order to prevent any breach or continuing breach of this Section III·F, the Company, Clear Channel, and the Sponsors each expressly agrees in connection therewith to be subject to injunctive relief, specific performance, and any and all other forms of appropriate relief, as determined by the Court, without any requirement of a bond or other security.

3.　The Independent Directors shall have sole authority to select and retain such persons as they choose to aid them in implementing the Corporate Governance Measures.

## G.　RELEASES

1.　Upon Final Court Approval, the Plaintiffs, the Company, the SLC (on behalf of the Company), and all Company Stockholders (derivatively on behalf of the Company) shall, by operation of the Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Plaintiff Claims against the Released Defendant Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Defendant Persons with regard to any Released Plaintiff Claims, and (iii) forever be barred and enjoined from asserting any Released Plaintiff Claims against any Released Defendant Persons.　All Parties acknowledge, and all Company Stockholders shall be deemed to acknowledge, the derivative nature of the Claims in the Derivative Action.

2.　Upon Final Court Approval, the Company, the SLC, and the Defendants, by operation of the Judgment and to the fullest extent allowed by law, shall

23

(i) release and be deemed to release and forever discharge the Released Defendant Claims against the Released Plaintiff Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Plaintiff Persons with regard to any Released Defendant Claims, and (iii) forever be barred and enjoined from asserting any Released Defendant Claims against any Released Plaintiff Persons.

3.      The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that he, she, they, or it has been advised by his, her, their, or its attorney concerning, and/or is familiar with, the provisions of California Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

4.      The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge: (i) that he, she, they, or it may hereafter discover facts in addition to those that he, she, they, or it now knows or believes to be true with respect to the Derivative Action and the Released Plaintiff Claims and Released Defendant Claims, as applicable; and (ii) that he, she, they, or it may have sustained damages, losses, fees, costs and/or expenses that are presently unknown and unsuspected with respect to Released Plaintiff Claims and Released Defendant Claims, as applicable, and that such damages, losses, fees, costs and/or expenses as the Plaintiffs, the Company, the Defendants, the SLC, and any Company

24

Stockholders may have sustained might give rise to additional damages, losses, fees, costs and/or expenses in the future.  Nevertheless, the Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that this Stipulation has been negotiated and agreed upon in light of such possible unknown facts and such possible damages, losses, fees, costs and/or expenses, and each expressly waives, or shall be deemed to have waived, any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.  The Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to have acknowledged, that this waiver was separately bargained for and is a material term of this Stipulation.

### H.    Dismissal of the Derivative Action

The parties shall seek dismissal of the Derivative Action, pursuant to Court of Chancery Rule 23.1, with prejudice on the merits, and entry of a Judgment substantially in the form attached as Exhibit F to this Stipulation.

## IV.    <u>PROCEDURE FOR APPROVAL</u>

A.    Within one (1) business day after executing this Stipulation, the Parties shall inform the Court of this Stipulation and request the entry of the Scheduling Order substantially in the form attached hereto as Exhibit A.

B.    Within fourteen (14) calendar days after the date that the Scheduling Order is entered by the Court, but in any event no later than forty-five (45) calendar days before the Settlement Hearing (the "Notice Date"), the Company shall mail, or cause to be

mailed, by first Class U.S. mail, postage prepaid, the Notice, substantially in the form attached hereto as Exhibit B, to Company Stockholders at their last known address as shown on the records maintained by or on behalf of the Company.   All Company Stockholders who are record holders of Company common stock on behalf of beneficial owners shall be directed to forward the Notice promptly to the beneficial owners of those securities.

C.      On the Notice Date, the Company shall cause the Notice to be posted on the Company website and shall file with the U.S. Securities and Exchange Commission a form 8-K attaching this Stipulation and all Exhibits hereto, and within ten (10) calendar days after the Notice Date shall publish the Summary Notice (substantially in the form attached hereto as Exhibit C) via a national newswire service such as Business Wire, Marketwire, or PR Newswire.   On the Notice Date, Counsel for the Plaintiffs shall cause the Notice to be posted on the websites for Counsel for the Plaintiffs.

D.      All costs related to providing notice of the Settlement (other than posting the Notice on the website of Counsel for the Plaintiffs) ("Notice Costs") shall be paid by the Company regardless of whether the Court declines to approve the Settlement or Final Court Approval otherwise fails to occur, and in no event shall the Plaintiffs or Counsel for the Plaintiffs be responsible for any such Notice Costs.

E.      If the Settlement is approved by the Court, the parties shall request that the Court enter the Judgment, substantially in the form attached as Exhibit F to this Stipulation.

## V.      <u>TERMINATION</u>

A.      The Plaintiffs (provided they unanimously agree), Defendants (provided they unanimously agree), and the SLC (acting for and on behalf of the Company), shall each have the right to terminate the Settlement and this Stipulation by providing written notice of their election to do so ("Termination Notice") to the other parties to this Stipulation within thirty (30) calendar days of: (a) the Court's declining to enter the Scheduling Order in any material respect; (b) the Court's refusal to approve this Stipulation or any part of it that materially affects any Party's rights or obligations hereunder; (c) the Court's declining to enter the Judgment in any material respect; or (d) the date upon which the Judgment is modified or reversed in any material respect by an appellate court.

B.      The MOU and this Stipulation shall be null and void and of no force and effect, if (i) the proposed Settlement is terminated pursuant to the terms of this Stipulation, or (ii) the proposed Settlement does not obtain Final Court Approval for any other reason.  If the proposed Settlement is terminated pursuant to the terms of this Stipulation, or the proposed Settlement does not obtain Final Court approval for any other reason, the MOU and this Stipulation shall not be deemed to prejudice in any way the respective positions of the SLC (acting for and on behalf of Outdoor, with the full power and authority delegated to it by the Outdoor Board), the Plaintiffs, or any Defendant with respect to the Derivative Action or any other action.

## VI.    NO ADMISSION OF LIABILITY

The provisions contained in this Stipulation shall not be deemed a presumption, concession, or admission by any Party of any fault, liability or wrongdoing with respect

27

to, or of any infirmity or weakness of, any claim or defense as to any facts or claims that have been or might be alleged or asserted in the Derivative Action (including any facts or claims identified by the SLC in the course of its investigation), or any other action or proceeding that has been, will be, or could be brought, or that the consideration provided under the Settlement represents the consideration that could be or would have been recovered at trial, and shall not be interpreted, construed, deemed, invoked, offered, or received in evidence or otherwise used by any person in the Derivative Action, or in any other action or proceeding, whether civil, criminal, administrative, for any purpose, except in connection with any claim for breach of this Stipulation and damages flowing therefrom to Outdoor, the Defendants, the Plaintiffs, or Counsel for the Plaintiffs.

## VII.    **RELATED ACTIONS**

If any action is currently pending or is later filed in state or federal court asserting any of the Released Plaintiff Claims prior to Final Court Approval of the proposed Settlement, Counsel for the Plaintiffs and Counsel for the SLC shall use best efforts in working with Counsel for the Defendants to prevent, stay, or seek the dismissal of such derivative claims, and to oppose entry of any interim or final relief in favor of plaintiff in any other action in any other forum against any of the Defendants that challenges the proposed Settlement or otherwise involves any of the Released Plaintiff Claims.  In the event that any final injunction, decision, order, judgment, determination or decree is entered or issued by any court or governmental entity prior to Final Court Approval of the proposed Settlement that would make consummation of the Settlement in accordance with the terms of this Stipulation unlawful, or that would restrain, prevent, enjoin, or

28

otherwise prohibit consummation of the Settlement, the Defendants reserve the right to withdraw from this Stipulation.  In addition, in the event that any preliminary or temporary injunction, decision, order, determination, or decree (an "Interim Order") is entered or issued by any court or governmental entity prior to Final Court Approval of the proposed Settlement that would restrain, prevent, enjoin, or otherwise prohibit consummation of the Settlement, then, notwithstanding anything herein to the contrary, the Defendants shall have no obligation to consummate the Settlement unless and until such Interim Order expires or is terminated or modified in a manner such that consummation of the Settlement would no longer be restrained, prevented, enjoined, or otherwise prohibited.

## VIII.  <u>ATTORNEYS' FEES</u>

    **A.**    Concurrent with seeking final approval of the Settlement, Counsel for the Plaintiffs intend to apply to the Court for an award of attorneys' fees and expenses (the "Fee Application"), which shall seek no more than six million dollars ($6,000,000.00). Counsel for the Plaintiffs shall not seek fees or expenses from the Court in excess of six million dollars ($6,000,000.00), and Defendants shall take no position on the amount of the Fee Application (provided it complies with this Stipulation).  Clear Channel and the SLC (acting for and on behalf of the Company) acknowledge Counsel for the Plaintiffs' right to an award of fees and expenses as a result of their prosecution of the Derivative Action.

    **B.**    To the extent Counsel for the Plaintiffs are awarded attorneys' fees and expenses by Court order, payment shall be made by Clear Channel to Counsel for the

Plaintiffs within five (5) business days after the later of this Court's entry of (i) the Judgment or (ii) an order awarding such attorneys' fees and expenses ("Fee and Expense Order"), notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof, subject to the obligation of Counsel for the Plaintiffs to refund up to the full amount of fees and expenses if either the Judgment or the Fee and Expense Order is reversed or modified by final, non-appealable order, but only to the extent required by such reversal or modification.

C.      The full amount of fees and expenses awarded to Counsel for the Plaintiffs pursuant to the Fee and Expense Order, if any, shall be paid by Clear Channel (including with respect to matters agreed to by, and under the sole control of, the Company (*e.g.*, the establishment of the Committee and the powers granted to it pursuant to the charter)), and neither the Company nor any Defendant other than Clear Channel shall have any responsibility for payment of any such fees and expenses to Counsel for the Plaintiffs.

D.      This Stipulation and the Settlement are not conditioned upon the approval of an award of attorneys' fees and expenses, and any decision by the Court to not approve the requested amount of attorneys' fees and expenses shall not affect the validity of the Stipulation and the Settlement.

E.      Except as provided in Sections IV·D and VIII·A-C of this Stipulation, neither the Plaintiffs nor Counsel for the Plaintiffs shall seek any fees, expenses, costs, or compensation relating to the Derivative Action, and neither the Company nor the

Defendants shall bear any expenses, costs, damages, or fees alleged or incurred by the Plaintiffs or by any of their attorneys, experts, advisors, agents, or representatives.

## IX.   MISCELLANEOUS PROVISIONS

A.   The Exhibits hereto are material and integral parts hereof and are fully incorporated herein by reference.  Notwithstanding the foregoing, in the event that there exists a conflict or inconsistency between the terms of this Stipulation and the terms of any Exhibit hereto, the terms of the Stipulation shall prevail.

B.   The Parties agree that in the event of any breach of this Stipulation, all of the Parties' rights and remedies at law, equity, or otherwise are expressly preserved.

C.   This Stipulation may be executed in one or more counterparts, each of which shall be deemed an original and, when taken together with the other signed counterparts, shall constitute one and the same instrument.  Facsimile or PDF signatures shall constitute valid evidence of execution.  This Stipulation shall be deemed to be executed as of the date that all Counsel for the Parties have executed a counterpart, even though no single counterpart is executed by all Counsel for the Parties.

D.   This Stipulation and the Exhibits attached hereto constitute the entire agreement among the Parties and no representations, warranties, or inducements have been made to any Party concerning the Stipulation or its Exhibits other than the representations, warranties and covenants contained and memorialized in this Stipulation or its Exhibits.

E.   The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

31

**F.**     The consummation of this Settlement as embodied in this Stipulation shall be under the authority of the Court, and the Court shall retain jurisdiction over all matters relating to the administration, enforcement, and consummation of the Settlement including, without limitation, any matters relating to an award of attorneys' fees and expenses to Counsel for the Plaintiffs.

**G.**     Each Party acknowledges that he, she, they, or it have been advised by counsel in connection with this Stipulation.

**H.**     This Stipulation may be amended or any of its provisions waived only by a writing executed by all signatories hereto.

**I.**     In the event that any dispute arises among or between the Parties regarding the interpretation of this Stipulation, or any provision thereof, the Parties acknowledge and agree that all of the Parties shall be deemed collectively to be the drafting party and any rule of construction pursuant to which ambiguities are construed against the drafting party shall not be applicable.

**J.**     Waiver by any Party of any breach of this Stipulation by any other Party shall not be deemed a waiver of any other prior or subsequent breach of this Stipulation, and failure by any Party to assert any claim for breach of this Stipulation shall not be deemed to be a waiver as to that or any other breach and will not preclude any Party from seeking to remedy a breach and enforce the terms of this Stipulation.

**K.**     Any failure by any Party to insist upon the strict performance by any other Party of any of the provisions of this Stipulation shall not be deemed a waiver of any of the provisions of this Stipulation, and such Party, notwithstanding such failure, shall have

the right thereafter to insist upon the strict performance of any and all of the provisions of this Stipulation to be performed by such other Party.  Waiver by any Party of any breach of this Stipulation by any other Party shall not be deemed a waiver of any other prior or subsequent breach of this Stipulation, and failure by any Party to assert any claim for breach of this Stipulation shall not be deemed to be a waiver as to that or any other breach and will not preclude any Party from seeking to remedy a breach and enforce the terms of this Stipulation.

**L.** The Plaintiffs and Counsel for the Plaintiffs represent and warrant that the Plaintiffs are each stockholders of the Company and were stockholders of the Company at all relevant times for purposes of maintaining standing in the Derivative Action.

**M.** Each counsel or other person executing this Stipulation on behalf of any Party hereto warrants that he or she has the full authority to bind his or her principal to this Stipulation.

**N.** The Stipulation shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties.

**O.** The Stipulation shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to conflict of laws principles.  Any action relating to this Stipulation will be filed exclusively in the Court.  Each Party: (i) consents to personal jurisdiction in such action (but no other action) brought in the Court; (ii) consents to service of process by registered mail upon such Party and/or such Party's agent; (iii) waives any objection to venue in the Court and any claim that Delaware or the

Court is an inconvenient forum; and (iv) waives any right to demand a jury trial as to such action (but no other action).

P.    In addition to the actions specifically provided for in this Stipulation, the Parties will use their best efforts from the date of this Stipulation to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper, or advisable under applicable laws, regulations or agreements to consummate and make effective this Stipulation.  Counsel for the Parties agree to cooperate fully with one another in seeking the Court's approval of this Stipulation and to use their best efforts to effect the consummation of this Stipulation.  Without further order of the Court, the Parties may agree to reasonable extensions of time not expressly set by the Court in order to carry out any of the provisions of this Stipulation.

Q.    Each Party hereto represents and warrants that he, she, or it is the legal owner of all rights and claims attributable to him, her, or it that are the subject matter of this Stipulation and that there has been no assignment, hypothecation, or transfer by operation of law or otherwise of any such rights and claims.

DATED: July 8, 2013

**GRANT & EISENHOFER  P.A.**

OF COUNSEL:

Mark Lebovitch
Jeremy Friedman
**Bernstein Litowitz Berger
 & Grossmann LLP**
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Robert D. Klausner
**Klausner, Kaufman, Jensen
 & Levinson**
10059 Northwest 1st Court
Plantation, FL 33324
(954) 916-1202

*Attorneys for Plaintiff City of Pinellas
Park Firefighters Pension Board*

Joseph E. White, III
Jonathan M. Stein
Lester R. Hooker
**SAXENA WHITE, P.A.**
2424 North Federal Hwy. Suite 257
Boca Raton, Florida 33431
(561) 394-3399

*Attorneys for Plaintiff NECA-IBEW
Pension Trust Fund*

By:   *Michael J. Barry*
    Stuart M. Grant (#2526)
    Michael J. Barry (#4368)
    Nathan A. Cook (#4841)
    123 Justison Street
    Wilmington, DE 19801
    (302) 622-7000

*Attorneys for Plaintiffs City of Pinellas Park
Firefighters Pension Board and NECA-IBEW
Pension Trust Fund*

35

**POTTER ANDERSON & CORROON LLP**

OF COUNSEL:

Michael Chertoff
Elaine W. Stone
**COVINGTON & BURLING, LLP**
1201 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 662-6000

Jonathan M. Sperling
**COVINGTON & BURLING, LLP**
The New York Times Building
New York, NY  10018
(212) 841-1000

By:___*Michael A. Pittenger*_____
   Donald J. Wolfe, Jr. (#285)
   Michael A. Pittenger (#3212)
   Berton W. Ashman, Jr. (#4681)
   Samuel L. Closic (#5468)
   Hercules Plaza – 6th Floor
   1313 North Market
   P.O. Box 951
   Wilmington, DE  19899
   (302) 984-6000

*Attorneys for the Special Litigation Committee
of the Board of Directors of Clear Channel
Outdoor Holdings, Inc. (acting for and on
behalf of Nominal Defendant Clear Channel
Outdoor Holdings, Inc.)*

**ASHBY & GEDDES**

By:___*Philip Trainer, Jr.*_____
   Philip Trainer, Jr. (#2788)
   Toni-Ann Platia (#5051)
   500 Delaware Avenue, 8th Floor
   P.O. Box 1150
   Wilmington, DE  19899
   (302) 654-1888

*Attorneys for Defendants Douglas L. Jacobs
and Christopher M. Temple*

SEITZ ROSS ARONSTAM & MORITZ LLP

OF COUNSEL:

Kevin B. Huff
Brendan J. Crimmins
**KELLOGG, HUBER, HANSEN,
  TODD, EVANS & FIGEL, P.L.L.C.**
1615 m Street, N.W., Suite 400
Washington, D.C.  20036
(202) 326-7900

*Attorneys for Defendants Margaret W.
Covell, Blair E. Hendrix, Daniel G.
Jones, Mark P. Mays, Randall T. Mays,
Scott R. Wells, James C. Carlisle, Clear
Channel Communications, Inc., Bain
Capital Partners, LLC, and Thomas H.
Lee Partners, L.P.*

Barry G. Sher
Jodi Kleinick
**PAUL HASTINGS LLP**
75 East 55th Street
New York, NY  10022
(212) 318-6000

*Attorneys for Defendant Robert Pittman*

By:   *Collins J. Seitz, Jr.*
    Collins J. Seitz, Jr. (#2237)
    David E. Ross (#5228)
    S. Michael Sirkin (#5389)
    100 S. West Street, Suite 400
    Wilmington, DE  19801
    (302) 576-1600

*Attorneys for Defendants Margaret W.
Covell, Blair E. Hendrix, Daniel G. Jones,
Mark P. Mays, Randall T. Mays, Robert
Pittman, Scott R. Wells, James C. Carlisle,
Clear Channel Communications, Inc., Bain
Capital Partners, LLC, and Thomas H. Lee
Partners, L.P.*

**BOUCHARD MARGULES & FRIEDLANDER, P.A.**


By:  *Andre G. Bouchard*
    Andre G. Bouchard (#2504)
    222 Delaware Avenue, Suite 1400
    Wilmington, DE  19801
    (302) 573-3500

*Attorneys for Defendants Thomas R. Shepherd, Marsha M. Shields, and Dale W. Tremblay*

1100318

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July, 2013, a true and correct copy of the foregoing was served by *LexisNexis File & Serve* on the following:

Jay W. Eisenhofer, Esquire
Michael J. Barry, Esquire
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE  19801

Collins J. Seitz, Jr., Esquire
David E. Ross, Esquire
SEITZ ROSS ARONSTAM & MORITZ LLP
100 West Street, Suite 400
Wilmington, DE  19801

Philip Trainer, Jr., Esquire
Toni-Ann Platia, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE  19801

Andre G. Bouchard, Esquire
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801

/s/  *Samuel L. Closic*
Samuel L. Closic (I.D. No. 5468)

**EXHIBIT A**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR | ) | CONSOLIDATED |
| HOLDINGS, INC. DERIVATIVE | ) | |
| LITIGATION | ) | C.A. No. 7315-CS |

## <u>SCHEDULING ORDER</u>

The parties to the above-captioned derivative action (the "Derivative Action"), and the Special Litigation Committee of the Board of Directors of Clear Channel Outdoor Holdings, Inc. (acting for and on behalf of nominal defendant Clear Channel Outdoor Holdings, Inc.) (collectively, the "Parties"), having applied pursuant to Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware for an Order to approve the proposed settlement of the Derivative Action (the "Settlement") in accordance with the Stipulation of Settlement entered into by the Parties, dated as of July 8, 2013 (the "Stipulation"), which provides for the dismissal of the Derivative Action with prejudice upon the terms and conditions set forth in the Stipulation; the Court having read and considered the Stipulation and accompanying documents; the Stipulation being sufficient to warrant notice to Company Stockholders; and all Parties having consented to entry of this Order,

**NOW, THEREFORE,** this ___ day of July, 2013, upon application of the Parties, **IT IS HEREBY ORDERED** as follows:

1.      Except for terms otherwise defined herein, the Court adopts and incorporates the definitions in the Stipulation for purposes of this Order.

2.      A hearing (the "Settlement Hearing") shall be held before The Honorable Leo E. Strine, Jr., Chancellor, on _____ at __ :__ _.m., at the New Castle County Courthouse, 500 North King Street, Wilmington, Delaware 19801, to:

    a.      determine whether Plaintiffs and Counsel for the Plaintiffs have adequately represented the interests of Outdoor and its stockholders;

    b.      determine whether the Settlement should be approved by the Court as fair, reasonable, adequate, and in the best interests of Outdoor and its stockholders;

    c.      determine whether the Judgment, substantially in the form attached as Exhibit F to the Stipulation, should be entered by the Court dismissing the Derivative Action with prejudice, and releasing, barring, and enjoining the prosecution of any Released Plaintiff Claims against the Released Defendant Persons and any Released Defendant Claims against the Released Plaintiff Persons;

    d.      consider the application by Counsel for the Plaintiffs for an award

of attorneys' fees and expenses; and

  e.  hear and determine any objections to the Settlement and/or Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses;

  f.  rule on such other matters as the Court may deem appropriate.

3. The Court reserves the right to adjourn and reconvene the Settlement Hearing, including consideration of Counsel for the Plaintiffs' application for an award of attorneys' fees, costs, and/or expenses, without further notice to Company Stockholders other than by announcement at the Settlement Hearing.

4. The Court reserves the right to approve the Settlement at or after the Settlement Hearing with such modification as may be consented to by the Parties to the Stipulation and without further notice to Company Stockholders.

5. Within fourteen (14) calendar days after the date of entry of this Order, but in any event no later than forty-five (45) calendar days before the Settlement Hearing (the "Notice Date"), the Company shall mail, or cause to be mailed, by first Class U.S. mail, postage prepaid, the Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing, and Right to Appear (the "Notice"), substantially in the form attached to the Stipulation as Exhibit B, to Company Stockholders at their last known address as shown on the stock records maintained by or on behalf of the Company.   All

3

Company Stockholders who are record holders of Company common stock on behalf of beneficial owners are directed to forward the Notice promptly to the beneficial owners of those securities, as set forth in the Notice.

6.     On the Notice Date, the Company shall cause the Notice to be posted on the Company website, and within ten (10) calendar days of the Notice Date, shall publish the Summary Notice, substantially in the form attached to the Stipulation as Exhibit C, via a national newswire service such as Business Wire, Marketwire, or PR Newswire.  On the Notice Date, Bernstein Litowitz Berger & Grossman LLP, Grant & Eisenhofer P.A., Klausner, Kaufman, Jensen & Levinson, and Saxena White, P.A. shall cause the Notice to be posted on their respective firm websites.

7.     The Court approves the form, content and requirements of the Notice and the Summary Notice and finds that the form and manner of notice specified herein is the best form and manner of notice practicable and shall constitute due and sufficient notice of the Settlement Hearing to all persons entitled to receive such notice, and fully satisfy the requirements of due process, Court of Chancery Rule 23.1, and applicable law.  The Company shall, prior to the date of the Settlement Hearing ordered herein, file proof of the dissemination of the Notice and the Summary Notice as ordered herein.

8.     Other than the cost of posting the Notice on the website of Counsel for the Plaintiffs, all costs related to providing notice of the Settlement ("Notice

Costs") shall be paid by the Company regardless of whether the Court declines to approve the Settlement or Final Court Approval otherwise fails to occur, and in no event shall Plaintiffs or Counsel for the Plaintiffs be responsible for any such Notice Costs.

9.     Any Company Stockholder who continues to own shares of Company common stock as of the date of the Settlement Hearing and who objects to the Stipulation, the Settlement, the Judgment (attached to the Stipulation as Exhibit F) proposed to be entered herein, Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses, or who otherwise wishes to be heard with respect to any matter, may appear in person or through his, her, or its attorney at the Settlement Hearing and present evidence or argument that may be proper and relevant; provided, however, that no such person other than Plaintiffs, the Defendants, the SLC (acting for and on behalf of the Company), and their respective counsel in the Derivative Action shall be heard, and no papers, briefs, pleadings or other documents submitted by any such person other than Plaintiffs, the Defendants, the SLC (acting for and on behalf of the Company), and their respective counsel in the Derivative Action shall be received and considered by the Court unless no later than fourteen (14) calendar days prior to the Settlement Hearing, such person files with the Register in Chancery, the Court of Chancery, 500 North King Street, Wilmington, Delaware, 19801, the following: (i) a written and signed notice of intention to appear that states the name,

address and telephone number of the objector and, if represented, his, her or its counsel; (ii) proof that the objector owned shares of Company common stock as of the date of entry of the Scheduling Order and continues to own such shares; (iii) a written detailed statement of the person's objection to any matter before the Court; and (iv) the specific grounds therefor or the reasons why such person desires to appear and to be heard, as well as all documents and writings which such person desires the Court to consider, including any legal and evidentiary support.  Any such filings with the Court shall also be served simultaneously upon each of the following counsel by hand or overnight delivery such that they are received no later than fourteen (14) calendar days prior to the Settlement Hearing:

> Collins J. Seitz, Jr.
> David E. Ross
> S. Michael Sirkin
> SEITZ ROSS ARONSTAM & MORITZ LLP
> 100 S. West Street, Suite 400
> Wilmington, DE  19801
> (302) 576-1600
>
> *Attorneys for Defendants Margaret W. Covell, Blair E. Hendrix, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Scott R. Wells, James C. Carlisle, Clear Channel Communications, Inc., Bain Capital Partners, LLC, and Thomas H. Lee Partners, L.P.*
>
> Philip Trainer, Jr.
> Toni-Ann Platia
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> P.O. Box 1150
> Wilmington, DE  19899
> (302) 654-1888

*Attorneys for Defendants Douglas L. Jacobs and Christopher M. Temple*

Andre G. Bouchard
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500

*Attorneys for Defendants Thomas R. Shepherd, Marsha M. Shields, and Dale W. Tremblay*

Donald J. Wolfe, Jr.
Michael A. Pittenger
Berton W. Ashman, Jr.
Samuel L. Closic
POTTER ANDERSON & CORROON LLP
Hercules Plaza – 6th Floor
1313 North Market
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000

*Attorneys for the Special Litigation Committee of the Board of Directors of Clear Channel Outdoor Holdings, Inc. (acting for and on behalf of Nominal Defendant Clear Channel Outdoor Holdings, Inc.)*

– and –

Mark Lebovitch
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

Stuart M. Grant
Michael J. Barry
Nathan A. Cook
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801

(302) 622-7000

*Counsel for Plaintiffs*

10.    Unless the Court otherwise directs, any person who fails to object in the manner prescribed above shall be deemed to have waived his, her, or its right to object and shall be forever barred from raising any objection to the Settlement, Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses, or any other matter related to the Settlement in the Derivative Action or any other action or proceeding.

11.    Counsel for the Parties are directed to promptly furnish each other with copies of any and all objections or other stockholder correspondence related to the Settlement and/or the Settlement Hearing that might come into their possession unless it appears that such correspondence has already been received by the other counsel.

12.    All briefs in support of the approval of the Settlement and/or Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses shall be filed and served no later than twenty-one (21) calendar days before the Settlement Hearing, and reply papers, if any, shall be filed and served no later than seven (7) calendar days before the Settlement Hearing.

13.    All proceedings in the Derivative Action, other than such proceedings as may be necessary to carry out the terms and conditions of the

Settlement, are hereby stayed and suspended until further order of this Court. Pending final determination of whether the Settlement should be approved, Plaintiffs, Counsel for the Plaintiffs, all other Company Stockholders, the Defendants, the Company, and the SLC, or any of them as applicable, are enjoined from filing, commencing, or prosecuting any other lawsuit in any jurisdiction with respect to any Released Plaintiff Claims or Released Defendant Claims.

14.     If the Settlement provided for in the Stipulation shall be approved by the Court following the Settlement Hearing, the Court shall enter an Order and Final Judgment substantially in the form attached to the Stipulation as Exhibit F.

15.     If the Stipulation is terminated pursuant to the terms of the Stipulation or Final Court Approval otherwise fails to occur, then all proceedings in the Derivative Action will revert to their status as of March 27, 2013; no materials created by or received from another Party that were used in, obtained during, or related to settlement discussions shall be admissible for any purpose in any court or tribunal or used in any other capacity, absent consent from the disclosing party; and the MOU and Stipulation shall not be deemed to prejudice in any way the respective positions of the SLC (acting for and on behalf of Outdoor, with the full power and authority delegated to it by the Outdoor Board), the Plaintiffs, or any Defendant with respect to the Derivative Action or any other action.

16.     Whether the Order and Final Judgment becomes Final is not

conditioned upon the approval of an award of attorneys' fees, costs, and/or expenses to Counsel for the Plaintiffs, either at all or in any particular amount, by the Court.

17.    The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

_____

Chancellor

1102521

10

# EXHIBIT B

**EXHIBIT B**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR | ) | CONSOLIDATED |
| HOLDINGS, INC. DERIVATIVE | ) | |
| LITIGATION | ) | C.A. No. 7315-CS |

**NOTICE OF PENDENCY OF DERIVATIVE ACTION, PROPOSED SETTLEMENT OF
DERIVATIVE ACTION, SETTLEMENT HEARING,
AND RIGHT TO APPEAR**

TO:    ALL RECORD AND BENEFICIAL HOLDERS OF SHARES OF THE COMMON STOCK OF CLEAR CHANNEL OUTDOOR HOLDINGS, INC. ("OUTDOOR" OR THE "COMPANY") AS OF THE CLOSE OF BUSINESS ON [INSERT DATE OF SCHEDULING ORDER].  BROKERAGE FIRMS, BANKS, AND/OR OTHER PERSONS OR ENTITIES WHO HELD OUTDOOR COMMON STOCK OF RECORD AS OF THE CLOSE OF BUSINESS ON [INSERT DATE OF SCHEDULING ORDER], WHO ARE NOT THE BENEFICIAL OWNERS OF SUCH STOCK, ARE DIRECTED TO FORWARD THIS NOTICE PROMPTLY TO THE BENEFICIAL OWNERS OF THE STOCK, OR REQUEST THE COMPANY TO DO SO (SEE SECTION AT THE END OF THIS NOTICE ENTITLED "NOTICE TO PERSONS OR ENTITIES HOLDING RECORD OWNERSHIP ON BEHALF OF OTHERS").

The purpose of this Notice is to inform you about: (i) the pendency of the above-captioned shareholder derivative action (the "Derivative Action" or "Action"), which was brought by certain Outdoor stockholders on behalf of and for the benefit of the Company in the Court of Chancery of the State of Delaware (the "Court"); (ii) a proposed settlement of the Derivative Action (the "Settlement"), subject to Court approval, on the terms and conditions set forth in the Stipulation of Settlement executed on July 8, 2013 (the "Stipulation," a full and complete copy of which is attached to this Notice as Exhibit [1]); (iii) the hearing that the Court will hold on _____, 2013 to determine whether to approve the Settlement and to consider Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses; and (iv) current stockholders' rights with respect to the proposed Settlement and Counsel for the Plaintiffs' application for attorneys' fees and expenses.[1]

**PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.
YOUR RIGHTS WILL BE AFFECTED BY THE DERIVATIVE ACTION AND
SETTLEMENT.**

The Stipulation was entered into as of July 8, 2013, between and among: (i) plaintiffs in the Derivative Action, City of Pinellas Park Firefighters Pension Board and NECA-IBEW (together, the "Plaintiffs"); (ii) defendants Clear Channel Communications, Inc. ("Clear

---

[1] All capitalized terms not otherwise defined in this Notice shall have the meaning provided in the Stipulation.

Channel"), Bain Capital Partners, LLC ("Bain"), Thomas H. Lee Partners, L.P. ("THL"), Margaret W. Covell, Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Thomas R. Shepherd, Marsha M. Shields, Christopher M. Temple, Dale W. Tremblay, Scott R. Wells, and James C. Carlisle (collectively, the "Defendants"); and (iii) the Special Litigation Committee of the Board of Directors of Outdoor (acting for and on behalf of nominal defendant Outdoor) (the "SLC" and collectively with Plaintiffs and Defendants, the "Parties"), subject to the approval of the Court pursuant to Delaware Chancery Court Rule 23.1.

| WHAT IS THE PURPOSE OF THIS NOTICE? |
| --- |

1. The purpose of this Notice is to explain the Derivative Action, the terms of the proposed Settlement, and how the proposed Settlement affects Outdoor stockholders' legal rights.

2. In a derivative action, one or more people and/or entities who are current stockholders of a corporation sue on behalf of and for the benefit of the corporation, seeking to enforce the corporation's legal rights.

3. As described more fully in paragraph ___ below, current stockholders have the right to object to the proposed Settlement and the application by Counsel for the Plaintiffs for an award of attorneys' fees and expenses. They have the right to appear and be heard at the Settlement Hearing, which will be held before The Honorable Leo E. Strine, Jr., Chancellor, on _____ at __:_ _ .m., at the New Castle County Courthouse, 500 North King Street, Wilmington, DE 19801. At the Settlement Hearing, the Court will (a) determine whether Plaintiffs and Counsel for the Plaintiffs have adequately represented the interests of Outdoor and its stockholders; (b) determine whether the proposed Settlement should be approved by the Court as fair, reasonable, adequate, and in the best interests of Outdoor and the Company Stockholders; (c) determine whether the Court should enter an Order and Final Judgment, substantially in the form attached as Exhibit F to the Stipulation, dismissing the Derivative Action with prejudice, and releasing, barring, and enjoining the prosecution of any Released Plaintiff Claims against the Released Defendant Persons and any Released Defendant Claims against the Released Plaintiff Persons; (d) consider the application by Counsel for the Plaintiffs for an award of attorneys' fees and expenses; (e) hear and determine any objections to the Settlement and/or Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses; and (f) rule on such other matters as the Court may deem appropriate.

4. The Court has reserved the right to adjourn or continue the Settlement Hearing, including consideration of the application by Counsel for the Plaintiffs for attorneys' fees and expenses, without further notice to you other than by announcement at the Settlement Hearing or any adjournment thereof. The Court has further reserved the right to approve the Settlement, at or after the Settlement Hearing, with such modifications as may be consented to by the Parties and without further notice of any kind.

| WHAT IS THIS CASE ABOUT?  WHAT HAS HAPPENED SO FAR? |
|---|

THE FOLLOWING DESCRIPTION OF THE DERIVATIVE ACTION AND THE SETTLEMENT HAS BEEN PREPARED BY COUNSEL FOR THE PARTIES.  THE COURT HAS MADE NO FINDINGS WITH RESPECT TO SUCH MATTERS, AND THIS NOTICE IS NOT AN EXPRESSION OR STATEMENT BY THE COURT OF FINDINGS OF FACT.

5.      Plaintiffs, who are stockholders of the Company, brought substantially identical actions derivatively on behalf of the Company against Defendants with respect to a 2009 agreement to amend the Revolving Promissory Note, dated as of November 10, 2005, between Clear Channel, as maker, and Outdoor, as payee (as amended by the first amendment dated as of December 23, 2009, and as may be further amended, the "Note").

6.      The derivative actions brought by Plaintiffs were subsequently consolidated into the Derivative Action.   The principal allegations of the Verified Stockholder Derivative Complaint that is the subject of the Derivative Action are, among other things:

a.      that Clear Channel is overleveraged with debt arising from its 2008 $24 billion leveraged buyout arranged by Bain and THL;

b.      that Clear Channel's increased leverage has, in turn, increased its risk of default, thereby making it difficult for Clear Channel to raise capital;

c.      that, in late 2009, to solve its liquidity issues, Clear Channel, as Outdoor's controlling stockholder, forced Outdoor to agree to support and approve a $1 billion unsecured loan in the form of the Note at an unreasonably low interest rate of 9.25%;

d.      that the Note is integrated into the combined cash management systems of Clear Channel and Outdoor pursuant to which Clear Channel sweeps Outdoor's cash accounts on a daily basis into a Clear Channel master account and Clear Channel provides funds to Outdoor on days that Outdoor's disbursements exceed its collections;

e.      that, as part of the cash management system, Outdoor records net amounts "due to" or "due from" Clear Channel on its consolidated balance sheets;

f.      that the Note permits Clear Channel to borrow up to $1 billion from Outdoor, and Clear Channel's borrowings under the Note are unsecured such that Outdoor would be treated as a general unsecured creditor in the event of a Clear Channel bankruptcy;

g.      that the Note was originally due to expire by its own terms on August 10, 2010, and provided for an interest rate equal to the average one-month generic treasury bill rate;

h.      that on December 23, 2009, Clear Channel and Outdoor agreed to extend the Note through December 15, 2017, and to increase the interest rate to an unreasonably

3

low interest rate;

        i.      that Outdoor anticipates the balance on the Note will increase to over $1.0 billion in the next few years;

        j.      that the Note is payable on demand and Outdoor could demand immediate repayment; and

        k.      that Outdoor has unreasonably refused to demand repayment and has instead allowed outstanding indebtedness under the Note to grow to $650 million.

7.      The Plaintiffs asserted derivative claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment, and sought rescission of the Note, termination of the cash management agreement, and attorneys' fees, as appropriate.

8.      In response to the Derivative Action, on April 4, 2012, the Board of Directors of the Company (the "Outdoor Board") established and empowered the SLC to "investigate all matters related to the Litigation, review and evaluate the findings of such investigation" and to "take all actions as the [SLC] deems appropriate and in the best interests of the Corporation with respect thereto, including, without limitation, prosecution, control, and supervision of the Litigation by the Corporation including, if determined to be appropriate, its settlement." The Outdoor Board's resolutions further provide that the SLC's determinations "shall be final and binding upon the Corporation and shall not be subject to review or approval by the [Outdoor] Board" and that the SLC is authorized and empowered "to retain, at the Corporation's expense, any independent advisors that are acceptable to the Special Litigation Committee in its sole discretion, including legal counsel, as it deems necessary or desirable to assist and advise it in connection with the investigation, review, and evaluation of the Litigation"  The SLC is composed of two independent members of the Outdoor Board, Christopher M. Temple and Douglas L. Jacobs, neither of whom was a member of the Outdoor Board at the time of the 2009 Note amendment and extension.

9.      On June 20, 2012, the SLC moved for a six-month stay (the "Stay") of the proceedings in the Derivative Action to facilitate the SLC's review, investigation, and determination with respect to the derivative claims asserted by the Plaintiffs in the Verified Stockholder Derivative Complaint.

10.      On July 10, 2012, the Plaintiffs moved for partial summary judgment, arguing that the Outdoor Board breached its fiduciary duties by refusing to exercise its right to demand repayment and instead continuing to allow the loan to Clear Channel to grow to more than $700 million.

11.      On July 23, 2012, the Court granted the SLC's Stay motion.

12.      The SLC, with the assistance of Counsel for the SLC, engaged in an intensive investigation and evaluation of the derivative claims asserted in the Derivative Action, as well as additional possible claims relating to the subject matter of the Derivative Action identified by the SLC, and that investigation included (i) the collection and review of pertinent hard copy and electronic documents from (a) current and former employees, officers, and directors of each of

Outdoor and Clear Channel, (b) employees of Bain and THL, (c) members of the Special Committee of the Outdoor Board that approved the 2009 transaction (the "2009 Special Committee"), and (d) the 2009 Special Committee's legal and financial advisors; (ii) the interviews, by Counsel for the SLC, of twenty-five witnesses (with SLC members attending and participating in six interviews of current or former members of the Outdoor Board); and (iii) the retention of an economic expert, Dr. Kenneth Lehn, a former Chief Economist of the Securities and Exchange Commission and a Professor at the Katz Graduate School of Business at the University of Pittsburgh, to assist and advise the SLC in its analysis; and (iv) legal analysis of the derivative claims asserted in the Verified Stockholder Derivative Complaint, and of additional possible claims relating to the subject matter of the Derivative Action identified by the SLC.

13.     Pursuant to the authority granted to the SLC in its authorizing resolution, the SLC made the determinations attached as Exhibit A to the Affidavit of Christopher M. Temple, dated July 3, 2013, filed concurrently with the Stipulation.

14.     In December 2012, the SLC (acting for and on behalf of Outdoor and with the full power delegated to it by the Outdoor Board) initiated discussions with certain of the Defendants to explore the prospects of settlement.   The SLC then developed a framework setting forth components of a potential settlement.

15.     Thereafter, the SLC entered into negotiations with Counsel for the Plaintiffs and certain of the Defendants regarding the terms of a potential settlement within the framework developed by the SLC.

16.     The parties to the Derivative Action and the SLC subsequently entered into a binding Memorandum of Understanding dated March 28, 2013 (the "MOU"), reflecting their agreement in principle for the settlement of the Derivative Action between and among the SLC (acting for and on behalf of the Company), the Plaintiffs, and Defendants.  On July 8, 2013, the parties entered into the formal Stipulation of Settlement setting forth the terms of the Settlement.

| WHAT ARE THE TERMS OF THE SETTLEMENT? |
| --- |

17.     Set forth below is a summary of the principal terms of the proposed Settlement of the Derivative Action, as agreed to by the SLC and the parties, subject to the approval of the Court.   The following statements are a summary and reference is made to the Stipulation attached hereto as Exhibit [1] for a full and complete statement of the terms of the proposed Settlement:

a.     **Immediate Draw-Down of Note Balance by the Company**

Not later than ten (10) calendar days after Final Court Approval of the Settlement, the Company will on the same day both (a) notify Clear Channel of its intent to make a demand for repayment of $200 million outstanding under the Note twenty (20) calendar days thereafter (or if that day is not a business day, then the next business day thereafter), and (b) declare a dividend to be paid conditioned on Clear Channel having satisfied such demand.  On the twentieth (20th) calendar day after providing such notice to Clear

Channel (or if that day is not a business day, then the next business day thereafter), Outdoor will demand repayment of $200 million outstanding under the Note.  Clear Channel will satisfy the demand the same day it is made.

b.    **Amendment to Note Interest Rate**

Not later than ten (10) business days after Final Court Approval of the Settlement, the Company and Clear Channel will adopt a Note amendment in substantially the form attached to the Stipulation as Exhibit D.  The Note amendment will change the Contract Rate such that, in the event that (x) the outstanding balance (which shall be calculated on a daily basis) due under the Note exceeds $1.0 billion, the per annum rate of interest applicable to such excess balance (*i.e.*, the amount that exceeds $1.0 billion) will be (only for so long as the outstanding balance due under the Note exceeds $1.0 billion) an amount equal to the Average Yield-to-Maturity for the series of Clear Channel Reference Notes that has the nearest future maturity date or (y) the Clear Channel Liquidity Ratio is less than 2.0x, the per annum rate of interest applicable to the entire balance outstanding under the Note will be (only for so long as the Clear Channel Liquidity Ratio is less than 2.0x) an amount equal to the Average Yield-to-Maturity for the series of Clear Channel Reference Notes that has the nearest future maturity date.  For purposes of determining the Contract Rate, the series of Clear Channel Reference Notes that has the nearest future maturity date shall be determined without regard to any series of Clear Channel Reference Notes that has a maturity date less than 90 calendar days from the date of measurement.  If no trades were reported during the month for the applicable Clear Channel Reference Notes, the Average Yield-to-Maturity from the previous month shall be used.  If no series of Clear Channel Reference Notes that has a maturity date of 90 days or more from the date of measurement continues in existence on the date of measurement, Average Yield to Maturity shall be calculated in the manner described in the three preceding sentences, except that the publicly traded Clear Channel unsecured debt that has the nearest maturity date of 90 days or more from the date of measurement shall be substituted for the Clear Channel Reference Notes.  The Average Yield-to-Maturity shall in no event be less than 6.5%, nor greater than 20%.  Interest will be calculated by Clear Channel on the last day of each month using (x) daily Note balance amounts and (y) (if applicable) the Average Yield-to-Maturity for such month.

The Clear Channel Liquidity Ratio is defined to equal (A) the aggregate of (i) cash and cash equivalents set forth on Clear Channel's balance sheet (not including Unavailable Cash or Outdoor Minority Cash) and (ii) Borrowing Availability (collectively, "Clear Channel Liquidity") divided by (B) the amount that would be payable to non-affiliated holders of the Company's common stock (the "Outdoor Public Share") assuming (1) a demand by the Company of the aggregate amount outstanding under the Note and (2) a simultaneous dividend of the proceeds of such demand to the stockholders of the Company.

Clear Channel Reference Notes is defined as Clear Channel's 5.5% Senior Notes Due 2014, 4.9% Senior Notes Due 2015, 5.5% Senior Notes Due 2016, and 6.875% Senior Debentures due 2018.

c. **Creation of a Committee of Independent Directors of the Outdoor Board to Monitor the Note**

Not later than ten (10) business days after Final Court Approval of the Settlement, the Company will establish a committee of the Board (the "Committee") for the specific purpose of monitoring the Note, composed of all then-serving Independent Directors of the Company, and will adopt a Committee charter in substantially the form attached to the Stipulation as Exhibit E. The Committee will be provided reports on a monthly basis, as described in further detail below, and will have access to independent legal and financial advisors. The Committee charter will provide for the Committee to have the non-exclusive authority (*i.e.*, in addition to the authority of the full Board), if the Committee so desires and believes it to be in the best interests of the Company's stockholders, to demand payments under the Note in the following specified circumstances:

    i.    if the Clear Channel Liquidity Ratio is less than 2.0x on an actual or projected basis, the Committee will be authorized to demand payment up to the full amount outstanding under the Note; or

    ii.    if the Outdoor Public Share is greater than $114.0 million on an actual or projected basis, then the Committee will be authorized to demand payment up to the amount required to reduce the Outdoor Public Share to $85.0 million;

in each such case provided that the Committee simultaneously declares a dividend equal to the amount so demanded, to be paid simultaneously with the amount paid pursuant to the demand.

d. **Reporting Obligations**

    i.    No later than the 16th calendar day of every month (beginning with the month after the month in which the Judgment is entered by the Court), Clear Channel will deliver to the Outdoor Board (and then solely to the Committee after the Committee has been established pursuant to the terms of the Settlement) a report on the status of the Note balance, Clear Channel Liquidity, and the Clear Channel Liquidity Ratio, with each amount calculated as of month's end for the three preceding months and projected as of month's end for the current month and three coming months. If at any time after delivery of any of these reports a circumstance occurs (or is reasonably likely to occur) such that the previously projected balances of the Note or Clear Channel Liquidity were to no longer be accurate in any material respect, then Clear Channel will notify the Outdoor Board and the Committee as soon as reasonably practicable. If any circumstance would result in the projected Clear Channel Liquidity Ratio being less than 2.0x or the projected Outdoor Public Share exceeding $114.0 million, Clear Channel will provide such notification even if not material.

ii.     No later than July 1 of each year, Clear Channel will deliver to the Committee a forecast projecting Note balance, Clear Channel Liquidity, and the Clear Channel Liquidity Ratio.  Projections for the remainder of the then-current calendar year will be on a monthly basis, and projections for the three succeeding years will be on the same periodic basis as Clear Channel uses for its regular internal forecasting process.

iii.    Clear Channel will provide the Outdoor Board (and the Committee if it so desires) an annual presentation on Clear Channel's capital structure status and outlook/financing plan, with quarterly updates if requested by the Outdoor Board or the Committee.

iv.     Clear Channel will calculate the actual Clear Channel Liquidity Ratio on a monthly basis.  If on any date Clear Channel has reason to know that the actual Clear Channel Liquidity Ratio falls below 2.0x, Clear Channel shall notify the Outdoor Board and the Committee as soon as reasonably practicable.  The Stipulation is not intended to impose upon Clear Channel an affirmative obligation to ascertain the components of the Clear Channel Liquidity Ratio more frequently than on a monthly basis in connection with delivery of the previously mentioned monthly reports.

e.     **The Provision of Legal Counsel and Financial Advisors to the Company's Independent Directors in Connection with Transactions Between Clear Channel and the Company.**

In connection with any proposed intercompany transaction between Clear Channel and the Company for which the approval of a majority of the Outdoor Board's Independent Directors is sought (including, without limitation, in connection with any transaction as to which approval by the Independent Directors is required by contract or otherwise), Clear Channel shall agree to pay the fees and any expenses related to any independent counsel and/or independent financial advisor whom the Independent Directors in their sole discretion shall choose to retain.

---

## WHAT ARE THE PARTIES' REASONS FOR THE SETTLEMENT?

18.     Plaintiffs and Counsel for the Plaintiffs thoroughly considered the facts and law underlying the Derivative Action.  While Plaintiffs and Counsel for the Plaintiffs believe that the derivative claims asserted in the Verified Stockholder Derivative Complaint have merit, they also recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Derivative Action and the uncertainty and risk inherent in litigation, the problems of proof, and the potential existence of valid defenses to the derivative claims asserted in the Verified Stockholder Derivative Complaint.  Plaintiffs and Counsel for the Plaintiffs also recognize and acknowledge that that they have no reason to contest the independence of the SLC, and the extent of the SLC's investigation and its determination following such investigation that the derivative claims asserted in the Verified Stockholder Derivative Complaint should be resolved in the manner and upon the terms set forth in the Stipulation.  In

light of the uncertainty and risks of continued litigation and the substantial benefits provided by the proposed Settlement, Plaintiffs and Counsel for the Plaintiffs have determined that the proposed Settlement is fair, reasonable, adequate, and in the best interests of the Company and its stockholders.

19.    The SLC (acting for and on behalf of the Company), in the exercise of its business judgment, has determined that it is in the best interests of the Company and its stockholders that the Derivative Action be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation, and that the terms and conditions are fair, reasonable, and adequate.  The SLC has reached this conclusion only after a comprehensive consideration of the pertinent factual and legal issues surrounding the allegations made in the Verified Stockholder Derivative Complaint, as well as additional possible claims relating to the subject matter of the Derivative Action identified by the SLC, and only after an extensive investigation that spanned more than six months.  In addition, the SLC's determinations were informed by various prudential considerations, including the costs (financial and otherwise) of litigation, the uncertainty and risk inherent in any litigation, the potential disparity between the costs associated with continued litigation and a potential recovery sufficient to justify those costs, the availability of relief through this Settlement that would not be available through litigation, and the possibility that continued litigation would threaten harm to the Company's competitive position, prospects, and reputation and distract the Outdoor Board and senior management from managing the affairs and operations of the Company.

20.    While the Defendants believe that the derivative claims asserted in the Verified Stockholder Derivative Complaint lack merit, they also recognize and acknowledge the following: (i) the expense and length of continued proceedings necessary to defend the Derivative Action; and (ii) the uncertainty and risk inherent in litigation.

---

| WHAT WILL HAPPEN IF THE SETTLEMENT IS APPROVED? WHAT CLAIMS WILL THE SETTLEMENT RELEASE? |
|---|

21.    If the Settlement is approved, the Court will enter a judgment (the "Judgment"). Pursuant to the Judgment, upon Final Court Approval of the Settlement, the Derivative Action will be dismissed with prejudice and the following releases will occur:

**Release of Claims by the Company, the SLC and Plaintiffs**:  the Company, the SLC (on behalf of the Company), the Plaintiffs and all Company Stockholders (derivatively on behalf of the Company) shall, by operation of the Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Plaintiff Claims against the Released Defendant Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Defendant Persons with regard to any Released Plaintiff Claims, and (iii) forever be barred and enjoined from asserting any Released Plaintiff Claims against any Released Defendant Persons.

"Released Plaintiff Claims" means any and all causes of action, claims, damages, and awards, whether equitable, legal, or administrative in nature, whether past or present, suspected or unsuspected, and whether based on federal, state or local law, statute, ordinance,

regulation, contract, common law, or any other source, and including known claims and Unknown Claims ("Claims") that (i) have been asserted in the Derivative Action, or (ii) that could have been asserted in the Derivative Action, or in any other court action or before any court, administrative body, tribunal, arbitration panel, or other adjudicatory body, from the beginning of time to the date of the Stipulation, that are based upon, arise out of, or relate in any way, directly or indirectly, to: (a) the allegations made in, or the subject matter of, the Derivative Action; (b) the matters discussed in Exhibit A to the Affidavit of Christopher M. Temple, dated July 3, 2013, filed concurrently with the Stipulation; (c) the issuance by a subsidiary of the Company of the 9.25% Series A Senior Notes Due 2017 and 9.25% Series B Senior Notes Due 2017 and the use of proceeds thereof (including repayment of the $2.5 billion term loan payable by the Company to Clear Channel and the amendment and extension of the Note in connection therewith) including consummation of the issuance in lieu of any other potential transaction considered; (d) the adoption, approval, or amendment of, or the exercise or non-exercise of rights under, the Note; (e) any potential claims relating to the subject matter of the Derivative Action identified by the SLC in the course of its investigation; and/or (f) the Stipulation (including, without limitation, any and all Claims relating to the negotiation and execution of the Stipulation and any matter referred to herein) or the settlement of the Derivative Action. Notwithstanding the foregoing, Released Plaintiff Claims shall not mean and does not include any claims by the Parties to enforce the terms of the Stipulation.

"Released Defendant Persons" means the Company, all current and former directors of the Company, and all Defendants and any of their respective employers, parent entities, controlling persons, principals, affiliates or subsidiaries and each of their respective past or present officers, directors, partners, stockholders, representatives, employees, attorneys, financial or investment advisors, consultants, accountants, investment bankers, commercial bankers, agents, heirs, executors, trustees, personal representatives, estates, administrators, predecessors, successors, assigns, insurers, and reinsurers.

**Release of Claims by Defendants:** The Company, the SLC, and the Defendants, shall, by operation of the Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Defendant Claims against the Released Plaintiff Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Plaintiff Persons with regard to any Released Defendant Claims, and (iii) forever be barred and enjoined from asserting any Released Defendant Claims against any Released Plaintiff Persons.

"Released Defendant Claims" means any and all Claims that are based upon or arise out of the institution, prosecution or settlement of the claims asserted by Plaintiffs in the Derivative Action. Notwithstanding the foregoing, Released Defendant Claims shall not mean and does not include any claims by the Parties to enforce the terms of the Stipulation.

"Released Plaintiff Persons" means Plaintiffs and Counsel for the Plaintiffs.

"Unknown Claims" means any Released Plaintiff Claims that the Company, the SLC, any Plaintiff or any other Company Stockholder does not know or suspect to exist in his, her or its favor at the time of the release of the Released Defendant Persons, and any Released

Defendant Claims that the Company, the SLC, or any of the Defendants does not know or suspect to exist in his, her or its favor at the time of the release of the Released Plaintiff Persons.

**Waiver of Rights Conferred by California Civil Code Section 1542:**  The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that he, she, they, or it has been advised by his, her, their, or its attorney concerning, and/or is familiar with, the provisions of California Civil Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge: (i) that he, she, they, or it may hereafter discover facts in addition to those that he, she, they, or it now knows or believes to be true with respect to the Derivative Action and the Released Plaintiff Claims and Released Defendant Claims, as applicable; and (ii) that he, she, they, or it may have sustained damages, losses, fees, costs and/or expenses that are presently unknown and unsuspected with respect to Released Plaintiff Claims and Released Defendant Claims, as applicable, and that such damages, losses, fees, costs and/or expenses as the Plaintiffs, the Company, the Defendants, the SLC, and any Company Stockholders may have sustained might give rise to additional damages, losses, fees, costs and/or expenses in the future.  Nevertheless, the Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that the Stipulation has been negotiated and agreed upon in light of such possible unknown facts and such possible damages, losses, fees, costs and/or expenses, and each expressly waives, or shall be deemed to have waived, any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.  The Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to have acknowledged, that this waiver was separately bargained for and is a material term of the Stipulation.

22.     Since the Company will have released the Released Plaintiff Claims against the Released Defendant Persons, upon Final Court Approval, no Company Stockholder will be able to bring another action asserting those claims against those persons on behalf of the Company.

23.     Pending final determination of whether the Settlement should be approved, all proceedings in the Derivative Action, other than such proceedings as may be necessary to carry out the terms and conditions of the Settlement, have been stayed and suspended.  Pending final determination of whether the Settlement should be approved, Plaintiffs, Counsel for the Plaintiffs, all other Company Stockholders, the Defendants, the Company, and the SLC, or any of them as applicable, are enjoined from filing, commencing, or prosecuting any Released Plaintiff Claims or Released Defendant Claims in any other lawsuit in any jurisdiction.

| HOW WILL THE ATTORNEYS BE PAID? |
|---|

24.    Counsel for the Plaintiffs have not received any payment for their services in pursuing the claims asserted in the Derivative Action, nor have Counsel for the Plaintiffs been reimbursed for their out-of-pocket expenses.  Counsel for the Plaintiffs invested their own resources for pursuing the Derivative Action on a contingency basis, meaning they would only recover their expenses and be compensated for their time if they created benefits through the Action.  In light of the risks undertaken in pursuing the Derivative Action on a contingency basis and the benefits created for the Company through the Settlement and the prosecution of the Derivative Action, Counsel for the Plaintiffs intend to apply to the Court for an award of attorneys' fees and expenses.  Counsel for the Plaintiffs shall not seek fees or expenses from the Court in excess of six million dollars ($6,000,000.00), and Defendants shall take no position on the amount of any application for an award of fees and expenses (provided that the application complies with the Stipulation).

25.    Clear Channel and the SLC (acting for and on behalf of the Company) acknowledge Counsel for the Plaintiffs' right to an award of fees and expenses as a result of their prosecution of the Derivative Action.

26.    The Court will determine the amount of any fee and expense award to Counsel for the Plaintiffs (the "Fee and Expense Award").  The full amount of any Fee and Expense Award shall be paid by Clear Channel to Counsel for the Plaintiffs in accordance with the terms of the Stipulation and neither the Company nor any Defendant other than Clear Channel shall have any responsibility for payment of any such fees and expenses.

| WHEN AND WHERE WILL THE SETTLEMENT HEARING BE HELD?  DO I HAVE THE RIGHT TO APPEAR AT THE SETTLEMENT HEARING? |
|---|

27.    The Court will consider the Settlement and all matters related to the Settlement at the Settlement Hearing.  The Settlement Hearing will be held before The Honorable Leo E. Strine, Jr., Chancellor, on _____ at __:_ _ .m., at the New Castle County Courthouse, 500 North King Street, Wilmington, DE 19801.  At the Settlement Hearing, the Court will (a) determine whether Plaintiffs and Counsel for the Plaintiffs have adequately represented the interests of Outdoor and its stockholders; (b) determine whether the proposed Settlement should be approved by the Court as fair, reasonable, adequate, and in the best interests of Outdoor and the Company Stockholders; (c) determine whether the Court should enter an Order and Final Judgment, substantially in the form attached as Exhibit F to the Stipulation, dismissing the Derivative Action with prejudice, and releasing, barring, and enjoining the prosecution of any Released Plaintiff Claims against the Released Defendant Persons and any Released Defendant Claims against the Released Plaintiff Persons; (d) consider the application by Counsel for the Plaintiffs for an award of attorneys' fees and expenses; (e) hear and determine any objections to the Settlement and/or Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses; and (f) rule on such other matters as the Court may deem appropriate.

28.     Any Company Stockholder who continues to own shares of Company common stock through _____, 2013, the date of the Settlement Hearing, who objects to the Stipulation, the Settlement, the Judgment, Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses, or who otherwise wishes to be heard with respect to any matter, may appear in person or through his, her, or its attorney at the Settlement Hearing and present any evidence or argument that may be proper and relevant; provided, however, that no such person other than Plaintiffs, the Defendants, the SLC (acting for and on behalf of the Company), and their respective counsel in the Derivative Action shall be heard, and no papers, briefs, pleadings, or other documents submitted by any such person shall be received and considered by the Court unless, no later than _____, 2013, fourteen (14) calendar days prior to the Settlement Hearing, such person files with the Register in Chancery, Court of Chancery, 500 North King Street, Wilmington, DE, 19801, the following: (a) a written and signed notice of intention to appear which states the name, address and telephone number of the objector and, if represented, his, her or its counsel; (b) proof that the objector owned shares of Outdoor stock as of _____, 2013, the date that the Scheduling Order was entered by the Court, and continues to hold such shares; and (c) a written detailed statement of the person's objections to any matter before the Court, and (d) the specific grounds therefor or the reasons why such person desires to appear and to be heard, as well as all documents and writings which such person desires the Court to consider, including any legal and evidentiary support. Any such filings with the Court must also be served upon each of the following counsel (by hand or overnight delivery) such that they are received no later than _____, 2013, fourteen (14) days prior to the Settlement Hearing:

*Counsel for the Plaintiffs:*

Mark Lebovitch
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

-and-

Stuart M. Grant
Michael J. Barry
Nathan A. Cook
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE 19801

*Counsel for Defendants Margaret W. Covell, Blair E.
Hendrix, Daniel G. Jones, Mark P. Mays, Randall T. Mays,
Robert Pittman, Scott R. Wells, James C. Carlisle, Clear
Channel Communications, Inc., Bain Capital Partners, LLC,
<u>and Thomas H. Lee Partners, L.P.</u>:*

Collins J. Seitz, Jr.
David E. Ross
S. Michael Sirkin
SEITZ ROSS ARONSTAM & MORITZ LLP
100 S. West Street, Suite 400
Wilmington, DE  19801

*Counsel for Defendants Douglas L. Jacobs and Christopher
<u>M. Temple</u>:*

Philip Trainer, Jr.
Toni-Ann Platia
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899

*Counsel for Defendants Thomas R. Shepherd, Marsha M.
<u>Shields, and Dale W. Tremblay</u>:*

Andre G. Bouchard
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801

*Counsel for the Special Litigation Committee of the Board of
Directors of Clear Channel Outdoor Holdings, Inc. (acting
for and on behalf of Nominal Defendant Clear Channel
<u>Outdoor Holdings, Inc.</u>):*

Donald J. Wolfe, Jr.
Michael A. Pittenger
Berton W. Ashman, Jr.
Samuel L. Closic
POTTER ANDERSON & CORROON LLP
Hercules Plaza – 6th Floor
1313 North Market
P.O. Box 951
Wilmington, DE  19899

29.     Unless the Court otherwise directs, any person who fails to object in the manner prescribed above shall be deemed to have waived his, her, or its right to object and shall be forever barred from raising any objection to the Settlement or Counsel for the Plaintiffs' application for an award of attorneys' and expenses, or any other matter related to the Settlement, in the Derivative Action or in any other action or proceeding.

30.     All briefs in support of the approval of the Settlement and/or Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses shall be filed and served no later than twenty-one (21) calendar days before the Settlement Hearing, and reply papers, if any, shall be filed and served no later than seven (7) calendar days before the Settlement Hearing.

---

### CAN I SEE THE COURT FILE?  WHOM SHOULD I CONTACT IF I HAVE QUESTIONS?

---

31.     This Notice does not purport to be a comprehensive description of the Derivative Action, the allegations related thereto, the terms of the Settlement, or the Settlement Hearing. For a more detailed statement of the matters involved in the Derivative Action, you may inspect the pleadings, the Stipulation, the Orders entered by the Court, and other papers filed in the Derivative Action at the Office of the Register in Chancery in the Court of Chancery of the State of Delaware, New Castle County Courthouse, 500 N. King Street, Wilmington, DE 19801, during regular business hours of each business day.  A copy of the Stipulation is also attached to this Notice as Exhibit [1].  If you have questions regarding the Settlement, you may write or call the following Plaintiffs' counsel: Mark Lebovitch, Bernstein Litowitz Berger & Grossmann LLP, 1285 Avenue of the Americas, New York, NY 10019, (800) 380-8496, or Michael J. Barry, Grant & Eisenhofer P.A., 123 S. Justison Street, Wilmington, DE 19801, (302) 622-7000.

**DO NOT CALL OR WRITE THE COURT OR THE OFFICE OF
THE REGISTER IN CHANCERY REGARDING THIS NOTICE.**

---

### NOTICE TO PERSONS OR ENTITIES HOLDING RECORD OWNERSHIP ON BEHALF OF OTHERS.

---

32.     Brokerage firms, banks, and other persons or entities who hold shares of Outdoor common stock as record owners, but not as beneficial owners, are directed to either (a) promptly request from Outdoor sufficient copies of this Notice to forward to all such beneficial owners and after receipt of the requested copies promptly forward such Notices to all such beneficial owners; or (b) promptly provide a list of the names and addresses of all such beneficial owners to _____, after which Outdoor will promptly arrange to send copies of the Notice to such beneficial owners.  Copies of this Notice may be obtained by calling Outdoor at _____ or by downloading a copy of the Notice from the Company's website at www._____.com.

Dated: _____, 2013

BY ORDER OF THE COURT OF CHANCERY
OF THE STATE OF DELAWARE

1102575

# EXHIBIT C

**EXHIBIT C**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR | ) | CONSOLIDATED |
| HOLDINGS, INC. DERIVATIVE | ) | |
| LITIGATION | ) | C.A. No. 7315-CS |

**SUMMARY NOTICE OF PENDENCY OF DERIVATIVE ACTION,
PROPOSED SETTLEMENT OF DERIVATIVE ACTION,
<u>SETTLEMENT HEARING, AND RIGHT TO APPEAR</u>**

TO:       ALL RECORD AND BENEFICIAL HOLDERS OF SHARES OF THE COMMON STOCK OF CLEAR CHANNEL OUTDOOR HOLDINGS, INC. ("OUTDOOR" OR THE "COMPANY") AS OF THE CLOSE OF BUSINESS ON [INSERT DATE OF SCHEDULING ORDER].

YOU ARE HEREBY NOTIFIED that the plaintiffs and defendants in the above-captioned derivative lawsuit (the "Derivative Action"), and the Special Litigation Committee of the Board of Directors of Outdoor (the "SLC"), have entered into a proposed settlement of the Derivative Action (the "Settlement").

PLEASE BE FURTHER ADVISED that pursuant to an Order of the Court of Chancery of the State of Delaware (the "Court"), dated _____, 2013 (the "Scheduling Order"), a hearing (the "Settlement Hearing") will be held on _____, 2013, at ___:___ __m., before The Honorable Leo E. Strine, Jr., in the Court of Chancery of the State of Delaware, New Castle County Courthouse, 500 North King Street, Wilmington, DE 19801.  The purpose of the Settlement Hearing is: (a) to determine whether Plaintiffs and Counsel for the Plaintiffs have adequately represented the interests of Outdoor and its stockholders; (b) to determine whether a Stipulation of Settlement dated July 8, 2013 (the "Stipulation"), and the terms and conditions of the Settlement proposed in the Stipulation, are fair, reasonable, adequate and in the best interests of Outdoor and its stockholders; (c) to determine whether the Court should enter an Order and Final Judgment, substantially in the form attached as Exhibit F to the Stipulation, dismissing the Derivative Action with prejudice, and releasing, barring, and enjoining the prosecution of any Released Plaintiff Claims against the Released Defendant Persons and any Released Defendant Claims against the Released Plaintiff Persons; (d) to consider the application by Counsel for the Plaintiffs for an award of attorneys' fees and expenses; (e) hear and determine any objections to the Settlement and/or Counsel for the Plaintiffs' application for an award of attorneys' fees and expenses; and (f) to rule on such other matters as the Court may deem appropriate.

1

The Derivative Action and Settlement address claims alleging that Clear Channel Communications, Inc. ("Clear Channel") and its private-equity sponsors, Bain Capital Partners, LLC and Thomas H. Lee Partners, L.P., breached their fiduciary duties to Outdoor and its stockholders by requiring the Company to agree to amend the terms of the Revolving Promissory Note, dated as of November 10, 2005, between Clear Channel, as maker, and Outdoor, as payee (as amended by the first amendment dated as of December 23, 2009, and as may be further amended, the "Note"), to extend the maturity date of the Note and to amend the interest rate payable on the Note (the "Contract Rate"). According to the derivative complaints, the terms of the amended Note were unfair to Outdoor because, among other things, the Contract Rate was below market. The derivative complaints allege that Clear Channel and its private-equity sponsors were unjustly enriched as a result of the foregoing transaction. The derivative complaints also allege that certain current and former directors of Outdoor and Clear Channel breached their fiduciary duties to Outdoor in connection with the transaction and that the transaction constituted corporate waste. The derivative complaints also allege that the Clear Channel Board of Directors (the "Board") breached its fiduciary duties to Outdoor and its stockholders by refusing to demand repayment of the outstanding balance of the Note despite the contractual right to do so. On April 4, 2012, the Board formed the SLC consisting of independent directors to review and investigate Plaintiffs' derivative claims and determine the course of action that serves the best interest of the Company and its stockholders.

The SLC (acting for and on behalf of the Company), in the exercise of its business judgment, has determined that it is in the best interests of the Company and its stockholders that the Derivative Action be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation, and that the terms and conditions are fair, reasonable, and adequate. The SLC has reached this conclusion only after a comprehensive consideration of the pertinent factual and legal issues surrounding the allegations made in the Verified Stockholder Derivative Complaint, as well as additional possible claims identified by the SLC, and only after an extensive investigation that spanned more than six months. In addition, the SLC's determinations were informed by various prudential considerations, including the costs (financial and otherwise) of litigation, the uncertainty and risk inherent in any litigation, the potential disparity between the costs associated with continued litigation and a potential recovery sufficient to justify those costs, the availability of relief through this Settlement that would not be available through litigation, and the possibility that continued litigation would threaten harm to the Company's reputation and distract the Company's board of directors and senior management from managing the affairs and operations of the Company.

On March 28, 2013, to avoid the costs, disruption, and distraction of further litigation, and without admitting the validity of any allegations made in the derivative complaints, legal counsel for the defendants entered into a binding memorandum of understanding  (the "MOU") with legal counsel for the SLC and the plaintiffs to settle the

Derivative Action.   On July 8, 2013, the parties to the MOU executed the Stipulation reflecting the terms of the MOU and presented such Stipulation to the Court for approval.

The principal terms of the Settlement are as follows:

- Not later than ten (10) calendar days after Final Court Approval, the Company will on the same day both (a) notify Clear Channel of its intent to make a demand for repayment of $200 million outstanding under the Note twenty (20) calendar days thereafter (or if that day is not a business day, then the next business day thereafter), and (b) declare a dividend to be paid the same business day that such demand is made, conditioned on Clear Channel having satisfied such demand.   On the twentieth (20th) calendar day after providing such notice to Clear Channel (or if that day is not a business day, then the next business day thereafter), Outdoor will demand repayment of $200 million outstanding under the Note.   Clear Channel will satisfy the demand the same day it is made.

- Not later than ten (10) business days after Final Court Approval, the Company and Clear Channel will adopt a Note amendment in substantially the form attached to the Stipulation as Exhibit D.   The Note amendment will change the Contract Rate such that, in the event that (x) the outstanding balance (which shall be calculated on a daily basis) due under the Note exceeds $1.0 billion, the per annum rate of interest applicable to such excess balance (i.e., the amount that exceeds $1.0 billion) will be (only for so long as the outstanding balance due under the Note exceeds $1.0 billion) an amount equal to the Average Yield-to-Maturity for the series of Clear Channel Reference Notes that has the nearest future maturity date or (y) the Clear Channel Liquidity Ratio is less than 2.0x, the per annum rate of interest applicable to the entire balance outstanding under the Note will be (only for so long as the Clear Channel Liquidity Ratio is less than 2.0x) an amount equal to the Average Yield-to-Maturity for the series of Clear Channel Reference Notes that has the nearest future maturity date.   For purposes of determining the Contract Rate, the series of Clear Channel Reference Notes that has the nearest future maturity date shall be determined without regard to any series of Clear Channel Reference Notes that has a maturity date less than 90 calendar days from the date of measurement.   If no trades were reported during the month for the applicable Clear Channel Reference Notes, the Average Yield-to-Maturity from the previous month shall be used.   If no series of Clear Channel Reference Notes that has a maturity date of 90 days or more from the date of measurement continues in existence on the date of measurement, Average Yield-to-Maturity shall be calculated in the manner described in the three preceding sentences, except that the publicly traded Clear Channel unsecured debt that has the nearest maturity date of 90 days or more from the date of measurement shall be substituted for the Clear Channel Reference Notes.   The Average Yield-to-Maturity shall in no event be less       than       6.5%,       nor       greater       than       20%.

All capitalized terms in this Notice not otherwise defined herein have the meaning given to them in this Notice and/or in the Stipulation of Settlement in this matter.

- Not later than ten (10) business days after Final Court Approval, the Company will establish a committee of the Board (the "Committee") for the specific purpose of monitoring the Note, composed of all then-serving Independent Directors of the Company, and will adopt a Committee charter in substantially the form attached to the Stipulation as Exhibit E.  The Committee will be provided reports on a monthly and annual basis, and will have access to independent legal and financial advisors.  The Committee charter will provide for the Committee to have the non-exclusive authority (*i.e.*, in addition to the authority of the full Board), if the Committee so desires and believes it to be in the best interests of the Company's stockholders, to demand payments under the Note in the following specified circumstances:

    o if the Clear Channel Liquidity Ratio is less than 2.0x on an actual and projected basis, the Committee will be authorized to demand payment up to the full amount outstanding under the Note; or

    o if the Outdoor Public Share is greater than $114.0 million on an actual or projected basis, then the Committee will be authorized to demand payment up to the amount required to reduce the Outdoor Public Share to $85.0 million;

    in each such case provided that the Committee simultaneously declares a dividend equal to the amount so demanded, to be paid simultaneously with the amount paid pursuant to the demand.

- A comprehensive release from liability arising out of the derivative claims asserted in the Derivative Action.

Before the Settlement Hearing, Counsel for the Plaintiffs intends to apply to the Court for an award of attorneys' fees and expenses.  Clear Channel and the SLC (acting for and on behalf of the Company) acknowledge the right of Counsel for the Plaintiffs to an award of fees and expenses as a result of their prosecution of the Derivative Action. Counsel for the Plaintiffs agree not to seek fees or expenses from the Court in excess of six million dollars ($6,000,000), and Defendants shall take no position on the amount of any application for an award of fees and expenses (provided that the application complies with the Stipulation).

If the Settlement is approved, the Action will be dismissed with prejudice and the Released Persons will be released by Plaintiffs, Defendants, the SLC, the Company, and

Company Stockholders, derivatively on behalf of the Company, as applicable, on the terms and subject to the conditions set forth in the Stipulation.

ANY PERSON THAT OWNED OUTDOOR COMMON STOCK AS OF _____, 2013, THE DATE THAT THE COURT ENTERED THE SCHEDULING ORDER, AND WHO CONTINUES TO OWN SHARES OF OUTDOOR COMMON STOCK THROUGH _____, 2013, THE DATE OF THE SETTLEMENT HEARING, AND WHO WISHES TO OBJECT TO THE SETTLEMENT OR THE APPLICATION FOR FEES AND EXPENSES BY COUNSEL FOR THE PLAINTIFFS, OR ANY OTHER MATTER RELATED TO THE SETTLEMENT, MAY DO SO BY FOLLOWING THE PROCEDURE SET FORTH IN SECTIONS 27-30 OF THE NOTICE OF PENDENCY OF DERIVATIVE ACTION, PROPOSED SETTLEMENT OF DERIVATIVE ACTION, SETTLEMENT HEARING, AND RIGHT TO APPEAR (the "Notice").  The Notice, as well as the Stipulation and the Court's _____, 2013 Scheduling Order, are available on Outdoor's website at _____ and on plaintiffs' counsel's websites at _____.

PLEASE DO NOT CONTACT THE COURT.

Dated:  _____, 2013

BY ORDER OF THE COURT OF CHANCERY
OF THE STATE OF DELAWARE

1102902

# EXHIBIT D

**SECOND AMENDMENT**
**TO**
**REVOLVING PROMISSORY NOTE**

**THIS SECOND AMENDMENT TO REVOLVING PROMISSORY NOTE,** entered into on [__], 2013 (this "*Amendment*"), is made to the Revolving Promissory Note dated November 10, 2005 (as amended by the First Amendment to Revolving Promissory Note entered into on December 23, 2009, the "*First Amended Note*"), executed by Clear Channel Communications, Inc., a Texas corporation ("*Maker*" or "*Clear Channel*"), as maker thereof, payable to the order of Clear Channel Outdoor Holdings, Inc., a Delaware corporation ("*CCOH*" or "*Outdoor*").

*Recitals*. CCOH, as the current legal and equitable owner and holder, and the payee, of the First Amended Note, and Maker desire to amend the First Amended Note to amend the Contract Rate payable on the Note, with such new Contract Rate being applicable as of the date hereof.

**NOW, THEREFORE**, in consideration of the premises, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties hereto, Maker and CCOH agree as follows:

**SECTION 1.** *Definitions*. Capitalized terms used but not defined herein have the meanings assigned in the First Amended Note, and the term "*Note*" when used in this Amendment means the First Amended Note, as further amended hereby.

**SECTION 2.** *Amendments*.

**2.1.** The section titled "Definitions" is hereby modified and amended by adding the following defined terms:

"*Average Yield-to-Maturity*" shall be the sum of the yields to maturity of the last reported trade on each Trading Day during the calendar month of the series of Clear Channel Reference Notes that has the nearest future maturity date, divided by the total number of Trading Days that month.  For purposes of determining the "Contract Rate," the series of Clear Channel Reference Notes that has the nearest future maturity date shall be determined without regard to any series of Clear Channel Reference Notes that has a maturity date less than 90 calendar days from the date of measurement.  If no trades were reported during the month for the applicable Clear Channel Reference Notes, the Average Yield-to-Maturity from the previous month shall be used.  If no series of Clear Channel Reference Notes that has a maturity date of 90 days or more from the date of measurement continues in existence on the date of measurement, Average Yield to Maturity shall be calculated in the manner described in the three preceding sentences, except that the publicly traded Clear Channel unsecured debt that has the nearest maturity date of 90 days or more from the date of measurement shall be substituted for the Clear Channel Reference Notes. Notwithstanding anything to the contrary in this paragraph, the Average Yield-to-Maturity shall in no event be less than 6.5% per annum, nor greater than 20% per annum.

"*Borrowing Availability*" shall mean the aggregate amount of cash that can be borrowed by Clear Channel or any of its wholly-owned subsidiaries under any revolving credit facility, line of credit or similar agreement as of the applicable measurement date; provided that, Borrowing Availability cannot exceed as of the applicable measurement date the amount of cash that Clear Channel would be permitted to borrow under any such facility or agreement pursuant to any other financing agreement to which Clear Channel is a party.

"*Clear Channel Liquidity*" shall be an amount equal to the aggregate of (a) cash and cash equivalents set forth on Clear Channel's balance sheet, excluding Unavailable Cash and Outdoor Minority Cash; and (b) Borrowing Availability.

"*Clear Channel Liquidity Ratio*" shall be an amount equal to (A) Clear Channel Liquidity divided by (B) the Outdoor Public Share.

"***Clear Channel Reference Notes***" shall mean Clear Channel's 5.5% Senior Notes Due 2014, 4.9% Senior Notes Due 2015, 5.5% Senior Notes Due 2016 and 6.875% Senior Debentures Due 2018.

"***Outdoor Minority Cash***" shall mean the cash and cash equivalents on the balance sheet of Outdoor on the date of determination, multiplied by the percentage of shares of Outdoor common stock then held by persons other than Clear Channel and its affiliates.

"***Outdoor Public Share***" shall mean the amount of cash that would be payable to holders of Outdoor common stock, other than Clear Channel or any subsidiary of Clear Channel, assuming (x) a demand by Outdoor of the aggregate amount outstanding under the Note and (y) a simultaneous dividend of the proceeds of such demand to the stockholders of Outdoor.

"***Trading Day***" shall be a day on which the applicable series of Clear Channel Reference Notes was traded, and a yield-to-maturity was recorded for at least one such trade, as reported by FINRA TRACE on Bloomberg LP.

"***Unavailable Cash***" shall mean the amount of cash on Clear Channel's consolidated balance sheet that is "restricted" as determined in accordance with U.S. Generally Accepted Accounting Principles or that is otherwise contractually restricted from being available for general use (e.g., cash pledged as collateral).

    **2.2.**  The term "***Contract Rate***" as defined and used in the First Amended Note is hereby amended and restated in its entirety to read as follows:

    "'***Contract Rate***' means a variable per annum rate of interest (as determined by Clear Channel from time to time and for each applicable period under the Note) equal to the weighted-average interest rate on the (a) outstanding Clear Channel Worldwide Holdings, Inc. 6.50% Series A Senior Notes due 2022 and Clear Channel Worldwide Holdings, Inc. 6.50% Series B Senior Notes due 2022 (collectively, the "CCWH Notes") and (b) any term loans or debt securities issued to refinance a significant portion of the CCWH Notes; provided that, in the event that (x) the outstanding balance due under the Note exceeds $1.0 billion, the per annum rate of interest applicable to such excess balance (i.e., the amount that exceeds $1.0 billion) will be (only for so long as the outstanding balance due under the Note exceeds $1.0 billion) an amount equal to the Average Yield-to-Maturity or (y) the Clear Channel Liquidity Ratio is, on an actual basis, less than 2.0x, the per annum rate of interest applicable to the entire outstanding balance due under the Note (only for so long as the Clear Channel Liquidity Ratio is less than 2.0x) will be an amount equal to the Average Yield-to-Maturity.  Interest will be calculated by Clear Channel as of the last day of each month using (x) daily Note balance amounts and (y) (if applicable) the Average Yield-to-Maturity for such month.  For purposes of clarity, the Contract Rate as of the date hereof is 6.5% per annum."

    **SECTION 3. *Representations and Warranties*.** Maker represents and warrants to CCOH that Maker's representations and warranties set forth in the First Amended Note are true and correct in all material respects as if made on the date hereof and on the effective date hereof, except as they may specifically relate to an earlier date.

    **SECTION 4. *Continuing Effect of First Amended Note*.** The First Amended Note, as further amended hereby, is hereby ratified and confirmed in all respects, and all references to the "Note" in the First Amended Note shall mean the First Amended Note as further amended hereby. This Amendment shall not constitute an amendment of, or waiver with respect to, any provision of the First Amended Note not expressly referred to herein and shall not be construed as an amendment, waiver or consent to any action on the part of any party hereto that would require an amendment, waiver or consent of CCOH except as expressly stated herein.

    **SECTION 5. *Governing Law*.** This Amendment shall be governed by, and construed and interpreted in accordance with, the law of the State of Texas.

    **SECTION 6. *Successors and Assigns*.** This Amendment is binding upon and shall inure to the benefit of Maker and CCOH and their respective successors and assigns permitted by the Note, except Maker may not assign or otherwise transfer any of its rights or obligations hereunder other than as provided in the Note.

    **SECTION 7. *Counterparts*.** This Amendment may be executed in any number of counterparts, and by each party hereto on separate counterparts, each of which counterpart when so executed shall be an original, but all

such counterparts taken together shall constitute one and the same instrument. A counterpart signature page delivered by fax or internet transmission shall be as effective as delivery of an originally executed counterpart.

*[Remainder of Page Left Intentionally Blank]*

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be duly executed and delivered by their respective proper and duly authorized officers on, and effective as of, the date first set forth above.

<u>**MAKER**</u>:

**Clear Channel Communications, Inc.**

_____
Name:
Title:

<u>**PAYEE**</u>:

**Clear Channel Outdoor Holdings, Inc.**

_____
Name:
Title:

# EXHIBIT E

CHARTER OF THE INTERCOMPANY NOTE COMMITTEE
OF THE BOARD OF DIRECTORS
OF CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

**(As of _____, 2013)**

This Intercompany Note Committee Charter (this "**_Charter_**") identifies the purpose, membership, meeting requirements and committee responsibilities of the Intercompany Note Committee (the "**_Committee_**") of the Board of Directors (the "**_Board_**") of Clear Channel Outdoor Holdings, Inc., a Delaware corporation (the "**_Company_**").

**Purpose**

The Committee has been formed for the specific purpose of monitoring the Revolving Promissory Note, dated as of November 10, 2005, as amended, between Clear Channel Communications, Inc. ("Clear Channel"), as maker, and the Company, as payee (as may be further amended from time to time, the "Note").

**Definitions**

All capitalized terms not defined herein have the meaning given to them in the Stipulation of Settlement dated July 8, 2013.

**Membership**

The members of the Committee shall at all times be all then-serving members of the Board who (i) satisfy the then-applicable Independence Tests set forth in the New York Stock Exchange Listed Company Manual, (ii) are not, and have not previously been, employed by (or a partner or member of, or held another analogous position at) Clear Channel, CCMH, Bain, or THL, or their respective affiliates, (iii) are not, and have not previously been, a director of Clear Channel or CCMH (it being understood that service as a director of any other company in which Bain, THL, or any funds managed by or affiliated with either of them has a direct or indirect investment shall not disqualify a director from meeting the qualifications of this paragraph), and (iv) do not have a material financial interest, directly or indirectly, in Clear Channel, CCMH, Bain, or THL, _other than_ an interest in funds managed by or affiliated with Bain or THL that do not have an economic interest in equity securities or debt obligations of Clear Channel or CCMH. Any questions regarding whether a director not previously a member of the Committee meets the qualifications of this paragraph shall be determined by the already-serving members of the Committee.

**Meetings**

Members of the Committee shall designate a Chair of the Committee (the "Chairperson"). The Committee shall meet as necessary to enable it to fulfill its responsibilities. The time, place and notice requirements, if any, of meetings of the Committee shall be determined by the Chairperson. The Committee may meet by telephone conference call or by any other means permitted by law and the Company's Bylaws. A majority of the members of the

Committee shall constitute a quorum. The Committee shall act on the affirmative vote of a majority of members present at a meeting at which a quorum is present. Without a meeting, the Committee may act by unanimous written consent of all members. The Committee shall determine its own rules and procedures, including designation of a chairperson pro tempore, in the absence of the Chairperson, and designation of a secretary. The secretary need not be a member of the Committee and shall attend Committee meetings and prepare minutes. The Committee shall maintain a written record of the Committee's meetings, the Committee members present, and any acts authorized.

The Committee may ask members of management, or others whose advice and counsel are relevant to the issues then being considered by the Committee, to attend any meetings and to provide such pertinent information as the Committee may request.

**Committee Responsibilities and Authority**

For so long as the Note remains outstanding, the Committee shall review, with such frequency as it deems necessary or appropriate, the Monthly Report, the Annual Report, and any other information delivered to it by Clear Channel pursuant to the Stipulation of Settlement dated July 8, 2013.

The Committee shall have the authority to retain, at the Company's cost and expense, independent legal counsel and an independent financial advisor as the Committee shall deem appropriate in order to perform its responsibilities.

If:

A.   the Clear Channel Liquidity Ratio is projected to be less than 2.0x at any time during a Projection Period, then from the date the applicable Monthly Report is provided and for so long as Clear Channel continues to project that the Clear Channel Liquidity Ratio will fall below 2.0x at any time during the Projection Period, then the Committee may, in its discretion, give Notice of Demand (as defined below) if it believes doing so is in the best interests of the Company (up to the full balance outstanding under the Note);

B.   the Company receives notice of a Liquidity Event, then from the date of such notice and for thirty (30) calendar days after each such Liquidity Event, then the Committee may, in its discretion, give Notice of Demand if it believes doing so is in the best interests of the Company (up to the full balance outstanding under the Note);

C.   the Outdoor Public Share is projected (in the applicable Monthly Report) to be greater than $114.0 million at any time during the thirty days after the delivery of the applicable Monthly Report, then from the date such Monthly Report is provided and for so long as Clear Channel continues to project that the Outdoor Public Share will exceed $114.0 million, the Committee may, in its discretion, give Notice of Demand if it believes doing so is in the best interests of the Company (up to the amount required to bring the projected

2

Outdoor Public Share (as set forth in the applicable Monthly Report) down to $85.0 million); or

D.      the Outdoor Public Share is at any time greater than $114.0 million, then the Committee may, in its discretion, give Notice of Demand if it believes doing so is in the best interests of the Company (up to the amount required to bring the Outdoor Public Share down to $85.0 million);

in each such case provided that (a) the Committee  provides no fewer than twenty (20) and no more than thirty (30) calendar days' notice to Clear Channel and the Board that it is exercising its power and authority to make a demand for repayment ("Notice of Demand"); (b) the Company has the right and ability to declare a dividend equal to the amount so demanded; and (c) the Committee simultaneously declares a dividend equal to the amount so demanded, to be paid simultaneously with such repayment.  For the avoidance of doubt, (x) the Committee is hereby authorized on behalf of the Board to make demands and to declare dividends solely upon the terms and conditions set forth herein and (y) the Committee's authority will be in addition to (as opposed to in place of) that of the full Board, which shall continue to have the right and authority to make demands under the Note if it so desires and believes it to be in the best interests of the Company.

1113182

**EXHIBIT F**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR HOLDINGS, INC. DERIVATIVE LITIGATION | ) ) ) | CONSOLIDATED<br><br>C.A. No. 7315-CS |

## ORDER AND FINAL JUDGMENT

A hearing having been held before this Court on _____, pursuant to the Court's Order of _____ (the "Scheduling Order"), upon the Stipulation of Settlement dated July 8, 2013 (the "Stipulation"), entered into in the above-captioned shareholder derivative action (the "Derivative Action"), which is incorporated herein by reference; it appearing that due notice of the hearing has been given in accordance with the Scheduling Order; the parties having appeared by their respective attorneys of record; the Court having heard and considered evidence in support of the proposed Settlement; the attorneys for the respective parties having been heard and an opportunity to be heard having been given to all other persons requesting to be heard in accordance with the Scheduling Order; the Court having determined that notice to Company Stockholders was adequate and sufficient; and the entire matter of the proposed Settlement having been heard and considered by the Court,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** this _____ day of _____, 2013, that:

A.    Unless otherwise defined herein, all defined terms shall have the meaning set forth in the Stipulation and the Scheduling Order.

B.     The Court has jurisdiction over the subject matter of the Derivative Action, and all matters relating to the Settlement of the Derivative Action, as well as personal jurisdiction over all of the Parties and each of the Company Stockholders.

C.     The Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing, and Right to Appear (the "Notice") has been given to Company Stockholders, pursuant to and in the manner directed by the Scheduling Order, proof of (i) mailing of the Notice and of the posting of the Notice on the websites of the Company, Grant & Eisenhofer, P.A., Bernstein Litowitz Berger & Grossman LLP, Klausner, Kaufman, Jensen & Levinson, and Saxena White, P.A.; and (ii) dissemination of the Summary Notice via a national newswire service such as Business Wire, Marketwire, or PR Newswire has been filed with the Court, and full opportunity to be heard has been offered to all Parties and all other persons and entities in interest with respect to all matters related to the Settlement.  The form and manner of the Notice are hereby determined to have been the best form and manner of notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware and due process.

D.     Based on the record in the Derivative Action, each of the provisions of Court of Chancery Rule 23.1 has been satisfied and the Derivative Action has been properly maintained according to the provisions of Court of Chancery Rule 23.1.

E.     Plaintiffs City of Pinellas Park Firefighters Pension Board and NECA-IBEW Pension Trust Fund have held stock in the Company since the time of the conduct

complained of in the Derivative Action, otherwise have standing to prosecute the Derivative Action, and are adequate representatives of all Company Stockholders.

F.    The Stipulation and the Settlement are found to be fair, reasonable, adequate, and in the best interests of Outdoor and Company Stockholders, and are hereby approved pursuant to the Court of Chancery Rule 23.1.  The Parties to the Stipulation are hereby authorized and directed to comply with and to consummate the Settlement in accordance with its terms and provisions, and the Register in Chancery is directed to enter and docket this Order and Final Judgment.

G.    This Order and Final Judgment shall not constitute any evidence, or an admission by any Party herein, that any acts of wrongdoing have been committed by any of the Parties to the Derivative Action and shall not be deemed to create any inference that there is any liability therefor.

H.    This Order and Final Judgment is binding on the Parties and all Company Stockholders, as well as their successors and assigns, and shall have preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of the Parties or Company Stockholders.

I.    The Derivative Action is hereby dismissed on the merits with prejudice as to all Defendants and as to the Company.  The Parties shall bear their own fees, costs, and/or expenses except as provided in Paragraph P below or as otherwise provided in the Stipulation and the Scheduling Order.

J.    Upon Final Court Approval of the Settlement, the Plaintiffs, the Company, the SLC, and all Company Stockholders (derivatively on behalf of the Company) shall,

by operation of this Order and Final Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Plaintiff Claims against the Released Defendant Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Defendant Persons with regard to any Released Plaintiff Claims, and (iii) forever be barred and enjoined from asserting any Released Plaintiff Claims against any Released Defendant Persons.

K.      Upon Final Court Approval of the Settlement, the SLC, the Company, and the Defendants shall, by operation of this Order and Final Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Defendant Claims against the Released Plaintiff Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Plaintiff Persons with regard to any Released Defendant Claims, and (iii) forever be barred and enjoined from asserting any Released Defendant Claims against any Released Plaintiff Persons.

L.      The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that he, she, they, or it has been advised by his, her, their, or its attorney concerning, and/or is familiar with, the provisions of California Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

M.      The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge: (i) that he,

4

she, they, or it may hereafter discover facts in addition to those that he, she, they, or it now knows or believes to be true with respect to the Derivative Action and the Released Plaintiff Claims and Released Defendant Claims, as applicable; and (ii) that he, she, they, or it may have sustained damages, losses, fees, costs and/or expenses that are presently unknown and unsuspected with respect to Released Plaintiff Claims and Released Defendant Claims, as applicable, and that such damages, losses, fees, costs and/or expenses as the Plaintiffs, the Company, the Defendants, the SLC, and any Company Stockholders may have sustained might give rise to additional damages, losses, fees, costs and/or expenses in the future. Nevertheless, the Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that the Stipulation has been negotiated and agreed upon in light of such possible unknown facts and such possible damages, losses, fees, costs and/or expenses, and each expressly waives, or shall be deemed to have waived, any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect. The Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to have acknowledged, that this waiver was separately bargained for and is a material term of the Stipulation.

N.     The Parties are hereby authorized, without further approval from the Court, to agree to adopt such amendments, modifications, and expansions of the Stipulation that are consistent with this Order and Final Judgment and the Stipulation and that do not limit the rights of Plaintiffs, the Defendants, the Company, or the Company's

Stockholders under the Stipulation.  Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

O.      If the Settlement is terminated pursuant to the terms of the Stipulation or Final Court Approval otherwise fails to occur, then this Order and Final Judgment and any related orders entered by the Court shall be treated as vacated, *nunc pro tunc*; the MOU and Stipulation shall be null and void and of no force and effect; and the MOU and Stipulation shall not be deemed to prejudice in any way the respective positions of the SLC (acting for and on behalf of Outdoor, with the full power and authority delegated to it by the Outdoor Board), the Plaintiffs, or any Defendant with respect to the Derivative Action or any other action.

P.      Counsel for the Plaintiffs are awarded attorneys' fees and expenses in the amount of $_____, which sum the Court finds to be fair and reasonable, and which shall be paid to Counsel for the Plaintiffs in accordance with the Stipulation.

Q.      No proceedings or Court order with respect to the award of attorneys' fees, costs, and/or expenses to Counsel for the Plaintiffs shall in any way disturb or affect this Order and Final Judgment (including precluding the Order and Final Judgment from being Final or otherwise being entitled to preclusive effect), and any such proceedings or Court order shall be considered separate from this Order and Final Judgment.

R.     Without affecting the finality of this Judgment in any way, this Court reserves jurisdiction over all matters relating to the administration, consummation and enforcement of the Settlement and this Order and Final Judgment.

_____
                                                    Chancellor

1102881

# Exhibit G

**CHARTER OF THE INTERCOMPANY NOTE COMMITTEE**
**OF THE BOARD OF DIRECTORS**
**OF CLEAR CHANNEL OUTDOOR HOLDINGS, INC.**

**(As of _____, 2013)**

This Intercompany Note Committee Charter (this "***Charter***") identifies the purpose, membership, meeting requirements and committee responsibilities of the Intercompany Note Committee (the "***Committee***") of the Board of Directors (the "***Board***") of Clear Channel Outdoor Holdings, Inc., a Delaware corporation (the "***Company***").

**Purpose**

The Committee has been formed for the specific purpose of monitoring the Revolving Promissory Note, dated as of November 10, 2005, as amended, between Clear Channel Communications, Inc. ("Clear Channel"), as maker, and the Company, as payee (as may be further amended from time to time, the "Note").

**Definitions**

All capitalized terms not defined herein have the meaning given to them in the Stipulation of Settlement dated July 8, 2013.

**Membership**

The members of the Committee shall at all times be all then-serving members of the Board who (i) satisfy the then-applicable Independence Tests set forth in the New York Stock Exchange Listed Company Manual, (ii) are not, and have not previously been, employed by (or a partner or member of, or held another analogous position at) Clear Channel, CCMH, Bain, or THL, or their respective affiliates, (iii) are not, and have not previously been, a director of Clear Channel or CCMH (it being understood that service as a director of any other company in which Bain, THL, or any funds managed by or affiliated with either of them has a direct or indirect investment shall not disqualify a director from meeting the qualifications of this paragraph), and (iv) do not have a material financial interest, directly or indirectly, in Clear Channel, CCMH, Bain, or THL, *other than* an interest in funds managed by or affiliated with Bain or THL that do not have an economic interest in equity securities or debt obligations of Clear Channel or CCMH. Any questions regarding whether a director not previously a member of the Committee meets the qualifications of this paragraph shall be determined by the already-serving members of the Committee.

**Meetings**

Members of the Committee shall designate a Chair of the Committee (the "Chairperson"). The Committee shall meet as necessary to enable it to fulfill its responsibilities. The time, place and notice requirements, if any, of meetings of the Committee shall be determined by the Chairperson. The Committee may meet by telephone conference call or by any other means permitted by law and the Company's Bylaws. A majority of the members of the

Committee shall constitute a quorum. The Committee shall act on the affirmative vote of a majority of members present at a meeting at which a quorum is present. Without a meeting, the Committee may act by unanimous written consent of all members. The Committee shall determine its own rules and procedures, including designation of a chairperson pro tempore, in the absence of the Chairperson, and designation of a secretary. The secretary need not be a member of the Committee and shall attend Committee meetings and prepare minutes. The Committee shall maintain a written record of the Committee's meetings, the Committee members present, and any acts authorized.

The Committee may ask members of management, or others whose advice and counsel are relevant to the issues then being considered by the Committee, to attend any meetings and to provide such pertinent information as the Committee may request.

**Committee Responsibilities and Authority**

For so long as the Note remains outstanding, the Committee shall review, with such frequency as it deems necessary or appropriate, the Monthly Report, the Annual Report, and any other information delivered to it by Clear Channel pursuant to the Stipulation of Settlement dated July 8, 2013.

The Committee shall have the authority to retain, at the Company's cost and expense, independent legal counsel and an independent financial advisor as the Committee shall deem appropriate in order to perform its responsibilities.

If:

A.    the Clear Channel Liquidity Ratio is projected to be less than 2.0x at any time during a Projection Period, then from the date the applicable Monthly Report is provided and for so long as Clear Channel continues to project that the Clear Channel Liquidity Ratio will fall below 2.0x at any time during the Projection Period, then the Committee may, in its discretion, give Notice of Demand (as defined below) if it believes doing so is in the best interests of the Company (up to the full balance outstanding under the Note);

B.    the Company receives notice of a Liquidity Event, then from the date of such notice and for thirty (30) calendar days after each such Liquidity Event, then the Committee may, in its discretion, give Notice of Demand if it believes doing so is in the best interests of the Company (up to the full balance outstanding under the Note);

C.    the Outdoor Public Share is projected (in the applicable Monthly Report) to be greater than $114.0 million at any time during the thirty days after the delivery of the applicable Monthly Report, then from the date such Monthly Report is provided and for so long as Clear Channel continues to project that the Outdoor Public Share will exceed $114.0 million, the Committee may, in its discretion, give Notice of Demand if it believes doing so is in the best interests of the Company (up to the amount required to bring the projected

2

Outdoor Public Share (as set forth in the applicable Monthly Report) down to $85.0 million); or

D.      the Outdoor Public Share is at any time greater than $114.0 million, then the Committee may, in its discretion, give Notice of Demand if it believes doing so is in the best interests of the Company (up to the amount required to bring the Outdoor Public Share down to $85.0 million);

in each such case provided that (a) the Committee  provides no fewer than twenty (20) and no more than thirty (30) calendar days' notice to Clear Channel and the Board that it is exercising its power and authority to make a demand for repayment ("Notice of Demand"); (b) the Company has the right and ability to declare a dividend equal to the amount so demanded; and (c) the Committee simultaneously declares a dividend equal to the amount so demanded, to be paid simultaneously with such repayment.  For the avoidance of doubt, (x) the Committee is hereby authorized on behalf of the Board to make demands and to declare dividends solely upon the terms and conditions set forth herein and (y) the Committee's authority will be in addition to (as opposed to in place of) that of the full Board, which shall continue to have the right and authority to make demands under the Note if it so desires and believes it to be in the best interests of the Company.

1113182

# Exhibit H

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE CLEAR CHANNEL OUTDOOR
HOLDINGS, INC. DERIVATIVE LITIGATION

)    CONSOLIDATED
)
)    C.A. No. 7315-CS

## BRIEF IN SUPPORT OF PROPOSED SETTLEMENT BY THE SPECIAL LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS OF <u>NOMINAL DEFENDANT CLEAR CHANNEL OUTDOOR HOLDINGS, INC.</u>

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
New York, NY 10018-1405
(212) 841-1000

Michael Chertoff
Elaine W. Stone
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-6000

Dated:  August 19, 2013

Donald J. Wolfe, Jr. (#285)
Michael A. Pittenger (#3212)
Berton W. Ashman, Jr. (#4681)
Samuel L. Closic (#5468)
1313 North Market Street
6th Floor, Hercules Plaza
Wilmington, Delaware 19899
(302) 984-6000

*Attorneys for the Special Litigation Committee
of the Board of Directors of Clear Channel
Outdoor Holdings, Inc. (acting for and on
behalf of Nominal Defendant Clear Channel
Outdoor Holdings, Inc.)*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 1

    A.    The Derivative Actions ................................................................................. 1

    B.    The SLC Investigation .................................................................................. 3

        1.    The SLC's Members ........................................................................ 3

            a)    Christopher M. Temple ....................................................... 4

            b)    Douglas L. Jacobs ............................................................... 5

        2.    Scope of the SLC's Investigation ................................................... 6

        3.    Findings of the SLC ........................................................................ 8

    C.    The Settlement ........................................................................................... 15

        1.    Settlement Negotiations ................................................................. 15

        2.    Terms of Settlement ....................................................................... 17

ARGUMENT ....................................................................................................................... 18

    A.    Legal Standards Governing Approval ....................................................... 18

    B.    The Proposed Settlement is Fair and Should Be Approved ....................... 19

        1.    The Decision to Settle is Supported by a Thorough Investigation .......... 19

        2.    The Settlement Confers Substantial Benefits ............................... 21

            a)    The Settlement Reduces the Due-From Note and Vests Authority for Making Certain Future Demands in an Independent Committee ................................................. 21

            b)    The Settlement Increases the Interest Rate on the Due-From Note in Times of Greater Investment Risk ................................. 27

        3.    The Costs of Litigation Would be Substantial, and the Outcome Uncertain ...................................................................................... 28

        4.    All Parties Support the Settlement ................................................ 33

CONCLUSION .................................................................................................................... 33

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americas Mining Corp. v. Theriault*,
   51 A.3d 1213, 1239 (Del. 2012) ........................................................31

*In re Amsted Indus., Inc. Litig.*,
   521 A.2d 1104 (Del. Ch. 1986) .........................................................19

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
   545 A.2d 1171 (Del. 1988) ...........................................................14, 30

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ...................................................................4

*Basic Cap. Mgmt. v. Dynex Com., Inc.*,
   348 S.W.3d 894 (Tex. 2011) .............................................................22

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) ............................................................4, 5

*In re Celera Corp. S'holder Litig.*,
   59 A.3d 418, 433 (Del. 2012) ...........................................................18

*City of Cibolo v. Koehler*,
   2011 WL 5869683 (Tex. Ct. App.) ....................................................22

*In re Cox Radio, Inc. S'holders Litig.*,
   2010 WL 1806616 (Del. Ch.) ............................................................19

*Electra Investment Trust PLC v. Crews*,
   1999 WL 135239 (Del. Ch.) .............................................................18

*Encite LLC v. Soni*,
   2011 WL 5920896 (Del. Ch.) ......................................................14, 31

*Franklin Balance Sheet Inv. Fund v. Crowley*,
   2007 WL 2495018 (Del. Ch.) ............................................................19

*Kahn v. Tremont Corp.*,
   694 A.2d 422 (Del. 1997) .................................................................31

*Katell v. Morgan Stanley Group, Inc.*,
   1995 WL 376952 (Del. Ch.) ...............................................................4

*Lewis v. Hirsch*,
  1994 WL 263551 (Del. Ch.) ....................................................................................18

*In re MAXXAM, Inc.*,
  659 A.2d 760 (Del. Ch. 1995).............................................................................14, 29

*In re Oracle Corp. Deriv. Litig.*,
  824 A.2d 917 (Del. Ch. 2003)...................................................................................6

*PaineWebber R&D Partners v. Centocor, Inc.*,
  1999 WL 160123 (Del. Ch.) ....................................................................................19

*In re Phila. Stock Exch., Inc.*,
  945 A.2d 1123 (Del. 2008) ......................................................................................18

*Polk v. Good*,
  507 A.2d 531 (Del. 1986) ...................................................................................18, 19

*In re: Resorts Int'l S'holders Litig.*,
  1988 WL 92749 (Del. Ch.), *aff'd* 570 A.2d 259 (Del. 1990) ..................................20

*S. Muoio & Co. v. Hallmark Entm't Invs. Co.*,
  2011 WL 863007 (Del. Ch.) ...............................................................................14, 30

*Tractebel Energy Mktg., Inc. v. E.I. Du Pont de Nemours & Co.*,
  118 S.W.3d 60 (Tex. Ct. App. 2003) .......................................................................22

*Weinberger v. UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ...................................................................................29, 30

*Zapata Corp. v. Maldonado*,
  430 A.2d 779 (Del. 1981) ........................................................................................19

iii

## PRELIMINARY STATEMENT

The Special Litigation Committee (the "SLC") of the Board of Directors (the "Outdoor Board") of Nominal Defendant Clear Channel Outdoor Holdings, Inc. ("Outdoor" or the "Company") seeks approval of the proposed settlement in this stockholder derivative action. The settlement follows a thorough, eight-month investigation by the SLC, is the result of extensive arm's-length negotiations, and has the agreement of all parties. It addresses the concerns advanced by Plaintiffs about the financial arrangements between Outdoor and its parent company and controlling stockholder, Clear Channel Communications, Inc. ("Clear Channel"), by providing for an immediate repayment of funds to Outdoor and its stockholders, and governance changes that insulate Outdoor's exercise of its rights under those arrangements against the risk of conflicted judgment. By contrast, the outcome of any litigation—aside from its direct and indirect costs to Outdoor—is uncertain, and in any event could not provide the governance improvements embodied in the settlement. Accordingly, the SLC respectfully requests that the proposed settlement be approved.

## FACTUAL BACKGROUND

### A.   THE DERIVATIVE ACTIONS

On March 7, 2012 and March 23, 2012, stockholders ("Plaintiffs") of Outdoor filed derivative lawsuits in the Delaware Court of Chancery (the "Complaints") against (i) certain current and former members of the Outdoor Board (collectively "the Individual Defendants")[1]; (ii) Outdoor's controlling stockholder, Clear Channel; (iii) Bain Capital Partners, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL") (together "the Sponsors" and, collectively with the

---

[1] The Individual Defendants are Margaret W. Covell, Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Mark P. Mays, Randall T. Mays, Robert Pittman, Thomas P. Shepherd, Marsha M. Shields, Christopher M. Temple, Dale W. Tremblay, Scott R. Wells, and James C. Carlisle.

Individual Defendants and Clear Channel, the "Defendants"), the two private equity firms that took Clear Channel private in July 2008 through a leveraged buyout and indirectly control Clear Channel; and (iv) nominal defendant Outdoor.[2]

The Complaints assert derivative claims for breach of fiduciary duty and waste of corporate assets against the Individual Defendants, and derivative claims for breach of fiduciary duty and unjust enrichment against Clear Channel, Bain, and THL (collectively, the "Derivative Claims"). All of the Derivative Claims arise out of amendments made in December 2009 to a promissory note issued by Clear Channel to Outdoor in 2005. Compl. ¶¶ 78-95.

Plaintiffs allege that, since becoming a public company, Outdoor has loaned money to Clear Channel pursuant to a cash management arrangement under which Outdoor's unspent cash is swept to Clear Channel on a daily basis (the "Cash Management Arrangement"). The loan was evidenced by a promissory note (the "Due-From Note") that was payable on demand and that specified that Clear Channel would pay interest on that cash at the one-month Treasury bill rate. Compl. ¶¶ 37-39. The amount owed under that promissory note grew following the leveraged buyout of Clear Channel by Bain and THL, from $4.2 million at the end of 2006 to $431.6 million at the end of December 2008. Compl. ¶ 48. Plaintiffs allege that a restructuring of Outdoor's debt by the Outdoor Board in 2009 left in place the Cash Management Arrangement, although the interest rate paid on the amount due from Clear Channel to Outdoor was increased to 9.25%. Compl. ¶¶ 50-51. The balance due to Outdoor increased to $656.0 million by the end of 2011. Compl. ¶ 56. The 2009 negotiations, Plaintiffs allege, gave rise to

---

[2] *City of Pinellas Park Firefighters Pension Board v. Covell, et al.*, Del. Ch., C.A. No. 7315-CS was filed on March 7, 2012. *NECA-IBEW Pension Trust Fund v. Mays, et al.*, Del. Ch., C.A. No. 7353-CS was filed on March 23, 2012. The Complaints, which are identical in all material respects, were consolidated as *In re Clear Channel Outdoor Holdings, Inc. Derivative Litigation*, Consolidated Del. Ch., C.A. No. 7315-CS.

the breaches of fiduciary duty by the Individual Defendants and by Clear Channel, Bain, and THL. The Complaints argue in particular that the Cash Management Arrangement is particularly improper given Clear Channel's lowered credit rating in the wake of its leveraged buyout and the possibility that Clear Channel could go bankrupt, leaving Outdoor an unsecured creditor and facing a "liquidity shortfall." Compl. ¶¶ 45-49, 53, 57-58. Plaintiffs further allege that the balance of the Due-From Note is payable to Outdoor on demand. Compl. ¶¶ 7, 63.

### B.   THE SLC INVESTIGATION

On April 4, 2012, the Outdoor Board adopted resolutions (the "Resolutions") establishing the SLC to investigate the facts underlying the Complaints and to determine, in its sole discretion, the course of action that serves the best interests of the Company and its stockholders. (Resolutions to be Considered by the Board of Directors of Clear Channel Outdoor Holdings, Inc. (Apr. 4, 2012), Exhibit A.)[3] The Resolutions delegated to the SLC the authority and power to, among other things, "investigate all matters related to the Litigation" and to "take all actions as the [SLC] deems appropriate," including prosecuting or settling the litigation. (*Id.*) The Resolutions specified that the determinations made by the SLC were to be "final and binding upon the Corporation" and not subject to review by the Outdoor Board. (*Id.*)

#### 1.   *The SLC's Members*

The Resolutions designated as the members of the SLC Christopher M. Temple and Douglas L. Jacobs, neither of whom are members of Outdoor's management, employees of any defendant entity, or members of management or the governing body of any defendant entity. (Affidavit of Christopher M. Temple in Support of Proposed Settlement (the "Temple Settlement

---

[3] All Exhibits referenced herein as "Exhibit __" are exhibits to the transmittal affidavit of Samuel L. Closic (the "Closic Affidavit"), filed contemporaneously herewith.

Affidavit") at ¶ 2, Exhibit B; Affidavit of Douglas L. Jacobs in Support of Proposed Settlement (the "Jacobs Settlement Affidavit") at ¶ 2, Exhibit C; Affidavit of Christopher M. Temple in Support of Motion to Stay (the "Temple Stay Affidavit") at ¶ 2 (June 20, 2012), Exhibit D; Affidavit of Douglas L. Jacobs in Support of Motion to Stay (the "Jacobs Stay Affidavit") at ¶ 2 (July 6, 2012), Exhibit E.)  Although both Mr. Temple and Mr. Jacobs are named as defendants in the derivative litigation, neither was a director when the financial arrangements between Clear Channel and Outdoor were restructured and the Due-From Note was amended in 2009.  (Temple Settlement Affidavit at ¶ 2, Exhibit B; Jacobs Settlement Affidavit at ¶ 2, Exhibit C.)

Both Mr. Temple and Mr. Jacobs are independent, taking account of any "financial ties, familial affinity, a particularly close or intimate personal or business affinity" with any of the defendants, *Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004), any "personal interest in the disputed transactions," *Katell v. Morgan Stanley Group, Inc*., 1995 WL 376952, at *8 (Del. Ch.), or any extraneous consideration or influence on a director's decision other than the corporate merits of the subject, *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984).

### a)  Christopher M. Temple

Mr. Temple has served on the Outdoor Board since May 16, 2011.  (Temple Stay Affidavit at ¶ 2, Exhibit D.)  Mr. Temple holds a B.B.A., *magna cum laude*, from the University of Texas and an M.B.A. from Harvard Business School.  (*Id.* ¶ 3.)  He was previously a licensed certified public accountant serving clients in the energy sector with KPMG in Houston, Texas. (*Id.*)  Mr. Temple is the president of DelTex Capital, LLC, a financial advisory and consulting firm.  (*Id.* ¶ 4.)  He also served as the president of Vulcan Capital, the private investment group of Vulcan Inc.  (*Id.* ¶ 4.)  Mr. Temple has never been an employee of Outdoor or its affiliates. (*Id.* ¶ 2.)

Mr. Temple has a casual personal relationship with John Connaughton, a managing director at Bain and a Clear Channel director.  (Temple Settlement Affidavit at ¶ 3, Exhibit B.)  Mr. Connaughton made the initial recommendation that Mr. Temple be appointed to the Outdoor Board.  (*Id.*)  The two do not socialize frequently, however; they have met for dinner or drinks approximately six times over the course of ten years.  (*Id.*)  This relationship is not close, and does not raise concerns as to Mr. Temple's independence under Delaware law.  *See, e.g.*, *Beam*, 845 A.2d at 1050 ("Allegations of mere personal friendship . . . standing alone, are insufficient to raise a reasonable doubt about a director's independence." (citation omitted)).  Mr. Temple was also on the Board of Directors of Charter Communications (the "Charter Board"), which purchased advertising from Outdoor.  (Temple Settlement Affidavit at ¶ 4, Exhibit B.)  These business transactions, however, do not raise any issues as to Mr. Temple's independence:  Mr. Temple's service on the Charter Board, from November 2009 to January 2011, ended prior to his service on the Outdoor Board; Charter Communications did not receive business from Outdoor but purchased services from Outdoor; and Mr. Temple had no role in the transactions, nor did he derive any personal benefit from them.  (*Id.* ¶¶ 4-5.)

b)      Douglas L. Jacobs

Mr. Jacobs has been a member of the Outdoor Board since May 25, 2010.  (Jacobs Stay Affidavit at ¶ 2, Exhibit E.)  Mr. Jacobs holds a B.A. from Amherst College and an M.B.A. from the Wharton School of Business at the University of Pennsylvania.  (*Id.* ¶ 3.)  He was the executive vice president and treasurer for FleetBoston Financial Group from 1995 to 2003.  (*Id.* ¶ 4.)  Mr. Jacobs currently sits on the boards of three other companies unrelated to the defendants.  (*Id.* ¶ 5.)  He has never been an employee of Outdoor or its affiliates.   (*Id.* ¶ 2.)  Mr. Jacobs was identified for Outdoor Board service as an independent director by a member of Clear Channel

Media Holdings Inc.'s Board of Directors, with whom Mr. Jacobs served on another board. (Jacobs Settlement Affidavit at ¶ 3, Exhibit C.)  Mr. Jacobs does not have relationships with any of the Outdoor Board members outside of his service on the Outdoor Board.  (*Id.* ¶ 3.)  Mr. Jacobs also is a director of Care New England, an organization of Rhode Island hospitals providing uncompensated care to low-income individuals, which purchases radio advertising from Clear Channel.  (*Id.* ¶ 4.)  Here too, however, Care New England does not receive business from Outdoor, and in any event, Mr. Jacobs has no decision-making power over the charity's advertising purchases.  (*Id.* ¶ 5.)

In short, both Mr. Temple and Mr. Jacobs are independent, financially disinterested from the defendants in the derivative litigation and the disputed transactions, lack familial ties or meaningful personal affinities with the defendants, and are fully capable of making a decision only in the best interests of Outdoor.  *See In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003) ("At bottom, the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind." (emphasis in original)).

## 2.  *Scope of the SLC's Investigation*

The Resolutions also provided for the SLC to retain as it deemed necessary legal counsel and other independent advisors at Outdoor's expense.  (Resolutions at 3, Exhibit A.)  Pursuant to those Resolutions, the SLC retained Covington & Burling LLP and Potter Anderson & Corroon LLP as its legal advisors (collectively, "SLC Counsel").  (Stipulation of Settlement at 4 (July 8, 2013), Exhibit F.)

The SLC, with the assistance of SLC Counsel, conducted a thorough factual and legal investigation of the issues and claims raised by the Complaints, including the three Derivative

Claims set forth in the Complaints: (1) that the Individual Defendants and corporate defendants breached their fiduciary obligations to Outdoor by forcing Outdoor, in December 2009, to extend a note from Outdoor to Clear Channel on terms alleged to be unfair to Outdoor; (2) that the Individual Defendants engaged in corporate "waste" in agreeing, in December 2009, to extend the note at an "unreasonably low interest rate;" and (3) that Clear Channel, Bain, and THL were unjustly enriched by the December 2009 extension of the note.  (Compl. ¶¶ 78-95; Temple Settlement Affidavit at ¶6, Exhibit B; Affidavit of Christopher M. Temple (July 3, 2013), Exhibit G.)  As discussed below,  the SLC also explored whether Outdoor might have other potential claims related to the December 2009 transaction.  (Temple Settlement Affidavit at ¶6, Exhibit B; Affidavit of Christopher M. Temple (July 3, 2013) at ¶2, Exhibit G.)  The SLC's investigation spanned a period of eight months.  (Temple Settlement Affidavit ¶ 6, Exhibit B.)  SLC Counsel conducted twenty-six interviews of twenty-four individuals, including former and current directors of the Company, former and current Company employees, outside financial and legal advisors, and directors of Clear Channel employed by Bain and THL.  (*Id.*; Stipulation of Settlement at 5, Exhibit F.)  SLC members participated in six of the most significant interviews. (Temple Settlement Affidavit at ¶6, Exhibit B.)

The SLC also collected over 100,000 pages of documents from sources including Outdoor; Clear Channel; current and former Outdoor directors, including the members of the 2009 Special Committee of the Outdoor Board (the "2009 Special Committee"); current and former Clear Channel directors; employees of Bain and THL; Lazard Frères & Co., LLC, financial advisors to the 2009 Special Committee; Vinson & Elkins LLP, legal counsel to the 2009 Special Committee; Kirkland & Ellis LLP, counsel to Clear Channel and Outdoor; and

Young, Conaway, Stargatt & Taylor, LLP, Delaware counsel to the 2009 Special Committee. (*Id.*; Stipulation of Settlement at 5, Exhibit F.)

In addition, the SLC, with the assistance and advice of counsel, analyzed the law applicable to the relevant issues and claims, including standards of liability and defenses.  The SLC also engaged an expert economist, Dr. Kenneth Lehn, to assist with valuation issues relating to the Due-From Note and the disputed December 2009 transaction, as well as the effect on Clear Channel and Outdoor of some of Plaintiffs' requested relief.  (Temple Settlement Affidavit at ¶6, Exhibit B; Stipulation of Settlement at 5, Exhibit F.)  Dr. Lehn is a Professor at the Katz Graduate School of Business at the University of Pittsburgh, and a former Chief Economist of the Securities and Exchange Commission.[4]  (Stipulation of Settlement at 5, Exhibit F.)

Finally, at the direction of the SLC, the SLC's Counsel met with counsel for Clear Channel, Bain, THL, and certain individual Defendants, and with counsel for Plaintiffs, to hear their perspectives on the applicable facts and law.  SLC Counsel reported the results of those meetings to the SLC.  (Temple Settlement Affidavit ¶ 7, Exhibit B.)

3.    *Findings of the SLC*

The SLC's key findings, in summary fashion, are as follows.[5]

Before November 2005, Outdoor was a wholly-owned subsidiary of Clear Channel.  On November 11, 2005, Outdoor made an initial public offering (the "IPO") of ten percent of Outdoor's common stock.  Clear Channel continued to indirectly hold approximately 90% of

---

[4] Dr. Lehn was supported by National Economic Research Associates, Inc. ("NERA").

[5] The full statement of the SLC's findings are attached as Exhibit A to the Affidavit of Christopher M. Temple (July 3, 2013), filed in support of the Stipulation of Settlement (which affidavit is included as Exhibit G to the Closic Affidavit), and are also attached as Exhibit H to the Closic Affidavit.

Outdoor's common stock after the IPO.  Clear Channel's holdings also included all of Outdoor's outstanding Class B shares, which are entitled to twenty votes per share.  Class A shares, by contrast, are entitled to a single vote per share.  After the IPO, Clear Channel held 99% of the total voting power of Outdoor's common stock.

In advance of Outdoor's partial IPO in late 2005, Outdoor and Clear Channel entered into a number of intercompany agreements (the "Intercompany Agreements").  These included, among others: (i) a Master Agreement, which provided for separation of the two companies pursuant to the IPO and delineated certain aspects of their relationship going forward;  (ii) a Corporate Services Agreement, pursuant to which Clear Channel would provide various services to Outdoor, including a Cash Management Arrangement; and (iii) two tandem promissory notes, evidencing amounts either due from Clear Channel to Outdoor (the Due-From Note) or due to Clear Channel from Outdoor (the "Due-To Note") pursuant to the Cash Management Arrangement.  Also in advance of the IPO, on August 2, 2005, Outdoor distributed a dividend to Clear Channel in the form of a $2.5 billion Senior Unsecured Term Promissory Note due August 2, 2010 (the "Term Note"), the debtor under which was a wholly-owned subsidiary of Outdoor, Clear Channel Outdoor, Inc.  Interest accrued on the balance of the Term Note at a variable per annum rate equal to the weighted-average cost of long-term debt of Clear Channel, 5.7% at the time of the dividend.  The key terms of these agreements were disclosed to prospective purchasers in the IPO.  (Clear Channel Outdoor Holdings, Inc. IPO Prospectus at 61-63, 106 (Nov. 10, 2005), Exhibit I.)

These agreements were favorable to Clear Channel in a number of ways.  For example, the Master Agreement prohibited Outdoor from incurring debt (other than debt to Clear Channel) in excess of $400 million and limited Outdoor's ability to use its own cash for acquisitions and

9

cash transfers.  (Defs. Br. in Opp. to Mot. to Expedite, Ex. C, 2005 CCOH 10-K, Ex. 10.1 (Mar. 31, 2006) (Master Agreement § 6.5(c)  (Nov. 6, 2005)); Statement of Findings at 1, Exhibit H.) The Master Agreement also prohibits Outdoor from causing Clear Channel to default on any of its other contracts and permits Clear Channel to take on new contracts that affect Outdoor as long as it consults with Outdoor first.  (Master Agreement §§ 6.5(b), 6.6.)  As another example, the interest rate on the Due-From Note—representing the rate paid by Clear Channel on cash swept from Outdoor pursuant to the Cash Management Arrangement—was set at the average one-month generic Treasury bill rate.  (IPO Prospectus at 62, Exhibit I.)  In contrast, under the Due-To Note, the rate paid by Outdoor on funds advanced by Clear Channel under the Cash Management Arrangement was set to a higher LIBOR-based rate.  (*Id.*)

On November 15, 2006, approximately one year after Outdoor's IPO, Clear Channel announced that it had agreed to a $26.7 billion buyout by the Sponsors (the "LBO").  In connection with the LBO, Clear Channel became a party to a Credit Agreement dated May 13, 2008, that included a negative covenant barring changes to the Cash Management Arrangement, the Due-From and Due-To Notes, and the Term Note, to the extent such changes are materially adverse to the lenders.  (*See* Defs. Br. in Opp. to Mot. to Expedite, Exs. M-R, CCOH Form S-4, Ex. 10.2, § 7.12(c) (June 2, 2008) (Credit Agreement).)  The same section expressly permits changes to the interest rate applicable to each of those arrangements, and the extension of each of them, as long as such actions are approved by the Clear Channel Board of Directors (the "Clear Channel Board").  (*Id.*)  Clear Channel consulted with Outdoor, pursuant to the Master Agreement, before entering into the Credit Agreement.  Following the LBO, the Outdoor Board consisted of three independent directors (James Raines, Marsha Shields, and Dale Tremblay), two directors affiliated with Bain (Individual Defendants Hendrix and Wells), two directors

affiliated with THL (Individual Defendants Covell and Jones), and three members of the Mays family, which co-founded Clear Channel (Lowry Mays and Individual Defendants Mark and Randall Mays).

The LBO substantially altered the credit risk to which Outdoor was exposed under the existing intercompany lending arrangement.  In the wake of the LBO, Clear Channel was heavily leveraged and was projecting a declining EBITDA in light of the recessionary environment of 2008 and 2009.  Responding to the concerns of Outdoor stockholders and Clear Channel's uncertain financial position, Outdoor's independent directors over the course of 2008 and early 2009 proposed several times to Randall Mays, who then-served as CFO of Outdoor and President and CFO of Clear Channel, that the Cash Management Arrangement be amended to allow Outdoor to retain more cash and that Outdoor consider using the balance on the Due-From Note to pay down the Term Note.  These proposals were either discouraged by Randall and Mark Mays or officially rejected by the Clear Channel Board.

In the meantime, Clear Channel, Bain, and THL received a number of unsolicited restructuring proposals in late 2008 and early 2009, including from Lazard Frères & Co. LLC ("Lazard").  In November 2008, Clear Channel retained Goldman Sachs ("Goldman") to assist it in formulating capital structure alternatives.  Goldman began presenting potential restructuring transactions to the independent directors of Outdoor in April 2009.  In response, the Outdoor Board adopted resolutions forming the 2009 Special Committee of independent directors, granting it the authority to retain independent advisors and to review, evaluate, and approve or reject all transactions proposed between the two companies.  The 2009 Special Committee retained Vinson & Elkins as a legal advisor and Lazard, led by then-Managing Director John Chachas, as a financial advisor.

11

Negotiations regarding a potential refinancing went forward in earnest in May and June, intermittently in the fall of 2009, and then again more seriously in November and December 2009.  Both sides stood to benefit from a negotiated transaction.  Outdoor was obligated to repay the $2.5 billion Term Note in August 2010, and under the restrictions set forth in the Master Agreement, Outdoor was incapable of raising funds sufficient to pay that obligation without Clear Channel's consent.  For its part, Clear Channel needed to address the risk that it would breach a secured-leverage covenant contained in its Credit Agreement, and a debt offering by Outdoor was an attractive—although not the only—potential method by which to do so.

During the course of the negotiations, the 2009 Special Committee remained concerned about Clear Channel's financial position.  On September 3, 2009, the independent directors of the Outdoor Board informed Mark and Randall Mays that at the Outdoor Board meeting scheduled for September 10, they would recommend that the Outdoor Board demand repayment of $300 million of the Due-From balance and prepay a portion of the Term Note.  The independent directors made the recommendation at the September 10 meeting as planned.  In response, Mark Mays told the Outdoor Board that the Clear Channel Board preferred to present a comprehensive proposal addressing the concerns regarding the Due-From Note and the Term Note.  The independent directors agreed to postpone the vote on their recommendation in exchange for assurances from the Bain and THL representatives on the Outdoor Board that Clear Channel would present a comprehensive proposal at a Special Meeting of the Outdoor Board to be held on October 19.  The proposal presented on October 19 did not contemplate an immediate refinancing of any portion of the Term Note or provide for any paydown of the Due-From Note.

Ultimately, the 2009 Special Committee considered ten proposals over the eight-month period.  It succeeded in extracting a number of concessions from Clear Channel, including:

- the establishment of a liquidity reserve of at least $100 million, which would be funded by a drawdown of the Due-From Note balance and which would remain on Outdoor's balance sheet;

- an escrow arrangement to service the interest payments on any newly-issued debt, which would be funded by deposits preceding the cash sweep on any given day;

- an increase in the interest rate on the Due-From Note to approximate the yield of any new Outdoor notes issued; and

- a commitment that Outdoor's overall leverage would not increase.

The final proposal, approved by the 2009 Special Committee and the Outdoor Board on December 17, 2009, featured a $2.5 billion "new money" offering of notes of a wholly-owned Outdoor subsidiary, Clear Channel Worldwide Holdings, Inc. ("Worldwide"), which would allow for prepayment of the entire Term Note balance, along with a $500 million paydown of the Due-From Note and the concessions mentioned above.  The proceeds of the partial paydown of the balance under the Due-From Note, together with proceeds of the notes offering, were used to repay the Term Note in full.  The rate on the new Worldwide notes was set at 9.25%.  On December 23, Outdoor and Clear Channel executed an amendment to the Due-From Note that reset the rate thereunder to the rate on the new Worldwide notes (by reference to the same variable per annum rate of interest under the Due-To Note), and extended the maturity date of the Due-From Note to December 15, 2017.

During Lazard's engagement by the 2009 Special Committee, Chachas participated in two separate, unrelated business pitches to THL.  The participants from THL included Charles Brizius, a THL managing director and Clear Channel Board member who had a role in shaping the refinancing proposals Clear Channel made to Outdoor over the course of 2009.  Lazard did not receive business as a result of either pitch.

Chachas left Lazard at the end of December 2009 to campaign for a United States Senate seat from Nevada.  In the several weeks before his departure, Chachas sent to Clear Channel

representatives who were involved in the negotiations a number of emails that had an ingratiating tone and, in a few instances, appeared to criticize his client or its other advisors. It is not entirely clear whether these comments were genuine or were intended as a negotiating tactic. On at least one occasion, Chachas forwarded to Clear Channel representatives an email chain that included confidential discussions among the 2009 Special Committee and its legal and financial advisors. After the final refinancing transaction had been approved, Chachas also sought contributions to his political campaign from representatives of Clear Channel and the Sponsors. Insofar as the SLC has been able to determine, no one employed by Clear Channel or the Sponsors contributed to his campaign. Upon learning of these facts during the course of the SLC's investigation, the members of the 2009 Special Committee were critical of the emails, but also expressed the strong view that this conduct did not affect the outcome of negotiations. The 2009 Special Committee directed Chachas to seek—and he successfully obtained—substantial concessions from Clear Channel. On occasion, after Chachas had advised the 2009 Special Committee that the terms of a particular proposal were fair, the 2009 Special Committee instructed Chachas to seek, and he in fact obtained, further concessions.

After an in-depth analysis of the above facts, the SLC reached the following key conclusions:

- *First*, the December 2009 transaction is subject to entire fairness review. *See In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del. Ch. 1995) (applying entire fairness review to a loan transaction between a controlling stockholder and a controlled firm).

- *Second*, the pre-existing contractual constraints to which Outdoor was subject during the 2009 negotiation process were binding on the Company and could not be avoided. *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *S. Muoio & Co. v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *11 (Del. Ch.). Thus, any assessment of the fairness of the December 2009 transaction between Outdoor and Clear Channel must take account of those constraints, as well as the entirety of the consideration received by Outdoor in the

December 2009 transaction.  *See Encite LLC v. Soni*, 2011 WL 5920896, at *23 (Del. Ch.) (noting that "all relevant factors" of the "economic and financial consideration" of the proposed transaction must be considered in evaluating fair price).

- *Third*, the December 2009 transaction provided substantial benefits to Outdoor, including an increase in the interest rate payable on the Due-From Note and the refinancing of the $2.5 billion Term Note that would have fallen due in August 2010.  Given the unique nature of the contractual relationships and the variety of consideration flowing in the December 2009 transaction, there is no reliable basis by which to measure whether greater benefits could have been achieved in a transaction between unrelated parties under the same contractual constraints.

- *Fourth,* the members of the 2009 Special Committee were independent, negotiated vigorously, and acted in good faith.  The SLC considered whether the conduct of Chachas interfered with the 2009 Special Committee's discharge of its duties.  The SLC found no evidence that it did, or that it resulted in Outdoor receiving less consideration in the December 2009 transaction than otherwise would have been the case.

- *Finally*, the SLC also considered whether the interested directors on the Outdoor Board—*i.e.*, the directors with ties to Clear Channel and/or the Sponsors—acted improperly in failing to acquiesce to the independent directors' periodic proposals to demand repayment of a portion of the Due-From Note balance.  There is evidence, however, that the interested directors believed that demanding repayment was not in Outdoor's best interests.  In light of the Master Agreement's restrictions on Outdoor's ability to borrow money, the balance due under the Due-From Note is Outdoor's main source of liquidity; thus, demanding repayment and using the money to retire the term note would reduce Outdoor's liquidity.  In addition, the SLC found no evidence that the failure to demand repayment resulted in Outdoor receiving less consideration in the December 2009 transaction than otherwise would have been the case.

### C.    The Settlement

1.    *Settlement Negotiations*

In December 2012, as the SLC neared the completion of its investigation, the SLC

initiated discussions with certain Defendants to explore the prospects of a settlement that would

address the issues raised by the Complaints, within the bounds of the pre-IPO contractual

arrangements to which Outdoor was subject.  (Stipulation of Settlement at 6, Exhibit F.)  The

SLC developed a framework setting forth components of a potential settlement over a series of

weeks and through discussions with these certain Defendants that extended into January 2013. (*Id.*)

The SLC consulted with Plaintiffs' counsel in January 2013 regarding the status and findings of the SLC's investigation and the possibility of settlement.  After that consultation, the SLC provided Plaintiffs' counsel with certain documents that had been produced to the SLC in connection with its investigation and Plaintiffs' counsel reviewed those documents.  (*Id.*) Plaintiffs also retained investment banking and advisory firm Cypress Associates LLC to review and provide input regarding the proposed settlement terms.  (*Id.* at 7.)

The SLC continued to negotiate with certain Defendants regarding the terms of a potential settlement within the framework developed by the SLC and to discuss with Plaintiffs the levels within the SLC framework at which certain Defendants had proposed to settle.  (*Id.*) Plaintiffs initially stated that they would not approve a settlement at the levels proposed by Defendants, and informed the SLC of the levels within the SLC framework at which they would support a settlement.  (*Id.*)  After several more weeks of negotiations, the parties reached an agreement in principle.  They set forth that agreement in a Memorandum of Understanding, signed by the parties on March 28, 2013.  (*Id.*)

The parties executed a final Stipulation of Settlement on July 8, 2013 (the "Stipulation of Settlement").  (Exhibit F.)  As a part of this Stipulation of Settlement, Plaintiffs' counsel agreed to apply for an award in this matter of attorneys' fees and expenses of no more than $6 million. Defendants agreed to take no position on the amount of the fee application as long as it complies with the Stipulation of Settlement.  (*Id.* at 29.)  Any fees and expenses awarded to Plaintiffs' counsel by the Court shall be paid by Clear Channel.  (*Id.* at 29-30.)

2.      *Terms of Settlement*

The proposed settlement squarely addresses the issues raised by the SLC's findings, and provides benefits that could not be obtained through litigation.  The proposed settlement has four major components:

(1) Outdoor will demand payment of $200 million outstanding under the Due-From Note and will declare a dividend of $200 million to be paid simultaneously with the receipt of that payment.

(2) Outdoor will establish a committee of the Outdoor Board (the "Intercompany Note Committee") for the specific purpose of monitoring the Due-From Note.  The Intercompany Note Committee will have access to independent legal and financial advisors.  The Intercompany Note Committee will have the non-exclusive authority to demand payment up to the full balance outstanding under the Due-From Note if Clear Channel's liquidity decreases below a defined threshold, and if the amount obtained by multiplying the Due-From Note balance by the percentage of common stock owned by non-affiliated holders of Outdoor is greater than $114.0 million, the Intercompany Note Committee may draw down the amount required to reduce that figure to $85 million.

(3)  Clear Channel will provide the Intercompany Note Committee with monthly and annual reports regarding the actual and projected status of the Due-From Note balance and Clear Channel's liquidity, to ensure the Intercompany Note Committee's timely access to information necessary to fulfill its mandate.

(4) Clear Channel and Outdoor will amend the interest rate on the Due-From Note such that (a) if Clear Channel's liquidity decreases below the defined threshold, the interest rate on the entire balance of the Due-From Note will be an amount equal to the average yield-to-maturity for

a specified series of Clear Channel debt[6] or (b) if the outstanding balance of the Due-From Note exceeds $1 billion, the interest rate on the portion of the balance exceeding $1 billion will be an amount equal to the average yield-to-maturity for that specified series of Clear Channel debt.  If either of these situations arises, the interest rate on the Due-From Note shall in no event be less than 6.5% nor greater than 20%.

These terms are spelled out at pages 18 through 24 of the Stipulation of Settlement. (Exhibit F.)

ARGUMENT

The proposed settlement should be approved because it is the result of the SLC's independent and reasonable business judgment, it is supported by all parties, and the benefits it provides are superior to the available alternatives.

### A.    Legal Standards Governing Approval

"[Delaware] law favors the voluntary settlement of contested issues."  *In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 433 (Del. 2012) (alteration in original).  On a motion to approve a settlement under Ch. Ct. R. 23.1(c), therefore, "the trial court is not required to try the case or decide the issues on the merits."  *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1137 (Del. 2008). Rather, the Court should "consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then . . . apply its own business judgment in deciding whether the settlement is reasonable in light of these factors."  *Id.* (quoting *Polk v. Good*, 507 A.2d 531, 535 (Del. 1986) (internal quotation marks omitted); *see also Lewis v. Hirsch*, 1994 WL 263551, at *2 (Del. Ch.) (applying this standard to a stockholder derivative

---

[6] The Stipulation of Settlement identifies the relevant series of debt to be used in this calculation, defined as the "Clear Channel Reference Notes."  (Stipulation of Settlement at 10, Exhibit F.)

action).  A settlement approved by a special litigation committee must be shown to be "not only

fair, but . . .  result[ing] from a thorough investigation undertaken by disinterested, independent

directors who made reasonable efforts to investigate the claims in good faith."  *Electra*

*Investment Trust PLC v. Crews*, 1999 WL 135239, at * 3 (Del. Ch.).

In considering whether to approve a settlement, a principal focus is on the benefits

conferred by settlement. *PaineWebber R&D Partners v. Centocor, Inc.*, 1999 WL 160123, at *15

(Del. Ch.). In particular, a settlement is more valuable when it enables the plaintiffs to "obtain a

benefit at least somewhat more favorable than could have been achieved through trial or through

action taken independently of the litigation." *Franklin Balance Sheet Inv. Fund v. Crowley*,

2007 WL 2495018, at *10 (Del. Ch.) (setting plaintiffs' counsel's fees based on the benefit

achieved in a given settlement).  Other considerations include the probable validity of the claims;

the amount of the compromise as compared with the amount and collectability of a judgment; the

delay, expense, and burdens of litigation; and the views of the parties involved.  *In re Cox Radio,*

*Inc. S'holders Litig.*, 2010 WL 1806616, at *9 (Del. Ch.) (citing *Polk*, 507 A.2d at 536), *aff'd* 9

A.3d 475 (Del. 2010) (Table).  Courts also note the depth of the investigation conducted by the

parties. Indeed, one must "know enough about the strengths and weaknesses of the claims and

about any defenses to sensibly and competently evaluate the value of the claims." *In re Amsted*

*Indus., Inc. Litig.*, 521 A.2d 1104, 1107 (Del. Ch. 1986).

### B.  The Proposed Settlement is Fair and Should Be Approved

#### 1.  *The Decision to Settle is Supported by a Thorough Investigation*

The Resolutions constituting the SLC gave the SLC the final and binding authority to

investigate the facts underlying the Complaints and to determine, in its sole discretion, the course

of action that serves the best interests of the Company and its stockholders.  This delegation of

authority to the SLC under the Resolutions meets the standard set forth by the Delaware

Supreme Court in *Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del. 1981).

As part of its investigation, the SLC investigated the three claims set forth in the

Complaints: (1) that the individual and corporate defendants breached their fiduciary obligations

to Outdoor by forcing Outdoor, in December 2009, to extend the Due-From Note on terms

patently unfair to Outdoor; (2) that the Individual Defendants engaged in corporate "waste" in

agreeing, in December 2009, to extend the Due-From Note at an "unreasonably low interest

rate;" and (3) that Clear Channel, Bain, and THL were unjustly enriched by the December 2009

extension of the Due-From Note.  (Compl. ¶¶ 78-95; Temple Settlement Affidavit at ¶6, Exhibit

B; Affidavit of Christopher M. Temple (Jul. 3, 2012) at ¶2, Exhibit G.)

In addition, the SLC considered two theories of liability suggested by Plaintiffs' motion

for expedited proceedings, filed June 27, 2012.  Those theories of liability were premised on the

Defendants' alleged continuing failure to (1) demand payment from Clear Channel of the Due-

From Note balance and to (2) increase the interest rate at which Outdoor lends to Clear Channel

under the Due-From Note.  Finally, the SLC investigated a possible claim—not raised by

Plaintiffs—based on the Outdoor Board not demanding repayment of a portion of the Due-From

Note balance in 2009.  (Affidavit of Christopher M. Temple (Jul. 3, 2012) at ¶2, Exhibit G;

Summary of Findings by the Special Litigation Committee of the Board of Directors of Clear

Channel Outdoor Holdings, Inc., Exhibit H.)

As detailed above, the SLC's investigation was independent, professional, and

comprehensive.  The SLC's decision to enter into this settlement was based on the full range of

information available, and represents a valid exercise of its business judgment.  *See In re:*

*Resorts Int'l S'holders Litig.*, 1988 WL 92749, at \*5 (Del. Ch.) (noting that "where a

20

disinterested board or special committee, fully informed and expertly advised, makes a considered business decision, that decision will be entitled" to deference as a valid exercise of business judgment), *aff'd* 570 A.2d 259 (Del. 1990).  The extensive investigation, including the information shared with Plaintiffs as part of the settlement discussions, provides all parties with ample basis to conclude that the Derivative Claims should be settled on the terms provided in the Stipulation of Settlement, and that the proposed settlement itself is fair and reasonable to Outdoor and its stockholders.

> 2.    *The Settlement Confers Substantial Benefits*
>
> > a)    The Settlement Reduces the Due-From Note and Vests Authority for Making Certain Future Demands in an Independent Committee

The intercompany relationship between Clear Channel and Outdoor has historically been substantially more favorable to Clear Channel than to Outdoor.  It includes a Cash Management Arrangement pursuant to which all of Outdoor's operating cash is loaned to Clear Channel on an unsecured basis, at an interest rate that is not based on the risk associated with lending to Clear Channel.  While the debt is repayable on demand, the Master Agreement's limitations on Outdoor's uses of cash—coupled with the daily sweep of operating cash back to Clear Channel—substantially constrain the utility of the demand feature.

As noted above, the Cash Management Arrangement and Master Agreement cannot be challenged by Outdoor or its stockholders because they pre-date Outdoor's IPO and their key terms were disclosed to prospective purchasers.  The terms of those agreements are further cemented by the Clear Channel Credit Agreement, which provides for an event of default in the event of any changes to the Intercompany Agreements materially adverse to Clear Channel's lenders.  As also noted above, the Master Agreement provides that Outdoor may not cause Clear Channel to default on any of its contracts.

21

The SLC explored whether the unanticipated change in Clear Channel's creditworthiness resulting from the LBO constituted changed circumstances that would excuse Outdoor from continuing to allow its cash to be swept under the Corporate Services Agreement.  The SLC concluded that it would not.  The agreement contains a Texas choice-of-law clause, and under Texas law, the contract doctrine of changed circumstances is available only where (i) a person necessary for performance has died; (ii) a thing necessary for performance has been destroyed or deteriorated; or (iii) governmental regulation prevents performance.  *See Tractebel Energy Mktg., Inc. v. E.I. Du Pont de Nemours & Co.*, 118 S.W.3d 60, 64-65 (Tex. Ct. App. 2003); *City of Cibolo v. Koehler*, 2011 WL 5869683, at *9 (Tex. Ct. App.).   The SLC also considered whether Outdoor could engage in an "efficient breach" of the Cash Management Arrangement. But because the Master Agreement requires Outdoor to indemnify Clear Channel against all damages arising from any breach by Outdoor of the Corporate Services Agreement that sets forth the Cash Management Arrangement (Master Agreement § 5.2), the SLC concluded that any breach likely would result in Outdoor being responsible for all consequential damages incurred by Clear Channel, and thus would not be "efficient."

Consequently, the relief originally sought by Plaintiffs—the end of the Cash Management Arrangement —is not available, through litigation or otherwise (unless Clear Channel were to agree to such a change, which it is not obligated to do, and which—as noted—likely would result in an event of default under Clear Channel's loan agreements).

The Due-From Note's demand feature, one of the few prerogatives reserved to Outdoor by the Intercompany Agreements, is a means by which the Company could moderate the impact of the Cash Management Arrangement.  If used in concert with the Company's authority to issue dividends—one of the few permitted uses of cash by Outdoor under the Master Agreement—it

22

could yield substantial value to the Company's stockholders.  (Money that is demanded and not used will be swept back to Clear Channel pursuant to the Cash Management Arrangement.)  This value must be weighed, however, against the benefit to Outdoor of maintaining a balance on the Due-From Note in light of the lack of other sources of liquidity.

In choosing how to balance these considerations and determine whether to make a demand for payment under the Due-From Note, the risk that the non-independent directors of Outdoor will consider the interests of the *borrower*, Clear Channel, above the interests of Outdoor is greatest at the very time that the risks posed to Outdoor by the loan—and thus the reasons for exercising the right of demand—become most compelling.

The proposed settlement therefore addresses the central concern presented by Plaintiffs' Complaints—the growth of the Due-From Note balance—in the following ways:  it secures for Outdoor an immediate repayment of $200 million of the balance; it addresses the potential for conflicts by providing that in the event Clear Channel's near-term financial position materially deteriorates or the Due-From Note balance reaches a defined limit, a newly formed committee of Outdoor's independent directors will be able to exercise the demand feature on its own; and it requires Clear Channel to provide those directors with the information needed to fulfill that obligation.

(1)     $200 Million Paydown of the Due-From Balance

First, the proposed settlement  provides that Outdoor will demand repayment of $200 million outstanding under the Due-From Note and, at the same time, declare a dividend to be paid pro rata to all holders of Outdoor common stock.  The demand must be made, and the dividend paid, no more than 30 days after final approval of the settlement.  Absent the dividend payment—one of the few uses to which Outdoor may put its cash absent prior approval from

23

Clear Channel—the $200 million would simply be re-swept to Clear Channel pursuant to the ordinary operation of the Cash Management Arrangement between the companies.

(2)      Establishment of a Monitoring Committee

Second, the proposed settlement requires Outdoor to establish the Intercompany Note Committee with the authority to demand repayment under the Due-From Note when the balance exceeds a certain amount or when Clear Channel's liquidity falls below a certain threshold.  The amount demanded must be paid out to the Outdoor stockholders as a dividend.  The Intercompany Note Committee will be composed of all then-serving independent and disinterested Outdoor directors and will be authorized to retain independent legal and financial advisors as needed to assist the Intercompany Note Committee in carrying out its duties.  The authority given to the Intercompany Note Committee thus ensures that whenever the right of the Intercompany Note Committee to demand repayment is triggered, the exercise of that right will be determined by independent directors charged with making decisions in the best interests of Outdoor.

The Intercompany Note Committee will have the authority to draw down on the Due-From Note when the actual or projected balance of the Due-From Note attributable to public stockholders (the "Outdoor Public Share") reaches $114 million (in other words, when the amount resulting from multiplying the balance of the Due-From Note by the percentage of Outdoor stock held by public stockholders exceeds $114 million).  When that balance is reached, or when it is projected to be reached within the coming 30 days, the Intercompany Note Committee may draw the balance down as needed to restore the Outdoor Public Share to $85 million.  As of January 31, 2013, the Outdoor Public Share corresponded to 11.4% of the total ownership of Outdoor common stock.  At that percentage, the Outdoor Public Share will reach

24

$114 million when the total Due-From Note balance reaches $1 billion.  Correspondingly, reducing the Outdoor Public Share to $85 million would mean drawing the total Due-From Note balance down to $750 million.  According to current Company projections, the Due-From Note balance will reach $1 billion in the fourth quarter of 2014.

The Intercompany Note Committee will also have the authority to draw down the Due-From Note when the ratio of (a) Clear Channel Liquidity (as defined in the Stipulation of Settlement) to (b) the Outdoor Public Share (as defined in the Stipulation of Settlement) (the "Clear Channel Liquidity Ratio") drops below 2.0x.[7]  When such an event is projected to occur at any time within the coming three months, the Intercompany Note Committee will be authorized to make a demand for repayment (a "Notice of Demand") to draw down the entire balance of the Due-From Note.  If such an event actually occurs, the Intercompany Note Committee similarly will be authorized to give a Notice of Demand for an amount up to the Due-From Note's full balance from the date on which it receives notice of the event and for up to 30 days thereafter.

In sum, the authority delegated to the newly-formed Intercompany Note Committee ensures independent action in the two circumstances in which the full Outdoor Board's decision not to make a demand is potentially at the greatest risk of being influenced by the needs of Clear Channel or the Sponsors:  when the balance of the Due-From Note is so large that a decision not to exercise the demand feature may not be based solely on consideration of Outdoor's best

---

[7] Clear Channel must calculate Clear Channel Liquidity and the Clear Channel Liquidity Ratio, on a monthly basis.  When calculating Clear Channel Liquidity, Clear Channel must exclude cash that is restricted according to Generally Accepted Accounting Principles, and must also exclude the percentage of Outdoor cash and cash equivalents commensurate to the percentage of common stock held by minority shareholders.  Clear Channel will have an ongoing duty to inform the Intercompany Note Committee if Clear Channel has reason to know that the Clear Channel Liquidity Ratio has dropped below 2.0x.

interests; and when Clear Channel's own financial position is precarious or is projected to become so.  In the latter case, the authorization to act up to three months in advance of a projected liquidity crisis at Clear Channel further ensures the Intercompany Note Committee's ability to protect the interests of Outdoor and its minority stockholders.

(3)      Reporting Obligations

Third, the proposed settlement imposes reporting obligations on Clear Channel to ensure that the newly-formed Intercompany Note Committee will have the information needed to fulfill its mandate. On a monthly basis, Clear Channel must provide the Intercompany Note Committee with a report setting out the Due-From Note's balance as of month's end for the three preceding months, and projected as of month's end for the current month and the three succeeding months. In the same report, Clear Channel must also report Clear Channel Liquidity and the Clear Channel Liquidity Ratio as of month's end for the three preceding months, projected as of the current month's end, and projected as of month's end for the three succeeding months.  In addition to these monthly reporting obligations, Clear Channel is subject to an ongoing duty to inform the Intercompany Note Committee if an event or circumstance arises that serves to render a previously-provided report materially inaccurate, or if it has reason to know that the Clear Channel Liquidity Ratio has fallen below the specified level.

The settlement will also require Clear Channel to provide the Intercompany Note Committee with an annual report forecasting the Due-From Note balance, Clear Channel Liquidity, and the Clear Channel Liquidity Ratio for the remainder of the then-current calendar year and for three full calendar years thereafter.

26

    b)  The Settlement Increases the Interest Rate on the Due-From Note
       in Times of Greater Investment Risk

   The SLC's investigation also suggested room for improvement with respect to the interest

rate on the Due-From Note.  Although the 2009 Special Committee achieved a substantial

improvement, the rate remains tethered to Outdoor's cost of borrowing, and thus may not reflect

the rate Outdoor could earn in the market for a loan to Clear Channel on comparable unsecured

terms.  If Outdoor refinances its debt, as it did in November 2012,[8] the rate on the Due-From

Note may be further reduced.

   Even assuming the Company could recover damages for past deficiencies in the interest

rate—the quantum of which is substantially uncertain—such damages would not address the

issue going forward.  The proposed settlement does so by requiring Clear Channel to approve an

amendment to the interest rate under two circumstances:  when the Clear Channel Liquidity

Ratio drops below 2.0x, the interest rate will increase on the entire outstanding balance; and

when the balance of the Due-From Note surpasses $1 billion, the interest rate will increase on the

balance in excess of $1 billion.

   In both cases, the increased interest rate will be set according to the market yield on the

series of unsecured Clear Channel reference notes with the nearest future maturity date greater

than 90 days.  The Stipulation of Settlement identifies four series of unsecured "Clear Channel

Reference Notes" that will serve as interest-rate referents:  the 5.5% Senior Notes Due 2014,

4.9% Senior Notes Due 2015, 5.5% Senior Notes Due 2016, and 6.875% Senior Debentures Due

2018.  In the event that one (or both) of the triggering events occurs, the interest rate may not

---

[8] Outdoor refinanced the Worldwide notes in November 2012, reducing the interest rate from
9.25% to 6.5%.  Although the interest rate received on the Due-From Note was reduced as a
result, the Company realized substantial net savings by paying lower interest on the balance of its
debt.

exceed 20%. And if one of the above two triggering events has occurred and the market yield on

the applicable Clear Channel Reference Note has dropped below 6.5%—the presently-applicable

interest rate—the settlement provides that the interest rate owed to Outdoor will not be less than

6.5%.

The proposed settlement thus tethers the interest rate on the Due-From Note to the risks

associated with Outdoor's lending to Clear Channel. The Clear Channel Reference Notes

provide an objective measure of compensation the market would demand for lending to Clear

Channel on an unsecured basis, similar to the Due-From Note obligation. The interest rate

increases will be triggered by events that would be expected to increase the risk to Outdoor. The

increased interest rate associated with a drop in Clear Channel's Liquidity will compensate

Outdoor for the increased risk of a Clear Channel default. And the increased interest rate

associated with a $1 billion-plus balance will compensate Outdoor for the risk associated with

placing an increasingly large sum in a single, non-diversified investment.

3.    *The Costs of Litigation Would be Substantial, and the Outcome Uncertain*

The SLC concluded that the benefits of settlement, including the elimination of the

expected expense, burden, and disruption of further litigation, outweigh the potential benefits of

allowing the litigation to proceed.

If the Company were to pursue the Derivative Claims, it would be required to pay the

legal fees and related costs of counsel for Outdoor to pursue the Derivative Claims on behalf of

the Company. Even if the SLC were to permit Plaintiffs to pursue the Derivative Claims, the

Company would still incur substantial litigation costs as a nominal defendant, including in

connection with discovery. In addition, the Company likely would be required to advance the

substantial legal fees and related costs of counsel for the Individual Defendants to defend the

claims.  The Company has indemnification agreements with each of the Company's directors, and both those agreements and the Company's bylaws require the Company to indemnify the directors and to advance expenses, including all reasonable legal fees and other costs of defending a court case, to the fullest extent permitted by law.  (Form of Independent Director Indemnification Agreement and Form of Affiliate Director Indemnification Agreement §§ 2, 12(h), attached as Exhibits 10.1 and 10.2 to Form 8-K filed by Clear Channel Outdoor Holdings, Inc. on June 3, 2009, Exhibit J; Amended and Restated By-Laws of Clear Channel Outdoor Holdings, Inc. § 6.9(A) (Dec. 7, 2007), Exhibit K).

The SLC also took account of the fact that, in its judgment, continuing this litigation would divert management's attention from the core business of the Company.  The issues involved here relate to judgments made by senior company personnel and board members, and many of the relevant witnesses are senior employees of both Outdoor and Clear Channel. Pursuing claims against Clear Channel would therefore distract those employees from Outdoor's business needs. Indeed, because certain Outdoor directors employed by Bain and THL played a key role in the events recounted above, distraction would still ensue even if the suit were limited to only the Sponsor defendants.  In short, even in a scenario where some or most of the Individual Defendants were dismissed from the litigation, there would still be burdens associated with discovery and a possible trial for management and board members.

Finally, the SLC concluded that there was substantial uncertainty about the Company's ability to prevail on the Derivative Claims or to recover significant damages if it were to prevail. Because Clear Channel stood on both sides of the 2009 negotiations, as Clear Channel and as the majority stockholder of Outdoor, the resulting December 2009 transaction must be evaluated under the "entire fairness" standard.  *See In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del. Ch.

29

1995) (applying entire fairness review to a loan transaction between a controlling stockholder

and a controlled firm).  Entire fairness review is concerned with "two basic aspects" of the

transaction under review: "fair dealing and fair price."  *Weinberger v. UOP, Inc.*, 457 A.2d 701,

711 (Del. 1983).  The process inquiry centers on the timing of the transaction, its initiation, its

structure, and the manner in which director and/or stockholder approval was secured.  The price

inquiry is concerned with "the economic and financial considerations" of the challenged

transaction.  *Id.*

The fundamental allegation of the Complaints—that the negotiations at the end of 2009,

and the resulting transactions, gave rise to breaches of fiduciary duty—does not take account of

Outdoor's lack of a legal right to alter the Cash Management Arrangement, given that the

arrangement was entered into before Outdoor's IPO.  Under Delaware law, neither Clear

Channel nor the directors of Outdoor owed fiduciary duties to Outdoor before the IPO took

place; instead, they owed duties only to Clear Channel itself.  *Anadarko Petroleum Corp.*, 545

A.2d at 1174.  And Clear Channel was entitled to stand on those contractual rights even after the

IPO, as a parent company is not required to "act altruistically" towards its subsidiary and has no

"obligation to defer payments or to make other financial concessions for the sake of [its

subsidiary], or its minority stockholders."  *S. Muoio & Co.*, 2011 WL 863007, at *11.  Given

these constraints, Outdoor was substantially limited in its 2009 negotiating position.

Additionally, Plaintiffs' allegation that the December 2009 transaction was unfair failed

to capture meaningful components of that transaction that make it difficult to determine whether

Outdoor received a fair price in the financial restructuring.  Fair price, in the context of the entire

fairness standard, requires analysis of the entire transaction.  *See Encite LLC*, 2011 WL 5920896,

at *23 ("Fair price 'relates to the economic and financial considerations of the proposed

30

[transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.'" (alteration in original) (quoting *Weinberger*, 457 A.2d at 711)).  Considered in isolation, the amended interest rate on the Due-From Note likely undercompensated Outdoor for the risk associated with long-term unsecured lending to Clear Channel.  Yet the overarching December 2009 transaction negotiated by the 2009 Special Committee and consummated in connection with that amendment provided other meaningful benefits to Outdoor, including the refinancing of the Term Note, that could not be achieved without Clear Channel's consent.  These benefits were obtained in part because Outdoor provided a source of capital to Clear Channel, which Clear Channel needed to maintain its compliance with its Credit Agreement.

Because the multifaceted and constrained nature of the December 2009 transaction would make it difficult to evaluate whether Outdoor received a fair price, which party bears the burden of proving or disproving entire fairness becomes particularly important in evaluating the likelihood of success on the derivative claims.  The default rule is that where, as here, a transaction between a controlling stockholder and the controlled firm is subject to entire fairness review, "the defendants bear the burden of proving that the transaction . . . was entirely fair to the minority stockholders."  *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).  Defendants can, however, shift the burden of proof on the issue of entire fairness to plaintiffs by demonstrating that the challenged transaction was approved by "a well functioning committee of independent directors."  *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997).

Although the SLC found that the 2009 Special Committee was independent, negotiated vigorously, and acted in good faith, the SLC did identify issues affecting the 2009 Special Committee's process that arguably bear on whether the 2009 Special Committee's approval of

the December 2009 transaction shifts the burden of proof to the party challenging the transaction. The conduct of the 2009 Special Committee's principal individual financial advisor in actively seeking business from a Sponsor and in conveying (although perhaps unintentionally) arguably confidential (although not necessarily material) information to Clear Channel representatives bears on the integrity of the 2009 Special Committee's process (but not on the integrity of the independent directors who were members of the 2009 Special Committee).  Similarly, the unwillingness of the interested directors on Outdoor's board to agree with the independent directors' repayment proposals could be considered to have withheld benefits to which Outdoor was entitled in order to induce Outdoor to agree to Clear Channel's refinancing terms.  In both instances, however, the SLC did not find any evidence that this conduct affected the 2009 Special Committee's ability to negotiate vigorously or that it affected the terms of the final transaction.  Accordingly, the SLC determined that the Company's chances of prevailing on the Derivative Claims (or the additional potential claims explored by the SLC) or to recover significant damages were uncertain.

In short, the costs—financial and otherwise—to Outdoor and its stockholders of a suit against its parent company and members of its board would most likely far exceed whatever monetary recovery Outdoor might hope to obtain from litigation.  Approving the proposed settlement would bring to a close a dispute over the nature of the arrangements between Outdoor and Clear Channel that extends back to 2008 and would limit the Company's exposure to future suits on those same arrangements.  The SLC's business judgment is that this would be a better outcome for the Company than the profound difficulties, uncertainties, disruption, and significant expense that would accompany this litigation going forward.

4.    *All Parties Support the Settlement*

Finally, the proposed settlement is supported by all parties to the litigation, including Plaintiffs.  Plaintiffs' support of this resolution of their Derivative Claims further demonstrates that the proposed settlement is fair and reasonable to all stockholders.

## CONCLUSION

For the foregoing reasons, the proposed settlement is fair and reasonable and should be approved.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  ___*/s/ Michael A. Pittenger*_____
   Donald J. Wolfe, Jr. (#285)

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
New York, NY 10018-1405
(212) 841-1000

   Michael A. Pittenger (#3212)
   Berton W. Ashman, Jr. (#4681)
   Samuel L. Closic (#5468)
   1313 North Market Street
   6th Floor, Hercules Plaza
   Wilmington, Delaware 19899
   (302) 984-6000

Michael Chertoff
Elaine W. Stone
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-6000

*Attorneys for the Special Litigation Committee of the Board of Directors of Clear Channel Outdoor Holdings, Inc. (acting for and on behalf of Nominal Defendant Clear Channel Outdoor Holdings, Inc.)*

Dated:  August 19, 2013
1119460

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2013, a true and correct copy of the foregoing was served by *LexisNexis File & Serve* on the following:

Jay W. Eisenhofer, Esquire
Michael J. Barry, Esquire
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE  19801

Collins J. Seitz, Jr., Esquire
David E. Ross, Esquire
SEITZ ROSS ARONSTAM & MORITZ LLP
100 West Street, Suite 400
Wilmington, DE  19801

Philip Trainer, Jr., Esquire
Toni-Ann Platia, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE  19801

Andre G. Bouchard, Esquire
BOUCHARD MARGULES &
FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801

 /s/  *Samuel L. Closic*
Samuel L. Closic (I.D. No. 5468)

# Exhibit I

EFiled:  Sep 10 2013 09:10AM EDT
Transaction ID 54078107
Case No. 7315-CS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CLEAR CHANNEL OUTDOOR | ) | CONSOLIDATED |
| HOLDINGS, INC. DERIVATIVE | ) | C.A. No. 7315-CS |
| LITIGATION | ) | |

## ORDER AND FINAL JUDGMENT

A hearing having been held before this Court on September 9, 2013, pursuant to the Court's Order of July 9, 2013 (the "Scheduling Order"), upon the Stipulation of Settlement dated July 8, 2013 (the "Stipulation"), entered into in the above-captioned shareholder derivative action (the "Derivative Action"), which is incorporated herein by reference; it appearing that due notice of the hearing has been given in accordance with the Scheduling Order; the parties having appeared by their respective attorneys of record; the Court having heard and considered evidence in support of the proposed Settlement; the attorneys for the respective parties having been heard and an opportunity to be heard having been given to all other persons requesting to be heard in accordance with the Scheduling Order; the Court having determined that notice to Company Stockholders was adequate and sufficient; and the entire matter of the proposed Settlement having been heard and considered by the Court,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** this 9th day of September, 2013, that:

A.    Unless otherwise defined herein, all defined terms shall have the meaning set forth in the Stipulation and the Scheduling Order.

B.     The Court has jurisdiction over the subject matter of the Derivative Action, and all matters relating to the Settlement of the Derivative Action, as well as personal jurisdiction over all of the Parties and each of the Company Stockholders.

C.     The Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing, and Right to Appear (the "Notice") has been given to Company Stockholders, pursuant to and in the manner directed by the Scheduling Order, proof of (i) mailing of the Notice and of the posting of the Notice on the websites of the Company, Grant & Eisenhofer, P.A., Bernstein Litowitz Berger & Grossman LLP, Klausner, Kaufman, Jensen & Levinson, and Saxena White, P.A.; and (ii) dissemination of the Summary Notice via a national newswire service such as Business Wire, Marketwire, or PR Newswire has been filed with the Court, and full opportunity to be heard has been offered to all Parties and all other persons and entities in interest with respect to all matters related to the Settlement. The form and manner of the Notice are hereby determined to have been the best form and manner of notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware and due process.

D.     Based on the record in the Derivative Action, each of the provisions of Court of Chancery Rule 23.1 has been satisfied and the Derivative Action has been properly maintained according to the provisions of Court of Chancery Rule 23.1.

E.     Plaintiffs City of Pinellas Park Firefighters Pension Board and NECA-IBEW Pension Trust Fund have held stock in the Company since the time of the conduct

complained of in the Derivative Action, otherwise have standing to prosecute the Derivative Action, and are adequate representatives of all Company Stockholders.

F.     The Stipulation and the Settlement are found to be fair, reasonable, adequate, and in the best interests of Outdoor and Company Stockholders, and are hereby approved pursuant to the Court of Chancery Rule 23.1.  The Parties to the Stipulation are hereby authorized and directed to comply with and to consummate the Settlement in accordance with its terms and provisions, and the Register in Chancery is directed to enter and docket this Order and Final Judgment.

G.     This Order and Final Judgment shall not constitute any evidence, or an admission by any Party herein, that any acts of wrongdoing have been committed by any of the Parties to the Derivative Action and shall not be deemed to create any inference that there is any liability therefor.

H.     This Order and Final Judgment is binding on the Parties and all Company Stockholders, as well as their successors and assigns, and shall have preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of the Parties or Company Stockholders.

I.     The Derivative Action is hereby dismissed on the merits with prejudice as to all Defendants and as to the Company.  The Parties shall bear their own fees, costs, and/or expenses except as provided in Paragraph P below or as otherwise provided in the Stipulation and the Scheduling Order.

J.     Upon Final Court Approval of the Settlement, the Plaintiffs, the Company, the SLC, and all Company Stockholders (derivatively on behalf of the Company) shall,

by operation of this Order and Final Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Plaintiff Claims against the Released Defendant Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Defendant Persons with regard to any Released Plaintiff Claims, and (iii) forever be barred and enjoined from asserting any Released Plaintiff Claims against any Released Defendant Persons.

K.      Upon Final Court Approval of the Settlement, the SLC, the Company, and the Defendants shall, by operation of this Order and Final Judgment and to the fullest extent allowed by law, (i) release and be deemed to release and forever discharge the Released Defendant Claims against the Released Plaintiff Persons, (ii) covenant and be deemed to covenant not to sue any of the Released Plaintiff Persons with regard to any Released Defendant Claims, and (iii) forever be barred and enjoined from asserting any Released Defendant Claims against any Released Plaintiff Persons.

L.      The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that he, she, they, or it has been advised by his, her, their, or its attorney concerning, and/or is familiar with, the provisions of California Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

M.      The Plaintiffs, the Defendants, the Company, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge: (i) that he,

4

she, they, or it may hereafter discover facts in addition to those that he, she, they, or it now knows or believes to be true with respect to the Derivative Action and the Released Plaintiff Claims and Released Defendant Claims, as applicable; and (ii) that he, she, they, or it may have sustained damages, losses, fees, costs and/or expenses that are presently unknown and unsuspected with respect to Released Plaintiff Claims and Released Defendant Claims, as applicable, and that such damages, losses, fees, costs and/or expenses as the Plaintiffs, the Company, the Defendants, the SLC, and any Company Stockholders may have sustained might give rise to additional damages, losses, fees, costs and/or expenses in the future. Nevertheless, the Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to acknowledge, that the Stipulation has been negotiated and agreed upon in light of such possible unknown facts and such possible damages, losses, fees, costs and/or expenses, and each expressly waives, or shall be deemed to have waived, any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect. The Plaintiffs, the Company, the Defendants, and the SLC expressly acknowledge, and all Company Stockholders shall be deemed to have acknowledged, that this waiver was separately bargained for and is a material term of the Stipulation.

N.     The Parties are hereby authorized, without further approval from the Court, to agree to adopt such amendments, modifications, and expansions of the Stipulation that are consistent with this Order and Final Judgment and the Stipulation and that do not limit the rights of Plaintiffs, the Defendants, the Company, or the Company's

Stockholders under the Stipulation.  Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

O.    If the Settlement is terminated pursuant to the terms of the Stipulation or Final Court Approval otherwise fails to occur, then this Order and Final Judgment and any related orders entered by the Court shall be treated as vacated, *nunc pro tunc*; the MOU and Stipulation shall be null and void and of no force and effect; and the MOU and Stipulation shall not be deemed to prejudice in any way the respective positions of the SLC (acting for and on behalf of Outdoor, with the full power and authority delegated to it by the Outdoor Board), the Plaintiffs, or any Defendant with respect to the Derivative Action or any other action.

P.    Counsel for the Plaintiffs are awarded attorneys' fees and expenses in the amount of $ _6,000,000_ , which sum the Court finds to be fair and reasonable, and which shall be paid to Counsel for the Plaintiffs in accordance with the Stipulation.

Q.    No proceedings or Court order with respect to the award of attorneys' fees, costs, and/or expenses to Counsel for the Plaintiffs shall in any way disturb or affect this Order and Final Judgment (including precluding the Order and Final Judgment from being Final or otherwise being entitled to preclusive effect), and any such proceedings or Court order shall be considered separate from this Order and Final Judgment.

R.     Without affecting the finality of this Judgment in any way, this Court reserves jurisdiction over all matters relating to the administration, consummation and enforcement of the Settlement and this Order and Final Judgment.

_____
Chancellor

1102881

# Exhibit J

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE


IN RE CLEAR CHANNEL OUTDOOR HOLDINGS : CONSOLIDATED
INC., DERIVATIVE LITIGATION          : C.A. 7315-CS


- - -


                          Chancery Courtroom No. 12A
                          New Castle County Courthouse
                          500 North King Street
                          Wilmington, Delaware
                          Monday, September 9, 2013
                          10:34 a.m.


- - -

BEFORE:  HON. LEO E. STRINE, JR., Chancellor

- - -


SETTLEMENT HEARING


------------------------------------------------------
              CHANCERY COURT REPORTERS
                500 North King Street
             Wilmington, Delaware 19801
                  (302) 255-0521

2

1   APPEARANCES:

2        STUART M. GRANT, ESQ.
         JOHN S. TAYLOR, ESQ.
3        Grant & Eisenhofer, P.A.
              -and-
4        AMY MILLER, ESQ.
         of the New York Bar
5        Bernstein, Litowitz, Berger & Grossmann LLP
              -and-
6        JONATHAN M. STEIN, ESQ.
         of the Florida Bar
7        Saxena White, P.A.
           for Plaintiffs
8
         MICHAEL A. PITTENGER, ESQ.
9        SAMUEL L. CLOSIC, ESQ.
         Potter, Anderson & Corroon LLP
10            -and-
         JONATHAN M. SPERLING, ESQ.
11       COLIN P. WATSON, ESQ.
         of the New York Bar
12       Covington & Burling LLP
           for Defendant Special Litigation Committee
13         of the Board of Directors of Clear Channel
           Outdoor Holdings, Inc.
14
         COLLINS J. SEITZ, JR., ESQ.
15       DAVID E. ROSS, ESQ.
         Seitz Ross Aronstam & Moritz
16            -and-
         KEVIN B. HUFF, ESQ.SQ.
17       of the District of Columbia Bar
         Kellogg, Huber, Hansen, Todd, Evans & Figel
18         for Defendants Clear Channel Communications,
           Clear Channel Communications, Inc., Bain
19         Capital Partners, LLC, James C. Carlisle,
           Margaret W. Covell, Blair E. Hendrix, Daniel
20         G. Jones, Mark P. Mays, Randall T. Mays,
           Robert Pittman, Thomas R. Shepard, Marsha M.
21         Shields, Thomas H. Lee Partners, L.P.,
           Scott R. Wells and Dale W. Tremblay
22

23

24

3

APPEARANCES CONTINUED:

    PHILIP TRAINER, JR., ESQ.
    Ashby & Geddes, P.A.
      for Defendant Douglas L. Jacobs and
      Christopher M. Temple

    ANDRE G. BOUCHARD, ESQ.
    Bouchard, Margules & Friedlander, P.A.
      for Defendants Thomas R. Shepard, Marsha M.
      Shields and Dale W. Tremblay

- - -

4

 1                    THE COURT:  Good morning.

 2                    I apologize to everybody for keeping

 3     you waiting.  I would feel better about it if you

 4     could have been outside.  It's lovely out, but you had

 5     to be in here.

 6                    MR. PITTINGER:  Absolutely.  Mike

 7     Pittenger, Potter Anderson, for the Special Litigation

 8     Committee of Clear Channel Outdoor.  With me today is

 9     Jonathan Sperling of Covington & Burling, who will be

10     making the argument on our behalf, with Your Honor's

11     permission.

12                    THE COURT:  Sure.

13                    MR. SPERLING:  Good morning,

14     Your Honor.

15                    THE COURT:  Good morning.

16                    MR. SPERLING:  As Mr. Pittenger

17     indicated, we represent the Special Litigation

18     Committee of Clear Channel Outdoor, and we're before

19     you today to seek approval of the settlement of the

20     derivative claims asserted in this action.  The SLC

21     has worked vary hard to attain the settlement and has

22     support of all parties, and it provides substantial

23     benefits to Outdoor and its shareholders.

24                    Just as background, Your Honor, the

                    CHANCERY COURT REPORTERS

5

1   derivative lawsuits challenged a 2009 amendment to the

2   cash management arrangement between Clear Channel

3   Outdoor, which we generally call "Outdoor," and its

4   90 percent shareholder Clear Channel Communications,

5   Inc.

6                    Under that cash management

7   arrangement, all of Outdoor's cash, excess cash,

8   excess operating cash, is swept on a daily basis to

9   Clear Channel.  That functions as a loan and it's an

10  unsecured loan.  And the derivative complaint has

11  asserted three causes of action: breach of fiduciary

12  duty, waste, unjust enrichment, all based on a 2009

13  amendment to the cash management arrangement.

14                   The SLC investigated those claims over

15  a period of eight months, and the key finding, really,

16  Your Honor, that the SLC made was that that cash

17  management arrangement is, number one, very

18  disadvantageous to Outdoor; and, number two, there is

19  very little that Outdoor can do about it.  The cash

20  management arrangement was instituted before Outdoor

21  was brought public through an IPO in 2005.  All of the

22  terms of the cash management arrangement were fully

23  disclosed to shareholders, future investors, that

24  bought in.  Under the Delaware Supreme Court's

6

1   Anadarko decision, that puts those arrangements beyond

2   challenge by shareholders.

3               THE COURT:  It's like a trusts and

4   estates case, isn't it?  When you spin off something,

5   you write the estate plan and you make the subsidiary

6   a trust fund baby and it just has to live with it.

7               MR. SPERLING:  It just has to live

8   with it, Your Honor.

9               The 2009 amendment --

10              THE COURT:  Yeah, because,

11  unfortunately, unlike actual -- now we have innovative

12  things like once you're dead, an actual human person

13  is dead, all the living beneficiaries just come in

14  together and you do what you do, but because

15  corporations have indefinite lives, they hang around,

16  the parent, and the child can never get free.

17              MR. SPERLING:  That's absolutely

18  right, Your Honor.  And look, you know, one of the key

19  issues here is that the beneficiary of the cash

20  management arrangement from a credit perspective

21  substantially changed after the LBO of Clear Channel

22  Communications.  But as Your Honor points out,

23  corporations are perpetual, and the fact that the

24  credit risk to which Outdoor was exposed chain, it

7

1    doesn't allow Outdoor to exit the situation.

2                    The 2009 --

3                    THE COURT:  Can I ask you a question

4    about a couple of points?  The plaintiffs indicate

5    that Outdoor still has the preexisting -- they had a

6    preexisting right to call in the loan, and that that

7    hasn't been altered by the settlement.  Is that true?

8                    MR. SPERLING:  Your Honor, there is

9    the loan and there is the promissory note that

10   memorializes the indebtedness.  And the promissory

11   note is a demand note, so it's absolutely true that

12   Outdoor can demand repayment, but --

13                   THE COURT:  But is this where I think

14   you and the plaintiffs maybe have a little divide?  As

15   I understand it, what you're saying is there's this

16   sort of circular issue.  If you demand it, then it

17   becomes cash of Outdoor, which then can get swept

18   back.

19                   MR. SPERLING:  That's exactly right,

20   Your Honor.  And so the only way you avoid the sweep

21   is by getting the money outside of Outdoor.  It's got

22   to get distributed right away.  And there are severe

23   restrictions --

24                   THE COURT:  And that's subject to

CHANCERY COURT REPORTERS

8

1  certain corporate governance rights of the parent.

2              MR. SPERLING:  That's exactly right,

3  Your Honor.

4              THE COURT:  So in terms of that

5  preexisting protection, that has just not been that

6  efficacious, because even if you demand the cash back,

7  if they can just sweep it -- and there is no

8  reconciliation of these two rights?  What I mean is

9  they don't sit easily next to each other in a sensible

10  way.

11              MR. SPERLING:  They are drafted as

12  they are drafted, Your Honor.  And Clear Channel was

13  able to set up these arrangements.  Clear Channel

14  Communications, the 90 percent shareholder, was able

15  to set up these arrangements to its liking before the

16  IPO.  It did disclose to perspective purchasers that

17  these arrangements were not negotiated at arm's

18  length.  We certainly agree with Your Honor that one

19  would hope for a better arrangement for Outdoor, but

20  we take it as we have it.

21              THE COURT:  So the drafters laid those

22  things side by side.  So they didn't except from the

23  ability of Clear Channel to do a sweep of the cash,

24  cash that had come back in response to calling the

CHANCERY COURT REPORTERS

9

1    note?

2                    MR. SPERLING:  They did not

3    explicitly, Your Honor, and that's certainly something

4    that the Special Litigation Committee looked into.

5    The sweep is set up to sweep operating cash.  And so

6    one thing we certainly considered is once you demand

7    the money back --

8                    THE COURT:  Is that considered

9    operating cash?

10                   MR. SPERLING:  And we really could not

11   find any basis to conclude that it was not, and that

12   the better view was that it was.  And had the Special

13   Litigation Committee taken the position that it was

14   not, then we would have had a very extended, protected

15   and expensive fight on our hands, and not one that we

16   felt at all confident that we would win.

17                   THE COURT:  The settlement broke the

18   link between the -- as I understand it, the old

19   financing was set in some sort of symmetrical way;

20   right?  The due from and the due to notes or whatever

21   used to have some sort of relationship in terms of the

22   interest rate?

23                   MR. SPERLING:  They actually were

24   mismatched, Your Honor.  So the due to, which is the

10

rate that Outdoor would pay to Clear Channel in the

event that Outdoor was borrowing from Clear Channel,

was a LIBOR-based rate that basically matched Clear

Channel's cost of borrowing.  The due from note

reflecting the balance owed to Outdoor had a rate

originally of the 30-day generic T-bill rate.  So it

was a very low interest rate that Clear Channel was

paying to Outdoor.

In 2009, as part of the amendment,

that was raised to 9-1/4 percent.  The gravamen of the

plaintiff's complaint was that that 9-1/4 percent

still didn't reflect Clear Channel's credit risk.  And

the SLC's view is that it did not accurately reflect

Clear Channel's credit risk, but it was a substantial

improvement, number one, over what Outdoor was

contractually saddled with.

THE COURT:  But wasn't there a time --

I guess there is a lot of complexity to the

arrangements between the two companies, but as I

understand it, for example, when Outdoor was able to

refinance its notes in autumn of last year, which

saved it money, that had the effect, because it was

able to get a refinancing of its own credit, it had

the effect of reducing its obligations --

11

1          MR. SPERLING:  Clear Channel's
2 obligations to Outdoor.
3          THE COURT:  Right.  So if Outdoor
4 could borrow at a lower rate in the market, it
5 couldn't just take advantage of that cost-free.  It
6 then simultaneously had to suffer the reduction in
7 interest rate payments from Clear Channel, even though
8 Outdoor's cost of capital might not be the same.
9          MR. SPERLING:  Correct, Your Honor.
10 So it's not that the rate potentially paid by Outdoor
11 to Clear Channel and the rate paid by Clear Channel to
12 Outdoor were matched.  Pursuant to the 2009 amendment,
13 the rate that Clear Channel would pay to Outdoor is
14 pegged to the rate of Outdoor's debt.
15          THE COURT:  Outside lines of credit.
16          MR. SPERLING:  Exactly, so that at
17 least Outdoor is not losing money by issuing debt.
18          THE COURT:  That link has now been
19 broken?
20          MR. SPERLING:  The link is broken only
21 under certain circumstances, Your Honor.  So the link
22 will be broken --
23          THE COURT:  So when you hit these
24 financial thresholds, the coverage ratio, the other

12

1    things, then there is an increase in the rate.

2                    MR. SPERLING:  That's exactly right,

3    Your Honor.  Then we start looking not to Outdoor's --

4    the rates paid by purchasers of Outdoor's debt, but,

5    rather, what Clear Channel debt is trading for.

6                    THE COURT:  And that's tied to the

7    unsecured debt --

8                    MR. SPERLING:  Of Clear Channel.

9                    THE COURT:  -- of Clear Channel?

10                   MR. SPERLING:  That's right,

11   Your Honor.  And that was something that we put

12   forward.  For example, Clear Channel in the first

13   instance took the position that if they were going to

14   acquiesce to something like that at all, they wanted

15   it tied to secured debt, and we said absolutely not.

16                   THE COURT:  How did I -- this is

17   something I'm going to ask Mr. Grant and his team as

18   well.  The 200 million comes in and it's dividended

19   out.  89 percent of it goes to Clear Channel.

20   11 percent of it goes to the public stockholders.  But

21   Clear Channel can immediately begin drawing down more

22   debt from Outdoor; right?

23                   MR. SPERLING:  It can, Your Honor,

24   although I think "drawing down" is something of a

13

1   misnomer.  It's not that Clear Channel decides to go

2   tap this line.  When Outdoor has excess cash, it is

3   loaned.  So to the extent that Outdoor has more excess

4   cash, then, yes, the balance will immediately begin to

5   grow again.  To the extent Outdoor does not have

6   excess cash, the growth in the balance will stop or

7   diminish.

8                    THE COURT:  Yeah, and it's a weird

9   relationship; right?  Because it's not necessarily

10  that Clear Channel even has a use for the capital.  It

11  just gets to have ownership of it.

12                   MR. SPERLING:  Yes, Your Honor.

13                   THE COURT:  And then make the source

14  of it an unsecured debtor to get back its own cash.

15                   MR. SPERLING:  That's right.  Perhaps

16  fortunately, Clear Channel's debt structure is such

17  that it probably does have a use for the money.

18                   THE COURT:  Yeah, to service other

19  debt is what you're saying.  Yeah.

20                   This was a strange IPO, this Outdoor

21  IPO.

22                   MR. SPERLING:  It was a strange IPO,

23  Your Honor.  It became stranger following the LBO.

24                   THE COURT:  This is one of the hot

14

1  markets; right?  Outdoor advertising was like an

2  emerging market?

3            MR. SPERLING:  I don't know how much

4  it was emerging, but it's definitely, as you can see

5  from the balance, Outdoor throws off a lot of cash.

6            THE COURT:  Was everybody trying to

7  maneuver to get in on the offering?

8            MR. SPERLING:  Outdoor has made a

9  number of acquisitions.  It's been a successful

10  business.  The advertising market can be challenging,

11  but it's clearly throwing off good amounts of cash.

12            THE COURT:  What is the incremental

13  benefit of the 200 million?  Did anybody look at this

14  as compared to being owed the money?  Because,

15  obviously, as a company, what you're getting out to

16  the public investors is the cash.  I suppose you can

17  make an offer.  You know, Clear Channel then gets the

18  money, its share, but it doesn't have to pay interest

19  on it anymore.

20            MR. SPERLING:  That's right.

21            THE COURT:  So to some extent, there

22  is some offset of the benefit to Outdoor.  Right?

23            MR. SPERLING:  There is an offset,

24  Your Honor, but at least Outdoor is getting the money

15

 1  back and the minority share is getting distributed,

 2  whereas in the absence of that, there is always the

 3  risk that Clear Channel holds onto the money, pays a

 4  rate but arguably below-market rate, and then if it

 5  goes into financial distress, is never able to repay

 6  the money.

 7              And one of the things the SLC needed

 8  to grapple with is because of the various restrictions

 9  set up by the pre-IPO contracts, Outdoor really can't

10  go out and raise third-party financing without Clear

11  Channel's consent.  And so the balance owed by --

12              THE COURT:  Outdoor doesn't have any

13  regular dividends, I take it.

14              MR. SPERLING:  No, Your Honor, not to

15  my knowledge.

16              THE COURT:  How much per share is this

17  dividend, the public float?

18              MR. SPERLING:  Your Honor, I don't

19  remember offhand.  I can certainly get that for you.

20              Mr. Grant is telling me it's 65 cents,

21  ballpark, and that sounds right to me.

22              THE COURT:  And what does Outdoor

23  trade at?

24              MR. SPERLING:  Mr. Grant is telling me

16

1   5 to $6 right now.

2                    MR. GRANT:  It's a good chunk.  It's

3   like a 10 percent dividend.  It's a substantial

4   amount.

5                    MR. SPERLING:  And there was a good

6   response in the market, Your Honor, to the

7   announcement.

8                    THE COURT:  Because it's some

9   liquidity; right?

10                   Okay.  I'm trying to think if I had

11  any -- I think those are my main questions for you.

12  Do you have anything else?

13                   MR. SPERLING:  I don't need to go on.

14  If we've addressed Your Honor's questions, I'm happy

15  to turn it over to Mr. Grant.

16                   Thank you, Your Honor.

17                   MR. GRANT:  Your Honor, if I could

18  just follow up on some of the things that Mr. Sperling

19  said.  You know, one of the challenges -- what we

20  really wanted was to say, "Call back the entire loan,

21  dividend it out, 11 percent will go to the public

22  shareholders, give Clear Channel its 89 percent of the

23  money, and let's start again at zero."  And we were

24  pushing very hard on that.  But the problem is, as was

17

1   said at the very end, that Outdoor can't borrow on its

2   own except in very limited circumstances and then very

3   limited amounts.

4                   THE COURT:  Without the parent's

5   permission.

6                   MR. GRANT:  Right.  And so the problem

7   is, you know, we spoke to the special committee, or

8   through its lawyers, and kept pressing them, "Why

9   can't we do that?"  And they said, There are business

10  reasons why we need access to 400 to 600 million.

11  There are opportunities out there that we're looking

12  at right now that may cause us to want to be able to

13  buy something.  And if we do, then we can call that

14  money back.  If we don't and we've dividended it out,

15  while a normal company might be able to go into the

16  market and finance that, we can't."

17                  So the idea was what's the maximum

18  that we could get back to give to the shareholders

19  while not having this settlement impose a problem on

20  the business judgment of the board to be able to do

21  acquisitions that would inure to the company's

22  benefit.  And so that got to be a little bit dicey and

23  part of it.

24                  And I will tell you that the number

18

1  that the special committee wanted was much smaller

2  than the number that we wanted.  And we told them we

3  wouldn't sign on to a substantially lower number.  And

4  I think with our help, the special committee was able

5  to push Clear Channel to come up to the 200 million.

6  And --

7            THE COURT:  Now, how does this

8  reduction -- you heard me talking to Mr. Sperling

9  about this weird interplay between the demand right

10 that Outdoor has and the sweep account where, you

11 know, arguably, you demand it, they say, "Okay, here's

12 50 million back," and then they sweep it up to Clear

13 Channel.

14            MR. GRANT:  Right.

15            THE COURT:  How does that work with

16 the $114 million limit for the public stockholders?

17            MR. GRANT:  What happens is when you

18 say, "I'm demanding the loan; you've got to return it

19 tomorrow," you also, at the board level, have to say,

20 "We're declaring a dividend tomorrow to all those who

21 are shareholders."  And then as soon as that money

22 comes in, it goes out.

23            THE COURT:  Is that understood?  Is

24 that in the -- I haven't read the papers.

CHANCERY COURT REPORTERS

19

1            MR. GRANT:  That's more than
2    understood.  That's explicit.  That has to happen.
3            THE COURT:  So the call right, when
4    you call -- when it gets over 114, you're going to
5    call back 29, and it's going to get dividended out.
6            MR. GRANT:  Immediately, because it
7    can't even sit there and wait, but it immediately gets
8    dividended out.
9            THE COURT:  And it won't be just
10   dividended to the public stockholders; right?
11           MR. GRANT:  Well, no, it will be
12   dividended to everyone, but then it's not 29.  What
13   you really have to do is say 11 percent is 29, and the
14   other 89 percent -- so it goes in and it immediately
15   gets dividended out.
16           THE COURT:  The $29 million dividend
17   to the public stockholders, and then --
18           MR. GRANT:  And then whatever
19   approximately nine times that is --
20           THE COURT:  To Clear Channel.
21           MR. GRANT:  Correct.  And that will,
22   again, dramatically reduce the amount due or the note
23   that's the "from."
24           THE COURT:  And there is no time limit

CHANCERY COURT REPORTERS

20

1   on any of these arrangements between Clear Channel and

2   Outdoor?

3                    MR. GRANT:  That's my understanding.

4                    MR. SPERLING:  Your Honor, the due

5   from note itself has a maturity date of 2017.  The

6   underlying sweep obligation is set forth in a

7   different agreement, corporate services agreement, and

8   that has no inherent sunset provision.  It goes on in

9   perpetuity until such time as Clear Channel

10  Communications doesn't control Outdoor anymore.

11                   MR. GRANT:  And so, of course, the

12  problem is when the due from note has a maturity date,

13  it gets paid, and the next day, the cash is sitting

14  there and it gets taken again.  So in that regard, as

15  long as the cash sweep is there, the other notes don't

16  even matter because they're always going to take

17  Outdoor's cash.

18                   THE COURT:  That's what I was asking

19  about this demand.  The preexisting demand thing just

20  isn't that useful because if you demand it all --

21                   MR. GRANT:  Unless you are prepared to

22  spend it within 24 hours, you basically --

23                   THE COURT:  And even then, what you're

24  saying is what you've got is a contractual agreement

21

1  that you can spend it on this dividend.  If it weren't

2  for this settlement, would you be able to do a

3  dividend?

4               MR. GRANT:  I think they still would

5  be able to.  I think if they asked for the money in,

6  as long as it's not sitting there to be swept in the

7  bank account the next day, I think they could do that.

8  But, of course, you would need --

9               THE COURT:  So a dividend is within

10  the --

11               MR. GRANT:  Within the Outdoor board's

12  purview, but the problem is a majority of the Outdoor

13  board is Clear Channel.

14               THE COURT:  Right.

15               MR. GRANT:  So they don't seem so keen

16  on --

17               THE COURT:  This says "shall," this

18  shall happen.  Okay.

19               MR. GRANT:  Right.  Right.

20               THE COURT:  And that's what I mean

21  about it being a contractual trimming back of that

22  sweep account, functionally, in this limited area.

23               MR. GRANT:  Correct.

24               THE COURT:  Because otherwise, you

22

1    could demand it back, but -- you can say, Well, we're

2    going to dividend it" -- I guess the independent

3    directors can say, "We want to dividend it," and then

4    the majority is affiliated with Clear Channel.  Right?

5                   MR. GRANT:  Right.

6                   THE COURT:  And they would say, "Well,

7    that's funny, but" --

8                   MR. GRANT:  Well, although here's the

9    interesting thing --

10                   THE COURT:  They do sit as a

11    fiduciary.

12                   MR. GRANT:  Yes.  And I just wanted to

13    add that.  While we all shook hands and said, "Okay,

14    we have a deal," the message was we're not going to be

15    able to sit there and micromanage your business.  You

16    guys all have fiduciary duties to Outdoor and Outdoor

17    shareholders.  So that if --

18                   THE COURT:  What I'm saying is if the

19    board makes a demand or they still have a fiduciary

20    duty to consider whether they make a demand, and if

21    they make a demand or, frankly, the independent

22    directors say you should make a demand and they refuse

23    to do it, when they're sitting as a fiduciary, they're

24    supposed to act in the best interest of Outdoor and

23

1   its stockholders.  And what it means by "its

2   stockholders," its stockholders are those folks in

3   their capacity as Outdoor stockholders, not because of

4   their larger portfolio.  And this might shine more of

5   a light on their -- on them and make it more difficult

6   for them not to take action.

7                   MR. GRANT:  Right.  And, you know, I

8   left them with the parting words of Freddie Krueger

9   that "I'll be back."  Anyway --

10                  THE COURT:  I've never seen that

11  movie, actually.

12                  MR. GRANT:  Just let me give

13  Your Honor --

14                  THE COURT:  It's one of these horror

15  films?

16                  MR. GRANT:  Yes.  There are like eight

17  of them or something.  But, just an example, so let's

18  say that --

19                  THE COURT:  And I have not yet seen

20  "Sharknado."

21                  MR. GRANT:  So let's say the due from

22  was up to 800 million, so that doesn't trigger

23  anything yet.  But let's also say that all the

24  properties out there that Outdoor could ever

24

conceivably think of buying have already been bought

up.  And Outdoor says, "Gee, to make sure that we

fully fund our business, we only need 200 million in

access to cash."  It would seem to me to be Outdoor's

fiduciary duty to say, "We have all this excess cash.

We ought to be dividending it out."

And there is nothing in this

settlement that lets them off the hook to say, "Well,

gee, now we don't have to regularly reassess the

amount of cash there."  It's not like, okay, as long

as you're under this threshold, you don't have to give

it back.  You always have to be mindful of your

fiduciary duties.  The only thing is once it hits this

threshold, you don't have a choice anymore.  You've

got to ask for it back.

THE COURT:  Can I ask a question?  It

may be going into the fee part.  And this relates to

this issue, again, of the interest rate.  How can I

treat the 200 million as if it's like a damage award

on a deal?  There was a reference to the Genentech;

right?

MR. GRANT:  I think the better

reference is to Southern Peru.

THE COURT:  Everybody --

25

1          MR. GRANT:  I didn't mean in
2 magnitude.  I meant that the attorney's fee was
3 awarded on the amount of the judgment, not what went
4 to the --
5          THE COURT:  I was going to say,
6 Genentech, one of the things that's pure about
7 Genentech is Genentech was a situation where somebody
8 had a deal at 89.  It went to 95.  There is a $6
9 difference.  It all went into the class's hands.
10          MR. GRANT:  Right.
11          THE COURT:  In southern Peru -- and I
12 don't think I was making any new law on this.
13 Frankly, I didn't think I was making new law on really
14 any of it, even on the size of the fee.  It's just
15 billions are different than -- you know, I've awarded
16 a few people in this room some pretty big fees, not
17 just on one side, even.  There are some people who
18 they don't -- they want to hide that they do
19 plaintiffs' work at times, but they're over there, and
20 you know who they are too, and they've done pretty
21 well.
22          Even Pittenger has been a plaintiff's
23 bulldog at times, although his firm actually
24 represented someone suing him.  No, that's not true.

26

But I did have a case involving a different Michael
Pittenger, and the Potter firm was on the other side.
And they actually did it pro bono just for the
vicarious pleasure.

No, but what I was going to say about
Southern Peru, in terms of -- you know, it is the case
that in derivative litigation, because it's supposed
to benefit the company, if it's a damage award and it
comes in, it goes to the corporate coffer.  What is
different a little bit about Southern Peru, obviously,
is that the money stayed in the corporation.

And what I was asking Mr. Sperling
about is, here, a lot -- there is no question in terms
of the 11 percent that went out to the public
stockholders, it's easy -- especially, you can
conceive of it as, you know, they've had excess cash
impounded in this.  They're not really getting an NPV
positive investment use of it.  They're just having it
sucked up to the parent at credit risk.  But with the
remainder, it doesn't stay in the -- the 89 percent
doesn't stay in either.  And, arguably, the entity, as
I said, is giving up the interest rate on it; right?

Like, I mean, the thing is as
between -- when you look at that in terms of a

27

1    derivative benefit, Clear Channel is the recipient

2    either way, but, arguably, the entity -- how is the

3    entity better off as to that portion, which is to have

4    that money in Clear Channel's hands outright, as

5    opposed to having Clear Channel owe that portion of it

6    plus the interest?

7                    MR. GRANT:  Well, I also -- I think

8    that they're benefited in large part because there is

9    a huge credit risk here.  And to have 800 or

10   850 million in a credit risk to -- I thought it was

11   funny that the credit risk was CCC and that was also

12   their initials.  At one time, I actually wanted to put

13   CCC minus because that's what some of their debt is.

14                    But, anyway, I think the idea of not

15   having so much -- one of the reasons I think the

16   Outdoor stock popped was not only that they were

17   getting some money back, but it's that the percentage

18   of the assets that are sitting there kind of locked up

19   in this, you know, somewhat dangerous concentrated

20   investment was reduced.

21                    So I think the benefit of just saying,

22   okay, the assets, we have all these Outdoor signs,

23   versus the cash, that balance has changed now and,

24   therefore, gives you a different valuation than if a

28

1   higher percentage is locked up in a very risky credit.

2   And so I think it helps them with that.

3             THE COURT:  But does it dampen down --

4   the way Mr. Sperling submitted it is because what

5   Clear Channel owes is just -- it's really -- it's like

6   the more successful Outdoor is, if it has a great

7   quarter, it ends up being owed more money by Clear

8   Channel?

9             MR. GRANT:  Yes.  Yeah.  It's -- look,

10   I mean, when we were working with this stuff, it was

11   very hard to get our arms around it.

12             THE COURT:  Because you say, "Well, we

13   had a great quarter" --

14             MR. GRANT:  And we still have no cash.

15   All we have is a larger receivable.

16             THE COURT:  From --

17             MR. GRANT:  From a CCC credit risk.

18             THE COURT:  But that's a good defense

19   against activism; right?  Because if -- everybody

20   wants you to take on leverage.  If you're Clear

21   Channel and your symbol is CCC, you can say, "We're

22   already at optimal capital structure for you guys."

23             MR. GRANT:  Well, again, as Mr.

24   Sperling pointed out, when the deal was cut, they were

29

1   not like that.  It was the $16 billion leveraged

2   buyout that put them in that group.

3                And I guess I ought to add, you know,

4   one of the interesting things is, you're talking about

5   activism, JHL Capital in November of '11 wrote a

6   letter and said, you know, "This arrangement is really

7   awful.  You guys have got to do something about it."

8   And the company said, "Gee, there is nothing that can

9   be done."  Add it wasn't until Panella Park comes in

10  in March of '12 and says, "We're going sue you and

11  we'll see if some things are done," that the special

12  committee is created where they're hounding away and,

13  lo and behold, there are things that can be done.

14                Maybe I can use that as a segue,

15  Your Honor.  Your Honor said, "What's the benefit to

16  the company?"  To the extent that Your Honor is

17  looking at that with regard to the fee, I mean, I

18  think the fee, even if you looked solely at what the

19  public shareholders are getting --

20                THE COURT:  So if you just look at the

21  dividend --

22                MR. GRANT:  Exactly.  It's reasonable.

23  And the other thing I should mention --

24                THE COURT:  You're talking about like

30

1  30 percent of the dividend.

2          MR. GRANT:  Well, it's an interesting

3  way of looking at it because Outdoor is not paying for

4  the fee.  CCC is paying for it.  So none of it is

5  actually coming from our client and what they own.

6  CCC is paying for it.  So if you said, "Well, the

7  dividend is about 20" --

8          THE COURT:  So just by having CCC pay

9  it, though, it's just increasing the credit risk.

10          MR. GRANT:  They do that too.  They do

11  that too.  But if you look at it and say, "Well, there

12  is 22 plus the 6 of the fee" --

13          THE COURT:  Think of all these credit

14  risk cost factors over on this side of the room.

15  Then --

16          MR. GRANT:  I'm looking, and I see

17  credit risk just looking to my right.

18          But so the total benefit, in a way, is

19  28, is the 22 plus the 6.

20          THE COURT:  I mean, Mr. Bouchard

21  either got indoor or outdoor tanning in some way.  I

22  don't know if we want to ask him on the record which

23  it is.  He's looking really good, either way.  But,

24  you know --

CHANCERY COURT REPORTERS

31

1          MR. GRANT:  It's the sunroof on the

2   Bentley.  I think that's what does it.

3          Anyway, so it's -- you know, the total

4   aggregate benefit just in the cash is really

5   28 million because it's the 22 plus the 6, so we're

6   under 25 percent.  And then, of course, we talked

7   about the future prophylactic obligations that are put

8   in with regard to future dividends.  So I think the

9   fee is reasonable in that regard.

10          THE COURT:  Because the amount of the

11   dividend, again, was 65 cents per share, essentially?

12          MR. GRANT:  Well, I want to be careful

13   on 65.  It's 11 percent of the 200 million, so it's

14   $22 million.

15          THE COURT:  $22 million.

16          MR. GRANT:  I forgot how many shares.

17   It's about 30 million shares outstanding, I think it

18   was.  So it's somewhere along 63, 64, somewhere around

19   there.  And then, again, I guess it depends on whether

20   you look at the price today or the day before the

21   dividend was announced, but it's a good chunk of cash.

22          THE COURT:  Thank you, Mr. Grant.

23          Anybody else have anything?

24          Mr. Sperling?

32

1           MR. SPERLING:  Just for a moment,
2    Your Honor.  I wanted to clarify two things, one of
3    which, I think, is already clear to the Court.
4    Mr. Grant, I'm sure unintentionally, misspoke on one
5    issue.  He, of course, accurately described the
6    fact --
7           THE COURT:  Unintentionally?
8           MR. SPERLING:  I'm sure it's
9    unintentionally.
10           THE COURT:  That's what I thought you
11    said, but it was a little pre-caffeinated, so it
12    wasn't clear.
13           MR. SPERLING:  Most definitely
14    unintentional, I'm sure, Your Honor.  Mr. Grant was
15    describing the fact that the Outdoor board always has
16    the right before the triggers set forth in the
17    settlement are hit to demand repayment of all or a
18    portion of the due from balance and to issue a
19    dividend if they see fit.  When the triggers are hit,
20    I think Mr. Grant said that at that point, it becomes
21    an obligation.
22           There is no obligation to do it when
23    the triggers are hit, but when the triggers are hit,
24    the independent committee has the right to do it

33

1   without regard to the other members of the board.

2                   One other I think very minor issue --

3                   THE COURT:  Well, which takes it

4   outside of the control of Clear Channel.

5                   MR. SPERLING:  Correct, Your Honor, or

6   any of its representatives on the Outdoor board.

7                   THE COURT:  Because I suppose there

8   could be -- one could conceive of situations where the

9   spillover effects to Outdoor of doing something

10  against Clear Channel because of the relationship

11  would outweigh the benefits of doing it.

12                  MR. SPERLING:  Exactly right, Your

13  Honor.  The independent directors still have to

14  exercise their fiduciary duty and figure out, under

15  the circumstances as they present themselves at the

16  time, is it or is it not in Outdoor's interest to

17  actually pull this money back.

18                  The other issue, very minor, but just

19  so that the record is absolutely clear, I spoke to

20  Mr. Grant about this, I think there is a passage in

21  Mr. Grant's brief which suggests that Clear Channel

22  will pay for all of the independent committee's

23  outside advisors.  In fact, Clear Channel will only

24  pay for the independent committee's outside advisors

34

1  in connection with any future transaction between the

2  two companies.  Outdoor will pay for whatever outside

3  advisors the independent directors need in the course

4  of their executing their functions as part of that new

5  independent committee.

6              THE COURT:  So any future -- like, if

7  there is an actual negotiation over redoing these

8  credit arrangements or something like that, in that

9  case, Clear Channel will pay for the advisor for

10 Outdoor?

11             MR. SPERLING:  For example, or any

12 other transaction that needs to be negotiated between

13 the two.

14             THE COURT:  But if it's just the

15 committee seeking advice to deliberate on whether to

16 demand or something like that, then Outdoor will pay

17 them?

18             MR. SPERLING:  That's correct,

19 Your Honor.

20             Thank you, Your Honor.

21             THE COURT:  But since it's doing so

22 with its operating cash, otherwise, it's going to go

23 to Clear Channel; right?  Like when the lawyers, like,

24 negotiate, they're out there like, "Hey, I know you

35

wouldn't, like, rather pay me than other vendors, but
pay me or Clear Channel?  Come on.  Don't you want
another associate on this?"

I have only two of the three things I
usually have to do at these kinds of hearings because
it is not a class action.  It's a derivative action,
which is actually, if you think about it, a form of
class action.  So I don't have to certify a class
representative or anything.  I just need to approve
the settlement.

I'm confident that the settlement is
reasonable and fair.  It's difficult -- in some ways,
this case is inspiring only in this sense.  I've
always wondered why corporations tie themselves in
knots when they do spin-offs and set up odd
negotiations where they give leverage to something
that they're spinning off.  That always gets whacky,
and then you often have litigation down the line.  And
they end up, they're like, "We don't need to split you
off.  It's just one thing."

This, of course, though, illustrates
that you've got to be careful what you buy if you're
buying stock in a spun-off corporation that is subject
to ongoing contractual constraints by the former

36

1   owner.

2             And I think when you look at what the

3   plaintiffs could have achieved under the litigation,

4   you know, the reality is that the pre-IPO arrangements

5   were formidable and it's very difficult to complain

6   about them because they're not the sort of thing that

7   was the subject of a fiduciary negotiation.  They were

8   disclosed and people bought into them.

9             Given that, I think what the

10  litigation achieved -- and it was a combination

11  effort, obviously, between the plaintiffs and the

12  Special Litigation Committee, but I think the SLC has

13  been -- its own name suggests that the benefit here

14  has to be attributed substantially to the litigation,

15  because the SLC's creation was really impelled by the

16  litigation and by the fact that there was somebody who

17  was willing to go head to head on behalf of Outdoor

18  with Clear Channel.

19             Is it a perfect settlement?  I don't

20  think there is anything perfect here for Outdoor,

21  because Outdoor is locked in a symbiotic relationship

22  with its former parent.  I guess it's still its parent

23  in sort of classic parent-subsidiary terms.  And I

24  don't think that there was any legal theory that was

37

1    going to allow Outdoor to break that link in a

2    thorough-going way that the Outdoor stockholders might

3    prefer.

4                And you can't play pretend.  That

5    isn't the company they invested in.  They didn't

6    invest in a spun-off company that would do its own

7    financing.  They knew when they invested that this was

8    a company that was tethered in an ongoing way to Clear

9    Channel.

10                I think given those realities and

11    especially my understanding of the sweep account now

12    and the difficulty that posed for anybody -- I mean,

13    it would have been a very interesting contractual

14    litigation.  I do think those two things sit very

15    oddly next to each other.  But it did -- you know, on

16    the plain language of those agreements, and Delaware

17    takes those seriously, you know, yeah, you could

18    demand it back, but because of the sweep arrangement

19    and because of the power on the board and because of

20    the specific contractual rights, what was the utility

21    of that?

22                That's now been replaced with

23    something where there is substantially more clout on

24    the part of the independent members of the board who

38

are not directly beholden to Clear Channel.  Though
they have the fiduciary flexibility not to invoke some
of these rights, it certainly puts them under the gun
and allows them to hold their -- retain their own
advisors, and it allows them to act unilaterally to
accomplish certain things to protect the minority
stockholders and Outdoor itself without having to get
permission from the Clear Channel directors.  So those
are substantial benefits on an ongoing basis.

And the dividend feature of it, the
reduction of the outstanding amount plus the dividend
out, in particular to the public stockholders, is a
substantial benefit.  Given the stock price and given
the market cap of Outdoor, a dividend of this kind is
not a trifle.

And the potential that the independent
directors will be able to deliver periodic liquidity
if the results of the company are such that Clear
Channel's cash accumulation grows is a substantial
ongoing benefit.  So I have no problem approving the
settlement.

The fee, it's a nice hourly wage
that's requested, but I'm not going to quibble with
it.  I'm not looking at the fee as if -- because of

39

1   the trade-off with the interest rate and the fact that

2   the money goes immediately out, I have a little

3   difficulty -- and I can't say that I worked out this

4   in my mind exactly -- I have some difficulty in sort

5   of dollar-for-dollar equating it to a damage award or

6   something like that, because it is a bit of a

7   trade-up.

8              That doesn't trouble me in terms of

9   awarding the fee because if you simply look at this as

10  a $22 million special dividend to the minority

11  stockholders, that clearly would not have occurred

12  absent the litigation.  And when you simply look at

13  the fee requested in relationship to that number, it's

14  fully in accord with our precedent.

15             I don't think that this is any kind of

16  shared benefit case simply because there is an SLC.  I

17  think it's clearly a litigation-driven thing, and so

18  the fee would be justifiable just in relationship to

19  that number.  And I do think there is -- I give credit

20  to the idea that Outdoor as a whole having less

21  exposure to Clear Channel is a benefit to itself and

22  all its stockholders.

23             And, as I just explained in approving

24  the fee, the caps, the coverage caps, and the amount

40

1    that's set in the settlement that triggers power for
2    the independent directors when the minority
3    stockholders' exposure to the credit risk gets above a
4    certain level, has the promise of real future economic
5    benefit to them, both in terms of protecting them from
6    excess credit risk and actually beginning to create a
7    relationship between Outdoor and Clear Channel where
8    perhaps the independent directors of Outdoor begin to
9    say to Clear Channel, "We're a fairly good cash-
10   generating business.  We actually think you might want
11   to start considering some more regular liquidity
12   events for the minority stockholders."  That's the
13   sort of thing that could come out of this.  But at the
14   very least, it gives them the leverage to protect the
15   minority stockholders against excess risk in the
16   future without having to get permission of Clear
17   Channel.
18                    So when you put those together, when
19   you put together the $200 million overall reduction,
20   when you take into account specifically the special
21   dividend to the minority stockholders, and the then
22   the ongoing protection of them, I'm not going to
23   quibble about the hourly rates.
24                    Sugarland, primarily -- and it may be

41

1    aptly named -- primarily focuses on the benefit; and I

2    think the fee is reasonable in relation to the

3    benefit.

4              We have always adhered in Chancery --

5    there was nothing new about Southern Peru in this

6    regard except the magnitude of the recovery.  We've

7    always adhered to the idea that if you get a very

8    solid recovery, you should have a very solid fee.

9    That's the way the best incentive system works.  You

10   don't want to say, "If you get really good results,

11   we're going to shave your fee."  That doesn't make any

12   sense.  We should be shaving a fee when there are not

13   really good results.

14             And here, it seems to me what's

15   requested is -- as I said, if you look at the hourly

16   rate, you could say, "Well, I wish I got that."  We

17   don't build fees on envy because there are cases where

18   people get something that sounds like the salary of a

19   former Chicago Bears linebacker for their efforts.

20             So for all those reasons -- the

21   quality of counsel is immense, which means that's a

22   perfectly ordinary factor in our court because you're

23   always immensely talented.  There were complex issues,

24   all those kinds of things.  I've considered them to

42

1    the extent that's necessary under Sugarland, but the

2    primary thing is the benefit and is what is being

3    requested reasonable to the benefit to Outdoor,

4    because this is a derivative action.

5                    And I also give credit to the fact

6    that because there was an SLC on the scene, that the

7    SLC comes at these things from a little bit different

8    perspective than ordinary defendants do; and their

9    presence on the scene and participation in the fee

10   arrangements and the fact that the fee is being paid

11   by Clear Channel also counts in favor of its

12   reasonableness.

13                   So I'm going to approve the fee as

14   requested.  If somebody has an implementing order, I

15   would be happy to sign it.

16                   And, again, I apologize for delaying

17   the hearing, and I hope you all have a good day.

18                   (Court adjourned at 11:20 a.m.)

19                        – – –

20

21

22

23

24

43

1                       CERTIFICATE

2

3               I, JEANNE CAHILL, RDR, CRR, Official

4    Court Reporter for the Court of Chancery of the State

5    of Delaware, do hereby certify that the foregoing

6    pages numbered 3 through 42 contain a true and correct

7    transcription of the proceedings as stenographically

8    reported by me at the hearing in the above cause

9    before the Chancellor of the State of Delaware, on the

10   date therein indicated.

11               IN WITNESS WHEREOF I have hereunto set

12   my hand this 12th day of September, 2013.

13

14                              /s/ Jeanne Cahill

15                        --------------------------
                              Official Court Reporter

16                           of the Chancery Court
                                State of Delaware
17

18

19

20

21

22

23

24

# Exhibit K

EFiled:  May 12 2016 04:10PM EDT
Transaction ID 59001358
Case No. 12312-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GAMCO ASSET MANAGEMENT INC., | |
| Plaintiff, | |
| v. | **PUBLIC (REDACTED) VERSION  5/12/16** |
| iHEARTMEDIA INC., iHEARTCOMMUNICATIONS, INC., BAIN CAPITAL PARTNERS, LLC, THOMAS H. LEE PARTNERS, L.P., ROBERT W. PITTMAN, VINCENTE PIEDRAHITA, BLAIR HENDRIX, DANIEL G. JONES, OLIVIA SABINE, CHRISTOPHER TEMPLE, DALE W. TREMBLAY and DOUGLAS L. JACOBS, | C.A. No. 12312-VCS |
| Defendants, | |
| -and- | |
| CLEAR CHANNEL OUTDOOR HOLDINGS, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF THE ACTION .......................................... 2

II.   PARTIES ........................................................................................ 9

    A.   Plaintiff ................................................................................ 9

    B.   Defendants ......................................................................... 10

          i.    Nominal Defendant Clear Channel Outdoor Holdings, Inc. ...................................................................... 10

          ii.   The iHeart Defendants ................................................ 10

          iii.  The Private Equity Defendants ..................................... 11

          iv.  The Board Defendants ................................................. 12

III.  SUBSTANTIVE ALLEGATIONS ...................................................... 13

    A.   History of iHC's Control over CCOH ...................................... 13

    B.   iHC's 10-Year History of Financial Problems ........................... 18

          i.    The Highly Leveraged 2009 Buyout Burdens the iHeart Defendants With Debt ..................................... 18

          ii.   The iHeart Defendants' Post-LBO Financial Crisis ............... 18

    C.   The 2012 Litigation Over CCOH's Exposure to iHC ..................... 20

    D.   The iHeart Defendants' Worsening Financial Crisis ...................... 23

    E.   The Board Continues to Allow Defendants to Exploit CCOH and Diminish CCOH's Liquidity Through the Revolving Note ........ 25

    F.   Plaintiff's Section 220 Demand Confirmed that the Board Caused CCOH to Enter Into Numerous Transactions that Served to Prop Up the iHeart Defendants .......................................... 27

          i.    The Note Offering to Benefit iHC .............................. 30

          ii.   The Asset Sales ........................................................ 34

G.  The Texas Litigation.............................................................. 39

H.  CCOH's Future Viability as a Stand-Alone Public Company ........... 41

IV.  DERIVATIVE ALLEGATIONS ................................................. 42

V.  DEMAND ON THE BOARD IS EXCUSED AS FUTILE ......................... 43

VI.  CLAIMS FOR RELIEF ......................................................... 48

      COUNT I Breach of Fiduciary Duty  Derivatively
          Against the iHeart Defendants and the Private
          Equity Defendants as Controlling Stockholders............ 48

      COUNT II Breach of Fiduciary Duty  Derivatively
          Against the Board Defendants ....................................... 49

      COUNT III Aiding and Abetting Breaches of Fiduciary
          Duty, in the Alternative,  Derivatively Against the
          iHeart Defendants and the Private Equity
          Defendants ................................................................... 50

      COUNT IV Unjust Enrichment  Derivatively Against the
          iHeart Defendants and the Private Equity
          Defendants ................................................................... 51

      COUNT V Waste of Corporate Assets  Derivatively
          Against the Board Defendants, the iHeart
          Defendants, and the Private Equity Defendants ........... 52

VII.  PRAYER FOR RELIEF .......................................................... 54

Plaintiff GAMCO Asset Management Inc. ("GAMCO" or the "Plaintiff"), by and through its undersigned counsel, brings this Verified Stockholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Clear Channel Outdoor Holdings, Inc. ("CCOH" or the "Company") against:

(i)     The members of CCOH's board of directors (the "Board" or "Board Defendants");

(ii)    iHeartCommunications, Inc. ("iHC"), CCOH's 90% owner;

(iii)   iHeartMedia, Inc. ("iHM"), iHC's indirect parent company (together with iHC, the "iHeart Defendants"); and

(iv)    Bain Capital Partners, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL"), the iHeart Defendants' private equity sponsors and majority owners (the "Private Equity Defendants).

The allegations in this Complaint are made upon Plaintiff's personal knowledge with regard to its own acts and upon information and belief as to all other matters, including the actions of the Board, iHC, iHM, Bain and THL (collectively, the "Defendants").  Plaintiff's information and belief is based upon, among other things, investigation by its counsel, including review of:   (i) documents CCOH produced in response to Plaintiff's demand pursuant to § 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220 (the "220 Demand"); (ii) public information, articles, and regulatory filings; and (iii) court filings, including in the pending action captioned *iHeart Communications, Inc. v. Benefit Street Partners LLC, et al.*, No. 2016 CI 04006 (D. Ct. Bexar Cty, Tex.), in which iHC is

1

seeking, among other things, to enjoin certain of its debtholders from issuing notices of default.

## I.  NATURE AND SUMMARY OF THE ACTION

1.     This derivative action arises because CCOH's Board refuses to untangle the Company from intercompany agreements (the "Intercompany Agreements")[1] with its majority owner iHC (which owns 90% of the Company's stock) that are materially deleterious to the current and future performance of CCOH.  The Intercompany Agreements act as an anchor dragging down CCOH for the benefit of the iHeart and Private Equity Defendants, who, along with the Board Defendants, have diverted CCOH's funds and caused the Company to sell valuable assets and incur interest expenses on new debt in order to prop up the iHeart Defendants' overleveraged and unsustainable capital structure.  These acts, as described more fully herein, demonstrate commercially-unreasonable stripping of value from CCOH for Defendants' benefit that constitute serious breaches of fiduciary duty by the Board, Private Equity, and iHeart Defendants.

2.     CCOH is a profitable public company that owns or operates more than 650,000 outdoor advertising displays worldwide and generated consolidated revenue of approximately $2.8 billion in 2015.  Since CCOH was spun off as a

---

[1] The Intercompany Agreements include, among other things, a Master Agreement, Corporate Services Agreement, Employee Matters Agreement, Tax Matters Agreement, and Trademark License Agreement.

2

public company from iHC's predecessor in 2005, the two entities have been parties to the Intercompany Agreements, which include a cash-management "sweep" arrangement in which all of CCOH's cash is up-streamed to iHC daily in exchange for a receivable in the form of a revolving promissory note, dated November 10, 2005, and amended in December 2009 and October 2013 (the "Revolving Note"). Under the arrangement, CCOH has no access to the cash iHC's diverts from it, but is permitted the "right to demand repayment" of the amounts owed under the Revolving Note at any time.

3.      While the cash management arrangement was never intended to be a financing source for CCOH's parents, iHC and iHM, the Revolving Note balance has increased as the iHeart Defendants' financial health has deteriorated.  Virtually all or a sizable portion of the cash swept from the Company is used for iHC's day-to-day operations or to prop up the iHeart Defendants' unsustainable capital structure, which is mired in $20.8 billion in debt.  To date, the iHeart Defendants have managed to service the suffocating debt, but they continue to sustain hundreds of millions in losses each year and face billions of dollars in maturing debt that they have little, if any, prospect of repaying or refinancing.

4.      The Intercompany Agreements remain in place solely for the benefit of Defendants and serve no rational business purpose for CCOH.  Indeed, because of iHC's complete dominion over CCOH, the Company has not only abandoned

3

any autonomous business or growth strategies, but has been forced by the Board and other Defendants to incur interest expenses and to sell valuable assets to provide cash to the iHeart Defendants.  For example, in January 2016, the iHeart Defendants forced CCOH to sell "non-core" assets in eight markets to raise cash. A Bloomberg analyst described this sale as "a case of burning your sofa to heat up the house."  These needless transactions perpetrated to benefit the iHeart Defendants have depressed CCOH's stock price

5.    iHC's dominion over CCOH has real-world consequences to CCOH and its current and future performance beyond depression of its stock price.  As set forth in more detail herein, among other things, the Intercompany Agreements and CCOH's lack of autonomy over its own cash have:

- Prevented CCOH from making acquisitions (*i.e.*, inorganic growth), which would allow it to leverage synergies that would exist if CCOH acquired smaller outdoor advertising properties;

- Prevented CCOH from investing its capital in improvements (*i.e.*, organic growth) such as replacing static billboards with digital billboards, which would drastically increase revenue through the ability to sell innumerably more advertisements on existing displays;

- Prevented CCOH from paying down its own debt and thereby improving balance sheet and creating financial flexibility to pursue growth;

- Required CCOH to divest assets at suboptimal prices on Defendants' timetable to fund the iHeart Defendants; and

4

- Required CCOH to loan its cash to iHC at rates substantially below the rates at which the market is willing to extend credit to the iHeart Defendants.

6.     The harm the Board has inflicted on CCOH for the benefit of the iHeart and Private Equity Defendants is not imaginary. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████. In so doing, the Defendants are effectively forcing CCOH and its minority stockholders to assume the risk of iHeart Defendants' unsustainable capital and operating structure at below market terms, rather than using CCOH's revenue to grow its businesses and capitalize on its market position.

7.     By year end 2015, Defendants had allowed the balance in the Revolving Note to reach $930 million – a staggering 43% of CCOH's current market capitalization of $2.124 billion[2] – without regard to the escalating risk the market recognized that is attached to lending money to iHC.  For example, iHC's

---

[2] This calculation of market cap utilizes CCOH's $5.88 per share closing price on May 6, 2016 and accounts for the 46,392,713 publically traded Class A shares and the 315,000,000 Class B shares owned by iHC.

public debt pays a higher interest rate to investors than the Revolving Note pays to CCOH, and such public debt trades a steep discount (currently around 35% of par) that reflects market perception that the iHeart Defendants will never be capable of repaying their staggering debt.

8.     No rational board discharging its duty to act in the best interests of CCOH and its stockholders would place the Company's cash at risk in this manner, much less divert such cash from a business where capital investment generates multiples approaching 12x (as evidenced by recent CCOH asset sales).  Simply stated, the Board, supported by the other Defendants, permits CCOH to be used as a liquidity source for the iHeart Defendants in wholesale derogation of their fiduciary duties and at the expense of the Company and public stockholders.  The dramatic impact Defendants' misconduct is having on CCOH's value is apparent when the Company's stock price is a fraction of its demonstrable value evident from prices realized in asset sales.

9.     The Board's refusal to extricate CCOH from the agreements and to reduce the Company's exposure to iHC – including the failure to demand payment on the outstanding balance on the Revolving Note – persists against the backdrop of the iHeart Defendants' escalating financial crisis that threatens to subsume CCOH.  The iHeart Defendants are $20.8 billion in debt (on which certain noteholders have already issued notices of default that are subject to litigation in

Texas state court), iHM has reported negative net income in 11 consecutive quarters and losses exceeding $600 million per year since 2013, and iHM's stock price has fallen from $7.50 per share in June 2015 to $0.95 per share on May 6, 2016, two days after it announced first-quarter 2016 earnings.

10.     Notably, the Board cannot claim it is unaware of its fiduciary duties or the problems posed by any delay in demanding repayment on the Revolving Note. To the contrary, this derivative action is not the first time public stockholders sought to end the controlled Board's breaches of fiduciary duties favoring the remaining Defendants.  In 2013, the Board settled a derivative lawsuit brought in 2012 (the "2012 Lawsuit") in exchange for an agreement lowering the Revolving Note balance by about $200 million, resetting its terms, and requiring the iHeart Defendants to permit a specially-created committee of the Board to demand partial repayment of the loan and to dividend the proceeds if the future balance reached certain thresholds.

11.     But the settlement, while plainly putting the Board on notice of its obligation to protect CCOH from the iHeart Defendants' financial crisis, has not chastened the Board into curtailing its commercially-irrational conduct, as the exposure to iHC and harm to CCOH has grown unabated.  The amount owed to CCOH on the Revolving Note continued to grow through year-end 2015 as the

iHeart Defendants' financial condition worsened.[3]   Yet the Board has failed to attempt to terminate the Company's participation in the Intercompany Agreements or cash-management arrangement despite the acknowledged unsustainable nature of the iHeart Defendants' capital structure and the escalating risk to CCOH.

12.    Notably, the Private Equity Defendants created this situation.  In July 2008, they took iHC private through a merger with iHM (an entity created by the Private Equity Defendants for the purpose of acquiring iHC) to create a media colossus that currently controls more than 850 radio stations.  But to finance the transaction, they loaded the iHeart Defendants with approximately $18 billion in debt, *more than the entire radio industry generates in advertising dollars in a given year*, which has since grown to $20.8 billion.  In 2015 alone, iHM paid $1.74 billion in interest on the debt while sustaining a net loss of $661 million.

13.    From the standpoint of CCOH and its minority stockholders, iHC's unsustainable capital structure is not a justification for continuing to waste CCOH's cash, assets and business opportunities.  Any director acting in good faith and solely in the interests of CCOH and its minority stockholders would: (i) seek

---

[3] CCOH's first quarter 2016 financials reflect that the $930 million Revolving Note balance as of year-end 2015 was reduced in the first quarter of 2016 by a $300 million repayment to CCOH by iHC, but 90% of the payment was immediately round-tripped back to iHC as part of a $300 million dividend funded by the repayment (along with another $240 million funded by asset sales discussed in more detail below).

to terminate the cash management arrangement and normalize CCOH's administrative and operating structure to shield the Company from its exposure to the iHC and the iHeart Defendants' unsustainable capital structure; (ii) take all actions necessary to stop dollars from being diverted from CCOH that should properly be invested in the Company's own growth and opportunity; and (iii) conclude that the Revolving Note balance should have been and has to be reduced or eliminated.

14.    As set forth in more detail below, the Board Defendants are liable for their breaches of fiduciary duty and damages they have inflicted on CCOH and its minority stockholders as a result.  The iHeart and Private Equity Defendants are likewise liable to CCOH and its minority stockholders for their breaches of fiduciary duties and aiding and abetting the Board's misconduct.

## II.    PARTIES

### A.    Plaintiff

15.    Plaintiff GAMCO is a Delaware corporation that provides investment advisory services to open and closed-end funds, institutional and private wealth management investors, and investment partnerships.  GAMCO, along with certain affiliates, is a significant minority stockholder of CCOH, was a stockholder at all times during the misconduct complained of herein, and intends to continue to hold Company stock through the resolution of this action.  As of April 7, 2016,

9

GAMCO, along with certain of its affiliates, owned 4,600,558 shares of CCOH's publicly-traded Class A common stock – constituting 9.9% of all outstanding Class A shares.

### B.   Defendants

#### i.   Nominal Defendant Clear Channel Outdoor Holdings, Inc.

16.   Nominal Defendant CCOH is a Delaware corporation that is among the largest providers of outdoor advertising in the U.S. and worldwide.   CCOH's business, "out-of-home" advertising, fundamentally differs from the iHeart Defendants' core radio businesses.

17.   As CCOH sets forth in numerous filings with the SEC and detailed below, iHC has complete control over CCOH and its operations through a series of Intercompany Agreements.   The public stockholders of CCOH, including Plaintiff, own approximately 72% of the Company's Class A shares but, due to 315,000,000 Class B shares iHC owns, control less than 1% of the vote on corporate matters.

#### ii.   The iHeart Defendants

18.   Defendant iHM is an American mass media company and the holding company of iHC.   The Private Equity Defendants incorporated iHM in Delaware in 2007 by for the purposes of acquiring the business of iHC.   Through its subsidiaries, including iHC, iHM owns and operates more than 850 radio stations

in the U.S., making it the largest owner and operator of radio stations in the nation. iHM also owns an extensive digital radio network.

19.     iHM's stock is traded on the Over-the-Counter Bulletin Board under the ticker symbol IHRT.  On June 3, 2015, iHM's stock price was $7.50 per share, after trading as high as $9.26 per share on October 1, 2014.  On May 6, 2016, the stock closed at $0.95 per share, reflecting doubt that the company can manage its unsustainable capital structure.

20.     Defendant iHC is an indirect wholly-owned subsidiary of iHM incorporated under the laws of Texas and is in turn controlled by the Private Equity Defendants.   iHC owns approximately 90% of CCOH's outstanding shares, including more than 10,000,000 Class A shares and 315,000,000 Class B shares, and approximately 99% of the total voting power of the Company.

21.     iHC is not a public company.

### iii.     The Private Equity Defendants

22.     Defendant Bain is a Massachusetts private equity fund.

23.     Defendant THL is a Delaware limited partnership.

24.     The Private Equity Defendants control and own 67% of iHM's stock and control iHC through their power to elect all but two of iHC's directors and to appoint management.  According to iHC's public filings with the SEC, the Private Equity Defendants and iHC are parties to an agreement through which affiliates of

11

the Private Equity Defendants provide management and financial advisory services to iHC. For the years 2013-2015, iHC paid the Private Equity Defendants' affiliates more than $45 million for such services.

### iv.   The Board Defendants

25.    Defendant Robert W. Pittman has been the Executive Chairman of CCOH's Board since 2011 and Chief Executive Office ("CEO") of CCOH since March 2015. Defendant Pittman was appointed CEO and director of iHM and iHC in 2011, Chairman of iHM and iHC in 2013, and Chairman and CEO of iHeartMedia Capital I, LLC ("iHM Capital") (the direct parent of iHC and an indirect wholly-owned subsidiary of iHM) in 2013. Prior to 2011, Defendant Pittman served as Chairman of Media and Entertainment Platforms for iHM and iHC.

26.    Defendant Vicente Piedrahita has been a member of the Board since 2014. Defendant Piedrahita joined THL in 2012 and is currently a Principal in THL's Strategic Resources Group.

27.    Defendant Blair E. Hendrix has been a member of the Board since 2008. Defendant Hendrix is a Managing Director of Bain Capital and head of Bain's operationally focused Portfolio Group for North America. Defendant Hendrix also currently serves as a director of iHC, iHM and is a member of the board of managers of iHM Capital.

28.     Defendant Daniel G. Jones has been a member of the Board since 2008.   Defendant Jones is a Managing Director at THL and is part of THL's Strategic Resources Group.

29.     Defendant Olivia Sabine has been a member of the Board since March 2015.  Defendant Sabine is an Executive Vice President of Bain.

30.     Defendant Christopher M. Temple has been a member of the Board since 2011.

31.     Defendant Dale W. Tremblay has been a member of the Board since 2005.

32.     Defendant Douglas L. Jacobs has been a member of the Board since 2010.

33.     Defendants Pittman, Piedrahita, Hendrix, Jones, Sabine, Temple, Tremblay and Jacobs, each a member of the Board, are collectively referred to as the "Board" or "Board Defendants."

## III.    SUBSTANTIVE ALLEGATIONS

### A.     History of iHC's Control over CCOH

34.     CCOH, the oldest advertising company in the U.S., provides clients with the opportunity to advertise through and on a variety of outdoor media, including billboards, transit shelters, buses, commuter rail cars, and other "out-of-home" advertising displays.  As of December 31, 2015, CCOH owns or operates

more than 650,000 advertising displays worldwide and, for the year ended December 31, 2015, generated consolidated revenue of approximately $2.8 billion.

35.     The Company traces its roots back to the three companies that merged into its current incarnation: Foster & Kleiser (1901-1986), Patrick Media Outdoors (1986-1995) and Eller Media Company (1959-1997).  In 1997, iHC's predecessor – Clear Channel Communications, Inc. ("CCC") – acquired Eller Media Company and renamed it Clear Channel Outdoor Holdings, Inc. in August 2005.

36.     In November 2005, CCOH became a publicly traded company through an initial public offering (the "IPO") in which iHC sold 35.0 million shares of CCOH's Class A Common Stock to public investors.  iHC retained the majority ownership in CCOH and, as of December 31, 2015, owns all 315,000,000 of CCOH's outstanding shares of Class B Common Stock and 10,726,917 shares of CCOH's Class A Common Stock.  iHC's ownership collectively represents approximately 90% of the CCOH's outstanding shares and 99% of the voting power within the Company.

37.     In connection with the IPO, iHC caused CCOH to enter into the Intercompany Agreements governing the relationship between the entities that, in essence, give iHC total dominion and control over CCOH.  The agreements, which provide for iHC's provision of services to CCOH (in exchange for tens of millions of dollar in yearly fees) and the allocation of employee benefit, tax, and other

14

liabilities and obligations attributable to CCOH's operations, include, among other things, a Master Agreement, Corporate Services Agreement, Employee Matters Agreement, Tax Matters Agreement, and Trademark License Agreement.

38.    CCOH's annual report for 2015 acknowledges that the Intercompany Agreements allow iHC virtually total control of CCOH:

> These agreements allow iHeartCommunications to retain control over many aspects of our operations. We are not able to terminate these agreements or amend them in a manner we deem more favorable so long as iHeartCommunications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock.[4]

39.    CCOH also acknowledges the extent to which iHC's stock ownership allows it to exercise control over every aspect of CCOH's business, including severely limiting the Company's disposition of assets, potential mergers or business combinations, or other corporate opportunities:

> As long as iHeartCommunications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock, it will have the ability to direct the election of all members of our Board of Directors and, therefore, to exercise a controlling influence over our business and affairs, including any determinations with respect to mergers or other business combinations, our acquisition or disposition of assets, our incurrence of indebtedness, our issuance of any additional common stock or other equity

---

[4] *See* Clear Channel Outdoor Holdings, Inc. SEC Form 10-K for the year-ended December 31, 2015 (the "2015 Form 10-K") at 33.

securities, our repurchase or redemption of common stock or any preferred stock, if applicable, and our payment of dividends in certain situations. Similarly, iHeartCommunications will have the power to determine the outcome of matters submitted to a vote of our stockholders, including the power to prevent an acquisition or any other change in control, and to take other actions that might be favorable to iHeartCommunications.[5]

40.    Put more succinctly, iHC's dominion over CCOH restricts the Company from exploring its own favorable business opportunities, including incurring indebtedness or otherwise seeking external financing, or from preventing iHC from directing the Company to take "other actions that might be favorable" to iHC to the detriment of CCOH.   But, the mere fact that iHC has the power to oppress CCOH and its minority stockholders does not give it license to do so without regard to its fiduciary obligations or the fiduciary obligations of the CCOH Board.

41.    CCOH's cash management sweep arrangement with iHC is the most harmful and restrictive aspect of iHC's control over CCOH.   Pursuant to the Corporate Services Agreement, all cash generated from CCOH's operations is transferred daily into iHC's accounts in exchange for a receivable in the form of the Revolving Note, which the Company then records as amounts "Due from iHeartCommunications" on its consolidated balance sheet.

---

[5] *See* 2015 Form 10-K at 5.

42.     While such amounts are ostensibly "lent" by CCOH under the Revolving Note, the "loans" are compulsory and, remarkably, the Company has no access to its own cash, iHC is not required to provide such cash to fund CCOH's operations, and CCOH cannot seek external sources of financing. As CCOH itself explains in the Form 10-K:

> We do not have any material committed external sources of capital independent from iHeartCommunications, and iHeartCommunications is not required to provide us with funds to finance our working capital or other cash requirements. In addition, we have no access to the cash transferred from us to iHeartCommunications other than our right to demand payment by iHeartCommunications of the amounts owed to us under the revolving promissory note.

43.     Pursuant to its terms, interest accrues on the Revolving Note at as little as 6.5%, which is drastically below what non-affiliated lenders are receiving on debt the iHeart Defendants issued. However, the principal balance is payable on demand by CCOH or when the note matures on December 15, 2017.

44.     Since inception, CCOH has periodically and consistently advanced hundreds of millions of dollars to iHC under the Revolving Note and made very few repayment demands. However, as set forth below in Parts III.D. and III.E., the loan amount escalated in recent years as the iHeart Defendants' financial condition deteriorated, and often approached $1 billion (it currently stands at $640 million due to a repayment and dividend back to iHC as detailed herein).

17

### B.    iHC's 10-Year History of Financial Problems

#### i.    The Highly Leveraged 2009 Buyout Burdens the iHeart Defendants With Debt

45.    In November 2006, iHC's board of directors agreed to sell the company for $18.7 billion, or $37.60 per share, in a leveraged buyout (the "LBO") by a consortium of private equity firms including the Private Equity Defendants.

46.    To entice iHC's stockholders, the Private Equity Defendants increased their offer twice.  In September 2007, iHC's stockholders approved the LBO at a price of $39.20 per share.

47.    Before the LBO could close, however, the 2007-08 global financial crisis commenced and credit markets seized up, causing the financing banks to refuse to honor their financing commitments.  A lengthy legal battle ensued, and was settled for a revised equity buyout price of $17.9 billion, or $36 per share.

48.    In July 2008, iHC completed its merger with a subsidiary of iHM.  To limit their own funding obligations, the Private Equity Defendants saddled iHC with more than $18 billion in debt, which has since grown to exceed $20.8 billion.

#### ii.    The iHeart Defendants' Post-LBO Financial Crisis

49.    The premium the Private Equity Defendants paid and the high debt associated with the LBO almost immediately raised questions in the market concerning whether iHC would default on its obligations.  For example, in May 2009, the New York Post reported that iHC had begun reaching out to its lenders

18

about restructuring the massive debt.  ██████████████████████████
███████████████████████████████████████████████████████.

50.     Concerns regarding an iHC bankruptcy made it nearly impossible for iHC to issue new debt in the public market or in private arms-length transactions. Rather than invest more of their own capital to repair iHC's balance sheet, however, the Private Equity and iHeart Defendants decided to strip cash from CCOH through the Revolving Note.  In essence, CCOH, along with its public stockholders, became a captive and low-cost lender because neither the Private Equity Defendants nor any other market participant was willing to provide capital to bolster a patently failed investment.

51.     The legacy cash management arrangement entered in CCOH's 2005 IPO was never intended to serve as a liquidity facility for iHC.  For this reason, consistent with a simple cash management agreement intended to foster intercompany corporate efficiencies, prior to the LBO the balance on the debt remained comparatively low.  Indeed, one year after the IPO, as of year-end 2006, the inter-company debt was zero.

52.     As iHC's distress became more pronounced, however, the Private Equity Defendants and iHC utilized the Revolving Note as a liquidity facility. Borrowings under the note escalated until the outstanding balance reached $431.6 million in December 2008, with interest at an unconscionably low 0.02% rate.

53.   By the end of 2009, the maturity date on the Revolving Note was rapidly approaching and iHC had yet to restructure the massive debt from the LBO.   Accordingly, the CCOH Board, composed primarily of individuals associated with the Private Equity Defendants and members of the Mays family (the founding family of CCC which sold IHC to Bain and THL for a fortune), extended the term of the loan until December 2017.

54.   At nearly the same time, in December 2009, Standard & Poor's downgraded iHC's debt to an abysmal "CCC-" rating.   Yet the interest rate on the amended note did not reflect the junk quality of iHC's debt.

55.   Not surprisingly given the iHeart Defendants' financial condition and liquidity needs, the outstanding balance on the Revolving Note continued to escalate until, as of the quarters ending December 31, 2011 and March 31, 2012, respectively, the balance reached $656 million and $702 million.

C.   **The 2012 Litigation Over CCOH's Exposure to iHC**

56.   In May 2012, minority stockholders of CCOH filed the 2012 Litigation[6] challenging the decision by CCOH's Board to approve the 2009 amendment to the Revolving Note on commercially-unreasonable terms, and seeking relief requiring the Board to demand repayment of all or part of the

---

[6] The 2012 Litigation was captioned *In re: Clear Channel Outdoor Holdings Inc. Derivative Litigation*, C.A. No. 7315-CS (Del. Ch.).

20

outstanding balance.   Then, as now, the Board's letting the balance increase unabated with no practical path to repayment was a breach of its duty of loyalty.

57.     Plaintiffs in the 2012 Litigation complained that the Revolving Note was originally due to expire by its own terms on August 10, 2010, but that on December 23, 2009, iHC and CCOH agreed to extend the note through December 15, 2017 and to set an interest rate at a commercially unreasonable level.

58.     Plaintiffs in the 2012 Litigation also alleged that CCOH's Board breached its duties by refusing to demand repayment on the note and allowing the amounts owed to escalate.   In particular, the stockholders were concerned that, as of year-end 2011, the balance on the note had reached $656.0 million.   At that time, iHM's consolidated net income for 2011 (including iHC, CCOH and other subsidiaries) was *negative* $302 million and fell to negative $424 million in 2012.

59.     In June 2013, a settlement was reached.   Pursuant to its terms, the Board was required to make an immediate $200 million repayment demand to iHC on the Revolving Note, which IHC was to honor, and to adjust the interest rate, as well as to declare a simultaneous $200 million *pro rata* dividend to CCOH stockholders (both public and affiliated stockholders).

60.     In addition, the Board was required to establish a special committee "for the specific purpose of monitoring the Note," focusing on the amount due from iHC to CCOH and CCOH's liquidity.   Specifically, the settlement required

CCOH to issue monthly reports to the committee setting forth, among other things, the Revolving Note balance and the "Clear Channel Liquidity Ratio."[7] If the loan balance or liquidity ratio exceed certain trigger points, the committee has the absolute right to demand repayments and simultaneously to declare a dividend equal to the repayment amount.

61.     Critically, while the special committee is charged with monitoring the liquidity triggers and, if those triggers are exceeded, determining whether to make a repayment demand, nothing in the settlement absolves or relieves the Board as a whole, or any committee or the Board or individual Board Defendant, of their fiduciary obligation to protect CCOH from the iHeart Defendants' escalating liquidity risk by demanding appropriate repayment on the Revolving Note *as CCOH is entitled to do at any time*, or attempting to terminate the cash-management sweep arrangement or other Intercompany Agreements.[8]

---

[7] The "Clear Channel Liquidity Ratio" is defined as CCOH's liquidity (cash and cash equivalents set forth on CCOH's balance sheet plus the Company's borrowing ability) divided by the "Outdoor Public Share" (the cash payable to public stockholders if CCOH demanded payment of the outstanding amount on the Revolving Note and made a simultaneous dividend to stockholders – *i.e.*, approximately 10% of the Revolving Note balance).

[8] Nor does the fact that certain liquidity triggers contemplated by the settlement have not been reached absolve the special committee or Board itself from its fiduciary obligations to explore reducing or terminating the harmful Intercompany Agreements that are handcuffing CCOH's growth and business opportunities. Notably, these thresholds relate to CCOH's liquidity and debt, but the real threat to

62.    The 2012 Litigation plainly put each of the Board Defendants on notice of the unreasonableness of allowing iHC to increase the Revolving Note balance without limit or regard for the effect on CCOH.  It also reminded each Board Defendant of their independent and constant, continuing and unremitting obligation to consider CCOH's interests in capping the Revolving Note balance, otherwise insulating itself from iHC's financial troubles, and attempting to free the Company from its demonstrably harmful agreements with iHC to permit it to explore autonomous business and growth opportunities.  They have not done so.

### D.    The iHeart Defendants' Worsening Financial Crisis

63.    Since the 2012 Litigation ended in June 2013, the iHeart Defendants' financial condition has deteriorated.   Starting with the quarter immediately following the settlement, iHM has reported 11 consecutive quarters of negative net income on a consolidated basis.  Indeed, iHM reported losses of more than $606 million in 2013, $793 million in 2014, and $737 million in 2015, despite the positive contribution of CCOH, which overcame the financial drag from the Intercompany Agreements by reporting positive net income in 11 of the past 21 quarters.[9]

---

the Company is the exposure to the iHeart Defendants' financial crisis, which is not captured by the liquidity thresholds in the settlement.

[9] On May 4, 2016, CCOH announced its financial results for the most recent quarter.  For first quarter of 2016, the Company had net income of $141 million,

64.     iHM's falling revenue and suffocating debt have all but precluded restructuring the debt except on highly unfavorable terms or as part of a bankruptcy.  In 2015, iHM paid $1.74 billion in yearly interest on the $20.8 billion in debt, driving a net loss of $661 million despite $6.5 billion in 2015 revenue.

65.     Nearly $8.5 billion in debt (other than amounts owed under the Revolving Note) comes due in the next three years, consisting of at least $193 million in notes maturing in 2016 and $8.3 billion in 2019 bonds and term loans.

66.     In fact, iHC's financial condition has deteriorated to the point that a recent article in March 31, 2016 article in MediaLife Magazine described iHC as "teetering on collapse" and characterizing its future as "not a question of whether it collapses but when."

67.     Not surprisingly, the iHeart Defendants' nearly constant financial deterioration since the buyout continues to cause consternation among investors. The iHeart Defendants' public debt currently trades at about 35% of par, and iHM's stock price has fallen from $7.50 a share at the beginning of June 2015 to $0.95 per share on May 6, 2016.

---

including a $282 million gain recognized on the asset sale discussed herein.  By contrast, including the contribution of CCOH, on a consolidated basis iHM had a net loss of $59 million in the first quarter of 2016.

**E.**   **The Board Continues to Allow Defendants to Exploit CCOH and Diminish CCOH's Liquidity Through the Revolving Note**

68.   Despite being put squarely on notice that their focus must be on protecting CCOH and its minority investors from the risk posed by increasing the Revolver Note balance, the Board Defendants have disloyally let the iHeart and Private Equity Defendants increase the massive drain the Revolving Note poses.

69.   When the 2012 Litigation began, the outstanding balance on the Revolving Promissory Note was approximately $656.0 million. The quarter-end or year-end balances since the first quarter after the 2013 settlement have each been between $875 million and $950 million, including $930 million as of December 31, 2015. Moreover, through year-end 2015, the outstanding Revolving Note balance was staggering compared to CCOH's market cap – equaling an amount between 24.2% and 46.07%.

70.   On January 21, 2016, CCOH notified iHC that in February 2016 it intended to demand repayment of $300 million outstanding on the Revolving Note. Contemporaneously, the Board declared special cash dividends payable on February 4, 2016 to Class A and Class B stockholders of record in an aggregate amount equal to $540.0 million, using proceeds of the repayment demand and the sale of CCOH's assets (the "February Dividend"). As 90% owner of CCOH's stock, iHC received approximately $486.7 million of the February Dividend.

71.     Accordingly, as of the end of the first quarter of 2016, the Revolving Note balance is $640 million.  However, this ostensible benefit to CCOH from the "repayment" was illusory.  At the time of the demand the Board was fully aware that iHC would virtually simultaneously receive the repayment back in the form of the February Dividend, and as such CCOH kept none of the repayment amount to be used for its corporate purposes.

72.     Put another way, the Defendants created what was effectively a "round trip" transaction where they caused a wholly-unnecessary sale of CCOH's assets so that the Board Defendants could couple the proceeds of those transactions with the $300 million "repayment" to fund the February Dividend, 90% of which would go back to iHC.  In this way, defendants created the illusion of a repayment on the Revolving Note by iHC when in reality CCOH's assets and receivable on the note was used to simply funnel money back to iHC.

73.     This transaction demonstrates that, in an effort to enhance the optics of dividends designed to provide iHC with much-needed cash, the CCOH Board permitted what was essentially round-trip transactions and repayments.  iHC's repayment of the note was made with CCOH's own money or assets and none of the proceeds of the repayment remained at the Company.  This reduction of the Revolving Note receivable by $300 without any corresponding benefit to CCOH is

26

a prime example of the Board Defendants' abdication of their fiduciary duties to the Company.

**F.    Plaintiff's Section 220 Demand Confirmed that the Board Caused CCOH to Enter Into Numerous Transactions that Served to Prop Up the iHeart Defendants**

74.    A review of CCOH's internal documents produced in response to Plaintiff's §220 demand confirms that the Board Defendants, ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬. These transactions have damaged CCOH's current value and undermined the Company's future prospects, for which the iHeart Defendants, the Private Equity Defendants, and the Board should be held accountable.

75.    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

10    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

11    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████.

76.    ████████████████████████████████████████████████████

█████████████████████████████████████████. For example, in an April 30,

2015 Form 8-K announcing first quarter results, CEO of Clear Channel Outdoor

Americas stated that the Company was "driving growth in many U.S. markets" and

the CEO of Clear Channel International stated that the Company was "driving

growth across key markets both in developed and emerging countries."

77.    CCOH's common stock closed at $11.56 per share on May 1, 2015

and reached $11.58 at close on June 2, 2015.

78.    Just a few months later, ██████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

---

12 ████████████████████████████████████████████████████████████████

██████████.

28



[14]

79. █████████████████████████████████████████████

80. █████████████████████████████████████████████

[13]

[14]

[15]

[16]

29

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.[18]

81.    The iHeart Defendants have always viewed CCOH's assets as available for their own use to alleviate their own liquidity difficulties.  ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████.[19]

### i.    The Note Offering to Benefit iHC

82.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[17] ████████████████████████.

[18] ███████████████████████████████████.

[19] ████████████████████████████.

[20] ████████████████████████.

███████████████.

83.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████.

84.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

21 ████████████████████████████.

22 

.

████████████████████████████████████

████████████████████████████████████

███████████████████████.

85.    Specifically, as announced on December 16, 2016, the Board Defendants caused CCOH, through its indirect wholly owned subsidiary, Clear Channel International B.V. ("CCI"), to issue $225 million in 8.75% Senior Notes due 2020 through which CCI received $217.8 million in net proceeds (the "Note Offering"). The notes mature in 2020 and bear interest at a rate of 8.75% per annum.

86.    Besides an unnecessary capital raise (since CCOH's cash can be exempted from the sweep arrangement to supply the Company's operational needs without issuing third party debt at all) the Note Offering causes CCOH to incur approximately $98.4 million in interest expense over the life of the notes.

87.    The Note Offering served no business purposes other than to prop up the iHeart Defendants.[23]  Indeed, following the Note Offering, CCOH caused CCI, along with other CCOH subsidiaries, to return all but 10% of the proceeds of the notes back to CCOH so that, in turn, the Board could cause the Company to

---

[23] Besides a capital raise that should not be needed (since amounts transferred to iHC under the Revolving Note can be lowered to reflect CCOH's operational needs without issuing any debt) the Note Offering causes CCOH to incur approximately $98.4 million in interest expense over the life of the notes.

declare a dividend to stockholders, meaning the iHeart Defendants received 90% of the debt proceeds that passed through CCOH.

88. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████.

89. Once the Note Offering and the related transactions were completed, on December 20, 2015, the Board Defendants used the net proceeds of the Note Offering to declare a special cash dividend in the amount of $217.8 million, payable *pro rata* to holders of Class A and Class B common stock as of the record date of January 4, 2016 (the "January Dividend"). The dividend was paid to such holders on January 7, 2016.

90. In other words, instead of following through with its business strategy of spending money to expand CCOH's reach to new locations, the Board took on a significant amount of debt bearing an over-market 8.75% per annum interest rate in order to fund a dividend that almost entirely benefited the iHeart Defendants, and in turn, the Private Equity Defendants. Worse yet, the issuance of new debt at the

[24] ███████████████████████████████████████.

CCOH level did not lower the balance of the debt that iHC owed to CCOH.

91.    In response to the Note Offering, Moody's downgraded the corporate family rating of Clear Channel Worldwide Holdings, Inc. to B3 from B2 as the Note Offering increased the pro forma leverage level from 7.3x to 7.6x.  Moody's further noted that the iHeart Defendants rely on CCOH's cash flow to service its own debt, and thus CCOH's credit ratings are constrained by the iHeart Defendants' weak credit conditions.

### ii.    The Asset Sales

92.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████.

93.    In the first quarter of 2016, CCOH sold assets in eight strategic U.S. markets – Cleveland and Columbus, Ohio, Des Moines, Iowa, Ft. Smith, Arkansas, Memphis, Tennessee, Portland, Oregon, Reno, Nevada, Seattle, Washington and Wichita, Kansas – in a series of transactions that generated $602 million in cash (the "Asset Sales").  In 2015, these assets generated $105 million in revenue, $48 million in OIBDAN,[25] and $29 million in operating income for CCOH.  ████

---

[25] OIBDAN is an important financial metric on which CCOH relies to evaluate its operating performance.  The Company defines OIBDAN as operating income

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████.

94.    ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████[28].

95.    ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

adjusted to exclude depreciation and amortization, impairment charges, and other operating expenses.

[26] ████████████████████████████████.

[27] ████████████████████████████████.

[28] ████████████████████████████████.

35





. The Lamar Asset Sale proceeded to close on January 7, 2016.

98.

36
.

99.

---

33

34 .

35 .

36 .



[REDACTED].[37]    Instead, for example, the Board could have demanded repayment without the dividend and allowed CCOH to apply the proceeds toward organic revenue growth such as, among other things, replacing static billboards with digital billboards that are a superior platform for advertisements and generate greater income.[38]

100.    In sum, [REDACTED]

[REDACTED]. [REDACTED]

[REDACTED]

[REDACTED]    In order to do so, the Board approved the Loan and Asset Sales Transactions, which worsened the Company's

_____

[37] [REDACTED]

[38] In its May 4, 2016 earnings release, CCOH attributed its revenue growth in first quarter 2016 to "higher revenues from digital billboards as a result of new deployments, organic growth and higher occupancy, as well as higher revenues from static billboards as a result of higher occupancy." However, on information and belief, CCOH has deployed digital billboards in a fraction of the commercially viable locations country-wide.

credit profile, caused the Company to incur over $98 million in interest expense, and resulted in the sale of valuable assets.

101.   Through all this time, the Board only ostensibly acted on behalf of CCOH and its minority stockholders after Plaintiff sent its Section 220 Demand. On January 21, 2016, CCOH notified iHC of the Repayment Demand of $300 million of the more than $900 million outstanding on the Revolving Promissory Note effective on February 4, 2016.  However, the belated demand did not actually benefit CCOH.  With iHC's knowledge and approval, CCOH used the proceeds of the Repayment Demand and the Asset Sales to declare the February Dividend to stockholders of record as of February 1, 2016 and payable on February 4, 2016 (the February Dividend together with the Repayment Demand, the Note Offering, and the January Dividend, the "Loan and Dividend Transactions").

### G.   The Texas Litigation

102.   Besides the harm to CCOH from issuing needless debt and selling valuable long term assets, as set forth above, Defendants' refusal to lower the balance on the iHC loan has increased the risk to CCOH of losses from the restructuring that the iHeart Defendants will inevitably face.  Moreover, iHC's valuable ownership stake in CCOH has become the focus of the iHeart Defendants' creditors as a possible asset to be used to obtain recovery in a potential reorganization.

39

103.   On March 8, 2016, iHC received notices from holders of more than 25% of the outstanding principal amount of four of the company's outstanding series of Priority Guarantee Notes ("PGN"), alleging that iHC's transfer of 100,000,000 shares of Class B Common Stock of CCOH to another subsidiary violated the covenants in the indentures governing the PGN.

104.   The notices asserted that after 60 days, the transfer (if not cured) would trigger an Event of Default that will accelerate the due date of iHC's indebtedness.  In response, iHC filed suit in Texas State Court, asking the court to rule by declaratory judgment that it is not in default or in violation of any covenant or provision of the indentures, and seeking a temporary restraining order preventing the holders from accelerating the debt (the "Texas Litigation").

105.   On March 9, 2016, the court granted a temporary restraining order in favor of iHC in the Texas Litigation to stop the PGN holders from sending additional notices or acting on the notices of default already delivered.

106.   Plaintiff GAMCO appeared as an intervenor in the Texas Litigation in support of iHC's petition for a restraining order and injunction.  While iHC has made its own bed and a restructuring is likely inevitable, GAMCO is in favor of iHC's attempts to delay any restructuring of the iHeart Defendants so that this litigation might compel the Board Defendants to take steps to protect CCOH, rather than the iHeart Defendants and Private Equity Defendants.

107.   On April 5, 2016, prior to the final day of an evidentiary hearing, the parties in the Texas Litigation agreed to extend the temporary restraining order until a trial on the merits on the permanent injunction and declaratory judgment action, set for May 16, 2016.

108.   Alarmingly, despite the pressure of a potential default and resulting bankruptcy threatened by the Texas Litigation, public filings demonstrate that the CCOH Board has sat idle and done nothing to limit the Company's exposure to the iHeart Defendants.  Indeed, it is not even clear that the Board has held meetings in March or April to discuss the Texas Litigation or protecting CCOH's interests.[39]

**H.     CCOH's Future Viability as a Stand-Alone Public Company**

109.   After the price of CCOH's stock reached $11.58 per share on June 2, 2015, the market has taken an understandably jaundiced view of the Note Offering and Asset Sales that have been forced upon CCOH and, since the dividends in early 2016, the Company's shares have traded between $3.83 and $5.88 per share.

110.   CCOH's future viability as a public company and achieving maximum value for its stockholders plainly requires the Board to extricate the Company from

---

[39] On April 15, 2016, CCOH filed a supplement to its April 13, 2016 Proxy Statement disclosing that director Thomas R. Shepherd had passed away nearly a month before on March 19, 2016.  The need to file the proxy supplement suggests that either (i) the Board did not hold a meeting in that four-week period to discuss the implications of the Texas Litigation on CCOH or how to protect its interests; or (ii) CCOH Board meetings are mere formalities to rubber stamp the decisions by the iHeart Defendants and the Private Equity Defendants.

41

the restrictions that iHC and the other Defendants have placed on it. The Board must normalize the administrative and operational structure and reduce operational risk by severing the administrative relationships with the iHeart Defendants whose unsustainable debt structure puts CCOH at significant operational and fiscal risk.

111.   If the Board were acting solely for the Company, it would seek to sever the lending relationship to help stabilize the CCOH financial and capital structure and to eliminate the risk of the iHeart Defendants' dominion over $640 million (historically closer to $1 billion) in CCOH's cash. Doing so would enable CCOH to deploy that capital to grow the business or to use it in connection with transactions that help unlock value.

112.   At a minimum, the substantial depression in the common stock market price will be reduced by severing CCOH from the iHeart Defendants' unsustainable capital structure. The return of the cash should have a similarly positive impact on share price. Legitimate repayment by iHC of hundreds of millions owed on the Revolving Note would amount to dollars per share in value that the market is steeply discounting because CCOH is under the control of its parent.

## IV.   **DERIVATIVE ALLEGATIONS**

113.   Plaintiff brings this Action derivatively to redress injuries CCOH has suffered as a direct result of the breaches of fiduciary duties and attendant

42

misconduct by the Defendants.

114.   Plaintiff currently owns approximately 9.9% of CCOH's Class A common stock and has owned CCOH Class A common stock continuously during the wrongful course of conduct by the Defendants as alleged herein.

115.   Plaintiff will adequately and fairly represent the interests of CCOH and its minority stockholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in stockholder derivative litigation.

## V.      **DEMAND ON THE BOARD IS EXCUSED AS FUTILE**

116.   Plaintiff has not made a demand on the Board or Board Defendants to institute this action against the Defendants.  Such demand would have been futile as the Board and Board Defendants are incapable of making an independent and disinterested decision to investigate the allegations contained herein and to institute and vigorously prosecute the claims asserted in this Action.

117.   CCOH is 90% owned and controlled by iHM.  iHM, in turn, is 67% owned and controlled by the Private Equity Defendants, Bain and THL, which took the iHeart-affiliated companies private in 2008.

118.   The Private Equity Defendants directly benefit from numerous revenue streams from iHM, which as alleged herein, relies on CCOH for a significant portion of its cash flow.  Moreover, the Private Equity Defendants have a strong incentive to make CCOH help the iHeart Defendants stave off bankruptcy,

so as to avoid the need for the Private Equity Defendants to make further equity investments in the iHeart Defendants, or lose control of those defendants as a result of sales or other transfers of value upon a restructuring.

119.   As discussed above, pursuant to the settlement of the 2012 Litigation, CCOH's Board established a committee to ostensibly monitor the amount due from iHC under the Revolving Note, and vested that committee with non-exclusive authority to demand repayments under certain specified circumstances tied to iHC's liquidity or the amount outstanding under the note – provided that the Board declared a simultaneous dividend equal to the amount so demanded. However, the settlement does not, and never has, prevented the Board from independently demanding repayment regardless of the ratios established in the settlement.   Nor does it exempt them from liability for acts or inaction in degradation of their fiduciary duties as directors.

120.   CCOH's Board currently consists of eight members: Defendants Piedrahita, Pittman, Hendrix, Jones, Sabine, Jacobs, Temple, and Tremblay.  The majority of these directors cannot independently consider a demand that CCOH bring suit to redress the Defendants' wrongful actions.

121.   Specifically, the majority of the Board Defendants are individuals who are not independent as they are either beholden to iHM, iHC, THL, or Bain Capital and/or are unable to act independently of their influence.  Moreover, each of the

44

Board Defendants approved the transactions complained of herein and therefore faces liability as a result of his or her breaches of fiduciary duty.

122.   *First*, Defendant Pittman has served as the Chairman and CEO of the Company since March 2, 2015.  Moreover, he has been the CEO and a director of iHM and iHC since October 2, 2011 and as Chairman of each company since May 17, 2013.  He has served as Chairman, CEO, and a member of the board of managers of iHM Capital since April 26, 2013.

123.   As an iHM executive, Pittman serves at the pleasure of the Private Equity Defendants.   Pittman has received and will continue to receive compensation that represents a significant, material portion of his personal wealth due to his role as an iHM executive.  In 2012, 2013, and 2015, Pittman received total compensation of $3.6 million, $2 million, and $7.3 million respectively from iHM.  He received no compensation from CCOH.  Therefore, Pittman is directly incentivized to cause CCOH to take actions to support and buttress iHM and is thus incapable of independently considering a pre-suit demand.  Pittman also owes fiduciary duties to CCOH, iHC, and iHM, thus making him incapable of independently evaluating any transaction among the various entities.  CCOH does not hold Pittman out as an independent director in its proxy filings.

124.   *Second*, Defendant Piedrahita joined THL in March 2012 and is currently a Principal in THL's Strategic Resources Group.  Prior to joining THL,

45

Piedrahita was employed by CCOH as the Director of Strategic Projects and Initiatives. THL, along with Bain, controls iHM, which is the direct beneficiary of the transactions complained of herein. As a Principal of THL, Piedrahita is thus conflicted and incapable of independently considering a pre-suit demand. CCOH does not hold Piedrahita out as an independent director in its proxy filings.

125. *Third*, Defendant Hendrix has been employed by Bain since 2000. He is currently a Managing Director of Bain and head of the firm's Portfolio Group for North America. Hendrix also currently serves as a director of iHC and iHM and as a member of the board of managers of iHM Capital. Bain, along with THL, controls iHM, which is the direct beneficiary of the transactions complained of herein. As a Managing Director of Bain, and as a fiduciary for iHM stockholders, Hendrix is thus conflicted and incapable of independently considering a pre-suit demand. CCOH does not hold Hendrix out as an independent director in its proxy filings.

126. *Fourth*, Defendant Jones has been employed by THL since 2007. Currently, Jones is a Managing Director at THL and is part of the firm's Strategic Resources Group. THL, along with Bain, controls iHM, which is the direct beneficiary of the transactions complained of herein. As a Managing Director of THL, Jones is thus conflicted and incapable of independently considering a pre-suit demand. CCOH does not hold Jones out as an independent director in its

46

proxy filings.

127. *Fifth*, Defendant Sabine has been employed by Bain since 2006 and is currently an Executive Vice President. Bain, along with THL, controls iHM, which is the direct beneficiary of the transactions complained of herein. As an Executive Vice President of Bain, Sabine is thus conflicted and incapable of independently considering a pre-suit demand. CCOH does not hold Sabine out as an independent director in its proxy filings.

128. Thus, at least five of the eight members of the Board have strong ties to iHM, iHC, and the Private Equity Defendants such that they are incapable of independently considering a pre-suit demand concerning the matters alleged herein.

129. ██████████████████████████████████████ ████████████████████ Such transactions were designed solely to benefit iHM, iHC, and its controllers, to the detriment of CCOH and its stockholders. As such, each CCOH director breached his or her duty of loyalty by placing the interests of iHM, iHC, and its controllers over those of CCOH and its stockholders. Accordingly, none of the directors are entitled to exculpation and each faces a substantial likelihood of liability for approving the transactions complained of herein. Therefore, none of the directors would be capable of independently evaluating a pre-suit demand.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### Derivatively Against the iHeart Defendants and the Private Equity Defendants as Controlling Stockholders

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    iHM, iHC, and the Private Equity Defendants owe fiduciary duties to the minority stockholders of the Company because they own a majority interest in and/or exercise control over the business affairs of CCOH.

132.    iHM, iHC, and the Private Equity Defendants have breached their duty of loyalty by elevating and favoring their own interests over the interests of CCOH and its minority stockholders, including by causing the Company, or directing the Board Defendants to cause the Company to, among other things: (i) continually loan iHC cash under the Revolving Note at commercially-irrational rates; (ii) ███████████████████████████████████████ ███████████████████████████████████████ (iii) issue expensive new debt through subsidiaries to provide cash to the iHeart Defendants through the January Dividend; and (iv)  effect the Asset Sales and Repayment Demand to provide cash to the iHeart Defendants through the February Dividend.

133.    As a result of these actions of iHM, iHC, and the Private Equity

Defendants, the Company has been and will be damaged.

134.   Plaintiff has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty
### Derivatively Against the Board Defendants

135.   Plaintiff incorporates by reference and re-alleges the allegations set forth above in paragraphs 1 through 129, as though fully set forth herein.

136.   The Board Defendants, as directors of CCOH, are fiduciaries of the Company and its stockholders.  As such, they owe the Company the highest duties of good faith, fair dealing, due care and loyalty.

137.   The Board Defendants have breached their duty of loyalty by elevating and favoring the interests of iHM, iHC, and the Private Equity Defendants over the interests of CCOH and its minority stockholders, including by causing the Company, or directing the Board Defendants to cause the Company to, among other things: (i) continually loan iHC cash under the Revolving Note at commercially-irrational rates; (ii) ███████████████████████████████████████ ███████████████████████████████████████████████ ████████████ (iii) issue expensive new debt through subsidiaries to provide cash to the iHeart Defendants through the January Dividend; and (iv)  effect the Asset Sales and Repayment Demand to provide cash to the iHeart Defendants through the February Dividend.

138.   Any director acting in good faith and in accordance with his or her fiduciary duties to CCOH would cap the loan balance and explore strategies to reduce the Company's exposure, regardless of what the Private Equity Defendants, iHM and iHC directed the Board to do.

139.   In contemplating, planning, and/or affecting the foregoing conduct, and consciously and deliberately serving the interests of iHM, iHC, and the Private Equity Defendants to the detriment of CCOH and its minority stockholders, the Board Defendants breached their duty of good faith and acted in bad faith to the Company.

140.   As a result of these actions of the Board Defendants, the Company has been and will be damaged.

141.   Plaintiff has no adequate remedy at law.

## COUNT III
**Aiding and Abetting Breaches of Fiduciary Duty, in the Alternative, Derivatively Against the iHeart Defendants and the Private Equity Defendants**

142.   Plaintiff incorporates by reference and re-alleges the allegations set forth above in paragraphs 1 through 129, as though fully set forth herein.

143.   Solely to the extent any or all of iHC, iHM, and the Private Equity Defendants are not deemed to be controlling stockholders of the Company, they are named herein as aiders and abettors of the breaches of fiduciary duty on the part of the Board Defendants.

144.   iHC, iHM, and the Private Equity Defendants were aware of the Board Defendants' fiduciary duties to manage CCOH in the interests and benefit of the Company and its minority stockholders.  By favoring the interests of iHC, iHM, and the Private Equity Defendants over those of the Company and its public stockholders, the Board Defendants have breached their fiduciary duty.

145.   iHC, iHM, and the Private Equity Defendants aided and abetted the Board Defendants' breaches of their fiduciary duty.

146.   iHC, iHM and the Private Equity Defendants had knowledge of the Board Defendants' fiduciary duties, the breaches thereof, and knowingly participated in the breach by causing the Note Offering and Asset Sales, and associated dividends, and by promoting the Board's refusal to demand repayment on the Revolving Note.

147.   As a result of conduct of iHC, iHM and the Private Equity Defendants, the Company has been harmed.

148.   Plaintiff has no adequate remedy at law.

### COUNT IV
### Unjust Enrichment
### Derivatively Against the iHeart Defendants and the Private Equity Defendants

149.   Plaintiff incorporates by reference and re-alleges the allegations set forth above in paragraphs 1 through 129, as though fully set forth herein.

150.   The iHeart Defendants and the Private Equity Defendants were

unjustly enriched as a result of the Note Offering and Asset Sales, and associated dividends, at the expense of CCOH and its public stockholders.  Moreover, they were each unjustly enriched through the growing and unreasonable balance under the Revolving Promissory Note.

151.   As a result of the actions of iHC, iHM and the Private Equity Defendants, the Company has been and will be damaged.

152.   Plaintiff has no adequate remedy at law.

## COUNT V
### Waste of Corporate Assets
### Derivatively Against the Board Defendants, the iHeart Defendants, and the Private Equity Defendants

153.   Plaintiff incorporates by reference and re-alleges the allegations set forth above in paragraphs 1 through 129, as though fully set forth herein.

154.   The Board Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of CCOH and in the use and preservation of its property and assets, and the Board Defendants had the highest obligation of fair dealing.  Moreover, the iHeart Defendants and the Private Equity Defendants had a fiduciary duty not to abuse their control over CCOH in order to further their own interests at the expense of the Company and its public stockholders

155.   The Board Defendants, the iHeart Defendants, and the Private Equity Defendants breached these duties by diverting corporate assets for improper and

52

unnecessary purposes. Any benefits the Company received cannot reasonably be viewed as a fair exchange for corporate assets and monies CCOH expended.

156. This misconduct wasted CCOH's corporate assets through the Loan and Dividend Transactions, which were designed solely to favor iHC, iHM, and the Private Equity Defendants, and by allowing the outstanding balance under the Revolving Promissory Note to rise to an unreasonable level. The Loan and Dividend Transactions were improper and unnecessary, and no person of ordinary, sound business judgment would view these transactions as fair or reasonable.

157. The Board Defendants, the iHeart Defendants, and the Private Equity Defendants further wasted corporate assets by failing to properly consider the interests of the Company and its public stockholders. Any benefits the Company received cannot be reasonably viewed as a fair exchange for the corporate assets and monies CCOH expended as a result of the Board Defendants' misconduct.

158. As a result of the wrongful conduct on the part of the Board Defendants, the iHeart Defendants, and the Private Equity Defendants, CCOH has suffered and continues to suffer economic losses and non-economic losses, all in the amount to be determined according to proof at the time of trial.

159. As a result of the waste of corporate assets, the Board Defendants, the iHeart Defendants, and the Private Equity Defendants are liable to CCOH.

160. Plaintiff has no adequate remedy at law.

## VII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      an order declaring that the Board Defendants, the iHeart Defendants and the Private Equity Defendants breached their fiduciary duties to the Company;

b.      an order declaring that iHC, iHM and the Private Equity Defendants aided and abetted the Board Defendants' breaches of fiduciary duty;

c.      an order rescinding payments to iHC and its affiliates in the Loan and Dividend Transactions;

d.      an order awarding damages, together with pre- and post-judgment interest to the Company;

e.      an order requiring iHC, iHM, and the Private Equity Defendants to disgorge all profits, benefits and other value they have obtained as a result of the fiduciary misconduct alleged herein;

f.      an award of Plaintiffs' costs and expenses incurred in this action, including, but not limited to, experts' and attorneys' fees and expenses; and

g.      any such other and further relief as the Court deems just and proper.

ROSENTHAL, MONHAIT &
GODDESS, P.A.

_____
Norman M. Monhait (#1040)
P. Bradford deLeeuw (#3569)
919 Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
*Attorneys for Plaintiff GAMCO Asset
Management Inc.*

OF COUNSEL:

Vincent R. Cappucci
Andrew J. Entwistle
Joshua K. Porter
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
New York, NY 10017
(212) 894-7200

Mark Lebovitch
Christopher J. Orrico
John Vielandi
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

Ned Weinberger (Bar No. 5256)
LABATON SUCHAROW LLP
300 Delaware Avenue, Suite 1340
Wilmington, DE 19801
(302) 573-2540

May 12, 2016

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 12th day of May, 2016, a copy of

the foregoing **Public (Redacted) Version Of Plaintiff's Verified**

**Shareholder Derivative Complaint** was served by electronic filing through

*LexisNexis File & ServeXpress* upon counsel for defendants:

> Brad Sorrels, Esquire
> WILSON SONSINI GOODRICH
>   & ROSATI PC
> 222 Delaware Avenue, Suite 800
> Wilmington, Delaware  19801

Norman M. Monhait (#1040)

# Exhibit L

EFiled:  Dec 29 2017 02:49PM EST
Transaction ID 61510748
Case No. 2017-0930-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, derivatively on behalf of all other similarly situated stockholders of CLEAR CHANNEL OUTDOOR HOLDINGS, INC., | ) ) ) ) ) C.A. No. _____ |
| Plaintiff, | ) ) |
| v. | ) |
| BLAIR E. HENDRIX, DOUGLAS L. JACOBS, DANIEL G. JONES, VICENTE PIEDRAHITA, ROBERT W. PITTMAN, OLIVIA SABINE, DALE W. TREMBLAY, IHEARTCOMMUNICATIONS, INC., IHEARTMEDIA, INC., BAIN CAPITAL PARTNERS, LLC, and THOMAS H. LEE PARTNERS, L.P., | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) |
| CLEAR CHANNEL OUTDOOR HOLDINGS, INC., | ) ) ) |
| Nominal Defendant. | ) ) |

## <u>VERIFIED DERIVATIVE COMPLAINT</u>

Plaintiff Norfolk County Retirement System ("Plaintiff") brings this Verified Derivative Complaint (the "Complaint") derivatively on behalf of nominal defendant Clear Channel Outdoor Holdings, Inc. ("Clear Channel" or the "Company") against: (a) Clear Channel's controlling stockholder group consisting of iHeartCommunications, Inc. ("iHC"), iHeartMedia, Inc. ("iHM" and, together with iHC, "iHeart"), Bain Capital Partners, LLC ("Bain") and Thomas H. Lee

Partners, L.P. ("THL," and together with iHeart, iHM and Bain, the "Control Group Defendants") and (b) Clear Channel's board of directors (the "Board" or the "Individual Defendants," and together with the Control Group Defendants, "Defendants"). The allegations of the Complaint are based on the knowledge of Plaintiff as to itself, and on information and belief, including the investigation of counsel, as to all other matters.

## INTRODUCTION

1.     This action challenges the Clear Channel Board's November 2017 decision to continue lending greater than $1 billion to Clear Channel's controlling stockholder, iHeart, at far-below-market interest rates that come nowhere close to reflecting iHeart's dire financial condition and lack of creditworthiness.

2.     For years, Clear Channel has been bedeviled by its relationship with iHeart, which owns approximately 90% of Clear Channel's outstanding stock and has stacked the Clear Channel Board with iHeart affiliates. Clear Channel was a wholly-owned subsidiary of iHeart before being taken public in 2005 and, in connection with its initial public offering ("IPO"), was saddled with a series of intercompany agreements governing its relationship with iHeart. Those agreements include a revolving promissory note (the "Revolving Note") pursuant to which all of Clear Channel's cash-on-hand is swept up to iHeart daily in return

for an increase in the amount owed to Clear Channel by iHeart under the Revolving Note.

3.      At present, iHeart owes Clear Channel over $1 billion.  This creates a perilous situation for Clear Channel, because iHeart faces an imminent debt crisis stemming from a 2006 leveraged buyout ("LBO") of iHeart organized by Bain and THL.  As a result of the LBO, iHeart has greater than $20 billion in debt and is teetering on the brink of insolvency.  Indeed, iHeart has issued repeated "going concern" warnings, reporting just last month that there is "substantial doubt" as to its ability to survive another year.  If iHeart were to become insolvent or file for bankruptcy protection, then Clear Channel would become just another unsecured creditor of iHeart unlikely to ever be repaid in full, if at all.  Indeed, iHeart's bankruptcy could cause Clear Channel to experience a severe liquidity shortfall of its own.

4.      The Revolving Note was set to mature on December 15, 2017, at which time the full amount owed to Clear Channel by iHeart would have become due and payable.  On November 29, 2017, however, Clear Channel announced that it had agreed to amend the Revolving Note to extend its maturity date from December 15, 2017 to May 15, 2019.  Clear Channel agreed to continue lending to iHeart under the Revolving Note at far-below-market interest rates.  Indeed, as

3

detailed below, Clear Channel agreed to amend the interest rate terms of the Revolving Note to be *more* favorable to iHeart than the pre-amendment terms.

5.     As amended, the vast majority of the balance on the Revolving Note will incur interest at a per annum rate of 9.3%, and no part of the balance will ever incur interest at a rate higher than 20%.  Meanwhile, on the public markets, iHeart's debt is trading at exorbitant rates that reflect its true lack of creditworthiness.  For example, as of the date of the filing of this complaint, iHeart's 6.875% Senior Debentures maturing on June 15, 2018 are trading at prices reflecting a yield-to-maturity of *316.678%*.

6.     The terms of the November 2017 amendment (defined below as the "Third Amendment") are not merely commercially unreasonable.  They are commercially unconscionable.  Clear Channel's agreement to the Third Amendment can only be explained by the Control Group Defendants' domination of the Clear Channel Board and continued use of Clear Channel as a lifeline, without regard for the best interests of Clear Channel or its minority, unaffiliated stockholders.

7.     Plaintiff brings this action to remedy the harm incurred by Clear Channel as a result of the Clear Channel Board and the Control Group Defendants' faithless conduct in connection with the Third Amendment, which causes Clear Channel to lend to iHeart on patently unfair terms.

## THE PARTIES

8.      Plaintiff Norfolk County Retirement System is currently a Class A stockholder of Clear Channel and has been a Class A stockholder of Clear Channel at all times relevant to the claims asserted herein.

9.      Nominal Defendant Clear Channel is among the largest providers of outdoor advertising in the United States and throughout the world.  Clear Channel is incorporated under the laws of the State of Delaware, with its principal executive offices located at 20880 Stone Oak Pkwy, San Antonio, Texas 78258.   The Company is publicly-traded on the New York Stock Exchange under the ticker symbol "CCO."

10.     Defendant Blair E. Hendrix ("Hendrix") has served as a member of the Clear Channel Board since 2008.  Hendrix is a Managing Director of Bain and the head of the firm's operationally-focused Portfolio Group for North America. Hendrix joined Bain in 2000.  Hendrix also currently serves as a director of iHC and iHM and as a member of the board of managers of iHeartMedia Capital I, LLC ("iHeartMedia Capital").

11.     Defendant Douglas L. Jacobs has served as a member of the Clear Channel Board since 2010.

12.     Defendant Daniel G. Jones ("Jones") has served as a member of the Clear Channel Board since 2008.  Jones is a Managing Director at THL and is part

5

of the firm's Strategic Resources Group, which works in collaboration with senior management and THL investment professionals to drive value at portfolio companies.

13.    Defendant Vicente Piedrahita ("Piedrahita") has served as a member of the Clear Channel Board since 2014.  Piedrahita joined THL in March 2012 and is currently a Principal in the firm's Strategic Resources Group.  Prior to joining THL, Piedrahita worked at Clear Channel as Director of Strategic Projects and Initiatives from August 2010 until March 2012.

14.    Defendant Robert W. Pittman ("Pittman") was appointed as Clear Channel's Chairman and Chief Executive Officer ("CEO") in March 2015. Additionally, Pittman was appointed Executive Chairman and a director of Clear Channel and as CEO and a director of iHM and iHC in October 2011, and in May 2013 was appointed Chairman of iHM and iHC.  Pittman also was appointed as Chairman and CEO and a member of the board of managers of iHeartMedia Capital, a subsidiary of iHM and iHC, in April 2013.

15.    Defendant Olivia Sabine ("Sabine") has served as a member of the Clear Channel Board since 2015.  Sabine is an Executive Vice President at Bain.

16.    Defendant Dale W. Tremblay has served as a member of the Clear Channel Board since 2005.

6

17.     The defendants listed in paragraphs 10 to 16 are collectively referred to herein as the "Board" or "Individual Defendants."

18.     Defendant iHM is a Delaware corporation engaged in the mass media industry.  Through its subsidiaries, iHM owns and operates more than 850 radio stations throughout the United States, making it the largest owner and operator of radio stations in the nation.

19.     Defendant iHC, formerly known as Clear Channel Communications, Inc., is a Texas corporation and an indirect wholly-owned subsidiary of iHM.  iHC owns approximately 90% of Clear Channel's outstanding shares, including more than 10 million shares of Class A common stock and 315 million shares of Class B common stock, representing approximately 99% of the total voting power of Clear Channel stockholders.[1]

20.     Defendant Bain is a private equity fund structured as a Massachusetts limited liability company.

21.     Defendant THL is a private equity fund structured as a Delaware limited partnership.

---

[1] As of April 6, 2017, Bain and THL together owned 65.6% of iHM's outstanding common stock on an as converted basis and controlled iHC with the power to seat all but two of iHC's directors and to appoint iHC's management.

## I.   SUBSTANTIVE ALLEGATIONS

### A.   iHeart and Clear Channel Enter The Intercompany Loan

22.   On November 11, 2005, Clear Channel became a publicly-traded company through an IPO in which the Company sold 10%, or 35 million shares, of its Class A common stock.   Prior to the IPO, Clear Channel was an indirect, wholly-owned subsidiary of iHeart.

23.   Following the IPO, iHeart retained—and as of the date of this Complaint continues to own—a majority stake in Clear Channel through its ownership of approximately 90% of all Clear Channel outstanding shares, constituting approximately 99% of the Company's voting power.[2]

24.   In connection with the IPO, iHeart and Clear Channel entered into various agreements designed to perpetuate iHeart's control and influence over Clear Channel.   One such agreement was a cash management program with iHeart, pursuant to which all cash generated from Clear Channel's operations remaining

---

[2] Clear Channel concedes in its public filings that iHeart controls the Company. *See, e.g.*, Clear Channel's Form 10-K filed with the U.S. Securities and Exchange Commission (the "SEC") on February 23, 2017 ("[iHeart] owns shares of our common stock representing more than 50% of the total voting power of our common stock and, as a result, we have elected to be treated as a 'controlled company' under the NYSE corporate governance standards."); Clear Channel's proxy statement filed with the SEC on April 19, 2017 ("Because [iHeart] controls more than 50% of the voting power of [Clear Channel], we have elected to be treated as a 'controlled company' under the NYSE Corporate Governance Standards.").

after Clear Channel pays its accounts payable and payroll is transferred daily to iHeart in exchange for a receivable in the form of a revolving promissory note, *i.e.*, the Revolving Note.

25.     As originally structured, the Revolving Note had an expiration date of August 10, 2010 and required iHeart to pay Clear Channel interest at a rate equal to the average one-month generic Treasury bill rate.  Any borrowings evidenced by the Revolving Note would be unsecured and the holder would be treated as a general unsecured creditor of the borrower in the event of bankruptcy.

### B.     AFTER BAIN AND THL TAKE iHC PRIVATE, iHEART STRUGGLES UNDER MASSIVE DEBT LOAD AND THE BALANCE ON THE REVOLVING NOTE BALLOONS

26.     In November 2006, the iHC board of directors agreed to sell iHC for $18.7 billion, or $37.60 per share, in a LBO led by a consortium of private equity firms that included Bain and THL.  The offer price increased twice and, in September 2007, the iHC stockholders approved the LBO at $39.20 per share.

27.      Before the LBO could close, however, the global financial markets fell into crisis, credit seized up, and the banks that had committed to finance the transaction refused to honor their commitments.  After a lengthy legal battle, the parties settled on a revised buyout price of $36 per share, for a total transaction price of $17.9 billion.  iHC completed its merger with a subsidiary of iHM in July 2008.

9

28.   As a result of the LBO, iHeart took on more than $18 billion in debt, an amount that has since grown to over $20.8 billion.  This debt load quickly led to concern in the market regarding iHeart's ability to service its debt obligations.  In May 2009, the New York Post reported that iHeart was speaking with lenders about restructuring its debt, including through a pre-packaged bankruptcy.

29.   Rumors of impending bankruptcy made it increasingly difficult, if not impossible, for iHeart to issue debt in the public market or through arms-length negotiations.  As a result, iHeart depended more heavily than ever upon the cash management sweep arrangement and the Revolving Note with Clear Channel, which provided iHeart desperately needed cash flow.  Indeed, the Revolving Note became iHeart's principal source of liquidity.

30.   By December 2008, the balance on the Revolving Note had reached $431.6 million.  By the end of 2009, the maturity date on the Revolving Note was approaching and iHeart still had not restructured its debt obligations from the LBO.

31.   To ensure iHeart retained its ability to tap Clear Channel for cash, iHeart compelled Clear Channel to amend-and-extend the terms of the intercompany loan.  The Clear Channel Board, composed almost exclusively of Bain and THL executives and members of the Mays family (which founded iHC and sold the Company to Bain and THL), agreed.

10

32.     The amended Revolving Note, dated December 23, 2009, extended the term of the agreement from August 10, 2010 until December 15, 2017 (the "First Amendment").  The applicable rate of interest was also increased from the one-month Treasury bill rate to a flat 9.25%.

33.     While the 9.25% interest rate represented an increase in the applicable interest rate, it was still substantially below the then-current market rate.  In December 2009, around the same time that the term of the Revolving Note was extended, Standard & Poor's downgraded iHeart's debt to a "CCC-" rating.  According to data supplied by the Bank of America Merrill Lynch Global Index System, accessed via the Bloomberg Professional Terminal, the average yield on "CCC" or worse credit for the month of December 2009 was 12.75814%.

34.     Over the next few years, the outstanding balance on the Revolving Note continued to grow.  As of the quarter ending March 31, 2012, the balance on the Revolving Note had reached $702 million.  As the balance on the note escalated, iHeart's performance only deteriorated.  In 2011, iHeart reported a consolidated net loss of $302 million.  In 2012, that figure fell further to a loss of $424 million.

## C.   CLEAR CHANNEL ENTERS INTO A SETTLEMENT TO RESOLVE A STOCKHOLDER DERIVATIVE CLAIM RELATING TO THE REVOLVING NOTE AND ENTERS A SECOND AMENDMENT

35.     In May 2012, concerned by the escalating balance on the Revolving Note and iHeart's deteriorating financial condition, minority stockholders of Clear Channel filed derivative litigation in the Court of Chancery alleging that the Clear Channel Board breached its fiduciary duties by: (a) agreeing to extend the terms of the Revolving Note on commercially-unreasonable terms, and (b) failing to demand repayment on the Revolving Note as its balance escalated.  That litigation was captioned *In re Clear Channel Outdoor Holdings Inc. Derivative Litigation*, C.A. No. 7315-C (Del. Ch.) (the "2012 Litigation").

36.     The 2012 Litigation caused the Clear Channel Board to form a Special Litigation Committee ("SLC") composed of two purportedly independent directors, with independent counsel from Covington & Burling LLP and Potter Anderson & Corroon LLP.  After an eight-month investigation, the SLC brokered a comprehensive settlement that was founded on the premise that the Company's Revolving Note with iHeart was essentially unfair, but that the Clear Channel Board lacked the practical ability to exit the Company's binding agreements, and intertwined relationship, with iHeart.

37.     Under the terms of the settlement agreement brokered by the SLC to resolve the 2012 Litigation, the Clear Channel Board was required to: (a) make a

12

$200 million repayment demand on the Revolving Note and to declare a simultaneous $200 million dividend to Clear Channel stockholders, (b) enact corporate governance reforms to address the balance of the Revolving Note going forward, and (c) modify the applicable rate of interest on the Revolving Note.

38.     The increase in the applicable rate of interest was achieved through a Second Amendment to the Revolving Note (the "Second Amendment"), entered between Clear Channel and iHeart on October 23, 2013.

39.     Pursuant to the Second Amendment, the default rate of interest on the first $1 billion outstanding on the Revolving Note would be a variable per annum rate of interest equal to the weighted-average interest rate on two outstanding notes issued by a subsidiary of Clear Channel—the "Clear Channel Worldwide Holdings, Inc. 6.50% Series A Senior Notes due 2022" and the "Clear Channel Worldwide Holdings, Inc. 6.50% Series B Senior Notes due 2022" (the "CCWH Senior Notes")—and any term loans or debt securities issued to refinance a significant portion of those notes.  At the time of the Second Amendment, the default rate on the first $1 billion outstanding on the Revolving Note was 6.5%.

40.     The Second Amendment called for a different rate of interest (the "Average Yield-to-Maturity") to be triggered in certain circumstances. Specifically, the Average Yield-to-Maturity rate would be applied to any excess balance on the Revolving Note over $1 billion.  It would also be applied to the

13

entirety of the outstanding balance on the Revolving Note in the event that iHeart's "liquidity ratio" fell below 2.0x.[3]

41.     Calculating the Average Yield-to-Maturity rate requires first identifying which of four identified series of iHeart notes—iHeart's 5.5% Senior Notes Due 2015, 4.9% Senior Notes Due 2015, 5.5% Senior Notes Due 2016, and 6.875% Senior Debentures Due 2018 (the "Reference Notes")—is closest to maturity, ignoring any series with a maturity date less than 90 days from the date of measurement.  The Average Yield-to-Maturity rate is then calculated as the sum of the yields to maturity of the last FINRA-reported trade on each trading day for the relevant note series during the calendar month, divided by the total number of trading days that month.  The Second Amendment provided, however, that the Average Yield-to-Maturity rate could in no event to be less than 6.5% per annum, nor greater than 20% per annum.

## D.     THE BALANCE ON THE INTERCOMPANY LOAN CONTINUES TO GROW AS IHEART TEETERS ON THE BRINK OF BANKRUPTCY

42.     Since the settlement of the 2012 Litigation, iHeart's financial condition has continued to deteriorate and the balance on the Revolving Note has skyrocketed.

---

[3] In general terms, the liquidity ratio is calculated by dividing iHC's liquidity by the amount of cash that would be payable to Clear Channel's public stockholders in the event that Clear Channel demanded full payment of the Revolving Note and issued a simultaneous dividend of the proceeds to Clear Channel stockholders.

14

43.   iHeart reported consolidated net losses of more than $606 million in 2013, $793 million in 2014, $754 million in 2015, and $296 million in 2016.  For the first nine months of 2017, iHeart has reported a consolidated net loss of more than $771 million.  As of the end of September 2017, iHeart's total long-term debt stood at approximately $20 billion, with a staggering $8.4 billion of that debt set to mature in 2019.

44.   In view of its extreme debt and mounting losses, iHeart has been forced to issue repeated "going concern" warnings.  Indeed, iHeart's quarterly report on Form 10-Q for the third quarter of 2017, filed with the SEC on November 8, 2017, reported that there is "substantial doubt" as to the company's ability to last another year without falling into bankruptcy.

45.   In an attempt to stave off bankruptcy by restructuring its debt, iHeart has been engaged in desperate negotiations with its creditors.  Thus far, however, iHeart's creditors have rejected the company's proposals.  In November 2017, a large group of iHeart bond and loan holders led by Franklin Resources rejected an iHeart proposal that went so far as to offer the group a greater than 87% equity stake in both iHeart's radio business and iHeart's stake in Clear Channel in exchange for settling approximately $7.7 billion of iHeart's debt.

46.   In the meantime, iHeart has increased its reliance on the Revolving Note with Clear Channel.  At the end of 2016, the balance on the Revolving Note

15

was approximately $885 million.  By the fourth quarter of 2017, it had grown to $1.05 billion.  The Clear Channel Board made small repayment demands in September and October of 2017 that resulted in just over $5 million being returned to Clear Channel's public stockholders, but the total amount corresponding to the ownership interests of Clear Channel's minority, unaffiliated stockholders remains in excess of $110 million.

47.    iHeart's quarterly report for the third quarter of 2017 concedes that, were Clear Channel to demand repayment of the full balance of the Revolving Note and issue a corresponding dividend, it is uncertain whether iHeart would have sufficient cash to pay the $110 million balance that would be owed to Clear Channel's non-iHeart stockholders.  Indeed, in the same filing, iHeart disclosed that it had only $64 million of cash and cash equivalents on its balance sheet (excluding $222.4 million of cash and cash equivalents held by Clear Channel, but which iHeart reports on its balance sheet).

48.    Clear Channel's own quarterly report for the third quarter of 2017 also acknowledges the threat posed to Clear Channel by iHeart's debt crisis, recognizing that if iHeart were to become insolvent or file a bankruptcy petition, Clear Channel would become just another unsecured creditor of iHeart.  The Company further acknowledged that, in addition to making it highly unlikely that

16

Clear Channel would ever be repaid in full, such an event could subject Clear Channel to "a liquidity shortfall" of its own.

### E. THE CLEAR CHANNEL BOARD AGREES TO AMEND AND EXTEND THE INTERCOMPANY LOAN YET AGAIN, ON GROSSLY UNFAIR TERMS

49.     As the December 15, 2017 maturity date on the Revolving Note approached, iHeart made clear its intention to extend the note, writing in its quarterly report for the third quarter of 2017 that "we intend to extend the maturity of the [Revolving Note] prior to its maturity."

50.     In view of iHeart's debt crisis and its need for an extension of the Revolving Note, Clear Channel had significant leverage in negotiations with iHeart to ensure that any extension of the Revolving Note would be on terms fair to Clear Channel and its public stockholders.

51.     In particular, Clear Channel had the ability and opportunity to ensure that any extension of the Revolving Note would be accompanied by an amendment that would render the Revolving Note's interest rate provisions fair from the perspective of Clear Channel and its minority, unaffiliated stockholders.

52.     As described in Section I.C, *supra*, the Second Amendment had tied the default interest rate on the first $1.0 billion of the Revolving Note's balance to the CCWH Senior Notes.  A different rate, the Average Yield-to Maturity, applied to excess balance above $1.0 billion (or to the entire balance in the event of iHeart's failure to meet requisite liquidity standards) and was tied to the yield on

17

other, riskier, notes—but could not be lower than 6.5% or higher than 20% per annum.

53.    As of late November 2017, the rate on the first $1.0 billion outstanding on the Revolving Note had risen from 6.5% to 9.3%.  The rate on the additional balance above $1.0 billion was at the Average Yield-to-Maturity rate's cap of 20%.  Were it not for the 20% cap, the Average Yield-to-Maturity rate would have been drastically higher.  Since 2016, the relevant note for calculating the Average Yield-to-Maturity rate has been iHeart's 6.875% Senior Debentures Due 2018.  In late November 2017, as a result of iHeart's debt crisis, that note was trading at rates reflecting a yield-to-maturity *in excess of 180%*. As of the filing of this Complaint, the note trades at rates reflecting a yield-to-maturity of *316.678%*.

54.    Thus, as of late November 2017, iHeart was plainly receiving the benefit of below-market rates on the Revolving Note, and Clear Channel was suffering as a result.  As Clear Channel has repeatedly disclosed in its public filings, if iHeart were to become illiquid or file a bankruptcy petition, Clear Channel would become a wholly unsecured creditor of iHeart, effectively standing in the back of the line for repayment.  It therefore made no sense to tie the interest rate on the first $1.0 billion owed under the Revolving Note to the relatively modest rates on the CCWH Senior Notes.  Notably, those notes *are guaranteed by Clear Channel itself*, and therefore do not reflect iHeart's creditworthiness (or lack

18

thereof).   Rather, iHeart's own various debt instruments presently trade at rates reflecting a per annum interest rate many times higher than the 9.3% default rate being paid under the Second Amendment.  In view of iHeart's precarious financial condition, Clear Channel's unsecured position, and the sheer size of the debt outstanding on the Revolving Note, a fair interest rate on any part of the Revolving Note balance would have to be far in excess of the rate on the CCWH Senior Notes.

55.    The Average Yield-to-Maturity rate provided for in the Second Amendment had also become unreasonably low in view of the 20% cap.  As of late November 2017, as noted above, the yield-to-maturity on the relevant reference note was in excess of 180%.[4]   The same note traded at a yield-to-maturity of approximately 12% when the Second Amendment was entered.  The astronomical rise in the note's yield reflects the market's recognition of iHeart's deteriorating financial condition, which has rendered the 20% cap in the Second Amendment irrational.  The chart below depicts the rise in the yield-to-maturity on iHeart's 6.875% Senior Debentures due 2018 from the entry of the Second Amendment on

---

[4] Indeed, now, in December 2017, it trades at approximately 316%.

19

October 23, 2013 to the December 29, 2017 date of this Complaint:



56. Any fair rate of interest on the outstanding balance over $1 billion (or to be applied in the event of iHeart falling below the required liquidity ratio) would have to be far in excess of the 20% provided for in the Second Amendment.

57. Any properly functioning and independent board of directors would have seized the opportunity of the Revolving Note's approaching maturity date, and iHeart's need to extend the Revolving Note, to secure a fair interest rate and terms for Clear Channel and its minority, unaffiliated stockholders. The Clear Channel Board, however, wholly failed to leverage its bargaining position, instead agreeing to an extension of the Revolving Note on terms even more favorable to iHeart than under the Second Amendment.

58. On November 29, 2017, with the approval of the Clear Channel Board, the Company entered the Third Amendment to the Revolving Note,

20

extending the maturity date of the Revolving Note from December 15, 2017 to May 15, 2019.  The Third Amendment altered the default rate on the first $1 billion outstanding on the Revolving Note to a flat 9.3% per annum, effectively freezing in place the existing rate prior to the Third Amendment.  Thus, not only did the Clear Channel Board fail to negotiate for the substantial increase in the default rate on the Revolving Note demanded by iHeart's continued financial deterioration, it actually agreed to lock the existing rate in place, denying Clear Channel the benefit of any further increases.  The Third Amendment also preserved the pre-existing method of calculating the Average Yield-to-Maturity rate, including the 20% cap, despite the fact that the yield on the relevant 2018 reference note has grown completely out of proportion with the 20% cap.  As noted above, the relevant 2018 reference note currently trades at a yield of greater than 316%.

59.     Unsurprisingly, Clear Channel's announcement of the Third Amendment, filed on Form 8-K with the SEC on December 1, 2017, provides no indication that Clear Channel or the Board retained any independent advisors in connection with the Company's agreement to the Third Amendment.  Indeed, the Company's public statements provide no indication that Clear Channel or the Board conducted any fresh analysis of iHeart's creditworthiness or took any other

steps to determine what would be a fair interest rate for the Revolving Note given iHeart's deteriorating financial condition.

60.     In sum, the interest rates established by the Third Amendment are not merely commercially unreasonable and below what an independent bargaining party would accept in an arm's-length negotiation—they are commercially unconscionable.   The Clear Channel Board's decision to enter the Third Amendment can only be explained as the result of the Board's domination by the Control Group Defendants, who are continuing to use iHeart's Revolving Note with Clear Channel as a source of cash to prop up iHeart, without regard for the interests of Clear Channel's unaffiliated public stockholders.

## II.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61.     Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duties alleged herein.

62.     Plaintiff has owned Clear Channel Class A common stock continuously during the wrongful course of conduct by the Control Group Defendants and the Individual Defendants alleged herein, and continues to hold Clear Channel Class A common stock.

63.     Plaintiff will fairly and adequately represent the interests of Clear Channel and its stockholders in enforcing and prosecuting their rights and has retained counsel competent and experienced in stockholder derivative litigation.

22

64.     Plaintiff has not made a demand on the Clear Channel Board to bring suit because any demand would be futile and is therefore excused.

65.     As of the date of the filing of this Complaint, the Clear Channel Board consisted of seven directors.  At least five of these directors suffer from conflicts of interest and divided loyalties with respect to evaluating whether to challenge a transaction like the Third Amendment, which directly inures to the benefit of iHeart.

   a.   **Hendrix** is a Managing Director of Bain and also serves on the boards of iHC, iHM and iHeartMedia Capital. Bain, along with THL, control iHC, which is the direct beneficiary of the Third Amendment.

   b.   **Jones** is a Managing Director at THL.  THL, along with Bain, control IHC, which is the direct beneficiary of the Third Amendment.

   c.   **Piedrahita** is a Principal at THL.  Thus, Piedrahita suffers the same incapacitating conflict as his THL colleague Jones.

   d.   **Pittman** is Executive Chairman and CEO of iHC, which is the direct beneficiary of the Third Amendment.

   e.   **Sabine** is an Executive Vice President at Bain.  Thus, Sabine suffers the same incapacitating conflict as her Bain colleague Hendrix.

66.     Thus, a majority of the Clear Channel Board could not disinterestedly and independently consider a demand to prosecute the claims alleged herein.

67.     Accordingly, demand on the Clear Channel Board is excused as futile.

23

## COUNT I
## DERIVATIVE CLAIM AGAINST THE CONTROL GROUP
## DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

68.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

69.     The Control Group Defendants (*i.e.*, iHC, iHM, Bain and THL), as Clear Channel's controlling stockholders, owe fiduciary duties to the Company and its stockholders.  As such, the Control Group Defendants owe Clear Channel the highest duties of due care and loyalty.

70.     The Control Group Defendants breached their fiduciary duties by exploiting their position of control to require Clear Channel to enter the Third Amendment on terms unfair to the Company.

71.     As a result of the actions of the Control Group Defendants, the Company has been and will be damaged.

72.     Plaintiff has no adequate remedy at law.

<u>**COUNT II**</u>
# DERIVATIVE CLAIM AGAINST THE INDIVIDUAL DEFENDANTS <u>FOR BREACH OF FIDUCIARY DUTY</u>

73.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

74.     The Individual Defendants, as current directors of Clear Channel, are fiduciaries of the Company and its stockholders.  As such, they owe the Company the highest duties of due care and loyalty.

75.     The Individual Defendants have breached their duty of loyalty by approving the unfair Third Amendment and elevating the interests of iHC, iHM, Bain and THL over the interests of Clear Channel and the Company's minority, unaffiliated stockholders.

76.     Among other things, as a result of the actions of the Individual Defendants described herein, Clear Channel has been and will be deprived of tens—if not hundreds—of millions of dollars in interest payments that would have been paid to the Company had the Third Amendment reflected commercially reasonable terms.

77.     Also as a result of the actions of the Individual Defendants, the Company has been exposed to massive loss in the event iHeart declares bankruptcy or becomes insolvent.

78.     Plaintiff has no adequate remedy at law.

## COUNT III
## DERIVATIVE CLAIM AGAINST THE INDIVIDUAL DEFENDANTS
## FOR WASTE OF CORPORATE ASSETS

79.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.   The unreasonably low interest rates established by the Third Amendment are tantamount to a disguised gift of corporate value from Clear Channel to iHeart.

81.   The terms of the Third Amendment could not have been agreed to in good faith and represent a waste of corporate assets by the Individual Defendants.

82.   As a result of these actions by the Individual Defendants, the Company has been and will be damaged.

83.   Plaintiff has no adequate remedy at law.

## COUNT IV
## DERIVATIVE CLAIM AGAINST THE CONTROL GROUP
## DEFENDANTS FOR UNJUST ENRICHMENT

84.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.   The Control Group Defendants were and will continue to be unjustly enriched as a result of the unfairly favorable terms of the Third Amendment.

86.   It would be unconscionable for the Control Group Defendants to retain the illicit benefits of the Third Amendment.

26

87.   As a result of the actions of the Control Group Defendants, the Company has been and will continue to be damaged.

88.   Plaintiff has no adequate remedy at law.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

a)   Declaring that a demand upon the Clear Channel Board would be futile and is therefore excused;

b)   Declaring that the Defendants breached their fiduciary duties to the Company;

c)   Modifying the Third Amendment to bear a commercially reasonable rate of interest;

d)   Ordering the immediate disgorgement of all profits, benefits and other compensation obtained by Defendants as a result of their breaches of fiduciary duties;

e)   Awarding damages, together with pre- and post-judgment interest;

f)   Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

g)   Awarding such other and further relief as is just and equitable.

LABATON SUCHAROW LLP

*/s/  Ned Weinberger*

OF COUNSEL:                          Ned Weinberger (#5256)
Jeremy S. Friedman                   Thomas Curry (#5877)
Spencer Oster                        300 Delaware Ave., Suite 1340
David F.E. Tejtel                    Wilmington, DE 19801
FRIEDMAN OSTER & TEJTEL PLLC         (302) 573-2540
240 East 79th Street, Suite A
New York, NY  10075
(888) 529-1108

GRANT & EISENHOFER P.A.

*/s/  Michael J. Barry*
Jay W. Eisenhofer (#2864)
Michael J. Barry (#4368)
Mary S. Thomas (#5072)
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000

*Counsel for Plaintiff*

Dated: December 29, 2017

# Exhibit M

EFiled:  Aug 27 2018 10:22AM EDT
Transaction ID 62384026
Case No. 2018-0633-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GAMCO ASSET MANAGEMENT, INC., on its own behalf and on behalf of all similarly situated outside shareholders of Clear Channel Outdoor Holdings, Inc., <br><br> Plaintiff, <br><br> v. <br><br> BLAIR HENDRIX, DOUGLAS L. JACOBS, DANIEL G. JONES, PAUL KEGLEVIC, VINCENTE PIEDRAHITA, ROBERT W. PITTMAN, OLIVIA SABINE, DALE W. TREMBLAY, BAIN CAPITAL PARTNERS, LLC, and THOMAS H. LEE PARTNERS, L.P., <br><br> Defendants. | C.A. No. _____ |

## VERIFIED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................2

     A.      Overview of the Intercompany Agreements ..........................................3

     B.      Overview of the Intercompany Note Committee ................................6

     C.      Overview of the iHeart Entities' End-Stage Financial Crisis ..............7

     D.      Overview of Defendants' Wrongdoing ................................................9

     E.      Overview of GAMCO's Causes of Action .........................................12

     F.      GAMCO's Prior Litigation ................................................................14

II.      THE PARTIES AND NON-PARTIES .........................................................15

     A.      Plaintiff GAMCO .............................................................................15

     B.      The Clear Channel Board Defendants.................................................19

     C.      The Intercompany Note Committee Defendants .................................22

     D.      The Private Equity Defendants .........................................................22

     E.      Non-Party Clear Channel ..................................................................23

     F.      Non-Party iHeartMedia .....................................................................24

     G.      Non-Party iHeartCommunications.....................................................25

III.      BACKROUND FACTS ...............................................................................25

     A.      iHeartCommunications' Control over Clear Channel ........................25

          1.      The Intercompany Agreements and Revolving Note ..............25

          2.      December 2017 Expiration Date for Revolving Note .............30

     B.      iHeartCommunications' Post-LBO Financial Problems ....................31

          1.      The Highly-Leveraged 2009 LBO ...........................................31

          2.      The Post-LBO Financial Crisis................................................31

i

C.      The 2013 Settlement................................................................33

D.      The Post-2013 Settlement Revolving Note Balance............................41

E.      Clear Channel's 2016 Transactions for iHeartCommunications' Benefit .................................................................................42

F.      GAMCO's 2016 Litigation ................................................44

IV.     the iHEART ENTITIES' PROGRESSION INTO BANKRUPTCY............46

A.      The iHeart Entities' Continued Financial Losses ................................46

B.      The iHeart Entities' Record Financial Loses in 2017 ........................46

C.      The Escalating Revolving Note Balance in 2017 ................................47

D.      The iHeart Entities' Failed 2017 Debt Restructuring Offers ..............50

E.      Doubts About iHeartCommunications as a Going Concern ...............52

F.      The Creditors' Proposal for a Pre-Packaged Bankruptcy ..................54

G.      The February 1, 2018 Missed Interest Payment ................................56

V.      THE INTERCOMPANY NOTE COMMITtEE AND the BOARD FAIL TO EFFECT REPAYMENT ................................................................57

A.      The Intercompany Note Committee Fails to Demand Repayment..................................................................................57

B.      The Board Permits the Revolving Note to Be Extended ....................63

C.      The Board Fails to Demand Repayment After the Liquidity Ratio Trigger is Reached....................................................................65

D.      Permitting the Revolving Note Balance to Remain Outstanding was a Breach of Fiduciary Duty.........................................................66

VI.     CLASS ACTION ALLEGATIONS.............................................68

VII.    CLAIMS FOR RELIEF ........................................................71

        COUNT I  Breach of Fiduciary Duty Against the Intercompany Note Committee Defendants ..................71

COUNT II Breach of Fiduciary Duty  Against the Board
    Defendants ....................................................................73

COUNT III Breach of Fiduciary Duty  Against the Board
    Defendants ....................................................................74

COUNT IV Breach of Fiduciary Duty  Against the
    Private Equity Defendants ..............................................75

COUNT IV Aiding and Abetting Breach of Fiduciary
    Duty  Directly Against the Private Equity
    Defendants ....................................................................76

VIII.  PRAYER FOR RELIEF ................................................................77

Plaintiff GAMCO Asset Management Inc. ("GAMCO") brings this Verified Class Action Complaint (the "Complaint") on behalf of itself and a proposed class of minority shareholders (the "Minority Shareholders") of Clear Channel Outdoor Holdings, Inc. ("Clear Channel" or the "Company") from November 8, 2017 to March 14, 2018 (the "Class"), who were at all relevant times unaffiliated with either Clear Channel's direct parent, iHeartCommunications, Inc. ("iHeartCommunications"), or the Company's indirect parent, iHeartMedia, Inc. ("iHMedia," together with iHeartCommunications, the "iHeart Entities").

GAMCO brings the Complaint on behalf of the Class against the:

(i)     Members of Clear Channel's board of directors as of November 29, 2017 (the "Board" or "Board Defendants");

(ii)    Members of the purportedly independent special committee of the Board as of November 8, 2017 that was created in 2013 (the "Intercompany Note Committee" or "Intercompany Note Committee Defendants") to control the balance owed to Clear Channel on an intercompany revolving note (the "Revolving Note") by iHeartCommunications; and

(iii)   iHeart Entities' private equity sponsors and majority owners as of November 8, 2017, Bain Capital Partners, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL, together with Bain, the "Private Equity Defendants") by virtue of a 2008 leveraged buy-out (the "LBO") to take control of the iHeart Entities.

The Complaint's allegations are based on GAMCO's personal knowledge regarding its own acts, and upon information and belief as to all other matters, gathered from public filings by Clear Channel, from public reports and news articles, and from Clear Channel's board materials from 2015-2016.

-1-

## I.    INTRODUCTION

1.    Plaintiff GAMCO, together with its affiliated investment funds, is the second-largest Minority Shareholder of Clear Channel, owning 9.7 percent of Clear Channel's Class A common stock and 1.3 percent of the Company's outstanding common stock overall.[1]   GAMCO brings this class action on behalf of itself and Clear Channel's other Minority Shareholders based on separate breaches of fiduciary duty by the Intercompany Note Committee and Board Defendants in November 2017 for failure to employ contractual rights respectively available to those Defendants to ensure repayment on the Revolving Note and to declare a *pro rata* dividend to Clear Channel shareholders, including Minority Shareholders.

2.    Exercising the contractual rights available to the Intercompany Note Committee and Board Defendants would have avoided the virtual certainty that the unsecured Revolving Note balance (Clear Channel's single biggest asset) and Minority Shareholders' interest in the note would become impaired or wholly uncollectable when the iHeart Entities inevitably filed their long-anticipated bankruptcy petition – which ultimately occurred on March 14, 2018 (the "iHeart Bankruptcy").

3.    Instead, the Intercompany Note Committee and Board Defendants did

---

[1] JPMorgan Chase & Co. is Clear Channel's largest minority shareholder, owning slightly more common stock than GAMCO (11.5 percent of Class A common stock and 1.5 percent of all outstanding stock overall).

nothing, choosing to fiddle while Rome burned.   By doing nothing, these Defendants continued to favor the increasingly unsalvageable interests of the iHeart Entities (which were majority owned and controlled by the Private Equity Defendants) in breach of their fiduciary duties to Minority Shareholders, thereby costing Minority Shareholders at least $89.7 million to $108.2 million.

### A.   Overview of the Intercompany Agreements

4.   Clear Channel is a profitable publicly-traded company that – through both domestic and international divisions – operates more than 650,000 outdoor advertising displays worldwide, in over 35 countries on five continents, and including 43 of the 50 largest markets in the United States.   This generates significant revenue, including approximately $2.591 billion in 2017 alone.

5.   iHeartCommunications is the controlling shareholder of Clear Channel through its ownership of 89.5 percent of Clear Channel's total outstanding common stock and its control of 99 percent of the voting power of the Company. This control of Clear Channel stems from a public offering in November 2005 (the "IPO"), pursuant to which iHeartCommunications' predecessor sold approximately 10 percent of Clear Channel while retaining ownership and voting control.

6.   In connection with the IPO, Clear Channel was forced to enter into

certain onerous intercompany agreements (the "Intercompany Agreements")[2] that have continually hindered Clear Channel's growth, business opportunities, and access to its own cash.  Among these Intercompany Agreements is a Corporate Services Agreement which contains a cash management arrangement that requires Clear Channel's daily unspent cash from domestic operations to be "swept" to iHeartCommunications and recorded as the balance on the Revolving Note.

7.     Under this arrangement, Clear Channel has no access to or ability to utilize the cash that is diverted daily to iHeartCommunications.   Indeed, iHeartCommunications is not even required by the Corporate Services Agreement or Revolving Note to provide Clear Channel with funds to finance its working capital or other cash requirements.  Moreover, in the limited instances when Clear Channel does have access to its own cash – for example, daily before it is swept – its authority to use such cash is severely restricted.

8.     However, prior to the iHeart Entities' Bankruptcy, Clear Channel, by decision of its board, did have the right under the Revolving Note to demand repayment of some or all of the outstanding balance at any time and to simultaneously declare a dividend to shareholders.  While there were certainly restrictions on what else it could do to escape the Intercompany Agreements and

_____

[2] The Intercompany Agreements include, among other things, a Master Agreement, Corporate Services Agreement, Employee Matters Agreement, Tax Matters Agreement and Trademark License Agreement.

cash management agreement, Clear Channel, through the Board, was at least permitted to make a demand and dividend.

9.      This demand feature of the Revolving Note and the authority to declare dividends, two of the few prerogatives reserved for the Board by the Intercompany Agreements, were the means by which the Board could moderate the impact of the cash management arrangement.  If the demand feature was employed in concert with the Company's authority to issue dividends – once again, one of the few uses of cash permitted to Clear Channel – it could protect Minority Shareholders by distributing Clear Channel's inaccessible cash directly to them.

10.     Significantly, the demand feature could be employed at any time, including upon the expiration of the Revolving Note.  By its terms, the Revolving Note had an expiration date of December 15, 2017, at which time "the outstanding principal balance . . .  and all interest accrued and unpaid thereon [would] be due and payable."

11.     Accordingly, as of the December 15, 2017 expiration date of the Revolving Note, iHeartCommunications was immediately required to repay the Revolving Note balance and the Board would have had the ability to dividend the proceeds of the repayment to shareholders.  Thus, even if the underlying cash management arrangement stayed in place and Clear Channel's cash would otherwise be re-swept, the Board could avoid the sweep declaring a dividend.

**B.      Overview of the Intercompany Note Committee**

12.      The Intercompany Agreements and Revolving Note had been harmful to Clear Channel since inception and, consequently, were a constant source of consternation for Minority Shareholders.  In this regard, in March 2012, two small shareholders initiated derivative litigation alleging, among other things, that the then-board breached its fiduciary duty to the Company and its Minority Shareholders by allowing Clear Channel to extend the maturity date of the Revolving Note to December 2015, when it was otherwise set to expire in 2009 (the "2012 Litigation").

13.      Because of, among other things, the restriction on the rights of Clear Channel to access its own cash under the Intercompany Agreements and the corresponding difficulty in proving the Minority Shareholders were harmed by the 2009 renewal, in September 2013, the plaintiffs agreed to a settlement (the "2013 Settlement") that ostensibly offered Clear Channel some forward-looking protection from the escalating Intercompany Note Balance and created a procedure (purportedly independent from the Board) through which Minority Shareholders could receive their *pro rata* portion if the outstanding balance reached certain thresholds.

14.      Specifically, the 2013 Settlement required Clear Channel to make a one-time $200 million repayment demand to iHeartCommunications and

immediately to declare a *pro rata* dividend of those proceeds to Company shareholders.  Significantly, in addition, the Board was required to establish the Intercompany Note Committee "for the specific purpose of monitoring the Note."

15.    Essentially, the Intercompany Note Committee was created to protect Minority Shareholders from harm to them from the one-sided cash-management arrangement with iHeartCommunications and the resulting constantly escalating Revolving Note balance.  The 2013 Settlement required Clear Channel to issue monthly reports to the Intercompany Note Committee setting forth, among other things, the Revolving Note balance compared to certain of iHeartCommunications' financial indicators, such as liquidity, and, if certain thresholds were reached, the Intercompany Note Committee was authorized to demand payment in whole or part on the outstanding balance on the Revolving Note, provided it declared simultaneous dividends to shareholders.

16.    In other words, if, for example, the Revolving Note Balance reached a certain ratio of iHeartCommunications' liquidity (the "Liquidity Trigger Ratio"), Minority Shareholders were ostensibly protected by the Intercompany Note Committee's authority to demand repayment and declare a dividend.

### C.    Overview of the iHeart Entities' End-Stage Financial Crisis

17.    Unfortunately, as it had before the 2012 Litigation, following the 2013 Settlement, the iHeart Entities' financial condition continued to grow progressively

-7-

worse.   These entities simply could not service the more than $20 billion in suffocating debt loaded onto them in the 2008 LBO by the Private Equity Defendants.  Indeed, the iHeart Entities lost billions of dollars from 2013 to 2017, to the point that bankruptcy became a virtual certainty.

18.    The iHeart Entities' years-long financial crisis came to a head in 2017. The companies suffered record losses in 2017, and, beginning no later than March 2017, the iHeart Entities repeatedly and unsuccessfully attempted to negotiate a restructuring of billions of dollars in debt held by senior creditors.  In this regard, iHeartCommunications made numerous debt exchange offers, each of which was rejected by senior lenders and almost uniformly met with counter-proposals offering pre-packaged bankruptcy options that would impair unsecured creditors such as Clear Channel.

19.    By the fourth quarter of 2017, the iHeart Entities Bankruptcy had become virtually inevitable – it was just a question of when.  Indeed, on November 8, 2017, iHeartMedia acknowledged as much in a filing with the Securities and Exchange Commission (the "SEC"), admitting "there [was] substantial doubt as to [iHeartCommunications'] ability to continue as a going concern for a period of 12 months following November 8, 2017."

### D.      Overview of Defendants' Wrongdoing

20.      Against the backdrop of the iHeart Entities' end-stage financial crisis, also on November 8, 2017, Clear Channel announced that for the first time that the Liquidity Trigger Ratio had been reached under the 2013 Settlement that gave the Intercompany Note Committee "the right pursuant to the terms of the settlement of the derivative litigation filed by our stockholders regarding the [Revolving Note] . . . to make a demand on the [note]."

21.      In the same filing, the Company further announced that "[i]f future demands are made in accordance with the terms of the committee charter or if our board of directors makes a demand, we will declare a simultaneous dividend equal to the amount so demanded, which would further reduce the amount of the [balance on the Revolving Note]."

22.      In short, as of November 8, 2017, the iHeart Entities' restructuring negotiations with senior lenders had failed, iHeartMedia acknowledged that the iHeart Entities lacked the liquidity to continue as a going concern, and Clear Channel announced the Intercompany Note Committee had authority to demand repayment on the Revolving Note and declare a dividend.  Clear Channel also acknowledged again the Board's general contractual right to demand repayment and to declare a dividend.

23.      Notably, during the same approximate time frame (December 15,

2017), the Revolving Note was set to expire and become due and payable to Clear Channel by its own terms, thereby giving the Board yet another option to achieve repayment and dividend the proceeds to shareholders, including the Minority Shareholders.

24.    Remarkably, in the face of the iHeart Entities' imminent bankruptcy, neither the Intercompany Note Committee – created for the express purpose of monitoring the Revolving Note balance to protect Clear Channel and Minority Shareholders as part of the 2013 Settlement – nor the Board exercised options starting in November 2017 to ensure the repayment of the $1.051 billion then outstanding on the Revolving Note.

25.    Specifically:

- As of November 8, 2017, the Intercompany Note Committee had 30 days to demand partial or full repayment of the Revolving Note based on authority created by the 2013 Settlement that vested when the balance reached a triggering ratio tied to iHeartCommunications' liquidity;

- Leading up to and as of December 15, 2017, the Board had the option to let the Revolving Note expire by its own terms, at which time the outstanding principal balance and all interest accrued and unpaid would have become due and payable without any additional action by Clear Channel; and

- Even after the Intercompany Note Committee's option to demand repayment expired (if indeed it did) and the Board permitted the Company to extend the term of the Revolving Note, the Board maintained its general right until the date of the iHeart Bankruptcy to demand repayment and declare a dividend.

-10-

26.    Instead of employing the foregoing options that would have protected Minority Shareholders of Clear Channel and insured value for the imperiled Revolving Note balance, the Intercompany Note Committee and the Board – of which five of the eight members were interested directors affiliated with the iHeart Entities or Private Equity Defendants – decided to follow the years-long pattern of elevating the interests of the iHeart Entities, and by extension the Private Equity Defendants, above those of Minority Shareholders.  And they did so with the full knowledge that Clear Channel and its Minority Shareholders would invariably receive less value on the Revolving Note balance once the iHeart Entities declared bankruptcy.

27.    Finally, even after the Intercompany Note Committee and Board failed to utilize their contractual options to demand repayment or let the Revolving Note expire, respectively, and to effectuate a dividend, the Board continued to fail to exercise the Revolving Note's general right to make a repayment demand and to declare a dividend until the iHeart Entities declared bankruptcy in March 2018, even though the threshold negotiated in the 2013 Settlement had been reached and the Board knew the iHeart Entities were mere months from bankruptcy.

### E. Overview of GAMCO's Causes of Action

28.    On May 3, 2018, Clear Channel filed its annual report for 2017 (the "2017 Form 10-K") in which it stated that the Company "did not expect . . . to recover all of the amounts owed to us under the [Revolving] Note upon the implementation of any plan of reorganization that is ultimately accepted by the requisite creditors and approved by the Bankruptcy Court."  Instead, the Company placed "management's best estimate of the cash settlement amount of the note" at $212 million and, as a result, revealed it had taken an $855 million fourth-quarter 2017 loss on the Revolving Note (which was $1.067 billion at year-end 2017). Currently, management estimates the recoverable amount at an even lower $154.8 million.

29.    Put another way, had the Intercompany Note Committee or the Board exercised their contractual rights to demand repayment of the Revolving Note and to declare an immediate dividend to shareholders, Minority Shareholders may have received as much as $108.7 million in cash.  By contrast, even in the unlikely event that Clear Channel chooses to dividend the amount it recovers on the Revolving Note as an unsecured creditor of iHeartCommunications, Minority Shareholders will recover only approximately $16.2 million.

30.    Accordingly, for the reasons set forth above and in more detail below, by this Complaint, GAMCO, as the second-largest minority shareholder of Clear

Channel, brings claims on its own behalf and on behalf of the Class of Minority Shareholders against:

- The Intercompany Note Committee Defendants for breach of fiduciary duty for failure to make a repayment demand on the Revolving Note, as authorized by the 2013 Settlement, which would have been accompanied by a dividend to Minority Shareholders;

- The Board Defendants for breach of fiduciary duty for permitting Clear Channel to renew and extend the Revolving Note rather than letting it expire and declaring a dividend to Minority Shareholders;

- The Board Defendants for breach of fiduciary duty for failing to exercise Clear Channel's contractual right to demand repayment and dividend the proceeds to shareholders up to the time of the iHeart Bankruptcy in March 2018;

- The Private Equity Defendants, as indirect controlling shareholders, for breach of fiduciary duty for failure to direct the Board to let the Revolving Note expire and/or to demand repayment and declare a dividend to protect the interests of Minority Shareholders; and

- The Private Equity Defendants for aiding and abetting the breaches of fiduciary duty to Minority Shareholders by the Intercompany Note Committee and Board.

31.     GAMCO brings these claims on behalf of a proposed class defined as:

All persons or entities that held Class A common shares of Clear Channel from November 8, 2017 to March 14, 2018 (the "Class Period"), excluding any: (i) director, officer or employee of Clear Channel; (ii) indirect or direct parent, subsidiary or affiliate of Clear Channel; and (iii) director, officer or employee of any indirect or direct parent, subsidiary or affiliate of Clear Channel.

-13-

32.     The breaches of fiduciary duty and acts of aiding and abetting by Defendants caused damage to GAMCO and the Class of Minority Shareholders in an amount to be determined at trial.

###     F.     GAMCO's Prior Litigation

33.     As set forth below in Sections II.A and III.F, in 2016 GAMCO filed a derivative action on behalf of Clear Channel (the "2016 Litigation") against many of these same Defendants claiming breaches of fiduciary duty for, among other things, failure to effectuate repayment of the Revolving Note and a declare a dividend.

34.     This Court dismissed that action, holding that it was barred by the 2013 Settlement because GAMCO had not alleged new circumstances to take the new claims outside the settlement and had not alleged the Board's failure to act within the framework of the 2013 Settlement.  This is no longer the case.  Now the Liquidity Trigger Ratio has been reached and neither the Board nor the Intercompany Note Committee demanded repayment.  Moreover, this Court acknowledged there could be circumstances – presumably an end-stage financial crisis at iHeartCommunications of the type that occurred here – that would require the Board to demand repayment and declare a dividend, *even where* the triggers

had not be reached.[3]

## II.     THE PARTIES AND NON-PARTIES

### A.     Plaintiff GAMCO

35.     Plaintiff GAMCO is a Delaware corporation that provides investment advisory services to open and closed-end funds, institutional and private wealth management investors, and investment partnerships.  GAMCO, along with certain of its affiliates, is the second-largest minority stockholder of Clear Channel, was a Minority Shareholder stockholder at all times during the Class Period, and intends to continue to hold Company stock through the resolution of this action.

36.     The current action is not the first act undertaken by GAMCO on behalf of Minority Shareholders based on concerns about Clear Channel and its board's inability or unwillingness to act in accordance with the best interests of

---

[3] In addition, the instant case is not the only one currently pending related to the Revolving Note.   On December 29, 2017, another stockholder of Clear Channel filed a derivative lawsuit in the Court of Chancery of the State of Delaware, captioned *Norfolk County Retirement System, v. iHeartMedia, Inc.*, et al., C.A. No. 2017-0930-JRS.   However, that case complains only about the Revolving Note being renewed at a purportedly below market interest rate.  The *Norfolk* plaintiff does not complaint about *the fact* that the renewal occurred. By contrast, here GAMCO brings a class action on behalf of Minority Shareholders that – given iHeartCommunications' financial condition – the note should not have been renewed by the Board at any price. Oral argument on the motion to dismiss in Norfolk is scheduled for September 20, 2018.

Minority shareholders, or indeed even the first litigation filed on behalf of Minority Shareholders.

37.     In December 2015, Clear Channel announced that an indirect, wholly-owned subsidiary would offer $225 million in notes, the proceeds of which would be used to fund a dividend to Clear Channel's shareholders, including iHeartCommunications.  Suspecting that the notes offering was solely motivated by iHeartCommunication's constant liquidity needs, in late December 2015 GAMCO made a demand to the Board under Section 220 of the Delaware General Corporation Law for documents concerning the offering.

38.     Based on the contents of documents produced in response to the 220 Demand that revealed the Board had caused the Company to abandon its prior growth strategy in favor of the notes offering and certain asset sales to provide liquidity to iHeartCommunications, in May 2016 GAMCO filed a derivative lawsuit (the "2016 Litigation") for, among other things, the Board's failure to demand repayment on the Revolving Note and its approval of the transactions solely designed to provide liquidity to iHeartCommunications.

39.     On November 23, 2016, the Delaware Chancery Court dismissed GAMCO's 2016 Litigation. As in the 2012 Litigation brought by other Minority Shareholders, the Court recognized "the corner into which the Intercompany Agreements have painted the [Clear Channel] Board" and determined that there

-16-

was no "basis upon which GAMCO [could] establish that the Board has breached its fiduciary duty *by adhering to the carefully-negotiated governance and monitoring provisions agreed to in the 2013 Settlement*."[4]  However, like in the 2012 Litigation, the court did recognize that "circumstances may arise that would require the [Clear Channel] Board, in the proper exercise of its fiduciary duties, to demand repayment of the Revolving Note *even absent one of the liquidity triggers being reached*."

40.   On October 12, 2017, the Delaware Supreme Court affirmed the dismissal of GAMCO's 2016 Litigation, ruling that "the Court of Chancery properly found that under the pled circumstances, *which included the board acting within the framework established by a forward-looking settlement agreement and the company's binding contractual obligations that strictly limited its ability to use repaid funds*, the complaint failed to state a claim for breach of fiduciary duty."

41.   Significantly, after both the Delaware Chancery and Supreme Court found that GAMCO did not plead a breach of fiduciary duty because the board members were ostensibly acting within the framework of the 2013 Settlement, on November 8, 2017, iHeartMedia announced that the liquidity trigger from the 2013 Settlement had been reached and the Intercompany Note Committee had authority

_____

[4] Unless otherwise noted, emphasis in quoted materials herein is added.

to demand full repayment of the Revolving Note, to be followed by a dividend to Clear Channel shareholders.

42.    As set forth in this Complaint, GAMCO believes that when the Intercompany Note Committee failed to make such a demand upon the liquidity trigger and in the face of the iHeart Entities' looming bankruptcy, neither the Board nor the committee was working within the framework of the 2013 Settlement as reasoned by the Delaware Chancery and Supreme Court.

43.    Consequently, on November 21, 2017, GAMCO made a new demand to the Board under Section 220 seeking documents sufficient to determine whether the: (i) Intercompany Note Committee breached its fiduciary duty to Clear Channel and Minority Shareholders by failing to exercise the demand provision under the 2013 Settlement; and (ii) Board was contemplating extending the maturity date on the Revolving Note despite the fact that iHeartCommunications and iHeartMedia were in negotiations with creditors that could result in a pre-packaged bankruptcy or other outcome that could impair collectability of the note balance.

44.    Clear Channel refused to produce any documents in response to this demand, asserting that the fact the Intercompany Note Committee could have exercised the demand provision pursuant to the 2013 Settlement did not mean that it was a breach of fiduciary duty not to do so.  Examining whether this was or

wasn't a breach was precisely the function of GAMCO's renewed Section 220 demand.

45.     As of the date of this Complaint, GAMCO, along with certain of its affiliates, owns 4,600,558 shares of Clear Channel's publicly-traded Class A common stock – constituting 9.7 percent of all outstanding Class A shares and 1.3 percent of all outstanding common shares.

### B.     The Clear Channel Board Defendants

46.     Defendant Blair E. Hendrix became a member of the Board in 2008. Defendant Hendrix has been employed by Defendant Bain since 2000.  He is currently a Managing Director of Bain and head of the firm's Portfolio Group for North America.     Hendrix also currently serves as a director of iHeartCommunications and iHeartMedia.   Bain, along with THL, controls iHeartMedia, which in turn controls iHeartCommunications, the counter-party on the Revolving Note.  As a Managing Director of Bain, and as a fiduciary for iHeartMedia stockholders, Hendrix is conflicted.  Clear Channel does not hold Hendrix out as an independent director in its proxy filings.

47.     Defendant Douglas L. Jacobs is an independent director who became a member of the Board in 2010.

48.     Defendant Daniel G. Jones became a member of the Board in 2008. Defendant Jones has been employed by Defendant THL since 2007.  Currently,

Jones is a Managing Director at THL and is part of the firm's Strategic Resources Group.  THL, along with Bain, controls iHeartMedia, which in turn controls iHeartCommunications, the counter-party on the Revolving Note.  As a Managing Director of THL, Jones is conflicted.  Clear Channel does not hold Jones out as an independent director in its proxy filings.

49.    Defendant Paul Keglevic is an independent director who became a member of the Board since 2017.

50.    Defendant Vicente Piedrahita became a member of the Board in 2014. Defendant Piedrahita joined Defendant THL in March 2012 and is currently a Principal in THL's Strategic Resources Group.  Prior to joining THL, Piedrahita was employed by Clear Channel as the Director of Strategic Projects and Initiatives.  THL, along with Bain, controls iHeartMedia, which in turn controls iHeartCommunications, the counter-party on the Revolving Note.  As a Principal of THL, Piedrahita is conflicted.  Clear Channel does not hold Piedrahita out as an independent director in its proxy filings.

51.    Defendant Robert W. Pittman became the Executive Chairman of Clear Channel's Board in 2011 and Chief Executive Officer ("CEO") of Clear Channel in March 2015.  Defendant Pittman was appointed CEO and director of iHeartMedia and iHeartCommunications in 2011, Chairman of iHeartMedia and iHeartCommunications in 2013, and Chairman and CEO of iHeartMedia Capital I,

LLC ("iHeartMedia Capital") (the direct parent of iHeartCommunications and an indirect wholly-owned subsidiary of iHeartMedia) in 2013.  As an iHeartMedia executive, Pittman served at the pleasure of the Private Equity Defendants. Pittman owed fiduciary duties to Clear Channel, iHeartCommunications, and iHeartMedia, thus making him incapable of independently evaluating any transaction among the various entities.  Clear Channel does not hold Pittman out as an independent director in its proxy filings.

52.     Defendant Olivia Sabine became a member of the Board in March 2015.  Defendant Sabine has been employed by Defendant Bain since 2006 and is currently an Executive Vice President.   Bain, along with THL, controls iHeartMedia, which in turn controls iHeartCommunications, the counter-party on the Revolving Note.  As an Executive Vice President of Bain, Sabine is conflicted. Clear Channel does not hold Sabine out as an independent director in its proxy filings.

53.     Defendant Dale W. Tremblay was an independent director, who became an member of the Board in 2005.

54.     Defendants Pittman, Piedrahita, Hendrix, Jones, Sabine, Tremblay, Jacobs and Keglevic are collectively the Board and/or Board Defendants.

### C.     The Intercompany Note Committee Defendants

55.     Pursuant to the terms of the 2013 Settlement, Defendants Tremblay, Jacobs and Keglevic, as Clear Channel's independent directors, collectively comprised the Intercompany Note Committee as of November 2017 and are the Intercompany Note Committee Defendants.

### D.     The Private Equity Defendants

56.     Defendant Bain is a Massachusetts private equity fund.

57.     Defendant THL is a Delaware limited partnership.

58.     Prior to the iHeart Bankruptcy, and during November 2017, the Private Equity Defendants together controlled and owned 65.6 percent of iHeartMedia's stock and controlled iHeartCommunications through their power to elect more than half of iHeartCommunications' directors and to appoint management.

59.     Prior to the iHeart Bankruptcy, the Private Equity Defendants and iHeartCommunications were parties to an agreement through which affiliates of the Private Equity Defendants provide management and financial advisory services to iHeartCommunications.  For the years 2015 and 2016, iHeartCommunications paid the Private Equity Defendants' affiliates $15.4 million and $15.3 million, respectively, for such services and paid $11.4 million for the first nine months of 2017.

-22-

E.     **Non-Party Clear Channel**

60.     Clear Channel is a Delaware corporation that is among the largest providers of outdoor advertising in the U.S. and worldwide.

61.     As Clear Channel sets forth in numerous SEC filings and as detailed below, iHeartCommunications has complete control over Clear Channel and its operations through the Intercompany Agreements.   The public Minority Shareholders of Clear Channel, including GAMCO, own approximately 73.7 percent of the Company's Class A common shares and approximately 10.5 percent of all outstanding common stock but, due to 315,000,000 Class B common shares owned by iHeartCommunications either directly or through subsidiaries such as Broader Media LLC ("Broader Media"),[5] Minority Shareholders control less than 1 percent of the vote.

62.     Clear Channel is the "Payee" counter-party to iHeartCommunications on the Revolving Note, the balance of which is the result of the cash management arrangement under which the Company's domestic cash that is swept daily from

---

[5] In March 2016, iHeartCommunications initiated an action in Texas State Court for declaratory judgment (the "Texas Litigation") that successfully challenged notices of default from certain senior noteholders claiming that its transfer of 100,000,000 shares of Class B Common Stock of Clear Channel to Broader Media violated certain indenture covenants and accelerated its debt.  GAMCO intervened in the Texas Litigation to protect the interests of Clear Channel's Minority Shareholders.

the Company to iHeartCommunications.  As of November 8, 2017, the balance due from iHeartCommunications was $1.051 billion.

63.    As of the close of business on November 8, 2017, Clear Channel's common stock closed at $3.95 per share, giving the Company a total market capitalization of $1.428 billion and meaning the Revolving Note balance equaled 73.6 percent of Clear Channel's market capitalization at November 8, 2017.

### F.    Non-Party iHeartMedia

64.    iHeartMedia is an American mass media company incorporated under the laws of Delaware and the indirect holding company of iHeartCommunications. The Private Equity Defendants incorporated iHeartMedia in Delaware in 2007 for the purposes of acquiring the business of iHeartCommunications, which they accomplished through the 2008 LBO that resulted in their indirect control of iHeartCommuncations through ownership of iHeartMedia.

65.    Through    its    subsidiaries,    including    iHeartCommunications, iHeartMedia owns and operates more than 850 radio stations in the U.S., making it the largest owner and operator of radio stations in the nation, and owns an extensive digital radio network.

66.    Prior to the iHeart Bankruptcy, iHeartMedia's stock was traded on the Over-the-Counter Bulletin Board under the ticker symbol IHRT.

67.    Prior to the iHeart Bankruptcy, the Private Equity Defendants owned

65.6 percent of the outstanding common stock of iHeartMedia.

### G. Non-Party iHeartCommunications

68.     iHeartCommunications is an indirect wholly-owned subsidiary of iHeartMedia incorporated under the laws of Texas.  Through their majority ownership of iHeartMedia, the Private Equity Defendants controlled iHeartCommunications.  iHeartCommunications owns approximately 89.5 percent of Clear Channel's outstanding shares, including more than 10,000,000 Class A shares and, directly or through subsidiaries, 315,000,000 Class B shares. iHeartCommunications controls approximately 99 percent of the total voting power of the Company.

69.     iHeartCommunications is not a public company and does not report individual financial information to the SEC.

## III.  BACKGROUND FACTS

### A.    iHeartCommunications' Control over Clear Channel

#### 1.    The Intercompany Agreements and Revolving Note

70.     In November 2005, Clear Channel became a publicly traded company through the IPO when iHeartCommunications' predecessor sold 35.0 million shares (more than 70 percent) of Clear Channel's Class A Common Stock to public investors.  However, the predecessor retained its majority ownership in Clear Channel and, as of December 31, 2017, iHeartCommunications owns all

315,000,000 of Clear Channel's outstanding shares of Class B Common Stock (either directly or through its wholly-owned subsidiaries such as Broader Media) and 10,726,917 shares of Clear Channel's Class A Common Stock (through its wholly-owned subsidiary CC Finco, LLC).

71.    iHeartCommunications' ownership collectively represents approximately 89.5 percent of Clear Channel's outstanding common shares of any class and more than 99 percent of the voting power of the Company.

72.    In connection with the IPO, Clear Channel was forced to enter into the Intercompany Agreements governing the relationship between the entities that, in essence, give iHeartCommunications total dominion and control over Clear Channel.    The agreements provide for iHeartCommunications' provision of services to Clear Channel (in exchange for tens of millions of dollar in yearly fees) and the allocation of employee benefit, tax, and other liabilities and obligations attributable to Clear Channel's operations.

73.    Clear Channel's annual report for 2017 acknowledges that the Intercompany Agreements allow iHeartCommunications virtually total control of Clear Channel:

> These agreements allow iHeartCommunications to retain control over many aspects of our operations.  We are not able to terminate these agreements or amend them in a manner we deem more favorable so long as iHeartCommunications continues to own shares of our common stock representing more than 50% of the total

voting power of our common stock.

74.     Clear    Channel    also    acknowledges    the    extent    to    which iHeartCommunications' stock ownership allows it, under the Master Agreement, to exercise control over every aspect of Clear Channel's business, including the election of directors and severe limitations on the Company's disposition of assets, potential mergers, or other corporate opportunities:

> As long as iHeartCommunications continues to own shares of our common stock representing more than 50% of the total voting power of our common stock, it will have the ability to direct the election of all members of our Board of Directors and, therefore, to exercise a controlling influence over our business and affairs, including any determinations with respect to mergers or other business combinations, our acquisition or disposition of assets, our incurrence of indebtedness, our issuance of any additional common stock or other equity securities, our repurchase or redemption of common stock or any preferred stock, if applicable, and our payment of dividends in certain situations.

75.     In addition, the Master Agreement prevents Clear Channel from taking any actions that would cause iHeartCommunications to default on any third-party agreements, including credit agreements:

> [Clear Channel] acknowledges and agrees that it shall not. . . take any action or enter into any commitment or agreement that may reasonably be anticipated to result, with or without notice and with or without lapse of time or otherwise, in a contravention or event of default by [iHeartCommunications] of . . . any credit agreement or other    material    instrument    binding    upon [iHeartCommunications].

-27-

76.    Clear Channel's cash management sweep arrangement contained in the Corporate Services Agreement similarly permits iHeartCommunications to control Clear Channel.  As set forth in Clear Channel's annual report for 2006 (its first annual report as a public company), pursuant to the Corporate Services Agreement, all cash generated from Clear Channel's domestic operations is swept and comingled daily into iHeartCommunications' accounts after Clear Channel meets its accounts payable and payroll obligations:

> As part of the cash management services, on a daily basis, cash from our U.S. based operations is transferred to a concentration account maintained by us which is then transferred, or used to fund, our disbursement account. Our disbursement account is used to pay our accounts payable and payroll obligations. Any amount remaining in our concentration account after funding our disbursement account is transferred to [iHeartCommunications].

77.    The amounts swept to iHeartCommunications are correspondingly recorded as a receivable in the form of the balance due on the Revolving Note:

> **INTER-COMPANY ARRANGEMENTS**.  This Note evidences funds from time to time transferred to the Maker, for the Maker's account, by Payee. It is contemplated that by reason of prepayments or adjustments hereon, there may be times when no indebtedness is owing hereunder; but notwithstanding such occurrences, this Note shall remain valid and shall be in full force and effect as to amounts from time to time owed by Maker to Payee under this Note subsequent to each such occurrence. The records of Maker shall be conclusive evidence, absent manifest error, of funds transferred by Payee to Maker that are evidenced hereby, the payments and other applications

-28-

thereon and the outstanding unpaid amounts of principal thereof and accrued interest thereon.

78.     The cash sweep from Clear Channel to iHeartCommunications restricts the Company's access to its own cash.  iHeartCommunications is not required to provide cash to fund Clear Channel's operations and Clear Channel cannot seek external sources of financing.  One of the only controls Clear Channel has under the cash management arrangement is a right to demand repayment.  As explained in its 2017 annual report:

> We do not have any material committed external sources of capital independent from iHeartCommunications, and iHeartCommunications is not required to provide us with funds to finance our working capital or other cash requirements.  In addition, we have no access to the cash transferred from us to iHeartCommunications *other than our right to demand payment by iHeartCommunications of the amounts owed to us under the revolving promissory note*.

79.     By their terms, the Intercompany Agreements – along with the cash management arrangement – are highly restrictive, largely preventing Clear Channel's access to its own cash and severely limiting its disposition of its cash during the times it does have access.

80.     For these reasons, the Revolving Note's demand feature, one of the few prerogatives reserved to Clear Channel by the Intercompany Agreements, is a means by which the Company could, if left alone to do so by the iHeart Entities and Private Equity Defendants, moderate the impact of the cash management

-29-

arrangement by using the Company's authority to issue dividends – one of the few permitted uses of cash by Clear Channel – to provide value to stockholders.

### 2.    December 2017 Expiration Date for Revolving Note

81.    The Revolving Note, by its terms, was set to expire on December 15, 2017, at which time, under its own terms, "the outstanding principal balance . . . and all interest accrued and unpaid thereon [would] be due and payable."

82.    Significantly, while the Master Agreement and Corporate Services Agreement will remain in place until such time as iHeartCommunications' ownership of Clear Channel falls below 50 percent (putting aside any changes made in the iHeart Bankruptcy, neither the Revolving Note nor the Corporate Services Agreements (nor that Master Agreement or other Intercompany Agreements) by their terms address whether the cash sweep arrangement and/or the limitations on Clear Channel's use of its own cash are intended to continue after the expiration of the Revolving Note – the instrument through which the cash sweep arrangement functions and is recorded.

83.    Indeed, it is also unclear whether iHeartCommuncations' use of Clear Channel's cash for its own purposes would survive expiration of the Revolving Note – the instrument that records the "loan" balance.

84.    In any case, the Board's authority to declare a dividend to Clear Channel shareholders at any time would have been operative in December 2017

and would have enabled the Board to declare a dividend of the entire amount of the Revolving Note when it became due and payable upon expiration.

## B.   iHeartCommunications' Post-LBO Financial Problems

### 1.   The Highly-Leveraged 2009 LBO

85.   In November 2006, iHeartCommunications' board of directors agreed to sell the company in the LBO to a consortium of private equity firms including the Private Equity Defendants for $18.7 billion, or $37.60 per share.

86.   To entice iHeartCommunications's stockholders, the Private Equity Defendants increased their offer twice.  In September 2007, stockholders approved the LBO at a price of $39.20 per share.

87.   Before the LBO could close, however, the 2007-08 global financial crisis commenced and credit markets seized up, causing the financing banks to refuse to honor their financing commitments.  A lengthy legal battle ensued, and was settled for a revised equity buyout price of $17.9 billion, or $36 per share.

88.   To finance the LBO, the Private Equity Defendants caused iHeartCommunications to borrow more than $18 billion, which has since grown to exceed $20 billion.

### 2.   The Post-LBO Financial Crisis

89.   The premium the Private Equity Defendants paid and the high debt associated with the LBO almost immediately raised questions in the market

-31-

concerning whether iHeartCommunications would default on its obligations.  For example, as early as May 2009, public reports indicated that iHeartCommunications was reaching out to its lenders about restructuring the massive debt.  As part of those discussions, iHeartCommunications and its lenders debated reorganizing the debt as part of a pre-packaged bankruptcy.

90.    Concerns regarding an iHeartCommunications bankruptcy made it nearly impossible for iHeartCommunications to issue new debt in the public market or in private arms-length transactions.  Rather than invest more of their own capital to repair iHeartCommunications' balance sheet, however, the iHeart Entities and Private Equity Defendants decided to strip cash from Clear Channel through the Revolving Note.  In essence, Clear Channel, along with its Minority Shareholders, became a captive and low-cost lender because neither the Private Equity Defendants nor any other market participant was willing to provide capital.

91.    The legacy cash management arrangement entered in Clear Channel's 2005 IPO was never intended to serve as a liquidity facility for iHeartCommunications.   For this reason, consistent with a simple cash management agreement intended to foster intercompany corporate efficiencies, prior to and shortly after the LBO, the balance on the debt remained comparatively low.  Indeed, one year after the IPO, as of year-end 2006, the inter-company debt was zero.

92.    As    iHeartCommunications'    financial    distress    became    more

pronounced, however, the Private Equity Defendants and iHeartCommunications

increasingly utilized the Revolving Note as a liquidity facility.   Borrowings under

the  note  escalated  until  the  outstanding  balance  reached  $431.6  million  in

December 2008, with interest at an unconscionably low 0.02 percent rate.

93.    By the end of 2009, the maturity date on the Revolving Note was

rapidly approaching and iHeartCommunications had yet to restructure the massive

debt from the LBO.  Accordingly, the Clear Channel Board, composed primarily of

individuals  associated  with  the  iHeart  Entities  and  Private  Equity  Defendants,

extended the term of the Revolving Note until December 15, 2017.

94.    Not  surprisingly  given  iHeartCommunications'  financial  condition

and liquidity needs, the outstanding balance on the Revolving Note continued to

escalate until, as of the quarter ending March 31, 2012, the balance reached $702

million.

### C.    The 2013 Settlement

95.    Consequently, in May 2012, certain Minority Shareholders of Clear

Channel (the "2012 Plaintiffs") – not including GAMCO – a derivative action on

behalf  of  Clear  Channel  in  the  Delaware  Court  of  Chancery,[6]  challenging  the

---

[6] *In re: Clear Channel Outdoor Holdings Inc. Derivative Litigation*, C.A. No.
7315-CS (Del. Ch.) (the "2012 Litigation").

-33-

decision by the board as then constituted to approve the 2009 amendment to the Revolving Note, and seeking relief requiring the Board to demand repayment of all or part of the outstanding balance.

96. The 2012 Plaintiffs complained that the Revolving Note was originally due to expire by its own terms on August 10, 2010, but that on December 23, 2009, iHeartCommunications and Clear Channel agreed to extend the note through December 15, 2017. The 2012 Plaintiffs complained about the extension, which was purportedly the product of extensive negotiations that included certain concessions by iHeartCommunications, iHeartMedia and the Private Equity Defendants, including a $500 million repayment of amounts outstanding on the Revolving Note through an offset of certain amounts owed by Clear Channel. By virtue of the $500 million repayment, as of December 31, 2009 the outstanding balance was $123.3 million.

97. Unfortunately, following the extension of the Revolving Note the balance again started to escalate. By December 31, 2010, the balance had reached $383.8 million, by December 31, 2011 it had reached $656.0 million, and by March 31, 2012 it had reached $702 million. Accordingly, the 2012 Plaintiffs also alleged that, in addition to claims based on the extension of the Revolving Note to December 2017, Clear Channel's Board as then constituted breached its duties by refusing to demand repayment on the note post-amendment thus allowing the

-34-

balance to escalate.

98.     In June 2013, the 2013 Settlement was reached.  The 2012 Plaintiffs agreed to settle purportedly because a special litigation committee of the board (the "SLC") determined, after an investigation into the 2012 Plaintiffs' allegations, that Clear Channel's options with respect to the Intercompany Agreements and cash management arrangements were limited, and that the proceeds of any repayment demand without a corresponding dividend would merely be re-swept back to iHeartCommunications – thereby causing any repayment demand to be futile.

99.     Accordingly, pursuant to the terms of the 2013 Settlement, defendants in the action agreed that the Board would make an immediate $200 million repayment demand to iHeartCommunications on the Revolving Note, which iHeartCommunications was to honor and to declare a simultaneous $200 million *pro rata* dividend to Clear Channel stockholders (both affiliated and Minority Shareholders).

100.   During the approval hearing for the 2013 Settlement, counsel for the SLC recognized that the $200 million did not provide value to Clear Channel itself because it would be used to fund a dividend and the Company would forgo interest on that amount, but argued that the 2013 Settlement was favorable because it ensured value to Minority Shareholders and lessened the risk of iHeartCommunications' nonpayment:

> There is an offset, Your Honor, but at least [Clear Channel] is getting the money back and the minority share is getting distributed, whereas in the absence of that, there is always the risk that [iHeartCommunications] holds onto the money, pays a rate but arguably below-market rate, and then if it goes into financial distress, is never able to repay the money.

101.   In addition to the $200 million demand and dividend, the Board was required to establish the Intercompany Note Committee "for the specific purpose of monitoring the Note" on an ongoing basis, focusing on the amount due from iHeartCommunications to Clear Channel measured against iHeartCommunications' available liquidity.  The Intercompany Note Committee was essentially created to protect Minority Shareholders.

102.   Specifically, the 2013 Settlement required (and continues to require) Clear Channel to issue monthly reports to the Intercompany Note Committee setting forth, among other things, the Revolving Note balance.  In addition, Clear Channel must report the ratio of iHeartCommunications' "liquidity" (defined as cash and cash equivalents set forth on its balance sheet plus the company's borrowing ability) to the "Public Share" of the note balance (defined as the cash payable to Minority Shareholders if Clear Channel demands payment of the outstanding amount on the Revolving Note and makes simultaneous dividend to stockholders – *i.e.*, now approximately 10.5 percent of the Revolving Note balance).

103.   This ratio of iHeartCommunications' liquidity to the Public Share of the Revolving Note balance (the "Liquidity Ratio") is a central feature of the 2013 Settlement and the protections that the settlement contemplates will be afforded to Clear Channel and Minority Shareholders.  Specifically, if the Liquidity Ratio falls below two (*i.e.*, the Public Share multiplied by two exceeds iHeartCommunications' liquidity), then the key protection of the 2013 Settlement is triggered (the "Liquidity Ratio Trigger") and the Intercompany Note Committee is authorized to demand repayment of some or all of the Revolving Note balance, provided that the Board simultaneously declares a dividend equal to the repayment amount.

104.   The 2013 Settlement also contains a second – less important – trigger. If the Revolving Note balance reaches a level where the Public Share (the amount that is attributable to the Outside Shareholders) exceeds $114 million, the Intercompany Note Committee is authorized to demand repayment, but only up to an amount that will draw the balance down as needed to restore the Public Share to $85 million.

105. Notably, in connection with the 2013 Settlement, the SLC that investigated the allegations in the 2012 Litigation – and includes two members of the Intercompany Note Committee – filed a brief in support of the settlement which touted the purported protections that creation of the Intercompany Note

Committee would provide to Minority Shareholders vis-à-vis the Revolving Note.

106. In particular, that brief claimed that the Independent Note Committee's ability to demand repayment with an attendant dividend would offer protection from conflicts of interests inherent in allowing the Board members controlled by the iHeart and Private Equity Defendants from making the decision whether to exercise the demand feature of the Revolving Note, particularly at a time when iHeartCommunications is in financial peril and there is the most pressure on the Board not to do so:

> The [Revolving Note's] demand feature, one of the few prerogatives reserved to [Clear Channel] by the Intercompany Agreements, is a means by which the Company could moderate the impact of the Cash Management Arrangement. If used in concert with the Company's authority to issue dividends—one of the few permitted uses of cash by Outdoor under the Master Agreement—it could yield substantial value to the Company's stockholders. (Money that is demanded and not used will be swept back to [iHeartCommunications] pursuant to the Cash Management Arrangement.) This value must be weighed, however, against the benefit to [Clear Channel] of maintaining a balance on the [Revolving Note] in light of the lack of other sources of liquidity.
>
> In choosing how to balance these considerations and determine whether to make a demand for payment under the [Revolving Note], the risk that the non-independent directors of [Clear Channel] will consider the interests of the *borrower*,[7] [iHeartCommunications], above the

---

[7] Emphasis in original.

-38-

interests of [Clear Channel] is greatest at the very time that the risks posed to [Clear Channel] by the loan—and thus the reasons for exercising the right of demand—become most compelling.

The proposed settlement therefore addresses the central concern presented by Plaintiffs' Complaints—the growth of the [Revolving Note] balance—in the following ways: it secures for [Clear Channel] an immediate repayment of $200 million of the balance; it addresses the potential for conflicts by providing that in the event [iHeartCommunications'] near-term financial position materially deteriorates or the [Revolving Note] balance reaches a defined limit, a newly formed committee of [Clear Channel's] independent directors will be able to exercise the demand feature on its own; and it requires [iHeartCommunications] to provide those directors with the information needed to fulfill that obligation.

107.  Moreover, according to the SLC, the 2013 Settlement was valuable to Clear Channel and Minority Shareholders because it required iHeartCommunications to provide actual monthly financial information on iHeartCommunications and monthly and yearly projections to ensure the Intercompany Note Committee had adequate information and advanced notice when it was prudent to make a repayment demand:

> [T]he proposed settlement imposes reporting obligations on [iHeartCommunications] to ensure that the newly-formed Intercompany Note Committee will have the information needed to fulfill its mandate. On a monthly basis, [iHeartCommunications] must provide the Intercompany Note Committee with a report setting out the Due-From Note's balance as of month's end for the three preceding months, and projected as of month's end for the current month and the three succeeding months.

-39-

In the same report, [iHeartCommunications] must also report [iHeartCommunications'] Liquidity and the [iHeartCommunications] Liquidity Ratio as of month's end for the three preceding months, projected as of the current month's end, and projected as of month's end for the three succeeding months. In addition to these monthly reporting obligations, [iHeartCommunications] is subject to an ongoing duty to inform the Intercompany Note Committee if an event or circumstance arises that serves to render a previously-provided report materially inaccurate, or if it has reason to know that the [iHeartCommunications] Liquidity Ratio has fallen below the specified level. The settlement will also require [iHeartCommunications] to provide the Intercompany Note Committee with an annual report forecasting the Due-From Note balance, [iHeartCommunications'] Liquidity, and the [iHeartCommunications] Liquidity Ratio for the remainder of the then-current calendar year and for three full calendar years thereafter.

108. Unfortunately, as it turns out, the Intercompany Note Committee did not provide the protection that the SLC touted as a central feature of the 2013 Settlement. As set forth below, in 2017, when iHeartCommunications' financial condition reached a stage where its bankruptcy became inevitable and the Liquidity Trigger Ratio in the 2013 Settlement had been reached, the Intercompany Note Committee failed to employ its demand right as it is authorized to do for the specific purpose of protecting Clear Channel and its Minority Shareholders from conflicts of interest of the Board.

### D. The Post-2013 Settlement Revolving Note Balance

109. Equally unfortunately, the 2013 Settlement had no long-term tempering effect on the Revolving Note balance as iHeartCommunications continued to face escalating financial problems.

110. As of September 31, 2013, the last date that Clear Channel reported the Revolving Note balance before the terms of the 2013 Settlement were implemented, the balance was $944.6 million.

111. On November 8, 2013, pursuant to the 2013 Settlement, Clear Channel made the $200 million repayment demand and the Board declared a corresponding dividend, $176 million of which was returned to iHeartCommunications and $24 million of which was paid to Minority Shareholders.

112. The repayment demand had no lasting effect. As of December 31, 2013, the first reported balance following the $200 million demand, the balance was $879.1 million, and by November 8, 2017 it had reached $1.051 billion.

113. Indeed, only once did Clear Channel make a repayment demand and corresponding dividend during 2014-2015 under the Intercompany Note Committee's authority granted by the 2013 Settlement. On August 11, 2014, ostensibly because the Revolving Note balance had reached $950 million and the Public Share – then at 12 percent of the total – reached the $114 million threshold

prescribed in the 2013 Settlement, Clear Channel made a repayment demand of $175 million and the Board declared a dividend, $154 million of which went back to iHeartCommunications and $21 million of which went to Minority Shareholders.

114.   However, this demand had no lasting effect.  By virtue of the demand, the Revolving Note balance fell to $875.9 million at the end of third-quarter 2014, from $950.1 million at the end of second-quarter of 2014.  But by year-end 2014 the balance was back to $947.8 million and stayed relatively steady to be $930.8 million by year-end 2015 and $1.067 billion by year-end 2017.

### E.   Clear Channel's 2016 Transactions for iHeartCommunications' Benefit

115.   Following the 2013 Settlement, the iHeart Entities' financial condition continued to deteriorate.  From the quarter immediately following the settlement to the end of 2015, iHeartMedia reported 11 consecutive quarters of negative net income on a consolidated basis, including losses of more than $606 million in 2013, $793 million in 2014, and $737 million in 2015.

116.   Consequently, beginning in December 2015, Clear Channel announced a series of transactions to be consummated in early 2016 that were undertaken strictly for the purpose of attempting to provide liquidity to iHeartCommunications.

117.   On December 7, 2015, Clear Channel announced that its indirect,

wholly-owned subsidiary, Clear Channel International B.V. was commencing an offering of $250 million in senior notes (the "Notes Offering") and that, through a series of transactions, proceeds of the notes would be distributed to Clear Channel to be used to fund a $220 million cash dividend to shareholders in January 2016, including iHeartCommunications (the "January Dividend").

118.  On January 7, 2016, Clear Channel paid the January Dividend in an aggregate amount of $217.8 million, of which $196.3 million went to iHeartCommunications and $21.5 million to Minority Shareholders.

119.  Also on January 7, 2017, Clear Channel completed the sale of assets in five markets to Lamar Advertising Company for an aggregate purchase price of $458.5 million.  On January 14, 2016, Clear Channel likewise completed the sale of assets in three addition markets for an aggregate purchase price of $107.5 million.  Together, these two sets of asset sales (the "Asset Sales") generated proceeds of $566 million.

120.  On February 4, 2016, Clear Channel demanded repayment of $300.0 million outstanding on the Revolving Note from iHeartCommunications and paid a $540 million dividend to Clear Channel shareholders using the proceeds of the demand and cash on hand from the Asset Sales (the "February Dividend"), which resulted in approximately $486.5 million being immediately returned to iHeartCommunications and approximately $53.3 million being paid to Minority

-43-

Shareholders.  As a result, the balance on the Revolving Note – which was $930.8 million at year end 2015 – was reduced by $300.0 million.

121.   Significantly, the Notes Offering, January Dividend, Asset Sales and February Dividend were all undertaken by Clear Channel (or, in the case of the Notes Offering, its subsidiary) for the sole purpose of providing liquidity to iHeartCommunications to, among other things, service its crushing debt.

122.   Significantly, like Clear Channel's only other significant repayment demand on the Revolving Note – the $175 million demand in August 2014 – the $300 million demand on February 4, 2016 that partially funded the February Dividend had no lasting effect on the Revolving Note balance.  Following the demand, the first quarter 2016 balance fell to $640.0 million, but throughout 2016 it increased back to around pre-demand levels.

### F.   GAMCO's 2016 Litigation

123.   Based on the rising Revolving Note balance and Notes Offering, January Dividend, Asset Sales and February Dividend, in May 2016, GAMCO filed the 2016 Litigation on behalf of Clear Channel against most of these same defendants for, among other things, the Board's failure to attempt "to extract" Clear Channel from the restrictive Intercompany Agreements, failure to demand repayment on the Revolving Note, and use of the Notes Offering and Assets sales to strip value from Clear Channel for iHeartCommunications' benefit.

124.   On November 23, 2016, the Delaware Chancery Court dismissed the 2016 Litigation.  As in the 2012 Litigation brought by other Minority Shareholders, the Court recognized "the corner into which the Intercompany Agreements have painted the [Clear Channel] Board" and determined that there was no "basis upon which GAMCO [could] establish that the Board has breached its fiduciary duty by *adhering to the carefully-negotiated governance and monitoring provisions agreed to in the 2013 Settlement*."  However, like in the 2012 Litigation, the court did recognize that "*circumstances may arise that would require the [Clear Channel] Board, in the proper exercise of its fiduciary duties, to demand repayment of the Revolving Note even absent one of the liquidity triggers being reached*."

125.   On October 12, 2017, the Delaware Supreme Court affirmed the dismissal of GAMCO's 2016 Litigation, ruling that "the Court of Chancery properly found that under the pled circumstances, *which included the board acting within the framework established by a forward-looking settlement agreement* and the company's binding contractual obligations that strictly limited its ability to use repaid funds, the complaint failed to state a claim for breach of fiduciary duty."

## IV.   THE iHEART ENTITIES' PROGRESSION INTO BANKRUPTCY

### A.   The iHeart Entities' Continued Financial Losses

126.   On February 23, 2017, iHeartMedia filed its Form 10-K with the SEC for the year ending December 31, 2016.  iHeartMedia revealed that it lost $296.3 million in 2016, which marked the seventh consecutive year since the LBO that iHeart Entities lost in excess of $200 million.  In the three years following the settlement alone (2014-2016), the iHeart Entities lost in excess of $1.84 billion on a consolidated basis.

127.   iHeartMedia also reported that, on a consolidated basis, it has total assets of $12.8 billion and total liabilities, including long-term debt, of $21.7 billion, meaning its liabilities exceed its assets by more than $10 billion.

### B.   The iHeart Entities' Record Financial Loses in 2017

128.   Unfortunately, in 2017, the iHeart Entities' losses continued to escalate even more, reaching record levels.

129.   On May 4, 2017, the iHeart Entities announced $378.7 million losses for first quarter of 2017, approximately $290.2 million more than the same period in 2016.

130.   On August 3, 2017, the iHeart Entities announced $174.0 million in losses for second quarter of 2017.

131.   On November 8, 2017, the iHeart Entities announced losses of $248.1 million for third quarter 2017.

132.   In total, for the first nine months of 2017, the iHeart Entities lost $810.4 million, *which is larger than any single-year loss by the iHeart Entities since the 2009 LBO*.   Not including income tax offsets, the iHeart Entities lost $917.4 million in 2017.

### C.   The Escalating Revolving Note Balance in 2017

133.   Like the iHeart Entities' mounting losses, the Revolving Note balance also escalated by quarter in 2017, despite a series of small repayment demands by the Board designed to keep the balance below the triggering thresholds from the 2013 Settlement.

134.   On May 5, 2017, Clear Channel reported that, as of first quarter 2017, the Revolving Note balance was $915.1 million, up $29.4 million from the prior quarter and up $275.1 million from first quarter 2016.

135.   On August 3, 2017, Clear Channel reported that, as of second quarter 2017, the Revolving Note balance was $928.8 million, up $13.7 million from the prior quarter and up $239.2 million from second quarter 2016.

136.   On November 8, 2017, Clear Channel reported that, as of third quarter 2017, the Revolving Note balance was $1.051 billion, up $122.3 million from the prior quarter, a 13.1 percent increase, and up $281.9 million from third quarter 2016.

137.   Notably, the $1.051 billion balance at September 30, 2017, was the

-47-

largest balance in the Revolving Note's history and caused the "Public Share" to approach the $114 million threshold trigger for the 2013 Settlement.

138.   Accordingly, to avoid the "Public Share" trigger, on October 5, 2017, Clear Channel made a $25 million repayment demand on the Revolving Note and the Board declared a simultaneous dividend, under which iHeartCommunications received approximately 89.8 percent of the proceeds, or approximately $22.5 million, and the remaining 10.2 percent, or approximately $2.5 million, was paid to the Minority Shareholders.

139.   Similarly, on October 31, 2017, Clear Channel made another $25 million repayment demand and the Board declared a simultaneous dividend, under which iHeartCommunications received approximately 89.5 percent of the proceeds, or approximately $22.4 million, and the remaining 10.5 percent, or approximately $2.6 million, was paid to the Minority Shareholders.

140.   Nevertheless, by year-end 2017, the Revolving Note balanced reached $1.067 billion, the highest balance ever.

141.   Finally, on January 24, 2018, Clear Channel made a $30 million repayment demand on the Revolving Note and the Board declared a simultaneous dividend, under which iHeartCommunications received approximately 89.5 percent of the proceeds, or approximately $26.85 million, and the remaining 10.5 percent, or approximately $3.15 million, was paid to the Minority Shareholders.

142.   Significantly, even with the $80 million in foregoing demands and dividends, the outstanding balance on the Revolving Note at the time of the iHeart Bankruptcy was $1.031 billion, near its historical high.

143.   At bottom, except for the repayment in first-quarter 2016 funded in part by Clear Channel's own Asset Sales, even with the small incremental demands, the Revolving Note balance has grown progressively worse every quarter until November 2017, when iHeartCommunications could no longer avoid hitting the Liquidity Trigger Ratio.   As illustrated in the following chart, given the sustained Revolving Note balance in the high nine-figures, and its progressive growth, it is clear that Clear Channel was never going to recover the balance without affirmative action by the Board or Intercompany Note Committee.



144.   Nevertheless, despite reaching the trigger that allowed the Intercompany Note Committee to take action to protect Minority Shareholders – the purpose of the 2013 Settlement – committee did nothing.  Nor did the Board act under its contractual right to demand repayment and declare a dividend.  By virtue of these failures, the committee and Board were far from, as the Court ruled in GAMCO's 2016 Litigation, "adhering to the carefully-negotiated governance and monitoring provisions agreed to in the 2013 Settlement."

### D.   The iHeart Entities' Failed 2017 Debt Restructuring Offers

145.   In an attempt to restructure iHeartCommunications' overwhelming debt, on March 15, 2017, the iHeart Entities announced a new two-fold strategy involving "Private Offers to Holders of Its Five Series of Priority Guarantee Notes and Its Senior Notes Due 2021 to Exchange Such Notes for New Securities in Connection with a Proposed Global Restructuring of Its Indebtedness" and "Private Term Loan Offers in Connection with a Proposed Global Restructuring of Its Indebtedness."

146.   Specifically, on March 15, 2017, the iHeart Entities commenced an offer to holders of certain series of iHeartCommunications' outstanding priority guaranteed notes (the "PGN Holders") to exchange the existing priority guaranteed notes ("Existing Notes") for new securities (the "New Securities") of iHeartCommunications, iHeartMedia, and, under a certain high participation

-50-

threshold, CC Outdoor Holdings, Inc., a newly-created entity that would hold iHeartCommunications' 89.5 percent equity interest in Clear Channel (the "Exchange Offers").

147.   Also on March 15, 2017, iHeartCommunications commenced an offer to lenders (the "Term Loan Lenders") under its Term Loan D and Term Loan E facilities to amend existing term loans and/or exchange them for new term loans of iHeartCommunications and New Securities (the "Term Loan Offers").

148.   The type and amount of securities issued to tendering PGN Holders and Term Loan Lenders depended on the participation level.   The original deadlines to participate in the Term Loan Offers and Exchange Offers were April 7, 2017 and April 14, 2017, respectively.

149.   Unfortunately for the iHeart Entities, the offers did not generate any interest or participation.   On April 5, 2017, iHeartCommunications announced that no Existing Notes had been tendered in the Exchange Offers and, accordingly, the company was extending the deadlines for creditors to participate until April 21, 2017.

150.   However, despite repeated extensions and amendments to the offers to make them more appealing, no interest in the Exchange Offers or Term Loan Offers ever materialized.   In fact, iHeartCommunications has extended the deadline for creditors to participate eighteen times, including the last on January 18, 2018

when iHeartCommunications announced the latest extension of the Exchange and Term Loan Offers until March 16, 2018. As of January 17, 2018, an aggregate amount of approximately $36.7 million of Existing Notes, *representing only approximately 0.4 percent of outstanding Existing Notes*, had been tendered into the Exchange Offers.

### E.    Doubts About iHeartCommunications as a Going Concern

151.    On November 8, 2017, iHeartCommunications filed its SEC Form 10-Q for the third quarter of 2017. In it, iHeartCommunications revealed that, based on its substantial debt balance and upcoming maturities, management had raised substantial doubt about iHeartCommunications' ability to continue as a going concern over the next 12 months, absent refinancing its debt:

> Based on . . . the significance of the forecasted future negative cash flows resulting from our substantial debt balance, including anticipated future cash interest payments (including interest due in the fourth quarter of 2017 and in 2018) and the maturities of the $365.0 million in current borrowings under our receivables-based credit facility that matures December 24, 2017, the $51.5 million aggregate principal amount of 10% Senior Notes due January 15, 2018, the $175.0 million aggregate principal amount of 6.875% Senior Notes due June 15, 2018 and the $24.8 million of contractual AHYDO catch-up payments to be made on our 14% Senior Notes due 2021 beginning with the interest payment due on August 1, 2018, ***management has determined that there is substantial doubt as to our ability to continue as a going concern for a period of 12 months following November 8, 2017***.

152.    iHeartCommunications further revealed that the possibility of continuing as a going concern was conditioned on successfully refinancing its various types and tranches of debt, including the Existing Notes and Existing Term Loans underlying the Exchange Offers and Term Loan Offers that had thus far generated virtually no participation from creditors:

> The Company is in advanced negotiations with potential lenders to refinance the amounts outstanding under the Company's receivables-based credit facility and currently expects to refinance the amounts outstanding under that facility prior to its maturity. In addition, management is taking actions to maximize cash available to meet the Company's obligations as they become due in the ordinary course of business. In addition, as more fully described in Note 3, the Company launched notes exchange offers and term loan offers in March 2017, which notes exchange offers and term loan offers remain open as of November 8, 2017. *The Company has engaged in discussions with many of its lenders and noteholders regarding the terms of the global exchange offers and term loan offers, which have been revised since launch and remain subject to substantial further revision, but no agreement has been reached with respect to those discussions and the discussions remain ongoing*. These actions are intended to mitigate those conditions which raise substantial doubt of the Company's ability to continue as a going concern for a period within 12 months following November 8, 2017.

153.    As further acknowledged by iHeartCommuncations, there was no assurance that any refinancing transactions will be completed:

> While we continue to work toward completing the notes exchange offers and the term loan offers or other similar transactions, refinancing the amounts outstanding under

-53-

the receivables-based credit facility and taking other actions to create additional liquidity, ***there is no assurance that the notes exchange offers and the term loan offers or other similar transactions will be completed, that the amounts outstanding under the receivables-based credit facility will be refinanced or that we will be able to create additional liquidity***.

154.   Once again, the Exchange Offers and Term Loan Offers generated little interest.  iHeartCommunications extended the participation deadline eighteen times since March 2017 and only approximately 0.4 percent of Existing Notes were ever tendered.

**F.      The Creditors' Proposal for a Pre-Packaged Bankruptcy**

155.   On November 30, 2017, iHeartMedia filed a current report on SEC Form 8-K providing an update on the status of negotiations with certain PGN Holders and Term Loan Lenders.  The filing revealed that, on November 21, 2017, the iHeart Entities provided these lenders with a new proposal for reorganizing iHeartCommunications' debt in a "*fully consensual transaction*" under the following terms, among others:

- PGN Holders and Term Loan Lenders receive: (i) $7.0 billion in new debt from recapitalized iHeart; and (ii) 87.5 percent equity in recapitalized iHeart and 87.5 percent of iHeartCommunications' ownership of Clear Channel; and

- Existing iHeartCommunications equity (65.6 percent of which is the Private Equity Defendants) receive: (i) 21.5 percent equity in recapitalized iHeart; and (ii) 12.5 percent of iHeartCommunications' ownership of Clear Channel.

-54-

156.   On November 28, 2017, the PGN Holders and Term Loan Lenders participating in the negotiations provided the iHeart Entities with a counter-proposal under which, among other things, the PGN Holders and Term Loan Lenders would receive $5.75 billion in new debt plus 95.3 percent of the equity in recapitalized iHeart and 100 percent of iHeartCommunications' equity interest in Clear Channel.

157.   The proposal by the PGN Holders and Term Loan Lenders was also a "fully consensual transaction," but, significantly, it also included an "option for stapled pre-packaged chapter 11" proceeding.  Moreover, the proposal provided for intercompany debt (which presumably included the Revolving Note balance) "to be resolved in a manner satisfactory to the consenting PGN holders and Term Lenders."

158.   Put another way, as of the end of November 2017, the parties were far apart on various proposals to stave off an iHeartCommunications bankruptcy and, indeed, either through a chapter 11 proceeding or in order to resolve it in a manner "satisfactory" to the creditors, the creditors' proposal included discharge, elimination or modification of the Revolving Note balance.

159. Finally, in its November 30, 2017 announcement, iHeartMedia emphasized that no agreement had been reached and that, notably, any agreement

would also have to be adopted by other creditors who are not party to the negotiations:

> No agreement has been reached with respect to the above discussions and discussions remain ongoing. There can be no assurance that any agreement will be reached. Any such agreement will require the consent of additional debt holders who are not party to the negotiations, and who hold substantial percentages of our debt.

160. In short, the iHeart Entities conceded doubt whether iHeartCommunications could continue as a going concern absent refinancing of its debt, the negotiations with certain of the PGN Holders and Term Loan Lenders were far apart, any deal required the consent of other creditors, and the last proposal by the PGN Holders and Term Loan Lenders included an option for a pre-packaged chapter 11 proceeding and/or "satisfactory" resolution of the intercompany debt that would likely modify or eliminate the unsecured Revolving Note balance.

### G.    The February 1, 2018 Missed Interest Payment

161. On February 1, 2018, iHeartCommunications issued a press release announcing that it elected not to make an interest payment of approximately $106 million due on February 1, 2018 on its outstanding 14 percent unsecured Senior Notes due 2021 (the "2021 Notes"). As of September 30, 2017, iHeartCommunications owed $1.7 billion on the 2021 Notes.

162.   Under the indenture governing the notes, iHeartCommunications had a 30-day grace period to make the interest payment before such default triggered an event of default, which would trigger defaults on other indentures and agreements.

163.   On February 2, 2018, the *Wall Street Journal* published its article surmising that the iHeart Entities were "likely to file for bankruptcy protection as early as March after a decade of ballooning debt and faltering growth, drawing the curtain on one of the biggest leveraged buyouts before the 2008 financial crisis," and that the missed interest payment "kicked off a countdown on a 30-day grace period during which creditors and the company will try to reach a deal to restructure the debt, most likely including a bankruptcy filing."

## V.   THE INTERCOMPANY NOTE COMMITTEE AND THE BOARD FAIL TO EFFECT REPAYMENT

### A.   The Intercompany Note Committee Fails to Demand Repayment

164.   As discussed above, on November 8, 2017, Clear Channel filed its Form 10-Q for the third quarter of 2017 which revealed that, as September 30, 2017, the Revolving Note balance was a record $1.051 billion.

165.   In this regard, the Company revealed that, ***for the first time***, the Liquidity Trigger Ratio in the 2013 Settlement had been reached, meaning the Public Share had reached two-times iHeartCommunications' total liquidity, thereby authorizing the Intercompany Note Committee to make a full or partial demand for

repayment of the balance under the Revolving Note, to be accompanied by a dividend to shareholders:

> As previously disclosed, we established a committee of our board of directors, consisting of our independent and disinterested directors, for the specific purpose of monitoring the Due from iHeartCommunications Note. This committee has the non-exclusive authority to demand payments under the Due from iHeartCommunications Note under certain specified circumstances tied to iHeartCommunications' liquidity or the amount outstanding under the Due from iHeartCommunications Note, as long as our board of directors declares a simultaneous dividend equal to the amount so demanded. The committee last made a demand under the Due from iHeartCommunications Note on August 11, 2014. *As of November 8, 2017, the committee has the right pursuant to the terms of the settlement of the derivative litigation filed by our stockholders regarding the Due from iHeartCommunications Note but not the obligation, to make a demand on the Due from iHeartCommunications Note*. *If future demands are made in accordance with the terms of the committee charter or if our board of directors makes a demand, we will declare a simultaneous dividend equal to the amount so demanded*, which would further reduce the amount of the "Due from iHeartCommunications" asset that is available to us as a source of liquidity for ongoing working capital, capital expenditure, debt service and other funding requirements.

166.   Accordingly, as of November 8, 2017, assuming that Minority Shareholders owned 89.5 percent of Clear Channel, if the Intercompany Note Committee had demanded repayment in full under the Revolving Note and the proceeds funded a dividend to shareholders, as contemplated by the 2013

Settlement, iHeartCommunications would have received back $940.6 million and Minority Shareholders would have received $110.3 million.

167. Under the 2013 Settlement, the Intercompany Note Committee Defendants were only authorized to make a notice of demand for repayment up to the Revolving Note's full balance for 30 days following the date they received notice that the Liquidity Ratio trigger had been reached. They failed to do so.

168. Notably, according to the SLC for the 2012 Litigation, the Liquidity Trigger Ratio and repayment demand feature of the 2013 Settlement was implemented for the exclusive purpose of protecting Clear Channel and its Minority Shareholders in circumstances where, as here, the balance owed to Clear Channel was most at risk because iHeartCommunications was in financial distress and the Board members affiliated with the iHeart Entities and Private Equity Defendants were conflicted:

> In choosing how to balance these considerations and determine whether to make a demand for payment under the [Revolving Note], the risk that the non-independent directors of [Clear Channel] will consider the interests of the *borrower*, [iHeartCommunications], above the interests of [Clear Channel] is greatest at the very time that the risks posed to [Clear Channel] by the loan—and thus the reasons for exercising the right of demand— become most compelling.

169. Because of the Intercompany Note Committee's authority to demand repayment if the Liquidity Ratio trigger was reached, the SLC argued that the 2013

Settlement adequately "addresses the potential for conflicts by providing that in the event [iHeartCommunications'] near-term financial position materially deteriorates or the [Revolving Note] balance reaches a defined limit, a newly formed committee of [Clear Channel's] independent directors will be able to exercise the demand feature on its own," which "could moderate the impact of the Cash Management Arrangement" and, "[i]f used in concert with the Company's authority to issue dividends . . . could yield substantial value to the Company's stockholders."

170.   When it came time for the Intercompany Note Committee to exercise its authority to protect Minority Shareholders as bargained for by the 2012 Plaintiffs, the Intercompany Note Committee Defendants failed to do so.

171.   Significantly, the Intercompany Note Committee Defendant's failure to demand repayment was not simply a typical determination subject to their judgment, but rather was due to bad faith.  The Intercompany Note Committee declined to demand repayment and cause a dividend to Minority Shareholders in order to capitulate to the wishes of the larger Board and iHeart Entities and Private Equity Defendants, despite the fact that:

- The Intercompany Note Committee was created as the central feature of the 2013 Settlement expressly to create protections for Clear Channel and, more specifically for the Minority Shareholders that would benefit from any repayment demand and dividend caused by the committee;

- The SLC acknowledged that the larger Board was conflicted and that the Intercompany Note Committee's independence was a vital feature of the 2013 Settlement because the committee would be able to make a demand when iHeartCommunications' financial crisis was at its worst and the pressure on the Board not to do so was at its highest;

- The Intercompany Note Committee Defendants – most of whom were members of the Board in early 2016 during the Notes Offering and Assets Sales – were aware of the Board's history of approving Clear Channel transactions solely for the benefit of iHeartCommunications and consequently knew or should have known the Board would not effect a repayment and dividend to protect Minority Shareholders if the Intercompany Note Committee declined to exercise its authority to do so;

- As a term of the 2013 Settlement, the Intercompany Note Committee received monthly reports on the Revolving Note balance and monthly and three-month estimates on the Liquidity Ratio trigger, such that the committee was aware before November 8, 2017 that the ratio would be triggered and that it needed to prepare to demand repayment;

- As a term of the 2013 Settlement, the Intercompany Note Committee received monthly reports and estimates concerning iHeartCommunications' financial condition and thus was aware that iHeartCommunications was facing bankruptcy in 2018; and

- The Intercompany Note Committee was aware that the iHeart Entities' debt outweighed its assets by more than $10 billion and if iHeartCommunications filed for bankruptcy the unsecured Revolving Note would be impaired or wholly discharged and the Minority Shareholders would receive no value for the asset.

172. For these reasons, it is evident that the Intercompany Note Committee

Defendants took actions and/or failed to take actions under pressure from the other

Defendants that were intended to, or were certain to, harm the interests of Minority Shareholders while benefiting the iHeart Entities and Private Equity Defendants.

173.   Significantly, the Intercompany Note Committee's failure occurred in further bad faith.  The Intercompany Note Committee's right to demand repayment and force a corresponding dividend was the central feature of the 2013 Settlement negotiated to provide protection to Minority Shareholders under the cash management arrangement and Revolving Note, and the committee's purported "independence" was the cornerstone of the protection that Minority Shareholders would receive if the financial crisis at iHeartCommunications escalated and the pressure on the interested Board to not demand repayment increased.

174.   Nevertheless, the Intercompany Note Committee instead abandoned its independence and acquiesced to the will of the conflicted Board and Private Equity Defendants by failing to demand repayment, despite the fact that the exceeded triggering threshold was negotiated and recognized as the point at which the Intercompany Note Committee should step in to protect Minority Shareholders. Moreover, under the terms of the 2013 Settlement, the Intercompany Note Committee Defendants knew that their conduct would damage the Minority Shareholders.

175. Significantly,   the   Intercompany   Note   Committee   could   have demanded repayment and the Board could have let the Revolving Note expire (or

itself demanded repayment) without violating certain contractual obligations to iHeartCommunications under the Master Agreement not to cause it to default on other agreements and/or without materially forcing iHeartCommunications closer to bankruptcy.   Because iHeartCommunications receives 89.5 percent of any dividend, Defendants could have structured any repayment by iHeartCommunications and attendant dividend by Clear Channel in a manner that required iHeartCommunications to only repay the $100-plus million that would be actually paid to Minority Shareholders, while retaining the dividend amount it would receive without round-tripping it through Clear Channel.

### B.    The Board Permits the Revolving Note to Be Extended

176.   As discussed above, after more than eight years since the previous extension, the Revolving Note, by its terms, was set to expire on December 15, 2017.   At that time, without Clear Channel taking any additional steps, the outstanding balance would have become immediately due and payable.

177.   Although at the time the Revolving Note would have expired and the proceeds that became due were purportedly still subject to the daily sweep under the cash management arrangement, the Board and Clear Channel still had the right under the Master Agreement to issue dividends – one of the few permitted uses of cash by Clear Channel – that, if exercised in conjunction with expiration of the

Revolving Note and the attendant repayment could have yielded $110.3 million in dividends to Outside Stockholders.

178.   Instead, on November 29, 2017, iHeartCommunications and Clear Channel amended the Revolving Note to extend the maturity from December 15, 2017 to May 15, 2019.[8]

179.   Significantly, the Board permitted Clear Channel to extend the Revolving Note despite the fact that: (i) the iHeart Entities sustained record losses in 2017; (ii) the Revolving Note balance finally reached a level in 2017 that the 2013 Settlement contemplated was troublesome enough to create the Intercompany Note Committee's demand authority; and (iii) negotiations on debt restructuring that would save iHeartCommunications were unsuccessful and bankruptcy was imminent.

180.   Moreover, unlike when the Board extended the Revolving Note in 2009 in exchange for certain concessions, including a $500 million repayment of amounts outstanding on the Revolving Note through an offset of certain amounts owed by Clear Channel, the Board did not achieve any concession that would

---

[8] The Board's purported justification for renewing the Revolving Note is unknown. On November 21, 2017, GAMCO made a demand to the Board under Section 220 for information concerning, among other things, the Board's intent with respect to the expiration of the Revolving Note.  The Board flatly refused to produce documents in response to the November 2017 Section 220 Demand.

protect Minority Shareholders, such as demanding that the Revolving Note become a secured debt.

### C. The Board Fails to Demand Repayment After the Liquidity Ratio Trigger is Reached

181. As discussed herein, the parties to the 2013 Settlement negotiated both the creation of the Intercompany Note Committee to protect Minority Shareholders from the escalating Revolving Note balance – the Intercompany Note Committee does not benefit Clear Channel which is not permitted to retain any demand proceeds – and the Liquidity Trigger Ratio reflected when the Revolving Note balance versus iHeartCommunications' liquidity has reached a point Minority Shareholders need protection. Nevertheless, the Liquidity Ratio trigger was reached and the Intercompany Note Committee failed to act within its 30-day window to demand repayment that would have resulted in a dividend to Minority Shareholders.

182. Significantly, the 2013 Settlement and creation of the Intercompany Note Committee did not – because it cannot – relieve the Board of its obligation to meet its fiduciary duty to Clear Channel's Minority Shareholders. Indeed, in his opinion dismissing the GAMCO's 2016 Litigation, Vice Chancellor Slights recognized that "circumstances may arise that would require the [ ] Board, in the proper exercise of its fiduciary duties, to demand repayment of the Revolving Note even absent one of the liquidity triggers being reached."

-65-

183.   Here, in fourth quarter of 2017 and into 2018, the liquidity triggers – the bargained-for measure of when Minority Shareholders were entitled to protection by the Intercompany Note Committee – were reached and iHeartCommunications' financial crisis reached its historical worst.   Nevertheless, the Board failed to exercise general right to demand repayment under the Revolving Note and to declare a dividend.

### D.   Permitting the Revolving Note Balance to Remain Outstanding was a Breach of Fiduciary Duty

184.   Under the circumstances as set forth in this Complaint, there was no reasonable or rational basis for the Intercompany Note Committee or Board to fail to take the steps available to them to ensure repayment of the Revolving Note balance and that the Minority Shareholders would receive value for the Company's largest receivable in the form of a dividend.   Specifically:

- The iHeart Entities' losses continued to escalate to historical levels in 2017 and there was doubt that iHeartCommunications would continue as a going concern;

- The iHeart Entities conceded that iHeartCommunications' ability to avoid bankruptcy was contingent on debt restructuring negotiations with creditors that had been unsuccessful;

- The iHeart Entities acknowledged there is no certainty that restructuring negotiations would result in a deal agreeable to all creditors;

- Even assuming Clear Channel collected interest on the Revolving Note balance, those interest payments depended on iHeartCommunications' continuing as a going concern;

- There was no benefit for Clear Channel to leave the cash at iHeartCommunications instead of demanding repayment and declaring a dividend, the Company was restricted from using the cash for its own corporate purposes so having it "available" as a resource at iHeartCommunications was illusory; and

- Clear Channel's cash held by iHeartCommunications was essentially useless to the Company because if it was repaid without a corresponding dividend it is immediately swept back to iHeartCommunications.

185.   At bottom, the only procedure through which the Revolving Note balance could provide any benefit to Clear Channel or its Minority Shareholders was through ensuring repayment of the balance on the Revolving Note and declaring a simultaneous dividend to shareholders.

186.   Significantly, the Intercompany Note Committee and Board likely could have provided this benefit without violating the Master Agreement's prohibition against Clear Channel taking action that causes iHeartCommunications to violate any third-party agreements or default on any obligations and without materially pushing iHeartCommunications closer to bankruptcy.

187.   It is uncontroverted that iHeartCommunications receives 89.5 percent of any dividend and Minority Shareholders receive approximately 10.5 percent. Accordingly, a *pro rata* dividend on $1.051 billion would have provided $940.6 million to iHeartCommunications and $110.3 million to Minority Shareholders.  If the Intercompany Note Committee would have made a demand and caused a

dividend, Clear Channel and iHeartCommunications could have structured the transaction so that iHeartCommunications only actually paid the $110.3 million, thereby decreasing the chance it violated any covenants with other creditors.

## VI.   CLASS ACTION ALLEGATIONS

188.   GAMCO brings this class action pursuant to Court of the Chancery Rule 23 directly on its own behalf and on behalf of the Class of Minority Shareholders of Clear Channel Class A common shares from November 8, 2017 to March 14, 2018.

189.   Causes of Action I, II, III, IV and V are properly maintainable as a class action.

190.   For these Causes of Action, a class action is superior to other available methods of fair and efficient adjudication of this controversy.

191.   The Class is so numerous that joinder of all members is impracticable. As of November 8, 2017, more than 36.1 million Class A common shares were outstanding and held by individuals and entities unaffiliated with Defendants, and members of the class are believed to exceed 100 and be spread across the U.S.

192.   Moreover, there are questions of law and fact that are common to the Class members and that predominate over any questions affecting only individuals, including by not limited to:

(a)   Whether the Intercompany Note Committee breached its

fiduciary duty to Minority Shareholders by failing to demand repayment on the Revolving Note after the balance reached the Liquidity Ratio Trigger, a demand that would have resulted in dividend to Minority Shareholders in excess of $100 million;

(b)   Whether the Board breached its fiduciary duty to Minority Shareholders by permitting Clear Channel to extend and renew the Revolving Note when letting the note expire by its own terms and declaring a dividend would have resulted in dividend to Minority Shareholders in excess of $100 million;

(c)   Whether the Board breached its fiduciary duty to Minority Shareholders by failing to demand repayment and declare a dividend up to March 14, 2018 following expiration of the Intercompany Note Committee's option to demand repayment under the 2013 Settlement, which would have resulted in dividend to Minority Shareholders in excess of $100 million;

(d)   Whether the Private Equity Defendants breached the fiduciary duty to Minority Shareholders by failing to direct the Board to let the Revolving Note expire and/or to demand repayment and declare a dividend to protect the interests of Minority Shareholders; and

-69-

(e) Whether the Private Equity Defendants aided and abetted the breaches of fiduciary duty to Clear Channel's Minority Shareholders by the Intercompany Note Committee Defendants and Board Defendants.

193.   GAMCO's claims and defenses are typical claims and defenses of other Class members and GAMCO has no motives that are against the interests of all Class members.  GAMCO will fairly and adequately protect the interests of the Class.

194.   GAMCO is committed to prosecuting this action, and has retained competent counsel experienced in litigation of this nature.

195.   Defendants have acted in a manner that adversely affects GAMCO and all Class members alike.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for the Defendants; or adjudications with respect to individual members of the Class, as a practical matter, be dispositive of the interests of the other members or severely impair or impede their ability to protect their interests.

## VII.   CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty Against the Intercompany Note Committee
### Defendants

196.   GAMCO incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.   GAMCO brings this action against the Intercompany Note Committee Defendants for failure in November 2017 to exercise their contractual right to demand repayment of the Revolving Note balance from iHeartCommunications and to declare a *pro rata* dividend of the proceeds to Clear Channel shareholders, of which the Minority Shareholders would have been entitled to 10.5 percent – or approximately $110 million at the time.

198.   The Intercompany Note Committee failed to do so despite the fact that the committee was created in 2013 *for the express purpose* of protecting Minority Shareholders from Clear Channel's escalating exposure to under the Revolving Note.

199.   The Intercompany Note Committee was created to monitor the balance of the Revolving Note and provided with the non-exclusive authority to demand repayment in full or part on the Revolving Note within 30 days of the balance attributable to the Minority Shareholders reaching a certain ratio of

iHeartCommunications liquidity, provided the Board at the same time declared a dividend equal to the repayment amount demanded.

200.   The Intercompany Note Committee was intended to provide protection to Minority Shareholders when the Revolving Note balance reached a certain point and the Company's non-independent director majority was conflicted between their duty to Minority Shareholders and consideration of the interests of iHeartCommunications.

201.   By virtue of their role in monitoring the Revolving Note balance on behalf of Clear Channel and its Minority Shareholders arising from the 2013 Settlement, the Intercompany Note Committee Defendants owed and continue to owe a fiduciary duty to the Class of Outsider Shareholders.

202.   As of no later than November 8, 2017, the Liquidity Ratio trigger was reached, thereby authorizing the Intercompany Note Committee to demand repayment of the $1.051 billion then-due on the Revolving Note.

203.   The Intercompany Note Committee failed in bad faith to demand repayment of the Revolving Note balance which would have provided a direct benefit to Minority Shareholders in the form of the accompanying dividend.  The Intercompany Note Committee Defendants' failure to do so constituted a breach of fiduciary duty to the Class of Minority Shareholders causing damages at an amount to be determined at trial.

## COUNT II
## Breach of Fiduciary Duty Against the Board Defendants

204.   GAMCO incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.   GAMCO brings this action against the Board Defendants because the Board allowed Clear Channel to agree with iHeartCommunications to extend the maturity of the Revolving Note, which was by its own terms set to expire and become due and payable on December 15, 2017, instead of letting the note expire and exercising the Board's contractual authority immediately to dividend the proceeds to Clear Channel's shareholders.

206.   The Board Defendants, as directors of Clear Channel, owed and continue to owe a fiduciary duty to the Class of Minority Shareholders.

207.   The Revolving Note, the balance on which reached $1.051 billion as of November 8, 2017, was set to expire by its terms on December 15, 2017.  By its terms, upon expiration of the Revolving Note all outstanding balances and accrued interest thereon would have become due and payable to Clear Channel, at which time the Board Defendants were authorized to declare an equal dividend to shareholders.

208.   Rather than allow the Revolving Note to expire and to declare a dividend, which would have provided a direct benefit to Minority Shareholders in the form of the accompanying dividend, the Board Defendants permitted Clear

Channel to renew and extend the note until May 2019, which constituted a breach of fiduciary duty to the Class of Minority Shareholders causing damages at an amount to be determined at trial.

## COUNT III
### Breach of Fiduciary Duty Against the Board Defendants

209.   GAMCO incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.   GAMCO brings this action against the Board Defendants because, even after the Intercompany Note Committee and Board failed to utilize their contractual options to demand repayment or let the Revolving Note expire, respectively, and to effectuate a dividend, the Board continued to fail to exercise the Revolving Note's general right to make a repayment demand and to declare a dividend until the iHeart Entities declared bankruptcy in March 2014.

211.   The Board Defendants failed to do so even though the threshold negotiated in the 2013 Settlement had been reached and the Board knew the iHeart Entities were mere months from bankruptcy, which constituted a breach of fiduciary duty to the Class of Minority Shareholders causing damages at an amount to be determined at trial.

**COUNT IV**
**Breach of Fiduciary Duty Against the Private Equity Defendants**

212.   GAMCO incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.   GAMCO brings this action against the Private Equity Defendants, who controlled the iHeart Entities and Clear Channel's Board.

214.   The Private Equity Defendants, as direct or indirect controlling shareholders, owed and continue to owe a fiduciary duty to the Class of Minority Shareholders of Clear Channel.

215.   The Private Equity Defendants were at all times in control of Clear Channel's Board, and could have directed – or refrained themselves from preventing – the Board to permit expiration of the Revolving Note and to declare an equal dividend to shareholders, which would have provided a direct benefit to the Class of Minority Shareholders.

216.   The Private Equity Defendants failed to direct – or failed to refrain themselves from preventing – the Board to permit the Revolving Note to expire and to declare a dividend, which would have provided a direct benefit to the Class of Minority Shareholders in the form of the accompanying dividend.  Their failure to do so constituted a breach of fiduciary duty to the Class of Minority Shareholders causing damages at an amount to be determined at trial.

-75-

## COUNT IV
## Aiding and Abetting Breach of Fiduciary Duty Against the Private Equity Defendants

217.   GAMCO incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.   Solely to the extent the Private Equity Defendants are not deemed to be controlling stockholders of the Company, they are named herein as aiders and abettors of the breach of fiduciary duty on the part of the Board Defendants.

219.   The Private Equity Defendants knew that Board Defendants, as directors of Clear Channel, owed and continue to owe a fiduciary duty to the Minority Shareholders of Clear Channel.

220.   The Private Equity Defendants knew that the Revolving Note, the balance on which reached $1.051 billion as of November 8, 2017, was set to expire by its terms on December 15, 2017.

221.   The Private Equity Defendants likewise knew that, by its terms, upon expiration of the Revolving Note all outstanding balances and accrued interest thereon would have become due and payable to Clear Channel, at which time the Board Defendants were authorized to declare an equal dividend to shareholders.

222.   The Private Equity Defendants failed to direct – or failed to refrain themselves from preventing – the Board to permit the Revolving Note to expire

and to declare a dividend, which would have provided a direct benefit to the Class of Minority Shareholders in the form of the accompanying dividend.

223.   The Private Equity Defendants' failure to do so constituted aiding and abetting the Board's breach of fiduciary duty to the Class of Minority Shareholders causing damages at an amount to be determined at trial.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a.    An order declaring that the Intercompany Note Committee Defendants breached their fiduciary duty to the Class of Minority Shareholders;

b.    An order declaring that the Board Defendants breached their fiduciary duty to the Class of Minority Shareholders;

c.    An order declaring that the Private Equity Defendants breached their fiduciary duty to the Class of Minority Shareholders;

d.    An order declaring that the Private Equity Defendants aided and abetted the Board Defendants' breaches of fiduciary duty to the Class of Minority Shareholders;

e.    An order awarding damages, together with pre- and post-judgment to the Class of Minority Shareholders;

f.    An award of GAMCO's costs and expenses incurred in this action, including, but not limited to, experts' and attorneys' fees and expenses; and

g.     Any such other and further relief as the Court deems just and proper.


Dated: August 27, 2018                    Respectfully submitted,


                                          FARNAN LLP

                                          /s/ Brian E. Farnan

OF COUNSEL:                               Brian E. Farnan (Bar No. 4089)
                                          Michael J. Farnan (Bar No. 5165)
Vincent R. Cappucci                       919 N. Market Str., 12th Floor
Andrew J. Entwistle                       Wilmington, DE 19801
ENTWISTLE & CAPPUCCI LLP                  Tel: (302) 777-0300
299 Park Avenue, 20th Floor               Fax: (302) 777-0301
New York, NY 10171                        bfarnan@farnanlaw.com
(212) 894-7200                            mfarnan@farnanlaw.com

                                          *Attorneys for Plaintiff GAMCO Asset*
                                          *Management Inc.*

EFiled:  Aug 27 2018 10:22AM EDT
Transaction ID 62384026
Case No. 2018-0633-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GAMCO ASSET MANAGEMENT, INC.,
on its own behalf and on behalf of all
similarly situated outside shareholders of
Clear Channel Outdoor Holdings, Inc.,

           Plaintiff,

       v.

BLAIR HENDRIX, DOUGLAS L. JACOBS,
DANIEL G. JONES, PAUL KEGLEVIC,
VINCENTE PIEDRAHITA, ROBERT W.
PITTMAN, OLIVIA SABINE, DALE W.
TREMBLAY, BAIN CAPITAL PARTNERS,
LLC, and THOMAS H. LEE PARTNERS, L.P.,

           Defendants.

C.A. No. _____

## VERIFICATION OF PLAINTIFF GAMCO ASSET MANAGEMENT INC.

STATE OF NEW YORK       :
                           :   ss.
COUNTY OF WESTCHESTER   :

I, David M. Goldman, being duly sworn according to law, deposes and says:

    1.    I am General Counsel of GAMCO Asset Management, Inc. ("GAMCO"), plaintiff in this class action.  I am fully familiar with the facts set forth herein concerning GAMCO and authorized to make this verification on its behalf.

1

2.    I have read the foregoing Verified Class Action Complaint (the "Complaint"). The allegations in the Complaint concerning GAMCO are true. On information and belief, I believe all other allegations in the Complaint to be true.

Executed this 27th day of August, 2018.

GAMCO ASSET MANAGEMENT, INC.

David M. Goldman

SUBSCRIBED TO AND SWORN BEFORE ME this 27th day of August, 2018.

Notary Public

My Commission Expires:

2-5-2022

REBECCA HOLLINS ARNALL
NOTARY PUBLIC-STATE OF NEW YORK
No. 02AR6370440
Qualified In New York County
My Commission Expires 02-05-2022

2

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

EFiled: Aug 27 2018 10:22AM EDT
Transaction ID 62384026
Case No. 2018-0633-

The information contained herein is for the use by the Court for statistical and administrative p ... only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case:

GAMCO Asset Management Inc. v.  Blair Hendrix, Douglas L. Jacobs, Daniel G. Jones,
Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, Dale W. Tremblay,
Bain Capital Partners, LLC, And Thomas H. Lee Partners, L.P.

2. Date Filed: 8/27/2018

3. Name and address of counsel for plaintiff(s):

Brian E. Farnan (Bar No. 4089), Michael J. Farnan (Bar No. 5165), Farnan LLP,
919 N. Market St., 12th Floor, Wilmington, DE 19801

4. Short statement and nature of claim asserted:

This is a shareholder direct class action that seeks to remedy the Defendants' breaches
of fiduciary duties.

5. Substantive field of law involved (check one):

| | | |
|---|---|---|
| _____ Administrative law | _____ Labor law | _____ Trusts, Wills and Estates |
| _____ Commercial law | _____ Real Property | _____ Consent trust petitions |
| _____ Constitutional law | _____ 348 Deed Restriction | _____ Partition |
| __X__ Corporation law | _____ Zoning | _____ Rapid Arbitration (Rules 96,97) |
| _____ Trade secrets/trade mark/or other intellectual property | | _____ Other |

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to
be filed with the Register of Wills):

GAMCO Asset Management Inc. v. iHeartMedia, Inc., et al., C.A. 12312-VCS
GAMCO Asset Management Inc. v. iHeartMedia, Inc., et al., No. 593, 2016 D

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):

This Court has jurisdiction pursuant to 10 Delaware Code § 341

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.

N/A

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings,
check here ____.  (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance,
check here and attach a statement of good cause. _____

/s/ Brian E. Farnan (Bar No. 4089)
Signature of Attorney of Record & Bar ID

# EXHIBIT N

MINUTES OF A MEETING
OF THE BOARD OF DIRECTORS OF
CLEAR CHANNEL OUTDOOR HOLDINGS, INC.
(a Delaware corporation)

January 23, 2018

Pursuant to notice duly given, a telephonic meeting of the Board of Directors (the "**Board**") of Clear Channel Outdoor Holdings, Inc., a Delaware corporation (the "**Company**"), was held on January 23, 2018, commencing at 4:00 p.m. (Eastern). Present in person or by telephone were Board members Douglas L. Jacobs, Olivia Sabine, Robert W. Pittman, Blair E. Hendrix, Daniel G. Jones, Paul Keglevic, and Dale W. Tremblay.

Also participating at the invitation of the Board were Robert H. Walls, Jr., Executive Vice President, General Counsel, and Secretary of the Company; Lauren E. Dean, Senior Vice President, Associate General Counsel, and Assistant Secretary of the Company; Brian Coleman, Senior Vice President, Treasurer, and Assistant Secretary of the Company; Julie Hill, Senior Vice President – Liquidity & Asset Management of the Company; Richard J. Bressler, Chief Financial Officer of the Company; Steven J. Macri, Senior Vice President – Corporate Finance of the Company; Paul McNicol, Executive Vice President and Deputy General Counsel of the Company; Adam Keil of Moelis & Company LLC ("**Moelis**"), advisor to iHeartMedia, Inc., a significant stockholder of the Company ("**Parent**"); Brian D. Wolfe, Jon A. Ballis, and Anup Sathy of Kirkland & Ellis LLP, counsel to the Company and Parent ("**K&E**"); William B. Chandler III and Amy L. Simmerman of Wilson Sonsini Goodrich & Rosati, Professional Corporation, counsel to the Board ("**WSGR**"); Jonathan M. Sperling and Jack S. Bodner of Covington & Burling LLP ("**Covington**"), counsel to a special committee of the Board (the "**Special Committee**"); and Jeffery J. Stegenga and Justin Schmaltz of Alvarez & Marsal, advisor to Parent ("**Alvarez**").

There being a quorum present, the meeting was called to order. Ms. Simmerman served as secretary of the meeting and recorded the minutes.

At the request of the Board, Mr. Stegenga summarized the liquidity and capital structure slide deck provided in the Board materials delivered to the members of the Board prior to the meeting regarding Parent's forecasted liquidity. Mr. Stegenga noted that Parent's board of directors had reviewed the same forecast the previous week, which forecast reflected that Parent's liquidity on January 12, 2018 was approximately $213 million assuming that the $44 million maturity due on Parent's outstanding 10% Senior Notes was paid, as it ultimately was on January 15, 2018. Mr. Stegenga then reported that Parent anticipates that its liquidity could fall below $50 million by the end of February or early March 2018 and noted that being below that level of liquidity is a precarious position for a company the size of Parent.

At the request of the Board, Mr. Coleman reported on the status of the Company's negotiations to convert its revolving credit facility to an asset-backed facility. Mr. Coleman reported that an audit performed on domestic receivables revealed that they may support a financing capacity for the proposed facility of up to $125 million. Mr. Coleman discussed the steps required to close the transaction, noting that the Company continued to perform additional diligence and that, ultimately, Board approval would be required. Mr. Coleman further informed the Board that the Company anticipated having an update in a few weeks which would likely

include a term sheet. In response to questions from the Board relating to how funds from the facility would be used and whether draws would be subject to the cash management arrangement between Parent and the Company, Mr. Coleman explained that the proposed facility would initially provide the Company with the ability to backstop certain letters of credit and that it could provide the Company with additional liquidity. Mr. Coleman also stated that it was not the intent for funds from this facility to be swept up to Parent, but that management would continue to evaluate the relationship between the cash management arrangement and the proposed facility.

At the request of the Board, Mr. Keil provided an update with respect to negotiations among Parent and its junior and senior lenders. Mr. Keil reported that there has been active negotiation with Parent's senior lenders represented by PJT Partners, and that Parent was in the process of developing a counterproposal to a proposal made last week by certain creditor constituencies. Mr. Keil noted that all proposals continue to contemplate a separation of the Company and Parent.

At the request of the Board, Mr. Sathy gave a report on the status of Parent's contingency planning relating to a potential bankruptcy. Mr. Sathy reported that K&E is working together with Moelis and Alvarez to, among other things, negotiate with creditors, draft the required filing documents and support agreements, consider the possible terms of a debtor-in-possession financing facility, and otherwise work toward a pre-arranged or prepackaged bankruptcy filing.

At the request of the Board, Mr. Chandler discussed the formation of a new special committee of the Board (the "**New Committee**") consisting of independent directors to engage in negotiations that could arise in relation to the potential Chapter 11 bankruptcy filing by Parent, including, among other things, negotiations with respect to the treatment of the existing cash management arrangement and other intercompany agreements between Parent and the Company and/or the balance outstanding under the intercompany revolving promissory note payable by Parent to the Company. Discussion ensued, and Mr. Chandler responded to questions from the Board relating to the appropriate power and authority to be granted to the New Committee, the composition of the proposed committee, and the fees to be paid to the committee members. At the suggestion of Mr. Jacobs, the Board discussed the potential dissolution of the existing Special Committee for purposes of clarity, in light of the anticipated role of the New Committee. Following further discussion, upon a motion duly made and seconded, the resolutions attached hereto as **Exhibit A** and incorporated herein by reference relating to the New Committee were unanimously approved by the Board, and in connection therewith, the Board unanimously approved the dissolution of the existing Special Committee, effective upon the adjournment of this meeting of the Board.

**Executive Session**

At approximately 4:25 p.m. (Eastern), at the request of the Board, all meeting attendees left the meeting other than the non-management directors and the representatives from K&E, WSGR, and Covington. An executive session of the non-management members of the Board commenced. Members of the Board discussed certain discretionary bonus payments that had recently been made by Parent to certain Parent executives. At the request of the Board, Mr. Chandler responded to questions relating to the Company's prior repatriation of funds and resulting payments to Parent, whether such bonus payments were consistent with Parent's past practice in terms of size and timing, the process used by Parent's board in evaluating and approving the bonus payments, and whether such payments were regularly granted to retain

2

executives in financially troubled companies.  Discussion ensued regarding the consistency of the bonus payments with Parent's past bonus practices, the Company's similar compensation plan, the relationship between Parent and the Company, and information provided to the Board by Parent.  Mr. Keglevic noted that, to his knowledge, bonus payments of this nature were commonly used by financially troubled companies to, among other things, avoid the damage caused by loss of key executives.  Discussion next ensued relating to the process around Parent's approval of the bonus payments, including Parent's use of an industry expert in its analysis. Discussion ensued.

**Adjournment of Meeting**

There being no further business, the meeting was duly adjourned at 4:45 p.m. (Eastern).

Amy L. Simmerman, Secretary of the Meeting

## Exhibit A

### RESOLUTIONS
### OF THE BOARD OF DIRECTORS OF
### CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

---

**WHEREAS**, iHeartMedia, Inc. (*"Parent"*), a significant direct or indirect stockholder of Clear Channel Outdoor Holdings, Inc., a Delaware corporation (the *"Company"*), is considering restructuring alternatives, including a restructuring of Parent and certain of its subsidiaries consummated pursuant to voluntary chapter 11 cases commencing under chapter 11 of the bankruptcy code (the *"Restructuring Transaction"*);

**WHEREAS**, though the Company will not file a petition under chapter 11 of the bankruptcy code, the Restructuring Transaction could implicate the need for certain negotiations between or among the Company, Parent, and third parties regarding certain related issues involving the Parent and the Company (the *"Negotiations"*), including regarding the existing cash management and other intercompany arrangements between the Parent and the Company and/or the balance outstanding under the intercompany revolving promissory note by and between the Company and Parent related thereto (the *"Due from iHeart Note"*); and

**WHEREAS**, the Board of Directors of the Company (the *"Board"*) has determined it is in the best interest of the Company and the stockholders of the Company to constitute a special committee of the Board (the *"Committee"*) composed of directors who are not otherwise affiliated with the Parent or significant stockholders thereof (i) to conduct any Negotiations, (ii) to direct the entry into or disapproval of contracts, in the name and on behalf of the Company, to which the Company is to be a party that would memorialize the result of any Negotiations to the fullest extent permitted by law, (iii) to evaluate and act on any course of action the Company may have with respect to the cash management and other intercompany arrangements and/or the Due from iHeart Note as a result of the Restructuring Transaction, to the extent such is within the scope of the Committee's delegation as set forth below, and (iv) to the extent that Section 141(c)(2) of the Delaware General Corporation Law does not permit the Board to delegate to the Committee the power or authority to approve, adopt, amend, or recommend an action or transaction deemed advisable by the Committee, to recommend that the Board approve, adopt, amend, or recommend such action or transaction.

**NOW, THEREFORE, BE IT RESOLVED**, that the formation of the Committee, composed of directors Paul Keglevic, Doug Jacobs and Dale Tremblay, all of whom are non-management directors as well as directors who are not affiliated with Parent or any of Parent's significant stockholders, is hereby constituted and approved, with such duties delegated and powers granted to the Committee as hereinafter described;

**FURTHER RESOLVED**, that, to the fullest extent permitted by law, the Board hereby delegates to the Committee the full power and authority of the Board, to the extent applicable, in each case in connection with the Restructuring Transaction (collectively, the *"Delegated Authority"*), to:

      (a)     Consider, evaluate, negotiate, and approve or disapprove of (i) any change in the terms of or termination of the cash management or other intercompany arrangements between the Company and Parent and (ii) any matters related to the treatment of the balance outstanding under the Due from iHeart Note in connection with a Restructuring Transaction; and otherwise conduct any Negotiations related to the foregoing.

      (b)     Direct the entry into any contracts or instruments, in the name and on behalf of the Company, related to (a) above.

      (c)     To the extent that Section 141(c)(2) of the Delaware General Corporation Law does not permit the Board to delegate to the Committee the power or authority to approve, adopt, amend, or recommend an action or transaction deemed advisable by the Committee, recommend that the Board approve, adopt, amend, or recommend such action or transaction related to (a) above.

      (d)     Retain, direct, oversee, compensate (at the Company's expense), and receive advice from independent legal counsel and any additional third parties or advisors that the Committee may deem necessary, useful, or advisable to assist the Committee in performing its duties and responsibilities.

      (e)     Obtain such information regarding the Company and Parent and its affiliates from the Company, Parent, or their respective boards of directors, officers, employees, or agents, and direct that the officers, employees, agents, or advisors of the Company provide such assistance, as the Committee may deem necessary, useful, or advisable to assist the Committee in performing its duties and responsibilities.

      (f)     Authorize, direct, and oversee the officers and agents of the Company, and each of them, in carrying out any Negotiations or contracts related thereto which may be approved by the Committee.

      (g)     Determine its own procedures and hold meetings (including telephonically or electronically) at such locations and times as it determines and act by unanimous written consent of the members in lieu of a meeting, all to the fullest extent permitted by the Delaware General Corporation Law, the Company's certificate of incorporation, and the Company's Bylaws; *provided*, that the Committee shall maintain minutes of its formal meetings and report periodically to the Board.

**FURTHER RESOLVED**, that any approval granted by the Committee consistent with the authority granted in these resolutions will represent the valid approval of the Board;

**FURTHER RESOLVED**, that the Board will not approve, and the Company will not effect, any actions on behalf of the Company with respect to the Delegated Authority, if such actions have not first been approved by the Committee or recommended by the Committee to the Board;

**FURTHER RESOLVED**, that any advisors providing services to the Company and the Board shall also be available to advise, and provide services to, the Committee, to the extent that advice is requested, and that the Committee shall have authority to discharge its responsibilities, including the authority to (i) retain advisors, including legal counsel, financial advisors or other

consultants or experts, to advise the Committee (which also may be advisors that are providing services to the Company), (ii) approve the compensation and other retention terms of the same, and (iii) terminate the same;

**FURTHER RESOLVED,** that each Committee member shall receive (1) a monthly fee of $20,000 for his service on the Committee and (2) a fee of $1,500 for each meeting of the Committee that such member attends in person or telephonically and shall be reimbursed all reasonable expenses incurred in connection with serving on the Committee;

**FURTHER RESOLVED,** that the Committee be, and it hereby is, authorized: (1) to obtain such information regarding the Company, and to obtain such assistance, from the officers, employees, and agents of the Company as the Committee may deem to be necessary, useful, or advisable; and (2) to direct the actions of the officers, other directors, and employees in connection with the Delegated Authority in such manner as the Committee shall determine to be reasonable and appropriate under the circumstances;

**FURTHER RESOLVED,** that the officers, employees, and agents of the Company shall cooperate fully with the Committee and its advisors in all respects related to the Delegated Authority, and shall take direction from the Committee in connection with the Delegated Authority, and are hereby directed to provide to the Committee and its advisors such information and materials, including, without limitation, the books, records, projections, and financial statements of the Company and any documents, reports, or studies pertaining to the Delegated Authority as may be useful or helpful in the discharge of the Committee's duties or as may be determined by the Committee, or any member thereof, to be appropriate or advisable in connection with the discharge of the duties of the Committee and each of its members;

**FURTHER RESOLVED,** that the Committee and the officers of the Company be, and each of them hereby is, authorized, empowered, and directed, for and on behalf of the Company, to take any and all actions, and to enter into, execute, and deliver such agreements and instruments, and to perform all such acts and things as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable, or appropriate in order to carry out the purpose and intent of the foregoing resolutions; and

**FURTHER RESOLVED,** that for the avoidance of doubt, the foregoing powers and authority of the Committee shall exist only so long as the Restructuring Transaction is under consideration or being pursued by Parent or the Company (including, for the avoidance of doubt, through the pendency of any bankruptcy proceeding relating to the Restructuring Transaction).

Ex. A-3