**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
12/17/2018

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER (I) DIRECTING THE APPLICATION OF
BANKRUPTCY RULES 7023 AND 7023.1, (II) PRELIMINARILY
APPROVING THE SETTLEMENT, (III) APPROVING THE RETENTION
OF PRIME CLERK LLC AS NOTICE ADMINISTRATOR, (IV) APPROVING
THE FORM AND MANNER OF NOTICE, (V) SCHEDULING A FAIRNESS HEARING
TO CONSIDER FINAL APPROVAL OF THE SETTLEMENT AS PART
OF CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF**

Upon the joint emergency motion (the "Motion")[2] of the above-captioned debtors and

debtors in possession (collectively, the "Debtors"), Clear Channel Outdoor Holdings, Inc.

("CCOH"), and GAMCO Asset Management, Inc. ("GAMCO") and to implement the terms of the

Settlement Agreement dated December 16, 2018, the parties seek entry of an order (this "Order"):

(i) directing the application of Rules 7023 and 7023.1 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and, by incorporation, Rules 23 and 23.1 of the Federal Rules

of Civil Procedure (the "Civil Rules"); (ii) preliminarily approving the settlement and mutual

release attached hereto as **Exhibit 1** (the "Settlement," and the agreement, the "Settlement

Agreement") among (a) GAMCO Asset Management, Inc. ("GAMCO") both individually on

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

behalf of the putative class of public shareholders of Clear Channel Outdoor Holdings, Inc.

("CCOH") and derivatively on behalf of CCOH, and Norfolk County Retirement System

("Norfolk"), both individually and derivatively on behalf of CCOH (together with GAMCO and

the Remaining Minority Shareholders (as defined in the Settlement Agreement), the "Settling

Plaintiffs"); (b) CCOH; (c) Bain Capital Partners, LLC and Bain Capital LP (collectively, "Bain");

(d) Thomas H. Lee Partners, L.P. ("THL," and together with Bain, the "Sponsor Entities"); (e) the

Delaware Individual Defendants (as defined in the Settlement Agreement); and (f) iHeartMedia,

Inc., and its debtor affiliates (collectively, the "Debtors") in the Debtors' chapter 11 cases (the

"Chapter 11 Cases"); (iii) approving the retention of Prime Clerk LLC as Notice Administrator;

(iv) approving the form and manner of notice to Class Members of the Settlement Agreement;

(v) scheduling a fairness hearing (the "Fairness Hearing") to consider final approval of the

Settlement as part of confirmation of the Plan; and (vi) granting related relief; all as more fully set

forth in the Motion and the Settlement Agreement; and this Court having jurisdiction over this

matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a

preliminary order consistent with Article III of the United States Constitution; and this Court

having found that venue of this proceeding and the Motion in this district is permissible pursuant

to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion

is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this

Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the

Motion were appropriate under the circumstances and no other notice need be provided; and this

Court having reviewed the Motion and having heard the statements in support of the relief

requested therein at a hearing before this Court (the "Hearing"); and this Court having determined

that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      The Settlement Agreement is hereby preliminarily approved.

3.      The Debtors are authorized to retain Prime Clerk LLC as the Notice Administrator (the "Notice Administrator") to provide the Class Notice (as defined herein) to each Class Member.

4.      The form of the notice to be sent to the Class Members (the "Class Notice") attached to this Order as **Exhibit 2** and the service of the Class Notice by the Notice Administrator to each Class Member, at the last known address of each Class Member according to the Debtors' books and records (or as updated by class counsel's searches for current addresses or as may otherwise be determined by the Parties) comports with all applicable law and is hereby approved.

5.      The form of notice to be published in a nationwide financial publication attached to this Order as **Exhibit 3** is hereby approved.

6.      The form of notice to be filed on the docket regarding the modified confirmation hearing schedule (the "Modified Confirmation Hearing Notice") attached to this Order as **Exhibit 4** is hereby approved.

7.      The Class Notice shall be mailed by first-class mail, postage prepaid, by the Notice Administrator within two (2) business days following the entry of this Order.

8.      The Debtors shall serve the Modified Confirmation Hearing Notice upon all Holders of Claims and Interests entitled to vote on the Plan and such notice is appropriate under the circumstances and shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

9.      The Court shall conduct the Fairness Hearing on January 22, 2019 at 8:30 a.m., prevailing Central Time, to consider final approval of the Settlement Agreement as part of confirmation of the Plan.  The Court may adjourn the Fairness Hearing without further notice of any kind.

10.     Objections or other responses to final approval of the Settlement Agreement are to be filed with the Court and mailed to the parties listed in the Class Notice, so that they are received by all parties no later than January 14, 2019.  Objections or other responses must be in writing and must set forth the basis for any such objection or other response to the Settlement Agreement.

11.     This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Order.

Signed:

    December 17, 2018

                                          _____
                                                     Marvin Isgur
                                          United States Bankruptcy Judge

## Exhibit 1

### Settlement Agreement

*Execution Version*

## SETTLEMENT AGREEMENT
## AMONG THE DEBTORS, CCOH, THE SPONSOR ENTITIES, THE DELAWARE
## INDIVIDUAL DEFENDANTS, AND THE SETTLING PLAINTIFFS

This Settlement Agreement, dated as of December 16, 2018 (this "Settlement Agreement") is entered into between and among: (a) GAMCO Asset Management, Inc. ("GAMCO") both individually on behalf of the putative class of public shareholders of Clear Channel Outdoor Holdings, Inc. ("CCOH") and derivatively on behalf of CCOH, and Norfolk County Retirement System ("Norfolk"), both individually and derivatively on behalf of CCOH (together with GAMCO and the Remaining Minority Shareholders (as defined herein), the "Settling Plaintiffs"); (b) CCOH; (c) Bain Capital Partners, LLC and Bain Capital LP (collectively, "Bain"); (d) Thomas H. Lee Partners, L.P. ("THL," and together with Bain, the "Sponsor Entities"); (e) the Delaware Individual Defendants (as defined herein); and (f) iHeartMedia, Inc., and its debtor affiliates (collectively, the "Debtors") in the Debtors' chapter 11 cases (the "Chapter 11 Cases") and embodies the terms and conditions of (x) a global settlement of all direct or derivative claims by or on behalf of the Settling Plaintiffs or CCOH, as applicable, against the Settling Defendants'/Company's Releasees (as defined herein), including those that have been asserted, could have been asserted, or could ever be asserted with respect to the Chapter 11 Cases and/or in the cases captioned (a) *GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) (the "GAMCO Action") and (b) *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (Del. Ch.) (the "Norfolk Action," and together with the GAMCO Action, the "Delaware Actions") and (y) the separation of CCOH (or its successor) and the subsidiaries of CCOH (or its successor) from the Debtors in accordance with the Plan (as defined herein) and the Settlement Term Sheet dated November 22, 2018 attached hereto as **Exhibit B** (the "Separation," and together with the Delaware Actions, the "Settlement").  Subject to the approval of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and the terms and conditions expressly provided herein, this Settlement Agreement is intended to fully, finally, and forever compromise, settle, release, resolve, and dismiss with prejudice all claims by or on behalf of the Settling Plaintiffs or CCOH, as applicable, against the Settling Defendants'/Company's Releasees (as defined herein), including but not limited to those asserted in the Delaware Actions against the Settling Defendants and the Debtors, and those related to the

Separation, upon the completion of the Settling Parties' (as defined herein) respective obligations set forth herein.

**WHEREAS:**

A.      On November 29, 2017, CCOH entered into a Third Amendment (the "<u>Third Amendment</u>") to a certain Revolving Promissory Note, dated November 10, 2005, between iHeartCommunications, Inc., as maker, and CCOH as payee, as amended, amended and restated, supplemented or otherwise modified from time to time (the "<u>Intercompany Note</u>"), which amendment extended the maturity date of the Intercompany Note from December 15, 2017 to May 15, 2019.

B.      On December 29, 2017, Norfolk filed a verified derivative complaint on behalf of CCOH against certain of the Settling Defendants (the "<u>Norfolk Action Defendants</u>") in the Delaware Court of Chancery (the "<u>Norfolk Complaint</u>").  As in the GAMCO Action, the Norfolk Complaint challenged the decision to extend the maturity of the Intercompany Note.

C.      On March 6, 2018, the Norfolk Action Defendants filed a motion to dismiss the Norfolk Complaint, along with their opening brief in support thereof.  The Norfolk Action Defendants argued, *inter alia*, that the Norfolk Complaint failed to state a valid claim for relief under governing law.  Briefing on the Norfolk Action Defendants' motion to dismiss was completed on June 26, 2018.  Oral argument on the motion to dismiss was heard by the Court of Chancery on September 20, 2018.  The Court of Chancery has not yet issued its decision on the motion to dismiss.

D.      On March 16, 2018, the Debtors entered into a restructuring support agreement (the "<u>Restructuring Support Agreement</u>") with groups representing their primary stakeholders. The Restructuring Support Agreement and the Plan contemplate the Separation, subject to negotiations of an agreement among the stakeholders, occurring on the effective date of the Debtors' Plan (the "<u>Plan Effective Date</u>").  The Settlement is the result of extensive negotiations regarding the Separation between the Debtors, the CCOH Special Committee (as defined herein), and GAMCO, and the Settlement is an integral part of the Debtors' plan of reorganization and maximizes the value of the Debtors' interests in CCOH for the benefit of the Debtors' estates.

E.      On March 14, 2018, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

F.      On March 16, 2018, counsel for (i) those Debtors that are also Norfolk Action Defendants and (ii) the Sponsoring Entities filed a Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings (i) notifying the Court of Chancery that the Debtors had filed the Voluntary Petitions and (ii) informing the Court of Chancery that actions against the Debtors were subject to the Automatic Stay, pursuant to Section 362(a) of the Bankruptcy Code.  That same day, counsel for Norfolk wrote the Court of Chancery stating that the Automatic Stay only stayed the Norfolk Action as to Debtors, and not as to any of the other Norfolk Action Defendants.

G.      On August 27, 2018, GAMCO, a minority shareholder of CCOH, filed a verified class action complaint (the "GAMCO Complaint") on its own behalf and on behalf of the Proposed Settlement Class.  The GAMCO Complaint was filed in the Delaware Court of Chancery (as defined herein) and named as defendants the Delaware Individual Defendants and certain of the Sponsor Entities.  The GAMCO Complaint alleged that the Delaware Individual Defendants breached their fiduciary duties by failing to employ available contractual rights to demand repayment of the Intercompany Note, and to declare a pro rata dividend to shareholders of CCOH. The GAMCO Complaint also challenged the decision to extend the maturity of the Intercompany Note.

H.      In the GAMCO Complaint, GAMCO further alleged that had the Intercompany Note Committee Defendants (as defined herein) exercised their available contractual rights, certain of the Settling Defendants would have avoided the "virtual certainty" that the Intercompany Note balance would become "impaired or wholly uncollectable" when the Debtors filed for bankruptcy on March 14, 2018.[1]  The GAMCO Complaint requested an order declaring that the Delaware Individual Defendants and certain of the Sponsor Entities breached fiduciary duties to the minority shareholders of CCOH, as well as an award of damages.

I.      On September 5, 2018, GAMCO filed *GAMCO Asset Management, Inc.'s Limited Objection to the Debtors' Motion For Approval of the Disclosure Statement* [Docket No. 1406] objecting to the release provisions contained in the Plan and reserving its rights with respect to confirmation of the Plan.  In discussions with the Debtors' Counsel (as defined herein), GAMCO

---

[1]      *See GAMCO Complaint* at 2.

has threatened to object to confirmation of the Plan derivatively on behalf of CCOH based on the treatment of the balance on the Intercompany Note owed to CCOH.

J.      On November 28, 2018, Norfolk filed the *Limited Objection of Norfolk County Retirement System To The Approval Of Fifth Amended Joint Chapter 11 Plan Of Reorganization* [Docket No. 2055] objecting to the release provisions contained in the Plan, proposing revisions to the release provisions contained in the Plan, and reserving its rights with respect to confirmation of the Plan.

K.      On December 3, 2018, Debtors filed a *Notice of Filing of Separation Settlement Term Sheet* [Docket No. 2111] (the "Separation Term Sheet").  The Separation Term Sheet, *inter alia*, outlined terms of a proposed settlement among GAMCO, CCOH, Debtors, defendants in the GAMCO Action, and the Sponsoring Entities, including describing releases that would be provided in connection with that settlement.

L.      On December 8, 2018, Debtors filed a *Joint Emergency Motion for Entry of an Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Preliminarily Approving the Settlement, (III) Approving the Retention of Prime Clerk LLC as Notice Administrator, (IV) Approving the Form and Manner of Notice, (V) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement as Part of Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 2143] (the "Joint Emergency Motion"), and GAMCO filed an *Emergency Motion for Entry of an Order (I) Directing the Application of Bankruptcy Rule 7023 and 7023.1, (II) Certifying a Class, Designating a Class Representative, and Appointing Class Counsel for Purposes of Settlement, and (III) Granting Related Relief* [Docket No. 2144] (the "GAMCO Class Certification Motion"; and collectively with the Joint Emergency Motion, the "Emergency Motions").  Debtors and GAMCO, respectively, requested that the Court consider the Emergency Motions at a hearing on December 11, 2018.

M.      On December 10, 2018, Norfolk filed a *Preliminary Objection* to the Emergency Motions [Docket No. 2149] ("Norfolk's Preliminary Objection").  At a hearing on December 11, 2018, the Court scheduled a further hearing concerning Norfolk's Preliminary Objection for December 17, 2018.

N.      On December 13, 2018, the Debtors and CCOH filed the *Joint Further Reply in Support of Joint Emergency Motion and Emergency Motion* [Docket No. 2188] addressing Norfolk's Preliminary Objection.

4

O.      Following the December 11 hearing, counsel for Norfolk and the Settling Defendants engaged in further negotiations that resulted in the agreement reflected in this Settlement Agreement.

P.      This Settlement Agreement (together with the exhibits hereto) reflects the final and binding agreement between the Settling Parties with respect to the Delaware Actions, the Plan, and the Separation.

Q.      GAMCO, based upon its investigation and prosecution of the GAMCO Action and prior related litigation, as well as its pursuit of claims and objections in connection with the Chapter 11 Cases, has concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, adequate, and in the best interests of CCOH and the Settling Plaintiffs.  GAMCO, based on its direct oversight of the prosecution of the GAMCO Action and prior related litigation, as well as its pursuit of claims and objections in connection with the Chapter 11 Cases, and with the advice of Entwistle & Cappucci LLP, has agreed to settle and release the claims raised in the GAMCO Action against the Settling Defendants, and all other causes of action that have been asserted, could have been asserted, or could ever be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the GAMCO Action or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things: (a) the substantial financial benefit that the Settling Plaintiffs and CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation and trial against the Settling Defendants.

R.      Norfolk, based upon its investigation and prosecution of the Norfolk Action and prior related litigation, as well as its pursuit of claims and objections in connection with the Chapter 11 Cases, has concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, adequate, and in the best interests of CCOH and the Settling Plaintiffs.  Norfolk, based on its direct oversight of the prosecution of the Norfolk Action and prior related litigation, as well as its pursuit of claims and objections in connection with the Chapter 11 Cases, and with the advice of Settling Plaintiffs' Counsel, has agreed to settle and release the claims raised in the Norfolk Action against certain of the Settling Defendants, and all other causes of action that have been asserted, could have been asserted, or could ever be asserted by or on behalf of the Settling

Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the Norfolk Action or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things: (a) the substantial financial benefit that the Settling Plaintiffs and CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation and trial against the Settling Defendants.

S.     The CCOH Special Committee has concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, adequate, and in the best interests of CCOH.  The CCOH Special Committee, based on its pursuit of claims and objections in connection with the Chapter 11 Cases, and with the advice of CCOH Special Committee's Counsel and financial advisors, has agreed, on behalf of CCOH, to the fullest extent of the CCOH Special Committee's authority to do so under its authorizing resolutions, to settle and release causes of action that have been asserted, could have been asserted, or could ever be asserted by or on behalf of CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the intercompany agreements between CCOH and the Debtors, including the claims in the Norfolk Action and any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things: (a) the substantial financial benefit that CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation.

T.     This Settlement Agreement constitutes a compromise of all matters that are in dispute between the Settling Parties.  The Settling Defendants and CCOH are entering into this Settlement Agreement solely to implement the Separation and eliminate the uncertainty, burden, and expense of further protracted litigation.   Each of the Settling Defendants denies any wrongdoing, and this Settlement Agreement shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Settling Defendants with respect to any claim or allegation of any fault or liability or wrongdoing or damage whatsoever, or any infirmity in the defenses that the Settling Defendants have, or could have, asserted.  The Settling Defendants and the Debtors expressly deny that the Settling Plaintiffs or CCOH have asserted any valid claims against any of the Settling Defendants or the Debtors, and expressly deny any and all allegations of fault, liability, wrongdoing or damages whatsoever.

6

U.      Similarly, this Settlement Agreement shall in no event be construed or deemed to be evidence of or an admission or concession on the part of the Settling Plaintiffs of any infirmity in any of the claims asserted in the Delaware Actions, or an admission or concession that any of the Settling Plaintiffs' claims to liability had any merit.

NOW THEREFORE, it is hereby stipulated and agreed, by and among the Settling Parties, by and through their respective undersigned attorneys and subject to approval by the Bankruptcy Court pursuant to sections 105(a), 363(b), and 1123(b) of title 11 of the United States Code, rules 23 and 23.1 of the Federal Rules of Civil Procedure, and rules 7023, 7023.1, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that, in consideration of the benefits flowing to the Settling Plaintiffs and CCOH from this Settlement Agreement, all Released Claims as against the Settling Defendants'/Company's Releasees and all Released Claims as against the Settling Plaintiffs' Releasees shall be settled and released, upon and subject to the terms and conditions set forth below and as incorporated into the Plan; provided that, for the avoidance of doubt, the obligations of a Releasee under the Settlement Agreement, the Separation Documents, or the Plan shall not be released.

## **DEFINITIONS**

1.      As used in this Settlement Agreement and any exhibits attached hereto and made a part hereof, the following capitalized terms shall have the following meanings:

(a)      "Bain" means Bain Capital Partners, LLC and Bain Capital LP.

(b)      "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

(c)      "Board Defendants" means Blair Hendrix, Douglas L. Jacobs, Daniel G. Jones, Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, and Dale W. Tremblay.

(d)      "CCOH and the Delaware Individual Defendants' Counsel" means Wilson Sonsini Goodrich & Rosati, P.C.

(e)      "CCOH Special Committee" means the special committee of independent directors established by the board of directors of CCOH on January 23, 2018, to consider, review, and negotiate certain transactions between the Debtors and CCOH in connection with the Debtors' Chapter 11 Cases.

(f) "CCOH Special Committee's Counsel" means Willkie Farr & Gallagher LLP.

(g) "Class Period" means, for settlement purposes only, the period from March 14, 2015 to March 14, 2018.

(h) "Confirmation Order" means an order of the Bankruptcy Court confirming the Plan.

(i) "Corporate Services Agreement" means that certain Corporate Services Agreement dated November 16, 2005 by and between iHeartMedia Management Services, Inc. and CCOH.

(j) "Debtors' Counsel" means the law firm of Kirkland & Ellis, LLP.

(k) "Delaware Actions" means collectively, the cases filed in the Delaware Court of Chancery captioned (a) *GAMCO Asset Management, Inc. v. Blair Hendrix, et. al.*, Case No. 208-0633-VCS (Del. Ch.) and (b) *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (Del. Ch.).

(l) "Delaware Court of Chancery" means the Court of Chancery of the State of Delaware.

(m) "Delaware Individual Defendants" means collectively, the Board Defendants and the Intercompany Note Committee Defendants.

(n) "Effective Date" with respect to the Settlement Agreement means the first date by which all of the events and conditions specified in section 16 of this Settlement Agreement have been met and have occurred or have been waived in writing pursuant to the notice provision provided herein.

(o) "iHC" means iHeartCommunications, Inc.

(p) "iHM" means iHeartMedia, Inc.

(q) "Intercompany Note Committee Defendants" means Dale W. Tremblay, Douglas L. Jacobs, and Paul Keglevic, as members of the independent committee of the CCOH Board of Directors as of November 8, 2017 that was created in 2013 to monitor the balance of the Intercompany Note.

(r) "Litigation Expenses" means reasonable costs and expenses incurred in connection with commencing, prosecuting, and settling the Delaware Actions and the claims and objections in connection with the Chapter 11 Cases (which may include the costs and expenses of

the Settling Plaintiffs' Counsel directly related to their representation of the Proposed Settlement Class).

(s)     "Notice" means the Notice of Settlement, substantially in the form attached hereto as **Exhibit 1** to **Exhibit A**, which is to be mailed to the Proposed Settlement Class.

(t)     "Notice Administrator" means Prime Clerk LLC, the firm retained, subject to approval of the Bankruptcy Court, to provide all notices approved by the Bankruptcy Court to the Proposed Settlement Class.

(u)     "Notice Costs" means the reasonable costs, fees, and expenses that are incurred in connection with providing notices to the Proposed Settlement Class concerning this Settlement Agreement as set forth herein (including, without limitation, mailing of the Notice to the Proposed Settlement Class and publication of the Summary Notice).

(v)     "Plan" means the Debtors' *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit D**, as may be modified or amended from time to time.

(w)     "Preliminary Approval Order" means the order, substantially in the form attached hereto as **Exhibit A**, with any revisions reasonably acceptable to CCOH, GAMCO, Norfolk, and the Debtors, to be entered by the Bankruptcy Court preliminarily approving the Settlement and directing that notice of the Settlement be provided to the Proposed Settlement Class.

(x)     "Proposed Settlement Class" means all persons and entities who or which purchased or otherwise acquired or held shares of CCOH common stock during the Class Period. Included within the Proposed Settlement Class are all persons and entities who or which purchased or otherwise acquired shares of CCOH common stock on the open market and/or pursuant or traceable to the registered public offerings on or about November 11, 2005.

(y)     "Released Claims" means all claims, objections and all other causes of action that have been asserted, could have been asserted, or could ever be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the Delaware Actions or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the Separation and actions taken to effectuate the Separation, including, without limitation, the

9

refinancing of certain indebtedness of CCOH, or the negotiation or execution of the Settlement, with the exception of the Releasee's ongoing obligations under the Settlement, the Separation Documents, or the Plan.

(z)      "Releasee(s)" means each and any of the Settling Defendants'/Company's Releasees and each and any of the Settling Plaintiffs' Releasees.

(aa)      "Releases" means the releases set forth in section 7 and section 10 of this Settlement Agreement.

(bb)      "Remaining Minority Shareholders" means all members of the Proposed Settlement Class except for GAMCO and Norfolk.

(cc)      "Restructuring Support Agreement" means that certain Restructuring Support Agreement, made and entered into as of March 16, 2018, by and among the Debtors, the Consenting Creditors (as defined therein) party thereto from time to time, and the Consenting Sponsors (as defined therein) party thereto from time to time, as such may be amended from time to time in accordance with its terms.

(dd)      "Separation" means the separation of CCOH (or its successor) and the Subsidiaries of CCOH (or its successor) from the Debtors in accordance with the Plan.

(ee)      "Separation Documents" means collectively, (i) the Settlement and Separation Agreement, substantially in the form attached hereto as **Exhibit 1** to **Exhibit C**, with any revisions reasonably acceptable to (a) CCOH, (b) the Debtors, and (c) GAMCO, solely with respect to any revisions that are materially inconsistent with the Term Sheet and adverse to CCOH; (ii) the Transition Services Agreement, substantially in the form attached hereto as **Exhibit 2** to **Exhibit C**, with any revisions reasonably acceptable to (a) CCOH, (b) the Debtors, and (c) GAMCO, solely with respect to any revisions that are materially inconsistent with the Term Sheet and adverse to CCOH; (iii) the Tax Matters Agreement, substantially in the form attached hereto as **Exhibit 3** to **Exhibit C**, with any revisions reasonably acceptable to (a) CCOH, (b) the Debtors, and (c) GAMCO, solely with respect to any revisions that are materially inconsistent with the Term Sheet and adverse to CCOH; (iv) the Merger Agreement, substantially in the form attached hereto as **Exhibit 4** to **Exhibit C**, with any revisions reasonably acceptable to (a) CCOH, (b) the Debtors, and (c) GAMCO, solely with respect to any revisions that are materially inconsistent with the Term Sheet and adverse to CCOH; (v) the Revolving Loan Agreement, substantially in the form attached hereto as **Exhibit 5** to **Exhibit C**, with any revisions reasonably

acceptable to (a) CCOH, (b) the Debtors, and (c) GAMCO, solely with respect to any revisions that are materially inconsistent with the Term Sheet and adverse to CCOH; and (vi) any other documents entered into in connection with, or contemplated by, the foregoing, or the Plan.

(ff)    "Settlement" means the settlement between the Settling Parties, including without limitation, the resolution of the Delaware Actions as against the Settling Defendants and potential claims and objections in connection with the Chapter 11 Cases, on the terms and conditions set forth in this Settlement Agreement.

(gg)    "Settlement Agreement" means this Agreement of Settlement Among the Settling Parties.

(hh)    "Settlement Class Member" means each person and entity who or which is a member of the Proposed Settlement Class.

(ii)    "Settlement Hearing" means the hearing set by the Bankruptcy Court under Rule 23(e)(2) and 23.1 of the Federal Rules of Civil Procedure and Bankruptcy Rules 7023, 7023.1, and 9014 to consider final approval of the terms of the Settlement.

(jj)    "Settling Defendants" means the Delaware Individual Defendants, the Sponsor Entities, iHC, and iHM.

(kk)    "Settling Defendants'/Company's Releasees" means collectively, the Settling Defendants, CCOH, the Debtors, and their respective current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any.

(ll)    "Settling Parties" means collectively, the Settling Defendants, the Settling Plaintiffs, the Debtors, and CCOH.

(mm)    "Settling Plaintiffs" means GAMCO, Norfolk, and any or all of the Remaining Minority Shareholders.

(nn)    "Settling Plaintiffs' Counsel" means collectively, the law firms of (a) Entwistle & Cappucci, LLP, (b) Labaton Sucharow LLP, (c) Grant & Eisenhofer, P.A., and (d) Friedman Oster & Tejtel PLLC.

(oo)   "Settling Plaintiffs' Releasees" means collectively, the Settling Plaintiffs and their respective current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any.

(pp)   "Settlement Consideration" means the consideration set forth in section 6 and section 7 of this Settlement Agreement.

(qq)   "Sponsor Entities" means Bain and THL.

(rr)   "Sponsor Entities' Counsel" means Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. and Ross Aronstam & Mortiz LLP.

(ss)   "Summary Notice" means the *Summary Notice of (I) Pendency of Proposed Settlement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs, (II) Settlement Fairness Hearing, and (III) Application for an Award of Settling Plaintiffs' Attorneys' Fees and Reimbursement of Litigation Expenses*, substantially in the form attached hereto as **Exhibit 2** to **Exhibit A**, to be published as set forth in the Preliminary Approval Order.

(tt)   "Term Sheet" means that certain Settlement Term Sheet dated November 22, 2018 attached hereto as **Exhibit B**.

(uu)   "THL" means Thomas H. Lee Partners, L.P.

## CLASS CERTIFICATION

2.   Prior to or promptly upon execution of this Settlement Agreement, but in no event later than ten (10) calendar days following such execution, GAMCO shall move for: (a) certification of the Proposed Settlement Class pursuant to Bankruptcy Rules 7023, 7023.1, and 9014, and rules 23(a) and 23(b)(1) of the Federal Rules of Civil Procedure; (b) designation of GAMCO as class representatives for the Proposed Settlement Class; and (c) appointment of Entwistle & Cappucci LLP as counsel for the Proposed Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  Solely for purposes of the Settlement and for no other purpose, the Settling Defendants, the Debtors, and CCOH do not contest certification of the Proposed Settlement Class, designation of GAMCO as class representatives, and appointment of Entwistle & Cappucci LLP as counsel for the Proposed Settlement Class.  In the event that the

Settlement is terminated pursuant to the terms of this Settlement Agreement, the certification of the Proposed Settlement Class in connection with this Settlement Agreement shall become null and void.  In such case, the Settling Plaintiffs shall have the ability to continue to prosecute the GAMCO Complaint and/or the Norfolk Complaint, respectively, in the Delaware Court of Chancery, and shall have the ability to otherwise seek certification of the Proposed Settlement Class, and Settling Defendants shall have the right to contest both the merits and class certification.

## PRELIMINARY APPROVAL OF SETTLEMENT

3.      Prior to or promptly upon execution of this Settlement Agreement, but in no event later than ten (10) calendar days following such execution, the Debtors, CCOH, Norfolk, and GAMCO shall move for preliminary approval of the Settlement in the Bankruptcy Court and the scheduling of a hearing for consideration of final approval of the Settlement before the Bankruptcy Court, and the other Settling Parties shall not oppose that motion.  Concurrently with the joint motion for preliminary approval, the Debtors, CCOH, and GAMCO shall apply to the Bankruptcy Court for entry of the Preliminary Approval Order, substantially in the form attached hereto as **Exhibit A**.

4.      If the Bankruptcy Court denies the joint motion for preliminary approval, then the Settling Parties shall retain all of their respective rights as if this Settlement Agreement had never been entered.

## THE SETTLEMENT CONSIDERATION

5.      In full and final satisfaction, compromise, settlement, and discharge of the Delaware Actions, and in exchange for the Releases, agreements to cooperate, and other promises and consideration set forth herein, the Settling Defendants and the Debtors agree to provide the consideration set forth in section 6 and section 7 below and the other consideration set forth in the Term Sheet attached hereto as **Exhibit B**.  GAMCO's view of the value and benefits of the Settlement, including those reflected in the Term Sheet negotiated by GAMCO, the Debtors, CCOH, and others, was previously described in the *Supplemental Declaration of Andrew J. Entwistle in Further Support of GAMCO Asset Management, Inc.'s Emergency Motion for Entry of an Oder (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Certifying a class, Designating a Class Representative, and Appointing Class Counsel for Purposes of Settlement, and (III) Granting Related Relief* [Docket No. 2193].  The Settling Defendants and the Debtors recognize that Norfolk and its counsel's prosecution of the Norfolk Action was a causal

13

factor in (a) the Settling Defendants and the Debtors' willingness to provide the consideration set forth in the Term Sheet and (b) the Debtors' agreement following the December 11 hearing at which Norfolk raised certain objections to the Settlement to, among other things, (i) increase the amount available to CCOH under the Revolving Loan Agreement at the prime rate of interest from $170,000,000 to $200,000,000 as reflected in the Revolving Loan Agreement between iHC and CCOH attached hereto, (ii) commit to provide indemnification for certain tax liabilities of CCOH as set forth in the Tax Matters Agreement attached hereto, and (iii) commit to provide indemnification to CCOH for potential liabilities relating to certain existing leases between CCOH and third parties as reflected in the Separation Agreement attached hereto (collectively, the "Additional Post-Hearing Consideration"). The Debtors recognize that the Additional Post-Hearing Consideration provides CCOH and its affiliates with significant estimated value, including valuable commercial considerations, and with contingent value potentially in excess of $25,000,000.

6.        As of and upon the occurrence of the Plan Effective Date, a corporate separation of CCOH from iHC or any other affiliated entity will occur pursuant to the terms of the Plan, the Term Sheet, and the Separation Documents attached hereto as **Exhibit C**.

7.        The Settling Defendants, the Debtors, and all their respective current and former officers, directors, employees, affiliates, partners, members, agents, attorneys, heirs, administrators, and assigns, if any, will forever, fully, and unconditionally release, discharge, and covenant not to sue the Settling Plaintiffs, CCOH, and their respective current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any, from all claims, objections and all other causes of action that have been asserted, could have been asserted, or could ever be asserted by the Settling Defendants or the Debtors, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the Delaware Actions or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of the Settlement, provided that claims for indemnification against a Debtor, a Debtor's affiliate, or any

other Releasee, and claims otherwise preserved by or arising under the Settlement, the Separation Documents, or the Plan, are not released.

8.      The Settling Defendants and the Debtors acknowledge that they have been advised concerning, and/or are familiar with, the provisions of California Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR;

9.      The Settling Defendants and the Debtors expressly acknowledge that they may hereafter discover facts in addition to those that they now know or believe to be true with respect to the Released Claims and that this Settlement Agreement has been negotiated and agreed upon in light of such possible unknown facts, and expressly waive, or shall be deemed to have waived, any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.  The Settling Defendants and the Debtors expressly acknowledge that this waiver was separately bargained for and is a material term of this Settlement Agreement.

**RELEASE OF CLAIMS BY SETTLING PLAINTIFFS AND CCOH**

10.      In exchange for the Settlement Consideration set forth above:

(a)      the Settling Plaintiffs, CCOH, and all their respective current and former officers, directors, employees, affiliates, partners, members, agents, attorneys, heirs, administrators, and assigns, if any, will forever, fully, and unconditionally release, discharge, and covenant not to sue the Settling Defendants, the Debtors, and their respective current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any, from the Released Claims which include, among other things, all claims, objections and all other causes of action that have been asserted, could have been asserted, or could ever be

asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases or the Delaware Actions or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of the Settlement, provided that claims for indemnification against a Debtor, a Debtor's affiliate, or any other Releasee, and claims otherwise preserved by or arising under the Settlement, the Separation Documents, or the Plan, are not released;

(b)      the Settling Plaintiffs and CCOH acknowledge that they have been advised concerning, and/or are familiar with, the provisions of California Code Section 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR;

(c)      the Settling Plaintiffs and CCOH expressly acknowledge that they may hereafter discover facts in addition to those that they now know or believe to be true with respect to the Released Claims and that this Settlement Agreement has been negotiated and agreed upon in light of such possible unknown facts, and expressly waive, or shall be deemed to have waived, any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.  The Settling Plaintiffs and CCOH expressly acknowledge that this waiver was separately bargained for and is a material term of this Settlement Agreement; and

(d)      the Settling Plaintiffs and CCOH will support the Plan.

**ATTORNEYS' FEES AND LITIGATION EXPENSES**

11.      Subject to the terms and conditions of this Settlement Agreement and any order of the Bankruptcy Court, the Settling Defendants, CCOH, and the Debtors have agreed the Debtors will pay Settling Plaintiffs' Counsel's fees and Litigation Expenses in the amount of (a) $4,700,000 in the aggregate to Entwistle & Cappucci LLP and (b) $2,450,000 in the aggregate to Labaton Sucharow LLP, Grant & Eisenhofer, P.A., and Friedman Oster & Tejtel PLLC, collectively.  No award of attorneys' fees and/or Litigation Expenses will be payable unless and until (i) there is a

final and non-appealable Confirmation Order from the Bankruptcy Court finally approving the Settlement, (ii) there are final and non-appealable judgments dismissing each of the Delaware Actions with prejudice, and (iii) the Plan Effective Date has occurred.  Except as provided in this paragraph, neither the Settling Plaintiffs nor the Settling Plaintiffs' Counsel will seek or be entitled to any fees, expenses, costs, or compensation relating to the Chapter 11 Cases or the Delaware Actions.

12.     The costs of the notice process of this Settlement Agreement, including the payment of all fees and expenses incurred by the Notice Administrator, and the fees and Litigation Expenses of Settling Plaintiffs' Counsel, will be paid in full by the Debtors.

### NOTICE AND SETTLEMENT ADMINISTRATION

13.     As part of the Preliminary Approval Order, the Debtors shall seek appointment of Prime Clerk LLC as the Notice Administrator.  The Notice Administrator shall administer the Notice process described below under Debtors' Counsel's supervision and subject to the jurisdiction of the Bankruptcy Court.  None of the Settling Parties shall have any involvement in or any responsibility, authority, or liability whatsoever for the notice process and shall have no liability whatsoever to any person or entity, including, but not limited to, Settling Plaintiffs' Counsel in connection with the foregoing.  Settling Plaintiffs' Counsel shall cooperate in the administration of the Settlement Agreement to the extent reasonably necessary to effectuate its terms.

14.     In accordance with the terms of the Preliminary Approval Order to be entered by the Bankruptcy Court, Debtors' Counsel shall cause the Notice Administrator to mail the Notice Form to those members of the Proposed Settlement Class as may be identified through reasonable effort.  Debtors' Counsel shall also cause the Notice Administrator to have the Summary Notice published in accordance with the terms of the Preliminary Approval Order.  For the purposes of identifying and providing notice to the Proposed Settlement Class, within ten (10) business days of the date of entry of the Preliminary Approval Order, the Debtors shall provide or cause to be provided to the Notice Administrator, in electronic format, a list (consisting of names and addresses) of the Proposed Settlement Class.

15.     Any Settlement Class Member who or that does not timely and validly object to the Settlement in the manner stated in the Preliminary Approval Order: (a) shall be deemed to have waived his, her, its ability, to the extent any ability exists, to request to be excluded from the

Proposed Settlement Class; (b) shall be forever barred from requesting exclusion from the Proposed Settlement Class in this or any other proceeding; and (c) shall be bound by the provisions of this Settlement Agreement, the Settlement, and all proceedings, determinations, orders, and judgments in the Chapter 11 Cases and relating to the Settlement, including, but not limited to, the Plan, the Confirmation Order, and the Releases provided for herein, whether favorable or unfavorable to the Proposed Settlement Class.

## CONDITIONS OF SETTLEMENT AND EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION

16.    The Effective Date of the Settlement shall be deemed to occur on the occurrence or waiver in writing of all of the following events:

(a)    the Bankruptcy Court has entered the Preliminary Approval Order, substantially in the form set forth in **Exhibit A** attached hereto;

(b)    the Settling Defendants have not exercised their option to terminate the Settlement pursuant to the provisions of this Settlement Agreement;

(c)    CCOH has not exercised its option to terminate the Settlement pursuant to the provisions of this Settlement Agreement;

(d)    the Debtors have not exercised their option to terminate the Settlement pursuant to the provisions of this Settlement Agreement;

(e)    the Settling Plaintiffs have not exercised their option to terminate the Settlement pursuant to the provisions of this Settlement Agreement; and

(f)    the Bankruptcy Court has entered the Confirmation Order that certifies the Proposed Settlement Class and approves the Settlement as described herein, following notice to the Proposed Settlement Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, and the Confirmation Order is final and no longer subject to appeal.

17.    If (i) the Settling Defendants exercise their right to terminate the Settlement as provided in this Settlement Agreement; (ii) CCOH exercises its right to terminate the Settlement as provided in this Settlement Agreement; (iii) the Debtors exercise their right to terminate the Settlement as provided in this Settlement Agreement; (iv) the Settling Plaintiffs exercise their right to terminate the Settlement as provided in this Settlement Agreement; (v) the Bankruptcy Court disapproves the Settlement; (vi) the Delaware Court of Chancery disapproves the Settlement; or (vii) the Effective Date as to the Settlement otherwise fails to occur, then:

(a)     the Settlement and the Settlement Agreement shall be canceled and terminated;

(b)     the Settling Plaintiffs and the Settling Defendants shall revert to their respective positions in the Delaware Actions as of immediately prior to the date of execution of this Settlement Agreement;

(c)      the Settling Parties shall retain all of their respective rights and defenses as of immediately prior to the date of execution of this Settlement Agreement; and

(d)     the terms and provisions of this Settlement Agreement shall have no further force and effect with respect to the Settling Parties and shall not be used against any of the Settling Parties or in the Delaware Actions or any other proceeding for any purpose, and any order entered by the Bankruptcy Court in accordance with the terms of this Settlement Agreement shall be treated as vacated, *nunc pro tunc*.  In addition, no filings or orders submitted to the Bankruptcy Court shall be used in any other proceeding for any purpose.

18.    It is further stipulated and agreed that each of the Settling Parties shall have the right to terminate the Settlement and this Settlement Agreement, by providing written notice of their election to do so ("Termination Notice") to the other parties to this Settlement Agreement within thirty (30) days after:  (a) the Bankruptcy Court's refusal to enter the Preliminary Approval Order in any material respect or (b) the Bankruptcy Court's refusal to enter a Confirmation Order that approves the Settlement or any material part thereof.  Any decision or proceeding, however, whether in the Bankruptcy Court or any other court, with respect to an application for attorneys' fees or reimbursement of Litigation Expenses shall not affect the finality of any Confirmation Order, if applicable, and shall not be grounds for termination of the Settlement.

## NO ADMISSION OF WRONGDOING

19.    Neither this Settlement Agreement (whether or not consummated), including the exhibits hereto, the negotiations leading to the execution of this Settlement Agreement, nor any proceedings taken pursuant to or in connection with this Settlement Agreement and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a)     shall be offered against any of the Settling Defendants'/Company's Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Settling Defendants'/Company's Releasees with respect to the truth of any fact alleged by the Settling Plaintiffs or CCOH, or the validity of any claim that

has been asserted, could have been asserted, or could ever be asserted, the deficiency of any defense that has been or could have been asserted in the Delaware Actions or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Settling Defendants'/Company's Releasees or in any way referred to for any other reason as against any of the Settling Defendants'/Company's Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Settlement Agreement;

        (b)    shall be offered against any of the Settling Plaintiffs' Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Settling Plaintiffs' Releasees that any of their claims are without merit, that any of the Settling Defendants'/Company's Releasees had meritorious defenses, or that damages recoverable from the Settling Defendants under the GAMCO Complaint and/or the Norfolk Complaint would not have exceeded the Settlement Consideration or with respect to any liability, negligence, fault, or other wrongdoing of any kind, or in any way referred to for any other reason as against any of the Settling Plaintiffs' Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Settlement Agreement; or

        (c)    shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial against the Settling Defendants.

## MISCELLANEOUS PROVISIONS

20.    All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.  Notwithstanding the foregoing, in the event that there exists a conflict or inconsistency between the terms of this Settlement Agreement and the terms of any exhibit attached hereto, the terms of the Settlement Agreement shall prevail.

21.    Nothing in this Settlement Agreement is intended to or shall limit the releases provided for in the Plan.

22.    The Settling Parties intend this Settlement Agreement and the Settlement to be a final and complete resolution of all disputes that have been asserted, could have been asserted, or could ever be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis, with respect to the Released Claims, including without

limitation, in the Delaware Actions.  The Settling Parties agree that the amounts paid and the other terms of the Settlement were negotiated at arms' length and in good faith by the Settling Parties, and reflect the Settlement that was reached voluntarily after extensive negotiations and consultation with experienced legal counsel, who were fully competent to assess the strengths and weaknesses of their respective clients' claims or defenses.  The terms of the Settlement, as reflected in this Settlement Agreement, may not be modified or amended, nor may any of its provisions be waived except by a writing signed on behalf of the Settling Plaintiffs, CCOH, the Debtors, and the Settling Defendants (or their successors-in-interest).

23.     The Releasees who are not signatories hereto shall be third-party beneficiaries under the Settlement and shall be entitled to enforce this Settlement Agreement in accordance with its terms.  It is not the intention of the Settling Parties to confer third-party beneficiary rights or remedies upon any other person or entity.

24.     The obligations and duties in this Settlement Agreement may not be assigned or transferred absent written consent of the Settling Parties.

25.     The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

26.     The administration and consummation of the Settlement as embodied in this Settlement Agreement shall be under the authority of the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction for the purpose of entering orders providing for awards of attorneys' fees and Litigation Expenses to Settling Plaintiffs' Counsel and enforcing the terms of this Settlement Agreement.

27.     The waiver by one Settling Party of any breach of this Settlement Agreement by any other Settling Party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement Agreement.

28.     This Settlement Agreement may be executed in one or more counterparts, including by signature transmitted via facsimile, or by a .pdf or .tif image of the signature transmitted via email.  All executed counterparts and each of them shall be deemed to be one and the same instrument.

29.     This Settlement Agreement shall be binding upon and inure to the benefit of the Settling Parties and their respective affiliates, successors, heirs, executors, trustees, administrators,

agents, and assigns, including any and all Releasees and any corporation, partnership, or other entity into or with which any Settling Party may merge, consolidate or reorganize.

30.     The construction, interpretation, operation, effect and validity of this Settlement Agreement and all documents necessary to effectuate it shall be governed by the internal laws of the State of Texas without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

31.     Any action arising under or to enforce this Settlement Agreement or any portion thereof, shall be commenced and maintained only in the Bankruptcy Court, except that the releases may be enforced in any court of competent jurisdiction.

32.     This Settlement Agreement shall not be construed more strictly against one Settling Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Settling Parties, it being recognized that it is the result of arms'-length negotiations between the Settling Parties and all Settling Parties have contributed substantially and materially to the preparation of this Settlement Agreement.

33.     All counsel and any other person executing this Settlement Agreement and any of the exhibits hereto, or any related Settlement documents, warrant and represent that they have the full authority to do so and that they have the authority to take appropriate action required or permitted to be taken pursuant to the Settlement Agreement to effectuate its terms.

34.     Settling Plaintiffs' Counsel, CCOH and the Delaware Individual Defendants' Counsel, Debtors' Counsel, Sponsor Entities' Counsel, and the CCOH Special Committee's Counsel shall cooperate with one another in connection with the Debtors seeking Bankruptcy Court approval of the Preliminary Approval Order and the Settlement, as embodied in this Settlement Agreement, and cooperate with each other and use best efforts to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the Bankruptcy Court of the Settlement, dismissal with prejudice of the Delaware Actions, and dismissal with prejudice of any action that is currently pending or that is later filed in state or federal court asserting any of the Released Claims.

35.     In addition, in connection with obtaining dismissal with prejudice of the Delaware Actions, Settling Plaintiffs and Settling Plaintiffs' Counsel agree to file a stipulation and proposed order of dismissal with prejudice in each of the Delaware Actions substantially in the form attached hereto as **Exhibit E**.  Finally, within the first business day after the signing of this Settlement

Agreement, Norfolk agrees to withdraw its *Emergency Motion to Consolidate and Appoint Lead Plaintiff and Co-Lead Counsel* pending in the Delaware Court of Chancery and seek a stay of the Norfolk Action pending final approval of this Settlement Agreement by the Bankruptcy Court.

36.    If any Settling Party is required to give notice to another Settling Party under this Settlement Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery or facsimile or email transmission, with confirmation of receipt. Notice shall be provided as follows:

| | |
|---|---|
| If to GAMCO individually or as representative of the Proposed Settlement Class: | Andrew J. Entwistle<br>**Entwistle & Cappucci, LLP**<br>299 Park Avenue, 20th Floor<br>New York, NY 10171<br>Telephone:  (212) 894-7200<br>Facsimile:  (212) 894-7272<br>Email:  aentwistle@entwistle-law.com |
| If to Norfolk individually and derivatively on behalf of CCOH: | Ned Weinberger<br>**Labaton Sucharow LLP**<br>300 Delaware Ave., Suite 1340<br>Wilmington, DE 19801<br>Telephone:  (302) 573-2540<br>Facsimile:  (302) 573-6928<br>Email:  nweinberger@labaton.com<br><br>-and-<br><br>Gordon Z. Novod<br>**Grant & Eisenhofer, P.A.**<br>485 Lexington Avenue<br>New York, NY 10017<br>Telephone:  (646) 722-8523<br>Facsimile:  (646) 722-8501<br>Email:  gnovod@gelaw.com<br><br>-and- |

Jeremy S. Friedman
Spencer Oster
David F.E. Tejtel
**Friedman Oster & Tejtel PLLC**
240 East 79th Street, Suite A
New York, NY 10075
Telephone:  (888) 529-1108
Email:  jfriedman@fotpllc.com
              oster@fotpllc.com
              dtejtel@fotpllc.com


If to the Debtors:                              James H.M. Sprayregen, P.C.
                                                     Anup Sathy, P.C.
                                                     Brian D. Wolfe
                                                     William A. Guerrieri
                                                     Benjamin M. Rhode
                                                     **Kirkland & Ellis LLP**
                                                     **Kirkland & Ellis International LLP**
                                                     300 North LaSalle Street
                                                     Chicago, IL 60654
                                                     Telephone:  (312) 862-2000
                                                     Facsimile:  (312) 862-2200
                                                     Email:  james.sprayregen@kirkland.com
                                                                  anup.sathy@kirkland.com
                                                                  brian.wolfe@kirkland.com
                                                                  will.guerrieri@kirkland.com
                                                                  benjamin.rhode@kirkland.com

                                                                    -and-


                                                     Christopher J. Marcus, P.C.
                                                     **Kirkland & Ellis LLP**
                                                     **Kirkland & Ellis International LLP**
                                                     601 Lexington Avenue
                                                     New York, NY 10022
                                                     Telephone:  (212) 446-4800
                                                     Facsimile:  (212) 446-4900
                                                     Email: christopher.marcus@kirkland.com

If to CCOH or the Delaware Individual
Defendants:

William B. Chandler
Bradley D. Sorrels
Shannon E. German
**Wilson Sonsini Goodrich & Rosati, P.C.**
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone:  (302) 304-7600
Facsimile:  (866) 974-7329
Email:  wchandler@wsgr.com
          bsorrels@wsgr.com
          sgerman@wsgr.com


If to the CCOH Special Committee:

Matthew A. Feldman
Paul V. Shalhoub
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Email:  mfeldman@willkie.com
          pshalhoub@willkie.com


and

Jennifer J. Hardy
**Willkie Farr & Gallagher LLP**
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1700
Facsimile:  (713) 510-1799
Email:  jhardy2@willkie.com

If to the Sponsor Entities:                               Kevin B. Huff
                                                          Brendan J. Crimmins
                                                          **Kellogg, Hansen, Todd, Figel &**
                                                          **Frederick, P.L.L.C.**
                                                          1615 M Street, N.W., Suite 400
                                                          Washington, D.C. 20036
                                                          Telephone:  (202) 326-7900
                                                          Facsimile:  (202) 326-7999
                                                          Email:  khuff@kellogghansen.com
                                                                     bcrimmins@kellogghansen.com

                                                          and

                                                          David E. Ross
                                                          **Ross Aronstam & Moritz LLP**
                                                          100 South West Street, Suite 400
                                                          Wilmington, Delaware 19801
                                                          Telephone:  (302) 576-1600
                                                          Facsimile:  (302) 576-1100
                                                          Email:  dross@ramllp.com

37.     Except as otherwise provided herein, each Settling Party, other than the Delaware Individual Defendants, shall bear its own costs.

38.     All agreements made and orders entered during the course of the Delaware Actions relating to the confidentiality of information shall survive this Settlement.

39.     No opinion or advice concerning the tax consequences of the proposed Settlement is being given or will be given by the Settling Parties or their counsel; nor is any representation or warranty in this regard made by virtue of this Settlement Agreement.  Each Settlement Class Member's tax obligations, and the determination thereof, are the sole responsibility of the Settlement Class Member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member.

**IN WITNESS WHEREOF,** the Settling Parties have caused this Settlement Agreement to be executed, by their duly authorized attorneys, as of December 16, 2018.

| | |
|---|---|
| **Entwistle & Cappucci, LLP** | **Kirkland & Ellis LLP** |

By: _/s/ Andrew J. Entwistle_                     By: _/s/ William A. Guerrieri_

      Andrew J. Entwistle                          William A. Guerrieri

Andrew J. Entwistle
**Entwistle & Cappucci, LLP**
299 Park Avenue, 20th Floor
New York, NY 10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
***Counsel for GAMCO***
***and the Proposed Settlement Class***

James H.M. Sprayregen, P.C.
Anup Sathy, P.C.
Brian D. Wolfe
William A. Guerrieri
Benjamin M. Rhode
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

                  -and-

Christopher J. Marcus, P.C.
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
***Counsel for the Debtors***

**Labaton Sucharow LLP and Grant &
Eisenhofer, P.A.**

By: /s/ *Ned Weinberger*
     Ned Weinberger

Ned Weinberger
**Labaton Sucharow LLP**
300 Delaware Ave., Suite 1340
Wilmington, DE 19801
Telephone:  (302) 573-2540
Facsimile:  (302) 573-6928
Email:  nweinberger@labaton.com

     -and-

Gordon Z. Novod
**Grant & Eisenhofer, P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone:  (646) 722-8523
Facsimile:  (646) 722-8501

     -and-

Jeremy S. Friedman
Spencer Oster
David F.E. Tejtel
**Friedman Oster & Tejtel PLLC**
240 East 79th Street, Suite A
New York, NY 10075
Telephone:  (888) 529-1108
Email:  jfriedman@fotpllc.com
       oster@fotpllc.com
       dtejtel@fotpllc.com
*Counsel for Norfolk*

**Wilson Sonsini Goodrich & Rosati, P.C.**

By: /s/ *William B. Chandler*
      William B. Chandler

William B. Chandler
Bradley D. Sorrels
Shannon E. German
**Wilson Sonsini Goodrich & Rosati, P.C.**
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone:  (302) 304-7600
Facsimile:  (866) 974-7329
***Counsel for CCOH and the Delaware
Individual Defendants***

**Willkie Farr & Gallagher LLP**

By: /s/ *Matthew A. Feldman*
      Matthew A. Feldman

Matthew A. Feldman
Paul V. Shalhoub
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
***Counsel for the CCOH Special Committee***

**Kellogg, Hansen, Todd, Figel & Frederick,
P.L.L.C**

By: /s/ *Kevin B. Huff*
      Kevin B. Huff

Kevin B. Huff
Brendan J. Crimmins
**Kellogg, Hansen, Todd, Figel &
Frederick, P.L.L.C**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999

-and-

David E. Ross
**Ross Aronstam & Moritz LLP**
100 South West Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 576-1600
Facsimile:  (302) 576-1100
***Counsel for the Sponsor Entities***

## EXHIBIT A

**Preliminary Approval Order**

## EXHIBIT 1

**Notice of Settlement**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**NOTICE OF (I) PENDENCY OF PROPOSED SETTLEMENT
AMONG THE DEBTORS, CCOH, THE SPONSOR ENTITIES,
THE DELAWARE INDIVIDUAL DEFENDANTS, AND THE
SETTLING PLAINTIFFS, (II) SETTLEMENT FAIRNESS
HEARING, AND (III) PAYMENT OF SETTLING PLAINTIFFS'
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

*This notice relates to a proposed settlement
agreement among the Debtors, CCOH, the Sponsor
Entities, the Delaware Individual Defendants, and the Settling Plaintiffs.[2]*

*A Federal Court authorized this notice.  This is not a solicitation from a lawyer.*

**PLEASE READ THIS NOTICE CAREFULLY.  THIS NOTICE EXPLAINS IMPORTANT RIGHTS YOU MAY HAVE, INCLUDING THE POSSIBLE RELEASE OF CERTAIN CLAIMS.  IF YOU ARE A MEMBER OF THE CLASS, YOUR LEGAL RIGHTS WILL BE AFFECTED WHETHER OR NOT YOU ACT.  IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, THE PROPOSED SETTLEMENT AGREEMENT, OR YOUR PARTICIPATION IN THE PROPOSED SETTLEMENT, PLEASE DO NOT CONTACT THE BANKRUPTCY COURT, THE SETTLING DEFENDANTS, THE DEBTORS, CCOH, OR THEIR COUNSEL.  ALL QUESTIONS SHOULD BE DIRECTED TO CLASS COUNSEL OR THE NOTICE ADMINISTRATOR.  A HEARING TO DETERMINE THE FAIRNESS OF THE SETTLEMENT AGREEMENT AND TO FINALLY APPROVE THE SETTLEMENT AGREEMENT WILL BE HELD ON JANUARY 22, 2019 AT 8:30 A.M., PREVAILING CENTRAL TIME, BEFORE THE HONORABLE MARVIN ISGUR AND THE HONORABLE LEE ROSENTHAL, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

---

[1]   Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]   Capitalized terms not defined herein shall have the meanings set forth in the Settlement Agreement.

To:  The putative class of public shareholders of Class A common stock of Clear Channel Outdoor Holdings, Inc. ("CCOH") during the period from March 14, 2015 to March 14, 2018 (the "Class Period," and the shareholders except for GAMCO and Norfolk, the "Remaining Minority Shareholders").

## INTRODUCTION

On March 14, 2018 (the "Petition Date"), iHeartMedia, Inc. ("iHM"), and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code.

On August 27, 2018, GAMCO Asset Management, Inc. ("GAMCO") filed a verified class action complaint (the "GAMCO Complaint") in the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") on behalf of itself and the Class (as defined herein) against the Delaware Individual Defendants (as defined herein) and the Sponsor Entities (as defined herein).  That case is captioned *GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) (the "GAMCO Action").

On December 29, 2017, Norfolk County Retirement System ("Norfolk") filed a verified derivative complaint (the "Norfolk Complaint") on behalf of CCOH against certain of the Delaware Individual Defendants, the Sponsor Entities, and the Debtors in the Delaware Court of Chancery.  The Norfolk Action is captioned *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (Del. Ch.) (the "Norfolk Action," and together with the GAMCO Action, the "Delaware Actions").

 GAMCO (the "Class Representative," and together with the Remaining Minority Shareholders and Norfolk, the "Settling Plaintiffs," each person or entity a "Class Member," and together the "Class"), individually, on behalf of the Class, and derivatively on behalf of CCOH, CCOH, the Debtors, Norfolk, individually and on behalf of CCOH, the Sponsor Entities, Bain Capital LP, and the Delaware Individual Defendants (collectively, the "Parties"), have reached a proposed settlement to resolve claims and objections in connection with the Debtors' chapter 11 cases (the "Chapter 11 Cases") and the Delaware Actions, and to effectuate the separation of the iHeart and CCOH businesses (the "Separation") as memorialized in the *Settlement Agreement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs* dated as of December 16, 2018 (the "Settlement Agreement") and incorporated into the *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2207] (the "Plan").  As described below, the benefits of the Settlement Agreement will inure to the Class Members.  The Parties believe that entry into the Settlement Agreement is in the best interests of the Settling Parties and other parties in interest.

This notice constitutes notice to the Class Members of (a) the proposed Settlement Agreement which resolves claims in the Chapter 11 Cases and the Delaware Actions and sets forth the terms of the Separation, (b) the attorneys' fees and expenses to be paid by the Debtors in the Chapter 11 Cases to Entwistle & Cappucci LLP, Labaton Sucharow LLP, Grant & Eisenhofer

P.A., and Friedman Oster & Tejtel PLLC (collectively, "Settling Plaintiffs' Counsel"), (c) the ability of each Class Member to object to or comment on the Settlement Agreement and Settling Plaintiffs' Counsel's attorneys' fees and Litigation Expenses (as defined herein) and to appear at the Fairness Hearing (as defined herein) at which the Bankruptcy Court will consider final approval of the Settlement Agreement and Settling Plaintiffs' Counsels' attorneys' fees and expenses, and (d) the date of the hearing (the "Fairness Hearing") before the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") to determine the fairness, to grant final approval of the Settlement Agreement as part of confirmation of the Plan, and to award Settling Plaintiffs' Counsels' attorneys' fees and Litigation Expenses.

The hearing to consider Confirmation of the Plan, which commenced on December 11, 2018, at 9:00 a.m., prevailing Central Time before the Honorable Marvin Isgur, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, Texas 77002 (the "Confirmation Hearing"), has been continued as set forth below and in the *Order Regarding Confirmation Hearing Dates* [Docket No. 2171] (the "Confirmation Scheduling Order") entered by the Bankruptcy Court on December 11, 2018 (all times, prevailing Central Time):

- **January 10, 2019 at 9:00 a.m.** to consider all confirmation issues other than those scheduled to be heard on January 17, 2019 and January 22, 2019.

- **January 17, 2019 at 9:00 a.m.** to consider all issues concerning the CCOH Separation Settlement, other than those issues scheduled to be heard on January 22, 2019.

- **January 22, 2019 at 8:30 a.m.** to consider all remaining issues concerning consideration of the class action settlement related to the CCOH Separation Settlement and the GAMCO Motion.

- **January 23, 2019 at 2:30 p.m.** to consider all remaining confirmation issues.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **OBJECT TO THE SETTLEMENT AGREEMENT BY SUBMITTING A WRITTEN OBJECTION SO THAT IT IS RECEIVED NO LATER THAN JANUARY 14, 2019.** | If you do not like the Settlement Agreement or the payment of Settling Plaintiffs' Counsels' attorneys' fees and reimbursement of reasonable costs and expenses incurred in connection with representing GAMCO, Norfolk, and the Proposed Settlement Class in connection with the Chapter 11 Cases ("Litigation Expenses"), you may write to the Bankruptcy Court and explain why you do not like them. You cannot object to the Settlement Agreement or the payment of fees and Litigation Expenses unless you are a Class Member. If the Settlement Agreement is approved over your objection, you will be bound by the Settlement. You do not have the right to request exclusion from the Settlement. |

| | |
|---|---|
| **GO TO A HEARING ON JANUARY 22, 2019 AT 8:30 A.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS RECEIVED NO LATER THAN JANUARY 14, 2019.** | Filing a written objection and notice of intention to appear by January 14, 2019 allows you to speak in Bankruptcy Court, at the discretion of the Bankruptcy Court, about the fairness of the Settlement Agreement and/or the payment of attorneys' fees and Litigation Expenses.  If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Bankruptcy Court, speak to the Bankruptcy Court about your objection.  If the Settlement Agreement is approved over your objection, you will be bound by the Settlement.  You do not have the right to request exclusion from the Settlement. |
| **DO NOTHING.** | If you are a member of the Class and you do nothing and the Settlement Agreement is approved, then you will be bound by the Settlement and may be bound by any judgments or orders entered by the Delaware Court of Chancery related to the Delaware Actions. |

## DESCRIPTION OF THE CLAIMS

The GAMCO Complaint named as defendants: (a) members of the board of directors for CCOH as of November 29, 2017, including Blair Hendrix, Douglas L. Jacobs, Daniel G. Jones, Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, and Dale W. Tremblay (collectively, the "Board Defendants"); (b) members of the committee appointed by the board of directors for CCOH to monitor the Revolving Promissory Note, dated November 10, 2005, between iHeartCommunications, Inc. ("iHC"), as maker, and CCOH, as payee, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "Intercompany Note") as of November 8, 2017 (the "Intercompany Note Committee Defendants" together with the Board Defendants, the "Delaware Individual Defendants"); and (c) Bain Capital Partners, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL," and together with Bain, the "Sponsor Entities," and together with the Delaware Individual Defendants, iHC, and iHM, the "Settling Defendants").

The GAMCO Complaint alleges that in November 2017, the Delaware Individual Defendants breached their fiduciary duties owed to the Class relating to the Intercompany Note. The GAMCO Complaint alleges that the Delaware Individual Defendants breached their fiduciary duties by failing to exercise rights available to them to cause CCOH to demand repayment under the Intercompany Note—or to allow the Intercompany Note to mature, which would result in a demand for repayment—and to simultaneously declare a *pro rata* dividend to CCOH's shareholders.

The GAMCO Complaint also alleges that the Sponsor Entities breached fiduciary duties owed to the Class by failing to direct the Board Defendants to let the Intercompany Note mature

and to declare a corresponding dividend.  Alternatively, the GAMCO Complaint asserts that the Sponsor Entities aided and abetted alleged breaches of fiduciary duty by the Board Defendants by failing to direct the Board Defendants to permit the Intercompany Note to mature and to declare a dividend.

The GAMCO Complaint seeks declaratory relief and damages for the Class.

The Norfolk Complaint named as defendants:  (a) certain of the Board Defendants, (b) the Sponsor Entities, and (c) iHC and iHM.  The Norfolk Complaint also named CCOH as a nominal defendant.  Similarly to the GAMCO Complaint, the Norfolk Complaint challenged the decision to extend the maturity of the Intercompany Note at the agreed upon interest rate.  The Norfolk Complaint seeks declaratory and other equitable relief derivatively on behalf of CCOH.

In the Chapter 11 Cases, on September 5, 2018, CCOH timely filed its proof of claim against each Debtor entity, which included a liquidated claim in the amount of $1,031,721,306.00 on account of the Intercompany Note.  On the same date, GAMCO filed in the Chapter 11 Cases *GAMCO Asset Management, Inc.'s Limited Objection to the Debtors' Motion for Approval of the Disclosure Statement* [Docket No. 1406] objecting to the release provisions contained in the Plan and reserving its rights with respect to confirmation of the Plan.  GAMCO threatened to object to confirmation of the Plan based on the treatment of the balance of the Intercompany Note owed to CCOH.

On November 28, 2018, Norfolk filed in the Chapter 11 Cases the *Limited Objection of Norfolk County Retirement System to the Approval of Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2055] objecting to the release provisions contained in the Plan.

## THE PROPOSED SETTLEMENT AGREEMENT

On March 16, 2018, the Debtors entered into a restructuring support agreement (the "Restructuring Support Agreement") with groups representing their primary creditors and stakeholders.  The Restructuring Support Agreement and the Plan contemplate the Separation occurring on the effective date of the Plan (the "Effective Date").

The Settlement Agreement reflects the final and binding agreement between the Settling Defendants, the Settling Plaintiffs, the Debtors, and CCOH (collectively, the "Settling Parties") with respect to the Delaware Actions, the Plan, and the Separation.  The Class Representative, based upon its respective investigation and prosecution of the Delaware Actions and prior related litigation, as well as their pursuit of claims and objections in the Chapter 11 Cases, have concluded that the terms and conditions of the Settlement Agreement are fair, reasonable, adequate, and in the best interests of the Class.  The Settlement Agreement is the product of months of hard-fought, good-faith, arms'-length negotiations between the Debtors, the special committee of independent directors established by the board of directors of CCOH on January 23, 2018, to consider, review, and negotiate certain transactions between the Debtors and CCOH in connection with the Debtors' Chapter 11 Cases (the "CCOH Special Committee"), GAMCO, and other constituents, that (a) provides CCOH with sufficient liquidity to operate as a stand-alone enterprise following the Separation, (b) obtains the support of the Settling Parties for the Plan and the Separation, and

5

(c) settles outstanding issues among the Parties, including those related to the Plan and the Delaware Actions, bringing to a close what may have otherwise turned into expensive, protracted, and complex litigation that would have likely delayed the Debtors' emergence from chapter 11.

As shareholders of CCOH, Class Members have a direct interest in ensuring that CCOH is adequately capitalized following the Separation to preserve their equity investment. Additionally, without the Settlement Agreement, the Class Members face uncertainty regarding the outcome of the Delaware Actions; even assuming the Class Representative or Norfolk were to prevail at trial or in their respect Delaware Action, it could take years for Class Members to receive any payment on their alleged claims. By way of the Settlement Agreement, Class Members will be able to realize an immediate benefit from their equity interest in CCOH, which will be bolstered by the additional consideration being provided by the Debtors to CCOH.

Based on the Class Representative's direct oversight of the prosecution of the GAMCO Action and with the advice of Class Counsel, the Class Representative has agreed to settle and release the claims described above and specified in the Settlement Agreement against the Settling Defendants, CCOH, the Debtors, and their respective current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any (collectively, the "Settling Defendants'/Company's Releasees") and all other causes of action that have been asserted or could be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases, the GAMCO Action, or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things: (a) the substantial financial benefit that the Settling Plaintiffs and CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation and trial against the Settling Defendants. The Settlement Agreement constitutes a compromise of all matters that are in dispute between the Settling Parties.

Based on Norfolk's direct oversight of the prosecution of the Norfolk Action and with the advice of Settling Plaintiffs' Counsel, Norfolk has agreed to settle and release the claims described above and specified in the Settlement Agreement against the Settling Defendants'/Company's Releasees and all other causes of action that have been asserted or could be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases, the Norfolk Action, or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things: (a) the substantial financial benefit that the Settling Plaintiffs and CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation and trial against the Settling Defendants. The Settlement Agreement constitutes a compromise of all matters that are in dispute between the Settling Parties.

## THE TERMS OF THE SETTLEMENT

The following description of the proposed Settlement Agreement is only a summary. In the event of any difference between this summary and the terms of the Settlement Agreement, the terms and conditions of the Settlement Agreement shall control. You may secure a copy of the Settlement Agreement from Class Counsel or from Prime Clerk LLC (the "Notice Administrator") at the address shown below. The terms of the Settlement Agreement relevant to the Class Members are summarized as follows:

**Full Separation of CCOH.** As of the Effective Date, a corporate separation of CCOH from the Debtors will occur, pursuant to which: (i) the cash sweep arrangement under the existing Corporate Services Agreement (the "CSA") will terminate; (ii) any agreements or licenses requiring royalty payments to the Debtors by CCOH for trademarks or other intellectual property will terminate (with such termination to become effective as of December 31, 2018); and (iii) a new transition services agreement ("TSA") will become effective and supersede and replace the existing CSA for administrative services currently and historically provided to CCOH by the Debtors; *provided however*, that (a) CCOH is permitted to terminate all or parts of the TSA with thirty (30) days' notice to iHC, (b) the transition period will generally be 12 months from the date of Separation (subject to certain services requiring a longer transition period) and (c) the cost for such services will generally be consistent with the aggregate cost applicable under the existing CSA.

Pursuant to the Settlement Agreement, the Debtors agree to waive: (i) the set-off for the value of the intellectual property transferred, including royalties on any intellectual property as set forth above under "Full Separation of CCOH" (which specifically includes a waiver of all license fees from the Petition Date through December 31, 2018); and (ii) the repayment of the post-petition intercompany balance outstanding in favor of the Debtors as of December 31, 2018. For the avoidance of doubt, to the extent the Debtors owe CCOH on account of the post-petition intercompany balance as of December 31, 2018, the Debtors shall repay this amount in full in cash on the Effective Date. In addition, any intercompany balance that accrues pursuant to the cash sweep arrangement under the existing CSA (and after the termination of the royalty payments as set forth above) in favor of the Debtors or CCOH from January 1, 2019 through the Effective Date, as applicable, shall be paid by CCOH or the Debtors, respectively, within five (5) business days following the Effective Date.

**CCOH's Recovery in the Debtors' Chapter 11 Cases.** The Plan contemplates the allowance of CCOH's claim against iHC in the amount of $1,031,721,306.00 (the "CCOH Claim") without setoff of any kind and that such allowed claim will receive a cash payment of 14.44%, which will result in CCOH recovering approximately $150 million pursuant to its proof of claim (which recovery will be without setoff or reduction). The CCOH Claim is not subject to subordination or reduction for any reason.

**Additional CCOH Liquidity.** The Debtors have agreed to make available to CCOH, for a period of no more than three years following the Effective Date, an unsecured revolving line of credit (with customary, arms'-length terms and interest at the prime rate) in an aggregate amount not to exceed $200 million as part of the TSA.

7

## CLASS COUNSEL'S RECOMMENDATION

Class Counsel recommends the Settlement, believing that it is fair, reasonable, and adequate to the Class as the Settlement creates enormous value in CCOH, accomplishes the Separation, and provides sufficient operational liquidity for CCOH post-separation—all to the substantial benefit of the Class.

## SETTLING PLAINTIFFS' COUNSEL'S FEES AND EXPENSES

Settling Plaintiffs' Counsel has not received any payment for their services in pursuing claims against the Settling Defendants on behalf of the Class, nor has Settling Plaintiffs' Counsel been reimbursed for their out-of-pocket expenses.  Subject to the conditions set forth in the Settlement Agreement, the Parties have agreed that the Debtors will pay to Settling Plaintiffs' Counsel, following the occurrence of (a) the entry of a final and non-appealable order from the Bankruptcy Court confirming the Plan and finally approving the Settlement, (b) the entry of final and non-appealable judgments dismissing each of the Delaware Actions with prejudice, and (c) the Effective Date, attorneys' fees and Litigation Expenses in the amount of (i) $4,700,000 in the aggregate to Entwistle & Cappucci LLP and (ii) $2,450,000 in the aggregate to Labaton Sucharow LLP, Grant & Eisenhofer, P.A., and Friedman Oster & Tejtel PLLC, collectively, for reimbursement of the reasonable costs and expenses of Settling Plaintiffs' Counsel.  The payment of attorneys' fees and Litigation Expenses is subject to Bankruptcy Court approval.  Class Members are not personally liable for any such fees or expenses.

## RELEASE OF CLAIMS AND EFFECT OF
## APPROVAL OF SETTLEMENT AGREEMENT

In exchange for the Settlement consideration set forth above, the Settling Plaintiffs, CCOH, and all their respective current and former officers, directors, employees, affiliates, partners, members, agents, attorneys, heirs, administrators, and assigns, if any, will forever, fully, and unconditionally release, discharge, compromise, and settle all possible claims against, and covenant not to sue, the Settling Defendants'/Company's Releasees, from all claims, objections and all other causes of action that have been asserted or could be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases, the Delaware Actions, or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of the Settlement.

## HOW TO OBJECT

If you are satisfied with the proposed Settlement including Settling Plaintiffs' Counsel's fees and expenses, you do not need to do anything.  If you are concerned that the Debtors do not have your current address, please promptly notify the Notice Administrator as follows:

Clear Channel Notice Administrator
**c/o Prime Clerk LLC**
830 Third Avenue, 3rd Floor
New York, NY 10022
Telephone:  (877) 756-7779
Email:  clearchannelnoticeadmin@primeclerk.com

If, on the other hand, you believe that the proposed Settlement is unfair or inadequate or feel that Class Counsel's fees and expenses should not be approved, you do not have the right to request exclusion from the Settlement, but you may object to the Settlement and/or Settling Plaintiffs' Counsel's fees and expenses by mailing certified mail, return receipt requested, a detailed written statement bearing the caption of this action shown above on the first page stating your comment or objection, to the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Courtroom 404, Houston, Texas 77002, and by sending copies of that statement, also by certified mail, return receipt requested, to:  (1) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attention: Anup Sathy, P.C., Brian D. Wolfe, William A. Guerrieri, and Benjamin M. Rhode, and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention:  Christopher J. Marcus, P.C.; (2) Entwistle & Cappucci, LLP, 299 Park Avenue, 20th Floor, New York, New York 10171, Attention: Andrew J. Entwistle; (3) Labaton Sucharow LLP, 300 Delaware Ave., Suite 1340, Wilmington, Delaware 19801, Attention: Ned Weinberger; (4) Grant & Eisenhofer P.A., 485 Lexington Avenue, New York, New York 10017 Attention: Gordon Novod; (5) Friedman Oster & Tejtel PLLC**,** 240 East 79th Street, Suite A, New York, New York 10075, Attention: Jeremy S. Friedman, Spencer Oster, and David F.E. Tejtel; and (6) Willkie Farr & Gallagher LLP, 600 Travis Street, Houston, Texas 77002, Attention Jennifer J. Hardy, and Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: Matthew A. Feldman, Paul V. Shalhoub and Benjamin McCallen. **Objections must be mailed so as to be received no later than January 14**, **2019, and must include the caption of the action and your name, address, and telephone number together with a detailed statement of the basis for your objection and whether you wish to be heard personally or by counsel at the Fairness Hearing at which the Bankruptcy Court will consider binding approval of the Settlement and the award of Settling Plaintiffs' Counsel's attorneys' fees and Litigation Expenses, as described above.**

You may also appear in person or by counsel at the Fairness Hearing described below.

### FAIRNESS HEARING TO APPROVE SETTLEMENT
### AND AWARD ATTORNEYS' FEES AND COSTS

The Fairness Hearing for final consideration and approval of the Settlement Agreement and the payment of Settling Plaintiffs' Counsel's attorneys' fees and Litigation Expenses is scheduled to take place on January 22, 2019 at 8:30 a.m., prevailing Central Time, before the Honorable Marvin Isgur, United States Bankruptcy Judge, and the Honorable Lee Rosenthal, Chief Judge for the United States District Court for the Southern District of Texas, at the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Courtroom 404, Houston, Texas 77002.  That hearing may be adjourned without further notice.  If you wish to determine if the hearing is adjourned, you may contact Mr. Entwistle, Mr. Weinberger, Mr. Novod, and Mr. Friedman at the addresses shown below.

## OTHER INFORMATION

Any questions Class Members concerning this notice or the Delaware Actions should be directed to Mr. Entwistle.  All requests for more information, including a copy of the Settlement Agreement, should be sent by first-class mail to Mr. Entwistle at the addresses indicated below.

While the Bankruptcy Court has approved the sending of this notice, that does not indicate, and is not intended to indicate, that the Bankruptcy Court has any opinion as to the respective claims or defenses asserted by the Parties in the Delaware Actions.

### DO NOT CALL OR WRITE THE BANKRUPTCY COURT, THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, THE SETTLING DEFENDANTS, OR THEIR COUNSEL REGARDING THIS NOTICE

**Requests for notice or to be added to the mailing list for future notices related to the Settlement should be made to the Notice Administrator:**

Clear Channel Notice Administrator
**c/o Prime Clerk LLC**
830 Third Avenue, 3rd Floor
New York, NY 10022
Telephone:  (877) 756 7779
Email:
clearchannelnoticeadmin@primeclerk.com

**Inquiries, other than requests for notice, should be made to Class Counsel:**

Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI, LLP**
299 Park Avenue, 20th Floor
New York, NY 10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Email:  aentwistle@entwistle-law.com

**Dated: _____, 2018**

# **EXHIBIT 2**

## **Summary Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| IHEARTMEDIA, INC., *et al.*,[1] | § Case No. 18-31274 (MI) |
| | § |
| Debtors. | § (Jointly Administered) |
| | § |

### SUMMARY NOTICE OF (I) PENDENCY OF PROPOSED SETTLEMENT AMONG THE DEBTORS, CCOH, THE SPONSOR ENTITIES, THE DELAWARE INDIVIDUAL DEFENDANTS, AND THE SETTLING PLAINTIFFS, (II) SETTLEMENT FAIRNESS HEARING, AND (III) APPLICATION FOR AN AWARD OF SETTLING PLAINTIFFS' ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

*This summary notice relates to a proposed settlement
agreement among the Debtors, CCOH, the Sponsor Entities,
the Delaware Individual Defendants, and the Settling Plaintiffs.[2]*

*A Federal Court authorized this notice. This is not a solicitation from a lawyer.*

PLEASE READ THIS NOTICE CAREFULLY.  THIS NOTICE EXPLAINS IMPORTANT RIGHTS YOU MAY HAVE, INCLUDING THE POSSIBLE RELEASE OF CERTAIN CLAIMS. IF YOU ARE A MEMBER OF THE CLASS, YOUR LEGAL RIGHTS WILL BE AFFECTED WHETHER OR NOT YOU ACT.  IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, THE PROPOSED SETTLEMENT AGREEMENT, OR YOUR PARTICIPATION IN THE PROPOSED SETTLEMENT, PLEASE DO NOT CONTACT THE BANKRUPTCY COURT, THE SETTLING DEFENDANTS, THE DEBTORS, CCOH, OR THEIR COUNSEL. ALL QUESTIONS SHOULD BE DIRECTED TO CLASS COUNSEL OR THE NOTICE ADMINISTRATOR.  A HEARING TO DETERMINE THE FAIRNESS OF THE SETTLEMENT AGREEMENT AND TO FINALLY APPROVE THE SETTLEMENT AGREEMENT WILL BE HELD ON JANUARY 22, 2019 AT 8:30 A.M. PREVAILING CENTRAL TIME, BEFORE THE HONORABLE MARVIN ISGUR AND THE HONORABLE LEE ROSENTHAL, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.

---

[1]   Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]   Capitalized terms not defined herein shall have the meanings set forth in the Settlement Agreement.

TO:     The putative class of minority shareholders of Class A common stock of Clear Channel Outdoor Holdings, Inc. ("CCOH") during the period from March 14, 2015 to March 14, 2018 (the "Class Period," and the shareholders except for GAMCO and Norfolk, the "Remaining Minority Shareholders").

**PLEASE TAKE NOTICE THAT** on March 14, 2018, iHeartMedia, Inc., and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code.

**PLEASE TAKE FURTHER NOTICE THAT** on August 27, 2018, GAMCO Asset Management, Inc. ("GAMCO") filed a verified class action complaint in the Court of Chancery of the State of Delaware on its own behalf and on behalf of the putative class of holders of Class A common stock of CCOH against the Delaware Individual Defendants (as defined herein) and certain of the Sponsor Entities (as defined herein). That case is captioned *GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) (the "GAMCO Action").

**PLEASE TAKE FURTHER NOTICE THAT** on December 29, 2017, Norfolk County Retirement System ("Norfolk") filed a separate verified derivative complaint on behalf of CCOH against certain of the Delaware Individual Defendants, certain of the Sponsor Entities, and the Debtors in the Delaware Court of Chancery.  The Norfolk Action is captioned *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (Del. Ch.) (the "Norfolk Action," and together with the GAMCO Action, the "Delaware Actions").

**PLEASE TAKE FURTHER NOTICE THAT** GAMCO, and together with the Remaining Minority Shareholders and Norfolk (collectively, the "Settling Plaintiffs," each person or entity a "Class Member," and together the "Class"), individually, on behalf of the Class, and derivatively on behalf of CCOH, CCOH, the Debtors, Norfolk, individually and on behalf of CCOH, the Sponsor Entities, Bain Capital LP, and the Delaware Individual Defendants (collectively, the "Settling Parties"), have reached a proposed settlement to resolve the claims and objections in connection with the Debtors chapter 11 cases (the "Chapter 11 Cases") and the Delaware Actions, and to effectuate the separation of the iHeart and CCOH businesses as memorialized in the *Settlement Agreement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs* dated as of December 16, 2018 (the "Settlement Agreement") and incorporated into the *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2207].  The benefits of the Settlement Agreement will inure to the Class Members and the Settling Parties believe that entry into the Settlement Agreement is in the best interests of the Settling Parties and other parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT** the Settlement Agreement, if approved, will settle and release the claims raised in the Delaware Actions, and all other causes of action that have been asserted or could be asserted by the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis against, among others:  (a) members of the board of directors for CCOH, including Blair Hendrix, Douglas L. Jacobs, Daniel G. Jones, Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, and Dale W. Tremblay (collectively, the "Board Defendants"); (b) members of the committee appointed by the board of directors of CCOH to

monitor that certain Revolving Promissory Note, dated November 10, 2005, between iHeartCommunications, Inc., as maker, and CCOH, as payee, as amended, amended and restated, supplemented, or otherwise modified from time to time, as of November 8, 2017 (the "Intercompany Note Committee Defendants," and together with the Board Defendants, the "Delaware Individual Defendants"); (c) the Debtors; and (d) Bain Capital Partners, LLC, Bain Capital LP, and Thomas H. Lee Partners, L.P. ("THL," and together with Bain Capital Partners, LLC and Bain Capital LP, the "Sponsor Entities," and together with the Delaware Individual Defendants and the Debtors, the "Settling Defendants").

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "Fairness Hearing") will be held on January 22, 2019 at 8:30 a.m., *prevailing Central Time*, before the Honorable Marvin Isgur and the Honorable Lee Rosenthal at the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), 515 Rusk Avenue, Houston, TX 77002, to determine the fairness and grant of final approval of the Settlement Agreement and award of attorneys' fees and reasonable costs and expenses incurred in connection commencing, prosecuting and settling the Delaware Actions (which may include costs and expenses of the Settling Plaintiffs' counsel directly related to their representation of the Class) to Entwistle & Cappucci LLP, Labaton Sucharow LLP, Grant & Eisenhofer P.A., and Friedman Oster & Tejtel PLLC (collectively, "Settling Plaintiffs' Counsel").

**PLEASE TAKE FURTHER NOTICE THAT** if you are a member of the Class, your rights will be affected by the Settlement Agreement.  If you have not yet received the *Notice of (I) Pendency of Proposed Settlement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs, (II) Settlement Fairness Hearing, and (III) Application for an Award of Settling Plaintiffs' Attorneys' Fees and Reimbursement of Litigation Expenses* (the "Notice"), you may obtain copies of the Notice and related documents by contacting Prime Clerk LLC (the "Notice Administrator") at:

> Clear Channel Notice Administrator
> **c/o Prime Clerk LLC**
> 830 Third Avenue, 3rd Floor
> New York, NY 10022
> Telephone:  (877) 756-7779
> Email:  clearchannelnoticeadmin@primeclerk.com

Copies of the Notice can also be downloaded from the website maintained by the Notice Administrator, https://cases.primeclerk.com/iheartmedia.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Settlement Agreement or Settling Plaintiffs' Counsels' application for attorneys' fees and litigation expenses must be filed with the Bankruptcy Court and delivered to the Settling Parties' counsel such that they are received no later than January 14, 2019, in accordance with the instructions set forth in the Notice.

**Please do not contact the Court, the Debtors, CCOH, the Settling Defendants, or their counsel regarding the Notice. All questions about this notice or the Settlement Agreement should be directed to Class Counsel or the Notice Administrator.**

Inquiries, other than requests for the Notice, should be made to Class Counsel:

> Andrew J. Entwistle
> **ENTWISTLE & CAPPUCCI, LLP**
> 299 Park Avenue, 20th Floor
> New York, NY 10171
> Telephone: (212) 894-7200
> Facsimile: (212) 894-7272
> Email:  aentwistle@entwistle-law.com

Requests for the Notice should be made to:

> Clear Channel Notice Administrator
> **c/o Prime Clerk LLC**
> 830 Third Avenue, 3rd Floor
> New York, NY 10022
> Telephone:  (877) 756-7779
> Email:  clearchannelnoticeadmin@primeclerk.com

[*Remainder of page intentionally left blank*]

## **EXHIBIT B**

**Settlement Term Sheet**

IN RE: IHEARTMEDIA, INC., ET AL., CASE NO. 18-31274 (MI) (BANKR. S.D. TEX.)
(JOINTLY ADMINISTERED)

-AND-

GAMCO ASSET MANAGEMENT, INC. V. BLAIR HENDRIX, ET AL.,
CASE NO. 208-0633 (DEL. CH.)

SETTLEMENT TERM SHEET

November 22, 2018

This term sheet (the "Term Sheet") describes the principal terms of a proposed global settlement (the "Settlement") of all claims, objections and all other causes of action that have been asserted or could be asserted by or on behalf of Clear Channel Outdoor Holdings, Inc. ("CCOH") and/or GAMCO Asset Management, Inc. ("GAMCO"), individually, derivatively, and on behalf of any class of investors in publicly-traded stock of CCOH against: (i) iHeartCommunications, Inc. ("iHC") and its associated debtors (with iHC, the "iHeart Debtors") in the above-referenced jointly administered chapter 11 cases (the "iHeart Chapter 11 Cases"); and (ii) the defendants in the above-referenced class action in the Delaware Chancery Court (the "Delaware Action"), on the terms outline below, subject to definitive documentation (the "Settlement Agreement").

| 1. **Settling Parties** | | The parties to this Settlement and the Settlement Agreement will be (collectively, the "<u>Settling Parties</u>"):<br><br>    a.  GAMCO, individually and on behalf of the putative class of public holders of CCOH (the "<u>Proposed Delaware Class</u>"), and derivatively on behalf of CCOH;<br><br>    b.  CCOH;<br><br>    c.  iHC and the other iHeart Debtors in the iHeart Chapter 11 Cases;<br><br>    d.  the individual defendants in the Delaware Action, consisting of Blair Henrdrix, Douglas L. Jacobs, Daniel G. Jones, Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, and Dale W. Tremblay (the "<u>Delaware Individual Defendants</u>"); and<br><br>    e.  the private equity sponsor defendants in the Delaware Action, consisting of Bain Capital Partners, LLC ("<u>Bain</u>") and Thomas H. Lee Partners, L.P. ("<u>THL</u>") (the "<u>Delaware Sponsor Defendants</u>").<br><br>GAMCO, CCOH, and the Proposed Delaware Class are the "<u>Settling Plaintiffs</u>."<br><br>The iHeart Debtors, Delaware Individual Defendants, and Delaware Sponsor Defendants are the "<u>Settling Defendants</u>." |
| 2. **Settlement Consideration** | A. **Full Separation of CCOH:** | As of the effective date (the "<u>Effective Date</u>") of iHeart Debtors' chapter 11 plan in the iHeart Chapter 11 Cases (the "<u>Plan</u>"), a corporate separation of CCOH from iHC or any other affiliated entity will occur, pursuant to which: (i) the cash sweep arrangement under the existing Corporate Services Agreement ("<u>CSA</u>") will terminate; (ii) any agreements or licenses requiring royalty payments to iHeart Debtors by CCOH for trademarks or other intellectual property will terminate (with such termination to become effective as of December 31, 2018); and (iii) a new transition services agreement ("<u>TSA</u>") will become effective and supersede and replace the existing CSA for administrative services currently and historically provided to CCOH by iHC; provided <u>however</u>, that (a) CCOH is permitted to terminate all or parts of the TSA with thirty (30) days' notice to iHC, (b) the transition period will generally be 12 months from the date of separation (subject to certain |

|  |  | services requiring a longer transition period) and (c) the cost for such services will generally be consistent with the aggregate cost applicable under the existing CSA.<br><br>Pursuant to this Settlement, the iHeart Debtors agree to waive: (i) the set-off for the value of the intellectual property transferred, including royalties on any intellectual property as set forth above under "Full Separation of CCOH" (which specifically includes a waiver of all license fees from the petition date through December 31, 2018); and (ii) the repayment of the post-petition intercompany balance outstanding in favor of the iHeart Debtors as of December 31, 2018.  For the avoidance of doubt, to the extent the iHeart Debtors owe CCOH on account of the post-petition intercompany balance as of December 31, 2018, the iHeart Debtors shall repay this amount in full in cash on the Effective Date.  In addition, any intercompany balance that accrues pursuant to the cash sweep arrangement under the existing CSA (and after the termination of the royalty payments as set forth above) in favor of the iHeart Debtors or CCOH from January 1, 2019 through the Effective Date, as applicable, shall be paid by CCOH or the iHeart Debtors, respectively, within five (5) business days following the Effective Date. |
|---|---|---|
|  | **B.  CCOH's Recovery in the iHeart Chapter 11 Cases** | The Plan estimates that CCOH will recover approximately $150 million pursuant to its proof of claim, which recovery will be without setoff or reduction. |
|  | **C.  Closing the Liquidity Gap** | The iHeart Debtors agree to make available to CCOH for a period of no more than three years following the Effective Date an unsecured revolving line of credit (with customary, arms-length terms and interest at Prime) in an aggregate amount not to exceed $170 million as part of the TSA.  The Plan also contemplates the issuance by CCOH (or its successor company) of preferred stock in an aggregate amount equal to approximately 2% of CCOH's equity value. |
| **3. <u>Delaware Sponsor Defendants</u>** |  | This Settlement is contingent on court approval of the Plan that includes the Delaware Sponsor Defendants agreeing with the Unsecured Creditors Committee to waive any claims against the iHeart Debtors for unpaid management fees. |
| **4. <u>Settlement Releases</u>** |  | In exchange for the Settlement Consideration set forth herein: |

a.  The Settling Plaintiffs, and all their respective current and former officers, directors, employees, affiliates, partners, members, agents, attorneys, heirs, administrators, and assigns, if any, will forever, fully, and unconditionally release and discharge the Settling Defendants and their current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any, from all claims, objections and all other causes of action that have been asserted or could be asserted by the Settling Plaintiffs, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the iHeart Chapter 11 Cases or the Delaware Action or the intercompany agreements between CCOH and iHeart, including any and all claims relating to the negotiation or execution of the Settlement (the "<u>Settling Plaintiffs Releases</u>");

b.  The Settling Plaintiffs will withdraw all objections to the proposed Plan releases and agree to the inclusion of specific case references to the Delaware Proceeding in those Plan releases; and

c.  The Settling Defendants will provide the Settling Plaintiffs with commensurate releases (the "<u>Settling Defendants Releases</u>").

The Settling Plaintiffs Releases and Settling Defendants Releases are the "Mutual Releases."

The Settlement, Settlement Consideration and Mutual Releases as memorialized in a Settlement Agreement will be effectuated by a Bankruptcy Rule 9019 settlement and/or a plan settlement, and, to the extent deemed necessary by the iHeart Debtors, the Delaware Chancery Court, and will include a release as described above binding on CCOH and a class of all CCOH public equity holders certified under Rule 23(b)(1), as well as an injunction against litigating released claims.  The Settlement will also provide for reimbursement by the iHeart Debtors of fees and expenses of GAMCO and the Proposed Delaware Class, in the amount of $5 million in the aggregate.  The Settlement will also include dismissal with prejudice of all claims in the Delaware Action. The settlement notice, claims process and administration will be approved by the Bankruptcy Court and handled through the Estate notice administrator under supervision of iHeart Debtors counsel and counsel for GAMCO. The costs of notice and administration of this settlement will be borne by the iHeart Debtors. All other related matters will be addressed in the bankruptcy proceedings.

# **EXHIBIT C**

**Separation Documents**

## __EXHIBIT 1__

**Settlement and Separation Agreement**

SETTLEMENT AND SEPARATION AGREEMENT

BY AND AMONG

IHEARTMEDIA, INC.,

IHEARTCOMMUNICATIONS, INC.,

CLEAR CHANNEL HOLDINGS, INC.,

AND

CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

DATED AS OF [●], 20[●]

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ............................................................................................**2**
    Section 1.1    Definitions.........................................................................2

**ARTICLE II THE SEPARATION**............................................................................**19**
    Section 2.1    Restructuring Steps ............................................................19
    Section 2.2    NYSE Listing.....................................................................19
    Section 2.3    Merger Agreement .............................................................19
    Section 2.4    Transfer of Outdoor Assets and iHeart Assets...................19
    Section 2.5    Assumption of Outdoor Liabilities and iHeart Liabilities. ......21
    Section 2.6    Approvals; Novation of Liabilities .....................................23
    Section 2.7    Settlement of Intercompany Notes; Treatment of Intercompany Accounts and Agreements ..................................................24
    Section 2.8    Issuance of Preferred Stock ..............................................25
    Section 2.9    Treatment of Shared Contracts .........................................26
    Section 2.10    Allocation of Costs for Approvals, Releases and Consents......26
    Section 2.11    Bank Accounts; Cash Balances ........................................27
    Section 2.12    Insurance Matters..............................................................28
    Section 2.13    Guarantees, Letters of Credit, Surety Bonds and Other Obligations.........30
    Section 2.14    Litigation...........................................................................30
    Section 2.15    2020 Notes ........................................................................31
    Section 2.16    Certain Employee and Employee Benefit Matters...................31
    Section 2.17    IP Licenses .......................................................................34

**ARTICLE III REPRESENTATIONS AND WARRANTIES** .....................................**35**
    Section 3.1    Mutual Representations and Warranties. .............................35
    Section 3.2    No Other Representations and Warranties............................35

**ARTICLE IV THE CLOSING** ....................................................................................**37**
    Section 4.1    Closing ..............................................................................37
    Section 4.2    Conditions to the Separation .............................................37

**ARTICLE V MUTUAL RELEASES; INDEMNIFICATION** .....................................**38**
    Section 5.1    Release of Pre-Closing Claims .........................................38
    Section 5.2    Indemnification by Outdoor Group ...................................40
    Section 5.3    Indemnification by iHeart Group.......................................40
    Section 5.4    Indemnification Obligations Net of Insurance Proceeds ..........41
    Section 5.5    Procedures for Indemnification of Third-Party Claims ...........41
    Section 5.6    Additional Matters ............................................................43
    Section 5.7    Remedies Cumulative .......................................................45
    Section 5.8    Survival of Indemnities .....................................................45
    Section 5.9    No Impact on Third Parties................................................45
    Section 5.10    No Cross-Claims or Third-Party Claims.............................45
    Section 5.11    Tax Matters .......................................................................45
    Section 5.12    Non-Solicitation of Employees.........................................45
    Section 5.13    Non-Competition ..............................................................46

Section 5.14    Separateness Covenants ...................................................................47
Section 5.15    Survival ..........................................................................................47

**ARTICLE VI ACCESS OF INFORMATION; CONFIDENTIALITY ...................................47**
Section 6.1    Agreement for Exchange of Information ................................................47
Section 6.2    Compensation for Providing Information................................................48
Section 6.3    Record Retention ................................................................................48
Section 6.4    Limitations of Liability ........................................................................49
Section 6.5    Other Agreements Providing for Exchange of Information .....................49
Section 6.6    Production of Witnesses; Records; Cooperation ...................................50
Section 6.7    Privileged Matters ..............................................................................50
Section 6.8    Confidentiality ....................................................................................51

**ARTICLE VII FURTHER ASSURANCES ...............................................................52**
Section 7.1    Further Assurances..............................................................................52
Section 7.2    Order of Precedence............................................................................53

**ARTICLE VIII TERMINATION ..........................................................................53**
Section 8.1    Termination.........................................................................................53
Section 8.2    Effect of Termination...........................................................................53

**ARTICLE IX DISPUTE RESOLUTION...................................................................53**
Section 9.1    Governing Law ...................................................................................53
Section 9.2    CONSENT TO JURISDICTION AND SERVICE OF PROCESS...........54
Section 9.3    WAIVER OF JURY TRIAL..................................................................54

**ARTICLE X MISCELLANEOUS ...........................................................................54**
Section 10.1    Counterparts; Entire Agreement ........................................................54
Section 10.2    Assignability .....................................................................................55
Section 10.3    Third-Party Beneficiaries...................................................................55
Section 10.4    Notices..............................................................................................55
Section 10.5    Severability .......................................................................................57
Section 10.6    Publicity ...........................................................................................57
Section 10.7    Headings ...........................................................................................58
Section 10.8    Survival of Covenants........................................................................58
Section 10.9    Waivers of Default.............................................................................58
Section 10.10          Specific Performance ...............................................................58
Section 10.11          Amendments ...........................................................................58
Section 10.12          Interpretation...........................................................................58
Section 10.13          Mutual Drafting ......................................................................59
Section 10.14          Limitations of Liability .............................................................59

EXHIBITS

Exhibit A          Restructuring Transactions Memorandum
Exhibit B          Form of Merger Agreement
Exhibit C          Form of Transition Services Agreements

| | |
|---|---|
| Exhibit D | Form of New Tax Matters Agreement |
| Exhibit E | Form of Amended EBIT Program Agreement |
| Exhibit F | Form of Revolving Loan Agreement |
| Exhibit G | Form of New CCOH Certificate of Incorporation |
| Exhibit H | Form of New CCOH Bylaws |

## SETTLEMENT AND SEPARATION AGREEMENT

This SETTLEMENT AND SEPARATION AGREEMENT, made and entered into as of [●], 20[●] (this "***Agreement***"), is by and among iHeartMedia, Inc., a Delaware corporation ("***IHM***"), iHeartCommunications, Inc. (f/k/a Clear Channel Communications, Inc.), a Texas corporation ("***IHC***"), Clear Channel Holdings, Inc., a Delaware corporation and a wholly-owned subsidiary of IHC ("***CCH***"), and Clear Channel Outdoor Holdings, Inc., a Delaware corporation ("***CCOH***" and, together with CCH after the Merger, "***New CCOH***", and, together with IHM, IHC, CCH, and CCOH, the "***Parties***" and each a "***Party***"). Capitalized terms used herein and not otherwise defined shall have the respective meanings assigned to them in <u>Article I</u>.

## R E C I T A L S

WHEREAS, IHC and CCOH entered into that certain Master Agreement, dated as of November 16, 2005 (as the same has been amended from time to time prior to the date hereof in accordance with its terms, the "***CCOH Master Agreement***"), which provided for the partial separation of CCOH from IHC, after which CCOH became a publicly traded company majority owned by IHC;

WHEREAS, the Parties acknowledge that the separation of the iHeart Business and the Outdoor Business was substantially completed prior to the date hereof pursuant to the CCOH Master Agreement and that except as otherwise provided in this Agreement or in any Ancillary Agreement, the iHeart Assets are currently owned by, and the iHeart Liabilities are currently the obligations of, and shall in each case be retained by, the iHeart Group;

WHEREAS, on March 14, 2018, IHM and certain of its Subsidiaries, including CCH but not including CCOH (collectively, the "***Debtors***") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***") under Case No. 18-31274 (the "***Chapter 11 Cases***");

WHEREAS, in connection with the Chapter 11 Cases, on April 28, 2018, the Debtors filed a plan of reorganization (as amended through the date hereof, and as may be amended from time to time following the date hereof, the "***Plan of Reorganization***"), which contemplates, among other things, that IHC will transfer its CCH common stock to certain IHM creditors upon the effectiveness of the Plan of Reorganization, after which CCH will be an independent publicly traded company in which IHC no longer holds any equity interest;

WHEREAS, in connection with the consummation of the Separation (as defined herein), the Parties desire to enter into, or cause to be entered into, the Ancillary Agreements (as defined herein); and

WHEREAS, the Board of Directors of IHM, the Board of Directors of IHC, the Board of Directors of CCOH (the "***CCOH Board***"), and the special committee of CCOH independent directors as established by the CCOH Board on January 23, 2018 (the "***CCOH Special Committee***") each have determined that it is appropriate and desirable that the Parties take the respective actions described herein in furtherance of the Separation, and the Parties have set forth herein the principal actions required to effect the Separation and certain agreements that will

govern aspects of the relationship of the iHeart Group and the Outdoor Group following the Separation.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I
# DEFINITIONS

**Section 1.1** <u>**Definitions**</u>.  For the purpose of this Agreement, the following terms shall have the following meanings:

"*Action*" means any demand, action, claim, dispute, suit, arbitration, inquiry, investigation or other proceeding of any nature by or before any Governmental Authority.

"*Affiliate*" means, when used with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.  For the purpose of this definition, "*control*" (including with correlative meanings, "*controlled by*" and "*under common control with*") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or other interests, by contract, or otherwise; <u>provided</u> that it is expressly agreed that, from and after the Closing Date and for purposes of this Agreement and the Ancillary Agreements, no member of the Outdoor Group, on the one hand, and no member of the iHeart Group, on the other hand, shall be deemed to be an Affiliate of any member of the other Group.

"*Agreement*" shall have the meaning set forth in the Preamble.

"*Allowed Prepetition Claim Amount*" means $1,031,721,306.

"*Amended EBIT Program Agreement*" shall have the meaning set forth in <u>Section 2.7(f)</u>.

"*Ancillary Agreements*" means the New Tax Matters Agreement, the Transition Services Agreement, the Amended EBIT Program Agreement, the Merger Agreement, the New CCOH Certificate of Incorporation, New CCOH Bylaws the Revolving Loan Agreement and the Transfer Documents.

"*Approvals*" means the Governmental Approvals and any other notices, reports or other filings to be made, or any other consents, registrations, approvals, permits or authorizations to be obtained from, any other Third Party, in each case in connection with the Transactions.

"*Assets*" means, with respect to any Person, the assets, properties and rights (including goodwill) of such Person, wherever located (including in the possession of vendors or other Third Parties or elsewhere), whether real, personal or mixed, tangible, intangible or contingent, in each case whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of such Person, including the following:

(a)     all interests in any capital stock, equity interests or capital or profit interests of any Subsidiary or any other Person, all bonds, notes, debentures or other securities issued by any Subsidiary or any other Person, all loans, advances or other extensions of credit or capital contributions to any Subsidiary or any other Person and all other investments in securities of any Person;

(b)     all apparatus, computers and other electronic data processing equipment, fixtures, machinery, equipment, furniture, office equipment, automobiles, trucks, vessels, motor vehicles and other transportation equipment and other tangible personal property;

(c)     all interests in real property of whatever nature, including easements, whether as owner, mortgagee or holder of a security interest in real property, lessor, sublessor, lessee, sublessee or otherwise;

(d)     all accounting and other books, records and files, regardless of form or format;

(e)     all license agreements, leases of personal property, open purchase orders for supplies, parts or services;

(f)     all written technical information, data, specifications, research and development information, engineering drawings, operating and maintenance manuals, and materials and analyses prepared by consultants and other Third Parties;

(g)     all Intellectual Property and Software;

(h)     all cost information, sales and pricing data, customer prospect lists, supplier records, customer and supplier lists, customer and vendor data, correspondence and lists, product literature, artwork, design, formulations and specifications, quality records and reports and other books, records, studies, surveys, reports, plans and documents;

(i)     all prepaid expenses, trade accounts and other accounts and notes receivables;

(j)     all rights under contracts or agreements, all claims or rights against any Person arising from the ownership of any Asset, all rights in connection with any bids or offers and all claims, choses in action or similar rights, whether accrued or contingent;

(k)     all rights under Insurance Policies and all rights in the nature of insurance, indemnification or contribution;

(l)     all licenses, permits, approvals and authorizations which have been issued by any Governmental Authority;

(m)     cash or cash equivalents, bank accounts, lock boxes and other deposit arrangements; and

(n)    interest rate, currency, commodity or other swap, collar, cap or other hedging or similar agreements or arrangements.

"***Assumed Actions***" means those Actions, whenever commenced, primarily relating to the Outdoor Business, including those in which any member of the iHeart Group is a party.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Business***" means, (a) with respect to the iHeart Group, the iHeart Business, and (b) with respect to the Outdoor Group, the Outdoor Business.

"***Business Day***" means any day, other than a Saturday or Sunday or a day on which banks are required or authorized by law to close in New York City, New York.

"***CCH***" shall have the meaning set forth in the Preamble.

 "***CCOH***" shall have the meaning set forth in the Preamble.

"***CCOH Board***" shall have the meaning set forth in the Recitals.

"***CCOH Corporate Services Agreement***" means the Corporate Services Agreement between iHeartMedia Management Services, Inc. (formerly, Clear Channel Management Services, L.P.) (a member of the iHeart Group) and CCOH, dated as of November 10, 2005, as the same has been amended from time to time prior to the date hereof in accordance with its terms.

"***CCOH Employee Matters Agreement***" means the Employee Matters Agreement between IHC and CCOH, dated as of November 10, 2005, as the same has been amended from time to time prior to the date hereof in accordance with its terms.

"***CCOH License Agreement***" means the Amended and Restated License Agreement between iHM Identity, Inc. (formerly, Clear Channel Identity, L.P.) (a member of the iHeart Group) and Outdoor Management Services, Inc. (an Affiliate of CCOH), dated as of November 10, 2005, as amended by that certain First Amendment dated as of January 1, 2011, and as the same has been amended from time to time prior to the date hereof in accordance with its terms.

"***CCOH Master Agreement***" shall have the meaning set forth in the Recitals.

"***CCOH Note***" means that certain revolving promissory note, dated as of November 10, 2005, payable by CCOH to IHC, in the original principal amount of $1,000,000,000, as amended through the date hereof.

"***CCOH Special Committee***" shall have the meaning set forth in the Recitals.

"***CCOH Tax Matters Agreement***" means the Tax Matters Agreement between IHC and CCOH, dated as of November 10, 2005, as the same has been amended from time to time prior to the date hereof in accordance with its terms.

"***Change of Control***" means the occurrence of any of the following events:

(a)      sale or disposition, in one or a series of related transactions, of all or substantially all, of the assets of either IHM, IHC or CCOH, as applicable, to any "person" or "group" (as such terms are defined in Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act); or

(b)      any person or group is or becomes the beneficial owner, directly or indirectly, of more than 50% of the total equity securities of either IHM, IHC or CCOH, as applicable (or any entity which controls IHM, IHC or CCOH, as applicable, or which is a successor to all or substantially all of the assets of IHM, IHC or CCOH, as applicable), including by way of merger, recapitalization, reorganization, redemption, issuance of equity securities, consolidation, tender or exchange offer or otherwise; or

(c)      a merger of either IHM, IHC or CCOH, as applicable, with or into another Person in which the securityholders immediately prior to such merger cease to hold at least 50% of the equity securities (or the common stock of the surviving corporation or ultimate parent) immediately following such merger.

"***Closing***" shall have the meaning set forth in <u>Section 4.1</u>.

"***Closing Date***" shall have the meaning set forth in <u>Section 4.1</u>.

"***COC Costs***" shall have the meaning set forth in <u>Section 2.10(a)</u>.

"***CoC Trigger***" shall have the meaning set forth in the definition of Revenue Producing Contract.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Confidential Information***" means, with respect to a Group: (a) any proprietary information that is competitively sensitive or otherwise of value to the members of such Group and not generally known to the public, including product planning information, marketing strategies, financial information, information regarding operations, consumer and/or customer relationships, consumer and/or customer profiles, sales estimates, business plans, and internal performance results relating to the past, present or future business activities of the members of such Group and the consumers, customers, clients and suppliers of the members of such Group; (b) any proprietary scientific or technical information, design, invention, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords any member of such Group a competitive advantage over their competitors; and (c) all confidential or proprietary concepts, documentation, reports, data, specifications, Software, source code, object code, flow charts, databases, inventions, information, and Trade Secrets, in each case, related primarily to such Group's Business.

"***Confirmation Order***" shall have the meaning set forth in <u>Section 4.2(b)(iii)</u>.

"***Copyrights***" means any copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, whether or not registered, and all registrations and

5

applications for registration of any of the foregoing, and all rights in and to any of the foregoing provided by international treaties or conventions.

"***Deductible***" shall have the meaning set forth in Section 2.10(a).

"***Delayed Transfer Employee***" shall have the meaning set forth in Section 2.16(a).

"***Domain Names***" means any Internet domain names, URLs, social media accounts, and registrations and passwords in respect thereof.

"***EBIT Program Agreement***" means that certain EBIT Program Agreement, dated as of November 10, 2005, by and between IHM and CCOH, as amended by that certain Amendment to EBIT Program Agreement, dated as of September 18, 2012, as the same has been amended from time to time prior to the date hereof in accordance with its terms.

"***Effective Date***" shall mean the effective date of the Plan of Reorganization as set forth therein.

"***Eligible Costs***" means: (i) the aggregate amount of profits[1] that, but for its termination, amendment or other modification as a direct result of a CoC Trigger, the Outdoor Group would have actually generated under a Revenue Producing Contract following such termination, amendment or other modification through the earlier of (A) the remaining term (without any extensions) of such Revenue Producing Contract (without taking into account any extension, amendment, termination or other modification to the term thereof as a result of the CoC Trigger) and (B) three (3) years following the Closing Date (taking into account all relevant facts and circumstances, including any alternative profits generated from the same counterparty to such Revenue Producing Contract (or any of its affiliates) during such period); or (ii) the aggregate amount of any one-time COC Costs incurred pursuant to Section 2.6(a), Section 2.6(b), Section 2.6(c) or Section 2.9 with respect to a Revenue Producing Contract within twelve (12) months following the Closing Date; provided that Eligible Costs shall expressly exclude any costs and expenses under any Outdoor Group Plan and any liabilities relating to or arising out of any member of the Outdoor Group's listing on the Hong Kong Stock Exchange.

"***Eligible Costs Statement***" shall have the meaning set forth in Section 2.10(b).

"***Emergence Conditions***" means the conditions precedent to the effectiveness of the Plan of Reorganization as set forth therein.

"***Employee Transfer Date***" shall have the meaning set forth in Section 2.16(a).

"***Environmental Law***" means any Law relating to pollution, the protection or restoration of, or prevention of harm to, the environment or natural resources, including the use, handling, transportation, treatment, storage, disposal or Release of Hazardous Materials, or public or worker health or safety.

---

[1]     Note to Draft: Parties to discuss if a more specific definition is needed.  Discuss including definition of "Profits" tied to OIBDAN.

6

"*Environmental Liabilities*" means all Liabilities relating to, arising out of or resulting from (i) the use, handling, transportation, treatment, storage, disposal, Release or discharge of, or any human exposure to, any Hazardous Materials, (ii) Environmental Law, or (iii) contract or agreement relating to such matters (including related removal, remediation or cleanup costs, investigatory costs, response costs, natural resources damages, property damages, personal injury damages, and costs of compliance and indemnity, contribution or similar obligations, as well as any Liabilities imposed as part of any settlement, judgment or other determination of Liability) and all costs and expenses, interest, fines, penalties or other monetary sanctions in connection therewith.

"*Excluded Actions*" means those Actions, whenever commenced, primarily relating to the iHeart Business, including those in which any member of the Outdoor Group is a party.

"*Excluded Assets*" means, with respect to any Person:

(a)     cash, cash equivalents and short and long term investments;

(b)     all deposits, letters of credit and performance and surety bonds;

(c)     the rights and benefits of such Person under this Agreement or any Ancillary Agreement;

(d)     except as provided in <u>Section 2.16</u>, the sponsorship of and all Assets of each employee benefit plan of such Person; and

(e)     [●].[2] [3]

"*Exploit*" means, with respect to any Software, to use, modify, enhance, make derivative works from, perform, copy and distribute the Software, or any derivative thereof.

"*GAAP*" means the accounting principles generally accepted in the United States, consistently applied.

"*Governmental Approvals*" means any notices, reports or other filings to be made, or any consents, registrations, approvals, permits or authorizations to be obtained from, any Governmental Authority.

"*Governmental Authority*" means any multinational, foreign, federal, state, local or other governmental statutory or administrative authority, regulatory body or commission or any court, tribunal or judicial or arbitral authority which has any jurisdiction or control over any member of either Group.

---

[2]     <u>Note to Draft</u>: Subject to ongoing diligence.

[3]     <u>Note to Draft</u>: Parties to discuss Excluded Asset treatment for commingled books and records that are stored at an offsite Iron Mountain repository and their respective rights and responsibilities with respect to these records and required modifications to Article 6 to address these records.

"***Group***" means either the iHeart Group or the Outdoor Group, as the context requires.

"***Guarantee Release***" means the release of CCH from its guarantees of all of IHC's prepetition indebtedness and its guarantee of the IHC debtor-in-possession credit facility.

"***Hazardous Materials***" means any chemical, material, substance, waste, pollutant, emission, discharge, Release or contaminant for which liability or standards of conduct may be imposed under, or that is prohibited, limited or regulated by or pursuant to, any Environmental Law, and any natural or artificial substance (whether solid, liquid or gas, noise, ion, vapor or electromagnetic) that could cause harm to human health or the environment, including petroleum, petroleum products and byproducts, asbestos and asbestos-containing materials, urea formaldehyde foam insulation, electronic, medical or infectious wastes, polychlorinated biphenyls, radon gas, radioactive substances, chlorofluorocarbons and all other ozone-depleting substances.

"***IHC***" shall have the meaning set forth in the Preamble.

"***iHeart 401(k) Plan***" shall have the meaning set forth in Section 2.16(c).

"***iHeart Assets***" means the following Assets of any member of either Group, other than Outdoor Assets:

(a)     all issued and outstanding equity interests held by IHM or its Subsidiaries in any entity that is not a member of the Outdoor Group;

(b)     the IHM Intellectual Property and IHM Software;

(c)     all rights and benefits of any member of the iHeart Group under this Agreement or any Ancillary Agreement;

(d)     the equity securities of Radio Newco and all of its Subsidiaries;

(e)     the Assets listed on Schedule 1.1A;

(f)     the sponsorship of and all Assets of each iHeart Plan;

(g)     all Assets owned by any member of either Group as of the date hereof that are primarily related to or primarily used or held for use in connection with the iHeart Business;

(h)     all Assets owned by any member of the iHeart Group as of the date hereof that relate to or are used or held for use in the iHeart Business;

(i)     except as provided in Section 2.16, all Assets owned by any member of either Group to the extent reflected as being assets of the iHeart Group in the most recently publicly-filed financial statements of IHM; and

(j)     Assets not used primarily in the Outdoor Business, including any and all Assets that are expressly contemplated by this Agreement, the Restructuring Transactions Memorandum or any Ancillary Agreement as either Assets to be

8

retained by IHM or any other member of the iHeart Group or Assets that are to be transferred by CCH or any member of the Outdoor Group to iHeart or a designated member of the iHeart Group, including Assets primarily related to the Radio Business.

"*iHeart Business*" means the business currently conducted and currently contemplated to be conducted by any member of the iHeart Group after giving effect to the transactions contemplated by the Restructuring Transactions Memorandum, including, for the avoidance of doubt, the Radio Business.

"*iHeart Competing Business*" means, to the extent competitive with the iHeart Business as of the Closing Date, (i) engaging in broadcast radio, streaming or digital audio content, including podcasting, smart audio analytics, program syndication, entertainment, traffic and weather data distribution and music research services, (ii) selling, leasing or licensing advertising opportunities on any of the platforms listed in the foregoing clause (i) and (iii) curating, promoting, producing and televising nationally recognized live and taped music and audio related events.  Notwithstanding the foregoing, engaging in traffic and weather data distribution or advertising, incorporating sound or music into one-off three dimensional advertising builds or promoting events or entertainment in a manner and to the extent consistent with the existing Outdoor Business shall not be deemed to be an iHeart Competing Business.

"*iHeart Group*" means IHM, each Subsidiary of IHM immediately after giving effect to the transactions contemplated by the Restructuring Transactions Memorandum (including, for the avoidance of doubt, Radio Newco and its Subsidiaries) and each Affiliate of IHM after giving effect to the transactions contemplated by the Restructuring Transactions Memorandum (in each case other than any member of the Outdoor Group).

"*iHeart Liabilities*" means (without duplication) all Liabilities, whether arising before, on or after the Closing Date, to the extent relating to, arising out of or resulting from the operation or ownership of the iHeart Business and the iHeart Assets (and not the Outdoor Business and Outdoor Assets), including:

(a)     the Liabilities listed on <u>Schedule 1.1B</u> and any and all other Liabilities that are expressly contemplated by this Agreement or any Ancillary Agreement as Liabilities to be retained or assumed by IHM or any other member of the iHeart Group, including all Liabilities arising in connection with Excluded Actions;

(b)     all agreements and obligations of any member of the iHeart Group under this Agreement or any of the Ancillary Agreements;

(c)     all Liabilities under any "bulk sale" or "bulk transfer" Laws of any jurisdiction that may be applicable with respect to the transfer or sale of any or all of the iHeart Assets to any member of the iHeart Group;

(d)     any and all Liabilities to the extent relating to, arising out of or resulting from any iHeart Assets (other than Liabilities arising under any Shared Contracts to the

9

extent such Liabilities relate to the Outdoor Business, subject to <u>Section 2.9</u>), in any such case, whether arising before, on or after the Closing Date;

(e)     all Liabilities (other than Outdoor Liabilities) as of the applicable Employee Transfer Date relating to the employment or termination of employment with any member of the iHeart Group of any Transferred Employee; and[4]

(f)     any Environmental Liabilities to the extent relating to, arising out of or resulting from the operation or ownership of the iHeart Business, as conducted at any time (including any Liability to the extent relating to, arising out of or resulting from any act or failure to act by any member of the iHeart Group or any of their directors, officers, employees, agents or representatives), <u>provided</u> that to the extent any Environmental Liabilities relate to any facility that is shared by the Outdoor Business and the iHeart Business, the allocation of such Environmental Liabilities between the iHeart Group and the Outdoor Group will reflect the allocation of costs that had been allocated between the iHeart Group and the Outdoor Group on each Group's respective books and records with respect to the applicable facility at the time such Environmental Liability occurred, other than any such Environmental Liabilities relating to or arising out of the iHeart Group's gross negligence or willful misconduct (which shall be borne by the iHeart Group to the extent such Environmental Liabilities arise from such gross negligence or willful misconduct).

"***iHeart Name and iHeart Marks***" means the names, marks, trade dress, logos, monograms, Domain Names and other source or business identifiers of any member of either Group using or containing "iHeart" (in block letters or otherwise), "iHeart" either alone or in combination with other words or elements, and all names, Marks, trade dress, logos, monograms, Domain Names and other source or business identifiers confusingly similar to or embodying any of the foregoing either alone or in combination with other words or elements, together with the goodwill associated with any of the foregoing.

"***iHeart NQDC Plan***" shall have the meaning set forth in <u>Section 2.16(e)</u>.

"***iHeart Note***" means that certain revolving promissory note, dated as of November 10, 2005, payable by IHC to CCOH, in the original principal amount of $1,000,000,000, as amended through the date hereof.

"***iHeart Plan***" means any benefit or compensation plan, program, policy, agreement or arrangement sponsored, maintained, contributed to, or required to be contributed to by any member of the iHeart Group, other than any Outdoor Group Plan.

"***iHeart Territory***" means each and every country, province, state, city, or other political subdivision of the world in which any member of the iHeart Group conducts the iHeart Business as of the Closing.

---

[4]     <u>Note to Draft</u>: Subject to continuing review.

"*IHM*" shall have the meaning set forth in the Preamble.

"*IHM Accounts*" shall have the meaning set forth in <u>Section 2.11(a)</u>.

"*IHM Indemnitees*" shall have the meaning set forth in <u>Section 5.2</u>.

"*IHM Intellectual Property*" means (a) the iHeart Name and iHeart Marks, and (b) all other Intellectual Property (excluding Outdoor Intellectual Property) that, as of the Closing Date, is owned or purported to be owned by or licensed by a Third Party to any member of either Group.

"*IHM Software*" means all Software that, as of the Closing Date, is owned or purported to be owned by or licensed by a Third Party to any member of either Group, other than the Outdoor Software.

"*Indemnifying Party*" shall have the meaning set forth in <u>Section 5.4(a)</u>.

"*Indemnitee*" shall have the meaning set forth in <u>Section 5.4(a)</u>.

"*Indemnity Payment*" shall have the meaning set forth in <u>Section 5.4(a)</u>.

"*Insurance Policy*" means any insurance policy or other contract of insurance.

"*Insurance Proceeds*" means those monies (a) received by an insured from an insurance carrier or (b) paid by an insurance carrier on behalf of the insured, in any such case net of any applicable premium adjustments (including reserves and retrospective premium adjustments) and net of any costs or expenses incurred by such insured in the collection thereof.

"*Intellectual Property*" means all of the following whether arising under the Laws of the United States or of any other foreign or multinational jurisdiction: (a) Patents; (b) Marks; (c) Domain Names; (d) Copyrights; (e) Trade Secrets and rights in respect thereof; and (f) any other intellectual property rights arising from or in respect of any technology or Software.

"*Intercompany Accounts*" means, other than the Intercompany Notes, the aggregate amount owed by any member of the iHeart Group to the Outdoor Group, or the aggregate amount owed by any member of the Outdoor Group to the iHeart Group, in each case, in respect of the CCOH Corporate Services Agreement or the CCOH License Agreement.

"*Intercompany Notes*" means the iHeart Note and CCOH Note.

"*Law*" means any federal, state, provincial, local or foreign law (statutory, common or otherwise), constitution, convention, code, ordinance, rule, regulation, treaty (including any income tax treaty), Order, license, permit, authorization, Approval, consent or other requirement, in each case, enacted, promulgated, issued or entered by a Governmental Authority.

"*Liabilities*" means any and all debts, liabilities, guarantees, assurances, commitments, Losses and obligations, whether fixed, absolute or contingent, matured or unmatured, accrued or not accrued, asserted or unasserted, liquidated or unliquidated, foreseen or unforeseen, known or

unknown, reserved or unreserved, or determined or determinable, whenever or however arising and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto, including those debts, liabilities, guarantees, assurances, commitments, Losses and obligations arising under any Law, Action, Order, contract (including this Agreement), agreement or undertaking.

"*Licensed IHM IP*" means all IHM Intellectual Property (other than the iHeart Name and iHeart Marks) that as of the date hereof is used or held for use in the conduct or operation of the Outdoor Business and that does not constitute Outdoor Intellectual Property; provided, however, that Licensed IHM IP shall not include any Intellectual Property licensed by a Third Party to any member of either Group to the extent sublicensing pursuant to the applicable agreement with the applicable Third Party (i) is not permitted without an Approval or (ii) would result in a loss of any rights under the applicable agreement with such Third Party.

"*Licensed IHM Software*" means all IHM Software that as of the date hereof is used or held for use in the conduct or operation of the Outdoor Business and that does not constitute Outdoor Software; provided, however, that Licensed IHM Software shall not include any Software licensed by a Third Party to any member of either Group to the extent sublicensing pursuant to the applicable agreement with the applicable Third Party (i) is not permitted without an Approval or (ii) would result in a loss of any rights under the applicable agreement with such Third Party.

"*Licensed Outdoor IP*" means all Outdoor Intellectual Property (other than the Outdoor Name and Marks) that as of the date hereof is used or held for use in the conduct or operation of the iHeart Business and that does not constitute IHM Intellectual Property; provided, however, that Licensed Outdoor IP shall not include any Intellectual Property licensed by a Third Party to any member of either Group to the extent sublicensing pursuant to the applicable agreement with the applicable Third Party (i) is not permitted without an Approval or (ii) would result in a loss of any rights under the applicable agreement with such Third Party.

"*Licensed Outdoor Software*" means all Outdoor Software that as of the date hereof is used or held for use in the conduct or operation of the iHeart Business and that does not constitute IHM Software; provided, however, that Licensed Outdoor Software shall not include any Software licensed by a Third Party to any member of either Group to the extent sublicensing pursuant to the applicable agreement with the applicable Third Party (i) is not permitted without an Approval or (ii) would result in a loss of any rights under the applicable agreement with such Third Party.

"*linked*" shall have the meaning set forth in Section 2.11(a).

"*Losses*" means any and all out-of-pocket costs, damages, losses, fines, penalties, Liabilities and expenses incurred or suffered by a Person.

"*Marks*" means any trademarks, service marks, trade names, service names, trade dress, logos and other source or business identifiers, including all goodwill associated with any of the foregoing and any and all common law rights in and to any of the foregoing, registrations and applications for registration of any of the foregoing, all rights in and to any of the foregoing

12

provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

"*Merger*" shall have the meaning set forth in Section 2.3.

"*Merger Agreement*" shall have the meaning set forth in Section 2.3.

"*New CCOH*" shall have the meaning set forth in the Preamble.

"*New CCOH Bylaws*" shall have the meaning set forth in Section 2.7(h).

"*New CCOH Certificate of Incorporation*" shall have the meaning set forth in Section 2.7(h).

"*New Tax Matters Agreement*" shall have the meaning set forth in Section 2.7(c).

"*Non-Compete Period*" means the period beginning on the Closing Date and ending on the earlier of (i) two (2) year following the Closing Date, (ii) the last day on which services are provided under the Transition Services Agreement and (iii) the consummation of a Change of Control of either IHM or New CCOH (regardless to whom the Non-Compete Period applies); provided, that if the consummation of a Change of Control of IHM or New CCOH occurs within the first year following the Closing Date, then the Non-Compete Period shall end on the one (1) year anniversary of the Closing Date.

"*NYSE*" means The New York Stock Exchange.

"*Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"*Outdoor 401(k) Plan*" shall have the meaning set forth in Section 2.16(c).

"*Outdoor Accounts*" shall have the meaning set forth in Section 2.11(a).

"*Outdoor Assets*" means (without duplication):

(a)     all Assets (other than Intellectual Property or rights therein) owned by any member of either Group as of the date hereof that are primarily related to or primarily used or held for use in connection with the Outdoor Business, other than Assets primarily related to the Radio Business and those Assets set forth on Schedule 1.1C;

(b)     all Assets owned by any member of the Outdoor Group as of the date hereof that relate to or are used or held for use in the Outdoor Business, other than those Assets set forth on Schedule 1.1C;[5]

---

[5]     Note to Draft: Subject to further review and comment finalization of the Schedules.

(c)    all Assets owned by any member of either Group to the extent reflected as being assets of the Outdoor Group in the most recently publicly-filed financial statements of CCOH;

(d)    the Outdoor Intellectual Property and Outdoor Software;

(e)    all rights and benefits of any member of the Outdoor Group under this Agreement or any Ancillary Agreement;

(f)    the Assets listed on Schedule 1.1D;[6] and

(g)    the sponsorship of and the assets maintained pursuant to or in connection with the Outdoor Group Plans.

"***Outdoor Business***" means the business currently conducted and currently contemplated to be conducted by any member of the Outdoor Group, after giving effect to the transactions contemplated by the Restructuring Transactions Memorandum.

"***Outdoor Business Employee***" shall have the meaning set forth in Section 2.16(a).

"***Outdoor Competing Business***" means, to the extent competitive with the Outdoor Business as of the Closing Date, (i) engaging in the ownership, leasing, management, commercialization or other operation or licensing of billboards, street furniture displays, airport or other transit displays and other out of home media visual displays and (ii) selling, leasing or licensing advertising opportunities on any of the platforms listed in the foregoing clause.

"***Outdoor Employee***" shall have the meaning set forth in Section 2.16(b).

"***Outdoor Group***" means New CCOH and each Subsidiary of New CCOH (excluding, for the avoidance of doubt, any member of the iHeart Group) after giving effect to the transactions contemplated by the Restructuring Transactions Memorandum.

"***Outdoor Group Plan***" means any benefit or compensation plan, program, policy, agreement or arrangement listed on Schedule 1.1E.[7]

"***Outdoor Indemnitees***" shall have the meaning set forth in Section 5.3.

"***Outdoor Intellectual Property***" means (i) all of the Intellectual Property owned or purported to be owned by, licensed by a Third Party to or otherwise used or held for use by any member of either Group as of the date hereof that is primarily related to or primarily used or held for use by in the conduct or operation of the Outdoor Business and (ii) the Outdoor Transferred Intellectual Property.

---

[6]   Note to Draft:  To include Insurance Policies that need to be transferred to the Outdoor Group.

[7]   Note to Draft:  To include the Outdoor 401(k) Plan.

"*Outdoor Liabilities*" means (without duplication) the following Liabilities, whether arising before, on or after the Closing Date:

(a)     Liabilities to the extent relating to, arising out of or resulting primarily from the operation or ownership of the Outdoor Business;

(b)     any Environmental Liabilities to the extent relating to, arising out of or resulting from the operation or ownership of the Outdoor Business, as conducted at any time (including any Liability to the extent relating to, arising out of or resulting from any act or failure to act by any member of the Outdoor Group or any of their directors, officers, employees, agents or representatives), <u>provided</u> that to the extent any Environmental Liabilities relate to any facility that is shared by the Outdoor Business and the iHeart Business, the allocation of such Environmental Liabilities between the iHeart Group and the Outdoor Group will reflect the allocation of costs that had been allocated between the iHeart Group and the Outdoor Group on each Group's respective books and records with respect to the applicable facility at the time such Environmental Liability occurred, other than any such Environmental Liabilities relating to or arising out of the Outdoor Group's gross negligence or willful misconduct (which shall be borne by the Outdoor Group to the extent such Environmental Liabilities arise from such gross negligence or willful misconduct);

(c)     the Liabilities listed on <u>Schedule 1.1F</u> and any and all other Liabilities that are expressly contemplated by this Agreement or any Ancillary Agreement as Liabilities to be retained or assumed by any member of the Outdoor Group, including all Liabilities arising in connection with the Assumed Actions;

(d)     all agreements and obligations of any member of the Outdoor Group under this Agreement or any of the Ancillary Agreements;

(e)     any and all Liabilities to the extent relating to, arising out of or resulting from any Outdoor Assets (other than Liabilities arising under any Shared Contracts to the extent such Liabilities relate to the iHeart Business, subject to <u>Section 2.9</u>), in any such case, whether arising before, on or after the Closing Date;

(f)     all Liabilities under any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may be applicable with respect to the transfer or sale of any or all of the Outdoor Assets to any member of the Outdoor Group;

(g)     all Liabilities relating to all accrued but unused paid time off credited to any Transferred Employee as of his or her Employee Transfer Date, except any such liability that would result in a duplication of charges under the CCOH Corporate Services Agreement; and[8]

---

[8]     <u>Note to Draft</u>: Subject to continuing review.

(h)      the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with any Outdoor Group Plan.

"***Outdoor Name and Marks***" means the Marks set forth on <u>Schedule 1.1G</u>, together with the goodwill associated with any of the foregoing.

"***Outdoor NQDC Plan***" shall have the meaning set forth in <u>Section 2.16(e)</u>.

"***Outdoor Software***" means (i) all Software owned or purported to be owned by, licensed by a Third Party to, or otherwise used or held for use by any member of either Group as of the date hereof that is primarily related to or primarily used or held for use in the conduct or operation of the Outdoor Business and (ii) the Outdoor Transferred Software.

"***Outdoor Territory***" means each and every country, province, state, city, or other political subdivision of the world in which any member of the Outdoor Group conducts the Outdoor Competing Business as of the Closing Date.

"***Outdoor Transferred Intellectual Property***" means (i) the Intellectual Property described on <u>Schedule 1.1H</u> and (ii) the Outdoor Name and Marks.

"***Outdoor Transferred Software***" means the Software set forth on <u>Schedule 1.1I</u>.

"***Party***" shall have the meaning set forth in the Preamble.

"***Patents***" means any patents, patent applications (including patents issued thereon) and statutory invention registrations, including reissues, divisions, continuations, continuations in part, substitutions, renewals, extensions and reexaminations of any of the foregoing, and all rights in any of the foregoing provided by international treaties or conventions;

"***Person***" means an individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability entity, any other entity and any Governmental Authority.

"***Plan of Reorganization***" shall have the meaning set forth in the Recitals.

"***Pre-Closing Claims***" means any and all Actions and Liabilities whatsoever, whether at Law or in equity (including any right of contribution or any right pursuant to any Environmental Law), whether arising under any contract or agreement, by operation of law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed in each case on or before the Closing, including with respect to the transactions contemplated by the Restructuring Transactions Memorandum and any Taxes arising therefrom (except as expressly set forth in the Restructuring Transactions Memorandum or any other Ancillary Agreement), but other than claims for breach of this Agreement or any Ancillary Agreement.

"***Privilege***" and "***Privileges***" mean, individually or collectively, as applicable, the attorney-client privilege, the work product doctrine, the common interest privilege and any other

basis on which any member of either Group would be entitled to assert or have a privilege, immunity or protection.

"***Privileged Information***" means any document or information, regardless of form or format, as to which any member of either Group would be entitled to assert or have a Privilege, including any communications by or to attorneys, memoranda and other materials prepared by attorneys or under their direction.

"***Radio Business***" means the broadcast radio, digital online and mobile platforms and products, program syndication, entertainment, traffic and weather data distribution and music research services businesses of IHM and its Subsidiaries as of the date hereof and as of immediately prior to the Closing.

"***Radio Newco***" means any entity formed in connection with the Restructuring Transactions Memorandum for the purpose of owning the Radio Business.

"***Release***" means any release, spill, emission, discharge, leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the environment (including ambient air, surface water, groundwater and surface or subsurface strata).

"***Representatives***" means, with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants, attorneys or other representatives.

"***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of March 16, 2018, by and among the Company Parties, the Consenting Creditors and the Consenting Sponsors (in each case, as defined therein).

"***Restructuring Transactions Memorandum***" means the memorandum attached as Exhibit A setting forth the restructuring steps to be taken prior to the Closing Date and the sequence thereof.

"***Revenue Producing Contract***" means any legally binding contract or agreement under which the Outdoor Groups generates revenue with respect to which the execution, delivery or performance of this Agreement, including the consummation of the Separation or any of the other Transactions, in each case, with or without notice or lapse of time or both: (x) would constitute or result in a default, breach or violation thereof; (y) would give rise to the right to modify, terminate or accelerate or cause the modification, termination or acceleration of, any right (including any right to payment or termination) or obligation thereunder; or (z) would require any authorization, consent, approval, exemption or other action by or notice, or filing with, any Person (collectively, a "***CoC Trigger***"), and which contract or agreement is terminated, amended or otherwise modified within twelve (12) months following the Closing Date as a direct result of such CoC Trigger (and for which there would be no right to terminate, amend or otherwise modify but for such CoC Trigger).

"***Revolving Loan Agreement***" shall have the meaning set forth in Section 2.7(g).

"*Separation*" means the transfer of the capital stock of New CCOH to be owned by IHC following the consummation of the Merger pursuant to the Merger Agreement to the [Term Loan Lenders and PGN Holders (each as defined in the Plan of Reorganization)] pursuant to and in accordance with the Plan of Reorganization, together with all steps, actions and transactions contemplated by the Restructuring Transactions Memorandum involving any member of the Outdoor Group.

"*Shared Contract*" means any contract or agreement listed on <u>Schedule 1.1J</u>.

"*Software*" means any and all: (a) computer programs, including any and all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form; (b) databases and compilations, including any and all data and collections of data, whether machine-readable or otherwise; (c) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons; and (d) documentation, including user manuals and other training documentation, relating to any of the foregoing.

"*Subsidiary*" means, with respect to any Person, any other legal entity of which such Person either directly or indirectly: (a) beneficially owns more than 50% of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests or (iii) the capital or profit interests; or (b) otherwise has the power to vote sufficient securities to elect a majority of the board of directors or similar governing body.

"*Surety Bonds*" means those certain surety bonds listed on <u>Schedule 1.1K</u>.[9]

"*Tax Benefit*" means any decrease in Tax payments actually required to be made to a Governmental Authority (or any increase in any refund otherwise receivable from any Governmental Authority), including any decrease in Tax payments (or increase in any refund) that actually results from an increase in Tax attributes.

"*Tax Return*" shall have the meaning set forth in the form of the New Tax Matters Agreement.

"*Taxes*" shall have the meaning set forth in the form of the New Tax Matters Agreement.

"*Third Party*" means Person who is not a member of the iHeart Group or the Outdoor Group.

"*Third-Party Claim*" shall have the meaning set forth in <u>Section 5.5(a)</u>.

"*Trade Secrets*" means any confidential and proprietary information, including trade secrets.

---

[9]     <u>Note to Draft</u>. Schedule to include IHM's existing surety bonds solely related to the Outdoor Business.

"***Transactions***" shall mean the transactions contemplated under this Agreement and any Ancillary Agreement, including the Separation and Merger.

"***Transfer Documents***" means each document deemed a "Transfer Document" pursuant to Section 2.4 or Section 2.5.

"***Transferred Employee***" shall have the meaning set forth in Section 2.16(a).

"***Transition Services Agreement***" shall have the meaning set forth in the Recitals.

## ARTICLE II
## THE SEPARATION

**Section 2.1**     **Restructuring Steps**.   The Parties shall use commercially reasonable efforts to consummate all transactions contemplated by, and in the order, time and manner specified in, the Restructuring Transactions Memorandum, including as further set forth in (and in accordance with) this Agreement.[10]

**Section 2.2**     **NYSE Listing**. On or prior to the Closing Date, IHM shall use its commercially reasonable efforts to cause the shares of New CCOH common stock to be issued in the Merger and the shares of New CCOH common stock to be distributed to creditors of IHM to be listed on the NYSE or other nationally recognized exchange, subject to official notice of issuance.

**Section 2.3**     **Merger Agreement**.   Promptly after the date hereof, CCH and CCOH shall enter into an agreement and plan of merger, substantially in the form attached hereto as Exhibit B (the "***Merger Agreement***"), pursuant to which, subject to the terms and conditions thereof, CCOH shall merge with and into CCH, with CCH being the surviving corporation (the "***Merger***"). CCH and CCOH agree to timely consummate the Merger in accordance with the Merger Agreement and the Restructuring Transactions Memorandum. Any obligation hereunder of New CCOH shall be deemed an obligation of CCH and CCOH.

**Section 2.4**     **Transfer of Outdoor Assets and iHeart Assets**.

(a)     Subject to the satisfaction or waiver of each of the conditions to Closing set forth in Section 4.2, on the Closing Date, unless otherwise provided in this Agreement or in any Ancillary Agreement, in accordance with the Restructuring Transactions Memorandum and to the extent not previously effected prior to the Closing Date:

(i)     IHM and IHC shall cause each relevant member of the iHeart Group to assign, transfer, convey and deliver to IHC, and IHC shall transfer (whether on account of a contribution, in satisfaction of any claim, in exchange for other property, or otherwise, as reasonably determined by the parties and in accordance with the Plan of

---

[10]     Note to Draft: Timing of asset transfer relative to the other steps to be discussed once we have more clarity on what assets/liabilities are being moved and the entities involved. Transfers are to be completed prior to the distribution of New CCOH stock to the creditors (but TBD on whether that will be pre or post-merger).

Reorganization) to [CCH][11], and CCH shall accept, any and all direct or indirect right, title and interest in and to any Outdoor Assets owned by the iHeart Group (including, for the avoidance of doubt, any and all Outdoor Intellectual Property and any and all Outdoor Software, in each case, that are owned by a member of the iHeart Group[12]), but excluding the Excluded Assets; and

(ii)     CCH and CCOH shall, and shall cause each relevant member of the Outdoor Group to transfer (whether on account of a distribution, in satisfaction of any claim, in exchange for other property, or otherwise, as reasonably determined by the parties and in accordance with the Plan of Reorganization) to the relevant member of the iHeart Group, and such member of the iHeart Group shall accept, any and all direct or indirect right, title and interest in and to all of the iHeart Assets owned by the Outdoor Group, but excluding the Excluded Assets.

(b)     In furtherance of the consummation of the above Transactions:

(i)     IHM and IHC shall, and shall cause the relevant members of the iHeart Group to, execute and deliver such transfer agreements, bills of sale, deeds, stock powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent necessary to evidence the transfer, conveyance and assignment of all of the iHeart Group's right, title and interest in and to the Outdoor Assets to the relevant member of the Outdoor Group; and

(ii)     CCH and CCOH shall, and shall cause the relevant members of the Outdoor Group to, execute and deliver such transfer agreements, bills of sale, deeds, stock powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent necessary to evidence the transfer, conveyance and assignment of all of the Outdoor Group's right, title and interest in and to the iHeart Assets to the relevant member of the iHeart Group.

All of the documents contemplated by this Section 2.4(b) shall be deemed "***Transfer Documents***" for purposes of this Agreement.

(c)     If any Outdoor Assets have not been transferred to the appropriate member of the Outdoor Group on or prior to the Closing Date (including any Outdoor Assets owned by or in the possession of any member of the iHeart Group that are discovered after the Closing Date), after the Closing IHM shall, and shall cause such member of the iHeart Group holding such Asset to (i) hold such Outdoor Asset in trust for the use and benefit of the member of the Outdoor Group entitled thereto (at the expense of the member of the Outdoor Group entitled thereto) and the applicable members of the iHeart Group and Outdoor Group shall enter into arrangements, including subcontracting, sublicensing, subleasing, back-to-back agreement, or other similar arrangement, to convey the economic rights and obligations relating to such

---

[11]     Note to Draft: Subject to ongoing diligence.

[12]     Note to Outdoor: The terms "Outdoor Intellectual Property" and "Outdoor Software" include IP / software licensed from a third party.

Outdoor Assets to the Outdoor Group, (ii) if such Outdoor Asset is a contract with a third party, without the prior written consent of CCOH (not to be unreasonably withheld, conditioned or delayed), the iHeart Group shall not terminate (except for the expiration of such contract in accordance with its terms) or amend, modify or supplement such contract in any manner materially adverse to the Outdoor Group, and shall continue to perform the obligations under such contract with a third party in the ordinary course of business consistent with past practice, and (iii) enter into appropriate agreements or arrangements to transfer such Outdoor Asset as soon as reasonably practicable to the relevant member of the Outdoor Group, and the agreements entered into in connection therewith shall constitute Transfer Documents.

(d)     If any iHeart Assets have not been transferred to the appropriate member of the iHeart Group on or prior to the Closing Date (including any iHeart Assets owned by or in the possession of any member of the Outdoor Group that are discovered after the Closing Date), after the Closing, New CCOH shall, and shall cause such member of the Outdoor Group holding such Asset to (i) hold such iHeart Asset in trust for the use and benefit of the member of the iHeart Group entitled thereto (at the expense of the member of the iHeart Group entitled thereto) and the applicable members of the iHeart Group and Outdoor Group shall enter into arrangements, including subcontracting, sublicensing, subleasing, back-to-back agreement, or other similar arrangement, to convey the economic rights and obligations relating to such iHeart Assets to the iHeart Group, (ii) if such iHeart Asset is a contract with a third party, without the prior written consent of IHM (not to be unreasonably withheld, conditioned or delayed), the Outdoor Group shall not terminate (except for the expiration of such contract in accordance with its terms) or amend, modify or supplement such contract in any manner materially adverse to the iHeart Group, and shall continue to perform the obligations under such contract with a third party in the ordinary course of business consistent with past practice, and (iii) enter into appropriate agreements or arrangements to transfer such iHeart Asset as soon as reasonably practicable to the relevant member of the iHeart Group, and the agreements entered into in connection therewith shall constitute Transfer Documents.

(e)     CCH and CCOH hereby waive compliance by the members of the iHeart Group with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the Outdoor Assets to any member of the Outdoor Group.

(f)     IHM and IHC hereby waive compliance by each and every member of the Outdoor Group with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the iHeart Assets to any member of the iHeart Group.

**Section 2.5     <u>Assumption of Outdoor Liabilities and iHeart Liabilities.</u>**

(a)     Subject to the satisfaction or waiver of each of the conditions to Closing set forth in <u>Section 4.2</u>, on the Closing Date, unless otherwise provided in this Agreement or in any Ancillary Agreement, in accordance with the Restructuring Transactions Memorandum and the Plan of Reorganization, as applicable to the extent not previously effected prior to the Closing Date:

(i)      IHM and IHC shall cause each relevant member of the [iHeart Group][13] to, accept, assume, and agree to perform, discharge and fulfill all iHeart Liabilities; and

(ii)      CCH and CCOH shall, and shall cause each relevant member of the Outdoor Group to accept, assume, and agree to perform, discharge and fulfill all Outdoor Liabilities.

(b)      In furtherance of the consummation of the above Transactions:

(i)      IHM and IHC shall, and shall cause the other members of the iHeart Group to, execute and deliver such assumptions of contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption of such iHeart Liability by the relevant members of the iHeart Group; and

(ii)      CCH and CCOH shall, and shall cause the other members of the Outdoor Group to, execute and deliver such assumptions of contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption of such Outdoor Liability by the relevant members of the Outdoor Group.

All of the documents contemplated by this Section 2.5 shall be deemed "*Transfer Documents*" for purposes of this Agreement.

(c)      If any Outdoor Liabilities have not been assigned to the appropriate member of the Outdoor Group on or prior to the Closing Date (including any Outdoor Liabilities owned by or in the possession of any member of the iHeart Group that are discovered after the Closing Date), after the Closing (i) the member of the iHeart Group retaining such Outdoor Liabilities shall retain such Outdoor Liabilities for the account of the member of the Outdoor Group liable thereto (at the expense of the member of the Outdoor Group liable thereto) and the applicable members of the iHeart Group and Outdoor Group shall enter into arrangements, including subcontracting, sublicensing, subleasing, back-to-back agreement, or other similar arrangement, to convey the obligations relating to such Outdoor Liabilities to the Outdoor Group and (ii) CCH shall, and shall cause such member of the Outdoor Group to enter into appropriate agreements or arrangements to assume such Liabilities as soon as reasonably practicable from the relevant member of the iHeart Group, and the agreements entered into in connection therewith shall constitute Transfer Documents.

(d)      If any iHeart Liabilities have not been assigned to the appropriate member of the iHeart Group on or prior to the Closing Date (including any iHeart Liabilities owned by or in the possession of any member of the Outdoor Group that are discovered after the Closing Date), after the Closing (i) the member of the Outdoor Group retaining such iHeart Liabilities shall retain such iHeart Liabilities for the account of the member of the iHeart Group liable thereto (at the expense of the member of the iHeart Group liable thereto) and the applicable members of the iHeart Group and Outdoor Group shall enter into arrangements, including subcontracting, sublicensing, subleasing, back-to-back agreement, or other similar arrangement, to convey the obligations relating to such iHeart Liabilities to the iHeart Group and (ii) IHM

---

[13]      Note to Draft: Subject to ongoing diligence.

shall, and shall cause such member of the iHeart Group to enter into appropriate agreements or arrangements to assume such Liabilities as soon as reasonably practicable from the relevant member of the Outdoor Group, and the agreements entered into in connection therewith shall constitute Transfer Documents.

Section 2.6    **Approvals; Novation of Liabilities**.

(a)    Subject to Section 2.10(a), the Parties shall use commercially reasonable efforts to obtain, as soon as reasonably practicable and in no event later than the consummation of the applicable step in the Restructuring Transactions Memorandum, each Approval set forth on Schedule 2.6 hereto and each other Approval required to consummate such step, the transfer or assignment of any Asset (including contracts with Third Parties), assumption of any Liability contemplated by this Agreement.

(b)    In furtherance of the transactions contemplated in Section 2.4 and Section 2.5, subject to Section 2.10(a), each of IHM, on the one hand, and CCH and CCOH, on the other hand, at the request of the other, shall, if reasonably practicable, use commercially reasonable efforts   to obtain, or to cause to be obtained, any Approval required to novate or assign all obligations under agreements, leases, licenses and other Assets or Liabilities of any nature whatsoever that constitute Outdoor Assets or Outdoor Liabilities, or to obtain in writing the unconditional release of all members of the iHeart Group party to such arrangements, so that, in any such case, the members of the Outdoor Group shall be solely responsible for the Outdoor Liabilities.

(c)    In furtherance of the transactions contemplated in Section 2.4 and Section 2.5, subject to Section 2.10(a), each of IHM, on the one hand, and CCH and CCOH, on the other hand, at the request of the other, shall, if reasonably practicable, use commercially reasonable efforts to obtain, or to cause to be obtained, any Approval required to novate or assign all obligations under agreements, leases, licenses and other Assets or Liabilities of any nature whatsoever that constitute iHeart Assets or iHeart Liabilities, or to obtain in writing the unconditional release of all members of the Outdoor Group party to such arrangements, so that, in any such case, the members of the iHeart Group shall be solely responsible for the iHeart Liabilities.

(d)    If and to the extent that the valid, complete and perfected transfer or assignment of any Outdoor Assets or iHeart Assets, as applicable, or the assumption of any Outdoor Liabilities or iHeart Liabilities, as applicable, would be a violation of applicable Law or require any Approval that has not been made or obtained at or prior to the Closing, then, unless the Parties shall mutually otherwise determine, the transfer or assignment of any Outdoor Assets or iHeart Assets, as applicable, or the assumption of any Outdoor Liabilities or iHeart Liabilities, as applicable, shall be automatically deemed deferred and any such purported transfer, assignment or assumption shall be null and void until such time as all legal impediments are removed or such Approvals have been obtained or made, at which time, such Asset shall be automatically transferred and Parties will sign appropriate documentation evidencing the same. Notwithstanding the foregoing, any such Assets or Liabilities shall continue to constitute Outdoor Assets or iHeart Assets, as applicable, or Outdoor Liabilities or iHeart Liabilities, as applicable, for all other purposes of this Agreement.

**Section 2.7    Settlement of Intercompany Notes; Treatment of Intercompany Accounts and Agreements**.

(a)    Subject to the satisfaction or waiver of each of the conditions to Closing set forth in Section 4.2, on the Closing Date, in accordance with the Plan of Reorganization and the Restructuring Transactions Memorandum, the Intercompany Notes and Intercompany Accounts to the extent incurred prior to January 1, 2019 shall be settled, terminated, canceled, extinguished and be of no further force or effect and in exchange therefor, New CCOH shall receive (i) the Outdoor Name and Marks in accordance with  Section 2.4 and (ii) reimbursement of the reasonable and documented out-of-pocket costs and expenses of legal counsel and financial advisors incurred on or prior to the Closing Date of the CCOH Board or the CCOH Special Committee, in each case, to the extent incurred in connection with the Separation.

(b)    In consideration for the settlement, termination, cancellation and extinguishment of the Intercompany Notes, subject to the satisfaction or waiver of each of the conditions to Closing set forth in Section 4.2, on the Closing Date, CCOH shall receive cash in an amount equal to $148,980,556.59. CCOH, on the one hand, and IHM, on the other hand, shall on or promptly after the Closing Date pay the other any amount owed to it under the Intercompany Accounts to the extent incurred on or after January 1, 2019.

(c)    The Parties agree that, upon consummation of the Closing, each of the following shall be terminated, canceled and be of no further force or effect (including any provisions that purport to survive termination)[14]: (i) all agreements, arrangements, commitments or understandings, whether or not in writing, between or among members of the Outdoor Group, on the one hand, and members of the iHeart Group, on the other hand, relating to the sweep of the cash balance in CCOH's concentration account to IHC's master account, (ii) the CCOH Master Agreement, (iii) the CCOH Employee Matters Agreement, (iv) the CCOH Corporate Services Agreement (concurrent with the termination of the CCOH Corporate Services Agreement the Transition Services Agreement shall become effective) and (v) the CCOH License Agreement. Each Party shall, at the reasonable request of any other Party, take, or cause to be taken, such other actions as may be necessary to effect the foregoing in this Section 2.7.[15] For the avoidance of doubt, the provisions of this Section 2.7(c) shall not apply to any of the following agreements, arrangements, commitments or understandings (or to any of the provisions thereof), which shall remain in force and effect pursuant to their terms: (i) this Agreement and the Ancillary Agreements (and each other agreement or instrument expressly contemplated by this Agreement or any Ancillary Agreement to be entered into by any of the Parties or any of the members of their respective Groups); (ii) any agreements, arrangements, commitments or understandings to which any Third Party is a party; (iii) any Shared Contracts, which will be treated as set forth in Section 2.9; and (iv) any agreements, arrangements, commitments or understandings listed or described on Schedule 2.7(iv) and any other

---

[14]    Note to Draft: Subject to review of the surviving provisions under the below-listed agreements. Consider whether certain standard surviving provisions (e.g., confidentiality) should continue to survive.

[15]    Note to Draft: Termination or amendment of other agreements or arrangements between the iHeart Group and the Outdoor Group shall be mutually agreed on a case-by-case basis; to discuss if there are other agreements to be terminated.

agreements, arrangements, commitments or understandings that this Agreement or any Ancillary Agreement expressly contemplates will survive the Closing Date.

(d)     At the Closing, IHM shall enter into, and shall cause IHC and iHeartMedia Management Services, Inc., a Delaware corporation and Subsidiary of IHM, to enter into, and CCOH agrees to enter into, the Transition Services Agreement, substantially in the form attached hereto as Exhibit C, as the same may be amended from time to time in accordance with its terms (the "***Transition Services Agreement***").

(e)     The Parties agree that, upon consummation of the Closing, the CCOH Tax Matters Agreement shall be amended and restated in substantially the form attached hereto as Exhibit D, as the same may be amended from time to time in accordance with its terms (the "***New Tax Matters Agreement***").

(f)     The Parties agree that, upon the consummation of the Closing, the EBIT Program Agreement shall be amended in substantially the form attached hereto as Exhibit E, as the same may be amended from time to time in accordance with its terms (the "***Amended EBIT Program Agreement***").  The Amended EBIT Program Agreement shall provide that (i) its term shall continue for the term (including any extension) of services provided under the Transition Services Agreement, and (ii) the iHeart Group shall pay to the Outdoor Group all costs incurred by the Outdoor Group for the services provided to the iHeart Group under the Amended EBIT Program Agreement (including costs for production, installation and removal of signage advertising).[16]

(g)     At the Closing, IHC will and CCOH will cause Clear Channel Outdoor, LLC to, enter into the Revolving Loan Agreement, substantially in the form attached hereto as Exhibit F, as the same may be amended from time to time in accordance with its terms (the "***Revolving Loan Agreement***").

(h)     IHM and CCH agree to take all necessary action that may be required in accordance with the Restructuring Transactions Memorandum to provide for the adoption by New CCOH of the Amended and Restated Certificate of Incorporation of New CCOH in substantially the form attached hereto as Exhibit G (the "***New CCOH Certificate of Incorporation***") and the Amended and Restated Bylaws of New CCOH substantially in the form attached hereto as Exhibit H (the "***New CCOH Bylaws***"), and CCH shall file the New CCOH Certificate of Incorporation with the Secretary of State of the State of Delaware.

Section 2.8     <u>Issuance of Preferred Stock</u>. [IHM and CCOH shall each use reasonable efforts to cooperate with each other to issue preferred stock of New CCOH equal to approximately 2% of the equity value of New CCOH to one or more Third Party purchasers in

---

[16]     <u>Note to Draft</u>: Such payment obligation may be estimated and agreed to by the Parties as of the Effective Date and paid by the iHeart Group to the Outdoor Group on such date, with a true-up mechanism to reflect actual costs incurred by the Outdoor Group to be agreed upon by the Parties. Subject to continuing review and discussion among the Parties, including whether this is needed.

accordance with the Restructuring Transactions Memorandum, the proceeds of which shall remain with New CCOH immediately following the Closing.][17]

**Section 2.9    Treatment of Shared Contracts**.

(a)    Subject to Section 2.10(a), the Parties shall use their commercially reasonable efforts to separate the Shared Contracts into separate contracts so that the Outdoor Group will be entitled to the rights and benefits, and shall be subject to the Liabilities, with respect to or arising from each Shared Contract to the extent primarily related to the Outdoor Business, and the iHeart Group will retain the rights and benefits, and shall be subject to the Liabilities, with respect to or arising from to each Shared Contract to the extent primarily related to the iHeart Business.  If an Approval is required to separate a Shared Contract and such Approval has not been obtained or made or if the separation of a Shared Contract has not been completed as of the Closing for any other reason, then, subject to Section 2.10(a), the Parties shall use their commercially reasonable efforts to develop and implement arrangements (including subcontracting, sublicensing, subleasing or back-to-back agreement) to pass along to the Outdoor Group the benefit and the Liabilities of the portion of any such Shared Contract related to the Outdoor Business and to pass along to the iHeart Group the benefit and the Liabilities of the portion of the Shared Contract related to the iHeart Business, as the case may be.  With respect to each Shared Contract, the obligations set forth in this Section 2.9 shall terminate upon the earlier of (x) the termination or expiration of each such Shared Contract in accordance with its terms and (y) the second anniversary of the Closing Date.

(b)    Each of IHM and CCH shall, and shall cause the members of its Group to, (i) treat for all Tax purposes the portion of each Shared Contract inuring to their respective Businesses as an Asset owned by, and/or Liabilities of, as applicable, such Group not later than the Closing Date, and (ii) neither report nor take any Tax position (on a Tax Return or otherwise) inconsistent with such treatment (unless otherwise required by applicable Law).

(c)    To the extent of any inconsistency with the other sections of this Agreement, Section 2.9 shall govern the treatment of any Shared Contracts.

**Section 2.10    Allocation of Costs for Approvals, Releases and Consents**.

(a)    Any costs or expenses, contributions of capital or payments of any other consideration in any form (including providing or maintaining any letter of credit, guarantee or other financial accommodation) required in order to obtain any Approval, consent or release (a "***COC Cost***") contemplated under Section 2.6(a), Section 2.6(b), Section 2.6(c) or Section 2.9, and any losses as a result of failure to obtain thereof or as a result of any amendment, termination or modification of any contract or agreement as a result of or in connection with the Transactions shall be borne entirely by CCOH or another member of the Outdoor Group; provided, that the iHeart Group shall bear one-third (1/3) of any Eligible Costs in excess of the first $10,000,000 of Eligible Costs (the "***Deductible***") up to the first $35,000,000 of Eligible Costs incurred (such that the iHeart Group shall not bear in excess of $8,333,333.33 of Eligible Costs) in accordance with the rest of this Section 2.10.

---

[17]    Note to Draft: Subject to continuing review and discussion among the Parties.

(b)     Promptly following the end of each fiscal quarter following the Effective Date and prior to IHM satisfying its obligations to reimburse New CCOH for Eligible Costs in accordance with this Section 2.10, New CCOH shall provide IHM with a report setting forth the amount of Eligible Costs incurred in such quarter and the aggregate amount of Eligible Costs incurred following the Effective Date, together with reasonably detailed documentation sufficient to evidence the determination and calculation of such Eligible Costs, including a reconciliation to New CCOH's publicly filed quarterly financial statements for such quarter (or the publicly filed audited financial statements in the case of a fiscal year-end) (each, an "*Eligible Costs Statement*"). No later than sixty (60) days after delivery of an Eligible Costs Statement, IHM shall, or shall cause another member of the iHeart Group to, reimburse the Outdoor Group for the portion of the Eligible Costs incurred during such quarter that are to be borne by the iHeart Group pursuant to Section 2.10(a) and that are undisputed (it being agreed that profits shall only be deemed lost or foregone during a quarter to the extent the profits would have been generated under the applicable Revenue Generating Contract during such quarter but for the termination, amendment or other modification thereof).

(c)     To the extent any member of the iHeart Group incurs any COC Costs in excess of the amount to be borne by the iHeart Group pursuant to Section 2.10(a) (including as a result of any adjustments made to the financial statements of the Outdoor Group in connection with its year-end audit), then New CCOH shall, or shall cause a member of the Outdoor Group to, promptly reimburse the iHeart Group therefor.

(d)     If any member of the Outdoor Group is required to enter into a new contract, agreement or other arrangement, or modify or amend the existing terms of any Revenue Generating Contract (prior to the termination, amendment or other modification thereof) in order to obtain any Approval or release contemplated under Section 2.6(a), Section 2.6(b) and Section 2.6(c) or to mitigate any losses as a result of failure to obtain thereof or as a result of any action as a result of or in connection with the Separation, then CCOH hereby agrees it shall, and shall cause the applicable members of the Outdoor Group to, keep IHM and the applicable members of the iHeart Group reasonably apprised of the status of any negotiations or discussions with Third Parties in connection therewith. After the Deductible has been exhausted, New CCOH shall not, and shall cause each other member of the Outdoor Group not to, execute or enter into any agreement, amendment or other modification or consummate any transaction with respect to any contract or agreement for which IHM may be liable for any Eligible Costs without IHM's prior written consent (which shall not be unreasonably withheld, conditioned or delayed).

### Section 2.11   Bank Accounts; Cash Balances.

(a)     Subject to the satisfaction or waiver of each of the conditions to Closing set forth in Section 4.2, at the Closing, each of IHM, CCOH and CCH agrees to take, or cause the members of their respective Groups to take all actions necessary to amend all contracts or agreements governing each bank and brokerage account owned by CCH or any other member of the Outdoor Group (collectively, the "*Outdoor Accounts*") so that such Outdoor Accounts, if currently linked (whether by automatic withdrawal, automatic deposit or any other authorization to transfer funds from or to, hereinafter "*linked*") to any bank or brokerage account owned by IHM or any other member of the iHeart Group (collectively, the "*IHM Accounts*"), are de-linked from the IHM Accounts, in each case effective from and after the Closing Date.

27

(b)      Each of IHM, CCOH and CCH agrees to take, or cause the respective members of their respective Groups to take, in connection with the Separation, all actions necessary to amend all contracts or agreements governing the IHM Accounts so that such IHM Accounts, if currently linked to an Outdoor Account, are de-linked from the Outdoor Accounts, in each case effective from and after the Closing Date.

(c)      Any outstanding payments initiated by IHM, CCH, or any other member of their respective Groups prior to any de-linking described in Section 2.11(a) or Section 2.11(b), as the case may be, shall be honored following such de-linking by the Person or Group owning the account from which the payment was initiated.

Section 2.12   **Insurance Matters**.[18]

(a)      Except for the Insurance Policies set forth on Schedule 2.12(a)[19], CCH and CCOH agree to arrange insurance coverage for each member of the Outdoor Group to be effective no later than the Closing Date, such that on the Closing Date, each member of the Outdoor Group shall have in effect all insurance programs required to comply with their respective contractual obligations and such other Insurance Policies as may be reasonably necessary or advisable and IHM agrees to reasonably cooperate with CCH and CCOH with respect thereto in good faith. Subject to compliance with the foregoing, in no event shall any member of the iHeart Group or any IHM Indemnitee have any Liability or obligation whatsoever to any member of the Outdoor Group in the event that any Insurance Policy shall be terminated or otherwise cease to be in effect for any reason, shall be unavailable or inadequate to cover any Liability of any member of the Outdoor Group for any reason, or shall not be renewed or extended beyond its expiration date.  Other than as provided in Section 2.12(c), the Transition Services Agreement or in Schedule 2.12(a), from and after the Closing Date, (i) none of New CCOH or any member of the Outdoor Group shall have any rights to or under any of IHM's or its Affiliates' Insurance Policies and (ii) none of IHM or any member of the iHeart Group shall have any rights to or under any of New CCOH's or its Affiliates Insurance Policies.

(b)      Subject to the terms and conditions of the Insurance Policies, each Party shall retain the exclusive right to control its Insurance Policies and programs, including the right to exhaust, settle, release, commute, buy back or otherwise resolve disputes with respect to any of its Insurance Policies and programs and to amend, modify or waive any rights under any Insurance Policies and programs. None of the Parties or any of its Affiliates shall have any obligation to secure extended reporting for any claims under any of its or their respective liability policies for any acts or omissions by any member of the other Party's Group insured prior to the Closing Date.

(c)      [From and after the Closing Date, IHM shall, upon New CCOH's written request, use commercially reasonable efforts to make claims for any Loss, Liability or damage

---

[18]   Note to Draft: Subject to continuing review and discussion among the Parties.

[19]   Note to Draft:  Schedule to list (i) D&O and media liability insurance policies, for which tail coverage will be provided through IHM; (ii) certain occurrence-based policies, for which IHM will provide coverage to Outdoors.

with respect solely to the Outdoor Assets or Outdoor Liabilities under IHM's Insurance Policies with Third Party insurers under the Insurance Policies set forth on Schedule 2.12(c)[20] ("*Covered Insurance Policies*"), arising out of insured incidents occurring from the date coverage thereunder first commenced until the Closing Date, to the extent the terms and conditions of any such Covered Insurance Policies and agreements relating thereto so allow; provided, that (i) [subject to clause (vi) of this proviso, New CCOH shall, or shall cause a member of the Outdoor Group to, promptly pay all of IHM's and IHC's and each member of the iHeart Group's out-of-pocket costs and expenses incurred in connection with the foregoing], (ii) New CCOH shall, and shall cause the applicable member(s) of the Outdoor Group to, cooperate with IHM and IHC and share such information as is reasonably necessary in order to permit IHM and IHC to manage and conduct the insurance matters contemplated by this Section 2.12(c), (iii) IHM, IHC and the iHeart Group may, at any time, without Liability or obligation to New CCOH or any member of the Outdoor Group (other than as set forth in Section 2.11(c)), amend, commute, terminate, buy-out, extinguish liability under, or otherwise modify any Covered Insurance Policies (and such claims shall be subject to any such amendments, commutations, terminations, buy-outs, extinguishments and modifications), (iv) any such claim will be subject to all of the terms and conditions of the applicable Insurance Policy, (v) [IHM shall, or shall cause a member of the iHeart Group to, be responsible for the retention thereunder][21] and (vi) IHM shall pay to New CCOH its equitable share (as determined by IHM in good faith based on the amount of premiums paid or allocated to the Outdoor Business in respect of the applicable Insurance Policy) of any net proceeds actually received by IHM from the insurer under the applicable Covered Insurance Policy [(after deducting IHM's out-of-pocket costs and expenses incurred in connection therewith)].][22]

(d)     If, after the Closing Date, IHM, IHC or any member of the iHeart Group proposes to amend, commute, terminate, buy-out, extinguish liability under or otherwise modify any Covered Insurance Policies under which New CCOH has rights to assert claims pursuant to Section 2.11(b) in a manner that would adversely affect any such rights of New CCOH, then (i) IHM shall give New CCOH prior written notice thereof (it being understood that the decision to take any such action shall be in the sole discretion of IHM) and (ii) IHM shall pay to New CCOH its equitable share (as determined by IHM in good faith based on the amount of premiums paid or allocated to the Outdoor Business in respect of the applicable Insurance Policy) of any net proceeds actually received by IHM from the insurer under the applicable Insurance Policy as a result of IHM's amendment, commutation, termination, buy-out, extinguishment of liability under or other modification of such Covered Insurance Policy (after deducting IHM's out-of-pocket costs and expenses incurred in connection therewith).

(e)     This Agreement shall not be considered as an attempted assignment of any Insurance Policy and shall not be construed to waive any right or remedy of any member of either Group in respect of any Insurance Policy or any other contract or policy of insurance.

---

[20]   Note to Draft:  To include the D&O tail and media liability extended reporting period policies.

[21]   Note to Draft: To discuss whether CCOH shall maintain its letter of credit supporting its legacy claims liability, to be reduced as claims are paid out.

[22]   Note to Draft:  Subject to further review.

**Section 2.13    Guarantees, Letters of Credit, Surety Bonds and Other Obligations**.
In furtherance of, and not in limitation of, the obligations set forth in Section 2.5:

(a)    On or prior to the Closing Date, or as soon as practicable thereafter, (i) CCH shall (with the reasonable cooperation of the applicable member(s) of the iHeart Group) use its reasonable best efforts to have any member(s) of the iHeart Group removed as guarantor of or obligor for any Outdoor Liability, including in respect of those guarantees, letters of credit and other obligations set forth on Schedule 2.13(a)(i), but excluding those guarantees, letters of credit and other obligations set forth on Schedule 2.13(a); and (ii) IHM shall (with the reasonable cooperation of the applicable member(s) of the Outdoor Group) use its reasonable best efforts to have any member(s) of the Outdoor Group removed as guarantor of or obligor for any iHeart Liability, including in respect of those guarantees, letters of credit and other obligations set forth on Schedule 2.13(a)(ii); provided that, in each case of clauses (i) and (ii), if any such release is not obtained, CCH, on the one hand, and IHM, on the other hand, shall, and shall cause the applicable members of its Group to, indemnify, defend and hold harmless each of the other Group's Indemnitees for any Liability arising from or relating to the applicable guarantee, letter of credit or other obligation.

(b)    On or prior to the Closing Date, to the extent required to obtain a release from a guarantee, letter of credit or other obligation of any member of the other Group, each Party shall, or cause the applicable member(s) of its Group to, execute substitute documents to effectuate such release at its own cost and expense.

(c)    Notwithstanding anything to the contrary contained herein, the applicable member(s) of the iHeart Group will remain as guarantor(s) of or obligor(s) for those guarantees, letters of credit and other obligations set forth on Schedule 2.13(a) for the period set forth in Schedule 2.13(a).[23] New CCOH hereby agrees not to, and shall cause the applicable members of the Outdoor Group not to, take any action or inaction that would or would reasonably be expected to cause any obligations under the guarantees, letters of credit or other obligations set forth on Schedule 2.13(a) to become due and payable. To the maximum extent not prohibited by applicable Law, New CCOH hereby agrees to reimburse and indemnify and hold the applicable members of the iHeart Group, harmless for, from and against any and all costs, expenses, taxes, Liabilities or related obligations imposed upon such member of the iHeart Group as a result of or in connection with the members of the iHeart Group maintaining the guarantees, letters of credit or other obligations set forth on Schedule 2.13(a) following the Closing Date.  The remedies provided in this Section 2.13(a) shall be cumulative and shall not preclude the assertion by any Party to this Agreement of any other rights or the seeking of any other remedies against any other Party to this Agreement.

**Section 2.14    Litigation**.

(a)    *Management of Assumed Actions*. From and after the Closing Date, the Outdoor Group shall assume and thereafter, except as provided in Article V, direct the defense or prosecution of the Assumed Actions and be responsible for all Liabilities that may result from

---

[23]    Note to Draft: Schedule to list the Singapore Street Furniture Contract and the London Bus Contract.

the Assumed Actions and all fees and costs relating to the defense of the Assumed Actions, including attorneys' fees and costs incurred thereafter. CCH agrees that, at all times from and after the Closing Date, if an Assumed Action is commenced by a Third Party naming both one or more members of the Outdoor Group and one or more members of the iHeart Group as defendants thereto, then CCH and CCOH shall use commercially reasonable efforts to cause such members of the iHeart Group to be removed from such Action; provided that if CCH is unable to cause such members of the iHeart Group to be removed from such Action, CCH and IHM shall consult in good faith with each other with respect to the resolution of such Action.

(b)      *Management of Excluded Actions*. From and after the Closing Date, the iHeart Group shall assume and thereafter, except as provided in Article V, direct the defense or prosecution of the Excluded Actions and be responsible for all Liabilities that may result from the Excluded Actions and all fees and costs relating to the defense of the Excluded Actions, including attorneys' fees and costs incurred thereafter. IHM agrees that, at all times from and after the Closing Date, if an Excluded Action is commenced by a Third Party naming both one or more members of the iHeart Group and one or more members of the Outdoor Group as defendants thereto, then IHM shall use its commercially reasonable efforts to cause such members of the Outdoor Group to be removed from such Action; provided that if IHM is unable to cause such members of the Outdoor Group to be removed from such Action, IHM and CCH shall consult in good faith  with each other with respect to the resolution of such Action.

(c)      *Settlement of Action*. No member of the iHeart Group shall settle any Excluded Action in which any member of the Outdoor Group is also a party, and no member of the Outdoor Group shall settle any Assumed Action in which any member of the iHeart Group is also a party without the prior written consent of the other Party (not to be unreasonably withheld, conditioned or delayed), except that if the Party managing the Action is fully indemnifying the other Party, such managing Party may nevertheless settle such Action without such consent so long as such settlement or compromise does not (x) result in any non-monetary remedy or relief being imposed upon any member of the other Party's Group or (y) contain or involve an admission or statement providing for or acknowledging any Liability or criminal wrongdoing on behalf of the other Party's Group or any of its Affiliates.

**Section 2.15   2020 Notes**. Effective immediately upon the Bankruptcy Court's entry of a final order confirming the Plan of Reorganization, IHC hereby waives its right under Section 6.5(c) of the CCOH Master Agreement to consent to CCOH's and its Subsidiaries' ability to replace or refinance the Series A and Series B Senior Subordinated Notes due 2020 issued by Clear Channel Worldwide Holdings, Inc.

**Section 2.16   Certain Employee and Employee Benefit Matters**.[24]

(a)      *Transfer of Employees*. Effective not later than immediately prior to the Closing, the iHeart Group shall transfer to a member of the Outdoor Group the employment of each employee of the iHeart Group whose employment duties are primarily dedicated to the Outdoor Business set forth on Schedule 2.16(a) (the "***Outdoor Business Employees***"); provided,

---

[24] Note to Draft:   Subject to continuing review and discussion among the Parties.

that the iHeart Group shall not transfer the employment of those Outdoor Business Employees that are reasonably necessary by the iHeart Group to perform any services under the Transition Services Agreement, including only those set forth on Schedule 2.16(a) (the "***Delayed Transfer Employees***").  Following the Closing, New CCOH shall offer employment to each Delayed Transfer Employee on terms and conditions of employment that are comparable to the terms and conditions of employment applicable to such Delayed Transfer Employee in effect immediately prior to their separation from employment with any member of the iHeart Group.  Each such offer of employment shall be made on the earlier of (i) the date mutually agreed upon by the Parties and (ii) a date that is not less than [30] days prior to the termination of the last individual service such Delayed Transfer Employee is performing under the Transition Services Agreement.  Each Outdoor Business Employee whose employment is transferred to, or who accepts an offer of employment with, a member of the Outdoor Group shall be deemed a "Transferred Employee" for purposes of this Agreement.  For Delayed Transfer Employees who become Transferred Employees, the effective date of their employment with New CCOH shall be the date they actually commence employment with New CCOH; for all other Outdoor Business Employees, the effective date of their employment with the Outdoor Group shall be the Closing Date (which such dates are referred to herein as the "***Employee Transfer Date***").

      (b)   *Service Credit*.  New CCOH shall use its commercially reasonable best efforts to cause the members of the Outdoor Group to recognize all service credited under an iHeart Plan that is a 401(k) or paid time off plan through the Employee Transfer Date applicable to each Transferred Employee or through the Closing for all other employees of the Outdoor Group as of the Closing Date (together with the Transferred Employees, the "***Outdoor Employees***") for purposes of eligibility to participate, vesting and level of paid time off benefits under any similar benefit plan, program or arrangement provided for the benefit of the Outdoor Employees after the Closing, but only to the extent that such credit was provided for the same purpose under the analogous iHeart Plan and if such credit does not result in the duplication of benefits or compensation for the same period of service.

      (c)   *Health and Welfare Benefit Plan Matters*.  In the calendar year in which the Closing Date or Employee Transfer Date, as applicable, occurs, New CCOH shall use its commercially reasonable best efforts to and shall cause the Outdoor Group to use its commercially reasonable best efforts to (i) cause to be waived for the Transferred Employees (and any of their covered dependents) all pre-existing condition exclusions, active at work requirements, waiting periods, and any other similar requirements or limitations under any Outdoor Group Plan providing welfare benefits to the extent waived or satisfied under any corresponding iHeart Plan as of the Closing Date, and (ii) cause any deductible, co-insurance and out-of-pocket expenses paid by a an Outdoor Employee (or covered dependent) under an iHeart Plan providing welfare benefits during the year in which the Closing Date or Employee Transfer Date, as applicable, occurs to be credited for purposes of satisfying any deductibles, co-insurance and out-of-pocket expenses under the corresponding Outdoor Group Plan.

      (d)   *401(k) Plan*. Effective no later than the Closing Date, CCOH shall cause a member of the Outdoor Group to establish a defined contribution plan that includes a cash or deferred arrangement intended to be qualified under Section 401(k) of the Code for the benefit of the Outdoor Employees (the "***Outdoor 401(k) Plan***") which, to the extent commercially reasonable and practicable, is substantially similar to iHeart Plans that include a cash or deferred

arrangement intended to be qualified under Section 401(k) of the Code (the "*iHeart 401(k) Plan*"), including with respect to the available investments under the Outdoor 401(k) Plan, except that stock of CCOH shall not be included as an investment option for any contributions made following the Closing Date (but shall remain an investment option with respect to account balances invested therein as of the Closing prior to any elective transfer out of such investment) under the Outdoor 401(k) Plan. As of the Closing Date or Employee Transfer Date, as applicable, or as soon as administratively practicable thereafter, IHM, IHC and New CCOH shall cause to be transferred (in accordance with the requirements of Section 414(l) of the Code) to the Outdoor 401(k) Plan the aggregate account balances, whether accrued pre-Closing or post-Closing, under the iHeart 401(k) Plan of the Outdoor Employees who have account balances in the iHeart 401(k) Plan. Such transfer shall be in cash, or with respect to participant loans, in kind. The Parties acknowledge that actions required to be taken pursuant to this Agreement may be subject to fiduciary duties or standards of conduct under the Employee Retirement Income Security Act of 1974, as amended, or other applicable Law. Neither Party shall be deemed to be in violation of this Agreement if it fails to comply with any provision of this Agreement based upon its good faith determination that to do so would violate such a fiduciary duty or standard.

(e)     *Nonqualified Deferred Compensation Arrangements*. Effective no later than the Closing Date, CCOH shall cause a member of the Outdoor Group to establish a nonqualified deferred compensation plan that is compliant with Section 409A of the Code for the benefit of  the Outdoor Employees (the "*Outdoor NQDC Plan*") which, to the extent commercially reasonable and practicable,  is substantially similar to any iHeart Plan that is also a nonqualified deferred compensation arrangement intended to be compliant under Section 409A of the Code (the "*iHeart NQDC Plan*"), including with respect to the available investments under the Outdoor 409A Plan.  As of the Closing Date or Employee Transfer Date, as applicable, or as soon as administratively practicable thereafter, IHM, IHC and New CCOH shall cause to be transferred (in accordance with the requirements of Section 409A of the Code) to the Outdoor NQDC Plan the aggregate account balances, whether accrued pre-Closing or post-Closing, under the iHeart NQDC Plan of the Outdoor Employees who have account balances in the iHeart NQDC Plan.  Such transfer shall be in cash, or with respect to participant loans, in kind. [The Parties acknowledge that the actions described in this Section 2.16(e) shall be fully subject to Section 409A of the Code and the parties hereto shall cooperate in good faith to comply therewith to minimize any adverse tax consequences to the relevant Outdoor Employees, including that the Parties shall take any actions reasonably necessary to avoid the occurrence of a "separation of service" (as defined in Section 409A of the Code) for any Outdoor Employees for purposes of the iHeart NQDC Plan by reason of the Transactions alone, it being understood that in no event will any of the Parties hereto reimburse or pay any individual for any tax or other cost under or related to Section 409A of the Code.[25]]

(f)     Nothing in this Section 2.16, express or implied, shall: (i) establish, amend or modify any iHeart Plan, Outdoor Group Plan or any other benefit or compensation plan, program, policy, contract, agreement or arrangement, or (ii) confer any benefits, remedies or rights whatsoever, including any third party beneficiary rights, on any Person other than the Parties.

---

[25]     Note to Draft: Subject to continuing review.

Section 2.17   **IP Licenses**.

(a)   *iHeart IP License*. IHM and IHC, on behalf of themselves and the relevant members of the iHeart Group, hereby grant to New CCOH and each other member of the Outdoor Group a non-exclusive, royalty-free, fully-paid, perpetual, irrevocable, non-terminable, worldwide license (or with respect to any Intellectual Property owned by a Third Party, sublicense) under all Licensed IHM IP to operate the Outdoor Business (including natural evolutions thereof), effective as of the Closing Date.  The foregoing license shall be sublicensable and transferable (i) to service providers, consultants, or independent contractors in connection with the performance of services for the Outdoor Group in the ordinary course of the Outdoor Business (including natural evolutions thereof), and (ii) to an acquirer or any of its Affiliates in connection with a Change of Control.

(b)   *IHM Software License*. IHM and IHC, on behalf of themselves and the relevant members of the iHeart Group, hereby grant to New CCOH and each other member of the Outdoor Group a non-exclusive, royalty-free, fully-paid, perpetual, irrevocable, non-terminable, worldwide license (or with respect to any Software owned by a Third Party, sublicense) to fully Exploit the Licensed IHM Software in connection with the operation of the Outdoor Business (including natural evolutions thereof), effective as of the Closing Date.  The foregoing license shall be sublicensable and transferable (i) to service providers, consultants, or independent contractors in connection with the performance of services for the Outdoor Group in the ordinary course of the Outdoor Business (including natural evolutions thereof), and (ii) to an acquirer or any of its Affiliates in connection with a Change of Control.

(c)   *Outdoor IP License*. New CCOH, on behalf of themselves and the relevant members of the Outdoor Group, hereby grant to IHM and IHC and each other member of the iHeart Group a non-exclusive, royalty-free, fully-paid, perpetual, irrevocable, non-terminable, worldwide license (or with respect to any Intellectual Property owned by a Third Party, sublicense) under all Licensed Outdoor IP to operate the iHeart Business (including natural evolutions thereof), effective as of the Closing Date.  The foregoing license shall be sublicensable and transferable (i) to service providers, consultants, or independent contractors in connection with the performance of services for the iHeart Group in the ordinary course of the iHeart Business (including natural evolutions thereof), and (ii) to an acquirer or any of its Affiliates in connection with a Change of Control.

(d)   *Outdoor Software License.* New CCOH, on behalf of themselves and the relevant members of the Outdoor Group, hereby grant to IHM and IHC and each other member of the iHeart Group a non-exclusive, royalty-free, fully-paid, perpetual, irrevocable, non-terminable, worldwide license (or with respect to any Software owned by a Third Party, sublicense) to fully Exploit the Licensed Outdoor Software in connection with the operation of the iHeart Business (including natural evolutions thereof), effective as of the Closing Date.  The foregoing license shall be sublicensable and transferable (i) to service providers, consultants, or independent contractors in connection with the performance of services for the iHeart Group in the ordinary course of the iHeart Business (including natural evolutions thereof), and (ii) to an acquirer or any of its Affiliates in connection with a Change of Control.

34

(e)     *Domain License.* New CCOH, on behalf of themselves and the relevant members of the Outdoor Group, hereby grant to IHM and IHC and other members of the iHeart Group a non-exclusive, royalty-free, fully-paid, perpetual, irrevocable, sublicenseable, non-terminable, worldwide license to access, use, register, and otherwise make available the "clearchannel.com" domain (including subdomains thereof and the use of the "CLEAR CHANNEL" trademark in connection therewith) in connection with internal-use Software (including "OneSpace" Software) of IHM, IHC and each other member of the iHeart Group, with such Software accessible solely through the internal networks of such Persons.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

**Section 3.1     Mutual Representations and Warranties.**

Each of IHM and IHC hereby make the following representations and warranties, on their own behalf and on behalf of the applicable members of the iHeart Group, to CCH and CCOH, and CCH and CCOH hereby make the following representations and warranties, on their own behalf and on behalf of the applicable members of the Outdoor Group, to IHM and IHC, as of the date hereof and as of the Closing:

(a)     such Person has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or will be a party as of the Closing and to consummate the Transactions contemplated hereby and thereby;

(b)     the execution and delivery by such Person of this Agreement and the Ancillary Agreements to which it is or will be a party as of the Closing and the consummation of the Transactions contemplated hereby and thereby have been duly authorized by all necessary and proper action on its part;

(c)     this Agreement and the Ancillary Agreements to which such Person is or will be a party as of the Closing has been or will be duly and validly executed and delivered by it and (assuming that due execution and delivery by the other parties hereto and thereto) constitutes or will constitute the legal, valid and binding obligation of such Person, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity; and

(d)     the execution and delivery by such Party of this Agreement and the Ancillary Agreements to which it is or will be a party as of the Closing and the consummation by such Party of the Transactions contemplated hereby and thereby do not and will not, as of the Closing conflict with any provision of its articles or certificate of incorporation, bylaws, certificate of formation, operating agreement or other organizational documents, as applicable.

**Section 3.2     No Other Representations and Warranties**.     Except for the representations and warranties expressly set forth in this Agreement or any Ancillary Agreement, no member of either the iHeart Group or the Outdoor Group nor any of their Representatives makes or has made any representation or warranty of any kind whatsoever, express or implied, to (and each member of the iHeart Group and the Outdoor Group disclaims reliance on all

representations and warranties of any kind, whatsoever, express or implied, or made by) any member of the other Group or any other Person with respect to any of the Transactions or matters contemplated hereby (including with respect to the respective Business, Assets, Liabilities, condition or prospects (financial or otherwise) of, or any other matter involving, either Business, or the sufficiency of the Assets transferred to or owned by the applicable Group, or the title to any such Assets, or that any requirements of applicable Law are complied with, with respect to the Separation).  No Person has been authorized by any member of either Group or their respective Affiliates or Representatives to make any representation or warranty relating to any member of either Group with respect to any of the Transactions or matters contemplated hereby (including with respect to the respective Business, Assets, Liabilities, condition or prospects (financial or otherwise) of, or any other matter involving, either Business, or the sufficiency of the Assets transferred to the applicable Group, or the title to any such Assets, or that any requirements of applicable Law are complied with, with respect to the Separation), and if made, such representation or warranty must not be relied upon by such Person or any of its Affiliates or Representatives as having been authorized by such member of either Group or any of its or their respective Affiliates or Representatives (or any other Person). EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY AGREEMENT, THE REPRESENTATIONS AND WARRANTIES MADE BY ANY PARTY IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE TO ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY EXPRESS OR IMPLIED, AND  EACH MEMBER OF EACH GROUP SHALL TAKE ALL OF THE BUSINESS, ASSETS AND OTHER LIABILITIES TRANSFERRED TO OR ASSUMED BY IT PURSUANT TO THIS AGREEMENT ON AN "AS IS, WHERE IS" BASIS AND ALL OTHER IMPLIED REPRESENTATIONS AND WARRANTIES, ON MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, MARKETABILITY, TITLE, VALUE OR OF FREEDOM FROM ENCUMBRANCE ARE HEREBY EXPRESSLY DISCLAIMED, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO A MEMBER OF EITHER GROUP OR THEIR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL INFORMATION, SUPPLEMENTAL DATA OR FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS). EACH GROUP SHALL RELY SOLELY ON THEIR OWN EXAMINATION AND INVESTIGATION OF THE OTHER GROUP'S BUSINESS AND ASSETS AS WELL AS THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY ANCILLARY AGREEMENT.  NO MEMBER OF A GROUP NOR ANY OF ITS REPRESENTATIVES HAS MADE (AND THE MEMBERS OF THE OTHER GROUP AND THEIR REPRESENTATIVES HAVE NOT RELIED UPON) ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, (A) AS TO THE ACCURACY OR COMPLETENESS OF ANY OF THE INFORMATION PROVIDED OR MADE AVAILABLE TO SUCH GROUP PRIOR TO THE EXECUTION OF THIS AGREEMENT AND (B) WITH RESPECT TO ANY PROJECTIONS, FORECASTS, ESTIMATES, PLANS OR BUDGETS OF FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS (OR ANY COMPONENT THEREOF) OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SUCH GROUP HERETOFORE OR HEREAFTER DELIVERED TO OR MADE AVAILABLE TO SUCH GROUP OR ITS REPRESENTATIVES.

**ARTICLE IV**
**THE CLOSING**

**Section 4.1     Closing**.  Unless this Agreement is validly terminated pursuant to <u>Section 8.1</u>, the closing of the Separation (the "***Closing***") shall occur as soon as practicable on the Effective Date after the satisfaction or waiver (if permitted hereunder) of all of the conditions set forth in <u>Section 4.2</u> other than those conditions that by their nature are to be satisfied at the Closing (but subject to the fulfillment or waiver of such conditions at the Closing), at the offices of Kirkland and Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (or remotely via the electronic exchange of executed documents), unless another date or place is mutually agreed upon in writing by the Parties. The date upon which the Closing occurs hereunder is referred to herein as the "***Closing Date***." The Closing will be deemed to be effective as of 11:59 p.m. (local time) in each jurisdiction in which the Business is conducted on the Closing Date for Tax, accounting, operational and all other matters.

**Section 4.2     Conditions to the Separation**.

(a)     *Mutual Closing Conditions*. The obligations of each Party to consummate the Separation shall be subject to the fulfillment (or, to the extent permitted by applicable Law, written waiver by each Party) of the following conditions:

(i)     All Emergence Conditions (other than the Separation and those conditions that by their nature are to be satisfied simultaneously with the Effective Date) shall have been satisfied.

(ii)     All conditions precedent to the consummation of the Merger as set forth in the Merger Agreement shall have been satisfied or waived, other than those conditions that by their nature are to be satisfied simultaneously with the consummation of the Merger).

(iii)     The transactions contemplated in the Restructuring Transactions Memorandum to be taken on or prior to the Closing Date (including the distribution of the equity securities of Radio Newco to IHC) shall have been completed (except for those Transactions that are to occur at the Closing, but subject to such Transactions occurring at the Closing).

(iv)     All Approvals listed in <u>Schedule 4.2</u> shall have been obtained and be in full force and effect.

(v)     No Order issued by any Governmental Authority of competent jurisdiction or other legal restraint or prohibition preventing the consummation of any of the Transactions, declaring unlawful the Transactions or causing such Transactions to be rescinded shall be in effect.

(b)     *Additional Closing Conditions for IHM, IHC and CCH*. The obligations of IHM, IHC and CCH to consummate the Separation shall be subject to the fulfillment (or, to the extent permitted by applicable Law, written waiver by each of IHM and IHC) of the following conditions:

(i)      The representations and warranties made by CCOH in <u>Article III</u> shall be true and correct both as of the date hereof and as of the Closing Date, in each case in all material respects.

(ii)     CCOH shall have performed and complied with, in all material respects, all covenants required by this Agreement to be performed prior to the Closing.

(iii)    The Bankruptcy Court shall have entered an Order (which may be an Order approving the Plan of Reorganization), in form and substance reasonably acceptable to IHM and CCOH, approving this Agreement and finding that the terms of this Agreement represent sound exercises of business judgment by each member of the iHeart Group and CCOH (the "**_Confirmation Order_**").

(c)      *Additional Closing Conditions for CCOH*. The obligations of CCOH to consummate the Separation shall be subject to the fulfillment (or, to the extent permitted by applicable Law, written waiver by CCOH) of the following conditions:

(i)      The representations and warranties made by IHM, IHC and CCH in <u>Article III</u> shall be true and correct both as of the date hereof and as of the Closing Date, in each case in all material respects.

(ii)     IHM, IHC and CCH shall have performed and complied with, in all material respects, all covenants required by this Agreement to be performed prior to the Closing.

**ARTICLE V**
**MUTUAL RELEASES; INDEMNIFICATION**

**Section 5.1**      <u>**Release of Pre-Closing Claims**</u>.

(a)      Except as provided in <u>Section 5.1(c)</u> or as otherwise expressly provided in this Agreement or any Ancillary Agreement, effective as of the Closing Date, New CCOH does hereby, on behalf of itself and each member of the Outdoor Group and each of their respective successors and assigns, release and forever discharge IHM and the members of the iHeart Group, each of their respective successors and assigns, and all Persons who at any time prior to the Closing Date have been stockholders, directors, officers, agents or employees of IHM or any member of the iHeart Group (in each case, in their respective capacities as such), and each of their respective heirs, executors, administrators, successors and assigns, from any and all Pre-Closing Claims.

(b)      Except as provided in <u>Section 5.1(c)</u> or as otherwise expressly provided in this Agreement or any Ancillary Agreement, effective as of the Closing Date, IHM does hereby, on behalf of itself and each member of the iHeart Group and each of their respective successors and assigns, release and forever discharge New CCOH and the members of the Outdoor Group, each of their respective successors and assigns, and all Persons who at any time prior to the Closing Date have been stockholders, directors, officers, agents or employees of New CCOH or any member of the Outdoor Group (in each case, in their respective capacities as such), and each

38

of their respective heirs, executors, administrators, successors and assigns, from any and all Pre-Closing Claims.

(c)     Nothing contained in Section 5.1(a) and Section 5.1(b) shall impair any right of any Person to enforce this Agreement, any Ancillary Agreement or any agreements, arrangements, commitments or understandings that are specified in the applicable Schedules thereto as not to terminate as of the Closing Date, in each case in accordance with its terms. Nothing contained in Section 5.1(a) or Section 5.1(b) shall release any Person from:

(i)     any Liability assumed, transferred, assigned, retained or allocated to the Group of which such Person is a member in accordance with, or any other Liability of any member of any Group under, this Agreement or any Ancillary Agreement;

(ii)     any Liability that a member of the iHeart Group or Outdoor Group may have with respect to indemnification or contribution pursuant to this Agreement, which Liability shall be governed by the provisions of Article V and any other applicable provisions of this Agreement or any Ancillary Agreement; or

(iii)     honoring its existing obligations to indemnify, or advance expenses to, any Person who was a director, officer or employee of a Party or any member of its Group at or prior to the Closing Date, to the extent that such Person was entitled to such indemnification or advancement of expenses pursuant to then-existing indemnification obligations, it being understood that (x) if the underlying Action giving rise to any obligation arises out of or is primarily related to an Outdoor Liability, New CCOH shall indemnify the applicable member of the iHeart Group for such Liability and (y) if the underlying Action giving rise to any obligation arises out of or is primarily related to an iHeart Liability, IHM shall indemnify the applicable member of the Outdoor Group for such Liability, in each case, in accordance with the provisions set forth in this Article V.

(d)     Each of IHM and IHC, on the one hand, and New CCOH, on the other hand, shall not make, and shall not permit any member of their respective Groups to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any member of the other Group, or any other Person released pursuant to Section 5.1(a) and Section 5.1(b), with respect to any Liabilities released pursuant thereto.

(e)     It is the intent of each of IHM and New CCOH, except as expressly set forth in Section 5.1(c), by virtue of the provisions of this Section 5.1, to provide for a full and complete release and discharge of all Liabilities existing or arising from all acts and events occurring or failing to occur or alleged to have occurred or to have failed to occur and all conditions existing or alleged to have existed on or before the Closing Date, between any member of the Outdoor Group, on the one hand, and any member of the iHeart Group, on the other hand (including any contractual agreements or arrangements existing or alleged to exist between or among any such members prior to the Closing).  At any time, at the request of either IHM, or New CCOH, the other Party shall cause each member of its respective Group to execute and deliver releases reflecting the provisions hereof.

**Section 5.2**    <u>**Indemnification by Outdoor Group**</u>.  Subject to <u>Section 5.4</u>, from and after the Closing Date, New CCOH shall, and shall cause the other members of the Outdoor Group to, indemnify and hold harmless IHM, each member of the iHeart Group and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "***IHM Indemnitees***"), from and against any and all Liabilities of the IHM Indemnitees relating to, arising out of or resulting from any of the following, whether such Liabilities arise or accrue prior to, on or after the Closing Date:

(a)    the Outdoor Business, the Outdoor Liabilities or the Outdoor Assets, including any Liabilities arising out of or relating to the Assumed Actions (including those from which New CCOH is unable to cause a member of the iHeart Group to be removed pursuant to <u>Section 5.6(c)</u>);

(b)    the failure of any member of the Outdoor Group or any other Person to pay, perform or otherwise promptly discharge any of the Outdoor Liabilities in accordance with their respective terms; and

(c)    any breach by any member of the Outdoor Group of this Agreement;

<u>provided</u> that the indemnification obligations hereunder shall in no event be duplicative of any obligation of CCOH or any of its Subsidiaries pursuant to any Ancillary Agreement; <u>provided</u>, <u>further</u>, that except as specifically contemplated in <u>Section 5.6(f)</u>, all matters related to Taxes shall be governed solely by the New Tax Matters Agreement and no indemnity with respect to Taxes shall arise as a result of this <u>Section 5.2</u>.

**Section 5.3**    <u>**Indemnification by iHeart Group**</u>.  Subject to <u>Section 5.4</u>, from and after the Closing Date, IHM and IHC shall, and shall cause the other members of the iHeart Group to, indemnify and hold harmless CCH, CCOH and each member of the Outdoor Group and each of their respective directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "***Outdoor Indemnitees***"), from and against any and all Liabilities of the Outdoor Indemnitees relating to, arising out of or resulting from any of the following, whether such Liabilities arise or accrue prior to, on or after the Closing Date:

(a)    the iHeart Business, the iHeart Liabilities or the iHeart Assets, including any Liabilities arising out of or relating to any Excluded Action (including those from which IHM or IHC is unable to cause a member of the Outdoor Group to be removed pursuant to <u>Section 5.6(c)</u>);

(b)    the failure of IHM, IHC or any other member of the iHeart Group or any other Person to pay, perform or otherwise promptly discharge any iHeart Liabilities in accordance with their respective terms; and

(c)    any breach by any member of the iHeart Group of this Agreement;

<u>provided</u> that the indemnification obligations hereunder shall in no event be duplicative of any obligation of IHM or any of its Subsidiaries pursuant to any Ancillary Agreement; <u>provided</u>, <u>further</u>, that except as specifically contemplated in <u>Section 5.6(f)</u>, all matters related to Taxes

shall be governed solely by the New Tax Matters Agreement and no indemnity with respect to Taxes shall arise as a result of this Section 5.3.

**Section 5.4    Indemnification Obligations Net of Insurance Proceeds**.

(a)    The Parties intend that any Liability subject to indemnification or reimbursement pursuant to this Article V shall be net of Insurance Proceeds that actually reduce the amount of the Liability.  Accordingly, the amount that any Person (an "*Indemnifying Party*") is required to pay to any Person entitled to indemnification hereunder (an "*Indemnitee*") shall be reduced by any Insurance Proceeds actually recovered by or on behalf of the Indemnitee in respect of the related Liability.  If an Indemnitee receives a payment (an "*Indemnity Payment*") required by this Agreement from an Indemnifying Party in respect of any Liability and subsequently receives Insurance Proceeds, then the Indemnitee shall pay to the Indemnifying Party an amount equal to the excess of the Indemnity Payment received over the amount of the Indemnity Payment that would have been due if the Insurance Proceeds had been received, realized or recovered before the Indemnity Payment was made.

(b)    An insurer that would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto or, solely by virtue of the indemnification provisions hereof, have any subrogation rights with respect thereto, it being expressly understood and agreed that the indemnification provisions hereof do not create any benefit to any insurer or any other Third Party or otherwise alter the terms and conditions of any Insurance Policies.

(c)    Each of IHM, IHC, CCOH and CCH hereby waives, for itself and each member of its Group, any rights to recover against the other Party in subrogation or as subrogee for a Third Party, but solely with respect to Pre-Closing Claims released pursuant to Section 5.1 and solely to the extent that such waiver of subrogation is permitted under any applicable Insurance Policies.

**Section 5.5    Procedures for Indemnification of Third-Party Claims**.

(a)    If an Indemnitee shall receive written notice from a Third Party of any claim or demand or the commencement by any such Person of any Action (each, a "*Third-Party Claim*") with respect to which an Indemnifying Party may be obligated to provide indemnification to such Indemnitee pursuant to Section 5.2 or Section 5.3, or any other provision of this Agreement, such Indemnitee shall promptly (but in no event more than 30 days following receipt of such claim or demand) give such Indemnifying Party written notice thereof.  Any such notice shall (i) state that the Indemnitee has paid or, incurred Losses, or reasonably anticipates that the Indemnitee will pay or incur Losses for which such Indemnitee is entitled to indemnification pursuant to this Agreement; (ii) specify in reasonable detail each individual item of Loss included in the amount so stated, the date (if any) such item was paid or incurred, the basis for any reasonably anticipated Losses and the nature of the misrepresentation, breach of warranty, breach of covenant or other claim to which each such item is related and (iii) include copies of all notices and documents (including court papers) received by the Indemnitee relating to the Third-Party Claim.  Notwithstanding the foregoing, the failure of an Indemnitee to provide notice in accordance with this Section 5.5(a) shall not relieve an Indemnifying Party of its indemnification obligations under this Agreement, except to the extent to which the

Indemnifying Party shall demonstrate that it was prejudiced by the Indemnitee's failure to provide notice in accordance with this Section 5.5(a).

(b)     An Indemnifying Party may elect to defend (and to seek to settle or compromise), at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, any Third-Party Claim.  Within 60 days after the receipt of notice from an Indemnitee in accordance with Section 5.5(a), the Indemnifying Party shall notify the Indemnitee of its election whether the Indemnifying Party shall assume responsibility for defending such Third-Party Claim; provided that if the Indemnifying Party fails to notify the Indemnitee in accordance with the foregoing sentence, the Indemnifying Party shall be deemed to elect not to defend (or to seek to settle or compromise) such Third-Party Claim.

(c)     If an Indemnifying Party has elected to assume the defense of a Third-Party Claim, then such Indemnifying Party shall be solely liable for all fees and expenses incurred by it in connection with the defense of such Third-Party Claim (including its counsel) and shall not be entitled to seek any indemnification or reimbursement from the Indemnitee for any such fees or expenses incurred during the course of its defense of such Third-Party Claim, regardless of any subsequent decision by the Indemnifying Party to reject or otherwise abandon its assumption of such defense.

(d)     Notwithstanding an election by an Indemnifying Party to defend a Third-Party Claim pursuant to Section 5.5(b), an Indemnitee may, upon notice to the Indemnifying Party, elect to take over the defense of such Third-Party Claim at the cost and expense of the Indemnifying Party (i) to the extent such Third-Party Claim relates to any actual or alleged criminal Action, allegation or investigation, (ii) to the extent such Third-Party Claim seeks an injunction or equitable relief against an Indemnitee as the primary remedy or (iii) to the extent any Indemnitee shall reasonably determine that such Indemnitee and the Indemnifying Party have actual or potential differing defenses or conflicts of interest between them that make joint representation inappropriate.

(e)     If the Indemnifying Party elects to assume the defense of a Third-Party Claim in accordance with this Agreement, then (i) the Indemnitee may retain separate counsel (including local counsel as necessary) of its own choosing to monitor and participate in (but not control) the defense of any Third-Party Claim at its own cost and expense subject to limitations to preserve Privilege or Third Party confidentiality and (ii) the Indemnitee may not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Party; provided that the Indemnitee may choose separate counsel at the sole cost and expense of the Indemnifying Party in the event that outside counsel to the Indemnitee reasonably determines that a conflict of interest arises between the Indemnitee and the Indemnifying Party or both the Indemnitee and the Indemnifying Party are named parties to such Third-Party Claim and there are material differing defenses between them that make joint representations inappropriate, but shall not be entitled to determine or conduct the defense of such Third-Party Claim or settlement negotiations with respect to such Third-Party Claim.

(f)     An Indemnifying Party that does not elect to defend a Third-Party Claim as contemplated hereby nevertheless shall have the right to employ separate counsel (including

42

local counsel as necessary) of its own choosing to monitor and participate in (but not control) the defense of any Third-Party Claim for which it is a potential Indemnifying Party at its own cost and expense, subject to limitations to preserve Privilege or Third Party confidentiality. Without limiting the foregoing, subject to Section 6.6, each Party shall act in good faith and cooperate with the Party entitled to conduct and control the defense of such Third-Party Claim in such defense and make available to the controlling Party, at the non-controlling Party's expense, all witnesses, information and materials in such non-controlling Party's possession or under such non-controlling Party's control relating thereto as are reasonably required by the controlling Party.

(g)     Notwithstanding the foregoing in this Section 5.5, no Party may, or permit any of its Subsidiaries to, settle or compromise any Third-Party Claim for which any Indemnitee is seeking or would seek to be indemnified hereunder without the prior written consent of the other Party, which consent may not be unreasonably withheld, conditioned or delayed, unless such settlement or compromise is solely for monetary damages, does not involve any finding or determination of wrongdoing or violation of Law by the other Group and provides for a full, unconditional and irrevocable release of the other Group from all Liability in connection with the Third-Party Claim.

(h)     The Indemnifying Party who elects to defend a Third-Party Claim pursuant to Section 5.5(b) shall keep the Indemnitee reasonably informed of the progress of any Third-Party Claim and notify the Indemnitee when any such Third-Party Claim is closed, regardless of whether such Third-Party Claim was resolved by settlement, verdict, dismissal or otherwise.

Section 5.6     **Additional Matters**.

(a)     Any claim on account of a Liability that does not result from a Third-Party Claim shall be asserted by written notice given by the Indemnitee to the relevant Indemnifying Party promptly (and in any event within 60 days) following its discovery of such item or matter. No delay on the part of the Indemnitee in giving any such notice shall relieve the Indemnifying Party of any indemnification obligation hereunder except to the extent that the Indemnifying Party is actually prejudiced by such delay. The notice delivered pursuant to this Section 5.6(a) shall (i) state that the Indemnitee has paid or incurred Losses, or reasonably anticipates that the Indemnitee will pay or incur Losses, for which such Indemnitee is entitled to indemnification pursuant to this Agreement and (ii) specify in reasonable detail each individual item of Loss included in the amount so stated, the date (if any) such item was paid or incurred, the basis for any reasonably anticipated Losses and the nature of the misrepresentation, breach of warranty, breach of covenant or claim to which each such item is related. Such Indemnifying Party shall have a period of 30 days after the receipt of such notice within which to respond thereto. If such Indemnifying Party does not respond within such 30-day period, then such Loss specified in such notice shall be deemed a Liability of such Indemnifying Party hereunder. If such Indemnifying Party disputes the Liability asserted under the claim notice, the Indemnifying Party shall send a notice of such dispute (an "**Objection Notice**") to the Indemnitee within 30 days following receipt by the Indemnifying Party of the claim notice. Upon receipt of an Objection Notice, such Indemnitee and the Indemnifying Party shall attempt in good faith to agree upon the rights and obligations of the respective Parties with respect to such disputed claim. If no such resolution

43

can be reached after good faith negotiation after no less than 30 days following delivery of an Objection Notice, each Party shall be free to pursue such remedies as may be available to such Party as contemplated by this Agreement.

(b)     In the event of payment by or on behalf of any Indemnifying Party to any Indemnitee in connection with any Third-Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnitee as to any events or circumstances in respect of which such Indemnitee may have any right, defense or claim relating to such Third-Party Claim against any claimant or plaintiff asserting such Third-Party Claim or against any other Person.  Such Indemnitee shall reasonably cooperate with such Indemnifying Party, at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right, defense or claim.

(c)     In the event of an Action for which indemnification is sought pursuant to Section 5.2 or Section 5.3 and in which the Indemnifying Party is not a named defendant, if the Indemnifying Party shall so request, the Parties shall use commercially reasonable efforts to substitute the Indemnifying Party for the named defendant.

(d)     An Indemnitee shall take all reasonable steps to mitigate damages in respect of any claim for which it seeks indemnification hereunder, and shall use commercially reasonable efforts to avoid any costs or expenses associated with such claim and, if such costs and expenses cannot be avoided, to minimize the amount thereof.

(e)     Any Indemnity Payment shall be decreased to take into account an amount equal to the Tax Benefit actually realized by the Indemnitee (or its Affiliates) in the taxable year the Liability giving rise to such Indemnity Payment arose or accrued or in the two succeeding taxable years, which Tax Benefit would not have arisen or been allowable but for the incurrence or payment of such Liability; provided that if any such Tax Benefit is actually realized by an Indemnitee (or its Affiliates) in a taxable year subsequent to the taxable year of an Indemnity Payment, the Indemnitee shall promptly pay or cause to be paid to the Indemnifying Party (or its designee) an amount equal to the Tax Benefit actually realized. For purposes of this Agreement, any Tax Benefit actually realized by the Indemnitee (or its Affiliates) in the taxable year a Liability giving rise to an Indemnity Payment arose or accrued or in the two succeeding taxable years shall be determined using a "with and without" methodology (treating any deductions or amortization attributable to such indemnified Liabilities as the last items claimed for any taxable year, including after the utilization of any otherwise available net operating loss carryforwards).

(f)     THE INDEMNITY AGREEMENTS CONTAINED IN THIS ARTICLE V SHALL REMAIN OPERATIVE AND IN FULL FORCE AND EFFECT, REGARDLESS OF (I) ANY INVESTIGATION MADE BY OR ON BEHALF OF ANY INDEMNITEE OR (II) THE KNOWLEDGE BY THE INDEMNITEE OF LIABILITIES FOR WHICH IT MIGHT BE ENTITLED TO INDEMNIFICATION HEREUNDER.

(g)     THE RELEASES AND INDEMNIFICATION OBLIGATIONS OF THE PARTIES IN THIS AGREEMENT ARE EXPRESSLY INTENDED, AND SHALL OPERATE AND BE CONSTRUED, TO APPLY EVEN WHERE THE LOSSES OR LIABILITIES FOR WHICH THE RELEASE AND/OR INDEMNITY ARE GIVEN ARE CAUSED, IN WHOLE

OR IN PART, BY THE SOLE, JOINT, JOINT AND SEVERAL, CONCURRENT, CONTRIBUTORY, ACTIVE OR PASSIVE NEGLIGENCE OR THE STRICT LIABILITY OR FAULT OF THE PARTY BEING RELEASED OR INDEMNIFIED.

Section 5.7    **Remedies Cumulative**.  The remedies provided in this Article V shall be cumulative and shall not preclude assertion by any Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnifying Party; provided that the procedures set forth in this Article V shall be the exclusive procedures governing any indemnification claim or indemnification Action brought under this Agreement; provided, further, that if an Indemnitee has recovered any Losses from an Indemnifying Party pursuant to any provision of this Agreement or any Ancillary Agreement or otherwise, it shall not be entitled to recover the same Losses in duplication pursuant to any other provision of this Agreement or any Ancillary Agreement or otherwise.

Section 5.8    **Survival of Indemnities**.  The rights and obligations of each of IHM, IHC, CCH, CCOH and their respective Indemnitees under this Article V shall survive (a) the sale or other transfer by any Party of any Assets or Businesses or the assignment by it of any Liabilities, and (b) any merger, consolidation, business combination, sale of all or substantially all Assets, restructuring, recapitalization, reorganization or similar transaction involving a Party or any of its respective Subsidiaries.

Section 5.9    **No Impact on Third Parties**.   For the avoidance of doubt, the indemnifications provided for in this Article V are made only for purposes of allocating responsibility for Liabilities between the members of the iHeart Group, on the one hand, and the members of the Outdoor Group, on the other hand, and are not intended to, and shall not, affect any obligations to, or give rise to any rights of, any Third Parties.

Section 5.10   **No Cross-Claims or Third-Party Claims**.  Each of IHM and IHC, on the one hand, and CCH and CCOH, on the other hand, agrees that it shall not, and shall not permit the members of its respective Group to, in connection with any Third-Party Claim, assert as a counterclaim or Third-Party Claim against any member of the Outdoor Group or the iHeart Group, respectively, any claim (whether sounding in contract, tort or otherwise) that arises out of or relates to this Agreement or any Ancillary Agreement, any breach or alleged breach hereof or thereof, the Transactions (including all actions taken in furtherance of the Transactions on or prior to the date hereof), or the construction, interpretation, enforceability or validity hereof or thereof.

Section 5.11   **Tax Matters**.   Notwithstanding anything in this Agreement to the contrary, the New Tax Matters Agreement shall exclusively govern the allocation or Liability for Taxes and this Agreement shall not be interpreted as addressing any matter related to Taxes except as provided in Section 2.9(b) and Section 5.6(e).

Section 5.12   **Non-Solicitation of Employees**.   For a period of eighteen months following the Effective Date, each of IHM and IHC, on the one hand, and CCH and CCOH, on the other hand, agrees that it shall not, and shall not permit the members of its respective Group to, directly solicit, recruit or hire, without the written consent of the other Group, (i) all employees who primarily work in a sales capacity (including, without limitation, account

executives and sales managers) and (ii) all employees with a title of Vice-President and above. To the extent this prohibition is waived, any solicitation, recruitment or hiring efforts by either Group during the one year period after the Effective Date shall be coordinated with each Group's [Vice President of Human Resources] (or such employee serving a similar function) or his or her designee and appropriate management.  Notwithstanding the foregoing, this prohibition on solicitation, recruitment and hiring does not apply to actions taken by a Party: (a) in furtherance of the transactions contemplated by the Restructuring Transactions Memorandum, including for the avoidance of doubt, with respect to the employees in clauses (i) and (ii) of this Section 5.12; (b) in connection with a general recruitment effort, including the use of professional search and recruitment firms or recruitment carried out through a public solicitation or general solicitation, or the hiring of any person who responds thereto; or (c) with respect to any such employee who has been employed with the applicable Group for less than three months prior to the date of any such solicitation, recruitment or hiring.

    Section 5.13    Non-Competition. Each of IHM and IHC shall not, and shall not permit any member of the iHeart Group to, without the written consent of CCOH, engage in the Outdoor Competing Business anywhere in the Outdoor Territory during the Non-Compete Period; provided, that neither the foregoing nor anything else in this Agreement shall limit or restrict (including during the Non-Compete Period or otherwise) IHM, IHC or any member of the iHeart Group from acquiring equity interests, assets, any, business or product lines (regardless of the form, structure or manner of any such transaction, whether by sale, merger, consolidation or otherwise) of another Person who engages in the Outdoor Competing Business and for such Person and its Affiliates (other than the iHeart Group as of immediately prior to such acquisition) to continue to engage in the Outdoor Competing Business; provided, further, that for the avoidance of doubt, in the event of a Change of Control of IHM, neither the foregoing nor anything else in this Agreement shall limit or restrict (including during the Non-Compete Period or otherwise) any Person or group engaged in an Outdoor Competing Business that becomes the beneficial owner, directly or indirectly, of more than 50% of the total equity securities of IHM, IHC or any member of the iHeart Group from engaging in such Outdoor Competing Business.  CCOH shall not, and shall not permit any member of the Outdoor Group to, without the written consent of IHC and IHM to engage in an iHeart Competing Business anywhere in the iHeart Territory during the Non-Compete Period; provided, that neither the foregoing nor anything else in this Agreement shall limit or restrict (including during the Non-Compete Period or otherwise) CCOH or any member of the Outdoor Group from acquiring equity interests, assets, any, business or product lines (regardless of the form, structure or manner of any such transaction, whether by sale, merger, consolidation or otherwise) of another Person who engages in an iHeart Competing Business and for such Person and its Affiliates (other than the Outdoor Group as of immediately prior to such acquisition) to continue to engage in the iHeart Competing Business; provided, further, that for the avoidance of doubt, in the event of a Change of Control of New CCOH, neither the foregoing nor anything else in this Agreement shall limit or restrict (including during the Non-Compete Period or otherwise) any person or group engaged in an iHeart Competing Business that becomes the beneficial owner, directly or indirectly, of more than 50% of the total equity securities of New CCOH or any member of the Outdoor Group from engaging in such iHeart Competing Business. Each Party hereby acknowledges that the iHeart Group and the Outdoor Group engage through separate platforms in a business that derives revenue from selling, leasing and/or licensing advertisements, and the solicitation, sale, lease or license of advertisement opportunities to any Person shall in no way be

a breach of this Agreement even if any such activities results in a corresponding reduction in sales or revenue on any other platform of the other Group. Notwithstanding the foregoing, the performance by any of the Parties or any of the members of their respective Groups of any obligations under this Agreement or any of the Ancillary Agreements (and each other agreement or instrument expressly contemplated by this Agreement or any Ancillary Agreement to be entered into by any of the Parties or any of the members of their respective Groups) shall in no way constitute a breach of this Agreement, including the covenants set forth in this Section 5.13.

Section 5.14   **Separateness Covenants**.  The covenants contained in Section 5.12 and Section 5.13 shall be construed as a series of separate covenants, one for each city, county and state of any geographic area.  Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in Section 5.12 and Section 5.13.  If, in any judicial or arbitral proceeding, a court or arbitrator refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be revised, or if revision is not permitted it shall be eliminated from this Agreement, to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced.  In the event that the provisions of Section 5.12 and Section 5.13 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law.  In the event that the applicable court or arbitrator does not exercise the power granted to it in the prior sentence, the Parties agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

Section 5.15   **Survival**. If any member of either Group or any of their respective successors or assigns (i) shall merge or consolidate with or merge into any Person and shall not be the surviving or continuing corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of their respective properties and assets as an entity in one or a series of related transactions to any Person, then in each such case, proper provisions shall be made so that the successors or assigns of such Group member shall assume all of the obligations set forth in this Agreement; provided that neither Party or such Group member, as applicable, shall be relieved from such obligations.

# ARTICLE VI
## ACCESS OF INFORMATION; CONFIDENTIALITY

Section 6.1   **Agreement for Exchange of Information**.

(a)   Except in the case of an adversarial Action by one Party against another Party or one or more members of one Group against one or more members of the other Group, from the date of this Agreement until six years following the Closing Date, as soon as reasonably practicable after a Party's written request, each of IHM and New CCOH shall provide the members of the other Group, as well as their Representatives, reasonable access during normal business hours to, or, at IHM or New CCOH's written request, provide copies of, (i) all information in the possession or under the control of the other Party and (ii) the relevant personnel and representatives used in the preparation of such information as may be reasonably required by the requesting Party in connection with, among other things, to comply with

requirements imposed by a Governmental Authority, any Action, or governmental investigations of the requesting Party or in order to enable the requesting Party to comply with its obligations under this Agreement and any Ancillary Agreement, but only to the extent that such information relates to the requesting Party's Business, any Outdoor Asset, Outdoor Liability, iHeart Asset or iHeart Liability, as applicable; provided that in the event IHM or New CCOH, as applicable, determines that any such provision of information could be commercially detrimental, violate any Law or agreement or waive any attorney-client or attorney work product Privilege, then the Parties shall use commercially reasonable efforts to permit compliance with such obligations to the extent and in a manner that avoids such harm or consequence.  The Party providing information pursuant to this Section 6.1 shall only be obligated to provide such information in the form, condition and format in which it then exists and in no event shall such Party be required to perform any improvement, modification, conversion, updating or reformatting of any such information, and nothing in this Section 6.1 shall expand the obligations of the Parties under Section 6.3.  The Party requesting the information shall bear all reasonable and documented out-of-pocket expenses incurred by the providing Party in connection with such request; provided, that New CCOH shall not be so responsible for any such expenses to the extent (i) the request for information arises out of its receipt of services under the Transition Services Agreement and (i) such expenses would result in a duplication of charges under the Transition Services Agreement.

(b)     The Parties' obligations to provide information and cooperation with respect to Taxes shall be governed by the New Tax Matters Agreement.

**Section 6.2     Compensation for Providing Information**.  The Party requesting information pursuant to Section 6.1 agrees to reimburse the other Party for the reasonable costs, if any, of creating, gathering and copying such information or otherwise complying with the request with respect to such information (including any costs and expenses incurred in any review of information for purposes of protecting any Privileged Information of the providing Party or in connection with the restoration of backup tapes for purposes of providing the requested information).  Except as may be otherwise specifically provided elsewhere in this Agreement or in any other agreement between the Parties, such costs shall be computed in accordance with the providing Party's standard methodology and procedures, if any, and if there are no such standard methodology and procedures, then on a commercially reasonable basis.

**Section 6.3     Record Retention**.

(a)     To facilitate the possible exchange of information pursuant to this Section 6.3 after the Closing Date, except as otherwise required or agreed in writing (including in any Ancillary Agreement), the Parties agree to use commercially reasonable efforts to retain all information in their respective possession or control on the Closing Date in accordance with the policies and procedures of IHM as in effect immediately prior to the Closing Date or such other commercially reasonable policies and procedures as may be adopted by the applicable Party after the Closing Date as provided herein.  Notwithstanding the foregoing, (i) no Party shall be required to delay implementation of any amendment to information retention policies and legal hold procedures to the extent such amendments are required by applicable Law, and (ii) nothing in this Section 6.3 shall require any Party to retain electronic mail beyond the periods specified in relevant corporate policies, unless such electronic mail is subject, by virtue of its content, to

48

other specific records retention provisions, or is subject to a litigation hold or document retention notice, or is otherwise known by its custodian to relate to a pending or threatened Action.

(b)     In the event of an inadvertent failure by either IHM or New CCOH or any of their respective Subsidiaries to comply with the document retention policies as required under this Section 6.3, such Party shall be liable to the other Party solely for the amount of any monetary fines or penalties imposed or levied against such other Party by a Governmental Authority (which fines or penalties shall not include any Liabilities asserted in connection with the claims underlying the applicable Action, other than fines or penalties resulting from any claim of spoliation) as a result of such other Party's inability to produce information caused by such inadvertent failure and, notwithstanding Section 5.2 and Section 5.3, shall not be liable to such other Party for any other Liabilities with respect to such inability to produce information.

Section 6.4     Limitations of Liability.  In the absence of willful misconduct or fraud by the Party providing information pursuant to this Section 6.4, no Party shall have any Liability to any other Party in the event that any such information is found to be inaccurate.  No Party shall have any Liability to any other Party if any information is destroyed after commercially reasonable efforts by such Party to comply with the provisions of Section 6.3.

Section 6.5     Other Agreements Providing for Exchange of Information.

(a)     The rights and obligations granted under this Section 6.5 are subject to any specific limitations, qualifications or additional provisions on the sharing, exchange, retention or confidential treatment of information set forth herein or in any Ancillary Agreement.

(b)     Any Party that receives, pursuant to a request for information in accordance with this Section 6.5, information that is not relevant to its request shall promptly after the discovery thereof (i) return such information to the providing Party or, at the providing Party's request, destroy such information and (ii) deliver to the providing Party a certificate certifying that such information was returned or destroyed, as the case may be, which certificate shall be signed by an authorized Representative of the receiving Party, provided that a Party shall not be required to destroy or return any such information to the extent that: such information has been backed up electronically pursuant to such Party's standard document retention policies and will be managed and ultimately destroyed consistent with such policies.

(c)     When any information furnished by one Party to another Party is no longer needed for the purposes contemplated by this Agreement or any Ancillary Agreement, the receiving Party shall, at its option, promptly after receiving a written notice from the disclosing Party, either return to the disclosing Party all such information in a tangible form (including all copies thereof and all notes, extracts or summaries based thereon) or certify to the disclosing Party that it has destroyed such information (and such copies thereof and such notes, extracts or summaries based thereon), provided that a Party shall not be required to destroy or return any such information to the extent that: (i) such Party is required to retain such information in order to comply with any applicable Law; (ii) such information has been backed up electronically pursuant to such Party's standard document retention policies and will be managed and ultimately destroyed consistent with such policies; or (iii) such information is kept in such Party's legal files for purposes of resolving any claim.

49

**Section 6.6    Production of Witnesses; Records; Cooperation**.  At all times from and after the Closing Date, except in the case of an adversarial Action by one Party against another Party or one or more members of one Group against one or more members of the other Group (which shall be governed by discovery rules as may be applicable under Article V or otherwise), each Party shall use commercially reasonable efforts to make available to the other Party, without cost (other than reimbursement of actual out-of-pocket expenses) to, and upon prior written request of, the other Party, its Representatives as witnesses to the extent that the same may reasonably be required by the other Party (giving consideration to business demands of such Representatives) in connection with any Action in which the requesting Party may from time to time be involved with respect to the iHeart Business, the Outdoor Business or any Transactions. In connection with any matter contemplated by this Section 6.6, for each such Action, the Parties will enter into a mutually acceptable common interests and joint defense agreement, so as to maintain to the extent practicable any applicable Privilege, immunity or protection of the Parties.

**Section 6.7    Privileged Matters**.

(a)    The Parties recognize that legal and other professional services that have been and shall be provided prior to the Closing Date have been and shall be rendered for the collective benefit of the Parties and their respective Subsidiaries, and that each Party and its respective Subsidiaries should be deemed to be the client with respect to such services for the purposes of asserting all Privileges that may be asserted under applicable Law in connection therewith.

(b)    The Parties agree as follows:

(i)    IHM shall be entitled, in perpetuity, to control the assertion or waiver of all Privileges in connection with any Privileged Information that relates primarily to (A) the iHeart Business or (B) any iHeart Liabilities resulting from any Actions that are now pending or may be asserted in the future, in each case of clauses (A) and (B) whether or not such Privileged Information is in the possession or under the control of a member of the iHeart Group or the Outdoor Group; and

(ii)    New CCOH shall be entitled, in perpetuity, to control the assertion or waiver of all Privileges in connection with any Privileged Information that relates primarily to (A) the Outdoor Business or (B) any Outdoor Liabilities resulting from any Actions that are now pending or may be asserted in the future, in each case of clauses (A) and (B) whether or not such Privileged Information is in the possession or under the control of a member of the iHeart Group or the Outdoor Group.

(c)    Subject to Sections 6.7(d) and 6.7(e), the Parties agree that they shall have a shared Privilege with respect to all Privileges not allocated pursuant to Section 6.7(b) and all Privileges relating to any Actions or other matters that involve both Parties (or one or more of their respective Subsidiaries) and in respect of which both Parties have Liabilities under this Agreement, and that no such shared Privilege may be waived by either Party without the consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed).

50

(d)     If any dispute arises between IHM, on the one hand, or New CCOH, on the other hand, or between any member of their respective Groups, regarding whether a Privilege should be waived to protect or advance the interests of either Party and/or their respective Group members, each Party agrees that it shall: (i) negotiate with the other Party in good faith; (ii) endeavor to minimize any prejudice to the rights of the other Party; and (iii) not unreasonably withhold, condition or delay consent to any request for waiver by the other Party.  Further, each Party specifically agrees that it shall not withhold, condition or delay its consent to the waiver of a Privilege for any purpose except to protect its own legitimate interests.

(e)     Upon receipt by any member of the iHeart Group or the Outdoor Group, as applicable, of any subpoena, discovery or other request that may reasonably be expected to result in the production or disclosure of Privileged Information subject to a shared Privilege or as to which any member of the other Group has the sole right hereunder to assert a Privilege, IHM or New CCOH, as applicable, shall promptly provide written notice to the other Party of the existence of the request (which notice shall be delivered no later than five Business Days following the receipt of any such subpoena, discovery or other request; *provided* that the failure to provide any such notice shall not be a basis for Liability of a Party except and solely to the extent the other Party shall have been prejudiced thereby) and shall provide such other Party a reasonable opportunity to review such Privileged Information and to assert any rights it or they may have, including under this Section 6.7 or otherwise, to prevent the production or disclosure of such Privileged Information.

(f)     Any furnishing of, or access to, information pursuant to this Agreement is made in reliance on the agreement of the Parties set forth in this Section 6.7 and in Section 6.8 to maintain the confidentiality of Privileged Information and to assert and maintain all Privileges applicable thereto.  The Parties further agree that: (i) the transfer by one Party to the other Party of any Privileged Information that should not have been transferred pursuant to the terms of this Section 6.7 shall not be deemed to constitute a waiver of any Privilege that has been or may be asserted under this Agreement or otherwise with respect to such Privileged Information; and (ii) the Party receiving such Privileged Information shall promptly return such Privileged Information to the Party who has the right to assert such Privilege.

(g)     In furtherance of, and without limitation to, the Parties' agreement under this Section 6.7, IHM, on the one hand, and CCH and CCOH, on the other hand, shall, and shall cause the members of their respective Groups to, use reasonable efforts to maintain their respective separate and joint Privileges, including by executing joint defense and/or common interest agreements where necessary or useful for this purpose.

Section 6.8     **Confidentiality**. Each Party acknowledges that it or a member of its Group may have in its possession and, in connection with this Agreement and the Ancillary Agreements, may receive Confidential Information of the other Party or any member of such other Party's Group.  Each of IHM and CCH shall hold and cause its Representatives and the members of its respective Group and their Representatives to hold in strict confidence and not to use (except as permitted by this Agreement or any Ancillary Agreement) any such Confidential Information concerning the other Group unless (i) such Party or any members of its respective Group or its or their Representatives is or are compelled to disclose such Confidential Information by judicial or administrative Order or by other requirements of applicable Law or by

a request of a Governmental Authority of competent jurisdiction; or (ii) such Confidential Information can be demonstrated to have been (A) available to the general public without breach of this Agreement, (B) lawfully acquired after the Closing Date on a non-confidential basis from other sources not known by such Party to be under any legal obligation to keep such information confidential, or (C) developed independently by such Party or member of its respective Group without the use of any Confidential Information of the other Group.   Notwithstanding the foregoing, such Party or member of its Group or its or their Representatives may disclose such Confidential Information to the members of its Group and its or their Representatives on a "need to know" basis and so long as such Persons are informed by such Party of the confidential nature of such information and are directed to treat such information confidentially.   The obligations imposed by this <u>Section 6.8</u> on the members of each Group and their Representatives shall be satisfied if such Persons exercise the same level of care with respect to such Confidential Information as they would with respect to their own proprietary information.   If a Party or any member of its Group or any of its or their Representatives becomes compelled to disclose any Confidential Information of the other Group by judicial or administrative Order or by other requirements of applicable Law or a request of a Governmental Authority, such Party will promptly notify the other Party (to the extent permitted by applicable Law and reasonably practicable) and, upon request, use reasonable efforts (at the other Party's sole cost and expense) to cooperate with the other Party's efforts to seek a protective order or other remedy.   If no such protective order or other remedy is obtained or timely sought, such Party or any member of its Group or any of its or their Representatives (x) may furnish only that portion of the Confidential Information that it concludes, after consultation with counsel, is so requested or required to be disclosed, and (y) will exercise its reasonable efforts (at the other Party's sole cost and expense) to obtain assurances that confidential treatment will be afforded to such information.   Each of IHM and CCH agrees to be responsible for any breach of this <u>Section 6.8</u> by it, the members of its respective Group and its and their Representatives.

**ARTICLE VII**
**FURTHER ASSURANCES**

**Section 7.1**     **<u>Further Assurances</u>**.

(a)     In addition to the actions specifically provided for elsewhere in this Agreement and in the Ancillary Agreements, each of the Parties shall, and shall cause the members of each Group to, use commercially reasonable efforts, prior to, on and after the Closing Date, to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable on its part under applicable Laws and agreements, to consummate and make effective the Transactions.

(b)     Without limiting the foregoing, prior to, on and after the Closing Date, each Party shall use commercially reasonable efforts to cooperate with each other Party, and without any further consideration, but at the expense of the requesting Party, to execute and deliver, or cause to be executed and delivered, all instruments, and to make all filings with, and to obtain or make any Approvals of, any Governmental Authority or any other Person under any permit, license, agreement, indenture or other instrument, and to take all such other actions as such Party may reasonably be requested to take by any other Party from time to time, consistent with the terms of this Agreement and the Ancillary Agreements, in order to make effective the

Transactions; <u>provided</u> that, for the avoidance of doubt, neither Party shall be obligated to contribute any capital or pay any consideration in any form (including providing or maintaining any letter of credit, guaranty or other financial accommodation) to any Third Party, or agree to any change in the terms of the transferred arrangement which is material in the context of the particular item being transferred.  Without limiting the foregoing, each Party shall, at the reasonable request of the other Party and at the cost and expense of the requesting Party, take such other actions as may be reasonably necessary to vest in such other Party all of the transferring Party's right, title and interest to the Assets to be transferred to such other Party by this Agreement.

Section 7.2    **Order of Precedence**.  In the case of any conflict between the provisions of this Agreement and the provisions of any Ancillary Agreement, the provisions of the Ancillary Agreement shall prevail.

## ARTICLE VIII
## TERMINATION

Section 8.1    **Termination**.  This Agreement may only be terminated:

(a)    by an agreement in writing signed by each of the Parties;

(b)    by either IHM or CCOH if the Separation has not been consummated prior to [June 30, 2019]; and

(c)    by either IHM or CCOH if (1) IHM files (x) a plan of reorganization, a disclosure statement or a proposed Confirmation Order in the Chapter 11 Cases that does not contemplate the Separation, or (y) any motion, pleading, or other document with the Bankruptcy Court in the Chapter 11 Cases that is otherwise materially inconsistent with the applicable Restructuring Support Agreement or the Plan of Reorganization in effect as of the date hereof, or (2) the Confirmation Order (x) does not contemplate the Separation or (y) is not otherwise materially consistent with the Plan of Reorganization in effect as of the date hereof.

Section 8.2    **Effect of Termination**.  In the event that this Agreement is terminated, this Agreement shall become null and void and no Party, nor any Party's directors, officers or employees, shall have any Liability of any kind to any Person by reason of this Agreement.

## ARTICLE IX
## DISPUTE RESOLUTION

Section 9.1    **Governing Law**.  This Agreement (including all its Exhibits, Schedules, Annexes and Appendices) (and any claims or disputes arising out of or related hereto or to the Transactions or to the inducement of any Party to enter herein, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) shall be exclusively governed by and construed and interpreted in accordance with the Laws of the State of Delaware, irrespective of any choice of laws principles that would result in the application of the Laws of another jurisdiction, including all matters of formation, existence, validity, interpretation, construction, effect, enforceability, performance, breach, termination, and remedies; <u>provided</u> that any matter arising out of or related to the certificate of incorporation,

bylaws or other organizational documents of an entity formed under the Laws of a jurisdiction other than the State of Delaware or any corporate action taken pursuant to such organizational documents or the Laws of the jurisdiction of such entity's formation shall be governed by and construed and interpreted in accordance with the Laws of such other jurisdiction.

**Section 9.2    CONSENT TO JURISDICTION AND SERVICE OF PROCESS**. THE PARTIES HERETO AGREE THAT JURISDICTION AND VENUE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT BY ANY PARTY PURSUANT TO THIS AGREEMENT (AND ANY CLAIMS OR DISPUTES ARISING OUT OF OR RELATED HERETO OR TO THE TRANSACTIONS OR TO THE INDUCEMENT OF ANY PARTY TO ENTER HEREIN WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE AND WHETHER PREDICATED ON COMMON LAW, STATUTE OR OTHERWISE) SHALL PROPERLY AND EXCLUSIVELY LIE IN THE CHANCERY COURT OF THE STATE OF DELAWARE AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (OR, IF THE CHANCERY COURT OF THE STATE OF DELAWARE DECLINES TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, ANY STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE). BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH SUIT, ACTION OR PROCEEDING.  THE PARTIES HERETO IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN SUCH COURT AND HEREBY WAIVE ANY OBJECTION THAT ANY SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH SUIT, ACTION OR PROCEEDING.   EACH OF THE PARTIES FURTHER IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.4.   NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW

**Section 9.3    WAIVER OF JURY TRIAL**. EACH PARTY HERETO EXPRESSLY AND IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT, THE ANCILLARY AGREEMENTS, THE TRANSACTIONS OR THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF, AND ANY ACTION RELATING TO OR ARISING IN ANY WAY THEREFROM SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1    Counterparts; Entire Agreement**.

(a)    This Agreement and each Ancillary Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each party hereto or

thereto, as the case may be, and delivered to each other party hereto or thereto, as the case may be.

(b)    This Agreement and, when executed and delivered, the Ancillary Agreements, and the Exhibits, Annexes and Schedules hereto and thereto, contain the entire agreement between the Parties with respect to the subject matter (including, effective as of the Closing, the CCOH Master Agreement, the CCOH Corporate Services Agreement, the CCOH License Agreement, the Tax Matters Agreement and the EBIT Agreement) hereof and thereof, supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter and there are no agreements or understandings between the Parties with respect to such subject matter other than those set forth or referred to herein or therein.

(c)    Each Party acknowledges that it and each other Party may execute this Agreement and the Ancillary Agreements by facsimile, stamp, mechanical or electronic signature (including in PDF, TIFF or any similar format).  Each Party expressly adopts and confirms each such facsimile, stamp, mechanical or electronic signature made in its respective name as if it were a manual signature, agrees that it shall not assert that any such signature is not adequate to bind such Party to the same extent as if it were signed manually and agrees that, at the reasonable request of any other Party at any time and if so requested for such other Party, it shall as promptly as reasonably practicable cause this Agreement and each Ancillary Agreement to be manually executed (any such execution to be as of the date of the initial date thereof).

**Section 10.2   Assignability**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns; provided that no party hereto may assign its respective rights or delegate its respective obligations under this Agreement without the express prior written consent of the other parties hereto; provided, further, that each Party may assign its rights and delegate its obligations under this Agreement to any of its Affiliates (provided that no such assignment or delegation shall release such Party from any Liability or obligation under this Agreement).

**Section 10.3   Third-Party Beneficiaries**.  Except as set forth in Article V, (a) the provisions of this Agreement are solely for the benefit of the parties hereto, and are not intended to confer upon any Person except the parties hereto, any rights or remedies hereunder or thereunder, and (b) there are no third-party beneficiaries of this Agreement and this Agreement shall not provide any Third Party with any remedy, claim, Liability, reimbursement, claim of Action or other right.

**Section 10.4   Notices**.  All notices, requests, claims, demands or other communications under this Agreement and, to the extent applicable and unless otherwise provided therein, under each of the Ancillary Agreements, shall be in writing and shall be deemed to have been given or made (i) when personally delivered, (b) the next Business Day if sent by overnight courier service marked for overnight delivery, (iii) upon transmission if sent by email prior to 5:00 p.m. New York City time on a Business Day (or as of 9:00 a.m. New York City time the following Business Day if sent after 5:00 p.m. New York City time or on a day that is not a Business Day) if either receipt is acknowledged (such acknowledgement not to be unreasonably withheld) or within one Business Day if a copy is sent pursuant to clause (b), or (iv) three Business Days after

55

deposit in the United States mail, certified and with proper postage prepaid, addressed as follows (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.4):

If to IHM, to:

iHeartMedia, Inc.
20880 Stone Oak Parkway
San Antonio, Texas 78258
Attention: Lauren Dean
E-mail: LaurenDean@iheartmedia.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Douglas A. Ryder, P.C.,
                Dvir Oren
                Brian D.Wolfe
E-mail:         douglas.ryder@kirkland.com
                dvir.oren@kirkland.com
                brian.wolfe@kirkland.com


If to CCH prior to the Closing, to:

Clear Channel Outdoor Holdings, Inc.
99 Park Avenue, 2nd Floor
New York, NY 10016
Attention: Lynn Feldman
E-mail: LynnFeldman@clearchannel.com

Clear Channel Outdoor Holdings, Inc.
c/o Clear Channel International Ltd.
33 Golden Square
London W1F9JT
United Kingdom
Attention: Adam Tow
E-mail: Adam.Tow@clearchannel.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Douglas A. Ryder, P.C.,

> Dvir Oren
> Brian D.Wolfe
E-mail:    douglas.ryder@kirkland.com
> dvir.oren@kirkland.com
> brian.wolfe@kirkland.com

If to CCH after the Closing or CCOH, to:

Clear Channel Outdoor Holdings, Inc.
99 Park Avenue, 2nd Floor
New York, NY 10016
Attention: Lynn Feldman
E-mail: LynnFeldman@clearchannel.com

Clear Channel Outdoor Holdings, Inc.
c/o Clear Channel International Ltd.
33 Golden Square
London W1F9JT
United Kingdom
Attention: Adam Tow
E-mail: Adam.Tow@clearchannel.com

with a copy (which shall not constitute notice) to:

Wilson, Sonsini, Goodrich & Rosati
1301 Avenue of the Americas
New York, NY 10019
Attention:  Benjamin Hoch
> Bradley Finkelstein
E-mail: bhoch@wsgr.com
> bfinkelstein@wsgr.com

**Section 10.5    Severability**.    If any provision of this Agreement or any Ancillary Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof or thereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.   Upon such determination, the Parties shall negotiate in good faith in an effort to agree upon such a suitable and equitable provision to effect the original intent of the Parties.

**Section 10.6    Publicity**.  From and after the Closing Date, New CCOH and IHM shall consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other public statements with respect to the Transactions, and shall not issue any such press release or make any public statement prior to such consultation, except as may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or national securities quotation system.

**Section 10.7   Headings**.  The article, section and paragraph headings contained in this Agreement and in the Ancillary Agreements are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or any Ancillary Agreement.

**Section 10.8   Survival of Covenants**.  Except as expressly set forth in this Agreement, the covenants, representations and warranties contained in this Agreement and each Ancillary Agreement, and Liability for the breach of any obligations contained herein or therein, shall survive the Separation and shall remain in full force and effect.

**Section 10.9   Waivers of Default**.  Waiver by any Party of any default by the other Party of any provision of this Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default, nor shall it prejudice the rights of such Party.  No failure or delay by any Party in exercising any right, power or Privilege under this Agreement shall operate as a waiver thereof nor shall a single or partial exercise thereof prejudice any other or further exercise thereof or the exercise of any other right, power or Privilege.

**Section 10.10   Specific Performance**.  In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement or any Ancillary Agreement, the party or parties who are, or are to be, thereby aggrieved shall have the right to seek specific performance and injunctive or other equitable relief (on an interim or permanent basis) in respect of its or their rights under this Agreement or such Ancillary Agreement, in addition to any and all other rights and remedies at Law or in equity, and all such rights and remedies shall be cumulative.  The Parties agree that the remedies at Law for any breach or threatened breach, including monetary damages, may be inadequate compensation for any Loss and that any defense in any Action for specific performance that a remedy at Law would be adequate is waived.  Any requirements for the securing or posting of any bond with such remedy are waived by each of the Parties.

**Section 10.11   Amendments**.  No provisions of this Agreement shall be deemed waived, amended, supplemented or modified by any party hereto or thereto, as the case may be, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized Representative of the party against whom such waiver, amendment, supplement or modification is sought to be enforced.

**Section 10.12   Interpretation**.  In this Agreement and any Ancillary Agreement:

(a)      words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other genders as the context requires;

(b)      the terms "***hereof***," "***herein***," "***herewith***" and words of similar import, and the terms "***Agreement***" and "***Ancillary Agreement***" shall, unless otherwise stated, be construed to refer to this Agreement or the applicable Ancillary Agreement as a whole (including all of the Schedules, Exhibits, Annexes and Appendices hereto and thereto) and not to any particular provision of this Agreement or such Ancillary Agreement;

(c)      Article, Section, Exhibit, Schedule, Annex and Appendix references are to the Articles, Sections, Exhibits, Schedules, Annexes and Appendices to this Agreement (or the applicable Ancillary Agreement) unless otherwise specified;

(d)     the word "*including*" and words of similar import when used in this Agreement (or the applicable Ancillary Agreement) means "including, without limitation";

(e)     unless expressly stated to the contrary in this Agreement or in any Ancillary Agreement, the word "*or*" shall not be exclusive;

(f)     unless expressly stated to the contrary in this Agreement or in any Ancillary Agreement, all references to "***the date hereof,***" "***the date of this Agreement,***" "***hereby***" and "***hereupon***" and words of similar import shall all be references to the date first stated in the preamble to this Agreement, regardless of any amendment or restatement hereof;

(g)     unless otherwise provided, all references to "***$***" or "***dollars***" are to United States dollars; and

(h)     references to the performance, discharge or fulfillment of any Liability in accordance with its terms shall have meaning only to the extent such Liability has terms, and if the Liability does not have terms, the reference shall mean performance, discharge or fulfillment of such Liability.

**Section 10.13 <u>Mutual Drafting</u>**.  This Agreement and the Ancillary Agreements shall be deemed to be the joint work product of the parties hereto and thereto, as the case may be, and any rule of construction that a document shall be interpreted or construed against a drafter of such document shall not be applicable.

**Section 10.14 <u>Limitations of Liability</u>**.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NO MEMBER OF THE OUTDOOR GROUP, ON THE ONE HAND, NOR THE IHEART GROUP, ON THE OTHER HAND, SHALL BE LIABLE UNDER THIS AGREEMENT TO THE OTHER FOR ANY LOST PROFITS, LOST BUSINESS OPPORTUNITIES, OR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, PUNITIVE, EXEMPLARY, REMOTE, SPECULATIVE OR SIMILAR DAMAGES (OTHER THAN ANY SUCH LIABILITY WITH RESPECT TO A THIRD-PARTY CLAIM). Notwithstanding any other provision of this Agreement, no individual who is a shareholder, director, employee, officer, agent or other Representative of IHM, CCH or CCOH, in such individual's capacity as such, shall have any Liability in respect of or relating to the covenants or obligations of IHM, CCOH or CCH, as applicable, under this Agreement or any Ancillary Agreement or in respect of any certificate delivered with respect hereto or thereto and, to the fullest extent legally permissible, each of IHM, CCOH and CCH, for itself and its respective Subsidiaries and its and their respective shareholders, directors, employees and officers, waives and agrees not to seek or enforce any such Liability that any such Person otherwise might have pursuant to applicable Law.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized Representatives, in each case as of the date first written above.

IHEARTMEDIA, INC.

By: _____
Name:
Title:

IHEARTCOMMUNICATIONS, INC.

By: _____
Name:
Title:

CLEAR CHANNEL HOLDINGS, INC.

By:_____
Name:
Title:

CLEAR CHANNEL OUTDOOR
HOLDINGS, INC.

By:_____
Name:
Title:

**<u>Exhibit A</u>**
**<u>Restructuring Transactions Memorandum</u>**

See attached.

**<u>Exhibit B</u>**
**<u>Form of Merger Agreement</u>**

See attached.

**Exhibit C**
**Form of Transitions Services Agreement**

See attached.

**<u>Exhibit D</u>**
**<u>Form of New Tax Matters Agreement</u>**

See attached.

**<u>Exhibit E</u>**
**<u>Form of Amended EBIT Program Agreement</u>**

See attached.

**<u>Exhibit F</u>**
**<u>Form of Revolving Loan Agreement</u>**

See attached.

**Exhibit G**
**Form of CCH Certificate of Incorporation**

See attached.

## Exhibit H
## Form of Amended and Restated Bylaws of CCH

See attached.

# **EXHIBIT 2**

**Transition Services Agreement**

**TRANSITION SERVICES AGREEMENT**

**DATED [●], 20[●]**

**AMONG**

**IHEARTMEDIA MANAGEMENT SERVICES, INC.,**

**IHEARTMEDIA, INC.,**

**IHEARTCOMMUNICATIONS, INC.**

**AND**

**CLEAR CHANNEL OUTDOOR HOLDINGS, INC.**

# Table of Contents

**Page**

TRANSITION SERVICES AGREEMENT ............................................................................... 1

ARTICLE I DEFINITIONS ................................................................................................... 1
    Section 1.1    Certain Defined Terms.................................................................. 1
    Section 1.2    Other Terms. .................................................................................. 3

ARTICLE II SERVICES AND TERMS ............................................................................... 4
    Section 2.1    Services; Scope. ............................................................................ 4
    Section 2.2    Reserved. ....................................................................................... 6
    Section 2.3    Services Managers. ...................................................................... 6
    Section 2.4    Performance and Receipt of Services. ........................................ 7
    Section 2.5    Representations and Warranties................................................... 7
    Section 2.6    DISCLAIMER. .............................................................................. 8
    Section 2.7    Parent Guarantee. ......................................................................... 8

ARTICLE III ADDITIONAL AGREEMENTS ...................................................................... 8
    Section 3.1    Leases. ........................................................................................... 8
    Section 3.2    Computer-Based Resources. ......................................................... 8
    Section 3.3    Access. .......................................................................................... 8

ARTICLE IV COSTS AND DISBURSEMENTS; PAYMENTS ........................................... 9
    Section 4.1    Service Charges. ........................................................................... 9
    Section 4.2    Consents. ..................................................................................... 10

ARTICLE V STANDARD FOR SERVICE; COMPLIANCE WITH LAWS........................... 10
    Section 5.1    Standard for Service..................................................................... 10
    Section 5.2    Compliance with Laws. ............................................................... 11

ARTICLE VI INDEMNIFICATION; LIMITATION ON LIABILITY ................................. 12
    Section 6.1    Indemnification by Each Provider. .............................................. 12
    Section 6.2    Indemnification by Each Recipient.............................................. 12
    Section 6.3    Indemnification Matters; Exclusive Remedies. .......................... 13
    Section 6.4    Limitations on Liability. .............................................................. 13
    Section 6.5    Liability for Payment Obligations. ............................................. 13

ARTICLE VII DISPUTE RESOLUTION ............................................................................. 14
    Section 7.1    Applicable Law. ........................................................................... 14
    Section 7.2    Dispute Resolution. ..................................................................... 14

ARTICLE VIII TERM; TERMINATION .............................................................................. 14
    Section 8.1    Term. ............................................................................................ 14
    Section 8.2    Termination.................................................................................. 14
    Section 8.3    Effect of Termination................................................................... 15
    Section 8.4    Survival........................................................................................ 16

Section 8.5      Force Majeure. ......................................................................................... 16

ARTICLE IX GENERAL PROVISIONS ........................................................................... 16
Section 9.1      Independent Contractors. ......................................................................... 16
Section 9.2      Subcontractors. ........................................................................................ 17
Section 9.3      Additional Services; Books and Records. ................................................ 17
Section 9.4      Confidential Information. ........................................................................ 17
Section 9.5      Notices. .................................................................................................... 18
Section 9.6      Taxes. ...................................................................................................... 19
Section 9.7      Severability. ............................................................................................ 19
Section 9.8      Entire Agreement. ................................................................................... 20
Section 9.9      Assignment; No Third Party Beneficiaries. ............................................ 20
Section 9.10    Amendment. ............................................................................................ 20
Section 9.11    Rules of Construction. ............................................................................. 20
Section 9.12    Counterparts. ........................................................................................... 21
Section 9.13    No Right to Set-Off. ................................................................................ 21
Section 9.14    Specific Performance. ............................................................................. 21

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT, dated to be effective as of [●], 20[●] (this "Agreement"), is made by and among iHeartMedia Management Services, Inc., a Delaware corporation ("Management Services"), and Clear Channel Outdoor Holdings, Inc., a Delaware corporation ("CCOH"), and, with respect to Section 2.7 only, iHeartMedia, Inc., a Delaware corporation ("IHM") and iHeartCommunications, Inc., a Texas corporation ("IHC").[1] Certain capitalized terms used in this Agreement are defined in Section 1.1 and the definitions of the other capitalized terms used in this Agreement are cross-referenced in Section 1.2.

### R E C I T A L S

WHEREAS, IHM, IHC, CCOH and Clear Channel Holdings, Inc., a Delaware corporation ("CCH"), have entered into a Settlement and Separation Agreement, dated as of [●], 20[●] (the "Separation Agreement"), pursuant to which, among other things, IHM and its subsidiaries will separate the iHeart Business and the Outdoor Business, and CCOH will merge with and into CCH (such surviving corporation, "New CCOH") with New CCOH thereafter existing as an independent, publicly traded company, as set forth in the Separation Agreement;

WHEREAS, prior to such separation, members of the iHeart Group previously provided certain administrative and support services and other assistance to the Outdoor Group pursuant to that certain Corporate Services Agreement between Clear Channel Management Services, L.P. and Clear Channel Outdoor Holdings, Inc. dated December 10, 2005 (the "CCOH Corporate Services Agreement");

WHEREAS, after such separation, both CCOH and IHM desire for Management Services to provide certain administrative and support services and other assistance to the Outdoor Group in accordance with the terms and subject to the conditions set forth herein, and Management Services desires to provide or cause to be provided by other members of the iHeart Group, such services and assistance to the Outdoor Group;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I
### DEFINITIONS

### Section 1.1     Certain Defined Terms.

The following capitalized terms used in this Agreement will have the meanings set forth below:

"Force Majeure" means, with respect to a party, an event beyond the reasonable control of such party (or any Person acting on its behalf), which by its nature could not have been

---

[1] Note to Draft: Party names may be adjusted based on the timing of execution of this TSA.

reasonably foreseen by such party (or such Person), or, if it could have been reasonably foreseen, was unavoidable, and includes, without limitation, (i) acts of God, storms, floods, riots, fires, explosions, blackouts, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure of energy sources or distribution facilities, (ii) change in Law or (c) labor strikes, lockouts or any other kind of labor dispute.

"Information Systems" means computing, telecommunications or other digital operating or processing systems or environments, including, without limitation, computer programs, data, databases, computers, computer libraries, communications equipment networks and systems. When referenced in connection with Services, Information Systems will mean the Information Systems accessed and/or used in connection with the Services.

"Intellectual Property" means all of the following, whether protected, created or arising under the laws of the United States or any other foreign jurisdiction: (i) patents, patent applications (along with all patents issuing thereon), statutory invention registrations, divisions, continuations, continuations-in-part, substitute applications of the foregoing and any extensions, reissues, restorations and reexaminations thereof, and all rights therein provided by international treaties or conventions; (ii) copyrights, mask work rights, database rights and design rights, whether or not registered, published or unpublished, and registrations and applications for registration thereof, and all rights therein whether provided by international treaties or conventions or otherwise; (iii) trademarks, service marks, trade dress, logos and other identifiers of source, including all goodwill associated therewith and all common law rights, registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (iv) intellectual property rights arising from or in respect of domain names, domain name registrations and reservations and URLs; (v) trade secrets; (vi) intellectual property rights arising from or in respect of Technology; and (vii) all other applications and registrations related to any of the intellectual property rights set forth in the foregoing clauses (i) through (vi) above.

"IT-Based Service" means (i) each Service specifically identified on Schedule A as an "IT Service," and (ii) any other Service the use and enjoyment of which by a Recipient reasonably requires the use of another IT Service.

"Outdoor Group" means CCOH and each Subsidiary of CCOH immediately after the Distribution Date (excluding, for the avoidance of doubt, Outdoor and any member of the iHeart Group).

"Provider" means Management Services or another member of the iHeart Group that is providing a Service pursuant to this Agreement.

"Provider Owned Technology" means Technology owned by Provider, its Affiliates or any of its or their respective subcontractors or personnel and used in connection with the Services, including any modifications, enhancements or derivative works of such Technology or any new Technology developed by Provider, and all Intellectual Property rights subsisting in any of the foregoing.

- 2 -

"Provider Third Party Technology" means all Technology licensed (other than by Recipient) to Provider that is provided to Recipient for use in connection with the Services, and all Intellectual Property rights subsisting in the foregoing.

"Recipient" means CCOH or another member of the Outdoor Group to whom a Service pursuant to this Agreement is being provided.

"Recipient Owned Technology" means: (a) Technology owned by Recipient or any of its Affiliates; (b) Technology developed or acquired by Recipient after the date hereof; (c) derivative works, modifications and enhancements to any of the foregoing; and (d) all Intellectual Property rights subsisting in any of the foregoing.

"Recipient Third Party Technology" means all Technology licensed (other than by Provider) to Recipient that is provided to Provider for use in connection with the Services, and all Intellectual Property rights subsisting in the foregoing.

"Service Termination Date" means the effective date of the termination of this Agreement pursuant to Section 8.2(a) or such earlier termination date as may be determined in accordance with Section 8.2(a) in respect of any specified Service.

"Software" means the object and source code versions of computer programs and any associated documentation therefor.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, techniques, ideas, know-how, software, programs, models, routines, confidential and proprietary information, databases, tools, inventions, invention disclosures, creations, improvements, works of authorship, and all recordings, graphs, drawings, reports, analyses, other writings, and any other embodiment of the above, in any form, whether or not specifically listed herein.

### Section 1.2    Other Terms.

For purposes of this Agreement, the following terms have the meanings set forth in the sections or agreements indicated.

| Term | Section |
| --- | --- |
| Affiliate | Separation Agreement |
| Agreement | Preamble |
| Breaching Party | Section 8.2(a) |
| CCH | Recitals |
| CCOH | Preamble |
| CCOH Corporate Services Agreement | Separation Agreement |
| CCOH Stock | Separation Agreement |
| Consents | Section 4.2 |
| Distribution Date | Separation Agreement |
| Effective Date | Separation Agreement |
| Group | Separation Agreement |
| iHeart Business | Separation Agreement |
| iHeart Group | Separation Agreement |

iHeart Services Manager(s)........................................Section 2.3
IHC........................................................................Preamble
IHM.......................................................................Preamble
Laws......................................................................Separation Agreement
Liabilities ..............................................................Separation Agreement
Management Services .............................................Preamble
New Tax Matters Agreement....................................Separation Agreement
Non-Breaching Party ..............................................Section 8.2(a)
Outdoor Business....................................................Separation Agreement
Outdoor Services Manager(s) ..................................Section 2.3
Person....................................................................Separation Agreement
Provider Indemnified Party.......................................Section 6.3
Recipient Indemnified Party .....................................Section 6.2
Representative.........................................................Separation Agreement
Separation Agreement.............................................Recitals
Services .................................................................Section 2.1(a)
Service Charges .....................................................Section 4.1(a)
Standard for Services ..............................................Section 5.1
Subsidiary ..............................................................Separation Agreement
Substitute Service...................................................Section 2.1(a)
Taxes.....................................................................Separation Agreement
Term......................................................................Section 8.1

## ARTICLE II
## SERVICES AND TERMS

**Section 2.1**   **Services; Scope.**

(a)      During the Term, subject to the terms and conditions set forth in this Agreement, Management Services will provide, or will cause to be provided, to the Outdoor Group, (i) the services set forth on Schedule A, and (ii) reasonably promptly following CCOH's prior written request therefor at any time during the first three months following the date hereof, any other finance, information technology, human resources, legal services, management oversight and other general services of an administrative and/or advisory nature with respect to the Outdoor Business, as such services were provided as of, and at any time during the one year period prior to, the last day prior to the date hereof under the CCOH Corporate Services Agreement (collectively, the "Services"); provided, however, that the Services under clause (ii) will not include any of the services set forth on Schedule C (the "Excluded Services"); provided, further, that to the extent CCOH requests Management Services to provide such additional services and such additional services were not contemplated in the determination of the Service Charges set forth on Schedule A, CCOH shall pay for such additional services an amount consistent with the methodology for pricing set forth on Schedule A (which, for the avoidance of doubt, means amounts that are consistent with what was previously paid by CCOH under the CCOH Corporate Services Agreement) and Schedule A shall be appropriately amended to reflect such additional services and fees. Subject to the exclusion of the Excluded Services, the "Services" also will include any Services to be provided by the iHeart Group to the Outdoor Group as agreed pursuant to Section 9.3(a).  During the first three months following the Effective Date, IHM will

promptly notify CCOH in writing of any other services (other than the Excluded Services) of which it becomes aware, and of which CCOH is not aware, that were provided at any time during the one year period prior to the date hereof under the CCOH Corporate Services Agreement but are (A) not included on Schedule A and (B) that have not otherwise been transferred, licensed or assigned to CCOH or any member of the Outdoor Group. Unless a broader scope is set forth on the Schedules or otherwise agreed to by the parties, the scope and manner of provision of each Service will at least be substantially the same as the scope and manner of provision of such service provided by the iHeart Group to the Outdoor Group during such one year period prior to the date hereof.  Nothing in this Agreement will require that any Service be provided other than for use in, or in connection with, the Outdoor Business as conducted prior to the date hereof and any reasonable expansions thereof (other than through an acquisition, however structured). Nothing in the preceding sentence or elsewhere in this Agreement will be deemed to restrict or otherwise limit the volume or quantity of any Service; provided, that, volume or quantity changes with respect to a Service that change a Provider's costs of providing that Service in any material respect shall require the parties to negotiate in good faith and use their commercially reasonable efforts to agree upon a price change with respect to such Service.

(b)     The Services will include, and the Service Charges reflect charges for, such maintenance, support, error correction, training, updates and enhancements normally and customarily provided by members of the iHeart Group to other iHeart Group members that receive such services. If CCOH requests that Management Services provides a custom modification in connection with any Service, and such custom modification is not contemplated by the Services set forth on Schedule A and does not arise from a Provider's failure to meet the Standard for Services or the applicable service levels set forth on Schedule A, then the parties will negotiate in good faith and use their commercially reasonable efforts to agree upon a price change with respect to such Service. The Services will include all functions, responsibilities, activities and tasks, and the materials, documentation, resources, rights and licenses to be used, granted or provided by the iHeart Group that are not specifically described in this Agreement as a part of the Services, but are incidental to, and would normally be considered an inherent part of, or necessary subpart included within, the Services or are otherwise necessary for the iHeart Group to provide, or the Outdoor Group to receive, the Services except for any Excluded Services.

(c)     Technology, Software and Proprietary Rights.

(i)     Recipient hereby grants, and shall cause its Affiliates to grant, to each Provider (and solely to the extent necessary for Provider to provide the Services, to subcontractors under Section 9.2) a nonexclusive, worldwide, nontransferable (except as provided in Section 9.9), irrevocable (except as provided in Section 8.3), fully paid-up, royalty-free right and license, solely during the Term, for the express and sole purpose of providing the Services, to use the Recipient Owned Technology and the Recipient Third Party Technology made available by Recipient to Provider pursuant to this Agreement. Except as otherwise requested or approved in writing by Recipient, Provider will, and will cause its Affiliates and its and their subcontractors and personnel to, cease all use of Recipient Owned Technology and Recipient Third Party Technology upon the termination of the Services, and the parties acknowledge that such right and license will terminate upon the termination of the Services.

- 5 -

(ii)     Provider hereby grants, and shall cause its Affiliates to grant, to each Recipient a nonexclusive, worldwide, nontransferable (except as provided in <u>Section 9.9</u>), irrevocable (except as provided in <u>Section 8.3</u>), fully paid-up, royalty-free right and license, solely during the Term, to the extent required to fully and completely use the Services, to use the Provider Owned Technology and the Provider Third Party Technology (to the extent Provider can grant such rights). The parties acknowledge that such right and license will terminate upon the termination of the Services.

(iii)     This Agreement will not assign any rights to Technology, Software or Intellectual Property between the parties; assignment of the foregoing is set forth in the Separation Agreement.

(d)     Without limiting <u>Article V</u>, throughout the term of this Agreement, the Provider and the Recipient of any Service will cooperate with one another and use their good faith, commercially reasonable efforts to effect the efficient, timely and seamless provision and receipt of the Services.

(e)     Any Software delivered by a Provider hereunder will be delivered, at the election of the Provider (acting reasonably), either (i) with the assistance of the Provider, through electronic transmission or downloaded by the Recipient from the applicable intranet, or (ii) by installation by the Provider on the relevant equipment, with retention by the Provider of all tangible media on which such Software resides. Provider shall transfer to Recipient a tangible medium containing such Software (including any enhancements, upgrades or updates) to the extent necessary to perform the Services. Upon the Termination or expiration of the Services, Recipient will return or certify the destruction of such tangible medium containing such Software. Each party will comply with all reasonable security measures implemented by the other party in connection with the delivery of Software.

**Section 2.2     Reserved.**

**Section 2.3     Services Managers.**[2]

Management Services will designate a dedicated services account manager(s) (the "<u>iHeart Services Manager(s)</u>") who will be directly responsible for coordinating and managing the delivery of the Services and will have authority to act on the iHeart Group's behalf with respect to the Services. CCOH will designate a dedicated services account manager(s) (the "<u>Outdoor Services Manager(s)</u>") who will be directly responsible for coordinating and managing the delivery of the Services and will have authority to act on the Outdoor Group's behalf with respect to the Services. The iHeart Services Manager(s) and the Outdoor Services Manager(s) will work together in good faith to address the Outdoor Group's issues and the parties' relationship under this Agreement.

---

[2] Note to Draft: Discuss if having Service Managers is useful in this context.

**Section 2.4**      **Performance and Receipt of Services.**

Each of Management Services and CCOH will, and will cause its respective Groups to, comply with the following provisions with respect to the Services:

(a)      Each Provider and Recipient will at all times comply with its own then in-force written security guidelines and policies applicable to the performance, access and/or use of the Services and Information Systems. To the extent that either party is accessing the other party's facilities or Information Systems, such party will adhere to the guidelines and policies of the other party.

(b)      Each Provider and Recipient will take commercially reasonable measures to ensure that no computer viruses or similar items are coded or introduced into the Services or Information Systems. If a computer virus is found to have been introduced into the Services or Information Systems, the parties hereto will use their commercially reasonable efforts to cooperate and to diligently work together to eliminate the effects of such computer virus.

(c)      Each Provider and Recipient will exercise reasonable care in providing and receiving the Services to (i) prevent access to the Services or Information Systems by unauthorized Persons, and (ii) not damage, disrupt or interrupt the Services or Information Systems.

**Section 2.5**      **Representations and Warranties.**

(a)      Each party represents and warrants to the other that: (i) it has all requisite legal and corporate power to execute and deliver this Agreement; (ii) it has taken all corporate action necessary for the authorization, execution and delivery of this Agreement; (iii) it is not a party to a contract with any other Person, firm, or other entity that would violate or interfere with its obligations hereunder; and (iv) this Agreement is a legal, valid and binding obligation of it, enforceable against it in accordance with the terms of this Agreement.

(b)      Each party represents and warrants that it is duly licensed or qualified to do business and is in good standing in every jurisdiction in which a license or other qualification is required for the conduct of its business, except where the failure to be so licensed or qualified would have no material adverse effect on its ability to fulfill its obligations under this Agreement.

(c)      Each of Management Services, IHM and IHC represents and warrants to CCOH that:  to its knowledge, except for the Excluded Services set forth on Schedule C, the Services set forth on Schedule A constitute all of the services that were provided as of, or at any time during the one year period prior to, the last day prior to the date hereof under the CCOH Corporate Services Agreement, except for (A) services that CCOH knows were provided during such period under the CCOH Corporate Services and are nonetheless not included on Schedule A, (B) services that have been transferred, licensed or assigned to CCOH or any member of the Outdoor Group prior to the date hereof.

### Section 2.6    DISCLAIMER.

EXCEPT AS EXPRESSLY PROVIDED HEREIN,  THERE ARE NO OTHER, AND PROVIDER DOES NOT MAKE AND HEREBY DISCLAIMERS ALL OTHER, REPRESENTATIONS, WARRANTIES, OR GUARANTEES OF ANY KIND WITH RESPECT TO THE SERVICES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NONINFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE.

### Section 2.7    Parent Guarantee.

Each of IHM and IHC absolutely, unconditionally and irrevocably guarantees (on a joint and several basis) to CCOH the full and complete performance of all obligations, covenants and agreements required to be observed and performed or reimbursed or credited by any member of the iHeart Group to any member of the Outdoor Group under this Agreement.

### ARTICLE III
### ADDITIONAL AGREEMENTS

### Section 3.1    Leases.[3]

Management Services and CCOH agree that each lease or sublease listed on Schedule B, pursuant to which any member of the Outdoor Group leases or subleases real property from any member of the iHeart Group, will remain in full force and effect pursuant to its terms unless otherwise agreed to in writing by the parties or expired in accordance with its terms.

### Section 3.2    Computer-Based Resources.

(a)     Management Services and CCOH agree that the Outdoor Group will not have access to all or any part of the Information Systems of the iHeart Group pursuant to this Agreement, except to the extent necessary for the Outdoor Group to receive the Services (subject to the Outdoor Group complying with all reasonable security measures implemented by the iHeart Group as deemed necessary by the iHeart Group to protect its Information Systems).

(b)     Management Services and CCOH agree that the iHeart Group will not have access to all or any part of the Information Systems of the Outdoor Group pursuant to this Agreement, except to the extent necessary for the iHeart Group to perform the Services (subject to the iHeart Group complying with all reasonable security measures implemented by the Outdoor Group as deemed necessary by the Outdoor Group to protect its Information Systems).

### Section 3.3    Access.

CCOH will allow the iHeart Group and its Representatives reasonable access to the facilities of the Outdoor Group necessary for the performance of the Services and to enable the iHeart Group to fulfill its obligations under this Agreement. Management Services will allow the

---

[3] Note to Draft: We expect the leases to be surviving contracts under the Separation Agreement. To discuss whether they need to be included in the TSA.

Outdoor Group and its Representatives reasonable access to the facilities of the iHeart Group necessary for the performance of the Services and to enable the Outdoor Group to fulfill its obligations under this Agreement. All such access shall be subject to the reasonable security and insurance requirements of the party providing the access and shall not unreasonably interfere with the operations at such facilities.

## ARTICLE IV
## COSTS AND DISBURSEMENTS; PAYMENTS

**Section 4.1**     **Service Charges.**

(a)     Schedule A sets forth with respect to each Service a description of the charges for such Service or the basis for the determination thereof (the "Service Charges"). Further, without duplication to the Services Charges, in connection with performance of the Services, the Provider will make payments for the benefit of and on behalf of the Recipient and will incur out-of-pocket costs and expenses (collectively, the "Other Costs"), which will be reimbursed to the Provider by the Recipient to the extent such Other Costs are reasonably incurred and of the type previously passed through to and reimbursed by CCOH under the CCOH Corporate Services Agreement; provided, that any Other Costs incurred outside of the ordinary course of business will only be payable if the Recipient has, in each case, pre-approved such Other Costs in writing; it being agreed that if Recipient withholds its consent, Provider's obligation to provide such Service shall be excused to the extent such provision would require Provider to incur such Other Costs); provided, further, that all Other Costs will only be payable by the Recipient if it has received from the Provider reasonably detailed data and other documentation sufficient to support the calculation of amounts due to the Provider as a result of such Other Costs. Except for the Service Charges, the Other Costs reimbursable pursuant to the preceding sentence and any amounts that may become payable pursuant to Section 6.2, there are no other amounts payable by CCOH or any Recipient in respect of any Services or this Agreement.

(b)     The Provider will deliver an invoice to the Recipient at the start of each calendar month (or at such other frequency as is set forth on Schedule A) in arrears for the Service Charges and Other Costs. The invoice shall contain reasonably detailed data and documentation sufficient to support the calculation of any amount due to the Provider under this Agreement. The Recipient will pay the undisputed amount of such invoice to the Provider in U.S. dollars within 45 days of the date of such invoice; provided, that to the extent consistent with past practice with respect to Services rendered outside the United States, payments may be made in local currency. If the Recipient fails to pay such amount (excluding any amount contested in good faith) by such date, the Recipient will be obligated to pay to the Provider, in addition to the amount due, interest on such amount at the lesser of (i) the three month London Interbank Offered Rate (LIBOR) plus 100 basis points or (ii) the maximum rate of interest allowed by applicable law, from the date the payment was due through the date of payment. If, within 45 days of receipt of an invoice, the Recipient disputes the Provider's calculation of any amount due to the Provider, then the dispute will be resolved pursuant to Section 7.2.

**Section 4.2**      **Consents.**

Management Services and CCOH acknowledge and agree that certain Software licenses and other licenses, consents, approvals, notices, registrations, recordings, filings and other actions (collectively, "Consents") may be required by Management Services, CCOH or members of their respective Groups in connection with the provision of the Services. Other than any license fees (100% of which shall be borne by Recipient), with respect to each Service, the Provider and the Recipient shall each pay 50% of all costs incurred in order to obtain, perform or otherwise satisfy each such Consent. To the extent that a Consent is obtained, performed or otherwise satisfied entirely by either the Provider or the Recipient, as applicable (the "Paying Party"), then the non-Paying Party shall reimburse the Paying Party for 50% of the actual, out-of-pocket costs incurred by the Paying Party. In the event that any required Consent is not obtained, then unless and until such Consent is obtained, Provider shall use all commercially reasonable efforts to determine and promptly adopt, subject to Recipient's approval (which shall not be unreasonably withheld conditioned or delayed), an alternative approach as necessary and sufficient to provide the Services without such Consent to put Recipient in the same or substantially the same position as if such Consent had been obtained (it being agreed that Provider shall not be in breach of this Agreement as a result of not adopting an alternative approach not approved by Recipient so long as Provider continues to comply with its efforts set forth in this sentence to find another alternative approach). The Provider and the Recipient shall each pay 50% of all costs incurred in order to obtain such alternative approach (other than with respect to license fees, 100% of which shall be borne by Recipient).  To the extent that any Consent is required under a Shared Contract, the provisions set forth in [Section 2.9(a)] of the Separation Agreement are hereby incorporated into, and made a part of this Section 4.2. Prior to payment of, or reimbursement for, such out-of-pocket expenses, Provider will provide the Recipient with an invoice accompanied by reasonably detailed data and documentation sufficient to evidence the out-of-pocket expenses for which the Provider is seeking payment or reimbursement. Upon receipt of such invoice and data and documentation, the Recipient will either pay the amount of such invoice directly in accordance with its general payment terms with vendors or reimburse the Provider for its payment of the invoice within 30 days of the date of its receipt of such invoice. If within 30 days of receipt of an invoice, Recipient disputes the invoiced amount, then the parties will work together to resolve such dispute. If the parties are unable to resolve such dispute, the dispute will be resolved pursuant to Section 7.2.

## ARTICLE V
## STANDARD FOR SERVICE; COMPLIANCE WITH LAWS

**Section 5.1**      **Standard for Service**.

Without limiting any other provisions in this Agreement (including any applicable standards set forth in Schedule A), Management Services agrees that the Provider will perform the Services such that the nature, quality, degree of skill, standard of care and the service levels at which such Services are performed are no less than the nature, quality, degree of skill, standard of care and the service levels at which the substantially same services were provided to the members of the Outdoor Group by or on behalf of the Provider on the date immediately prior to the date hereof or during the one year period prior thereto and, in any case, shall be performed in a timely, professional, workmanlike manner (the "Standard for Services"); provided, that (i)

during the first six (6) months following the Effective Date, Provider shall not modify the manner in which Provider or its Affiliates provides the Services or the Standard of Services in a manner that is adverse to Recipient and (ii) for the remainder of the term of this Agreement, Provider, in its sole discretion and upon at least 15 days' prior written notice to Recipient, may modify the manner in which it provides the Services to such Recipient to conform to modifications in the manner in which Provider or its Affiliates generally provide services to any member of the iHeart Group, in each case, only to the extent such modification is not adverse (including with respect to the Standard for Services) to Recipient in any material respect. Management Services shall assign (to the extent such individuals are available) each of the employees or contractors that have been mutually agreed between IHM and CCOH expressly identified as "dedicated employees" on <u>Schedule A</u>[4] opposite an individual Service to provide the corresponding Services for the period of time set forth on <u>Schedule A</u> throughout the term of such Service. IHM and IHC shall not, and shall cause each Provider to not, terminate the employment or contracting relationship with such employee or contractor for the period of time set forth on <u>Schedule A</u> following the Effective Date, except for material breach of any employment or service agreement, gross negligence, willful misconduct, fraud or other "cause" event.[5]  In the event any such employee or contractor is unable to provide such Service at any time during the term of the applicable Service, then Management Services will cause the applicable Provider to assign a substitute employee or contractor of comparable skill and experience to provide such Service for the remainder of the term of such Service, which substitute employee or contractor will be subject to prior written approval of the applicable Recipient(s), which approval will not be unreasonably withheld, conditioned or delayed (it being agreed that Provider shall not be in breach of this Agreement as a result of not assigning a substitute employee or contractor not approved by Recipient so long as Provider continues to comply with its efforts set forth in this sentence to find a substitute employee or contractor).

   **Section 5.2      <u>Compliance with Laws.</u>**

   Each of Management Services and CCOH will be responsible for its, and its respective Group's, compliance with any and all Laws applicable to its performance under this Agreement; <u>provided</u>, <u>however</u>, that each of Management Services and CCOH will, subject to reimbursement of out-of-pocket expenses by the requesting party, use commercially reasonable efforts to cooperate and provide the other party with all reasonably requested assistance (including, without limitation, the execution of documents and the provision of relevant information) to ensure compliance with all applicable Laws in connection with any regulatory action, requirement, inquiry or examination related to this Agreement or the Services.

---

[4]      Note to Draft: Parties to negotiate in good faith to identify a list of employees whose skill set or knowledge base is essential to the provision of the Services.

[5]      Note to Draft: This provision is subject to further review following identification of the individuals to whom this provision would apply.

**ARTICLE VI**
**INDEMNIFICATION; LIMITATION ON LIABILITY**

**Section 6.1      Indemnification by Each Provider.**

Management Services will, and will cause each Provider to indemnify, defend and hold harmless each relevant Recipient and each of its Affiliates and each of their respective directors, officers, employees and subcontractors, and each of the heirs, executors, successors and assigns of any of the foregoing (each, a "Recipient Indemnified Party"), from and against any and all Liabilities of the Recipient Indemnified Parties relating to, arising out of, or resulting from:

(a)      the gross negligence or willful misconduct of a Provider Indemnified Party in connection with such Provider Indemnified Party's provision of the Services;

(b)      any alleged infringement, violation or misappropriation by a Recipient of any Software, Technology or any other Intellectual Property (other than Recipient Owned Technology) used or made accessible to Recipient by or on behalf of a Provider in connection with the provision of the Services;

(c)      the improper use or improper disclosure of information of, or regarding, a customer or potential customer of a Recipient Indemnified Party in connection with the transactions contemplated by this Agreement or a Provider Indemnified Party's provision of the Services; or

(d)      any violation of applicable Law by a Provider Indemnified Party in connection with the transactions contemplated by this Agreement or such Provider Indemnified Party's provision of the Services;

**Section 6.2      Indemnification by Each Recipient.**

CCOH will, and will cause each Recipient to, indemnify, defend and hold harmless each relevant Provider and each of its Affiliates and each of their respective directors, officers, employees and subcontractors, and each of the heirs, executors, successors and assigns of any of the foregoing (each, a "Provider Indemnified Party") from and against any and all Liabilities of the Provider Indemnified Parties relating to, arising out of, or resulting from:

(a)      any Taxes, together with interest and penalties, that are the responsibility of CCOH under Section 9.6;

(b)      the gross negligence or willful misconduct of a Recipient or its Affiliates in connection with such party's use of the Services;

(c)      any alleged infringement, violation or misappropriation by a Provider of any Software, Technology or any other Intellectual Property (other than Provider Owned Technology) used or made accessible to Provider by or on behalf of Recipient in connection with the receipt of the Services; or

(d)      any violation of applicable Law by a Recipient Indemnified Party in connection with the transactions contemplated by this Agreement or such Recipient Indemnified Party's receipt or use of the Services.

Section 6.3      **Indemnification Matters; Exclusive Remedies.**

The indemnification procedures set forth in [Sections 5.4 through 5.6] of the Separation Agreement are hereby incorporated into, and made a part of this Article VI and as otherwise applicable to this Agreement. The provisions of this Article VI, as well as each party's right to pursue and obtain damages for a breach of this Agreement, specific performance and/or injunctive relief, will constitute the sole and exclusive remedies for Liabilities arising under this Agreement, whether in contract, tort or otherwise, including for any such party's ordinary or contributory negligence.

Section 6.4      **Limitations on Liability.**

**Notwithstanding any other provision contained in this Agreement, Management Services and CCOH agree on their behalf, and on behalf of their respective Groups, that no member of the iHeart Group on the one hand, and no member of the Outdoor Group, on the other hand, will be liable to any member of the other Group, whether based on contract, tort (including negligence), warranty or any other legal or equitable grounds, for any special, indirect, punitive, incidental or consequential losses, damages or expenses of the other Group, including, without limitation, loss of data, loss of profits, interest or revenue, or use or interruption of business, arising from any claim relating to breach of this Agreement or otherwise relating to any of the Services provided hereunder; provided that the foregoing limitation on liability shall not apply to (i) damages awarded to a third party pursuant to a third party claim for which a Provider is required to indemnify, defend and hold harmless any Recipient Indemnified Party under Section 6.1 or (ii) damages awarded to a third party pursuant to a third party claim for which a Recipient is required to indemnify, defend and hold harmless any Provider Indemnified under Section 6.2.** Notwithstanding anything to the contrary contained in this Agreement, the aggregate liability of the Provider Indemnified Parties, on the one hand, or the Recipient Indemnified Parties, on the other hand, whether based on contract, tort (including negligence), warranty or any other legal or equitable grounds, will in no event exceed an amount equal to the aggregate payments made by the Recipients to the Providers for Services pursuant to this Agreement for the 12-month period preceding the date of such event giving rise to a claim hereunder.

Section 6.5      **Liability for Payment Obligations.**

Nothing in this Article VI will be deemed to eliminate or limit, in any respect, any member of the iHeart Group's or any member of the Outdoor Group's express obligation in this Agreement to pay or reimburse, as applicable, for (a) Service Charges; (b) applicable Other Costs; (c) amounts payable or reimbursable with respect to any custom modification provided pursuant to Section 2.1(b); (d) any amounts payable or reimbursable pursuant to the terms of the leases referred to in Section 3.1; (e) amounts payable or reimbursable in respect of 50% of the Consents pursuant to Section 4.2, (f) amounts payable or reimbursable pursuant to Section 5.2 with respect to compliance with Laws; (g) amounts payable or reimbursable pursuant to

Section 9.3(b) with respect to books and records; and (h) amounts payable or reimbursable pursuant to Section 9.6 with respect to Taxes.

## ARTICLE VII
## DISPUTE RESOLUTION

### Section 7.1    Applicable Law.

This Agreement will be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware, without giving effect to any conflicts of law rule or principle that might require the application of the laws of another jurisdiction.

### Section 7.2    Dispute Resolution.

To the extent not resolved through discussions between the iHeart Services Manager(s) and the Outdoor Services Manager(s), any dispute, controversy or claim arising out of, or relating to, this Agreement will be resolved in accordance with [Article IX] of the Separation Agreement, which dispute resolution provisions are hereby incorporated into, and made a part of, this Section 7.2.

## ARTICLE VIII
## TERM; TERMINATION

### Section 8.1    Term.

The term of this Agreement will begin on the Effective Date (as defined in the Separation Agreement) and end at midnight on the one-year anniversary of the Effective Date, unless earlier terminated in accordance with the terms of this Agreement (the "Term"). Notwithstanding the foregoing, CCOH may, in its sole discretion, extend the Term as to all or any individual Service (an "Extended Service") for one-month periods up to an aggregate of 12 additional months for each individual Service by providing to Management Services 30 days' prior written notice of each such extension, in each case, on the same terms and conditions as set forth herein; provided, that with respect to any Extended Service other than an IT-Based Service, the Service Charge for such Extended Service shall be increased by: (i) 20% of the amount set forth opposite such Extended Service on Schedule A for any such Extended Services performed during the first three months following such one-year anniversary; (ii) 30% of the amount set forth opposite such Extended Service on Schedule A for any such Extended Services performed following such three-month extension and prior to six months following such one-year anniversary; and (iii) 40% of the amount set forth opposite such Extended Service on Schedule A for any such Extended Services performed following such six-month extension; provided, further, that with respect to any Extended Service that is an IT-Based Service, no increase shall be made to the Service Charge with respect thereto during the first twelve months following such one-year anniversary.

### Section 8.2    Termination.

(a)    This Agreement may be terminated with respect to all or any individual Service, in whole or in part, at any time by CCOH upon 30 days' prior written notice; provided, that

CCOH may not terminate any individual Service that Provider reasonably determines is required in connection with the continued provision of any other non-terminated Service, unless all such co-dependent Services are terminated concurrently; provided, further, that, except as expressly set forth on Schedule A, CCOH will pay for all fixed costs and expenses associated with such early termination to the extent such fixed costs and expenses are set forth on or are expressly contemplated by Schedule A.[6] Notwithstanding the foregoing, with respect to specific Services provided hereunder: (i) either party hereto (the "Non-Breaching Party") may terminate this Agreement with respect to any individual Service, in whole or in part, at any time upon prior written notice by the Non-Breaching Party to the other party (the "Breaching Party") if the Breaching Party (including any member of its respective Group) has failed to perform any of its material obligations under this Agreement relating to such Service or part thereof, and such failure will have continued without cure for a period of 30 days after receipt by the Breaching Party of a written notice of such failure from the Non-Breaching Party seeking to terminate such Service or part thereof; provided, however, that no Service or part thereof may be terminated pursuant to this clause (i) until the parties have completed the dispute resolution process set forth in Section 7.2 with respect to such Service or part thereof; and (ii) Management Services and CCOH may from time to time mutually agree to terminate any individual Service, in whole or in part; provided that any such agreement to terminate a Service or part thereof will comply with Section 9.10 and include all terms and conditions applicable to termination of the Service or part thereof to be terminated. Any such termination of an individual Service or part thereof will not in any way affect the obligations of the terminating party to continue to receive all other Services (or parts thereof) not so terminated and to continue to provide Services as required by this Agreement. In the event any individual Service is terminated in part pursuant to the terms of this Agreement, the applicable Provider and the applicable Recipient shall cooperate in good faith to determine the amount of Service Charges reasonably attributable to the terminated part, and the Service Charges for such Service shall be automatically deemed reduced by such amount. In the event the Provider and Recipient disagree on the amount that should be attributed to the terminated part, the parties shall first attempt to resolve the disagreement pursuant to the dispute resolution process set forth in Section 7.2.

(b)      In addition to and not in limitation of the rights and obligations set forth in [Section 2.1(d) or Section 2.6] of the Separation Agreement, upon the written request of the Recipient of a Service, the Provider of a Service will cooperate with the Recipient and use its good faith, commercially reasonable efforts to assist with the efficient and timely transition of such Service to the Recipient (or Affiliate of the Recipient or such third party vendor designated by the Recipient) by the Service Termination Date for such Service, in each case to enable the Recipient to perform such Service itself in substantially the same manner as such Service was performed by the Provider prior to the Service Termination Date.

### Section 8.3      Effect of Termination.

Upon termination or expiration of any Service or part thereof pursuant to this Agreement, the relevant Provider will have no further obligation to provide such terminated Service or part, and the relevant Recipient will have no obligation to pay any Service Charges or Other Costs

---

[6] Note to Draft: Subject to further review following finalization of Schedule A.

relating to any such Service or part (other than for or in respect of Services or parts thereof provided in accordance with the terms of this Agreement and received by such Recipient prior to such termination). Upon termination of this Agreement in accordance with its terms, (i) no Provider will have any further obligation to provide any Service, and no Recipient will have any obligation to pay any Service Charges or Other Costs relating to any Service or make any other payments under this Agreement (other than for or in respect of Services received by such Recipient prior to such termination); and (ii) all licenses granted under this Agreement shall immediately terminate and each party (and any member of its Group or any other Person acting on its behalf) shall immediately cease all use of the Software, Technology or any other Intellectual Property provided or made accessible to it by or on behalf of the other party under this Agreement.

### Section 8.4     Survival.

Each of Section 2.7 (Parent Guarantee), Section 3.2 (Computer-Based Resources), Article IV (Costs and Disbursements; Payments), Article VI (Indemnification; Limitation on Liability), Article VII (Dispute Resolution), Section 8.3 (Effect of Termination), this Section 8.4 (Survival), and Article IX (General Provisions) will survive the expiration or other termination of this Agreement and remain in full force and effect.

### Section 8.5     Force Majeure.

No party hereto (or any member of its Group or any other Person acting on its behalf) will have any liability or responsibility for any breach, including failure to fulfill any obligation (other than a payment obligation), under this Agreement so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure. A party claiming the benefit of this provision will promptly, as soon as reasonably practicable after the occurrence of any such event: (a) notify the other party of the nature and extent of any such Force Majeure condition and (b) use reasonable efforts to remedy and overcome such event. Upon remedying or overcoming the circumstances giving rise to Force Majeure, the Provider shall promptly notify the Recipient of the termination of such Force Majeure condition and shall promptly resume its performance of Services as soon as feasible. If the Force Majeure in question prevails for a continuous period in excess of sixty (60) days after the date on which the Force Majeure begins, the parties shall consult together with a view to determining mutually acceptable measures to overcome the difficulties arising therefrom.

## ARTICLE IX
## GENERAL PROVISIONS

### Section 9.1     Independent Contractors.

In providing Services hereunder, the Provider will act solely as independent contractor and nothing in this Agreement will constitute or be construed to be or create a partnership, joint venture, or principal/agent relationship between the Provider, on the one hand, and the Recipient, on the other hand. All Persons employed by the Provider in the performance of its obligations under this Agreement will be the sole responsibility of the Provider.

### Section 9.2       Subcontractors.

Any Provider may hire or engage, with the applicable Recipient's prior written approval (which approval shall not be unreasonably withheld, conditioned or delayed), one or more subcontractors to perform any or all of its Services; provided, that Management Services will remain responsible for all its obligations under this Agreement, including, without limitation, with respect to the scope of the Services, the Standard for Services and the content of the Services provided to the Recipient.  Schedule D attached hereto lists subcontractors approved as of the date hereof and the Services that are proposed to be subcontracted to them.  Except as set forth in Schedule D, no Provider may subcontract the performance of any Services without the prior written approval of the applicable Recipient (which approval shall not be unreasonably withheld, conditioned or delayed).  Under no circumstances will any Recipient be responsible for making any payments directly to any subcontractor engaged by a Provider.

### Section 9.3       Additional Services; Books and Records.

(a)       If, during the term of this Agreement, a party hereto identifies a need for additional or other transition services to be provided by or on behalf of Management Services, the parties hereto agree to negotiate in good faith to provide such requested services (provided that such services are of a type generally provided by the iHeart Group at such time) and the applicable service fees, payment procedures, and other rights and obligations with respect thereto. To the extent practicable, such additional or other services will be provided on terms substantially similar to those applicable to Services of similar types and otherwise on terms consistent with those contained in this Agreement.

(b)       All books, records and data maintained by a Provider for a Recipient with respect to the provision of a Service will be the exclusive property of such Recipient. The Recipient, at its sole cost and expense, will have the right to inspect, and make copies of, any such books, records and data during regular business hours upon reasonable advance notice to the Provider. At the sole cost and expense of the Provider, upon termination of the provision of any Service, all relevant books, records and data relating to such terminated Service will be delivered by the Provider to the Recipient in a mutually agreed upon format to the address of CCOH set forth in Section 9.5 or any other mutually agreed upon location; provided, however, that the Provider will be entitled to retain one copy of all such books, records and data relating to such terminated Service for archival purposes and for purposes of responding to any dispute that may arise with respect thereto.

### Section 9.4       Confidential Information.

CCOH agrees to, and will cause the other members of the Outdoor Group to, maintain and safeguard all Confidential Information pursuant to [Section 7.9] of the Separation Agreement, and  Management Services agrees to, and will cause the other members of the iHeart Group to, maintain and safeguard all Confidential Information pursuant to [Section 7.9] of the Separation Agreement, and each party hereto agrees that [Section 7.9] of the Separation Agreement is hereby incorporated by reference into, and made a part of, this Agreement.

**Section 9.5**     Notices.

All notices, requests, claims, demands and other communications under this Agreement will be in writing and will be given or made (and will be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as will be specified in a notice given in accordance with this Section 9.5):

If to Management Services:

    iHeartMedia Management Services, Inc.
    20880 Stone Oak Parkway
    San Antonio, Texas 78258
    Attention: Lauren Dean
    E-mail: LaurenDean@iheartmedia.com

If to CCOH:

    Clear Channel Outdoor Holdings, Inc.
    99 Park Avenue, 2nd Floor
    New York, NY 10016
    Attention: Lynn Feldman
    E-mail: LynnFeldman@clearchannel.com

    and

    Clear Channel Outdoor Holdings, Inc.
    c/o Clear Channel International Ltd.
    33 Golden Square
    London  W1F9JT
    United Kingdom
    Attention: Adam Tow
    E-mail: AdamTow@clearchannel.com

with a copy (which shall not constitute notice) to:

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, NY 10014
    Attention: Douglas A. Ryder, P.C., Dvir Oren; Brian D. Wolfe
    E-mail: douglas.ryder@kirkland.com;
    dvir.oren@kirkland.com;
    brian.wolfe@kirkland.com

with a copy (which shall not constitute notice) to:

    Wilson, Sonsini, Goodrich & Rosati, P.C.
    1303 Avenue of the Americas
    New York, NY 10019
    Attention: Benjamin Hoch
           Bradley Finkelstein
           James Clessuras
    E-mail: bhoch@wsgr.com
           bfinkelstein@wsgr.com
           jclessuras@wsgr.com

If to any other member of the iHeart Group:

    iHeartMedia, Inc.
    20880 Stone Oak Parkway
    San Antonio, Texas 78258
    Attention: Lauren Dean

If to any other member of the Outdoor Group:

    Clear Channel Outdoor Holdings, Inc.
    20880 Stone Oak Parkway
    San Antonio, Texas 78258
    Attention: [●]

E-mail: LaurenDean@iheartmedia.com                    E-mail: [●]

with a copy (which shall not constitute notice)      with a copy (which shall not constitute notice)
to:                                                  to:

Kirkland & Ellis LLP                                 Wilson, Sonsini, Goodrich & Rosati, P.C.
601 Lexington Avenue                                 1303 Avenue of the Americas
New York, NY 10014                                   New York, NY 10019
Attention: Douglas A. Ryder, P.C., Dvir             Attention: Benjamin Hoch
Oren; Brian D. Wolfe                                            Bradley Finkelstein
E-mail: douglas.ryder@kirkland.com;                            James Clessuras
dvir.oren@kirkland.com;                              E-mail: bhoch@wsgr.com
brian.wolfe@kirkland.com                                       bfinkelstein@wsgr.com
                                                               jclessuras@wsgr.com

### Section 9.6    **Taxes.**

Except as otherwise specifically provided for in the New Tax Matters Agreement:

(a)      Each party will be responsible for any personal property Taxes on property it owns or leases, for franchise and privilege Taxes on its business, and for Taxes based on its net income or gross receipts.

(b)      Each Recipient may report and (as appropriate) pay any sales, use, excise, value-added, services, consumption, and other Taxes directly if the Recipient provides the applicable Provider with a direct pay or exemption certificate.

(c)      A Provider will promptly notify the applicable Recipient of, and coordinate with the Recipient the response to and settlement of, any claim for Taxes asserted by applicable taxing authorities for which the Recipient is alleged to be financially responsible hereunder.

(d)      Each Recipient will be entitled to receive and to retain any refund of Taxes paid to a Provider pursuant to this Agreement. In the event a Provider receives a refund of any Taxes paid by a Recipient to the Provider, the Provider will promptly pay, or cause the payment of, such refund to the Recipient.

(e)      Each of the parties hereto agrees that if reasonably requested by the other party, it will cooperate with such other party to enable the accurate determination of such other party's Tax liability and assist such other party in minimizing its Tax, liability to the extent legally permissible. The Provider's invoices will separately state the amounts of any Taxes the Provider is proposing to collect from the Recipient.

### Section 9.7    **Severability.**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any law or as a matter of public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will

negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

### Section 9.8    Entire Agreement.

Except as otherwise expressly provided in this Agreement, this Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes all prior agreements and undertakings, both written and oral, between or on behalf of the parties hereto with respect to the subject matter of this Agreement, including the CCOH Corporate Services Agreement. The Schedules and Recitals to this Agreement are hereby incorporated by reference into and made part of this Agreement for all purposes.

### Section 9.9    Assignment; No Third Party Beneficiaries.

This Agreement will not be assigned by any party hereto without the prior written consent of the other party hereto; provided, however, that Management Services may assign this Agreement in connection with a merger, consolidation, reorganization, sale of all or substantially all of its assets or similar transaction within the iHeart Group whether or not Management Services is the surviving entity. Except as provided in Article VI with respect to indemnified parties and subject to the proviso below, this Agreement is for the sole benefit of the parties to this Agreement, the members of their respective Group and their permitted successors and assigns and nothing in this Agreement, express or implied, is intended to or will confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement; provided, that if CCOH sells, transfers or spins off a member of the Outdoor Group or a business line of any member of the Outdoor Group (a "SpinCo"), Management Services will continue to provide the Services to such SpinCo (but not more than the amount and level of Services that were provided to the applicable member of the Outdoor Group prior to the consummation of such sale, transfer or spin off) on the terms and conditions of this Agreement for the remainder of the term hereof. CCOH will cause each member of the Outdoor Group receiving Services hereunder as a Recipient to abide by the terms and conditions of this Agreement, and Management Services will cause each member of the iHeart Group providing Services hereunder as a Provider to abide by the terms and conditions of this Agreement.

### Section 9.10   Amendment.

No provision of this Agreement may be amended or modified except by a written instrument signed by all the parties of this Agreement to such agreement. No waiver by any party of any provision hereof will be effective unless explicitly set forth in writing and executed by the party so waiving. The waiver by either party hereto of a breach of any provision of this Agreement will not operate or be construed as a waiver of any other subsequent breach.

### Section 9.11   Rules of Construction.

(a)      Interpretation of this Agreement will be governed by the following rules of construction: (i) words in the singular will be held to include the plural and vice versa and words

of one gender will be held to include the other gender as the context requires, (ii) references to the terms Article, Section, paragraph, and Schedule are references to the Articles, Sections, paragraphs, and Schedules to this Agreement unless otherwise specified, (iii) the word "including" and words of similar import will mean "including, without limitation," (iv) provisions will apply, when appropriate, to successive events and transactions, (v) the headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement, and (vi) this Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

(b)     Unless specifically stated in the Separation Agreement that a particular provision of the Separation Agreement should be given effect in lieu of a conflicting provision in this Agreement, to the extent that any provision contained in this Agreement conflicts with, or cannot logically be read in accordance with, any provision of the Separation Agreement, the provision contained in this Agreement will prevail.

(c)     Unless specifically stated in the Schedules to this Agreement, to the extent that any provision contained in this Agreement conflicts with, or cannot logically be read in accordance with, any provision of a Schedule to this Agreement the provision contained in such Schedule will prevail.

### Section 9.12   Counterparts.

This Agreement may be executed in one or more counterparts, and by the different parties to each such agreement in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail will be as effective as delivery of a manually executed counterpart of any such Agreement.

### Section 9.13   No Right to Set-Off.

CCOH will, and will cause each other Recipient to, pay the full amount of costs and disbursements, including Other Costs, incurred under this Agreement, and will not set-off, counterclaim or otherwise withhold any other amount owed to a Provider on account of any obligation owed by a Provider to a Recipient.

### Section 9.14   Specific Performance.

Subject to the provisions of Section 7.2, in the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the party or parties who are, or are to be, thereby aggrieved shall have the right to specific performance and injunctive or other equitable relief (on an interim or permanent basis) in respect of its or their rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The parties hereto agree that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any losses and liabilities, and hereby waive any defense in any

action or proceeding for specific performance that a remedy at law would be adequate. Any requirements for the securing or posting of any bond with such remedy are waived by each of the parties hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Transition Services Agreement to be executed to be, effective on the date first written above by their respective duly authorized officers.

IHEARTMEDIA MANAGEMENT SERVICES, INC.

By: _____

Name:

Title:

IHEARTMEDIA, INC.

By: _____

Name:

Title:

IHEARTMEDIACOMMUNICATIONS, INC.

By: _____

Name:

Title:

CLEAR CHANNEL OUTDOOR HOLDINGS, INC.

By: _____

Name:

Title:

[SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT]

# EXHIBIT 3

**Tax Matters Agreement**

# TAX MATTERS AGREEMENT

This Tax Matters Agreement (this "***Agreement***"), dated as of _____, 2019, is entered into by and among iHeartMedia, Inc., a Delaware corporation ("***IHM***"), iHeartCommunications, Inc., a Texas corporation ("***IHC***"), [Radio Newco], a Delaware corporation ("***Radio Newco***"), Clear Channel Holdings, Inc., a Nevada corporation ("***CCH***"), Clear Channel Outdoor Holdings, Inc., a Delaware corporation ("***CCOH***"), Clear Channel Outdoor, Inc. ("***CCOI***").

# RECITALS

WHEREAS, certain IHM Group Members (as defined below), on the one hand, and certain Outdoor Group Members (as defined below), on the other hand, file Income Tax Returns (as defined below) on a consolidated, combined or unitary basis for certain federal, state, local and foreign Income Tax (as defined below) purposes;

WHEREAS, IHM prepares and files, or causes to be prepared and filed, the Income Tax Returns of each Outdoor Group Member, whether or not such Outdoor Group Member files an Income Tax Return on a consolidated, combined or unitary basis with any IHM Group Member;

WHEREAS, IHC (f/k/a Clear Channel Communications, Inc.), which is an IHM Group Member, and CCOH, which is an Outdoor Group Member, are parties to that certain Tax Matters Agreement dated as of November 10, 2005 (the "***2005 Tax Matters Agreement***");

WHEREAS, on March 14, 2018, IHM and certain of its subsidiaries, including IHC and CCH (collectively, the "Debtors"), filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***");

WHEREAS, on April 28, 2018 the Debtors filed with the Court a plan of reorganization that was amended on August 5, 2018, and further amended or modified on August 23, 2018, August 28, 2018, September 12, 2018, September 18, 2018, October 10, 2018, and October 17, 2018  (as the same may be further amended, the "***Plan***") and confirmed by the Court by order dated [_____], pursuant to which the Debtors will undertake certain restructuring and recapitalization transactions with respect to its capital structure, including a separation of CCOH from IHM, IHC and the other Debtors, all as further described in the Transaction Documents (the "***Transactions***"),

WHEREAS, in connection with the Plan, CCH shall convert from a Nevada corporation to a Delaware corporation by filing a certificate of conversion in accordance with Delaware law, which is intended to qualify as a reorganization under Section 368(a)(1)(F) of the Code;

WHEREAS, in connection with the Plan, CCH will be fully and unconditionally released and discharged from all of its obligations under guarantees of IHC's indebtedness (the "***CCH Release***");

WHEREAS, in connection with the Plan, CCH shall form Radio Newco which will not be a guarantor of IHC's pre-petition indebtedness;

WHEREAS, in connection with the Plan, CCOH shall cause the conversion of CCOI, a direct wholly owned subsidiary of CCOH, into a limited liability company (the "***Conversion***"),

which is intended to qualify as a complete liquidation described in Section 332 of the Code pursuant to which the excess loss account in the stock of CCOI is eliminated;

WHEREAS, in connection with the Plan, CCH shall contribute the Radio Business Subsidiaries to Radio Newco in a taxable transaction in exchange for common stock and preferred stock of Radio Newco, which  preferred stock CCH will sell to one or more third parties for cash pursuant to a pre-arranged and binding commitment (the "***Radio Contribution***");

WHEREAS, in connection with the Plan, following the Radio Contribution, CCH shall distribute to IHC in a taxable distribution the common stock of Radio Newco and the proceeds of the sale of the preferred stock of Radio Newco (the "***Radio Distribution***");

WHEREAS, in connection with the Plan, following the Conversion and the distribution to CCH of the shares of CCOH stock owned by Broader Media LLC and CC Finco LLC, each a direct wholly owned subsidiary of CCH, CCOH shall merge with and into CCH, and CCH shall be the surviving corporation in such merger (the "***CCOH Merger***"), which merger is intended to qualify as a complete liquidation described in Section 332 of the Code with respect to CCH pursuant to which the excess loss account in the stock of CCOH is eliminated and as a reorganization under Section 368(a) of the Code with respect to the public shareholders of CCOH;

WHEREAS, in connection with the Plan, CCH or CCOH will issue preferred stock to one or more third parties for cash;

WHEREAS, in connection with the Plan, following the CCOH Merger and pursuant to the terms of the Plan, IHC shall transfer to its creditors the stock of CCH owned by IHC (the "***CCH Distribution***") in a taxable transaction;

WHEREAS, in connection with the Plan, the parties desire to enter into this Agreement which the parties intend shall replace and supersede in full the 2005 Tax Matters Agreement, to provide for and agree upon the allocation between the parties of liabilities for Taxes arising prior and subsequent to, and/or in connection with the Transactions and to provide for and agree upon other matters relating to Taxes;

NOW THEREFORE, in consideration of the premises set forth above and the terms and conditions set forth below, the parties hereto agree as follows:

## ARTICLE I
## Definitions

Section 1.1    Definitions.  For purposes of this Agreement, the following capitalized terms shall have the meanings set forth below:

"***Adjustment***" shall mean any proposed or final change in the Tax liability of any Person.

"***Affiliate***" shall mean any Person that directly or indirectly is "controlled" by the other Person in question.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an Entity, whether through ownership of voting securities, by contract or otherwise.  Except as otherwise provided herein, the term Affiliate shall refer to Affiliates of a Person as determined immediately after the CCH Distribution.

"*Affiliated Group*" shall mean an affiliated group of corporations within the meaning of Section 1504(a) of the Code (or any analogous combined, consolidated, unitary or other similar group under state, local or non-U.S. income Tax law).

"*Code*" shall mean the Internal Revenue Code of 1986, as amended.

"*Deconsolidation Date*" shall mean the date on which a Deconsolidation Event occurs.

"*Deconsolidation Event*" shall mean, with respect to each Outdoor Group Member, any event or transaction that causes such Outdoor Group Member to no longer be eligible to join any IHM Group Member in filing an applicable Tax Return on a consolidated, combined or unitary basis; for the avoidance of doubt, the CCH Distribution shall be a Deconsolidation Event with respect to CCH and each Outdoor Group Member for U.S. federal income tax purposes.

"*Entity*" shall mean a partnership (whether general or limited), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, without regard to whether it is treated as a disregarded entity for U.S. federal tax purposes.

"*Final Determination*" shall mean the final resolution of any Tax matter by issuance of IRS Form 4549, a closing agreement with the IRS or other relevant Taxing Authority, a deficiency notice with respect to which the period for filing a petition with the Tax Court or the relevant foreign, state or local tribunal has expired, a decision of any court of competent jurisdiction that is not subject to appeal or as to which the time for appeal has expired, any allowance of a Refund in respect of an overpayment of Tax, but only after the expiration of all periods during which such Refund may be recovered by the jurisdiction imposing the Tax, or  any other final resolution, including by reason of the expiration of the applicable statute of limitations.

"*IHM Group*" shall mean IHM and its Subsidiaries, excluding, however, any Outdoor Group Member; for the avoidance of doubt, the IHM Group shall include CCH, except that with respect to the operations and activities of CCH in any Taxable Period or portion thereof beginning after the CCOH Merger and in its capacity as transferee of or successor to CCOH in the CCOH Merger, CCH shall be considered an Outdoor Group Member.

"*IHM Group Member*" shall mean each Entity that is included in the IHM Group.

"*Income Tax Return*" shall mean any Tax Return filed or required to be filed with any Taxing Authority with respect to Income Taxes.

"*Income Taxes*" shall mean all Taxes imposed on or measured in whole or in part by net income or profits or net worth or a taxable base in the nature of net income or profits or net worth, including franchise Taxes based on such factors and any alternative minimum Tax, and shall include any addition to Tax, additional amount, interest and penalty imposed with respect to such Taxes.

"*Indemnified Party*" shall mean, with respect to a matter, a Person that is entitled to seek indemnification pursuant to the terms and conditions of this Agreement with respect to such matter.

"*Indemnifying Party*" shall mean, with respect to a matter, a Person that is obligated to provide indemnification pursuant to the terms and conditions of this Agreement with respect to such matter.

"*Indirect Gains Taxes*" shall mean all Taxes, other than U.S. federal (or applicable state or local) Income Taxes and Transfer Taxes, imposed on the transfer of any assets or equity interests as a result of the transfer in the Transactions of the equity interests in an entity holding such assets or interests.

"*Intended Tax Treatment*" shall mean the intended income tax treatment of each of the Transactions, as described in the recitals of this Agreement and in Schedule 3.3 attached hereto.

"*IRS*" shall mean the United States Internal Revenue Service or any successor thereto, including but not limited to its agents, representatives and attorneys acting in their official capacity.

"*Losses*" shall mean any loss, cost, fine, penalty, fee, damage, obligation, liability, payment in settlement, Tax or other expense of any kind, including reasonable attorneys' fees and costs, but excluding any consequential, special, punitive or exemplary damages.

"*Non-Income Tax Return*" shall mean any Tax Return filed or required to be filed with any Taxing Authority with respect to Non-Income Taxes

"*Non-Income Taxes*" shall mean any Taxes other than Income Taxes.

"*Outdoor Group*" shall mean CCOH and its Subsidiaries, and in any Taxable Period or portion thereof beginning after the CCOH Merger, CCH, with respect to its operations and activities after the CCOH Merger and in its capacity as transferee of or successor to CCOH in the CCOH Merger, and its Subsidiaries.

"*Outdoor Group Member*" shall mean each Entity that is included in the Outdoor Group.

"*Person*" shall mean an individual or any Entity.

"*Radio Business Subsidiaries*" shall mean all Subsidiaries of CCH other than CCOH and its Subsidiaries.

"*Refund*" shall mean any refund (or credit in lieu thereof) of Taxes (including any overpayment of Taxes that can be refunded or, alternatively, applied to other Taxes payable), including any interest paid on or with respect to such refund of Taxes.

"*Settlement and Separation Agreement*" shall mean that certain Settlement and Separation Agreement, dated as of [_____], 2019, by and among [IHM, IHC, CCH and CCOH].

"*Straddle Period*" shall mean any Taxable Period that begins on or before and ends after the date of the CCH Distribution (or, if later with respect to a Tax, the date of the Deconsolidation Event applicable to such Tax).

"*Subsidiary*" shall mean, with respect to any Person, any other Person of which at least (i) ownership interests constituting more than fifty percent (50%) of the total combined equity economic interest or the capital or profits, in the case of a partnership, or (ii) a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions, is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries.

"*Tax Benefit*" shall mean a reduction in the Tax liability of any Person (or of the Affiliated Group of which it is a member) for any Taxable Period. Except as otherwise provided in this Agreement, a Tax Benefit shall be deemed to have been realized or received from a Tax Item in a Taxable Period only if, and to the extent that, the Tax liability of the Person (or of the Affiliated

Group of which it is a member) for such Taxable Period is less than it would have been if such Tax liability were determined without regard to such Tax Item.

"*Tax Controversy*" shall mean any audit, assessment of Taxes, pre-filing agreement, other examination by any Taxing Authority, proceeding, appeal of a proceeding or litigation relating to Taxes, whether administrative or judicial, including proceedings relating to competent authority determinations.

"*Tax Detriment*" shall mean an increase in the Tax liability of any Person (or of the Affiliated Group of which it is a member) for any Taxable Period. Except as otherwise provided in this Agreement, a Tax Detriment shall be deemed to have been realized or suffered from a Tax Item in a Taxable Period only if, and to the extent that, the Tax liability of the Person (or the Affiliated Group of which it is a member) for such period is greater than it would have been if such Tax liability were determined without regard to such Tax Item.

"*Tax Item*" shall mean any item of income, gain, loss, deduction, credit, recapture of credit, tax basis, or any other item which may have the effect of increasing or decreasing Taxes paid or payable by any Person (or the Affiliated Group of which it is a member).

"*Tax Return*" shall mean any return, report, certificate, form or similar statement or document (including any related supporting information or schedule attached thereto and any information return or declaration of estimated Tax) supplied to, filed with or required to be supplied to or filed with a Taxing Authority in connection with the payment, determination, assessment or collection of any Tax or the administration of any laws relating to any Tax return or claim for Refund.

"*Taxable Period*" shall mean any taxable year or portion thereof.

"*Taxes*" shall mean any and all U.S. federal, state, local, foreign or other governmental taxes, assessments, duties, fees, levies or similar charges of any kind, including all income, gross receipts, license, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, excise, social security (or similar), unemployment, disability, real property, personal property, sales, use, intangibles, transfer, value-added, registration, alternative or add-on minimum, *ad valorem*, payroll, employment, withholding, estimated and other taxes of any kind whatsoever, whether disputed or not, and including all additions to tax, additional amounts, interest and penalties imposed with respect to such taxes.

"*Taxing Authority*" shall mean, with respect to any Tax, the government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, instrumentality or authority thereof, that imposes such Tax, and the agency (if any) charged with the collection of such Tax, including the IRS.

"*Transaction Document*" shall mean any document executed by any IHM Group Member and/or any Outdoor Group Member, as the case may be, in connection with the Transactions, including this Agreement and the Plan.

"*Transaction Taxes*" shall mean any Taxes imposed on any IHM Group Member or Outdoor Group Member in connection with the Transactions, other than Transfer Taxes and Indirect Gains Taxes.

"*Transition Services Agreement*" shall mean that certain Transition Services Agreement, dated as of [_____], 2019, by and among [iHeartMedia Management Services, Inc., a Delaware corporation, CCOH, IHM, and IHC].

"*Transfer Taxes*" shall mean all U.S. federal, state, local or foreign sales, use, privilege, gains, transfer (including real property transfer), documentary, stamp, duties, recording, and similar Taxes and fees (including any penalties, interest or additions thereto) imposed upon any party hereto or any of its Subsidiaries in connection with the Transactions.

Other capitalized terms defined elsewhere in this Agreement shall have the meaning given them in this Agreement.

## ARTICLE II
## Preparation, Filing and Payment of Taxes Shown Due on Tax Returns

Section 2.1    Tax Payments. Subject in each case to the provisions of Article V:

(a)    *Estimated Income Tax Payments.*

(i)    For each Taxable Period ending on or before the date of the CCH Distribution (or, if later with respect to a Tax, the date of the Deconsolidation Event applicable to such Tax), CCOH or, after the CCOH Merger, CCH shall pay, or cause to be paid, to IHM the amount of any estimated Income Taxes owed by any Outdoor Group Member and paid by IHM on such Outdoor Group Member's behalf, whether or not such estimated Income Tax is attributable to an Income Tax Return filed on a consolidated, combined or unitary basis with any IHM Group Member ("*Estimated Income Tax Payments*").   In the case of any Estimated Income Tax Payments with respect to which any Outdoor Group Member joins any IHM Group Member in filing an Income Tax Return on a consolidated, combined or unitary basis, the amount of such Estimated Income Tax Payments that are owed to IHM by such Outdoor Group Member shall be determined as if such Outdoor Group Member filed a separate Income Tax Return based solely on the income, apportionment factors and other Tax Items of such Outdoor Group Member.

(ii)    For any Straddle Period, the Estimated Income Tax Payments of such Outdoor Group Member shall be determined based on the Tax Items of such Outdoor Group Member that accrue before or on the Deconsolidation Date (a "*Pre-Deconsolidation Straddle Period*"), calculated as if there were an interim closing of the books of such Outdoor Group Member as of the close of business on the date of the Deconsolidation Event, except that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions, other than with respect to property placed in service after the Deconsolidation Event or taken out of service prior to the Deconsolidation Event) shall be allocated on a daily basis.   For purposes of determining the amount of Estimated Income Tax Payments of each Outdoor Group Member, to the extent that such Outdoor Group Member would be entitled to file an Income Tax Return with respect to the applicable Income Tax on a consolidated, combined or unitary basis

-6-

with any other Outdoor Group Member, the Estimated Income Tax Payments of such Outdoor Group Members shall be determined as though such Outdoor Group Members filed an Income Tax Return with respect to such Income Tax on a consolidated, combined or unitary basis based solely on the income, apportionment factors and other Tax Items of such Outdoor Group Members.

(b)      *Separate Income Tax Liability*.

(i)      CCOH or, after the CCOH Merger, CCH shall pay, or cause to be paid, to IHM an amount equal to the excess, if any, of (i) the Income Taxes incurred by any Outdoor Group Member under applicable Tax law and paid by IHM on such Outdoor Group Member's behalf or, in the case of any Income Tax with respect to which any Outdoor Group Member joins any IHM Group Member in filing an Income Tax Return on a consolidated, combined or unitary basis, the amount of Income Taxes that would be incurred by the Outdoor Group Member had such Outdoor Group Member filed a separate Income Tax Return based solely on the income, apportionment factors and other Tax Items of such Outdoor Group Member ("***Separate Income Tax Liability***"), over (ii) the aggregate amount of Estimated Income Tax Payments actually made to IHM with respect to the Separate Income Tax Liability for such Taxable Period.

(ii)      If the aggregate amount of Estimated Income Tax Payments actually made to IHM with respect to the Separate Income Tax Liability for such Taxable Period exceeds such Separate Income Tax Liability, IHM and IHC shall pay to CCOH or, after the CCOH Merger, CCH an amount equal to such excess.

(iii)      To the extent that any IHM Group Member utilizes any credits or deductions, including, without limitation, foreign tax credits, alternative minimum tax credits, net operating losses or net capital losses, which are attributable to any Outdoor Group Member, and such utilization results in a Tax Benefit being realized by such IHM Group Member (treating any credits or deductions attributable to the IHM Group as utilized prior to the utilization of any credits or deductions attributable to the Outdoor Group), then IHM and IHC shall pay to CCOH or, after the CCOH Merger, CCH the amount of such Tax Benefit at the time of the filing of the Income Tax Return reflecting the realization of the Tax Benefit, and such credits or deductions with respect to which IHM or IHC has paid CCOH or CCH shall not be utilizable by any Outdoor Group Member for purposes of computing such Outdoor Group Member's Estimated Income Tax Payments or Separate Income Tax Liability; provided that, (A) the determination of whether any credit or deduction is attributable to any Person for any Taxable Period ending on or before the effective date of this Agreement shall be determined in accordance with the 2005 Tax Matters Agreement, taking into account any prior utilization of any such credit or deduction under the 2005 Tax Matters Agreement, notwithstanding, for the avoidance of doubt, any differing attribution of any such credit or deduction under Treasury Regulation Section 1.1502-21 or otherwise under applicable Law, (B) any credit or deduction attributable to CCH and existing immediately prior to the CCH Merger shall not be treated as a credit or deduction of an Outdoor Group

-7-

Member, and (C) any reduction under Sections 108(b) or 1017 and Treasury Regulations Sections 1.1502-28 or 1.1502-36 of any credits or deductions, including, without limitation, foreign tax credits, alternative minimum tax credits, net operating losses, net capital losses tax basis or other Tax Item attributable to any Outdoor Group Member in connection with the Transactions shall not be treated as a utilization of a credit or deduction or other Tax Item by an IHM Group Member.  Schedule 2.1(b)(iii) sets out the difference, if any, between the amount of credits or deductions attributable to the Outdoor Group Members as determined under the 2005 Tax Matters Agreement and as would be determined under Treasury Regulation Section 1.1502-21 or otherwise under applicable Law, in each case, as of December 31, 2017; provided that, IHM shall use commercially reasonable efforts to provide CCH, at such time as is reasonably practicable, an updated draft of Schedule 2.1(b)(iii) that sets out any such differences as of the date of the CCH Distribution.  For purposes of determining the amount of an Outdoor Group Member's Separate Income Tax Liability, to the extent that such Outdoor Group Member would be entitled to file an Income Tax Return on a consolidated, combined or unitary basis with any other Outdoor Group Member, the Separate Income Tax Liability of such Outdoor Group Members shall be determined as though such Outdoor Group Members had filed a consolidated, combined or unitary Income Tax Return based solely on the income, apportionment factors and other Tax Items of such Outdoor Group Members.  Notwithstanding anything else in this agreement to the contrary, and acknowledging that the Settlement and Separation Agreement constitutes full and final satisfaction of any claims under the iHeart Note (as defined in the Settlement and Separation Agreement), no amount shall be payable under this Agreement as a result of any Tax Benefit relating to the settlement of the iHeart Note.

(c)      *Additional Calculations*.   For purposes of determining the amount of an Outdoor Group Member's Estimated Income Tax Payments and Separate Income Tax Liability, IHM shall be entitled to claim all deductions arising by reason of the exercise of any stock options to purchase shares of IHM stock, or arising by reason of the payment of deferred or other compensation by IHM to the extent such payment is not reimbursed by an Outdoor Group Member. In addition, for purposes of any Income Tax Return filed by, with respect to or on behalf of, any Outdoor Group Member (whether or not such Outdoor Group Member files an Income Tax Return on a consolidated, combined or unitary basis with any IHM Group Member), IHM shall be, to the extent permitted by applicable Tax law, entitled to claim all deductions arising by reason of the exercise of any stock options to purchase IHM stock or arising by reason of the payment of deferred or other compensation by IHM to the extent such payment is not reimbursed by an Outdoor Group Member. If, pursuant to a Final Determination, all or any part of such deduction is disallowed or is proposed to be disallowed to IHM then, to the extent permitted by applicable Tax law, the appropriate Outdoor Group Member shall report such deduction on its Income Tax Return (including an amended Income Tax Return).  If an Outdoor Group Member realizes a Tax Benefit in any Taxable Period beginning after the date of the CCH Distribution (or, if later with respect to a Tax, the date of the Deconsolidation Event applicable to such Tax), as a result of a deduction arising by reason of the exercise of any stock option to purchase shares of IHM stock or arising by reason of the payment of

deferred or other compensation by IHM to the extent such payment is not reimbursed by CCOH or CCH, CCH or CCOH shall pay, or cause to be paid, the amount of such Tax Benefit to IHM.

(d)     *Non-Income Taxes.* Non-Income Taxes shall be allocated between the IHM Group Members, on the one hand, and Outdoor Group Members, on the other hand, based on the applicable items attributable to or arising from any business retained by any IHM Group Member, on the one hand, and any business contributed to (or otherwise held on the CCH Distribution Date by) any Outdoor Group Member, on the other hand, that contribute to such Taxes (e.g., sales Taxes and value added Taxes shall be allocated to the IHM Group Members to the extent arising from taxable sales made by any business retained by any IHM Group Member).  CCOH or, after the CCOH Merger, CCH shall pay, or cause to be paid, to IHM an amount equal to the Non-Income Taxes incurred by any Outdoor Group Member under applicable Tax law and paid by IHM on such Outdoor Group Member's behalf ("***Separate Non-Income Tax Liability***"), and IHM and IHC shall pay, or cause to be paid, to CCOH or CCH an amount equal to the Non-Income Taxes incurred by any IHM Group Member under applicable Tax law and paid by CCOH or CCH on such IHM Group Member's behalf.

(e)     *Tax Liability of CCH for Taxable Periods Before the CCH Distribution.*  For the avoidance of doubt, for all purposes of this Agreement, any Tax liability of CCH attributable to any Taxable Period ending on or before the date of the CCH Distribution, other than any such Tax liability resulting from CCH's being a transferee or successor of CCOH in connection with the CCOH Merger or arising from the operations and activities of CCH and its Subsidiaries after the CCOH Merger, shall not be treated as a liability of an Outdoor Group Member, nor shall any Tax Item of CCH arising during any such Taxable Period, other than any such Tax Item resulting from CCH's being a transferee or successor of CCOH in connection with the CCOH Merger or arising from the operations and activities of CCH and its Subsidiaries after the CCOH Merger, be treated as a Tax Item of any Outdoor Group Member.  All provisions of this Agreement shall be construed in a manner consistent with this Section 2.1(e).

(f)     *Timing*.

(i)     For each Taxable Period beginning on or before the date of the CCH Distribution (or, if later with respect to a Tax, the date of the Deconsolidation Event applicable to such Tax), IHM shall prepare and deliver to CCOH or, after the CCOH Merger, CCH a schedule (the "***Schedule***") showing in reasonable detail IHM's calculation of any Estimated Income Tax Payments, Separate Income Tax Liability and Separate Non-Income Tax Liability, as the case may be, of each Outdoor Group Member and, subject to Section 4.4, (i) any payments by CCH or CCOH to IHM or IHC required pursuant to Section 2.1(a), (b) or (d) hereof shall be made based on the Schedule  no later than the later of (A) fifteen days before the date that such payment is due and payable to the applicable Taxing Authority and (B) ten days after CCOH's or CCH's receipt of the Schedule, and (ii) any payments by IHM or IHC to CCOH or CCH required pursuant to Section 2.1(b) or (d) hereof

-9-

shall be made, based on the Schedule, no later than the date such Tax Return is filed with the applicable Taxing Authority.

(ii)     Except as otherwise provided herein, all indemnification or other payments to be made pursuant to this Agreement shall be made within fifteen days of written notice of a request for indemnification or payment by the Indemnified Party, which notice shall be accompanied by a computation of the amount due. If any payments required to be made pursuant to this Agreement (including Estimated Income Tax Payments) are not made when due, such payments shall bear interest at the prevailing federal short-term interest rate as determined under Section 6621 of the Code.

(g)     *Adjustments*.

(i)     If, as a result of a Final Determination, there is an Adjustment that would have the effect of increasing or decreasing an Outdoor Group Member's Separate Income Tax Liability or Separate Non-Income Tax Liability for Taxable Periods beginning on or before the date of the CCH Distribution (or, if later with respect to a Tax, the date of the Deconsolidation Event applicable to such Tax), then CCOH or, after the CCOH Merger, CCH shall pay, or cause to be paid, to IHM the amount of any increased Separate Income Tax Liability or Separate Non-Income Tax Liability, and IHM and IHC shall pay to CCOH or, after the CCOH Merger, CCH the amount of any decreased Separate Income Tax Liability or Separate Non-Income Tax Liability; provided, however, that IHM's and IHC's payment to CCOH or CCH shall not exceed the net amount of payments received by IHM from any Outdoor Group Member or CCH with respect to the Separate Income Tax Liability or Separate Non-Income Tax Liability for such Taxable Periods.

(ii)     If, as a result of a Final Determination, there is an Adjustment to any of the credits or deductions attributable to any Outdoor Group Member which resulted in a payment by IHM to CCOH or CCH pursuant to Section 2.1(b)(iii) of this Agreement (or to CCOH under Section 2(b) of the 2005 Tax Matters Agreement) that would have the effect of increasing or decreasing the Tax Benefit to the IHM Group Member utilizing such credit or deduction, then CCOH or CCH shall pay, or cause to be paid, to IHM the amount of any decreased Tax Benefit and IHM and IHC shall pay to CCOH or CCH the amount of any increased Tax Benefit.

(h)     *Other Adjustments.* If, as a result of a Final Determination, there is an Adjustment with respect to any Tax Item of any Outdoor Group Member for any Taxable Period beginning on or before the date of the CCH Distribution (or, if later with respect to a Tax, the date of the Deconsolidation Event applicable to such Tax), including any portion of a Straddle Period ending on such date, that results in a Tax Detriment being realized by any IHM Group Member, or by any Outdoor Group Member for which the IHM Group is otherwise liable, then CCOH or, after the CCOH Merger, CCH shall indemnify IHM against such Tax Detriment.  If there is an Adjustment pursuant to Section 482 of the Code or similar authority under applicable Tax law which results in a Tax Detriment being

-10-

realized by any IHM Group Member or any Outdoor Group Member, on the one hand, and a corresponding Tax Benefit being realized by any Outdoor Group Member or any IHM Group Member, on the other, which is not otherwise taken into account through payments or indemnification under this Agreement, then CCOH or, after the CCOH Merger, CCH, on the one hand, shall pay to IHM, on the other hand, or IHM and IHC, on the one hand, shall pay to CCOH or, after the CCOH Merger, CCH, on the other hand, as the case may be, the amount of such Tax Benefit to the extent of such Tax Detriment.

(i)     *Reimbursements.*  Each Outdoor Group Member shall repay, or cause to be repaid, any IHM Group Member for any payment made by such IHM Group Member on behalf of any Outdoor Group Member for Taxes owed by such Outdoor Group Member and that are not otherwise subject to the payment provisions of this Section 2.1.

Section 2.2     Tax Return Preparation.

(a)     Subject to Section 2.2(b), (i) IHM shall prepare and file, or cause to be prepared and filed, all Tax Returns that are required under applicable law to be filed by, with respect to or on behalf of any Outdoor Group Member (whether or not such Outdoor Group Member files a Tax Return on a consolidated, combined or unitary basis with any IHM Group Member) on or before the date of the CCH Distribution and which IHM has prepared and filed, or caused to be prepared and filed with respect to or on behalf of any Outdoor Group Member pursuant to the most recent past practice of IHM, and (ii) IHM shall prepare and file, or cause to be prepared and filed, any Tax Return which IHM determines shall be filed on a consolidated, combined or unitary basis with any Outdoor Group Member, for any Taxable Period beginning before a Deconsolidation Event applicable to the Tax that is the subject matter of the relevant Tax Return.

(b)     With respect to the Tax Returns prepared by IHM pursuant to Section 2.2(a), CCOH or, after the CCOH Merger, CCH shall be entitled to review (i) any income Tax Returns which relate solely to the Outdoor Group and (ii) any Tax Returns, or portions thereof, which relate to (x) Taxes for which an Outdoor Group Member may be liable under applicable law or (y) Taxes or Tax Items in respect of which any Outdoor Group Member is entitled to any rights or benefits, or has any obligations, under this Agreement.  IHM shall provide each such Tax Return or portions thereof, as applicable, to CCOH or, after the CCOH Merger, CCH at least thirty (30) days prior to the due date for filing such Tax Return (including extensions).  CCOH or CCH shall provide comments as soon as practicable with respect to such Tax Returns or portions thereof, and, either (i) IHM shall reflect such comments on such Tax Returns, or (ii) the consent of CCOH or, after the CCOH Merger, CCH, not to be unreasonably withheld or delayed, shall be required, in each case before such Tax Returns are filed with the applicable Taxing Authority, provided, however, that IHM shall not be required to reflect the comments of CCOH or, after the CCOH Merger, CCH or obtain the consent of CCOH or, after the CCOH Merger, CCH with respect to any matter reflected on such Tax Return which is not reasonably expected to affect any Taxes or Tax Items in respect of which any Outdoor Group Member is entitled to any rights or benefits, or has any obligations, under this Agreement, provided further, however, that if a dispute involving a position on a Tax Return cannot be resolved pursuant to those provisions prior to the due date (including extensions) for any such Tax Return,

-11-

the Tax Return shall be timely filed with IHM's position reflected and, following the resolution of such dispute, such Tax Return shall be amended to the extent necessary to reflect the resolution of such dispute. Any disputes with respect to any such Tax Return or portion thereof, as applicable, shall be subject to Section 3.3 and Section 4.4.

(c)     Except as set forth in, and without duplication of any payments made under, the Transition Services Agreement, CCOH or, after the CCOH Merger, CCH shall reimburse IHM for an allocable portion of its expenses incurred in preparing and filing any Tax Returns described in Section 2.2(a) on behalf of any Outdoor Group Member, as such allocation is reasonably agreed to by IHM and CCOH or, after the CCOH Merger, CCH.

(d)     Unless otherwise required by law, the IHM Group Members and Outdoor Group Members, as applicable, shall file the appropriate information and statements, as required by Treasury Regulations Section and 1.368-3, with the IRS with respect to the CCOH Merger, and shall retain the appropriate information relating to the CCOH Merger as described in Treasury Regulations Section 1.368-3(d).

**ARTICLE III**
**Tax Proceedings**

Section 3.1     Notification of Tax Controversies.  Within ten (10) days after an Indemnified Party becomes aware of the commencement of a Tax Controversy that may give rise to an indemnity payment pursuant to Article II or Article V, such Indemnified Party shall notify the Indemnifying Party in writing of such Tax Controversy, and thereafter shall promptly forward or make available to the Indemnifying Party copies of notices and communications relating to such Tax Controversy.  The failure of the Indemnified Party to notify the Indemnifying Party in writing of the commencement of any such Tax Controversy within such ten (10) day period or promptly forward any further notices or communications shall not relieve the Indemnifying Party of any obligation which it may have to the Indemnified Party under this Agreement except to the extent (and only to the extent) that the Indemnifying Party is actually materially prejudiced by such failure.

Section 3.2     Tax Controversies. CCOH or, after the CCOH Merger, CCH shall have control over any portion of a Tax Controversy that relates solely to Taxes for which any Outdoor Group Member would be liable under this Agreement, including Taxes for which such Outdoor Group Member joined in filing a Tax Return on a consolidated, combined or unitary basis with any IHM Group Member.  IHM shall have control over any portion of a Tax Controversy that relates solely to Taxes for which any IHM Group Member would be liable under this Agreement, including Taxes for which such IHM Group Member joined in filing a Tax Return on a consolidated, combined or unitary basis with any Outdoor Group Member.  To the extent a Tax Controversy relates to Taxes for which both an IHM Group Member and an Outdoor Group Member would be liable under this Agreement, to the extent possible the various portions of such Tax Controversy shall be distinguished and allocated so that each party will control the portion of such Tax Controversy which relates solely to Taxes for which it would be liable under this Agreement.  To the extent any portion of a Tax Controversy cannot be distinguished as being attributable solely to Taxes for which only an IHM Group Member or an Outdoor Group Member would be liable under this Agreement, if the Tax Return that is the subject of the Tax Controversy

was filed by a member of the Outdoor Group, then CCOH or, after the CCOH Merger, CCH shall have control over such portion of the Tax Controversy, and otherwise, IHM shall have control over such portion of the Tax Controversy.   In exercising control over any portion of any Tax Controversy, CCOH, or after the CCOH Merger, CCH or IHM, as applicable, (i) shall be entitled to act through counsel and other representatives of its own choosing, at its sole expense, (ii) shall consult with the other party with respect to any portion of any Tax Controversy the resolution of which could reasonably be expected to have an adverse impact on the other party, and (iii) without the consent of the other party (which consent shall not be unreasonably withheld, delayed or conditioned), shall not settle or compromise any portion of any Tax Controversy if such settlement or compromise could reasonably be expected to have an adverse impact on the other party.   IHM (with respect to any portion of a Tax Controversy controlled by CCOH, or after the CCOH Merger, CCH) and CCOH, or after the CCOH Merger, CCH (with respect to a Tax Controversy controlled by IHM and for which an Outdoor Group Member may have liability under this Agreement) shall have the right to observe the conduct of any proceedings with counsel and other representatives of its choosing, at its sole expense.   Notwithstanding anything to the contrary in the foregoing, CCOH, or after the CCOH Merger, CCH, shall control and IHM shall be entitled to fully participate in any Tax Controversy with respect to Income Taxes of any Affiliated Group of which Radio Computing Services (UK) Ltd. is a member relating to any Taxable Period beginning before any Deconsolidation Event with respect to Radio Computing Services (UK) Ltd.   CCOH, CCH and IHM agree to fully cooperate as reasonably requested with the other in the negotiation, settlement or litigation of any liability for Taxes of any IHM Group Member or Outdoor Group Member.

        Section 3.3   <u>Consistency</u>.  IHM, CCOH and CCH shall (and shall cause each of their respective Subsidiaries to) take the position on all Tax Returns and in all Tax Controversies that the Transactions shall be subject to Tax in accordance with the Intended Tax Treatment and shall prepare such Tax Returns and defend such Tax Controversies in a manner consistent with the Intended Tax Treatment, in each case unless otherwise required by a Final Determination.

**ARTICLE IV**
<u>**Cooperation**</u>

        Section 4.1   Tax Information.

      (a)   CCOH, and after the CCOH Merger, CCH shall cooperate, and shall cause each Outdoor Group Member to cooperate, with IHM in the preparation and filing of Tax Returns, as described in <u>Article II</u>, or in the conduct of Tax Controversies, as described in <u>Article III</u>, by maintaining such books and records and providing on a timely basis such information as may be reasonably necessary or useful in the filing of such Tax Returns or the conduct of such Tax Controversies and executing any documents, providing any further information and taking any actions which IHM may reasonably request in connection therewith.

      (b)   If CCOH, and after the CCOH Merger, CCH fails to provide, or fails to cause any Outdoor Group Member to provide, any information requested pursuant to this <u>Article IV</u> on a timely basis, then IHM shall have the right to engage an independent

-13-

certified public accountant of its choice to gather such information.  CCOH, and after the CCOH Merger, CCH agrees to permit any such independent certified public accountant full access to all Tax Returns and other relevant information in the possession of any Outdoor Group Member during reasonable business hours, and to reimburse or pay directly all costs and expenses incurred in connection with the engagement of such independent certified public accountant.

(c)     If CCOH, and after the CCOH Merger, CCH supplies, or causes any Outdoor Group Member to supply, information to an IHM Group Member in connection with the preparation and filing of any Tax Return or in connection with the conduct of any Tax Controversy and an officer of the requesting party signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then a duly authorized officer with the requisite knowledge shall certify, under penalties of perjury, the accuracy of the information so supplied. CCOH, and after the CCOH Merger, CCH shall indemnify and hold harmless each IHM Group Member and its respective officers and employees, against any cost, fine, penalty or other expenses of any kind attributable to an Outdoor Group Member supplying an IHM Group Member with inaccurate information, in connection with the preparation and filing of any Tax Return or in connection with the conduct of any Tax Controversy.

Section 4.2     Other Cooperation.  Whenever any Outdoor Group Member or IHM Group Member learns of a breach or a violation of any obligation or provision contained in this Agreement, CCOH, and after the CCOH Merger, CCH or IHM, as applicable, shall give notice to the other party within ten days of becoming aware of such breach or violation.

Section 4.3     Retention of Records. CCOH, and after the CCOH Merger, CCH, and IHM and IHC agree to retain, and cause each IHM Group Member or Outdoor Group Member, respectively, to retain, the appropriate records which may affect the determination of the Separate Income Tax Liability or Separate Non-Income Tax Liability of any Outdoor Group Member or the Tax liability of any IHM Group Member which files a Tax Return on a consolidated, combined or unitary basis with any Outdoor Group Member until such time as there has been a Final Determination with respect thereto. Any IHM Group Member or Outdoor Group Member intending to destroy any materials, records, or documents relating to the foregoing matters shall provide CCH or IHM, respectively, with 90 days advance notice and the opportunity to copy or take possession of such materials, records and documents.

Section 4.4     Resolution of Disputes. Any dispute concerning (i) the calculation or basis of determination of any payment provided for hereunder or (ii) any Tax Return or portion thereof provided to CCOH or, after the CCOH Merger, CCH, shall be resolved by a nationally recognized firm of independent certified public accountants mutually acceptable to IHM, on the one hand, and CCOH or, after the CCOH Merger, CCH, on the other hand, whose judgment shall be conclusive and binding upon the parties.

**ARTICLE V**
**Tax Indemnity**

Section 5.1     Indemnities for Transaction Taxes and Other Taxes.

-14-

(a)      *CCOH's and CCH'S Indemnity of IHM and IHC.*  Notwithstanding any provision of this Agreement to the contrary but except as provided in Section 5.1(b)(ii), CCOH, and after the CCOH Merger, CCH, shall indemnify IHM and each IHM Group Member, and their respective directors, officers and employees, and hold them harmless, on an after-Tax basis, from and against any Transaction Taxes imposed on any Outdoor Group Member.

(b)      *IHM's and IHC's Indemnity of CCOH and CCH.*  Notwithstanding any provision of this Agreement to the contrary, IHM and IHC shall indemnify CCOH, and after the CCOH Merger, CCH and each Outdoor Group Member, and their respective directors, officers and employees, and hold them harmless, on an after-Tax basis, from and against (i) (A) any Transaction Taxes imposed on any IHM Group Member, (B) any Transfer Taxes and Indirect Gains Taxes which are the responsibility of the IHM Group pursuant to Section 5.2 and, (C) any Tax liability imposed on CCH or any other Outdoor Group Member for any Taxable Period beginning before the date of the CCH Distribution (in excess of the Separate Income Tax Liabilities and Separate Non-Income Tax Liabilities of the Outdoor Group) for which CCH or any Outdoor Group Member is liable solely as a result of Treasury Regulation Section 1.1502-6 (or any similar provision under foreign, state or local law) as a result of being or having been a member of the affiliated group of which IHM is the common parent corporation for federal tax purposes, or a member of a combined, consolidated, unitary or similar group for foreign, state or local tax purposes, which includes any IHM Group Member, and (ii) an amount equal to 50% of the amount by which (A) the amount of any Transaction Taxes imposed on any Outdoor Group Member which are paid to the applicable Taxing Authority on or prior to the third anniversary of the CCH Distribution, exceeds (B) $5,000,000; provided that, the aggregate liability of the IHM and IHC pursuant to this Section 5.1(b)(ii) shall in no event exceed $15,000,000.  For the avoidance of doubt, the obligations of IHM and IHC pursuant to Section 5.1(b)(ii) shall not apply to, and IHM and IHC shall not bear any liability pursuant to Section 5.1(b)(ii) for, any Transaction Taxes imposed on any Outdoor Group Member which are paid to the applicable Taxing Authority after the third anniversary of the CCH Distribution.

Section 5.2      Transfer Taxes and Indirect Gains Taxes.  Notwithstanding any other provision in this Agreement, all Transfer Taxes and Indirect Gains Taxes shall be borne by the IHM Group.

**ARTICLE VI**
**Miscellaneous**

Section 6.1      Term of the Agreement.  This Agreement shall become effective as of the date of its execution and, except as otherwise expressly provided herein, shall continue in full force and effect indefinitely.

Section 6.2      Other Tax Sharing Arrangements.  Other than any agreement entered into pursuant to the Settlement and Separation Agreement, all Tax sharing, indemnification, and similar agreements, written or unwritten, as between an IHM Group Member, on the one hand, and an Outdoor Group Member, on the other hand, addressing the same or substantially similar issues as are addressed by this Agreement (including, for the avoidance of doubt, the 2005 Tax Matters Agreement) shall be or shall have been terminated no later than the

-15-

date hereof and, following the date hereof, no IHM Group Member or Outdoor Group Member shall have any further rights or obligations under any such Tax sharing, indemnification, or similar agreements; provided that this Section 6.2 shall not affect any claim by any IHM Group Member or Outdoor Group Member arising before the effective date of this Agreement under the 2005 Tax Matters Agreement.

Section 6.3    Injunctions. The parties acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. The parties hereto shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in any court having jurisdiction, such remedy being in addition to any other remedy to which they may be entitled at law or in equity.

Section 6.4    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect, and shall in no way be affected, impaired or invalidated. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such which may be hereafter declared invalid, void or unenforceable. In the event that any such term, provision, covenant or restriction is held to be invalid, void or unforeseeable, the parties hereto shall use their best efforts to find and employ an alternate means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.

Section 6.5    Assignment. Except by operation of law or in connection with the sale of all or substantially all the assets of a party hereto, this Agreement shall not be assignable, in whole or in part, directly or indirectly, by any party hereto without the advance written consent of the other party, and any attempt to assign any rights or obligations arising under this Agreement without such consent shall be void; provided, however, that the provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by, the parties hereto and their respective successors and permitted assigns.

Section 6.6    Further Assurances. Subject to the provisions hereof, the parties hereto shall make, execute, acknowledge and deliver such other instruments and documents, and take all such other actions, as may be reasonably required in order to effectuate the purposes of this Agreement and to consummate the transactions contemplated hereby. Subject to the provisions hereof, each of the parties shall, in connection with entering into this Agreement, performing its obligations hereunder and taking any and all actions relating hereto, comply with all applicable laws, regulations, orders and decrees, obtain all required consents and approvals and make all required filings with any Taxing Authority, governmental agency, other regulatory or administrative agency, commission or similar authority, and promptly provide the other parties with all such information as they may reasonably request in order to be able to comply with the provisions of this sentence.

Section 6.7    Joint and Several Liability.  Each of CCOH, and after the CCOH Merger, CCH, and CCOI shall be jointly and severally liable to IHM, IHC and Radio Newco for any obligations of any Outdoor Group Member under this Agreement.  Each of IHM,

IHC and Radio Newco shall be jointly and severally liable to CCOH, and after the CCOH Merger, CCH and CCOI for any obligations of any IHM Group Member under this Agreement.

Section 6.8    Parties in Interest. Except as herein otherwise specifically provided, nothing in this Agreement expressed or implied is intended to confer any right or benefit upon any Person other than the parties hereto and their respective successors and permitted assigns.

Section 6.9    Waivers, Etc. No failure or delay on the part of the parties in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No modification or waiver of any provision of this Agreement, nor the consent to any departure by the parties therefrom, shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

Section 6.10    Setoff. All payments to be made by any party under this Agreement shall be made without setoff, counterclaim or withholding, all of which are expressly waived.

Section 6.11    Change of Law. If, due to any change in applicable law or regulations or their interpretation by any court of law or other governing body having jurisdiction subsequent to the date of this Agreement, the performance of any provision of this Agreement or any transaction contemplated hereby shall become impracticable or impossible, the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such provision.

Section 6.12    Confidentiality. Subject to any contrary requirement of law and the right of each party to enforce its rights hereunder in any arbitration or legal action, each party agrees that it shall keep strictly confidential, and shall cause its employees and agents to keep strictly confidential, any information which it or any of its employees or agents may acquire pursuant to, or in the course of performing its obligations under, any provision of this Agreement.

Section 6.13    Headings. Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

Section 6.14    Counterparts. For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto, and each such executed counterpart shall be, and shall be deemed to be, an original instrument.

Section 6.15    Notices. All notices, consents, requests, instructions, approvals and other communications provided for herein shall be validly given, made or served, if in writing and delivered personally, by telegram or sent by registered mail, postage prepaid, or by facsimile or other electronic transmission to:

If to IHM:[1]

    iHeartMedia, Inc.
    20880 Stone Oak Parkway
    San Antonio, Texas 78258
    Attention: [●]
    E-mail:

If to CCOH:[2]

    Clear Channel Outdoor Holdings, Inc.
    99 Park Avenue, 2nd Floor
    New York, NY 10016
    Attention:
    E-mail:

with a copy (which shall not constitute notice) to:

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, NY 10014
    Attention: [●]
    E-mail: [●]

with a copy (which shall not constitute notice) to:

    Wilson Sonsini Goodrich & Rosati
    1301 Avenue of the Americas
    New York, NY 10019
    Attention:  Benjamin Hoch
              Bradley Finkelstein
              Eileen Marshall
    E-mail:  bhoch@wsgr.com
            bfinkelstein@wsgr.com
            emarshall@wsgr.com

If to any other member of the IHM Group:[3]

    iHeartMedia, Inc.
    20880 Stone Oak Parkway
    San Antonio, Texas 78258
    Attention: [●]
    E-mail: [●]

If to any other member of the Outdoor Group:[4]

    Clear Channel Outdoor Holdings, Inc.
    20880 Stone Oak Parkway
    San Antonio, Texas 78258
    Attention: [●]
    E-mail: [●]

with a copy (which shall not constitute notice) to:

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, NY 10014
    Attention: [●]

with a copy (which shall not constitute notice) to:

    Wilson Sonsini Goodrich & Rosati
    1301 Avenue of the Americas
    New York, NY 10019
    Attention:  Benjamin Hoch

---

[1] IHM to confirm.
[2] CCOH to confirm.
[3] IHM to confirm.
[4] CCOH to confirm.

E-mail: [●]

Bradley Finkelstein
Eileen Marshall
E-mail:  bhoch@wsgr.com
bfinkelstein@wsgr.com
emarshall@wsgr.com

or to such other address as any party may, from time to time, designate in a written notice given in a like manner. Notice delivered personally or given by telegram shall be deemed delivered when received by the recipient. Notice given by mail as set out above shall be deemed delivered five calendar days after the date the same is mailed. Notice given by facsimile or other electronic transmission shall be deemed delivered on the day of transmission provided telephone confirmation of receipt is obtained promptly after completion of transmission.

Section 6.16   Costs and Expenses. Unless otherwise specifically provided herein, each party agrees to pay its own costs and expenses resulting from the exercise of its respective rights or the fulfillment of its respective obligations hereunder.

Section 6.17   Applicable Law. This Agreement shall be governed by and construed and enforced in accordance with the domestic substantive laws of the State of Delaware without regard to any choice or conflict of laws, rules or provisions that would cause the application of the domestic substantive laws of any other jurisdiction.

[REMAINDER OF THE PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their respective officers, each of whom is duly authorized, all as of the day and year first above written.

iHEARTMEDIA, INC.

By: _____

Name: _____

Title: _____

iHEARTCOMMUNICATIONS, INC.

By: _____

Name: _____

Title: _____

[RADIO NEWCO]

By: _____

Name: _____

Title: _____

CLEAR CHANNEL HOLDINGS, INC.

By: _____

Name: _____

Title: _____

CLEAR CHANNEL OUTDOOR
HOLDINGS, INC.

By: _____

Name: _____

Title: _____

CLEAR CHANNEL OUTDOOR, INC.

By: _____

Name: _____

Title: _____

## Schedule 3.3

*See attached.*

# **EXHIBIT 4**

**Merger Agreement**

**AGREEMENT AND PLAN OF MERGER**

by and between

**CLEAR CHANNEL OUTDOOR HOLDINGS, INC.**

AND

**CLEAR CHANNEL HOLDINGS, INC.**

Dated as of [●], 20[●]

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** .................................................................**2**
 Section 1.01 Definitions.................................................................2

**ARTICLE II THE MERGER**.............................................................**7**
 Section 2.01 The Merger.................................................................7
 Section 2.02 Closing.................................................................7
 Section 2.03 Effective Time of the Merger .................................7
 Section 2.04 Effects of the Merger .................................................7
 Section 2.05 Certificate of Incorporation and By-laws of the Surviving Corporation.................................................................7
 Section 2.06 Directors and Officers of the Surviving Corporation .................7

**ARTICLE III CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES** ..............**8**
 Section 3.01 Effect on Capital Stock .................................................8
 Section 3.02 Payment for Securities; Surrender of Certificates .................9
 Section 3.03 Treatment of CCOH Equity Incentive Plans .................10

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ..............**12**
 Section 4.01 Mutual Representations and Warranties .................12
 Section 4.02 No Other Representations and Warranties.................12

**ARTICLE V COVENANTS** .................................................................**13**
 Section 5.01 Legal Opinions.................................................................13
 Section 5.02 Tax Matters .................................................................14
 Section 5.03 Preparation of the S-4 .................................................14
 Section 5.04 Section 16 Matters.................................................................16
 Section 5.05 Stock Exchange Listing; Delisting.................................16
 Section 5.06 Directors and Officers.................................................16
 Section 5.07 Broader Media and CC Finco Distributions. .................16
 Section 5.08 Stockholder Litigation .................................................17
 Section 5.09 Efforts .................................................................17
 Section 5.10 D&O Insurance .........................................**Error! Bookmark not defined.**
 Section 5.11 CCH Certificate of Incorporation and Bylaws**Error! Bookmark not defined.**

**ARTICLE VI CONDITIONS PRECEDENT** .................................**17**
 Section 6.01 Conditions to Each Party's Obligation to Effect the Merger.................17
 Section 6.02 Conditions to Obligations of CCOH.................................18
 Section 6.03 Conditions to Obligations of CCH.................................18

**ARTICLE VII TERMINATION, AMENDMENT AND WAIVER** ..............**19**
 Section 7.01 Termination.................................................................19
 Section 7.02 Effect of Termination.................................................19

**ARTICLE VIII GENERAL PROVISIONS** .................................**19**

Section 8.01   Non-survival of Representations, Warranties, Covenants and
                Agreements ......................................................................19
Section 8.02   Notices ..............................................................................20
Section 8.03   Interpretation and Other Matters.......................................21
Section 8.04   Counterparts ......................................................................22
Section 8.05   Entire Agreement; No Third-Party Beneficiaries. ..............22
Section 8.06   Amendment ........................................................................22
Section 8.07   Extension; Waiver..............................................................22
Section 8.08   Governing Law; Consent to Jurisdiction ............................22
Section 8.09   Assignment ........................................................................23
Section 8.10   Specific Performance .........................................................23
Section 8.11   Severability ........................................................................24
Section 8.12   Waiver of Jury Trial...........................................................24
Section 8.13   No Recourse........................................................................24

**Exhibits**

Exhibit A-1   Form of WSGR Legal Opinion
Exhibit A-2   Form of K&E Legal Opinion
Exhibit B     Form of CCOH Tax Representation Letter
Exhibit C     Form of CCH Tax Representation Letter
Exhibit D     Form of Amended Certificate of Incorporation of CCH
Exhibit E     Form of Amended and Restated Bylaws of CCH

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER, dated as of [●], 20[●] (this "*Agreement*"), by and between Clear Channel Outdoor Holdings, Inc., a Delaware corporation ("*CCOH*"), and Clear Channel Holdings, Inc., a Delaware corporation ("*CCH*").

## R E C I T A L S

WHEREAS, CCH is a wholly-owned Subsidiary (as defined herein) of iHeartCommunications, Inc. (f/k/a Clear Channel Communications, Inc.), a Texas corporation ("*IHC*"), and prior to November 16, 2005, CCOH was also a wholly-owned Subsidiary of IHC;

WHEREAS, IHC and CCOH entered into that certain Master Agreement, dated as of November 16, 2005 (as the same has been amended from time to time prior to the date hereof in accordance with its terms), which provided for the partial separation of CCOH from IHC, after which CCOH became a publicly traded company majority owned by IHC;

WHEREAS, on March 14, 2018, iHeartMedia, Inc., a Delaware corporation ("*IHM*"), and certain of its Subsidiaries, including CCH but not including CCOH (collectively, the "*Debtors*") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "*Bankruptcy Court*") under Case No. 18-31274 (the "*Chapter 11 Cases*");

WHEREAS, in connection with the Chapter 11 Cases, on April 28, 2018, the Debtors filed a plan of reorganization (the "*Plan of Reorganization*"), which contemplates, among other things, that IHC will transfer its CCOH common stock to certain IHM creditors upon the effectiveness of the Plan of Reorganization, after which CCOH will be an independent publicly traded company in which IHC no longer holds any equity interest;

WHEREAS, in connection with the Separation (as defined herein), IHM, IHC, CCH and CCOH have entered into that certain Settlement and Separation Agreement, dated as of [●], 20[●] (the "*Separation Agreement*"), pursuant to which, among other things, CCOH and CCH have agreed to enter into this Agreement to effect a business combination transaction on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the parties intend that CCOH will, in accordance with the General Corporation Law of the State of Delaware (the "*DGCL*"), merge with and into CCH, with CCH continuing as the surviving corporation (the "*Merger*") on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Board of Directors of CCH has (i) determined that the transactions contemplated by this Agreement, including the Merger, are fair to and in the best interests of CCH and its stockholders, (ii) adopted, approved and declared advisable this Agreement and the transactions contemplated hereby, including the Merger, and (iii) resolved to recommend the approval of this Agreement by the stockholders of CCH;

WHEREAS, on January 23, 2018, the Board of Directors of CCOH (the "*CCOH Board*") established a special committee of CCOH independent directors (the "*CCOH Special Committee*");

WHEREAS, the CCOH Special Committee has recommended to the CCOH Board, and the CCOH Board has, (i) determined that the transactions contemplated by this Agreement, including the Merger, are fair to and in the best interests of CCOH and all of its stockholders, including its public stockholders, (ii) adopted, approved and declared advisable this Agreement and the transactions contemplated hereby, including the Merger, and (iii) resolved to recommend the approval of this Agreement by the stockholders of CCOH;

WHEREAS, CCH and CCOH desire to make certain representations, warranties, covenants and agreements in connection with the Merger and the transactions contemplated by this Agreement and also to prescribe various conditions to the Merger; and

WHEREAS, it is the intention of the parties that, for federal income Tax purposes, (i) the Merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code, and, as to CCH, as a complete liquidation of CCOH to which Section 332 of the Code applies, and (ii) this Agreement constitutes and will be adopted as a "plan of reorganization" within the meaning of Treasury Regulations Sections 1.368-2(g) and 1.368-3(a) and a "plan of liquidation" within the meaning of Section 332 of the Code.

NOW, THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants and agreements contained in this Agreement, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01   Definitions**.** For the purpose of this Agreement, the following terms shall have the following meanings:

"*Affiliate*" means, when used with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.  For the purpose of this definition, "*control*" (including with correlative meanings, "*controlled by*" and "*under common control with*") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or other interests, by contract, or otherwise.

"*Agreement*" shall have the meaning set forth in the preamble.

"*Approvals*" means the Governmental Approvals and any other notices, reports or other filings to be made, or any other consents, registrations, approvals, permits or authorizations to be obtained from, any other Third Party, in each case in connection with the Transactions.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Book-Entry Share*" shall have the meaning set forth in Section 3.01(b).

"***Broader Media***" shall have the meaning set forth in Section 5.07(a).

"***Broader Media Distribution***" shall have the meaning set forth in Section 5.07(a).

"***Business Day***" means any day, other than a Saturday or Sunday or a day on which banks are required or authorized by Law to close in New York City, New York.

"***capital stock***" or "***shares of capital stock***" means (i) with respect to a corporation, as determined under the Laws of the jurisdiction of organization of such entity, capital stock or such shares of capital stock; (ii) with respect to a partnership, limited liability company, or similar entity, as determined under the Laws of the jurisdiction of organization of such entity, units, interests, or other partnership or limited liability company interests; or (iii) any other equity ownership or participation.

"***CC Finco***" shall have the meaning set forth in Section 5.07(b).

"***CC Finco Distribution***" shall have the meaning set forth in Section 5.07(b).

"***CCH***" shall have the meaning set forth in the Preamble.

"***CCH Stockholder Approval***" means the affirmative vote or a written consent of the holders of shares of CCH common stock entitled to vote on the adoption of this Agreement and is the only vote of holders of securities of CCH which is required to adopt this Agreement, to approve the Merger and to consummate the Transactions.

"***CCH Tax Representation Letter***" shall have the meaning set forth in Section 5.01.

"***CCOH***" shall have the meaning set forth in the Preamble.

"***CCOH Board***" shall have the meaning set forth in the Recitals.

"***CCOH Class A Common Stock***" means each share of Class A common stock of CCOH, par value $0.01 per share.

"***CCOH Class B Common Stock***" means each share of Class B common stock of CCOH, par value $0.01 per share.

"***CCOH Common Stock***" means the CCOH Class A Common Stock and the CCOH Class B Common Stock.

"***CCOH Equity Incentive Plans***" means the (i) Clear Channel Outdoor Holdings, Inc. 2005 Stock Incentive Plan, (ii) Clear Channel Outdoor Holdings, Inc. Amended and Restated 2006 Annual Incentive Plan, and (iii) Clear Channel Outdoor Holdings, Inc. Amended and Restated 2012 Stock Incentive Plan, in each case, as amended or amended and restated through the Effective Date.

"***CCOH Restricted Stock Award***" shall have the meaning set forth in Section 3.03(c).

"**_CCOH Restricted Stock Unit_**" means each right or award of any kind, contingent or accrued, vested or unvested, to acquire or receive a share of CCOH Class A Common Stock or benefits measured by the value of such a Share pursuant to any existing CCOH Equity Incentive Plan.

"**_CCOH Stockholder Approval_**" means the affirmative vote or a written consent of the holders of shares of CCOH Common Stock representing the majority of the voting power of the CCOH Common Stock entitled to vote on the adoption of this Agreement and is the only vote of holders of securities of CCOH which is required to adopt this Agreement, to approve the Merger and to consummate the Transactions.

"**_CCOH Stock Option_**" means any Option granted pursuant to any CCOH Equity Incentive Plan.

"**_CCOH Tax Representation Letter_**" shall have the meaning set forth in <u>Section 5.01</u>.

"**_Certificate_**" shall have the meaning set forth in <u>Section 3.01(b)</u>.

"**_Certificate of Merger_**" shall have the meaning set forth in <u>Section 2.03</u>.

"**_Closing_**" shall have the meaning set forth in <u>Section 2.02</u>.

"**_Closing Date_**" shall have the meaning set forth in <u>Section 2.02</u>.

"**_Code_**" means the Internal Revenue Code of 1986, as amended.

"**_Confirmation Order_**" shall have the meaning set forth in <u>Section 6.01(e)</u>.

"**_Debtors_**" shall have the meaning set forth in the Recitals.

"**_DGCL_**" shall have the meaning set forth in the Recitals.

"**_Effective Date_**" shall mean the effective date of the Plan of Reorganization as set forth therein.

"**_Effective Time_**" shall have the meaning set forth in <u>Section 2.03</u>.

"**_Excluded Shares_**" shall have the meaning set forth in <u>Section 3.01(a)</u>.

"**_Form S-4_**" shall have the meaning set forth in <u>Section 5.03(a)</u>.

"**_Governmental Approvals_**" means any notices, reports or other filings to be made, or any consents, registrations, approvals, permits or authorizations to be obtained from, any Governmental Authority.

"**_Governmental Authority_**" means any multinational, foreign, federal, state, local or other governmental statutory or administrative authority, regulatory body or commission or any court, tribunal or judicial or arbitral authority which has any jurisdiction or control over either party.

"*IHC*" shall have the meaning set forth in the Recitals.

"*IHM*" shall have the meaning set forth in the Recitals.

"*Information Statement Waiting Period*" means the twenty calendar days following the date on which the Form S-4 is sent or made available to the stockholders of CCOH pursuant to Section 5.03.

"*K&E*" shall have the meaning set forth in Section 5.01.

"*K&E Legal Opinion*" shall have the meaning set forth in Section 5.01.

"*Law*" means any federal, state, provincial, local or foreign law (statutory, common or otherwise), constitution, convention, code, ordinance, rule, regulation, treaty (including any income tax treaty), Order, license, permit, authorization, Approval, consent or other requirement, in each case, enacted, promulgated, issued or entered by a Governmental Authority.

"*Legal Opinion*" shall have the meaning set forth in Section 5.01.

"*Letter of Transmittal*" shall have the meaning set forth in Section 3.02(a).

"*Merger*" shall have the meaning set forth in the Recitals.

"*Merger Consideration*" shall have the meaning set forth in Section 3.01(b).

"*New CCOH Common Stock* shall have the meaning set forth in Section 3.01(b).

"*New CCOH Restricted Stock Unit*" means each right or award of any kind, contingent or accrued, vested or unvested, to acquire or receive a share of New CCOH Common Stock or benefits measured by the value of such a share of New CCOH Common Stock pursuant to any existing CCOH Equity Incentive Plan.

"*New CCOH Stock Option*" means any Option to purchase shares of New CCOH Common Stock.

"*New CCOH Restricted Stock Award*" shall have the meaning set forth in Section 3.03(c).

"*Non-Recourse Parties*" shall have the meaning set forth in Section 8.13.

"*Options*" means any subscriptions, subscriptions rights, options, warrants, rights (including stock appreciation rights), preemptive rights or other contracts, commitments, understandings or arrangements, including any right of conversion or exchange under any outstanding security, instrument or agreement.

"*Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"***Person***" means an individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability entity, any other entity and any Governmental Authority.

"***Plan of Reorganization***" shall have the meaning set forth in the Recitals.

"***Radio Separation***" means the separation of the Radio Business (as defined in the Separation Agreement) pursuant to and in accordance with the Separation Agreement.

"***Replacement Opinion***" shall have the meaning set forth in Section 5.01.

"***Replacement Opinion Provider***" shall have the meaning set forth in Section 5.01.

"***Representatives***" means, with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants, attorneys or other representatives.

"***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of March 16, 2018, by and among IHM, the Debtors and the other parties signatory thereto, as amended through the date hereof, and as may be amended from time to time following the date hereof in accordance with its terms.

"***Restructuring Transactions Memorandum***" means the memorandum attached to the Separation Agreement setting forth the restructuring steps to be taken prior to the Closing Date and the sequence thereof.

"***SEC***" means the United States Securities and Exchange Commission.

"***Separation***" shall have the meaning set forth in the Separation Agreement.

"***Separation Agreement***" shall have the meaning set forth in the Recitals.

"***Subsidiary***" means, with respect to any Person, any other legal entity of which such Person either directly or indirectly: (a) beneficially owns more than 50% of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests or (iii) the capital or profit interests; or (b) otherwise has the power to vote sufficient securities to elect a majority of the board of directors or similar governing body.

"***Surviving Corporation***" shall have the meaning set forth in Section 2.01.

"***Taxes***" shall have the meaning set forth in the Separation Agreement.

"***Third Party***" means Person who is not CCH, CCOH or any of their Subsidiaries or Affiliates.

"***Transactions***" shall mean the transactions contemplated pursuant to this Agreement, including the Merger.

"***Transaction Litigation***" shall have the meaning set forth in Section 5.08.

-6-

"***Transfer Agent***" means [Computershare].

"***WSGR***" shall have the meaning set forth in Section 5.01.

"***WSGR Legal Opinion***" shall have the meaning set forth in Section 5.01.

## ARTICLE II
## THE MERGER

Section 2.01    The Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the DGCL, at the Effective Time, CCOH shall be merged with and into CCH.  At the Effective Time, the separate corporate existence of CCOH shall cease, and CCH shall be the surviving corporation in the Merger (the "***Surviving Corporation***") and shall continue its corporate existence under the Laws of the State of Delaware and shall succeed to and assume all of the rights and obligations of CCOH in accordance with the DGCL.

Section 2.02    Closing.  Unless this Agreement is validly terminated pursuant to Section 7.01, the closing of the Merger (the "***Closing***") shall occur as soon as practicable on the Effective Date after the satisfaction or waiver (if permitted hereunder) of all of the conditions set forth in Article VI other than those conditions that by their nature are to be satisfied at the Closing (but subject to the fulfillment or waiver of such conditions at the Closing), at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (or remotely via the electronic exchange of executed documents), unless another date or place is mutually agreed upon in writing by the parties. The date upon which the Closing occurs hereunder is referred to herein as the "***Closing Date.***"

Section 2.03    Effective Time of the Merger.    Subject to the provisions of this Agreement, on the Closing Date, the parties shall cause a certificate of merger (the "***Certificate of Merger***") to be executed, acknowledged and filed with the Secretary of State of the State of Delaware as provided in Section 251 of the DGCL.  The Merger shall become effective upon the filing of the Certificate of Merger or at such later time as is agreed to by the parties hereto and specified in the Certificate of Merger (the time at which the Merger becomes effective is herein referred to as the "***Effective Time***").

Section 2.04    Effects of the Merger.  The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL.

Section 2.05    Certificate of Incorporation and By-laws of the Surviving Corporation.  At the Effective Time, the certificate of incorporation of the Surviving Corporation shall be amended to read in its entirety as set forth in Exhibit D hereto (which shall, among other things, change the name of the Surviving Corporation to "Clear Channel Outdoor Holdings, Inc.") and the by-laws of the Surviving Corporation shall be amended to read in its entirety as set forth in Exhibit E hereto.

Section 2.06    Directors and Officers of the Surviving Corporation.  The directors and officers of CCH immediately prior to the Effective Time, shall, from and after the Effective Time, be the directors and officers of the Surviving Corporation until their successors have been duly elected or appointed and qualified, or their earlier death, resignation or removal.

## ARTICLE III
## CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES[1]

Section 3.01    Effect on Capital Stock.  At the Effective Time, by virtue of the Merger and without any action on the part of CCH, CCOH or the holders of any shares of CCOH Common Stock or any capital stock of CCOH:

(a)    Cancellation of Certain CCOH Common Stock.  All CCOH Common Stock that is owned by CCH or any direct or indirect wholly-owned subsidiary of CCH as of immediately prior to the Effective Time (each such share of CCOH Common Stock being an "*Excluded Share*" and collectively, the "*Excluded Shares*") shall automatically be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(b)    Conversion of CCOH Common Stock.  At the Effective Time, each share of CCOH Common Stock issued and outstanding immediately prior to the Effective Time (other than the Excluded Shares) shall be cancelled and converted into the right to receive, subject to Section 3.02(a), one (1) validly issued, fully paid and non-assessable share of common stock, par value $0.01 per share, of the Surviving Corporation (the "*New CCOH Common Stock*") (the "*Merger Consideration*").  From and after the Effective Time, subject to  Section 3.02(a), all of such shares of CCOH Common Stock (other than Excluded Shares) shall no longer be outstanding and shall automatically be converted into an equal number of shares of New CCOH Common Stock, and each certificate (a "*Certificate*") representing any shares of CCOH Common Stock (other than Excluded Shares) and each non-certificated share of CCOH Common Stock represented by book-entry (a "*Book-Entry Share*") (other than Excluded Shares) shall thereafter only represent the right to receive the Merger Consideration upon the surrender of such Certificate or receipt of an "agent's message" in accordance with  Section 3.02. Immediately following the Effective Time, each holder of CCOH Common Stock as of immediately prior to the Effective Time (other than Excluded Shares) shall have the right to receive the same number of shares of New CCOH Common Stock represented by book-entry as the number of shares of CCOH Common Stock such holder owned immediately prior to the Effective Time; provided, that upon a stockholder's written request, the Surviving Corporation shall issue to such stockholder a certificate representing such stockholder's shares of New CCOH Common Stock.

(c)    Conversion of CCH Common Stock.  The shares of CCH issued and outstanding immediately prior to the Effective Time shall be converted into and become in the aggregate a number of validly issued, fully paid and non-assessable shares of New CCOH Common Stock, equal to the number of Excluded Shares outstanding immediately prior to the Merger.

(d)    No Appraisal Rights.  No dissenters' rights or appraisal rights shall be available to the stockholders of CCOH or CCH in accordance with the DGCL.

---

[1]    Note to Draft: Current intention is for the preferred stock to be issued after the Effective Time. If CCOH issues preferred stock prior to the Effective Time then this Agreement to be revised to reflect that preferred stock will need to be converted to preferred stock of CCH in the Merger.

Section 3.02    Payment for Securities; Surrender of Certificates.

(a)    Procedures for Surrender.

(i)    Certificates.  Promptly after the Effective Time, the Surviving Corporation shall cause the Transfer Agent to mail to each holder of record (as of immediately prior to the Effective Time) of a Certificate whose shares of CCOH Common Stock were converted into the right to receive the Merger Consideration at the Effective Time pursuant to this Agreement: (A) a letter of transmittal in customary form reasonably acceptable to CCH and CCOH (the "*Letter of Transmittal*"), which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Transfer Agent, and shall otherwise be in such form and have such other provisions as CCH and CCOH may reasonably specify; and (B) instructions for effecting the surrender of the Certificates in exchange for the Merger Consideration payable in respect thereof pursuant to the provisions of this Article III.  Upon surrender of Certificates for cancellation to the Transfer Agent, and upon delivery of a Letter of Transmittal, duly executed and in proper form with respect to such Certificates, and such other documents as may reasonably be required by the Transfer Agent, the holder of such Certificates shall be entitled to receive in exchange therefor the Merger Consideration in book-entry form into which such shares of CCOH Common Stock have been converted pursuant to Section 3.01(a).

(ii)    Book-Entry Shares.  Any holder of Book-Entry Shares whose shares of CCOH Common Stock were converted into the right to receive the Merger Consideration at the Effective Time pursuant to this Agreement shall not be required to deliver a Certificate or an executed Letter of Transmittal to the Transfer Agent to receive the Merger Consideration that such holder is entitled to receive pursuant to this Agreement.  In lieu thereof, each such holder shall, upon receipt by the Transfer Agent of an "agent's message" (or such other evidence, if any, of surrender as the Transfer Agent may reasonably request) be entitled to receive in exchange therefor the Merger Consideration pursuant to Section 3.01.  Payment of the Merger Consideration with respect to Book-Entry Shares shall only be made to the Person in whose name such Book-Entry Shares are registered.

(iii)    Transfer of Shares.  In the event of a transfer of ownership of CCOH Common Stock that is not registered in the transfer records of CCOH, the Merger Consideration may be issued to a Person other than the Person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or shall otherwise be in proper form for transfer and the Person requesting the Merger Consideration pays any transfer or other similar Taxes required by reason of the payment of the Merger Consideration to a Person other than the registered holder of the Certificate so surrendered or shall establish to the satisfaction of the Surviving Corporation that such Taxes either have been paid or are not required to be paid.

(b)    No Further Ownership Rights in CCOH Common Stock; Closing of Transfer Books.  As of the Effective Time, the stock transfer books of CCOH shall be closed, and there shall be no further registration of transfers on the stock transfer books of CCOH of the shares of CCOH Common Stock that were outstanding immediately prior to the Effective Time, other than registrations of transfers to reflect, with customary settlement procedures, trades

effected prior to the Effective Time. The Merger Consideration paid in accordance with the terms of this Article III shall be deemed to have been paid in full satisfaction of all rights pertaining to such CCOH Common Stock. From and after the Effective Time, the holders of CCOH Common Stock outstanding immediately prior to the Effective Time shall cease to have any rights with respect to such CCOH Common Stock except as otherwise provided for herein or by applicable Law. If, after the Effective Time, Certificates or Book-Entry Shares are presented to the Surviving Corporation, or the Transfer Agent for any reason, they shall be canceled and, subject to the procedures set forth in Section 3.02(a), exchanged as provided in this Article III, except as otherwise required by law.

(c) No Liability. Notwithstanding anything to the contrary in Section 3.02(d), none of the parties hereto nor the Surviving Corporation nor the Transfer Agent or any of their respective directors, officers, employees and agents shall be liable to any holder of a share of CCOH Common Stock for Merger Consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate (or affidavits of loss in lieu thereof as provided in Section 3.02(d)) shall not have been surrendered prior to the date on which the Merger Consideration represented by such Certificate would otherwise escheat to or become the property of any Governmental Authority, any such Merger Consideration shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

(d) Lost, Stolen or Destroyed Certificates. If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by the Surviving Corporation, the posting by such Person of a bond in such reasonable amount as the Surviving Corporation may direct as indemnity against any claim that may be made against it or the Surviving Corporation with respect to such Certificate, the Transfer Agent shall issue, or pay or cause to be paid, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration deliverable in respect thereof pursuant to this Agreement.

Section 3.03   Treatment of CCOH Equity Incentive Plans. CCH and CCOH shall each adopt resolutions and take all necessary actions (x) such that CCH shall adopt the CCOH Equity Incentive Plans and all CCOH Equity Awards as of the Effective Time and (y) to effectuate the following:

(a) Effect on CCOH Stock Options. Subject to any written agreement between the relevant holder and CCH and/or CCOH, at the Effective Time, each CCOH Stock Option (or portion thereof) that is outstanding and unexercised as of immediately prior to the Effective Time, shall be converted into and shall become a New CCOH Stock Option (or an equal portion thereof); provided, however, that such conversion shall, in each case, comply with the requirements of Section 424 of the Code and Section 409A of the Code. Each New CCOH Stock Option shall continue to have, and shall be subject to, the same terms and conditions as applied to the CCOH Stock Option immediately prior to the Effective Time (but taking into account any changes thereto provided for in the CCOH Equity Incentive Plans, in any award agreement or in such CCOH Stock Option by reason of this Agreement or the Merger). Promptly following the Effective Time, but in no event more than ten Business Days after the Closing Date, the Surviving Corporation shall issue to each holder of an outstanding CCOH Stock Option

-10-

that is converted into a New CCOH Stock Option hereunder a document evidencing the foregoing assumption of such CCOH Stock Option by the Surviving Corporation.

(b)　　Effect on CCOH Restricted Stock Units.  Subject to any written agreement between the relevant holder and CCH and/or CCOH, as of the Effective Time, each CCOH Restricted Stock Unit (or portion thereof) that is outstanding as of immediately prior to the Effective Time (but excluding, for the avoidance of doubt, any CCOH Restricted Stock Unit or portion thereof that becomes vested as a result of the consummation of the Merger and is settled in CCOH Common Stock that, in turn, converts into the right to receive the Merger Consideration pursuant to Section 3.01) shall be assumed by the Surviving Corporation and shall be converted into a New CCOH Restricted Stock Unit in accordance with this Section 3.03. Each such New CCOH Restricted Stock Unit as shall continue to have, and shall be subject to, the same terms and conditions as applied to the CCOH Restricted Stock Unit immediately prior to the Effective Time (but taking into account any changes thereto provided for in the CCOH Equity Incentive Plans, in any award agreement or in such CCOH Restricted Stock Unit by reason of this Agreement or the Merger).  As of the Effective Time, each such New CCOH Restricted Stock Unit as so assumed and converted shall represent the right to receive a corresponding number of shares of New CCOH Common Stock.  Promptly following the Effective Time, but in no event more than ten Business Days after the Closing Date, the Surviving Corporation shall issue to each holder of a CCOH Restricted Stock Unit that is converted into a New CCOH Restricted Stock Unit a document evidencing the foregoing assumption of such CCOH Restricted Stock Unit by the Surviving Corporation.

(c)　　Effect on CCOH Restricted Stock Awards. Subject to any written agreement between the relevant holder and CCH and/or the CCOH, as of the Effective Time, each restricted share of CCOH Class A Common Stock granted under the applicable CCOH Equity Incentive Plan (a "***CCOH Restricted Stock Award***"), shall be converted into the right to receive a corresponding number of restricted shares of New CCOH Common Stock (a "***New CCOH Restricted Stock Award***"). Each unvested converted CCOH Restricted Stock Award so assumed and converted shall continue to have, and shall be subject to, the same terms and conditions as applied to the CCOH Restricted Stock Award immediately prior to the Effective Time (but taking into account any changes thereto provided for in the applicable CCOH Equity Incentive Plan, in any award agreement or in such CCOH Stock Option by reason of this Agreement or the Merger). Promptly following the Effective Time, but in no event more than ten Business Days after the Closing Date, the Surviving Corporation shall issue to each holder of a CCOH Restricted Stock Award that is converted into a New CCOH Restricted Stock Award a document evidencing the foregoing assumption of such CCOH Restricted Stock Award by the Surviving Corporation.

(d)　　Form S-8.  As soon as practicable after the Effective Time (but in no event later than ten Business Days following the Effective Time), the Surviving Corporation shall cause to be filed with the SEC a registration statement on Form S-8 (or any successor form), if available for use by the Surviving Corporation, relating to the shares of New CCOH Common Stock issuable with respect to such New CCOH Stock Options and New CCOH Restricted Stock Units eligible for registration on Form S-8.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

Section 4.01    Mutual Representations and Warranties.  Each of CCOH and CCH hereby make, the following representations and warranties to the other, on its own behalf and on behalf of its respective Subsidiaries, as of the date hereof and as of the Closing:

(a)    such Person has all requisite power and authority to execute and deliver this Agreement to which it is or will be a party as of the Closing and to consummate the Transactions;

(b)    the execution and delivery by such Person of this Agreement and the consummation of the Transactions have been duly authorized by all necessary and proper action on its part;

(c)    this Agreement has been duly and validly executed and delivered by it and (assuming that due execution and delivery by the other parties hereto) constitutes the legal, valid and binding obligation of such Person, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity;

(d)    the execution and delivery by such party of this Agreement and the consummation by such party of the Transactions do not and will not, as of the Closing conflict with any provision of its articles or certificate of incorporation, bylaws, certificate of formation, operating agreement or other organizational documents, as applicable;

(e)    each Person, directly or through its Subsidiaries, operates at least one significant historic business line, or owns at least a significant portion of its historic business assets, in each case within the meaning of Treasury Regulations Section 1.368-1(d);

(f)    neither Person is aware of the existence of any fact, or has taken or agreed to take any action, that would prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code or a "complete liquidation" to which Section 332 of the Code applies;

(g)    CCOH is not aware of any reason that it could not provide the CCOH Tax Representation Letter as the basis for a legal opinion that the Merger qualifies as a reorganization under Section 368(a)(1)(A) of the Code; and

(h)    CCH is not aware of any reason that it could not provide the CCH Tax Representation Letter as the basis for a legal opinion that the Merger qualifies as a reorganization under Section 368(a)(1)(A) of the Code.

Section 4.02    No Other Representations and Warranties.  Except for the representations and warranties expressly set forth in this Agreement, neither CCOH, CCH nor any of their respective Representatives makes or has made any representation or warranty of any kind whatsoever, express or implied, to (and each of CCH, CCOH and each of their respective

-12-

Subsidiaries disclaims reliance on all representations and warranties of any kind, whatsoever, express or implied, or made by) CCH, CCOH, and of their respective Subsidiaries or any other Person with respect to any of the Transactions or matters contemplated hereby (including with respect to the respective business, assets, liabilities, condition or prospects (financial or otherwise) of, or any other matter involving, either business, or the sufficiency of the assets owned by CCH or CCOH, or the title to any such assets, or that any requirements of applicable Law are complied with, with respect to the Separation).  No Person has been authorized by either CCH or CCOH or their respective Affiliates or Representatives to make any representation or warranty relating to the other party with respect to any of the Transactions or matters contemplated hereby (including with respect to the respective business, assets, liabilities, condition or prospects (financial or otherwise) of, or any other matter involving, either business, or the sufficiency of the assets, or the title to any assets, or that any requirements of applicable Law are complied with, with respect to the Separation), and if made, such representation or warranty must not be relied upon by such Person or any of its Affiliates or Representatives as having been authorized by such party or any of its or their respective Affiliates or Representatives (or any other Person). EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REPRESENTATIONS AND WARRANTIES MADE BY EITHER PARTY IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE TO ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY EXPRESS OR IMPLIED, AND  EACH PARTY SHALL TAKE ALL OF THE BUSINESS, ASSETS AND OTHER LIABILITIES TRANSFERRED TO OR ASSUMED BY IT PURSUANT TO THIS AGREEMENT ON AN "AS IS, WHERE IS" BASIS AND ALL OTHER IMPLIED REPRESENTATIONS AND WARRANTIES, ON MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, MARKETABILITY, TITLE, VALUE OR OF FREEDOM FROM ENCUMBRANCE ARE HEREBY EXPRESSLY DISCLAIMED, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO EITHER PARTY OR THEIR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL INFORMATION, SUPPLEMENTAL DATA OR FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS). EACH PARTY SHALL RELY SOLELY ON ITS OWN EXAMINATION AND INVESTIGATION OF THE OTHER PARTY'S BUSINESS AND ASSETS AS WELL AS THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT.   NEITHER PARTY NOR ANY OF ITS REPRESENTATIVES HAS MADE (AND NEITHER PARTY NOR THEIR REPRESENTATIVES HAVE RELIED UPON) ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF ANY OF THE INFORMATION PROVIDED OR MADE AVAILABLE TO SUCH PARTY PRIOR TO THE EXECUTION OF THIS AGREEMENT.

## ARTICLE V
## COVENANTS

Section 5.01   Legal Opinions. CCOH agrees to use reasonable best efforts to obtain a legal opinion from Wilson Sonsini Goodrich & Rosati, P.C. in the form attached hereto as Exhibit A-1 ("**WSGR**" and the "**WSGR Legal Opinion**") and CCH agrees to use reasonable best efforts to obtain a legal opinion from Kirkland & Ellis LLP in the form attached hereto as Exhibit A-2 ("**K&E**" and the "**K&E Legal Opinion**"; each of the WSGR Legal Opinion and K&E Legal Opinion, a "**Legal Opinion**"), each dated as of the Closing Date to the effect that as

of the Closing Date and based on the various assumptions, qualifications and limitations contained therein (including applicable Tax Law in effect as of the Closing Date), the Merger shall be treated as a reorganization within the meaning of Section 368(a) of the Code.  On the Closing Date, CCOH shall deliver to WSGR and K&E (or to the applicable Replacement Opinion Provider) an officer's certificate in the form attached hereto as Exhibit B, dated as of the Closing Date and signed by an officer of CCOH (the "***CCOH Tax Representation Letter***"). On the Closing Date, CCH shall deliver to WSGR and K&E (or to the applicable Replacement Opinion Provider) an officer's certificate in the form attached hereto as Exhibit C, dated as of the Closing Date, and signed by an officer of CCH (the "***CCH Tax Representation Letter***"). CCOH and CCH shall direct WSGR and K&E, respectively, to rely on certain assumptions, including assumptions regarding the absence of changes in existing facts and the completion of the Merger strictly in accordance with this Agreement and the Form S-4, in rendering their respective opinions. The Legal Opinions shall also rely upon the CCOH Tax Representation Letter, the CCH Tax Representation Letter, and the representations and warranties made under Article IV and will assume that these representations and warranties are true, correct and complete, and that CCOH and CCH, as the case may be, shall comply with the covenants set forth in this Agreement. CCOH and CCH shall cooperate with one another to facilitate the issuance of the Legal Opinions referred to in this Section 5.01.  In the event that K&E is unwilling or unable to provide the K&E Legal Opinion, or WSGR is unwilling or unable to provide the WSGR Legal Opinion, then CCOH (if the K&E Legal Opinion is not being provided) shall have the right to require CCH to use reasonable best efforts to obtain, or CCH (if the WSGR Legal Opinion is not being provided), shall have the right to require CCOH to use reasonable best efforts to obtain, from a nationally recognized "Big 4" accounting firm or law firm that is reasonably acceptable to each of CCH and CCOH (a "***Replacement Opinion Provider***"), an opinion addressing the matters that would have been addressed by the K&E Legal Opinion or WSGR Legal Opinion, as applicable (a "***Replacement Opinion***"), and the delivery of such Replacement Opinion shall satisfy any condition in this Agreement that would otherwise have been satisfied by K&E Legal Opinion or WSGR Legal Opinion, as applicable; provided, that any such Replacement Opinion shall be subject to the same requirements as the opinion it is replacing, and CCH and CCOH, as applicable, shall fully cooperate in providing the applicable accounting firm or law firm with the same information and materials, including the CCOH Tax Representation Letter or CCH Tax Representation Letter, as applicable, that would have been provided to K&E or WSGR.

Section 5.02   Tax Matters.  CCOH and CCH shall not, and shall cause their respective Subsidiaries not to, take any action, cause any action to be taken, knowingly fail to take any action or knowingly fail to cause any action to be taken, which action or failure to act would prevent or impede, or would be reasonably likely to prevent or impede, the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code or, with respect to CCH, as a complete liquidation to which Section 332 of the Code applies.

Section 5.03   Preparation of the S-4.

(a)   No later than [●] days following the date of this Agreement, CCH and CCOH shall file an information statement/prospectus on Form S-4 (the "***Form S-4***") relating to the Merger, which will include all information required to be disclosed by CCOH on Schedule-14C and a notice of action taken by written consent by the stockholders of CCOH pursuant to the

requirements of Section 228 of the DGCL, which notice must also be mailed in accordance with the DGCL. Each of CCOH and CCH shall use its reasonable best efforts to (A) have the Form S-4 declared effective under the Securities Act as promptly as practicable after such filing, (B) ensure that the Form S-4 complies in all material respects with the applicable provisions of the Exchange Act or Securities Act, and (C) keep the Form S-4 effective for so long as necessary to complete the Merger. Each of CCOH and CCH shall furnish all information concerning itself, its Affiliates and the holders of its shares to the other and provide such other assistance as may be reasonably requested in connection with the preparation, filing and distribution of the Form S-4. The Form S-4 shall include as exhibits legal opinions that are substantively consistent with the Legal Opinions (which legal opinions shall rely on representation letters substantially similar to the CCOH Tax Representation Letter and CCH Tax Representation Letter), the information that included the basis for rendering such opinion, and all other information reasonably requested by each party to be included therein. Each of CCOH and CCH shall promptly notify the other upon the receipt of any comments from the SEC or any request from the SEC for amendments or supplements to the Form S-4, and shall, as promptly as practicable after receipt thereof, provide the other with copies of all material correspondence between it and its Representatives, on one hand, and the SEC, on the other hand, and all written comments with respect to the Form S-4 received from the SEC and advise the other party of any oral comments with respect to the Form S-4 received from the SEC. CCOH and CCH shall use their reasonable best efforts to respond as promptly as practicable to any comment from the SEC with respect to the Form S-4. Prior to filing the Form S-4 (or any amendment or supplement thereto) or responding to any comments of the SEC with respect thereto, each of CCOH and CCH shall cooperate and provide the other a reasonable opportunity to review and comment on such document or response in advance (including the proposed final version of such document or response) and consider in good faith any comments provided by CCOH or CCH or any of their respective Representatives with respect thereto. CCH shall advise CCOH, promptly after it receives notice thereof, of the time of effectiveness of the Form S-4, the issuance of any stop order relating thereto or the suspension of the qualification of the New CCOH Common Stock issuable in connection with the Merger for offering or sale in any jurisdiction, and CCH shall use its reasonable best efforts to have any such stop order or suspension lifted, reversed or otherwise terminated. CCH shall also use its reasonable best efforts to take any other action required to be taken under the Securities Act, the Exchange Act, any applicable foreign or state securities or "blue sky" laws and the rules and regulations thereunder in connection with the issuance of the New CCOH Common Stock in the Merger, and CCOH shall furnish all information concerning CCOH, its Subsidiaries and the holders of the CCOH Common Stock as may be reasonably requested in connection with any such actions.

(b)     If, at any time prior to the date of effectiveness under the Securities Act (with respect to the Form S-4), CCOH or CCH discovers that any information relating to CCOH or CCH or any of their respective Affiliates, officers or directors, should be set forth in an amendment or supplement to the Form S-4 so that such document would not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they are made, not misleading, the party that discovers such information shall as promptly as practicable notify the other party and an appropriate amendment or supplement describing such information shall be filed with the SEC as promptly as practicable after the other party has

-15-

had a reasonable opportunity to review and comment thereon, and, to the extent required by applicable law, disseminated to the holders of CCOH Common Stock.

(c)     On or prior to the Closing Date, CCH will file or cause to be filed a registration statement on Form 8-A (or an amendment to CCOH's registration statement on Form 8-A) for the registration of the New CCOH Common Stock under the Exchange Act.

Section 5.04     <u>Section 16 Matters</u>.  Prior to the Effective Time, the CCOH Board, or an appropriate committee of non-employee directors thereof, shall adopt a resolution consistent with the interpretive guidance of the SEC so that the disposition by any officer or director of CCOH who is a covered Person of CCOH for purposes of Section 16 of the Exchange Act ("**Section 16**") of CCOH Common Stock or other equity interest in CCOH (including derivative securities) pursuant to this Agreement and the Merger shall be an exempt transaction for purposes of Section 16.

Section 5.05     <u>Stock Exchange Listing; Delisting.</u>

(a)     On or prior to the Closing Date, CCH shall use its commercially reasonable efforts to cause the shares of New CCOH Common Stock to be issued in the Merger and the shares of New CCOH Common Stock to be distributed to creditors of IHM to be approved for listing on the NYSE or other nationally recognized exchange, subject to official notice of issuance.

(b)     Prior to the Closing, upon CCH's request, CCOH shall take all reasonable actions to cause the delisting of CCOH Common Stock from the NYSE and the termination of CCOH's registration under the Exchange Act as soon as practicable following the Effective Time.

Section 5.06     <u>Directors and Officers</u>.

(a)     Prior to the Closing, CCH shall cause the CCH Board to take all actions necessary so that the individuals set forth on <u>Schedule 5.06(a)</u> shall be the directors and officers of CCH as of immediately prior to the Effective Time and shall serve until their successors have been duly elected or appointed and qualified, or their earlier death, resignation or removal

(b)     At or prior to the Closing, CCOH shall cause each individual on Schedule 5.06(b) to deliver a resignation from the CCOH Board for individuals set forth on <u>Schedule 5.06(b)</u>, which resignation shall be effective immediately prior to the Effective Time.

Section 5.07     <u>Broader Media and CC Finco Distributions</u>.

(a)     Prior to the Closing, CCH shall cause Broader Media, LLC, a Delaware limited liability company and wholly-owned Subsidiary of CCH ("**Broader Media**"), to distribute all of the shares of CCOH Common Stock held by Broader Media to CCH, and CCH shall accept such CCOH Common Stock (such distribution, the "**Broader Media Distribution**"). Upon the consummation of the Broader Media Distribution, such CCOH Common Stock shall constitute Excluded Shares for purposes of this Agreement.

(b)     Prior to the Closing, CCH shall cause CC Finco, LLC, a Delaware limited liability company and wholly-owned Subsidiary of CCH ("*CC Finco*"), to distribute all of the shares of CCOH Common Stock held by CC Finco to CCH, and CCH shall accept such CCOH Common Stock (such distribution, the "***CC Finco Distribution***"). Upon the consummation of the CC Finco Distribution, such shares of CCOH Common Stock shall constitute Excluded Shares for purposes of this Agreement.

(c)     No later than the close of business on the day immediately preceding the Closing Date, CCH shall, and, as applicable, shall cause Broader Media to, convert all of the shares of CCOH Class B Common Stock into CCOH Class A Common Stock, in each case, in accordance with the terms and procedures set forth in the Amended and Restated Certificate of Incorporation of CCOH, dated as of November 9, 2005.

Section 5.08     Stockholder Litigation.  In the event that any stockholder litigation related to this Agreement, the Transactions or any of the transactions contemplated by the Restructuring Transactions Memorandum or the Separation Agreement is brought, or to CCOH's knowledge, threatened in writing, against CCOH and/or the members of the CCOH Board prior to the Effective Time (a "***Transaction Litigation***"), CCOH shall promptly notify CCH of any such Transaction Litigation and shall keep CCH reasonably informed with respect to the status thereof.  CCH shall have the right, at its sole discretion, to participate in the defense or settlement of any Transaction Litigation, and, in any event, CCOH shall not settle, compromise, come to an arrangement regarding or agree to settle, compromise or come to an arrangement regarding any Transaction Litigation, without CCH's prior written consent.

Section 5.09     Efforts.  Subject to the terms and conditions set forth herein and to applicable legal requirements, each of CCH and CCOH shall cooperate and use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with each other parties in doing, all things, necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transactions, including the satisfaction of the respective conditions set forth in Article VI.  Further, neither CCH nor CCOH shall take, or cause to be taken, any action or do, or cause to be done, anything that would reasonably be expected to materially impede or delay the Transactions, including the satisfaction of the respective conditions set forth in Article VI.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

Section 6.01     Conditions to Each Party's Obligation to Effect the Merger.  The obligations of each of CCH and CCOH to effect the Merger shall be subject to the fulfillment (or, to the extent permitted by applicable Law, written waiver by each of CCOH and CCH on or prior to the Effective Time) of the following conditions:

(a)     Stockholder Approval.  The CCH Stockholder Approval and the CCOH Stockholder Approval shall have been obtained.

(b)     No Injunctions or Restraints.  No Order issued by any Governmental Authority of competent jurisdiction or other legal restraint or prohibition preventing the

consummation of any of the Transactions, declare unlawful the Transactions or cause such Transactions to be rescinded shall be in effect.

(c)    <u>Form S-4</u>.  The Form S-4 shall have been declared effective by the SEC under the Securities Act and no stop order suspending the effectiveness of the Form S-4 shall have been issued by the SEC and remain in effect and no proceedings for that purpose shall have been initiated or threatened in writing by the SEC.

(d)    <u>Information Statement Waiting Period</u>.  The Information Statement Waiting Period shall have expired.

(e)    <u>Confirmation of Plan of Reorganization</u>. The Bankruptcy Court shall have entered an Order (which may be an Order approving the Plan of Reorganization) approving this Agreement (the "***Confirmation Order***").

(f)    <u>Emergence Conditions</u>. All conditions precedent to the effectiveness of the Plan of Reorganization as set forth therein shall have been satisfied prior to or contemporaneously with the Closing.

(g)    <u>Separation Steps</u>. All steps contemplated to be taken prior to the consummation of the Merger pursuant to the Restructuring Transactions Memorandum, including the Radio Separation, Broader Media Distribution and the CC Finco Distribution, shall have occurred in accordance with the Restructuring Transactions Memorandum.

(h)    <u>CCOH Class B Common Stock Conversion</u>. CCH shall have, and shall have caused Broader Media to have, converted all of their shares of CCOH Class B Common Stock into CCOH Class A Common Stock.

Section 6.02    <u>Conditions to Obligations of CCOH</u>.  The obligation of CCOH to effect the Merger is further subject to satisfaction or waiver at or prior to the Effective Time by CCOH of the following additional conditions:

(a)    <u>Legal Opinion</u>. CCOH shall have received the WSGR Legal Opinion or a Replacement Opinion, as applicable.

(b)    <u>Bring Down of Representations and Warranties</u>. The representations and warranties made by CCH in <u>Article IV</u> shall be true and correct both as of the date hereof and as of the Closing Date, in each case in all material respects.

(c)    <u>Performance of Covenants</u>. CCH shall have performed and complied with, in all material respects, all covenants required by this Agreement to be performed prior to the Closing.

Section 6.03    <u>Conditions to Obligations of CCH</u>.  The obligation of CCH to effect the Merger is subject to satisfaction or waiver on or prior to the Effective Time by CCH of the following additional conditions:

(a)      Legal Opinion. CCH shall have received the K&E Legal Opinion or a Replacement Opinion, as applicable.

(b)      Bring Down of Representations and Warranties. The representations and warranties made by CCOH in Article IV shall be true and correct both as of the date hereof and as of the Closing Date, in each case in all material respects.

(c)      Performance of Covenants. CCOH shall have performed and complied with, in all material respects, all covenants required by this Agreement to be performed prior to the Closing.

(d)      Listing. The shares of New CCOH Common Stock issuable as Merger Consideration pursuant to this Agreement shall have been approved for listing on the NYSE, or other nationally recognized exchange, subject to official notice of issuance.

## ARTICLE VII
## TERMINATION, AMENDMENT AND WAIVER

Section 7.01   Termination.  This Agreement may only be terminated and the Merger abandoned at any time prior to the Effective Time:

(a)      by mutual written agreement of CCH and CCOH;

(b)      by either CCH or CCOH if the Separation has not been consummated prior to June 30, 2019; and

(c)      by either CCH or CCOH if (1) IHM files (x) a plan of reorganization, a disclosure statement or a proposed Confirmation Order in the Chapter 11 Cases that does not contemplate the Separation, or (y) any motion, pleading, or other document with the Bankruptcy Court in the Chapter 11 Cases that is otherwise materially inconsistent with the applicable Restructuring Support Agreement or the Plan of Reorganization in effect as of the date hereof, or (2) the Confirmation Order (x) does not contemplate the Separation or (y) is not otherwise materially consistent with the Plan of Reorganization in effect as of the date hereof.

Section 7.02   Effect of Termination.  In the event that this Agreement is terminated, this Agreement shall become null and void and no party, nor any party's directors, officers or employees, shall have any further obligation or liability of any kind to any Person by reason of this Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

Section 8.01   Non-survival of Representations, Warranties, Covenants and Agreements. None of the representations, warranties, covenants and agreements of the parties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time; provided, however, that this Section 8.01 shall not limit any covenant or agreement of the parties in this Agreement or in any instrument delivered pursuant to this Agreement to the extent that such covenant or agreement contemplates performance after the Effective Time.

Section 8.02    Notices.  All notices, requests, claims, demands or other communications under this Agreement, shall be in writing and shall be deemed to have been given or made (i) when personally delivered, (ii) the next Business Day if sent by overnight courier service marked for overnight delivery, (iii) upon transmission if sent by email prior to 5:00 p.m. New York City time on a Business Day (or as of 9:00 a.m. New York City time the following Business Day if sent after 5:00 p.m. New York City time or on a day that is not a Business Day) if either receipt is acknowledged (such acknowledgement not to be unreasonably withheld) or within one Business Day if a copy is sent pursuant to clause (ii), or (iv) three Business Days after deposit in the United States mail, certified and with proper postage prepaid, addressed as follows (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

if to CCOH, to:

Clear Channel Outdoor Holdings, Inc.
99 Park Avenue, 2nd Floor
New York, NY 10016
Attention: Lynn Feldman
E-mail: LynnFeldman@clearchannel.com

Clear Channel Outdoor Holdings, Inc.
c/o Clear Channel International Ltd.
33 Golden Square
London W1F9JT
United Kingdom
Attention: Adam Tow
E-mail: Adam.Tow@clearchannel.com

with a copy (which shall not constitute notice) to:

Wilson, Sonsini, Goodrich & Rosati, P.C.
1301 Avenue of the Americas
New York, NY 10019
Attention: Benjamin Hoch
            Bradley Finkelstein
            Amy Simmerman
E-mail: bhoch@wsgr.com
         bfinkelstein@wsgr.com
         asimmerman@wsgr.com

if to CCH, to:

Clear Channel Outdoor Holdings, Inc.
99 Park Avenue, 2nd Floor
New York, NY 10016
Attention: Lynn Feldman
E-mail: LynnFeldman@clearchannel.com

-20-

Clear Channel Outdoor Holdings, Inc.
c/o Clear Channel International Ltd.
33 Golden Square
London W1F9JT
United Kingdom
Attention: Adam Tow
E-mail: Adam.Tow@clearchannel.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Douglas A. Ryder, P.C.,
              Dvir Oren
              Brian D. Wolfe
E-mail:       douglas.ryder@kirkland.com
              dvir.oren@kirkland.com
              brian.wolfe@kirkland.com

Section 8.03    <u>Interpretation and Other Matters</u>. In this Agreement:

(a)    words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other genders as the context requires;

(b)    the terms "hereof," "herein," "herewith" and words of similar import, and the term "Agreement" shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the Schedules, Exhibits, Annexes and Appendices hereto) and not to any particular provision of this Agreement;

(c)    Article, Section, Exhibit, Schedule, Annex and Appendix references are to the Articles, Sections, Exhibits, Schedules, Annexes and Appendices to this Agreement unless otherwise specified;

(d)    the word "including" and words of similar import when used in this Agreement means "including, without limitation";

(e)    unless expressly stated to the contrary in this Agreement, the word "or" shall not be exclusive;

(f)    unless expressly stated to the contrary in this Agreement, all references to "the date hereof," "the date of this Agreement," "hereby" and "hereupon" and words of similar import shall all be references to the date first stated in the preamble to this Agreement, regardless of any amendment or restatement hereof; and

(g)      unless otherwise provided, all references to "$" or "dollars" are to United States dollars.

Section 8.04    Counterparts.    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each party hereto and delivered to the other party hereto.

Section 8.05    Entire Agreement; Third-Party Beneficiaries.

(a)      This Agreement and the Exhibits, Annexes and Schedules hereto and thereto, contain the entire agreement between the parties with respect to the subject matter hereof and thereof, supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter and there are no agreements or understandings between the parties with respect to such subject matter other than those set forth or referred to herein or therein.

(b)      Nothing in this Agreement is intended to confer, and does not confer, any rights or remedies under or by reason of this Agreement (or any breach hereof) on any Person other than the parties hereto and their respective successors and permitted assigns, except (i) iHeartMedia, Inc., a Delaware corporation, shall be an express third party beneficiary with the right to enforce all of the provisions of this Agreement, (ii) after the Effective Time, for the provisions of Article III, which shall be enforceable by the holders of New CCOH Common Stock to the extent necessary to receive the consideration to which such holder is entitled pursuant to Article III, and (iii) the provisions of Section 8.13, which shall be enforceable by the Non-Recourse Parties. This Agreement is the product of negotiation by the parties having the assistance of counsel and other advisers.  It is the intention of the parties that this Agreement not be construed more strictly with regard to one party than with regard to the other.

Section 8.06    Amendment.  This Agreement may be amended by the parties at any time prior to the Effective Time by an instrument in writing signed by each of the parties hereto; provided, however, that after receipt of the CCOH Stockholder Approval, there shall not be made any amendment that by Law or in accordance with the rules or any relevant stock exchange, requires further approval by the stockholders of CCOH without the further approval of such stockholders.

Section 8.07    Extension; Waiver.  At any time prior to the Effective Time, a party may (a) extend the time for the performance of any of the obligations or other acts of the other party or parties, (b) waive any breach or inaccuracies in the representations and warranties of the other party or parties contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance by the other parties with any of the agreements or conditions contained in this Agreement.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

Section 8.08    Governing Law; Consent to Jurisdiction and Service of Process.

(a)    This Agreement (including all its Exhibits, Schedules, Annexes and Appendices) (and any claims or disputes arising out of or related hereto or to the Transactions or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) shall be exclusively governed by and construed and interpreted in accordance with the Laws of the State of Delaware, irrespective of any choice of laws principles that would result in the application of the Laws of another jurisdiction, including all matters of formation, existence, validity, interpretation, construction, effect, enforceability, performance, breach, termination, and remedies; provided that any matter arising out of or related to the certificate of incorporation, bylaws or other organizational documents of an entity formed under the Laws of a jurisdiction other than the State of Delaware or any corporate action taken pursuant to such organizational documents or the Laws of the jurisdiction of such entity's formation shall be governed by and construed and interpreted in accordance with the Laws of such other jurisdiction.

(b)    THE PARTIES HERETO AGREE THAT JURISDICTION AND VENUE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT BY ANY PARTY PURSUANT TO THIS AGREEMENT (AND ANY CLAIMS OR DISPUTES ARISING OUT OF OR RELATED HERETO OR TO THE TRANSACTIONS OR TO THE INDUCEMENT OF ANY PARTY TO ENTER HEREIN WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE AND WHETHER PREDICATED ON COMMON LAW, STATUTE OR OTHERWISE) SHALL PROPERLY AND EXCLUSIVELY LIE IN THE CHANCERY COURT OF THE STATE OF DELAWARE AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (OR, IF THE CHANCERY COURT OF THE STATE OF DELAWARE DECLINES TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, ANY STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE). BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH SUIT, ACTION OR PROCEEDING.  THE PARTIES HERETO IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN SUCH COURT AND HEREBY WAIVE ANY OBJECTION THAT ANY SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH SUIT, ACTION OR PROCEEDING.   EACH OF THE PARTIES FURTHER IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.02.   NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 8.09    Assignment.   This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns; provided that no party hereto may assign its respective rights or delegate its respective obligations under this Agreement without the express prior written consent of the other party hereto; provided, further, that each party may assign its rights and delegate its obligations under this Agreement to any of its Affiliates (provided that no such assignment or delegation shall release such party from any liability or obligation under this Agreement).

Section 8.10    Specific Performance.   In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the party who is

thereby aggrieved shall have the right to seek specific performance and injunctive or other equitable relief (on an interim or permanent basis) in respect of its or their rights under this Agreement, in addition to any and all other rights and remedies at Law or in equity, and all such rights and remedies shall be cumulative.  The parties agree that the remedies at Law for any breach or threatened breach, including monetary damages, may be inadequate compensation for any damage or loss and that any defense in any action, suit, arbitration or other proceeding of any nature for specific performance that a remedy at Law would be adequate is waived.  Any requirements for the securing or posting of any bond with such remedy are waived by each of the parties.

Section 8.11   <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof or thereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.  Upon such determination, the parties shall negotiate in good faith in an effort to agree upon such a suitable and equitable provision to effect the original intent of the parties.

Section 8.12   <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO EXPRESSLY AND IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT, THE TRANSACTIONS OR THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF, AND ANY ACTION RELATING TO OR ARISING IN ANY WAY THEREFROM SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Section 8.13   <u>No Recourse</u>. This Agreement may only be enforced against, and any claims or causes of action that may be based upon or arise out of this Agreement, or the negotiation, execution or performance of this Agreement, may only be made against the Persons that are expressly identified as parties hereto and no former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Representatives or Affiliates of any party hereto or any former, current or future stockholder, controlling Person, director, officer, employee, general or limited partner, member, manager, agent, Representative or Affiliate of any of the foregoing (each, a "***Non-Recourse Party***") shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, any breach of this Agreement or in respect of any representations made or alleged to be made in connection herewith.  Without limiting the rights of any party against the other party hereto, in no event shall either party or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages for breach of this Agreement from, any Non-Recourse Party.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, CCOH and CCH have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

**CLEAR CHANNEL OUTDOOR HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**CLEAR CHANNEL HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

## <u>Exhibit A-1</u>

**Form of WSGR Legal Opinion**

See attached.

**<u>Exhibit A-2</u>**

**Form of K&E Legal Opinion**

See attached.

## **Exhibit B**

**Form of CCOH Tax Representation Letter**

See attached.

**<u>Exhibit C</u>**

**Form of CCH Tax Representation Letter**

See attached.

## <u>Exhibit D</u>

**Form of Amended and Restated Certificate of Incorporation of CCH**

See attached.

## **Exhibit E**

**Form of Amended and Restated Bylaws of CCH**

See attached.

## **EXHIBIT 5**

**Revolving Loan Agreement**

# REVOLVING LOAN AGREEMENT

THIS REVOLVING LOAN AGREEMENT (the "Agreement") is made on [●], 2019, between iHeartCommunications, Inc., a Texas corporation (the "Lender"), and Clear Channel Outdoor, LLC, a Delaware limited liability company (the "Borrower").[1]

WHEREAS, the parties hereto desire to enter into this Agreement, pursuant to which the Lender shall provide a commitment to the Borrower to provide revolving loans (the "Loans") in an aggregate principal amount equal to $200,000,000 (the "Commitment").

WHEREAS, substantially simultaneously with the execution of this Agreement, Clear Channel Outdoor Holdings, Inc. ("CCOH") will merge (the "Merger") with and into the immediate parent company of CCOH, Clear Channel Holdings, Inc. ("CCH"), pursuant to the terms of a merger agreement, with CCH surviving the Merger, becoming the immediate parent company of the Borrower, and changing its name to Clear Channel Outdoor Holdings, Inc. ("New CCOH").

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made and the representations, warranties and covenants herein contained, the Lender and the Borrower hereby agree as follows:

1.   Loans.  Subject to the terms and conditions and relying upon the certifications set forth in each Borrowing Notice referred to below, the Lender agrees to lend to the Borrower Loans at any time and from time to time on and after the date hereof until the Maturity Date in accordance with the terms hereof, in an aggregate principal amount not to exceed the Commitment; *provided*, that (i) the conditions set forth in Section 4 have been satisfied or waived as of the date of each funding (each, a "Funding Date") and (ii) no more than one Borrowing (as defined below) funding shall be permitted during any calendar week. Subject to the other terms and conditions hereof, amounts paid or prepaid in respect of any Loan may be reborrowed.  Each Loan made on the same date, and requested in the same Borrowing Notice, is referred to herein as a "Borrowing".

2.   Interest.  Interest shall accrue on the unpaid principal amount of the Loans outstanding from time to time on a daily basis at a rate equal to, as of any date of determination, that certain rate quoted in The Wall Street Journal as the U.S. "prime rate" on such date or, if The Wall Street Journal ceases to quote such rate or if the rate reported as of such time is not ascertainable, the highest per annum interest rate published in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) (or any comparable successor publication) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Lender) or any similar release by the Federal Reserve Board (as reasonably determined by the Lender) (the "Prime Rate"), per annum, compounded quarterly, and shall be payable in accordance with Section 3; *provided that* so long as any Event of Default (as defined below) has occurred and is continuing, at the option of the Lender, interest shall accrue at the rate of the Prime Rate *plus* 2.0% per annum (the "Default Rate"), compounded quarterly, on the unpaid outstanding principal amount of the Loans (plus any accrued but unpaid interest) outstanding from time to time for the period beginning on the date on which the Lender has delivered written notice of such Event of Default occurs and ending on the date on which such Event of Default ceases to exist, or, if less, at the highest rate then permitted under applicable law.  Interest on each Loan shall be due and payable in arrears on the last day of each fiscal quarter of the Borrower, commencing on [●].[2]  Any accrued interest (including Default Rate interest) which for any reason has not been paid shall be paid in full on the

---

[1]   May be amended to include co-borrowers.

[2]   To be the last date of the fiscal quarter in which the Agreement is executed.

Maturity Date (as defined below).  Demand, diligence, presentment, protest and notice of non-payment and protest are hereby waived by the Borrower.  Notwithstanding anything to the contrary contained in this Agreement, the interest paid or agreed to be paid under this Agreement shall not exceed the maximum rate of non-usurious interest permitted by applicable requirements of law.

3.   <u>Payments of Principal and Interest</u>.  Borrower shall pay interest on and repay the Loans as follows:

    a.   Subject to the remaining provisions of this Section 3, Borrower may, in its sole discretion, pay all or any portion of the outstanding Loans or terminate all or any portion of the outstanding Commitment, in each case at any time and without premium or penalty.  Any payments so made shall be applied first to accrued but unpaid interest and second to outstanding principal.

    b.   If, on any date, the aggregate principal amount of outstanding Loans exceeds the Commitment, the Borrower shall within five (5) days, other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, New York, New York (each, a "<u>Business Day</u>"), prepay Loans in an aggregate amount equal to such excess.

    c.   With respect to any fiscal month of the Borrower, if the amount equal to (1) total unrestricted cash and cash equivalents on the balance sheet of New CCOH and its subsidiaries (other than China Outdoor Media Investment (HK) Co., Ltd., Hainan Whitehorse Advertising Media Investment Company Ltd. and other than cash or cash equivalents held in accounts located in Mexico, Peru, Chile or Brazil) *plus* (2) to the extent Availability exceeds $25,000,000 under any other Indebtedness (as defined below) of the Borrower, the aggregate excess amount under all such Indebtedness *less* (3) an amount equal to all accrued, unpaid interest expense in respect of the CC Notes (as defined below) due or required to be paid within 30 days ("<u>Consolidated Liquidity</u>"), in each case, as set forth in the applicable Monthly Liquidity Statement (as defined below), exceeds $137,500,000 on each day of such fiscal month, the Borrower shall promptly (but in any event, within five (5) Business Days after delivery of such Monthly Liquidity Statement) prepay the Loans in an aggregate amount equal to the amount by which Consolidated Liquidity, as of the last day of such fiscal month, exceeds $137,500,000.

    As used herein, "<u>Availability</u>" means, as of any date, (a) the "Excess Availability," as of such date, as defined under that certain Credit Agreement, dated as of June 1, 2018, among Borrower, the other borrower entities party thereto, Deutsche Bank AG New York Branch, as administrative agent, and the lenders party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>ABL Credit Agreement</u>"), or any similar term in any Indebtedness that Refinances (as defined below) the obligations and commitments under the ABL Credit Agreement; and (b) the amount available, as of such date, to be borrowed, after giving effect to any outstanding loans, letters of credit or other obligations.

    "<u>CC Notes</u>" means (a) the 6.50% Series A Senior Notes due 2022, 6.50% Series B Senior Notes due 2022, 7.625% Series A Senior Subordinated Notes due 2020 and 7.625% Series B Senior Subordinated Notes due 2020, in each case, issued by Clear Channel Worldwide Holdings, Inc., (b) the 8.75% senior notes due 2020 issued by Clear Channel International B.V., and (c) any Indebtedness that Refinances any of the foregoing notes.

d.    The unpaid principal amount of Loans outstanding under this Agreement, together with all accrued but unpaid interest shall be due and payable in full on, and the outstanding Commitment shall be deemed to have terminated on, the earliest to occur of ("Maturity Date"):  (a) the date that is three (3) years after the date hereof, (b) the date the entire unpaid principal amount of, and all accrued interest on, the Loans is declared to be immediately due and payable in full, and the outstanding Commitment terminated, pursuant to the provisions of this Agreement after an Event of Default and (c) the date the Lender and the Borrower mutually agree in writing to terminate this Agreement.

e.    Any payment to be made to the Lender hereunder shall be made by wire transfer of immediately available funds to the account designated by the Lender.

f.    All interest shall be computed on the basis of actual number of days occurring during the period for which such interest is payable over a year comprised of 360 days.

g.    Payments due on any day other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with that payment.

h.    Any payment to be made hereunder shall be made free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, duties, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes to the extent such gross-up would be required if such payments were payments made under this Agreement). Lender shall on the date hereof (and at the time or times thereafter at the request of Borrower) deliver to Borrower a properly completed and executed IRS Form W-9 or appropriate IRS Form W-8, plus any additional forms or documentation reasonably requested by Borrower to determine whether any withholding is required under applicable law.

4.    <u>Condition</u>. The only conditions to the disbursement of the Loans under the Commitment on any Funding Date shall be:

a.    the execution and delivery (via email) by a financial officer with appropriate seniority of the Borrower of a borrowing notice in substantially the form of <u>Exhibit A</u> (each, a "<u>Borrowing Notice</u>") on a Business Day not later than 1:00 p.m., New York City time, four (4) Business Days (or such later date as agreed to by the Lender) before a proposed Borrowing;

b.    the accuracy in all respects of all representations and certifications set forth in such Borrowing Notice;

c.    after giving pro forma effect to such Borrowing, the aggregate outstanding principal amount of the Loans not exceeding the Commitment; and

d.    after giving pro forma effect to such Borrowing and the substantially concurrent use of proceeds thereof, Consolidated Liquidity not exceeding $137,500,000.

5.    <u>Affirmative Covenants</u>. From and after the date hereof, so long as the Lender shall have any Commitment hereunder or any Loan hereunder which remains unpaid or unsatisfied, the Borrower shall deliver to the Lender:

3

a.      deliver to the Lender promptly after it becomes available, but in any event no later than thirty (30) days following the end of each fiscal monthly period of the Borrower unaudited internally prepared consolidated monthly balance sheets and related statements of income of New CCOH and its subsidiaries in the form customarily prepared by New CCOH;

b.      deliver to the Lender promptly after it becomes available, but in any event no later than thirty (30) days following the end of each fiscal monthly period, (i) a report setting forth the cash balance and Indebtedness of New CCOH and (ii) a report calculating the Consolidated Liquidity of New CCOH and its subsidiaries as of the last day of such fiscal month (each, a "Monthly Liquidity Statement"); and

c.      deliver to the Lender promptly after it becomes available, but in any event no later than four (4) days following the end of each fiscal month, a report setting forth the projected monthly sources and uses of cash for the Borrower and its subsidiaries for the following three (3) month period.

6.      Negative Covenants. From and after the date hereof, so long as the Lender shall have any Commitment hereunder or any Loan hereunder which is accrued and payable remains unpaid or unsatisfied, the Borrower shall not, directly or indirectly, make any cash payment to prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof any Indebtedness, except:

a.      such Indebtedness may be modified, refinanced, refunded, renewed, replaced or extended (including paid with the net cash proceeds of any Indebtedness incurred substantially contemporaneously with such Indebtedness) ("Refinance") to the extent that the principal amount (or accreted value, if applicable) of the Indebtedness incurred to Refinance such Indebtedness is not less than the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced except by an amount up to any unpaid accrued or capitalized interest, premium, costs, fees, expenses, commissions, underwriting discounts and similar amounts incurred in connection with such Refinancing;

b.      the payment of any dividend or distribution or consummation of any redemption in respect of the [Preferred Equity];

c.      (i) payments of regularly scheduled principal and interest; (ii) mandatory offers to repay, repurchase or redeem (including in connection with the proceeds of asset sales); (iii) mandatory prepayments of principal, premium and interest; and (iv) payments of fees, expenses, indemnification obligations and any other amounts required to be paid by the documents governing such Indebtedness, in each case, with respect to such Indebtedness;

d.      any repayments or prepayments of loans or other obligations under the ABL Credit Agreement or any other third-party credit facility or extension providing for revolving loans, lines of credit or similar extensions of credit.

7.      Events of Default. Upon the occurrence and during the continuance of any of the following events (each, an "Event of Default"):

a.      default shall be made in the scheduled payments of principal or interest or prepayments due hereunder, when and as the same shall become due and payable, and in the case of interest or prepayments, such default shall continue unremedied for a period of three (3) Business Days;

      b.      any written representation or warranty made or deemed made in any Borrowing Notice or any document required to be delivered in connection herewith shall prove to have been incorrect or untrue in a manner materially adverse to the Lender when so made, deemed made or furnished;

      c.      failure by the Borrower for thirty (30) days after receipt of written notice given by the Lender to comply with any obligations, covenants or agreements (other than defaults specified in Section 7(a) above); or

      d.      the Borrower or any of its subsidiaries (A) fails to make any payment beyond the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any indebtedness (i) in respect of borrowed money; or (ii) evidenced by bonds, notes, debentures or similar instruments (clauses (i) and (ii), other than any intercompany indebtedness, "Indebtedness"), in each case having an outstanding aggregate principal amount greater than $50,000,000, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of swap obligations, termination events or equivalent events pursuant to the terms of such swap obligations), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, the entirety of such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity;

provided, in each case, the occurrence of a default or event that was (i) caused by, or resulted from, any act or omission (or failure to act or omit to act) by the Lender or any affiliate thereof, or any employee of the Lender or any affiliate thereof, including, but not limited to, in connection with the provision of "Services" as defined in and pursuant to that certain Transition Services Agreement, dated as of [●], among Borrower, Lender, iHeartMedia Management Services, Inc. and iHeartMedia, Inc., as amended, amended and restated, supplemented or otherwise modified from time to time according to its terms; or (ii) subject to the supervision of the Lender or any affiliate thereof, or any employee of the Lender or any affiliate thereof, in connection with the provision of such Services shall not be an Event of Default hereunder;

then, and at any time thereafter during the continuance of such Event of Default, the Lender may, by notice to the Borrower, terminate the Commitment, declare the Loans and other outstanding obligations under this Agreement to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued unpaid interest thereon and all other liabilities of the Borrower accrued hereunder, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or otherwise to the contrary notwithstanding.

8.     <u>General</u>.

      a.      In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Agreement operate or would prospectively operate to invalidate this Agreement, then and in any such event, only such provision(s) shall be deemed null and void and shall not affect any other provision of this Agreement and the remaining provisions of this Agreement shall remain operative and in full force and effect and in no way shall be affected, prejudiced or disturbed thereby.

b.      This Agreement is entered into and shall be enforceable in accordance with the internal laws (and not the laws of conflicts) of the State of New York and shall be construed in accordance therewith.

c.      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no party hereto may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other party (not to be unreasonably withheld, delayed or conditioned). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement. In the event that Lender (or any assignee thereof) assigns all or a portion of the Commitments or Loans to another person, such other person shall deliver to Borrower prior to the effectiveness of such assignment (and at the time or times thereafter at the request of Borrower) a properly completed and executed IRS Form W-9 or appropriate IRS Form W-8, plus any additional forms or documentation reasonably requested by Borrower to determine whether any withholding is required under applicable law.  It is the intent of the parties to this Agreement that the Loans be maintained in "registered form" for U.S. federal income tax purposes.  Accordingly, Borrower shall maintain a register for the recordation of the names and addresses of the Lender(s), the Commitments of the Lender(s), and the principal amount of, and interest on, Loans owing to such Lender(s).  The entries in such register shall be conclusive absent manifest error, and no assignment shall be effective unless and until recorded in such register.  In the event that any Lender sells a participation interest in any Commitments or Loans, such Lender shall maintain a similar register.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the day and year set forth above.

**Clear Channel Outdoor, LLC**, as the Borrower

By: _____
Name:
Title:

**iHeartCommunications, Inc.**, as the Lender


By: _____
Name:
Title:

**Exhibit A**
FORM OF BORROWING NOTICE

iHeartCommunications, Inc., as the Lender
[●]
Attention: [●]
Tel: [●]
Email: [●]

[DATE][1]

Ladies and Gentlemen:

Reference is made to the Revolving Loan Agreement, dated as of [●], 2019 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Loan Agreement"), between iHeartCommunications, Inc., a Texas corporation (the "Lender"), and Clear Channel Outdoor, LLC, a Delaware limited liability company (the "Borrower").  Capitalized terms used herein that are not defined herein shall have the meanings assigned to such term in the Loan Agreement.

The Borrower hereby gives you notice pursuant to Section 4 of the Loan Agreement that it requests a borrowing of Loans under the Commitment, and in connection therewith, sets forth below the terms on which such Borrowing is requested to be made:

(A)     Funding Date:[2]     _____

(B)     Account Number and Information:     _____

(C)     Principal Amount of Borrowing:     _____

The undersigned, a financial officer with appropriate seniority of the Borrower, hereby represents, warrants and certifies to the Lender that the following statements will be true and correct on the Funding Date: (a) no Event of Default shall exist or would result from such proposed Borrowing or from the application of the proceeds therefrom; (b) after giving pro forma effect to such proposed Borrowing, the principal amount of Loans outstanding would not exceed the Commitment; (c) after giving pro forma effect to such proposed Borrowing and the substantially concurrent use of proceeds thereof, Consolidated Liquidity will not exceed $137,500,000; and (d) each of the conditions to lending set forth in Section 4 of the Loan Agreement will be satisfied as of the Funding Date set forth above.

[SIGNATURE PAGE FOLLOWS]

---

[1]     Must be notified by delivery via email not later than 1:00 p.m., New York City time, four Business Days before a proposed Borrowing.

[2]     Date of Borrowing must be a Business Day.

IN WITNESS WHEREOF, the undersigned has caused this Borrowing Notice to be executed and delivered by its duly authorized financial officer as of the date set forth above.

Clear Channel Outdoor, LLC, as the Borrower

By: _____

Name:

Title:

Schedule 3(e)

Notice and Wire Instructions

**<u>EXHIBIT D</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, *et al.*,[1] | § | Case No. 18-31274 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**MODIFIED FIFTH AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF IHEARTMEDIA, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth C. Freeman (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 752-4221
Email: ptomasco@jw.com
efreeman@jw.com
mcavenaugh@jw.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Brian D. Wolfe (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
anup.sathy@kirkland.com
brian.wolfe@kirkland.com
will.guerrieri@kirkland.com
benjamin.rhode@kirkland.com

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Pkwy., San Antonio, Texas 78258.

-and-

Christopher J. Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        christopher.marcus@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................................... 1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References** .............................................................................................................. 1

    A.    Defined Terms ............................................................................................... 1
    B.    Rules of Interpretation .................................................................................. 27
    C.    Computation of Time .................................................................................... 28
    D.    Governing Law ............................................................................................. 28
    E.    Reference to Monetary Figures ..................................................................... 28
    F.    Nonconsolidated Plan ................................................................................... 28

**Article II. Administrative and Priority Claims** ............................................................... 28

    A.    Administrative Claims .................................................................................. 28
    B.    Professional Fee Claims ................................................................................ 29
    C.    DIP Claims ................................................................................................... 31
    D.    Priority Tax Claims ...................................................................................... 32

**Article III. Classification, Treatment, and Voting of Claims and Interests** ...................... 32

    A.    Classification of Claims and Interests ............................................................ 32
    B.    Summary of Classification ............................................................................. 32
    C.    Treatment of Classes of Claims and Interests ................................................ 33
    D.    Special Provision Governing Unimpaired Claims .......................................... 42
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ........... 43
    F.    Subordinated Claims ..................................................................................... 43
    G.    Intercompany Interests .................................................................................. 43
    H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ............................................................................................................. 43

**Article IV. Provisions for Implementation of the Plan** ....................................................... 44

    A.    General Settlement of Claims and Interests ................................................... 44
    B.    Restructuring Transactions ............................................................................ 44
    C.    Sources of Consideration for Plan Distributions ............................................ 45
    D.    Issuance and Distribution of New iHeart Common Stock, Special Warrants, and/or the Beneficial Interests in the FCC Trust ..................................................... 45
    E.    Issuance of New Debt ................................................................................... 46
    F.    The New ABL Credit Agreement Documents ............................................... 47
    G.    The CCOH Separation .................................................................................. 47
    H.    Preferred Stock Transactions ......................................................................... 48
    I.    Waiver of Turnover Rights ............................................................................ 48
    J.    FCC Licenses ............................................................................................... 49
    K.    FCC Trust .................................................................................................... 49
    L.    Corporate Existence ...................................................................................... 51
    M.    New Corporate Governance Documents ........................................................ 51
    N.    New Boards ................................................................................................... 52
    O.    Corporate Action .......................................................................................... 52

P.      Vesting of Assets in the Reorganized Debtors ................................................ 53
Q.      Cancellation of Notes, Instruments, Certificates, and Other Documents ......................... 53
R.      Effectuating Documents; Further Transactions ................................................ 54
S.      Section 1145 Exemption ..................................................................... 54
T.      Section 1146(a) Exemption .................................................................. 55
U.      Post-Emergence Equity Incentive Program .................................................... 55
V.      Employee Matters ........................................................................... 55
W.      Preservation of Rights of Action ........................................................... 56
X.      Consenting Stakeholder Fees ................................................................ 56
Y.      Guarantor General Unsecured Recovery Cash Pool ............................................. 57
Z.      Dismissal of the Committee's Standing Motion and Disputed ABL Claims
        Objection ................................................................................. 57

**Article V. Treatment of Executory Contracts and Unexpired Leases ................................... 57**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .................... 57
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired
        Leases .................................................................................... 58
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ................... 58
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ................. 59
E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ............ 59
F.      Indemnification Provisions ................................................................. 60
G.      Insurance Policies ......................................................................... 60
H.      Reservation of Rights ...................................................................... 62
I.      Nonoccurrence of Effective Date ............................................................ 62
J.      Contracts and Leases Entered into After the Petition Date ................................. 62

**Article VI. Provisions Governing Distributions ..................................................... 62**

A.      Timing and Calculation of Amounts to Be Distributed ...................................... 62
B.      Rights and Powers of Distribution Agent .................................................... 63
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ................ 63
D.      Compliance Matters ......................................................................... 66
E.      Foreign Currency Exchange Rate ............................................................. 66
F.      Claims Paid or Payable by Third Parties .................................................... 67
G.      Setoffs and Recoupment ..................................................................... 67
H.      Allocation between Principal and Accrued Interest ......................................... 68

**Article VII. Procedures for Resolving Contingent, Unliquidated,  and Disputed Claims ............... 68**

A.      Resolution of Disputed Claims .............................................................. 68
B.      Time to File Objections to Disputed Claims and Disputed Interests. ...................... 69
C.      Disputed Claims Reserve .................................................................... 69
D.      Adjustment to Claims and Interests without Objection ..................................... 70
E.      No Interest ................................................................................ 70
F.      Disallowance of Claims ..................................................................... 70
G.      Amendments to Proofs of Claim ............................................................. 71
H.      Distributions after Allowance .............................................................. 71

**Article VIII. Effect of Confirmation of the Plan .................................................. 71**

A.      Discharge of Claims and Termination of Interests ......................................... 71
B.      Releases by the Debtors .................................................................... 72

C.      Releases by Holders of Claims and Interests .................................................. 73
D.      Exculpation ..................................................................................................... 74
E.      Injunction ....................................................................................................... 74
F.      Release of Liens ............................................................................................. 75
G.      Protection against Discriminatory Treatment ................................................ 75
H.      Recoupment .................................................................................................... 76
I.      Document Retention ....................................................................................... 76
J.      Reimbursement or Contribution ..................................................................... 76
K.      Term of Injunctions or Stays ......................................................................... 76
L.      SEC Rights Reserved ..................................................................................... 76
M.      Release of Preference Actions ........................................................................ 76

**Article IX. Conditions Precedent to the Effective Date** ............................................. **77**

A.      Conditions Precedent to the Effective Date. ................................................. 77
B.      Waiver of Conditions Precedent .................................................................... 79
C.      Effect of Non-Occurrence of Conditions to Consummation .......................... 79

**Article X. Modification, Revocation, or Withdrawal of the Plan** ............................... **79**

A.      Modification of Plan ...................................................................................... 79
B.      Effect of Confirmation on Modifications ....................................................... 80
C.      Withdrawal of Plan ......................................................................................... 80

**Article XI. Retention of Jurisdiction** .......................................................................... **80**

**Article XII. Miscellaneous Provisions** ......................................................................... **82**

A.      Immediate Binding Effect .............................................................................. 82
B.      Additional Documents .................................................................................... 83
C.      Payment of Statutory Fees ............................................................................. 83
D.      Statutory Committee and Cessation of Fee and Expense Payment. ............... 83
E.      Reservation of Rights ..................................................................................... 83
F.      Successors and Assigns .................................................................................. 83
G.      Service of Documents ..................................................................................... 84
H.      Entire Agreement; Controlling Document ..................................................... 85
I.      Plan Supplement ............................................................................................. 86
J.      Non-Severability ............................................................................................ 86
K.      Votes Solicited in Good Faith ........................................................................ 86
L.      Closing of Chapter 11 Cases .......................................................................... 86
M.      Waiver or Estoppel ......................................................................................... 87
N.      Substantial Consummation ............................................................................. 87

## INTRODUCTION

iHeartMedia, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession, propose this modified fifth amended joint chapter 11 plan of reorganization.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court [Docket No. 76].  This Plan constitutes a separate chapter 11 plan for each Debtor for the resolution of outstanding Claims against and Interests in each Debtor pursuant to the Bankruptcy Code, and unless otherwise set forth herein, the classifications and treatment of Claims against and Interests in the Debtors set forth in Article III of the Plan apply separately with respect to each Debtor.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Pursuant to section 1125(b) of the Bankruptcy Code, votes to accept or reject a chapter 11 plan cannot be solicited from holders of claims or interests entitled to vote on a chapter 11 plan until a disclosure statement has been approved by a bankruptcy court and distributed to such holders.  On September 20, 2018, the Bankruptcy Court entered the Disclosure Statement Order, which, among other things, approved the Disclosure Statement, established procedures for voting on the Plan, and scheduled the Confirmation Hearing.  On October 18, 2018, the Bankruptcy Court entered the *Order (I) Approving the Debtors' Continued Solicitation of the Fifth Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, (II) Modifying Certain Deadlines and Procedures in Connection With Plan Confirmation and Shortening Notice With Respect Thereto, (III) Approving the Form of Ballots in Connection Therewith, and (IV) Granting Related Relief*, which, among other things, approved the supplement to the Disclosure Statement and modified Confirmation schedule.  Holders of Claims against and Interests in the Debtors should refer to the Disclosure Statement for a discussion of the Debtors' history, business, properties, operations, historical financial information, projections of future operations, and risk factors, as well as a summary and description of the Plan, the Restructuring Transactions that the Debtors seek to consummate on the Effective Date of the Plan, and various related matters.

## ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A.     **Defined Terms**

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.     "*10.625% PGN Agent*" means Deutsche Bank Trust Company Americas, in its capacity as collateral agent under the 10.625% PGN Indenture, and any predecessors and successors in such capacity.

2.     "*10.625% PGN Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the 10.625% PGNs or the 10.625% PGN Indenture.

3.     "*10.625% PGN Indenture*" means that certain Indenture, dated as of February 26, 2015, among iHC, as the issuer, iHeart Capital I, as holdings, each of the Subsidiary Guarantors, the 10.625% PGN Trustee, as trustee, paying agent, registrar, authentication agent, and transfer agent, and the 10.625% PGN Agent, as collateral agent, providing for the issuance of 10.625% PGNs, as amended, supplemented, or otherwise modified from time to time.

1

4. "*10.625% PGN Trustee*" means U.S. Bank National Association, in its capacities as trustee, paying agent, registrar, authentication agent, and transfer agent under the 10.625% PGN Indenture, and any predecessors and successors in such capacities.

5. "*10.625% PGNs*" means the 10.625% priority guarantee notes due 2023, issued by iHC pursuant to the 10.625% PGN Indenture.

6. "*11.25% PGN Agent*" means Deutsche Bank Trust Company Americas, in its capacity as collateral agent under the 11.25% PGN Indenture, and any predecessors and successors in such capacity.

7. "*11.25% PGN Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the 11.25% PGNs or the 11.25% PGN Indenture.

8. "*11.25% PGN Indenture*" means that certain Indenture, dated as of February 28, 2013, among iHC, as the issuer, iHeart Capital I, as holdings, each of the Subsidiary Guarantors, the 11.25% PGN Trustee, as trustee, paying agent, registrar, authentication agent, and transfer agent, and the 11.25% PGN Agent, as collateral agent, providing for the issuance of 11.25% PGNs, as amended, supplemented, or otherwise modified from time to time.

9. "*11.25% PGN Trustee*" means UMB Bank, National Association, solely in its capacities as successor trustee, paying agent, registrar, authentication agent, and transfer agent under the 11.25% PGN Indenture, and any predecessors and successors in such capacities.

10. "*11.25% PGNs*" means the 11.25% priority guarantee notes due 2021, issued by iHC pursuant to the 11.25% PGN Indenture.

11. "*1145 Securities*" means, collectively, the New iHeart Common Stock (including New iHeart Common Stock issued upon exercise of the Special Warrants and New iHeart Class A Common Stock issued upon conversion of New iHeart Class B Common Stock), the Special Warrants, the New Debt (to the extent issued in the form of bonds), and the CCOH Interests distributed to Holders of Claims, as well as, if applicable, the beneficial interests in the FCC Trust and the shares of New iHeart Common Stock and/or Special Warrants to be issued to the holders of such beneficial interests after the FCC grants the FCC Long Form Applications.

12. "*2021 Noteholder Group Representatives*" shall have the meaning set forth in the Restructuring Support Agreement and shall additionally include Porter Hedges LLP, Quinn Emanuel Urquhart & Sullivan, LLP, and one special FCC counsel.

13. "*2021 Notes*" means the 14.000% senior notes due 2021, issued by iHC pursuant to the 2021 Notes Indenture.

14. "*2021 Notes Agent*" means Deutsche Bank Trust Company Americas, in its capacities as paying agent, registrar, and transfer agent under the 2021 Notes Indenture, and any predecessors and successors in such capacities.

15. "*2021 Notes Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the 2021 Notes or the 2021 Notes Indenture.

16. "*2021 Notes Indenture*" means that certain Indenture, dated as of June 21, 2013, among iHC, as the issuer, iHeart Capital I, as holdings, each of the Subsidiary Guarantors, the 2021 Notes Trustee,

as trustee, and the 2021 Notes Agent, as paying agent, registrar, and transfer agent, providing for the issuance of the 2021 Notes, as amended, supplemented, or otherwise modified from time to time.

17.     "*2021 Notes Trustee*" means Delaware Trust Company (as successor to Law Debenture Trust Company of New York), in its capacity as trustee under the 2021 Notes Indenture, and any predecessors and successors in such capacity.

18.     "*4(a)(2) Securities*" means, collectively, the Radio NewCo Preferred Stock and the CCOH Preferred Stock, if issued in a Taxable Separation, and the New Debt, to the extent issued in the form of bonds in a third-party market financing.

19.     "*5.50% Legacy Notes*" means the 5.50% senior notes due 2016, issued by iHC pursuant to the Legacy Notes Indenture.

20.     "*6.875% Legacy Notes*" means the 6.875% senior notes due 2018, issued by iHC pursuant to the Legacy Notes Indenture.

21.     "*7.25% Legacy Notes*" means the 7.25% debentures due October 15, 2027, issued by iHC pursuant to the Legacy Notes Indenture.

22.     "*9.0% PGN Due 2019 Agent*" means Deutsche Bank Trust Company Americas, in its capacity as collateral agent under the 9.0% PGN Due 2019 Indenture, and any predecessors and successors in such capacity.

23.     "*9.0% PGN Due 2019 Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the 9.0% PGNs Due 2019 or the 9.0% PGN Due 2019 Indenture.

24.     "*9.0% PGN Due 2019 Indenture*" means that certain Indenture, dated as of October 25, 2012, among iHC, as the issuer, iHeart Capital I, as holdings, each of the Subsidiary Guarantors, the 9.0% PGN Due 2019 Trustee, as trustee, paying agent, registrar, custodian, and transfer agent, and the 9.0% PGN Due 2019 Agent, as collateral agent, providing for the issuance of 9.0% PGNs Due 2019, as amended, supplemented, or otherwise modified from time to time.

25.     "*9.0% PGN Due 2019 Trustee*" means, collectively, Wilmington Trust, National Association, in its capacities as successor trustee, paying agent, registrar, custodian, and transfer agent under the 9.0% PGN Due 2019 Indenture, and any predecessors and successors in such capacities.

26.     "*9.0% PGNs Due 2019*" means the 9.0% priority guarantee notes due 2019, issued by iHC pursuant to the 9.0% PGN Due 2019 Indenture.

27.     "*9.0% PGN Due 2021 Agent*" means Deutsche Bank Trust Company Americas, in its capacities as collateral agent, paying agent, registrar, authentication agent, custodian, and transfer agent under the 9.0% PGN Due 2021 Indenture, and any predecessors and successors in such capacities.

28.     "*9.0% PGN Due 2021 Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the 9.0% PGNs Due 2021 or the 9.0% PGN Due 2021 Indenture.

29.     "*9.0% PGN Due 2021 Indenture*" means that certain Indenture, dated as of February 23, 2011, among iHC, as the issuer, iHeart Capital I, as holdings, each of the Subsidiary Guarantors, the 9.0% PGN Due 2021 Trustee, as trustee, and the 9.0% PGN Due 2021 Agent, as collateral agent, paying agent,

registrar, authentication agent, custodian, and transfer agent, providing for the issuance of 9.0% PGNs Due 2021, as amended, supplemented, or otherwise modified from time to time.

30.     "*9.0% PGN Due 2021 Trustee*" means BOKF, National Association, solely in its capacity as successor trustee under the 9.0% PGN Due 2021 Indenture, and any predecessors and successors in such capacity.

31.     "*9.0% PGNs Due 2021*" means the 9.0% priority guarantee notes due 2021, issued by iHC pursuant to the 9.0% PGN Due 2021 Indenture.

32.     "*9.0% PGN Due 2022 Agent*" means Deutsche Bank Trust Company Americas, in its capacity as collateral agent under the 9.0% PGN Due 2022 Indenture, and any predecessors and successors in such capacity.

33.     "*9.0% PGN Due 2022 Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the 9.0% PGNs Due 2022 or the 9.0% PGN Due 2022 Indenture.

34.     "*9.0% PGN Due 2022 Indenture*" means that certain Indenture, dated as of September 10, 2014, among iHC, as the issuer, iHeart Capital I, as holdings, each of the Subsidiary Guarantors, the 9.0% PGN Due 2022 Trustee, as trustee, paying agent, registrar, authentication agent, custodian, and transfer agent, and the 9.0% PGN Due 2022 Agent, as collateral agent, providing for the issuance of 9.0% PGNs Due 2022, as amended supplemented, or otherwise modified from time to time.

35.     "*9.0% PGN Due 2022 Trustee*" means Wilmington Trust, National Association, in its capacity as successor trustee, paying agent, registrar, authentication agent, custodian, and transfer agent under the 9.0% PGN Due 2022 Indenture, and any predecessors and successors in such capacities.

36.     "*9.0% PGNs Due 2022*" means the 9.0% priority guarantee notes due 2022, issued by iHC pursuant to the 9.0% PGN Due 2022 Indenture.

37.     "*ABL Agent*" means TPG Specialty Lending, Inc., in its capacity as administrative agent, for the benefit of itself and the other ABL Secured Parties that are party to the ABL Credit Agreement.

38.     "*ABL Credit Agreement*" means that certain Credit Agreement, dated as of November 30, 2017, by and between the ABL Agent, the other ABL Secured Parties, iHC as parent borrower, the several subsidiary borrowers thereto, and iHeart Capital I, as amended, restated, amended and restated, supplemented, or otherwise modified prior to the commencement of these Chapter 11 Cases.

39.     "*ABL Secured Parties*" means the ABL Agent and those certain lenders and letter of credit issuers party to the ABL Credit Agreement.

40.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date pursuant to sections 328, 330, or 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

41.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and Administrative

Claims arising under section 503(b)(9) of the Bankruptcy Code), which shall be 30 days after the Effective Date.

42. "*Administrative Claims Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and Claims arising under section 503(b)(9) of the Bankruptcy Code), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of an Administrative Claim; *provided that* the Administrative Claims Objection Bar Date may be extended by order of the Bankruptcy Court.

43. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

44. "*Allowed*" means, with respect to any Claim against or Interest in a Debtor, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim or a request for payment of an Administrative Claim, as applicable, that is Filed on or before the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of an Administrative Claim is not required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim or Interest allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided that*, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been allowed by a Final Order.  Except as otherwise specified in the Plan, any Final Order, or as otherwise agreed by the Debtors, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims (as determined by Final Order of the Bankruptcy Court), the amount of an Allowed Claim shall not include interest or fees on such Claim accruing from and after the Petition Date.  Except with respect to a Term Loan Credit Agreement Claim, a PGN Claim, or a 2021 Notes Claim (none of which shall be subject to offset, recoupment, or reduction), for purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Except with respect to a Term Loan Credit Agreement Claim, a PGN Claim, the CCOH Due From Claim, or a 2021 Notes Claim (none of which shall be subject to section 502(d) of the Bankruptcy Code), notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt:  (x) any Proof of Claim or any request for payment of an Administrative Claim (other than requests for payment of Professional Fee Claims), that is Filed after the applicable Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "*Allow*" and "*Allowing*" shall have correlative meanings.

45. "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of certain Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Reorganized Debtors, as applicable, in accordance with the Plan, which list shall be included in the Plan Supplement.

46.    "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

47.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

48.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of Texas.

49.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

50.    "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 743].

51.    "*Board Selection Committee*" means the committee of seven Persons formed prior to the Effective Date, one of whom shall be appointed by the Consenting Sponsors and the remainder of whom shall be appointed by the Required Consenting Senior Creditors, with responsibility for interviewing and selecting non-management members of the Reorganized iHeart New Board and the board of directors of CCOH as set forth in Article IV.N of the Plan.

52.    "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

53.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

54.    "*Cash Collateral Order*" means the *Final Order (I) Authorizing Postpetition Use of Cash Collateral and (II) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rules 4001-(b) and 4002-1* [Docket No. 452].

55.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, interest, guaranty, suit, obligation, liability, debt, damage, remedy, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of

6

contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Action.

56.     "*CCH*" means Clear Channel Holdings, Inc., a corporation incorporated under the laws of Nevada.

57.     "*CCOH*" means Clear Channel Outdoor Holdings, Inc., a corporation incorporated under the laws of Delaware.

58.     "*CCOH Due From Claim*" means any Claim held by CCOH against iHC, including any Claim arising under, derived from, secured by, based on, or related to the Intercompany Revolving Promissory Note.

59.     "*CCOH Interest*" means any Interest in CCOH (or its successor), excluding the CCOH Preferred Stock.

60.     "*CCOH Litigation*" means *Norfolk County Retirement System v. Hendrix*, C.A. No. 2017-0930-JRS in the Court of Chancery of the State of Delaware.

61.     "*CCOH Plan and Separation Settlement*" means the settlement of potential Claims and Causes of Action amongst CCOH, GAMCO Asset Management, Inc., and the Debtors arising under certain intercompany arrangements identified in Article VII.P of the Disclosure Statement, the putative class action lawsuit currently pending in the Court of Chancery of the State of Delaware, captioned *GAMCO Asset Management, Inc. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS, and CCOH's and GAMCO Asset Management, Inc.'s potential objections to Confirmation, as reflected in that certain Settlement Agreement among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs, dated as of [____], 2018.

62.     "*CCOH Preferred Stock*" means, if the Taxable Separation is effectuated pursuant to the terms and conditions set forth in Article IV.G, the new contingent-voting preferred stock of CCOH (or its successor) issued pursuant to the Preferred Stock Transactions.

63.     "*CCOH Separation*" means the separation of CCOH (or its successor) and the Subsidiaries of CCOH (or its successor) from the Debtors in accordance with the Plan and the CCOH Plan and Separation Settlement.

64.     "*CCOH Separation Documents*" means all agreements, documents, and instruments evidencing, effectuating, or relating to the CCOH Separation and the CCOH Plan and Separation Settlement, to be delivered or entered into in connection therewith (including any settlement agreement, separation agreement, transition services agreement, tax matters agreement, merger agreement, and loan agreement, each of which may be included in the Plan Supplement, as well as any registration statement, information statement, shareholders agreement, and other documents), which shall be consistent with the terms of the CCOH Plan and Separation Settlement and otherwise in form and substance reasonably acceptable to the Required Consenting Senior Creditors, CCOH, the Debtors, and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to, or the releases under the Plan or the CCOH Plan and Separation Settlement in favor of (a) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders and (b) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors.

65.     "*CCOH Transfer Agent*" means Computershare Trust Company, in its capacity as transfer agent for CCOH's existing Class A Common Stock and Class B Common Stock.

66.     "*Certificate*" means any document, instrument, or other writing evidencing a Claim against or an Interest in the Debtors.

67.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code pursuant to the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 76].

68.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

69.     "*Claims Bar Date*" means, collectively, the applicable dates (including the Administrative Claims Bar Date) by which Proofs of Claim and requests for payment of Administrative Claims must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

70.     "*Claims, Noticing, and Solicitation Agent*" means Prime Clerk LLC, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

71.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

72.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

73.     "*Class B Election*" means an affirmative election made by a Holder of an Allowed Term Loan Credit Agreement Claim, an Allowed PGN Claim, an Allowed iHC 2021 / Legacy Notes Claim, or an Allowed iHeart Interest on such Holder's Ownership Certification to receive New iHeart Class B Common Stock in lieu of New iHeart Class A Common Stock.

74.     "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

75.     "*Committee Plan Settlement*" means the settlement of the Claims and Causes of Action identified in the Standing Motion, Disputed ABL Claims Objection, and the Committee's potential objections to Confirmation.

76.     "*Communications Act*" means chapter 5 of title 47 of the United States Code, 47 U.S.C. §§ 151–622, as now in effect or hereafter amended, or any other successor federal statute, and the rules and regulations promulgated thereunder.

77.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

78.     "*Confirmation Date*" means the date on which Confirmation occurs.

79. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

80. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

81. "*Consenting Sponsors*" shall have the meaning set forth in the Restructuring Support Agreement.

82. "*Consenting Stakeholder*" shall have the meaning set forth in the Restructuring Support Agreement.

83. "*Consenting Stakeholder Fees*" means the reasonable and documented fees and expenses incurred at any time on or prior to the Effective Date in connection with the Debtors by (a) members of the Term Loan/PGN Group, (b) members of the Term Lender Group, (c) the 2021 Noteholder Group Representatives, (d) the Consenting Sponsors, (e) the Term Loan Credit Agreement Agent, (f) the PGN Trustees and Agents, (g) the 2021 Notes Trustee, and (h) the 2021 Notes Agent.

84. "*Consummation*" means the occurrence of the Effective Date.

85. "*Contingent DIP Obligations*" means all of the Debtors' obligations under the DIP Credit Agreement Documents that are contingent and/or unliquidated (including, without limitation, those set forth in Section 10.04 and 10.05 of the DIP Credit Agreement), but excluding (i) DIP Claims that, as of or prior to the Effective Date, become either Repaid DIP Claims or Converted DIP Claims and (ii) DIP Claims as to which a claim has been asserted on or prior to the Effective Date.

86. "*Continuing Liens*" has the meaning set forth in Article II.C of the Plan.

87. "*Converted DIP Claims*" has the meaning set forth in Article II.C of the Plan.

88. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

89. "*Debtor*" means one of the Debtors, in its capacity as a debtor and debtor in possession.

90. "*Debtors*" means, collectively, (a) AMFM Broadcasting Licenses, LLC, (b) AMFM Broadcasting, Inc., (c) AMFM Operating, Inc., (d) AMFM Radio Licenses, LLC, (e) AMFM Texas Broadcasting, LP, (f) AMFM Texas Licenses, LLC, (g) AMFM Texas, LLC, (h) Capstar Radio Operating Company, (i) Capstar TX, LLC, (j) CC Broadcast Holdings, Inc., (k) CC Finco Holdings, LLC, (*l*) CC Licenses, LLC, (m) Christal Radio Sales, Inc., (n) Cine Guarantors II, Inc., (o) Citicasters Co., (p) Citicasters Licenses, Inc., (q) Clear Channel Broadcasting Licenses, Inc., (r) Clear Channel Holdings, Inc., (s) Clear Channel Investments, Inc., (t) Clear Channel Metro, LLC, (u) Clear Channel Mexico Holdings, Inc., (v) Clear Channel Real Estate, LLC, (w) Critical Mass Media, Inc., (x) iHC, (y) iHeartMedia + Entertainment, Inc., (z) iHeart Capital I, (aa) iHeartMedia Capital II, LLC, (bb) iHeart, (cc) iHeartMedia Management Services, Inc., (dd) iHM Identity, Inc., (ee) Katz Communications, Inc., (ff) Katz Media Group, Inc., (gg) Katz Millennium Sales & Marketing, Inc., (hh) Katz Net Radio Sales, Inc., (ii) M Street Corporation, (jj) Premiere Networks, Inc., (kk) Terrestrial RF Licensing, Inc., (*ll*) TTWN Media Networks, LLC, and (mm) TTWN Networks, LLC, each in its respective capacity as a debtor and debtor in possession in the Chapter 11 Cases.

9

91.     "*Declaratory Ruling*" means a declaratory ruling adopted by the FCC granting the relief requested in a Petition for Declaratory Ruling.

92.     "*DIP Agent*" means Citibank, N.A., in its capacity as administrative agent under the DIP Credit Agreement, and any successors in such capacity.

93.     "*DIP Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the DIP Credit Agreement Documents, including, but not limited to, any and all principal amounts outstanding, fees, expenses, costs, other charges and accrued but unpaid interest arising under the DIP Credit Agreement.

94.     "*DIP Credit Agreement*" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of June 14, 2018, among iHC, the DIP Subsidiary Borrowers, iHeart Capital I, the DIP Agent, as administrative agent, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs Bank USA, PNC Capital Markets LLC, and RBC Capital Markets, as lead arrangers, and the other lenders and L/C issuers party thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time.

95.     "*DIP Credit Agreement Documents*" means the DIP Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including the DIP Order and any guaranty agreements, pledge and collateral agreements, UCC financing statements or other perfection documents, intercreditor agreements, subordination agreements, fee letters, and other security agreements.

96.     "*DIP Facilities*" means those certain debtor-in-possession financing facilities governed by the DIP Credit Agreement Documents.

97.     "*DIP Lenders*" has the meaning set forth in the DIP Order.

98.     "*DIP Order*" means the *Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363(b), 364(c)(1) and 364(e), (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Authorizing Debtors to Obtain Exit Financing* [Docket No. 918].

99.     "*DIP Subsidiary Borrowers*" means, collectively, (a) AMFM Broadcasting, Inc., (b) AMFM Texas Broadcasting, LP, (c) Capstar Radio Operating Company, (d) Christal Radio Sales, Inc., (d) Citicasters Co., (e) iHeartMedia + Entertainment, Inc., (f) Katz Communications, Inc., (g) Katz Millennium Sales & Marketing, Inc., (h) Premiere Networks, Inc., and (i) any additional borrowers made party to the DIP Credit Agreement pursuant to Section 6.11 thereof or otherwise.

100.    "*Disclosure Statement*" means the *Disclosure Statement Relating to the Fourth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1484], approved by the Bankruptcy Court on September 20, 2018, as supplemented by the *Disclosure Statement Supplement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1633], as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

101.    "*Disclosure Statement Order*" means the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation*

*of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Docket No. 1481], entered by the Bankruptcy Court on September 20, 2018, as supplemented by the *Order (I) Approving the Debtors' Continued Solicitation of the Fifth Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, (II) Modifying Certain Deadlines and Procedures in Connection With Plan Confirmation and Shortening Notice With Respect Thereto, (III) Approving the Form of Ballots in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 1631], entered by the Bankruptcy Court on October 18, 2018, approving, among other things, the Disclosure Statement and solicitation procedures with respect to the Plan.

102.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; and (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order.

103.    "*Disputed ABL Claims Objection*" means the *Objection of the Official Committee of Unsecured Creditors to the ABL Disputed Amounts* [Docket No. 1056] filed by the Committee on July 6, 2018.

104.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity or Entities designated by the Reorganized Debtors to make or to facilitate distributions that are to be made pursuant to the Plan.

105.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

106.    "*Distribution Record Date*" means, other than with respect to Securities of the Debtors deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the Debtors and the Required Consenting Senior Creditors or designated in a Final Order of the Bankruptcy Court.  The Distribution Record Date shall not apply to Securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with Article VI of the Plan and, as applicable, the customary procedures of DTC.

107.    "*D&O Liability Insurance Policies*" means all insurance policies that have been issued (or provide coverage) at any time to directors', managers', officers', members', and trustees' liability maintained by the Debtors, the Reorganized Debtors, or the Estates as of the Effective Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

108.    "*DTC*" means The Depository Trust Company.

109.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

110.    "*Equity Allocation Mechanism*" means the methodology for allocating the New iHeart Common Stock and Special Warrants among the Holders of Allowed Term Loan Credit Agreement Claims, Allowed PGN Claims, Allowed iHC 2021 / Legacy Notes Claims, and Allowed iHeart Interests set forth on **Exhibit A** to the Plan.

111.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

112.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

113.    "*Excess Cash*" means all excess cash estimated after payment of, among other things, all Restructuring Transaction costs and, after consideration of a reserve for minimum liquidity for Reorganized iHeart, which reserve shall be in an amount agreed upon between the Debtors and the Required Consenting Senior Creditors by the date of the entry of the Disclosure Statement Order.

114.    "*Exchange 11.25% PGNs*" means the 11.25% PGNs bearing CUSIP Nos. 45174HAF4, 45174HAG2, 45174HAZ0, 45174HBA4, 45174HBB2, and U45057AC7.

115.    "*Exchange 11.25% PGNs Distribution*" means, collectively, the Exchange 11.25% PGNs Equity Distribution and the Exchange 11.25% PGNs Non-Equity Distribution.

116.    "*Exchange 11.25% PGNs Equity Distribution*" means Special Warrants, New iHeart Common Stock, or a combination of Special Warrants and New iHeart Common Stock, as determined in accordance with the Equity Allocation Mechanism, constituting, in the aggregate (and inclusive of the shares of New iHeart Common Stock that may be received by Holders of Exchange 11.25% PGN Claims upon the exercise of the Special Warrants (if any) received as part of this Exchange 11.25% PGNs Equity Distribution), 2.07 percent of the New iHeart Common Stock on a fully diluted basis (but excluding and subject to dilution on account of the Post-Emergence Equity Incentive Program).

117.    "*Exchange 11.25% PGNs Non-Equity Distribution*" means $122,169,057 in aggregate principal amount of the New Debt, allocated proportionally by principal amount among New Term Loans, New Secured Notes, and New Unsecured Notes.

118.    "*Exchange 11.25% PGN Claims*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Exchange 11.25% PGNs or the 11.25% PGN Indenture as it relates to the Exchange 11.25% PGNs.

119.    "*Exculpated Party*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the Committee and the members of the Committee, solely in their capacities as members of the Committee, (d) each current and former Affiliate of each Entity in clauses (a) through (c); and (e) each Related Party of each Entity in clauses (a) through (d).

120.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

121.    "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Unit performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

122.    "*FCC Applications*" means, collectively, each requisite application, petition, or other request filed or to be filed with the FCC in connection with the Restructuring Transactions or this Plan, including the FCC Long Form Applications.

12

123.    "*FCC Approval*" means the FCC's grant of (a) the FCC Long Form Applications or (b) consent to the implementation of the FCC Trust pending the grant of the FCC Long Form Applications, whichever comes first; *provided that* the possibility that an appeal, request for stay, or petition for rehearing or review by a court or administrative agency may be filed with respect to such grant, or that the FCC may reconsider or review such grant on its own authority, shall not prevent such grant from constituting FCC Approval for purposes of the Plan.

124.    "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers, and permits that are issued from time to time by the FCC.

125.    "*FCC Long Form Applications*" means the applications filed with the FCC seeking FCC consent to the Transfer of Control.

126.    "*FCC Ownership Procedures Order*" means the *Order Establishing Procedures for Compliance with FCC Media and Foreign Ownership Requirements* [Docket No. 1480], entered by the Bankruptcy Court on September 20, 2018, establishing procedures for, among other things, completion and submission of the Ownership Certifications.

127.    "*FCC Trust*" means the trust or other entity acceptable to the FCC, which will remain subject to the supervision of the Bankruptcy Court, that may be created on or before the Effective Date into which the New iHeart Common Stock and/or Special Warrants will be issued if the FCC Trust is utilized as described in the Plan.

128.    "*FCC Trust Agreement*" means the trust agreement that will, if the FCC Trust is to be utilized as described in the Plan, among other things:  (a) establish and govern the FCC Trust; and (b) set forth the respective powers, duties, and responsibilities of the FCC Trustees, the form of which shall be included in the Plan Supplement, and which shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Senior Creditors, and, solely with respect to the those terms and provisions that would have a material adverse effect on the value of the distribution to (x) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, and (y) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors.

129.    "*FCC Trustees*" means those Persons, including the members of the existing board of directors of iHeart, and such other Persons designated to manage the FCC Trust. The FCC Trustees shall be the fiduciaries responsible for implementing the applicable provisions of the Plan relating to the FCC Trust in accordance with the FCC Trust Agreement. If the New iHeart Common Stock is issued to the FCC Trust, the Reorganized iHeart New Board shall consist of the same individuals as the FCC Trustees during the period that the New iHeart Common Stock is held by the FCC Trust.

130.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

131.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Claims, Noticing, and Solicitation Agent.

132.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

133.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial,

13

reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided that* the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

134.    "*General Unsecured Claim*" means any Claim against a Debtor that is not Secured and is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) a DIP Claim (e) a Term Loan Credit Agreement Claim, (f) a PGN Claim, (g) a 2021 Notes Claim, (h) a Legacy Notes Claim, (i) a CCOH Due From Claim, (j) an Intercompany Claim, (k) an Intercompany Notes Claim, or (*l*) a Section 510(b) Claim.

135.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

136.    "*Guarantor Debtors*" means, collectively, (a) the Debtors that are Subsidiary Guarantors and (b) iHeart Capital I.

137.    "*Guarantor General Unsecured Claim*" means any General Unsecured Claim against a Guarantor Debtor that is not a TTWN Debtor.

138.    "*Guarantor General Unsecured Recovery Cash Pool*" means Cash in the amount equal to $17,500,000, *minus* the Guarantor General Unsecured Recovery Cash Pool Reduction (if any), *plus* the Guarantor General Unsecured Recovery Cash Pool Supplement (if any).

139.    "*Guarantor General Unsecured Recovery Cash Pool Account*" means a segregated account to be funded on or prior to the Effective Date in accordance with Article IV.Y.

140.    "*Guarantor General Unsecured Recovery Cash Pool Reduction*" means an amount (which shall not be less than zero) equal to (i) the aggregate amount of (a) Allowed General Unsecured Claims against Non-Obligor Debtors plus (b) Allowed General Unsecured Claims against the TTWN Debtors, *minus* (ii) $2,300,000.

141.    "*Guarantor General Unsecured Recovery Cash Pool Supplement*" means, in the event that Holders of Allowed Guarantor General Unsecured Claims would receive a recovery of less than 50 percent on account of such Claims (without taking into account the Guarantor Unsecured Recovery Cash Pool Supplement), an amount (which shall not be less than zero) equal to 50 percent of the amount that would otherwise be necessary to provide Holders of Allowed Guarantor General Unsecured Claims with a recovery of 50 percent on account of such Claims (the "Additional True-Up Cash"); *provided that* to the extent the amount of the Additional True-Up Cash is insufficient to provide Holders of Allowed Guarantor General Unsecured Claims with a recovery of 45 percent on account of such Claims, the Additional True-Up Cash shall be increased by the amount of Cash necessary to provide such Holders with a recovery of 45 percent on account of such Claims.

142.    "*Guarantor Funded Debt Unsecured Claim*" means any Claim against a Guarantor Debtor that is not a TTWN Debtor that is a (a) Term Loan / PGN Deficiency Claim or (b) 2021 Notes Claim.

143. "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

144. "*iHC*" means iHeartCommunications, Inc., a corporation incorporated under the laws of Texas, formerly known as Clear Channel Communications, Inc.

145. "*iHC 2021 / Legacy Notes Claim*" means any Claim against iHC that is a (a) 2021 Notes Claim or (b) Legacy Notes Claim.

146. "*iHC 2021 / Legacy Notes Equity Distribution*" means Special Warrants, New iHeart Common Stock, or a combination of Special Warrants and New iHeart Common Stock, as determined in accordance with the Equity Allocation Mechanism, constituting, in the aggregate (and inclusive of the shares of New iHeart Common Stock that may be received by Holders of iHC 2021 / Legacy Notes Claims upon the exercise of the Special Warrants (if any) received as part of this iHC 2021 / Legacy Notes Equity Distribution), 5.0 percent of the New iHeart Common Stock on a fully diluted basis (but excluding and subject to dilution on account of the Post-Emergence Equity Incentive Program).

147. "*iHC Unsecured Claim*" means any Claim against iHC that is a (a) Term Loan / PGN Deficiency Claim or (b) General Unsecured Claim.

148. "*iHeart*" means iHeartMedia, Inc., a corporation incorporated under the laws of Delaware, formerly known as CC Media Holdings, Inc.

149. "*iHeart Capital I*" means iHeartMedia Capital I, LLC, a company organized under the laws of Delaware, formerly known as Clear Channel Capital I, LLC.

150. "*iHeart Interest*" means any issued and outstanding common stock in iHeart.

151. "*iHeart Interests Equity Distribution*" means Special Warrants, New iHeart Common Stock, or a combination of Special Warrants and New iHeart Common Stock, as determined in accordance with the Equity Allocation Mechanism, constituting, in the aggregate (and inclusive of the shares of New iHeart Common Stock that may be received by Holders of iHeart Interests upon the exercise of the Special Warrants (if any) received as part of the iHeart Interests Equity Distribution), 1.0 percent of the New iHeart Common Stock on a fully diluted basis (but excluding and subject to dilution on account of the Post-Emergence Equity Incentive Program).

152. "*iHeart Transfer Agent*" means Computershare Trust Company, in its capacity as transfer agent for iHeart's existing Class A Common Stock and Class B Common Stock.

153. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

154. "*Indemnification Provisions*" means the provisions in place before or as of the Effective Date, whether in a Debtor's bylaws, certificates of incorporation, limited liability company agreement, partnership agreement, management agreement, other formation or organizational document, board resolution, indemnification agreement, contract, or otherwise providing the basis for any obligation of a Debtor as of the Effective Date to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, any of the Debtors' current and former directors, equityholders, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals, and each such Entity's respective affiliates, as applicable.

155. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

156.    "*Intercompany Claim*" means any Claim against a Debtor that is held by another Debtor or a direct or indirect subsidiary of a Debtor, other than a PGN Claim, 2021 Notes Claim, Legacy Notes Claim, Term Loan Credit Agreement Claim, or CCOH Due From Claim.

157.    "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor or an Affiliate of a Debtor, other than an iHeart Interest.

*158.*    "*Intercompany Notes Claim*" means any PGN Claim, 2021 Notes Claim, or Legacy Notes Claim that is held by a Debtor.

*159.*    "*Intercompany Revolving Promissory Note*" means that certain Revolving Promissory Note, dated November 10, 2005, between iHC, as maker, and CCOH, as payee, as amended, amended and restated, supplemented, or otherwise modified from time to time.

160.    "*Interest*" means any equity security as such term is defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

161.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 442], entered by the Bankruptcy Court on April 12, 2018, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

162.    "*Issuance Date*" means (a) the Effective Date or (b) if the FCC Trust is utilized as described in the Plan, the date of any issuance of New iHeart Common Stock or Special Warrants to the holders of beneficial interests in the FCC Trust.

163.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

164.    "*Legacy Notes*" means, collectively, the 6.875% Legacy Notes, the 5.50% Legacy Notes, and the 7.25% Legacy Notes.

165.    "*Legacy Notes Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Legacy Notes or the Legacy Notes Indenture.

166.    "*Legacy Notes Indenture*" means that certain Senior Indenture, dated as of October 1, 1997, between iHC and the Legacy Notes Trustee, as trustee, providing for the issuance of securities in series (including the issuance of the 7.25% Legacy Notes), as amended, supplemented, or otherwise modified from time to time, including by (a) that certain Third Supplemental Indenture, dated as of June 16, 1998, between iHC and the Legacy Notes Trustee, as trustee, providing for the issuance of the 6.875% Legacy Notes and (b) that certain Nineteenth Supplemental Indenture, dated as of December 16, 2004, between iHC and the Legacy Notes Trustee, as trustee, providing for the issuance of the 5.50% Legacy Notes.

167.    "*Legacy Notes Trustee*" means Wilmington Savings Fund Society, FSB, and The Bank of New York Mellon, in their capacities as trustee or as successor trustee under the Legacy Notes Indenture, as applicable, and any predecessors and successors in such capacity.

168.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

169.    "*New ABL Credit Agreement*" means either (i) the Exit Facility Agreement, as defined in the DIP Credit Agreement, which shall be in form and substance consistent with the requirements set forth in the New ABL Credit Agreement Term Sheet or (ii) a new Credit Agreement among iHC, the DIP Subsidiary Borrowers, iHeart Capital I, the New ABL Credit Agreement Agent, and the New ABL Credit Agreement Lenders party thereto, to be effective on the Effective Date, the proceeds of which shall be used to pay in full in Cash all DIP Claims.  The form of the New ABL Credit Agreement shall be included in the Plan Supplement and shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors, the Debtors, and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders.

170.    "*New ABL Credit Agreement Agent*" means the administrative agent under the New ABL Credit Agreement, and any successors thereto in such capacity.

171.    "*New ABL Credit Agreement Documents*" means, collectively, the New ABL Credit Agreement and all other agreements, documents, and instruments related thereto, including any guarantee agreements, pledge and collateral agreements, notes, UCC financing statements or other perfection documents, intercreditor agreements, subordination agreements, fee letters, and other security documents or instruments, which shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors, the Debtors, and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders.  If the New ABL Credit Agreement governs Converted DIP Claims, the New ABL Credit Agreement Documents shall be consistent with the requirements set forth in the New ABL Credit Agreement Term Sheet.

172.    "*New ABL Credit Agreement Lenders*" means each of the lenders under the New ABL Credit Agreement, solely in their capacity as such.

173.    "*New ABL Credit Agreement Term Sheet*" means the Exit Facility Term Sheet, as defined in the DIP Credit Agreement.

174.    "*New ABL Indebtedness*" means all indebtedness, guarantees, or other obligations arising under the New ABL Credit Agreement Documents.

175.    "*New Boards*" means, collectively, the boards of directors or managers of Reorganized iHeart and any other Reorganized Debtor, if applicable, on and after the Issuance Date to be appointed in accordance with the Plan, the initial board members of which shall be identified, to the extent known, at or prior to the Confirmation Hearing.

176.    "*New CCOH Corporate Governance Documents*" means the documents providing for corporate governance of CCOH upon the CCOH Separation, including charters, certificates of incorporation, bylaws, operating agreements, or other organizational documents, formation documents, or shareholders' agreements, as applicable, which shall be consistent with the terms of the CCOH Plan and Separation Settlement and otherwise in form and substance reasonably acceptable to the Required Consenting Senior Creditors, the Debtors, and CCOH.

17

177.    "*New Corporate Governance Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, certificates of incorporation, bylaws, operating agreements, or other organizational documents, formation documents, or shareholders' agreements, as applicable, consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable), which shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors, the Debtors, and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to (a) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders and (b) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors, and forms of which may be included in the Plan Supplement.

178.    "*New Debt*" means the $5,750,000,000 in principal amount of new debt comprised of New Term Loans, New Secured Notes, and New Unsecured Notes to be issued pursuant to the Plan and the New Debt Documents.

179.    "*New Debt Agreements*" means the indentures or loan agreements governing the New Debt, the form of which shall be included in the Plan Supplement, and which shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors and the Debtors, following consultation with the Required Consenting 2021 Noteholders; and *provided further that* any terms and provisions that would have a material adverse effect on the value of the distributions to (a) the Holders of 2021 Notes Claims shall require the consent of the Required Consenting 2021 Noteholders and (b) the Consenting Sponsors on account of their iHeart Interests shall require the consent of the Consenting Sponsors.

180.    "*New Debt Documents*" means, collectively, the New Debt Agreements, and all other agreements, documents, and instruments evidencing or securing the New Debt, to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents), which shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors and the Debtors, following consultation with the Required Consenting 2021 Noteholders; and *provided further that* any terms and provisions that would have a material adverse effect on the value of the distributions to (a) the Holders of 2021 Notes Claims shall require the consent of the Required Consenting 2021 Noteholders and (b) the Consenting Sponsors on account of their iHeart Interests shall require the consent of the Consenting Sponsors.

181.    "*New iHeart Class A Common Stock*" means the new shares of class A common stock in Reorganized iHeart, par value $0.001 per share, to be issued on the Effective Date or upon exercise of the Special Warrants, as applicable, pursuant to the terms of the Plan, the Equity Allocation Mechanism, the New Corporate Governance Documents, and the Special Warrant Agreement.

182.    "*New iHeart Class B Common Stock*" means the new shares of limited-voting class B common stock in Reorganized iHeart, par value $0.001 per share, to be issued on the Effective Date or upon exercise of the Special Warrants, as applicable, pursuant to the terms of the Plan, the Equity Allocation Mechanism, the New Corporate Governance Documents, and the Special Warrant Agreement. The terms of the New iHeart Class B Common Stock will provide that any share of New iHeart Class B Common Stock may be converted, at the election of the Holder of such share, into New iHeart Class A Common Stock on a one-for-one basis (subject to adjustments for stock splits, combinations, dividends, or distributions with respect to the New iHeart Class A Common Stock), subject to (a) a determination by Reorganized iHeart that such conversion would not result in a violation of the Communications Act or any rules or regulations promulgated by the FCC and (b) the receipt of any necessary approval from the FCC.

183.    "*New iHeart Common Stock*" means, collectively, the New iHeart Class A Common Stock and the New iHeart Class B Common Stock.

184.    "*New Secured Notes*" means secured notes to be issued pursuant to the Plan and the New Debt Documents in the principal amount set forth in the Plan Supplement.

185.    "*New Term Loans*" means secured term loans to be issued pursuant to the Plan and the New Debt Documents in the principal amount set forth in the Plan Supplement.

186.    "*New Unsecured Notes*" means unsecured notes to be issued pursuant to the Plan and the New Debt Documents in the principal amount set forth in the Plan Supplement.

187.    "*Non-9.0% PGN Due 2019 Claim*" means any Claim that is (a) a 9.0% PGN Due 2021 Claim, (b) a 9.0% PGN Due 2022 Claim, (c) a 10.625% PGN Claim, or (d) an 11.25% PGN Claim.

188.    "*Non-Obligor Debtors*" means, collectively, (a) iHeart and (b) iHeartMedia Capital II, LLC.

189.    "*Notes*" means, collectively, (a) the 10.625% PGNs, (b) the 11.25% PGNs, (c) the 9.0% PGNs Due 2019, (d) the 9.0% PGNs Due 2021, (e) the 9.0% PGNs Due 2022, (f) the 2021 Notes, and (g) the Legacy Notes.

190.    "*Notes Claim*" means any Claim that is (a) a PGN Claim, (b) a 2021 Notes Claim, or (c) a Legacy Notes Claim.

191.    "*Notes Indentures*" means, collectively, (a) the 10.625% PGN Indenture, (b) the 11.25% PGN Indenture, (c) the 9.0% PGN Due 2019 Indenture, (d) the 9.0% PGN Due 2021 Indenture, (e) the 9.0% PGN Due 2022 Indenture, (f) the 2021 Notes Indenture, and (g) the Legacy Notes Indenture.

192.    "*Notes Trustees and Agents*" means, collectively, (a) the PGN Trustees and Agents, (b) the 2021 Notes Trustee, (c) the 2021 Notes Agent, and (d) the Legacy Notes Trustee.

193.    "*Other Secured Claim*" means a Secured Claim against a Debtor that is not:  (a) a DIP Claim; (b) a Secured Term Loan Credit Agreement Claim; (c) a Secured PGN Claim; or (d) a Secured Tax Claim.

194.    "*Ownership Certification*" means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors or Reorganized Debtors, as applicable, to determine (a) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act, as interpreted and applied by the FCC and (b) whether the holding of more than 4.99 percent of the New iHeart Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval.

195.    "*Ownership Certification Deadline*" means the deadline set forth in the FCC Ownership Procedures Order for returning Ownership Certifications.

196.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

197.    "*Petition Date*" means March 14, 2018.

198.    "*Petition for Declaratory Ruling*" means a filing that shall be submitted to the FCC by the Debtors or Reorganized Debtors pursuant to 47 C.F.R. §§ 1.5000 *et seq.* for Reorganized iHeart to exceed the 25 percent indirect foreign ownership benchmark contained in 47 U.S.C. § 310(b)(4).

199.    "*PGN Claim*" means any Claim against a Debtor that is a 9.0% PGN Due 2019 Claim or a Non-9.0% PGN Due 2019 Claim.

200.    "*PGN Trustees and Agents*" means, collectively, (a) the 10.625% PGN Trustee, (b) the 10.625% PGN Agent, (c) the 11.25% PGN Trustee, (d) the 11.25% PGN Agent, (e) the 9.0% PGN Due 2019 Trustee, (f) the 9.0% PGN Due 2019 Agent, (g) the 9.0% PGN Due 2021 Trustee, (h) the 9.0% PGN Due 2021 Agent, (i) the 9.0% PGN Due 2022 Trustee, and (j) the 9.0% PGN Due 2022 Agent.

201.    "*Plan*" means this *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* and all exhibits, supplements, appendices, and schedules, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

202.    "*Plan Settlement*" means the good-faith compromises and settlements provided by the Plan, including, but not limited to, the Committee Plan Settlement and the CCOH Plan and Separation Settlement, as described in the Disclosure Statement and Article IV.A of the Plan.

203.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than fourteen days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, as it may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law, which shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors and the Debtors, and (a) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, (b) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Consenting Sponsors on account of their iHeart Interests or impair the releases in favor of the Consenting Sponsors provided under the Plan or the CCOH Plan and Separation Settlement, the Consenting Sponsors, (c) solely with respect to the provisions that impact the Committee, the treatment of General Unsecured Claims, the distributions of Cash to Holders of General Unsecured Claims, and the releases and exculpations to be granted to the Committee and its members solely in their capacity as members of the Committee, the Committee, and (d) solely with respect to those terms and provisions that impact CCOH or the CCOH Plan and Separation Settlement, or impair the releases in favor of CCOH, CCOH.

204.    "*Post-Emergence Equity Incentive Program*" means the management incentive plan to be adopted by the New Board(s) on the Effective Date to be in effect on and after the Effective Date, the form of which shall be included in the Plan Supplement.

205.    "*Preferred Stock Term Sheet*" means the term sheet governing the Radio NewCo Preferred Stock and the CCOH Preferred Stock, the form of which shall be included in the Plan Supplement, and which shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Senior Creditors, and, (a) solely with respect to the those terms and provisions that would have a material adverse effect on the value of the distribution to (x) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, and (y) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors, and (b) solely with respect to the CCOH Preferred Stock, CCOH.

206.    "*Preferred Stock Transactions*" means, as part of the Taxable Separation: (a) on or before the Effective Date, but in all cases before the CCOH Separation, and pursuant to prearranged and binding

agreements, (i) the issuance of the Radio NewCo Preferred Stock to CCH, and (ii) the sale of Radio NewCo Preferred Stock by CCH and the issuance of the CCOH Preferred Stock by CCOH (or its successor) to one or more third party investors in exchange for Cash or other consideration to be determined; *provided, however*, that Holders of Allowed Claims or Allowed Interests receiving Special Warrants, New iHeart Common Stock, or beneficial interests in the FCC Trust pursuant to the Plan shall not be permitted to purchase the Radio NewCo Preferred Stock and Holders of Allowed Claims receiving CCOH Interests pursuant to the Plan shall not be permitted to purchase the CCOH Preferred Stock; (b) if applicable, the distribution of Cash received in connection with the issuance of the Radio NewCo Preferred Stock to fund recoveries under the Plan; and (c) if applicable, the use of such Cash received in connection with the issuance of the CCOH Preferred Stock as a source of liquidity for CCOH (or its successor) or the distribution of such Cash to fund recoveries under the Plan.

207.    "*Priority Non-Tax Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

208.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

209.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

210.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

211.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

212.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

213.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash as soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

214.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

215.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

216.   "*Radio NewCo*" means the new holding company organized by CCH in connection with the consummation of the Restructuring Transactions to hold the equity interests of certain entities that conduct certain operations, as set forth in the Restructuring Transactions Memorandum.

217.   "*Radio NewCo Preferred Stock*" means, if the Taxable Separation is effectuated pursuant to the terms and conditions set forth in Article IV.G, the new contingent-voting preferred stock of Radio NewCo issued pursuant to the Preferred Stock Transactions.

218.   "*Regulations*" means the United States Treasury regulations promulgated pursuant to the Tax Code.

219.   "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

220.   "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of certain Executory Contracts and Unexpired Leases to be rejected by the Reorganized Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time by the Debtors or Reorganized Debtors, as applicable, in accordance with the Plan, which list shall be included in the Plan Supplement.

221.   "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

222.   "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Holder of a DIP Claim; (d) the DIP Agent; (e) the New ABL Credit Agreement Lenders; (f) the New ABL Credit Agreement Agent; (g) each Consenting Stakeholder; (h) the Term Loan Credit Agreement Agent; (i) each of the PGN Trustees and Agents; (j) the 2021 Notes Agent; (k) the 2021 Notes Trustee; (*l*) the Committee and each member of the Committee (solely in its capacity as a member of the Committee); (m) each of the ABL Secured Parties; (n) CCOH; (o) each current and former Affiliate of each Entity in clauses (a) through (n); (p) each Related Party of each Entity in clauses (a) through (o); and (q) DTC; *provided that* any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party shall not be a "Released Party."

223.   "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Holder of a DIP Claim; (d) the DIP Agent; (e) the New ABL Credit Agreement Lenders; (f) the New ABL Credit Agreement Agent; (g) each Consenting Stakeholder; (h) the Term Loan Credit Agreement Agent; (i) each of the PGN Trustees and Agents; (j) the 2021 Notes Agent; (k) the 2021 Notes Trustee; (*l*) all Holders of Claims against the Debtors; (m) all Holders of Interests in the Debtors; (n) the Committee and each member of the Committee (solely in its capacity as a member of the Committee); (o) each of the ABL Secured Parties; (p) CCOH; (q) each current and former Affiliate of each Entity in clauses (a) through (p); and (r) each Related Party of each Entity in clauses (a) through (q); *provided that* any Entity that opts out of or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

224.   "*Remaining Distribution*" means, collectively, the Remaining Equity Distribution and the Remaining Non-Equity Distribution.

225. "*Remaining Equity Distribution*" means Special Warrants, New iHeart Common Stock, or a combination of Special Warrants and New iHeart Common Stock, as determined in accordance with the Equity Allocation Mechanism, constituting, in the aggregate (and inclusive of the shares of New iHeart Common Stock that may be received by Holders of Allowed Secured Term Loan Credit Agreement Claims, Allowed Secured PGN Claims, or Allowed Guarantor Funded Debt Unsecured Claims upon the exercise of the Special Warrants (if any) received as part of this Remaining Equity Distribution), 89.72 percent of the New iHeart Common Stock on a fully diluted basis (but excluding and subject to dilution on account of the Post-Emergence Equity Incentive Program).

226. "*Remaining Non-Equity Distribution*" means $5,296,830,943 in aggregate principal amount of the New Debt, allocated proportionally by principal amount among New Term Loans, New Secured Notes, and New Unsecured Notes.

227. "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, or otherwise, on and after the Effective Date.

228. "*Reorganized iHeart*" means iHeart, or any successor or assign thereto, by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, or otherwise, on and after the Effective Date.

229. "*Repaid DIP Claims*" has the meaning set forth in Article II.C of the Plan.

230. "*Required Consenting 2021 Noteholders*" shall have the meaning set forth in the Restructuring Support Agreement.

231. "*Required Consenting Senior Creditors*" shall have the meaning set forth in the Restructuring Support Agreement.

232. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, made and entered into as of March 16, 2018, by and among the Debtors, the Consenting Creditors (as defined therein) party thereto from time to time, and the Consenting Sponsors (as defined therein) party thereto from time to time, as such may be amended from time to time in accordance with its terms.

233. "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

234. "*Restructuring Transactions Memorandum*" means that certain memorandum describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement.

235. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement, *provided that* such schedule shall not include any Causes of Action against any Released Party, and any such inclusion will be deemed void *ab initio*.

236. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

237.     "*SEC*" means the United States Securities and Exchange Commission.

238.     "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

239.     "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a Secured Claim.

240.     "*Secured 9.0% Due 2019 PGN Claim*" means any Secured Claim against a Debtor that is a 9.0% PGN Due 2019 Claim.

241.     "*Secured Non-9.0% Due 2019 PGN Claim*" means any Secured Claim against a Debtor that is a Non-9.0% PGN Due 2019 Claim.

242.     "*Secured PGN Claim*" means any Claim against a Debtor that is a Secured 9.0% PGN Due 2019 Claim or a Secured Non-9.0% PGN Due 2019 Claim.

243.     "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

244.     "*Secured Term Loan / 2019 PGN Claim*" means any Claim against a Debtor that is a Secured Term Loan Credit Agreement Claim or a Secured 9.0% Due 2019 PGN Claim.

245.     "*Secured Term Loan / 2019 PGN Supplemental Equity Distribution*" means Special Warrants, New iHeart Common Stock, or a combination of Special Warrants and New iHeart Common Stock, as determined in accordance with the Equity Allocation Mechanism, constituting, in the aggregate (and inclusive of the shares of New iHeart Common Stock that may be received by Holders of Allowed Term Loan / 2019 PGN Claims upon the exercise of the Special Warrants (if any) received as part of this Secured Term Loan / 2019 PGN Supplemental Equity Distribution), 2.21 percent of the New iHeart Common Stock on a fully diluted basis (but excluding and subject to dilution on account of the Post-Emergence Equity Incentive Program).

246.     "*Secured Term Loan / 2019 PGN Supplemental Non-Equity Distribution*" means $131,000,000 aggregate principal amount of the New Debt, allocated proportionally by principal amount of New Term Loans, New Secured Notes, and New Unsecured Notes.

247.     "*Secured Term Loan / 2019 PGN Supplemental Distribution*" means, collectively, the Term Loan / 2019 PGN Supplemental Equity Distribution and the Term Loan / 2019 PGN Supplemental Non-Equity Distribution.

248.     "*Secured Term Loan Credit Agreement Claim*" means any Secured Claim against a Debtor that is a Term Loan Credit Agreement Claim.

249.     "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

250.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

251.    "*Special Warrant*" means a warrant, issued by Reorganized iHeart pursuant to the Plan, the Equity Allocation Mechanism, and the Special Warrant Agreement, to purchase New iHeart Common Stock, the terms of which will provide that it will not be exercisable unless such exercise complies with applicable law, which shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Senior Creditors, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors.

252.    "*Special Warrant Agreement*" means the warrant agreement, to be effective on the Effective Date, governing any Special Warrants that may be issued by Reorganized iHeart, the form of which shall be included in the Plan Supplement.

253.    "*Sponsor Unsecured Claims*" means any General Unsecured Claim held by the Consenting Sponsors other than those under or related to any Indemnification Provision.

254.    "*Standing Motion*" means, collectively, the *Motion of the Official Committee of Unsecured Creditors of iHeartMedia, Inc.,* et al. *for Standing to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1089] and the *Amended Motion of the Official Committee of Unsecured Creditors of iHeartMedia, Inc.,* et al. *for Standing to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1095] filed by the Committee on July 9, 2018, and July 10, 2018, respectively.

255.    "*Subsidiary Guarantors*" means, collectively, (a) AMFM Broadcasting Licenses, LLC, (b) AMFM Broadcasting, Inc., (c) AMFM Operating, Inc., (d) AMFM Radio Licenses, LLC, (e) AMFM Texas Broadcasting, LP, (f) AMFM Texas Licenses, LLC, (g) AMFM Texas, LLC, (h) Capstar Radio Operating Company, (i) Capstar TX, LLC, (j) CC Broadcast Holdings, Inc., (k) CC Finco Holdings, LLC, (*l*) CC Licenses, LLC, (m) Christal Radio Sales, Inc., (n) Cine Guarantors II, Inc., (o) Citicasters Co., (p) Citicasters Licenses, Inc., (q) Clear Channel Broadcasting Licenses, Inc., (r) Clear Channel Holdings, Inc., (s) Clear Channel Investments, Inc., (t) Clear Channel Metro, LLC, (u) Clear Channel Mexico Holdings, Inc., (v) Clear Channel Real Estate, LLC, (w) Critical Mass Media, Inc., (x) iHeartMedia + Entertainment, Inc., (y) iHeartMedia Management Services, Inc., (z) iHM Identity, Inc., (aa) Katz Communications, Inc., (bb) Katz Media Group, Inc., (cc) Katz Millennium Sales & Marketing, Inc., (dd) Katz Net Radio Sales, Inc., (ee) M Street Corporation, (ff) Premiere Networks, Inc., (gg) Terrestrial RF Licensing, Inc., (hh) TTWN Media Networks, LLC, and (ii) TTWN Networks, LLC.

256.    "*Tax Code*" means the United States Internal Revenue Code of 1986, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

257.    "*Taxable Separation*" means the CCOH Separation (and any related transactions), if structured with the intent of the Debtors realizing and recognizing any gains or losses in connection with such transactions for U.S. federal income tax purposes.

258.    "*Tax-Free Separation*" means the CCOH Separation (and any related transactions), if structured with the intent of the Debtors avoiding the recognition of any gain or loss realized with respect to such transactions for U.S. federal income tax purposes.

259.    "*Term Lender Group*" shall have the meaning set forth in the Restructuring Support Agreement.

260.    "*Term Loan / 2019 PGN Claim*" means any Claim that is a Term Loan Credit Agreement Claim or a 9.0% PGN Due 2019 Claim.

261.    "*Term Loan / PGN Group*" shall have the meaning set forth in the Restructuring Support Agreement.

262.    "*Term Loan / PGN Deficiency Claim*" means any Claim against a Debtor that is (a) a Term Loan Credit Agreement Claim that is not a Secured Term Loan Credit Agreement Claim or (b) a PGN Claim that is not a Secured PGN Claim.

263.    "*Term Loan Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of May 13, 2008, as amended and restated as of February 23, 2011, among iHC, as parent borrower, the certain subsidiary co-borrowers party thereto, certain foreign subsidiary revolving borrowers party thereto, iHeart Capital I, as holdings, the Term Loan Credit Agreement Agent, as administrative agent, swing line lender, and L/C issuer, and the other lenders party thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time.

264.    "*Term Loan Credit Agreement Agent*" means Citibank, N.A., in its capacity as administrative agent under the Term Loan Credit Agreement Documents, and any predecessors and successors in such capacity.

265.    "*Term Loan Credit Agreement Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Term Loan Credit Agreement Documents.

266.    "*Term Loan Credit Agreement Documents*" means, collectively, the Term Loan Credit Agreement and all other agreements, documents, and instruments related thereto, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

267.    "*Texas Litigation*" means the following proceedings:  (a) *iHeartCommunications, Inc. v. Benefit Street Partners LLC et al.*, No. 2016 CI 04006 in the District Court of Bexar County, Texas; (b) *iHeartCommunications, Inc. v. Canyon Capital Advisors LLC et al.*, No. 2016 CI 07857 in the District Court of Bexar County, Texas; (c) *iHeartCommunications, Inc. et al. v. Benefit Street Partners LLC et al.*, Cause No. 2016 CI 12468 in the District Court of Bexar County, Texas; (d) *Franklin Advisers, Inc., et al. v. iHeart Communications, Inc.*, Case No. 04-16-00532-CV, in the Fourth Court of Appeals District, San Antonio, Texas; (e) *iHeartCommunications, Inc. et al. v. U.S. Bank National Association*, Case No. 2016 CI 21286 in the District Court of Bexar County, Texas; and (f) all appellate proceedings related to any of the foregoing.

268.    "*Transfer of Control*" means the transfer of control of the FCC Licenses held by any of the subsidiaries of iHeartMedia, Inc. as a result of the issuance of the New iHeart Common Stock and/or Special Warrants to Holders of Allowed Term Loan Credit Agreement Claims, Allowed PGN Claims, Allowed iHC 2021 / Legacy Notes Claims, and Allowed iHeart Interests, or to holders of beneficial interests in the FCC Trust after the FCC grants the FCC Long Form Applications.

269.    "*TTWN Debtors*" means, collectively, Clear Channel Metro LLC, TTWN Networks, LLC, and TTWN Media Networks, LLC.

270.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an

26

intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

271.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

272.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

273.     "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

274.     "*Voting Deadline*" means November 16, 2018 at 5:00 p.m. prevailing Central Time, or such later date and time as agreed to by the Debtors and CCOH as to the CCOH Due From Claim.

## B.     Rules of Interpretation

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (4) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest or as a Consenting Stakeholder includes that Entity's authorized successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, to the extent applicable to the Chapter 11 Cases; (13) any effectuating provisions may be interpreted by the Debtors or the  Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (15) all references herein to consent, acceptance, or approval shall (unless otherwise specified) be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which (unless otherwise specified) may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      **Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided that* corporate, limited liability company, or partnership governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.      **Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      **Administrative Claims**

Except as otherwise specifically provided in the Plan, and except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment with respect to such Holder, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Holders of DIP Claims) will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Administrative Claim, an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which

28

an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

A notice setting forth the Administrative Claims Bar Date will be (a) Filed on the Bankruptcy Court's docket and served with the notice of entry of the Confirmation Order, and (b) posted on the Claims, Noticing, and Solicitation Agent's website.  Except as otherwise provided in this Article II.A, and except for Professional Fee Claims, DIP Claims, Administrative Claims of CCOH, and Claims for Consenting Stakeholder Fees, and unless previously Filed, requests for payment of Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Reorganized Debtors and the requesting Holder no later than the Administrative Claims Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.      Professional Fee Claims**

1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay Professional Fee Claims owing to the Professionals in Cash to such Professionals in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided that* the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

      2.      <u>Professional Fee Escrow Account</u>

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

      3.      <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided that* the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

      4.      <u>Post-Confirmation Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, for any fees and expenses incurred from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, or the Committee.  For any fees and expenses incurred from and after the Confirmation Date, the Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, Reorganized Debtors, and the Committee, as applicable.  If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    **DIP Claims**

The DIP Claims shall be Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Facilities on such date, (b) all interest accrued and unpaid thereon to the date of payment and (c) any and all accrued and unpaid fees, expenses and indemnification or other obligations of any kind payable under the DIP Credit Agreement Documents.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, on the Effective Date, all Holders of Allowed DIP Claims shall (a) to the extent clause (b) below does not apply, receive payment in full in Cash of their Allowed DIP Claims from the Debtors (the "*Repaid DIP Claims*"), at which time all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity or (b) solely in the event that the conditions precedent set forth on Annex I of the New ABL Credit Agreement Term Sheet shall have been satisfied prior to or contemporaneously with the Effective Date or validly waived, have their Allowed DIP Claims converted into New ABL Indebtedness on a dollar-for-dollar basis (such converted DIP Claims the "*Converted DIP Claims*") in accordance with the terms of the New ABL Credit Agreement (under clause (i) of the definition thereof), the New ABL Credit Agreement Term Sheet and the DIP Credit Agreement (including, without limitation, Section 2.18), and the Holders of such Converted DIP Claims shall upon such conversion become New ABL Credit Agreement Lenders.  If the Allowed DIP Claims become Converted DIP Claims, contemporaneously with such conversion, all liens and security interests granted to secure the obligations arising under the DIP Credit Agreement shall continue, remain in effect and be deemed to secure the obligations under the New ABL Credit Agreement Documents (the "*Continuing Liens*").

Notwithstanding anything to the contrary in the Plan or the Confirmation Order (including, for the avoidance of doubt, Articles VIII.B and VIII.C of the Plan), (i) any Contingent DIP Obligations that do not receive the treatment above shall survive the Effective Date, shall not be discharged or released pursuant to the Plan or the Confirmation Order, and, solely in the event that the Allowed DIP Claims become Converted DIP Claims, shall continue to be secured by all liens and security interests granted to secure the obligations arising under the New ABL Credit Agreement, and (ii) the DIP Facilities and the DIP Credit Agreement Documents shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (A) the Contingent DIP Obligations and (B) the relationships among the DIP Agent and the DIP Lenders, as applicable, including but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders), reinstatement obligations pursuant to Section 10.28 of the DIP Credit Agreement and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.  After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agent and the DIP Lenders for any reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facilities in accordance with the terms thereof.  The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Credit Agreement Documents.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, requests for payment and expenses of professionals compensated pursuant to the DIP Order are not required to be filed and served other than in compliance with the procedures set forth in the DIP Order.

**D.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

**A.      Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is summarized in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Secured Term Loan / 2019 PGN Claims | Impaired | Entitled to Vote |

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 5A | Secured Non-9.0% PGN Due 2019 Claims Other Than Exchange 11.25% PGN Claims | Impaired | Entitled to Vote |
| 5B | Secured Exchange 11.25% PGN Claims | Impaired | Entitled to Vote |
| 6 | iHC 2021 / Legacy Notes Claims | Impaired | Entitled to Vote |
| 7A | General Unsecured Claims Against Non-Obligor Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7B | General Unsecured Claims Against TTWN Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7C | Term Loan/PGN Deficiency Claims Against the TTWN Debtors | Impaired | Entitled to Vote |
| 7D | iHC Unsecured Claims | Impaired | Entitled to Vote |
| 7E | Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors | Impaired | Entitled to Vote |
| 7F | Guarantor Funded Debt Unsecured Claims Against CCH | Impaired | Entitled to Vote |
| 7G | Guarantor General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | CCOH Due From Claims | Impaired | Entitled to Vote |
| 9 | iHeart Interests | Impaired | Entitled to Vote |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

## C.  Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed

Interest, except to the extent different treatment is agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.

1.  <u>Class 1 — Secured Tax Claims</u>

   (a)  *Classification*:  Class 1 consists of all Secured Tax Claims.

   (b)  *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, at the option of the applicable Reorganized Debtor:

      (i)  payment in full in Cash of such Holder's Allowed Secured Tax Claim; or

      (ii)  equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under applicable non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

   (c)  *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.  <u>Class 2 — Other Secured Claims</u>

   (a)  *Classification*:  Class 2 consists of all Other Secured Claims.

   (b)  *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Reorganized Debtor:

      (i)  payment in full in Cash of such Holder's Allowed Other Secured Claim;

      (ii)  Reinstatement of such Holder's Allowed Other Secured Claim;

      (iii)  delivery of the collateral securing such Holder's Allowed Other Secured Claim; or

      (iv)  such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

   (c)  *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.  <u>Class 3 — Priority Non-Tax Claims</u>

   (a)  *Classification*:  Class 3 consists of all Priority Non-Tax Claims.

34

(b)     *Treatment*:  Each Holder of an Allowed Priority Non-Tax Claim shall receive, at the option of the applicable Reorganized Debtor, payment in full in Cash of such Holder's Allowed Priority Non-Tax Claim or such other treatment rendering such Holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)     *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.     Class 4 — Secured Term Loan / 2019 PGN Claims

(a)     *Classification*:  Class 4 consists of all Secured Term Loan / 2019 PGN Claims.

(b)     *Allowance:*  The Secured Term Loan / 2019 PGN Claims shall be Allowed, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $1,306,230,566, comprised of:  (i) $990,479,068 on account of the Term Loan Credit Agreement Claims; and (ii) $315,751,498 on account of the 9.0% PGN Due 2019 Claims.

(c)     *Treatment*:  Each Holder of an Allowed Secured Term Loan / 2019 PGN Claim shall receive its Pro Rata share (calculated based on the total aggregate amount of Allowed Claims in Class 4 that are not Intercompany Notes Claims) of:

(i)      either (x) the Secured Term Loan / 2019 PGN Supplemental Distribution or (y) if the FCC Trust is utilized as described in the Plan, the Secured Term Loan / 2019 PGN Supplemental Non-Equity Distribution and 2.21 percent of the beneficial interests in the FCC Trust;

(ii)     either (x) 13.99 percent of the Remaining Distribution or (y) if the FCC Trust is utilized as described in the Plan, 13.99 percent of the Remaining Non-Equity Distribution and 12.55 percent of the beneficial interests in the FCC Trust; and

(iii)    Class 4's Pro Rata share (calculated based on the total aggregate amount of Allowed Claims in Class 4, Class 5A, and Class 5B that are not Intercompany Notes Claims) of the Excess Cash.

Pursuant to the Plan Settlement, each Secured Term Loan / 2019 PGN Claim that is an Intercompany Notes Claim will be cancelled and there shall be no distributions made on account of any such Secured Term Loan / 2019 PGN Claim.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Therefore, Holders of Allowed Secured Term Loan / 2019 PGN Claims are entitled to vote to accept or reject the Plan.

5.     Class 5A — Secured Non-9.0% PGN Due 2019 Claims Other Than Exchange 11.25% PGN Claims

(a)     *Classification*:  Class 5A consists of all Secured Non-9.0% PGN Due 2019 Claims other than Exchange 11.25% PGN Claims.

(b)     *Allowance:*  The Secured Non-9.0% PGN Due 2019 Claims shall be Allowed, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $589,302,043, comprised of:  (i) $240,812,176 on account of the 9.0% PGN Due 2021 Claims; (ii) $137,147,612 on account of the 9.0% PGN Due 2022 Claims; (iii) $131,303,253 on account of the 10.625% PGN Claims; and (iv) $80,039,002 on account of the 11.25% PGN Claims that are not Exchange 11.25% PGN Claims.

(c)     *Treatment*:  Each Holder of an Allowed Secured Non-9.0% PGN Due 2019 Claim other than Exchange 11.25% PGN Claims shall receive its Pro Rata share (calculated based on the total aggregate amount of Allowed Claims in Class 5A that are not Intercompany Notes Claims) of:

(i)     either (x) 7.42 percent of the Remaining Distribution or (y) if the FCC Trust is utilized as described in the Plan, 7.42 percent of the Remaining Non-Equity Distribution and 6.66 percent of the beneficial interests in the FCC Trust; and

(ii)    Class 5A's Pro Rata share (calculated based on the total aggregate amount of Allowed Claims in Class 4, Class 5A, and Class 5B that are not Intercompany Notes Claims) of the Excess Cash.

Pursuant to the Plan Settlement, each Secured Non-9.0% PGN Due 2019 Claim other than an Exchange 11.25% PGN Claim that is an Intercompany Notes Claim will be cancelled and there shall be no distributions made on account of any such Secured Non-9.0% PGN Due 2019 Claim other than an Exchange 11.25% PGN Claim.

(d)     *Voting*:  Class 5A is Impaired under the Plan.  Therefore, Holders of Allowed Secured Non-9.0% PGN Due 2019 Claims are entitled to vote to accept or reject the Plan.

6.      <u>Class 5B — Secured Exchange 11.25% PGN Claims</u>

(a)     *Classification*:  Class 5B consists of all Secured Exchange 11.25% PGN Claims.

(b)     *Allowance:*  The Secured Exchange 11.25% PGN Claims in Class 5B shall be Allowed, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $374,864,583.

(c)     *Treatment*:  Each Holder of an Allowed Secured Exchange 11.25% PGN Claim shall receive its Pro Rata share of:

(i)     either (x) the Exchange 11.25% PGNs Distribution or (y) if the FCC Trust is utilized as described in the Plan, the Exchange 11.25% PGNs Non-Equity Distribution and 2.07 percent of the beneficial interests in the FCC Trust; and

(ii)    Class 5B's Pro Rata share (calculated based on the total aggregate amount of Allowed Claims in Class 4, Class 5A, and Class 5B that are not Intercompany Notes Claims) of the Excess Cash.

Pursuant to the Plan Settlement, each Secured Exchange 11.25% PGN Claim that is an Intercompany Notes Claim will be cancelled and there shall be no distributions made on account of any such Secured Exchange 11.25% PGN Claim.

(d)     *Voting*:  Class 5B is Impaired under the Plan.  Therefore, Holders of Allowed Secured Exchange 11.25% PGN Claims are entitled to vote to accept or reject the Plan.

7.     Class 6 — iHC 2021 / Legacy Notes Claims

(a)     *Classification*:  Class 6 consists of all iHC 2021 / Legacy Notes Claims.

(b)     *Allowance:*  The iHC 2021 / Legacy Notes Claims shall be Allowed against iHC, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $2,408,796,061 on account of the 2021 Notes Claims.

(c)     *Treatment*:  Each Holder of an Allowed iHC 2021 / Legacy Notes Claim shall receive its Pro Rata share (calculated based on the total aggregate amount of Allowed Claims in Class 6 that are not Intercompany Notes Claims) of:

(i)     $200,000,000 aggregate principal amount of the New Debt, allocated proportionally by principal amount among New Term Loans, New Secured Notes, and New Unsecured Notes; and

(ii)     either (x) the iHC 2021 / Legacy Notes Equity Distribution or (y) if the FCC Trust is utilized as described in the Plan, 5.0 percent of the beneficial interests in the FCC Trust.

Pursuant to the Plan Settlement, each iHC 2021 / Legacy Notes Claim that is an Intercompany Notes Claim will be cancelled without any distribution on account of such iHC 2021 / Legacy Notes Claim, and (i) the distribution that otherwise would have been made on account of such Intercompany Notes Claims that are 2021 Notes Claims shall be allocated, Pro Rata, to Holders of Allowed 2021 Notes Claims that are not Intercompany Notes Claims, and (ii) the distribution that otherwise would have been made on account of such Intercompany Notes Claims that are Legacy Notes Claims shall be allocated, Pro Rata, to Holders of Allowed Legacy Notes Claims that are not Intercompany Notes Claims.

(d)     *Voting*:  Class 6 is Impaired under the Plan.  Therefore, Holders of Allowed iHC 2021 / Legacy Notes Claims are entitled to vote to accept or reject the Plan.

8.     Class 7A — General Unsecured Claims Against Non-Obligor Debtors

(a)     *Classification*:  Class 7A consists of all General Unsecured Claims against the Non-Obligor Debtors.

(b)     *Treatment*:  Each Holder of an Allowed General Unsecured Claim against the Non-Obligor Debtors shall receive, at the option of the applicable Reorganized Non-Obligor Debtor, payment in full in Cash of such Holder's Allowed General Unsecured Claim against such Non-Obligor Debtor or such other treatment

rendering such Holder's Allowed General Unsecured Claim against such Non-Obligor Debtor Unimpaired.

(c)     *Voting*:  Class 7A is Unimpaired under the Plan.  Holders of Allowed General Unsecured Claims against the Non-Obligor Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.     <u>Class 7B — General Unsecured Claims Against TTWN Debtors</u>

(a)     *Classification*:  Class 7B consists of all General Unsecured Claims against the TTWN Debtors.

(b)     *Treatment*:  Each Holder of an Allowed General Unsecured Claim against the TTWN Debtors shall receive, at the option of the applicable Reorganized TTWN Debtor, payment in full in Cash of such Holder's Allowed General Unsecured Claim against a TTWN Debtor or such other treatment rendering such Holder's Allowed General Unsecured Claim against a TTWN Debtor Unimpaired.

(c)     *Voting*:  Class 7B is Unimpaired under the Plan.  Holders of Allowed General Unsecured Claims against the TTWN Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10.    <u>Class 7C — Term Loan/PGN Deficiency Claims Against the TTWN Debtors</u>

(a)     *Classification*:  Class 7C consists of all Term Loan / PGN Deficiency Claims against the TTWN Debtors.

(b)     *Allowance*:  The Term Loan / PGN Deficiency Claims in Class 7C shall be Allowed against the TTWN Debtors, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $10,949,779,638, comprised of: (i) $5,423,876,352 on account of the Term Loan Credit Agreement Claims; (ii) $1,729,059,339 on account of the 9.0% PGN Due 2019 Claims; (iii) $1,551,540,953 on account of the 9.0% PGN Due 2021 Claims; (iv) $883,635,286 on account of the 9.0% PGN Due 2022 Claims; (v) $845,980,374 on account of the 10.625% PGN Claims; and (vi) $515,687,333 on account of the 11.25% PGN Claims.

(c)     *Treatment*:  Pursuant to the Plan Settlement, the distributions on account of each Term Loan / PGN Deficiency Claim in this class shall be deemed satisfied by the distributions provided in Class 7E and the distributions to other parties provided in Class 6, Class 7D, Class 7G, and Class 8.

(d)     *Voting*:  Class 7C is Impaired under the Plan.  Holders of Allowed Term Loan / PGN Deficiency Claims against the TTWN Debtors are entitled to vote to accept or reject the Plan.

11.    <u>Class 7D — iHC Unsecured Claims</u>

(a)     *Classification*:  Class 7D consists of all iHC Unsecured Claims.

(b)     *Allowance*:  The Term Loan / PGN Deficiency Claims in Class 7D shall be Allowed against iHC, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $13,454,622,496, comprised of: (i) $6,414,355,420 on account of the Term Loan Credit Agreement Claims; (ii) $2,044,810,838 on account of the 9.0% PGN Due 2019 Claims; (iii) $1,834,875,000 on account of the 9.0% PGN Due 2021 Claims; (iv) $1,045,000,000 on account of the 9.0% PGN Due 2022 Claims; (v) $1,000,468,750 on account of the 10.625% PGN Claims; and (vi) $1,115,112,488 on account of the 11.25% PGN Claims.

(c)     *Treatment*:  Each Holder of an Allowed iHC Unsecured Claim shall receive payment of Cash equal to the greater of (i) 14.44 percent of the Allowed amount of such Allowed iHC Unsecured Claim and (ii) the percentage recovery provided to the Holders of iHC Unsecured Claims, CCOH Due From Claims, and/or iHC 2021 / Legacy Notes Claims.  For the avoidance of doubt, any determination of whether any other Allowed unsecured Claim against iHC receives a greater recovery shall not consider or include (a) any consideration included in the transactions contemplated by the Plan in connection with the CCOH Separation, (b) recoveries for Claims against Debtors other than iHC, and (c) recoveries for Claims or Interests that are subordinate to Allowed General Unsecured Claims against iHC.  Pursuant to the Plan Settlement, each Term Loan / PGN Deficiency Claim against iHC will be cancelled without any distribution on account of such Term Loan / PGN Deficiency Claim against iHC.

(d)     *Voting*:  Class 7D is Impaired under the Plan.  Therefore, Holders of Allowed iHC Unsecured Claims are entitled to vote to accept or reject the Plan.

12.   <u>Class 7E — Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors</u>

(a)     *Classification*:  Class 7E consists of all Guarantor Funded Debt Unsecured Claims, other than Exchange 11.25% PGN Claims, against Guarantor Debtors other than CCH and the TTWN Debtors.

(b)     *Allowance*:  The Term Loan / PGN Deficiency Claims in Class 7E shall be Allowed against each Guarantor Debtor other than CCH and the TTWN Debtors, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $10,949,779,638, comprised of:  (i) $5,423,876,352 on account of the Term Loan Credit Agreement Claims; (ii) $1,729,059,339 on account of the 9.0% PGN Due 2019 Claims; (iii) $1,551,540,953 on account of the 9.0% PGN Due 2021 Claims; (iv) $883,635,286 on account of the 9.0% PGN Due 2022 Claims;  (v) $845,980,374 on account of the 10.625% PGN Claims;  and (vi) $515,687,333 on account of the 11.25% PGN Claims that are not Exchange 11.25% PGN Claims.  The 2021 Notes Claims in Class 7E shall be Allowed against each Guarantor Debtor other than CCH and the TTWN Debtors, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $2,408,796,061.

(c)     *Treatment*:  Each Holder of an Allowed Guarantor Funded Debt Unsecured Claim, excluding Allowed Exchange 11.25% PGN Claims, against a Guarantor Debtor other than CCH and the TTWN Debtors shall receive its Pro Rata share of (a) 78.59

percent of the Remaining Distribution or (b) if the FCC Trust is utilized as described in the Plan, 70.51 percent of the beneficial interests in the FCC Trust and 78.59 percent of the Remaining Non-Equity Distribution; *provided that* all distributions on account of the 2021 Notes Claims in Class 7E shall be distributed to the Holders of the Allowed Term Loan / PGN Deficiency Claims that are not Intercompany Notes Claims pursuant to the 2021 Notes Indenture; *provided further that* the distributions that otherwise would have been made on account of Intercompany Notes Claims that are Term Loan / PGN Deficiency Claims (excluding Exchange 11.25% PGN Claims) shall be allocated, Pro Rata, to Holders of Allowed Term Loan / PGN Deficiency Claims (excluding Exchange 11.25% PGN Claims) that are not Intercompany Notes Claims.

(d)     *Voting*:  Class 7E is Impaired under the Plan.  Therefore, Holders of Allowed Guarantor Funded Debt Unsecured Claims (other than Exchange 11.25% PGN Claims) against Guarantor Debtors other than CCH and the TTWN Debtors are entitled to vote to accept or reject the Plan.

13.     <u>Class 7F — Guarantor Funded Debt Unsecured Claims Against CCH</u>

(a)     *Classification*:  Class 7F consists of all Guarantor Funded Debt Unsecured Claims against CCH.

(b)     *Allowance*:  The Term Loan / PGN Deficiency Claims in Class 7F shall be Allowed against CCH, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $13,454,622,496, comprised of:  (i) $6,414,355,420 on account of the Term Loan Credit Agreement Claims; (ii) $2,044,810,838 on account of the 9.0% PGN Due 2019 Claims; (iii) $1,834,875,000 on account of the 9.0% PGN Due 2021 Claims; (iv) $1,045,000,000 on account of the 9.0% PGN Due 2022 Claims; (v) $1,000,468,750 on account of the 10.625% PGN Claims; and (vi) $1,115,112,488 on account of the 11.25% PGN Claims.  The 2021 Notes Claims in Class 7F shall be Allowed against CCH, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $2,408,796,061.

(c)     *Treatment*:  Each Holder of an Allowed Guarantor Funded Debt Unsecured Claim against CCH shall receive its Pro Rata share of 100 percent of the CCOH Interests held by the Debtors and CC Finco, LLC and Broader Media, LLC, which are non-Debtor affiliates of the Debtors (which is estimated to be approximately 89.5 percent of all outstanding CCOH Interests); *provided that* all distributions on account of the 2021 Notes claims in Class 7F shall be distributed to the Holders of Allowed Term Loan / PGN Deficiency Claims that are not Intercompany Notes Claims pursuant to the 2021 Notes Indenture; *provided further that* the distributions that otherwise would have been made on account of Intercompany Notes Claims that are Term Loan / PGN Deficiency Claims shall be allocated, Pro Rata, to Holders of Allowed Term Loan / PGN Deficiency Claims that are not Holders of Intercompany Notes Claims.

(d)     *Voting*:  Class 7F is Impaired under the Plan.  Therefore, Holders of Allowed Guarantor Funded Debt Unsecured Claims against CCH are entitled to vote to accept or reject the Plan.

14.    Class 7G — Guarantor General Unsecured Claims

    (a)    *Classification*:  Class 7G consists of all Guarantor General Unsecured Claims.

    (b)    *Treatment*:  Each Holder of an Allowed Guarantor General Unsecured Claim shall receive its Pro Rata share of the Guarantor General Unsecured Recovery Cash Pool; *provided that* no Holder of an Allowed Guarantor General Unsecured Claim shall receive a recovery (i) less than 45 percent of such Holder's Allowed Claim or (ii) greater than 55 percent of such Holder's Allowed Claim.

    (c)    *Voting*:  Class 7G is Impaired under the Plan.  Therefore, Holders of Allowed Guarantor General Unsecured Claims are entitled to vote to accept or reject the Plan.

15.    Class 8 — CCOH Due From Claims

    (a)    *Classification*:  Class 8 consists of all CCOH Due From Claims.

    (b)    *Allowance*:  The CCOH Due From Claims in Class 8 shall be Allowed, without offset, recoupment, reductions, or deduction of any kind, in an aggregate amount equal to $1,031,721,306.

    (c)    *Treatment*:  Each Holder of an Allowed CCOH Due From Claim shall receive payment of Cash equal to 14.44 percent of the Allowed amount of such Allowed CCOH Due From Claim.

    (d)    *Voting*:  Class 8 is Impaired under the Plan.  Therefore, Holders of Allowed CCOH Due From Claims are entitled to vote to accept or reject the Plan.

16.    Class 9 — iHeart Interests

    (a)    *Classification*:  Class 9 consists of all iHeart Interests.

    (b)    *Allowance*:  iHeart Interests held by the Consenting Sponsors shall be deemed Allowed as of the Effective Date.

    (c)    *Treatment*:  Each Holder of an Allowed iHeart Interest shall receive its share of either (x) the iHeart Interests Equity Distribution or (y) if the FCC Trust is utilized as described in the Plan, 1.0 percent of the beneficial interests in the FCC Trust, and such distributions shall be made in accordance with the terms of the documents providing for corporate governance of iHeart.

    (d)    *Voting*:  Class 9 is Impaired under the Plan.  Therefore, Holders of Allowed iHeart Interests are entitled to vote to accept or reject the Plan.

17.    Class 10 — Section 510(b) Claims

    (a)    *Classification*:  Class 10 consists of all Section 510(b) Claims.

    (b)    *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such

Section 510(b) Claim exists. Accordingly, the Debtors believe that Class 10 shall be deemed eliminated from the Plan in accordance with Article III.E of the Plan.

(c) *Treatment*: All Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d) *Voting*: Class 10 is Impaired under the Plan. Holders of Section 510(b) Claims, if any, are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

18. Class 11 — Intercompany Claims

(a) *Classification*: Class 11 consists of all Intercompany Claims.

(b) *Treatment*: All Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Senior Creditors, either (a) Reinstated or (b) cancelled without any distribution on account of such interests.

(c) *Voting*: Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

19. Class 12 — Intercompany Interests

(a) *Classification*: Class 12 consists of all Intercompany Interests.

(b) *Treatment*: All Intercompany Interests shall be, at the option of the Reorganized Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) cancelled without any distribution on account of such Intercompany Interests.

(c) *Voting*: Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## D. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

E.    **Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

F.    **Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Except with respect to a Term Loan Credit Agreement Claim, a PGN Claim, the CCOH Due From Claim, or a 2021 Notes Claim (which are to be Allowed as set forth in this Plan and shall not be subject to offset, recoupment, or reduction), pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.    **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, and to use certain funds and assets to make certain distributions and satisfy certain obligations as set forth in the Plan of certain other Debtors and Reorganized Debtors to the Holders of certain Allowed Claims and Allowed Interests.

H.    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.      General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, including the Committee Plan Settlement and CCOH Plan and Separation Settlement, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and CCOH (as to the CCOH Plan and Separation Settlement).   As part of and in consideration of the Committee Plan Settlement and in exchange for the Committee's support of, among other things, the releases and treatment of Claims and Interests held by the Consenting Sponsors and their Affiliates under the Plan, the Confirmation Order shall provide that the Sponsor Unsecured Claims shall be deemed withdrawn with prejudice as of the Effective Date.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

### B.      Restructuring Transactions

On or before the Effective Date, the applicable Debtors or Reorganized Debtors will, among other things, enter into any transaction, including those transactions set forth in the Restructuring Transactions Memorandum, and will take any action as may be necessary or advisable to effect the transactions described in the Plan, including, as applicable, the issuance, transfer, or cancellation of any assets, securities, notes, instruments, certificates, and other documents required to be issued, transferred, or cancelled pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "*Restructuring Transactions*").  The actions to implement the Restructuring Transactions may include:   (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable law; (4) the execution and delivery of the New Debt Documents, and any filing related thereto; (5) the execution and delivery of the New ABL Credit Agreement Documents, and any filing related thereto; (6) the execution and delivery of the CCOH Separation Documents, and any filing related thereto; (7) if the FCC Trust is utilized as described in the Plan, the execution of the FCC Trust Agreement; (8) the filing of any required FCC Applications; (9) consummation of the Preferred Stock Transactions; and (10) all other actions that the applicable Reorganized Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.    Sources of Consideration for Plan Distributions

Distributions under the Plan will be funded with, or effectuated by, as applicable, (1) Cash held on the Effective Date by or for the benefit of the Debtors, (2) the issuance of the New iHeart Common Stock, the Special Warrants, and, if applicable, the beneficial interests in the FCC Trust, (3) the issuance of or borrowings under the New Debt, (4) the issuance of or borrowings under the New ABL Credit Agreement, (5) the CCOH Interests currently held by the Debtors and non-Debtors CC Finco, LLC and Broader Media, LLC as they exist after the CCOH/CCH Merger, (6) if applicable, the Cash proceeds of the Preferred Stock Transactions, if any, (7) the waiver by Holders of certain Term Loan / PGN Deficiency Claims of such Holders' recoveries from certain Debtors on account of such Claims, (8) the Guarantor General Unsecured Recovery Cash Pool, and (9) the waiver by each Debtor that is a Holder of an Intercompany Notes Claim of its recoveries on account of such Claims.   In accordance with and upon consummation of the Restructuring Transactions, iHC (or the applicable entity as provided by the Restructuring Transactions Memorandum) shall make all distributions under the Plan with respect to all Allowed Claims against and Allowed Interests in all of the Debtors.  No right of subrogation or contribution shall ever arise in favor of any Guarantor Debtor against iHC with respect to or on account of any distribution under the Plan, unless otherwise provided by the Restructuring Transactions Memorandum.

## D.    Issuance and Distribution of New iHeart Common Stock, Special Warrants, and/or the Beneficial Interests in the FCC Trust

On the Effective Date, the Interests in iHeart shall be cancelled, and Reorganized iHeart shall issue the New iHeart Common Stock and the Special Warrants, or, if applicable, the beneficial interests in the FCC Trust to applicable Holders of Claims and Interests in exchange for such Holders' respective Claims against or Interests in the Debtors as set forth in Article III.C hereof; *provided that* the iHeart Interests may instead be Reinstated as New iHeart Common Stock with respect to the distributions of New iHeart Common Stock to Holders of Allowed iHeart Interests.  If the FCC Trust is utilized as described in the Plan, then after the FCC grants the FCC Long Form Applications, the New iHeart Common Stock and/or Special Warrants will be issued to the holders of the beneficial interests in the FCC Trust as set forth in the Plan.  The issuance of the New iHeart Common Stock and/or the Special Warrants is authorized without the need for any further corporate action and without the need for any further action by Holders of any Claims or Interests.

All of the New iHeart Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable, and the Special Warrants issued pursuant to the Plan shall be duly authorized and validly issued.  Each distribution and issuance of the New iHeart Common Stock and/or Special Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the acceptance of New iHeart Common Stock and/or Special Warrants by any Holder of any Claim or Interest shall be deemed as such Holder's agreement to the New Corporate Governance Documents and/or the Special Warrant Agreement, as applicable, as each may be amended or modified from time to time following the Effective Date in accordance with its terms.

Subject to meeting the applicable listing standards of a U.S. stock exchange, Reorganized iHeart will use its reasonable best efforts to obtain a listing for the New iHeart Class A Common Stock on a recognized U.S. stock exchange as promptly as reasonably practicable on or after the Issuance Date. Subject to meeting the applicable requirements for pink sheet trading and cooperation from a market maker, in the event that listing on a recognized U.S. stock exchange has not occurred by or on the Issuance Date, Reorganized iHeart will use its reasonable best efforts to qualify the New iHeart Class A Common Stock for trading in the pink sheets until such time as the New iHeart Class A Common Stock is listed on a recognized U.S. stock exchange.

**E.      Issuance of New Debt**

On the Effective Date, to the extent the New Debt has not been replaced with Cash proceeds of third-party market financing that becomes available on or prior to the Effective Date, iHC and its applicable Debtor Affiliates will execute the New Debt Documents, pursuant to which iHC will issue the New Debt to applicable Holders of Claims in partial exchange for such Holders' respective Claims as set forth in Article III.C hereof.  The issuance of the New Debt is authorized without the need for any further corporate action and without the need for any further action by Holders of any Claims or Interests.  All Holders of Allowed Term Loan Credit Agreement Claims, Allowed PGN Claims, and Allowed iHC 2021 / Legacy Notes Claims entitled to distributions of New Debt hereunder shall be deemed to be a party to, and bound by, the applicable New Debt Documents, regardless of whether such Holder has executed a signature page. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Debt Documents (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Debt Documents, (3) shall be deemed perfected on the Effective Date and (4) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

Subject to the occurrence of the Effective Date, the New Debt Documents shall constitute legal, valid, and binding obligations of iHC and its applicable Debtor Affiliates party thereto and shall be enforceable in accordance with their respective terms.  Each distribution and issuance of the New Debt under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the acceptance of New Debt by any Holder of any Claim shall be deemed as such Holder's agreement to the New Debt Documents, as each may be amended or modified from time to time following the Effective Date in accordance with its terms.

The Reorganized Debtors and the Holders that are granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Some or all of the New Debt may be replaced with cash proceeds of third-party market financing that becomes available on or prior to the Effective Date.  Any reduction of New Debt shall be made proportionally across all Holders of Claims and Interests that are entitled to receive New Debt under the Plan.

F.      **The New ABL Credit Agreement Documents**

On the Effective Date, iHC, the DIP Subsidiary Borrowers, and the other applicable Debtors will execute and deliver, file, record and/or issue, as applicable, the New ABL Credit Agreement Documents. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New ABL Credit Agreement Documents, and solely in the event that the Allowed DIP Claims become Converted DIP Claims, the Continuing Liens (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New ABL Credit Agreement Documents, (3) shall be deemed perfected, and (4) shall be deemed granted in good faith as an inducement to the lenders thereunder to extend credit under the New ABL Credit Agreement and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance or subordination, and the priorities of such Liens shall be as set forth in the New ABL Credit Agreement Documents.   Subject to the occurrence of the Effective Date, notwithstanding anything to the contrary in the Plan or the Confirmation Order (including, for the avoidance of doubt, Articles VIII.B and VIII.C of the Plan), the New ABL Credit Agreement Documents shall constitute legal, valid, and binding obligations of reorganized iHC, the reorganized DIP Subsidiary Borrowers, and the other applicable Reorganized Debtors party thereto and shall be enforceable in accordance with their respective terms.

Entering into the New ABL Credit Agreement Documents, and the incurrence of obligations thereunder, is authorized pursuant to the Confirmation Order without the need for (x) (i) any further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity, including the need for any further action by Holders of any Claims or Interests or (ii) further notice to the Bankruptcy Court, and (y) entry of the Confirmation Order shall be deemed approval of the New ABL Credit Agreement Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), to the extent not previously approved by the Bankruptcy Court, and shall constitute an Approval Order, as such term is defined in the New ABL Credit Agreement Term Sheet.

G.      **The CCOH Separation**

On or before the Effective Date, and pursuant to the CCOH Plan and Separation Settlement, the applicable Debtors will execute the CCOH Separation Documents, and on the Effective Date, the CCOH Separation will occur, pursuant to a Taxable Separation or a Tax-Free Separation.

To effectuate the CCOH Separation as a Taxable Separation, CCOH will merge with and into CCH, with CCH surviving the merger (the "*CCOH/CCH Merger*") on the Effective Date.   Prior to the CCOH/CCH Merger, (i) CCH will be released from its guarantee of all of the Debtors' prepetition and postpetition indebtedness, including the DIP Facility, (ii) CCH will transfer its radio subsidiaries and certain other assets to iHC, and (iii) Broader Media, LLC and CC Finco, LLC will distribute their CCOH stock to CCH.   CCH will file a Form S-4 registration statement with the SEC to register the CCOH Interests that will be issued to the CCOH Class A common stockholders in the CCOH/CCH Merger in exchange for their CCOH Class A common stock.   The CCOH Interests cannot be issued to the CCOH stockholders until (i) the SEC declares the Form S-4 registration statement effective, and (ii) 20 calendar days have passed from the mailing of an Information Statement on Schedule 14C to CCOH's Class A common stockholders. On the Effective Date, the Reorganized Debtors will transfer the CCOH Interests held by the Debtors upon completion of the CCOH/CCH Merger to Holders of Allowed Guarantor Funded Debt Unsecured Claims against CCH in exchange for such Holders' respective Claims as set forth in Article III.C of the Plan.

To effectuate the CCOH Separation as a Tax-Free Separation, on the Effective Date, the Reorganized Debtors will transfer the CCOH Interests held by the Debtors and by CC Finco, LLC and

47

Broader Media, LLC (which are non-Debtor affiliates of the Debtors) to applicable Holders of Allowed Guarantor Funded Debt Unsecured Claims against CCH in exchange for such Holders' respective Claims as set forth in Article III.C hereof.

The Confirmation Order shall constitute the Bankruptcy Court's approval of the CCOH Plan and Separation Settlement and the CCOH Separation Documents, and the CCOH Plan and Separation Settlement and the CCOH Separation shall be authorized without the need for any further action by Holders of any Claims or Interests; *provided that* CCOH (or its successor) shall have taken any and all actions required by applicable corporate law, securities laws, and stock exchange requirements. Subject to the occurrence of the Effective Date, the CCOH Separation Documents shall constitute legal, valid, and binding obligations of the Debtors and shall be enforceable in accordance with their respective terms. The distribution of CCOH Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution and by the terms and conditions of the instruments evidencing or relating to such distribution, which terms and conditions shall bind each Entity receiving such distribution, and shall be subject to compliance with applicable corporate law, securities laws, and stock exchange requirements. For the avoidance of doubt, the acceptance of the CCOH Interests by any Holder of any Claim shall be deemed as such Holder's agreement to the CCOH Separation Documents, as each may be amended or modified from time to time following the Effective Date in accordance with its terms.

Subject to meeting the applicable listing standards of a U.S. stock exchange, the Debtors or the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to cause CCOH (or its successor) to use its reasonable best efforts to obtain or maintain a listing for the CCOH Interests on a recognized U.S. stock exchange upon the effective date of the CCOH Separation.

## H.    Preferred Stock Transactions

If the Taxable Separation is effectuated pursuant to the terms and conditions set forth in Article IV.G, Radio NewCo, CCH, and CCOH (or its successor) shall enter into the Preferred Stock Transactions. Under the Preferred Stock Transactions, Radio NewCo and CCOH (or its successor) will be authorized to issue a certain number of shares of Radio NewCo Preferred Stock and CCOH Preferred Stock, respectively, on terms to be disclosed in the Preferred Stock Term Sheet. The Radio NewCo Preferred Stock will initially be issued to CCH and will be sold by CCH to one or more third party investors in exchange for Cash. Radio NewCo, CCH, and CCOH (or its successor) shall issue and execute all securities, instruments, certificates, and other documents required to effectuate the Preferred Stock Transactions. All of the shares of Radio NewCo Preferred Stock and CCOH Preferred Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. The Preferred Stock Transactions are authorized without the need for any further corporate action. If CCOH issues the CCOH Preferred Stock and CCOH subsequently merges with another entity pursuant to the Restructuring Transactions, such CCOH Preferred Stock will be exchanged for new CCOH Preferred Stock issued by the surviving entity in such merger.

CCH will distribute the Cash proceeds from the sale of the Radio NewCo Preferred Stock to iHC prior to the CCOH Separation, and iHC shall use such proceeds to fund distributions to certain Holders of Allowed Claims against the Debtors in accordance with the Plan. CCOH (or its successor) shall be entitled to retain the Cash proceeds from the sale of the CCOH Preferred Stock and use such proceeds at its discretion.

## I.    Waiver of Turnover Rights

Solely to the extent provided in Article III.C hereof and pursuant to the Plan Settlement, on the Effective Date, the Holders of Term Loan Credit Agreement Claims and PGN Claims, the Term Loan Credit

Agreement Agent, and the PGN Trustees and Agents shall be deemed to have waived their turnover rights under the 2021 Notes Indenture.

**J.      FCC Licenses**

The required FCC Long Form Applications shall be filed, as promptly as practicable.  In addition, the Debtors shall file a Petition for Declaratory Ruling; *provided that* the Debtors may file such Petition for Declaratory Ruling after the Effective Date and, if such Petition for Declaratory Ruling is filed prior to the Effective Date, its grant shall not be a condition to Consummation.  After the FCC Long Form Applications are filed, any Entity that thereafter acquires a Term Loan Credit Agreement Claim, PGN Claim, iHC 2021 / Legacy Notes Claim, or an iHeart Interest may be issued Special Warrants in lieu of any New iHeart Common Stock that would otherwise be issued to such Entity under the Plan.  In addition, the Debtors may request that the Bankruptcy Court implement restrictions on trading of Claims and Interests that might adversely affect the FCC Approval process.  The Debtors shall diligently prosecute the FCC Applications, including the Petition for Declaratory Ruling that the Debtors or Reorganized Debtors file, and shall promptly provide such additional documents or information requested by the FCC in connection with its review of the foregoing.

**K.      FCC Trust**

1.      Generally

In the event that the Debtors and the Required Consenting Senior Creditors determine that approval of the FCC Long Form Applications is causing or may cause unwanted delay in Consummation of the Plan, the Debtors shall, subject to the consent of the Required Consenting Senior Creditors, promptly seek FCC consent to establish, for the benefit of the Holders of Allowed Claims and Allowed Interests that may be entitled to distributions from the FCC Trust under the Plan, the FCC Trust; *provided that* in the event the CCOH Separation is to be consummated in a Tax-Free Separation, the use of the FCC Trust shall be subject to concluding that the use of such trust will not cause the Tax-Free Separation to fail to be tax-free or otherwise prevent the implementation of the Tax-Free Separation.  The powers, authority, responsibilities, and duties of the FCC Trust and the FCC Trustees shall be set forth in and shall be governed by the FCC Trust Agreement.  The FCC Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, provisions necessary to ensure the continued treatment of the FCC Trust as a "grantor trust" and a "liquidation trust," and the beneficiaries of the FCC Trust as the grantors and owners thereof, for United States federal income tax purposes; *provided that* to the extent any assets of the FCC Trust are subject to uncertain distribution because of any unliquidated, disputed, or contingent claims, such assets shall be held in a sub-account subject to treatment as a disputed ownership fund for United States federal income tax purposes.  The FCC Trust and the FCC Trustees, including any successors, shall be bound by the Plan and shall not challenge any provision of the Plan.

2.      Creation and Funding of the FCC Trust

On or before the Effective Date, if the FCC Trust is implemented, the FCC Trust Agreement shall be executed in a manner consistent with the Plan.  In that event, and subject to the required FCC Approval, iHeart will establish the FCC Trust in accordance with the FCC Trust Agreement for the benefit of the Holders of Allowed Claims and Allowed Interests that may be entitled to distributions from the FCC Trust under the Plan, and iHeart will deposit with the FCC Trust the minimum amount necessary for the recognition of the FCC Trust for United States federal income tax purposes.

3.        Appointment of the FCC Trustees

On the Effective Date, and in compliance with the provisions of the Plan and the FCC Trust Agreement, if the FCC Trust is implemented, the Debtors will appoint the FCC Trustees in accordance with the FCC Trust Agreement and, thereafter, any successor FCC Trustees shall be appointed and serve in accordance with the FCC Trust Agreement. The FCC Trustees or any successor thereto will administer the FCC Trust in accordance with the Plan and the FCC Trust Agreement.

4.        Contributions to the FCC Trust

If the FCC Trust is utilized as described in the Plan, Reorganized iHeart shall issue the New iHeart Common Stock and/or Special Warrants to the FCC Trust on the Effective Date for the benefit of the Holders of Allowed Term Loan Credit Agreement Claims, Allowed PGN Claims, Allowed iHC 2021 / Legacy Notes Claims, and Allowed iHeart Interests that otherwise would have been entitled to receive a distribution of such New iHeart Common Stock and/or Special Warrants pursuant to Article III.C of the Plan.

5.        Treatment of the FCC Trust

For all federal income tax purposes, the Debtors intend that, other than with respect to any assets of the FCC Trust that are subject to potential disputed claims of ownership or uncertain distributions, (a) the FCC Trust be classified as a "liquidating trust" under Section 301.7701-4(d) of the Regulations and qualify as a "grantor trust" under Section 671 of the Tax Code and (b) any beneficiaries of the FCC Trust will be treated as grantors and deemed owners thereof.  Accordingly, for all United States federal income tax purposes, it is intended that any beneficiaries of the FCC Trust be treated as if they had received a distribution of an undivided interest in the assets of the FCC Trust (*i.e.*, the New iHeart Common Stock and/or Special Warrants) and then contributed such undivided interest to the FCC Trust.  In the event the FCC Trust is implemented, the FCC Trustees shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the FCC Trust pursuant to the Plan and the FCC Trust Agreement and not unduly prolong its duration.  The FCC Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the FCC Trust Agreement.

With respect to any of the assets of the FCC Trust that are subject to potential disputed claims of ownership or uncertain distributions, the Debtors intend that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Regulations.  Any such disputed ownership fund will be subject to separate entity taxation.

6.        Transferability of Beneficial Interests

Ownership of a beneficial interest in the FCC Trust shall be uncertificated and shall be in book entry form.  The beneficial interests in the FCC Trust will not be registered pursuant to the Securities Act, as amended, or any state securities law.  If the beneficial interests in the FCC Trust constitute Securities, the parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to the beneficial interests.  The beneficial interests will be transferable, subject to the terms of the FCC Trust Agreement.

7.        Distributions; Withholding

In the event the FCC Trust is implemented, the FCC Trustees or the Distribution Agent shall make distributions to the beneficiaries of the FCC Trust when and as authorized pursuant to the FCC Trust Agreement in compliance with the Plan and the FCC Approval, *provided that* distributions to Holders of

Allowed Notes Claims may be made to or at the direction of the applicable Notes Trustees and Agents and the iHeart Transfer Agent, each of which may act (but is not required to) as Distribution Agent for distributions from the FCC Trust to the respective Holders of such Claims in accordance with the Plan (including as provided in, and subject to the limitations set forth in, Article VI.C.1 of the Plan) and the applicable indentures in the case of the Allowed Notes Claims, subject to implementing a mechanism with respect to the beneficial interests in the FCC Trust to be held by Holders of Allowed Notes Claims and Allowed iHeart Interests.  The FCC Trustees may withhold from amounts otherwise distributable from the FCC Trust to any Entity any and all amounts required to be withheld by the FCC Trust Agreement or any law, regulation, rule, ruling, directive, treaty, or other governmental requirement, including the FCC Approval, and in accordance with Article VI.D of the Plan.

        8.      Termination of the FCC Trust

To the extent created, the FCC Trust shall terminate as soon as practicable, but in no event later than the third anniversary of the Effective Date; *provided that*, on or after the date that is less than 30 days before such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the FCC Trust for a finite period if such an extension is necessary to complete any pending matters required under the FCC Trust Agreement; *provided further that* the aggregate of all extensions shall not exceed two years unless the FCC Trustees receive an opinion of counsel or a favorable ruling from the Internal Revenue Service to the effect that any such extension would not adversely affect the status of the FCC Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Regulations. Notwithstanding the foregoing, multiple extensions may be obtained so long as the conditions in the preceding sentence are met no more than six months prior to the expiration of the then-current termination date of the FCC Trust.

## L.    Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

## M.    New Corporate Governance Documents

To the extent advisable or required under the Plan or applicable non-bankruptcy law, on the Effective Date, except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, the Reorganized Debtors will file their respective New Corporate Governance Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation or formation in accordance with the applicable corporate or formational laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Corporate Governance Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend, amend and restate, supplement, or modify the New Corporate Governance Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation or formation and the New Corporate Governance Documents.

N.     **New Boards**

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose at or prior to the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Boards. To the extent any such Person is an Insider, the Debtors also will disclose the nature of any compensation to be paid to such Person. Each such Person shall serve from and after taking office pursuant to the terms of the applicable New Corporate Governance Documents.

1.     Reorganized iHeart

On the Issuance Date, the members of the New Board of Reorganized iHeart shall take office and replace the then-existing Board of Directors of iHeart. All directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board. The New Board of Reorganized iHeart shall consist of nine voting members. The Board Selection Committee shall be responsible for interviewing and selecting the remaining members. The Chief Executive Officer and President/Chief Operating Officer/Chief Financial Officer of iHeart shall have the right to consult with the Board Selection Committee regarding such candidates. The Board Selection Committee may take recommendations for potential directors from the Chief Executive Officer and President/Chief Operating Officer/Chief Financial Officer of iHeart, a qualified search firm, or any of the Consenting Stakeholders. The Board Selection Committee shall consult with the Chief Executive Officer and President/Chief Operating Officer/Chief Financial Officer of iHeart to determine an appropriate number of independent directors.

If the New iHeart Common Stock is issued to the FCC Trust, during the period of time that the New iHeart Common Stock is held by the FCC Trust (pending the FCC's grant of the FCC Long Form Applications), then the board of directors of Reorganized iHeart shall consist of the same individuals as the FCC Trustees.

2.     CCOH (Or Its Successor)

The Board Selection Committee shall interview and select individuals to be nominated and elected by the CCOH board of directors to serve on the board of CCOH or its successor with terms commencing prior to the distribution of CCOH Interests on the Effective Date to applicable Holders of Allowed Guarantor Funded Debt Unsecured Claims against CCH. The election process shall be done in compliance with applicable corporate law and securities law requirements, and the composition of the board of CCOH or its successor shall be in compliance with applicable requirements of any stock exchange on which the CCOH Interests will be listed.

O.     **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1) selection of the directors, managers, members, and officers for the Reorganized Debtors; (2) the distribution of the New iHeart Common Stock and Special Warrants or, if applicable, the beneficial interests in the FCC Trust; (3) the applicable Reorganized Debtors' entry into, delivery, and performance under the New Debt Documents; (4) the applicable Reorganized Debtors' entry into, delivery, and performance under the New ABL Credit Agreement Documents; (5) the Preferred Stock Transactions (if any); (6) implementation of the Restructuring Transactions and performance of all actions and transactions contemplated hereby and thereby; (7) adoption of the New

Corporate Governance Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (9) implementation of the CCOH Plan and Separation Settlement and the transactions contemplated thereby; and (10) all other acts or actions contemplated by the Plan or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New iHeart Common Stock, the Special Warrants, the New Debt Documents, the New ABL Credit Agreement Documents, the Radio NewCo Preferred Stock, the CCOH Preferred Stock, the New Corporate Governance Documents, and, if applicable, the FCC Trust Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.O shall be effective notwithstanding any requirements under non-bankruptcy law.

**P.      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property in each Debtor's Estate, all Causes of Action of the Debtors (unless otherwise released or discharged pursuant to the Plan or the CCOH Plan and Separation Settlement), and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New Debt Documents, Liens securing obligations under the New ABL Credit Agreement Documents (including the Contingent DIP Obligations secured by the New ABL Credit Agreement Documents, if applicable), and Liens securing obligations on account of any Other Secured Claims that are Reinstated pursuant to the Plan).  On and after the Effective Date, except as otherwise provided herein, and subject to compliance with the applicable provisions of the Communications Act, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided that* the Bankruptcy Court shall retain jurisdiction with respect to the FCC Trust, if established, as set forth in Article XI of the Plan.

**Q.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, Certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except with respect to any Claim or Interest that is Reinstated pursuant to the Plan) shall be deemed cancelled and surrendered without any need for a Holder

to take further action with respect thereto, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; *provided that*, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or Confirmation Order, Confirmation, or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) allowing Holders to receive distributions as specified under the Plan; and (2) allowing and preserving the rights of the Term Loan Credit Agreement Agent and Notes Trustees and Agents, as applicable, to make distributions as specified under the Plan on account of Allowed Claims and Allowed Interests, as applicable, including allowing the Notes Trustees and Agents to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable Notes Indenture (including, for the avoidance of doubt, pursuant to Article VI.C.1 of the Plan).

**R.     Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Debt Documents, the New ABL Credit Agreement Documents, the New iHeart Common Stock, the Special Warrants, the CCOH Plan and Separation Settlement, the New Corporate Governance Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**S.     Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 1145 Securities shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The 1145 Securities to be issued under the Plan (1) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (2) will be freely tradable and transferable in the United States by the recipients thereof that (a) are not "affiliates" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) have not been "affiliates" within 90 days of such transfer, and (c) are not entities that are "underwriters" as defined in section 1145(b)(1) of the Bankruptcy Code, and  subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such 1145 Securities and subject to any restrictions in the New Corporate Governance Documents; *provided that* transfer of the 1145 Securities may be restricted by the Communications Act and the rules of the FCC, the New Corporate Governance Documents, the Special Warrant Agreement, and, if the FCC Trust is implemented, the FCC Trust Agreement. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the 1145 Securities to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

The 4(a)(2) Securities will be issued without registration in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, or any similar registration exemption applicable outside of the United States or, to the extent permitted by law, section 1145 of the Bankruptcy Code.  Any securities issued in reliance on Section 4(a)(2) and/or Regulation D or any similar registration exemption applicable outside of the United States will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law and subject to any restrictions in the New Corporate Governance Documents, the Communications Act and the rules of the FCC.

**T.  Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Entity) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**U.  Post-Emergence Equity Incentive Program**

On the Effective Date, the New Board(s) will adopt and implement the Post-Emergence Equity Incentive Program, to be in effect on and after the Effective Date, pursuant to which certain directors, managers, officers, and employees of the Reorganized Debtors will be granted awards on terms to be disclosed in the Plan Supplement.  The Post-Emergence Equity Incentive Program shall reserve up to eight percent of the New iHeart Common Stock on a fully diluted basis for certain managers, officers, and employees of the Reorganized Debtors in the form of options, restricted stock units, and/or other equity-based awards.

**V.  Employee Matters**

Unless otherwise provided herein or otherwise amended or modified as set forth in the Assumed Executory Contract and Unexpired Lease List, all employee wages, compensation, benefit, and incentive programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such

term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## W.    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.**  Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.  Notwithstanding the foregoing, the Texas Litigation shall be dismissed with prejudice on the Effective Date.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan.   The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.   The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## X.    Consenting Stakeholder Fees

On the Effective Date, the Reorganized Debtors shall pay all Consenting Stakeholder Fees to the extent not already paid by the Debtors.  After the Effective Date, the Reorganized Debtors shall pay all Consenting Stakeholder Fees in Cash, to the extent not already paid by the Debtors, in each case, within ten Business Days of receipt by the Reorganized Debtors of an invoice from any Entity entitled to a Consenting Stakeholder Fee for any unpaid Consenting Stakeholder Fees.

Y.      **Guarantor General Unsecured Recovery Cash Pool**

On the Effective Date, the Debtors shall establish and fund the Guarantor General Unsecured Recovery Cash Pool Account with Cash in an amount equal to the Guarantor General Unsecured Recovery Cash Pool, which shall be held in trust for distributions to Holders of Allowed Guarantor General Unsecured Claims as provided herein. The Guarantor General Unsecured Recovery Cash Pool Account (1) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors, (2) shall be held in trust to fund distributions as provided herein, and (3) no Liens, Claims, or Interests shall encumber the Guarantor General Unsecured Recovery Cash Pool Account in any way (whether on account of the New ABL Indebtedness, the New Debt, or otherwise).

Following the Effective Date, if necessary to comply with the requirements set forth in this Plan, the Reorganized Debtors shall contribute Cash to the Guarantor General Unsecured Recovery Cash Pool Account to account for the Guarantor General Unsecured Recovery Cash Pool Supplement.  In the event that Cash remains in the Guarantor General Unsecured Recovery Cash Pool after (a) the reconciliation of all General Unsecured Claims against Non-Obligor Debtors and Guarantor Debtors, and (b) all distributions have been made to Holders of Allowed General Unsecured Claims against Non-Obligor Debtors and Allowed General Unsecured Claims against Guarantor Debtors as provided herein, such Cash shall be remitted to the Reorganized Debtors.

Z.      **Dismissal of the Committee's Standing Motion and Disputed ABL Claims Objection**

The Confirmation Order shall provide that on the Effective Date, (a) the Standing Motion shall be deemed withdrawn with prejudice and (b) the Disputed ABL Claims Objection shall be deemed withdrawn with prejudice.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease (including those set forth in the Assumed Executory Contract and Unexpired Lease List) shall be deemed assumed as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) was previously assumed, assumed and assigned, or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is identified on the Rejected Executory Contract and Unexpired Lease List; or (4) is the subject of a motion to reject that is pending on the Effective Date.  On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease that is identified on the Rejected Executory Contract and Unexpired Lease List shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each

Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List or the Assumed Executory Contract and Unexpired Lease List identified in this Article V.A of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Reorganized Debtors, as applicable, no later than 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.E of the Plan, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent, or disputed.**  All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim in accordance with Article III.C of the Plan.

**D.**     **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided that* the Reorganized Debtors may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity; *provided, further, that* notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any such dispute and approving the assumption of any such Executory Contract or Unexpired Lease, the Reorganized Debtors shall have the right to reject any such Executory Contract or Unexpired Lease that is subject to dispute, whether by amending the Rejected Executory Contract and Unexpired Lease List in accordance with Article V.A of the Plan or otherwise.

At least twenty-one days prior to the first day of the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment and proposed cure amounts to be sent to applicable third parties, which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Debtors no later than seven days prior to the first day of the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

**E.**     **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed

to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## F.        Indemnification Provisions

On and as of the Effective Date, the Indemnification Provisions will be assumed by the Debtors, and shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date, and the Reorganized Debtors' governance documents shall provide for indemnification, defense, reimbursement, and limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former directors, equityholders, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals to the fullest extent permitted by law and at least to the same extent as provided under the Indemnification Provisions against any Cause of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted; *provided that* the Reorganized Debtors shall not indemnify any Person for any Cause of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence, bad faith, or willful misconduct.  None of the Reorganized Debtors will amend or restate their respective governance documents before, on, or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such rights to indemnification, defense, reimbursement, limitation of liability, or advancement of fees and expenses.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Indemnification Provisions.

## G.        Insurance Policies

Each of the Debtors' insurance policies, including each of the D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, each of the Debtors shall be deemed to have assumed all insurance policies and all agreements, documents, and instruments relating thereto, and such insurance policies and such agreements, documents, or instruments relating thereto shall re-vest in the applicable Reorganized Debtor, including each of the D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the insurance policies and any agreements, documents, or instruments relating thereto.  In addition, on and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce, limit, or restrict the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers, officers, members, and trustees of the Debtors who served in such capacity at any time prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies, shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of whether such directors, managers, officers, members, or trustees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in Article VIII, all of the Debtors' current and former directors', managers', officers', members', and trustees' rights as beneficiaries of the D&O Liability Insurance Policies are preserved to the extent set forth herein.

### 1.        Chubb and AIG Insurance Contracts

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any cure notice, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to object to or opt out of any releases):  (a) on the Effective Date (1) the Debtors shall be

deemed to have assumed all insurance policies that have been issued at any time by ACE American Insurance Company, Federal Insurance Company, and/or each of their affiliates and successors (together with ESIS, Inc., the "*Chubb Companies*") or National Union Fire Insurance Company of Pittsburgh, Pa. and/or each of their affiliates and successors (collectively, the "*AIG Companies*," and together with the Chubb Companies, collectively, the "*Insurers*") to any of the Debtors (or any of their predecessors), and any agreements, endorsements, addenda, schedules, documents, or instruments relating thereto (collectively, the "*Insurance Contracts*") in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code and (2) such Insurance Contracts shall vest in the Reorganized Debtors; (b) all Insurance Contracts (including any and all letters of credit and other collateral and security provided in relation thereto) and all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) thereunder, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect; (c) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Contracts (including, but not limited to, (i) any agreement to arbitrate disputes, (ii) any provisions regarding the application, provision, maintenance, use, nature and priority of collateral/security, and (iii) any provisions regarding the payment of any retention by the Debtors or Reorganized Debtors, as applicable, or any amounts within any deductible by the Insurers, and the obligation of the Debtors to pay or reimburse the Insurers therefor); any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred; (d) nothing alters or modifies the duty, if any, that the Insurers have to pay claims covered by the Insurance Contracts and the Insurers' right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor subject to the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred; (e) the claims of the Insurers (whether arising before or after the Effective Date) under the Insurance Contracts (i) shall be paid in full in the ordinary course of business by the Debtors (or after the Effective Date, the Reorganized Debtors) and the Insurers shall not need to or be required to file or serve an Administrative Claim, a Cure Claim, or an objection to a proposed cure amount, and (ii) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; and (f) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.E of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against the Insurers under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the  ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any of the Insurers under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all fees, costs, and expenses in relation to each of the foregoing; (III) the Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the Insurers may determine; and (IV) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the foregoing.  For the avoidance of doubt, the Insurance Contracts shall include D&O Liability Insurance Policies to the extent such policies are issued by the Insurers.

**H.      Reservation of Rights**

Neither the exclusion nor the inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contract and Unexpired Lease List or the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

**I.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**J.      Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by the entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the next Distribution Date after such Claim or Interest becomes, as applicable, an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Interest shall receive the full amount of distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Distribution Agent.  Specifically with respect to Holders of Allowed Guarantor General Unsecured Claims, each such Holder shall receive from the Guarantor General Unsecured Claims Pool Account (1) an initial distribution in Cash equal to 45 percent of such Holder's Allowed Guarantor General Unsecured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if such Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes an Allowed Claim) and (2) upon completion of the Claims reconciliation process, its Pro Rata share of a potential supplemental Cash distribution (i.e., the Guarantor General Unsecured Recovery Cash Pool Supplement) in accordance with Article III.C.14 of the Plan.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims or Interests shall not be

entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.      Rights and Powers of Distribution Agent**

1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

2.      Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent (including any of the Notes Trustees and Agents acting as a Distribution Agent) on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Reorganized Debtors, in each case, within ten Business Days of receipt by the Reorganized Debtors of an invoice from such Distribution Agent for any such amounts.

**C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.      Distributions Generally

Except as otherwise provided herein, the Distribution Agent shall make all distributions required under the Plan.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of Allowed Notes Claims and Allowed iHeart Interests may be made to or at the direction of the applicable Notes Trustees and Agents, the iHeart Transfer Agent, or the CCOH Transfer Agent, as applicable, each of which may act as Distribution Agent (or direct the Distribution Agent) for distributions to the respective Holders of such Claims or Interests in accordance with the Plan and the applicable indentures in the case of Allowed Notes Claims.  As applicable, the Notes Trustees and Agents, the iHeart Transfer Agent, and the CCOH Transfer Agent may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.  Notwithstanding anything to the contrary herein, such distributions shall be subject in all respects to any rights of the Notes Trustees and Agents, the iHeart Transfer Agent, and the CCOH Transfer Agent to assert a charging lien against such distributions.  For the avoidance of doubt, The Bank of New York Mellon, in its capacity as Legacy Notes Trustee for the issuance of the 5.50% Legacy Notes, shall have the right to assert a charging lien against distributions that would have been made to the 5.50% Legacy Notes but are instead being distributed to Holders of the non-5.50% Legacy Notes pursuant to the Plan.  All distributions to be made to Holders of Allowed Notes Claims and Allowed iHeart Interests through DTC shall be made eligible for distribution through the facilities of DTC and, for the

avoidance of doubt, under no circumstances will any of the Notes Trustees and Agents be responsible for making or required to make any distribution under the Plan to Holders of Allowed Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests, including Claims and Interests that become Allowed Claims or Allowed Interests after the Effective Date, shall be made to Holders by the Distribution Agent:  (a) to the address of each such Holder as set forth in the Debtors' books and records (or if the Debtors have been notified in writing, on or before the date that is 10 Business Days before the Effective Date, of a change of address, to the changed address) or in the Claims Register as of the Distribution Record Date; or (b) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided that* the address for each Holder of an Allowed Claim or Allowed Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such Holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim, and one distribution may be made with respect to the aggregated Claim.  Notwithstanding anything to the contrary in the Plan, including this Article VI.C, the Debtors, the Reorganized Debtors, any Distribution Agent, the Notes Trustees and Agents, the iHeart Transfer Agent, or the CCOH Transfer Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

## 2.   Distributions on Account of Obligations of Multiple Debtors

Holders of Allowed Claims (other than Secured Term Loan / PGN Claims and Guarantor Funded Debt Unsecured Claims) may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed claim plus applicable interest, if any.

For all purposes associated with distributions under the Plan on account of any Secured Term Loan / PGN Claim, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

## 3.   Record Date of Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, distributions to Holders of Allowed Term Loan Credit Agreement Claims and Allowed iHeart Interests that are not deposited in DTC shall be made to such Holders that are listed on the register or related document maintained by the Term Loan Credit Agreement Agent or the iHeart Transfer Agent, as applicable, as of the Distribution Record Date.  The Distribution Record Date shall not apply to Notes Claims and iHeart Interests deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC.  In addition, distributions to Holders of Allowed Term Loan Credit Agreement Claims and Allowed iHeart Interests (whether or not deposited in DTC) are subject to the Equity Allocation Mechanism.

4.      Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim or Disputed Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Disputed Interest until all of the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided that*, if the Reorganized Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Disputed Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims and Allowed Interests pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.      De Minimis Distributions; Minimum Distributions

No fractional units or amounts of New iHeart Common Stock, Special Warrants, New Debt, CCOH Interests, or beneficial interests in the FCC Trust, if applicable, shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts, and such fractional amount shall be deemed to be zero. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance of a number of units or amounts of New iHeart Common Stock, Special Warrants, New Debt, CCOH Interests, or beneficial interests in the FCC Trust, if applicable, that is not a whole number, the actual distribution of units or amounts of New iHeart Common Stock, Special Warrants, New Debt, CCOH Interests, or beneficial interests in the FCC Trust, if applicable, shall be rounded as follows:  (a) fractions of greater than one-half shall be rounded to the next higher whole number; and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized units or amounts of New iHeart Common Stock, Special Warrants, New Debt, CCOH Interests, or beneficial interests in the FCC Trust, if applicable, to be distributed to Holders of Allowed Claims and Interests shall be adjusted as necessary to account for the foregoing rounding; *provided that* DTC shall be considered a single holder for purposes of distributions; and *provided further that* with respect to CCOH Interests, the foregoing rounding principles may be adjusted to prevent the total number of authorized units or amounts of CCOH Interests to be distributed to Holders of Allowed Claims and Interests from increasing.

The Distribution Agent shall not make any distributions to a Holder of an Allowed Claim or an Allowed Interest on account of such Allowed Claim or Allowed Interest of New iHeart Common Stock, Special Warrants, New Debt, CCOH Interests, beneficial interests in the FCC Trust, if applicable, or Cash where such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $100.00, and each Claim or Interest to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against or Interest in the Reorganized Debtors or their property.

6.      Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or

received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six months after the later of (x) the Effective Date and (y) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall be discharged and forever barred. Notwithstanding the foregoing, subject to Article IV.Y of the Plan, any such distribution described herein which is intended for a Holder of an Allowed Guarantor General Unsecured Claim shall be remitted to the Guarantor General Unsecured Recovery Cash Pool.

       7.     <u>Manner of Payment Pursuant to the Plan</u>

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, Automated Clearing House, or credit card, or as otherwise provided in applicable agreements; *provided, however*, that distributions of Cash to Holders of Allowed Notes Claims shall be made through the facilities of DTC.

       8.     <u>No Distributions to Holders of Intercompany Notes Claims</u>

In accordance with the waiver by each Debtor that is a Holder of an Intercompany Notes Claim of its recoveries on account of such Intercompany Notes Claim and Article III.C of the Plan, the Debtors shall implement procedures to ensure that there shall be no distributions made to any Holders of Intercompany Notes Claims on account of such Intercompany Notes Claims.

**D.     Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and any Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.     Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S.

66

dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

**F.     Claims Paid or Payable by Third Parties**

    1.     <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor (or other Distribution Agent), as applicable.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor (or other Distribution Agent), as applicable, on account of such Claim, such Holder shall, within 10 Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 10-Business Day grace period specified above until the amount is repaid.

    2.     <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, including the Chubb Insurance Contracts, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such satisfaction, such Claim may be expunged to the extent of any such satisfaction on the Claims Register by the Claims, Noticing, and Solicitation Agent without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy, including the Chubb Insurance Contracts.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance (including the Chubb Insurance Contracts), agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies (including the Chubb Insurance Contracts), agreements related thereto, and applicable non-bankruptcy law.

**G.     Setoffs and Recoupment**

Except as otherwise expressly provided for herein and except with respect to a Term Loan Credit Agreement Claim, a PGN Claim, the CCOH Due From Claim, or a 2021 Notes Claim (none of which shall be subject to setoff, recoupment, reduction, or deduction), each Debtor, Reorganized Debtor, or such Entity's designee as instructed by such Debtor or Reorganized Debtor, as applicable, may, pursuant to the

Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, setoff against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Cause of Action of any nature whatsoever that the Debtor or Reorganized Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided that* neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Causes of Action the Debtors or Reorganized Debtors may possess against such Holder.

**H.      Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim, if any.

## ARTICLE VII.

### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**A.      Resolution of Disputed Claims**

1.      Allowance of Claims and Interests

On and after the Effective Date, each of the Reorganized Debtors shall have and shall retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date, including any Cause of Action retained pursuant to Article IV.W of the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against or Interest in any Debtor shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

2.      Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors (or any authorized agent or assignee thereof) shall have the sole authority:  (a) to File, withdraw, or litigate to judgment, objections to Disputed Claims against or Disputed Interests in any of the Debtors; (b) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.       Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Disputed Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Disputed Claim; *provided that* such limitation shall not apply to Disputed Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Disputed Claim is estimated.

Each of the foregoing Disputed Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**B.       Time to File Objections to Disputed Claims and Disputed Interests.**

Any objections to Disputed Claims and Disputed Interests shall be Filed on or before the later of (1) the first Business Day following the date that is 180 days after the Effective Date and (2) such later date as may be specifically fixed by the Bankruptcy Court.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims and Disputed Interests.

**C.       Disputed Claims Reserve**

On the Effective Date, the Debtors shall establish one or more reserves of New Debt for any Disputed Claim or Disputed Interest entitled to receive New Debt to the extent such Claim or Interest is ultimately Allowed existing as of the Effective Date, which reserve(s) shall be administered by the Reorganized Debtors or the Distribution Agent, as applicable.  After the Effective Date, the Reorganized Debtors or the Distribution Agent shall hold such New Debt in such reserve(s) in trust for the benefit of the Holders of Claims and Interests ultimately determined to be Allowed after the Effective Date.  The Reorganized Debtors or the Distribution Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims and Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims and Interests as such amounts would have been distributable had such Claims and Interests been Allowed Claims and Allowed Interests as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable reserve(s).

The Debtors, the Reorganized Debtors, and CCH will distribute to Holders of Allowed Claims and Interests any New iHeart Common Stock, Special Warrants, beneficial interests in the FCC Trust (if the

FCC Trust is utilized as described in the Plan), or CCOH Interests (as applicable) when such Disputed Claims or Disputed Interests are Allowed pursuant to Article VII of the Plan.

### D.    Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E.    No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against or Interests in the Debtors, and no Holder of a Claim against or Interest in the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### F.    Disallowance of Claims

Except as otherwise expressly provided for herein, all Claims of any Entity from which property is recoverable, based on an order from the Bankruptcy Court, under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that is avoidable, based on an order from the Bankruptcy Court, under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered by the Bankruptcy Court and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.

Subject in all respects to Article V.F, all Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein, agreed to by the Reorganized Debtors or otherwise pursuant to an order of the Bankruptcy Court, all Proofs of Claim Filed after the applicable Claims Bar Date shall be deemed disallowed in full and expunged as of the Effective Date, forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

G.      **Amendments to Proofs of Claim**

A Proof of Claim against or Proof of Interest in any Debtor may be amended before the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim or Interest or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, or applicable nonbankruptcy law.  On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by the Debtors or Reorganized Debtors, as applicable; *provided that* the foregoing shall not apply to Administrative Claims other than 503(b)(9) Claims.

H.      **Distributions after Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A.      **Discharge of Claims and Termination of Interests**

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) on the Effective

Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**B.      Releases by the Debtors**

      **Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Credit Agreement Documents, the Notes and Notes Indentures, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement Documents, the New ABL Credit Agreement Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement Documents, the New ABL Credit Agreement Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including the claims and causes of action asserted in the Texas Litigation and the CCOH Litigation.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) and Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests**

of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

## C.    Releases by Holders of Claims and Interests

On and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Credit Agreement Documents, the Notes and Notes Indentures, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement Documents, the New ABL Credit Agreement Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement Documents, the New ABL Credit Agreement Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including the claims and causes of action asserted in the Texas Litigation and the CCOH Litigation. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and

opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

**D.     Exculpation**

Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement Documents, the ABL Credit Agreement Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement Documents, the ABL Credit Agreement Documents, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**E.     Injunction**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any Lien, Claim, or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action, unless such Holder has Filed a motion requesting the right to perform

such setoff on or before the Effective Date, and notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, or compromised pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former directors, managers, officers, principals, predecessors, successors, employees, agents, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E.

F.     **Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, the New Debt Documents, the New ABL Credit Agreement Documents, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than, solely in the event that the Allowed DIP Claims become Converted DIP Claims, the Continuing Liens and the Liens securing the Contingent DIP Obligations) shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Reorganized Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

G.     **Protection against Discriminatory Treatment**

To the maximum extent provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including no Governmental Unit, shall discriminate against any Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.    Recoupment

In no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## I.    Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## J.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## K.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## L.    SEC Rights Reserved

Notwithstanding any provision herein to the contrary or an abstention from voting on the Plan, no provision of the Plan, or any order confirming the Plan:  (i) releases any non-Debtor Person or Entity (including any Released Party) from any Claim or Cause of Action of the SEC; or (ii) enjoins, limits, impairs or delays the SEC from commencing or continuing any Claims, Causes of Action, proceedings or investigations against any non-Debtor Person or Entity (including any Released Party) in any forum.

## M.    Release of Preference Actions

As of the Effective Date, the Debtors, on behalf of themselves and their Estates, shall be deemed to waive and release all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law; *provided that*, except as expressly provided in this Article VIII.M or the Confirmation Order, the Reorganized Debtors shall retain the right to assert any Claims assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.      Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      The Bankruptcy Court shall have entered the Disclosure Statement Order, which order shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors, the Debtors, and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to (a) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, (b) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors, and (c) CCOH, CCOH, and such order shall be a Final Order and in full force and effect.

2.      The Bankruptcy Court shall have entered the Confirmation Order, which order shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors, the Debtors, the DIP Agent, and, solely with respect to those terms and provisions that (a) would have a material adverse effect on the value of the distributions to (i) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders and (ii) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors, (b) impact the Committee, the treatment of General Unsecured Claims, the distribution of Cash to Holders of Allowed General Unsecured Claims, and the releases and exculpation to be granted to the Committee and its members, the Committee, (c) impact the ABL Secured Parties, the ABL Agent, and (d) impact CCOH or the CCOH Plan and Separation Settlement, or impair the releases in favor of CCOH, CCOH, and such order shall not have been stayed, modified, or vacated on appeal.

3.      The Plan Supplement, including any amendments, modifications, or supplements to the documents, schedules, or exhibits included therein shall have been Filed with the Bankruptcy Court pursuant to the terms of the Plan.

4.      The Internal Revenue Service shall have issued a private letter ruling to iHeart or iHeart shall have received an opinion of counsel or accounting firm chosen by the Debtors, in each case in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Creditors, with respect to any and all matter(s) that such parties have reasonably determined that the receipt of a private letter ruling or an opinion of counsel or accounting firm is advisable with respect to the Restructuring Transactions.

5.      The Reorganized Debtors shall have executed and delivered the New ABL Credit Agreement Documents and shall have issued the New ABL Credit Agreement Indebtedness in connection therewith.

6.      All DIP Claims (other than Contingent DIP Obligations that continue Unimpaired) shall have become either Repaid DIP Claims or Converted DIP Claims.

7.      The New Debt shall have been issued by Reorganized iHC.

8.      The New iHeart Common Stock and, if necessary, the Special Warrants shall have been issued by Reorganized iHeart.

9.  If the Taxable Separation is effectuated pursuant to the terms and conditions set forth in Article IV.G, the Preferred Stock Transactions shall have occurred.

10.  The FCC Approval and any other authorizations, consents, regulatory approvals, rulings, or documents required to implement and effectuate the Plan shall have been obtained.

11.  If the FCC Trust is utilized as described in the Plan, the FCC Trust shall have been established in accordance with the provisions of the Plan and the FCC Trust Agreement.

12.  The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

13.  The Reorganized Debtors shall have entered into all documents effectuating the separation of CCOH from the Debtors, including all such documents attached to the CCOH Plan and Separation Settlement.

14.  The Restructuring Support Agreement shall not have been terminated.

15.  The Reorganized Debtors shall have paid, to the extent unpaid and invoiced at least five Business Days prior to the Effective Date, all Consenting Stakeholder Fees.

16.  All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effectuated or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units as provided for in the Plan.

17.  Each of the New Corporate Governance Documents will be in full force and effect as of the Effective Date.

18.  (a) The Required Consenting Senior Creditors shall have determined in their reasonable judgment, with the assistance of their financial and legal advisors, that (i) the aggregate amount of Allowed General Unsecured Claims against Non-Obligor Debtors classified into Class 7A is reasonably expected to be equal to or less than $4.75 million; (ii) the aggregate amount of Allowed General Unsecured Claims against the TTWN Debtors classified into Class 7B is reasonably expected to be equal to or less than $3.0 million, and (iii) the aggregate amount of Allowed iHC Unsecured Claims classified into Class 7D, excluding Term Loan / PGN Deficiency Claims, is reasonably expected to be equal to or less than $2.0 million or (b) the Bankruptcy Court shall have entered a Final Order estimating (i) the aggregate amount of Allowed General Unsecured Claims against Non-Obligor Debtors classified into Class 7A to be equal to or less than $4.75 million; (ii) the aggregate amount of Allowed General Unsecured Claims against the TTWN Debtors classified into Class 7B to be equal to or less than $3.0 million, and (iii) the aggregate amount of Allowed iHC Unsecured Claims classified into Class 7D, excluding Term Loan / PGN Deficiency Claims, to be equal to or less than $2.0 million.

19.  The Guarantor General Unsecured Recovery Cash Pool Account shall have been established and funded in Cash in accordance with Article IV.Y.

20.  The Sponsor Unsecured Claims shall have been deemed withdrawn with prejudice.

### B.      Waiver of Conditions Precedent

The Debtors may, with the prior written consent of (a) the Required Consenting Senior Creditors, (b) solely with respect to Articles IX.A.2 and IX.A.6, the DIP Agent, (c) solely with respect to Article IX.A 6, the DIP Lenders (d) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, (e) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors, (f) solely with respect to those terms and provisions that impact CCOH or the CCOH Plan and Separation Settlement, and the releases to be granted to CCOH, CCOH and (g) solely with respect to Articles IX.A.19 and IX.A.20, the Committee (in each case for (a) through (g), such consents not to be unreasonably withheld) waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan, other than the conditions set forth in (i) Article IX.A.10–11 and (ii) Article IX.A.16 (which condition may only be waived by the party entitled to payment in accordance with such condition) at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

### C.      Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur, then the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.      Modification of Plan

Subject to the limitations and terms contained in the Plan, the Debtors reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of (a) the Required Consenting Senior Creditors, (b) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, (c) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Consenting Sponsors on account of their iHeart Interests or impair the releases in favor of the Consenting Sponsors provided in the Plan, the Consenting Sponsors, (d) solely with respect to those terms and provisions that impact the Committee, the treatment of General Unsecured Claims, the distribution of Cash to Holders of Allowed General Unsecured Claims, and the releases or exculpation to be granted to the Committee and its members, the Committee, (e) solely with respect to those terms and provisions that impact the ABL Secured Parties, the ABL Agent, and (f) solely with respect to those terms and provisions that impact CCOH or the CCOH Plan and Separation Settlement, or impair the releases in favor of CCOH, CCOH and (2) after the entry of the Confirmation Order (with the consent of (a) the Required Consenting Senior Creditors, (b) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, (c) solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Consenting Sponsors on account of their iHeart Interests or impair the releases in favor of the Consenting Sponsors provided in the Plan or the

CCOH Plan and Separation Settlement, the Consenting Sponsors, (d) solely with respect to those terms and provisions that impact the Committee, the treatment of General Unsecured Claims, the distribution of Cash to Holders of Allowed General Unsecured Claims, and the releases and exculpation to be granted to the Committee and its members, the Committee, (e) solely with respect to those terms and provisions that impact the ABL Secured Parties, the ABL Agent, and (f) solely with respect to those terms and provisions that impact CCOH or the CCOH Plan and Separation Settlement, or impair the releases in favor of CCOH, CCOH, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code;  (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.        ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; *provided that* the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.        grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.        hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.        decide and resolve all matters related to the issuance of the New Debt, the New iHeart Common Stock, and the Special Warrants;

12.        enter and implement such orders as are necessary or appropriate regarding the actions of the FCC Trust pursuant to the terms of the Plan and the FCC Trust Agreement, including orders regarding the FCC Trustees' operating decisions and exercise of control over the New iHeart Common Stock and Special Warrants;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

17.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

18.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

19.     enforce all orders previously entered by the Bankruptcy Court; and

20.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.     **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory

Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

## B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; *provided that* such agreements and other documents shall be in form and substance reasonably acceptable to the Required Consenting Senior Creditors and, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to (1) the Holders of 2021 Notes Claims, the Required Consenting 2021 Noteholders, and (2) the Consenting Sponsors on account of their iHeart Interests, the Consenting Sponsors.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

## D.    Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve, and members thereof shall be released from all rights and duties from or related to the Chapter 11 Cases, provided, however, that the Committee will stay in existence solely for the limited purpose of (a) filing and prosecuting final fee applications, and (b) participating in any adversary proceeding commenced after the date of this Plan in which the Committee is named as a defendant, including any appeals thereof.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except for the fees and expenses incurred by the Committee's professionals in connection with the matters identified in clauses (a) and (b) of the foregoing sentence.

## E.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

## F.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

## G.     Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| Reorganized Debtors | **iHeartMedia, Inc.**<br>20880 Stone Oak Parkway<br>San Antonio, Texas, 78258<br>Attention:  Robert Walls, General Counsel |
| | with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Anup Sathy, P.C., William A. Guerrieri, Brian D. Wolfe, and Benjamin M. Rhode |
| | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Christopher J. Marcus, P.C. |
| Counsel to the Term Loan / PGN Group | **Jones Day**<br>555 South Flower Street<br>Fiftieth Floor<br>Los Angeles, California 90071<br>Attention:  Bruce Bennett, Joshua M. Mester, and James Johnston |
| Counsel to the Term Lender Group | **Arnold & Porter Kaye Scholer LLP**<br>70 W. Madison Street, Suite 4200<br>Chicago, IL 60602<br>Attention:  Michael D. Messersmith |
| | **Arnold & Porter Kaye Scholer LLP**<br>250 W. 55th Street<br>New York, NY 10019<br>Attention:  Alan Glantz |
| Counsel to the 2021 Noteholder Group | **Gibson, Dunn & Crutcher LLP**<br>333 South Grand Avenue<br>Los Angeles, California 90071<br>Attention:  Robert Klyman and Matthew J. Williams |

| | |
|---|---|
| Counsel to the Consenting Sponsors | **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:  Matthew S. Barr and Gabriel A. Morgan |
| Counsel to the DIP Agent | **Davis Polk & Wardwell LLP**<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention:  Eli J. Vonnegut and Stephen D. Piraino |
| Counsel to the Committee | **Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park<br>New York, New York 10036<br>Attention:  Ira S. Dizengoff, Philip C. Dublin, and Naomi Moss |
| Counsel to the CCOH Special Committee | **Willkie Farr & Gallagher LLP**<br>787 Seventh Avenue<br>New York, New York 10019<br>Attention:  Matthew A. Feldman and Paul V. Shalhoub |
| Counsel to CCOH | **Wilson Sonsini Goodrich & Rosati, P.C.**<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Attention:  Benjamin Hoch |
| Counsel to GAMCO Asset Management, Inc. | **Entwistle & Cappucci, LLP**<br>299 Park Avenue, 20th Floor<br>New York, New York 10171<br>Attention:  Andrew J. Entwistle |

## H.    Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan. Except as set forth in the Plan, in the event that any provision of the Restructuring Support Agreement, the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.      Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.primeclerk.com/iheartmedia or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.      Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors in consultation with the Required Consenting Senior Creditors and the Required Consenting 2021 Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, the New Corporate Governance Documents, the New Debt Documents, the New ABL Credit Agreement Documents, as any of such documents may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to their terms; (2) integral to the Plan and may not be deleted or modified without the consent of the parties thereto; and (3) non-severable and mutually dependent.

## K.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Stakeholders, and each of their respective Affiliates, and each of their and their Affiliates' agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, in each case solely in their respective capacities as such, will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

## L.      Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**M.** **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

**N.** **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Dated:  [_____], 2018                          IHEARTMEDIA, INC.
                                               on behalf of itself and all other Debtors

                                               _____

                                               Scott Hamilton
                                               Chief Accounting Officer
                                               iHeartMedia, Inc.

## **EXHIBIT E**

**Stipulation and Proposed Order of Dismissal**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

NORFOLK COUNTY RETIREMENT
SYSTEM, derivatively on behalf of all
other similarly situated stockholders of
CLEAR CHANNEL OUTDOOR
HOLDINGS, INC.,

                  Plaintiff,

           v.

BLAIR E. HENDRIX, DOUGLAS L.
JACOBS, DANIEL G. JONES,
VICENTE PIEDRAHITA, ROBERT
W. PITTMAN, OLIVIA SABINE,
DALE W. TREMBLAY,
IHEARTCOMMUNICATIONS, INC.,
IHEARTMEDIA, INC., BAIN
CAPITAL PARTNERS, LLC, and
THOMAS H. LEE PARTNERS, L.P.,

                  Defendants,

        -and-

CLEAR CHANNEL OUTDOOR
HOLDINGS, INC.,

                  Nominal Defendant.

C.A. No. 2017-0930-JRS

## STIPULATION AND [PROPOSED] ORDER OF DISMISSAL

WHEREAS, on December 29, 2017, Plaintiff Norfolk County Retirement

System ("Norfolk") commenced this derivative action on behalf of Clear Channel

Outdoor Holdings, Inc. ("CCOH");

WHEREAS, on March 6, 2018, Defendants moved to dismiss Norfolk's claims, and such motion was argued on September 20, 2018 and is still pending as of the date of the below defined Global Settlement;

WHEREAS, on March 14, 2018, iHeartMedia, Inc. and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code;

WHEREAS, on December 16, 2018, the Debtors, the parties to the above captioned action, and other parties in interest agreed to a global settlement that covers and releases all of Norfolk's claims (the "Global Settlement"); and

WHEREAS, on January, [●], 2019, the Bankruptcy Court approved the Global Settlement, including the adequacy of notice to be provided to CCOH stockholders notifying CCOH stockholders that, among other things, (i) Norfolk's claims in this action will be dismissed with prejudice as a result thereof, and (ii) Norfolk's counsel will receive a fee of $2,450,000 in the aggregate in connection with the Global Settlement.

IT IS HEREBY ORDERED this ___ day of _____, 2019, that:

1.      Plaintiff's Verified Derivative Complaint is DISMISSED with prejudice.

LABATON SUCHAROW LLP

/s/
_____
Ned Weinberger (#5256)
Thomas Curry (#5877)
300 Delaware Ave., Suite 1340
Wilmington, DE 19801
(302) 573-2540

GRANT & EISENHOFER P.A.

/s/
_____
Jay W. Eisenhofer (#2864)
Michael J. Barry (#4368)
Mary S. Thomas (#5072)
123 Justison Street
Wilmington, DE 19801
(302) 622-7000

OF COUNSEL:

|
|
|
|
|
|
|

*Counsel for Plaintiff*

WILSON SONSINI GOODRICH & ROSATI, P.C.

/s/
_____
William B. Chandler III (#116)
Bradley D. Sorrels (#5233)
Lori W. Will (#5402)
Andrew D. Berni (#6137)
222 Delaware Avenue, Suite 800
Wilmington, DE 19801
(302) 304-7600

*Counsel for Defendants Blair E. Hendrix, Douglas L. Jacobs, Daniel G. Jones, Vicente Piedrahita, Robert W. Pittman, Olivia Sabine, Dale W. Tremblay and Nominal Defendant Clear Channel Outdoor Holdings, Inc.*

ROSS ARONSTAM & MORITZ LLP

/s/
_____
David E. Ross (#5228)
Bradley R. Aronstam (#5129)
100 South West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600

OF COUNSEL:

Kevin B. Huff
Brendan J. Crimmins
KELLOGG HANSEN TODD FIGEL & FREDERICK, PLLC
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Defendants iHeartMedia, Inc., iHeartCommunications, Inc., Bain Capital Partners, LLC, and Thomas H. Lee Partners, L.P.*

3

SO ORDERED this _____ day of _____, 2019.


_____
Vice Chancellor Joseph R. Slights III

**Exhibit 2**

**Class Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

NOTICE OF (I) PENDENCY OF PROPOSED SETTLEMENT
AMONG THE DEBTORS, CCOH, THE SPONSOR ENTITIES,
THE DELAWARE INDIVIDUAL DEFENDANTS, AND THE
SETTLING PLAINTIFFS, (II) SETTLEMENT FAIRNESS
HEARING, AND (III) PAYMENT OF SETTLING PLAINTIFFS'
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

*This notice relates to a proposed settlement*
*agreement among the Debtors, CCOH, the Sponsor*
*Entities, the Delaware Individual Defendants, and the Settling Plaintiffs.[2]*

*A Federal Court authorized this notice.  This is not a solicitation from a lawyer.*

PLEASE READ THIS NOTICE CAREFULLY.  THIS NOTICE EXPLAINS IMPORTANT
RIGHTS YOU MAY HAVE, INCLUDING THE POSSIBLE RELEASE OF CERTAIN
CLAIMS.  IF YOU ARE A MEMBER OF THE CLASS, YOUR LEGAL RIGHTS WILL BE
AFFECTED WHETHER OR NOT YOU ACT.  IF YOU HAVE ANY QUESTIONS ABOUT
THIS NOTICE, THE PROPOSED SETTLEMENT AGREEMENT, OR YOUR
PARTICIPATION IN THE PROPOSED SETTLEMENT, PLEASE DO NOT CONTACT THE
BANKRUPTCY COURT, THE SETTLING DEFENDANTS, THE DEBTORS, CCOH, OR
THEIR COUNSEL.  ALL QUESTIONS SHOULD BE DIRECTED TO CLASS COUNSEL OR
THE NOTICE ADMINISTRATOR.  A HEARING TO DETERMINE THE FAIRNESS OF
THE SETTLEMENT AGREEMENT AND TO FINALLY APPROVE THE SETTLEMENT
AGREEMENT WILL BE HELD ON JANUARY 22, 2019 AT 8:30 A.M., PREVAILING
CENTRAL TIME, BEFORE THE HONORABLE MARVIN ISGUR AND THE HONORABLE
LEE ROSENTHAL, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.

---

[1]  Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]  Capitalized terms not defined herein shall have the meanings set forth in the Settlement Agreement.

To:  The putative class of public shareholders of Class A common stock of Clear Channel Outdoor Holdings, Inc. ("CCOH") during the period from March 14, 2015 to March 14, 2018 (the "Class Period," and the shareholders except for GAMCO and Norfolk, the "Remaining Minority Shareholders").

## INTRODUCTION

On March 14, 2018 (the "Petition Date"), iHeartMedia, Inc. ("iHM"), and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code.

On August 27, 2018, GAMCO Asset Management, Inc. ("GAMCO") filed a verified class action complaint (the "GAMCO Complaint") in the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") on behalf of itself and the Class (as defined herein) against the Delaware Individual Defendants (as defined herein) and the Sponsor Entities (as defined herein).  That case is captioned *GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) (the "GAMCO Action").

On December 29, 2017, Norfolk County Retirement System ("Norfolk") filed a verified derivative complaint (the "Norfolk Complaint") on behalf of CCOH against certain of the Delaware Individual Defendants, the Sponsor Entities, and the Debtors in the Delaware Court of Chancery.  The Norfolk Action is captioned *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (Del. Ch.) (the "Norfolk Action," and together with the GAMCO Action, the "Delaware Actions").

 GAMCO (the "Class Representative," and together with the Remaining Minority Shareholders and Norfolk, the "Settling Plaintiffs," each person or entity a "Class Member," and together the "Class"), individually, on behalf of the Class, and derivatively on behalf of CCOH, CCOH, the Debtors, Norfolk, individually and on behalf of CCOH, the Sponsor Entities, Bain Capital LP, and the Delaware Individual Defendants (collectively, the "Parties"), have reached a proposed settlement to resolve claims and objections in connection with the Debtors' chapter 11 cases (the "Chapter 11 Cases") and the Delaware Actions, and to effectuate the separation of the iHeart and CCOH businesses (the "Separation") as memorialized in the *Settlement Agreement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs* dated as of December 16, 2018 (the "Settlement Agreement") and incorporated into the *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2207] (the "Plan").  As described below, the benefits of the Settlement Agreement will inure to the Class Members.  The Parties believe that entry into the Settlement Agreement is in the best interests of the Settling Parties and other parties in interest.

This notice constitutes notice to the Class Members of (a) the proposed Settlement Agreement which resolves claims in the Chapter 11 Cases and the Delaware Actions and sets forth the terms of the Separation, (b) the attorneys' fees and expenses to be paid by the Debtors in the Chapter 11 Cases to Entwistle & Cappucci LLP, Labaton Sucharow LLP, Grant & Eisenhofer

P.A., and Friedman Oster & Tejtel PLLC (collectively, "Settling Plaintiffs' Counsel"), (c) the ability of each Class Member to object to or comment on the Settlement Agreement and Settling Plaintiffs' Counsel's attorneys' fees and Litigation Expenses (as defined herein) and to appear at the Fairness Hearing (as defined herein) at which the Bankruptcy Court will consider final approval of the Settlement Agreement and Settling Plaintiffs' Counsels' attorneys' fees and expenses, and (d) the date of the hearing (the "Fairness Hearing") before the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") to determine the fairness, to grant final approval of the Settlement Agreement as part of confirmation of the Plan, and to award Settling Plaintiffs' Counsels' attorneys' fees and Litigation Expenses.

The hearing to consider Confirmation of the Plan, which commenced on December 11, 2018, at 9:00 a.m., prevailing Central Time before the Honorable Marvin Isgur, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, Texas 77002 (the "Confirmation Hearing"), has been continued as set forth below and in the *Order Regarding Confirmation Hearing Dates* [Docket No. 2171] (the "Confirmation Scheduling Order") entered by the Bankruptcy Court on December 11, 2018 (all times, prevailing Central Time):

- **January 10, 2019 at 9:00 a.m.** to consider all confirmation issues other than those scheduled to be heard on January 17, 2019 and January 22, 2019.

- **January 17, 2019 at 9:00 a.m.** to consider all issues concerning the CCOH Separation Settlement, other than those issues scheduled to be heard on January 22, 2019.

- **January 22, 2019 at 8:30 a.m.** to consider all remaining issues concerning consideration of the class action settlement related to the CCOH Separation Settlement and the GAMCO Motion.

- **January 23, 2019 at 2:30 p.m.** to consider all remaining confirmation issues.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **OBJECT TO THE SETTLEMENT AGREEMENT BY SUBMITTING A WRITTEN OBJECTION SO THAT IT IS RECEIVED NO LATER THAN JANUARY 14, 2019.** | If you do not like the Settlement Agreement or the payment of Settling Plaintiffs' Counsels' attorneys' fees and reimbursement of reasonable costs and expenses incurred in connection with representing GAMCO, Norfolk, and the Proposed Settlement Class in connection with the Chapter 11 Cases ("Litigation Expenses"), you may write to the Bankruptcy Court and explain why you do not like them. You cannot object to the Settlement Agreement or the payment of fees and Litigation Expenses unless you are a Class Member. If the Settlement Agreement is approved over your objection, you will be bound by the Settlement. You do not have the right to request exclusion from the Settlement. |

3

| | |
|---|---|
| **GO TO A HEARING ON JANUARY 22, 2019 AT 8:30 A.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS RECEIVED NO LATER THAN JANUARY 14, 2019.** | Filing a written objection and notice of intention to appear by January 14, 2019 allows you to speak in Bankruptcy Court, at the discretion of the Bankruptcy Court, about the fairness of the Settlement Agreement and/or the payment of attorneys' fees and Litigation Expenses.  If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Bankruptcy Court, speak to the Bankruptcy Court about your objection.  If the Settlement Agreement is approved over your objection, you will be bound by the Settlement. You do not have the right to request exclusion from the Settlement. |
| **DO NOTHING.** | If you are a member of the Class and you do nothing and the Settlement Agreement is approved, then you will be bound by the Settlement and may be bound by any judgments or orders entered by the Delaware Court of Chancery related to the Delaware Actions. |

## DESCRIPTION OF THE CLAIMS

The GAMCO Complaint named as defendants: (a) members of the board of directors for CCOH as of November 29, 2017, including Blair Hendrix, Douglas L. Jacobs, Daniel G. Jones, Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, and Dale W. Tremblay (collectively, the "Board Defendants"); (b) members of the committee appointed by the board of directors for CCOH to monitor the Revolving Promissory Note, dated November 10, 2005, between iHeartCommunications, Inc. ("iHC"), as maker, and CCOH, as payee, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "Intercompany Note") as of November 8, 2017 (the "Intercompany Note Committee Defendants" together with the Board Defendants, the "Delaware Individual Defendants"); and (c) Bain Capital Partners, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL," and together with Bain, the "Sponsor Entities," and together with the Delaware Individual Defendants, iHC, and iHM, the "Settling Defendants").

The GAMCO Complaint alleges that in November 2017, the Delaware Individual Defendants breached their fiduciary duties owed to the Class relating to the Intercompany Note. The GAMCO Complaint alleges that the Delaware Individual Defendants breached their fiduciary duties by failing to exercise rights available to them to cause CCOH to demand repayment under the Intercompany Note—or to allow the Intercompany Note to mature, which would result in a demand for repayment—and to simultaneously declare a *pro rata* dividend to CCOH's shareholders.

The GAMCO Complaint also alleges that the Sponsor Entities breached fiduciary duties owed to the Class by failing to direct the Board Defendants to let the Intercompany Note mature

4

and to declare a corresponding dividend.  Alternatively, the GAMCO Complaint asserts that the Sponsor Entities aided and abetted alleged breaches of fiduciary duty by the Board Defendants by failing to direct the Board Defendants to permit the Intercompany Note to mature and to declare a dividend.

The GAMCO Complaint seeks declaratory relief and damages for the Class.

The Norfolk Complaint named as defendants:  (a) certain of the Board Defendants, (b) the Sponsor Entities, and (c) iHC and iHM.  The Norfolk Complaint also named CCOH as a nominal defendant.  Similarly to the GAMCO Complaint, the Norfolk Complaint challenged the decision to extend the maturity of the Intercompany Note at the agreed upon interest rate.  The Norfolk Complaint seeks declaratory and other equitable relief derivatively on behalf of CCOH.

In the Chapter 11 Cases, on September 5, 2018, CCOH timely filed its proof of claim against each Debtor entity, which included a liquidated claim in the amount of $1,031,721,306.00 on account of the Intercompany Note.  On the same date, GAMCO filed in the Chapter 11 Cases *GAMCO Asset Management, Inc.'s Limited Objection to the Debtors' Motion for Approval of the Disclosure Statement* [Docket No. 1406] objecting to the release provisions contained in the Plan and reserving its rights with respect to confirmation of the Plan.  GAMCO threatened to object to confirmation of the Plan based on the treatment of the balance of the Intercompany Note owed to CCOH.

On November 28, 2018, Norfolk filed in the Chapter 11 Cases the *Limited Objection of Norfolk County Retirement System to the Approval of Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2055] objecting to the release provisions contained in the Plan.

## THE PROPOSED SETTLEMENT AGREEMENT

On March 16, 2018, the Debtors entered into a restructuring support agreement (the "Restructuring Support Agreement") with groups representing their primary creditors and stakeholders.  The Restructuring Support Agreement and the Plan contemplate the Separation occurring on the effective date of the Plan (the "Effective Date").

The Settlement Agreement reflects the final and binding agreement between the Settling Defendants, the Settling Plaintiffs, the Debtors, and CCOH (collectively, the "Settling Parties") with respect to the Delaware Actions, the Plan, and the Separation.  The Class Representative, based upon its respective investigation and prosecution of the Delaware Actions and prior related litigation, as well as their pursuit of claims and objections in the Chapter 11 Cases, have concluded that the terms and conditions of the Settlement Agreement are fair, reasonable, adequate, and in the best interests of the Class.  The Settlement Agreement is the product of months of hard-fought, good-faith, arms'-length negotiations between the Debtors, the special committee of independent directors established by the board of directors of CCOH on January 23, 2018, to consider, review, and negotiate certain transactions between the Debtors and CCOH in connection with the Debtors' Chapter 11 Cases (the "CCOH Special Committee"), GAMCO, and other constituents, that (a) provides CCOH with sufficient liquidity to operate as a stand-alone enterprise following the Separation, (b) obtains the support of the Settling Parties for the Plan and the Separation, and

(c) settles outstanding issues among the Parties, including those related to the Plan and the Delaware Actions, bringing to a close what may have otherwise turned into expensive, protracted, and complex litigation that would have likely delayed the Debtors' emergence from chapter 11.

As shareholders of CCOH, Class Members have a direct interest in ensuring that CCOH is adequately capitalized following the Separation to preserve their equity investment.  Additionally, without the Settlement Agreement, the Class Members face uncertainty regarding the outcome of the Delaware Actions; even assuming the Class Representative or Norfolk were to prevail at trial or in their respect Delaware Action, it could take years for Class Members to receive any payment on their alleged claims.  By way of the Settlement Agreement, Class Members will be able to realize an immediate benefit from their equity interest in CCOH, which will be bolstered by the additional consideration being provided by the Debtors to CCOH.

Based on the Class Representative's direct oversight of the prosecution of the GAMCO Action and with the advice of Class Counsel, the Class Representative has agreed to settle and release the claims described above and specified in the Settlement Agreement against the Settling Defendants, CCOH, the Debtors, and their respective current and former officers, directors, employees, employers, parent entities, controlling persons, principals, affiliates or subsidiaries, partners, stockholders, representatives, members, agents, attorneys, financial or investment advisers, consultants, accountants, investment bankers, commercial bankers, executors, trustees, heirs, administrators, predecessors, successors, insurers, reinsurers, and assigns, if any (collectively, the "Settling Defendants'/Company's Releasees") and all other causes of action that have been asserted or could be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases, the GAMCO Action, or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things:  (a) the substantial financial benefit that the Settling Plaintiffs and CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation and trial against the Settling Defendants.  The Settlement Agreement constitutes a compromise of all matters that are in dispute between the Settling Parties.

Based on Norfolk's direct oversight of the prosecution of the Norfolk Action and with the advice of Settling Plaintiffs' Counsel, Norfolk has agreed to settle and release the claims described above and specified in the Settlement Agreement against the Settling Defendants'/Company's Releasees and all other causes of action that have been asserted or could be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases, the Norfolk Action, or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of this Settlement, pursuant to the terms and provisions of this Settlement Agreement, after considering, among other things:  (a) the substantial financial benefit that the Settling Plaintiffs and CCOH will receive under this Settlement Agreement; and (b) the significant risks and costs of continued litigation and trial against the Settling Defendants.  The Settlement Agreement constitutes a compromise of all matters that are in dispute between the Settling Parties.

## THE TERMS OF THE SETTLEMENT

The following description of the proposed Settlement Agreement is only a summary.  In the event of any difference between this summary and the terms of the Settlement Agreement, the terms and conditions of the Settlement Agreement shall control.  You may secure a copy of the Settlement Agreement from Class Counsel or from Prime Clerk LLC (the "Notice Administrator") at the address shown below.  The terms of the Settlement Agreement relevant to the Class Members are summarized as follows:

**Full Separation of CCOH.**  As of the Effective Date, a corporate separation of CCOH from the Debtors will occur, pursuant to which: (i) the cash sweep arrangement under the existing Corporate Services Agreement (the "CSA") will terminate; (ii) any agreements or licenses requiring royalty payments to the Debtors by CCOH for trademarks or other intellectual property will terminate (with such termination to become effective as of December 31, 2018); and (iii) a new transition services agreement ("TSA") will become effective and supersede and replace the existing CSA for administrative services currently and historically provided to CCOH by the Debtors; *provided however*, that (a) CCOH is permitted to terminate all or parts of the TSA with thirty (30) days' notice to iHC, (b) the transition period will generally be 12 months from the date of Separation (subject to certain services requiring a longer transition period) and (c) the cost for such services will generally be consistent with the aggregate cost applicable under the existing CSA.

Pursuant to the Settlement Agreement, the Debtors agree to waive: (i) the set-off for the value of the intellectual property transferred, including royalties on any intellectual property as set forth above under "Full Separation of CCOH" (which specifically includes a waiver of all license fees from the Petition Date through December 31, 2018); and (ii) the repayment of the post-petition intercompany balance outstanding in favor of the Debtors as of December 31, 2018. For the avoidance of doubt, to the extent the Debtors owe CCOH on account of the post-petition intercompany balance as of December 31, 2018, the Debtors shall repay this amount in full in cash on the Effective Date.  In addition, any intercompany balance that accrues pursuant to the cash sweep arrangement under the existing CSA (and after the termination of the royalty payments as set forth above) in favor of the Debtors or CCOH from January 1, 2019 through the Effective Date, as applicable, shall be paid by CCOH or the Debtors, respectively, within five (5) business days following the Effective Date.

**CCOH's Recovery in the Debtors' Chapter 11 Cases.**  The Plan contemplates the allowance of CCOH's claim against iHC in the amount of $1,031,721,306.00 (the "CCOH Claim") without setoff of any kind and that such allowed claim will receive a cash payment of 14.44%, which will result in CCOH recovering approximately $150 million pursuant to its proof of claim (which recovery will be without setoff or reduction).  The CCOH Claim is not subject to subordination or reduction for any reason.

**Additional CCOH Liquidity.**  The Debtors have agreed to make available to CCOH, for a period of no more than three years following the Effective Date, an unsecured revolving line of credit (with customary, arms'-length terms and interest at the prime rate) in an aggregate amount not to exceed $200 million as part of the TSA.

## CLASS COUNSEL'S RECOMMENDATION

Class Counsel recommends the Settlement, believing that it is fair, reasonable, and adequate to the Class as the Settlement creates enormous value in CCOH, accomplishes the Separation, and provides sufficient operational liquidity for CCOH post-separation—all to the substantial benefit of the Class.

## SETTLING PLAINTIFFS' COUNSEL'S FEES AND EXPENSES

Settling Plaintiffs' Counsel has not received any payment for their services in pursuing claims against the Settling Defendants on behalf of the Class, nor has Settling Plaintiffs' Counsel been reimbursed for their out-of-pocket expenses. Subject to the conditions set forth in the Settlement Agreement, the Parties have agreed that the Debtors will pay to Settling Plaintiffs' Counsel, following the occurrence of (a) the entry of a final and non-appealable order from the Bankruptcy Court confirming the Plan and finally approving the Settlement, (b) the entry of final and non-appealable judgments dismissing each of the Delaware Actions with prejudice, and (c) the Effective Date, attorneys' fees and Litigation Expenses in the amount of (i) $4,700,000 in the aggregate to Entwistle & Cappucci LLP and (ii) $2,450,000 in the aggregate to Labaton Sucharow LLP, Grant & Eisenhofer, P.A., and Friedman Oster & Tejtel PLLC, collectively, for reimbursement of the reasonable costs and expenses of Settling Plaintiffs' Counsel. The payment of attorneys' fees and Litigation Expenses is subject to Bankruptcy Court approval. Class Members are not personally liable for any such fees or expenses.

## RELEASE OF CLAIMS AND EFFECT OF
## APPROVAL OF SETTLEMENT AGREEMENT

In exchange for the Settlement consideration set forth above, the Settling Plaintiffs, CCOH, and all their respective current and former officers, directors, employees, affiliates, partners, members, agents, attorneys, heirs, administrators, and assigns, if any, will forever, fully, and unconditionally release, discharge, compromise, and settle all possible claims against, and covenant not to sue, the Settling Defendants'/Company's Releasees, from all claims, objections and all other causes of action that have been asserted or could be asserted by or on behalf of the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis relating in any way to the subject matter of the Debtors' Chapter 11 Cases, the Delaware Actions, or the intercompany agreements between CCOH and the Debtors, including any and all claims relating to the negotiation or execution of the Settlement.

## HOW TO OBJECT

If you are satisfied with the proposed Settlement including Settling Plaintiffs' Counsel's fees and expenses, you do not need to do anything. If you are concerned that the Debtors do not have your current address, please promptly notify the Notice Administrator as follows:

Clear Channel Notice Administrator
**c/o Prime Clerk LLC**
830 Third Avenue, 3rd Floor
New York, NY 10022
Telephone:  (877) 756-7779
Email:  clearchannelnoticeadmin@primeclerk.com

If, on the other hand, you believe that the proposed Settlement is unfair or inadequate or feel that Class Counsel's fees and expenses should not be approved, you do not have the right to request exclusion from the Settlement, but you may object to the Settlement and/or Settling Plaintiffs' Counsel's fees and expenses by mailing certified mail, return receipt requested, a detailed written statement bearing the caption of this action shown above on the first page stating your comment or objection, to the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Courtroom 404, Houston, Texas 77002, and by sending copies of that statement, also by certified mail, return receipt requested, to:  (1) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attention: Anup Sathy, P.C., Brian D. Wolfe, William A. Guerrieri, and Benjamin M. Rhode, and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention:  Christopher J. Marcus, P.C.; (2) Entwistle & Cappucci, LLP, 299 Park Avenue, 20th Floor, New York, New York 10171, Attention: Andrew J. Entwistle; (3) Labaton Sucharow LLP, 300 Delaware Ave., Suite 1340, Wilmington, Delaware 19801, Attention: Ned Weinberger; (4) Grant & Eisenhofer P.A., 485 Lexington Avenue, New York, New York 10017 Attention: Gordon Novod; (5) Friedman Oster & Tejtel PLLC**,** 240 East 79th Street, Suite A, New York, New York 10075, Attention: Jeremy S. Friedman, Spencer Oster, and David F.E. Tejtel; and (6) Willkie Farr & Gallagher LLP, 600 Travis Street, Houston, Texas 77002, Attention Jennifer J. Hardy, and Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: Matthew A. Feldman, Paul V. Shalhoub and Benjamin McCallen. **Objections must be mailed so as to be received no later than January 14, 2019, and must include the caption of the action and your name, address, and telephone number together with a detailed statement of the basis for your objection and whether you wish to be heard personally or by counsel at the Fairness Hearing at which the Bankruptcy Court will consider binding approval of the Settlement and the award of Settling Plaintiffs' Counsel's attorneys' fees and Litigation Expenses, as described above.**

You may also appear in person or by counsel at the Fairness Hearing described below.

## FAIRNESS HEARING TO APPROVE SETTLEMENT AND AWARD ATTORNEYS' FEES AND COSTS

The Fairness Hearing for final consideration and approval of the Settlement Agreement and the payment of Settling Plaintiffs' Counsel's attorneys' fees and Litigation Expenses is scheduled to take place on January 22, 2019 at 8:30 a.m., prevailing Central Time, before the Honorable Marvin Isgur, United States Bankruptcy Judge, and the Honorable Lee Rosenthal, Chief Judge for the United States District Court for the Southern District of Texas, at the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Courtroom 404, Houston, Texas 77002.  That hearing may be adjourned without further notice.  If you wish to determine if the hearing is adjourned, you may contact Mr. Entwistle, Mr. Weinberger, Mr. Novod, and Mr. Friedman at the addresses shown below.

## OTHER INFORMATION

Any questions Class Members concerning this notice or the Delaware Actions should be directed to Mr. Entwistle.  All requests for more information, including a copy of the Settlement Agreement, should be sent by first-class mail to Mr. Entwistle at the addresses indicated below.

While the Bankruptcy Court has approved the sending of this notice, that does not indicate, and is not intended to indicate, that the Bankruptcy Court has any opinion as to the respective claims or defenses asserted by the Parties in the Delaware Actions.

### DO NOT CALL OR WRITE THE BANKRUPTCY COURT, THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, THE SETTLING DEFENDANTS, OR THEIR COUNSEL REGARDING THIS NOTICE

**Requests for notice or to be added to the mailing list for future notices related to the Settlement should be made to the Notice Administrator:**

Clear Channel Notice Administrator
**c/o Prime Clerk LLC**
830 Third Avenue, 3rd Floor
New York, NY 10022
Telephone:  (877) 756 7779
Email:
clearchannelnoticeadmin@primeclerk.com

**Inquiries, other than requests for notice, should be made to Class Counsel:**

Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI, LLP**
299 Park Avenue, 20th Floor
New York, NY 10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Email:  aentwistle@entwistle-law.com

**Dated: _____, 2018**

**<u>Exhibit 3</u>**

**Publication Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

## SUMMARY NOTICE OF (I) PENDENCY OF PROPOSED SETTLEMENT AMONG THE DEBTORS, CCOH, THE SPONSOR ENTITIES, THE DELAWARE INDIVIDUAL DEFENDANTS, AND THE SETTLING PLAINTIFFS, (II) SETTLEMENT FAIRNESS HEARING, AND (III) APPLICATION FOR AN AWARD OF SETTLING PLAINTIFFS' ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

*This summary notice relates to a proposed settlement*
*agreement among the Debtors, CCOH, the Sponsor Entities,*
*the Delaware Individual Defendants, and the Settling Plaintiffs.[2]*

*A Federal Court authorized this notice. This is not a solicitation from a lawyer.*

**PLEASE READ THIS NOTICE CAREFULLY.  THIS NOTICE EXPLAINS IMPORTANT RIGHTS YOU MAY HAVE, INCLUDING THE POSSIBLE RELEASE OF CERTAIN CLAIMS. IF YOU ARE A MEMBER OF THE CLASS, YOUR LEGAL RIGHTS WILL BE AFFECTED WHETHER OR NOT YOU ACT.  IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, THE PROPOSED SETTLEMENT AGREEMENT, OR YOUR PARTICIPATION IN THE PROPOSED SETTLEMENT, PLEASE DO NOT CONTACT THE BANKRUPTCY COURT, THE SETTLING DEFENDANTS, THE DEBTORS, CCOH, OR THEIR COUNSEL. ALL QUESTIONS SHOULD BE DIRECTED TO CLASS COUNSEL OR THE NOTICE ADMINISTRATOR.  A HEARING TO DETERMINE THE FAIRNESS OF THE SETTLEMENT AGREEMENT AND TO FINALLY APPROVE THE SETTLEMENT AGREEMENT WILL BE HELD ON JANUARY 22, 2019 AT 8:30 A.M. PREVAILING CENTRAL TIME, BEFORE THE HONORABLE MARVIN ISGUR AND THE HONORABLE LEE ROSENTHAL, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

---

[1]  Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]  Capitalized terms not defined herein shall have the meanings set forth in the Settlement Agreement.

TO:     The putative class of minority shareholders of Class A common stock of Clear Channel Outdoor Holdings, Inc. ("CCOH") during the period from March 14, 2015 to March 14, 2018 (the "Class Period," and the shareholders except for GAMCO and Norfolk, the "Remaining Minority Shareholders").

**PLEASE TAKE NOTICE THAT** on March 14, 2018, iHeartMedia, Inc., and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code.

**PLEASE TAKE FURTHER NOTICE THAT** on August 27, 2018, GAMCO Asset Management, Inc. ("GAMCO") filed a verified class action complaint in the Court of Chancery of the State of Delaware on its own behalf and on behalf of the putative class of holders of Class A common stock of CCOH against the Delaware Individual Defendants (as defined herein) and certain of the Sponsor Entities (as defined herein). That case is captioned *GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) (the "GAMCO Action").

**PLEASE TAKE FURTHER NOTICE THAT** on December 29, 2017, Norfolk County Retirement System ("Norfolk") filed a separate verified derivative complaint on behalf of CCOH against certain of the Delaware Individual Defendants, certain of the Sponsor Entities, and the Debtors in the Delaware Court of Chancery.  The Norfolk Action is captioned *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-JRS (Del. Ch.) (the "Norfolk Action," and together with the GAMCO Action, the "Delaware Actions").

**PLEASE TAKE FURTHER NOTICE THAT** GAMCO, and together with the Remaining Minority Shareholders and Norfolk (collectively, the "Settling Plaintiffs," each person or entity a "Class Member," and together the "Class"), individually, on behalf of the Class, and derivatively on behalf of CCOH, CCOH, the Debtors, Norfolk, individually and on behalf of CCOH, the Sponsor Entities, Bain Capital LP, and the Delaware Individual Defendants (collectively, the "Settling Parties"), have reached a proposed settlement to resolve the claims and objections in connection with the Debtors chapter 11 cases (the "Chapter 11 Cases") and the Delaware Actions, and to effectuate the separation of the iHeart and CCOH businesses as memorialized in the *Settlement Agreement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs* dated as of December 16, 2018 (the "Settlement Agreement") and incorporated into the *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2207].  The benefits of the Settlement Agreement will inure to the Class Members and the Settling Parties believe that entry into the Settlement Agreement is in the best interests of the Settling Parties and other parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT** the Settlement Agreement, if approved, will settle and release the claims raised in the Delaware Actions, and all other causes of action that have been asserted or could be asserted by the Settling Plaintiffs or CCOH, individually, derivatively, and/or on a class basis against, among others:  (a) members of the board of directors for CCOH, including Blair Hendrix, Douglas L. Jacobs, Daniel G. Jones, Paul Keglevic, Vincente Piedrahita, Robert W. Pittman, Olivia Sabine, and Dale W. Tremblay (collectively, the "Board Defendants"); (b) members of the committee appointed by the board of directors of CCOH to

monitor that certain Revolving Promissory Note, dated November 10, 2005, between iHeartCommunications, Inc., as maker, and CCOH, as payee, as amended, amended and restated, supplemented, or otherwise modified from time to time, as of November 8, 2017 (the "Intercompany Note Committee Defendants," and together with the Board Defendants, the "Delaware Individual Defendants"); (c) the Debtors; and (d) Bain Capital Partners, LLC, Bain Capital LP, and Thomas H. Lee Partners, L.P. ("THL," and together with Bain Capital Partners, LLC and Bain Capital LP, the "Sponsor Entities," and together with the Delaware Individual Defendants and the Debtors, the "Settling Defendants").

      **PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "Fairness Hearing") will be held on January 22, 2019 at 8:30 a.m., *prevailing Central Time*, before the Honorable Marvin Isgur and the Honorable Lee Rosenthal at the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), 515 Rusk Avenue, Houston, TX 77002, to determine the fairness and grant of final approval of the Settlement Agreement and award of attorneys' fees and reasonable costs and expenses incurred in connection commencing, prosecuting and settling the Delaware Actions (which may include costs and expenses of the Settling Plaintiffs' counsel directly related to their representation of the Class) to Entwistle & Cappucci LLP, Labaton Sucharow LLP, Grant & Eisenhofer P.A., and Friedman Oster & Tejtel PLLC (collectively, "Settling Plaintiffs' Counsel").

      **PLEASE TAKE FURTHER NOTICE THAT** if you are a member of the Class, your rights will be affected by the Settlement Agreement.  If you have not yet received the *Notice of (I) Pendency of Proposed Settlement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs, (II) Settlement Fairness Hearing, and (III) Application for an Award of Settling Plaintiffs' Attorneys' Fees and Reimbursement of Litigation Expenses* (the "Notice"), you may obtain copies of the Notice and related documents by contacting Prime Clerk LLC (the "Notice Administrator") at:

> Clear Channel Notice Administrator
> **c/o Prime Clerk LLC**
> 830 Third Avenue, 3rd Floor
> New York, NY 10022
> Telephone:  (877) 756-7779
> Email:  clearchannelnoticeadmin@primeclerk.com

      Copies of the Notice can also be downloaded from the website maintained by the Notice Administrator, https://cases.primeclerk.com/iheartmedia.

      **PLEASE TAKE FURTHER NOTICE THAT** any objections to the Settlement Agreement or Settling Plaintiffs' Counsels' application for attorneys' fees and litigation expenses must be filed with the Bankruptcy Court and delivered to the Settling Parties' counsel such that they are received no later than January 14, 2019, in accordance with the instructions set forth in the Notice.

**Please do not contact the Court, the Debtors, CCOH, the Settling Defendants, or their counsel regarding the Notice. All questions about this notice or the Settlement Agreement should be directed to Class Counsel or the Notice Administrator.**

Inquiries, other than requests for the Notice, should be made to Class Counsel:

> Andrew J. Entwistle
> **ENTWISTLE & CAPPUCCI, LLP**
> 299 Park Avenue, 20th Floor
> New York, NY 10171
> Telephone: (212) 894-7200
> Facsimile: (212) 894-7272
> Email:  aentwistle@entwistle-law.com

Requests for the Notice should be made to:

> Clear Channel Notice Administrator
> **c/o Prime Clerk LLC**
> 830 Third Avenue, 3rd Floor
> New York, NY 10022
> Telephone:  (877) 756-7779
> Email:  clearchannelnoticeadmin@primeclerk.com

[*Remainder of page intentionally left blank*]

**<u>Exhibit 4</u>**

**Modified Confirmation Hearing Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, INC., *et al.*,[1] | § | Case No. 18-31274 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## NOTICE OF MODIFIED FIFTH
## AMENDED PLAN, CCOH SEPARATION SETTLEMENT
## AGREEMENT, AND SETTING OF CONFIRMATION HEARING DATES

**PLEASE TAKE NOTICE THAT** on December 3, 2018, the Debtors filed the *Notice of Filing of Separation Settlement Term Sheet* [Docket No. 2111] (the "CCOH Settlement Term Sheet"),[2] which summarized the agreement in principle by and among the Debtors, Clear Channel Outdoor Holdings, Inc. ("CCOH"), GAMCO Asset Management, Inc. ("GAMCO"), the individual defendants named in case captioned *GAMCO Asset Mgmt. v. Hendrix, et al.*, C.A. No. 2018-0633-JRS (Del. Ch.) (the "GAMCO Action"), and the private equity sponsor defendants named in the GAMCO Action, regarding the terms of a settlement in connection with, among other things, the contemplated separation of the Debtors and CCOH pursuant to the Debtors' Plan (as defined herein) and all claims, objections, and all other causes of action that have been asserted or could be asserted by or on behalf of CCOH and/or GAMCO, individually, derivatively, and on behalf of any class of investors in publicly traded stock of CCOH against:  (a) iHeartCommunications, Inc. and its associated Debtors in the above-referenced chapter 11 cases; and (b) the defendants in the GAMCO Action.

**PLEASE TAKE FURTHER NOTICE THAT** on December 8, 2018, the Debtors filed the *Joint Emergency Motion for Entry of an Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Preliminarily Approving the Settlement, (III) Approving the Retention of Prime Clerk LLC as Notice Administrator, (IV) Approving the Form and Manner of Notice, (V) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement as Part of*

---

[1]   Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://cases.primeclerk.com/iheartmedia.   The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is:  20880 Stone Oak Parkway, San Antonio, Texas 78258.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Debtors' *Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code* (as amended or otherwise modified, the "Fifth Amended Plan") or the CCOH Settlement Term Sheet, as applicable.

*Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 2143] (the "CCOH Separation Settlement Motion").

**PLEASE TAKE FURTHER NOTICE THAT** on December 8, 2018, GAMCO Asset Management, Inc. filed *GAMCO Asset Management, Inc.'s Emergency Motion for Entry of an Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Certifying a Class, Designating a Class Representative, and Appointing Class Counsel for Purposes of Settlement, and (III) Granting Related Relief* [Docket No. 2144] (the "GAMCO Motion").

**PLEASE TAKE FURTHER NOTICE THAT** on December 16, 2018, GAMCO and Norfolk Country Retirement System, both individually, on behalf of the putative class of public shareholders of CCOH, and derivatively on behalf of CCOH, the Debtors, CCOH, the individual defendants in the GAMCO Action, the private equity sponsor defendants in the GAMCO Action, and Bain Capital LP, executed the *Settlement Agreement Among the Debtors, CCOH, the Sponsor Entities, the Delaware Individual Defendants, and the Settling Plaintiffs* (the "CCOH Separation Settlement").

**PLEASE TAKE FURTHER NOTICE THAT** on December 17, 2018, the Debtors filed the *Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2207] (the "Plan"), which includes modifications to the Fifth Amended Plan to incorporate the terms of the CCOH Separation Settlement (the "Modifications").

**PLEASE TAKE FURTHER NOTICE THAT** on December [●], 2018, the Court entered the *Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Preliminarily Approving the Settlement, (III) Approving the Retention of Prime Clerk LLC as Notice Administrator, (IV) Approving the Form and Manner of Notice, (V) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement as Part of Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. [●]] and the *Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Certifying a Class, Designating a Class Representative, and Appointing Class Counsel for Purposes of Settlement, and (III) Granting Related Relief* [Docket No. [●]].

**PLEASE TAKE FURTHER NOTICE THAT** the hearing to consider Confirmation of the Plan commenced on December 11, 2018, at 9:00 a.m., prevailing Central Time before the Honorable Marvin Isgur, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, Texas 77002 (the "Confirmation Hearing") and has been continued as set forth below (all times, prevailing Central Time):

- **January 10, 2019 at 9:00 a.m.** **to consider all confirmation issues other than those scheduled to be heard on January 17, 2019 and January 22, 2019.**

- **January 17, 2019 at 9:00 a.m.** **to consider all issues concerning the CCOH Separation Settlement, other than those issues scheduled to be heard on January 22, 2019.**

2

- **January 22, 2019 at 8:30 a.m.** to consider all remaining issues concerning consideration of the class action settlement related to the CCOH Separation Settlement and the GAMCO Motion.

- **January 23, 2019 at 2:30 p.m.** to consider all remaining confirmation issues.

> **PLEASE BE ADVISED:  THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.**
> **PLEASE BE FURTHER ADVISED:  IN THE EVENT THAT THE COURT DECLINES TO CONFIRM THE PLAN AT ANY TIME, THE DEBTORS MAY IMMEDIATELY REQUEST AT ANY SUCH CONFIRMATION HEARING THAT THE COURT CONFIRM THE PLAN WITHOUT SOME OR ALL OF THE MODIFICATIONS INCLUDED IN THE PLAN WITHOUT FURTHER NOTICE.**

> **ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS A THIRD PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

### CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN ON THE BASIS OF THE CCOH SEPARATION SETTLEMENT

**CCOH Separation Settlement Objection Deadline**.  The deadline for filing objections to the Plan solely with respect to the CCOH Separation Settlement is **January 9, 2019 at 11:59 p.m., prevailing Central Time** (the "CCOH Separation Settlement Objection Deadline"). All objections to the relief sought with respect to the CCOH Separation Settlement ***must***:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) set forth the name and address of the objector; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; ***and*** (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be ***actually received*** on or before the CCOH Separation Settlement Objection Deadline:

| Co-Counsel to the Debtors | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>James H.M. Sprayregen, P.C.<br>Anup Sathy, P.C.<br>Brian D. Wolfe<br>William A. Guerrieri<br>Benjamin M. Rhode<br>300 North LaSalle<br>Chicago, Illinois 60654<br><br>-and-<br><br>**KIRKLAND & ELLIS LLP**<br>Christopher J. Marcus, P.C.<br>601 Lexington Avenue<br>New York, New York 10022 | |

| *Co-Counsel to the Debtors* | *Counsel to the Term Loan/PGN Group* |
|---|---|
| **JACKSON WALKER, LLP**<br>Patricia B. Tomasco<br>Elizabeth C. Freeman<br>Matthew D. Cavenaugh<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010 | **JONES DAY**<br>Bruce Bennett<br>Joshua M. Mester<br>James Johnston<br>555 South Flower Street<br>Fiftieth Floor<br>Los Angeles, California 90071 |

| *Counsel to Special Committee of CCOH* | *Counsel to the 2021 Noteholder Group* |
|---|---|
| **WILLKIE FARR GALLAGHER, LLP**<br>Jennifer Hardy<br>600 Travis St., Ste. 2310<br>Houston, Texas 77002 | **GIBSON, DUNN & CRUTCHER LLP**<br>Robert Klyman<br>Matthew J. Williams<br>333 South Grand Avenue<br>Los Angeles, California 90071 |

| *Co-Counsel to Norfolk County Retirement System* | *Co-Counsel to Norfolk County Retirement System* |
|---|---|
| **FRIEDMAN OSTER & TEJTEL PLLC**<br>Jeremy S. Friedman<br>Spencer Oster<br>David F.E. Tejtel<br>240 East 79th Street, Suite A<br>New York, NY | **GRANT & EISENHOFER P.A.**<br>Gordon Novod<br>485 Lexington Avenue<br>New York, New York 10017 |
| *Co-Counsel to Norfolk County Retirement System* | *Counsel to GAMCO* |
| **LABATON SUCHAROW LLP**<br>Ned Weinberger<br>300 Delaware Avenue, Suite 1340<br>Wilmington, Delaware 19801 | **ENTWISTLE & CAPPUCCI**<br>Andrew Entwistle<br>229 Park Ave, 20th Floor<br>New York, N.Y. 10171 |
| *Counsel to the Term Lender Group* | *Counsel to the Consenting Sponsors* |
| **ARNOLD & PORTER KAYE SCHOLER LLP**<br>Alan Glantz<br>250 W. 55th Street<br>New York, New York 10019<br><br>-and-<br><br>**ARNOLD & PORTER KAYE SCHOLER LLP**<br>Michael D. Messersmith<br>70 W. Madison Street, Suite 4200<br>Chicago, Illinois 60602 | **WEIL, GOTSHAL & MANGES LLP**<br>Matthew S. Barr<br>Jacqueline Marcus<br>Gabriel A. Morgan<br>767 Fifth Avenue<br>New York, New York 10153 |

| Counsel to the Official Committee of Unsecured Creditors | U.S. Trustee |
|---|---|
| **AKIN GUMP STRAUSS HAUER & FELD LLP** <br> Philip C. Dublin <br> Naomi Moss <br> Edan Lisovicz <br> One Bryant Park <br> New York, New York 10036-6745 | **OFFICE OF THE UNITED STATES TRUSTEE** <br> Hector Duran <br> Stephen Douglas Statham <br> 515 Rusk Street, Suite 3516 <br> Houston, Texas 77002 |

## ADDITIONAL INFORMATION

If you would like to obtain copies of documents related to the Debtors' Chapter 11 Cases, including the Plan and the CCOH Separation, contact Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/iheartmedia and/or (b) calling the Debtors' restructuring hotline at:

U.S. Toll Free: 877-756-7779
International: 347-505-7142

You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

**BINDING NATURE OF THE PLAN:**

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Houston, Texas
December [●], 2018

*/s/ Draft*

Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth C. Freeman (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:           ptomasco@jw.com
                     efreeman@jw.com
                     mcavenaugh@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Brian D. Wolfe (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:           james.sprayregen@kirkland.com
                     anup.sathy@kirkland.com
                     brian.wolfe@kirkland.com
                     will.guerrieri@kirkland.com
                     benjamin.rhode@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:           christopher.marcus@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

     I certify that on December [●], 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ DRAFT*
_____
Patricia B. Tomasco
