**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| | § |
| In re: | § Chapter 11 |
| | § |
| IHEARTMEDIA, INC., *et al.*,[1] | § Case No. 18-31274 (MI) |
| | § |
| Debtors. | § (Jointly Administered) |
| | § |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT
OF CONFIRMATION OF JOINT CHAPTER 11 PLAN**

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia.  The location of Debtor iHeartMedia, Inc.'s principal place of business and the Debtors' service address is:  20880 Stone Oak Parkway, San Antonio, Texas 78258.

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 14

Background ........................................................................................................ 19

I.      Procedural History. .................................................................................... 19

II.     Voting Results. ........................................................................................... 21

III.    Restructuring Transactions and Global Settlements. .................................. 24

        A.      Restructuring Transactions. ............................................................ 24

        B.      Plan Distributions. ......................................................................... 26

        C.      Committee Plan Settlement. ........................................................... 27

        D.      CCOH Plan and Separation Settlement. ......................................... 29

IV.    Legacy Notes Trustee. ............................................................................... 32

        A.      Adversary Proceedings. ................................................................. 32

        B.      Plan Objection. .............................................................................. 33

Argument ........................................................................................................... 35

I.      The Plan Satisfies Each Requirement for Confirmation. ............................ 35

        A.      The Plan Fully Complies with the Applicable Provisions of the
              Bankruptcy Code (Section 1129(a)(1)). ......................................... 35

              i.       The Plan Satisfies the Classification Requirements of
                     Section 1122 of the Bankruptcy Code. ............................... 36

              ii.      The Plan Satisfies the Seven Mandatory Plan Requirements
                     of Sections 1123(a) of the Bankruptcy Code. ..................... 38

        B.      The Debtors Have Complied Fully with the Applicable
              Provisions of the Bankruptcy Code (Section 1129(a)(2)). ................ 41

              i.       The Debtors Complied with Section 1125 of the Bankruptcy
                     Code. ................................................................................ 42

              ii.      The Debtors Complied with Section 1126 of the Bankruptcy
                     Code. ................................................................................ 43

i

C.      The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).........................................45

D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).....................................................................46

E.      The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5))...............................47

F.      The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).........................................................48

G.      The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)). ...............................................................49

H.      The Plan Satisfies Section 1129(a)(8) of the Bankruptcy Code. .........................51

I.      The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)). ...........................52

J.      At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)). ...........................53

K.      The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).............................................................53

L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). .................................................54

M.      The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. .................................................................................55

N.      Sections 1129(a)(14) Through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. .......................................55

O.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(b) - (e)). ......................................56

II.    The Discretionary Contents of the Plan Are Appropriate..................................56

A.      The Plan Appropriately Incorporates a Settlement of Claims and Causes of Action. ................................................................57

B.      The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code. ..........................58

i.      The Debtor Release Is Appropriate and Complies with the Bankruptcy Code. ................................................................ 59

ii.     The Third-Party Release Is Consensual, Appropriate, and Complies with the Bankruptcy Code. ....................................... 66

iii.    The Exculpation Provision Is Appropriate and Complies with the Bankruptcy Code. ...................................................... 68

iv.     The Injunction Provision Is Appropriate and Complies with the Bankruptcy Code.................................................. 72

C.      The Plan Complies with Section 1123(d) of the Bankruptcy Code. ....................................................................................... 73

III.    The Modifications to the Plan Do Not Require Resolicitation and Should Be Approved. ................................................................. 74

IV.     Confirmation Objections.................................................................. 75

A.      Legacy Notes Trustee Objection.......................................................... 75

i.      The Plan Properly Classifies Claims and Interests. ................................ 76

a.      2021 Notes Claims and Legacy Notes Claims are Substantially Similar in Nature. .................................... 78

b.      The Debtors' Classification Scheme is Reasonable...................... 80

c.      The Debtors Proposed the Plan in Good Faith and Have Legitimate Business Reasons to Jointly Classify 2021 Notes Claims and Legacy Notes Claims. ....................................................................... 81

ii.     The Plan Does Not Disparately Treat Claims Within the Same Class. ............................................................................... 82

a.      Allocation of Intercompany Notes in Class 6 Does Not Represent Disparate Treatment.............................. 83

b.      Payment of the 2021 Noteholder Group's Professional Fees is Appropriate. .................................. 85

iii.    The Plan Does Not Violate the Absolute Priority Rule. .......................... 86

iv.     The Legacy Notes Trustee's Equitable Subordination Claims are Mooted by Entry of the Confirmation Order. ........................ 87

B.      U.S. Trustee and SEC Objections. ....................................................... 97

i.      The Debtor Release is Appropriate and in the Best Interests
        of the Debtors' Estates. ............................................................. 97

ii.     The Third Party Release is Consensual. .................................... 98

iii.    The Third-Party Release Does Not Require Carveouts for
        Actual Fraud, Willful Misconduct, or Gross Negligence. ........................ 99

iv.     The Exculpation Provision is Appropriate. ............................................. 101

C.      Objecting PGN Trustees' and Joining PGN Trustees' Objections.
        ........................................................................................................... 102

Conclusion ............................................................................................................. 104

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V.*
   (*In re Vitro S.A.B. de C.V.*),
   701 F.3d 1031 (5th Cir. 2012) ................................................44

*In re AFI Servs., LLC*,
   486 B.R. 827 (Bankr. S.D. Tex. 2013) ................................................71

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988) ........................................8, 57, 58

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) ................................................32

*Ameriforge Grp., Inc.*,
   No. 17-32660 (Bankr. S.D. Tex. May 19, 2017) ................................................49

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986) ................................................64

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist.*
   (*In re Applewood Chair Co.*),
   203 F.3d 914 (5th Cir. 2000) ................................................45

*In re ASARCO, L.L.C.*,
   650 F.3d 593 (5th Cir. 2011) ................................................21

*In re AWECO, Inc.*,
   725 F.2d. 293 (5th Cir. 1984) ................................................35

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................32

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ................................................23, 30

*Bank of New York Trust Co. v. Official Unsecured Creditors' Comm.*
   (*In re The Pacific Lumber Co.*),
   584 F.3d 229 (5th Cir. 2009) ................................................ *passim*

*In re BCBG Max Azria Glob. Holdings, LLC*,
   No. 17-10466 (Bankr. S.D.N.Y. July 26, 2017) ................................................49

*In re Bernhard Steiner Pianos USA, Inc.*,
  292 B.R. 109 (Bankr. N.D. Tex. 2002) ................................................................59, 60

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) ...................................................................37, 70

*In re Block Shim Dev. Company-Irving*,
  939 F.2d 289 (5th Cir. 1991) ..........................................................................................19

*In re Bos. Post Rd. Ltd. P'ship*,
  21 F.3d 477 (2d Cir. 1994) ..............................................................................................62

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985) .............................................................................32

*In re Breitburn Energy Partners LP*,
  582 B.R. 321 (Bankr. S.D.N.Y. 2018) ..........................................................................64

*Butner v. United States*,
  440 U.S. 48 (1979) ............................................................................................................71

*Matter of Cajun Elec. Power Co-op., Inc.*,
  150 F.3d 503 (5th Cir. 1998) ....................................................................................16, 20

*In re Camp Arrowhead, Ltd.*,
  451 B.R. 678 (Bankr. W.D. Tex. 2011) ...........................................................45, 47, 55, 69

*In re Capmark Fin. Grp., Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010) ...............................................................................23

*In re Cent. Med. Ctr.*,
  122 B.R. 568 (Bank. E.D. Mo. 1990) ......................................................................64, 65

*In re Chateaugay Corp.*,
  89 F.3d 942 (2d Cir. 1996) ........................................................................................59, 61

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..........................................................................52

*In re Chesnut*,
  356 F. App'x 732 (5th Cir. 2009) ...................................................................................67

*In re CJ Holding Co.*,
  No. 16-33590 (Bankr. S.D. Tex. Dec. 16, 2016) .........................................................49

*Clement v. Producers' Refining Co.*,
  277 S.W. 634 (Tex. Comm'n App. 1925) .....................................................................71

*In re Couture Hotel Corp.*,
  536 B.R. 712 (Bankr. N.D. Tex. 2015) .................................................................10

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ......................................................8, 15, 19

*In re Dana Corp.*,
  412 B.R. 53 (Bankr. S.D.N.Y. 2008) ...................................................................64

*In re Dow Corning Corp.*,
  255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*,
  280 F.3d 648 (6th Cir. 2002) ...............................................................................64

*In re Dow Corning Corp.*,
  237 B.R. 374 (E.D. Mich. 1999)...........................................................................57

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)......................................................59, 60, 61

*In re Drexel Burnham Lambert Grp., Inc.*,
  130 B.R. 910, *aff'd* 960 F.2d 285 (2d Cir. 1992).................................................64

*Ellis v. Amex Life Ins. Co.*,
  211 F.3d 935 (5th Cir. 2000) ...............................................................................67

*In re Energy & Exploration Partners, Inc.*,
  No. 15-44931 (Bankr. N.D. Tex. April 21, 2016) ..........................................46, 69

*In re Enron Corp.*,
  No. 01-16034 (AJG)
  (Bankr. S.D.N.Y. July 15, 2004)..........................................................................23

*Eubanks v. F.D.I.C.*,
  977 F.2d 166 (5th Cir. 1992) ...............................................................................67

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir. 1995) .................................................................35, 44, 46, 69

*FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
  255 F. App'x 909 (5th Cir. 2007) ..........................................................45, 46, 48

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................................................32

*In re General Homes Corp.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ...........................................................37, 38

*In re GenOn Energy, Inc.*,
  No. 17-33695 (Bankr. S.D. Tex. Dec. 12, 2017) ..............................................49, 53

*In re Goodrich Petroleum Corp.*,
  No. 16-31975 (Bankr. S.D. Tex. Sept. 28, 2016) ....................................................53

*In re Heritage Org., LLC*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007).................................................................37

*Hernandez v. Larry Miller Roofing, Inc.*,
  628 F. App'x 281 (5th Cir. 2016) ....................................................................45, 46

*In re Hibbard Brown & Co.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998)...................................................................64

*In re Idearc Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009).................................................................32

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...................................................................49

*In re ION Media Networks, Inc.*,
  419 B.R. 585 (Bankr. S.D.N.Y. 2009 2009).........................................................31

*In re J T Thorpe Co.*,
  308 B.R. 782 (Bankr. S.D. Tex. 2003) ..................................................................8

*Matter of Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987).............................................................................60

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993).........................................................................60, 61

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987) ...........................32

*JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props. Inc.
  (In re Transwest Resort Props., Inc.)*,
  881 F.3d 724 (9th Cir. 2018) ...........................................................................27

*In re Justice Oaks II, Ltd.*,
  898 F.2d 1544 (11th Cir. 1990) .........................................................................68

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)............................................................................32

*In re Kolton*,
  No. 89-53425-C (Bankr. W.D. Tex. Apr. 4, 1990)..................................................32

*In re Landing Assocs.*,
  157 B.R. 791 (Bankr. W.D. Tex. 1993)................................................................21, 28

*In re Lason, Inc.*,
  300 B.R. 227 (Bankr. D. Del. 2003) ...................................................................23, 25

*In re Light Tower Rentals, Inc.*,
  No. 16-34284 (Bankr. S.D. Tex. Sept. 30, 2016) ...................................................49

*In re Mangia Pizza Invs., LP*,
  480 B.R. 669 (Bankr. W.D. Tex. 2012)...................................................................57

*In re Medomak Canning*,
  922 F.2d 895 (1st Cir. 1990)...................................................................................67

*In re Midstates Petroleum Co., Inc.*,
  No. 16-32237 (Bankr. S.D. Tex. Sept. 28, 2016) ...................................................53

*In re Mirant Corp.*,
  348 B.R. 725 (Bankr. N.D. Tex. 2006).........................................................30, 37, 38

*In re Moore*,
  608 F.3d 253 (5th Cir. 2010) ..................................................................................35

*In re Neff*,
  60 B.R. 448 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) ...................23, 25

*Nilsen v. City of Moss Point, Miss.*,
  701 F.2d 556 (5th Cir. 1983) ..................................................................................67

*In re Nortel Networks, Inc.*,
  522 B.R. 491 (Bankr. D. Del. 2014) ........................................................................23

*In re Northfield Labs. Inc.*,
  467 B.R. 582 (Bankr. D. Del. 2010) ........................................................................68

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop.*
  (*In re Cajun Elec. Power Coop.*),
  119 F.3d 349 (5th Cir. 1997) ..................................................................................38

*In re One Times Square Assocs. Ltd. P'ship*,
  159 B.R. 695 (Bankr. S.D.N.Y. 1993),
  *aff'd* 165 B.R. 773 (Bankr. S.D.N.Y. 1994) ...........................................................60

*In re Palisades–on–the–Desplaines*,
  89 F.2d 214 (7th Cir. 1937) ....................................................................................60

ix

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture*
    *(Matter of Greystone III Joint Venture)*,
    995 F.2d 1274 (5th Cir. 1991) ...............................................................9, 59, 60, 62

*In re Pilgrim's Pride Corp.*,
    2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010)...................................... *passim*

*Pub. Fin. Corp. v. Freeman*,
    712 F.2d 219 (5th Cir. 1983) ...............................................................................19

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).................................................................51, 53, 72

*In re Quigley Co., Inc.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ..............................................................59, 61

*In re R.E. Loans, LLC*,
    No. 11-35865 (BJH), 2012 WL 2411877 (Bankr. N.D. Tex. June 26, 2012).........................57

*In re RAAM Global Energy Co.*,
    No. 15-35615 (Bankr. S.D. Tex. Jan. 28, 2016) ....................................................69

*In re Republic Airways Holdings, Inc.*,
    565 B.R. 710 (Bankr. S.D.N.Y. 2017) ................................................................64

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ....................................................... *passim*

*In re Sandridge Energy, Inc.*,
    No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016).........................................53

*In re Sears Methodist Ret. Sys., Inc.*,
    2015 WL 1066882 (Bankr. N.D. Tex. Mar. 6, 2015) ............................................52

*In re Sentry Operating Co. of Texas, Inc.*,
    264 B.R. 850 (Bankr. S.D. Tex. 2001) ...................................................................9

*In re Southcross Holdings, LP*,
    No. 16-20111 (Bankr. S.D. Tex. April 11, 2016) ........................................46, 49, 69

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ....................................................................49

*In re Star Ambulance Service, LLC*,
    540 B.R. 251 (Bankr. S.D. Tex. 2015) ................................................................28

*In re Sun Country Dev., Inc.*,
    764 F.2d 406 (5th Cir. 1985) ..............................................................................19

x

*In re Superior Used Cars, Inc.*,
  258 B.R. 680 (Bankr. W.D. Mich. 2001) ............................................................. 67

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) ............................................................................... 28

*In re Texas Extrusion Corp.*,
  844 F.2d 1142 (5th Cir. 1988) ............................................................................. 23

*Texas Gas Utilities Co. v. Barrett*,
  460 S.W.2d 409 (Tex. 1970) ................................................................................. 71

*In re The Vaughan Company., Realtors*,
  543 B.R. 325 (Bankr. D.N.M. 2015) ..................................................................... 64

*In re U.S. Fidelis, Inc.*,
  481 B.R. 503 (Bankr. E.D. Mo. 2012) .................................................................. 47

*In re Ultra Petrol. Corp.*,
  No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) .................................... 49, 53

*In re Varat Enters., Inc.*,
  81 F.3d 1310 (4th Cir. 1996) ............................................................................... 67

*In re Vill. at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) ............................................................................... 19

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ........................................................................... 64, 65

*Wilmington Savings Funds Society, FSB v. Bain Capital LP, et al*,
  Adv. No. 18-03287 (MI) ...................................................................................... 65

*In re Wool Growers Cent. Storage Co.*,
  371 B.R. 768 (Bankr. N.D. Tex. 2007) ......................................................... *passim*

## Statutes

11 U.S.C. § 101(51D)(B) ...................................................................................... 34

11 U.S.C. § 157(b)(2)(L) ...................................................................................... 51

11 U.S.C. § 326(a) ................................................................................................ 25

11 U.S.C. § 363(b) ................................................................................................ 21

11 U.S.C. § 503(b)(2) ........................................................................................... 25

11 U.S.C. § 1114(e) .............................................................................................. 29

11 U.S.C. § 1122(a) ................................................................................................9, 59

11 U.S.C. § 1123 ........................................................................................................70

11 U.S.C. § 1123(a)(1) ...............................................................................................12

11 U.S.C. § 1123(a)(2) ...............................................................................................12

11 U.S.C. § 1123(a)(3) ...............................................................................................12

11 U.S.C. § 1123(a)(4) ...............................................................................................12

11 U.S.C. § 1123(a)(5) ...............................................................................................12

11 U.S.C. § 1123(a)(6) ...............................................................................................14

11 U.S.C. § 1123(a)(7) ...............................................................................................14

11 U.S.C. § 1123(b)(1) ..........................................................................................34, 36

11 U.S.C. § 1123(b)(2) ..........................................................................................34, 36

11 U.S.C. § 1123(b)(3) ..........................................................................................34, 36

11 U.S.C. § 1123(b)(3)(A) ..........................................................................................34

11 U.S.C. § 1123(b)(4) ..........................................................................................34, 36

11 U.S.C. § 1123(b)(5) ..........................................................................................34, 36

11 U.S.C. § 1123(b)(6) ..........................................................................................34, 36

11 U.S.C. § 1123(d) ....................................................................................................55

11 U.S.C. § 1125(b) ....................................................................................................15

11 U.S.C. § 1126 .....................................................................................................5, 17

11 U.S.C. § 1126(c) ...............................................................................................18, 25

11 U.S.C. § 1126(d) ....................................................................................................18

11 U.S.C. § 1126(f) ....................................................................................................25

11 U.S.C. § 1127(a) ...............................................................................................56, 57

11 U.S.C. § 1127(d) ....................................................................................................56

11 U.S.C. § 1129(a)(3)...........................................................................................19, 51

11 U.S.C. § 1129(a)(5)(A)(i) ........................................................................................21

11 U.S.C. § 1129(a)(5)(A)(ii) .......................................................................................21

11 U.S.C. § 1129(a)(5)(B) ............................................................................................21

11 U.S.C. § 1129(a)(7) ..................................................................................................22

11 U.S.C. § 1129(a)(8) ..................................................................................................25

11 U.S.C. § 1129(a)(9) ..................................................................................................25

11 U.S.C. § 1129(a)(11) ................................................................................................28

11 U.S.C. § 1129(a)(12) ................................................................................................29

11 U.S.C. § 1129(a)(13) ................................................................................................29

11 U.S.C. § 1129(a)(14) ................................................................................................30

11 U.S.C. § 1129(a)(15) ................................................................................................30

11 U.S.C. § 1129(a)(16) ................................................................................................30

11 U.S.C. § 1129(b)(1) ..................................................................................................30

11 U.S.C. § 1129(c) .......................................................................................................33

11 U.S.C. § 1129(e) .......................................................................................................34

28 U.S.C. § 1930 ...........................................................................................................29

**Rules**

Fed. R. Bankr. P. 1019(2) .............................................................................................24

Fed. R. Bankr. P. 3002(c) .............................................................................................24

Fed. R. Bankr. P. 3019 ..................................................................................................57

Fed. R. Bankr. P. 3019(a) .............................................................................................58

**Other Authorities**

H.R. Rep. No. 95-595,
     95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936 ...............9

S. Rep. No. 95-989,
     95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 .................9

iHeartMedia, Inc. ("iHeart") and its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors") respectfully submit this memorandum of law in support of confirmation of the *Modified Fifth Amended Joint Chapter 11 Plan Reorganization of iHeartMedia, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2207] (as modified, amended, or supplemented from time to time, the "Plan").[2]  In support of confirmation of the Plan, and in response to objections thereto (collectively, the "Objections"), the Debtors respectfully state as follows.

### Introduction

1.      Approximately ten months after commencing these Chapter 11 Cases, the Debtors are seeking Confirmation of the Plan, which eliminates approximately $10 billion (or nearly two-thirds) of the Debtors' funded debt obligations (substantially comprised of obligations to creditors who ***support*** the Plan), resolves myriad complex claims and significant pre and postpetition litigation, separates the Debtors' business from CCOH, delivers value to every stakeholder in the capital structure, and is overwhelmingly supported by every Class entitled to vote at every Debtor entity.  In fact, ***every*** constituent is receiving a recovery under the Plan and, because the Plan is fully consensual from a Class perspective, the Debtors are not utilizing section 1129(b) of the Bankruptcy Code—an exceptionally rare occurrence in complex chapter 11 proceedings such as these.  This level of consensus is the culmination of years of complicated and often contentious multi-party negotiations (beginning well before the Petition Date) during which the Debtors engaged with their stakeholders to responsibly address the more than $16 billion of funded debt obligations that were hindering their ability to maximize the value of their business.

---

[2]     Capitalized terms used but not defined in this memorandum have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Supplement, as applicable.

With their balance-sheet issues addressed, the Debtors will be ready to take their rightful position as an undisputed market leader in the media space.

2.      After numerous capital market transactions and efforts over the preceding decade to capture trading discounts, address sizeable maturities, and comprehensively restructure their debt obligations on an out-of-court basis, in the fall of 2017 through the Petition Date, the Debtors and their creditors engaged in multilateral and bilateral negotiations on the terms of an in-court restructuring.  These efforts were successful, culminating in the execution of the Restructuring Support Agreement with holders of approximately $12 billion in funded debt obligations, including more than two-thirds of the Debtors' unsecured funded debtholders (*i.e.*, holders of the 2021 and Legacy Notes Claims, collectively).

3.      The Restructuring Support Agreement served as a blueprint for the Debtors' chapter 11 restructuring and Plan, detailing, among other things, the terms and conditions of a delicately balanced ceasefire with respect to significant threatened and actual prepetition litigation among the Debtors and their stakeholders (junior and senior).  As such, the Restructuring Support Agreement encapsulated far more than just the economic terms of a deleveraging transaction.  It also included essential non-economic terms, including bargained-for release provisions, which all parties to the Restructuring Support Agreement agreed to support and not opt out of.  The bargain for complete closure of the historical disputes was a critical component of the Restructuring Support Agreement.  Simply put, without both the economic and non-economic terms, there was no deal.

4.      With the Restructuring Support Agreement in hand, the Debtors entered these Chapter 11 Cases carrying a tremendous amount of consensus and support.  Nevertheless, there was still work to be done, as the Restructuring Support Agreement left open certain essential

15

elements of the Debtors' restructuring, including the treatment of General Unsecured Claims and the terms and conditions of the separation of the Debtors' business from CCOH.  Moreover, the Debtors' obligations under the Restructuring Support Agreement were subject to a broad "fiduciary out," and as detailed in the Cremens Declaration,[3] the Special Committee's investigation remained ongoing into whether there were any facts or circumstances that would render the Restructuring Transactions (including the releases) unfair to the Debtors.  Efforts to limit or condition the "fiduciary out" were soundly rejected to ensure that the Debtors retained the ability to consider all other restructuring options.  Finally, although the Debtors already enjoyed support throughout their capital structure, they continued to seek to build (and, in fact, have built) on that consensus.

5.      Specifically, since the Petition Date, some of the Debtors key achievements have included, among other things:

- attaining fully consensual orders on all of the Debtors' "first day" operational motions, as well as a fully consensual resolution to the use of the Debtors' cash collateral and an adequate protection stipulation relating to the collateral of the Term Loan / PGN Group (among others);

- negotiating and obtaining approval of a debtor-in-possession financing facility that refinanced the Debtors' prepetition ABL facility, resulting in significant cost savings to the Debtors' Estates;

- successfully maintaining and expanding operations, including through the acquisitions of Stuff Media, LLC and Jelli, Inc., with the broad support of major customers and vendors;

- reaching an agreement with the Committee regarding the treatment of General Unsecured Claims and obtaining the Committee's support for the Plan (including the Plan's release provisions);

- negotiating the terms of the CCOH Plan and Separation Settlement, which consensually separates the Debtors' business from that of CCOH and

---

[3]   As used herein, the "Cremens Declaration" means the *Declaration of Charles H. Cremens in Support of Confirmation of the Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtors Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith.

resolves and releases the GAMCO Litigation and the Norfolk Litigation (both as defined herein); and

- the Special Committee has not exercised the "fiduciary out" under the Restructuring Support Agreement or Plan and supports the Plan as proposed, including the release provisions.

6.     The result of the Debtors' efforts is a Plan that provides the best alternative available to the Debtors and their stakeholders to restructure their obligations.  No party has asserted otherwise, and every Class entitled to vote at every Debtor entity has voted overwhelmingly in favor of Confirmation.  The Plan delivers more than $545 million of value to the Debtors' junior stakeholders—including approximately $70 million of value to Holders of Legacy Notes Claims—well in excess of what such stakeholders would be entitled to in a liquidation or absent the agreement of the Debtors' senior creditors.  And the Plan incorporates valuable, bargained-for release provisions that resolve acrimonious, complex, and protracted litigation involving stakeholders throughout the Debtors' capital structure.[4]

7.     In short, the Plan will allow the Reorganized Debtors and their stakeholders to emerge from chapter 11 with a clean slate, separate the Debtors' business from CCOH, and position the Debtors for continued growth and long-term success as a world-class industry leader. Accordingly, the Debtors believe that the Plan not only maximizes the value of their Estates, but is also an extraordinary outcome for all of their stakeholders and will enable the Debtors to emerge from chapter 11 approximately one year after the Petition Date.

---

[4]     Among other things, the Plan and the settlements incorporated therein resolve and release the Texas Litigation, the Amended Committee Standing Motion and claims asserted in the draft complaint attached thereto, the Committee's Disputed ABL Claims Objection, the GAMCO Litigation, and the Norfolk Litigation, as well as the equitable subordination claims advanced by the Legacy Notes Trustee.

8.      Given the high level of consensus, the Debtors' Plan unsurprisingly faces little opposition.  Although certain parties have filed Objections to the Plan, including Cure Claim Objections,[5] of those Objections:

- three Objections requested certain language be added to the Confirmation Order, and all such Objections have been resolved;[6]

- five Objections are Cure Claim Objections;

- Norfolk County's Objection has been resolved as part of the CCOH Plan and Separation Settlement;

- three limited Objections remain unresolved from the Objecting PGN Trustees[7] arguing that the Plan, among other things, does not assume or preserve certain indemnification obligations owed by the Debtors to the PGN Trustees;

- one limited Objection remains unresolved from the Joining PGN Trustees[8] asserting that, if the Objecting PGN Trustees receive additional rights or benefits under the Plan or Confirmation Order, then the Joining PGN Trustees should receive the same treatment; and

- three other Objections remain unresolved.

9.      Of these remaining Objections, the only economic party in interest objecting to the Plan is the Legacy Notes Trustee, which has continued to press the same arguments throughout

---

[5]   A summary of each of the Objections are set forth in the chart attached hereto as **Exhibit A**.  The Debtors also received a number of informal objections from various parties in interest, all of which have been resolved.

[6]   The Debtors and James B. Martin have agreed that Martin does not object to the Plan and that both the Debtors and Martin reserve all rights with respect to the Objection, including the liquidation value of Martin's claim, that Confirmation may proceed prior to the resolution of Martin's Objection, that, to the extent the Objection is not resolved consensually, the Debtors and Martin reserve all rights to the valuation of Martin's claim, and have consensually agreed to extend the Debtors' time to respond to Martin's Objection.  *See Stipulation and Order Regarding Existing Deadlines With Respect to the Objection of James B. Martin to Confirmation of Plan of Reorganization in Absence of an Estimation of His Claim Pursuant to 11 U.S.C. § 502(C)(1)* [Docket No. 2357].

[7]   As used herein, "Objecting PGN Trustees") shall mean Computershare Trust Company, N.A. and Computershare Trust Company of Canada, solely in their capacities as indenture trustee for the 9% Priority Guarantee Notes due 2022, Deutsche Bank Trust Company Americas, in its capacities as paying agent, collateral agent, registrar, and/or transfer agent under the PGN Notes Indentures, and Wilmington Trust, National Association, solely in its capacity as successor indenture trustee for the 9% Priority Guarantee Notes due 2019.

[8]   As used herein, "Joining PGN Trustees" shall mean UMB Bank, National Association, solely in its capacity as the 11.25% PGN Trustee for the 11.25% PGNs, BOKF, National Association, solely in its capacity as the 9.0% PGN Due 2021 Trustee, and U.S. Bank National Association, solely in its capacity as 10.625% PGN Trustee.

these Chapter 11 Cases (*i.e.*, that Holders of Legacy Notes Claims are somehow secured creditors with claims not only against Debtor iHC but also against all of the Guarantor Debtors). The Debtors appreciate the efforts of the Legacy Notes Trustee to advocate for a different treatment for its holders. Its position has been given a full vetting by the Debtors. In sum, however, the views of the Legacy Notes Trustee have no merit and should be rejected. The Debtors submit that the Plan is the right restructuring transaction, and passage of additional time will not uncover any additional facts or circumstances to warrant a different treatment for such holders of Legacy Notes. Nevertheless, the Debtors have sought, and will continue to seek, the consensus and support of the Legacy Notes Trustee in advance of Confirmation.

10. As discussed in detail below, the remaining Confirmation issues are narrow, and none of the Objections present any reason to deny Confirmation and risk destroying the value associated with consummation of the Plan, which has been, and continues to be, the best value-maximizing alternative for all of the Debtors' stakeholders. Accordingly, the Debtors respectfully request that the Bankruptcy Court overrule the Objections and confirm the Plan.

## **Background**

## I. **Procedural History.**

11. On March 14, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 76]. On March 21, 2018, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 244].

12.     A description of the Debtors' businesses, the reasons for commencing the chapter 11 cases, and the relief sought from the Court to allow for a smooth transition into chapter 11 are set forth in the *Declaration of Brian Coleman, Senior Vice President and Treasurer of iHeartMedia, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 25] and the Disclosure Statement.

13.     On September 20, 2018, the Court entered the Disclosure Statement Order,[9] which approved, among other things, the procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").  Additionally, on October 18, 2018, after the Debtors, the Consenting Stakeholders, and the Committee negotiated the Committee Plan Settlement (discussed further below), the Bankruptcy Court entered the Continued Solicitation Order,[10] which approved, among other things, the adequacy of the Disclosure Statement Supplement for the *Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1633] (the "Disclosure Statement Supplement") and modified the dates and deadlines for the items in the confirmation schedule established by paragraph 5 of the Disclosure Statement Order.  All other dates and deadlines remained unchanged.

---

[9]     As used herein, "Disclosure Statement Order" means the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1481].

[10]     As used herein, "Continued Solicitation Order" means the *Order (I) Approving the Debtors' Continued Solicitation of the Fifth Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, (II) Modifying Certain Deadlines and Procedures in Connection with Plan Confirmation and Shortening Notice with Respect Thereto, (III) Approving the Form of Ballots in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 1631].

14.     The deadline for all Holders of Claims entitled to vote on the Plan to cast their ballots was November 16, 2018, at 5:00 p.m. (prevailing Central Time) (the "Voting Deadline").[11] The deadline to file objections to the Plan was November 28, 2018, at 5:00 p.m. (prevailing Central Time).  A series of hearings on the Plan's Confirmation and issues related to the Plan and CCOH Plan and Separation Settlement (the "Confirmation Hearing") is scheduled to begin on January 10, 2019, at 9:00 a.m.  (prevailing Central Time).  Contemporaneously herewith, the Debtors also submit a proposed order confirming the Plan (the "Confirmation Order").  On December 4, 2018, the Debtors filed the Voting Report [Docket No. 2116],[12] which is summarized below in Section II. As discussed herein, every Class entitled to vote overwhelmingly voted to accept the Plan.

## II.     Voting Results.

15.     In accordance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[13]  Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired by the Plan or (b) Impaired by the Plan such that they will receive no distribution of property under the Plan.  As a result, the following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

---

[11]   As set forth in the Supplemental Voting Report (as defined herein), the Debtors had extended the Voting Deadline solely with respect to CCOH while negotiations continued regarding the terms of the CCOH Plan and Separation Settlement.

[12]   On December 20, 2018, the Debtors filed the *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of iHeartMedia, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2246] (the "Supplemental Voting Report") to update the voting results to account for CCOH's vote to accept the Plan.

[13]   11 U.S.C. § 1126.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7A | General Unsecured Claims Against Non-Obligor Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7B | General Unsecured Claims Against TTWN Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 10 | Section 510(b) Claims[14] | Impaired | Note Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

16.     Accordingly, the Debtors solicited votes on the Plan only from Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims.  The voting results, as reflected in the Voting Report and Supplemental Voting Report, are summarized as follows:

| Class | Class Description | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Class Voting Result |
|---|---|---|---|---|---|---|
| 4 | Secured Term Loan / 2019 PGN Claims | 624 (99.68%) | 2 (0.32%) | $1,254,843,465.10 (99.99%) | $1,894.68 (0.01%) | Accept |

---

[14]     The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.  Accordingly, the Debtors believe that Class 10 shall be deemed eliminated from the Plan in accordance with Article III therein.  In addition, as set forth in the Debtors' objections to proofs of claim filed by certain individual holders of Legacy Notes [Docket Nos. 1661—1669, 1671—1673] (and for the reasons set forth by the Debtors in the trial regarding the Legacy Notes Trustee's adversary proceeding against iHC), the Debtors do not believe that such holders of Legacy Notes have valid claims against the Debtors pursuant to section 510(b) of the Bankruptcy Code.  Moreover, as set forth in the *Stipulation and Order (I) Granting the Legacy 510(b) Claimants Leave to Withdraw and Deeming the Legacy 510(b) Claims Withdrawn; and (II) Overruling iHeartCommunications, Inc.'s Claim Objections as Moot*, filed contemporaneously herewith, the Legacy 510(b) Claimants have agreed to withdraw such proofs of claim with prejudice.

| Class | Class Description | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Class Voting Result |
|---|---|---|---|---|---|---|
| 5A | Secured Non-9.0% PGN Due 2019 Claims Other Than Exchange 11.25% PGN Claims | 530 (97.79%) | 12 (2.21%) | $465,561,041.14 (99.85%) | $710,490.25 (0.15%) | **Accept** |
| 5B | Secured Exchange 11.25% PGN Claims | 65 (95.59%) | 3 (4.41%) | $352,741,282.98 (99.49%) | $1,809,902.20 (0.51%) | **Accept** |
| 6 | iHC 2021 / Legacy Notes Claims | 260 (71.43%) | 104 (28.57%) | $2,243,551,621.93 (90.53%) | $234,633,975.82 (9.47%) | **Accept** |
| 7C | Term Loan/PGN Deficiency Claims Against the TTWN Debtors | 1,155 (98.80%) | 14 (1.20%) | $9,871,253,158.04 (99.95%) | $4,588,029.02 (0.05%) | **Accept** |
| 7D | iHC Unsecured Claims | 1,272 (97.25%) | 36 (2.75%) | $12,200,584,490.20 (99.93%) | $8,713,111.67 (0.07%) | **Accept** |
| 7E | Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors | 1,281 (98.09%) | 25 (1.91%) | $12,024,474,216.65 (99.70%) | $36,693,425.35 (0.30%) | **Accept** |
| 7F | Guarantor Funded Debt Unsecured Claims Against CCH | 1,283 (98.09%) | 25 (1.91%) | $14,306,484,845.21 (99.72%) | $39,970,703.96 (0.28%) | **Accept** |
| 7G | Guarantor General Unsecured Claims[15] | 692 (83.98%) | 132 (16.02%) | $79,341,215.50 (98.77%) | $989,392.17 (1.23%) | **Accept** |

---

[15]   The voting results for Class 7G presented herein are presented on an aggregate basis.  The voting results for each Debtor entity in Class 7G can be found in the Voting Report and the Supplemental Voting Report, and each Class at each Debtor entity voted to accept the Plan.

| Class | Class Description | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Class Voting Result |
|-------|-------------------|----------------------|----------------------|----------------------|----------------------|---------------------|
| 8 | CCOH Due From Claims | 1 (100.00%) | 0 (0.00%) | $1,031,721,306.00 (100.00%) | $0.00 (0.00%) | Accept |
| 9 | iHeart Interests | N/A | N/A | 78,347,908 shares (99.99%) | 10,462 shares (0.01%) | Accept |

17.     As set forth above and in the Voting Report and Supplemental Voting Report, all Impaired Classes entitled to vote voted to accept the Plan.

**III.     Restructuring Transactions and Global Settlements.**

      **A.     Restructuring Transactions.**

18.     The Plan is the product of extensive, hard-fought negotiations between the Debtors and their primary stakeholder constituencies, including the Term Loan / PGN Group, Term Lender Group, 2021 Noteholder Group, Consenting Sponsors, Committee, and CCOH.  The Plan provides for a global compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  Under the Plan, the Debtors will reduce their funded debt obligations by nearly $10 billion to $5,750 million (consisting of New Term Loans, New Secured Notes, and New Unsecured Notes) and the New ABL Credit Agreement.  In addition, Radio NewCo (the new holding company organized by CCH pursuant to the Restructuring Transactions) will enter into the Preferred Stock Transactions, which will authorize Radio NewCo, CCH, and CCOH (or its successor) to issue the Radio NewCo Preferred Stock and CCOH Preferred Stock, respectively, the proceeds of which will be used to fund distributions to certain Holders of Allowed Claims against the Debtors pursuant to the Plan.  The proceeds from the CCOH Preferred Stock, however, will be retained by CCOH and will not be used to fund distributions under the Plan.  In addition, the Plan provides for

valuable, bargained-for release provisions that were an essential ingredient to the level of consensus the Plan enjoys and were a material inducement for the Consenting Stakeholders who executed the Restructuring Support Agreement to agree to support the Plan and provide the consideration detailed herein.  Last, the Debtors will consensually separate their business from CCOH pursuant to a Taxable Separation.

19.     In addition, the Debtors are seeking certain regulatory and governmental approvals and rulings from the FCC, SEC, and Internal Revenue Service ("IRS") as part of the Restructuring Transactions.  In particular, within approximately two weeks of the entry of the Confirmation Order, the Debtors will provide the FCC with final amendments to the FCC Applications, with FCC Approval anticipated within several weeks of the submission of the final amendments.  The Debtors are also required to register the CCOH Interests to be issued to CCOH Class A common stockholders in the CCOH/CCH Merger in exchange for their CCOH Class A common stock.  On December 21, 2018, CCH filed a registration statement on Form S-4 with the SEC.  The registration statement contains an information statement of CCOH and a prospectus of CCH.  CCH will address any SEC comments it receives before the registration statement is declared effective.  At this time, CCH is unable to estimate when (or if) the SEC comments will be received or when the registration statement may become effective, in part because of the impact of the partial government shutdown.  Once the registration statement is effective, CCH is required by SEC rules to mail the information statement/prospectus to holders of CCOH Class A common stock at least 20 days before the effectiveness of the CCOH/CCH Merger.  Last, the Debtors are seeking a private letter ruling from the IRS regarding certain elements of the Restructuring Transactions.  At this time, the Debtors are unable to estimate when (or if) the private letter ruling

will be received, in part because of the impact of the partial government shutdown.  Importantly, the Debtors' receipt of the private letter ruling is not a condition precedent to the Effective Date.

### B.    Plan Distributions.

20.    Despite economic realities that could (absent a consensual agreement like the Plan) reasonably lead to *zero* recoveries for junior stakeholders, the Plan provides over $545 million of value to junior stakeholders in the Debtors' capital structure.  In particular, Holders of Allowed iHC 2021 / Legacy Notes Claims will receive their Pro Rata share of $200 million of the New Debt and 5.0 percent of the equity in Reorganized iHeart.[16]  In addition, Holders of Allowed iHeart Interests will receive their share of 1.0 percent of the equity in Reorganized iHeart.  And pursuant to the Committee Plan Settlement (as described below), Holders of Allowed Guarantor General Unsecured Claims (*i.e.*, any Allowed General Unsecured Claim against a Guarantor Debtor that is not a TTWN Debtor) will receive such Holder's Pro Rata share of a $17.5 million cash pool (subject to certain adjustments set forth in the Plan), provided that in no event shall any such Holder receive a recovery less than 45 percent or greater than 55 percent on account of such Holder's Allowed Claim.

21.    The Plan also includes six additional classes of unsecured creditors:

- Holders of Allowed Guarantor Unsecured Claims against CCH will receive their Pro Rata share of 100 percent of the CCOH Interests held by the Debtors and CC Finco, LLC and Broader Media, LLC, which are non-Debtor affiliates of the Debtors (which is estimated to be approximately 89.5% of all outstanding CCOH Interests);[17]

- Holders of Allowed General Unsecured Claims against Non-Obligor Debtors and the TTWN Debtors will receive, at the option of the applicable

---

[16]    Notwithstanding their litigation position or vote to not accept the Plan, Holders of Legacy Notes in Class 6 will still receive their Plan treatment (*i.e.*, the Plan contains no "death trap" provision).

[17]    As a result of dilution from management/incentive programs, the Debtors currently own approximately 89.1% of all outstanding CCOH shares.  For purposes of calculating Plan recovery percentages, the Debtors assumed 89.5% ownership of CCOH, consistent with ownership and public disclosures at that time.

Reorganized Debtor, payment in full in Cash or such other treatment rendering such Holder's Allowed General Unsecured Claim Unimpaired;

- Holders of Allowed iHC Unsecured Claims will receive payment in Cash equal to 14.44 percent of the Allowed amount of such Allowed iHC Unsecured Claim;

- Holders of Allowed Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors will receive their Pro Rata share of $4,163 million of the New Debt and 70.51 percent of the equity in Reorganized iHeart;

- Holders of Allowed Term Loan / PGN Deficiency Claims against the TTWN Debtors will receive no recovery, and will instead be deemed satisfied by the distributions to other parties provided in Class 6, Class 7D, Class 7E, and Class 8; and

- The Holder of the Allowed CCOH Due From Claims will receive Cash equal to 14.44 percent of the Allowed amount of such CCOH Due From Claim (estimated to be approximately $150 million of cash, subject to adjustments set forth in the CCOH Plan and Separation Settlement

22.     The Plan also incorporates an intercreditor settlement among the Senior Creditors, which no party in interest has objected to.  This settlement addressed various disputed issues in these Chapter 11 Cases relating to the scope and extent of each of the Senior Creditors' respective security interests, and is more fully described in Article II.B of the Disclosure Statement.  In short, the settlement consensually addresses the allocation of the value ascribed to the undisputed Non-Principal Property collateral among the various tranches of Term Loan and PGN indebtedness.  Collectively, Holders of Term Loan Credit Agreement Claims and PGN Claims will receive $1,387 million of the New Debt and 23.49 percent of the equity in Reorganized iHeart on account of the secured portion of their claims.

C.     **Committee Plan Settlement.**

23.     Subsequent to the Court entering the Disclosure Statement Order on September 20, 2018, the Debtors commenced solicitation of votes for the Plan.  Notwithstanding the entry of the

27

Disclosure Statement Order and commencement of solicitation, the Debtors, the Consenting Stakeholders, and the Committee continued to negotiate a consensual resolution regarding the treatment of General Unsecured Claims set forth in the Plan.  On October 10, 2018, these negotiations proved fruitful, resulting in an agreement regarding such treatment and a number of additional unresolved issues.  The terms of the Committee Plan Settlement were incorporated into an amended version of the Plan [Docket No. 1632] (the "Fifth Amended Plan").

24.      Specifically, the Committee Plan Settlement provides for an enhanced recovery for certain Holders of General Unsecured Claims.  To start, on the Effective Date, the Consenting Sponsors and their Related Parties will withdraw all of their General Unsecured Claims, other than Claims arising from or related to the Indemnification Provisions, thereby materially reducing the General Unsecured Claims against the Debtors.  Each Holder of an Allowed Guarantor General Unsecured Claim (*i.e.*, any Allowed General Unsecured Claim against a Guarantor Debtor that is not a TTWN Debtor) will receive such Holder's Pro Rata share of the Guarantor General Unsecured Recovery Cash Pool, which is approximately $17.5 million in cash, subject to certain adjustments described in the Plan, provided that in no event shall any such Holder receive a recovery less than 45 percent or greater than 55 percent on account of such Holder's Allowed Claim (compared to a recovery of 0 to 7.53 percent in stock or debt for such Holders under previous versions of the Plan).

25.      In addition, the Committee Plan Settlement resolves the Claims and Causes of Action identified in the Committee's Standing Motion, the Committee's Disputed ABL Claims Objection, and the Committee's potential objections to Confirmation.  As a result of the Committee Plan Settlement, the Committee fully supports confirmation of the Plan and the release provisions provided therein.   Lastly, the Consenting Sponsors agreed with the Committee to waive

approximately $15 million in asserted unpaid management fees that were entitled to payment in full under the Plan.

### D.     CCOH Plan and Separation Settlement.

26.     As discussed in detail in the Disclosure Statement, a key component of the Debtors' Plan is the separation of their business from that of CCOH.[18]   In fact, the Debtors had been negotiating with CCOH around the terms of a separation prior to the commencement of these chapter 11 cases.   In response, the Debtors formed an internal working group dedicated to addressing separation issues.   As part of the separation efforts, the Debtors and CCOH exchanged diligence materials and several term sheets, held numerous formal and informal conferences, and conducted significant due diligence spanning many months of these Chapter 11 Cases.   In particular, the parties discussed the potential prepetition and postpetition claims that may exist between the Debtors and CCOH and ways in which such claims could be settled, the treatment of the Intercompany Revolving Promissory Note, the postpetition intercompany balance that may be owed to CCOH or that may be owed to iHM, and other claims that may arise under the Intercompany Agreements or between these two entities as a result of their historical corporate relationship and their future separation.   The Disclosure Statement discussed, at length, the current status of the CCOH separation efforts at that time.

27.     Since the filing of the Disclosure Statement and subsequent solicitation, the Debtors and CCOH have continued working toward a comprehensive settlement that would separate the two businesses.   At the hearing to approve the Debtors' Disclosure Statement on September 12, 2018, GAMCO Asset Management Inc. ("GAMCO"), one of the largest minority shareholders of CCOH, raised certain concerns regarding the Debtors' Disclosure Statement and Plan as both

---

[18]     *See* Disclosure Statement, Art. VII.P.

related to the release of certain claims brought by GAMCO in the GAMCO Litigation.[19] In addition, Norfolk County Retirement System ("Norfolk") raised similar concerns to those of GAMCO.  Norfolk had also asserted certain claims and causes of action, based on similar facts and circumstances as those in the GAMCO Litigation, in their derivative action filed on behalf of CCOH captioned *Norfolk County Retirement System v. Hendrix, et al.*, C.A. No. 2017-0930-VCS, pending in the Delaware Court of Chancery (the "Norfolk Litigation").  Norfolk also filed an objection to confirmation of the Plan.

28.     Subsequent to the Disclosure Statement hearing, the Debtors, CCOH, GAMCO, and Norfolk engaged in arms'-length negotiations regarding the terms of a separation.  On December 17, 2018, such efforts culminated in a global settlement of all claims, objections, and other causes of action that have been or could be asserted by or on behalf of CCOH, GAMCO, and/or Norfolk by and among the Debtors, CCOH, GAMCO, certain individual defendants in the GAMCO Litigation and/or the Norfolk Litigation, and the private equity sponsor defendants in the GAMCO Litigation and/or Norfolk Litigation (the "CCOH Plan and Separation Settlement").  The CCOH Plan and Separation Settlement includes hundreds of pages of separation documents memorializing the way the businesses will operate as separate entities.  These agreements were negotiated on an accelerated basis to ensure that Plan confirmation would not be delayed.

29.     The CCOH Plan and Separation Settlement provides for the consensual separation of the Debtors and CCOH, including approximately $150 million of recovery to CCOH on account of its Claim,[20] a $200 million unsecured revolving line of credit from the Debtors to CCOH for a

---

[19]    As used herein, "GAMCO Litigation" shall mean the putative class-action lawsuit filed by GAMCO in the Court of Chancery of the State of Delaware captioned *GAMCO Asset Management Inc. v. Blair Hendrix, et al.*, Case No. 2018-0633 (Del. Ch. 2018).

[20]    Claim No. 3833.

period of up to three years, the transfer of certain of the Debtors' intellectual property to CCOH, the waiver by the Debtors of the setoff for the value of the transferred intellectual property, mutual releases, the termination of the cash sweep under the existing Corporate Services Agreement, the termination of any agreements or licenses requiring royalty payments from CCOH to the Debtors for trademarks or other intellectual property, the waiver of any postpetition amounts owed by CCOH relating to such trademarks or other intellectual property, and the execution of a new transition services agreement and other separation documents. After the Debtors extended the Voting Deadline solely with respect to CCOH in connection with the CCOH Plan and Separation Settlement, as set forth in the Supplemental Voting Report, CCOH voted to accept the Plan.

30.     The Debtors, CCOH, and GAMCO sought and received preliminary Court approval of the CCOH Plan and Separation Settlement.[21] A fairness hearing to consider final approval of the CCOH Plan and Separation Settlement is currently scheduled for January 22, 2019. The Debtors incorporated the terms of the CCOH Plan and Separation Settlement into a modified version of the Plan [Docket No. 2207]. In addition, notices were sent to the CCOH shareholders informing them of the CCOH Plan and Separation Settlement, and Confirmation Notices were sent to all stakeholders regarding the modified Plan. Issues related to the CCOH Plan and Separation Settlement (other than those scheduled for the January 22 fairness hearing) are scheduled for a hearing on January 17, 2019. Objections related to such issues are due January 9, 2019, and briefs in support of such issues are due January 14, 2019. The Debtors intend to address matters related

---

[21]     *See Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Preliminarily Approving the Settlement, (III) Approving the Retention of Prime Clerk LLC as Notice Administrator, (IV) Approving the Form and Manner of Notice, (V) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement as Part of Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 2219] and *Order (I) Directing the Application of Bankruptcy Rules 7023 and 7023.1, (II) Certifying a Class, Designating a Class Representative, and Appointing Class Counsel for Purposes of Settlement, and (III) Granting Related Relief* [Docket No. 2221] (together, the "CCOH Settlement Orders").

to the CCOH Plan and Separation Settlement (and any objections thereto) in more detail at that time.

## IV.     Legacy Notes Trustee.

31.     Since the Petition Date, the Legacy Notes Trustee has objected to the Plan and the Debtors' restructuring with a shotgun approach and has continued to press the same arguments—that holders of Legacy Notes are secured creditors with extra-contractual claims against myriad Debtors and should therefore receive different treatment than the other unsecured creditors of iHC, the only Debtors obligated on the Legacy Notes.  Throughout the course of these Chapter 11 Cases, the Legacy Notes Trustee has received over ten thousand documents from the Debtors, taken thirteen depositions, and cross-examined six witnesses in court.  Despite ample discovery, the Legacy Notes Trustee has failed to articulate a compelling reason to deny Confirmation.  As the Court is well aware from the adversary proceeding, the Debtors fundamentally disagree with the Legacy Notes Trustee's position and unfounded arguments.   Nevertheless, the Debtors have sought, and will continue to seek, the support of the Legacy Notes Trustee in advance of Confirmation.

### A.     Adversary Proceedings.

32.     On March 21, 2018, one week after the Petition Date, the Legacy Notes Trustee filed an adversary proceeding[22] in the Chapter 11 Cases alleging that iHC and certain of its direct and indirect Debtor subsidiaries violated a negative covenant in the Legacy Notes Indenture.  The Debtors and the other defendants filed multiple motions to dismiss, and after extensive discovery, including multiple interrogatories and depositions, the Bankruptcy Court heard opening arguments and on October 24, 2018, conducted a one-day trial, hearing testimony from three witnesses.

---

[22]     *Wilmington Savings Fund Society, FSB v. iHeartCommunications, Inc. et al.*, Case No. 18-03052 (MI).

33.     On October 9, 2018, the Legacy Notes Trustee filed a second adversary proceeding[23] in the Debtors' Chapter 11 Cases against Debtor Clear Channel Holdings, Inc. ("CCH"), as well as against Defendants Bain Capital LP, Thomas H. Lee Partners, Abrams Capital LP ("Abrams") and Highfields Capital Management LP seeking to designate the Class 6 votes of CCH and Abrams in the chapter 11 cases and to equitably subordinate the claims of the non-Debtor defendants below the claims of the Legacy Notes Trustee.  On November 9, 2018, CCH, Bain Capital LP, Thomas H. Lee Partners, Abrams, and Highfields Capital Management LP each filed a motion to dismiss the action.  On November 30, 2018, the Legacy Notes Trustee filed its opposition to the motions to dismiss.  The Debtors believe this new adversary proceeding is without merit and that all defendants have compelling responses to the claims for equitable subordination.  Moreover, the Debtors submit that confirmation of the Plan moots and precludes the new adversary proceeding.

### B.     Plan Objection.

34.     The Legacy Notes Trustee also filed an Objection to the Plan,[24] advancing many of the same arguments that have been argued at length in its adversary proceedings.  Among other things, the Legacy Notes Trustee's Objection asserts the following:

> a.     ***That the Plan improperly classifies Holders of Legacy Notes Claims with Holders of 2021 Notes Claims.***  For the reasons set forth in the adversary proceeding and herein, the Debtors believe such arguments are meritless, that Holders of Legacy Notes Claims and Holders of 2021 Notes Claims are substantially similar, and that the Debtors' classification scheme is reasonable.
>
> b.     ***That the Plan disparately treats Holders of Legacy Notes Claims and Holders of 2021 Notes Claims because of the waiver and allocation of Intercompany Notes Claims within Class 6 and the payment of the professional fees of the 2021 Noteholder Group.***

---

[23]   *Wilmington Savings Fund Society, FSB v. Bain Capital, LP, et al.*, Case No. 18-03287 (MI).

[24]   *See* Legacy Notes Trustee Obj. [Docket No. 2060].

The Debtors believe such arguments are meritless as each Holder in Class 6 will receive *exactly* the same treatment, with the only difference being the allocation of those recoveries that would otherwise have been received on account of the Intercompany Notes Claims. Moreover, the payment of the professional fees of the 2021 Noteholder Group is appropriate because such payment is not on account of such Holder's Class 6 Claim, but rather is on account of the 2021 Noteholder Group's support of the Plan and Restructuring Support Agreement.

c.   ***That the Plan violates the absolute priority rule.*** As set forth herein, the Plan is fully consensual from a Class perspective; thus, the Debtors are not utilizing section 1129(b) of the Bankruptcy Code. As set forth in the Voting Report, this is true even assuming the Class 6 votes of Abrams and CCH are designated, as Class 6 would still vote to accept the Plan.[25] Moreover, the Debtors do not believe that any valid Section 510(b) Claims exist for the reasons set forth in Debtors' objections to proofs of claim filed by certain individual holders of Legacy Notes [Docket Nos. 1661—1669, 1671—1673] (and for the reasons set forth by the Debtors in the trial regarding the Legacy Notes Trustee's adversary proceeding against iHC).[26]

d.   ***That the Plan contains improper release provisions.*** As set forth herein, the release provisions are an integral, bargained-for component of the Plan, are a valid exercise of the Debtors' business judgment, and were carefully tailored to comport with Fifth Circuit law regarding such provisions.

e.   ***That Confirmation of the Plan does not moot the Legacy Notes Trustee's equitable subordination claims.*** The Legacy Notes Trustee's equitable subordination claims are meritless legally and factually, including because they allege only generalized harm to all the Debtors' creditors, and any such claims belong to the Debtors' Estates. In any event, all equitable subordination claims are being

---

[25]   As set forth in the Voting Report, the Debtors' Claims, Noticing, and Solicitation Agent analyzed whether Class 6 would be a rejecting Class if such votes of Abrams and CCH were designated. Based upon its analysis, the Debtors' Claims, Noticing, and Solicitation Agent determined that designating the Class 6 votes of Abrams and CCH would still result in Class 6 accepting the Plan. Accordingly, the Debtors and Legacy Notes Trustee have agreed that no further briefing or arguments will be scheduled concerning the Legacy Notes Trustee's vote designation motion, and that the vote designation motion is withdrawn. *See Stipulation and Order Regarding Existing Deadlines in Respect to Confirmation, the Legacy 510(B) Claims, and the CCOH Claim* [Docket No. 2356].

[26]   As set forth in the *Stipulation and Order (I) Granting the Legacy 510(b) Claimants Leave to Withdraw and Deeming the Legacy 510(b) Claims Withdrawn; and (II) Overruling iHeartCommunications, Inc.'s Claim Objections as Moot*, filed contemporaneously herewith, the Legacy 510(b) Claimants have agreed to withdraw such proofs of claim with prejudice.

resolved pursuant to the Plan, and the Plan will also bar any equitable subordination claims through the application of *res judicata*. There is no due process issue, and Legacy Notes Trustee has had ample opportunity to investigate and prosecute its equitable subordination claims during these Chapter 11 Cases.

## Argument

35.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[27]   As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.  The Debtors will provide evidence to support this conclusion at the Confirmation Hearing.  The Debtors thus respectfully request that the Court confirm the Plan.

**I.    The Plan Satisfies Each Requirement for Confirmation.**

**A.    The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

36.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[28]   The principal aim of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[29]   Accordingly, the determination of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

---

[27]    *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).  *See also In re Nuvira Hosp., Inc.*, 2016 WL 6839310, at *4 (Bankr. S.D. Tex. Nov. 21, 2016); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015).

[28]    11 U.S.C. § 1129(a)(1).

[29]    *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

i. **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

37. Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[30] Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining how to classify claims together.[31] Likewise, the Fifth Circuit has recognized that plan proponents may place similar claims into *different* classes, provided there is a rational basis to do so.[32]

38. The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into 19 separate Classes, with each Class differing from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria.[33] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

| Class | Claim or Interest |
|-------|-------------------|
| 1 | Secured Tax Claims |
| 2 | Other Secured Claims |
| 3 | Priority Non-Tax Claims |
| 4 | Secured Term Loan / 2019 PGN Claims |
| 5A | Secured Non-9.0% PGN Due 2019 Claims Other Than Exchange 11.25% PGN Claims |
| 5B | Secured Exchange 11.25% PGN Claims |
| 6 | iHC 2021 / Legacy Notes Claims |
| 7A | General Unsecured Claims Against Non-Obligor Debtors |

---

[30] 11 U.S.C. § 1122(a).

[31] *See In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly permissive of "any classification scheme that is not [specifically] proscribed, and that substantially similar claims may be *separately* classified.").

[32] *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (holding that section 1122(a) permits classification of "substantially similar" claims in different classes if undertaken for reasons other than to secure the vote of an impaired, assenting class of claims); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 733 (Bankr. N.D. Tex. 2015).

[33] Plan, Art. III.

| Class | Claim or Interest |
|-------|-------------------|
| 7B | General Unsecured Claims Against TTWN Debtors |
| 7C | Term Loan / PGN Deficiency Claims Against the TTWN Debtors |
| 7D | iHC Unsecured Claims |
| 7E | Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors |
| 7F | Guarantor Funded Debt Unsecured Claims Against CCH |
| 7G | Guarantor General Unsecured Claims |
| 8 | CCOH Due From Claims |
| 9 | iHeart Interests |
| 10 | Section 510(b) Claims |
| 11 | Intercompany Claims |
| 12 | Intercompany Interests |

39.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Estate legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.  For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business) and Secured Claims are classified separately from Unsecured Claims.  Where the Debtors separately classified the Senior Creditors' deficiency claims from General Unsecured Claims, there was a good business reason to do so (*i.e.*, in order to pay Holders of General Unsecured Claims pursuant to the Committee Plan Settlement), and, importantly, the Senior Creditors were heavily involved in the negotiation of the Committee Plan Settlement and do not object to such treatment.  These classifications facilitate the ease of distributions on the Effective Date.  As set forth in Section IV.A

37

below, the Legacy Notes Trustee's argument that the Debtors have improperly classified 2021

Notes Claims together with Legacy Notes Claims (all of which are unsecured notes claims) is

without merit and should be overruled.  For the foregoing reasons, the Plan satisfies section 1122

of the Bankruptcy Code.

> ii.     **The Plan Satisfies the Seven Mandatory Plan Requirements of Sections 1123(a) of the Bankruptcy Code.**

40.     The seven applicable requirements of section 1123(a) of the Bankruptcy Code

generally relate to the specification of claims treatment and classification, the equal treatment of

claims within classes, and the mechanics of implementing a plan.  The Plan satisfies each of these

requirements.

41.     ***Specification of Classes, Impairment, and Treatment.***     The first three

requirements of section 1123(a) of the Bankruptcy Code are that a plan specify (1) the

classification of claims and interests, (2) whether such claims and interests are impaired or

unimpaired, and (3) the precise nature of their treatment.[34]  The Plan, in particular Article III, sets

forth these specifications in detail in satisfaction of these three requirements.[35]   No party has

asserted otherwise.

42.     ***Equal Treatment.***  The fourth requirement of section 1123(a) of the Bankruptcy

Code is that a plan must "provide the same treatment for each claim or interest of a particular class,

unless the holder of a particular claim or interest agrees to a less favorable treatment."[36]  The Plan

meets this requirement because Holders of Allowed Claims or Interests will receive the same rights

and treatment as other Holders of Allowed Claims or Interests within such holders' respective

---

[34]     11 U.S.C. § 1123(a)(1); 11 U.S.C. § 1123(a)(2); 11 U.S.C. § 1123(a)(3).

[35]     Plan, Art. III.

[36]     11 U.S.C. § 1123(a)(4).

Class.  As discussed in Section IV.A below, the Legacy Notes Trustee's contention that the Plan disparately treats Holders of Claims in Class 6 (*i.e.*, Holders of 2021 Notes Claims and Holders of Legacy Notes Claims) should be overruled.  No other party has asserted that the Plan fails to satisfy section 1123(a)(4).

43.     ***Adequate Means for Implementation.***  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[37]  The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions that underlie the Plan.

44.     In particular, Article IV of the Plan sets forth the means for implementation of the Plan.  It also describes the means for cancellation of existing securities and implementation of the transactions underlying the Plan, including:   (a) effectuating the Restructuring Transactions, including the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the issuance and distribution of the New iHeart Common Stock and Special Warrants; (c) the issuance of the New Debt; (d) the execution of the New ABL  Credit  Agreement  Documents;  (e) executing  the  CCOH  Separation  Documents; (f) entering  into  the  Preferred  Stock  Transactions;  (g) filing  the  required  FCC  Long  Form Applications and filing a Petition for Declaratory Ruling to effectuate the transfer of the Debtors'

---

[37]    11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include:  retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

FCC Licenses; (h) filing the New Corporate Governance Documents; (i) authorizing the Debtors to take all actions contemplated under the Plan; (j) vesting all property in each Debtor's Estate, all Causes of Action of the Debtors (unless otherwise released or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan in each respective Reorganized Debtor; (k) providing for the cancellation of all notes, bonds, indentures, Certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except with respect to any Claim or Interest that is Reinstated pursuant to the Plan); (*l*) providing for the preservation and vesting of certain Causes of Action in the Reorganized Debtors; (m) providing for the appointment of the members of the New Boards; and (n) establishing the Guarantor General Unsecured Recovery Cash Pool.  In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors' emergence, such as the cancellation of existing securities, the establishment and termination of certain agreements, and the settlement of Claims and Interests.

45.     Additional terms governing the execution of these transactions are set forth in greater detail in the Plan Supplement.[38]   Thus, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.  No party has asserted otherwise.

46.     ***Non-Voting Stock.***  The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the

---

[38]     *See Notice of Filing Plan Supplement* [Docket Nos. 1781, 1929, 2245] (as amended, the "<u>Plan Supplement</u>").

election of directors upon an event of default.[39]  Here, Article IV.M of the Plan provides that the New Corporate Governance Documents will prohibit the issuance of non-voting equity securities. Thus, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

47.     ***Selection of Officers and Directors.***  Finally, section 1123(a)(7) of the Bankruptcy Code requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[40]  Article IV.N of the Plan outlines the manner of selecting the members of the New Boards and the officers, directors, and/or managers of each of the Reorganized Debtors, which accords with applicable state law, the Bankruptcy Code, the interests of creditors and equity security holders, and public policy.  Thus, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**B.     The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

48.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponents comply with applicable provisions of the Bankruptcy Code.  Case law and legislative history indicate that this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[41] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[42]

---

[39]   11 U.S.C. § 1123(a)(6).

[40]   11 U.S.C. § 1123(a)(7).

[41]   *See Cypresswood Land Partners*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[42]   11 U.S.C. § 1125(b).

### i.       The Debtors Complied with Section 1125 of the Bankruptcy Code.

49.      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[43] Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[44]

50.      Section 1125 of the Bankruptcy Code is satisfied here.  Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement and Disclosure Statement Supplement in accordance with section 1125(a)(1) of the Bankruptcy Code.[45]  The Court also approved the contents of the Solicitation Packages provided to Holders of Claims and Interests entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[46]  The Debtors, through their Claims, Noticing, and Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order and Continued Solicitation Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[47]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to

---

[43]   *Id.*

[44]   *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[45]   *See generally* Disclosure Statement Order, Continued Solicitation Order.

[46]   *See id.*

[47]   *See generally Affidavit of Service of Solicitation Materials* [Docket No. 1582]; *Affidavit of Service of Solicitation Materials* [Docket No. 1728] (together, the "Solicitation Affidavits").

each holder of a claim or interest in a particular class.  Here, the Debtors caused the Disclosure Statement and Disclosure Statement Supplement to be transmitted to all parties entitled to vote on the Plan.[48]

51.  Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### ii.    The Debtors Complied with Section 1126 of the Bankruptcy Code.

52.  Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[49]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Classes 1 (Secured Tax Claims), 2 (Other Secured Claims), 3 (Priority Non-Tax Claims), 7A (General Unsecured Claims Against Non-Obligor Debtors), and 7B (General Unsecured Claims Against TTWN Debtors), which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[50]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and therefore were not entitled to vote on the Plan.

- Class 10 (Section 510(b) Claims) would be Impaired under the Plan and would not receive any distributions or retain any property under the Plan (the "Deemed Rejecting Class").[51]  However, as noted in the Disclosure Statement and Plan, the Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.  Accordingly, the Debtors believe that Class 10 shall be deemed eliminated from the Plan in accordance with Article III therein.   In addition, as set forth in the Debtors' objections to proofs of claim filed by certain individual holders of Legacy Notes [Docket Nos. 1661–1669, 1671–1673] (and for the reasons set forth by the Debtors in the trial regarding the Legacy Notes Trustee's adversary proceeding against iHC), the Debtors do not believe that such

---

[48]   *See* Solicitation Affidavits.

[49]   *See* 11 U.S.C. § 1126.

[50]   *See* Plan. Art. III.B.

[51]   *Id.*

holders of Legacy Notes have valid claims against the Debtors pursuant to section 510(b) of the Bankruptcy Code.[52]

- Classes 11 (Intercompany Claims) and 12 (Intercompany Interests) will either be reinstated in accordance with Article III.G of the Plan or cancelled without any distribution on account of such Claims or Interests. Therefore, each Holder of an Intercompany Claim or Intercompany Interest were not entitled to vote to accept or reject the Plan.

53.     Rather, the Debtors solicited votes only from holders of Allowed Claims or Interests in the following Classes (collectively, the "Voting Classes"):

| Class | Claim or Interest |
|---|---|
| 4 | Secured Term Loan / 2019 PGN Claims |
| 5A | Secured Non-9.0% PGN Due 2019 Claims Other Than Exchange 11.25% PGN Claims |
| 5B | Secured Exchange 11.25% PGN Claims |
| 6 | iHC 2021 / Legacy Notes Claims |
| 7C | Term Loan / PGN Deficiency Claims Against the TTWN Debtors |
| 7D | iHC Unsecured Claims |
| 7E | Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors |
| 7F | Guarantor Funded Debt Unsecured Claims Against CCH |
| 7G | Guarantor General Unsecured Claims |
| 8 | CCOH Due From Claims |
| 9 | iHeart Interests |

Each of the Voting Classes is Impaired and entitled to receive a distribution under the Plan.[53]  The Voting Report reflects the results of the voting process in accordance with section 1126 of the

---

[52]   As set forth in the *Stipulation and Order (I) Granting the Legacy 510(b) Claimants Leave to Withdraw and Deeming the Legacy 510(b) Claims Withdrawn; and (II) Overruling iHeartCommunications, Inc.'s Claim Objections as Moot*, filed contemporaneously herewith, the Legacy 510(b) Claimants have agreed to withdraw such proofs of claim with prejudice.

[53]   *See* Plan, Art. III.B; *see generally* Solicitation Affidavits.

Bankruptcy Code.[54]   The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[55]

54.     As set forth in the Voting Report, all voting Classes entitled to vote voted to accept the Plan for each Debtor.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

### C.      The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

55.     Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan propose the plan "in good faith and not by any means forbidden by law."[56]   In assessing the good faith standard, Fifth Circuit courts consider whether a plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[57]   The court will view a plan "in light of the totality of circumstances surrounding the establishment of a Chapter 11 plan, mindful of the purposes underlying the Bankruptcy Code."[58]   The Plan must also achieve a result consistent with the Bankruptcy Code.[59]

---

[54]   "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan." 11 U.S.C. § 1126(c). "A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan."  *Id.* § 1126(d).

[55]   *See generally* Voting Report, Supplemental Voting Report.

[56]   11 U.S.C. § 1129(a)(3).

[57]   *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[58]   *See In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013); *In re Sun Country Dev., Inc.*, 764 F.2d at 408; *Pub. Fin. Corp. v. Freeman*, 712 F.2d 219, 220 (5th Cir. 1983); *Cypresswood Land Partners, I*, 409 B.R. at 425.

[59]   *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

56.     Here, the Special Committee negotiated and approved the terms of the proposed restructuring, and the Debtors negotiated, drafted, and implemented their proposed restructuring in good faith.  The Plan and related documents are a result of collaboration among the Debtors' key stakeholders, including the Term Loan / PGN Group, Term Lender Group, 2021 Noteholder Group, Consenting Sponsors, the Committee, and CCOH.  Consequently and as discussed further below, the Debtors believe that the Plan has been proposed in good faith and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

>    **D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

57.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be approved by the Court as reasonable or subject to approval by the Court as reasonable. The Fifth Circuit has held that this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[60]  As one court explained, as to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[61]

58.     In general, the Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code.  Article II.B of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than

---

[60]   *See Cajun Elec.*, 150 F.3d at 517-18 ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[61]   *Id.* at 517.

60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.

59.     Further, the Plan provides for the payment of the reasonable and documented professional fees and expenses of the Consenting Stakeholders that are incurred and unpaid as of the Effective Date.[62]   As a component of the Plan Settlement, this provision for the payment of such professional fees can be approved by the Court as a reasonable exercise of the Debtors' business judgment through entry of the Confirmation Order.[63]   Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.[64]

**E.     The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).**

60.     The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[65]   It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[66]   Lastly, it requires that the plan proponent disclose the identity of insiders to

---

[62]   Plan, Art. IV.X.

[63]   *See* 11 U.S.C. § 363(b) (allowing use of estate property outside of the ordinary course of business after notice and a hearing); *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion . . . [T]he bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.").

[64]   Although the Legacy Notes Trustee does not object to the payment of professional fees under section 1129(a)(4) of the Bankruptcy Code, the Legacy Notes Trustee has raised an objection to the payment of professional fees to the 2021 Noteholder Group arguing that it constitutes improper disparate treatment.  For the reasons set forth in Section IV.A of the Argument, the Debtors submit that such objection is without merit and should be overruled.

[65]   11 U.S.C. § 1129(a)(5)(A)(i).

[66]   11 U.S.C. § 1129(a)(5)(A)(ii).

be retained by the reorganized debtor and the nature of any compensation for such insider.[67] Courts have held that these provisions are meant to ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[68]

61.     In this case, the Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because the Debtors have disclosed the identities and affiliations of all persons, to the extent known, proposed to serve on the New Board of Reorganized iHeart.[69]  In instances where specific individuals are not yet known, the Debtors have disclosed which creditor constituency has the right to appoint the applicable director.  The Debtors believe control of the Reorganized Debtors by the proposed individuals or individuals to be appointed in accordance with the Plan and New Corporate Governance Documents will be consistent with public policy, and no party has asserted otherwise.  Therefore, the requirements under section 1129(a) of the Bankruptcy Code are satisfied.

**F.     The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

62.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Because the Plan does not propose any rate changes, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases.

---

[67]   *Id.* § 1129(a)(5)(B).

[68]   *See In re Landing Assocs.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.") (internal citation omitted).

[69]   *See Notice of Filing of Amended Plan Supplement* [Docket No. 1929].

G.    **The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

63.    The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[70]  The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[71]  "[I]f a claim is settled through a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for applying section 1129(a)(7)" of the Bankruptcy Code.[72]

64.    As demonstrated in the Liquidation Analysis, all Holders of Claims and Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[73]  Specifically, the projected recoveries under the Plan and the results of the

---

[70]   11 U.S.C. § 1129(a)(7).

[71]   *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (stating that under section 1127(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation); *see In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan") (internal citation omitted); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citation omitted).

[72]   *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010); *see In re Nortel Networks, Inc.*, 522 B.R. 491, 507 (Bankr. D. Del. 2014); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *117-20 (Bankr. S.D.N.Y. July 15, 2004) (observing that section 1129(a)(7) requires an "apples to apples" comparison that contains the same settlement, and "assuming common legal issues are resolved that same way [in chapter 7 and chapter 11]").

[73]   *See* Disclosure Statement, Art. XI.B, <u>Exhibit E</u>.

Liquidation Analysis for Holders of Claims and Interests in Impaired Classes entitled to vote on the Plan are as follows:

| Class | Claim or Interest | Liquidation Recovery (Low /High) | Plan Recovery |
|---|---|---|---|
| 4 | Secured Term Loan / 2019 PGN Claims | 9.2% - 13.1% | 100% |
| 5A | Secured Non-9.0% PGN Due 2019 Claims Other Than Exchange PGN Claims | 9.2% - 13.1% | 100% |
| 5B | Secured Exchange 11.25% PGN Claims | 9.2% - 13.1% | 100% |
| 6 | iHC 2021 / Legacy Notes Claims | 0.0% | 14.44% |
| 7C | Term Loan / PGN Deficiency Claims Against the TTWN Debtors | 2.4% - 4.0% | Agreed Treatment |
| 7D | iHC Unsecured Claims | 0.0% | 14.44% |
| 7E | Guarantor Funded Debt Unsecured Claims (Other Than Exchange 11.25% PGN Claims) Against Guarantor Debtors Other Than CCH and the TTWN Debtors | 0.0% - 3.86% | 0% - 7.79% |
| 7F | Guarantor Funded Debt Unsecured Claims Against CCH | 0.4% - 9.1% | 11.55% |
| 7G | Guarantor General Unsecured Claims | 0.0% - 7.7% | 45.0% - 55.0% |
| 8 | CCOH Due From Claims | 0.0% | 14.44% |
| 9 | iHeart Interests | 0.0% | N/A |

65.     In addition, the amount of claims and expenses in a chapter 7 liquidation would only increase, further reducing creditor recoveries.  The conversion to chapter 7 would require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7.[74]  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.  These additional Allowed Claims would be in addition to all of the unpaid expenses incurred by the Debtors during the chapter 11 cases, which the Estate would

---

[74]   *See* Fed. R. Bankr. P. 1019(2); 3002(c).

continue to be obligated to pay in a chapter 7 liquidation.  In addition, the chapter 7 trustee and his

or her professionals would incur fees and expenses that would also diminish creditor recoveries.[75]

66.     In light of the foregoing, the Debtors submit that a chapter 7 liquidation would

result in materially reduced recoveries, increased expenses, delayed distributions, and the prospect

of additional claims that were not asserted in the chapter 11 cases.  Accordingly, the Plan satisfies

section 1129(a)(7) of the Bankruptcy Code and the best interests test.  No party has asserted

otherwise.

### H.     The Plan Satisfies Section 1129(a)(8) of the Bankruptcy Code.

67.     The Bankruptcy Code generally requires that each class of claims or interests must

either accept the plan or be unimpaired under the plan.[76]  As discussed in Section II of the

Background, all voting Classes entitled to vote voted overwhelmingly to accept the Plan, and the

Debtors are not aware of any valid Claims in the Deemed Rejecting Class (*i.e.*, Class 10 (Section

510(b) Claims)) and believe that no such Section 510(b) Claim exists.  Accordingly, the Debtors

believe that Class 10 is deemed eliminated from the Plan in accordance with Article III therein.  In

addition, as set forth in the Debtors' objections to proofs of claim filed by certain individual holders

of Legacy Notes [Docket Nos. 1661–1669, 1671–1673] (and for the reasons set forth by the

Debtors in the trial regarding the Legacy Notes Trustee's adversary proceeding against iHC), the

Debtors do not believe that such holders of Legacy Notes have valid claims against the Debtors

pursuant to section 510(b) of the Bankruptcy Code.[77]

---

[75]     *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

[76]     11 U.S.C. § 1129(a)(8).

[77]     As set forth in the *Stipulation and Order (I) Granting the Legacy 510(b) Claimants Leave to Withdraw and Deeming the Legacy 510(b) Claims Withdrawn; and (II) Overruling iHeartCommunications, Inc.'s Claim Objections as Moot*, filed contemporaneously herewith, the Legacy 510(b) Claimants have agreed to withdraw such proofs of claim with prejudice.

**I.     The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).**

68.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code— administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in sections 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

69.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time defined in Article II.A of the Plan.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by

section 1129(a)(9)(B) are Impaired under the Plan.[78]   **Finally**, Article II.D of the Plan satisfies

section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of

Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in

section 1129(a)(9)(C) of the Bankruptcy Code.   Thus, the Plan satisfies each of the requirements

set forth in section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

> **J.   At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

70.   Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an

impaired class of claims, at least one impaired class of claims must accept the plan, "without

including any acceptance of the plan by any insider," as an alternative to the requirement under

section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept

the plan or be unimpaired under the plan.   Section 1129(a)(10) of the Bankruptcy Code applies on

a per plan, not a per debtor basis.[79]   As detailed herein and in the Voting Report, all voting Classes

voted to accept the Plan, exclusive of any acceptances by insiders, which includes an accepting

voting class at each Debtor.     Accordingly, the Plan satisfies the requirements of

section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

> **K.   The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).**

71.   Feasibility refers to the Bankruptcy Code's requirement that plan confirmation

must not be "likely to be followed by the liquidation, or the need for further financial

reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the

---

[78]   Plan, Art. III.B.

[79]   *In re Transwest Resort Props., Inc.*, 881 F.3d 724, 729 (9th Cir. 2018) ("Section 1129(a)(10) requires that one impaired class 'under the plan' approve 'the plan' . . . [and] makes no distinction concerning or reference to the creditors of different debtors under 'the plan,' nor does it distinguish between single-debtor and multi-debtor plans.") (internal citation omitted).

plan."[80]  Under this standard, the Fifth Circuit has held that the plan need only have a "reasonable

probability of success."[81]  Indeed, "a relatively low threshold of proof will satisfy § 1129(a)(11)

so long as adequate evidence supports a finding of feasibility."[82]  In particular, according to Fifth

Circuit law, "[w]here the projections are credible, based upon the balancing of all testimony,

evidence, and documentation, even if the projections are aggressive, the court may find the plan

feasible."[83]

72.     The Plan is feasible.  Through the Plan, the Debtors will reduce their prepetition

capital structure by nearly two-thirds to $5,750 million and separate their business from CCOH.

As set forth in the Valuation Analysis and Financial Projections attached to the Disclosure

Statement,[84] the Debtors anticipate that they will be able to meet their obligations under the Plan

and operate their businesses on a go-forward basis.  Accordingly, the Debtors believe the Plan

satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code, and no party

has asserted otherwise.

### L. The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).

73.     The Bankruptcy Code requires the payment of all fees payable under

28 U.S.C. § 1930.[85]  Article XII.C of the Plan includes an express provision requiring payment of

---

[80]    11 U.S.C. § 1129(a)(11).

[81]    *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)).

[82]    *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (9th Cir. BAP 2003).

[83]    *T-H New Orleans*, 116 F.3d at 802 (quoting *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 508 n.20 (Bankr S.D. Tex. 1989)).

[84]    *See* Disclosure Statement, Art. XI.C, Exhibit F, Exhibit G.

[85]    11 U.S.C. § 1129(a)(12).

all fees under 28 U.S.C. § 1930. The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

74.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[86] Section 1114(a) of the Bankruptcy Code defines retiree benefits as medical benefits.[87] Article IV.V of the Plan of the Plan provides that, on or after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.

**N.    Sections 1129(a)(14) Through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

75.    A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[88] Section 1129(a)(15) is inapplicable because no Debtor is an "individual" as defined in the Bankruptcy Code.[89] Section 1129(a)(16) is inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[90]

---

[86]   11 U.S.C. § 1129(a)(13).

[87]   Section 1114(a) defines "retiree benefits" as:  "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."  11 U.S.C. § 1114(a).

[88]   *See* 11 U.S.C. § 1129(a)(14).

[89]   *See* 11 U.S.C. § 1129(a)(15).

[90]   *See* 11 U.S.C. § 1129(a)(16).

O.     **The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(b) - (e)).**

76.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code is not applicable because all requirements of Section 1129(a) have been met, including Section 1129(a)(8).  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[91]

77.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

78.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[92]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

II.     **The Discretionary Contents of the Plan Are Appropriate.**

79.     Section 1123(b) of the Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[93]  Among other discretionary provisions, the Plan contains releases by the Debtors and third-party holders of Claims and Interests, as well as exculpation and injunction provisions.[94]  The Debtors have determined, as fiduciaries of their

---

[91]   11 U.S.C. § 1129(c).

[92]   11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,000,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

[93]   11 U.S.C. §§ 1123(b)(1), (2), (3), (4), (5), (6).

[94]   Plan, Art. VIII.

Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these chapter 11 cases.

### A.   The Plan Appropriately Incorporates a Settlement of Claims and Causes of Action.

80.   The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[95]   A court may only approve settlements under a plan when they are "fair and equitable."[96]

81.   Here, the Plan embodies a global settlement of claims and causes of action between the Debtors, the Consenting Stakeholders, the Committee, and CCOH.  Prior to the Petition Date, the Debtors negotiated a comprehensive Restructuring Support Agreement with organized groups of their lenders and stakeholders.  Such efforts culminated in the execution of the Restructuring Support Agreement that carries the support of the Consenting Stakeholders, including the Consenting Sponsors and a supermajority of claims across the Debtors' capital structure constituting nearly $12 billion of outstanding debt obligations.  In addition, the Plan incorporates the Committee Plan Settlement, an agreement with respect to the treatment of General Unsecured Claims and the settlement of additional claims and causes of action (including the Committee Standing Motion and the Disputed ABL Claims Objection) that was reached among the Debtors, the Committee, the Required Consenting Senior Creditors under the Restructuring Support Agreement, and the Consenting Sponsors.  Pursuant to the Committee Plan Settlement, the Committee supports the Plan's release provisions, including the release of the equitable subordination claims advanced by the Legacy Notes Trustee.  The Plan also incorporates the

---

[95]   11 U.S.C. § 1123(b)(3)(A).

[96]   *See In re Zale Corp.*, 62 F.3d 746, 754 n.22 (5th Cir. 1995) (citing *In re AWECO, Inc.*, 725 F.2d. 293, 297 (5th Cir. 1984)).

CCOH Plan and Separation Settlement, which results in the consensual separation of the Debtors' business from CCOH.  The settlements embodied in the Plan are fair and equitable.  The Plan resolves a host of alleged Claims and Causes of Action that were thoroughly analyzed by the Debtors, the Consenting Stakeholders, the Committee, CCOH, and their advisors, all of which are highly uncertain to succeed and have an immense capacity to cause extensive delay, cost, and uncertainty in these chapter 11 cases and otherwise, and achieves the overall objective of complete closure.  As further reflected by the support of creditors for the Plan, this settlement, which was the result of arms'-length negotiations, is in the best interests of creditors and all parties in interest.

    **B.**    **The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code.**

    82.    The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[97]  The Plan includes certain Debtor and consensual third-party releases, an exculpation provision, and an injunction provision.  These provisions comply with the Bankruptcy Code and prevailing law because, among other things, they are the product of extensive good faith, arms'-length negotiations.  Further, these provisions are bargained-for provisions that were necessary to generate consensus with certain of their stakeholders regarding the Plan.  Notably, these provisions are supported by the Consenting Stakeholders and the Committee.  In addition, as set forth in the Cremens Declaration, the Special Committee reviewed the appropriateness of the release and exculpation provisions in the Plan and concluded that the Plan is fair, reasonable, and in the best interests of the Debtors, their Estates, and their stakeholders, and that the Releases and Exculpation Provision, which are both integral

---

[97]    11 U.S.C. §§ 1123(b)(1)–(6).

parts of the intensively-negotiated and broadly-consensual Plan, should be approved as part of Confirmation of the Plan.[98]   Moreover, the overwhelming approval of the Plan by the Debtors' economic stakeholders, including the Committee, was a factor strongly supportive of the Special Committee's conclusion that the Releases and Exculpation are reasonable and appropriate.[99]   The U.S. Trustee, SEC, and Legacy Notes Trustee, however, have objected to the breadth of the Plan's third-party release and exculpation provisions.   For the reasons set forth below and in Section VI.B, the Debtors respectfully submit that the Court should overrule the Objections and approve the Plan's release, exculpation, and injunction provisions.

> ### i.      The Debtor Release Is Appropriate and Complies with the Bankruptcy Code.

83.      Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."   Accordingly, pursuant to section 1123(b)(3)(A), the Debtors may release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan.[100] In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[101] The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's

---

[98]   *See* Cremens Declaration, ¶¶ 22-27.

[99]   *Id* at ¶ 27.

[100]   *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp*., 348 B.R. 725, 737–39 (Bankr. N.D. Tex. 2006); *In re General Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[101]   *Mirant*, 348 B.R. at 738; *see also Heritage*, 375 B.R. at 259.

absolute priority rule.[102]   Courts generally determine whether a debtor release is "in the best interest of the estate" by reference to the following factors:

    a.    the probability of success of litigation;

    b.    the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

    c.    the interest of creditors with proper deference to their reasonable views; and

    d.    the extent to which the settlement is truly the product of arms'-length negotiations.[103]

Ultimately, courts afford debtors some discretion in determining for themselves the appropriateness of granting plan releases of estate causes of action.[104]

    84.    Article VIII.B of the Plan provides for releases by the Debtors, their Estates, and Related Parties[105] of any and all Causes of Action, including any derivative claims, the Debtors could assert against the Released Parties—*e.g.*, each of the Debtors and Reorganized Debtors; each Holder of a DIP Claim; the DIP Agent; the New ABL Credit Agreement Lenders; the New ABL Credit Agreement Agent; each Consenting Stakeholder; the Term Loan Credit Agreement Agent; each of the PGN Trustees and Agents; the 2021 Notes Agent; the 2021 Notes Trustee; the

---

[102]  *Mirant*, 348 B.R. at 738.

[103]  *Id.* at 739-40 (citing *In re Cajun Elec. Power Co-op.*, 119 F.3d at 355-56).

[104]  *See General Homes*, 134 B.R. at 861 ("[t]he court concludes that such a release is within the discretion of the Debtor").

[105]  As used herein, the term "<u>Related Parties</u>" refers to various individuals and entities related to the Debtors, Released Parties, Releasing Parties, and Exculpated Parties, as applicable, including affiliates, predecessors, successors, and current and former equity holders, officers, directors, employees, agents, advisors, and other professionals.

Committee and each member of the Committee (solely in its capacity as a member of the Committee); and each of the ABL Secured Parties—and Related Parties (the "Debtor Release").[106]

85.     The Plan, including the Debtor Release, was vigorously negotiated prepetition and postpetition by sophisticated entities that were represented by able counsel and financial advisors, including the Term Loan / PGN Group, the Term Lender Group, the 2021 Noteholder Group, the Consenting Sponsors, the Committee, CCOH, GAMCO, and Norfolk, and includes the settlement of Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  Notably, the release provisions in the Plan are supported by the Committee as part of the Committee Plan Settlement and followed a comprehensive investigation by the Committee of potential claims and causes of action against various parties released under the Plan.  The release provisions were a necessary element of consideration that these parties required before entering into the Restructuring Support Agreement and agreeing to support the Plan.  Any potential claims against the Released Parties are complex and, even if successful, may be difficult to collect in light of the sophisticated nature of the underlying transactions and certain structural barriers.

86.     Several additional reasons confirm that the Debtor Release is in the best interest of the Debtors' Estates and well within the Debtors' business judgment.  ***First***, the Debtors would not be where they are today—on the verge of confirmation of a highly consensual and value-maximizing transaction that resolves myriad complex issues—without the participation of the Released Parties.  In particular, the Plan provides for releases by the Debtors and related parties of any and all Causes of Action, including any derivative claims, that the Debtors could assert

---

[106]   The foregoing description is meant as a summary of the operative plan provisions only.  Certain of the Released Parties are defined as such in multiple capacities.  To the extent there is any conflict between the foregoing summary and the definition of "Released Party" contained in Article I of the Plan, the Plan shall control.

against holders, agents, and trustees of the Debtors' prepetition funded debt and postpetition DIP financing, the Debtors' current and former directors and officers, the Committee and each member of the Committee (solely in its capacity as a member of the Committee), and Related Parties.  In addition, the overall reorganization of the Debtors, of which the releases are an integral part, provides value to the Debtors' Estates and their stakeholders.   Notably, the parties to the Restructuring Support Agreement (which has broad support of parties across the Debtors' capital structure) have agreed to equitize and/or take reduced recoveries on account of their Claims and make other material concessions in order to significantly deleverage the Debtors' prepetition capital structure and provide the Reorganized Debtors with a clean slate.  The Term Loan / PGN Group and Term Lender Group agreed to a resolution that provides an increased recovery (relative to the Fourth Amended Plan [Docket No. 1482]) to Holders of Allowed General Unsecured Claims, including settling the Claims and Causes of Action in the Committee's Standing Motion and the Disputed ABL Claims Objection.  The 2021 Noteholder Group and Consenting Legacy Noteholders have agreed to support the Plan and not pursue litigation claims or other strategies in the Chapter 11 Cases in opposition to the Plan.  Further, the Consenting Sponsors have agreed to support the Plan on account of their equity interests and the Term Loan / PGN holdings of their affiliates, agreed not to trade on their equity positions (thereby ensuring the preservation of the Debtors' tax attributes), and agreed to waive recovery on account of their General Unsecured Claims, other than General Unsecured Claims arising from or related to Indemnification Provisions.[107]  With respect to the DIP Agent and Holders of DIP Claims, each provided valuable

---

[107]   The Consenting Sponsors filed proofs of claim against each Debtor in an amount no less than $15 million, plus certain contingent and unliquidated amounts.  *See* Proofs of Claim 2859, 2862.  As set forth in the Disclosure Statement, the projected amount of Claims set forth therein included, for illustrative purposes only, a General Unsecured Claim of approximately $8.2 million at each of the Debtors relating to the General Unsecured Claims on account of such claims.  *See* Disclosure Statement, Art. III.D, n.21.  The Consenting Sponsors have asserted that such claims are in excess of $15 million.

DIP financing to the Debtors' Estates that allowed the Debtors to refinance their prepetition ABL facility on favorable economic terms.  Moreover, under the existing DIP Credit Agreement, the Debtors have agreed to indemnify the DIP Agent and each DIP Lender.  And, if the postpetition DIP financing is converted into post-emergence exit financing, the New ABL Credit Agreement will also include the indemnification provisions as agreed to in the Exit Facility Term Sheet (as defined in the DIP Credit Agreement) (and the Debtors anticipate that any alternative market exit financing would also likely include similar indemnification provisions).

87.     In addition, the Notes Trustees and Agents and the Term Loan Credit Agreement Agent are the institutional representatives of the Holders of the respective Term Loan / PGN Claims, 2021 Notes Claims, and Legacy Notes Claims.  As described throughout the Disclosure Statement, the Plan Settlement is based on a significant contribution of value by these constituencies and the corresponding release of rights and remedies that could have been pursued (including potential rights to make arguments with respect to the Collateral Flip and the Disputed Committee Claims) (all of which rights and remedies are expressly reserved and may be pursued if the Plan is not confirmed).  As such, the Consenting Stakeholders, the Notes Trustees and Agents, and the Term Loan Credit Agreement Agent are essential parties to the Plan Settlement and, on account of the aforementioned contributions to the Plan, should be entitled to the releases contemplated therein.  Accordingly, the Plan provides the various Released Parties the global closure that they negotiated for in exchange for, among other things, the various concessions and benefits provided to the Debtors' Estates under the Plan.

88.     Further, many of the Related Parties, such as current and former directors, managers, officers, equity holders (in their capacities as such) may have indemnification rights against the Debtors under applicable agreements for, among other things, all losses, damages,

claims, liabilities, or expenses, including defense costs, for claims subject to the release provisions of the Plan against the Debtors' Estates.  As such, those indemnifications claims could directly affect the Debtors' Estates.  Including the Related Parties in the Debtor Release avoids the risk of alter ego and/or derivative liability beyond specific named parties, and the release is limited to those entities' capacities with respect to the primary Released Party.  Moreover, there is no question that directors, managers, and officers provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their prepetition responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.

89.  **Second**, as set forth in Article VI.F of the Disclosure Statement, the Special Committee was delegated authority over decisions with respect to, among other things, the maturing 2016 Legacy Notes, the exchange offer commenced in March 2017, and potential entry into the Restructuring Support Agreement, and the Special Committee undertook a thorough investigation of potential Claims and Causes of Action against the equity interest owners of the Debtors.  As set forth in the Cremens Declaration, the Special Committee and Disinterested Directors investigated potential claims and Causes of Action against the equity interest owners of the Debtors, including the Sponsors, and their representatives on the board(s) of the Debtors, which included legal and factual analyses of potential claims, and evaluation of the strengths and weaknesses of such claims.[108]  Following its investigation, the Special Committee concluded that the Debtors did not hold any viable Causes of Action against the Consenting Sponsors or their Related Parties in light of the cost and delay to pursue any claims and the compromises, material benefits, and contributions that the Consenting Sponsors provided in furtherance of the Debtors'

---

[108]   Cremens Declaration, ¶ 12.

restructuring and confirmation of the Plan, and that that the releases provided for by the Restructuring Support Agreement, in the context of the overall Plan and the benefits provided to Debtors and their constituents therein, continued be in the best interests of the Debtors and all of their constituents.[109]

90.     ***Third***, prosecution of the Claims and Causes of Action released under the Debtor Release would be complex and time consuming and could mire the Debtors and parties in interest in litigation rather than effectuating a consensual restructuring.  Simply put, the Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.  Moreover, as set forth in the Cremens Declaration, the Special Committee determined that the potential claims being released had, at best, minimal value, and the value of settlement, compromise, and the confirmation of the Plan without undue delay, with the broad support of stakeholders throughout the capital structure, outweighed any value that could be achieved by pursuing potential claims and Causes of Action that the Debtors and Releasing Parties could assert against the Released Parties.[110]  Importantly, the Debtor Release provides finality and avoids significant delay, and therefore the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

91.     ***Finally***, because the Debtors consented to the releases as part of the Plan Settlement, a carveout for Claims and Causes of Action related to actual fraud, gross negligence, or willful misconduct is unnecessary.  The Released Parties that benefit from the Debtor Release are providing (directly or through their Related Parties) the consideration discussed above and are

---

[109]   *Id.*

[110]   Cremens Declaration, ¶ 11.

consenting to the releases, which were a necessary component of the overall bargain that has put the Debtors on the path to a value-maximizing restructuring. Such releases are permissible under applicable Fifth Circuit law and, as a compromise under the Bankruptcy Code, do not require carveouts for actual fraud, gross negligence, or willful misconduct.[111]

92. Moreover, section 1129(b) of the Bankruptcy Code and the absolute priority rule are not applicable because all requirements of section 1129(a), including section 1129(a)(8), have been satisfied. Accordingly, the Debtors submit that the Debtor Release is fair, equitable, consistent with applicable law, represents a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, is a valid exercise of the Debtors' business judgment, and is in the best interests of their Estates, and should be approved.

ii. **The Third-Party Release Is Consensual, Appropriate, and Complies with the Bankruptcy Code.**

93. Article VIII.C of the Plan contains a third-party release provision (the "Third-Party Release"), which provides that each Releasing Party—including all Holders of Claims and Interests that do not specifically opt out of or object to their inclusion as a Releasing Party—and Related Parties shall release any and all Causes of Action (including a list of specifically

---

[111] *See Bigler*, 442 B.R. at 547; *see also In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017); *In re Goodman Networks Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. May 4, 2017); *In re Sherwin Alumina Co., LLC*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Feb. 17, 2017); *In re Linn Energy, LLC*, No. 16-60040 (Bankr. S.D. Tex. Jan. 27, 2017); *In re CJ Holding Co*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016); *In re Midstates Petroleum Co., Inc.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. Sept. 28, 2016); *In re Sandridge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 9, 2016); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. March 14, 2017).

enumerated claims) such parties could assert against the Debtors, the Reorganized Debtors, and the Released Parties.[112]

94.     The Third-Party Release is integral to the Plan and is a condition of the settlement embodied therein.  The provisions of the Plan were heavily negotiated by sophisticated parties, each of whom are represented by competent counsel.  The consensual Third-Party Release (together with the Debtor Release) are key components of the Debtors' restructuring and a key inducement to bring stakeholder groups to the bargaining table.  Put simply, the Debtors' key stakeholders are unwilling to support the Plan—including agreeing to restructure over two-thirds of the Debtors' $16 billion in funded debt obligations by equitizing and/or taking reduced recoveries—without assurances that they and their collateral would not be subject to post-emergence litigation or other disputes related to the restructuring.  The Third-Party Release therefore not only benefits the non-Debtor Released Parties, but also the Debtors' post-emergence enterprise as a whole.

95.     The Debtors believe that the Third-Party Release and opt-out mechanism approved by the Bankruptcy Court in connection with the Disclosure Statement Order and solicitation procedures comport with applicable Fifth Circuit law regarding the availability of third-party releases and should be approved.[113]  Ultimately, the restructuring contemplated by the Plan is value-maximizing and would not be possible absent the support of the Released Parties (or the

---

[112]   The foregoing description is meant as a summary of the operative plan provisions only.  Certain of the Releasing Parties are defined in multiple capacities.  To the extent there is any conflict between the foregoing summary and the definition of "Releasing Party" contained in Article I of the Plan, the Plan shall control.

[113]   *See Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V.* (*In re Vitro S.A.B. de C.V.*), 701 F.3d 1031, 1059 (5th Cir. 2012); *In re The Pac. Lumber Co.*), 584 F.3d at 252; *Zale Corp.*, 62 F.3d at 760-61; *see also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286-88 (5th Cir. 2016); *FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 911-12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist.* (*In re Applewood Chair Co.*), 203 F.3d 914, 919 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

Related Parties who are procuring the releases on their behalf), many of which will also be the Debtors' most significant post-emergence stakeholders. Thus, the Third-Party Release operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or costs associated with the continuation of disputes related to the Debtors' restructuring. Courts in this district and others have confirmed chapter 11 plans containing releases similar to the Third-Party Release in comparable cases.[114]

### iii. The Exculpation Provision Is Appropriate and Complies with the Bankruptcy Code.

96.     Article VIII.D of the Plan provides that only the Debtors, Reorganized Debtors, Committee members (solely in their capacities as members of the Committee), such parties' Affiliates, and Related Parties of the foregoing are exculpated from any Causes of Action arising out of acts or omissions related to these Chapter 11 Cases and certain related transactions as set forth therein—except for acts or omissions that are found to have been the product of actual fraud,

---

[114] *See, e.g.*, *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (overruling U.S. Trustee objection and confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (confirming chapter 11 plan where general unsecured creditors were impaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Light Tower Rentals, Inc.*, No. 16-34284 (DRJ) (Bankr. S.D. Tex. Sept. 30, 2016) (confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (same); *see also In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) (confirming chapter 11 plan where general unsecured creditors were impaired and deemed to have consented to third-party release provisions unless they asserted an objection to same); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("In this case, the third party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (overruling U.S. Trustee objection and confirming chapter 11 plan with third-party release applicable to unimpaired parties who were "deemed" to accept the plan and did not object to such release).

willful misconduct, or gross negligence (the "Exculpation Provision").[115]  Although several other parties sought to be included in the Exculpation Provision, the Debtors refused to include such parties, and the Plan's Exculpation Provision is narrowly tailored to include only fiduciaries of the Debtors' Estates.  As such, the Exculpation Provision is reasonable, appropriate, and vital to these Chapter 11 Cases because it provides protection to parties who served as fiduciaries to the Estates during the restructuring.

97.     At the outset, it is important to underscore the difference between the Third-Party Release and the Exculpation Provision.  Unlike the Third-Party Release, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care of actual fraud or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[116]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[117]  As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan,[118] as well as the statutory exculpation in section 1125(e) of the Bankruptcy Code.[119]  Once the court makes its good faith finding, it is appropriate to set the

---

[115]   The foregoing description is meant as a summary of the operative plan provisions only.  To the extent there is any conflict between the forgoing summary and the definition of "Exculpated Party" contained in Article I of the Plan, the Plan shall control.

[116]   *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[117]   *See* 11 U.S.C. § 1129(a)(3).

[118]   *See* 28 U.S.C. § 157(b)(2)(L).

[119]   *See* 11 U.S.C. § 1125(e) ("A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law,

standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[120] Exculpation provisions, therefore, appropriately prevent future collateral attacks against fiduciaries of the Debtors' Estate.  Here, the Exculpation Provision is likewise appropriate and vital because it provides protection to those parties who served as fiduciaries during the restructuring process.

98.     There can be no doubt that the Debtors themselves are entitled to the relief embodied in the Exculpation Provision.  Having acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, the Debtors are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation Provision.[121]  Further, granting such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code.[122]  Even courts in the Fifth Circuit that have approached plan exculpation provisions with skepticism have done so *only* where the provision at issue exculpates *non-debtor* parties.[123]  The *Pacific Lumber* court also carved out an exception in favor of exculpatory relief for non-debtor parties where such parties owe duties in favor of the debtors or their estate and act within the scope of those duties— *i.e.*, excluding acts of fraud or gross negligence.[124]

99.     The Exculpation Provision is essential to ensure that capable individuals are willing to manage and assist a debtor in the chapter 11 context.[125]  Here, in addition to the Debtors, each

---

rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.").

[120]   *See PWS*, 228 F.3d at 246-47 (observing that creditors providing services to the debtors are entitled to a limited grant of immunity for actions within the scope of their duties).

[121]   *See In re Sears Methodist Ret. Sys., Inc.*, 2015 WL 1066882, at *9 (Bankr. N.D. Tex. Mar. 6, 2015).

[122]   *See Pac. Lumber*, 584 F.3d at 252-53.

[123]   *See, e.g.*, *id.*

[124]   *Id.* at 253.

[125]   *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get

of the exculpated Related Parties—including the directors, officers, and advisors that have acted on the Debtors' behalf in these chapter 11 cases—owe duties in favor of the Estates, permitting them to receive the benefits of the Exculpation Provision.[126]   The directors, officers, and professionals that have acted on behalf of the Debtors in connection with the Chapter 11 Cases owe the Debtors fiduciary duties similar to those the debtor in possession owes to the Estates.  Further, the Debtors and their fiduciaries could not possibly have developed the Plan without the support and contributions of the Exculpated Parties.  To the extent the Debtors acted in good faith, the Debtors' management and professionals should presumptively not be subject to liability.[127]  To the extent any exculpated individuals do not, strictly speaking, owe fiduciary duties to the Debtors, they were integral participants to the settlement embodied by the Plan and are therefore properly included in the Exculpation Provision.  This court has confirmed numerous plans with identical and similar exculpation provisions.[128]

100.    Further, the *Pacific Lumber* court specifically recognized that official committees and their members are entitled to exculpatory relief—thus, exculpation in favor of the Committee and its members is appropriate.[129]   Accordingly, the Exculpation Provision complies with the Bankruptcy Code and is consistent with *Pacific Lumber* and its progeny.

---

the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case").

[126]  *See, e.g.*, *In re Pilgrim's Pride Corp.*, 2010 WL 200000, at *5 (N.D. Tex. Jan. 14, 2010) ("Debtors, serving through their management and professionals as debtors in possession, acted in the capacity of trustees for the benefit of their creditors . . . [t]o the extent Debtors acted in the Chapter 11 cases, other than in bad faith, pursuant to the authority granted by the Code or as directed by court order, Debtors' management and professionals presumptively should not be subject to liability").

[127]  *Id.*; *see also PWS*, 228 F.3d at 246–247 (observing that creditors providing services to the debtors are entitled to a limited grant of immunity for actions within the scope of their duties).

[128]  *See, e.g.*, *In re GenOn Energy, Inc., No. 17-33695* (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. March 14, 2017); *In re Goodrich Petroleum Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016); *In re Midstates Petroleum Co., Inc.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. Sept. 28, 2016); *In re Sandridge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 9, 2016).

[129]  *Pac. Lumber*, 584 F.3d at 252-53.

71

101.    The Exculpation Provision represents an integral piece of the settlement embodied by the Plan and is the product of good faith, arms'-length negotiations.  The Exculpation Provision is narrowly tailored to exclude actual fraud, willful misconduct, or gross negligence, relates only to acts or omissions in connection with or arising out of the administration of the Debtors' chapter 11 cases and their restructuring, and ultimately inures to the benefit of those parties that may owe fiduciary duties to the Debtors and their Estate.  Accordingly, the failure to approve the Exculpation Provision would undermine the purpose of the Plan and the settlements set forth in the Plan, Disclosure Statement, and Restructuring Support Agreement by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Plan when the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the Exculpation Provision.  As such, the Exculpation Provision should be approved.[130]

### iv.    The Injunction Provision Is Appropriate and Complies with the Bankruptcy Code.

102.    The injunction provision set forth in Article VIII.E. of the Plan (the "Injunction Provision") merely implements the Plan's settlement, release, and exculpation provisions, in part, by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled under the Plan.  The Injunction Provision is thus a key provision of the Plan because it enforces the release and exculpation provisions that are centrally important to the Plan.  Further, as described above, the injunction provided for in the Plan is consensual as to any party that did not

---

[130]    *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("The validity of a consensual release is primarily a question of contract law because such releases are no different from any other settlement or contract.") (quotations omitted); *Pilgrim's Pride*, 2010 WL 200000, at *5.

specifically object thereto.  As such, to the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Court should approve the Injunction Provision.[131]

### C.   The Plan Complies with Section 1123(d) of the Bankruptcy Code.

103.   Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law."[132]

104.   Article V of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code by payment of the default amount on the Effective Date, subject to the limitations described in Article V of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.[133]  The Debtors, in accordance with the Disclosure Statement and the Plan, distributed notices of proposed assumption to the applicable third parties.  These notices included procedures for objecting to the proposed assumptions of Executory Contracts and Unexpired Leases and any Claim for cure costs, as well as a process for resolving any disputes concerning the foregoing with the Bankruptcy Court.  Accordingly, the Debtors submit that the Plan complies with section 1123(d) of the Bankruptcy Code.

---

[131]   *See, e.g.*, *In re Camp Arrowhead, Ltd.,* 451 B.R. 678, 701–02 (W.D. Tex. 2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent*.  Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing") (citing *Pacific Lumber*, 584 F.3d at 253; *Pilgrim's Pride*, 2010 WL 200000, at *5).

[132]   *See* 11 U.S.C. § 1123(d).

[133]   *See* Plan, Article V.C.

### III.    The Modifications to the Plan Do Not Require Resolicitation and Should Be Approved.

105.    The Bankruptcy Code provides that a plan proponent may modify a plan "at any time" before confirmation.[134]    It further provides that all stakeholders that previously have accepted a plan should also be deemed to have accepted such plan as modified.[135]  The Bankruptcy Rules provide that such modifications do not require resolicitation where the court determines, after notice and a hearing, "that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification."[136]

106.    Rather, only those modifications that are "material" require resolicitation.[137]    A plan modification is not material unless it "so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."[138]  Thus, an improvement to the position of the creditors affected by the modification will not require resolicitation of a modified plan.[139]  Nor will a modification that is determined to be immaterial require resolicitation.[140]

---

[134]    11 U.S.C. § 1127(a).

[135]    *Id*. § 1127(d).

[136]    Fed. R. Bankr. P. 3019.

[137]    *See In re Am. Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (approving plan modification with *de minimis* effect on creditor recoveries pursuant to Bankruptcy Rule 3019); *In re R.E. Loans, LLC*, 2012 WL 2411877 at *10 (Bankr. N.D. Tex. June 26, 2012) (finding that none of the modifications adversely changed the treatment of the claim of any creditor or the interest of any equity security holder so as to require resolicitation pursuant to Bankruptcy Rule 3019).

[138]    *Am. Solar King*, 90 B.R. at 824.

[139]    *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 689 (Bankr. W.D. Tex. 2012) ("[A]nyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan 'does not adversely change the treatment of [that creditor's] claim.'") (citing *In re Dow Corning Corp.*, 237 B.R. 374, 378 (E.D. Mich. 1999)).

[140]    *See Am. Solar King*, 90 B.R. at 826 ("if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

107.    The Debtors filed a modified version of the Plan [Docket No. 2207] that contained certain modification to address and settle various formal and informal objections, as well as to incorporate the terms of the CCOH Plan and Separation Settlement.  Such modifications do not rise to the level of materiality that would require the Debtors to re-solicit acceptances for the Plan.[141]  Importantly, the current status of the separation negotiations between the Debtors and CCOH at the time votes were solicited for the Plan was discussed in detail in the Disclosure Statement.[142]

108.    Accordingly, the Debtors submit that no additional solicitation or disclosure is required and the modifications should be deemed accepted by all stakeholders that previously accepted the Plan.

## IV.    Confirmation Objections.

109.    The Debtors received seventeen formal Objections and various informal responses to confirmation of the Plan.  Many have been resolved consensually, and the Debtors continue to work to resolve the remaining unresolved issues.  As of the date hereof, there are a number of outstanding Objections asserting narrow issues and arguments, none of which are fatal to Confirmation.  Accordingly, for the reasons set forth in this Confirmation Brief and the record the Debtors will establish at the Confirmation Hearing, the Court should overrule the Objections and confirm the Plan.

### A.    Legacy Notes Trustee Objection.

110.    The Legacy Notes Trustee argues that the Plan (a) improperly classifies Holders of 2021 Notes Claims together with Holders of Legacy Notes Claims, (b) disparately treats such

---

[141]    *See* Fed. R. Bankr. P. 3019(a).

[142]    *See* Disclosure Statement, Art. VII.P.

Claims within the same class (*i.e.*, provides disparate treatment to Holders of Claims in Class 6), (c) violates the absolute priority rule, and (d) contains impermissible release provisions. The Legacy Notes Trustee also argues that the Plan cannot be confirmed until the Court determines the Allowed amount of CCOH's claim and that its equitable subordination adversary proceeding will not become moot upon confirmation of the Plan.  For the reasons set forth below, the Legacy Notes Trustee's Objection should be overruled in its entirety.

### i.       The Plan Properly Classifies Claims and Interests.

111.    The Legacy Notes Trustee argues that the Plan improperly classifies Holders of 2021 Notes Claims and Holders of Legacy Notes Claims, but its Objection misses the mark.  The Legacy Notes Trustee has continued to press the same arguments since the commencement of these Chapter 11 Cases—that holders of Legacy Notes are secured creditors because the "Collateral Flip-Up" has occurred and should therefore receive different treatment than the Debtors' other unsecured noteholders.  In fact, the ***only*** argument advanced by the Legacy Notes Trustee to support its claimed entitlement to superior treatment is that Holders of Legacy Notes are somehow secured creditors, an issue this Court has considered in detail.[143]  The Debtors fundamentally disagree with the Legacy Notes Trustee's position and unfounded arguments.  If the Legacy Notes Trustee is unsuccessful in its Adversary Complaint and Holders of Legacy Notes Claims do not have secured status, then such holders are holders of unsecured notes claims against iHC—as are Holders of 2021 Notes Claims—making classification of Holders of both such Claims together appropriate.

---

[143]   The Legacy Notes Trustee also advances the unfounded argument that the Legacy Notes Trustee has litigation rights that differ from the litigation rights commenced by the 2021 Noteholder Group.  *See* Legacy Notes Trustee Obj., ¶ 16.  As the Legacy Notes Trustee concedes, however, the 2021 Notes Trustee has also commenced substantially identical causes of action in the same adversary proceeding through a complaint in intervention, which would also make both Claims substantially similar.  *Id.*

112.    Section 1122 of the Bankruptcy Code requires that classes only include claims that are "substantially similar to the other claims or interests of such class."[144]   Generally, "classification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."[145]  Here, the 2021 Notes Claims and Legacy Notes Claims are nearly identical in that they share common priority and rights (*i.e.*, general unsecured notes claims against iHC).[146]  Moreover, as the Debtors have attested in the Adversary Proceeding and in the Disclosure Statement, the Legacy Notes Trustee's arguments concerning the occurrence of the Collateral Flip-Up are without merit, and therefore there is no business justification or other reason that would mandate separate classification of 2021 Notes Claims and Legacy Notes Claims.

113.    Further, debtors are typically granted significant discretion in classifying claims,[147] as are courts in approving classification schemes.[148]  Such discretion is guided by two principles: *first*, the classification scheme must be reasonable; and *second*, the classification scheme must not

---

[144]   11 U.S.C. § 1122(a).

[145]   *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007).

[146]   *See*, *e.g.*, *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991), *cert denied*, 506 U.S. 821 (1992) ("A fair reading of both subsections [of 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 113 (Bankr. N.D. Tex. 2002) ("The Fifth Circuit has taught that, as a general premise, substantially similar claims, or those which share common priority and rights against the debtor's estate, should be placed in the same class."); *see also Quigley*, 377 B.R. at 116 (citing *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Claims are similar if they have 'substantially similar rights *to the debtor's assets*.'"); *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) (concluding that "classification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason").

[147]   *See Drexel Burnham Lambert*, 138 B.R. at 757 (holding that a "plan proponent has significant flexibility in classifying claims"); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (Bankr. S.D.N.Y. 1994), *aff'd sub nom. In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994) ("[11 U.S.C § 1122(a)] on its face merely requires that claims classified together be 'substantially similar.' Thus, a debtor is allowed some discretion when classifying unsecured claims.").

[148]   *See*, *e.g., In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (The Bankruptcy Court has "broad discretion" to conclude that a classification scheme is "reasonable" and does not "'arbitrarily' designate classes."); *In re Palisades–on–the–Desplaines*, 89 F.2d 214, 217 (7th Cir. 1937) (noting that Congress intended to give the court "broad latitude" in classifying claims under analogous provision of former Bankruptcy Act).

arbitrarily designate classes where there is no legitimate purpose.[149]  The Debtors here satisfy both principles:  the Plan's classification scheme is reasonable, and the Debtors have a legitimate purpose in classifying 2021 Notes Claims and Legacy Notes Claims in the same class.

> a.    **2021 Notes Claims and Legacy Notes Claims are Substantially Similar in Nature.**

114.    The Legacy Notes Trustee rests its classification argument on the premise that, because of the Adversary Proceeding, the Holders of Legacy Notes Claims have litigation rights that differ from Holders of 2021 Notes Claims, and that therefore such claims are not substantially similar.  This argument is unpersuasive.  Claims that share common priority and rights against the debtor's estate may be jointly classified.[150]  "Claims are similar if they have 'substantially similar rights *to the debtor's assets*.'"[151]  Here, the 2021 Notes Claims and Legacy Notes Claims—all issues of which were issued by the same Debtor (iHC)—are unsecured, *pari passu*, and are receiving identical forms and amounts of consideration under the Plan.  Further, the Legacy Notes Trustee's reliance on its purported "litigation rights" is misguided.  As disclosed in the Disclosure Statement and at trial during the Adversary Proceeding, the Debtors believe the Legacy Notes Trustee's arguments in the Adversary Proceeding are without merit, and that any classification objection premised on such arguments is similarly without merit.  Accepting the Legacy Notes Trustee's argument would virtually require that a party asserting litigation against a debtor (no

---

[149]  *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir.1993) (interpreting § 1122(a) to bar the debtor from "arbitrarily" designating classes or doing so in a manner that "would not serve any legitimate purpose").

[150]  *See*, *e.g.*, *Greystone III Joint Venture*, 995 F.2d at 1278 ("A fair reading of both subsections [of 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *Bernhard Steiner Pianos*, 292 B.R. at 113 ("The Fifth Circuit has taught that, as a general premise, substantially similar claims, or those which share common priority and rights against the debtor's estate, should be placed in the same class.").

[151]  *See Quigley*, 377 B.R. at 116 (citing *Drexel Burnham Lambert*, 138 B.R. at 757); *Chateaugay Corp.*, 89 F.3d at 949 (concluding that "classification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason").

matter how flimsy the claim) be separately classified from other creditors not asserting those same litigation rights.  The Legacy Notes Trustee has cited no such authority, leaving the Debtors discretion to consider the weakness of the Legacy Notes Trustee's litigation position in determining a proper classification.  The Legacy Notes Trustee's remedy is not to lodge unfounded classification objections, but to seek to vindicate its purported rights through an adversary proceeding, which it has already done.

115.    The case cited by the Legacy Notes Trustee in support of its argument, *In re Premiere Services, Inc.*,[152] does not support its position that 2021 Notes Claims and Legacy Notes Claims must be classified separately.  Rather, *Premiere Services* merely holds that creditors with distinct claims can be separately classified, not that creditors with substantially similar claims cannot be classified together.   In *Premiere Services*, the court held that the debtor had good business reasons to separately classify an alleged unsecured creditor's claim where such creditor had possible setoff rights and was competing with the debtors in the same business (and would therefore benefit if the debtor's reorganization was not successful).[153]

116.    Further, *In re Durrett*,[154] another case cited by the Legacy Notes Trustee to advance its argument that the 2021 Notes Claims and Legacy Notes Claims are not substantially similar because of the disparate treatment of such claims, is equally inapposite.  For the reasons set forth below, the Plan does not disparately treat 2021 Notes Claims and Legacy Notes Claims in Class 6. In *Durrett*, the court held that the debtor inappropriately classified the deficiency claim of a mortgagee together with general unsecured creditors because the mortgagee was receiving a transfer of its underlying properties without incurring foreclosure costs, was waiving its deficiency

---

[152]   333 B.R. 130 (Bankr. N.D. Tex. 2005).

[153]   *Id.* at 134 - 35.

[154]   139 B.R. 1 (Bankr. D.N.H. 1992).

claim against the debtor, and was waiving its distribution on account of such claims, and that therefore the mortgagee was influenced by "totally different considerations" from the other creditors in the class.[155]  Here, both Holders of 2021 Notes Claims and Holders of Legacy Notes Claims are receiving the same recovery on account of their claims.  Moreover, this argument will be mooted if the Court rules in favor of the Debtors in the Adversary Proceeding.

### b.    The Debtors' Classification Scheme is Reasonable.

117.    The Debtors' Plan jointly classifies similar claims for purposes of voting and distribution.[156]  Secured claims are classified separately from unsecured claims, and claims against different Debtors that are receiving different forms of consideration under the Plan are also classified separately.  Where the Debtors separately classified the Senior Creditors' deficiency claims from General Unsecured Claims, there was a good business reason to do so (*i.e.*, in order to pay Holders of General Unsecured Claims pursuant to the Committee Plan Settlement), and, importantly, the Senior Creditors were heavily involved in the negotiation of the Committee Plan Settlement and do not object to such treatment.  2021 Notes Claims and Legacy Notes Claims are jointly classified because of their common priorities and rights against the Debtors' Estates. Separately classifying 2021 Notes Claims from Legacy Notes Claims as the Legacy Notes Trustee suggests would, in a twist of irony, likely be impermissible under the Bankruptcy Code and relevant case law.[157]

---

[155]  *Id.* at 3.

[156]  *See John Hancock*, 987 F.2d at 159 ("[I]t seems clear to us that this determination must be informed by the two purposes that classification serves under the Code:  voting to determine whether a plan can be confirmed . . . and treatment of claims under the plan.").

[157]  *See Greystone III Joint Venture*, 995 F.2d at 1279 ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

118.     Further, gerrymandering and classification arguments typically arise when debtors seek to silence the votes of their largest unsecured creditors in a cramdown context.[158]   Here, however, the Debtors are not utilizing section 1129(b) of the Bankruptcy Code and are not seeking to silence the largest body of unsecured creditors when the facts demonstrate that the 2021 Notes Claims are larger and more numerous than the Legacy Notes Claims.

> ### c.     The Debtors Proposed the Plan in Good Faith and Have Legitimate Business Reasons to Jointly Classify 2021 Notes Claims and Legacy Notes Claims.

119.     Notwithstanding the Legacy Notes Trustee's arguments to the contrary, the Debtors' Plan and classification scheme were proposed for the legitimate purpose of rehabilitating and reorganizing their business.  As discussed above, the Debtors do not believe there is a business justification for separately classifying the 2021 Notes Claims and Legacy Notes Claims.  Further, the Debtors have, at all opportunities, acted in the genuine belief that their efforts and the Plan present the greatest likelihood of a successful reorganization.  Despite the Legacy Notes Trustee contesting the Plan, the Debtors have worked diligently with their key stakeholders, including the Consenting Stakeholders, the Committee, and CCOH, to formulate a Plan that presents the best option for a successful reorganization, which delivers approximately $545 million of value to the Debtors' junior stakeholders—including approximately $70 million of value to Holders of Legacy Notes Claims—well in excess of what such stakeholders would be entitled to in a liquidation or absent the agreement of the Debtors' senior creditors.

---

[158]   *See In re Bos. Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994) ("A key premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization. . . . Chapter 11 is far better served by allowing those creditors with the largest unsecured claims to have a significant degree of input and participation in the reorganization process, since they stand to gain or lose the most from the reorganization of the debtor.  This Court thus holds that separate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims.").

###### ii.      The Plan Does Not Disparately Treat Claims Within the Same Class.

120.     The Legacy Notes Trustee also argues that the Plan provides Holders of Claims in Class 6 (*i.e.*, Holders of 2021 Notes Claims and Legacy Notes Claims) with different treatment in violation of section 1123(a)(4) of the Bankruptcy Code.  Specifically, the Legacy Notes Trustee takes issue with the allocation of Intercompany Notes Claims within Class 6 and the payment of the professional fees of the 2021 Noteholder Group.

121.     Both of these arguments should be overruled.  ***The Plan*** provides Holders of Claims in Class 6 with ***exactly*** the same treatment—each Holder's Pro Rata share based on each Holder's total Claim amount, of the Class 6 distribution.  The ultimate difference in recoveries results not from the Plan, but from the Holders of the Intercompany Notes Claims agreeing to waive the distributions that they would otherwise be entitled to.  The distributions that would otherwise be received by the Holders of Intercompany Notes Claims that are Legacy Notes Claims are instead distributed to the Holders of the other Legacy Notes Claims and the distributions that would otherwise be received by the Holders of Intercompany Notes Claims that are 2021 Notes Claims are instead distributed to the Holders of the other 2021 Notes Claims.  This increases the recoveries for ***both*** the other Legacy Notes Claims and the other 2021 Notes Claims by approximately $64.3 million in the aggregate.  But because the Intercompany Notes Claims consist of approximately $57.1 million in principal amount of Legacy Notes and approximately $453.9 million in principal amount of 2021 Notes, the waiver causes the recoveries of the 2021 Notes Claims to increase slightly more (approximately $6.2 million more), a *de minimis* amount relative to the projected overall amount of Claims in Class 6 (approximately $2,954 million).  This does not constitute disparate treatment under the Bankruptcy Code.

a.      **Allocation of Intercompany Notes in Class 6 Does Not Represent Disparate Treatment.**

122.    Section 1123(a)(4) of the Bankruptcy Code provides that a plan must "provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to less favorable treatment."  Neither the Bankruptcy Code nor the legislative history of section 1123(a)(4) precisely define the standard for "same treatment."[159]  "Same treatment," however, does not mean "identical."[160]  "[T]he Court of Appeals for the Second Circuit 'has approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate considerations.'"[161]  Moreover, many courts have interpreted the "same treatment" requirement as meaning that all claimants in the class must have the "same opportunity for recovery."[162]  This "same opportunity" standard has been used to uphold plans that either provide all creditors in a class with the same options as to treatment, or apply the same process in determining payment.[163]

123.    Here, the Plan provides all Holders of Claims in Class 6 (*i.e.*, the 2021 Notes Claims and the Legacy Notes Claims) with ***exactly*** the same treatment:  each Holder's Pro Rata share,

---

[159]   *In re AOV Indus., Inc.*, 792 F.2d 1140, 1151 (D.C. Cir. 1986).

[160]   *See In re Dana Corp.*, 412 B.R. 53, 61 (Bankr. S.D.N.Y. 2008).

[161]   *Id.* (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910, 918-19, *aff'd* 960 F.2d 285 (2d Cir. 1992))).

[162]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).  *See also In re Dana Corp.*, 412 B.R. 53, 61-62 (S.D.N.Y. 2008); *In re Republic Airways Holdings, Inc.*, 565 B.R. 710, 728 n.13 (Bankr. S.D.N.Y. 2017); *In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002); *In re Breitburn Energy Partners LP*, 582 B.R. 321 (Bankr. S.D.N.Y. 2018); *In re Cent. Med. Ctr.*, 122 B.R. 568 (Bank. E.D. Mo. 1990); *In re The Vaughan Co., Realtors*, 543 B.R. 325 (Bankr. D.N.M. 2015).

[163]   *See e.g., Dow Corning*, 255 B.R. at 497-98 (upholding plan providing claimants with the same option between settling and litigating their claim); *Dana Corp.,* 412 B.R. at 61-62 (upholding plan providing claimants with the same option between settling and litigating their claim); *Breitburn Energy*, 582 B.R. at 358 (upholding plan providing claimants with same opportunity to subscribe to a rights offering); *Cent. Med. Ctr.*, 122 B.R. at 574 (upholding plan subjecting claimants to the same random lottery system for determining bond redemption); *In re W.R. Grace,* 729 F.3d at 321 (upholding plan subjecting claimants to the same trust distribution procedures for payout).

based on each Holder's total Claim amount, of the Class 6 distribution.  Pursuant to the Plan, Holders of Intercompany Notes Claims under each of the 2021 Notes Indenture and the Legacy Notes Indenture agreed to waive the recoveries they would otherwise be entitled to receive, with such recoveries instead being distributed by the applicable indenture trustees to the other Holders of such claims under the indenture (*i.e.*, the Pro Rata recovery on the Intercompany Notes Claims under the 2021 Notes Indenture are instead being made to the other Holders of 2021 Notes Claims *in the same way* that the Pro Rata recovery on the Intercompany Notes Claims under the Legacy Notes Indenture are instead being made to other Holders of Legacy Notes Claims).

124.    A decision by a beneficial holder of a note (such as the Holders of the Intercompany Notes Claims) to waive their distribution does not limit the applicable indenture trustees' rights under its indenture to assert a Proof of Claim on behalf of such beneficial holder's outstanding notes.[164]  A decision by a beneficial holder of a note (such as the Holders of the Intercompany Notes Claims) to waive their beneficial distribution does not (and cannot) limit the applicable indenture trustees' obligation under its indenture to assert a Proof of Claim on behalf all outstanding notes.  The entire note remains outstanding, and the trustees' claim for the entire outstanding amount remains unaffected.  The waiver by Holders of Intercompany Claims, and the resulting reallocation of the recoveries that such Holders would otherwise be entitled to receive, thus does not transform a Pro Rata treatment provided to all Holders of Claims in Class 6 into disparate treatment under section 1123(a)(4) of the Bankruptcy Code.  Further, any other result would prejudice the rights of other Holders of 2021 Notes Claims in violation of the 2021 Notes

---

[164]    *See* 2021 Notes Indenture at 30 (defining "Proper Proof of Claim" as "at any time, a Proof of Claim in an amount not less than the sum of the aggregate outstanding principal amount of the Notes at such time plus accrued but unpaid interest on the Notes at such time"); *Id.* § 11.14 (providing that if the 2021 Notes Trustee fails file a Proper Proof of Claim prior to 15 days before the applicable deadline, certain senior creditors are authorized to file a proof of claim for and on behalf of the 2021 Noteholders).

Indenture's "no action clause" by reducing the portion of Class 6 distributions that such Holders would receive under the Plan.[165]   Therefore, the waiver by Holders of Intercompany Claims and the resulting reallocation of the recoveries that such Holders would otherwise be entitled to receive does not transform a pro rata treatment provided to all Holders of Claims in Class 6 into disparate treatment under section 1123(a)(4) of the Bankruptcy Code—such allocations were made pursuant to the same process.

### b.   Payment of the 2021 Noteholder Group's Professional Fees is Appropriate.

125.   The Legacy Notes Trustee also objects to the payment of the 2021 Noteholder Group's professional fees.[166]   Payment of such professional fees, however, is permitted under the Bankruptcy Code and does not constitute disparate treatment since such payment is not being made on account of the 2021 Noteholders Group's Claims.

126.   Courts have held that the payment of professional fees is permissible under section 363(b) of the Bankruptcy Code.[167]   When analyzing whether the payment of professional fees is appropriate, courts use the business judgment standard.[168]   In addition, the Supreme Court has interpreted the modifier "on account of" contained in section 1129(b) of the Bankruptcy Code in the context of the absolute priority rule to mean "because of," since that is the meaning ascribed to such phrase when used in other areas of the Bankruptcy Code.[169]

---

[165]   *See* 2021 Notes Indenture § 6.06 ("A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.").

[166]   *See* Legacy Notes Trustee Obj., ¶ 14 n. 4.

[167]   *See In re ASARCO LLC*, 441 B.R. 813, 829 (S.D. Tex. 2010), *aff'd sub nom. In re ASARCO, L.L.C.*, 653 F.3d 593 (5th Cir. 2011) (permitting reimbursement of fees incurred in connection with an auction of a highly unique asset); *In re Bethlehem Steel Corp.*, 2003 WL 21738964, at * 10 (S.D.N.Y. July 28, 2003) (permitting reimbursement of fees to union employees to enable the union to participate in the reorganization).

[168]   *ASARCO*, 441 B.R. at 828.

[169]   *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 450-51 (1999).

127.     Here, the payment of the 2021 Noteholder Group's professional fees is a sound exercise of the Debtors' business judgment and is not made because of (or on account of) such Holders' Class 6 Claims.  Rather, the payment of such fees (to the extent any such fees qualify as Consenting Stakeholder Fees) is part of the Plan Settlement and made because the 2021 Noteholder Group played a crucial role in negotiating, formulating, and supporting the Restructuring Support Agreement and the Plan that avoided a protracted and potentially litigious bankruptcy.  Holders of 2021 Notes Claims are receiving their treatment under the Plan (*i.e.*, each Holder's Pro Rata share of (a) $200 million in New Debt and (b) 5.0 percent of New iHeart Common Stock, Special Warrants, or combination of New iHeart Common Stock and Special Warrants) because of such Holder's 2021 Notes Claim.

### iii.     The Plan Does Not Violate the Absolute Priority Rule.

128.     The Legacy Notes Trustee argues that the Plan violates the absolute priority rule because (a) if the Court designates the Class 6 votes of Abrams and CCH, Class 6 could be a rejecting Class[170] and (b) because certain individual holders of Legacy Notes filed proofs of claim pursuant to section 510(b) of the Bankruptcy Code, such holders comprise members of Class 10, and because Class 10 is deemed to reject the Plan, the Plan is not fair and equitable with respect to those holders.  These arguments miss the mark and should be rejected.  ***First***, because all Classes entitled to vote on the Plan voted overwhelmingly to accept the Plan, neither section 1129(b) of the Bankruptcy Code nor the absolute priority rule are implicated.  ***Second***, as set forth in the Debtors' objections to proofs of claim filed by certain individual holders of Legacy Notes [Docket Nos. 1661–1669, 1671–1673], and for the reasons set forth by the Debtors in the trial

---

[170]  Pursuant to the *Stipulation and Order Regarding Existing Deadlines in Respect to Confirmation, the Legacy 510(B) Claims, and the CCOH Claim* [Docket No. 2356], the Debtors and Legacy Notes Trustee have agreed that no further briefing or arguments will be scheduled concerning the Legacy Notes Trustee's vote designation motion, and that the vote designation motion is withdrawn.

regarding the Legacy Notes Trustee's adversary proceeding against iHC, the Debtors do not believe that such holders of Legacy Notes have valid claims against the Debtors pursuant to section 510(b) of the Bankruptcy Code.  As such, the Debtors do not believe that Class 10 contains any valid Claims.  Moreover, the Legacy Notes Trustee's argument that the Debtors' objections to the purported 510(b) claims of individual holders of Legacy Notes were not timely filed misses the mark.[171]  The deadline the Legacy Notes Trustee refers to was a deadline relating only to claims in *voting* classes.  Because Class 10 (Section 510(b) Claims) is a Deemed Rejecting Class, such Holders, to the extent Class 10 included any valid Section 510(b) Claims, were not entitled to vote. Accordingly, the deadline for the Debtors to file objections to Claims does *not* apply to Holders of Claims in the Deemed Rejecting Class (*i.e.*, Class 10).  Moreover, as set forth in the *Stipulation and Order (I) Granting the Legacy 510(b) Claimants Leave to Withdraw and Deeming the Legacy 510(b) Claims Withdrawn; and (II) Overruling iHeartCommunications, Inc.'s Claim Objections as Moot*, filed contemporaneously herewith, the Legacy 510(b) Claimants have agreed to withdraw such proofs of claim with prejudice.  The Legacy Notes Trustee's argument should therefore be rejected.  Accordingly, the Plan is fair and equitable.

### iv.    The Legacy Notes Trustee's Equitable Subordination Claims are Mooted by Entry of the Confirmation Order.

129.    In its adversary proceeding[172] against certain of the Debtors' equity owners and Debtor Clear Channel Holdings, Inc., the Legacy Notes Trustee seeks to, among other things, equitably subordinate the claims of the Shareholder Defendants (as defined therein) to its own claims.  Any equitable subordination claims, however, asserted by the Legacy Notes Trustee or

---

[171]   Legacy Notes Trustee Obj., ¶ 24.

[172]   *See Wilmington Savings Funds Society, FSB v. Bain Capital LP, et al*, Adv. No. 18-03287 (MI).

any individual Holders of Legacy Notes Claims will be mooted, as any such claims will be resolved by confirmation the Plan and precluded as a matter of *res judicata*.

130.    The Plan comprehensively resolves all equitable subordination claims as to the Allowed Term Loan, PGN, and 2021 Notes Claims.  Article III.F of the Plan provides that:

> Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

131.    That provision alone resolves and moots any claim for equitable subordination concerning the Allowed Term Loan, PGN, and 2021 Notes Claims.  Additionally, Article VIII.B of the Plan releases, among other claims, any equitable subordination claims the Debtors could assert, and Article VIII.C releases, among other claims, any other equitable subordination claims held by Releasing Parties.  Entry of the Confirmation Order will thus, by its terms, moot any equitable subordination claims brought by the Legacy Notes Trustee.  The Legacy Notes Trustee argues that the Plan cannot resolve its equitable subordination claims because "such claims are not property of the Debtors' estates,"[173] but as Debtor CCH explained in its motion to dismiss the equitable subordination adversary proceeding, the claims alleged in the Legacy Notes Trustee's Complaint are fundamentally derivative claims that *are* the property of the Debtors' Estates.[174] But in any event, Article III.F makes clear that the allowance, classification, and treatment of Allowed Claims under the Plan is conclusive as to "*any* . . . equitable subordination rights relating thereto," regardless of whether such claims are property of the Debtors' estates or not.

---

[173]   Legacy Notes Trustee Obj. at 55.

[174]   *See generally* Defendant Clear Channel Holdings, Inc.'s Motion to Dismiss at 12-16, *Wilmington Savings Funds Society, FSB v. Bain Capital LP, et al.*, Adv. No. 18-03287 (MI) [Docket No. 73].

132.     Confirmation of the Plan will also preclude this adversary proceeding and any other equitable subordination claims by the Legacy Trustee or Legacy Noteholders on *res judicata* grounds.  Confirmation orders have *res judicata* effect in subsequent actions when they meet the generally applicable requirements for *res judicata*:  (1) there is an identity of parties between the confirmation proceedings and the subsequent action, (2) the confirmation order is rendered by a court of competent jurisdiction, (3) it is a final judgment on the merits, and (4) the same cause of action is involved in both confirmation and the subsequent action.[175]  All those elements will be present upon entry of the Confirmation Order.

133.     The first element, the identity of parties, will be met as to both the Legacy Notes Trustee and individual Holders of Legacy Notes Claims, because parties who participate in chapter 11 confirmation proceeding are bound for *res judicata* purposes, even if they are never formally "named" as parties—as are parties whose interests were adequately represented by a party to the original suit.[176]  There will be no dispute that the Confirmation Order meets the second and third elements of *res judicata* as a final judgment on the merits entered by a court of competent jurisdiction.[177]

---

[175]   *See In re Chesnut*, 356 F. App'x 732, 736 (5th Cir. 2009) (discussing elements of *res judicata* from *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983) (*en banc*) in connection with a confirmation order).

[176]   *Republic Supply*, 815 F.2d at 1051 ("There is no dispute that the parties before this court and those before the bankruptcy court are identical. . . . The record in the bankruptcy court shows that both Shoaf and Republic participated in the proceedings as creditors only and became parties even if never formally named as such. Therefore, the first element for application of *res judicata* is satisfied."); *see also In re Varat Enters., Inc.*, 81 F.3d 1310, 1316 n.6 (4th Cir. 1996) ("A party for the purposes of former adjudication includes one who participates in a Chapter 11 plan confirmation proceeding."); *In re Medomak Canning*, 922 F.2d 895, 898-99 (1st Cir. 1990) (holding that settlement of claim by chapter 7 trustee was *res judicata* as against creditor's subsequent claim for equitable subordination).

[177]   *Eubanks v. F.D.I.C.*, 977 F.2d 166, 171 (5th Cir. 1992) ("There is little doubt that the bankruptcy court's confirmation order is binding and final, and we accord it the weight of a final judgment for *res judicata* purposes.").

134.    The final element of *res judicata* will be met because any equitable subordination

claim, which seeks to alter the recoveries under a plan of reorganization, is the kind of claim that

can (and should) be brought in connection with plan confirmation, including identity of facts

creating the right of action and the evidence necessary to prosecute such action.[178]   Courts have

specifically recognized that a confirmation order bars a subsequent equitable subordination

claim.[179]

135.    The Legacy Notes Trustee asserts, however, that because the Plan has not yet been

confirmed, there is still an opportunity to modify the Plan to avoid these *res judicata*

implications.[180]   This argument about hypothetical plan modifications is beside the point.   The

question presented is whether the Plan currently before the Court would preclude the Legacy Notes

Trustee's equitable subordination claim if it is confirmed.   The answer to that question is an

unequivocal "yes."

136.    The Legacy Trustee generally argues that the Plan cannot be confirmed as written

because doing so (and mooting the Legacy Trustee's equitable subordination claim) would violate

---

[178]   *Cf. Ellis v. Amex Life Ins. Co.*, 211 F.3d 935, 938 n.1 (5th Cir. 2000) ("As the district court noted, *res judicata* bars all claims that were brought *or* could have been brought based on the operative factual nucleus."); *see also In re Superior Used Cars, Inc.*, 258 B.R. 680, 689-90 (Bankr. W.D. Mich. 2001) ("The first element is satisfied whenever a court of competent jurisdiction enters an order confirming a chapter 11 plan. . . . [T]he second element is easily satisfied . . . [when the second action involves the same parties, or their privies, as the first]. . . . The third element necessary for *res judicata* is that the second action raises an issue that was either actually litigated or which should have been litigated in the first action. The Sixth Circuit has held that claims by creditors that could have been brought within the context of the confirmation process are barred by *res judicata*. . . . As to the fourth element, [i]dentity of causes of action means an identity of the facts creating the right of action and of the evidence necessary to sustain each action.") (citation omitted).

[179]   *E.g.*, *In re Northfield Labs. Inc.*, 467 B.R. 582, 587–89 (Bankr. D. Del. 2010) ("Plaintiffs' equitable subordination request essentially constitutes a Plan objection.   As described above, Plaintiffs participated in the Debtor's bankruptcy case through counsel and Plaintiffs' owner participated as a member of the Committee.   The equitable subordination claim could have been raised as a Plan objection.   The Confirmation Order is a final judgment on the merits and was entered without objection from Plaintiffs.   Accordingly, claim preclusion bars Plaintiffs from litigating their equitable subordination claim."); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1552 (11th Cir. 1990) (affirming dismissal of an adversary complaint seeking equitable subordination because "these claims were, or at least could have been, raised in the [plaintiffs'] objection to confirmation").

[180]   Legacy Notes Trustee Obj., ¶¶ 61 - 64.

the Legacy Trustee's due process rights by depriving it "of the heightened procedural safeguards to which it is entitled under the Bankruptcy Rules."[181]   This due process argument does not withstand scrutiny.

137.   The crux of the Legacy Notes Trustee's argument is that its equitable subordination claim "was required" to be brought via an adversary proceeding under Bankruptcy Rule 7001(8), and therefore due process does not permit such a claim to be mooted by the Confirmation Order.[182] But language omitted from that rule, as well as caselaw, makes clear that there is no due process issue with addressing and resolving subordination claims as part of a plan.   The Legacy Notes Trustee omits key language from Bankruptcy Rule 7001(8) that an equitable subordination claim need *not* be addressed in an adversary proceeding "when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination."[183]   And the Legacy Notes Trustee's argument ignores the fact that the procedural safeguards of adversary proceedings are generally designed to protect the defendant creditor[184]—the opposite of the concerns raised by the Legacy Notes Trustee.   In short, Bankruptcy Rule 7001(8) exists to ensure that a creditor's claim is not subordinated without that creditor receiving formal notice through an adversary proceeding or through a plan of reorganization.   Here, Article III.F of the Plan has provided notice to all parties that the Plan's allowance and treatment of claims conclusively resolves all potential subordination issues.

---

[181]   Legacy Notes Trustee Obj., ¶ 58.

[182]   Legacy Notes Trustee Obj., ¶ 58.

[183]   Fed. R. Bankr. P. 7001(8).  *See also Rosbottom v. Schiff*, 589 B.R. 63, 70 (W.D. La. 2018) ("When an equitable subordination clause is contained within a proposed Chapter 11 plan its inclusion merely raises a contested matter."); *In re Wash. Mut., Inc.*, 462 B.R. 137, 145 (Bankr. D. Del. 2011) ("An adversary proceeding is only required for claim subordination if subordination is not provided for under a chapter 11 plan.").

[184]   *See generally In re Eads*, 417 B.R. 728, 740 (Bankr. E.D. Tex. 2009) ("One of the underlying purposes of Bankruptcy Rule 7001(2) . . . is to afford the creditor sufficient notice that it may be deprived of an interest in property.").

138.    The cases cited by the Legacy Notes Trustee—none of which involved equitable subordination or Bankruptcy Rule 7001(8)—bear out the fact that the Legacy Notes Trustee's purported procedural concerns are inapplicable.   In *In re RMS Titanic, Inc.*,[185] the Court determined that an adversary proceeding was appropriate to provide procedural protections for a non-debtor asserting an interest in property (*i.e.*, the party's whose interest in the property was to be modified).[186]   Likewise, in *Matter of Zale Corp.*,[187] the Fifth Circuit overturned an injunction where the enjoined parties were not given any opportunity to litigate their claims.[188]   As discussed below, the Legacy Notes Trustee has had (and continues to have) ample opportunity to litigate its claims.   Finally, in *In re Commercial W. Fin. Corp.*,[189] the Ninth Circuit held that the failure to commence an adversary proceeding prevented the creditors whose rights were to be modified from receiving adequate notice of the way in which their rights would be impacted.[190]   In any event, it is the interests of *creditors* whose rights would be impaired that an adversary proceeding's procedures are designed to protect.   No such concern exists here.

139.    From a due process perspective, there is no doubt that the Legacy Notes Trustee has had (and will continue to have) more than sufficient opportunity to litigate its equitable

---

[185]   2016 WL 8262050 (Bankr. M.D. Fla. July 22, 2016).

[186]   *Id*. at *4.

[187]   62 F.3d 746, 765 (5th Cir. 1995).

[188]   *Id*. at 764-65.   Additionally, *Zale* involved Federal Rule of Bankruptcy Procedure 7001(7), which at the time included no exception for where an injunction or equitable relief is included in a plan, *see* 62 F.3d at 762 n.47, but which has since been modified to include an exception for where an injunction or other equitable relief is addressed as part of a plan.   *See* Fed. R. Bankr. P. 7001(7); *id.* at 1999 Advisory Committee Notes ("This rule is amended to recognize that an adversary proceeding is not necessary to obtain injunctive or other equitable relief that is provided for in a plan under circumstances in which substantive law permits the relief.").

[189]   761 F.2d 1329 (9th Cir. 1985).

[190]   *Id*. at 1337 ("Had the Trustee complied with Rule 704, the investors would have been clearly warned of the serious consequences of the power the Trustee was seeking to exercise under section 544.   Although the disclosure statement accompanying the plan set forth the Trustee's substantive arguments supporting his ability to avoid the investors' interests, the statement did not clearly warn the investors that by voting for the plan, they would relinquish whatever security interests the partial assignments created in the borrower notes and deeds of trust.").

subordination claim.  In addition to having notice of the provisions of the Plan that address equitable subordination for months, the Legacy Notes Trustee has also been on notice of the allegations supporting its claim for many months, as well as all of the factual underpinning for the claim relates to actions that were taken months or years ago.  And by the time this matter reaches Confirmation, it will have been more than three months since the Legacy Notes Trustee filed its Complaint.  The Legacy Notes Trustee will have had more than sufficient opportunity to "investigate" these claims through the Confirmation process.

140.    The Trustee has also engaged in substantial discovery related to its equitable subordination claim.  That claim rests on several already public events: (a) a transaction involving Broader Media, LLC that was the subject of prior Texas litigation; (b) the circumstances around the non-occurrence of the collateral flip-up in December 2016; (c) the prepetition global exchange offer; and (d) the negotiation and execution of the Restructuring Support Agreement.  The Debtors' treatment of the collateral flip-up has already been the subject of a months'-long adversary proceeding, including exhaustive discovery by the Legacy Notes Trustee.  Likewise, documents related to the global exchange offer were produced in connection with the dispute concerning the Debtors' retention of LionTree and Moelis.[191]  The Legacy Trustee has also engaged in discovery related to the execution of the Restructuring Support Agreement in connection with confirmation, including deposing both of the disinterested directors, who are members of the Debtors' Special Committee (to whom the Debtors' full board delegated decision-making authority with respect to the Restructuring Support Agreement), and receiving a substantial document production related to the negotiation of the Restructuring Support Agreement.

---

[191]  Although the Legacy Notes Trustee was not one of the parties objecting to the retention of LionTree or Moelis, the Debtors produced to the Legacy Notes Trustee all documents that were produced to the objecting parties in that retention dispute.

141.    In total, the Debtors have provided the Legacy Notes Trustee hundreds of thousands of pages of documents relating to the transactions that the Legacy Notes Trustee challenges through the equitable subordination complaint.  In addition, Holders of Legacy Notes have had two separate opportunities to depose both members of the Debtors' Special Committee, which approved the events surrounding the collateral flip-up, the launch of the global exchange offers, and the Debtors' entry into the Restructuring Support Agreement.  The Legacy Notes Trustee also previously deposed Brian Coleman, the company employee most intimately involved with each of the financial transactions at the heart of the Legacy Notes Trustee's claims.  With all of this process, as well as the other opportunities the Legacy Notes Trustee had to engage in further discovery through the confirmation process, there can be no question that the Legacy Notes Trustee has had sufficient opportunity to investigate and pursue its equitable subordination claims to satisfy due process requirements.  The Legacy Notes Trustee will also be free to examine the Debtors' witnesses at the Confirmation Hearing on all of the issues underpinning its equitable subordination claims.  Because the Confirmation proceedings provide sufficient process for the Legacy Notes Trustee's equitable subordination claim, due process is not violated if the equitable subordination complaint is mooted by confirmation.[192]

---

[192]    *In re Seatco, Inc.*, 257 B.R. 469, 478 (Bankr. N.D. Tex. 2001), *opinion modified on reconsideration,* 259 B.R. 279 (Bankr. N.D. Tex. 2001) ("Thus, since CIT's rights were not adversely affected by the Debtor's failure to seek the injunctions through an adversary proceeding, CIT's objection to confirmation is overruled."); *see also In re Am. Dev. Int'l. Corp.,* 188 B.R. 925, 935 (N.D. Tex. 1995) (where rights of affected parties have been adequately protected and affected parties have had an opportunity to be heard, form should not be elevated over substance); *In re Eddy*, 572 B.R. 774, 781 (Bankr. M.D. Fla. 2017) ("Even if a matter should, under the Bankruptcy Rules, be tried in the context of an adversary proceeding rather than a contested matter, where the parties have received sufficient due process, a court will not elevate form over substance and may consider the claim on its merits."); *In re Timbs*, 178 B.R. 989, 994 (Bankr. E.D. Tenn. 1994) ("Moreover, even where there is merit to the argument that a certain matter must be brought within the context of an adversary proceeding rather than as a contested matter, courts have allowed the matter to proceed on the merits as originally filed where the rights of the affected parties have been adequately protected so that no prejudice has arisen, refusing to elevate form over substance.").

142.    Consistent with this view, numerous courts have recognized that an equitable subordination claim that a creditor (or other non-debtor) wishes to pursue may be brought as a confirmation objection.[193]  In light of the ample process that the Legacy Notes Trustee has already been afforded, the mooting and preclusion of the Legacy Notes Trustee's equitable subordination claims is consistent with due process, and the Legacy Notes Trustee's attempt to prolong proceedings in this case to exert leverage by delaying final resolution of creditors' priorities should be denied as the Legacy Notes Trustee may present its case through Confirmation proceedings.

143.    The Legacy Notes Trustee's equitable subordination claims are meritless in any event.  As described in Debtor CCH's motion to dismiss, and as the Debtors will establish at the Confirmation Hearing, each of the transactions was either approved by the Debtors' Special Committee, composed of disinterested directors (and not at the direction of, or under the influence or control of, the Consenting Sponsors or their representatives) or approved by Texas state trial and appellate courts.[194]  And as Debtor CCH also explained, the Legacy Notes Trustee's equitable subordination complaint only alleges (at most) generalized harm that only supports an estate cause of action, rather than an individualized cause of action, and it does not and cannot allege harm to any holders of Legacy Notes from the transactions described in the complaint.[195]  Moreover, the Legacy Notes Trustee only holds claims at Debtor iHC (which is largely a holding company) and holds no liens on iHC's interests in Principal Properties and its subsidiaries' equity.  As the Shareholder Defendants' unsecured deficiency claims against iHC are being waived in any event,

---

[193]  *Northfield Laboratories*, 467 B.R. at 589 ("The equitable subordination claim could have been raised as a Plan objection."); *In re Exide Techs.*, 303 B.R. 48, 76 n.41 (Bankr. D. Del. 2003) ("Any equitable subordination claim against $R^2$ (as well as against the Prepetition Lenders) would be foreclosed by confirmation of this Plan.").

[194]  *See* Defendant Clear Channel Holdings, Inc.'s Motion to Dismiss at 6–11, *Wilmington Savings Funds Society, FSB v. Bain Capital LP, et al*, Adv. No. 18-03287 (MI) [Docket No. 73].

[195]  *Id.* at 12–23.

and the Legacy Notes Trustee has no claims against any other iHC assets or any other Debtor to which any other claim could be subordinated, the scope of any possible equitable subordination is inherently constrained.

144.   Separately, in connection with this restructuring process, the Debtors' Special Committee has investigated these transactions and others for potential claims against the Consenting Sponsors, including equitable subordination, and determined to not pursue actions against the Consenting Sponsors given their valuable contributions as part of the Plan Settlement.  As set forth in the Cremens Declaration, the Special Committee concluded that none of the actions or transactions described therein and investigated by the Special Committee provided a basis to seek equitable subordination of debt held by the Sponsors' affiliates or other equity holders of the Debtors with representatives on the board.[196]  Moreover, the Plan not only directly moots and precludes the equitable subordination claims in the Legacy Notes Trustee's complaint, but also separately addresses the purported misconduct that is raised in the equitable subordination complaint.  Specifically:  (a) the CCOH shares transferred as part of the 2015 Broader Media transfer will be distributed according to the Plan's provisions; (b) the non-occurrence of the flip in December 2016 is reflected in the fact that the Legacy Notes Trustee only holds allowed claims (and only receives a recovery) on an unsecured basis at iHC; and (c) the overall Plan and Plan Settlement implements the Restructuring Support Agreement.[197]  Thus, the Plan will—in multiple ways—comprehensively resolve, moot, and preclude the Legacy Notes Trustee's claims and any claims based on the transactions that underlie its complaint.

---

[196]   Cremens Declaration, ¶ 21.

[197]   The 2017 global exchange offer, of course, expired and was not consummated, so it is irrelevant to the Plan and its provisions.

B.      **U.S. Trustee and SEC Objections.**

145.    The U.S. Trustee and the SEC object[198] to the Plan's Debtor Release, Third-Party Release, and Exculpation Provisions.  The U.S. Trustee and SEC's contentions that the releases are non-consensual are belied by the plain language of the Plan, multiple Court-approved notices and ballots sent to creditors, and the fact that approximately 473 parties in interest have exercised their right to opt-out of the Third-Party Release.  In addition, the SEC contends that the release provisions should exclude actual fraud, willful misconduct, and gross negligence.  These Objections should be overruled.

i.      **The Debtor Release is Appropriate and in the Best Interests of the Debtors' Estates.**

146.    The U.S. Trustee objects broadly to the Plan's release provisions, including the Debtor Release.[199]  As set forth in detail in Section II.B.i of the Argument herein, the Debtor Release represents a valid exercise of the Debtors' business judgment and is fair and equitable. The Debtor Release is an integral part of the Plan and is in the best interest of the Debtors' Estates as a component of the comprehensive settlement implemented thereunder.  Holders of Claims and Interests entitled to vote have overwhelmingly voted to accept the Plan, including the Debtor Release.

147.    The Plan, including the Debtor Release, was negotiated before and after the Petition Date by sophisticated parties represented by able counsel and financial advisors, is the result of an arms'-length negotiation process, and appropriately offers protection to parties that participated in the Debtors' restructuring process.  Specifically, and as detailed in Section II.B.i of the Argument

---

[198]    The Legacy Notes Trustee also objects, for nearly identical reasons, to the Plan's release provisions.  For the same reasons set forth herein, the Legacy Notes Trustee's Objection should also be overruled.

[199]    *See generally* U.S. Trustee Obj., ¶¶ 17-22

herein, the Released Parties under the Plan made significant concessions and contributions to the Debtors' Chapter 11 Cases, including, as applicable, actively supporting the Plan and these Chapter 11 Cases and waiving substantial rights and Claims against the Debtors under the Plan. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases and is appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates, the critical nature of the Debtor Release to the Plan, and the investigation of Claims and Causes of Action conducted by the Special Committee.

### ii.    The Third Party Release is Consensual.

148.    As set forth above, consensual third-party releases are permitted under applicable law and have previously been approved by Courts in this district.[200]   The Third-Party Release under the Plan is consensual.  The critical factor in determining whether a release is consensual is whether, after the Debtors' due process obligations have been satisfied, including the provision of appropriate notice, "the affected creditor *timely objects* to the provision."[201]

---

[200]   *See*, *e.g.*, *Republic Supply*, 815 F.2d at 1050 (finding third-party release enforceable since Bankruptcy Code does not proscribe such release where "it has been accepted and confirmed as an integral part of a plan of reorganization"); *Wool Growers*, 371 B.R. at 775–76 ("Most courts allow consensual [third-party] releases to be included in a plan . . . Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e)"); *see also Pilgrim's Pride*, 2010 WL 200000, at *5 (under *Pacific Lumber* "the court may not, *over objection*, approve through confirmation of the Plan third-party protections") (emphasis added); *Camp Arrowhead*, 451 B.R. at 701–02 ("the Fifth Circuit does allow permanent injunctions *so long as there is consent*.").

[201]   *Wool Growers*, 371 B.R. at 776 (citing *Zale Corp.*, 62 F.3d at 760–61) (emphasis added)); *see also In re Southcross Holdings, LP*, No. 16-20111 (Bankr. S.D. Tex. April 11, 2016), Confirmation Hr'g Tr. at 42 [Docket No. 191] (debtors correctly characterized that release was consensual since the debtors provided extensive notice of the plan and confirmation hearing and no party specifically objected to the plan's release provisions); *In re Energy & Expl. Partners, Inc.*, No. 15-44931, Confirmation Hr'g Tr. at 44, 47 (Bankr. N.D. Tex. April 21, 2016) [Docket No. 730] ("[I]f . . . notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given . . . I would say that this is one of those situations where [*Republic Supply*] says those people can waive substantive rights by not affirmatively participating in the case."); *see also In re RAAM Global Energy Co.*, No. 15-35615, Confirmation Hr'g Tr. at 61 (Bankr. S.D. Tex. Jan. 28, 2016) [Docket No. 399] ("[A]s to the holders of claims, it's limited to parties that have accepted and not opted out, and having reviewed it and in the absence of objections I think it is within the range of authority I have under existing Fifth Circuit law . . . ."); *Pilgrim's Pride*, 2010 WL 200000, at *5 (under *Pacific Lumber* "the court may not, *over objection*, approve through confirmation of the Plan third-party protections") (emphasis added).

149.    For the reasons set forth above in the Debtors' case in chief and those summarized below, the Debtors respectfully submit that they have met the legal standard for a consensual third-party release, and that the Third-Party Release in the Plan is therefore appropriate:

- all parties in interest have received extensive notice and opportunity to opt out of or object to the Third-Party Release (*see*, *e.g.*, ballots, confirmation hearing notice, the Plan, the Disclosure Statement);

- the parties to the Restructuring Support Agreement have consented to the Third-Party Release;

- the Committee supports the Third-Party Release;

- approximately 473 Holders of Claims and Interests have opted out of the Third-Party Release by objecting to the Plan or checking the "opt out" box on the ballots—the failure to do either constitutes consent under applicable law;

- the Third-Party Release is widely supported by the Debtors' stakeholders, with 90% of voting creditors accepting the Plan—those who opted out of or objected to the Third-Party Release are carved out from the definition of Releasing Party;

- the Third-Party Release is appropriately limited to the facts and circumstances of these Chapter 11 Cases;

- the Third Party Release is integral to the Plan and the Restructuring Support Agreement, each vigorously negotiated at arms'-length by sophisticated parties and necessary to forge consensus;

- the Third Party Release has been given for consideration, enabling General Unsecured Creditors to receive recoveries higher than they would otherwise be entitled to; and

- the Third Party Release is typical to those approved in comparable chapter 11 cases in this district.

### iii.    The Third-Party Release Does Not Require Carveouts for Actual Fraud, Willful Misconduct, or Gross Negligence.

150.    The SEC contends that the Third-Party Release should exclude actual fraud, willful misconduct, and gross negligence.  Consensual releases, such as the Third-Party Release here, may be granted without carveouts for actual fraud, willful misconduct, and gross negligence under

certain circumstances.  Under section 1123 of the Bankruptcy Code, "a plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[202] Settlements "require . . . consent and consideration by each participant in the agreement to be valid."[203]  Under section 1123 of the Bankruptcy Code, a settlement is valid when "it releases claims only of parties who have consented and to whom consideration has been provided."[204]

151.    To determine the validity of releases, courts evaluate whether consideration was provided in return for such release.  "The nature and extent of a debtor's interest in property is determined by reference to applicable state law—here, the laws of the State of Texas."[205]  Because the nature and extent of the Debtors' interest in the released claims is at stake here, state law—more specifically Texas law—governs.  In Texas, "where no other consideration is shown, mutual obligations by the parties to the agreement will furnish a sufficient consideration to constitute a binding contract."[206]

152.    As set forth above, each of the Released Parties under the Third-Party Release (the Term Loan / PGN Group, 2021 Noteholder Group, Term Lender Group, Consenting Sponsors, DIP Agent and Holders of DIP Claims, Notes Trustees and Agents, the Term Loan Credit Agreement Agent, and Related Parties) gave consideration for the third-party release (and are also releasing parties themselves, thereby making the release mutual).  In addition, because the release provisions provide a mechanism for parties in interest to opt-out, the Third-Party Release is

---

[202]  11 U.S.C. § 1123.

[203]  *Bigler*, 442 B.R. at 543-44.

[204]  *Id* at 549.

[205]  *In re AFI Servs., LLC*, 486 B.R. 827, 835 (Bankr. S.D. Tex. 2013); *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed.2d 136 (1979).

[206]  *Tex. Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970); *Clement v. Producers' Ref. Co.*, 277 S.W. 634 (Tex. Comm'n App. 1925).

consensual and thus does not require a carveout for actual fraud, willful misconduct, or gross negligence.  Moreover, the Legacy Notes Trustee's argument that the *Final Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Stock* [Docket No. 455] (the "Equity Trading Order") restricted the Debtors' equity sponsors from trading fundamentally misunderstands the purpose of such Order.  As the title suggests, the Equity Trading Order does not restrict the Consenting Sponsors, let alone any other equity interest owner, from trading their equity interests.  Rather, the Equity Trading Order establishes a set of procedures equity interest holders must follow prior to effectuating a transfer of Beneficial Ownership in Stock.  Nevertheless, the Consenting Sponsors' commitment to not trade on their equity interests came well before commencement of the Debtors' Chapter 11 Cases, let alone entry of the Equity Trading Order.[207]

### iv.  The Exculpation Provision is Appropriate.

153.    The U.S. Trustee and SEC also argue that the Exculpation Provision amount to an impermissible third-party release.[208]  For the reasons set forth herein, the Debtors respectfully disagree. Unlike the Third-Party Release, the exculpation provided for under Article VIII.D of the Plan will be effective as of the Effective Date against all parties in interest, not just against the Releasing Parties.  The Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care of actual fraud or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.  Therefore, to the fullest extent permissible under applicable law, and without limiting any provision of the Plan, the

---

[207]   *See* Restructuring Support Agreement, § 8.01 ("During the Restricted Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless . . .").

[208]   SEC Obj., § III; U.S. Trustee Obj., at ¶ 25.

Plan and its terms shall be enforceable against all Holders of Claims or Interests subject to certain parties opting out of the Third-Party Release.[209]

154.     As set forth herein, the Exculpation Provision is appropriate and vital because it provides protection to those parties who served as fiduciaries during the restructuring process. These individuals were integral participants in the Plan negotiation process.  There can be no doubt that the Debtors and their representatives are entitled to the relief embodied in the Exculpation Provision.  The Exculpation provision represents an essential component of the global settlement embodied by the Plan, which resolves numerous Claims and Causes of Action, provides a substantial recovery to all unimpaired classes, including General Unsecured Claims, and is the product of good faith, arms'-length negotiations.

155.     Although several other parties sought to be included in the Exculpation Provision, the Debtors refused to do so, and the Plan's Exculpation Provision is narrowly tailored to include only fiduciaries of the Debtors' Estates.   As such, the Exculpation Provision is reasonable, appropriate, and vital to these Chapter 11 Cases because it provides protection to parties who served as fiduciaries to the Estates during the restructuring.

### C.     Objecting PGN Trustees' and Joining PGN Trustees' Objections.

156.     The Objecting PGN Trustees allege that (a) the Plan fails to provide for the assumption of the Debtors' contingent and unliquidated indemnification obligations with respect to the Objecting PGN Trustees arising under the applicable Notes Indentures (the "PGN Indemnification Obligations"), (b) the Plan fails to provide for the express treatment of the PGN Indemnification Obligations, (c) the Plan fails to provide a mechanism for the Objecting PGN Trustees to receive distributions on account of the PGN Indemnification Obligations, and

---

[209]   *See* Plan, Art. VIII.E.

(d) the Debtors did not provide the Objecting PGN Trustees with an opportunity to accept or reject the Plan despite the extinguishment of the PGN Indemnification Obligations.  The Joining PGN Trustees assert that, if the Objecting PGN Trustees receive additional rights or benefits under the Plan or Confirmation Order, then the Joining PGN Trustees should receive the same treatment. Both Objections miss the mark, however, and in any event do not prevent Confirmation of the Plan and should therefore be overruled.

157.    *First*, the Bankruptcy Code does not require the Debtors to assume the PGN Indemnification Obligations, and the Debtors' decision not to assume the PGN Indemnification Obligations does not in and of itself prevent Confirmation of the Plan. *Second*, the Plan *does* provide for the express treatment of the PGN Indemnification Obligations. The Plan's definition of a "PGN Claim" includes any Claim against a Debtor arising under, derived from, secured by, based on, or related to an applicable priority guarantee notes indenture. The PGN Indemnification Obligations, which arise under the PGN Notes Indentures, fit squarely into this definition, and Article III.C of the Plan provides for the treatment of such PGN Claims. *Third*, the Objecting PGN Trustees have certain rights with respect to the Holders of PGN Claims under their applicable indentures, including a charging lien.  Nothing in the Plan overrides or otherwise restricts these rights.  *Finally*, the Debtors were not required to solicit the Objecting PGN Trustees on behalf of any wholly contingent and unliquidated Claim for the PGN Indemnification Obligations.  The solicitation procedures approved by the Disclosure Statement Order (which are customary to those in other large chapter 11 cases and were approved without objection from the Objecting PGN Trustees) provide that the amount of PGN Claims for voting purposes only will be established by reference to the Debtors' applicable books and records and the list of record holders maintained by the applicable agent, indenture trustee, or Nominee as

reflected in the securities position report(s) from DTC or other applicable depository firm, dated as of the Voting Record Date.[210]  As of the Voting Record Date, the Debtors did not recognize any PGN Indemnification Obligations in their applicable books and records (nor did the Objecting PGN Trustees assert any liquidated Claims on behalf of PGN Indemnification Obligations in any Proof of Claim), and therefore, for voting purposes, no Claims for PGN Indemnification Obligations exist that were required to be solicited.[211]  Accordingly, the Objecting PGN Trustees have not demonstrated that the Debtors failed to comply with any applicable provision of the Bankruptcy Code or that the Plan cannot be confirmed in its current form.

## Conclusion

158.    For the reasons set forth herein, the Debtors respectfully request that the Bankruptcy Court confirm the Plan and enter the Confirmation Order.

[*Remainder of page intentionally left blank*]

---

[210]    *See Solicitation and Voting Procedures* [Docket No. 1481], § D.2.

[211]    Even if the Debtors did solicit the Objecting PGN Trustees on behalf of their Filed Claims for PGN Indemnification Obligations, which asserted wholly contingent and unliquidated amounts for such Claims, those votes would be tabulated in the amount of $1.00 pursuant to section D.2 of the *Solicitation and Voting Procedures*.  Adding three rejecting votes and $3.00 of rejecting votes to the total tabulation of votes in all classes containing PGN Claims would still result in the acceptance of the Plan by all Classes entitled to vote.

Houston, Texas
January 7, 2019

/s/  Patricia B. Tomasco

| | |
|---|---|
| Patricia B. Tomasco (TX Bar No. 01797600) | James H.M. Sprayregen, P.C. |
| Elizabeth Freeman  (TX Bar No. 24009222) | Anup Sathy, P.C. (admitted *pro hac vice*) |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | Brian D. Wolfe (admitted *pro hac vice*) |
| **JACKSON WALKER L.L.P.** | William A. Guerrieri (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | Benjamin M. Rhode (admitted *pro hac vice*) |

Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth Freeman  (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, TX  77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email: ptomasco@jw.com
            efreeman@jw.com
            mcavenaugh@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Brian D. Wolfe (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
**INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email: james.sprayregen@kirkland.com
            anup.sathy@kirkland.com
            brian.wolfe@kirkland.com
            will.guerrieri@kirkland.com
            benjamin.rhode@kirkland.com

-and-

Christopher Marcus, P.C.
(admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
**INTERNATIONAL LLP**
601 Lexington Avenue
New York, NY  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email: christopher.marcus@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on January 7, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

**Exhibit A**

**Objections**

**IN RE IHEARTMEDIA, INC., CASE NO. 18-31274 (MI)**

**OBJECTIONS AND RESPONSES TO THE**
**MODIFIED FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF IHEARTMEDIA, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN")[1]**

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| **CONFIRMATION OBJECTIONS / RESERVATIONS OF RIGHTS** | | |
| Wilmington Savings Fund Society, FSB ("Legacy Notes Trustee") [Docket No. 2060] | • The Legacy Notes Trustee argues that the Plan: (1) provides for the disparate treatment of 2021 Notes Claims and Legacy Notes Claims; (2) improperly classifies the Legacy Notes Claims with the 2021 Notes Claims; (3) violates the absolute priority rule; (4) contains release provisions that (a) are overly broad and (b) do not contain carve-outs for fraud, willful misconduct, and gross negligence; and (5) contains an exculpation provision granted to non-estate fiduciaries.<br><br>• The Legacy Notes Trustee also argues that the Plan cannot be confirmed absent the court's determination of the appropriate allowed amount of the CCOH Due From Claims against iHC.<br><br>• The Legacy Notes Trustee also argues that the votes cast by Abrams and Debtor CCH on account of their respective iHC 2021 / Legacy Notes Claims should be designated and the remaining votes in Class 6 re-tabulated.<br><br>• The Legacy Notes Trustee also argues that Confirmation of the Plan would not moot its equitable subordination adversary proceeding. | • The Plan properly classifies Holders of 2021 Notes Claims with Holders of Legacy Notes Claims, both of which Claims are substantially similar, and the Debtors' classification scheme is reasonable. *See* Section VI.A.i.<br><br>• The Plan does not disparately treat Holders of 2021 Notes Claims and Holders of Legacy Notes Claims. Each Holder in Class 6 will receive **exactly** the same treatment, with the only difference being the allocation of those recoveries that would otherwise have been received on account of the Intercompany Notes Claims. Moreover, the payment of the professional fees of the 2021 Noteholder Group is appropriate because such payment is not on account of such Holder's Class 6 Claim, but rather is on account of the 2021 Noteholder Group's support of the Plan and Restructuring Support Agreement. *See* Section VI.A.ii.<br><br>• The Plan provides for the allowance of the CCOH Due From Claims, and the allowance of the CCOH Due From Claims under the Plan is appropriate as part of the CCOH Plan and Separation Settlement. Issues related to the CCOH Plan and Separation Settlement (other than those scheduled for the January 22 fairness hearing) are scheduled for a hearing on January 17, 2019. Objections |

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, and the Disclosure Statement Supplement, as applicable.

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| | | related to such issues are due January 9, 2019, and briefs in support of such issues are due January 14, 2019. The Debtors intend to address matters related to the CCOH Plan and Separation Settlement (and any objections thereto) in more detail at that time.<br><br>• The Plan does not violate the absolute priority rule. The Plan is fully consensual from a Class perspective; thus, the Debtors are not utilizing section 1129(b) of the Bankruptcy Code. As set forth in the Voting Report and the Supplemental Voting Report, this is true even assuming the Class 6 votes of Abrams and CCH are designated, as Class 6 would still vote to accept the Plan.[2] Moreover, the Debtors do not believe that any valid Section 510(b) Claims exist for the reasons set forth in Debtors' objections to proofs of claim filed by certain individual holders of Legacy Notes [Docket Nos. 1661—1669, 1671—1673] (and for the reasons set forth by the Debtors in the trial regarding the Legacy Notes Trustee's adversary proceeding against iHC).[3] *See* Section IV.B.<br><br>• The release and exculpation provisions are an integral, bargained-for component of the Plan, are a valid exercise of the Debtors' business judgment, and comport with Fifth Circuit law regarding such provisions. *See* Section IV.B.<br><br>• The Legacy Notes Trustee's equitable subordination claims are meritless legally and factually, including because they allege only generalized harm to all the Debtors' creditors, and any such claims belong to the Debtors' Estates. All equitable subordination claims are |

---

[2]   The Debtors and Legacy Notes Trustee have agreed that no further briefing or arguments will be scheduled concerning the Legacy Notes Trustee's vote designation motion, and that the vote designation motion is withdrawn. *See Stipulation and Order Regarding Existing Deadlines in Respect to Confirmation, the Legacy 510(B) Claims, and the CCOH Claim* [Docket No. 2356].

[3]   As set forth in the *Stipulation and Order (I) Granting the Legacy 510(b) Claimants Leave to Withdraw and Deeming the Legacy 510(b) Claims Withdrawn; and (II) Overruling iHeartCommunications, Inc.'s Claim Objections as Moot*, filed contemporaneously herewith, the Legacy 510(b) Claimants have agreed to withdraw such proofs of claim with prejudice.

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| | | being resolved pursuant to the Plan, and the Plan will also bar any equitable subordination claims through the application of *res judicata*. There is no due process issue, and Legacy Notes Trustee has had ample opportunity to investigate and prosecute its equitable subordination claims during these Chapter 11 Cases. *See* Section VI.A.iii. |
| Securities and Exchange Commission ("SEC") [Docket No. 2057] | • The SEC contends that the Plan contains release provisions that (a) do not include carve-outs for actions based on actual fraud, willful misconduct, or gross negligence, and (b) are not supported by independent consideration. The SEC proposes that the release provisions be deleted.<br><br>• The SEC also contends that the Plan contains an exculpation provision that is overly broad and provides for impermissible third-party releases—including parties no longer associated with the Debtors or bankruptcy proceedings. The SEC proposes that the exculpation provision be revised to apply to a less expansive list of exculpated parties. | • The release provisions in the Plan are consensual within the meaning of Fifth Circuit law and are integral to the Plan as a condition of the global settlement embodied therein. *See* Section VI.B.i.<br><br>• Because the release provisions are consensual and supported by consideration, such provisions do not require carveouts for actual fraud, willful misconduct, or gross negligence. *See* Section VI.B.ii.<br><br>• The Exculpation Provision is appropriate and vital because it provides protection to those parties who served as fiduciaries during the restructuring process, and is an essential component of the global settlement embodied by the Plan. Unlike the Third-Party Release, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care of actual fraud or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring and represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan, as well as the statutory exculpation in section 1125(e) of the Bankruptcy Code. *See* Section VI.B.iii. |

3

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| U.S. Trustee Objection ("U.S. Trustee") [Docket No. 2058] | • The U.S. Trustee contends that the Plan contains release provisions that are not supported by consideration, agreement, or specific action by or for the Related Parties.<br><br>• The U.S. Trustee also contends that the Plan contains release provisions that are not supported by independent and valuable consideration provided by each Released Party.<br><br>• The U.S. Trustee also contends that the Plan contains overly broad third party releases, exculpations, and injunctions—specifically as they relate to non-consensual, non-debtor releases and injunctions. | • The release provisions in the Plan are consensual within the meaning of Fifth Circuit law and is integral to the Plan as a condition of the global settlement embodied therein. *See* Section VI.B.i.<br><br>• Because the release provisions are consensual and supported by consideration, such provisions do not require carveouts for actual fraud, willful misconduct, or gross negligence. *See* Section VI.B.ii.<br><br>• The Exculpation Provision is appropriate and vital because it provides protection to those parties who served as fiduciaries during the restructuring process, and is an essential component of the global settlement embodied by the Plan. *See* Section VI.B.iii. |
| Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacity as indenture trustee for the 2022 PGN Notes (collectively, "Computershare") [Docket No. 2307]<br><br>Wilmington Trust, National Association, in its capacity as indenture trustee for the 2019 PGN Notes ("Wilmington Trust") [Docket No. 2320]<br><br>Deutsche Bank Trust Company Americas ("Deutsche Bank") [Docket No. 2344]<br><br>UMB Bank, National Association, solely in its capacity as the 11.25% PGN | • Computershare, Wilmington Trust, and Deutsche Bank (collectively, the "Objecting PGN Trustees") contend that the Plan:  (a) impermissibly extinguishes the Debtors' indemnification obligations to the Objecting PGN Trustees; (b) extinguishes the Objecting PGN Trustees' indemnification claim without consideration and without an opportunity for them to vote on the Plan; and (c) provides no clear procedure for making distributions on account of the Objecting PGN Trustees' claims, such as indemnification claims.<br><br>• The Objecting PGN Trustees, collectively, request that the Plan be amended to properly preserve their indemnification claims or that the claims be assumed by the Debtors.<br><br>• The Joining PGN Trustees assert that, if the Objecting PGN Trustees receive additional rights or benefits under the Plan or Confirmation Order, then the Joining PGN Trustees should receive the same treatment. | • The Bankruptcy Code does not require the Debtors to assume the PGN Indemnification Obligations, and the Debtors' decision not to assume the PGN Indemnification Obligations does not in and of itself prevent Confirmation of the Plan.<br><br>• The Plan *does* provide for the express treatment of the PGN Indemnification Obligations through the definition of a "PGN Claim," which includes any Claim against a Debtor arising under, derived from, secured by, based on, or related to an applicable priority guarantee notes indenture.<br><br>• The Objecting PGN Trustees have certain rights with respect to the Holders of PGN Claims under their applicable indentures, including a charging lien.  Nothing in the Plan overrides or otherwise restricts these rights. |

| **OBJECTING PARTY** | **OBJECTION** | **STATUS / DEBTORS' RESPONSE** |
|---|---|---|
| Trustee for the 11.25% PGNs, BOKF, National Association, solely in its capacity as the 9.0% PGN Due 2021 Trustee, and U.S. Bank National Association, solely in its capacity as 10.625% PGN Trustee (collectively, the "Joining PGN Trustees") [Docket No. 2358] | | |
| Tata America International Corporation ("Tata") [Docket No. 2056] | • Tata filed a Cure Claim Objection, stating that $198,957 is the amount required to cure all monetary defaults under the Tata Contracts prior to assumption. | • The Debtors are continuing to discuss this Cure Claim Objection with Tata in an effort to resolve consensually. |
| Google LLC f/k/a Google Inc. ("Google") [Docket No. 2279] | • Google filed a Cure Claim Objection stating that $334,674.27, plus any amounts due and owing after December 30, 2018, is required to cure all monetary defaults under the Google Contracts prior to assumption. | • The Debtors are continuing to discuss this Cure Claim Objection with Google in an effort to resolve consensually. |
| James B. Martin ("Martin") [Docket No. 2148] | • Martin filed a prepetition tort action against iHeartMedia seeking compensatory and punitive damages and contends that the value of the claim is $5,000,000, not $50,000 as filed, and that the Plan cannot be confirmed until a fair estimate of the claim has been determined. | • The Debtors and James B. Martin have agreed that Martin does not object to the Plan and that both the Debtors and Martin reserve all rights with respect to the Objection, including the liquidation value of Martin's claim, that Confirmation may proceed prior to the resolution of Martin's Objection, that, to the extent the Objection is not resolved consensually, the Debtors and Martin reserve all rights to the valuation of Martin's claim, and have consensually agreed to extend the Debtors' time to respond to Martin's Objection. *See Stipulation and Order Regarding Existing Deadlines With Respect to the Objection of James B. Martin to Confirmation of Plan of Reorganization in Absence of an Estimation of His Claim Pursuant to 11 U.S.C. § 502(C)(1)* [Docket No. 2357]. |

| **OBJECTING PARTY** | **OBJECTION** | **STATUS / DEBTORS' RESPONSE** |
|---|---|---|
| Broadcast Music, Inc. ("<u>BMI</u>") [Docket Nos. 1923, 2359] | • BMI filed a reservation of rights that proposes protective language preserving rights to certain claims in the license fees contemplated in the BMI License Agreements, notwithstanding the releases and discharge provisions set forth in the Plan or Confirmation Order.<br><br>• The proposed language further states that the claims, when liquidated, shall be paid as Cure Claims and the BMI License Agreements shall be fully enforceable by the Debtors and BMI on the Effective Date.<br><br>• BMI also filed a Cure Claim Objection [Docket No. 2359] contending that an individualized cure notice sent pursuant to the Plan Supplement inadvertently omitted a footnote containing negotiated language. | • **Resolved**:  The Debtors have resolved this Objection through the addition of language to the Confirmation Order and the Assumed Executory Contract and Unexpired Lease List. |
| Travis County Tax Assessor-Collector ("<u>Travis County</u>") [Docket No. 2047] | • Travis County contends that the Plan fails to provide for retention of their tax liens until their claims are paid in full.<br><br>• Travis County also contends that the Plan fails to provide that Travis County's claim will be paid over a period of five years from the Petition Date rather than 5 years from the Effective Date. | • **Resolved**:  The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| Norfolk County Retirement System ("<u>Norfolk</u>") [Docket No. 2055] | • Norfolk proposes protective language to the Confirmation Order stating that the Plan releases do not affect its claims asserted in the CCOH Litigation against the Non-Debtor Defendants. | • **Resolved**:  Norfolk's Objection has been resolved as part of the CCOH Plan and Separation Settlement, and its Objection to the Plan is deemed withdrawn as of the Effective Date. |
| Sony Music Entertainment ("<u>Sony</u>") [Docket No. 2080] | • Sony proposes language to the Confirmation Order that reserves certain auditing rights, or other contractual rights, under its Framework Digital Distribution Agreement with iHC, insofar as such rights would be impaired under the Plan. | • **Resolved**:  The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| Kforce, Inc. ("<u>Kforce</u>") [Docket No. 2115] | • Kforce filed a Cure Claim Objection stating that $146,788.28 is the amount required to cure all monetary | • **Resolved**:  The Debtors and Kforce have reached an agreement on the correct Cure amount and regarding the |

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| | defaults under the Kforce Agreements prior to assumption. | addition of language to the Assumed Executory Contract and Unexpired Lease List. |
| Comcast Cable Communications Management, LLC d/b/a Comcast Spotlight ("Comcast") [Docket No. 2136] | • Comcast filed a Cure Claim Objection stating that $144,213.83 is the amount required to cure all monetary defaults under the Advertising Agreement prior to assumption. | • **Resolved**: The Debtors and Comcast have reached an agreement on the correct Cure amount. |
| **INFORMAL OBJECTIONS / RESERVATIONS OF RIGHTS** | | |
| SoundExchange, Inc. ("SoundExchange") | • SoundExchange objects to the Plan on a limited basis stating that $526,799.99 is the amount required to cure all monetary defaults prior to assumption of the Restricted Use Agreement, to include late fees incurred through the Petition Date.<br><br>• SoundExchange proposes language to the Confirmation Order reserving certain auditing payments and distribution rights, defenses, and obligations, notwithstanding language in the Plan or Confirmation Order to the contrary. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| AIG Property Casualty, Inc. ("AIG") | • AIG requests cautionary language clarifying that the Plan does not affect the rights of either party under the assumed surety contract, without the filing of a cure claim or administrative expense claim. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Plan. |
| Argonaut Insurance Company ("Argo") | • Argo proposes cautionary language clarifying that the Plan does not affect the rights of either party under the assumed Surety Bond/Bill Guaranty Contract with iHeartMedia + Entertainment, Inc. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| Aspen American Insurance Company ("Aspen") | • Aspen requests a reservation of rights relating to the cancellation, at the direction of the Debtors, of a surety bond written on behalf of AM/FM Texas Broadcasting LP, as principal, and in favor of Pacific Gas and Electric, as obligee.<br><br>• Aspen is concerned about, and proposes cautionary language for, the third-party releases to the extent that it precludes Aspen from pursuing potential claims against CCOH. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| Berkley Insurance Company ("Berkley") | • Berkley proposes cautionary language clarifying that the Plan does not affect the rights of either party under the assumed Commercial Surety General Indemnity Agreement with iHeartCommunications, Inc. and iHeartMedia, Inc. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| Chubb Group of Insurance Companies ("Chubb") | • Chubb's requests cautionary language clarifying that the Plan does not affect the rights of either party under the assumed Directors and Officers Liability Excess Confirmation Contract with iHeartMedia, Inc., without the filing of a cure claim or administrative expense claim. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Plan. |
| Texas Comptroller of Public Accounts ("Comptroller") | • The Comptroller requests cautionary language clarifying that the state franchise tax liabilities set forth in the Comptroller's Claims shall be determined in accordance with Texas law.<br><br>• The Comptroller requests cautionary language clarifying that (i) the Comptroller is not required to file any Proofs of Claim as a condition for allowance or payment of any Administrative Claim held by the Comptroller, (ii) the Comptroller's setoff and recoupment rights under section 553 of the Bankruptcy Code and applicable non-bankruptcy law are fully preserved, (iii) the Comptroller's rights with respect to any Claim or Cause of Action against any non-Debtor party are fully preserved, and (iv) the Comptroller may amend any timely filed Proofs of | • **Resolved**: The Debtors have resolved these Objection through the addition of language to the Confirmation Order. |

| OBJECTING PARTY | OBJECTION | STATUS / DEBTORS' RESPONSE |
|---|---|---|
| | Claim to reflect the completion of tax audits, the filing of unfiled tax returns, or any amendment to previously filed tax returns. | |
| Mississippi Department of Revenue ("MDOR") | • MDOR requests cautionary language clarifying that (i) MDOR is not required to file any Proofs of Claim as a condition for allowance or payment of any Administrative Claim held by MDOR, (ii) MDOR's setoff and recoupment rights under section 553 of the Bankruptcy Code and applicable non-bankruptcy law are fully preserved, (iii) MDOR's rights with respect to any Claim or Cause of Action against any non-Debtor party are fully preserved, and (iv) MDOR may amend any timely filed Proofs of Claim to reflect the completion of tax audits, the filing of unfiled tax returns, or any amendment to previously filed tax returns. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| Texas Taxing Authorities ("Taxing Authorities") | • The Taxing Authorities request cautionary language clarifying that the Allowed Secured Tax Claims of the Taxing Authorities shall be paid in full in Cash within 30 days of the Effective Date or when due according to their terms, or in equal quarterly Cash payments for five years, and shall include all accrued interest. Furthermore, the Taxing Authorities request that tax liens shall be expressly retained in accordance with applicable non-bankruptcy law. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| Federal Communications Commission ("FCC") | • The FCC requests cautionary language clarifying that the Plan and Confirmation Order do not relieve the Debtors of their obligations to comply with the Communications Act of 1934. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |
| SAG-AFTRA | • SAG-AFTRA requests cautionary language that their collective bargaining agreements shall be honored in the ordinary course of business. | • **Resolved**: The Debtors have resolved this Objection through the addition of language to the Confirmation Order. |